UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
SELENA STALEY, VIVIAN HOLMES, and
OLIVE IVEY, on behalf of themselves and
all others similarly situated,

                Plaintiffs,                                FIRST AMENDED
                                                        COMPLAINT

                -against-                              Dkt No.22-CV-6781 (JSR)

FSR INTERNATIONAL HOTEL INC. d/b/a
FOUR SEASONS HOTELS AND RESORTS,
HOTEL 57 SERVICES, LLC, HOTEL 57, LLC,
TY WARNER HOTELS & RESORTS LLC,
and H. TY WARNER,

                                                        Jury Trial Demanded
                Defendants.
---------------------------------------------------------X

## COMPLAINT

Plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey   (hereinafter referred to collectively as "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Risman & Risman, P.C. and Brustein Law PLLC, as and for their First Amended Complaint (hereinafter referred to as "Complaint") in this action against Defendants FSR International Hotel Inc. d/b/a Four Seasons Hotels and Resorts ("Four Seasons Hotels"), Hotel 57 Services, LLC ("Hotel 57 Services, LLC"), Hotel 57 LLC ("Hotel 57 LLC"), Ty Warner Hotels & Resorts LLC ("Ty Warner Hotels"), and H. Ty Warner ("Ty Warner") (Hotel 57 Services, LLC, Hotel 57 LLC,  Ty Warner Hotels, and Ty Warner hereinafter collectively referred to as "Warner Defendants")  (Four Seasons Hotels and Warner Defendants hereinafter collectively referred to as "Defendants"), respectfully allege as follows:

## NATURE OF THE ACTION

1.     This action is brought by Plaintiffs and others similarly situated against the Defendants to remedy violations of the Federal Worker Adjustment and Retraining Notification ("WARN") Act, the New York State Worker Adjustment and Retraining Notification ("NY WARN") Act (WARN Act and NY WARN Act collectively referred to as "WARN Acts,") breach of contract, breach of implied covenant of good faith and fair dealing, and alter ego claims.

2.     This action is further brought by Plaintiffs individually for promissory estoppel against the Defendants.

3.     Beginning approximately March 20, 2020, and continuing for thirty days thereafter ("the Furlough Date"), Plaintiffs and other similarly situated employees that were working at the hotel, located at 57 East 57th Street, New York, New York, known as Four Seasons Hotel New York and/or Four Seasons New York ("The Hotel") were placed on furlough for an indefinite period of time.   Since that time, they have not been brought back to work.

4.     Although the furloughs/layoffs have extended for more than two and a half years, Defendants failed to provide Plaintiffs and others similarly situated with proper and timely notices under the WARN Acts.

5.     Instead, Defendants continued to claim that Plaintiffs and others similarly situated were on indefinite furlough, in violation of the WARN Acts.

6.     Despite not complying with the WARN Acts, Defendants continued to prevent the Plaintiffs and others similarly situated from seeking other employment, stating that if they secured other jobs, they would no longer be entitled to their hard earned No-Fault Separation Pay.

7.     As Defendants continued to dangle the prospect of a return to work in front of Plaintiffs and others similarly situated, Defendants had an obligation under the WARN Acts to

2

provide Plaintiffs and others similarly situated with updated notices related to their furlough and employment in compliance with the WARN Acts each time the furlough exceeded another six months.

8.      According to the EmPact Agreement between Defendants and each of the Plaintiffs and others similarly situated, the EmPact Agreement was for a duration of only one year, which automatically renewed as long as certain benchmarks did not occur.

9.      However, if a permanent layoff occurred the EmPact Agreement would not be automatically renewed.

10.     On June 25, 2021, the Hotel sent a memo to Plaintiffs and other similarly situated announcing that the Hotel would be undergoing substantial infrastructure and maintenance work, which was expected to last well into 2022 and they would not reassess reopening plans until early Spring 2022.

11.     During a question and answer session over Zoom on June 25, 2021, Frank Galasso, Director of Engineering for the Hotel stated that there was no timeline for completing the renovations and the work could take up to a year and a half.  When asked by one of the furloughed employees how long the Hotel would remain closed, Mr. Galasso said that the "fire alarms can take up to a year and a half …"

12.     Mr. Galasso also admitted during this call that the Hotel was contemplating doing a five year plan that was first proposed in 2019.

13.     On June 25, 2021, no date was set for reopening the Hotel, but Defendants knew that it would not reopen within six months from that date.

14.     As Defendants announced on June 25, 2021, that Plaintiffs and others similarly situated would be laid off for over six months and at least an entire year, those layoffs were

permanent with no right of recall since it was known that the furloughs would continue for more than a year and there was no ability to return to work for the duration of the EmPact Agreement.

15.     Pursuant to the EmPact Agreement, Defendants placed Plaintiffs and others similarly situated on a permanent layoff with no right of recall on June 25, 2021, resulting in the termination of their employment.

16.     Under the EmPact Agreement, Defendants were required to pay the Plaintiffs and others similarly situated their No-Fault Separation Pay when they permanently laid them off with no right of recall on June 25, 2021, for at least the duration of their employment contract.

17.     Since June 25, 2021, in the approximately eighteen months that have followed, Defendants have neither brought Plaintiffs and others similarly situated back to work, nor given any indication that the Hotel would be reopening ever, or that Plaintiffs or others similarly situated would be offered their jobs back.

18.     Despite conceding that the Hotel would not reopen for at least a year from the date of the June 25, 2021 memo, Defendants still failed to provide any notice under the WARN Acts that the furlough would continue for more than six months, which constituted an unexcused extension, and as such was considered a termination of employment under the WARN Acts.

19.     Those layoffs announced on June 25, 2021 were permanent layoffs under the WARN Acts because the layoffs would have lasted over six months, and no exceptions existed or were provided to Plaintiffs or others similarly situated that would excuse this layoff from employment from being exempt from proper notice under the WARN Acts.

20.     At the point that the layoffs were no longer temporary, and once the layoffs were permanent, and no exception to the WARN Acts applied, Defendants were required to provide

proper notice in compliance with the WARN Acts to Plaintiffs and others similarly situated of their permanent layoffs/terminations.

21.     Defendants failed to provide Plaintiffs as well as others similarly situated with 90 days' advance written notice of their terminations of employment, as required under the NY WARN Act when there is a plant closing or mass layoff.

22.     Defendants also failed to provide Plaintiffs as well as others similarly situated and terminated from their employment at that time, with 60 days' advance written notice of their terminations of employment, as required under the Federal WARN Act when there is a plant closing or mass layoff.

23.     By reason of Defendants' unlawful conduct, Plaintiffs and others similarly situated have suffered monetary damages, and other resulting injury and loss.

24.     Despite terminating the employment of the Plaintiffs and other similarly situated in New York and making their layoffs permanent, Defendants have not paid them the No-Fault Separation Pay owed to them as per their contracts.

25.     Initially, Defendants claimed that there was a decision to suspend the operations of the Hotel due to Covid-19, but thereafter Defendants claimed that the decision to continue to shut down the operations of the Hotel was the result of other factors, although Defendants failed to provide the mandated notice to the Plaintiffs and others similarly situated in compliance with the WARN Acts.

26.     The Hotel last sent a memo in November 2021, referring back to the June 25, 2021 meeting, confirming that there was no information to provide as to when the Hotel would be reopening, and upon information and belief have sent no additional memos about their employment status ot the status of the purported renovations.

27.     To avoid paying Plaintiffs and other similarly situated in New York what they were contractually obligated to pay them, or bring them back to work, Defendants instead refused to reopen the Hotel claiming that it would be undergoing renovations, and therefore could not be opened for business.

28.     Upon information and belief, the reason provided to the Plaintiffs and other similarly situated by the Defendants was false, and the real reason was that Defendants wanted to save millions of dollars instead of paying Plaintiffs and other similarly situated either their salaries or their No-Fault Separation Pay.

29.     Defendants disregarded their obligation to pay the Plaintiffs and others similarly situated their contractually obligated salaries, provide them the required timely WARN notices or the required WARN Act payments for each time the furlough exceeded another six months, and No-Fault Separation Pay, but instead Defendants have concocted an indefinite furlough charade, in defiance of the law, to avoid their legal obligations.

## JURISDICTION AND VENUE

30.     Plaintiffs and others similarly situated bring this action pursuant to the federal WARN Act and 20 CFR Part 639. This Court has subject matter jurisdiction over Plaintiffs' claim pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

31.     In addition, this Court has supplemental jurisdiction over the NY WARN Act, Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, and Alter Ego claims under 28 U.S.C. § 1367, because these claims arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as part of the same case or controversy under Article III of the United States Constitution.

32.     This Court also has supplemental jurisdiction over the Plaintiffs' individual claims of Promissory Estoppel under 28 U.S.C. § 1367, because these claims arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as part of the same case or controversy under Article III of the United States Constitution.

33.     Venue is proper in this district under 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

34.     Venue is also proper in this judicial district under 28 U.S.C. § I 39l(b)-(c) because Defendants conduct business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practice was committed here and employment records relevant to that practice are maintained and administered here.

## JURY TRIAL DEMAND

35.     Plaintiffs demand a trial by jury in this action.

## PARTIES

36.     Plaintiff Selena Staley (hereinafter referred to as "Ms. Staley" or "Plaintiff Staley") is a resident of the State of New York, who at all times material to this action has resided in New York County, New York. She is a Citizen of the United States. Ms. Staley was working at the Hotel for approximately twelve (12) years and was most recently working as a Reserving Agent until Defendants placed Ms. Staley on indefinite furlough of her employment on or about March 20, 2020, resulting in her permanent layoff.

37.     Plaintiff Vivian Holmes (hereinafter "Ms. Holmes" or "Plaintiff Holmes") is a resident of the State of New York, who at all times material to this action has resided in Westchester County, New York. She is a citizen of the United States. Ms. Holmes was working at the Hotel for approximately twenty-four (24) years and most recently was a Rooms Division Administrative Assistant, a position that she held until Defendants placed Ms. Holmes on indefinite furlough of her employment on or about March 20, 2020, resulting in her permanent layoff.

38.     Plaintiff Olive Ivey (hereinafter referred to as "Ms. Ivey" or "Plaintiff Ivey") is a resident of the State of New York, who at all times material to this action has resided in Kings County, New York. She is a citizen of the United States. Ms. Ivey was working at the Hotel for approximately twenty-four (24) years, and most recently as Senior Housekeeping Manager, a position she held until Defendants placed Ms. Ivey on indefinite furlough of her employment on or about March 20, 2020, resulting in her permanent layoff.

39.     Upon information and belief, Plaintiffs and others similarly situated who worked in the Hotel were employed by Defendant Four Seasons Hotels.

40.     Upon information and belief, Plaintiffs and others similarly situated who worked in the Hotel were also employed by Defendant Hotel 57 Services, LLC and were paid their salaries by Hotel 57 Services, LLC.

41.     Upon information and belief, Warner Defendants were also joint employers of Plaintiffs and other similarly situated.

FOUR SEASONS HOTELS:

42.     Upon information and belief, Four Seasons Hotels is a foreign corporation existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 1165 Leslie Street, Toronto, ON M3C 2K8, Canada.

43.     Upon information and belief, Four Seasons Hotels is authorized to conduct business and does conduct business in the State of New York, and operates hotels all over the world and all over the United States, including New York, and maintains a place of business at two locations in the New York City, State of New York.

44.     Four Seasons Hotels is registered and authorized to do business and to work in New York State as well as other States in the United States, including California.

45.     Four Seasons Hotels is registered and authorized to do business and to work in New York State under the assumed name Four Seasons Hotel, New York.

46.     Four Seasons Hotels also transacts significant business in New York.

47.     Upon information and belief, Four Seasons Hotels does conduct business and is authorized to do business in the State of New York.

48.     Upon information and belief, Four Seasons Hotels also contracts to supply services in the State of New York.

49.     Upon information and belief, Four Seasons Hotels regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from services rendered in the State of New York.

50.     Four Seasons Hotels employs workers in the State of New York, and regularly conducts business in the State of New York.

51.     Upon information and belief, as of March 1, 2020, Four Seasons Hotels employed approximately 500 employees in New York State at the Hotel.

52.     Four Seasons Hotels employed Plaintiffs and others similarly situated.

53.     Four Seasons Hotels managed the Hotel.

54.     Four Seasons Hotels operated the Hotel.

55.     Four Seasons Hotels made the decision to furlough the Plaintiffs and others similarly situated on or about the Furlough date

56.     Four Seasons Hotels agreed to furlough the Plaintiffs and others similarly situated on or about the Furlough date.

57.     Four Season Hotels permanently laid off the Plaintiffs and others similarly situated.

58.     Four Seasons Hotels entered into a contractual agreement with Plaintiffs and others similarly situated.

59.     Four Seasons Hotels operates another hotel located in New York City, doing business at Four Seasons New York Downtown, located at 27 Barclay Street, New York, New York 10007 ("Four Seasons Downtown").

60.     Four Seasons Hotels entered into a contractual agreement with the Warner Defendants.

61.     Four Seasons Hotels entered into several contractual agreements with the Warner Defendants.

62.     Four Seasons Hotels held themselves out to Plaintiffs and others similarly situated as their employer.

63.     Four Seasons Hotels continues to post jobs on its official website seeking employees for Four Seasons Downtown.

64.    Four Seasons Hotels continues to post jobs on their official website seeking employees for their hotels located in the United States and around the world.

65.    On the Four Seasons Hotels official website, under the "careers" section, to attract job applicants to work for their hotels it states in pertinent part: " . . . Four Seasons can offer what many hospitality professionals dream of – the opportunity to build a life-long career with global potential and a real sense of pride in work well done."

66.    The Four Seasons Hotels held itself out to Plaintiffs and others similarly situated as providing them an opportunity to build a life-long career with the Four Seasons Hotels and a real sense of pride to work for the Four Seasons Hotels, prior to permanently laying them off from the Hotel.


HOTEL 57 SERVICES, LLC:

67.    Upon information and belief, Hotel 57 Services, LLC is a foreign corporation, existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 57 East 57th Street, New York, New York.

68.    Upon information and belief, Hotel 57 Services, LLC is a domestic corporation, existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 57 East 57th Street, New York, New York.

69.    Upon information and belief, Hotel 57 Services, LLC owns the Hotel.

70.    Upon information and belief, Hotel 57 Services, LLC operates the Hotel.

71.    Upon information and belief, at all relevant times, Hotel 57 Services, LLC employed the Plaintiffs and others similarly situated working at the Hotel.

72.    Upon information and belief, Hotel 57 Services, LLC is an owner of the Hotel.

73.     Upon information and belief, Hotel 57 Services, LLC transacts significant business in New York.

74.     Upon information and belief, Hotel 57 Services, LLC, is authorized to conduct business and does conduct business in the State of New York, and maintains a place of business at 57 East 57th Street, New York, New York.

75.     Upon information and belief, Hotel 57 Services, LLC is registered and authorized to do business and to work in New York State and transacts significant business in New York.

76.     Upon information and belief, Hotel 57 Services, LLC is not registered and authorized to do business under the assumed name, Four Seasons Hotel, New York, in New York State.

77.     Hotel 57 Services, LLC does business under the assumed name, Four Seasons Hotel, New York, in New York State.

78.     Upon information and belief, Hotel 57 Services, LLC does conduct business and is authorized to do business in the State of New York.

79.     Upon information and belief, Hotel 57 Services, LLC contracts to supply services in the State of New York.

80.     Upon information and belief, Hotel 57 Services, LLC enters into contracts in the State of New York.

81.     Upon information and belief, Hotel 57 Services, LLC entered into a contract with Four Seasons Hotels.

82.     Upon information and belief, Hotel 57 Services, LLC entered into several contracts with Four Seasons Hotels.

83.     Upon information and belief, Hotel 57 Services, LLC regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from services rendered in the State of New York.

84.     Upon information and belief, at all relevant times, Hotel 57 Services, LLC was and is an employer that regularly employs employees in the State of New York.

85.     Upon information and belief, at all relevant times, Hotel 57 Services, LLC employed Plaintiffs and others similarly situated working at the Hotel.

86.     Hotel 57 Services, LLC managed the Hotel.

87.     Hotel 57 Services, LLC operated the Hotel.

88.     Hotel 57 Services, LLC made the decision to furlough the Plaintiffs and others similarly situated on the Furlough date.

89.     Hotel 57 Services, LLC agreed to furlough the Plaintiffs and others similarly situated on the Furlough Date.

90.     Hotel 57 Services, LLC permanently laid off the Plaintiffs and others similarly situated.

91.     Hotel 57 Services, LLC and the Four Seasons Hotels shared employees that worked at the Hotel.

92.     Some employees of Four Seasons Hotels were also employees of Hotel 57 Services, LLC.

Hotel 57 Services LLC employees held themselves out as employees of Four Seasons Hotels.

HOTEL 57 LLC:

93.     Upon information and belief, Hotel 57 LLC is a foreign corporation, existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 57 East 57th Street, New York, New York.

94.     Upon information and belief, Hotel 57 LLC is a domestic corporation, existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 57 East 57th Street, New York, New York.

95.     Upon information and belief, Hotel 57 LLC works to generate income for the Hotel.

96.     Upon information and belief, Hotel 57 LLC, is authorized to conduct business and does conduct business in the State of New York, and maintains a place of business at 57 East 57th Street, New York, New York.

97.     Hotel 57 LLC is registered and authorized to do business and to work in New York State under the assumed name Four Seasons Hotel, New York.

98.     Hotel 57 LLC is registered and authorized to do business and to work in New York State under the assumed name Four Seasons Hotel.

99.     Upon information and belief, Hotel 57 LLC is registered and authorized to do business and to work in New York State and transacts significant business in New York.

100.    Upon information and belief, Hotel 57 LLC does conduct business and is authorized to do business in the State of New York.

101.    Upon information and belief, Hotel 57 LLC contracts to supply services in the State of New York.

102.    Upon information and belief, Hotel 57 LLC enters into contracts regularly in the State of New York.

103.     Upon information and belief, Hotel 57 LLC regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from services rendered in the State of New York.

104.     Upon information and belief, Hotel 57 LLC is an employer that regularly employs employees in the State of New York.

105.     Upon information and belief, at all relevant times, Hotel 57, LLC employed Plaintiffs and others similarly situated working at the Hotel.

106.     Hotel 57, LLC managed the Hotel.

107.     Hotel 57, LLC operated the Hotel.

Hotel 57, LLC made the decision to furlough the Plaintiffs and others similarly situated on the Furlough Date.


TY WARNER HOTELS:

108.     Upon information and belief Ty Warner Hotels is a foreign corporation, existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 280 Chestnut Avenue, Westmont, IL 60559.

109.     Upon information and belief, Ty Warner Hotels is a domestic corporation existing under the laws of the State of New York, doing business in New York, with its principal place of business located at 280 Chestnut Avenue, Westmont, IL 60559.

110.     Upon information and belief, Ty Warner Hotels, is authorized to conduct business and does conduct business in the State of New York.

111.     Upon information and belief, Ty Warner Hotels operates the Hotel.

112.     Upon information and belief, Ty Warner Hotels owns the Hotel.

113.    Upon information and belief, Ty Warner Hotels maintains the Hotel.

114.    Upon information and belief, Ty Warner Hotels also owns and operates a hotel in California.

115.    Upon information and belief, Ty Warner Hotels is registered and authorized to do business and to work in New York State and also transacts significant business in New York.

116.    Upon information and belief, Ty Warner Hotels does conduct business and is authorized to do business in the State of New York.

117.    Upon information and belief, Ty Warner Hotels contracts to supply services in the State of New York.

118.    Upon information and belief, Ty Warner Hotels regularly does or solicits business, or engages in other persistent course of conduct, or derives substantial revenue from services rendered in the State of New York.

119.    Upon information and belief, at all relevant times herein, Ty Warner Hotels employed workers and conducted business in the State of New York.


TY WARNER:

120.    Upon information and belief, Ty Warner is a citizen of Illinois and resides in Oak Brook, Illinois.

121.    Upon information and belief, Ty Warner is the Chief Executive Officer of Defendants for Ty Warner Hotels, Hotel 57 Services, LLC, and Hotel 57 LLC,.

122.    Upon information and belief, Ty Warner is an Executive Officer of Ty Warner Hotels, Hotel 57 Services, LLC, and Hotel 57 LLC.

123.    Upon information and belief, Ty Warner is the owner of the Hotel.

124.    Upon information and belief, Ty Warner conducts business in the State of New York.

125.    Upon information and belief, Ty Warner operates the Hotel.

126.    Upon information and belief, Ty Warner maintains the Hotel.

127.    Upon information and belief, Ty Warner generates substantial revenue from the Hotel.

128.    Upon information and belief, Ty Warner also owns and operates a hotel in California.

129.    Upon information and belief, Ty Warner transacts significant business in New York.

130.    Upon information and belief, Ty Warner does conduct business in the State of New York.

131.    Upon information and belief, Ty Warner made the decision to furlough the Plaintiffs for an indefinite period of time, leading to their no fault termination.

132.    Upon information and belief, Ty Warner made the decision to keep the Hotel from reopening since the furlough date.

133.    Upon information and belief, Ty Warner made the decision to tell the Plaintiffs and others similarly situated that the Hotel could not reopen because it was undergoing maintenance and renovations.

WARNER DEFENDANTS:

134.    The Warner Defendants are all controlled by Ty Warner.

135.     Upon information and belief, the Warner Defendants work to generate income for the Hotel.

136.     Upon information and belief, the Warner Defendants work to generate income for Ty Warner.

137.     Upon information and belief, the Warner Defendants are controlled by Ty Warner.

138.     Upon information and belief, the Warner Defendants are dominated by Ty Warner.

139.     Upon information and belief, Ty Warner exercises complete domination of the Warner Defendants.

140.     Ty Warner treated the Warner Defendants interchangeably, for example, allowing Hotel 57 Services LLC to operate under the assumed name for Hotel 57 LLC, Four Seasons Hotel, New York.


DEFENDANTS JOINTLY EMPLOYED PLAINTIFFS
AND OTHERS SIMILARLY SITUATED:

141.     Upon information and belief, as of February 2020, Defendants employed approximately 500 employees, including Plaintiffs and others similarly situated, at the Hotel.

142.     Four Seasons Hotels is an "employer" within the meaning of the WARN Act and NY WARN Act.

143.     Hotel 57 Services, LLC is an "employer" within the meaning of the WARN Act and NY WARN Act.

144.     Hotel 57 LLC is an "employer" within the meaning of the WARN Act and NY WARN Act.

145.     Ty Warner Hotels is an "employer" within the meaning of the WARN Act and NY WARN Act.

146.    Ty Warner is an "employer" within the meaning of the WARN Act and NY WARN Act.

147.    The Warner Defendants are collectively an "employer" within the meaning of the WARN Acts.

148.    The Warner Defendants are individually an "employer" within the meaning of the WARN Acts.

149.    Upon information and belief, Defendants collectively controlled the operations of the Hotel, through their interrelation of operations; control over the employment opportunities and the employment characteristics of the employees of the Hotel, and control of hiring and/or firing of the employees of the Hotel, and most notably the hiring and/or selection of the general manager of the Hotel.

150.    Upon information and belief, Defendants collectively controlled the terms and conditions of employment of the employees working at the Hotel, supervised or controlled work schedules, and set pay rates for employees working at the Hotel.

151.    At all relevant times, Defendants collectively also had and have control over day-to-day operations at the Hotel and as such are a single employer and have an interrelation of operations, had direct control over the employees of the Hotel, authority over management, supervision, and oversight of the affairs, operation, and control of the Hotel, and had and have an active role in decision-making at the Hotel.

152.    The Hotel also has a "Suite in the Sky" known as the "Ty Warner Penthouse" as well as the "Ty Bar" serving cocktails and rare spirits collection, as advertised on the Four Seasons

website, displaying collective control over day-to-day operations of Defendants at the Hotel, as well as the control that Defendant Ty Warner had in the Hotel.

153.    Further, in the Ty Warner Hotels and Resorts website, under the section Ty Warner properties lists, it lists The Hotel as a "Ty Warner property."

154.    Upon information and belief, Defendants collectively had de-facto control of the decision to pay the No-Fault Separation Pay, were responsible for the employment practices at the Hotel, made the decision relating to the personnel policies, made the decision to refuse to open the Hotel so that Plaintiffs and others similarly situated could continue with their employment with the Hotel, and instead chose to place Plaintiffs and others similarly situated on indefinite furlough leading to the termination of employment of the Plaintiffs and others similarly situated.

155.    Upon information and belief, Defendants collectively were the decision-makers responsible for the employment practice giving rise to the decision to keep the Plaintiffs and similarly situated employees furloughed since the Furlough Date, resulting in their permanent layoff.

156.    Upon information and belief, Defendants collectively were the decision-makers responsible for the employment practice giving rise to the decision to keep the Plaintiffs and similarly situated furloughed since the Furlough Date resulting in the termination of their employment.

157.    Upon information and belief, Defendants collectively were the decision-makers responsible for failing to provide the Plaintiffs and others similarly situated with No-Fault separation pay.

158.    Upon information and belief, Defendants collectively were the decision-makers responsible for failing to provide the Plaintiffs and others similarly situated with proper notices under the WARN Acts.

159.    Upon information and belief, Defendants collectively were the decision-makers responsible for failing to bring the Plaintiffs and others similarly situated back to work at the Hotel.

160.    Upon information and belief, Defendants collectively were the decision-makers responsible for telling the Plaintiffs and others similarly situated that if they went to work elsewhere during their furlough they would be forfeiting their No-Fault separation pay.

161.    Upon information and belief, Defendants Four Seasons Hotels and Hotel 57 LLC both registered to use the assumed name of the Hotel – Four Seasons Hotel, New York and Four Seasons Hotel.

162.    As Plaintiff Holmes and Plaintiff Ivey had been employees of the Hotel for over twenty years, they had worked through changes in "ownership."   Through each change in ownership, they were told by representatives of Four Seasons Hotels that they and the other employees of the Hotel did not need to worry about their employment status due to changes in "ownership" because they were Four Seasons Hotels employees.

163.    The EmPact Agreement signed by each of the Plaintiffs and others similarly situated, included a signed letter from J. Allen Smith, President and Chief Executive Officer of Four Seasons Hotels and Resorts, promising, "As you have committed yourself to our quality standards, we believe you deserve an equal commitment from us to treat you with dignity and respect.  The employment pact, "EmPact", promises that Four Seasons will stand by what we say.  This contract is unique in our industry and is a reflection of our company culture.  Simply put, our culture is based on the Golden Rule: 'To treat other as we wish to be treated ourselves.'  The

Golden Rule guides our interactions with our guests, our business partners and investors, but most importantly with each other.  You were chosen to be part of our team because you embody these values.  Once again, welcome to our global community.  I wish you a successful career with Four Seasons…"

164.   Page 11 of that EmPact Agreement was titled, "I AM A FOUR SEASONS EMPLOYEE".

165.   Upon information and belief, the EmPact Agreement handbook is a Four Seasons Hotels handbook that is used by all Four Seasons Hotels in the United States.

166.   Upon information and belief, the retirement accounts for employees of the Hotel were through the Four Seasons Hotels Retirement Plan, which covered the entire Four Seasons Hotels organization throughout the United States.

## STATEMENT OF FACTS:

167.   On or about the Furlough Date, Plaintiffs and others similarly situated were placed on unpaid furlough.

168.   The Hotel is located at 57 East 57th Street, New York, New York 10022.

169.   Defendants failed to provide a timely and proper WARN notice on the Furlough Date.

170.   Defendants still failed to provide a timely and proper WARN Notice before the layoffs exceeded six months on or about September 21, 2020.

171.   Under the WARN Acts, Defendants were required to either provide 60 days paid salary with notice of their terminations of employment or provide a timely and proper WARN

notice of the qualified exception under the WARN Acts that permitted the layoffs to exceed six months.

172.    Under the WARN Acts, based upon Defendants repeated representations that Plaintiffs and others similarly situated would be brought back to work, Defendants were required to give new timely and proper WARN notices each time Defendants reasonably foresaw that an additional six-month extension would be required.

173.    Even though the notice requirement was triggered, Defendants failed to provide the required timely notice under the WARN Acts.

174.    Pursuant to the WARN Acts, Defendants were to provide Plaintiffs and others similarly situated with WARN notices, that had to be specific with information in the notice to be based on the best information available to the employer at the time the notice is served on the affected employees.

175.    The purpose of the WARN Acts is to provide notice to employees that their employment is ending and they should begin seeking other job opportunities.

176.    Defendants' representations and failure to provide proper timely WARN notices had the direct opposite impact from the protections the WARN Acts are supposed to provide, including accurate information about when they would be returning to work so that the Plaintiffs and others similarly situated could determine if they needed to seek out other employment.

177.    Defendants' representations that they intended to bring back Plaintiffs and others similarly situated also had the direct opposite impact of the WARN Acts by threatening to withhold their No-Fault Separation Pay if they obtained other work, thereby disincentivizing them from seeking out other employment.

178.    As such, the extension of the furloughs by more than another six months required Defendants to provide an additional 60 days pay in damages, to compensate Plaintiffs and others similarly situated for not giving them adequate time to look for other employment.

179.    On or about September 21, 2020, Plaintiffs and others similarly situated suffered an employment loss under the WARN Acts and were owed 60 days pay in damages under the WARN Acts.

180.    Despite the extended furloughs, Defendants continued to maintain to Plaintiffs and others similarly situated that their layoffs were only temporary.

181.    Defendants continued to maintain to Plaintiffs and others similarly situated that they still had a right to recall and that their layoffs were only temporary.

182.    Despite these representations, the layoffs continued for more than another six months.

183.    On or about March 22, 2021, Plaintiffs and others similarly situated suffered an employment loss under the WARN Acts and were owed an additional 60 days pay in damages under the WARN Acts.

184.    Despite the extended furloughs, Defendants continued to maintain to Plaintiffs and others similarly situated that their layoffs were only temporary.

185.    Defendants continued to fail to provide timely and proper WARN Notices in compliance with the WARN Acts on or about March 20, 2020, on or about September 21, 2020, and on or about March 22, 2021.

186.    On or about March 20, 2020, on or about September 21, 2020, and on about March 22, 2021, pursuant to the WARN Acts, there were mass layoffs of at least 25 employees, excluding part-time employees, constituting at least 33% of the employees at the single site of the Hotel.

187.    On or about March 20, 2020, on or about September 21, 2020, and on or about March 22, 2021, pursuant to the WARN Acts, there were plant closings, which were the permanent or temporary shut-down of a single site of employment where the shutdown resulted in an employment loss during a 30-day period where 25 or more employees, excluding any part time employees, wherein there was an effective cessation of production or of the work performed by a unit.

188.    On or about March 20, 2020, on or about September 21, 2020, and on or about March 22, 2021, there were mass layoffs of at least 50 employees, excluding part-time employees, constituting at least 33% of the employees at the single site of the Hotel.

189.    On on or about March 20, 2020, on or about September 21, 2020, and on or about March 22, 2021, there were plant closings, which were the permanent or temporary shut-down of a single site of employment where the shutdown resulted in an employment loss during a 30-day period where 50 or more employees, excluding any part time employees, wherein there was an effective cessation of production or of the work performed by a unit.

190.    The Hotel's temporary shutdowns triggered the notice requirement because the minimum number of terminations of employment and/or layoffs were exceeding six months or reductions in work hours constituted an employment loss under the WARN Acts.

191.    Defendants were mandated to provide WARN Notices pursuant to the WARN Acts to Plaintiffs and others similarly situated.

192.    None of the Plaintiffs or similarly situated employees received 90 days' advance written notice of their terminations of employment, as required under the NY WARN Act.

193.    None of the Plaintiffs or similarly situated employees received 60 days' advance written notice of their terminations of employment, as required under the WARN Act.

194.     Defendants have failed to comply with the WARN Acts by not providing any of the required notice under the Acts to the Plaintiffs or others similarly situated.

195.     Contrary to both the WARN Act and the NY WARN Act, Defendants have incredibly claimed that Plaintiffs and others similarly situated, were somehow furloughed for years, without Defendants continuing to provide Plaintiffs with proper WARN Notices, and are somehow still on furlough, years after the Furlough Date.

196.     Prior to their terminations of employment, Defendants did not provide proper timely notice in compliance with the WARN Acts to any of the Plaintiffs or to others similarly situated that their employment would be terminated.

197.     Defendants have also not provided any of the Plaintiffs the ability to go back to work and receive pay that they had prior to the Furlough Date.

198.     On May 22, 2020, on Four Seasons Hotel New York letterhead, Rudy Tauscher, then general manager of the Hotel, wrote, "In the last communication, which came from People and Culture on May 1, 2020, we indicated that we were looking at a potential re-open date of June 15, 2020.  Since that time, our owner, Ty Warner, has agreed to extend the complimentary housing for the Health Care Professionals through June 30, 2020.  In addition to that extension the social distancing guidelines and the stay-at-home orders still in place. Therefore it is necessary to extend the suspension of regular hotel operations until July 15, 2020.  We will advise if this date is to be revised or extended."

199.     On June 22, 2020, on Four Seasons Hotel New York letterhead, Rudy Tauscher, then general manager of the Hotel, wrote, "Dear Four Seasons Family…my last communication to you on May 22, 2020 indicated that we would be extending the Health Care Professionals complimentary housing through June 30, 2020.  With June 30th right around the corner, I wanted

to let you know that all Health Care Professional will be leaving by June 30, 2020 and the program will discontinue.  Upon departure of the Health Care Professionals, we will temporarily be suspending most of our hotel operations… Unfortunately, we will NOT be resuming normal hotel operations on July 15, 2020 as we had hoped.  We are now looking at a late summer re-opening date and will share more information as we have it."

200.   On July 29, 2020, Elizabeth Ortiz sent an email from her fourseasons.com email address to the email group "all.staff.nyf.dst@fourseasons.com" which included the email addresses of Plaintiffs and others similarly situated.  That email instructed them that "the only employees who should be on property are those who are currently scheduled to work.  If you are not scheduled to work but need to retrieve any personal items, pick up a paycheck or see People and Culture, please contact the People and Culture Office directly to make arrangements prior to your arrival.  Prior arrangements must be made in order to enter the Hotel so that we continue our due diligence in the face of this Pandemic.  Once you have received approval to be on property, please ensure that you bring with your employee ID and a Face Covering.  You must enter the building through the Employee Entrance."

201.   On September 17 2020, Rudy Tauscher, then General Manager, on Four Seasons Hotel New York letterhead, wrote, "In my last communication with on August 11, 2020, I indicated that we would continue to delay our re-opening until October 15, 2020.  Unfortunately, we are forced to make the hard decision to extend the re-opening until year-end 2020."

202.   On December 24, 2020, on Four Seasons Hotel New York letterhead, Antoine Chajwan, then President Hotel Operations, America East for Four Seasons Hotels and Resorts, sent a letter to Plaintiffs and others similarly situated that Rudy Tauscher was resigning as General Manager of Four Seasons Hotel New York, effective January 23, 2021.

203.    On December 24, 2020, Rudy Tauscher, on Four Seasons Hotel New York letterhead, wrote a farewell letter to Plaintiffs and others similarly situated in connection with his own resignation writing that "I spoke of planning to open the hotel in late April and I am doing everything I can to make this happen.  We have built forecasts and budgets and have discussed the merits of moving forward.  Four Seasons is going to great lengths to support our re-opening initiatives."

204.    In December 2020, Defendants made no mention of the need for any repairs or maintenance which would preclude the Hotel from reopening.

205.    Mr. Tauscher continued in the his letter, "We worked hard to improve the physical product, from the Meeting Room level to guestrooms and suites.  We also worked on back-of-the-house areas and offices… We corrected kitchen spaces, IRD, and completely redesigned the cafeteria."

206.    Mr. Tasucher concluded his letter by saying, "I leave you in great hands and can assure you that Four Seasons is doing everything possible to assist this fantastic property."

207.    Then in February 2021, Defendants sent Plaintiffs and other similarly situated employees a memo informing them that due to local and state restrictions and the lack of demand, reopening in April 2021 was not feasible.

208.    In the February 2021 memo, Defendants further stated that re-opening the Hotel needed to be financially viable.

209.    In the February 2021 memo, the Hotel assured Plaintiffs and others similarly situated that "… we will continue to closely monitor the market and demand situation.  We also will continue to monitor developments with the vaccines and overall pandemic.  Once the

pandemic conditions improve and demand increases, our goal is to confirm a re-opening date with you approximately 60 – 90 days in advance of reopening the hotel."

210.    Defendants stated that the Plaintiffs and others similarly situated would be back at work when the consumer demand reached a certain threshold in order to reopen, but that did not happen.

211.    The February 2021 memo further stated that once the pandemic conditions improved and demand increased, their goal was to confirm a reopening date, but that did not happen.

212.    At no point in the February 2021 memo did Defendants mention a need for any infrastructure or maintenance work delaying the re-opening.

213.    The memo noted that other hotels in their competitive set in New York City were also postponing their re-opening dates.

214.    However, by December 2020, Four Seasons Hotels did reopen the Four Seasons Downtown.

215.    On March 25, 2021, on Four Seasons New York Hotel letterhead, Elizabeth Ortiz, then Director of People & Culture wrote to Plaintiffs and others similarly situated stating in pertinent part: "Dear Four Seasons New York Family…Although we still have not confirmed a reopening date, we do want to connect and share relevant updates with you… We never imagined that when we temporarily closed on March 20th, 2020 that we would still be closed a year later… We do hope that the progress made over the last few months in New York and beyond continues and that we will be able to confirm a reopening date soon."

216.    However, by June 25, 2021, Defendants were no longer willing to confirm a reopening date.

217.   On June 25, 2021, on Four Seasons New York Hotel letterhead, Elizabeth Ortiz, then Director of People & Culture wrote to Plaintiffs and others similarly situated stating: "Good Afternoon Four Seasons New York Family… At this time we will continue to remain closed, as the Hotel will be undergoing substantial infrastructure and maintenance work that is expected to last well into 2022.  We will reassess our reopening plans in the early Spring of 2022 based upon the progress of this work.  Upon reopening, we are committed to recalling employees, as business levels rebound."

218.   By June 2021, the other hotels in the Hotel's competitive set had all reopened.

219.   The June 25, 2021 memo also stated that recalling employees would be directly tied to the business rebounding.

220.   Notably, the June 25, 2021 memo did not guarantee that all of the employees would have employment upon reopening.

221.   Despite that, on June 25, 2021, Defendants failed to provide any notice under either the WARN Act or the NY WARN Act that they would continue to place Plaintiffs and those similarly situated on furlough for more than six months, which constituted an unexcused extension, and as such was considered a termination of employment under the WARN Acts.

222.   On the same day as the June 25, 2021 memo was sent, there was a Zoom meeting held by Elizabeth Ortiz that Plaintiffs participated in.

223.   At the meeting, Ms. Ortiz acknowledged the email that she had sent out earlier, and also confirmed that "our president of operations for the Americas . . .  vice president for people and culture, also for the Americas . . .  [and] our regional director of people and culture from people and culture . . .," referring to executives of Four Seasons Hotels were also present for the meeting.

224.    Ms. Ortiz continued to state "And I know that everyone is really keen to reopen the hotel and begin welcoming back our guests. As I said in the email that I sent out earlier, at this time we are going to continue to remain closed as the hotel is going to undergo some infrastructure and maintenance work that needs to be done in order to get the hotel back up and running. This work we're told is expected to last into 2022, but we will reassess the reopening plans in the early spring of 2022 based upon the progress of the work as it gets done."

225.    Ms. Ortiz also said in this meeting: " . . . at this juncture . . . we will keep the hotel closed through the end of this year and early through next spring at least, and hopefully we'll get more information as it comes along. I know that there are probably multiple questions, lots of information. As I said, we do have some senior leaders on the call . . ."

226.    During this meeting Ms. Ortiz allowed for questions to be posed to her from employees of the Hotel, via a chat box.

227.    Ms. Ortiz confirmed during various times in this meeting that the Hotel would be remain closed through the year and the reopening would only be reevaluated during the spring.

228.    Ms. Ortiz was presented a question relating to employee severance.  Ms. Ortiz answered by stating: "At this juncture, we are looking at the fact that you are still currently furloughed. Employees that have worked with the company, have worked with this property for the time period that you have, you are considered to be furloughed, so we wouldn't be paying out that severance at this juncture, only because we do consider you to be furloughed, we do anticipate reopening, and we do anticipate recalling you to work once we do reopen."

229.    At this zoom meeting, Frank Galasso, Director of Engineering for the Hotel stated that there was no timeline for completing the renovations and the work could take up to a year and a half.

230.    Mr. Galasso had further stated at this meeting that he'd been telling ownership over the past year about " . . . work that's needed at the time, which is upgrading our electrical switch gear room, and some cooling power issues that we're having related to our whole HVAC system, and obviously our fire alarm system.  But there's other things that they are contemplating doing from a five-year plan that we had together back in 2019, so we're just waiting for the list of items beyond the stuff I've already requested over the past year . . . "

231.    When asked by one of the furloughed employees how long the Hotel would remain closed, Mr. Galasso said that the " fire alarms can take up to a year and a half…"

232.    At this meeting, Ms. Ortiz was also asked whether is was " . . . legal to be on a furlough for this amount of time?" and Ms. Ortiz responded by stating: ". . . There is no limitations on how long employees can be on furlough. There are thoughts that there are timeframes on that, but from a legal perspective, there isn't a length of time. From my understanding, there is not any length of time with respect to furlough. If a company puts employees on furlough with the intention to recall them and return them to work once they are ready to do so, then that would be part of the process . . ." representing to Plaintiffs and those similarly situated that they could remain on furlough indefinitely.

233.    On June 25, 2021, Ms. Ortiz confirmed that Plaintiffs and those similarly situated were still employees of the Hotel and had not forfeited their right to No-Fault Separation Pay as of that date.

234.    On June 25, 2021, Ms. Ortiz stated, "At this juncture, we are looking at the fact that you are still currently furloughed.  Employees that have worked with the company, have worked with this property for the time period that you have, you are considered to be furloughed, so we wouldn't be paying out that severance at this juncture, only because we do consider you to be

furloughed, we do anticipate reopening, and we do anticipate recalling you work once we do reopen."

235.    Even though Ms. Ortiz represented to Plaintiffs and others similarly situated that the Hotel anticipated bringing them back to work, Defendants knew that the Plaintiffs and others similarly situated would not be eligible to return to work before their contracts expired.

236.    Another question posed to Ms. Ortiz was: " . . . if we get a job, I'm assuming while on furlough, does that affect severance pay? Meaning will Four Seasons say you left and therefore you are forfeiting severance?" and Ms. Ortiz answered stating: " . . . The policies behind that is typically if you do leave the place of employment, you're no longer connected to or associated with that place of employment, so you would then not be eligible for any type of severance should that severance ever be paid out. But again, the issue of severance, as I said earlier, is not something that we are considering at this time simply because we do anticipate bringing everyone back to work."

237.    Ms. Ortiz's statement confirmed that that no severance would be provided if Plaintiffs or those similarly situated found other work.

238.    The participant employees of the Hotel attempted to get further answers asking "Can we have another town hall with ownership present and have them answer some of these questions?;  . . . Can you help us schedule a call? Is there anything that Four Seasons corporate would like to share? . . ."  Ms. Ortiz responded by stating: "I'm going to say this, I'm going to go off script here for a second, I will say this is that I do know that we would love to have everybody back in the building as soon as possible. I think in getting this news across the board, it's tough, it's tough to realize. It's like wow, it's been one year and then potentially another year. And I will say for myself, personally, is that we would love to have you back in the building sooner rather

than later. And I think throughout this year, we've done everything possible to remain connected and to remain engaged with everyone."

239.    It was apparent from this meeting that the furlough would last for over another six months, at least another year, and possibly for years, based on what was shared by Ms. Ortiz and the other representatives of the Hotel at the meeting.

240.    As such, on June 25, 2021, Defendants were required pursuant to the WARN Acts to provide timely and proper notice to Plaintiffs and others similarly situated, as well as to the other required entities that Plaintiffs and others similarly situated that their employment status had changed, they would not be brought back to work before September 23, 2021, they would not be brought back to work before December 26, 2021, they would not be brought to work before June 27, 2022, the basis for their furlough had changed and did not qualify as an exception under the WARN Acts.

241.    Despite being required to provide those WARN notices on June 25, 2021, Defendants failed to do so.

242.    As of December 13, 2022, Defendant Four Seasons Hotels still denies that Plaintiffs have been terminated or permanently laid off, even though Plaintiffs have not been brought back to work and according to Defendant Four Seasons Hotels remain on an indefinite furlough which has lasted for more than two and a half years.

243.    Under the WARN Acts, furloughs extending longer than six months without proper notice in compliance with the WARN Acts, is a violation that requires payment of salary and benefits for 60 days.

244.    Each time Defendants extended the furloughs of Plaintiffs and others similarly situated by another six months without providing proper timely notice, Defendants were required to pay Plaintiffs and others similarly situated an additional 60 days of salary and benefits.

245.    As Defendants have never given proper timely notice under the WARN Acts, but have continued to represent to Plaintiffs and others similarly situated that their furloughs were only temporary,at least four sets of 60 days compensation and any other damages pursuant to the WARN Acts is owed to each of the Plaintiffs and others similarly situated.

246.    On June 25, 2021, when Defendants announced that the Hotel would not be re-opening, but would be undergoing renovations, and the furloughs would last at least a year, the layoffs also became permanent with no right of recall for the duration of the EmPact Agreement.

247.    As the EmPact Agreement was only a one-year contract, the continued furloughs announced on June 25, 2021, had to be permanent as they exceeded the length of the employment contracts for Plaintiffs and others similarly situated.

248.    Plaintiffs and others similarly situated had no right of recall for the duration of their employment contracts as of June 25, 2021.

249.    As part of the EmPact Agreement, "the Four Seasons Hotel New York promise[d] to comply with its obligations under EmPact by treating [employees] with dignity and respect; providing competitive compensation and benefits…"

250.    Defendants' charade of an indefinite furlough constituted a breach of the EmPact Agreement requirement that Defendants treat Plaintiffs and others similarly situated with dignity and respect and provide them with competitive compensation and benefits.

251.    For Defendants to maintain their obligations to Plaintiffs and others similarly situated under the EmPact Agreement, Defendants would have been required to pay Plaintiffs and others similarly situated their competitive salaries and benefits.

252.    As Defendants have failed to pay Plaintiffs and others similarly situated their salaries, as required under the EmPact Agreement, it is clear that the employment of Plaintiffs and others similarly situated was terminated on June 25, 2021.

253.    As of June 25, 2021, Defendants had not paid Plaintiffs and others similarly situated their salaries for more than a year and had admitted that they did not intend to pay them their salaries for at least another year.

254.    As Defendants admitted that they would not be bringing back Plaintiffs or others similarly situated for at least an entire year, which was the duration of the EmPact Agreement, the EmPact Agreement could not automatically renew and Plaintiffs and others similarly situated were permanently laid off on June 25, 2021 with no right of recall.

255.    On June 25, 2021, Defendants terminated the employment of Plaintiffs and others similarly situated for No-Fault.

256.    On June 25, 2021, the decision to terminate the employment of Plaintiffs and others similarly situated was not as a result of any strikes, walkouts or lockouts, war, national emergencies, fires, acts of God, acts of terrorism, disasters, riots, boycotts, or any other cause beyond the control of Four Seasons Hotels.

257.    On June 25, 2021, the decision to terminate the employment of Plaintiffs and others similarly situated was not as a result of any strikes, walkouts or lockouts, war, national emergencies, fires, acts of God, acts of terrorism, disasters, riots, boycotts, or any other cause beyond the control of Hotel 57 Services, LLC.

258.    On June 25, 2021, the decision to terminate the employment of Plaintiffs and others similarly situated was not as a result of any strikes, walkouts or lockouts, war, national emergencies, fires, acts of God, acts of terrorism, disasters, riots, boycotts, or any other cause beyond the control of Defendants.

259.    Defendants owed Plaintiffs and others similarly situated their No-Fault Separation Pay based upon the termination of their employments on June 25, 2021.

260.    Further, no exception to WARN Act applies and Defendants were required to provide timely, appropriate and adequate notice to those employees who were terminated from their employment.

261.    In addition, no unforeseeable business exception applies or absolves Defendants of their obligation to provide notice of termination of employment under the WARN Acts.

262.    Defendants cannot claim that the circumstances that led to the termination of employment of their New York employees was not reasonably foreseeable.

263.    Despite claiming that the Plaintiffs and others similarly situated employees are still on an indefinite furlough, Defendants did not permit the Plaintiffs or other similarly situated employees from seeking temporary employment to mitigate their hardship caused by Defendants without waiving their right to the No-Fault Separation Pay or the ability to maintain their jobs upon the reopening of the Hotel.

264.    Upon information and belief, Defendants have purposefully stalled the reopening of the Hotel for their own financial benefit while simultaneously causing Plaintiffs and other similarly situated employees to choose between their own economic survival in the short term versus receiving their jobs back or their No-Fault Separation Pay at some unknown date in the future.

265.    Other Four Seasons hotels have undergone complete renovations without shutting down the hotel.  As a matter of fact, the Hotel has undergone various renovations and has never before shut down to guests.

266.    According to a 2017 celebritynetworth.com article written about the "Ty Warner Penthouse at Four Seasons Hotel New York," the cost of the Ty Warner Penthouse was $50,000 a night for the penthouse and the entire hotel property of the Hotel had just undergone a $120 million dollar renovation . . . 368 studios and suites were carefully curated by Ty Warner himself . . ."

267.    Upon information and belief, the Hotel finished a five-year renovation which included the guest rooms and business meeting rooms, and did not cause the Hotel to shut down at all.

268.    Upon information and belief, during that five-year renovation the Hotel also renovated a substantial part of the hotel, including but not limited to the front and back doors to the hotel, the spa, the banquet kitchen, room service kitchen, loading dock, lobby lounge, and elevators.

269.    Other hotels, including other Four Seasons hotels often undergo renovations, while staying open, sometimes undergoing renovations for years at a time.

270.    Upon information and belief, Defendants are refusing to open the Hotel for reasons other than what they are presenting to the Plaintiffs or other similarly situated employees.

271.    Upon information and belief, except for the Hotel and the Biltmore in Santa Barbara, which is owned by Ty Warner and/or companies controlled by Ty Warner, all of the Four Seasons hotels have reopened since the pandemic began.

272.    Upon information and belief, the excuse given for not re-opening the Hotel and Four Seasons Santa Barbara hotel was that each of these hotels was to undergo renovations necessitating the shutdown of those hotels.

273.    Upon information and belief, no renovations were conducted that necessitated closing the Hotel.

274.    Upon information and belief, no renovations were conducted that necessitated closing the Four Seasons Santa Barbara hotel.

275.    Upon information and belief, Defendants have refused to provide Plaintiffs and others similarly situated with those benefits and/or No-Fault Separation Pay promised and required by the U.S. EmPact Employee Handbook.

276.    Upon information and belief, Defendant Four Seasons Hotels had a contractual agreement wherein they shared financial responsibility for the salaries and benefits for each of the Plaintiffs and each of the members of the similarly situated proposed Class with the Warner Defendants.

277.    Upon information and belief, the Warner Defendants had a contractual agreement wherein they shared financial responsibility for the salaries and benefits for each of the Plaintiffs and each of the members of the similarly situated proposed Class.

278.    Upon information and belief, Defendants had been trying to terminate the employment of workers from the Hotel in the past in order to reduce financial obligations.

279.    Upon information and belief, Defendants refused to allow Plaintiffs and others similarly situated to get their jobs back, instead, continuing to keep them on furlough, resulting in their permanent layoffs, claiming that the Hotel could not be opened first due to COVID, then

consumer demand and financial viability, and then for the first time because the Hotel had to undergo substantial renovations.

280.    Upon information and belief, that is not the actual reason for not reopening the Hotel, and the real reason was to save Defendants money by avoiding their contractual obligations to either pay the salaries of Plaintiffs and other similarly situated employees or pay their No-Fault Separation Pay.

281.    Upon information and belief, Defendants used the pandemic as an excuse to stop paying Plaintiffs and others similarly situated their salaries, referring to their permanent layoffs as a furlough in order to avoid providing the Plaintiffs and others similarly situated with benefits and pay that they are entitled to under their EmPact Agreement and the law.

282.    Upon information and belief, Defendants used the pandemic as an excuse to stop paying Plaintiffs and each of the members of the proposed Class, hoping that they would find new jobs before the Hotel reopened, to avoid ever paying them the required No-Fault Separation Pay.

283.    Defendants also refused to comply with the mandates of the WARN Acts, further damaging the Plaintiffs and others similarly situated.

284.    Upon information and belief, the cost of paying the salaries or No-Fault Separation Pay for all the Plaintiffs and other similarly situated employees would have been millions of dollars, which is the motivation behind Defendants' aforementioned conduct.


**CLASS ALLEGATIONS:**

**WARN Act Claims (Causes of Action 1, 2 and 5)**

285.    All Plaintiffs bring the Federal WARN Act Claim (First Cause of Action), the NY WARN Act Claim (Second Cause of Action), and the Alter Ego Claim (Fifth Cause of Action)  on

behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

286.    The "Class" is defined as all former employees of Defendants who worked for Defendants at the Hotel, and whose employment was furloughed on the Furlough Date, and whose employment at the Hotel was furloughed for more than six months, commencing on or about the Furlough Date, and/or laid off as a result of a mass layoff and/or plant closing carried out by Defendants on or about or after March 20, 2020.

287.    All Plaintiffs are members of the Class and all Plaintiffs seek to act as representatives of the proposed Class.

288.    Plaintiffs reserve the right to modify the definition of the Class based on information that they or class counsel learn through discovery.

289.    The proposed Class meets all of the requirements of Federal Rule of Civil Procedure 23, as follows:


Numerosity:

290.    The persons in the Class are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants. Upon information and belief, Defendants furloughed the employment of at least 200 full-time employees, on the Furlough Date from the Hotel and those employees were each furloughed for more than six months.

291.     Upon information and belief, the identity of all the members of the Class and the recent residence address of each of the Class members is contained in Defendants' books and records.

Commonality:

292.     There are common questions of law and fact affecting the rights of the members of the Class, including, without limitation:

    a.  Whether the members of the Class were employees of Defendants who worked in a covered site of employment of Defendants;

    b.  Whether Defendants unlawfully terminated the employment of the members of the Class pursuant to the NY WARN Act without cause on their part and without giving them 90 days advance written notice in violation of the NY WARN Act; and

    c.  Whether Defendants unlawfully terminated the employment of the members of the Class pursuant to WARN Act without cause on their part and without giving them 60 days advance written notice in violation of the Federal WARN Act; and

    d.  Whether Defendants unlawfully failed to pay the Class members 60 days wages and benefits as required by the WARN Acts for each violation.

    e.  Whether Defendants provided Class members with timely required WARN Notices.

Typicality:

293.     The claims of Plaintiffs Staley, Holmes, and Ivey – the Named Plaintiffs – are typical of the claims of the Class members because they arise from the same course of conduct, *i.e.* Defendants' mass layoff and/or plant closure(s). Plaintiffs and the members of the proposed Class sustained the same or similar injuries arising out of and caused by Defendants' common

course of conduct in violation of these claims. Plaintiffs' claims are thereby representative of, and co-extensive with, the claims of the proposed Class members.

Adequacy:

294.    The named representatives will fairly and adequately protect the interests of the proposed Class. There are no conflicts between the interests of the Plaintiffs and the other members of the proposed Class.

Rule 23(b)(3) Requirements:

295.    This action is maintainable as a class action under Rule 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, because a class action is superior to other available methods for the fair and efficient adjudication of this litigation, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in Federal Court against a corporate defendant, and damages suffered by individual Class members are small compared to the expense and burden of individual prosecution of this litigation.

296.    Concentrating all potential litigation concerning the rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the rights of all the members of the Class.

**EmPact Claims (Causes of Action 3 - 5)**

297.    All Plaintiffs bring the Breach of Contract Claim (Third Cause of Action), the Breach of Implied Covenant of Good Faith and Fair Dealing Claim (Fourth Cause of Action), and the Alter Ego Claim (Fifth Cause of Action)  on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3).

298.     The "<u>Sub-Class</u>" is defined as all members of the Class who remained on furlough through June 25, 2021 and were not paid their No-Fault Separation Pay.

299.     All Plaintiffs are members of the Sub-Class and all Plaintiffs seek to act as representatives of the proposed Sub-Class.

300.     Plaintiffs reserve the right to modify the definition of the Sub-Class based on information that they or class counsel learn through discovery.

301.     The proposed Sub-Class meets all of the requirements of Federal Rule of Civil Procedure 23, as follows:

<u>Numerosity</u>:

302.     The persons in the Sub-Class are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, the facts on which the calculation of that number can be based are presently within the sole control of Defendants. Upon information and belief, at least 200 full-time employees at the Hotel remained on furlough as of June 25, 2021.

303.     Upon information and belief, the identity of all the members of the Sub-Class and the recent residence address of each of the Sub-Class members is contained in Defendants' books and records.

<u>Commonality</u>:

304.     There are common questions of law and fact affecting the rights of the members of the Sub-Class, including, without limitation:

>    a.   Whether Defendants permanently laid off the Sub-Class members with no right of recall, triggering Defendants' obligation to pay the Sub-Class members their No-Fault Separation Pay.

b.  Whether Defendants unlawfully failed to pay the Sub-Class members their No-Fault Separation Pay benefits as required by their contracts.

c.  Whether Defendants failure to pay competitive salary and benefits to the Sub-Class members triggered Defendants' obligation to pay the Sub-Class members their No-Fault Separation Pay.

Typicality:

305.    The claims of Plaintiffs Staley, Holmes, and Ivey – the Named Plaintiffs – are typical of the claims of the Sub- Class members because they arise from the same course of conduct, *i.e.* Defendants' decision to permanently layoff them off with no right of recall for more than a year. Plaintiffs and the members of the proposed Sub-Class sustained the same or similar injuries arising out of and caused by Defendants' common course of conduct in violation of these claims. Plaintiffs' claims are thereby representative of, and co-extensive with, the claims of the proposed Sub-Class members.

Adequacy:

306.    The named representatives will fairly and adequately protect the interests of the proposed Sub-Class. There are no conflicts between the interests of the Plaintiffs and the other members of the proposed Sub-Class.

Rule 23(b)(3) Requirements:

307.    This action is maintainable as a class action under Rule 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Sub-Class, because a class action is superior to other available methods for the fair and efficient adjudication of this litigation, where individual Plaintiffs may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate defendant, and damages suffered

by individual Sub-Class members are small compared to the expense and burden of individual prosecution of this litigation.

308.    Concentrating all potential litigation concerning the rights of the members of the Sub-Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the rights of all the members of the Sub-Class.

### AS AND FOR A FIRST CAUSE OF ACTION
**Violation of Federal Worker Adjustment and Retraining Notification Act**
**(20 CFR Part 639)**
**(On Behalf of All Plaintiffs and the Class Against Defendants.)**

309.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

310.    Plaintiffs bring this action on behalf of themselves and the proposed Class against Defendants.

311.    Defendants employed 100 or more employees, excluding part-time employees.

312.    Plaintiffs and the Class Members were laid off for more than six months since the Furlough Date, which continued for more than six months thereafter through on or about September 21, 2020, and/or continued for more than six months thereafter through on or about March 22, 2021, and/or continued through June 25, 2021.

313.    Plaintiffs and the Class members were not provided with the timely required WARN Act notices mandated under the WARN Act.

314.    Defendants were required by the WARN Act to give the Plaintiffs and the Class at least 60 days advance written notice of the terminations of their employments pursuant to the

WARN Act, §§ 639.4 and 639.5 of the CFR as well any extensions of their furloughs which exceeded six months in duration.

315.     In failing to provide timely required notice, Defendants failed to provide notice of:

i.   The name and address of the employment site where the plant closing or mass layoff will occur, and the name and telephone number of a company official to contact for further information;

ii.   A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;

iii.   The expected date of the first separation and the anticipated schedule for making separations; and,

iv.   The job titles of positions to be affected and the names of the workers currently holding affected jobs.

316.     Defendants terminated the employment of Plaintiffs and the Class members as part of, or as the foreseeable result of, mass layoffs or plant closings ordered by Defendants on or about March 20, 2020, on or about September 21, 2020, on or about March 22, 2021, and/or June 25, 2021.by placing Plaintiffs and the Class members on indefinite furlough without providing timely, mandated WARN Act Notices, updates, and extensions in compliance with the WARN Act, resulting in the employment loss of Plaintiffs and the Class members.

317.     Because none of these employees were provided with their job back since the Furlough Date, Defendants effectively terminated the employment of all of the Plantiffs and the Class members, without the required WARN Act notices.

318.     At all relevant times, Defendants were each an individual or private business entity defined as "employer" under the WARN Act.

319.     Defendants ordered a mass layoff or plant closing at the Facilities as defined by §
639.3 of the WARN Act, causing the termination of the employment of Plaintiffs and the Class.

320.     Defendants are economically intertwined and are a single employer under the
WARN Act.

321.     Defendants failed to give the requisite notices required by the applicable law. The
terminations of employment failed to give Plaintiffs and the members of the Class at least 60 days'
advance notice, as required by the WARN Act.

322.     Plaintiffs and the Class members suffered terminations of employment as defined
by § 639.3 of the CFR, having their employment terminated by Defendants without cause on their
part.

323.     As a result of this violation, Plaintiffs and the Class members seek the payment of
statutory remedies by Defendants under the WARN Act in the form of 60 days salary,
commissions, bonuses, benefits, and health insurance premiums for 60 days for each of the
violations of the WARN Act.

324.     Defendants failed to pay the Plaintiffs and each of the Class members their
respective wages, salary, commissions, bonuses, and health insurance premiums for 60 days
following each of the violations of the WARN Act.

325.     Based upon the foregoing facts, Plaintiffs and each of the members of the proposed
WARN Act Class were injured by Defendants' failure to give notice of the intended permanent
layoff/terminations of employment.

326.     Based upon the foregoing facts, Plaintiffs and each of the members of the proposed
Class have sustained damages including but not limited to those damages afforded by the WARN
Act, including but not limited to those damages listed above and costs and attorneys' fees.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of New York State Worker Adjustment and Retraining Notification Act**
**(New York Labor Law § 860 et seq.)**
**(On Behalf of All Plaintiffs and the Class Against Defendants.)**

327.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

328.    Plaintiffs bring this action on behalf of themselves and the proposed Class against Defendants.

329.    Defendants were required by the NY WARN Act to give the Plaintiffs and the Class members at least 90 days advance written notice of their terminations pursuant to § 860-B of the NY WARN Act.

330.    Defendants terminated the employment of Plaintiffs and the Class' members as part of, or as the foreseeable result of, mass layoffs or plant closings ordered by Defendants on or about March 20, 2020, on or about September 21, 2020, on or about March 22, 2021, and/or June 25, 2021.

331.    Defendants terminated the employment of Plaintiffs and the Class' members as part of, or as the foreseeable result of, mass layoffs or plant closings ordered by Defendants on or about March 20, 2020, on or about September 21, 2020, on or about March 22, 2021, and/or June 25, 2021.

332.    On or about March 20, 2020, on or about September 21, 2020, on or about March 22, 2021, and/or June 25, 2021.  Defendants terminated the employment of the Plaintiffs and the Class members.

333.    Because none of the Plaintiffs and the Class members were given their jobs back since the Furlough date, Defendants effectively terminated the employment of the Plaintiffs and the Class members on or about March 20, 2020, on or about September 21, 2020, on or about

March 22, 2021, and/or June 25, 2021 without any required proper notice of termination of employment and/or any extensions of their furloughs which exceeded six months in duration.

334.    At all relevant times, Defendants were individuals or private business entities defined as "employer" under the NY WARN Act and continued to operate as a business until Defendants decided to order a mass layoff or plant closing at the Facilities as defined by § 860-A(3),(4).

335.    Defendants failed to give the requisite notice required by the applicable law. The terminations failed to give the Plaintiffs and the Class members at least 90 days' advance notice of termination, as required by the NY WARN Act, as well any extensions of their furloughs which exceeded six months in duration.

336.    Pursuant to the NY WARN Act, the employment of the Plaintiffs and the Class members was terminated on or about March 20, 2020, on or about September 21, 2020, on or about March 22, 2021, and/or June 25, 2021.

337.    Defendants were required by the NY WARN Act to give the Plaintiffs and the Class members at least 90 days advance written notice of the mass layoff or employment loss pursuant to the NY WARN Act, as well any extensions of their furloughs which exceeded six months in duration.

338.    Plaintiffs and the Class members suffered terminations of employment as defined by § 860-A(2) of the NY WARN Act, having their employment terminated by Defendants without cause on their part.

339.    As a result of this violation, Plaintiffs and the Class members seek the payment of statutory remedies by Defendants under the NY WARN Act in the form of salary, commissions,

bonuses, benefits, and health insurance premiums for 60 days following their respective terminations, and each violation of the NY WARN Act.

340.    Defendants failed to pay the Plaintiffs and each of the Class members their respective wages, salary, commissions, bonuses, and health insurance premiums and any other benefits that they were entitled to under the NY WARN Act for 60 days following their respective terminations of employment.

341.    Based upon the foregoing facts, Plaintiffs and the Class members were injured by Defendants' failure to give notice of the intended terminations of employment, and/or failure to give notice of extensions of their furloughs beyond each set of six months..

342.    Based upon the foregoing facts, Plaintiffs and the Class members have sustained damages including but not limited to those damages afforded by the NY WARN Act, including but not limited to those damages listed above and costs and attorneys' fees.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of All Plaintiffs and the Sub-Class Against**
**the Defendants)**

343.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

344.    Plaintiffs bring this action on behalf of themselves and the proposed Sub-Class against Defendants.

345.    Prior to the Furlough Date, Plaintiffs and each of the members of the proposed Sub-Class had entered into valid contracts with Defendants and those contracts were still valid on June 25, 2021.

346.    The U.S. EmPact Employee Handbook was a valid contract between Defendants and each of the Plaintiffs and each of the members of the proposed Sub-Class.

347.    Plaintiffs and each of the members of the proposed Sub-Class had materially performed their contractual obligations.

348.    Plaintiffs and each of the members of the proposed Sub-Class were each permanently laid off with no right of recall and terminated from their employment for no-fault.

349.    Plaintiffs and each of the members of the proposed Sub-Class are entitled to No-Fault Separation Pay.

350.    Defendants have failed to pay Plaintiffs and each of the members of the proposed Sub-Class their No-Fault Separation Pay.

351.    Defendants have materially failed to perform its commitments under the contract with each of the Plaintiffs and each of the members of the proposed Sub-Class.

352.    Based upon the foregoing facts, Plaintiffs and the Sub-Class members were injured by Defendants.

353.    Based upon the foregoing facts, Plaintiffs and each of the members of the proposed Sub-Class have sustained damages including but not limited to their No-Fault Separation Pay and the natural and probable consequences of the breach.


### AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (On Behalf of All Plaintiffs and the Sub-Class Against
### Defendants)

354.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

355.    Plaintiffs bring this action on behalf of themselves and the proposed Sub-Class against Defendants.

356.    Plaintiffs and each of the members of the proposed Sub-Class had valid contracts with Defendants.

357.    The U.S. EmPact Employee Handbook was a valid contract between Defendants and each of the Plaintiffs and each of the members of the proposed Sub-Class.

358.    Plaintiffs and each of the members of the proposed Sub-Class had materially performed their contractual obligations.

359.    The employment of Plaintiffs and each of the members of the proposed Sub-Class were each terminated for no-fault and they were each permanently laid off with no right of recall.

360.    Plaintiffs and each of the members of the proposed Sub-Class are entitled to No-Fault Separation Pay.

361.    Defendant have failed to pay Plaintiffs and each of the members of the proposed Sub-Class their No-Fault Separation Pay.

362.    Defendants have materially failed to perform its commitments under the contract with each of the Plaintiffs and each of the members of the proposed Sub-Class.

363.    Defendants have advised each of the Plaintiffs and each of the members of the proposed Sub-Class that the Hotel intends to continue to furlough them.

364.    By claiming that the Plaintiffs and the members of the proposed Class continued to be on furlough after June 25, 2021, and remain on furlough, for more than two and a half years, Defendants are acting in bad faith.

365.    Defendants are refusing to call these multi-year periods of not paying Plaintiffs and the members of the proposed Sub-Class permanent layoffs to avoid their contractual obligations.

366.     Defendants have not performed their obligations under the contract with each of the Plaintiffs and the members of the proposed Sub-Class.

367.     Based upon the foregoing facts, Plaintiffs and the Sub-Class members were injured by Defendants.

368.     Based upon the foregoing facts, Plaintiffs and each of the members of the proposed Sub-Class have sustained damages including but not limited to their No-Fault Separation Pay and the natural and probable consequences of the breach.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**Alter Ego**
**<u>(On Behalf of All Plaintiffs and the Class and Sub-Class Against</u>**
**<u>Defendant Ty Warner)</u>**

369.     Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

370.     Ty Warner misused the corporate form of corporate Defendants, namely, Hotel 57 Services LLC, Hotel 57 LLC, and Ty Warner Hotels & Resorts LLC (Warner Corporate Defendants).

371.     Ty Warner exerted one or more acts of harm, domination, and control over Warner Corporate Defendants.

372.     Ty Warner exercised complete domination of Warner Corporate Defendants,  with respect to the transaction at issue by Ty Warner where he placed Plaintiffs and the members of the Class and/or Sub-Clsss on an indefinite furlough, yet called the employment loss temporary and represented that Plaintiffs and the members of the Class and/or Sub-Class would regain employment in due time. Due time has passed, and that never happened.

373.     Ty Warner exhibited such domination over Warner Corporate Defendants that it was used to commit a fraud or wrongdoing when Ty Warner falsely claimed that Plaintiffs would regain their employment with the Hotel after their "temporary" layoff.

374.     Ty Warner's domination and control led to inequity, fraud, or malfeasance.

375.     Ty Warner misused the corporate form to commit a wrong by making the decision to permanently layoff Plaintiffs and the members of the Sub-Class without paying the No-Fault Separation Pay to Plaintiffs and the members of the Sub-Class, not allowing Plaintiffs and the members of the Class and/or Sub-Class other temporary employment opportunities during the furlough period, and not allowing Plaintiffs and the members of the Class and/or Sub-Class any possibility of rehire to their former positions with the Hotel.

376.     Ty Warner exercised complete domination of the Hotel.

377.     Ty Warner operates the Hotel, owns the Hotel, maintains the Hotel, and conducts significant business in the State of New York on a regular basis.

378.     Upon information and belief, as owner and operator of the Hotel, Ty Warner uses the Hotel for his own personal gains.

379.     Upon information and belief, Ty Warner controlled the operations of the Hotel, controlled the employment opportunities, and the employment characteristics of the employees of the Hotel, and exercised control of hiring and firing the employees of the Hotel.  Ty Warner also controlled the hiring and selection of the general manager of the Hotel. Ty Warner controlled the terms and conditions of employment of the employees working at the Hotel, supervised employee work schedules, and set pay rates for the employees working at the Hotel.  Ty Warner had control over day-to-day operations at the Hotel.  He had authority over management, supervision, and

oversight of the affairs, operation, and control of the Hotel.  The Hotel's revenue goes directly to Ty Warner.

380.    Ty Warner exercised such domination over the Hotel that the Hotel has a "Suite in the Sky" known as the "Ty Warner Penthouse."  There was also the "Ty Bar," that served cocktails and rare spirts.

381.    Further, in the Ty Warner Hotels and Resorts website, under the section Ty Warner properties list, it lists the Hotel as a "Ty Warner Property."

382.    Because of Ty Warner's complete domination of the Warner Corporate Defendants, Ty Warner and the Warner Corporate Defendants could be one in the same.

383.    Ty Warner was responsible for the mass layoffs or indefinite furloughs that Plaintiffs and the members of the Class and/or Sub-Class faced..

384.    Ty Warner used his control of the Hotel to commit a wrong against Plaintiffs and each of the members of the Sub-Class when Ty Warner failed to pay the No-Fault Separation Pay to Plaintiffs and the members of the Sub-Class.

385.    Ty Warner improperly led Plaintiffs and the members of the Class and/or Sub-Class to believe that that they faced a temporary layoff and that the Hotel would reopen in due course.

386.    Instead, Ty Warner committed a wrong when he made the decision to refuse to open the Hotel which was announced on June 25, 2021, so that Plaintiffs and the members of the Sub-Class could continue with their employment with the Hotel, and instead chose to keep Plaintiffs and the members of the Sub-Class on indefinite furlough leading to the termination of employment of the Plaintiffs and the members of the Sub-Class.

387.    As Plaintiffs and the members of the Class and Sub-Class were employees of the Hotel, Ty Warner misused the corporate form to commit a wrong against Plaintiffs and  the members of the Class and/or Sub-Class.

388.    Defendant Ty Warner was the alter-ego of each the Warner Corporate Defendants and was the instrumentality or conduit of one or more of the other Defendants in the pursuit of a single business venture such that disregard of the separate nature of the Defendants' corporate organization, or other association, is necessary to prevent an injustice upon Plaintiffs and the each member of the Class and/or Sub-Class they seek to represent.

389.    Plaintiffs and each of the members of the Class and/or Sub-Class were injured as a result.

390.    By reason of the foregoing, Ty Warner is jointly and severally responsible for the aforesaid indebtedness to Plaintiffs and each of the members of the Class and/or Sub-Class, and is, therefore, personally liable to Plaintiffs and each of the members of the Class and/or Sub-Class in an amount to be proven at trial.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Promissory Estoppel**
**(On Behalf of Plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey, Individually, against Defendants)**

391.    Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs of the Complaint as though set forth at length herein.

392.    Defendants made a clear and unambiguous promise to Plaintiffs that in December 2020 that the Hotel would reopen by the end of April 2021, but that did not happen.

393.    Upon information and belief, in February 2021, Defendants assured Plaintiffs that "… we will continue to closely monitor the market and demand situation.  We also will continue to monitor developments with the vaccines and overall pandemic.  Once the pandemic conditions

improve and demand increases, our goal is to confirm a re-opening date with you approximately 60 – 90 days in advance of reopening the hotel."

394.    Plaintiffs, Selena Staley, Vivian Holmes, and Olive Ivey, reasonably and foreseeably relied on the Defendants' promises.

395.    Plaintiff Selena Staley sustained an injury as a result of the reasonable reliance.

396.    Plaintiff Vivian Holmes sustained an injury as a result of the reasonable reliance.

397.    Plaintiff Olive Ivey sustained an injury as a result of the reasonable reliance.

398.    Defendants cannot claim that the circumstances that led to the termination of employment of the Plaintiffs were not reasonably foreseeable.

399.    Plaintiffs reasonably relied on Defendants' promises that the Hotel would reopen.

400.    Defendants stated that Plaintiffs would be back at work when the consumer demand reached a certain threshold in order to reopen, and that once the pandemic conditions improved, and demand increased, their goal was to confirm a reopening date.

401.    By June 2021, the other hotels in the Hotel's competitive set had all reopened, making it reasonable for Plaintiffs to believe that the Hotel also would reopen.

402.    In reliance on Defendants' promise, Plaintiffs did not seek out other employment opportunities.  They believed that the Hotel would reopen, and they would have their jobs back.

403.    Based on that reliance, to date, Plaintiffs have not applied for other jobs. This caused significant economic and financial injury to the Plaintiffs.

404.    Defendants did not permit the Plaintiffs to seek temporary employment to mitigate their financial hardship caused by Defendants without waiving their right to the No-Fault Separation Pay, or the ability to maintain their jobs upon the reopening of the Hotel,

405.    The clear and unambiguous promise of Defendants that the Hotel would reopen, and then unreasonably did not reopen, and not permitting Plaintiffs to seek temporary employment caused Plaintiffs harm.

406.    Based upon the foregoing facts, Plaintiffs have sustained damages including but not limited to their No-Fault Separation Pay and severe economic loss to be determined at the time of trial.

## ALLEGATIONS REGARDING RELIEF

407.    Plaintiffs and the members of the Class and/or Sub-Class they seek to represent have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek in this action is the only means of securing complete and adequate relief. Plaintiffs and the members of the Class and/or Sub-Class they seek to represent are now suffering, and will continue to suffer, irreparable injury from Defendants' conduct, acts, and omissions.

408.    Defendants' actions have caused and continue to cause Plaintiffs and all the members of the Class and/or Sub-Class they seek to represent substantial losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.    Certify the Class and the Sub-Class under Federal Rule of Civil Procedure 23; appoint Plaintiffs as representatives of the Class and the Sub-Class ; and appoint their attorneys as Class Counsel to represent the members of the the Class and the Sub-Class.

b.    Declare that the practices complained of herein violate the Federal WARN Act, 20 CFR Part 639.

c.      Declare that the practices complained of herein violate the NY WARN Act, NYLL § 860 *et seq.*

d.      Award all damages permitted under the Federal WARN Act.

e.      Award all damages permitted under the NY WARN Act.

f.      Award all damages permitted under the Breach of Contract Claim against Defendants.

g.      Award all damages permitted under the Breach of Implied Covenant of Good Faith and Fair Dealing Claim against Defendants.

h.      Award all damages permitted based upon Alter Ego liability against Defendant Ty Warner.

i.      Award all damages permitted to Plaintiffs individually for their claim of Promissory Estoppel.

j.      Award Plaintiffs reasonable attorneys' fees and costs.

k.      Award such other and further relief as the Court deems equitable and just.


## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action for all claims.

PLAINTIFFS REQUEST TRIAL TO A JURY ON ALL CLAIMS ALLOWED BY LAW.


Dated: New York, New York
      December 16, 2022

                                    ___*/s/ Evan Brustein*_____
                                      Evan Brustein, Esq.
                                      Brustein Law PLLC
                                      299 Broadway, 17th Floor
                                      New York, New York 10007

(212) 233-3900
evan@brusteinlaw.com


Maya Risman, Esq.,
Risman & Risman, P.C.
299 Broadway, 17th Floor
New York, New York 10007
(212) 233-6400
mrisman@risman-law.com

*Counsel for Plaintiffs and the proposed
class*