UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

SELENA STALEY, VIVIAN HOLMES, and : 
OLIVE IVEY, on behalf of themselves and :
all others similarly situated, :    Case No. 22-cv-6781 (JSR)
                                        :
                       Plaintiffs, : **WARNER DEFENDANTS' LOCAL**
                                        : **CIVIL RULE 56.1 STATEMENT**
v. : **OF UNDISPUTED FACTS**
                                        :
FSR INTERNATIONAL HOTEL INC. d/b/a FOUR :
SEASONS HOTELS AND RESORTS, HOTEL 57 :
SERVICES, LLC, HOTEL 57, LLC, TY WARNER :
HOTELS & RESORTS LLC, and H. TY WARNER, :
                                        :
                     Defendants. :
                                        :

---------------------------------------------------------------X

     Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC, and H. Ty Warner (collectively the "Warner Defendants") submit, pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, the following undisputed material facts in support of their motion for summary judgment in the above-captioned action.

**A.**    **The Parties**

     1.    The Four Seasons Hotel New York (the "Hotel") is a landmark 52-story, I. M. Pei designed, 5-star hotel located at 57 East 57th Street in New York City. *See* Declaration of Marc B. Zimmerman dated May 31, 2024 ("Zimmerman Decl.") at ¶ 4, **Exhibit A** (First Amended Complaint) at ¶¶ 3 and 168; Declaration of Cathy Hwang dated My 30, 2024 ("Hwang Decl.") at ¶ 3.

     2.    Hotel 57 Services, LLC is a Delaware limited liability company. *Id.* at ¶ 5.

3.      The sole member of Hotel 57 Services, LLC is Hotel 57 Holdings, LLC, a limited liability company organized under the laws of Delaware. *Id.* at ¶ 6.

4.      Hotel 57 Services, LLC is (and at all times relevant to the Amended Complaint, was) the employer of the majority of the non-union employees working at the Hotel, including Plaintiffs Selena Staley ("Plaintiff Staley"), Vivian Holmes ("Plaintiff Holmes") and Olive Ivey (f/k/a Olive Rodriguez ("Plaintiff Ivey")) (collectively, "Plaintiffs").   *See* Elizabeth Ortiz Declaration dated May 30, 2024 ("Ortiz Decl.") at ¶¶ 5, 6.

5.      Hotel 57 Services, LLC is a signatory to an employment contract with non-union employees (including Plaintiffs) who work at the Hotel, titled U.S. EmPact[SM] Employee Handbook, revised February 1, 2018 (the "EmPact Agreement"). Zimmerman Decl. at ¶ 4, **Exhibit B** (Declaration of Evan Brustein dated December 5, 2022 ("Brustein Decl.") with accompanying Exhibit A (EmPact Agreement), Exhibit B (Declaration of Selena Staley dated December 4, 2022 ("Staley Decl.")), Exhibit C (Declaration of Vivian Holmes dated December 5, 2022 ("Holmes 12/5/22 Decl.")) and Exhibit D (Declaration of Olive Ivey dated December 5, 2022 ("Ivey Decl.")); Zimmerman Decl. at ¶ 5, **Exhibit C** (transcript of Olive Ivey deposition dated March 31, 2023 ("Ivey Tr.")) at 66:23-24; 68:2-15; Hwang Decl. at ¶¶ 7, 8.

6.      Hotel 57 Services, LLC also is (and at all times relevant to the Amended Complaint was) the employer of the majority of the union employees working at the Hotel.  Hwang Decl. at ¶ 11.

7.      The terms and conditions of the union employees working at the Hotel are governed by applicable union collective bargaining agreements -- not the EmPact Agreement.  Zimmerman Decl. at ¶ 6, **Exhibit D** (transcript of Elizabeth Ortiz deposition dated April 3, 2023 ("Ortiz Tr.")) at 95:13-15, 96:10-14; Hwang Decl. at ¶ 12.

8.      Hotel 57, LLC is a Delaware limited liability company.  Hwang Decl. at ¶ 16.

9.      The sole member of Hotel 57, LLC is Hotel 57 Holdings, LLC, a limited liability company organized under the laws of Delaware. *Id.* at ¶ 17; Zimmerman Decl. at ¶ 7, **Exhibit E** (transcript of deposition of Cathy Hwang dated April 14, 2023 ("Hwang Tr.")) at 295:16-24;.

10.     Hotel 57, LLC is the owner of the Hotel building and property and a signatory to the hotel management agreement with the Hotel's operator, defendant FSR International Hotels. Inc. ("FSR"), which manages the Hotel. *Id.* at ¶¶ 18, 20.

11.     Hotel 57, LLC has no employees.  *Id.* at ¶ 19; Hwang Tr. at 39:13-20, 40:7-15.

12.     Ty Warner Hotels & Resorts, LLC ("TWHR") is a Delaware limited liability company.  Hwang Decl. at ¶ 21.

13.     TWHR does not now have (nor did it have at any time) any ownership interest in the Hotel. *Id.* at ¶ 22.

14.     TWHR does not now have (nor did it have at any time) any ownership interest in Hotel 57, LLC. *Id.* at ¶ 23.

15.     TWHR does not now have (nor did it have at any time) any ownership interest in Hotel 57 Services, LLC. *Id.* at ¶ 24.

16.     TWHR is not a signatory to any collective bargaining agreement applicable to union employees working at the Hotel. *Id.*

17.     TWHR is not a signatory to the hotel management agreement. *Id.*

18.     TWHR plays no role with respect to Plaintiffs' employment at the Hotel. Hwang Tr. at 85:17-21, 86:2-15.

19.     Neither Hotel 57, LLC or TWHR is a subsidiary of, or contractor to, Hotel 57, Services, LLC.  Hwang Decl. at ¶ 4.

20.     Hotel 57 Services, LLC, Hotel 57, LLC and TWHR are separate and distinct entities. Hwang Decl. at ¶ 4.

21.     Neither Hotel 57, LLC, TWHR or H. Ty Warner is a signatory to the EmPact Agreement.  Hwang Decl. at ¶ 9.

22.     H. Ty Warner ("Mr. Warner") is an individual who maintains only indirect interests in Hotel 57 Services, LLC and Hotel 57, LLC and serves as an officer of each such entity.  Hwang Tr. at 92:16-17, 18-19; 93:1, 19-22, 94:1.

23.     Mr. Warner is not a signatory to the EmPact Agreement. Hwang Decl. at ¶ 9; Zimmerman Decl. at ¶ 4, **Exhibit B** (Brustein Decl. with accompanying Exhibit A (EmPact Agreement)), *in passim*.

24.     Mr. Warner is not a signatory to any collective bargaining agreement applicable to union employees working at the Hotel. Hwang Decl. at ¶15.

25.     Mr. Warner does not himself oversee the employees at the Hotel, control the employees at the Hotel or hire or fire employees at the Hotel. Hwang Tr. at 86:16-23, 87:13-25, 88:1-3, 317:14-20.

26.     Antione Chahwan, President of Hotel Operations America for Four Seasons Hotels and Resorts and Secretary of defendant FSR (the entity that operates the Hotel), has not had any contact directly with Mr. Warner. *See* Zimmerman Decl. at ¶ 8, **Exhibit F** (relevant portions of the deposition transcript of Antione Chahwan dated April 10, 2023 ("Chahwan Tr.")) at 42:13-15.

27.     FSR, which does business as Four Seasons Hotel, operates and manages branded hotels.  Chahwan Tr. at 26:17-22.

28.     FSR is a signatory to the hotel management agreement and operates the Hotel pursuant to the terms thereto.  *Id.* at 17:1-16; 26:14-22.

29.     Plaintiffs Staley, Holmes and Ivey all are New York residents.  Ivey Tr. at 7:21-23; *see also* Zimmerman Decl. at ¶ 9, **Exhibit G** (transcript of Selena Staley deposition dated April

11, 2023 ("Staley Tr.")) at 6:5-7; and ¶ 10, **Exhibit H** (transcript of Vivian Holmes deposition dated March 30, 2023 ("Holmes Tr.") at 21:15-18.

30.    Plaintiffs are non-union employees of Hotel 57 Services, LLC who work at the Hotel.  Staley Tr. at 300:15-25, 184:19-20; Holmes Tr. at 295:9-15; Ivey Tr. 115:13-17.

31.    Plaintiff Staley is employed by Hotel 57 Services, LLC as a Reservations Agent and was hired in 2007. Staley Tr. 24:6-10, 27:13-22.

32.    Plaintiff Holmes is employed by Hotel 57 Services, LLC as a Rooms Division Administrative Assistant and was hired in 1998.  Holmes Tr. at 147:4-15.

33.    Plaintiff Ivey is employed by Hotel 57 Services, LLC as a Housekeeping Manager and was hired in 1997. Ivey Tr. at 104:3-15.

**B.    The EmPact Agreement**

34.    Plaintiffs each are parties to the EmPact Agreement.  Staley Tr. 93:6-95:10; Ortiz Tr. at 205:23-25, 206:1-7; Zimmerman Decl. at ¶ 4, **Exhibit B** (Brustein Decl. with accompanying Exhibit B (Staley Decl.), Exhibit C (Holmes 12/5/22 Decl.) and Exhibit D (Ivey Decl.)).

35.    Plaintiffs' claims in the Amended Complaint for No-Fault Separation Pay are based on purported obligations to them pursuant to the terms of the EmPact Agreement.  Holmes Tr. at 152:12-17; Ivey Tr. at 198:23-25, 199:2-3; Staley Tr. at 111:11-15; First Amended Complaint, *in passim.*

36.    The EmPact Agreement provides for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC who worked at the Hotel if their employment with Hotel 57 Services, LLC terminated only under specified circumstances as set forth therein.  *Id.* at ¶ 6, **Exhibit B** (Brustein Decl. with accompanying Exhibit A (EmPact Agreement)) at pp. 56-58.

37.    The EmPact Agreement does not provide for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC (and such non-union employees of Hotel

57 Services, LLC are not entitled to "No-Fault Separation Pay) if their employment with Hotel 57 Services, LLC terminated by a "permanent layoff result[ing] from…national emergencies…acts of God…disasters…and any other cause beyond the control of Four Seasons." *Id.* at pp. 56-58.

38.   The EmPact Agreement does not provide for payment of "No-Fault Separation Pay" to non-union employees of Hotel 57 Services, LLC (and such non-union employees of Hotel 57 Services, LLC are not entitled to "No-Fault Separation Pay") if their employment with Hotel 57 Services, LLC was subject to a temporary furlough. *Id.* at p. 56.

39.   The EmPact Agreements sets forth, in relevant part "If I receive a permanent layoff with no right of recall or I am terminated for no fault, my termination will be considered "no-fault"…[h]owever, in the event of a permanent layoff or "no-fault termination", I will be eligible for separation pay in accordance with the "No-Fault Separation Pay Schedule" in effect at the time of my separation unless I have opted out by signing the "Opt-Out Verification" attached to my EmPact™" *Id*.

40.   The EmPact Agreement also provides that an employee of Hotel 57 Services, LLC "[m]ay be eligible to apply for positions (which may or may not be Comparable Employment) at another Four Seasons Hotel or Resort…[i]f I am transferred to another Four Seasons Hotel or Resort, I will not be entitled to No-Fault Separation Pay." *Id*. at 57.

41.   Further, the EmPact Agreements permits employees of Hotel 57 Services, LLC to have outside employment and activities. *Id*. at 27.

42.   Specifically, under the Section titled "Moonlighting and Outside Employment" the EmPact Agreement provides, in relevant part "I am free to have outside employment and activities, provided it does not affect my attendance, performance or the Four Seasons Hotel New York reputation in the community." *Id*.

43.     The EmPact Agreement also contains a dispute resolution process called the Complaint, Arbitration & Review for Employees ("C.A.R.E."), which sets forth "a procedure to assure that problems and complaints are resolved in this fashion." *Id.* at p. 54.

44.     The C.A.R.E. procedure sets forth a multi-step dispute resolution procedure that each of Plaintiffs expressly agreed to use *first* "for all complaints even if I have exercised my right to opt out of the mediation/arbitration provision of C.A.R.E." Zimmerman Decl. at ¶ 4, Exhibit B at Exhibit A (EmPact Agreement) at p. 60 and  Exhibits B, C, and D.

45.      Specifically, the C.A.R.E procedure set forth in the EmPact Agreement provides, in relevant part as follows:

| | |
|---|---|
| STEP 1: | I will discuss the matter informally with my immediate supervisor. |
| STEP 2: | If STEP 1 does not solve the problem, I will file a written complaint with the Human Resources Office within **14 days** after the event or problem occurred. At my request the Director of Human Resources may assist me in preparing my complaint. |
| STEP 3: | The Director of Human Resources will conduct an investigation concerning my written complaint, including a meeting with me, within **7 days** after filing. |
| STEP 4: | The Director of Human Resources will issue a written decision to me within **7 days** after the close of the investigation. |
| STEP 5: | If I am dissatisfied with the written decision in STEP 4, I will appeal to the General Manager within **14 days** after STEP 4. The General Manager will meet with me and give me a written decision on my appeal within **14 days** after our meeting. |
| STEP 6: | **MEDIATION/ARBITRATION**. If I am not satisfied with the General Manager's written decision in STEP 5, and the complaint is based on one of the following types of claims as defined by law:<br>**a.** employment discrimination;<br>**b.** harassment as it relates to my employment;<br>**c.** a wage or hour violation;<br>**d.** or termination of my employment from the Hotel (including "constructive discharge", but not a permanent layoff);<br>then I must submit my complaint to be heard by an independent mediator/arbitrator unless I have chosen to opt out of the mediation/arbitration provisions by following the opt-out procedure provided on page 61. |

Zimmerman Decl. at ¶ 4, Exhibit B at Exhibit A (EmPact Agreement) at pg. 54.

46.     At no time prior to commencing this lawsuit did Staley, Ivey or Homes comply with steps 1-5 of the C.A.R.E. procedure set forth in the EmPact Agreement. Staley Tr. 336:24-339:21;  Ivey Tr. 245:11-248:11; Holmes 375:21-25; 376:2-25; 377:2-25; 378:3-8.

**C.    COVID-19 Rapidly Grows From a Low-Risk Issue to a Global Pandemic Affecting All U.S. Businesses**

*__December 19, 2019: No Article About COVID-19 is Covered By the New York Times__*

47.     The New York Times did not publish any article about COVID-19 on December 19, 2019.  *See* Marc B. Zimmerman Declaration in support of Motion for Judicial Notice dated May 31, 2024 ("MBZ Decl.") at ¶¶ 3, 4, **Exhibit A**.

*__January 2020: The anticipated risk level in the U.S. is very low__*

48.     On January 19, 2020, the New York Times did not publish any article about COVID-19.  *Id.* at ¶¶ 5, 6, **Exhibit B**.

49.     Indeed, in January 2020, the soon-to-be COVID-19 pandemic was perceived in the United States as a very low risk that was doubtful even to spread within the United States.  MBZ Decl. at ¶¶ 7, 8, **Exhibits C, D**.

50.     In January 2020, the anticipated level of response to COVID-19 was relatively minor, including that "all that most Americans need to do [in response to COVID-19] is wash their hands and proceed with their usual weekend plans." *Id.* at ¶ 8, **Exhibit D**.

*__March 7, 2020: New York State declares a disaster emergency for COVID-19__*

51.     On March 7, 2020, New York State Governor Andrew Cuomo issued Executive Order 202.1, "Declaring a Disaster Emergency in the State of New York[.] MBZ Decl.  at ¶ 11, **Exhibit G** (Executive Order 202.1).

52.     Governor Cuomo's Executive Order 202.1 provided: "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and

more are expected to continue"; and "New York State is addressing the threat that COVID-19 poses to the health of its residents and visitors." *Id.*

53.     On March 7, 2020, as a consequence of the serious threat posed by COVID-19, Governor Cuomo "declare[ed] a state of disaster emergency for the entire state of New York." *Id.*

54.     As consequences of the serious threat posed by COVID-19, Governor Cuomo authorized "all necessary State agencies to take appropriate action to assist local governments and individuals in containing, preparing for, responding to and recovering from this state disaster emergency, to protect state and local property, and to provide such other assistance as is necessary to protect public health, welfare, and safety." *Id.*

55.     As consequences of the serious threat posed by COVID-19, numerous federal and state (including New York State) laws, ordinances, rules and regulations were enacted and modified on expedited timetables to address the COVID-19 outbreak. *Id.*

***March 11, 2020: COVID-19 is designated as a pandemic;***
***March 13, 2020: COVID-19 is declared a national emergency;***
***<u>Further limitations and restrictions come in rapid succession</u>***

56.     On March 11, 2020, the World Health Organization ("WHO") designated COVID-19 as a pandemic. *Id.* at ¶ 9, **Exhibit E**.

57.     On March 12, 2020, Governor Cuomo ordered the cancellation of any large events or gatherings anticipated to be in excess of 500 people and restricted places of public accommodation and events or gatherings with less than 500 people to 50% of their occupancy or seating capacity. *Id.* at ¶ 11, **Exhibit G** (EO 202.1).

58.     On March 13, 2020, COVID-19 was declared a national emergency (which ceased by proclamation on May 11, 2023). *Id.* at ¶10, **Exhibit F**.

59.     On March 16, 2020, Governor Cuomo modified the restrictions on large events or gatherings requiring cancellation of those of more than 50 people.  *Id.* at ¶ 11, **Exhibit G** (EO 202.3)

60.     On March 16, 2020, Governor Cuomo ordered restaurants and bars in New York State closed for on-site service. *Id.*

61.     On March 16, 2020, Governor Cuomo ordered gyms and fitness centers in New York State closed. *Id.*

62.     On March 16, 2020, Governor Cuomo ordered schools in New York State closed. *Id.*

### *March 18, 2020: New York State workplace restrictions ordered*

63.     On March 18, 2020, Governor Cuomo ordered shopping malls and indoor and outdoor places of public amusement in New York State closed.  *Id.* (EO 202.5).

64.     On March 18, 2020, Governor Cuomo ordered that, effective on March 20, 2020, other than for entities providing "essential" services, "All business and not-for-profit entities shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize", and employers in New York State were ordered to reduce their in-person workforce at any location by 50%.  *Id.* (EO 202.6).

65.     On March 19, 2020, Governor Cuomo modified the March 18, 2020 in-person workforce reduction for employers in New York State, effective on March 2020, from 50% to 75%. *Id.*

### *March 20, 2020: the Hotel temporarily suspended its hospitality operations*
### *due to the unprecedented risks and restrictions caused by COVID-19*

66.     On March 20, 2020, the Hotel temporarily suspended its operations with respect to outside guests due to the collective impact of the New York State Executive Orders, the

unprecedented health and safety issues, risks and restrictions presented by the COVID-19 global pandemic and national emergency, including the total decline of recreation and business travel and hotel accommodations. *See* Ortiz Tr. at 43:9-14; Staley Tr. at 204:21-23; and Hwang Tr. at 88:24, 89:1-3.

67.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, the plan was to re-open the Hotel and resume its operations on April 15, 2020.  Chahwan Tr. at 175:2-9.

68.     Despite that the Hotel temporarily suspended its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, it nonetheless continued to operate as a business, albeit with reduced staffing requirements.  Ortiz Tr. at 46:2-8, 68:18-21.

69.     As a result of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, most (but not all) Hotel employees either: (a) were placed on temporary furlough; or (b) had their working hours significantly reduced, beginning on that date and continuing over next few months.  Ortiz Tr. at 46:19-24.

70.     As a result of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, Plaintiffs Staley and Ivey were placed on temporary furlough from their employment at the Hotel on March 20, 2020.  Staley Tr. 204:10-14; Ivey 151:7-11, 153:12-16.

71.     Notwithstanding the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, Plaintiff Holmes continued to work at the Hotel (up to as many as 17 hours weekly) through July 2020. Zimmerman Decl. at ¶ 11, **Exhibit I** (Declaration of Vivian Holmes, dated February 6, 2023 ("Holmes 2/6/23 Decl.")) at ¶2; Holmes Tr. at 161:4-12; and Ortiz Tr. at 138:4-5.

72.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, some employees who worked at the Hotel were transferred to other Four Seasons locations.  Ivey Tr. at 48:16-23.

73.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, there was nearly complete uncertainty about the continuing and future impact COVID-19 would have on the global population -- much less the length of time the global pandemic would impact the Hotel's operations and when the Hotel could resume its operations with respect to outside guests.  Ortiz Tr. at 141:4-16.

74.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, ongoing construction projects at the Hotel continued.  Hwang Tr. at 164:20-24; Chahwan Tr. at 132:22-25, 133:1-4.

### *April 2, 2020: the Hotel reopens solely to house COVID-19 first responders*

75.     Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19, the Hotel reopened on April 2, 2020 for the sole purpose of housing (free of charge) COVID-19 first responders (*i.e.*, doctors, nurses and other health care professionals) who bravely were battling the COVID-19 pandemic in New York City.  Ortiz Tr. at 51:7-13.

76.     Upon the reopening of the Hotel on April 2, 2020 to house COVID-19 first responders, some Hotel 57 Services, LLC employees returned to in-person work at the Hotel.  Ortiz Tr. at 51:7-13.

77.     Upon the reopening of the Hotel on April 2, 2020 to house COVID-19 first responders, some Hotel 57 Services, LLC employees, including Plaintiff Holmes, continued to work remotely, albeit on a reduced schedule.  Ortiz Tr. at 138:21-25, 139:1-2.

78.     The COVID-19 pandemic was unpredictable and created a lot of uncertainty for the Hotel and the employees who worked there.  Holmes Tr. at 228:10-18.

79.     The uncertainty concerning the scope and duration of the COVID-19 pandemic in New York continued over the months following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Tr. at 64:9-11; and Chahwan Tr. at 48:1-15.

80.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Plaintiff Staley believed that the Hotel would reopen by April 15, 2020.  Staley Tr. at 208:3-12.

81.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Plaintiff Holmes was hopeful that the COVID-19 pandemic and the Hotel's closure would end quickly.  Holmes Tr. at 165:22-25.

82.     At the time of the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, Hotel 57 Services, LLC (through the Hotel manager, FSR) anticipated the Hotel would reopen on April 15, 2020.  Chahwan Tr. at 47:8-10; Ortiz Decl. at ¶ 9.

83.     Despite that Hotel 57 Services, LLC (through the Hotel manager, FSR) initially anticipated the Hotel would reopen on April 15, 2020, that target reopening date changed, and changed again, as the COVID-19 pandemic continued past each target date.  Chahwan Tr. at 47:8-25, 48: 1-25;  Ortiz Decl. at ¶ 10.

### *Employees of Hotel 57 Services, LLC were regularly apprised of the Hotel's status*

84.     Throughout the COVID-19 pandemic, employees of Hotel 57 Services, LLC were regularly apprised of the status of the Hotel, including its anticipated reopening. Ortiz Tr. at 144:5-9; Ortiz Decl. at ¶ 11.

85.     On April 9, 2020, Hotel 57 Services, LLC advised its employees that the Hotel was housing medical personnel working on the front lines, the changing COVID-19 restrictions and reported that the suspension of its regular operations would continue until April 30, 2020.  *See* Ortiz Decl. at ¶ 12, **Exhibit A** (April 9, 2020 Correspondence); Holmes Tr. 166:18-167:25.

86.     On April 30, 2020, Hotel 57 Services, LLC advised its employees that the continuing COVID-19 restrictions required it to postpone the Hotel's anticipated reopening date from April 30, 2020 to June 15, 2020. *Id.* at ¶ 13, **Exhibit B** (April 30, 2020 Correspondence); Staley Tr. at 227:5-10.

87.     On May 22, 2020, Hotel 57 Services, LLC advised its employees that it was extending first responder housing at the Hotel through June 30, 2020, and extended the suspension of Hotel operations through July 15, 2020. *Id.* at ¶¶ 14, **Exhibit C** (May 22, 2020 Correspondence); Staley Tr. at 231:25-232:10.

88.     On June 22, 2020, Hotel 57 Services, LLC advised its employees the Hotel would discontinue housing COVID-19 first responders and, given the continued effect of the COVID-19 pandemic on the Hotel, it would be "transitioning to a temporary shutdown of the hotel.".  *Id.* at ¶15 , **Exhibit D** (June 22, 2020 Correspondence)

89.     The Hotel's continuing closure following the temporary suspension of its operations with respect to outside guests on March 20, 2020 was due to the impact of COVID-19 on its operation and long-terms effects on the luxury hotel business.  Hwang Decl. at ¶ 27.

90.     Although the Hotel presently is closed following the temporary suspension of its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 on Hotel operations and its long-term impact on the luxury hotel business, it will re-open once its owner and operator determine a way to do so profitably and safely.  Hwang Tr. 88:24, 89:1-3, 208:6; Hwang Decl. at ¶ 28.

91.     Although the Hotel presently is closed following the temporary suspension of its operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 and its long-term impact on the luxury hotel business, it is not permanently closed.  Hwang Tr. at 223:12.

**D.     WARN Act Notices were issued to Hotel 57 Services, LLC employees**

92.     In or about August, 2020, faced with the numerous Executive Orders that restricted a wide range of activities in New York beginning with the onset of the pandemic in March 2020 and continuing for months thereafter,[1] Hotel 57 Services, LLC determined that COVID-19 likely would prevent the Hotel from reopening for an extended, indeterminable, period of time which it reasonably determined could last more than six (6) months.  Ortiz Tr. 100:1-19, 189:3-12; Ortiz Decl. at ¶ 16.

93.     On August 5, 2020, Hotel 57 Services, LLC sent WARN Act Notices to its non-union employees (including Plaintiffs), notifying them that, due to unforeseen business circumstances, their temporary layoff from their employment at the Hotel would continue for an as yet determined period of time. *Id.* at ¶  17, , Exhibits E, F, G (August 5, 2020 WARN Act Notices to Plaintiffs Holmes, Staley and Ivey); Holmes Tr. 234:3-6; Staley Tr. at 242:22-243:15.

94.     Hotel 57 Services, LLC issued WARN Act Notices to its non-union employees (including Plaintiffs), notifying them that they would be temporarily laid off from their employment at the Hotel less than four (4) months after the temporary suspension of the Hotel's

---

[1] *See* MBZ  Decl. at ¶ 11, Exhibit G (EO 202.8; EO 202.9; EO 202.10; EO 202.11; EO 202.12; EO 202.13; EO 202.14; EO 202.15; EO 202.16; EO 202.17; EO 202.18; EO 202.19; EO 202.20; EO 202.21; EO 202.22; EO 202.23; EO 202.24; EO 202.25; EO 202.26; EO 202.27; EO 202.28; EO 202.29; EO 202.30; EO 202.31; EO 202.32; EO 202.33; EO 202.34; EO 202.35; EO 202.36; EO 202.37; EO 202.38; EO 202.39; EO 202.40; EO 202.41; EO 202.42; EO 202.43; EO 202.44; EO 202.45; EO 202.46; EO 202.47; EO 202.48; EO 202.49; EO 202.50; EO 202.51; EO 202.52; EO 202.53; EO 202.54).

operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 on the Hotel and the unforeseen business circumstances the pandemic created. *Id.*

95.    On August 5, 2020, Hotel 57 Services, LLC sent WARN Act Notices to its non-union employees (including Plaintiffs) by regular mail and by e-mail. Ortiz Tr. 186:18-23.

96.    Hotel 57 Services, LLC also sent WARN Act Notices to its union employees who worked at the Hotel. Ortiz Tr. at 95:13-25, 96:1.

97.    The WARN Act Notices issued to each Hotel 57 Services, LLC employee set forth the individual date of their temporary layoff based upon their last day worked (*e.g.*, Plaintiff Ivey's notice specified March 14, 2020; Plaintiff Staley's notice specified March 21, 2020. Ortiz Decl. at ¶¶ 17, , Exhibits E, F, G.

98.    The WARN Act Notices stated the layoff was "expected to be temporary" for an "as yet undetermined" period. *Id.*

99.    The WARN Act Notice issued to Staley identifies the date her temporary layoff began as 3/21/2020. *Id.* at ¶ 17, Exhibit E.

100.    The WARN Act Notice issued to Holmes identifies the date her temporary layoff began as 7/14/2020. *Id.* at ¶ 17, Exhibit F.

101.    The WARN Act Notice issued to Ivey identifies the date her temporary layoff began as 3/14/2020. *Id.* at ¶ 17, Exhibit G.

102.    The WARN Act Notices also identified Rudolf Tauscher, General Manager of the Hotel and number (212) 350-6604 to contact for further information. *Id.* at ¶¶ 17, Exhibits E, F, G.

103.    The WARN Act Notices also included additional information such as Plaintiffs' eligibility "to receive job re-training, re-employment services, or other assistance with obtaining new employment from the New York State Department of Labor or its workforce partners". *Id.*

104.     The WARN Act Notices sent to Plaintiffs contained the best information available to Hotel 57 Services, LLC at the time they were sent in August 2020. *Id*. at ¶ 18.

**E.     Hotel 57 Services, LLC's furloughed employees were not terminated or permanently laid off from their employment at the Hotel and each maintains their right to be recalled to their employment at the Hotel upon its reopening**

105.     No employee of Hotel 57 Services, LLC (including Plaintiffs) who was temporarily furloughed following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 was terminated from their employment at the Hotel from the period March 2020 to the present.  Ortiz Tr. at 169:9-19; Chahwan Tr. at 191:5-10, 195:22-25.

106.     No employee of Hotel 57 Services, LLC (including Plaintiffs) who was temporarily furloughed following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 was permanently laid off with no right of recall to their employment at the Hotel from the period March 2020 to the present.  Ortiz Tr. at 169:9-19; Chahwan Tr. at 191:5-10, 195:22-25; Ortiz Decl. at ¶ 19.

107.     Hotel 57 Services, LLC's non-union employees were (and are) specifically permitted to maintain outside employment during their temporary furlough from their employment at the Hotel, without compromising their employment with Hotel 57 Services, LLC at the Hotel. Ortiz Tr. at 269:15-19, 270:9-13; EmPact Agreement at pp. 27; Hwang Tr. at 225:16-22; 226:21-23.

108.     Hotel 57 Services, LLC employees who have not previously: (a) resigned their employment with Hotel 57 Services, LLC; or (b) transferred to another FSR-operated property, all maintain their right to recall to their employment at the Hotel upon the reopening of the Hotel. EmPact Agreement at p. 57.

109.     Since it temporarily furloughed its employees following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of

COVID-19 on the Hotel, Hotel 57 Services, LLC steadfastly intended (and intends) to recall its employees once it is safe and profitable to reopen the Hotel.  Ortiz Tr. At 71:12-16, 73:4, 73:7-25; 74:1-3; 145:7-10; Ortiz Decl. at ¶ 21.

110.    Plaintiffs Staley, Holmes and Ivey all were, and remain, Hotel 57 Services, LLC employees from the date of their temporary furlough to date.  Ortiz Decl. at ¶ 22.

111.    In 2022, Plaintiff Ivey was told by Elizabeth Ortiz she was still an employee of Hotel 57 Services, LLC.   Ivey Tr. at 35:13-37:18.

112.    Plaintiff Ivey never received a notice of termination of her employment by Hotel 57 Service, LLC.  Ivey Tr. at 214:10-215:22.

113.    Plaintiffs Staley, Holmes and Ivey all maintain their right to recall to their employment with Hotel 57 Services, LLC at the Hotel upon the reopening of the Hotel.  Ortiz Decl. at ¶ 21.

114.    Plaintiff Holmes acknowledges she believes she has a right to be recalled to her employment at the Hotel upon the reopening of the Hotel.  Holmes Tr. at 363:17-20.

115.    Hotel 57 Services, LLC's non-exempt employees, including Plaintiffs Staley and Holmes, were paid by Hotel 57 Services, LLC during the period of their temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21: Ortiz Decl. at ¶¶ 36, 37, 38, 39, Exhibits H, I, J, K.

116.    Hotel 57 Services, LLC's non-exempt employees, including Plaintiffs Staley and Holmes, were paid (at their election their accrued but unused vacation time by Hotel 57 Services, LLC in 2021 and 2022 -- during the period of their temporary furlough.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21; Ortiz Decl. at ¶¶ 26, 37, 38, 39, 40, Exhibits I, J, K.

117.     Pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), Hotel 57 Services, LLC paid to its non-exempt "covered hotel service employee[s]", including Plaintiffs Staley and Holmes, weekly payments of five hundred dollars, commencing on October 11, 2021 and continuing for a maximum of 30 weeks (through its repeal on June 1, 2022), "for each week … that such employee *remains* laid off," as a result of closures or mass lay-offs caused by the COVID-19 pandemic.   Int. No. 2397-A §2(a). certain payments to "covered hotel service employee[s]".   Ortiz Decl. at ¶ 28.

118.     Pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), Hotel 57 Services, LLC, no payment was required thereunder to "managerial, supervisory or confidential employee[s]" of Hotel 57 Services, LLC, including Plaintiff Ivey.   *Id.*   at ¶ 28; Int. No. 2397-A §1(iii).

119.     Only a few non-union employees of Hotel 57 Services, LLC did not receive payments of five hundred dollars a week pursuant to New York City Local Law No. 405 Int. No. 2397-A (2021), because they were "managerial, supervisory or confidential employee[s]".   Ortiz Decl. at ¶ 29; Ortiz Tr. at 201:2-9.

120.     Hotel 57 Services, LLC continued making non-required payments of five hundred dollars weekly to a majority of its non-union employees who remained on temporary furlough, including Plaintiff Staley, following the 30-week period of payments required by New York City Local Law No. 405 Int. No. 2397-A (2021), through the present day, while they were (and are) on furlough.   Ortiz Tr. at 197:16-25, 198:1-2; 198:14-25, 199:1-25; Ortiz Decl. at ¶¶ 31, 32, Exhibit H

121.     From October 21, 2021  through the present day, Plaintiff Staley has received sixty five thousand dollars ($65,000), less applicable tax withholdings, from Hotel 57 Services, LLC. Ortiz Decl. at ¶¶ 33, 34, 39, 40, 41, 42, Exhibits K, L, M and N.

122.    Plaintiff Staley's last five hundred ($500) dollar payment from Hotel 57 Services, Inc. was May 30, 2024. *Id*. at ¶ 42, Exhibit N.

123.    During the period beginning on October 11, 2021 and continuing through the present day, Hotel 57 Services, LLC paid to its non-union employees who were on temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, the total sum of $1,436,051.00. Ortiz Decl. at ¶ 35.

124.    Following the conclusion of the mandatory payments under New York City Local Law, during the period beginning on June 1, 2022 and continuing through the present day, Hotel 57 Services, LLC paid to its non-union employees who were on temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020, the total sum of $1,013,524.75. Ortiz Decl. at ¶ 36.

125.    Hotel 57 Services, LLC's non-union employees, including Plaintiffs Staley and Holmes, each were provided W-2 forms from Hotel 57 Services, LLC reflecting payments made to them by Hotel 57 Services, LLC during the period of their temporary furlough.  Staley Tr. at 299:21-23; Holmes Tr. 300:4-6, 14-21; Ortiz Decl. at ¶ 37, 39, 41, Exhibits I, K and M.

126.    Hotel 57 Services, LLC made payments to its union employees who work at the Hotel during their period of temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Tr. 197:9-11.

127.    Plaintiffs were, and are, provided periodic communications concerning the Hotel's reopening status during their period of temporary furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020.  Ortiz Decl. at ¶ 11.

128.    Plaintiffs maintained, and continue to maintain, their employment seniority for purposes of employment and employment benefits at the Hotel during their period of temporary

furlough following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 and continuing to date. *Id.* at ¶ 25.

129.    Plaintiff Staley maintains her accrued vacation time bank with Hotel 57 Services, LLC (which presently includes 91 hours of vacation time) for use upon her return to work. *Id.* at ¶ 26.

130.    Plaintiff Ivey maintains her accrued vacation time bank with Hotel 57 Services, LLC (which presently includes 6 hours of vacation time) for use upon her return to work. *Id.*

**F.    The Hotel plans to reopen in Fall 2024**

131.    On August 3, 2023, Hotel 57 Services, LLC, in collaboration with its operator (FSR) announced the Hotel would be reopening by September 2024, upon completion of renovations and improvements to the Hotel and Hotel 57 Services, LLC and FSR are working hard to prepare and plan for the Hotel's reopening. MBZ Decl. at ¶¶ 12, 13, **Exhibit H** (Press Release).

132.    Following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to COVID-19 (when it would be less disruptive to guests), significant renovations and improvements were made to the Hotel.  Hwang Decl. at ¶ 28.

133.    Renovations and improvements to the Hotel made following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 were and are intended to make the Hotel an even more desirable destination and enhance the ability to reopen the Hotel safely and profitably. *Id.*

134.    COVID-19 remained a factor in the Hotel's continued closure following the temporary suspension of the Hotel's operations with respect to outside guests on March 20, 2020 due to the impact of COVID-19 and its long-term effect on the luxury hotel business.  *Id.* at ¶ 28.

135.    Upon the Hotel's reopening, Hotel 57, Services, LLC's employees, who have not either transferred or resigned, including Plaintiffs, remain on furlough with the right to recall to

their employment when the Hotel reopens. Chahwan Tr. at 191:5-10, 195:22-25; Ortiz Decl. at ¶ 21.

Dated:  New York, New York
       May 31, 2024

/s/ Marc B. Zimmerman
Marc B. Zimmerman
James J. Boland
SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, NY 10019
(212) 907-9700

Kathryn T. Lundy
VENABLE LLP
151 West 42nd Street, 49th Floor
New York, NY 10036
(212) 307-5500

*Attorneys for Defendants Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner Hotels & Resorts, LLC and H. Ty Warner*