# EXHIBIT C

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------------x
    SELENA STALEY, VIVIAN HOLMES, and
4   OLIVE IVEY, on behalf of themselves
    and all others similarly situated,

5

6
            Plaintiffs,       No.
7                        22-cv-6781

8        vs.

9   FSR INTERNATIONAL HOTEL INC. d/b/a
    FOUR SEASONS HOTELS AND RESORTS,
10  HOTEL 57 SERVICES, LLC, HOTEL 57, LLC,
    TY WARNER HOTELS & RESORTS, LLC, and
11  H. TY WARNER,

12          Defendants.
    ------------------------------------x
13

14

15          DEPOSITION OF OLIVE IVEY

16           New York, New York

17          Friday, March 31, 2023

18

19

20

21

22

23

24  Reported by:
    Frank J. Bas, RPR, CRR
25  Job No. 224133

## Page 2

```
1
2
3
4          March 31, 2023
5          9:58 a.m.
6
7          Deposition of OLIVE IVEY, held at the
8   offices of Freeborn & Peters, 1155 Avenue of
9   the Americas, New York, New York, before Frank
10  J. Bas, a Registered Professional Reporter,
11  Certified Realtime Reporter, and Notary Public
12  of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2   A P P E A R A N C E S:
3
4   Brustein Law
5   Attorneys for Plaintiffs
6       299 Broadway
7       New York, NY 10007
8   BY:  Evan Brustein, Esq.
9
10  Bromberg Law Office
11      40 Exchange Place
12      New York, NY 10005
13  BY:  Brian Bromberg, Esq.
14
15  Stokes Wagner
16  Attorneys for FSR
17  International Hotels, Inc.
18      903 Hanshaw Road
19      Ithaca, NY 14850
20  BY:  Paul Wagner, Esq. (Via Zoom)
21
22
23
24
25
```

## Page 4

```
1
2   A P P E A R A N C E S:
3
4   Freeborn & Peters
5   Attorneys for Warner Defendants
6       311 South Wacker Drive
7       Chicago, IL 60606
8   BY:  James Boland, Esq.
9        Kathryn Lundy, Esq.
10       Marc Zimmerman, Esq.
11
12
13
14
15
16
17
18
19
20
21
22          - o0o -
23
24
25
```

## Page 5

```
1                O. IVEY
2       ATTORNEY LUNDY:  Good morning.
3   Kathryn Lundy of Freeborn & Peters on
4   behalf of the Warner defendants.
5       ATTORNEY BOLAND:  Jim Boland of
6   Freeborn & Peters also on behalf of the
7   Warner defendants.
8       ATTORNEY BRUSTEIN:  Evan Brustein,
9   Brustein Law, for Olive Ivey.
10      ATTORNEY BROMBERG:  Brian Bromberg,
11  Bromberg Law Office PC, also for Olive
12  Ivey.
13      ATTORNEY WAGNER:  Paul Wagner from
14  Stokes Wagner for FSR International
15  Hotels, Inc.
16                _ _ _
17
18  O L I V E   I V E Y,
19  called as a witness, having been first duly
20  sworn by a Notary Public, was examined and
21  testified
22  as follows:
23  EXAMINATION BY
24  ATTORNEY LUNDY:
25      Q.  Good morning, Ms. Ivey.
```

O. IVEY

1
2    A.  Good morning.
3        Q.  My name is Kathryn Lundy.  I'm an
4  attorney from Freeborn & Peters, and I am an
5  attorney representing some of the defendants
6  in the lawsuit that you brought that we're
7  here to talk about today.
8            As you know, you were just sworn
9  under oath and we ask you to tell the truth
10  for each question that I ask.
11           In the process of me asking
12  questions we have a court reporter with us
13  today, so it's important for him to be able to
14  get down my questions and your answers.  So
15  even when you think you know the completion of
16  my question, I ask you to let me complete my
17  question before you are answering it.  Okay?
18    A.  Mm-hmm.
19        Q.  And I also ask that all of your
20  answers be verbal, because the court reporter
21  can't get down gestures or general sounds.  It
22  has to be yes, no, or verbal responses.
23  Understood?
24    A.  Understood.
25        Q.  If at any time you don't understand

O. IVEY

1
2  a question, please let me know and I'll try to
3  rephrase it.  But if you answer the question I
4  am going to understand that you understood the
5  question that I asked.  Understood?
6    A.  Understood.
7        Q.  If you ever need a break during the
8  deposition that's completely fine, we can
9  certainly take breaks.  I would just ask that
10  if there's a question pending, that you answer
11  the question before we do so.  Is that okay?
12    A.  Yes.
13        Q.  Ms. Ivey, do you have any reason to
14  believe that you would be unable to answer my
15  questions today truthfully?
16    A.  No.
17        Q.  Can you please provide your full
18  name for the record, please, spelling your
19  last name?
20    A.  Olive Ivey.  I-v-e-y.
21        Q.  And what is your current address?
22    A.  ████████████████████████
23  ████████████████
24        Q.  And your cell phone number?
25    A.  ████████████

O. IVEY

1
2        Q.  And have you had any other cell
3  phone numbers in the last three years?
4    A.  No.
5        Q.  And have you had any different cell
6  phone devices in the past three years?
7    A.  No.
8        Q.  And what about in the past five
9  years?
10    A.  No.
11        Q.  Are you known by any other name?
12    A.  Yes.
13        Q.  And what other names do you go by?
14    A.  Olive Rodriguez.  That was my
15  married name.
16        Q.  And for what period of time were
17  you referred to as Olive Rodriguez?
18    A.  Up until now.  I'm in the process
19  of changing my name due to divorce.
20        Q.  Any other names?
21    A.  No.
22        Q.  What about Williams, have you ever
23  been known by Olive Williams?
24    A.  Oh, many years ago.  Yes.  Sorry,
25  that was a previous marriage.

O. IVEY

1
2        Q.  And for what period of time did you
3  go by Olive Williams?
4    A.  I don't remember.  A couple of
5  years, maybe.
6        Q.  Was it more than five years ago?
7    A.  Yes.
8        Q.  More than ten years ago?
9    A.  Yes.
10        Q.  And I'm sorry if I already asked
11  this, but for what period of time did you go
12  by Olive Rodriguez, was it more than five
13  years ago?
14    A.  Yes.
15        Q.  More than ten years ago?
16    A.  Yes.
17        Q.  And now you're currently in the
18  process of changing your name back to Ivey?
19    A.  Yes.
20        Q.  Thank you.  Could you please
21  identify any email addresses that you
22  currently maintain?
23    A.  Yes.
24        Q.  And what are they?
25    A.  ████████@gmail.com.  And I have

O. IVEY

1
2 ███████████████████
3 ███████████████████
4 ███████████████████
5 ███████████████████
6 ███████████████████.
7     Q.   Are you currently in school?
8     A.   I am.
9     Q.   And what school are you attending?
10     A.   BMCC.
11     Q.   What does BMCC stand for?
12     A.   Borough of Manhattan Community
13 College.
14     Q.   And what degree or program are you
15 attending at that school?
16     A.   Business management.
17     Q.   Ms. Ivey, if you would just let me
18 finish asking the question.
19     A.   Mm-hmm.
20     Q.   Thank you.  Are you in school to
21 receive a degree for certification or
22 something else?
23     A.   A degree.
24     ATTORNEY BRUSTEIN:  Just wait a
25     second, because she may pause while

O. IVEY

1
2 she's talking.  Just wait to make sure
3 the question is fully complete.
4     Q.   When did you begin your program at
5 BMCC?
6     A.   It's two years ago.
7     Q.   That would be in 2012?
8     A.   Summer – yes.  Summer.
9     Q.   And when do you contemplate
10 completing your degree?
11     A.   This summer.
12     Q.   This summer being summer of 2023?
13     A.   Yes.
14     Q.   Do you have any other email
15 addresses?
16     A.   No.
17     Q.   Have you had any other email
18 addresses in the past ten years?
19     A.   Yes.
20     Q.   And what were they?
21     A.   ████████@Fourseasons.com.
22     Q.   Any others?
23     A.   There was a new email address that
24 was given to me at the Four Seasons downtown
25 property.  I was there for a short period of

O. IVEY

1
2 time, but I don't remember what that was.  I
3 know it has Olive and Rodriguez in it.  I was
4 just there for, like, probably a week or two.
5 So I don't remember.
6     Q.   When were you at the downtown Four
7 Seasons location?
8     A.   I don't remember what month it was,
9 to be honest.
10     Q.   Do you recall what year?
11     A.   I think it was last year.
12     Q.   Last year being 2022?
13     A.   Or – either 2022 or 2021.  I'm not
14 quite sure.  I would have to go and research
15 that.
16     Q.   And were you working down at the
17 downtown Four Seasons Hotel or something else?
18     A.   I was working there, yes.
19     Q.   And what position did you have
20 while you were working there?
21     A.   Housekeeping manager.
22     Q.   Is it your testimony that you were
23 working as a housekeeping manager at the
24 downtown Four Seasons Hotel for a week?
25     A.   Or it could have been a week or

O. IVEY

1
2 two.  Something ...
3     Q.   Who concluded that work?  Was it
4 your decision or was it the downtown Four
5 Seasons?
6     A.   I had an accident, I fell.
7     Q.   Do you recall when that was?
8     A.   I don't remember the date.  I was
9 on my way to work and I fell and injured my
10 knee, and I was unable to walk.
11     Q.   Did you receive any type of
12 workers' compensation or any other type of
13 payment –
14     A.   No.
15     Q.   – as a result of that injury?
16     A.   No.
17     Q.   Just let me finish.  I know
18 sometimes I pause a little awkwardly, but just
19 make sure the question's completed?
20     A.   Yes.
21     ATTORNEY BRUSTEIN:  Just wait two
22     seconds instead of one.
23     Q.   Have you worked since your injury?
24     A.   No.
25     Q.   Do you believe you're able to work

O. IVEY

1
2  now, following your injury?
3      A.  Yes.
4      Q.  Would you like to work?
5      A.  Yes.
6      Q.  What period of time did you use the
7  email address olive.rodriguez@Fourseasons.com?
8      A.  For as long as I was a manager at
9  Four Seasons.
10      Q.  And what period of time was that?
11      A.  It would have to be over ten years.
12      Q.  What period of time of ten years
13  was that?
14      A.  Up until my last day in March, when
15  I was furloughed.
16      Q.  And what year are you referring to?
17      A.  2019 was the day when the pandemic
18  struck.
19      Q.  It's your understanding --
20      A.  March.
21      Q.  -- that the pandemic struck in
22  March of 2019?
23      A.  Yes.  When we were sent home.
24  Actually, we were able to use that email -- I
25  was able to use that email after, because I

O. IVEY

1
2  used it when I was sent on task force.
3      Q.  When was the last time you accessed
4  your email account at Fourseasons.com?
5      A.  I don't remember.
6      Q.  Do you know whether or not you can
7  still access that account?
8      A.  I did try accessing that account
9  when I went downtown.  They were not able to.
10      Q.  Who is "they"?
11      A.  The Four Seasons downtown.  I had
12  to be given a new email address.
13      Q.  Have you ever reached out to anyone
14  else since your period of work down at the
15  downtown Four Seasons Hotel to try to access
16  this account?
17      A.  No.  I was told when I went
18  downtown that I was not in the system, and
19  they needed to give me a new email address.
20  And Alexandra said she had no idea why
21  corporate IT was not able to give me access to
22  that email.
23      Q.  Who is Alexandra?
24      A.  She is the former director of --
25  assistant director of human resources at the

O. IVEY

1
2  midtown property, and she transferred to
3  downtown and she's there now.  So she's the
4  one that I spoke with there.
5      Q.  Do you recall her last name?
6      A.  Alberti.
7      Q.  Can you spell that for me, please?
8      A.  I don't know how to spell it.  I
9  wouldn't be able to spell it correctly, maybe.
10      Q.  Based on your conversation with
11  Alexandra, was it your understanding that you
12  should have had access to your Fourseasons.com
13  email account?
14      ATTORNEY BRUSTEIN:  Objection.
15      Q.  You can answer the question.
16      A.  I should have had access to it,
17  yes.
18      Q.  Was it your understanding that it
19  might have been a technical glitch of some
20  sort?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  No.
23      Q.  Why do you say that?
24      A.  Because I have always been able to
25  access it if I went -- well, I went to the

O. IVEY

1
2  Four Seasons Philadelphia to work at some
3  point on task force, and I was able to use
4  that exact same email account.  I've never in
5  my years of having that email account not been
6  able to access it while I was working.
7      Q.  Did Alexandra tell you why you were
8  not able to access that account?
9      A.  She just said she was not able --
10  IT was not able to give me back that email
11  address.  And so they would need to give me a
12  new one.
13      Q.  And can you remind me what that new
14  email address is?
15      A.  I don't remember it.  I did not use
16  it for too long.  I know it had my first name
17  and my last name, and the number.
18      Q.  Your last name, being Ivey?
19      A.  Olive -- no -- Rodriguez.
20      Q.  Have you tried to access that
21  account since departing from Four Seasons
22  downtown?
23      A.  I have.
24      Q.  And when was that?
25      A.  After being -- when I was downtown

O. IVEY

1
2 I did try, when they told me that I couldn't,
3 I did try to get on there.  But I wasn't able
4 to.
5     Q.  I am referring to the new email
6 account.  Have you tried to access your new
7 email account since departing from Four
8 Seasons downtown?
9     A.  No.
10    Q.  Have you spoken to Elizabeth Ortiz
11 about accessing either of those Four Seasons
12 accounts?
13    A.  No.
14    Q.  Do you know who Elizabeth Ortiz is?
15    A.  Yes.
16    Q.  And can you identify her -- can you
17 please identify her for me, please?
18    A.  She is the director of people &
19 culture at the Four Seasons (clearing
20 throat) -- excuse me -- midtown.
21    Q.  When was the last time you've
22 spoken to Ms. Ortiz?
23    A.  I don't remember the date.
24    Q.  Do you remember the year?
25    A.  No.

O. IVEY

1
2     Q.  Was it recently?
3     A.  No.
4         ATTORNEY BRUSTEIN:  Objection.
5     Q.  What was the purpose of that
6 conversation?
7     A.  I needed to go to the Four Seasons
8 to retrieve my clothing.
9     Q.  Have you spoken to her at any other
10 time since March of 2019?
11    A.  I have been on --
12        ATTORNEY BRUSTEIN:  Objection.
13    Q.  You can answer the question.
14    A.  I have been on Zoom calls.
15    Q.  Have you had any text messages with
16 Ms. Ortiz?
17    A.  Yes.
18    Q.  Do you recall --
19        ATTORNEY BRUSTEIN:  Can we go off
20    the record for one second?  Can I just
21    talk to you not in front of the witness
22    for a second?
23        ATTORNEY LUNDY:  Sure.
24        ATTORNEY BRUSTEIN:  Okay.
25        (Pause in the proceedings.)

O. IVEY

1
2     Q.  Do you recall when you were texting
3 with Ms. Ortiz?
4     A.  I don't remember the date.
5     Q.  Do you recall how many times you've
6 had text messages with Ms. Ortiz?
7     A.  No.
8     Q.  In connection with this lawsuit did
9 you gather any of your text messages with
10 Ms. Ortiz?
11    A.  I don't remember.
12    Q.  Who is Selena Staley?
13        ATTORNEY BRUSTEIN:  Objection.
14    A.  She's an employee at the Four
15 Seasons -- that was working also at the Four
16 Seasons.
17    Q.  When you say Four Seasons, what are
18 you referring to?
19    A.  The Four Seasons Hotel in Midtown.
20    Q.  Did you speak to Ms. Staley about
21 testifying today?
22    A.  No.
23    Q.  Is Ms. Staley also a named
24 plaintiff in this lawsuit?
25    A.  She is.

O. IVEY

1
2     Q.  When was the last time you spoke to
3 her?
4     A.  I don't remember.
5     Q.  Was it recently?
6         ATTORNEY BRUSTEIN:  Objection.
7     A.  Yes.
8     Q.  Was it more than a month ago?
9     A.  Yes.
10    Q.  Was it during the -- was it after
11 August of 2022?
12    A.  I don't remember.
13    Q.  Do you remember what you talked
14 about?
15        ATTORNEY BRUSTEIN:  Objection to
16    the extent that the communication
17    involved attorney-client communication,
18    I am going to direct her not to answer,
19    and to limit any answers to
20    conversations where the lawyers were not
21    present.
22    Q.  You can answer.
23    A.  We had lunch prior to, I think it
24 was prior to the filing of this lawsuit.
25    Q.  Was it just the two of you or was

O. IVEY

1
2  anyone else present?
3      A.  There was three of us present.
4      Q.  Who was the third person?
5      A.  Vivian Holmes.
6      Q.  Do you recall when that lunch was?
7      A.  I don't remember the date.
8      Q.  Was it a summer month?  Was it warm
9  out?
10         ATTORNEY BRUSTEIN:  Objection.
11     A.  It was warm out.
12     Q.  Do you recall where you had lunch?
13     A.  I don't remember the name of the
14  restaurant, no.
15     Q.  Do you recall where it was located?
16     A.  It was in Manhattan.
17     Q.  And what did you three discuss?
18     A.  We basically, um, just wanted to
19  get together because I think we were
20  experiencing the same kind of anxiety and
21  wanting to basically talk about if we thought
22  they would reopen and we would be able to go
23  back to work and, you know, what -- what would
24  we do, what we need to do moving forward.
25     Q.  When you say "they" who are you

O. IVEY

1
2  referring to?
3      A.  Four Seasons, if we thought the
4  Four Seasons would reopen and we would be able
5  to go back.
6      Q.  When you were saying "the Four
7  Seasons," there's many properties --
8      A.  The Four Seasons midtown.
9      Q.  And when you say Four Seasons
10  midtown, are you referring to the property
11  located at 57 East 57th Street?
12     A.  Yes.
13     Q.  Okay.  So unless you specify
14  otherwise when you're saying "the Four
15  Seasons," today or the "hotel" I'll understand
16  you to mean the midtown property at 57 East
17  57th Street, is that okay?
18         ATTORNEY BRUSTEIN:  Objection.
19     A.  Yes.
20     Q.  Okay.  Are you aware that
21  Ms. Holmes appeared yesterday for her
22  deposition?
23     A.  Yes.
24     Q.  Did you speak to Ms. Holmes about
25  her deposition?

O. IVEY

1
2      A.  No.
3      Q.  Did you text with Ms. Holmes about
4  her deposition?
5      A.  I texted her yesterday morning to
6  wish her good luck.
7      Q.  Did she respond?
8      A.  Yes.
9      Q.  What did she say?
10     A.  She told me she was on her way.
11     Q.  Did you text her after her
12  deposition?
13     A.  Yes.
14     Q.  And what was that correspondence?
15     A.  I asked her if she was okay.
16     Q.  And what did she say?
17     A.  She said she was having -- it was a
18  long day and she was having a headache.
19     Q.  Anything else?
20     A.  She said she was -- she was shot.
21  Basically, she meant that she was just out of
22  it. And she wished me good luck today.
23     Q.  Anything else?
24     A.  She told me it was cold in here,
25  and that I should take a jacket.

O. IVEY

1
2         ATTORNEY BOLAND:  Good advice.
3      Q.  Anything else?
4      A.  No, that was it.
5      Q.  Was Ms. Staley also on that text
6  exchange?
7      A.  No.
8      Q.  Do you have a separate text
9  exchange with Ms. Staley?
10     A.  This morning I got a text -- one
11  text message from her, and it said she was
12  praying for me today.
13     Q.  When was the last time you texted
14  with Ms. Staley?
15     A.  I'm sorry.
16     Q.  It's okay.  Do you want to take a
17  minute?
18     A.  That was this morning.  She is not
19  someone I speak with on regular basis.
20         ATTORNEY LUNDY:  Why don't we take
21  a minute.
22         (Pause in proceedings.)
23     Q.  You testified that you speak to
24  Ms. Staley on regular basis, is that right?
25     A.  No.

O. IVEY

1
2     Q.   What did you testify?
3     A.   I said she's not someone that I
4  speak with on a regular basis.
5     Q.   Understood.  Do you speak with
6  Ms. Holmes on a regular basis?
7     A.   I wouldn't call it regular.
8     Q.   How would you call it?
9     A.   It depends on what kind of day
10  we're having.  Some days she's having a bad
11  day, and I'm having a good day.  So it usually
12  is, if she's having a bad day where she's, you
13  know, upset, she will call me and I will
14  encourage her.  And if I am having a bad day,
15  I call her, and she will probably tell me the
16  same thing that I tell her when she's having a
17  bad day.  So that's a standing joke between
18  us, that we repeat the same thing in circles
19  to support each other.
20     Q.   Since August of 2022 have you ever
21  deleted any of your text messages with
22  Ms. Holmes?
23     A.   I don't remember.
24     Q.   Have you ever gathered all of your
25  text messages with Ms. Holmes to be produced

O. IVEY

1  in this lawsuit?
2     A.   No.
3     Q.   Have you ever deleted any of your
4  text messages with Ms. Staley from August 2022
5  to the present?
6     A.   No, because usually I don't text
7  with her.  This morning she text me, I was
8  surprised.
9     Q.   Have you ever deleted any of the
10  text messages that you have with Ms. Ortiz?
11     A.   I don't remember doing that.
12     Q.   Do you, or have you ever text
13  messaged with anyone else who works at the
14  Four Seasons Hotel?
15     ATTORNEY BRUSTEIN:  Objection.
16     A.   I'm sure I have.
17     Q.   Do you recall their names?
18     A.   I have text with some of my team
19  members, especially during the pandemic.  We
20  text to check up on each other.  I ask them
21  how they're doing.
22     I've had a team member who lost
23  family members.  So if I hear that someone
24  lost a family member, I reach out to find out

O. IVEY

1
2  how they're doing, how they're coping.
3     I've had team members text me
4  because I was a leader there at the midtown
5  Four Seasons, so they would text me to find
6  out if I heard anything, if the hotel is
7  opening, I would tell them I don't know
8  anything.
9     Q.   When you used the word "team
10  members," who are you referring to?
11     A.   Housemen.
12     Q.   Do you recall anyone's names?
13     A.   Yes.  I remember Eli's mother
14  passed away from COVID.  I reached out to him.
15     Q.   Do you recall any other names of
16  your team members that you were just referring
17  to?
18     A.   Moin.  He had called me to find out
19  if I heard anything about the hotel reopening.
20  I told him I didn't know anything.
21     Q.   Anyone else that you can think of?
22     A.   Yes.  Marie Daniels, Gurrier.  She
23  had called me also to find out if I heard
24  anything.
25     Q.   Anyone else?

O. IVEY

1
2     A.   And her answer is usually no.  I
3  had one supervisor that, Odeth, she reached
4  out to me because she was getting a new -- she
5  heard about another job and she wasn't
6  confident that she could do it.  And she
7  wanted my advice on how to go about going
8  through the interview.  So I coached her on --
9  on how to do that and I told her, I encouraged
10  her to do it and told her that she could
11  definitely do it.  It was something that I was
12  confident that she could do.
13     Q.   Were any of these communications
14  that were by text message, did you delete any
15  of those?
16     A.   I don't remember --
17     ATTORNEY BRUSTEIN:  Objection.
18     A.   -- deleting.  I don't remember.
19     Q.   Do you know whether you have
20  produced any text messages in this lawsuit?
21     ATTORNEY BRUSTEIN:  Objection.
22     A.   I don't remember producing text
23  messages.
24     ATTORNEY BRUSTEIN:  Can we take a
25  five-minute break?

O. IVEY

1              O. IVEY
2        ATTORNEY LUNDY:  Sure.
3        ATTORNEY BRUSTEIN:  Thanks.
4              ---
5        (Recess from 10:24 to 10:31.)
6              ---
7        Q.  Ms. Ivey, you wanted to clarify
8    something?
9        A.  Yes.  So in my response to speaking
10   about when the hotel would reopen with Moin,
11   we did not text.  We spoke, I spoke with Eli
12   on the phone.  I spoke with Marie on the
13   phone.  I spoke with Odeth on the phone.
14       Q.  In connection with this lawsuit,
15   did you review your email account,
16   oliveniivey@gmail.com for any documents that
17   should be produced in connection with this
18   lawsuit?
19       A.  Yes.
20       Q.  And did you provide any of those
21   documents?
22       A.  Yes.
23       Q.  And did you review your account
24   cutiepicknewyork2@yahoo.com for any
25   information or documents that would be

O. IVEY

1    responsive in connection with the discovery in
2    this matter?
3        A.  Yes.
4        Q.  And did you provide those documents
5    for production?
6        A.  There were no documents there,
7    because I don't use that email account
8    anymore.  I have not used it since probably I
9    have been at the Four Seasons.  I don't use
10   it.
11       Q.  Thank you.  Do you maintain any
12   social media accounts?
13       A.  Yes.
14       Q.  What social media accounts do you
15   maintain?
16       A.  I have Facebook, LinkedIn,
17   Instagram.
18       Q.  And on Facebook what is your user
19   name?
20       A.  Olive Ivey Rodriguez.
21       Q.  And on LinkedIn?
22       A.  Olive -- it might be Olive Ivey
23   Rodriguez, or Olive Rodriguez.
24       Q.  And what about Instagram?

O. IVEY

1              O. IVEY
2        A.  Oliveivey26, I think.  Or
3    oliveivey26.  I have the account but I don't
4    use it very often.
5        Q.  Do you ever communicate through
6    your social media accounts through their
7    internal mail system?
8        A.  Could you please explain?
9        Q.  Sure.  So for example, on LinkedIn
10   there's a mechanism to message someone
11   privately, is that right?
12       ATTORNEY BRUSTEIN:  Objection.
13       A.  Yes.
14       Q.  Have you ever used that tool or
15   resource on LinkedIn?
16       A.  Yes.
17       Q.  And did you search your LinkedIn
18   account for any emails or private
19   conversations in connection with this lawsuit?
20       A.  No.
21       Q.  And what about Facebook; Facebook
22   also maintains an ability to have private
23   conversations messages, is that right?
24       A.  Yes.
25       Q.  And do you ever use that resource

O. IVEY

1    or tool on Facebook?
2        A.  Yes.
3        Q.  And did you search your private
4    messages or internal mail accounts through
5    Facebook in connection with this lawsuit?
6        ATTORNEY BRUSTEIN:  Objection.
7        A.  No, because I don't use it for any
8    form of business purposes.
9        Q.  Do you use LinkedIn for any form of
10   business purpose?
11       ATTORNEY BRUSTEIN:  Objection.
12       A.  Yes, but not with Four Seasons
13   midtown or any Four Seasons hotels.
14       Q.  For what purpose then?
15       A.  Usually it would be for people who
16   follow the hospitality industry.  I've had
17   people trying to sell stuff because I work in
18   a hotel, so they would try to marketing --
19   marketing ideas, products, recruiters over the
20   years have tried to hire me away from the Four
21   Seasons midtown.
22       Q.  If the hotel reopened tomorrow
23   would you want to be recalled back?
24       ATTORNEY BRUSTEIN:  Objection.

O. IVEY

1
2    A.  You mean rehired?
3    Q.  My question stands.  Would you want
4  to be recalled?
5        ATTORNEY BRUSTEIN:  Objection.
6    A.  I don't think I could be recalled
7  when I was terminated.  I would have to be
8  rehired.
9    Q.  When do you believe you were
10 terminated from the hotel?
11   A.  I think it was in -- it was
12 sometime last year, that I came to that
13 realization.
14   Q.  What time last year did you believe
15 you were terminated from the hotel?
16       ATTORNEY BRUSTEIN:  Objection.
17   A.  I don't remember which month.  I
18 received a phone call and someone from
19 Principal, which is the company that manages
20 the retirement benefit plan from Four Seasons,
21 and they were asking me what I wanted to do
22 with my 401(k) account.
23   Q.  When you say last -- sorry, I
24 apologize.
25   A.  And I didn't understand what they

O. IVEY

1
2  were asking me.  And they said I had the
3  option to cash it out with penalty or to roll
4  it over to a new employer.  And I told them
5  that I -- I started asking questions and the
6  person on the phone told me that they were
7  informed by Four Seasons that I am no longer
8  an employee there.
9        I told them that I was not informed
10 of that fact, I was not informed by the Four
11 Seasons that I was terminated, and so I would
12 not make any decision at that time.
13       So I reached out to Elizabeth Ortiz
14 and I told her about the conversation that I
15 had with the representative from Principal,
16 and she said -- I told her they told me I no
17 longer worked for the Four Seasons and have
18 the option to cash out or to roll over.  And
19 her response to me was they should not have
20 told you that.  I will call them and look into
21 it.  I never received a response back.
22   Q.  Did Ms. Ortiz tell you anything
23 else?
24       ATTORNEY BRUSTEIN:  Objection.
25   A.  Anything else in regard to?

O. IVEY

1
2    Q.  Your concerns about your 401(k)?
3    A.  No, she just told me that they
4  should not have told me that, and she would
5  reach out to them and take care of it.
6        So I understood that to mean that
7  she would correct the information that they
8  had.
9    Q.  This was by text message, is that
10 right?
11   A.  No, I spoke to her.
12   Q.  But you also corresponded with
13 Ms. Ortiz about this matter by text message,
14 is that right?
15   A.  I did send her a message to say
16 that I -- because if you call, you're not able
17 to really get through.  You have to send a
18 message to say you want to speak with her.
19 And then someone would either reach out --
20 someone would reach out to you.  Most times
21 because I think when you call you usually
22 don't get anyone on the phone, I'm not sure
23 why, probably because she's the only person
24 and it's a ...
25   Q.  Right.  But my question was you did

O. IVEY

1
2  text message with Ms. Ortiz about this matter,
3  is that right?
4    A.  I don't remember if it was by text
5  initially that I told her that I needed to
6  speak with her or that what I heard from
7  Principal, I know that there was some
8  correspondence.  I don't remember if it was by
9  text or if I spoke to her.  I know I spoke to
10 her, but what part of the conversation was by
11 text and speaking, I don't remember.
12   Q.  Ms. Ortiz told you that that
13 shouldn't have happened because you weren't
14 terminated, is that right?
15   A.  She told me, she said to me they
16 should not have told you that.  You're still
17 employed by the Four Seasons.  I will take
18 care of it.
19   Q.  Thank you.  And you referenced last
20 year.  What year are you referring to?
21   A.  2022.
22   Q.  Do you recall what month?
23   A.  No, I don't recall what month.
24   Q.  Was it cold out?
25   A.  I don't remember.

Page 38

O. IVEY

1        Q.  Ms. Ivey, I am going to show you a
2  document that's been previously marked as
3  exhibit 5.
4        (Defendants' Exhibit 5, Complaint
5        was previously marked for
6        identification.)
7        Q.  Ms. Ivey, I've just handed you a
8  document that was previously marked as exhibit
9  5.  It's dated August 9, 2022 and it's titled
10  Complaint.
11       Have you seen this document before?
12       A.  Yes.
13       Q.  And when did you see this document
14  before?
15       A.  I don't remember the date but it
16  was shown to me by my attorneys.
17       Q.  Is it fair to say that this is the
18  initial complaint that was filed in the
19  lawsuit that you brought against the
20  defendants in this action?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  Initial as it was the first
23  complaint?  I think it's fair to say.
24       Q.  And you're one of the plaintiffs in
25

Page 39

O. IVEY

1  this lawsuit, is that right?
2        A.  Yes.
3        Q.  And you are bringing claims on your
4  own behalf and on behalf of others similarly
5  situated to you, is that right?
6        A.  Yes.
7        Q.  And prior to this complaint being
8  filed with the court did you review this
9  document?
10       A.  Yes.
11       Q.  And did you confirm its accuracy?
12       A.  Yes.
13       Q.  And did you do anything in
14  connection with gathering any facts or
15  information with respect to the allegations
16  set forth in this complaint?
17       ATTORNEY BRUSTEIN:  Objection.
18       A.  I was given a list of discoveries
19  that I needed to present, and I did present
20  those.
21       Q.  And as you sit here today it's your
22  understanding that the allegations in the
23  complaint are accurate to the best of your
24  knowledge, is that right?
25

Page 40

O. IVEY

1        A.  Yes.
2        Q.  Okay.  You can put that aside.
3  Thank you.
4        (Defendants' Exhibit 6, First
5        Amended Complaint was previously marked
6        for identification.)
7        Q.  Ms. Ivey I am going to show you a
8  document that's been previously marked as
9  exhibit 6.
10       This document is dated on page 60
11  as December 16, 2022, and it's titled First
12  Amended Complaint.  Have you seen this
13  document before?
14       A.  Yes.
15       Q.  And can you identify it for me
16  please?
17       ATTORNEY BRUSTEIN:  Objection.
18       A.  It is a document that my attorneys
19  showed me.
20       Q.  Is it your understanding that this
21  is the second complaint that was filed in the
22  lawsuit amending the first?
23       A.  Yes.
24       Q.  And did you review this document
25

Page 41

O. IVEY

1  before it was filed with the court?
2        A.  Yes.
3        Q.  And did you confirm its accuracy?
4        A.  Yes.
5        Q.  As you sit here today, do you
6  believe the allegations in the amended
7  complaint marked as exhibit 6 are complete and
8  accurate?
9        ATTORNEY BRUSTEIN:  Objection.
10       A.  Yes.
11       Q.  Have you reviewed the amended
12  complaint since it was filed in December of
13  2022?
14       Q.  And it's your understanding that
15  the amended complaint was filed by you
16  individually but also on behalf of others
17  similarly situated, is that right?
18       ATTORNEY BRUSTEIN:  Objection.
19       A.  Yes.
20       Q.  And there's also two other
21  plaintiffs in this matter, Vivian Holmes and
22  Selena Staley, is that right?
23       A.  Yes.
24
25

O. IVEY

1
2    Q.  Do you know what a class action is?
3    A.  Yes.
4    Q.  Can you tell me what that is?
5         ATTORNEY BRUSTEIN:  Objection.
6    A.  My understanding of what a class
7    action is, is a suit seeking damages on behalf
8    of a group of people or similarly -- who are
9    in a similar situation as myself.
10   Q.  Do you understand that you are a
11   representative of others in this lawsuit?
12   A.  Yes.
13   Q.  What research did you do in
14   connection with this lawsuit prior to filing
15   it to ensure the accuracy of the information
16   and allegations set forth in the complaint?
17        ATTORNEY BRUSTEIN:  Objection.
18   A.  Well, I know that we were sent home
19   and we were not informed correctly, we were
20   not informed that we wouldn't be going back to
21   work.  I also know that it would be a
22   violation.  And so I looked into what -- what
23   I think would have been done incorrectly or
24   what should have been done and what wasn't
25   done.  And then I spoke with my attorneys.

O. IVEY

1
2    Q.  When you said you looked at, what
3    did you look at?
4         ATTORNEY BRUSTEIN:  Objection.  I
5    don't believe that was the testimony.
6    Q.  I'm sorry.  You looked into.  What
7    did you look into?
8    A.  What was -- what -- well, what --
9    what should the Four Seasons have told us in
10   regard to would we be coming back to work.
11   Would we be terminated.  What -- what should
12   they have done if they terminated us.  That
13   kind of things.  I realized later on that I
14   was terminated but no one told me I was
15   terminated.  I wanted to know -- I wanted to
16   know what -- if that was legal.  If that is
17   something that they should be doing.
18        So I -- I went back and looked at
19   the agreement I had with them.
20   Q.  Other than looking at the agreement
21   you had with them, did you look at any other
22   documents prior to commencing this lawsuit to
23   confirm the accuracy of the allegations in the
24   complaint?
25        ATTORNEY BRUSTEIN:  Objection.

O. IVEY

1
2    A.  I don't remember looking at any
3    other documents.
4    Q.  Do you know whether you have
5    responsibilities as a class representative?
6    A.  Yes.
7    Q.  What are they?
8    A.  My responsibility as a class
9    representative is to ensure that I speak with
10   the attorneys that are representing the class
11   action, and to ensure that any decisions that
12   are made are within the interests of all of
13   the people are represented under the action.
14   Q.  Anything else?
15        ATTORNEY BRUSTEIN:  Objection.
16   A.  I also think that my responsibility
17   is to ensure that any outcome is one that is
18   favorable under the law for all parties
19   involved, and that it's not just about me,
20   it's about an entire group of people.
21   Q.  How do you know what the other
22   individuals' interests are?  Have you spoken
23   to them?
24   A.  I would think that that --
25        ATTORNEY BRUSTEIN:  Objection.

O. IVEY

1
2    A.  When I was on the phone call, the
3    last phone call with the Four Seasons midtown
4    people were on that call asking for the hotel
5    to be opened, asking when would it be opened,
6    explaining that it was obvious that they were
7    experiencing anxiety, hardship --
8    Q.  Ms. Ivey, that's not my question.
9         ATTORNEY BRUSTEIN:  I would just
10   ask that she be able to finish.
11   Q.  Sure.
12   A.  -- and I realized that we were all
13   in the same boat.  We were all wanting to go
14   back to work.  That is what we were doing for
15   a very long period of time.
16   Q.  I understand that that's your --
17   A.  So --
18   Q.  Okay.  Please, go ahead.  Go ahead.
19   A.  So I know, or I truly believe that
20   we were all in the same boat and experiencing
21   many of the same things, many of the same
22   hardships, and I think that that is
23   qualification enough.  We were all treated the
24   same way.
25   Q.  I don't want to cut you off.  Were

O. IVEY

1
2  you finished with your answer?
3    A.  Yes.
4    Q.  Okay.  My question was:  Have you
5  spoken with any of the individuals you believe
6  that you have an obligation to protect their
7  interests?  Have you spoken to anyone?
8      ATTORNEY BRUSTEIN:  Objection.
9  Just to clarify, you keep asking two
10  questions at once.  The last one said
11  how do you know and that second one.
12  And I think just for --
13      ATTORNEY BOLAND:  They're two
14  questions.  One was one.  One was
15  another.
16      ATTORNEY BRUSTEIN:  I'm just saying
17  simultaneously.  It would be easier for
18  the record --
19      ATTORNEY LUNDY:  Could you read
20  back my question, please?
21      (Requested portion of the record
22  read back.)
23    A.  I have spoken to employees who,
24  like Moin I mentioned before, who have called
25  to say when is the hotel opening?  We want to

O. IVEY

1
2  go back to work.
3      I have spoken to Marie, as I
4  mentioned before, who was asking when can we
5  go back to work?  We need to go back to work.
6  Have you heard anything.
7      So as far as speaking to them about
8  filing a lawsuit, no, I haven't spoken to -- I
9  haven't discussed that with them.
10    Q.  You testified that you understand,
11  or rather, you believe you and the others are
12  in the same boat.  What makes you believe that
13  you're in the same boat as other employees
14  from the hotel?
15    A.  Because we were all working at the
16  same Four Seasons midtown.  We were all
17  terminated without notice or sent home, and we
18  have been waiting for three years to return to
19  work, and no one told us.  We don't have a
20  date.  We don't have anything to go by.  No
21  one tells -- we were told that there is work
22  on the way and that one, just one portion of
23  the work would take a year and a half, at
24  least a year and a half, and there are other
25  projects to be done.  So at that point we know

O. IVEY

1
2  that this is an open-ended situation.  So yes,
3  we're all in the same boat.
4    Q.  I asked you specifically how you
5  know that all of the individuals are in the
6  same boat as you?
7      ATTORNEY BRUSTEIN:  Objection.
8    Q.  How do you know that?
9    A.  I know that because we are all out
10  of work.
11    Q.  Do you know that every single
12  employee of the hotel is not working at this
13  moment?
14    A.  No.
15      ATTORNEY BRUSTEIN:  Objection.
16    Q.  Are you aware that some employees
17  were transferred to other hotels of the Four
18  Seasons?
19      ATTORNEY BRUSTEIN:  Objection.
20    A.  I am aware that they were
21  transferred to other Four Seasons or some
22  people are also working, but they were still
23  treated the same way.
24    Q.  Are you aware that other employees
25  found employment at other hotels or other

O. IVEY

1
2  establishments altogether?
3      ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't -- I am sure that they
5  have.  I have known of a few that were placed
6  in other hotels.
7    Q.  Are you aware that some employees
8  are seeking to be recalled back to work at the
9  hotel?
10      ATTORNEY BRUSTEIN:  Objection.
11    A.  I am sure they are.  But the hotel
12  is still closed.
13    Q.  Some employees of the hotel
14  currently work from that property to this day;
15  are you aware of that?
16      ATTORNEY BRUSTEIN:  Objection.
17    A.  I am aware of that.
18    Q.  Did you do any research to find out
19  what your responsibilities are to assert
20  claims on behalf of others in this case?
21      ATTORNEY BRUSTEIN:  Objection.
22    A.  Could you please repeat that
23  question.
24      ATTORNEY LUNDY:  Could you please
25  read it back?

Page 50

O. IVEY

1
2       (Requested portion of the record
3       read back.)
4       A.  I did not do any research. I spoke
5   with my attorneys to find out what action can
6   be taken on behalf of myself and my
7   co-workers.
8       Q.  Did you do any research to
9   determine what authority you have to settle
10  this case on behalf of others?
11      ATTORNEY BRUSTEIN:  Objection.
12      A.  I did not do any research but I
13  think I know I have the authority to do so.
14      Q.  Do you know how many claims are
15  alleged in the first amended complaint?
16      A.  No.
17      Q.  Why don't we look. Can you turn
18  back to exhibit 6, please?
19      ATTORNEY BRUSTEIN:  Objection. Oh,
20      you said amended complaint?
21      ATTORNEY LUNDY:  Yes.
22      ATTORNEY BRUSTEIN:  Withdrawn.
23      Sorry.
24      A.  Page what?
25      Q.  On page 46, please. It states: As

Page 51

O. IVEY

1
2   and for the first cause of action.  Let's turn
3   to page 49.  As and for a second cause of
4   action.  Let's turn to page 51 --
5       ATTORNEY BRUSTEIN:  Objection.
6       Could you please go a little slower.
7       ATTORNEY LUNDY:  Sure.
8       ATTORNEY BRUSTEIN:  If you're
9       asking her to follow along.
10      Q.  51, As and for third cause of
11  action. 52, As and for a fourth cause of
12  action. 54, As and for --
13      ATTORNEY BRUSTEIN:  Do you need
14      more time to see what she's doing?
15      A.  Yeah, can you ...
16      (The witness reviews document.)
17      A.  Okay.
18      Q.  Page 57, As and for a sixth cause
19  of action.
20      A.  Okay. Mm-hmm.
21      Q.  At the time the amended complaint
22  was filed, six causes of action were alleged
23  in this pleading, right?
24      ATTORNEY BRUSTEIN:  Objection.
25      Q.  Based upon what we just reviewed?

Page 52

O. IVEY

1
2       A.  Yes.
3       Q.  Do you know that some of those
4   causes of action have been withdrawn in this
5   lawsuit?
6       A.  I am sure --
7       ATTORNEY BRUSTEIN:  Objection.
8       A.  -- that whatever was done was done
9   with my well-being in mind, by my attorneys.
10  So yes.
11      Q.  My question was were you aware that
12  some of the causes of action have been
13  withdrawn from this amended complaint?
14      A.  Yes.
15      Q.  When did you become aware of that?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  When it was presented to me.
18      Q.  Was it before or after the claims
19  were withdrawn?
20      ATTORNEY BRUSTEIN:  Objection.
21      A.  Well, whenever my attorneys are
22  going to make a decision on anything they
23  would speak with us. They would call me on
24  the phone and they would tell us what exactly
25  they are going to do, as far as what they're

Page 53

O. IVEY

1
2   filing, what they're withdrawing and all of
3   that. After they are through, they send us
4   the documents and --
5       ATTORNEY BRUSTEIN:  I'm going to
6       object and direct you not to speak about
7       what's provided to you or not provided
8       to you.
9       THE WITNESS:  Okay.
10      ATTORNEY BRUSTEIN:  And the
11      substance of those conversations.
12      Q.  Yes, agreed. I don't want to know
13  what you talk about with your attorneys.
14      Do you know what causes of action
15  have been withdrawn?
16      A.  I don't know off the top of my
17  head.
18      Q.  Do you think it's within every
19  putative class member's interest to withdrawn
20  certain claims from this lawsuit?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  Could you --
23      Q.  Sure.
24      A.  -- ask that question again? I
25  don't understand what you're asking.

O. IVEY

1          O. IVEY
2      Q.   Sure.  Do you think it was in
3  everyone's best interest -- you represented
4  that as a class representative it's your job
5  to ensure their interests.
6      A.   Yes.
7      Q.   Do you think it was in their
8  interest to withdraw some of those claims?
9          ATTORNEY BRUSTEIN:  Objection.
10      A.   Yes.
11      Q.   But you don't know what those
12  claims are?
13          ATTORNEY BRUSTEIN:  Objection;
14      mischaracterization.
15      A.   Well, I read the documents that
16  were presented to me.  I don't memorize them.
17  So if I am going to be looking at something
18  and making a decision or being asked to make a
19  decision on something or advised by my
20  attorneys to make a decision on something,
21  because it's there, I'm not going to memorize
22  it.  I can't memorize -- this is a very big
23  document.  I cannot memorize everything.
24      Q.   Ms. Ivey, that wasn't my question.
25  I asked you if you can identify what causes of

1          O. IVEY
2  action were withdrawn that you believe were in
3  the other putative class members interests?
4      A.   I don't remember.
5          ATTORNEY BRUSTEIN:  Objection.
6      Q.   Okay, thank you.  Are you
7  represented by counsel in this case?
8      A.   I am.
9      Q.   How many attorneys are representing
10  you in this matter?
11      A.   Three.
12      Q.   Can you identify them for me,
13  please?
14      A.   There's Maya Risman, there's Evan
15  Brustein and this gentleman that's here.
16      Q.   Do you know the gentleman next to
17  you's name?
18      A.   Yes, I do.  But I am so flustered
19  right now, I ...
20      Q.   How did you select the lawyers in
21  this case?
22      A.   So I was given the name of Evan
23  first -- this is Brian, by the way.
24      Q.   Do you recall his last name?
25      A.   I was given the name of Evan first,

1          O. IVEY
2  Evan Brustein and Maya Risman, and I went
3  online and looked them up.
4      Q.   Who gave you their name, if anyone?
5      A.   Vivian gave me their names.
6      Q.   How did Vivian give you their
7  names?
8      A.   She told me on the phone.
9      Q.   Do you know where she found their
10  names?
11      A.   No.
12      Q.   Did she tell you?
13      A.   No.
14      Q.   Prior to engaging your attorneys in
15  this matter what research, if any, did you
16  determine qualified them to represent you and
17  other individuals similarly situated to you in
18  this matter?
19      A.   Well, I looked them up online, I
20  looked at their -- I saw that they were
21  attorneys experienced in the matter, and was
22  able to answer questions -- I thought they
23  would be able to answer my questions and --
24          ATTORNEY BRUSTEIN:  I'm going to
25      object and direct her not to -- to limit

1          O. IVEY
2  her answer to anything that doesn't
3  involve attorney-client communication.
4          ATTORNEY LUNDY:  That's fine.
5          ATTORNEY BRUSTEIN:  So any
6      conversations that you had with your
7      attorneys should not be part of the
8      answer.  Outside of those
9      communications.
10      A.   So basically I looked them up
11  online and then reached out to them.  And in
12  my initial conversation, I was comfortable.
13      Q.   Anything else?
14      A.   No.
15      Q.   Did you consider any other
16  attorneys before engaging those representing
17  you here?
18      A.   Some added names were thrown out,
19  but I don't remember the names that were
20  thrown out.
21      Q.   When you say thrown out, what does
22  that mean?
23      A.   That was mentioned to me.
24      Q.   By who?
25      A.   By Vivian.

Page 58

O. IVEY

1
2    Q.  Did you do any independent research
3    or investigation other than relying on what
4    Ms. Holmes presented to you?
5        ATTORNEY BRUSTEIN:  Objection.
6    A.  Yes, I went online and Googled
7    them.
8    Q.  Other than the attorneys' names
9    that Ms. Holmes provided to you, did you do
10   your own independent research or investigation
11   to identify any other potential attorneys to
12   represent you and others similarly situated in
13   this case?
14       ATTORNEY BRUSTEIN:  Objection.
15   A.  I might have Googled labor lawyers.
16   Q.  Did you identify anyone?
17   A.  I don't remember who I might have
18   came up on.  But I was -- I zeroed in on -- on
19   Evan and Maya from early on.
20   Q.  How were you introduced to
21   Mr. Bromberg?
22   A.  Mr. Bromberg.  I don't ... I was
23   introduced to him I think on Zoom.
24   Q.  Do you recall who introduced you?
25   A.  It was Evan and Maya.

Page 59

O. IVEY

1
2    Q.  Did you do any independent
3    investigation prior to retaining Mr. Bromberg
4    to represent you and others similarly situated
5    in this matter?
6    A.  I went online and looked him up.
7    Q.  Anything else?
8    A.  No.
9        ATTORNEY BRUSTEIN:  Objection.  I'm
10       just going to direct again to limit the
11       answer to not include attorney-client
12       communications.
13   Q.  When you say you looked him up,
14   what does that mean?
15   A.  I Googled him and I looked at, um,
16   his business -- his practice.  And I looked at
17   things that -- that he did online.
18   Q.  Anything else?
19   A.  No.
20   Q.  Do you have a written fee agreement
21   with your attorneys?
22   A.  Could you explain what that means?
23   Q.  Do you have an engagement letter
24   with your attorneys?
25   A.  I have -- I retained my attorneys.

Page 60

O. IVEY

1
2    I don't have a fee that they're charging me --
3        ATTORNEY BRUSTEIN:  Objection.  I
4        am going to just direct the witness not
5        to discuss what fee agreement there is,
6        just whether or not one exists.
7    Q.  Are you going to accept your
8    attorney's direction not to respond to the
9    question?
10       ATTORNEY BRUSTEIN:  Objection.  And
11       we went through this yesterday.
12       ATTORNEY LUNDY:  That's fine.  We
13       can make that record as we did
14       yesterday.
15       ATTORNEY BRUSTEIN:  I would ask
16       that you not question my witnesses if
17       they're going to take attorney's advice.
18       I don't think it's an appropriate
19       objection.
20       There's no reason for you to react.
21       ATTORNEY LUNDY:  So just so we can
22       create the record.
23   Q.  Ms. Ivey, when your attorney is
24   directing you not to respond to a question you
25   are going to take his recommendation, is that

Page 61

O. IVEY

1
2    right?
3    A.  Yes.
4    Q.  Okay.  Thank you.  Are you
5    incurring any out of pocket costs or fees in
6    connection with this lawsuit?
7        ATTORNEY BRUSTEIN:  Objection.
8    A.  No.
9    Q.  Do you have any responsibilities
10   for the costs relating to the class?
11       ATTORNEY BRUSTEIN:  Objection.
12   A.  No.
13   Q.  And if notice was required to be
14   provided to the class of those similarly
15   situated to you, would you be responsible for
16   the costs of sending those notices?
17       ATTORNEY BRUSTEIN:  Objection.
18   A.  No.
19   Q.  Are you prepared to pay the
20   defendants' legal fees if that came to pass in
21   this lawsuit?
22       ATTORNEY BRUSTEIN:  Objection.
23   A.  What do you mean by -- if I'm
24   prepared to pay out of my pocket?
25   Q.  Would you be personally prepared to

Page 62

O. IVEY

1  incur the financial obligations to pay the
2  defendants' attorneys' fees if that came to
3  pass in this lawsuit?
4  
5       ATTORNEY BRUSTEIN:  Objection.
6  A.  No.
7  Q.  All right.  We're going to go
8  through lots of documents but we'll do it
9  quickly, all right?  You can put exhibit 6 to
10 the side for the time being.  Thank you.
11      (Defendants' Exhibit 7, Notice of
12      Motion to Compel Arbitration and Dismiss
13      Class Claims and Stay Action, Memorandum
14      of Law in Support was previously marked
15      for identification.)
16 Q.  Ms. Ivey, I am going to show you a
17 document that's been marked exhibit 7.
18      ATTORNEY BRUSTEIN:  Does Paul have
19      these copies --
20      ATTORNEY LUNDY:  No.
21      ATTORNEY BRUSTEIN:  -- or is he
22      just hanging out?
23      ATTORNEY LUNDY:  He doesn't have
24      the copies.
25      ATTORNEY BOLAND:  You've got all of

Page 63

O. IVEY

1  them there if you want to look at them
2  again.
3  
4       ATTORNEY BRUSTEIN:  So if you can
5       just give me a minute.
6       ATTORNEY LUNDY:  7 through 19.
7       Sure.
8  Q.  Ms. Ivey, you have in front of you
9  a document that was marked yesterday as
10 exhibit 7 titled Notice of Motion to Compel
11 Arbitration, Dismiss Class Claims and Stay
12 Action.
13      Have you seen this document before?
14 A.  Yes.
15 Q.  Are you aware that a motion was
16 filed by the defendants to have this case
17 taken out of litigation and compelled to
18 arbitration?
19 A.  Yes.
20 Q.  Do you have a file or any of the
21 documents from this lawsuit at home?
22      ATTORNEY BRUSTEIN:  Objection.
23 A.  I have them on my computer.
24 Q.  Thank you.
25      (Defendants' Exhibit 8, Declaration

Page 64

O. IVEY

1  of Cathy Hwang was previously marked for
2  identification.)
3  
4  Q.  Let's turn to exhibit 8, please.
5       The document in front of you was
6  marked --
7       ATTORNEY BRUSTEIN:  You're not
8       going back to 7, right?
9       ATTORNEY LUNDY:  No.  We'll try to
10      breeze through these quickly.
11 Q.  The document marked exhibit 8 is
12 titled Declaration of Cathy Hwang and it's
13 dated November 15, 2022.
14      Have you seen this document before?
15      ATTORNEY BRUSTEIN:  Objection.
16 A.  Yes.
17 Q.  Do you know what matter it's in
18 reference to?
19      ATTORNEY BRUSTEIN:  Objection.
20 A.  It's in reference to the lawsuit
21 that we're bringing.
22 Q.  When did you see this document?
23      ATTORNEY BRUSTEIN:  Objection.
24 A.  I don't remember what date.
25 Q.  Do you maintain a copy of this

Page 65

O. IVEY

1  document in your files?  Electronically or
2  otherwise?
3  
4       ATTORNEY BRUSTEIN:  Objection.
5  A.  Electronically, yes.
6  Q.  Did you ever review this document?
7       ATTORNEY BRUSTEIN:  Objection.
8  A.  Yes.
9       (Defendants' Exhibit 9, Memorandum
10      of Law in Opposition to Defendants'
11      Motion to Compel Arbitration, Dismiss
12      Class Claims and Stay Action was
13      previously marked for identification.)
14 Q.  I am going to show you a document
15 marked exhibit 9.  This document is dated
16 December 6, 2022 titled Memorandum of Law in
17 Opposition to Defendants' Motion to Compel
18 Arbitration, Dismiss Class Claims and Stay
19 Action.
20      Have you seen this document before?
21 A.  Yes.
22 Q.  When did you see this document
23 before?
24 A.  I don't remember the dates.
25 Q.  Do you know whether or not you saw

O. IVEY

1  this document before December 6, 2022?
2  this document before December 6, 2022?
3      ATTORNEY BRUSTEIN: Objection.
4      A. I don't remember the dates.
5      Q. Did you ever review documents
6  before they're filed in this lawsuit on your
7  behalf?
8      A. Yes.
9      Q. Do you recall specifically
10 reviewing this document before it was filed?
11     ATTORNEY BRUSTEIN: Objection.
12     A. I don't remember.
13     (Defendants' Exhibit 10,
14     Declaration of Evan Brustein was
15     previously marked for identification.)
16     Q. I am going to show you a document
17 marked exhibit 10. Ms. Ivey, I have given you
18 a document marked exhibit 10. It's titled
19 Declaration of Evan Brustein, and it's dated
20 December 5, 2022.
21     Have you seen this document before?
22     A. Yes.
23     Q. Are you aware that the defendants,
24 the Warner defendants in this case have filed
25 a motion to dismiss the amended complaint in

O. IVEY

1  its entirety?
2  its entirety?
3      A. Yes, I am aware.
4      Q. When did you become aware of that?
5      A. I don't remember what date.
6      Q. Did you review this document before
7  it was filed?
8      A. Yes.
9      Q. And if you look on the last page of
10 this document --
11     A. Yes.
12     Q. -- it's titled Declaration of Olive
13 Ivey and it's dated December 5, and there is a
14 signature at the bottom. Is that your
15 signature?
16     A. It is, yes.
17     Q. And do you recall signing this
18 document?
19     A. Yes.
20     Q. And as you sit here today do you
21 believe that the information contained in this
22 declaration is true and accurate?
23     A. Yes.
24     Q. And in this declaration you state
25 at paragraph 3: I have reviewed the EmPact

O. IVEY

1  agreement annexed to the declaration of Evan
2  agreement annexed to the declaration of Evan
3  Brustein dated December 5, 2022 and that it is
4  true and accurate copy of the EmPact agreement
5  last revised February 2018 and I have
6  acknowledged receiving in 2018.
7      ATTORNEY BRUSTEIN: Objection.
8      Q. Is the EmPact agreement referenced
9  in paragraph 3 the EmPact agreement attached
10 to this exhibit 10?
11     A. It would appear so, yes.
12     Q. In connection with this lawsuit is
13 this the EmPact agreement that you have
14 brought claims under?
15     A. Yes.
16     Q. Your declaration also confirms that
17 you signed the EmPact agreement, is that
18 right?
19     ATTORNEY BRUSTEIN: Objection.
20     A. Yes.
21     Q. And you believe it's a valid
22 contract, is that right?
23     A. Yes.
24     Q. And you believe that you and all
25 others similarly situated fully complied with

O. IVEY

1  your obligations under the agreement?
2  your obligations under the agreement?
3      A. Yes.
4      Q. How do you know that others fully
5  complied with their obligations under this
6  agreement?
7      ATTORNEY BRUSTEIN: Objection.
8      A. Well, I think that it's an
9  agreement between us and the people that
10 presented it to us, and if we don't comply to
11 the EmPact then there are consequences to
12 that.
13     Q. How do you know that other
14 individuals fully complied with the contract?
15 How do you know?
16     ATTORNEY BRUSTEIN: Objection.
17     A. Because if we don't -- if -- 40
18 years I have been at the Four Seasons midtown.
19 If we don't comply to the EmPact because
20 then there are consequences for that.
21     Q. Did you speak to any others
22 similarly situated to you to confirm that they
23 fully complied with the EmPact agreement?
24     A. I have not spoken to them.
25     Q. But your allegations in your

1          O. IVEY
2  complaint say that you fully complied with the
3  EmPact agreement, is that right?
4      A.  Yes.
5      Q.  Okay.  But you don't know for sure
6  if others fully complied with the EmPact
7  agreement, right?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't know.
10      Q.  Let's put this aside.  We'll be
11  referring back to it later today.
12          (Defendants' Exhibit 11, Reply
13      Memorandum of Law in Further Support of
14      the Warner Defendants' Motion to Compel
15      was previously marked for
16      identification.)
17      Q.  Ms. Ivey I'm showing you a document
18  marked yesterday as exhibit 11.  It's dated
19  December 13, 2022 and it's titled Reply
20  Memorandum of Law in Further Support of the
21  Warner Defendants' Motion to Compel
22  Arbitration.
23          Have you seen this document before?
24      A.  Yes.
25      Q.  And have you reviewed it before?

1          O. IVEY
2      A.  Yes.
3      Q.  And do you maintain it in your
4  files?
5          ATTORNEY BRUSTEIN:  Objection.
6      A.  More than likely, yeah.
7      Q.  And do you recall when you reviewed
8  this document before?
9          ATTORNEY BRUSTEIN:  Objection.
10      A.  I don't remember.
11      Q.  Do you recall when you received
12  this?
13          ATTORNEY BRUSTEIN:  Objection.
14      A.  I don't remember.
15          (Defendants' Exhibit 12, Notice of
16      Motion to Dismiss, Memorandum of Law in
17      Support of the Warner Defendants' Motion
18      to Dismiss the Complaint was previously
19      marked for identification.)
20      Q.  Ms. Ivey, I am going to show you a
21  document that has been marked yesterday as
22  exhibit 12, and it's dated December 5, 2022
23  and its titled Notice of Motion to Dismiss,
24  and two pages in there's a Memorandum of Law
25  in Support of the Warner Defendants' Motion to

1          O. IVEY
2  Dismiss the Complaint.
3          Have you seen this before?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  Yes.
6      Q.  And do you know what it's in
7  reference to?
8      A.  I think it's in reference to a
9  motion to dismiss the case.
10      Q.  You previously testified that you
11  are aware that there were motions to dismiss
12  the complaint in this action, right?
13      A.  Yes.
14      Q.  Are you aware that there were two
15  motions to dismiss the complaint in this
16  action?
17          ATTORNEY BRUSTEIN:  Objection.
18      A.  Yes.
19      Q.  Do you recall when they were filed?
20      A.  I don't remember dates.
21      Q.  Do you know whether any are
22  currently pending?
23      A.  I don't -- I don't know.  I don't
24  remember.
25          (Defendants' Exhibit 13,

1          O. IVEY
2      Declaration of Elizabeth Ortiz was
3      previously marked for identification.)
4      Q.  Ms. Ivey, I am going to show you a
5  document marked exhibit 13.  This is a
6  document dated December 2, 2022 and it's
7  titled Declaration of Elizabeth Ortiz.
8          Have you seen this before?
9          ATTORNEY BRUSTEIN:  Objection.
10      A.  I don't remember if I saw this
11  before.  I don't remember.  I don't remember
12  if I've seen this before.
13          (Defendants' Exhibit 14, Notice of
14      Motion to Dismiss, Memorandum of Law in
15      Support of the Warner Defendants' Motion
16      to Dismiss was previously marked for
17      identification.)
18      Q.  Ms. Ivey, I am going to show you a
19  document marked exhibit 14.  It's dated
20  January 20, 2023 titled Notice of Motion to
21  Dismiss and Memorandum of Law in Support of
22  the Warner Defendants' Motion to Dismiss the
23  Amended Complaint on the third page.
24          Have you seen this document before?
25      A.  I don't remember if I have seen

O. IVEY

1   this document before.
2   Q.  Do you believe as a class
3   representative it's your responsibility to
4   review all documents that have been filed in
5   this lawsuit?
6   ATTORNEY BRUSTEIN:  Objection.
7   A.  Yes.
8   Q.  But you just testified that you
9   don't recall whether or not you've seen that
10  document before, is that right?
11  A.  Right.  Because it's a lot of
12  documents and it's -- its a lot of documents.
13  I don't remember -- I read documents that are
14  presented to me and sometimes I don't
15  remember -- it's a lot.  And I'm not -- I'm
16  not a legal mind.
17  (Defendants' Exhibit 15,
18  Declaration of Elizabeth Ortiz with
19  exhibits was previously marked for
20  identification.)
21  Q.  I am going to show you a document
22  marked exhibit 15.  This is dated December --
23  sorry -- January 19, 2023.  It's titled
24  Declaration of Elizabeth Ortiz.
25

O. IVEY

1   Have you seen this document before?
2   ATTORNEY BRUSTEIN:  Objection.
3   A.  I don't remember if I have seen
4   this document before.
5   (Defendants' Exhibit 16,
6   Plaintiffs' Memorandum of Law in
7   Opposition to Defendants' Hotel 57
8   Services Motion to Dismiss the Amended
9   Complaint was previously marked for
10  identification.)
11  Q.  Ms. Ivey, I am going to show you a
12  document marked exhibit 16.  It's dated
13  February 7, 2023.  It's titled Plaintiffs'
14  Memorandum of Law in Opposition to Defendants'
15  Hotel 57 Services LLC, Hotel 57 LLC, Ty Warner
16  Hotels & Resorts LLC and H. Ty Warner's Motion
17  to Dismiss LLC.
18  Have you seen this document before?
19  ATTORNEY BRUSTEIN:  Objection.
20  A.  I don't remember if I've seen this
21  document before.
22  Q.  Do you know whether this document
23  identifies the withdrawal of any of the
24  allegations in the complaint?
25

O. IVEY

1   ATTORNEY BRUSTEIN:  Objection.
2   A.  I don't remember -- I would have to
3   look.  I don't remember if I would have seen it
4   before.  I don't remember, so I wouldn't know
5   that.
6   ATTORNEY BRUSTEIN:  I am going to
7   need just a minute.
8   ATTORNEY LUNDY:  Sure.
9   ATTORNEY BRUSTEIN:  I don't mean to
10  go off the record.  I mean to find 17.
11  ATTORNEY LUNDY:  Oh, sure.
12  ATTORNEY BRUSTEIN:  We had a good
13  run, but ...
14  ATTORNEY LUNDY:  Yes.  You can take
15  my copy.  It's okay (handing.)
16  ATTORNEY BRUSTEIN:  Thank you.
17  (Defendants' Exhibit 17,
18  Declaration of Evan Brustein with
19  exhibits was previously marked for
20  identification.)
21  Q.  Ms. Ivey, I am going to show you a
22  document that has been marked exhibit 17.
23  Have you seen this document before?
24  (The witness reviews document.)
25

O. IVEY

1   A.  I'll see if something jogs my
2   memory about which document this is.  I don't
3   remember.
4   Q.  And this document is titled
5   Declaration of Evan Brustein, is that right?
6   A.  Yes.
7   Q.  And on the second page it's a
8   Memorandum of Law in Opposition to Petition
9   For Appointment of Arbitrators?
10  ATTORNEY BRUSTEIN:  Objection.
11  ATTORNEY LUNDY:  Strike that,
12  please.
13  A.  Yeah, I see that second page.
14  (Defendants' Exhibit 19, Reply
15  Memorandum of Law in Further Support of
16  the Warner Defendants' Motion to Dismiss
17  the Amended Complaint was previously
18  marked for identification.)
19  Q.  Ms. Ivey, I am going to show you a
20  document marked exhibit 19.  It's dated
21  February 14, 2023.  And it's a Reply
22  Memorandum of Law in Further Support of the
23  Warner Defendants Motion to Dismiss the
24  Amended Complaint.
25

Page 78

O. IVEY

1          O. IVEY
2       Have you seen this before?
3    A.  I don't remember.
4       ATTORNEY BROMBERG:  Did we skip 18?
5       ATTORNEY LUNDY:  We did.
6       ATTORNEY BROMBERG:  Just making
7    sure.
8       ATTORNEY BRUSTEIN:  Are you done
9    with that segment?
10      ATTORNEY LUNDY:  Yes.  Do you want
11   to take a break?
12      ATTORNEY BRUSTEIN:  I think a
13   five-minute break?
14      ATTORNEY LUNDY:  Sure.  That works.
15      ATTORNEY BRUSTEIN:  Thank you.
16         ---
17   (Recess from 11:21 to 11:31.)
18         ---
19      ATTORNEY LUNDY:  Back on the
20   record.
21   Q.  Ms. Ivey, as a plaintiff in this
22   matter, do you understand that you have an
23   obligation in this lawsuit to cooperate in the
24   production of documents and information?
25   A.  Yes.

Page 79

O. IVEY

1    Q.  Can you please describe what you
2    have done to cooperate in the production of
3    documents and information?
4       ATTORNEY BRUSTEIN:  Objection and
5       I'm going to direct her to exclude from
6       that answer communications and providing
7       documents or receiving documents with
8       counsel.
9    Q.  Ms. Ivey, what did you
10   independently do to identify and locate any
11   documents to be produced in this lawsuit?
12   A.  I searched for all correspondence
13   that I received.
14   Q.  How did you search for those
15   correspondence?
16   A.  On my email.
17   Q.  Anything else?
18   A.  Any mails that I might have
19   received.
20   Q.  When you say "mails" what do you
21   mean?
22   A.  Any mail from -- well, I received a
23   mail from Principal, so I turned it over.
24   Q.  Anything else?
25

Page 80

O. IVEY

1    A.  That's basically it.
2    Q.  Do you maintain any hard copy files
3    pertaining to your employment at the hotel?
4       ATTORNEY BRUSTEIN:  Objection.
5    A.  No.
6    Q.  Do you maintain any electronic
7    files pertaining to your employment at the
8    hotel?
9       ATTORNEY BRUSTEIN:  Objection.
10   A.  I have my emails.
11   Q.  Anything else?
12   A.  No.
13   Q.  Ms. Ivey, I am going to show you a
14   document that was previously marked yesterday
15   as exhibit 20.
16      (Defendants' Exhibit 20,
17   Plaintiffs' Rule 26 (A)(1)(A) Initial
18   Disclosures was previously marked for
19   identification.)
20   Q.  Ms. Ivey, I have shown you a
21   document that's been previously marked as
22   exhibit 20.  Have you seen this document
23   before?
24   A.  In this entirety, no.
25

Page 81

O. IVEY

1    Q.  And if you turn to the second page
2    you'll see at the bottom there are markings --
3    you'll see markings Staley v FSR 0001.  Do you
4    see that?
5    A.  No.  On --
6       ATTORNEY BRUSTEIN:  You said the
7       second page.
8       ATTORNEY LUNDY:  I'm sorry.  I
9       wasn't looking at the actual document.
10   Q.  Beginning at the production.
11   A.  This one here?
12   Q.  Correct.
13   A.  Okay.
14   Q.  And do you see at the bottom of
15   that page the marking Staley v FSR 0001?
16   A.  Yes.
17   Q.  And if you turn to the last page
18   you'll see a different number in the same
19   location, and that is Staley v FSR 0261.  Do
20   you see that?
21   A.  Yes.
22   Q.  And is it your understanding that
23   the documents marked Staley v FSR 0001 through
24   Staley v FSR 0261 was the entire initial

O. IVEY

1       O. IVEY
2   production of plaintiffs in this matter?
3       ATTORNEY BRUSTEIN: Objection.
4       A.  I am assuming it is.
5       Q.  Ms. Ivey, if you turn back to the
6   first document, which is titled Plaintiffs'
7   Rule 26 (A)(1)(A) Initial Disclosures, and if
8   you turn to, it's under section B.  And you
9   will see the identifiers that we were just
10  referencing, Staley v FSR 0001.  Do you see
11  that?
12      A.  Yes.
13      Q.  In section B?
14      A.  Yes.
15      Q.  Can you review B for a moment and
16  let me know when you're done.
17      A.  Okay.
18      (The witness reviews document.)
19      A.  Okay.
20      Q.  You previously testified that you
21  had gathered responsive documents and
22  information in connection with this lawsuit.
23  Are any of those documents that you were
24  referring to identified in this section B of
25  this document?

O. IVEY

1       O. IVEY
2       (The witness reviews document.)
3       A.  Yes.
4       Q.  Do you recall when you gathered
5   responsive documents for this lawsuit?
6       A.  I don't remember the date, no.
7       Q.  Do you recall whether it was before
8   December 26, 2022?
9       ATTORNEY BRUSTEIN: Objection.
10      A.  I don't remember.
11      Q.  Well, if the documents were
12  produced in or about December 26, 2022 it's
13  fair to say that it would have been before
14  that date, right?
15      ATTORNEY BRUSTEIN: Objection.
16      A.  That's fair to say.
17      Q.  Have you done anything since
18  December 26, 2022 to gather any additional
19  responsive documents or information in
20  connection with this lawsuit?
21      A.  I don't remember doing so.
22      Q.  Ms. Ivey, I am going to -- you can
23  put this aside.  Thank you.
24      (Defendants' Exhibit 21,
25      Plaintiffs' First Supplemental

O. IVEY

1       O. IVEY
2       Disclosures was previously marked for
3       identification.)
4       Q.  Ms. Ivey, I am going to show you a
5   document that was marked yesterday as exhibit
6   21.  Have you seen this before?
7       A.  I don't remember seeing this
8   document, no.
9       Q.  I'm sorry, I didn't hear you,
10  Ms. Ivey?
11      A.  I don't remember seeing this
12  document, no.
13      Q.  Okay.  This document references at
14  number 1, "audio recording on the June 25,
15  2021 Zoom meeting," and then it references
16  that same Staley v FSR with a new number,
17  0262.
18      A.  Mm-hmm.
19      Q.  Do you know what that's referring
20  to?
21      ATTORNEY BRUSTEIN: Objection.
22      A.  It's referring to the meeting on
23  June 25, 2021.
24      Q.  Have you heard any recording from a
25  meeting that occurred on June 25, 2021?

O. IVEY

1       O. IVEY
2       A.  Yes.
3       Q.  When did you hear that recording?
4       ATTORNEY BRUSTEIN: Objection.
5       A.  I don't remember the date.
6       Q.  What meeting are you referring to?
7       A.  It was a meeting that was held on,
8   I think it was Zoom, with the Four Seasons
9   Hotel midtown and all employees that wanted to
10  log on, and Elizabeth Ortiz was on, as were
11  some other Four Seasons, um, folks.  I don't
12  remember their names.
13      Q.  Do you know who was on the Zoom
14  meeting call other than those you've already
15  identified?
16      A.  There were a lot of employees on.
17  There was a lot of people on, so I don't -- I
18  don't recall who else was on.
19      Q.  Do you know who recorded the June
20  25, 2021, it was a Teams meeting, do you know
21  who recorded that?
22      A.  I don't know who did.
23      Q.  Who gave you a copy of the
24  recording?
25      ATTORNEY BRUSTEIN: Objection.  To

O. IVEY

1
2    the extent that that involves
3    attorney-client communication, I would
4    direct her not to answer. If it came
5    from some source other than
6    attorney-client communication she can
7    answer.
8    Q.   Can you answer the question?
9    A.   No.
10   Q.   Okay. But you don't know who
11   recorded the June 25, 2021 --
12   A.   No.
13   Q.   -- Teams meeting?
14   A.   No.
15   Q.   How many times have you listened to
16   the recording?
17   A.   I listened to it once.
18   Q.   At the time that the June 25, 2021
19   Teams meeting was occurring did you know it
20   was being recorded?
21   A.   No.
22       ATTORNEY BRUSTEIN:   Objection.
23   Q.   Did anyone on the Teams meeting
24   advise you that it was being recorded?
25       ATTORNEY BRUSTEIN:   Objection.

O. IVEY

1
2    A.   No.
3    Q.   Where were you located when the
4    Teams meeting on June 25, 2021 was occurring,
5    physically?
6    A.   In my house.
7    Q.   And where is your house?
8    A.   In Brooklyn.
9    Q.   You previously testified that there
10   were a lot of other employees on the Teams
11   meeting call. Do you know where they were
12   located?
13   A.   No.
14   Q.   Is it possible that they were out
15   of state?
16       ATTORNEY BRUSTEIN:   Objection.
17   A.   I don't know.
18   Q.   Do you know whether everyone on
19   that call was located in New York State?
20       ATTORNEY BRUSTEIN:   Objection.
21   A.   I don't know where they were.
22   Q.   And during that Teams meeting call
23   did you ask any questions?
24   A.   No.
25   Q.   Did you submit any questions by any

O. IVEY

1
2    written format during that Teams meeting?
3    A.   I had questions but they would be
4    repetitive for me to ask, because they were
5    being asked.
6    Q.   My question was did you submit any
7    written questions?
8    A.   No. I don't remember submitting
9    any.
10   Q.   Ms. Ivey, I am going to refer you
11   to another document. This one is marked
12   exhibit 24.
13       (Defendants' Exhibit 24,
14   Defendants' First Demand For Production
15   of Documents was previously marked for
16   identification.)
17   Q.   Have you seen this document before?
18   A.   Yes.
19   Q.   Can you identify it for me, please?
20   A.   It's --
21       ATTORNEY BRUSTEIN:   Objection.
22   A.   -- it was basically the document
23   asking us to produce documents.
24   Q.   Do you recall when you saw this
25   document?

O. IVEY

1
2    A.   I don't remember now.
3    Q.   You previously testified that you
4    gathered certain documents in connection with
5    this lawsuit, right?
6    A.   Yes.
7    Q.   And is this the document that you
8    reviewed to determine what records should be
9    produced in this matter?
10       ATTORNEY BRUSTEIN:   Objection.
11   A.   I don't remember if this was the
12   document that I used, but I do know that a
13   list was provided.
14   Q.   That's fine. Do you know whether
15   or not the Warner defendants ever served
16   additional requests for documents?
17       ATTORNEY BRUSTEIN:   Objection.
18   A.   Yes.
19   Q.   Do you recall when that was?
20   A.   I don't remember.
21   Q.   Do you know whether or not the
22   Warner defendants ever served any additional
23   requests for documents or information?
24       ATTORNEY BRUSTEIN:   Objection.
25   A.   Any additional from the first time?

Page 90

O. IVEY

1
2    Q.  Yes.
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I believe that we had two
5    requests -- or we had more than one request.
6    There was an initial request and then there
7    was an additional request that they needed
8    additional information.
9        Q.  When you say "they" are you
10   referring to the defendants?
11   A.  Yes.
12       (Defendants' Exhibit 25,
13   Plaintiffs' Responses and Objections to
14   Defendants' First Request For Production
15   of Documents was previously marked for
16   identification.)
17   Q.  Ms. Ivey, I am showing you a
18   document marked exhibit 25.  Have you seen
19   this document before?
20       ATTORNEY BRUSTEIN:  Objection.
21   A.  I don't remember seeing it.  I
22   don't remember.
23   Q.  Do you recall reviewing this
24   document before?
25   A.  I don't remember.

Page 91

O. IVEY

1
2    Q.  Throughout the document, let's turn
3    to page 20 as an example, document request
4    number 44.  The document request seeks "all
5    documents concerning any administrative
6    hearing, lawsuit or legal proceeding" --
7        ATTORNEY LUNDY:  Strike that.
8    Q.  Ms. Ivey, I am going to refer you
9    to page 4, please.  Document request No. 2.
10   The request seeks:  "All documents concerning
11   communications among plaintiffs concerning the
12   subject matter of this action and any of the
13   factual allegations and/or claims in the
14   complaint, specifically including, without
15   limitation plaintiffs hire and termination of
16   employment at the hotel by any of the
17   defendants."
18       You previously testified that you
19   have text messages with Ms. Holmes, is that
20   right?
21       ATTORNEY BRUSTEIN:  Objection.
22   A.  Yes, we text.
23   Q.  And you previously testified that
24   those text messages with Ms. Holmes pertained
25   to your employment at the hotel, is that

Page 92

O. IVEY

1
2    right?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  Could you rephrase?  It has to do
5    with -- we text about friends, family.
6    Q.  But you --
7    A.  We also text about if we would be,
8    you know, when we would be going back to work.
9    Q.  And have those text messages been
10   produced in this matter?
11       ATTORNEY BRUSTEIN:  Objection.
12   A.  I don't recall.
13   Q.  Thank you.
14       (Defendants' Exhibit 26,
15   Defendants' First Set of Interrogatories
16   was previously marked for
17   identification.)
18   Q.  Ms. Ivey, I am going to show you a
19   document marked exhibit 26.  Have you seen
20   this before?
21       (The witness reviews document.)
22       ATTORNEY BRUSTEIN:  Objection.
23   A.  I think I have, yes.
24   Q.  Do you recall when you saw it?
25   A.  I don't remember the date, no.

Page 93

O. IVEY

1
2    Q.  The document is titled Defendants'
3    First Set of Interrogatories.  Have you
4    gathered any information in connection with
5    this lawsuit to be produced in discovery in
6    this matter?
7    A.  Could you please repeat?  I'm
8    sorry?
9    Q.  Similar to gathering documents for
10   the production in this lawsuit for discovery,
11   did you also gather information that should be
12   produced as a plaintiff and a class
13   representative in this lawsuit?
14       ATTORNEY BRUSTEIN:  Objection.
15   A.  Yes.
16   Q.  Let's turn to interrogatory No. 1.
17   It says:  Identify by name, address, telephone
18   number and relationship to plaintiffs all
19   persons with knowledge of information
20   concerning and relevant to the subject matter
21   of this action and a brief description of that
22   knowledge.
23       You previously testified that you
24   have spoken to other teams members concerning
25   your status of employment at the hotel.  Did

O. IVEY

1    O. IVEY
2    you identify those individuals in response to
3    interrogatory No. 1?
4        ATTORNEY BRUSTEIN:  Objection.
5        A.  I did not communicate with them as
6    far as titles.  They were asking if we knew
7    when the hotel would reopen, if we would be
8    going back to work.  That kind of thing.  To
9    which I did not have an answer for them.
10       Q.  Do you believe this lawsuit
11   pertains to whether or not the hotel is going
12   to reopen?
13       ATTORNEY BRUSTEIN:  Objection.
14       A.  No.  This lawsuit pertains to the
15   fact that we were terminated without proper
16   warning or any form of compensation.
17       Q.  As you sit here today, do you
18   believe that all of the employees from the
19   hotel believe that they have been terminated
20   from their employment from the hotel?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  I don't know what they believe.
23       Q.  Do you believe that some of those
24   employees expect to be recalled if the hotel
25   reopens?

O. IVEY

1    O. IVEY
2        ATTORNEY BRUSTEIN:  Objection.
3        A.  I don't know what they expect.
4        Q.  Would it surprise you to learn that
5    Ms. Holmes would like to be recalled if the
6    hotel reopened?
7        ATTORNEY BRUSTEIN:  Objection.
8        A.  Nothing surprises me.
9        Q.  Are you aware that employees from
10   the hotel continue to work from that property
11   at 57 East 57th Street to this day?
12       ATTORNEY BRUSTEIN:  Objection.
13       A.  I don't know what happens at that
14   hotel.  I have not been there in three years.
15   So I don't know.  I've been there once to see
16   Ms. Ortiz to pick up my clothes, and, um, I am
17   assuming yes, there was security there, that
18   was the only person I saw, and Ms. Ortiz.
19       Q.  Thank you.
20           (Defendants' Exhibit 27,
21   Plaintiffs' Responses and Objections to
22   Warner Defendants' First Set of
23   Interrogatories was previously marked
24   for identification.)
25       Q.  Ms. Ivey, I am showing you a

O. IVEY

1        O. IVEY
2    document marked exhibit 27.  Have you seen
3    this before?
4        ATTORNEY BRUSTEIN:  Objection.
5        (The witness reviews document.)
6        A.  Yes, I think I've seen this before.
7        Q.  It's titled Plaintiffs' Responses
8    and Objections to Warner Defendants' First Set
9    of Interrogatories, is it not?
10       A.  That's what it says, yes.
11       Q.  If you could please --
12       ATTORNEY LUNDY:  We're going to
13   have our first exhibit today.  You can
14   keep that to the side, if you don't
15   mind.
16       ATTORNEY BRUSTEIN:  Off the record?
17       (Discussion off the record.)
18       (Defendants' Exhibit 59,
19   verification was marked for
20   identification).
21       Q.  Ms. Ivey, I am going to show you a
22   document that's been marked exhibit 59.
23       ATTORNEY BRUSTEIN:  Just one page.
24       ATTORNEY LUNDY:  Yes, just one
25   page.

O. IVEY

1        O. IVEY
2        Q.  Please keep exhibit 27 still
3    available.
4            Ms. Ivey, looking at exhibit 59, is
5    that your signature on the document?
6        A.  Yes, it is.
7        Q.  It says:  I am one of the
8    plaintiffs in the within action.  I have read
9    the foregoing plaintiffs' responses and
10   objections to Warner defendants' first set of
11   interrogatories.  I know the contents thereof,
12   the contents are true to the best of my
13   knowledge and information and belief.
14           Is your verification in reference
15   to exhibit 27?
16       A.  Yes.
17       Q.  And as you sit here today, is it
18   your understanding that the responses are true
19   and accurate to the best of your knowledge?
20       A.  Yes.
21           (Defendants' Exhibit 60, documents
22   was marked for identification).
23       Q.  Ms. Ivey, I have just handed you a
24   document that has been marked as exhibit 60.
25   If you would take a minute and review those

O. IVEY

1  O. IVEY
2  documents, please.
3      ATTORNEY BRUSTEIN: I'm sorry. The
4  first two pages don't have any Bates
5  numbers?
6      ATTORNEY LUNDY: Unfortunately at
7  times when we print out the production
8  it doesn't always have your Bates
9  numbers on them.
10     ATTORNEY BRUSTEIN: Okay. So you
11 are representing that these were Bates
12 numbered documents?
13     ATTORNEY LUNDY: Correct.
14     ATTORNEY BRUSTEIN: Okay. I just
15 wanted to make sure that there wasn't --
16     ATTORNEY BOLAND: It's a pain in
17 the ass to print them for some reason.
18 I don't know why.
19     ATTORNEY BROMBERG: Just for the
20 record, what's the first Bates number on
21 this?
22     ATTORNEY LUNDY: 90.
23     ATTORNEY BROMBERG: And the last
24 number is? It's cut off.
25     ATTORNEY LUNDY: Let's just focus

O. IVEY

1      on documents that appear to be from
2  Staley v FSR 0090 through Staley v FSR
3  103.
4      Q. Have you reviewed those documents,
5  Ms. Ivey?
6      A. Yes.
7      Q. Okay. Have you seen these
8  documents before?
9      A. Yes. The ones that I am looking
10 at, yes.
11     Q. And on the first page it says OM
12 Rodriguez?
13     A. Mm-hmm.
14     Q. And it lists an address at 65 East
15 81st Street, Brooklyn, New York 11236. Is
16 that your address?
17     A. Yes.
18     Q. And is the reference to OM
19 Rodriguez, to the best of your knowledge,
20 referring to you?
21     A. It is, yes.
22     Q. As you sit here today, is it your
23 understanding that documents marked at exhibit
24 60 are the documents that you have been able

O. IVEY

1      O. IVEY
2  to locate in connection with this lawsuit?
3      ATTORNEY BRUSTEIN: Objection.
4      A. Yes.
5      ATTORNEY BRUSTEIN: You're asking
6  about just that one page?
7      ATTORNEY LUNDY: I was talking
8  about the whole set, exhibit 60.
9      ATTORNEY BRUSTEIN: I'm just
10 confused by your question because you
11 said eleven pages you're directing her
12 attention and then the whole set? Are
13 you referring to the entire exhibit or
14 the eleven pages you asked her to look
15 at.
16     ATTORNEY LUNDY: Let me break it
17 down.
18     Q. Ms. Ivey, turning back to exhibit
19 60, from pages marked Staley v FSR 90 through
20 103 --
21     A. There's no -- okay. All right.
22     Q. Have you seen these documents
23 before?
24     A. Yes.
25     Q. And is it your understanding that

O. IVEY

1      these are documents that you located for the
2  production in this lawsuit?
3      A. Yes.
4      Q. And for the remaining pages of
5  exhibit 60, have you seen those pages before?
6      ATTORNEY BRUSTEIN: I'm just going
7  to object because these clearly, some of
8  them are partial pages.
9      ATTORNEY LUNDY: That's how they
10 were produced to us. So I'm just trying
11 to --
12     ATTORNEY BRUSTEIN: Well, they were
13 produced in electronic form.
14     ATTORNEY LUNDY: Right, and when we
15 printed them out this is how they
16 appear. So I am just asking her if
17 she's seen these documents before as
18 they appear.
19     A. I'm not sure what these two are
20 (indicating).
21     Q. Okay. And the document beginning
22 at Staley v FSR 107, have you seen that
23 before?
24     A. Yes.

O. IVEY

1
2   Q.  Thank you.
3       ATTORNEY BRUSTEIN:  Are you done
4   with 60?
5       ATTORNEY LUNDY:  I am.  Thank you.
6   Q.  Ms. Ivey, when did you first apply
7   for a job at the hotel?
8       ATTORNEY BRUSTEIN:  Objection.
9   A.  That was a long time ago.  That was
10  in October of -- I don't remember.  90 ...
11  this year will be 25 years.  So it would be 25
12  years ago.  What is that, '97?
13  Q.  Approximately 1997?
14  A.  Yes.
15  Q.  And what position did you apply for
16  back --
17  A.  Room attendant.
18  Q.  And were you hired as a room
19  attendant at the hotel?
20  A.  Yes.
21  Q.  And was that in approximately 1997?
22  A.  Approximately, yes.
23  Q.  Did you hold other positions at the
24  hotel?
25  A.  Yes.

O. IVEY

1
2   Q.  What other positions have you held?
3   A.  I was a telephone operator.
4   Q.  For how long were you a telephone
5   operator?
6   A.  Over a year.  I was reservations
7   agent.  I was a front office coordinator.  I
8   was a housekeeping floor supervisor.  I was a
9   housekeeping assistant manager.  And I was a
10  senior housekeeping manager.
11  Q.  When were you elevated to senior
12  housekeeping manager?
13  A.  I don't remember.  I don't remember
14  dates.  I know it was prior to -- it was
15  probably in 2019.  Approximately 2019.
16  Q.  We're going to refer back to
17  exhibit 10.
18      Ms. Ivey, we previously discussed
19  exhibit 10 and specifically the EmPact
20  agreement attached to it, is that right?
21  A.  Yes.
22  Q.  And you previously testified that
23  this was -- strike that.
24      You previously testified that you
25  signed this EmPact agreement, is that right?

O. IVEY

1
2   A.  Yes.
3   Q.  Did you receive the EmPact
4   agreement in the course of your employment
5   with Hotel 57 Services, LLC?
6   A.  Yes.
7   Q.  And did you review the EmPact
8   agreement at the time you signed it?
9   A.  Yes.
10  Q.  In January of 2020 you were a
11  manager at the hotel, is that right?
12  A.  Yes.
13  Q.  You were the senior housekeeping
14  manager?
15  A.  Yes.
16  Q.  And in that role what were your
17  responsibilities?
18      ATTORNEY BRUSTEIN:  Objection.
19  A.  I was responsible for the daily
20  operations of the housekeeping department,
21  supervising supervisors, room attendants,
22  housemen.  Ensure to cleanliness of the hotel,
23  basically.
24  Q.  What does it mean to supervise
25  supervisors?

O. IVEY

1
2   A.  So I supervised a staff.  There are
3   the supervisors who supervise the staff but I
4   also needed to oversee everything that was
5   being done on my shift for the day.
6   Q.  Did you receive training for that
7   role?
8   A.  Yes.
9   Q.  Did you have individuals that
10  reported into you?
11      ATTORNEY BRUSTEIN:  Objection.
12  A.  Yes.
13  Q.  How many individuals reported into
14  you?
15  A.  It differs on a daily basis.
16  Q.  Did you consider yourself to be a
17  supervisor?
18  A.  I considered myself to be a
19  manager.
20  Q.  And how many individuals did you
21  manage on a day-to-day basis?
22  A.  It differs.
23  Q.  How much did it differ?
24      ATTORNEY BRUSTEIN:  Objection.
25  A.  It differs significantly based on

O. IVEY

1 occupancy.
2
3 Q. Can you give me a general range of
4 how much it could differ?
5 ATTORNEY BRUSTEIN: Objection.
6 A. It just is really dependent on how
7 much -- how many people are reporting to work
8 that day. So on a slow day, holidays or
9 during slow season it can be twenty people or
10 thirty people. And on a day that we're
11 running at high occupancy it can be 70 people,
12 or even more. It really fluctuates based on
13 occupancy.
14 Q. In January 2020 did you have a
15 supervisor?
16 A. Yes.
17 Q. Who was your supervisor?
18 A. Well, I report to the director,
19 assistant director of housekeeping. And also
20 I report to the director of rooms.
21 Q. Can you identify those people for
22 me, please?
23 ATTORNEY BRUSTEIN: Objection.
24 A. The director of rooms is Sharon
25 Brambrut. The director -- we did not have a

O. IVEY

1
2 director of housekeeping -- well, a new hire
3 came on. Was she director or assistant
4 director? I don't remember if she was
5 director or assistant director. But her name
6 was Rasha.
7 Q. Do you know how to spell that?
8 A. R-a-s-h-a. I don't remember her
9 last name. She came on very shortly after
10 we -- she came on and she wasn't there for a
11 long time.
12 Q. Did she resign or something else?
13 A. No, she came on and then we -- she
14 was there for some months and then we were
15 sent home.
16 Q. Is Sharon Brambrut still employed
17 by Hotel 57 Services LLC?
18 ATTORNEY BRUSTEIN: Objection.
19 A. I don't know.
20 Q. When was the last time you spoke to
21 Sharon Brambrut?
22 A. When I went on task force.
23 Q. When did you go on task force?
24 ATTORNEY BRUSTEIN: Objection.
25 A. I don't remember the date. I spoke

O. IVEY

1
2 to her -- I know it was after I went to
3 Philadelphia. I spoke to her when I was
4 contacted to go downtown. Because I did a
5 stint downtown, so I remember her saying she
6 heard that I was going downtown.
7 Q. When you say downtown, is that --
8 A. Downtown Four Seasons. Downtown.
9 Q. When you say a stint, what do you
10 mean by that?
11 A. Task force.
12 Q. What's a task force?
13 A. Where we -- if another Four Seasons
14 needs help and employees from other Four
15 Seasons are available they have the option of
16 going there to work.
17 Q. You previously testified that you
18 also were on a task force in Philadelphia, is
19 that right?
20 A. Yes.
21 Q. When were you on a task force at
22 Four Seasons Philadelphia?
23 A. I don't remember the dates.
24 Q. Do you recall the year?
25 A. It might have been in '21 or '22.

O. IVEY

1 I think it was '21. It might have been '22.
2 ATTORNEY BRUSTEIN: I apologize, I
3 just want to interrupt. Because earlier
4 in the deposition you had defined Four
5 Seasons but now you're both using it to
6 refer to other Four Seasons. So I just
7 want to --
8 ATTORNEY LUNDY: Sure. Fair
9 enough. Thanks.
10 ATTORNEY BRUSTEIN: Make sure
11 that --
12 ATTORNEY LUNDY: The record's
13 clear. I appreciate that, thank you.
14 Q. Ms. Ivey, is it your recollection
15 that you were on task force at Four Seasons
16 Philadelphia in or about 2021 or in a
17 different year?
18 A. It's -- it's -- I think it might
19 have been 2021 or 2022. I think it's 2021,
20 though.
21 Q. Was the last time you spoke to
22 Ms. Brambrut when you were being assigned to
23 the task force for Four Seasons downtown?
24 ATTORNEY BRUSTEIN: Objection.
25

O. IVEY

1          O. IVEY
2    A.  Yes.
3    Q.  Prior to that assignment when was
4  your last conversation with Ms. Brambrut?
5    A.  I don't remember.
6    Q.  As a manager at the hotel were you
7  responsible for implementing any disciplinary
8  action of any employees from the housekeeping
9  staff in January of 2020?
10    A.  Yes, I was in charge of
11  implementing disciplinary action.
12    Q.  And what could that entail?
13    A.  Any breach of conduct.  Any
14  noncompliance to the rules, the regulations,
15  the standards.
16    Q.  Were you tasked with the
17  responsibility to hire and fire individuals
18  from the housekeeping staff?
19    A.  No.
20    Q.  But you were responsible for
21  disciplining members of the housekeeping
22  staff, right?
23        ATTORNEY BRUSTEIN:  Objection.
24    A.  Yes.
25    Q.  In January of 2020 were you

1          O. IVEY
2  responsible for recommending compensation
3  increases for housekeeping staff?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  No.
6    Q.  In March of 2020 who was the
7  general manager of the hotel?
8    A.  Rudy Tauscher.
9    Q.  During your employment with Hotel
10  57 Services, LLC have you ever spoken with H.
11  Ty Warner?
12    A.  No.
13    Q.  Have you ever had any interactions
14  with H. Ty Warner during your employment at
15  the hotel?
16        ATTORNEY BRUSTEIN:  Objection.
17    A.  I have gone to his room.
18    Q.  Have you ever --
19    A.  To do inspections.  But personal
20  interaction, no.
21        (Defendants' Exhibit 61, EmPact
22  documents was marked for
23  identification).
24    Q.  Ms. Ivey, I am showing you a
25  document that has been marked exhibit 61.

1          O. IVEY
2  There's three pages -- I'm sorry.  Four pages.
3  At the top of the first page in the second
4  paragraph it says "I, Olive Ivey-Williams."
5  Is that you?
6    A.  Yes.
7    Q.  And at the bottom of the page
8  there's a signature.  Is that your signature?
9    A.  Yes.
10    Q.  And turning to the next page it's
11  titled EmPact Summary and Understanding.  At
12  the bottom of the page it says "I, Olive
13  Ivey-Williams."  Is that your name?
14    A.  Yes.
15    Q.  And is that your signature at the
16  bottom of the page?
17    A.  Yes.
18    Q.  And turning to the next page, it's
19  titled EmPact Revisions Acknowledgment Form.
20  At the bottom is WARNERDEF_000100.
21    A.  Mm-hmm.
22    Q.  It says "Print Name," Olive
23  Rodriguez, is that you?
24    A.  It is me.
25    Q.  And is that your signature on the

1          O. IVEY
2  page?
3    A.  It is.
4    Q.  And it's dated April 18, 2018, is
5  that right?
6    A.  Yes.
7    Q.  And the next page, Bates-numbered
8  WARNERDEF_000101, also titled EmPact Revisions
9  Acknowledgment Form.
10        It appears to be an identical
11  document as the prior page, is that right?
12        ATTORNEY BRUSTEIN:  Objection.
13  Outside of the Bates number?
14        ATTORNEY LUNDY:  WARNERDEF_000100
15  and WARNERDEF_000101.
16    A.  Yes.
17    Q.  Is your signature on both of those
18  pages?
19    A.  Yes.
20    Q.  And they appear to be duplicates,
21  is that right?
22    A.  It does.
23    Q.  Okay.  Thank you.
24        ATTORNEY BRUSTEIN:  Are you done
25  with that one?

Page 114

O. IVEY

1
2    ATTORNEY LUNDY: Yes. Thank you.
3    I just have another line of questions
4    and maybe that would be a good great, at
5    that point?
6    ATTORNEY BRUSTEIN: Meaning after
7    or before?
8    ATTORNEY LUNDY: Before.
9    ATTORNEY BRUSTEIN: So now?
10   ATTORNEY LUNDY: Why don't we break
11   after the next set, does that work?
12   ATTORNEY BRUSTEIN: Yes. That's
13   why I said before or after, so I
14   understood what you meant.
15   ATTORNEY LUNDY: Yes.
16   (Defendants' Exhibit 62, 2019 Form
17   W-2 was marked for identification).
18   Q.  Ms. Ivey, I am showing you a
19   document that has been marked exhibit 62.
20   Have you seen this document before?
21   A.  Yes.
22   Q.  Can you identify it for me, please?
23   A.  It's my pay stub.
24   Q.  And when you say pay stub it's
25   referred to as a 2019 W-2 --

Page 115

O. IVEY

1
2    A.  W-2.
3    Q.  -- and earnings summary, is that
4    right?
5    A.  Yes.
6    Q.  And if you look at the top of the
7    page it says employer's name, address and ZIP
8    code, do you see that?
9    A.  Yes.
10   Q.  And it lists Hotel 57 Services,
11   LLC.  Do you see that?
12   A.  Yes.
13   Q.  And is it your understanding that
14   Hotel 57 Services, LLC issued your
15   compensation while working at the hotel?
16   ATTORNEY BRUSTEIN: Objection.
17   A.  Yes.
18   (Defendants' Exhibit 63, 2020 Form
19   W-2 was marked for identification).
20   Q.  Ms. Ivey, I am showing you a
21   document that has been marked exhibit 63.
22   Have you seen this before, please?
23   A.  Yes.
24   Q.  Can you identify it for me, please?
25   A.  It's my W-2.

Page 116

O. IVEY

1
2    Q.  From what year?
3    A.  2020.
4    Q.  And at the top of the page it
5    states employer's name address and ZIP code,
6    do you see that?
7    A.  Yes.
8    Q.  And it identifies your employer as
9    Hotel 57 Services, LLC, is that right?
10   A.  Yes.
11   Q.  Is that your understanding?
12   A.  Yes.
13   Q.  Thank you.
14   (Defendants' Exhibit 64, 2021 Form
15   W-2 was marked for identification).
16   Q.  Ms. Ivey, I am showing you a
17   document that has been marked exhibit 64.
18   Have you seen this document before?
19   A.  Yes.
20   Q.  Can you identify it for me, please?
21   A.  W-2, 2021.
22   Q.  And under Employer's it lists Hotel
23   57 Services, LLC, is that right?
24   A.  Yes.
25   Q.  And is it your understanding that

Page 117

O. IVEY

1
2    in 2021 your employer was Hotel 57 Services,
3    LLC?
4    ATTORNEY BRUSTEIN: Objection.
5    A.  Yes.
6    Q.  A little bit further down it
7    provides wages, do you see that?
8    A.  I can't -- okay.  I cannot see it
9    on this paper.
10   Q.  If you look to the right of the
11   document there's another column, it says
12   wages, tips and other compensation.  Do you
13   see that?
14   A.  Yes.
15   Q.  Okay.  And do you see that there's
16   funds -- strike that.
17   And below that wages, tips and
18   other compensation it lists an amount of
19   money, does it not?
20   ATTORNEY BRUSTEIN: Objection.
21   A.  Yes, it lists -- there are some
22   figures there.
23   Q.  And in 2021 did Hotel 57 Services,
24   LLC pay you any wages?
25   ATTORNEY BRUSTEIN: Objection.

O. IVEY

1
2     A.  In what year?
3     Q.  2021?
4     A.  Yes, according to this.
5     Q.  Do you recall what hours you worked
6  in 2021 at Hotel 57 Services, LLC?
7        ATTORNEY BRUSTEIN:  Objection.
8     A.  My hours varied.  I could work from
9  6:30 a.m. until 11 p.m.  It could be from 6:30
10  a.m. until 10 p.m.  6:30 to 6.  My day varies
11  based on workload.
12        ATTORNEY BRUSTEIN:  Can I just have
13     the last question read back?
14     Q.  Were you done with your answer?
15     A.  No.
16     Q.  Okay.  Why don't you finish
17  answering the question.
18     A.  So my work varied based on my
19  workload, and what it is that I needed to
20  complete on a daily basis.  My schedule time
21  would have been 6:30 a.m. to 5 p.m.  However,
22  it is not typical to leave in ten hours.  We
23  have ten hour days, but we are never able to
24  leave in ten hours.  So it varies.
25     Q.  And the schedule you were

O. IVEY

1
2  describing, what year were you working those
3  hours?
4     A.  2018, '19.  Every manager worked
5  those managers.  Well, most managers worked
6  ten hours -- all managers worked ten hours per
7  day.  In my capacity, in housekeeping, I am
8  required to work ten hours per day, but there
9  are longer days based on my workload.
10     Q.  Did you work --
11        ATTORNEY BRUSTEIN:  Can we take
12     a -- I don't know if you have a lot more
13     questions?
14        ATTORNEY LUNDY:  I have --
15        ATTORNEY BRUSTEIN:  I just know
16     we've been going for over an however,
17     so ...
18        ATTORNEY LUNDY:  I would like to
19     finish these line of questions.  It
20     won't take too long.
21     Q.  Ms. Ivey --
22        ATTORNEY BRUSTEIN:  One second.
23     Just listen to exactly what she's
24     asking.
25        THE WITNESS:  Okay.

O. IVEY

1
2     Q.  Ms. Ivey, do you recall the hours
3  that you worked in 2020 at the hotel?
4        ATTORNEY BRUSTEIN:  Objection.
5     A.  My hours varied.  I can tell you
6  that every day I started 6 -- most days I
7  start at 6:30 a.m.  But as far as what time I
8  leave, it varied.
9     Q.  Were you paid on a salary or hourly
10  basis?
11     A.  Salary.
12     Q.  And the individuals that reported
13  into you, that you managed, were they paid on
14  a salary or hourly basis?
15        ATTORNEY BRUSTEIN:  Objection.
16     A.  Hourly.
17     Q.  Do you recall the hours of work for
18  the individuals that reported into you in
19  2020?
20        ATTORNEY BRUSTEIN:  Objection.
21     A.  I recall their scheduled hours.
22     Q.  And what were those?
23     A.  It varies.
24     Q.  And what about in 2021, do you
25  recall the scheduled hours of work for the

O. IVEY

1
2  individuals that reported into you?
3        ATTORNEY BRUSTEIN:  Objection.
4     A.  I recall the scheduled hours for
5  whatever category of workers there were.  They
6  were --
7        ATTORNEY BRUSTEIN:  I would like to
8     take a two-minute break.
9        ATTORNEY LUNDY:  I mean I would
10     like to finish --
11        ATTORNEY BRUSTEIN:  I know but
12     you're asking questions where it's clear
13     that we've been going for more than an
14     hour.  I'm just asking for a two-minute
15     break.
16        ATTORNEY LUNDY:  Okay.  Take your
17     witness out.  That's fine.
18        ATTORNEY BRUSTEIN:  Thanks.
19           ---
20     (Recess from 12:29 to 12:36.)
21           ---
22     Q.  Ms. Ivey, do you know what other
23  employees of the hotel were paid in 2021?
24     A.  Paid what?
25     Q.  With respect to your team, the

Page 122

O. IVEY

1
2  housekeeping staff, do you know what members
3  of your housekeeping staff were paid in 2021?
4      ATTORNEY BRUSTEIN: Objection.
5      A.  You're talking about wages?
6      Q.  Compensation?
7      ATTORNEY BRUSTEIN: Objection.
8      A.  Well, there were no wages in 2021,
9  because we were on a pandemic, right?  So I
10 don't know of anyone getting -- what they got,
11 if anyone got any money, or paid to do
12 whatever.
13     Q.  Are you aware that employees of the
14 hotel continued to work in 2021?
15     ATTORNEY BRUSTEIN: Objection.
16     A.  (No response.)
17     ATTORNEY LUNDY: Withdrawn.
18     Q.  Ms. Ivey, are you aware that in
19 2021 hotel employees continued to receive
20 wages from the hotel?
21     ATTORNEY BRUSTEIN: Objection.
22     A.  I heard that they were getting some
23 form of payment.
24     Q.  Do you know who were?
25     A.  No.

Page 123

O. IVEY

1
2      Q.  Are you aware that individuals were
3  working and receiving wages from the hotel in
4  2021?
5      ATTORNEY BRUSTEIN: Objection.
6      A.  I heard that security was there, so
7  I'm assuming if there's security there, he
8  would be paid.
9      Q.  Are you aware of anyone else?
10     A.  We were told in the meeting that
11 engineering would stay there.  There would be
12 an engineer there, and security.  And
13 Ms. Ortiz.
14     Q.  So individuals employed by the
15 hotel continued to receive wages in 2021,
16 right?
17     ATTORNEY BRUSTEIN: Objection.
18     A.  I don't know.
19     Q.  You just testified that
20 individuals, security and Ms. Ortiz, continued
21 to be at the hotel in 2021, right?
22     ATTORNEY BRUSTEIN: Objection.
23     A.  That's what we were told.
24     Q.  Right.  So do you understand that
25 security and Ms. Ortiz continued to receive

Page 124

O. IVEY

1
2  wages in 2021 working at the hotel?
3      ATTORNEY BRUSTEIN: Objection.
4      A.  I'm assuming if they're working
5  they get wages.
6      Q.  And in 2021, we've already reviewed
7  exhibit 64, identifying the compensation that
8  you received from Hotel 57 Services, LLC, did
9  we not?
10     ATTORNEY BRUSTEIN: Objection.
11     A.  Yes.
12     (Defendants' Exhibit 65, earnings
13     statement was marked for
14     identification).
15     Q.  Ms. Ivey, have you seen this
16 document before?
17     A.  Yes.
18     Q.  Can you identify it for me, please?
19     A.  This is payment for my vacation
20 hours that was owed.
21     Q.  This is an earnings statement, is
22 that what the document is labeled as?
23     A.  Yes.
24     Q.  And below it, it lists Hotel 57
25 Services, LLC, do you see that?

Page 125

O. IVEY

1
2      A.  Yes.
3      Q.  And it's your understanding that
4  Hotel 57 Services, LLC was your employer, is
5  that right?
6      ATTORNEY BRUSTEIN: Objection.
7      ATTORNEY LUNDY: Strike that
8      question, please.
9      Q.  It's your understanding that Hotel
10 57 Services, LLC issued this earnings
11 statement?
12     ATTORNEY BRUSTEIN: Objection.
13     A.  Yes.
14     Q.  And it's your understanding that
15 Hotel 57 Services, LLC paid the sum listed in
16 this earnings statement?
17     ATTORNEY BRUSTEIN: Objection.
18     A.  Yes.
19     Q.  Under Earnings, if you see it says
20 vacation pay.  Is that right?
21     A.  Yes.
22     Q.  And it lists 24 hours, this period
23 913.38.  Do you know what that's referencing?
24     A.  It's vacation pay.
25     Q.  And at the top of the document it

Page 126

O. IVEY

1
2 says period beginning: July 16, 2022. Period
3 ending: July 22, 2022.
4       Do you see that?
5    A.  I see that.
6    Q.  So in July of 2022 you received a
7 payout of vacation in the amount of $913.38
8 from Hotel 57 Services, LLC, is that right?
9       ATTORNEY BRUSTEIN: Objection.
10    A.  That is correct.
11    Q.  You previously testified today that
12 you believe that your employment was
13 terminated in 2021?
14    A.  Yes.
15    Q.  Why would you be paid out vacation
16 in July of 2022 if you were terminated from
17 your employment from Hotel 57 Services, LLC?
18       ATTORNEY BRUSTEIN: Objection.
19    A.  This is vacation that was earned
20 prior to us going home from the pandemic, and
21 so this is vacation that was not being accrued
22 after COVID. It was just there. After being
23 home for so long, I needed to be paid out, we
24 were told that we had the option of cashing
25 out the vacation. And then after realizing

Page 127

O. IVEY

1
2 that we weren't going back to work and me
3 thinking that okay, I think I'm now
4 terminated, I opted to be paid out.
5    Q.  You believed, according to your
6 testimony earlier today, that you were
7 terminated from your employment in 2021,
8 right?
9    A.  Mm-hmm.
10    Q.  And as you sit here today your
11 testimony is that Hotel 57 Services paid you
12 out more than a year later your vacation pay
13 as a terminated employee?
14       ATTORNEY BRUSTEIN: Objection.
15    A.  I don't know why.
16    Q.  If you look under Information, it
17 says 401(k) eligible. Do you see that?
18    A.  Yes.
19    Q.  What do you understand that to
20 mean?
21       ATTORNEY BRUSTEIN: Objection.
22    A.  I understand it to mean that it is
23 eligible for 401(k) money to be taken from it.
24 However, if you notice that none was taken.
25    Q.  Would an individual who is no

Page 128

O. IVEY

1
2 longer employed with Hotel 57 Services still
3 be eligible for a 401(k)?
4       ATTORNEY BRUSTEIN: Objection.
5    A.  They would not be eligible.
6 However, if I was employed by Hotel 57, or by
7 the Four Seasons midtown and I have earnings
8 that my 401(k) contribution, which was
9 standing, would have been deducted. It
10 wasn't.
11    Q.  Your earnings statement identifies
12 that you were eligible for 401(k) in July of
13 2022, is that what this document says?
14       ATTORNEY BRUSTEIN: Objection.
15    A.  It does say that. But if you
16 notice that the $913, no contribution to my
17 401(k) was taken from it.
18    Q.  Do you know whether or not any
19 other employees of Hotel 57 Services also
20 received compensation in July of 2022?
21       ATTORNEY BRUSTEIN: Objection.
22    A.  I don't know.
23    Q.  In July of 2022 were you accruing
24 seniority at the hotel?
25       ATTORNEY BRUSTEIN: Objection.

Page 129

O. IVEY

1
2    A.  I couldn't have been accruing
3 seniority when I was terminated.
4    Q.  And when do you believe you were
5 terminated?
6       ATTORNEY BRUSTEIN: Objection.
7    A.  I think I was terminated, I don't
8 remember what date, but according to the
9 information I received from Principal, it
10 would appear that I was terminated in 2021.
11    Q.  Who is Principal?
12    A.  Principal is the company that
13 manages the 401(k) plan for the Four Seasons
14 Hotels and Resorts. I received a call from
15 them asking me what choices I would like to
16 make as far as my 401(k) monies, if I wanted
17 to cash it out with penalty or I had the
18 option of removing it and rolling it over into
19 another employer's plan, because I was no
20 longer employed by the Four Seasons. I asked
21 them how -- where did they get that
22 information from. And they said they were
23 informed by Four Seasons that I'm no longer an
24 employee there and therefore I would have the
25 option of moving my plan.

Page 130

O. IVEY

1
2  Q.  Is Principal your employer?
3      ATTORNEY BRUSTEIN:  Objection.
4  A.  No.
5  Q.  Was Principal ever your employer?
6  A.  No.  However, upon getting that
7  information from Principal, I did reach out to
8  Elizabeth Ortiz to advise her of what
9  transpired, the conversation I had with
10  Principal.  And her response to me was that
11  they should not have told me that.  And she
12  would take care of it.
13      I, um --
14  Q.  Do you know who employs --
15      ATTORNEY BRUSTEIN:  Wait.  I'm
16  sorry.  She was still in the middle of
17  speaking.  I just ask that she be able
18  to complete the answer.
19  Q.  I didn't mean to interrupt.
20  A.  She said she would take care of it.
21  And so I gave her some time.  I told her --
22  she never got back to me.  And I called.  I
23  didn't get her on the phone.  I never heard
24  anything from her after that.
25  Q.  Hotel 57 Services, LLC issued the

Page 131

O. IVEY

1
2  earnings statement in July of 2022, is that
3  right?
4      ATTORNEY BRUSTEIN:  Objection.
5  A.  Mm-hmm.
6  Q.  And for the W-2 forms that we've
7  reviewed from 2021 and 2020, it also lists
8  Hotel 57 Services, LLC as your employer, is
9  that right?
10      ATTORNEY BRUSTEIN:  Objection.
11  A.  That's correct.
12  Q.  Okay.  Ms. Ivey, what happened to
13  your 401(k)?
14  A.  Well, it's still in the Four
15  Seasons management plan, because I have that
16  option and I did not know -- well, I didn't --
17  I'm looking for -- I'll leave it there until I
18  have employment where I can roll it over.  I
19  think that would be the best, most financially
20  sound decision to make.
21  Q.  So it still remains in the same
22  location as it did --
23  A.  Yes.
24  Q.  -- back in 2021 when you were
25  corresponding with Principal, right?

Page 132

O. IVEY

1
2  A.  Yes.  I have the option of it
3  remaining there.  However, I cannot contribute
4  to it.
5      (Defendants' Exhibit 66,
6      WARNERDEF_00651 through WARNERDEF_00653
7      was marked for identification.)
8  Q.  Ms. Ivey, I have shown you a
9  document that has been marked exhibit 66.  At
10  the top it says Olive Rodriguez.  And if you
11  turn the page, it appears to be three separate
12  pages, Bates-numbered WARNERDEF_00651.  The
13  second page is WARNERDEF_00652.  And
14  WARNERDEF_00653.
15      Do you recognize this document?
16  A.  Yes.
17  Q.  Can you identify it for me, please?
18  A.  This is a message to Elizabeth
19  Ortiz about the communication that I received
20  from Principal, and what they told me.
21  Q.  Let's look at that.  The first
22  page, it says from Olive Rodriguez.
23  A.  Mm-hmm.
24  Q.  Hi Liz.  I was informed by
25  Principal that my status with the Four Seasons

Page 133

O. IVEY

1
2  has changed and I no am no longer with the
3  company since March 23.  Can you all shed some
4  light on this.
5      And there's a response:  Hi.  Who
6  is this?  Olive Rodriguez.  This is Olive.
7      And then the response is:  Oh,
8  sorry.  Hi Olive.  Your 401(k)?  There is no
9  status change.  Did you get a communication or
10  something?
11      Do you remember receiving that?
12  A.  Yes.
13  Q.  Do you recall when this text
14  message was sent?  What year?
15  A.  I don't remember, no.
16  Q.  It says Tuesday, May 17 at 3:02
17  p.m.  Do you see that?
18  A.  Yes.
19  Q.  All right.  And you previously
20  testified that you corresponded with Principal
21  in 2022, right?
22  A.  I don't remember what year I -- I
23  corresponded with them.  I've been getting
24  calls from them, multiple calls, actually, I
25  got from them.  But I do know that I spoke

Page 134

O. IVEY

1          O. IVEY
2 with them in 2022.
3          As far as when, dates, I don't
4 remember.
5     Q.  You previously testified today that
6 you came to the conclusion that your
7 employment was terminated from the hotel
8 because of your correspondence with Principal,
9 right?
10    A.  It wasn't just because of my
11 correspondence with Principal.  When we had
12 the meeting, the last meeting on the Zoom with
13 representatives from the Four Seasons, I left
14 that meeting thinking that I wasn't going back
15 to work.
16    Q.  When you say meeting with
17 representatives, are you referring to the town
18 hall meeting on --
19    A.  Yes.
20    Q.  -- June 25, 2021?
21    A.  Yes.
22    ATTORNEY BRUSTEIN:  Just wait for
23 her to finish the question.
24    THE WITNESS:  Thank you.
25    Q.  We've just reviewed documents

Page 135

1          O. IVEY
2 marked exhibit 65 from July of 2022
3 identifying the payout of vacation pay to you
4 from Hotel 57 Services, LLC, did we not?
5     A.  Yes.
6     Q.  All right.  And we're reviewing
7 exhibit 66, concerning your correspondence
8 with Ms. Ortiz regarding your 401(k), is that
9 right?
10    ATTORNEY BRUSTEIN:  Objection.
11    A.  Yes.
12    Q.  And is it your testimony that you
13 don't recall what year this text exchange
14 occurred?
15    A.  I don't remember what year, no.
16    Q.  Ms. Ivey, looking at our calendar,
17 it appears that May 17, 2022 was a Tuesday.
18 Does that refresh your recollection of whether
19 or not this text message was sent in 2022?
20    ATTORNEY BRUSTEIN:  Objection.  I
21 just want to correct the record.  We're
22 not looking at a calendar.
23    ATTORNEY BOLAND:  We are.
24    ATTORNEY BRUSTEIN:  Well, thank
25 you.  Ms. Lundy -- now that you're on

Page 136

1          O. IVEY
2 the record, that's helpful.  But
3 Ms. Lundy, if you would like to share a
4 calendar, that's fine.  Otherwise you're
5 just looking at a calendar by yourself.
6     Q.  Ms. Ivey, does Tuesday --
7 withdrawn.
8          Ms. Ivey, does it refresh your
9 recollection that on May 17 in 2022 it was a
10 Tuesday?
11    ATTORNEY BRUSTEIN:  Objection.
12    A.  No.
13    Q.  All right.  Let's move on.  Let's
14 just continue the full conversation between
15 you and Ms. Ortiz.  It says:  Did you get a
16 communication or something?  And on the next
17 page, Olive Rodriguez -- which is you, right?
18    A.  Mm-hmm.
19    Q.  You respond, I was called to make a
20 decision on my 401(k).  And the response is
21 "That's odd.  What decision?"
22          And Olive Rodriguez, which is you,
23 right?
24    ATTORNEY BRUSTEIN:  Objection.
25    Q.  Is that you?

Page 137

1          O. IVEY
2     A.  Yes.
3     Q.  You respond, they said my status
4 with the company has changed, so I have
5 options with my 401(k).  I now have the option
6 to roll over to a new company, cash out or
7 place it in a Roth IRA account.
8          And the response was "Very odd.
9 I'll reach out to them.  Nothing has changed."
10          Do you see that?
11    A.  Yes, I see that.
12    Q.  And you previously testified that
13 your 401(k) continues to remain with Four
14 Seasons, right?
15    A.  It does.
16    Q.  Okay.  Let's turn to the last page.
17 In the middle of the page you said:  "They
18 said they also sent me a letter in writing and
19 the response was OK, I'll look into it.  There
20 has been no change to your status."
21          Do you see that?
22    ATTORNEY BRUSTEIN:  Objection.  I
23 just want to be clear for the record.
24 You said you were going to read the
25 entire thing, so that there was a

O. IVEY

1
2  complete record?
3      ATTORNEY LUNDY:  Sure.  I was just
4  trying to be thoughtful of the time.  I
5  can read the whole exchange.  Let's go
6  back.
7      Q.  So on the second page Olive
8  Rodriguez, which is you, right?
9      A.  Yes.
10     Q.  You say:  They said my status with
11  the company has changed so I have options with
12  my 401(k).  I now have the option to roll over
13  to a new company, cash out or place it in a
14  Roth IRA.
15        The response is "Very odd.  I'll
16  reach out to them.  Nothing has changed."
17        Let's turn to the third page to get
18  the full text.
19     A.  Mm-hmm.
20     Q.  Anyway you can leave money with the
21  provider indefinitely.  Did you get something
22  in the mail?  I don't think they would have
23  called to tell you that.  Olive Rodriguez
24  responds -- which is you, right?
25     A.  Yes.

O. IVEY

1
2      Q.  -- they said they also sent me a
3  letter in writing.  And the response was OK.
4  I'll look into it.  There has been no change
5  to your status."
6        Is that what it says?
7      A.  Yes.
8      Q.  And you've testified that your
9  401(k) remains with Four Seasons, is that
10  right?
11     ATTORNEY BRUSTEIN:  Objection.
12     A.  My 401(k) remains with Four
13  Seasons.  However, I still have the option to
14  remove it if I want to.  And I also have the
15  option of letting it remain.  However, I
16  cannot make any contributions to it.
17     Q.  You made the election, as you sit
18  here today, to continue to have your 401(k)
19  remain with Four Seasons, is that right?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  Until I'm able to work at another
22  job.
23     Q.  If the hotel opened tomorrow would
24  you like to work at the hotel in midtown?
25     ATTORNEY BRUSTEIN:  Objection.

O. IVEY

1
2      A.  If the hotel opened tomorrow would
3  they rehire me, would be my first thought.
4      Q.  Whether they rehired --
5      A.  It would not be a recall --
6      Q.  I'm sorry.
7      A.  -- it would be a rehire.
8      Q.  Let me ask the question, Ms. Ivey.
9      A.  Okay.
10     Q.  Whether you want to characterize it
11  as a recall or a rehire, if the hotel was to
12  open tomorrow would you like to return to
13  employment?
14     ATTORNEY BRUSTEIN:  Objection.
15     A.  That is a -- that is a question
16  that I would have to think about.
17     Q.  So is it --
18     A.  Allow me to -- that is a question I
19  would have to think about.  I've been with
20  that company for 25 years.  And it is my
21  honest -- honest opinion that the way I am
22  treated by this company during this pandemic,
23  during this time, it's very painful.  I
24  committed -- I was a loyal, committed,
25  dedicated employee to this organization.  And

O. IVEY

1
2  if a business decision was made to send us
3  home and it was done in a dignified manner,
4  the -- the motto of the Four Seasons Hotel is
5  to treat others as you would like to be
6  treated.  This is what we were taught for 25
7  years.  Some people for more.  Some people for
8  less.  And I would have to really think long
9  and hard based on how I know I have been
10  treated.
11        We as a people that work in that
12  building at 57th Street was treated -- or are
13  being treated very poorly.  So yes, it's
14  something that I would really have to think
15  about.  Did I love that organization?  Did I
16  love working there?  Absolutely.
17     Q.  Do you know whether any other
18  employees of Hotel 57 Services would have to
19  think really hard about returning to work if
20  it reopened tomorrow --
21     A.  I cannot --
22     ATTORNEY BRUSTEIN:  Objection.
23     ATTORNEY LUNDY:  Let me finish my
24  question.
25     Q.  -- or would they accept the

O. IVEY

1          O. IVEY
2  opportunity without having to think about it
3  long and hard?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  I cannot speak for anyone else.  As
6  it pertains to that aspect of working, I
7  cannot speak for them.
8      Q.  So you don't know?
9          ATTORNEY BRUSTEIN:  Objection.
10     A.  I don't know.
11         ATTORNEY LUNDY:  I have one last
12     quick question, and then we can break.
13         (Defendants' Exhibit 67,
14     WARNERDEF_000150 was marked for
15     identification).
16     Q.  Ms. Ivey, I am showing you a
17  document that has been marked exhibit 67 with
18  Bates numbers WARNERDEF_000150.
19         Have you seen this exchange before?
20     A.  Yes.
21     Q.  Can you identify it for me, please?
22     A.  I think this is some form of
23  correspondence asking for, um, I was trying to
24  apply for, to get my vacation time paid out,
25  and I wasn't able to access.

O. IVEY

1          O. IVEY
2      Q.  It says Tuesday, May 10.  Do you
3  recall what year that is?
4      A.  I don't remember.  I don't remember
5  when it was.  It says May 10, but I am very,
6  very bad with dates.  So ...
7      Q.  Does it refresh your recollection
8  that in 2022, May 10 fell on a Tuesday?
9          ATTORNEY BRUSTEIN:  Objection.
10     A.  No.
11         ATTORNEY LUNDY:  Withdrawn.
12         ATTORNEY BOLAND:  Oh, wait.  It
13     did.  Yeah.
14     A.  It says Tuesday, May 10, but I
15  don't -- it doesn't jog my memory.
16         ATTORNEY BOLAND:  Sorry about that.
17     Q.  Okay.  It says: "Hi Sharon."  The
18  reference to Sharon, is that Sharon Brambrut
19  who we've been speaking about earlier?
20     A.  Yes.
21     Q.  And Sharon Brambrut was one of your
22  supervisors at the hotel?
23     A.  She's my direct -- she's the
24  director of rooms.
25     Q.  Did you consider her your

O. IVEY

1          O. IVEY
2  supervisor?
3      A.  Yes.
4      Q.  It says: "Hi Sharon! I would like
5  to apply for vacation to be paid weekly but I
6  am unable to access WD.  Are you able to
7  assist me with the resetting or applying?"
8          Is that your text message?
9      A.  Yes.
10     Q.  What does "WD" mean?
11     A.  Workday.
12     Q.  What is Workday?
13     A.  So Workday is our electronic file.
14  It has all our -- this is where we -- how we
15  go about applying for vacation, seeing how
16  much vacation we have accrued, how much we
17  have earned.  Anything to do with our worklife
18  would be found there.
19     Q.  Do you still have access to
20  Workday?
21     A.  I do not.
22     Q.  When was the last time you tried to
23  access Workday?
24     A.  I did try doing this.  I don't
25  remember if I was able to.  And I don't

O. IVEY

1          O. IVEY
2  remember if I was able to, or if Sharon had
3  done it for me.  I really don't remember.
4      Q.  It says: Hi Olive - how have you
5  been feeling?  Elizabeth has to help you with
6  Workday.  I have let her know your question
7  about Workday access."
8          ATTORNEY BRUSTEIN:  Objection.
9      Q.  Is it possible that Elizabeth --
10  withdrawn.  Is it possible to gain access to
11  Workday by contacting Ms. Ortiz for a reset
12  password of some sort?
13         ATTORNEY BRUSTEIN:  Objection.
14     A.  I know that when I am on the
15  property I could go to people & culture and
16  ask for assistance with getting into my file.
17         I don't -- for me, this message
18  would be, I don't know if she would have been
19  able to reset it or if she would have been --
20  I know she would have been able to go in and
21  put the days in for me.
22     Q.  Since filing this lawsuit have you
23  ever contacted Ms. Ortiz to gain access to
24  your Workday?
25         ATTORNEY BRUSTEIN:  Objection.

Page 146

O. IVEY

1
2      A.  I don't remember doing that.  As
3  far as I am concerned, I wouldn't -- I
4  wouldn't have done that.  Why would I -- why
5  would I contact her to get me into Workday if
6  I'm not working there?
7      Q.  So your answer is no, you haven't
8  contacted her to gain access to Workday?
9          ATTORNEY BRUSTEIN:  Objection.
10     A.  I don't remember doing that, no.
11     Q.  Do you recall whether or not you
12  gained access to Workday following this
13  correspondence with Sharon?
14     A.  I don't remember.  I think that --
15  I don't remember if I put it in or if she put
16  it in for me.  I do not remember.
17     Q.  Okay.
18         ATTORNEY LUNDY:  You want to take a
19  break?
20         (Lunch recess taken at 1:05 p.m.)
21
22
23
24
25

Page 147

O. IVEY

1
2      A F T E R N O O N   S E S S I O N
3          (1:59 p.m.)
4              ___
5
6  O L I V E   I V E Y,
7  resumed as a witness, having been
8  previously sworn by a Notary Public,
9  was examined and testified further as
10  follows:
11  EXAMINATION BY
12  ATTORNEY LUNDY:
13     Q.  Good afternoon, Ms. Ivey.
14     A.  Good afternoon.
15     Q.  How did you first learn about the
16  COVID-19 pandemic?
17     A.  I think it was on TV.
18     Q.  Do you recall when that was?
19     A.  No.
20     Q.  Do you recall what year it was?
21     A.  I think it was 2021.
22     Q.  Let's refer back to the amended
23  complaint again.  I believe it's exhibit 6.
24         Ms. Ivey, you have exhibit 6 in
25  front of you, the first amended complaint?

Page 148

O. IVEY

1
2      A.  Mm-hmm.
3      Q.  I am just going to refer you to
4  paragraph 3.
5          ATTORNEY BRUSTEIN:  What page?
6          ATTORNEY LUNDY:  Page 2, paragraph
7      3.
8      Q.  It says:  Beginning approximately
9  March 20 of 2020 and continuing for 30 days
10  thereafter ... and it's identified as the
11  furlough date ... plaintiffs and other
12  similarly situated employees that were working
13  at the hotel located at 57 East 57th Street
14  New York, New York known as the Four Seasons
15  Hotel New York and/or Four Seasons New York,
16  identified as the Hotel, were placed on
17  furlough for an indefinite period of time.
18  Since that time they have not been brought
19  back to work.
20         Does the date March 20, 2020
21  refresh your recollection about when you first
22  learned about the COVID-19 pandemic?
23         ATTORNEY BRUSTEIN:  Objection.
24     A.  That would not have been the date
25  we first learned about it.  It would have been

Page 149

O. IVEY

1
2  the date we were sent home.
3      Q.  Does paragraph 3 refresh your
4  recollection that you first learned about the
5  COVID-19 pandemic in 2020?
6      A.  I don't remember when I first heard
7  about it.  I know it was all over the news,
8  over TV.  So we were watching it unfold in
9  other parts of the country.  I don't know when
10  it was first reported in the U.S.  But I know
11  that -- I know that we were watching it unfold
12  on TV.  I don't know what dates.
13     Q.  My question, though, was not a
14  specific date, but a particular year.
15         Do you recall what year you first
16  learned about the COVID-19 pandemic?
17     A.  I don't remember what year.  Truth
18  be told, I'm very bad with dates.  So I
19  don't -- unless I write dates down and make
20  note of it, I don't remember dates.
21     Q.  When the COVID-19 pandemic first
22  began did it affect your day to day life?
23         ATTORNEY BRUSTEIN:  Objection.
24     A.  No, because we were still going
25  about our daily business as usual.  We went to

Page 150

O. IVEY

1
2  work, we were working, we were watching it on
3  TV. But I don't -- nothing was -- we didn't
4  really do anything differently. Because, you
5  know, it was -- it was something that was
6  happening but we didn't see it happening in
7  front of our eyes. It was just like we were
8  watching it happening in another country.
9      Q.  Did there come a period of time
10  where the COVID-19 pandemic did affect your
11  day to day life?
12      A.  Yes.
13      Q.  Do you recall when that was?
14      A.  In regard to affecting my day to
15  day life, I think it would have to be after we
16  were sent home and realized that COVID was
17  here, and now things were changing. We were
18  sent home from work, we were -- my routine now
19  has changed. My routine is usually you wake
20  up, you go to work, you work your hours, you
21  come home, you do your whatever needed to be
22  done. The work was a big part of my day. And
23  so not going to work on a daily basis yes,
24  that was a major disruption.
25      Q.  Did you personally foresee the

Page 151

O. IVEY

1
2  global COVID-19 pandemic before it affected
3  your day to day life?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  I think I thought it was going to
6  be bad, based on what I saw happening
7  overseas. So when the day came that I, on
8  March 20, when we were being sent home, and
9  they said we would be back in two weeks, I
10  never thought that we would be back in two
11  weeks.
12      Q.  Before you saw the news report on
13  TV about the COVID-19 pandemic, did you
14  personally foresee a global pandemic before it
15  was being reported on the news?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  I never thought of that.
18      Q.  Is it accurate to say that the
19  COVID-19 pandemic was unexpected?
20      ATTORNEY BRUSTEIN:  Objection.
21      A.  I don't think it was unexpected in
22  the United States.
23      Q.  Why not?
24      A.  Because we saw what it was doing
25  outside of the United States. So when it got

Page 152

O. IVEY

1
2  here, why would we be surprised -- why would
3  we think it was going to be any different from
4  it was in China? We saw it unfold in China,
5  we saw it over a period of time.
6      So for me, once it got here, I
7  thought that, I made preparation, like when --
8  when I was sent home, I had a freezer and a
9  refrigerator at home. And even though they
10  told me I was going to be home for two weeks,
11  I never believed it. I stocked up on food for
12  my family because of what I saw on TV.
13      Q.  Ms. Ivey, you're referring to "we."
14  Who are you referring to as "we"?
15      A.  When we were sent home?
16      Q.  Yes.
17      A.  Or what we were doing at home? We
18  were sent home means -- when I was sent home,
19  when we were all as employees of Four Seasons
20  midtown sent home and what we were making
21  preparation would be my family and I were
22  making preparation at home.
23      Q.  Were all employees of the hotel
24  sent home?
25      ATTORNEY BRUSTEIN:  Objection.

Page 153

O. IVEY

1
2      A.  On the day that we left? On March
3  20?
4      Q.  I'm just seeking clarification on
5  what you just said. You said when we were all
6  sent home from the hotel, and I am trying to
7  understand if you believe that all hotel
8  employees were sent home on a particular day
9  as a result of COVID-19?
10      ATTORNEY BRUSTEIN:  Objection.
11      A.  I don't know how many people were
12  sent home. I do know that the entire
13  housekeeping department on that day was told
14  to pack all our stuff and we would be leaving.
15  Because the city said that we were closing
16  down.
17      Q.  But some individuals, some
18  employees of the hotels continued to remain at
19  that property, and continued to work after you
20  were sent home?
21      ATTORNEY BRUSTEIN:  Objection. Is
22      there a question?
23      Q.  Is that right?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  Initially I don't -- I don't -- it

O. IVEY

1        O. IVEY
2   is my belief that that day when we were sent
3   home on the 20th, that everybody left. I
4   don't know that anyone stayed behind. And of
5   course I wasn't told that. It was just
6   something that I thought. Because everyone
7   had to be out -- to be home because of the
8   mandate from the city.
9        Q. So it's your personal belief that
10  all of the employees of the hotel were sent
11  home on a particular date because of COVID-19,
12  is that right?
13       ATTORNEY BRUSTEIN: Objection.
14       A. In the beginning, yes.
15       Q. And what is the basis of your
16  belief?
17       A. Because I think -- well, it is my
18  belief that the hotel midtown, Four Seasons
19  midtown was acting on what the city said. We
20  got a call -- I got a call stating that we are
21  all going home because the city mandated that
22  we go home and we would be on lockdown for two
23  weeks. So if that was a mandate, I thought
24  that it would have been for me natural --
25  natural for me to believe that everybody

O. IVEY

1        O. IVEY
2   vacated the premises.
3        Q. No one told you personally that
4   every employee from the hotel were being sent
5   home that day because of the pandemic, right?
6   No one told you that?
7        A. We were told that we are all -- we
8   are closing the hotel as mandated. So if the
9   hotel is closing I'm assuming that no one
10  would be there.
11       Q. My question was did anyone tell you
12  personally that all employees of the hotel
13  were being sent home that day because of the
14  pandemic?
15       ATTORNEY BRUSTEIN: Objection.
16       A. We were told that the hotel was
17  closing and we are all going to be going home
18  because it was mandated by the city.
19       If everyone left that day, I don't
20  know. But that was what we -- I was told.
21       Q. Did someone tell you that all
22  employees were being sent home?
23       ATTORNEY BRUSTEIN: Objection.
24       A. Sharon Brambrut said the hotel was
25  being closed and we are going to leave, we

O. IVEY

1        O. IVEY
2   should pack and leave because it was mandated
3   by the city. As far as what decision was
4   taken after, whether people were staying
5   behind or not, I was not privy to that.
6        Q. You don't know specifically who
7   "we" meant when that was being told to you?
8        ATTORNEY BRUSTEIN: Objection.
9        A. Could you please --
10       Q. You just testified that Sharon
11  Brambrut advised that "we should all go home."
12       A. Mm-hmm.
13       Q. But you don't know who "we" meant
14  when Sharon Brambrut used that term, is that
15  right?
16       A. She said the hotel was closing, the
17  hotel was closing, and as mandated by the city
18  we are all to vacate -- we are going to be on
19  lockdown. Now I am assuming if the city is on
20  lockdown because of a pandemic, that everybody
21  would be on lockdown. Not some people.
22  So ...
23       Q. So it's your personal belief that
24  everyone went home from the hotel?
25       ATTORNEY BRUSTEIN: Objection.

O. IVEY

1        O. IVEY
2        A. I believe so.
3        Q. You were previously testifying that
4   COVID-19 was not unexpected. My question
5   related to the global pandemic of COVID-19.
6        Do you believe that the global
7   pandemic of COVID-19 was unexpected?
8        ATTORNEY BRUSTEIN: Objection.
9        A. I believe that the global
10  expectation of COVID-19 was -- I believe
11  COVID-19 was unexpected. However, based on
12  what was happening prior to the pandemic
13  entering the United States, we should -- it
14  should not have been an unexpected event at
15  that point.
16       Q. My question, Ms. Ivey, was not
17  about the United States' expectation of the
18  entry of COVID-19 into the United States. My
19  question related to the general understanding
20  of a global pandemic.
21       Was COVID-19 expected by anyone at
22  any time?
23       ATTORNEY BRUSTEIN: Objection.
24       ATTORNEY LUNDY: Withdrawn.
25       Q. Is it fair to say that the COVID-19

O. IVEY

1      pandemic was unprecedented?
2
3          ATTORNEY BRUSTEIN:  Objection.
4      A.  Yes.
5      Q.  Have you ever experienced a global
6      pandemic before COVID-19?
7      A.  No.
8      Q.  Do you know anyone who is currently
9      alive who has experienced a global pandemic
10     before COVID-19?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  No.
13     Q.  Did there come a time before you
14     were sent home from work because of the
15     COVID-19 pandemic that hotel business
16     operations were being changed because of the
17     pandemic?
18         ATTORNEY BRUSTEIN:  Objection.
19     A.  I don't remember.  I don't remember
20     when -- I don't remember.
21     Q.  Did there come a time a period of
22     time in March 2020 that employees of the hotel
23     were told to no longer shake hands with
24     guests?
25     A.  Oh, yes.  Yes.

O. IVEY

1      Q.  Do you recall when that was?
2      A.  I don't remember when it was, but
3      yes, we were using sanitizers, and we were --
4      yes, we were wearing masks.
5      Q.  Those were hard to come by back
6      then, weren't they?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  They were.
9      Q.  How did you obtain a face mask?
10         ATTORNEY BRUSTEIN:  Objection.
11     A.  The -- well, we were not -- we were
12     not able to get the, the specialized masks.
13     But we had those surgical masks for myself, I
14     went online and purchased the -- K-9 is
15     what they called them?  Yeah, I went online
16     and purchased a pack for a hundred dollars.
17     Q.  Is it fair to say that purchasing
18     face masks were difficult in March of 2020?
19         ATTORNEY BRUSTEIN:  Objection.
20     A.  Yes.
21     Q.  Is it fair to say that they were
22     difficult to purchase -- withdrawn.
23         Is it fair to say that purchasing
24     face masks in March of 2020 was difficult
25

O. IVEY

1      because the COVID-19 pandemic was not
2      expected?
3          ATTORNEY BRUSTEIN:  Objection.
4      A.  I would say that the face masks
5      were difficult to purchase because of -- yes,
6      because of the COVID-19, but also because we
7      were not prepared.
8      Q.  Who is "we"?
9      A.  The country was not prepared, even
10     though they saw what was happening ahead of it
11     coming here.
12     Q.  In March 2020 did you know how long
13     the COVID-19 pandemic would last?
14         ATTORNEY BRUSTEIN:  Objection.
15     A.  I didn't know how long it would
16     last.  I did believe it would last for a
17     while.
18     Q.  What's the basis of that belief?
19     A.  What I saw unfolding.
20     Q.  What did you see unfolding?
21     A.  What was happening in China and
22     other countries prior to it coming here.
23     Hence the reason why I made preparations for
24     my family.
25

O. IVEY

1      Q.  Any other reason you believed it
2      would last a long time?
3      A.  I believe it would have lasted a
4      long time because I didn't think that it was
5      being taken seriously by our president.  And
6      so there were other people who just didn't
7      think it was real, even though it was there to
8      see.
9      Q.  Ms. Ivey, we didn't go through your
10     background.  Do you have any degrees in
11     science?
12     A.  No.  However --
13     Q.  I don't think there's a question
14     pending.  Do you have a degree in science?
15     A.  I am answering the question.
16     Q.  I think it's a yes or no.  Do you
17     have a degree in science?
18     A.  I do not have a degree in science.
19     However, I have a member of my family that
20     lives in my household that is a research
21     scientist, and during the time that the
22     pandemic was going on I did ask her to explain
23     some research papers that she brought up, I
24     asked her to lay down in common terms for me,
25

Page 162

```
1              O. IVEY
2  because so that I could have a clear
3  understanding of what the pandemic was about.
4  And so she printed the papers and she was able
5  to explain to me in simple terms what exactly
6  the virus was about.
7      Q.  Are you a doctor?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  I am not a doctor.
10     Q.  In April of 2020 did you know how
11 long the COVID-19 pandemic would last?
12         ATTORNEY BRUSTEIN:  Objection.
13     A.  I did not know how long it would
14 last.
15     Q.  In May 2020 did you know how long
16 the COVID-19 pandemic would last?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  The pandemic was -- in May of 2020
19 I did not know how long it would last.
20 However, I didn't think that it was going to
21 be over any time soon.
22     Q.  What was the basis of that belief?
23     A.  Again, because of what I saw
24 happening around me.
25     Q.  Do you have a degree in science?
```

Page 163

```
1              O. IVEY
2          ATTORNEY BRUSTEIN:  Objection.  You
3  asked that already.  I mean I think it's
4  really inappropriate to ask her about
5  degrees you know she doesn't have.  Can
6  we please move on?
7          ATTORNEY LUNDY:  I have a question
8  pending.
9      A.  I do not have a degree in science.
10 However, my common sense told me that based on
11 what was evident in front of my eyes, what was
12 happening, that it was not something that was
13 just going to be over overnight.
14     Q.  You used the word "any time soon."
15         What do you mean by "any time
16 soon"?
17     A.  It was not going to be two weeks or
18 a month.
19     Q.  What did you believe the length of
20 the COVID-19 pandemic would be?
21     A.  I didn't have a length for it, but
22 I think that I believed that as long as people
23 were not taking the protocol seriously or
24 doing, playing their part in helping it, to
25 stem it, and the fact that it seemed that if
```

Page 164

```
1              O. IVEY
2  so much was happening elsewhere and what was
3  also starting to happen here, that it would
4  not be something that would end quickly.
5      Q.  Were restrictions put into place in
6  New York City in March 2020 in response to the
7  COVID-19 pandemic?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  I think there were some
10 restrictions, yes.
11     Q.  What were they?
12         ATTORNEY BRUSTEIN:  Objection.
13     A.  I remember we were told to wear
14 masks.
15     Q.  Anything else?
16     A.  That is the most -- that is what I
17 remember the most.
18     Q.  Do you recall the state issuing
19 stay at home orders as a result of the
20 COVID-19 pandemic?
21     A.  Yes.  I don't remember when it
22 happened, but I know they did issue the order
23 to stay home.
24     Q.  And did you comply with that order
25 to stay at home?
```

Page 165

```
1              O. IVEY
2          ATTORNEY BRUSTEIN:  Objection.
3      A.  Yes, we -- I did comply.  I went
4  out when it was necessary.
5      Q.  Do you know how long the stay at
6  home orders were in place in New York City?
7      A.  I don't remember.
8      Q.  Do you know how long the stay at
9  home orders were in place in the state?
10     A.  I don't remember.
11     Q.  Do you recall how long the initial
12 stay at home order was put into place?
13         ATTORNEY BRUSTEIN:  Objection.
14     A.  No.
15     Q.  Do you know whether the stay at
16 home orders were extended for varying periods
17 of time?
18         ATTORNEY BRUSTEIN:  Objection.
19     A.  I don't remember how that went.  I
20 know there were orders, but as far as were
21 the -- I don't remember how that went.  I know
22 there were orders in place, though.
23     Q.  Do you recall the phrase
24 "flattening the curve"?
25     A.  Yes.
```

O. IVEY

1
2     Q.   What is your recollection of that
3   phrase, "flattening the curve"?
4     A.   So from my recollection, I think on
5   a daily basis there were reports, they would
6   have numbers of -- of people that were
7   contracting or that were affected by the --
8   contracting the virus or dying from the virus.
9   And so there was, I saw it on TV, like a
10  graph, a curve of what was happening on a
11  daily basis.  And flattening the curve was
12  basically at what point it started going down,
13  and leveling off.
14    Q.   So there was a hope, by this
15  concept of flattening the curve, that there
16  would be a point where the curve would flatten
17  and the COVID-19 pandemic would not be
18  impacting our day to day life, is that right?
19       ATTORNEY BRUSTEIN:  Objection.
20    A.   Well, I'm sure there was a hope.
21    Q.   Right.  But that was the concept,
22  for flattening the curve, right?
23       ATTORNEY BRUSTEIN:  Objection.
24    A.   I assume so, yes.
25    Q.   Did there come a time when the

O. IVEY

1
2   hotel stopped accepting guests as a result of
3   the COVID-19 pandemic?
4     A.   Yes.
5     Q.   Do you recall when that was?
6     A.   I don't remember the date.
7     Q.   Do you recall how you learned about
8   that cessation of operation?
9     A.   I don't remember.
10    Q.   When this change in hotel operation
11  was announced what was your expectation about
12  the length of this temporary closure of hotel
13  operation?
14       ATTORNEY BRUSTEIN:  Objection.
15    A.   I thought that I was going to be
16  sent home, which I was, eventually, even
17  before it happened, I -- I did believe that
18  there would come a time when we would be
19  sent -- when the staff would be sent home,
20  including myself.
21       Based on what I was seeing on -- in
22  the media, I did not have any idea how it
23  would play out and therefore I didn't have any
24  idea of how long it would be.
25    Q.   Did you have a hope that the

O. IVEY

1
2   closure would only be two weeks?
3       ATTORNEY BRUSTEIN:  Objection.
4     A.   I had a hope that it would be two
5   weeks, but I knew it wasn't going to be.
6     Q.   Is it accurate that there was
7   uncertainty about how long the COVID-19
8   pandemic would last?
9       ATTORNEY BRUSTEIN:  Objection.
10    A.   I'm sorry.  Could you please repeat
11  your question?  Sorry.
12    Q.   Is it accurate that there was
13  uncertainty about how long the pandemic would
14  last?
15    A.   Yes.  I think there was uncertainty
16  about how long the pandemic would last.
17    Q.   In March 2020 do you recall the
18  number of hours a week you were working?
19       ATTORNEY BRUSTEIN:  Objection.
20    A.   My scheduled hours per week would
21  be 50.  Ten hours per day five days per week.
22  That is normal.  There are days when it would
23  be over that amount.  But it would be a
24  minimum of 50 hours.
25    Q.   Did there come a period of time

O. IVEY

1
2   when the hotel was converted to a temporary
3   housing for COVID-19 first responders?
4     A.   I heard that on the news, yes.
5     Q.   When you learned about the hotel's
6   conversion to a temporary housing for first
7   responders, did you speak to anyone at the
8   hotel about that?
9     A.   I don't remember if I spoke with
10  anyone about that.  I am sure it was -- I
11  don't remember.
12    Q.   Did you work at the hotel when it
13  was being operated as a temporary housing for
14  first responders during the COVID-19?
15    A.   No, I did not.
16    Q.   Do you know whether any members of
17  the housekeeping staff did report to work when
18  the hotel was being operated as a temporary
19  housing for first responders?
20    A.   I don't know.  I am assuming that
21  there would have been someone there.
22    Q.   Do you know whether other employees
23  of the hotel were working at the property when
24  it was operating as a temporary housing
25  facility for first responders?

O. IVEY

1
2     A.  I am assuming that if the hotel is
3  open to first responders, there must be staff
4  there.  Who was there, I don't know.  But I am
5  sure there was staff there.  Because they
6  would not have had first responders there by
7  themselves.
8     Q.  Were you asked to come back to work
9  during the time period that the hotel was
10  operating as a temporary housing facility for
11  first responders?
12     A.  I was given the option to do so.
13  However, I declined, because at the time I
14  had -- I have a disabled son, and, um, I also
15  had an infant in my home, he was born -- he
16  was born during COVID.  So ...
17     Q.  Do you know --
18     A.  Out of an abundance of caution, I
19  had to decline.
20     Q.  Do you know whether other employees
21  of the hotel were asked to return to work
22  during the operation of the temporary housing
23  for first responders?
24     A.  I don't know.
25     Q.  Did you speak to any of your

O. IVEY

1
2  housekeeping staff about the opportunity to
3  return to work during the hotel's operation as
4  a temporary housing facility for first
5  responders?
6     A.  No.
7     Q.  How many hours of work did you
8  perform in April of 2020 for the hotel?
9     A.  No, I don't know how many hours.
10  Like I said, my hours varies.  So -- and I am
11  salaried.  So I'm never one to keep track of
12  hours.
13     Q.  Do you know how many hours a week
14  non-union employees were working at the hotel
15  in April 2020?
16     A.  If there was anyone there, I don't
17  know.  And I don't know how many hours if they
18  were working, how many hours they would have
19  been working.  I don't know.
20     Q.  You already testified that when the
21  hotel was operating as a temporary housing
22  facility for first responders, that there were
23  employees at the hotel.  Did you not?
24     A.  I said I am assuming that there
25  would have been workers at the hotel because

O. IVEY

1
2  there's no way that the hotel would be housing
3  people and not have workers there.
4     Q.  And you don't know how many hours a
5  week any of those employees would have been
6  working at the hotel during that time?
7     A.  No.  Because I wasn't there.
8     Q.  Was there a period of time after
9  March 2020 that you were working at the hotel
10  by remote means?
11     A.  If I was -- after March, 2020?
12     Q.  Yes.
13     A.  That I was working remotely?
14     Q.  Yes.
15     A.  No.
16     Q.  After March 2020 were you
17  responsible for coordinating any schedules for
18  the housekeeping staff during that time
19  period?
20     A.  No.
21     Q.  Let's look at exhibit 33, please.
22        (Defendants' Exhibit 33, Staley
23     v FSR 0204 to 0207 was previously marked
24     for identification.)
25     Q.  Ms. Ivey, I've shown you a document

O. IVEY

1
2  that's been marked exhibit 33 with Bates
3  number Staley v FSR 0204 --
4        ATTORNEY BRUSTEIN:  Objection.  It
5     says WARNERDEF --
6        (Discussion off the record.)
7     Q.  Ms. Ivey, before we turn to exhibit
8  33.  How many times during COVID-19 were you
9  given the opportunity to report back to the
10  hotel but declined?
11        ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.  I know that I
13  was told that they were going to be housing
14  medical personnel, and I was given, initially
15  given the option to work.  But I explained to
16  them why I would -- they said it was an option
17  for me.  And I declined at that point due to
18  my concerns for my family.
19        After that initial time I don't
20  remember ever being asked, except I was asked
21  to go to Philadelphia at some point, after the
22  reopening.
23     Q.  Are you referring to Four Seasons
24  Philadelphia?
25     A.  Yes.

Page 174

```
O. IVEY
1          O. IVEY
2     Q.  Do you know whether any other
3  employees from the hotel were also asked to
4  return to work but declined to do so?
5     A.  I don't know.
6     Q.  Let's turn to exhibit 33, please.
7  It's Bates-numbered Staley v FSR 204 through
8  Staley v. FSR 207.  And it's dated April 9,
9  2020.
10        Ms. Ivey, have you seen this
11 document before?
12    A.  Yes.
13    Q.  Can you identify it for me, please?
14    A.  I think it was a letter that was
15 sent out to us after we went home, on
16 informing us how to go about filing for
17 unemployment.
18    Q.  Looking at the paragraph starting
19 with hotel operations.  It says:  On March 20,
20 2020 in an abundance of caution we made the
21 difficult decision to temporarily suspend most
22 of the hotel operations.  At that time, we had
23 communicated that our hope was to return to a
24 full hotel operation on April 15, 2020.
25        Was it also your hope on April 9,
```

Page 175

```
O. IVEY
1          O. IVEY
2  2020 that the hotel would return to regular
3  operations beginning on April 15, 2020?
4     ATTORNEY BRUSTEIN:  Objection.
5     A.  It was my hope.  But I didn't
6  believe that it would happen.
7     Q.  In the third paragraph, in the same
8  section it says:  Since then, the COVID-19
9  pandemic has continued to impact our business
10 and the hospitality industry.
11        Do you believe it's accurate that
12 the pandemic impacted the hospitality industry
13 as a whole?
14     ATTORNEY BRUSTEIN:  Objection.
15    A.  Yes.
16    Q.  Is it fair to say that the COVID-19
17 pandemic impacted the business operations of
18 other industries, too?
19     ATTORNEY BRUSTEIN:  Objection.
20    A.  Yes.
21    Q.  And in the same paragraph it reads:
22 The federal government has extended social
23 distancing guidelines through April 30, 2020
24 and New York Governor Andrew Cuomo extended
25 the statewide stay at home order until April
```

Page 176

```
O. IVEY
1          O. IVEY
2  29, 2020.
3         Does this refresh your recollection
4  that the stay at home orders were extended at
5  varying times?
6      ATTORNEY BRUSTEIN:  Objection.
7      A.  I suppose so.
8      Q.  On the next page beginning at
9  Staley v. FSR 0205 it outlines unemployment.
10     A.  Mm-hmm.
11     Q.  Did you file for unemployment?
12     A.  I did.
13     Q.  Do you recall when you filed for
14  unemployment?
15     A.  I don't remember, but I'm sure the
16  documentation is somewhere there, that shows.
17     Q.  Did you search your records to
18  identify and collect any of those documents
19  pertaining to your application for
20  unemployment?
21     A.  Yes, I went on the unemployment
22  website, I printed it out.
23     Q.  In connection with this lawsuit?
24     A.  Yes.
25     Q.  Okay.  We can move on.
```

Page 177

```
O. IVEY
1          O. IVEY
2         Do you recall the last day you were
3  physically present at the hotel?
4      A.  I don't remember which day it was.
5  No, I don't remember which date.
6      Q.  Since March 20, 2020 how often has
7  the hotel been in communication with you
8  regarding your employment status and the
9  hotel's operation?
10     ATTORNEY BRUSTEIN:  Objection.
11     A.  I don't remember how often.  I know
12 that in the beginning they used to have these
13 meetings on teams or -- it would be remote
14 meetings.
15     ATTORNEY LUNDY:  Let's look at
16 exhibit 34.
17        (Defendants' Exhibit 34, Staley
18        v FSR 0054 was previously marked for
19        identification.)
20     Q.  Ms. Ivey, I have shown you a
21 document that's been previously marked exhibit
22 34 bearing Bates number Staley v FSR 0054
23 dated April 30, 2020.
24        Do you recognize this document?
25     A.  Yes.
```

Page 178

O. IVEY

1
2     Q.  Do you recall receiving this
3  document?
4     A.  Yes.
5     Q.  Do you recall how you received this
6  document?
7     A.  I am sure it was by email.
8     Q.  Do you recall what email this
9  document would have been sent to you?
10     A.  My personal email.
11     Q.  And what's the basis of that
12  belief?
13     A.  Because that's where I search for
14  all of my documents that I handed over.
15     Q.  In the first paragraph, the letter
16  reads: It is hard to believe that it's been
17  more than a month since we made the difficult
18  decision to temporarily suspend hotel
19  operations and then, shortly thereafter,
20  reopen to provide housing for the health care
21  professionals working on the front lines.
22        Do you recall reading this?
23     A.  Yes.
24     Q.  How did you feel about the hotel's
25  decision to provide housing for health care

Page 179

O. IVEY

1
2  professionals working on the front lines?
3        ATTORNEY BRUSTEIN:  Objection.
4     A.  I thought that it was a very good
5  thing to do.
6     Q.  Were you proud to be part of the
7  Four Seasons team making that decision?
8        ATTORNEY BRUSTEIN:  Objection.
9        ATTORNEY LUNDY:  Withdrawn.
10     Q.  Were you proud?
11        ATTORNEY BRUSTEIN:  Objection.
12     A.  Of course.
13     Q.  In the fourth paragraph it read,
14  second sentence: With the social distancing
15  guidelines and the stay at home orders still
16  in place, it is necessary to extend the
17  suspension of regular hotel operations until
18  June 15, 2020.
19        Does this letter refresh your
20  recollection about the need to extend stay at
21  home orders beyond its initial execution?
22     A.  Yes.
23     Q.  And when you read "it is necessary
24  to extend the suspension of regular hotel
25  operations until June 15, 2020," were you

Page 180

O. IVEY

1
2  surprised?
3        ATTORNEY BRUSTEIN:  Objection.
4     A.  I wasn't surprised, because of what
5  was happening at the time.
6     Q.  COVID-19 was unpredictable at that
7  time, is that fair to say?
8        ATTORNEY BRUSTEIN:  Objection.
9     A.  I think at that time, as far as the
10  impact it was having and the fact that that
11  aspect of it was unpredictable, I think that
12  the part of it that was unpredictable was, no
13  one could tell how long it would last.
14  However, you know, eventually we did figure
15  out that it was coming to an end.
16     Q.  Who is "we"?
17     A.  I mean society on a whole.  Because
18  the numbers had started to fall, and they were
19  being reported as falling.  And then at that
20  point hope -- hope returned.  You know, I
21  personally felt hopeful when the numbers
22  started falling, and thinking that okay,
23  things are going to now -- things are
24  gradually coming back to normal.
25     Q.  Do you know when the numbers

Page 181

O. IVEY

1
2  started to fall in New York City?
3     A.  No, I don't remember the dates.
4     Q.  You don't remember the dates?
5     A.  No.
6     Q.  When you received this letter dated
7  April 30, 2020 did you understand your layoff
8  from the hotel was only temporary?
9        ATTORNEY BRUSTEIN:  Objection.
10     A.  In April of 2020?  That is what I
11  thought, yes.
12        ATTORNEY BRUSTEIN:  Can we take a
13  break, please?
14        ATTORNEY LUNDY:  Sure.
15        ---
16     (Recess from 2:43 to 2:40.)
17        ---
18  BY ATTORNEY LUNDY:
19     Q.  Ms. Ivey, you previously testified
20  that a period of time came when the curve
21  flattened.  Was that before or after the
22  COVID-19 vaccination became available?
23        ATTORNEY BRUSTEIN:  Objection.
24     A.  I don't remember.
25     Q.  Let's return to exhibit 34, please.

Page 182

O. IVEY

1
2 You know what? Let's go to 35. Sorry.
3       (Defendants' Exhibit 35, Staley
4   v FSR 0086 to 87 was previously marked
5   for identification.)
6    Q.  Ms. Ivey, I've shown you a document
7 marked exhibit 35. It's Bates-numbered Staley
8 v FSR 0086 through Staley v FSR 0087. Do you
9 see this before?
10    A.  I don't know if I've seen it
11 before. It looks like a newsletter, we would
12 normally get. So I'm not sure if -- I'm not
13 sure if I've seen it before.
14    Q.  You're not sure if you've seen this
15 particular document before?
16    A.  This particular one, yes.
17    Q.  But you just testified that you
18 received newsletters from the hotel before, is
19 that correct?
20    A.  Yeah.
21    Q.  Something similar in format to what
22 we're looking at in exhibit 35?
23    A.  Yeah. I'm sure I've received
24 something like this. I don't know if this is
25 the exact one, but ...

Page 183

O. IVEY

1
2    Q.  Fair enough. How would you receive
3 these newsletters?
4    A.  Email.
5    Q.  To what email address?
6    A.  Olivernivey@gmail.com.
7    Q.  Did the hotel ever send you emails
8 to your Fourseasons.com account?
9    A.  When I'm at work, while I was
10 employed, yes.
11    Q.  Do you recall ever checking your
12 Fourseasons.com account following March 20 of
13 2020?
14    A.  For the -- I had an iPhone that we
15 got from the Four Seasons that connects us to
16 every -- all the apps that we use. So for the
17 time that I had access to that, I was able to
18 check.
19    Q.  Are you aware that Four Seasons
20 would send correspondence to both a Four
21 Seasons domain email account and to personal
22 email accounts to ensure delivery?
23       ATTORNEY BRUSTEIN: Objection.
24    A.  Well, after I started getting
25 emails on my personal account from Four

Page 184

O. IVEY

1
2 Seasons, I am assuming that that's where all
3 my -- any correspondence they send out, that's
4 where they would send it to. Because I was
5 receiving emails on my personal email.
6    Q.  My question was are you aware that
7 Four Seasons would send correspondence to two
8 accounts, to a personal account and also to a
9 business account with the domain
10 "@Fourseasons.com"?
11       ATTORNEY BRUSTEIN: Objection.
12    A.  I wasn't aware.
13    Q.  Turning to this particular document
14 on the first page, it identifies May 15
15 through 21 anniversaries. And then it lists
16 individual's names. Can you identify any of
17 those people listed in this document?
18    A.  Yes.
19    Q.  Can you identify some for me,
20 please?
21    A.  Winnie Chan. She's a room
22 attendant. Vicky Li, she's a room attendant.
23 Allen Slade is a bell attendant. Chris
24 Mylonas is bell. Pauline is housekeeping.
25    Q.  And reviewing this document

Page 185

O. IVEY

1
2 identifying anniversaries, is it your
3 understanding that Winnie Chan was celebrating
4 her 15 years of employment at Hotel 57
5 Services on May 16 of 2020?
6       ATTORNEY BRUSTEIN: Objection.
7    A.  That is what it -- yes.
8    Q.  Okay. We can move on.
9       (Defendants' Exhibit 36, Staley
10   v FSR 0055 was previously marked for
11   identification.)
12    Q.  Ms. Ivey, you can put that aside.
13 I am going to show you a document marked
14 exhibit 36, please. Ms. Ivey, I've shown you
15 a document previously marked exhibit 36
16 bearing Bates number Staley v FSR 0055 dated
17 May 22, 2020.
18       Have you seen this before?
19    A.  Yes.
20    Q.  Do you recall when you have seen it
21 before?
22    A.  I don't recall.
23    Q.  Do you recall how you received
24 this?
25    A.  Email.

Page 186

O. IVEY

1
2   Q.  Do you recall to what account?
3   A.  It would have been to
4   olivernivey@gmail.com.
5   Q.  But you don't know if it was also
6   sent to another account, too, is that right?
7   A.  No, because I didn't have access.
8   Q.  Did you check it?
9   A.  Well, I was not able to check it
10  after I no longer had access to my cell
11  phone -- to the company's phone.
12  Q.  It reads on the third paragraph:
13  In addition to that extension, the social
14  distancing guidelines and the stay at home
15  order is still in place, therefore it is
16  necessary to extend the suspension of regular
17  hotel operations until July 15, 2020.
18      Were you surprised that the hotel
19  extended the suspension of its regular hotel
20  operations through July 15, 2020 on May 22,
21  2020?
22      ATTORNEY BRUSTEIN:  Objection.
23  A.  I don't know what I felt at the
24  time.  I really don't know what I -- I don't
25  remember what I felt at the time.  I -- I

Page 187

O. IVEY

1
2   cannot tell what was happening.  I do know
3   that if an extension came during the time of
4   the pandemic, that it was, I'm sure it wasn't
5   a surprise for me.  Because I could see what
6   was happening.  Right?  We hear it every day
7   on the news.  So if things are not -- are not
8   changing in the right direction, and it
9   extended, then it would be no surprise to me.
10  Q.  What do you mean by during the time
11  of the pandemic?
12  A.  I mean during the times when the
13  numbers were high, the infection rate, the
14  death rate was being reported as being high,
15  and the city still had orders in place.  If
16  things came at that time, it wouldn't be a
17  surprise for me.
18  Q.  And was that before or after the
19  COVID-19 vaccine became available?
20  A.  I don't remember.
21  Q.  When you received the May 22, 2020
22  letter did you understand your layoff from
23  Hotel 57 Services was only temporary at that
24  time?
25      ATTORNEY BRUSTEIN:  Objection.

Page 188

O. IVEY

1
2   A.  At this time I was still thinking
3   that it was temporary.
4      (Defendants' Exhibit 37, Staley
5      v FSR 0056 was previously marked for
6      identification.)
7   Q.  You can put that aside.  We are
8   going to look at exhibit 37, please.
9      Ms. Ivey, we're looking at a
10  document previously marked exhibit 37 bearing
11  Bates number Staley v FSR 0056 dated June 22,
12  2020.
13      Have you seen this document before?
14      (The witness reviews document.)
15  A.  I think I have seen this document
16  before.
17  Q.  Do you recall when you saw this
18  document before?
19  A.  I don't remember dates, but the
20  document looks familiar.
21  Q.  I am going to refer you to the
22  third paragraph.  The first sentence reads:
23  "Upon departure of the health care
24  professionals, we will temporarily be
25  suspending most of our hotel operations."

Page 189

O. IVEY

1
2      In June 22, 2020 did you understand
3   that the hotel was suspending its operations
4   for temporary housing for first responders?
5      ATTORNEY BRUSTEIN:  Objection.
6   A.  In June?  What was the date?
7   Q.  Let me re-ask the question.  Do you
8   understand that the hotel ceased its temporary
9   housing of first responders in June of 2020?
10      ATTORNEY BRUSTEIN:  Objection.
11  A.  Well, based on the letter that we
12  got, the letter did say that they were doing
13  that.  So ...
14  Q.  Did you learn about the decision to
15  cease providing temporary housing to first
16  responders by letter correspondence or by
17  other means from the hotel?
18  A.  I think it was by letter.  I mean
19  email letter.
20  Q.  The letter says:  We will
21  temporarily be suspending most of our hotel
22  operations.
23      Do you understand what the term
24  "most of our hotel operations" means?
25  A.  That they were -- I'm not -- I'm

Page 190

O. IVEY

1  O. IVEY
2  not sure I understood what they were saying
3  here. Because most of the hotel operations,
4  wouldn't that mean that they were still -- I
5  mean for me, hotel operations is accepting
6  guests. Right? When they say they're
7  suspending most of it, I'm not sure what that
8  meant. I mean, is it -- I'm taking it to mean
9  that they would still be maintaining the
10  building, like the security of the building,
11  or whatever. But it sure didn't mean that
12  they were taking guests.
13      Q. The letter goes on to say: "During
14  this time, the hotel will continue to operate
15  with a reduced staffing to maintain the
16  building's safety and security."
17      Do you know who was in reduced
18  staffing at the hotel in June of 2020?
19      ATTORNEY BRUSTEIN: Objection.
20      A. I wouldn't know. I wouldn't know
21  that information, no. Unless I was there.
22  And I wasn't.
23      Q. But it's fair to say that in June
24  of 2020 the hotel maintained employees at the
25  hotel, albeit on a reduced staffing level?

Page 191

O. IVEY

1  O. IVEY
2      A. Well, that's what that says.
3      Q. Okay.
4      (Defendants' Exhibit 68, Internal
5  Memo dated June 25, 2020 to Olive
6  Rodriguez was marked for
7  identification).
8      Q. Ms. Ivey, I have shown you a
9  document marked exhibit 68 titled Internal
10  Memo dated June 25, 2020 to Olive Rodriguez.
11  And the subject line is Benefits Coverage
12  During Furlough.
13      Do you recognize this document?
14      A. Yes.
15      Q. Do you recall receiving this
16  document?
17      A. Yes.
18      Q. Do you recall electing continuation
19  of any benefit coverage from the hotel at that
20  time?
21      A. I did not elect to continue
22  coverage because I couldn't afford it.
23      Q. Do you know whether any employees
24  at the hotel elected to continue benefit
25  coverage during that time?

Page 192

O. IVEY

1  O. IVEY
2      ATTORNEY BRUSTEIN: Objection.
3      A. No, I wouldn't know that.
4      Q. You wouldn't know that? I couldn't
5  hear you. I'm sorry.
6      A. I wouldn't know that.
7      Q. You can put that aside.
8      (Defendants' Exhibit 69, letter
9  dated August 5, 2020 was marked for
10  identification).
11      Q. Ms. Ivey, I'm showing you a
12  document marked exhibit 69, a letter dated
13  August 5, 2020. Have you seen this document
14  before?
15      A. I don't remember. I don't remember
16  seeing this document. I don't know.
17      (The witness reviews document.)
18      A. I don't remember seeing this
19  document.
20      Q. Are you aware that other -- sorry,
21  I didn't mean to cut you off, if you were
22  still responding.
23      A. "On temporary layoff."
24      I don't remember. I might have. I
25  don't remember.

Page 193

O. IVEY

1  O. IVEY
2      Q. Are you aware that other employees
3  also received this same letter on August 5 of
4  2020?
5      ATTORNEY BRUSTEIN: Objection.
6      A. I am not privy to knowledge of what
7  other people received.
8      Q. The letter provides that your
9  temporary layoff which began on March 14, 2020
10  is continued for an undetermined number of
11  months.
12      Do you believe that you were
13  temporarily laid off on March 14, 2020?
14      ATTORNEY BRUSTEIN: Objection.
15      A. There was a point when I thought
16  that I was temporarily laid off. However,
17  after a while I started to believe that it was
18  permanent. Because think of it. If -- if you
19  had -- you have a husband or a wife, and that
20  person left home to go to work and you are
21  hearing from them while they're away at work,
22  they're calling, checking in, keeping in
23  touch, telling you how things are going, and
24  then you stop hearing from your wife or your
25  husband, and there's dead silence, would you

O. IVEY

1       think that you're still married?
2          Q.   Ms. Ivey, you've testified to many
3       questions today about when you believed you
4       were terminated from your employment. This
5       letter from August 5, 2020 identifies that the
6       layoffs included approximately 464 employees,
7       including yourself, and are still expected to
8       be temporary.
9          Do you know who those 464 employees
10      this letter is referring to is?
11
12         ATTORNEY BRUSTEIN: Objection.
13         A.   I don't know.
14         Q.   Okay.
15         A.   But I think the Four Seasons would
16      know.
17         Q.   I am asking you --
18         A.   The Four Seasons midtown would
19      know, and you would know because you would
20      have those records available. They would have
21      those records available. So I wouldn't ...
22         Q.   Ms. Ivey, I am asking you as the
23      class representative if you know who those
24      individuals are?
25         A.   No, I wouldn't have that record.

O. IVEY

1
2          Q.   Okay. Ms. Ivey, is it fair to say
3       that one of your claims in this lawsuit
4       pertains to an alleged violation of the
5       federal WARN Act?
6          A.   Yes.
7          Q.   Is it also fair to say that one of
8       your claims in this lawsuit pertains to an
9       alleged violation of the New York State WARN
10      Act?
11         A.   That is correct, yes.
12         Q.   How do you believe that the
13      defendants violated the federal and state WARN
14      Acts?
15         A.   I believe that we were sent home
16      temporarily, and at some point they, Four
17      Seasons midtown realized that it was going to
18      be permanent. They did not warn us within the
19      time as allowed under the law to let us know
20      that, number one, we were going to be out, we
21      were going to be terminated. And that is
22      something that they should have informed us or
23      warned us about.
24         Q.   Anything else?
25         A.   That's basically it.

O. IVEY

1
2          Q.   As you sit here today, is it your
3       testimony that you believe that the hotel did
4       not advise you about your employment status at
5       the hotel from March 2020 to the present?
6          ATTORNEY BRUSTEIN: Objection.
7          A.   They did inform us from about March
8       2020, when we were going home, that the amount
9       of time we were going to be home. Then it was
10      extended and it was extended and then after
11      that I believe that I was terminated without
12      any form of notice.
13         Q.   And on August 5 of 2020 were you
14      advised that your temporary layoff occurred on
15      March 14, 2020 and was expected to be
16      temporary?
17         ATTORNEY BRUSTEIN: Objection.
18         A.   I don't know what date I was
19      informed, because of course I don't remember.
20      However, according to the letter it stated
21      that it was supposed to be temporary.
22      However, that temporary situation has now
23      morphed into a permanent situation. Because I
24      cannot be temporarily laid off for three
25      years.

O. IVEY

1
2          Q.   Is it fair to say that the hotel
3       did notify you that you were temporarily laid
4       off?
5          ATTORNEY BRUSTEIN: Objection.
6          A.   It is fair to say they did inform
7       me I was temporarily laid off initially, yes.
8       But what is temporary?
9          Q.   From August 2020 to the present,
10      how frequently would you describe Hotel 57
11      Services communicating with its employees by
12      letters, newsletters or otherwise?
13         ATTORNEY BRUSTEIN: Objection.
14         A.   From what date?
15         Q.   August of 2020.
16         A.   I don't remember, to be honest. I
17      don't remember. I know that there have been
18      some town hall meetings and letters like the
19      ones that we have here. But I cannot tell you
20      how often those happened.
21         Q.   Could you describe it as
22      frequently, infrequently, or something else?
23         A.   I don't -- I would have to say in
24      the beginning we were being informed as things
25      developed. If there were changes, they were

O. IVEY

1      O. IVEY
2   telling us what was going on, and they were
3   keeping us abreast of any new development that
4   was happening. But then after a while
5   everything just went dark. We weren't -- we
6   just stopped hearing from them. We didn't
7   know what -- and I am assuming it's because
8   they themselves didn't have any information to
9   give to us. So how do you have a meeting
10  without information. New information, that
11  is.
12      So everything just went dark. But
13  I --
14      Q.  When did that occur?
15      ATTORNEY BRUSTEIN: Objection.
16      A.  I don't remember what date. We
17  haven't -- I haven't heard. I mean we haven't
18  had meetings in a very long time.
19      Q.  Do you know whether any individuals
20  who were employed by Hotel 57 Services LLC
21  resigned their employment after March 2020?
22      A.  I don't know.
23      Q.  Is it fair to say that one of your
24  claims in this lawsuit relates to whether you
25  are entitled to no-fault separation pay under

1      O. IVEY
2   the EmPact agreement?
3      A.  Yes.
4      Q.  Do you know whether any individuals
5   who were employed by Hotel 57 Services, LLC
6   were transferred to other properties of the
7   Four Seasons after March 2020?
8      ATTORNEY BRUSTEIN: Objection.
9      A.  I don't know. Actually yes. I
10  know of one person that was transferred.
11      Q.  Do you recall their name?
12      A.  Eugenia. E-u-g-e-n-i-a.
13      Q.  And do you believe that Eugenia
14  would be entitled to the no-fault separation
15  pay from Hotel 57 Services after she was
16  transferred to another property of Four
17  Seasons?
18      ATTORNEY BRUSTEIN: Objection.
19      A.  Well, I don't know because I don't
20  know if she was working also during the time
21  that others were laid off. I don't know if
22  she -- I don't know what kind of
23  correspondence or what kind of contact or even
24  if she was working during the pandemic. I
25  don't know these things. So I could not

1      O. IVEY
2   answer that question.
3      (Defendants' Exhibit 70, letter
4   dated July 10, 2020 was marked for
5   identification).
6      Q.  Ms. Ivey, I'm showing you a
7   document that has been marked exhibit 70.
8   It's a letter dated July 10, 2020. Have you
9   seen this document before?
10      (The witness reviews document.)
11      A.  I don't remember -- I don't -- I
12  don't know if I've seen this document before.
13  I -- I don't recall.
14      Q.  In the first paragraph it reads:
15  As of July 11, 2020 we will only allow
16  employees who are working at the hotel to be
17  on property.
18      Does this letter refresh your
19  recollection that there were employees working
20  at the property in July of 2020?
21      ATTORNEY BRUSTEIN: Objection.
22      A.  Well, the letter states that there
23  were people there. As far as me knowing that
24  there were people there, I don't know. The
25  letter is saying that there were people there.

1      O. IVEY
2   So I'm assuming that they're -- that they're
3   right.
4      Q.  When you say people, do you mean
5   employees?
6      A.  Yeah. Employees there. How many
7   were there, I wouldn't know that. The fact
8   that there were people there does not mean
9   that there were others who were not there.
10  Right? And the ones who were not there and
11  were not notified adequately of what was
12  happening, they were not there. So, you know,
13  those people should have been notified about
14  what was happening in the long-term.
15      Q.  I'm sorry. Ms. Ivey, I don't
16  understand your response.
17      A.  What I'm saying --
18      Q.  Hang on. Let me just ask a
19  question.
20      My question was whether or not this
21  letter refreshed your recollection that there
22  were employees working at the hotel on the
23  property in July 2020?
24      ATTORNEY BRUSTEIN: Objection. She
25  never said she didn't remember. She

O. IVEY

said she didn't know.

A. Yeah, and I said to you I don't know. I don't know if there were --

ATTORNEY BRUSTEIN: There's no coaching.

A. I did say that. I said the letter indicates that there were people there. Right? As far as I personally knowing that, I don't. Because I wasn't there.

Q. But you previously testified that if the hotel was in operation for temporary housing of first responders there would be employees there, did you not?

A. Yes, of course.

Q. Okay. And do you know how many employees would have been there?

A. No.

Q. Do you know their names?

A. I wouldn't know who was there. Because I wasn't there.

Q. As a class representative, do you believe it's your responsibility to know who was working at the hotel in July of 2020?

ATTORNEY BRUSTEIN: Objection.



O. IVEY

A. I don't think that I have to know who was working at the hotel during the time that the nurses were there. Because if that information is needed by my attorneys, I think that they would be able to get that information from the Four Seasons.

Q. So as you sit here today it's your understanding as a class representative, you don't need to know who specifically was working at the property in July of 2020 to represent their interests?

ATTORNEY BRUSTEIN: Objection.

A. I am saying I do not personally have to know that, because this is information that my legal representatives will be able to acquire should they need it.

Q. So the answer is no?

ATTORNEY BRUSTEIN: Objection.

A. The answer is what I just said.

Q. Which is no?

ATTORNEY BRUSTEIN: Objection.

A. I do not have to know specifically who was working.

Q. Let's turn to exhibit 41.



O. IVEY

(Defendants' Exhibit 41, Staley v FSR 0057 was previously marked for identification.)

Q. Ms. Ivey I've shown you a document marked exhibit 41. It's a letter dated August 11, 2020 and it's Bates-numbered Staley v FSR 0057.

Do you recall receiving this?

(The witness reviews document.)

A. I don't -- I don't remember if I received it. I don't.

Q. In the second sentence it says: As you are aware, the coronavirus is still active worldwide and specifically in New York City.

Does this refresh your recollection about the coronavirus being active worldwide and specifically in New York at that time?

ATTORNEY BRUSTEIN: Objection.

A. Well, this doesn't really spur my memory. However, I think that at this time, yes, the coronavirus was going on, was still very, very active.

Q. Thank you.

(Defendants' Exhibit 42, Staley



O. IVEY

v FSR 0088 to 89 was previously marked for identification.)

Q. I am going to show you a document marked exhibit 42.

Ms. Ivey, I've shown you a document marked exhibit 42 Bates-numbered Staley v FSR 0088 through Staley v FSR 0089. Have you seen this document before?

A. I don't remember seeing this document.

Q. The title of the document is Questions Follow-Up From All Employee Town Hall Call.

A. Mm-hmm.

Q. Do you recall participating in an employee town hall call in August 28 -- withdrawn.

Do you recall participating in an all employee town hall call in August of 2020?

A. I have participated in town hall calls. I don't know -- I don't recall what dates.

Q. Do you recall approximately how many town hall calls you participated in?

Page 206

O. IVEY

1
2     A.  No.  I know it's more than one,
3  more than two.  But I don't -- I don't recall.
4     Q.  More than ten?
5     A.  I wasn't keeping count, so I don't
6  know.
7     Q.  That's okay.  One of the questions
8  and answers in this document reads:  During
9  the temporary closure may I visit the hotel?
10  And it says yes.
11        Do you recall ever inquiring about
12  visiting the hotel during its temporary
13  closure?
14     A.  Yes.
15     Q.  And did you visit the hotel during
16  its temporary closure?
17     A.  Yes.  I went to get my -- I have
18  clothes there, my personal clothes that I
19  store in a locker, and I did go there to
20  retrieve them.
21        (Defendants' Exhibit 43, Staley v
22        FSR 0221 was previously marked for
23        identification.)
24     Q.  I am showing you a document
25  previously marked exhibit 43.  It's

Page 207

O. IVEY

1
2  Bates-numbered Staley v FSR 0221 and it's
3  dated September 17, 2020.
4        Do you recall receiving this
5  letter?
6     A.  I don't remember.
7     Q.  In the second paragraph it reads:
8  With the coronavirus still active worldwide
9  the travel and hospitality industry continues
10  to struggle with the way we do business.
11        Do you believe that in September
12  2020 the travel and hospitality industry
13  continued to struggle with the way they do
14  business?
15        ATTORNEY BRUSTEIN:  Objection.
16     A.  Yes.
17        ATTORNEY LUNDY:  I only have a few
18  more of these letters to go through, if
19  you want to do that quickly.
20        ATTORNEY BRUSTEIN:  You can push
21  through.  I just don't know in terms of,
22  you know, natural breaks.
23        ATTORNEY LUNDY:  Yes.  Let's try to
24  chug through.
25        (Defendants' Exhibit 44, FSR 0058

Page 208

O. IVEY

1
2  was previously marked for
3  identification.)
4     Q.  Ms. Ivey I'm showing you a document
5  previously marked exhibit 44.  It's Bates
6  number Staley v FSR 0058 dated October 5,
7  2020.  Do you recall receiving this letter?
8        (The witness reviews document.)
9     A.  I don't remember if I received this
10  letter.
11     Q.  That's okay.  We can move on.
12        (Defendants' Exhibit 45, Staley
13        v FSR 0001 was previously marked for
14        identification.)
15     Q.  Ms. Ivey, I am showing you a
16  document previously marked exhibit 45 bearing
17  Bates numbers Staley v FSR 0001.  Have you
18  seen this document before?
19        (The witness reviews document.)
20     A.  I don't remember.
21     Q.  It was from Elizabeth Ortiz sent on
22  November 19, 2020 to NYF All Staff DST.
23        Do you know what that email list
24  includes; who would be on it?
25     A.  I know that all staff is usually

Page 209

O. IVEY

1
2  all staff.
3     Q.  And as all staff would you have
4  received this email?
5        ATTORNEY BRUSTEIN:  Objection.
6     A.  Well, I should receive this email.
7  However, there have been -- there have been
8  instances where I think that I haven't
9  received an email or two.  I mean I never
10  really take it as a big deal.  I don't know
11  why, like even while I was working, some folks
12  would receive the email and I would be, like,
13  I don't receive it.  Or another person -- I
14  would receive an email and someone says they
15  didn't receive it.  I don't know if it's an
16  oversight or... I don't know.  But ...
17     Q.  With respect to exhibit 45, you
18  don't recall one way or another whether or not
19  you received it?
20     A.  I don't remember.
21     Q.  Okay.  Fair enough.
22        (Defendants' Exhibit 46, Staley
23        v FSR 0059 was previously marked for
24        identification.)
25     Q.  Ms. Ivey, I'm showing you a

Page 210

O. IVEY

1
2  document previously marked exhibit 46 bearing
3  Bates number Staley v FSR 0059 dated December
4  3, 2020.
5      Q. Do you recall receiving this
6  letter?
7      (The witness reviews document.)
8      A. I don't remember one way or the
9  other if I received this letter.
10     Q. The letter provides in the third
11 paragraph, the second sentence: Most major
12 attractions remain closed while restaurants
13 suffer from several eliminations.
14     Do you recall whether Broadway was
15 closed in December of 2020?
16     ATTORNEY BRUSTEIN: Objection.
17     A. I think -- yeah. I think that at
18 that time, yes, Broadway was -- I think
19 Broadway was closed, as was most places.
20     Q. Do you recall when Broadway
21 reopened?
22     A. I don't remember when it was
23 reopened.
24     Q. The email continues in the fourth
25 paragraph: As such, we wanted to let you know

Page 211

O. IVEY

1
2  that given the current situation and difficult
3  market conditions that persist, the hotel will
4  remain temporarily closed with an anticipated
5  reopening date of late April 2021.
6      Q. Do you recall the hotel's reopening
7  date being moved to April 2021?
8      ATTORNEY BRUSTEIN: Objection.
9      A. I don't remember when it was moved
10 to. I do know that we had several revisions,
11 time revisions throughout the pandemic, which,
12 you know, was expected based on what was
13 happening with the pandemic in New York. So
14 as far as when they were extending and the
15 dates they were extended, I don't remember
16 that.
17     Q. Thank you.
18     ATTORNEY LUNDY: Why don't we take
19 a break here.
20     ATTORNEY BRUSTEIN: Okay.
21     ---
22     (Recess from 3:29 to 3:46.)
23     ---
24 BY ATTORNEY LUNDY:
25     Q. Ms. Ivey, we previously discussed

Page 212

O. IVEY

1
2  the town hall that occurred on June 25, 2021.
3  Do you recall that discussion before?
4      A. Yes.
5      Q. During that town hall, do you
6  recall who was speaking?
7      A. There were so many people speaking.
8  I can't -- I can't recall.
9      Q. Did anyone from Hotel 57 Services,
10 LLC say during that town hall that your
11 employment was terminated?
12     ATTORNEY BRUSTEIN: Objection.
13     A. No one said that in so many words.
14     Q. Did you receive a notice of
15 termination of employment after the June 25,
16 2021 town hall?
17     A. I did not receive a letter of
18 termination from that meeting. However,
19 during the meeting so many questions were
20 asked, and one of the questions that was asked
21 was, you know, when we would be returning, and
22 we were informed of all of the projects that
23 were under way. And the director of
24 engineering was speaking on some of the
25 projects. And one of the projects that he

Page 213

O. IVEY

1
2  mentioned, he said there were -- I remember
3  him saying there was more than one project
4  that needed to take place. But when
5  questioned on the timeline I think he said
6  that there was, that the Fire Department
7  project would take at least a year and a half.
8  It usually takes -- I know there was a year
9  and a half that was thrown out there.
10     And with all the projects that were
11 mentioned during that meeting, and if one is
12 taking a year and a half, just -- it just
13 seemed to me as if -- it appeared, based on
14 the responses that there was no definite end
15 in sight. And at that point I left that
16 meeting feeling that we were not going to
17 return to work.
18     Q. Are you aware under New York law,
19 termination of employment requires five days
20 written notice of that termination?
21     ATTORNEY BRUSTEIN: Objection.
22     A. Under New York law termination
23 requires notice, or five days notice, as you
24 said. However, I am left wondering why is it
25 that I was terminated and not given notice.

Page 214

O. IVEY

1
2    Q.   That wasn't my question.  I was
3  just asking whether or not you were aware of a
4  requirement to provide five days written
5  notice following a termination of employment?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't know the law per se.
8  Anything that I know is either what I
9  researched for myself or what my attorneys.
10    Q.  Did you ever receive a letter of
11  notice of termination of employment from Hotel
12  57 Services?
13    A.  I did not receive a letter of
14  termination, except I did tell you that I was
15  informed by Principal that I should remove my
16  money, or I have the option to remove my
17  money, because I was terminated.
18        Also, if you would notice on the
19  exhibit that you showed me of my pay stub,
20  right?  If I am still employed by Four Seasons
21  why is it then that no money was contributed.
22  On those times that I worked on task force, no
23  money was taken from, I mean from my vacation,
24  no money was taken.  They paid me vacation but
25  no contribution was made to my 401(k).  And

Page 215

O. IVEY

1
2  that made -- there were so many -- there was
3  more than one reason why I know I was
4  terminated.  And that leaves me to ask the
5  question, why is it that no one from Four
6  Seasons midtown informed me that I was
7  terminated.  Why did I have to find out from
8  someone else.
9    Q.  Is Principal a separate entity from
10  Hotel 57 Services LLC?
11        ATTORNEY BRUSTEIN:  Objection.
12    A.  They are a separate entity.
13  However, they do communicate with each other.
14    Q.  This is a yes or no question.  Did
15  you --
16        ATTORNEY BRUSTEIN:  Objection.
17    Q.  -- receive a written notice of
18  termination of employment from Hotel 57
19  Services?
20        ATTORNEY BRUSTEIN:  Objection.
21    A.  I did not receive a letter of
22  termination.  However, Principal told me they
23  received one.
24    Q.  Ms. Ivey, when I'm asking a
25  question, I would ask you to listen to it and

Page 216

O. IVEY

1
2  answer the question that's before you.
3  Narratives that are not responsive to a
4  question is just going to keep us here a lot
5  longer.
6    A.  Okay.
7    Q.  You previously testified that
8  Principal is a separate entity from Hotel 57
9  Services LLC, is that correct?
10    A.  Yes, that's correct.
11    Q.  Do you have any supervisors at
12  Principal?
13        ATTORNEY BRUSTEIN:  Objection.
14    A.  I do not have supervisors at
15  Principal.  But I do have people from people
16  and culture, just the same way they inform
17  Principal that when I am employed, that okay,
18  we have a new employee, this is going to
19  happen.  When they terminate people that's how
20  they also send them notice to Principal saying
21  who was terminated.  And I think that's how
22  Principal was able to tell me that I need to
23  move my money and I can no longer contribute
24  to my retirement plan.
25    Q.  Ms. Ivey, is it your testimony that

Page 217

O. IVEY

1
2  Principal has the authority to terminate your
3  employment from Hotel 57 Services LLC?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  They don't.
6        (Defendants' Exhibit 50, Staley
7     v FSR 0061 was previously marked for
8     identification.)
9    Q.  I would like to show you exhibit
10  50, please.  Ms. Ivey, I'm showing you a
11  document marked exhibit 50 bearing Bates
12  number Staley v FSR 0061 dated June 25, 2021.
13        Do you recall receiving this
14  letter?
15    A.  No, I don't recall receiving a
16  letter from this lady.  I don't know -- I
17  don't recall.  I don't recall this.  I
18  don't -- no.
19    Q.  You previously identified Elizabeth
20  Ortiz as the director of people & culture of
21  Hotel 57 Services, LLC is that correct?
22    A.  Yes.
23    Q.  And this letter is signed by
24  Elizabeth Ortiz, is it not?
25    A.  Yes.  That's what it says, yes.

Page 218

O. IVEY

1
2    Q.   Does this letter refresh your
3    recollection that during the town hall you
4    were advised that the hotel will continue to
5    remain closed as a hotel, will be undergoing
6    substantial infrastructure and maintenance
7    work that is expected to last well into 2022?
8        ATTORNEY BRUSTEIN:  Objection.
9        A.   I think that that was said, that
10   there was -- yeah.
11   Q.   The letter continues:  Upon
12   reopening, we are committed to recalling
13   employees as business levels rebound.
14       Does the letter say that?
15       A.   The letter says that.
16   Q.   Do you see anywhere in this letter
17   that it references the termination of
18   employment of any employee?
19       A.   There is nothing in this letter
20   that says that.
21   Q.   And you previously testified that
22   you did not ask any questions either verbally
23   or in any written format during that town hall
24   meeting on June 25, 2021, is that correct?
25       ATTORNEY BRUSTEIN:  Objection.

Page 219

O. IVEY

1
2        A.   I did also say that it would be
3    repetitive because the questions that I had
4    were asked by other people.  So there was a
5    lot of people on the call asking questions.
6    So if I had a question to ask, when would the
7    hotel be opened, and someone else has already
8    asked it, I am not going to ask that, because
9    the information is given.  It would be silly.
10   Q.   So your answer is no, correct?
11       A.   No, I didn't ask.
12   Q.   Okay.  Thank you.
13       ATTORNEY LUNDY:  I would like to
14   look at exhibit 51, please.
15       (Defendants' Exhibit 51, Staley
16   v FSR 0082 to 85 was previously marked
17   for identification.)
18   Q.   Ms. Ivey, I'm showing you a
19   document marked exhibit 51 bearing Bates
20   number Staley v FSR 0082 and it continues to
21   Staley v FSR 0085.
22       Have you seen this document before?
23       A.   I don't remember seeing this
24   document, no.  I don't remember seeing this
25   document, no.

Page 220

O. IVEY

1
2    Q.   Please turn to the last page
3    bearing Bates number Staley v FSR 0085.
4        A.   Yes.
5    Q.   Do you identify any individuals
6    listed under Anniversaries?
7        A.   Yes.
8    Q.   Can you identify those people who
9    you recognize, please?
10       A.   Pamela Mapp, Winnie Chan, Maribel
11   Rodriguez.
12   Q.   Anyone else?
13       A.   Edward Nieves, Lyneate Agyeman.
14   Q.   Looking at Pamela Mapp
15   specifically, it identifies 28 years on July
16   12.  Does that reference, based upon your
17   review of this document, her years of service
18   at Hotel 57 Services LLC, at the hotel?
19       ATTORNEY BRUSTEIN:  Objection.
20       A.   Well, this document says that.  I
21   don't know how many years she -- I know she's
22   a long-term employee.  I don't know how many
23   years she was there.
24   Q.   Ms. Ivey, we've reviewed an initial
25   complaint and the amended complaint in this

Page 221

O. IVEY

1
2    lawsuit.  The amended complaint is exhibit 6.
3    Is that right?  You have identified this
4    before?
5        A.   Was it something you gave me
6    earlier?  This one here, number 6?
7    Q.   Yes, exhibit 6.  The amended
8    complaint.
9        A.   Yes, I have it here.
10   Q.   What do you think that the
11   defendants did wrong here?
12       ATTORNEY BRUSTEIN:  Objection.
13   Q.   That brought about this lawsuit?
14       A.   I think that, number one, they did
15   not inform us as mandated by the law of our
16   continued unemployment status.
17       Number two, I know for myself
18   personally, I believe myself to be terminated
19   and I was not informed by the Four Seasons
20   midtown that I was terminated.
21       And I believe that the fact that
22   they expect myself and people in similar
23   position as myself to be out of work and was
24   told that we -- if we take up employment
25   outside of the Four Seasons midtown while we

Page 222

O. IVEY

1    are out of work, it forfeits any form of
2    future severance pay that we would have been
3    entitled to.
4         You -- the Four Seasons midtown is
5    telling me that while having me out of work,
6    either indefinitely or having terminated me
7    without any form of notice.
8         If you are terminating me you
9    should give me notice and give me the option
10   of moving on. Give me closure. Give other
11   people in similar position closure. I think
12   that we deserve that. Even if we were working
13   there for one day, we deserve that. We have
14   families. We are human beings. We have
15   committed our lives and grew up with Four
16   Seasons. I went there in my 20s. I'm 53
17   years old. 53 years old. And I have
18   committed myself, I have worked many hours in
19   that place. Never questioned anything that I
20   was doing. Totally, totally loyal and
21   committed to the Four Seasons brand, and then
22   you come and tell me I cannot work or forfeit
23   anything that I have coming to me, when I have
24   a family to feed, I have a child, I have a

Page 223

O. IVEY

1    grandchild, I have myself. Everything that I
2    have worked for in 25 years have been wiped
3    out waiting on these people to tell me exactly
4    what is going on with me. I am not a rich
5    woman. I'm not from a rich family. I
6    migrated here over 30 years ago from Jamaica
7    to make a life for myself and my disabled
8    child. And to be treated like this in a
9    company that tells me to treat others the way
10   I want to be treated. This is the Four
11   Seasons motto. This is what we drive home
12   everyday. As a leader of the Four Seasons,
13   this is what I teach people that I coach
14   everyday, treat each other with respect, with
15   dignity. And we served the Four Seasons with
16   pride.
17        Do you know what it feels like when
18   you have made so many sacrifices with my
19   family, and then to go home and let my family
20   realize that the company that I was batting
21   for for 25 years treat me this poorly? It is
22   embarrassing, it is hurtful, and it is wrong.
23   It is wrong. On every level it is wrong.
24        Q. Ms. Ivey, why don't we take a

Page 224

O. IVEY

1    break?
2         ATTORNEY BRUSTEIN: Do you need a
3    break?
4         ATTORNEY BOLAND: Yes, we're going
5    to take a break.
6         ATTORNEY LUNDY: Let's take a
7    break.
8         A. It is so wrong. You guys have no
9    idea --
10        ATTORNEY LUNDY: We're off --
11        ATTORNEY BRUSTEIN: She's still
12   talking.
13        ATTORNEY BOLAND: She's still
14   talking.
15        A. You guys have no idea what this
16   does to me as a person. Can you imagine, I
17   joined this company in my 20s? I'm now 53
18   years old and to be unceremoniously let go
19   from a company that I have served almost all
20   of my adult life? Come on, guys. This is not
21   right.
22        I have never been in a courthouse
23   setting before. This is not how I was raised.
24   I was not raised to go against anyone or

Page 225

O. IVEY

1    anything. I was raised to stand up for rights
2    and justice and to do what is right, and my
3    dad died, and that's what he taught me. To
4    stand up for myself, and I never thought I
5    would have to stand up against a company that
6    I loved so much and I served for almost
7    all my adult life. It's wrong. I loved this
8    company. I never in a million years thought
9    that they would treat me like this. Never in
10   a million years. If someone had told me Four
11   Seasons would have done this to me, I would
12   tell them they're lying. Because when I was
13   serving, I was serving with pride. It's
14   hurtful. I don't even know how to explain how
15   badly it hurts. Because I believed in that
16   company.
17        ATTORNEY LUNDY: Can we take a
18   break, please?
19        ATTORNEY BOLAND: Let's take a
20   break.
21            ---
22        (Recess from 4:05 to 4:15.)
23            ---
24        Q. We're going to be referring to the

Page 226

O. IVEY

1          O. IVEY
2    EmPact agreement which is attached to the
3    Brustein declaration.
4          ATTORNEY BRUSTEIN: Is that 10?
5          ATTORNEY LUNDY: Yes, it's 10.
6          Good memory.
7    Q.   Ms. Ivey, I appreciate what you
8    believe you've heard being shared with you by
9    the hotel relative to your employment status.
10   But do you think it's possible that you may
11   have misinterpreted what was being shared to
12   you by the hotel and your ability to work
13   while the hotel remained on temporary closure?
14         ATTORNEY BRUSTEIN: Objection.
15   A.   No.
16   Q.   I would like to refer you to page
17   27 of the EmPact agreement, which I believe
18   you have in front of you.
19         The bottom is titled Moonlighting
20   and Outside Employment.
21         The agreement always allowed you to
22   work and moonlight outside of your employment
23   at Hotel 57 Services LLC.  Do you see that?
24         ATTORNEY BRUSTEIN: Objection.
25   A.   Yes.

Page 227

O. IVEY

1          O. IVEY
2    Q.   So is it possible that in these
3    communications from the hotel, specifically at
4    the June 25, 2021 town hall, the hotel was not
5    advising you that you were terminated or not
6    permitted to work outside of your employment,
7    because the agreement says that you can, but
8    rather if you resigned your employment and
9    went to work somewhere else, that you wouldn't
10   be entitled to no-fault separation pay; but
11   you were always permitted to moonlight outside
12   of your employment?
13         ATTORNEY BRUSTEIN: Objection.  Is
14   there a question?
15         ATTORNEY LUNDY: I believe one's
16   pending.
17         ATTORNEY BOLAND: It started with
18   "is it possible."
19         ATTORNEY BRUSTEIN: Oh, thank you.
20   Objection.
21   A.   I do not see how I could have
22   interpreted that statement, that information
23   that was given to me any differently.  The
24   question was asked if we go and take up
25   employment outside of the Four Seasons while

Page 228

O. IVEY

1          O. IVEY
2    we are out of work, will that affect our --
3    any severance pay that might be coming to us.
4    And you could go back and listen to the
5    recording.  Elizabeth was clear in her
6    response.  I don't see how I could have
7    interpreted it any other way other than how I
8    interpreted it.
9    Q.   Looking at the EmPact agreement at
10   page 27 under moonlighting and outside
11   employment.  It reads: I am free to have
12   outside employment and activities.
13         Do you see that?
14   A.   I see that.
15   Q.   And does the contract allow you to
16   have outside employment consistent with the
17   terms of this provision?
18         ATTORNEY BRUSTEIN: Objection.
19   A.   Well, this is what this is saying.
20   Moonlighting is taking up a second, I would
21   look at it as, okay, you have a second job
22   that substitutes your job, whatever income you
23   have going on at the Four Seasons.  However,
24   when the question was asked of Elizabeth, this
25   is what her response was.  She said if we take

Page 229

O. IVEY

1          O. IVEY
2    up employment out of Four Seasons it forfeits
3    any severance pay that is coming.  I'm saying
4    I don't know how else I would have interpreted
5    that.
6    Q.   Is it possible, Ms. Ivey, that
7    Ms. Ortiz was referring to a resignation of
8    employment and not to your ability to work
9    outside of employment consistent with the
10   terms of the agreement, is that possible?
11         ATTORNEY BRUSTEIN: Objection.
12   A.   Well, the word "resignation" never
13   came up.
14   Q.   Right.
15   A.   Right?  During the questioning the
16   word "resignation" never came up.  It was
17   not -- if I resigned, which would be a silly
18   question to ask, right?  If I resigned from
19   Four Seasons?  If someone resigns then there
20   is no way that they could be expecting to get
21   severance pay.  So it would not be even a
22   relevant question to ask her, right?
23   Q.   Ms. Ivey --
24   A.   If I resigned, will I get severance
25   pay?  No one resigns and gets severance pay.

Page 230

O. IVEY

1
2    Q.   Ms. Ivey, when was the last time
3    you listened to that recording?
4    A.   The last time I listened to that
5    recording was -- I don't remember.  I can't --
6    I don't remember when was the last time I
7    listened to it.
8        ATTORNEY BOLAND:  Dates.
9    A.   I don't remember dates.  I have
10   worked on my birthday before not remembering
11   it was my birthday.
12       ATTORNEY BOLAND:  I'm with you.
13   A.   And it was a switch with someone
14   else.  I wasn't scheduled to work.
15   Q.   Ms. Ivey, I am going to refer you
16   back to the amended complaint at paragraph
17   228.
18   A.   This one?
19   Q.   The one right next to you, yes.
20   The amended complaint.  It's on page 31.
21   Paragraph 228.  Do you see that there?
22   A.   Mm-hmm.
23   Q.   And Ms. Ivey, you previously
24   testified that the content of your amended
25   complaint is true and accurate, did you not?

Page 231

O. IVEY

1
2    A.   Mm-hmm.
3    Q.   And at paragraph 228 it's
4    summarizing the content of the town hall
5    meeting on June 25, 2021.  And in paragraph
6    28, 228, it says:  Ms. Ortiz answered by
7    stating, quote "At this juncture, we are
8    looking at the fact that you are still
9    currently furloughed, employees that have
10   worked with the company, have worked with this
11   property for the time period that you have,
12   you are considered to be furloughed, so we
13   wouldn't be paying out the severance at this
14   juncture, only because we do consider you to
15   be furloughed.  We do anticipate reopening and
16   we do anticipate recalling you to work once we
17   do open."
18       So I again ask you and refer you
19   back to page 27 of the EmPact agreement,
20   whether or not it's possible that you
21   misunderstood the content of that conversation
22   on June 25, 2021 and you were in fact
23   permitted to find outside employment and
24   activities because Hotel 57 Services LLC
25   considered you to be on furlough and

Page 232

O. IVEY

1
2    anticipated recalling you back?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.   The fact that -- okay.  Four
5    Seasons New York midtown is considering --
6    Ms. Ortiz is saying we are on layoff.
7    Q.   Ms. Ivey --
8    A.   However -- hold on.  I am trying to
9    understand.  Can layoff be permanent?
10   Q.   The purpose of this deposition is
11   not to ask a question.  Perhaps we should go
12   back and look at paragraph 228 and confirm
13   that this is a paragraph that you have
14   previously identified as being part of the
15   amended complaint -- 228, the one I just read
16   from -- as being true and accurate.  Is that
17   correct?
18       ATTORNEY BRUSTEIN:  Objection.
19   A.   Just give me one second.  Let me
20   look at it.
21       (The witness reviews document.)
22   A.   Yes, she did -- I am assuming that
23   she did say this.
24   Q.   The term "resignation" wasn't used,
25   or at least not referenced in this paragraph

Page 233

O. IVEY

1
2    228 of your amended complaint.
3    A.   Mm-hmm.
4    Q.   But was the idea of leaving the
5    hotel to accept employment used?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.   I don't see that here.
8    Q.   Reading paragraph -- I'm sorry.
9    Reading page 27 of the EmPact agreement today,
10   do you understand that if you were on, whether
11   actively working or on temporary furlough from
12   the hotel, you would be permitted to find
13   outside employment?
14       ATTORNEY BRUSTEIN:  Objection.
15   Q.   Based upon your reading of the
16   agreement?
17       ATTORNEY BRUSTEIN:  Objection.
18   A.   I am looking that if I am
19   temporarily furloughed, that I would be able
20   to take up employment based on what I see
21   here.  But that is not what was communicated
22   to us on the meeting.
23   Q.   And I refer you back to, Ms. Ivey,
24   to paragraph 228.  And you previously
25   testified that the contents of your amended

Page 234

O. IVEY

1  complaint was true and accurate, correct?
2
3     A.  Yes.
4     Q.  Is there anything in paragraph 228
5  that references that you were terminated from
6  your employment?
7       ATTORNEY BRUSTEIN:  Objection.
8     A.  No.  It did reference that I was
9  permanently laid off.
10     Q.  Where in paragraph 228 does it use
11  the word permanently laid off?
12     A.  It's -- there is nothing in the
13  paragraph that said I'm permanently laid off,
14  but if I am out of work for so many years, and
15  you're still telling me that I am furloughed
16  with no end in sight, then I'm going to
17  take -- I do believe that at that juncture
18  that we are not furloughed.
19     Q.  That might be your impression,
20  Ms. Ivey.  But what was relayed to you as
21  referenced in paragraph 228 was that Hotel 57
22  Services considered you to be furloughed and
23  anticipated recalling you to work once the
24  hotel does reopen, does it say that?
25       ATTORNEY BRUSTEIN:  Objection.

Page 235

O. IVEY

1
2     A.  It says that here, yes.
3     Q.  And if the hotel reopened tomorrow
4  you testified that you don't know whether or
5  not you would go back to work?
6       ATTORNEY BRUSTEIN:  Objection.
7     A.  I would have to think about it.  I
8  did say that.
9     Q.  Let's look at the no-fault
10  separation pay provision in the EmPact
11  agreement.  And that's a few pages towards the
12  end, beginning at page 56?
13       ATTORNEY BRUSTEIN:  Are you going
14  back to the EmPact agreement?
15       ATTORNEY LUNDY:  Yes.  The EmPact
16  agreement.
17     A.  Page 56?
18     Q.  We can actually turn to page 57
19  first.  Ms. Ivey, there's two columns at the
20  top of the page, continuous service and
21  no-fault separation pay.  Reading those
22  provisions is it your understanding that
23  no-fault separation pay is calculated based
24  upon the information contained on this page 57
25  of the EmPact agreement?

Page 236

O. IVEY

1
2     A.  Yes.
3     Q.  And as you sit here today what do
4  you believe to be your continuous service
5  years for Hotel 57 Services LLC for purposes
6  of calculating no-fault separation pay?
7     A.  It would be somewhere in the 24
8  years.
9     Q.  Do you believe that your years of
10  service should continue from March 20, 2020 to
11  the present?
12       ATTORNEY BRUSTEIN:  Objection.
13     A.  Until today?
14     Q.  Yes.
15     A.  It couldn't be until today.
16  Because I was already terminated.
17     Q.  Do you know the amount of no-fault
18  separation pay you are seeking in this
19  lawsuit, based upon the formula set forth on
20  page 57?
21     A.  I don't know the -- it was
22  calculated for me by my attorneys.  I cannot
23  tell you off the top of my head how much that
24  is.
25       (Defendants' Exhibit 28, letter

Page 237

O. IVEY

1
2  dated February 24, 2023 from Brustein
3  law firm was previously marked for
4  identification.)
5     Q.  I am going to show you a document
6  marked exhibit 28.  Ms. Ivey, I have given you
7  an exhibit marked 28.  It's a letter from
8  Brustein Law PLLC dated February 24, 2023.
9  And on the last page of this document it's
10  titled Verification.  Do you see that on the
11  last page?
12     A.  Yes.
13     Q.  Is that your signature at the
14  bottom of the page?
15     A.  On the last page, yes.
16     Q.  And is this document confirming
17  that the content of the February 24, 2023
18  letter is accurate, to your personal
19  knowledge?
20       ATTORNEY BRUSTEIN:  Objection.
21     A.  To my knowledge, yes.
22     Q.  Okay.  Let's turn back to the
23  letter, please at page 2.
24     A.  Page 2, okay.
25     Q.  Under section C it says:

Page 238

O. IVEY

1           O. IVEY
2  Plaintiff's Olive Ivey estimated damages are
3  as follows.
4       And I'm looking at (i).  It lists
5  $44,500 in no-fault separation pay.  Do you
6  see that?
7    A.  I see that.
8    Q.  And is it your understanding that
9  the sum of $44,500 is the amount of no-fault
10  separation pay that you would be entitled to
11  based upon your continuous years of service
12  for the hotel as outlined on page 57 of the
13  EmPact agreement?
14      ATTORNEY BRUSTEIN:  Objection.
15    A.  Well, that is what my attorneys
16  estimated it to be based on their knowledge of
17  how this has to be calculated --
18    Q.  And you verified that, right?
19    A.  Yes.
20    Q.  Okay.  So let's turn back to the
21  EmPact agreement, please.  You have previously
22  testified that you are proceeding with this
23  lawsuit as a potential class representative
24  for other employees of the hotel, is that
25  right?

Page 239

O. IVEY

1           O. IVEY
2    A.  Yes.
3    Q.  Do you know the amount of no-fault
4  separation pay other employees would be
5  entitled to in connection with this lawsuit?
6    A.  I do not.
7    Q.  Do you know whether all employees
8  of the hotel would be entitled to no-fault
9  separation pay?
10    A.  I do not.
11    Q.  Do you know whether any employees
12  of the hotel has resigned their employment and
13  accepted other employment at other
14  establishments?
15      ATTORNEY BRUSTEIN:  Objection.
16    A.  I do not.
17    Q.  Let's turn to page 56, please, of
18  the EmPact agreement.  At the bottom it says
19  no-fault separation pay.  Do you see that,
20  Ms. Ivey that section?
21    A.  No-fault separation pay?
22    Q.  Yes.
23    A.  Yes.
24    Q.  In the first sentence it says, If I
25  receive a permanent layoff with no right of

Page 240

O. IVEY

1           O. IVEY
2  recall or I am terminated for no-fault, my
3  termination will be considered no-fault.
4      Do you understand that in this
5  lawsuit you're asking the court to determine
6  that you were terminated from your employment
7  and you will not have a right to be recalled
8  to the hotel?
9      ATTORNEY BRUSTEIN:  Objection.
10    A.  Yes.
11    Q.  And as a class representative, do
12  you know if anyone else is willing to give up
13  their right to recall for payment of the
14  no-fault separation pay if the hotel was to
15  reopen?
16      ATTORNEY BRUSTEIN:  Objection.
17    A.  I don't know that.  But I'm sure
18  that my attorneys will be able to ascertain
19  that information.
20    Q.  Is it possible that there are
21  individuals or employees of Hotel 57 Services
22  who would like to be recalled to the hotel
23  when it reopens?
24      ATTORNEY BRUSTEIN:  Objection.
25    A.  Probably.

Page 241

O. IVEY

1           O. IVEY
2    Q.  As you sit here today, you would be
3  willing to accept $44,500 from the hotel for
4  no-fault separation pay instead of being
5  recalled to the hotel when it reopens?
6      ATTORNEY BRUSTEIN:  Objection.
7    A.  I am expecting to be paid, yes.
8    Q.  And you're willing to forgo the
9  ability to be recalled to the hotel when it
10  reopens?
11      ATTORNEY BRUSTEIN:  Objection.
12    A.  Yes.
13    Q.  Ms. Ivey, do you think you are
14  authorized to make that choice of electing
15  no-fault separation pay instead of being
16  recalled to the hotel for everyone else?
17      ATTORNEY BRUSTEIN:  Objection.
18    A.  If -- I'm sorry.  Could you please
19  repeat the question.
20      ATTORNEY LUNDY:  Can you re-read
21    the question, please.
22    (Requested portion of the record
23    read back.)
24    A.  No.
25    Q.  Do you know whether Hotel 57

Page 242

O. IVEY

1
2  Services also employs union members?
3      ATTORNEY BRUSTEIN: Objection.
4      A. (No response.)
5      Q. Let me rephrase the question. Are
6  you aware that individuals who are part of a
7  union are employed by Hotel 57 Services LLC?
8      ATTORNEY BRUSTEIN: Objection.
9      A. Yes.
10     Q. And do you know whether they are
11 also subject to the same agreement as you,
12 this EmPact agreement that we've been
13 reviewing today?
14     ATTORNEY BRUSTEIN: Objection.
15     A. There are certain aspects of the
16 EmPact agreement that they are -- that they're
17 bound by. But they also have a union
18 contract.
19     Q. A collective bargaining agreement?
20     A. Yes.
21     Q. And do you know whether that
22 collective bargaining agreement sets forth
23 their terms of compensation as an employee of
24 the hotel?
25     A. I do not know what's in their

Page 243

O. IVEY

1
2  contract, as far as that is concerned. I do
3  know about the rules and regulations as it
4  governs their work, their work rules. But not
5  their compensation or anything of that nature.
6      Q. So it's your understanding that the
7  EmPact agreement, which on its cover says
8  U.S. EmPact Employee Handbook also applies to
9  the union members relative to work rules, is
10 that correct?
11     ATTORNEY BRUSTEIN: Objection.
12     A. It does apply to them. But there
13 are things in their contract that is not
14 included in the EmPact agreement.
15     Q. That would be included in the
16 collective bargaining agreement, to your
17 knowledge?
18     ATTORNEY BRUSTEIN: Objection.
19     A. I -- I think so. Because the
20 EmPact serves for both union and non-union
21 employees, and the bargaining agreement just
22 serves for the unionized employees.
23     Q. Do you know whether union employees
24 have received any compensation since March of
25 2020?

Page 244

O. IVEY

1
2      A. I have heard that there are people
3  who have opted to receive compensation. I am
4  not -- I heard. I am not -- I haven't spoken
5  to anyone who said I have taken money.
6      Q. Do you believe that union employees
7  governed by a collective bargaining agreement
8  are similarly situated to you?
9      ATTORNEY BRUSTEIN: Objection.
10     A. Yes.
11     Q. In what way?
12     A. Well, they -- they're out of work
13 also. They were not adequately notified,
14 properly notified as they should have been
15 under the WARN Act. The difference for them
16 is that they are allowed under the union to be
17 employed, they are able to go to the union
18 house and have employment without losing their
19 status with the Four Seasons.
20     Q. How do you know they were not
21 properly notified, as you've just testified
22 to?
23     A. Well, I don't --
24     ATTORNEY BRUSTEIN: Objection.
25     A. -- I don't think any of us were.

Page 245

O. IVEY

1
2      Q. Are you aware that union employees
3  received separate WARN notices than non-union
4  employees?
5      A. I was not aware of that.
6      Q. Are you aware that union employees
7  have received compensation from Hotel 57
8  Services since March 2020?
9      ATTORNEY BRUSTEIN: Objection.
10     A. I heard that.
11     Q. Let's refer back to the EmPact
12 agreement, please, before we do that. I'm
13 sorry.
14         You previously testified that
15 Sharon Brambrut was your supervisor, is that
16 correct?
17     A. I reported to her too, yes.
18     Q. Okay. Did you ever discuss your
19 concerns regarding the payment or lack thereof
20 of the no-fault separation pay with Sharon
21 Brambrut?
22     A. I don't remember having that
23 discussion with her.
24     Q. Did you ever file a written
25 complaint with human resources -- with the

Page 246

```
           O. IVEY
1
2   human resources office about your concerns
3   about payment of no-fault separation pay?
4        ATTORNEY BRUSTEIN:  Objection.
5        A.  No.
6        Q.  Did you ever request the director
7   of human resources to assist you in preparing
8   any type of internal complaint about a concern
9   about no-fault separation pay?
10       ATTORNEY BRUSTEIN:  Objection.
11       A.  No.
12       Q.  Did you ever receive any written
13  decision on any complaint to human resources
14  regarding your concerns about no-fault
15  separation pay?
16       A.  No.
17       Q.  Did you ever file an appeal to a
18  general manager of the hotel about any
19  decision by human resources regarding the
20  failure to pay no-fault separation pay?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  While there was a GM, no.
23       Q.  Was the first time you raised the
24  concerns about the failure to pay no-fault
25  separation pay in this lawsuit?
```

Page 247

```
1            O. IVEY
2        ATTORNEY BRUSTEIN:  Objection.
3        A.  When I thought of raising the
4   question was on the town hall meeting.  But I
5   did not raise the question because the
6   question was already asked.
7        Q.  You raised it in your complaint
8   that we're here for today in the lawsuit, is
9   that right?
10       A.  Yes.
11       Q.  And that was the first time you
12  raised it in this lawsuit?
13       ATTORNEY BRUSTEIN:  Objection.
14       A.  In the lawsuit it was raised.
15  However I knew what the response was from the
16  meeting, because the question was asked.  As I
17  said before in the meeting, in the town hall
18  meeting, if a question is asked -- if someone
19  is thinking of a question and the question is
20  asked, there were so many people on, and the
21  question was asked by someone else, I'm not
22  going to ask the same question again.  Because
23  the question was asked and a response was
24  given.
25       Q.  A question was asked, is that what
```

Page 248

```
1            O. IVEY
2   you're saying?
3        A.  The question was asked.
4        Q.  Okay.
5        A.  And a response was given.
6        Q.  Okay.  But the first time that you
7   raised a complaint about not being paid
8   no-fault separation pay was when this lawsuit
9   was filed, is that correct?
10       A.  I never spoke with anyone at the
11  Four Seasons about that.
12       Q.  Okay.  Thank you.  I just have one
13  more line of questioning.  It should be pretty
14  quick.
15       ATTORNEY LUNDY:  Do we want to take
16  a break or do you want to keep going?
17  I'm okay to keep going.  Ms. Ivey, are
18  you all right?
19       THE WITNESS:  I'm okay.
20       ATTORNEY LUNDY:  Okay, great.
21       Q.  Ms. Ivey, we were looking at a
22  document letter marked exhibit 28, it's a
23  letter from February 24, 2023.  And it
24  identifies your estimated damages in this
25  lawsuit.  Can you look at that, please?
```

Page 249

```
1            O. IVEY
2        A.  Yes.
3        Q.  The letter identifies compensatory
4   damages in the amount of $110,000 based on
5   $44,500 in no-fault separation pay, $21,833 in
6   WARN Act damages for each of the three
7   violations of the WARN Act, totalling $65,500.
8        Do you see that?
9        A.  I see that, yes.
10       Q.  Is it your understanding that those
11  are the compensatory damages you are seeking
12  in this lawsuit?
13       ATTORNEY BRUSTEIN:  Objection.
14       A.  It is my understanding.
15       Q.  This section references each of the
16  three violations of the WARN Act.  Do you know
17  what the three violations this letter is
18  referring to?
19       A.  Yes.
20       Q.  Can you identify those for me
21  please?
22       A.  It was for all the times that they
23  did inform us that we would be returning to
24  work, but never did.
25       Q.  Do you recall those dates?
```

O. IVEY

1         O. IVEY
2         ATTORNEY BRUSTEIN:  Objection.
3     A.  No.
4         ATTORNEY BOLAND:  That question
5     answered itself.
6     Q.  I also see items 2 and 3 listed in
7  section C but without a specific accounting,
8  is that correct?
9     A.  Yes.
10    Q.  And as we sit here today, you're
11 unaware of what those specific estimated
12 damages are, is that right?
13        ATTORNEY BRUSTEIN:  Objection.
14    A.  I am unaware.  My understanding is
15 that it will be whatever the court decides.
16    Q.  Are you aware of any monetary
17 damages Ms. Selena Staley sustained in
18 connection with this lawsuit?
19        ATTORNEY BRUSTEIN:  Objection.
20    A.  No.
21    Q.  Are you aware of any monetary
22 damages allegedly sustained by Vivian Holmes
23 in connection with this lawsuit?
24        ATTORNEY BRUSTEIN:  Objection.
25    A.  No.

O. IVEY

1     Q.  What about anyone else that you are
2  representing as a class representative in this
3  lawsuit, do you know what damages they have
4  sustained in connection with this lawsuit?
5         ATTORNEY BRUSTEIN:  Objection.
6     A.  I do not know what damages they
7  sustained.  However, I am sure that that is
8  something that could be ascertained.
9     Q.  Other than the damages that we have
10 discussed in section C of the letter from
11 February 24, 2023 at exhibit 28, are you aware
12 of any other damages that you are seeking in
13 this lawsuit as you sit here today?
14        ATTORNEY BRUSTEIN:  Objection.
15    A.  Apart from here?
16    Q.  Yes.
17    A.  No.
18        ATTORNEY LUNDY:  Could we take a
19    quick break?
20        ATTORNEY BRUSTEIN:  Yes.
21        ATTORNEY LUNDY:  Thank you.
22                 ---
23    (Recess from 4:46 to 4:53.)
24                 ---

O. IVEY

1         O. IVEY
2  BY ATTORNEY LUNDY:
3     Q.  Ms. Ivey, we were just discussing
4  the damages in this matter as outlined in the
5  February 2, 2023 letter at exhibit 28.  How
6  do you feel that you have been financially
7  harmed by what the defendants did since the
8  beginning of COVID-19?
9         ATTORNEY BRUSTEIN:  Objection.
10    A.  How do I feel ...
11    Q.  That you have been financially
12 harmed by what the defendants did since the
13 beginning of COVID-19?
14    A.  Well, I have been unemployed.  It
15 was my sole way of making a living, and based
16 on what Ms. Ortiz said, that we weren't
17 allowed to seek employment or forfeit any
18 possible severance fee that would have been
19 coming to us if we worked, that left me
20 between a rock and a hard place.  I felt like
21 okay, I am not able to work and they're not --
22 we're not returning to the Four Seasons
23 midtown, we're not able to take up
24 unemployment.  If we take up unemployment
25 then -- if I take up unemployment then my 25

O. IVEY

1  years of service, any severance pay that would
2  go to me, is forfeited.  And during that time
3  I'm going from making a steady income for 25
4  years to zero.  Yes, I collected unemployment,
5  but then after my unemployment ceased I was
6  living off of my savings.  Now my savings, I
7  mean how much savings can one have to maintain
8  a family in this country when you're just
9  doing a regular job.  Right?
10        I've basically had to adjust the
11 way I live.  My family had to adjust the way
12 they live.  I depleted my savings, completely
13 depleted my savings, and at this juncture,
14 just basically I don't know what else to do.
15    Q.  And Ms. Ivey, for what you've just
16 described, would you like to be compensated
17 for those injuries?
18        ATTORNEY BRUSTEIN:  Objection.
19    A.  Yes.
20    Q.  And do you know specifically what
21 that compensation would be?
22        ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't know what that compensation
24 would be, because I have no experience in

Page 254

```
1           O. IVEY
2  legal matters.  However, I am sure my
3  attorneys are competent it enough to basically
4  advise me on what would be fair.
5      Q.  Ms. Ivey, in paragraph 23 of your
6  amended complaint it reads:  By reason of
7  defendants' unlawful conduct plaintiffs and
8  others similarly situated have suffered
9  monetary damages and other resulting injury
10 and loss.
11          Is it fair to say that others
12 similarly situated suffered other injury and
13 loss different from your own?
14     ATTORNEY BRUSTEIN:  Objection.
15     A.  I cannot say what or how much they
16 have suffered.  However, I am sure if you --
17 if they went from getting a paycheck every
18 week consistently, being able to budget and
19 being able to live a particular way, and then
20 going from something to nothing, it's obvious
21 that they would be affected.
22     ATTORNEY LUNDY:  I have no further
23 questions.  Thank you, Ms. Ivey.
24     THE WITNESS:  Thank you.
25     ATTORNEY WAGNER:  No questions from
```

Page 255

```
1           O. IVEY
2  me.  Thank you.
3      ATTORNEY BROMBERG:  Can we just
4  talk for two seconds?
5      ATTORNEY BRUSTEIN:  Yes.
6      (Pause in proceedings.)
7      ATTORNEY BRUSTEIN:  We are not
8  going to ask any questions.  We are just
9  going to reserve any, be able to, you
10 know, have signature at the end.
11     (Continued on the following page to
12 include jurat.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 256

```
1           O. IVEY
2      ATTORNEY BROMBERG:  We're reserving
3  review and signature.
4      ATTORNEY LUNDY:  Thank you,
5  Ms. Ivey.
6           ---
7      (Time noted: 5:01 p.m.  EDT)
8
9      _____
10          OLIVE IVEY
11
12 Sworn and subscribed to before
13 me this _____day
14 of _____, 2023,
15 in the jurisdiction aforesaid.
16
17 _____
18 NOTARY PUBLIC
19
20
21
22
23
24
25
```

Page 257

```
1
2       C E R T I F I C A T E
3  STATE OF NEW YORK    )
4  COUNTY OF NEW YORK    )
5      I, FRANK J. BAS, a Certified
6  Shorthand Reporter and Notary Public within
7  and for the State of New York, do hereby
8  certify:
9      That the witness whose testimony is
10 hereinbefore set forth, was duly sworn by me
11 and that such testimony given by the witness
12 was taken down stenographically by me and then
13 transcribed.
14     I further certify that I am not
15 related by blood or marriage to any of the
16 parties in this matter and that I am in no way
17 interested in the outcome of this matter.
18     That any copy of this transcript
19 obtained from a source other than the court
20 reporting firm, including from co-counsel, is
21 uncertified and may not be used at trial.
22     IN WITNESS WHEREOF, I have hereunto
23 set my hand this 12th day of April, 2023.
24
       _____
25     FRANK J. BAS, RPR, CRR
```

Page 258

```
1
2    ----------------- I N D E X -----------------
3    WITNESS      EXAMINATION BY      PAGE
4    OLIVE IVEY        MS. LUNDY        5
5    ----------------- EXHIBITS-----------------
     (Exhibits retained by Freeborn & Peters)
6
     DEFENDANTS'                     PAGE
7
     Defendants' Exhibit 59          96
8    verification
9    Defendants' Exhibit 60 documents    97
10   Defendants' Exhibit 61 EmPact    111
     documents
11
     Defendants' Exhibit 62 2019 Form    114
12   W-2
13   Defendants' Exhibit 63 2020 Form    115
     W-2
14
     Defendants' Exhibit 64 2021 Form    116
15   W-2
16   Defendants' Exhibit 65 earnings    124
     statement
17
     Defendants' Exhibit 66          132
18   WARNERDEF_00651 through
     WARNERDEF_00653
19
     Defendants' Exhibit 67          142
20   WARNERDEF_000150
21   Defendants' Exhibit 68 Internal    191
     Memo dated June 25, 2020 to Olive
22   Rodriguez
23   Defendants' Exhibit 69 letter    192
     dated August 5, 2020
24
     Defendants' Exhibit 70 letter    200
25   dated July 10, 2020
```

Page 259

```
1
2    ------- EXHIBITS CONTINUED -------
3    Defendants' Exhibit 5 Complaint    38
4    Defendants' Exhibit 6 First    40
     Amended Complaint
6
     Defendants' Exhibit 7 Notice of    62
7    Motion to Compel Arbitration and
     Dismiss Class Claims and Stay
8    Action, Memorandum of Law in
     Support
9
     Defendants' Exhibit 8 Declaration    63
10   of Cathy Hwang
11   defendants' Exhibit 9 Memorandum    65
     of Law in Opposition to Defendants'
12   Motion to Compel Arbitration,
     Dismiss Class Claims and Stay
13   Action
14   Defendants' Exhibit 10 Declaration    66
     of Evan Brustein
15
     Defendants' Exhibit 11 Reply    70
16   Memorandum of Law in Further
     Support of the Warner Defendants'
17   Motion to Compel
18   Defendants' Exhibit 12 Notice of    71
     Motion to Dismiss, Memorandum of
19   Law in Support of the Warner
     Defendants' Motion to Dismiss the
20   Complaint
21   Defendants' Exhibit 13 Declaration    72
     of Elizabeth Ortiz
22
     Defendants' Exhibit 14 Notice of    73
23   Motion to Dismiss, Memorandum of
     Law in Support of the Warner
24   Defendants' Motion to Dismiss
25
```

Page 260

```
1
2    ------- EXHIBITS CONTINUED -------
3    Defendants' Exhibit 15 Declaration    74
     of Elizabeth Ortiz with exhibits
4
     Defendants' Exhibit 16 Plaintiffs'    75
5    Memorandum of Law in Opposition to
     Defendants' Hotel 57 Services
6    Motion to Dismiss the Amended
     Complaint
7
     Defendants' Exhibit 17 Declaration    76
8    of Evan Brustein with exhibits
9    Defendants' Exhibit 19 Reply    77
     Memorandum of Law in Further
10   Support of the Warner Defendants'
     Motion to Dismiss the Amended
11   Complaint
12   Defendants' Exhibit 20 Plaintiffs'    80
     Rule 26 (A)(1)(A) Initial
13   Disclosures
14   Defendants' Exhibit 21 Plaintiffs'    83
     First Supplemental Disclosures
15
     Defendants' Exhibit 24 Defendants'    88
16   First Demand For Production of
     Documents
17
     Defendants' Exhibit 25 Plaintiffs'    90
18   Responses and Objections to
     Defendants' First Request For
19   Production of Documents
20   Defendants' Exhibit 26 Defendants'    92
     First Set of Interrogatories
21
     Defendants' Exhibit 27 Plaintiffs'    95
22   Responses and Objections to Warner
     Defendants' First Set of
23   Interrogatories
24   Defendants' Exhibit 33 Staley    172
     v FSR 0204 to 0207
25
```

Page 261

```
1
2    -------- EXHIBITS CONTINUED -------
3    Defendants' Exhibit 34 Staley    177
     v FSR 0054
4
     Defendants' Exhibit 35 Staley    182
5    v FSR 0086 to 87
6    Defendants' Exhibit 36 Staley    185
     v FSR 0055
7
     Defendants' Exhibit 37 Staley    188
8    v FSR 0056
9    Defendants' Exhibit 41 Staley    204
     v FSR 0057
10
     Defendants' Exhibit 42 Staley    204
11   v FSR 0088 to 89
12   Defendants' Exhibit 43 Staley v    206
     FSR 0221
13
     Defendants' Exhibit 44 FSR 0058    207
14
     Defendants' Exhibit 45 Staley    208
15   v FSR 0001
16   Defendants' Exhibit 46 Staley    209
     v FSR 0059
17
     Defendants' Exhibit 50 Staley    217
18   v FSR 0061
19   Defendants' Exhibit 51 Staley    219
     v FSR 0082 to 85
20
21   Defendants' Exhibit 28 letter    237
     dated February 24, 2023 from
22   Brustein law firm
23
24
25
```

Page 262

1        ERRATA SHEET
2 Case Name:
3 Deposition Date:
4 Deponent:
5 Pg. No. Now Reads   Should Read  Reason
6 ___ ___ _____  _____  _____
7 ___ ___ _____  _____  _____
8 ___ ___ _____  _____  _____
9 ___ ___ _____  _____  _____
10 ___ ___ _____  _____  _____
11 ___ ___ _____  _____  _____
12 ___ ___ _____  _____  _____
13 ___ ___ _____  _____  _____
14 ___ ___ _____  _____  _____
15 ___ ___ _____  _____  _____
16 ___ ___ _____  _____  _____
17 ___ ___ _____  _____  _____
18 ___ ___ _____  _____  _____
19 ___ ___ _____  _____  _____
20        _____
21        Signature of Deponent
22 SUBSCRIBED AND SWORN BEFORE ME
23 THIS ____ DAY OF _____, 2023.
24 _____
25 (Notary Public)  MY COMMISSION EXPIRES:_____

**$**

**$110,000** 249:4

**$21,833** 249:5

**$44,500** 238:5,9 241:3 249:5

**$65,500** 249:7

**$913** 128:16

**$913.38** 126:7

**(**

**(A)(1)(A)** 80:18 82:7 260:12

**(i)** 238:4

**0**

**0001** 81:4,16,24 82:10 208:13,17 261:15

**0054** 177:18,22 261:3

**0055** 185:10,16 261:6

**0056** 188:5,11 261:8

**0057** 204:3,8 261:9

**0058** 207:25 208:6 261:13

**0059** 209:23 210:3 261:16

**0061** 217:7,12 261:18

**0082** 219:16,20 261:19

**0085** 219:21 220:3

**0086** 182:4,8 261:5

**0087** 182:8

**0088** 205:2,8 261:11

**0089** 205:8

**0090** 99:3

**0204** 172:23 173:3 260:24

**0205** 176:9

**0207** 172:23 260:24

**0221** 206:22 207:2 261:12

**0261** 81:20,25

**0262** 84:17

**1**

**1** 84:14 93:16 94:3

**10** 66:13,17,18 68:10 103:17,19 118:10 143:2,5,8,14 200:4,8 226:4,5 258:25 259:14

**103** 99:4 100:20

**107** 101:23

**10:24** 30:5

**10:31** 30:5

**11** 70:12,18 118:9 200:15 204:7 259:15

**111** 258:10

**11236** 7:23 99:16

**114** 258:11

**115** 258:13

**116** 258:14

**11:21** 78:17

**11:31** 78:17

**12** 71:15,22 220:16 259:18

**124** 258:16

**12:29** 121:20

**12:36** 121:20

**12th** 257:23

**13** 70:19 72:25 73:5 259:21

**132** 258:17

**14** 73:13,19 77:22 193:9,13 196:15 259:22

**142** 258:19

**15** 64:13 74:18,23 174:24 175:3 179:18,

25 184:14 185:4 186:17,20 260:3

**16** 40:12 75:6,13 126:2 185:5 260:4

**17** 76:11,18,23 133:16 135:17 136:9 207:3 260:7

**172** 260:24

**177** 261:3

**18** 78:4 113:4

**182** 261:4

**185** 261:6

**188** 261:7

**19** 63:6 74:24 77:15, 21 119:4 208:22 260:9

**191** 258:21

**192** 258:23

**1997** 102:13,21

**1:05** 146:20

**1:59** 147:3

**2**

**2** 10:2 73:6 91:9 148:6 237:23,24 250:6

**20** 73:20 80:16,17,23 91:3 148:9,20 151:8 153:3 174:19 177:6 183:12 236:10 260:12

**200** 258:24

**2012** 11:7

**2018** 68:5,6 113:4 119:4

**2019** 14:17,22 19:10 103:15 114:16,25 258:11

**2020** 104:10 106:14 110:9,25 111:6 115:18 116:3 120:3, 19 131:7 148:9,20 149:5 158:22 159:19, 25 160:13 162:10,15, 18 164:6 168:17

171:8,15 172:9,11,16 174:9,20,24 175:2,3, 23 176:2 177:6,23 179:18,25 181:7,10 183:13 185:5,17 186:17,20,21 187:21 188:12 189:2,9 190:18,24 191:5,10 192:9,13 193:4,9,13 194:6 196:5,8,13,15 197:9,15 198:21 199:7 200:4,8,15,20 201:23 202:24 203:11 204:7 205:20 207:3,12 208:7,22 210:4,15 236:10 243:25 245:8 258:13, 21,23,25

**2021** 12:13 84:15,23, 25 85:20 86:11,18 87:4 109:17,20 116:14,21 117:2,23 118:3,6 120:24 121:23 122:3,8,14,19 123:4,15,21 124:2,6 126:13 127:7 129:10 131:7,24 134:20 147:21 211:5,7 212:2,16 217:12 218:24 227:4 231:5, 22 258:14

**2022** 12:12,13 21:11 26:20 27:5 37:21 38:10 40:12 41:14 64:13 65:16 66:2,20 68:3 70:19 71:22 73:6 83:8,12,18 109:20 126:2,3,6,16 128:13,20,23 131:2 133:21 134:2 135:2, 17,19 136:9 143:8 218:7

**2023** 11:12 73:20 74:24 75:14 77:22 237:2,8,17 248:23 251:12 252:5 256:14 257:23 261:21

**204** 174:7 261:9,10

**206** 261:12

**207** 174:8 261:13

**208** 261:14

**209** 261:16

**20s** 222:17 224:18

**20th** 154:3

**21** 83:24 84:6 108:25 109:2 184:15 260:14

**217** 261:17

**219** 261:19

**22** 108:25 109:2 126:3 185:17 186:20 187:21 188:11 189:2

**228** 230:17,21 231:3, 6 232:12,15 233:2,24 234:4,10,21

**23** 133:3 254:5

**237** 261:21

**24** 88:12,13 125:22 236:7 237:2,8,17 248:23 251:12 252:5 260:15 261:21

**25** 84:14,23,25 85:20 86:11,18 87:4 90:12, 18 102:11 134:20 140:20 141:6 191:5, 10 212:2,15 217:12 218:24 223:3,22 227:4 231:5,22 252:25 253:4 258:21 260:17

**26** 80:18 82:7 83:8, 12,18 92:14,19 260:12,20

**27** 95:20 96:2 97:2,15 226:17 228:10 231:19 233:9 260:21

**28** 205:17 220:15 231:6 236:25 237:6,7 248:22 251:12 252:5 261:21

**29** 176:2

**2:40** 181:16

**2:43** 181:16

**3**

**3** 67:25 68:9 148:4,7 149:3 210:4 250:6

**30** 148:9 175:23 177:23 181:7 223:7

**31** 230:20

**33** 172:21,22 173:2,8 174:6 260:24

**34** 177:16,17,22 181:25 261:3

**35** 182:2,3,7,22 261:4

**36** 185:9,14,15 261:6

**37** 188:4,8,10 261:7

**38** 259:4

**3:02** 133:16

**3:29** 211:22

**3:46** 211:22

**4**

**4** 91:9

**40** 69:17 259:5

**401(k)** 34:22 36:2 127:17,23 128:3,8, 12,17 129:13,16 131:13 133:8 135:8 136:20 137:5,13 138:12 139:9,12,18 214:25

**41** 203:25 204:2,6 261:9

**42** 204:25 205:5,7 261:10

**43** 206:21,25 261:12

**44** 91:4 207:25 208:5 261:13

**45** 208:12,16 209:17 261:14

**46** 50:25 209:22 210:2 261:16

**464** 194:7,10

**49** 51:3

**4:05** 225:23

**4:15** 225:23

**4:46** 251:24

**4:53** 251:24

**5**

**5** 38:4,5,10 66:20 67:13 68:3 71:22 118:21 192:9,13 193:3 194:6 196:13 208:6 258:4,23 259:4

**50** 168:21,24 217:6, 10,11 261:17

**51** 51:4,10 219:14,15, 19 261:19

**52** 51:11

**53** 222:17,18 224:18

**54** 51:12

**56** 235:12,17 239:17

**57** 23:11,16 51:18 75:8,16 95:11 104:5 107:17 111:10 115:10,14 116:9,23 117:2,23 118:6 124:8,24 125:4,10,15 126:8,17 127:11 128:2,6,19 130:25 131:8 135:4 141:18 148:13 185:4 187:23 197:10 198:20 199:5, 15 212:9 214:12 215:10,18 216:8 217:3,21 220:18 226:23 231:24 234:21 235:18,24 236:5,20 238:12 240:21 241:25 242:7 245:7 260:5

**57th** 23:11,17 95:11 141:12 148:13

**59** 96:18,22 97:4 258:7

**5:01** 256:7

**6**

**6** 40:5,10 41:8 50:18 62:9 65:16 66:2 118:10 120:6 147:23, 24 221:2,6,7 259:5

**60** 40:11 97:21,24 99:25 100:8,19 101:6 102:4 258:9

**61** 111:21,25 258:10

**62** 114:16,19 258:11 259:6

**63** 115:18,21 258:13 259:9

**64** 116:14,17 124:7 258:14

**65** 99:15 124:12 135:2 258:16 259:11

**655** 7:22

**66** 132:5,9 135:7 258:17 259:14

**67** 142:13,17 258:19

**68** 191:4,9 258:21

**69** 192:8,12 258:23

**6:30** 118:9,10,21 120:7

**7**

**7** 62:11,17 63:6,10 64:8 75:14 259:6

**70** 106:11 200:3,7 258:24 259:15

**71** 259:18

**718-581-6723** 7:25

**72** 259:21

**73** 259:22

**74** 260:3

**75** 260:4

**76** 260:7

**77** 260:9

**8**

**8** 63:25 64:4,11 259:9

**80** 260:12

**81st** 7:22 99:16

**83** 260:14

**85** 219:16 261:19

**87** 182:4 261:5

**88** 260:15

**89** 205:2 261:11

**9**

**9** 38:10 65:9,15 174:8, 25 259:11

**90** 98:22 100:19 102:10 260:17

**913.38** 125:23

**92** 260:20

**95** 260:21

**96** 258:7

**97** 102:12 258:9

**@**

**@bmc** 10:5

**@fourseasons.com** 184:10

**@yahoo.com** 10:3

**A**

**a.m.** 118:9,10,21 120:7

**ability** 32:22 226:12 229:8 241:9

**abreast** 198:3

**Absolutely** 141:16

**abundance** 170:18 174:20

**accept** 60:7 141:25 233:5 241:3

**accepted** 239:13

**accepting** 167:2 190:5

**access** 15:7,15,21 16:12,16,25 17:6,8, 20 18:6 142:25 144:6,19,23 145:7, 10,23 146:8,12

**183:17 186:7,10**

**accessed** 15:3

**accessing** 15:8 18:11

**accident** 13:6

**account** 15:4,7,8,16 16:13 17:4,5,8,21 18:6,7 30:15,23 31:8 32:3,18 34:22 137:7 183:8,12,21,25 184:8,9 186:2,6

**accounting** 250:7

**accounts** 18:12 31:13,15 32:6 33:5 183:22 184:8

**accrued** 126:21 144:16

**accruing** 128:23 129:2

**accuracy** 39:12 41:4 42:15 43:23

**accurate** 39:24 41:9 67:22 68:4 97:19 151:18 168:6,12 175:11 230:25 232:16 234:2 237:18

**acknowledged** 68:6

**Acknowledgment** 112:19 113:9

**acquire** 203:17

**Act** 195:5,10 244:15 249:6,7,16

**acting** 154:19

**action** 38:21 42:2,7 44:11,13 50:5 51:2,4, 11,12,19,22 52:4,12 53:14 55:2 62:13 63:12 65:12,19 72:12,16 91:12 93:21 97:8 110:8,11 259:8, 13

**active** 204:14,17,23 207:8

**actively** 233:11

**activities** 228:12 231:24

**Acts** 195:14

**actual** 81:10

**added** 57:18

**addition** 186:13

**additional** 83:18 89:16,22,25 90:7,8

**address** 7:21 11:23 14:7 15:12,19 17:11, 14 93:17 99:15,17 115:7 116:5 183:5

**addresses** 9:21 11:15,18

**adequately** 201:11 244:13

**adjust** 253:11,12

**administrative** 91:5

**adult** 224:21 225:8

**advice** 25:2 29:7 60:17

**advise** 86:24 130:8 196:4 254:4

**advised** 54:19 156:11 196:14 218:4

**advising** 227:5

**affect** 149:22 150:10 228:2

**affected** 151:2 166:7 254:21

**affecting** 150:14

**afford** 191:22

**aforesaid** 256:15

**afternoon** 147:13,14

**agent** 103:7

**agreed** 53:12

**agreement** 43:19,20 59:20 60:5 68:2,4,8, 9,13,17 69:2,6,9,19, 23 70:3,7 103:20,25 104:4,8 199:2 226:2, 17,21 227:7 228:9 229:10 231:19 233:9, 16 235:11,14,16,25 238:13,21 239:18 242:11,12,16,19,22

243:7,14,16,21 244:7 245:12

**Agyeman** 220:13

**ahead** 45:18 160:11

**albeit** 190:25

**Alberti** 16:6

**Alexandra** 15:20,23 16:11 17:7

**alive** 158:9

**allegations** 39:16,23 41:7 42:16 43:23 69:25 75:25 91:13

**alleged** 50:15 51:22 195:4,9

**allegedly** 250:22

**Allen** 184:23

**allowed** 195:19 226:21 244:16 252:17

**altogether** 49:2

**amended** 40:6,13 41:7,12,17 50:15,20 51:21 52:13 66:25 73:23 75:9 77:18,25 147:22,25 220:25 221:2,7 230:16,20,24 232:15 233:2,25 254:6 259:5 260:6,10

**amending** 40:23

**amount** 117:18 126:7 168:23 196:8 236:17 238:9 239:3 249:4

**and/or** 91:13 148:15

**Andrew** 175:24

**annexed** 68:2

**anniversaries** 184:15 185:2 220:6

**announced** 167:11

**answering** 6:17 118:17 161:16

**answers** 6:14,20 21:19 206:8

**anticipate** 231:15,16

**anticipated** 211:4 232:2 234:23

**anxiety** 22:20 45:7

**anymore** 31:9

**anyone's** 28:12

**apologize** 34:24 109:3

**appeal** 246:17

**appeared** 23:21 213:13

**appears** 113:10 132:11 135:17

**application** 176:19

**applies** 243:8

**apply** 102:6,15 142:24 144:5 243:12

**applying** 144:7,15

**Appointment** 77:10

**approximately** 102:13,21,22 103:15 148:8 194:7 205:24

**apps** 183:16

**April** 113:4 162:10 171:8,15 174:8,24,25 175:3,23,25 177:23 181:7,10 211:5,7 257:23

**arbitration** 62:12 63:11,18 65:11,18 70:22 259:7,12

**Arbitrators** 77:10

**ascertain** 240:18

**ascertained** 251:9

**aspect** 142:6 180:11

**aspects** 242:15

**ass** 98:17

**assert** 49:19

**assigned** 109:23

**assignment** 110:3

**assist** 144:7 246:7

**assistance** 145:16

**assistant** 15:25 103:9 106:19 107:3,5

**assume** 166:24

**assuming** 82:4 95:17 123:7 124:4 155:9 156:19 169:20 170:2 171:24 184:2 198:7 201:2 232:22

**attached** 68:9 103:20 226:2

**attendant** 102:17,19 184:22,23

**attendants** 104:21

**attending** 10:9,15

**attention** 100:12

**attorney** 5:2,5,8,10, 13,24 6:4,5 10:24 13:21 16:14,21 19:4, 12,19,23,24 20:13 21:6,15 22:10 23:18 25:2,20 27:16 29:17, 21,24 30:2,3 32:12 33:7,12,25 34:5,16 35:24 38:22 39:18 40:18 41:10,20 42:5, 17 43:4,25 44:15,25 45:9 46:8,13,16,19 48:7,15,19 49:3,10, 16,21,24 50:11,19, 21,22 51:5,7,8,13,24 52:7,16,20 53:5,10, 21 54:9,13 55:5 56:24 57:4,5 58:5,14 59:9 60:3,10,12,15, 21,23 61:7,11,17,22 62:5,18,20,21,23,25 63:4,6,22 64:7,9,15, 19,23 65:4,7 66:3,11 68:7,19 69:7,16 70:8 71:5,9,13 72:4,17 73:9 74:7 75:3,20 76:2,7,9,10,12,13,15, 17 77:11,12 78:4,5,6, 8,10,12,14,15,19 79:5 80:5,10 81:7,9 82:3 83:9,15 84:21 85:4,25 86:22,25 87:16,20 88:21 89:10,17,24 90:3,20 91:7,21 92:3,11,22

93:14 94:4,13,21 95:2,7,12 96:4,12,16, 23,24 98:3,6,10,13, 14,16,19,22,23,25 100:3,5,7,9,16 101:7, 10,13,15 102:3,5,8 104:18 105:11,24 106:5,23 107:18,24 109:3,9,11,13,25 110:23 111:4,16 113:12,14,24 114:2, 6,8,9,10,12,15 115:16 117:4,20,25 118:7,12 119:11,14, 15,18,22 120:4,15,20 121:3,7,9,11,16,18 122:4,7,15,17,21 123:5,17,22 124:3,10 125:6,7,12,17 126:9, 18 127:14,21 128:4, 14,21,25 129:6 130:3,15 131:4,10 134:22 135:10,20,23, 24 136:11,24 137:22 138:3 139:11,20,25 140:14 141:22,23 142:4,9,11 143:9,11, 12,16 145:8,13,25 146:9,18 147:12 148:5,6,23 149:23 151:4,16,20 152:25 153:10,21,24 154:13 155:15,23 156:8,25 157:8,23,24 158:3, 11,18 159:8,11,20 160:4,15 162:8,12,17 163:2,7 164:8,12 165:2,13,18 166:19, 23 167:14 168:3,9,19 173:4,11 175:4,14,19 176:6 177:10,15 179:3,8,9,11 180:3,8 181:9,12,14,18,23 183:23 184:11 185:6 186:22 187:25 189:5, 10 190:19 192:2 193:5,14 194:12 196:6,17 197:5,13 198:15 199:8,18 200:21 201:24 202:5, 25 203:13,19,22 204:19 207:15,17,20, 23 209:5 210:16 211:8,18,20,24 212:12 213:21 214:6 215:11,16,20 216:13

217:4 218:8,25
219:13 220:19
221:12 224:3,5,7,11,
12,14 225:18,20
226:4,5,14,24
227:13,15,17,19
228:18 229:11 230:8,
12 232:3,18 233:6,
14,17 234:7,25
235:6,13,15 236:12
237:20 238:14
239:15 240:9,16,24
241:6,11,17,20
242:3,8,14 243:11,18
244:9,24 245:9
246:4,10,21 247:2,13
248:15,20 249:13
250:2,4,13,19,24
251:6,15,19,21,22
252:2,9 253:19,23
254:14,22,25 255:3,
5,7 256:2,4

**attorney's** 60:8,17

**attorney-client**
21:17 57:3 59:11
86:3,6

**attorneys** 38:17
40:19 42:25 44:10
50:5 52:9,21 53:13
54:20 55:9 56:14,21
57:7,16 58:11 59:21,
24,25 203:5 214:9
236:22 238:15
240:18 254:3

**attorneys'** 58:8 62:3

**attractions** 210:12

**audio** 84:14

**August** 21:11 26:20
27:5 38:10 192:9,13
193:3 194:6 196:13
197:9,15 204:6
205:17,20 258:23

**authority** 50:9,13
217:2

**authorized** 241:14

**aware** 23:20 48:16,
20,24 49:7,15,17
52:11,15 63:15 66:23
67:3,4 72:11,14 95:9
122:13,18 123:2,9
183:19 184:6,12

192:20 193:2 204:14
213:18 214:3 242:6
245:2,5,6 250:16,21
251:12

**awkwardly** 13:18

—— B ——

**back** 9:18 17:10
22:23 23:5 33:24
35:21 42:20 43:10,18
45:14 46:20,22 47:2,
5 49:8,25 50:3,18
64:8 70:11 78:19
82:5 92:8 94:8
100:18 102:16
103:16 118:13 127:2
130:22 131:24
134:14 138:6 147:22
148:19 151:9,10
159:6 170:8 173:9
180:24 228:4 230:16
231:19 232:2,12
233:23 235:5,14
237:22 238:20
241:23 245:11

**background** 161:11

**bad** 26:10,12,14,17
143:6 149:18 151:6

**badly** 225:16

**bargaining** 242:19,
22 243:16,21 244:7

**BAS** 257:5,25

**based** 16:10 51:25
105:25 106:12
118:11,18 119:9
141:9 151:6 157:11
163:10 167:21
189:11 211:12
213:13 220:16
233:15,20 235:23
236:19 238:11,16
249:4 252:15

**basically** 22:18,21
24:21 57:10 80:2
88:22 104:23 166:12
195:25 253:11,15
254:3

**basis** 25:19,24 26:4,6
105:15,21 118:20
120:10,14 150:23

154:15 160:19
162:22 166:5,11
178:11

**Bates** 98:4,8,11,20
113:13 142:18 173:2
177:22 185:16
188:11 208:5,17
210:3 217:11 219:19
220:3

**Bates-numbered**
113:7 132:12 174:7
182:7 204:7 205:7
207:2

**batting** 223:21

**bearing** 177:22
185:16 188:10
208:16 210:2 217:11
219:19 220:3

**began** 149:22 193:9

**begin** 11:4

**beginning** 81:11
101:22 126:2 148:8
154:14 175:3 176:8
177:12 197:24
235:12 252:8,13

**behalf** 5:4,6 39:5
41:18 42:7 49:20
50:6,10 66:7

**beings** 222:15

**belief** 97:13 154:2,9,
16,18 156:23 160:19
162:22 178:12

**believed** 127:5
152:11 161:2 163:22
194:4 225:16

**bell** 184:23,24

**benefit** 34:20 191:19,
24

**Benefits** 191:11

**big** 54:22 150:22
209:10

**birthday** 230:10,11

**bit** 117:6

**blood** 257:15

**BMCC** 10:10,11 11:5

**boat** 45:13,20 47:12,
13 48:3,6

**Boland** 5:5 25:2
46:13 62:25 98:16
135:23 143:12,16
224:5,14 225:20
227:17 230:8,12
250:4

**born** 170:15,16

**Borough** 10:12

**bottom** 67:14 81:3,
15 112:7,12,16,20
226:19 237:14
239:18

**bound** 242:17

**Brambrut** 106:25
107:16,21 109:23
110:4 143:18,21
155:24 156:11,14
245:15,21

**brand** 222:22

**breach** 110:13

**break** 7:7 29:25
78:11,13 100:16
114:10 121:8,15
142:12 146:19
181:13 211:19 224:2,
4,6,8 225:19,21
248:16 251:20

**breaks** 7:9 207:22

**breeze** 64:10

**Brian** 5:10 55:23

**bringing** 39:4 64:21

**Broadway** 210:14,
18,19,20

**Bromberg** 5:10,11
58:21,22 59:3 78:4,6
98:19,23 255:3 256:2

**Brooklyn** 7:22 87:8
99:16

**brought** 6:6 38:20
68:14 148:18 161:24
221:13

**Brustein** 5:8,9 10:24
13:21 16:14,21 19:4,
12,19,24 20:13 21:6,
15 22:10 23:18 27:16

29:17,21,24 30:3
32:12 33:7,12,25
34:5,16 35:24 38:22
39:18 40:18 41:10,20
42:5,17 43:4,25
44:15,25 45:9 46:8,
16 48:7,15,19 49:3,
10,16,21 50:11,19,22
51:5,8,13,24 52:7,16,
20 53:5,10,21 54:9,
13 55:5,15 56:2,24
57:5 58:5,14 59:9
60:3,10,15 61:7,11,
17,22 62:5,18,21
63:4,22 64:7,15,19,
23 65:4,7 66:3,11,14,
19 68:3,7,19 69:7,16
70:8 71:5,9,13 72:4,
17 73:9 74:7 75:3,20
76:2,7,10,13,17,19
77:6,11 78:8,12,15
79:5 80:5,10 81:7
82:3 83:9,15 84:21
85:4,25 86:22,25
87:16,20 88:21
89:10,17,24 90:3,20
91:21 92:3,11,22
93:14 94:4,13,21
95:2,7,12 96:4,16,23
98:3,10,14 100:3,5,9
101:7,13 102:3,8
104:18 105:11,24
106:5,23 107:18,24
109:3,11,25 110:23
111:4,16 113:12,24
114:6,9,12 115:16
117:4,20,25 118:7,12
119:11,15,22 120:4,
15,20 121:3,7,11,18
122:4,7,15,21 123:5,
17,22 124:3,10
125:6,12,17 126:9,18
127:14,21 128:4,14,
21,25 129:6 130:3,15
131:4,10 134:22
135:10,20,24 136:11,
24 137:22 139:11,20,
25 140:14 141:22
142:4,9 143:9 145:8,
13,25 146:9 148:5,23
149:23 151:4,16,20
152:25 153:10,21,24
154:13 155:15,23
156:8,25 157:8,23
158:3,11,18 159:8,
11,20 160:4,15

162:8,12,17 163:2
164:8,12 165:2,13,18
166:19,23 167:14
168:3,9,19 173:4,11
175:4,14,19 176:6
177:10 179:3,8,11
180:3,8 181:9,12,23
183:23 184:11 185:6
186:22 187:25 189:5,
10 190:19 192:2
193:5,14 194:12
196:6,17 197:5,13
198:15 199:8,18
200:21 201:24 202:5,
25 203:13,19,22
204:19 207:15,20
209:5 210:16 211:8,
20 212:12 213:21
214:6 215:11,16,20
216:13 217:4 218:8,
25 220:19 221:12
224:3,12 226:3,4,14,
24 227:13,19 228:18
229:11 232:3,18
233:6,14,17 234:7,25
235:6,13 236:12
237:2,8,20 238:14
239:15 240:9,16,24
241:6,11,17 242:3,8,
14 243:11,18 244:9,
24 245:9 246:4,10,21
247:2,13 249:13
250:2,13,19,24
251:6,15,21 252:9
253:19,23 254:14
255:5,7 259:14 260:8
261:22

**budget** 254:18

**building** 141:12
190:10

**building's** 190:16

**business** 10:16
33:9,11 59:16 141:2
149:25 158:15 175:9,
17 184:9 207:10,14
218:13

**C**

**calculated** 235:23
236:22 238:17

**calculating** 236:6

**calendar** 135:16,22
136:4,5

**call** 26:7,8,13,15
34:18 35:20 36:16,21
45:2,3,4 52:23 85:14
87:11,19,22 129:14
154:20 205:14,17,20
219:5

**called** 5:19 28:18,23
46:24 130:22 136:19
138:23 159:16

**calling** 193:22

**calls** 19:14 133:24
205:22,25

**capacity** 119:7

**care** 36:5 37:18
130:12,20 178:20,25
188:23

**case** 49:20 50:10
55:7,21 58:13 63:16
66:24 72:9

**cash** 35:3,18 129:17
137:6 138:13

**cashing** 126:24

**category** 121:5

**Cathy** 64:2,12 259:10

**caution** 170:18
174:20

**cease** 189:15

**ceased** 189:8 253:6

**celebrating** 185:3

**cell** 7:24 8:2,5 186:10

**certification** 10:21

**Certified** 257:5

**certify** 257:8,14

**cessation** 167:8

**Chan** 184:21 185:3
220:10

**change** 133:9 137:20
139:4 167:10

**changed** 133:2
137:4,9 138:11,16
150:19 158:16

**changing** 8:19 9:18
150:17 187:8

**characterize** 140:10

**charge** 110:10

**charging** 60:2

**check** 27:21 183:18
186:8,9

**checking** 183:11
193:22

**child** 222:25 223:9

**China** 152:4 160:22

**choice** 241:14

**choices** 129:15

**Chris** 184:23

**chug** 207:24

**circles** 26:18

**city** 153:15 154:8,19,
21 155:18 156:3,17,
19 164:6 165:6 181:2
187:15 204:15

**claims** 39:4 49:20
50:14 52:18 53:20
54:8,12 62:13 63:11
65:12,18 68:14 91:13
195:3,8 198:24
259:7,12

**clarification** 153:4

**clarify** 30:7 46:9

**class** 42:2,6 44:5,8,
10 53:19 54:4 55:3
61:10,14 62:13 63:11
65:12,18 74:3 93:12
194:23 202:22 203:9
238:23 240:11 251:3
259:7,12

**cleanliness** 104:22

**clear** 109:14 121:12
137:23 162:2 228:5

**clearing** 18:19

**closed** 49:12 155:25
210:12,15,19 211:4
218:5

**closing** 153:15
155:8,9,17 156:16,17

**closure** 167:12 168:2
206:9,13,16 222:11,
12 226:13

**clothes** 95:16 206:18

**clothing** 19:8

**co-counsel** 257:20

**co-workers** 50:7

**coach** 223:14

**coached** 29:8

**coaching** 202:6

**code** 115:8 116:5

**cold** 24:24 37:24

**collect** 176:18

**collected** 253:5

**collective** 242:19,22
243:16 244:7

**College** 10:13

**column** 117:11

**columns** 235:19

**comfortable** 57:12

**commencing** 43:22

**committed** 140:24
218:12 222:16,19,22

**common** 161:25
163:10

**communicate** 32:5
94:5 215:13

**communicated**
174:23 233:21

**communicating**
197:11

**communication**
21:16,17 57:3 86:3,6
132:19 133:9 136:16
177:7

**communications**
29:13 57:9 59:12
79:7 91:11 227:3

**Community** 10:12

**company** 34:19
129:12 133:3 137:4,6
138:11,13 140:20,22

**company's** 186:11

**Compel** 62:12 63:10
65:11,17 70:14,21
259:7,12,17

**compelled** 63:17

**compensated**
253:17

**compensation**
13:12 94:16 111:2
115:15 117:12,18
122:6 124:7 128:20
242:23 243:5,24
244:3 245:7 253:22,
24

**compensatory**
249:3,11

**competent** 254:3

**complaint** 38:5,11,
19,24 39:8,17,24
40:6,13,22 41:8,13,
17 42:16 43:24
50:15,20 51:21 52:13
66:25 70:2 71:18
72:2,12,15 73:23
75:10,25 77:18,25
91:14 147:23,25
220:25 221:2,8
230:16,20,25 232:15
233:2 234:2 245:25
246:8,13 247:7 248:7
254:6 259:4,5,20
260:6,11

**complete** 6:16 11:3
41:8 118:20 130:18
138:2

**completed** 13:19

**completely** 7:8
253:13

**completing** 11:10

**completion** 6:15

**complied** 68:25
69:5,14,23 70:2,6

**comply** 69:10,19
164:24 165:3

**computer** 63:23

**concept** 166:15,21

**concern** 246:8

**concerned** 146:3
243:2

**concerns** 36:2
173:18 245:19 246:2,
14,24

**concluded** 13:3

**conclusion** 134:6

**conditions** 211:3

**conduct** 110:13
254:7

**confident** 29:6,12

**confirm** 39:12 41:4
43:23 69:22 232:12

**confirming** 237:16

**confirms** 68:16

**confused** 100:10

**connection** 20:8
30:14,17 31:2 32:19
33:6 39:15 42:14
61:6 68:12 82:22
83:20 89:4 93:4
100:2 176:23 239:5
250:18,23 251:5

**connects** 183:15

**consequences**
69:11,20

**considered** 105:18
231:12,25 234:22
240:3

**consistent** 228:16
229:9

**consistently** 254:18

**contact** 146:5 199:23

**contacted** 108:4
145:23 146:8

**contacting** 145:11

**contained** 67:21
235:24

**contemplate** 11:9

**content** 230:24
231:4,21 237:17

**contents** 97:11,12
233:25

**continuation** 191:18

**continue** 95:10
136:14 139:18
190:14 191:21,24
218:4 236:10

**continued** 122:14,19
123:15,20,25 153:18,
19 175:9 193:10
207:13 221:16
255:11 259:2 260:2
261:2

**continues** 137:13
207:9 210:24 218:11
219:20

**continuing** 148:9

**continuous** 235:20
236:4 238:11

**contract** 68:22 69:14
228:15 242:18 243:2,
13

**contracting** 166:7,8

**contribute** 132:3
216:23

**contributed** 214:21

**contribution** 128:8,
16 214:25

**contributions**
139:16

**conversation** 16:10
19:6 35:14 37:10
57:12 110:4 130:9
136:14 231:21

**conversations**
21:20 32:19,23 53:11
57:6

**conversion** 169:6

**converted** 169:2

**cooperate** 78:23
79:3

**coordinating** 172:17

**coordinator** 103:7

**copies** 62:19,24

**coping** 28:2

**copy** 64:25 68:4
76:16 80:3 85:23
257:18

**coronavirus** 204:14,
17,22 207:8

**corporate** 15:21

**correct** 36:7 81:13
98:13 126:10 131:11
135:21 182:19
195:11 216:9,10
217:21 218:24
219:10 232:17 234:2
243:10 245:16 248:9
250:8

**correctly** 16:9 42:19

**corresponded**
36:12 133:20,23

**correspondence**
24:14 37:8 79:13,16
134:8,11 135:7
142:23 146:13
183:20 184:3,7
189:16 199:23

**costs** 61:5,10,16

**counsel** 55:7 79:9

**count** 206:5

**countries** 160:23

**country** 149:9 150:8
160:10 253:9

**COUNTY** 257:4

**couple** 9:4

**court** 6:12,20 39:9
41:2 240:5 250:15
257:19

**courthouse** 224:23

**cover** 243:7

**coverage** 191:11,19,
22,25

**COVID** 28:14 126:22
150:16 170:16

**COVID-19** 147:16
148:22 149:5,16,21
150:10 151:2,13,19
153:9 154:11 157:4,
5,7,10,11,18,21,25
158:6,10,15 160:2,7,

14 162:11,16 163:20
164:7,20 166:17
167:3 168:7 169:3,14
173:8 175:8,16 180:6
181:22 187:19 252:8,
13

**create** 60:22

**CRR** 257:25

**culture** 18:19 145:15
216:16 217:20

**Cuomo** 175:24

**current** 7:21 211:2

**curve** 165:24 166:3,
10,11,15,16,22
181:20

**cut** 45:25 98:24
192:21

**cutiepicknewyork2
@yahoo.com** 30:24

**cutiepickney2** 10:2

---

**D**

**dad** 225:4

**daily** 104:19 105:15
118:20 149:25
150:23 166:5,11

**damages** 42:7 238:2
248:24 249:4,6,11
250:12,17,22 251:4,
7,10,13 252:4 254:9

**Daniels** 28:22

**dark** 198:5,12

**date** 13:8 18:23 20:4
22:7 38:16 47:20
64:24 67:5 83:6,14
85:5 92:25 107:25
129:8 148:11,20,24
149:2,14 154:11
167:6 177:5 189:6
196:18 197:14
198:16 211:5,7

**dated** 38:10 40:11
64:13 65:15 66:19
67:13 68:3 70:18
71:22 73:6,19 74:23
75:13 77:21 113:4

174:8 177:23 181:6
185:16 188:11 191:5,
10 192:9,12 200:4,8
204:6 207:3 208:6
210:3 217:12 237:2,8
258:21,23,25 261:21

**dates** 65:24 66:4
72:20 103:14 108:23
134:3 143:6 149:12,
18,19,20 181:3,4
188:19 205:23
211:15 230:8,9
249:25

**day** 14:14,17 24:18
26:9,11,12,14,17
49:14 95:11 105:5
106:8,10 118:10
119:7,8 120:6 149:22
150:11,14,15,22
151:3,7 153:2,8,13
154:2 155:5,13,19
166:18 168:21 177:2,
4 187:6 222:14
256:13 257:23

**day-to-day** 105:21

**days** 26:10 118:23
119:9 120:6 145:21
148:9 168:21,22
213:19,23 214:4

**dead** 193:25

**deal** 209:10

**death** 187:14

**December** 40:12
41:13 65:16 66:2,20
67:13 68:3 70:19
71:22 73:6 74:23
83:8,12,18 210:3,15

**decides** 250:15

**decision** 13:4 35:12
52:22 54:18,19,20
131:20 136:20,21
141:2 156:3 174:21
178:18,25 179:7
189:14 246:13,19

**decisions** 44:11

**declaration** 63:25
64:12 66:14,19
67:12,22,24 68:2,16
73:2,7 74:19,25
76:19 77:6 226:3

259:9,14,21 260:3,7

**decline** 170:19

**declined** 170:13
173:10,17 174:4

**dedicated** 140:25

**deducted** 128:9

**defendants** 5:4,7
6:5 38:21 63:16
66:23,24 77:24
89:15,22 90:10 91:17
195:13 221:11 252:7,
12

**defendants'** 38:5
40:5 61:20 62:3,11
63:25 65:9,10,17
66:13 70:12,14,21
71:15,17,25 72:25
73:13,15,22 74:18
75:6,8,15 76:18
77:15,17 80:17 83:24
88:13,14 90:12,14
92:14,15 93:2 95:20,
22 96:8,18 97:10,21
111:21 114:16
115:18 116:14
124:12 132:5 142:13
172:22 177:17 182:3
185:9 188:4 191:4
192:8 200:3 204:2,25
206:21 207:25
208:12 209:22 217:6
219:15 236:25 254:7
258:6,7,9,10,11,13,
14,16,17,19,21,23,24
259:4,5,6,9,11,14,15,
16,18,19,21,22,24
260:3,4,5,7,9,10,12,
14,15,17,18,20,21,
22,24 261:3,4,6,7,9,
10,12,13,14,16,17,
19,21

**defined** 109:5

**definite** 213:14

**degree** 10:14,21,23
11:10 161:15,18,19
162:25 163:9

**degrees** 161:11
163:5

**delete** 29:14

**deleted** 26:21 27:4,
10

**deleting** 29:18

**delivery** 183:22

**Demand** 88:14
260:16

**departing** 17:21 18:7

**department** 104:20
153:13 213:6

**departure** 188:23

**dependent** 106:6

**depends** 26:9

**depleted** 253:13,14

**deposition** 7:8
23:22,25 24:4,12
109:5 232:10

**describe** 79:2
197:10,21

**describing** 119:2

**description** 93:21

**deserve** 222:13,14

**determine** 50:9
56:16 89:8 240:5

**developed** 197:25

**development** 198:3

**devices** 8:6

**died** 225:4

**differ** 105:23 106:4

**difference** 244:15

**differently** 150:4
227:23

**differs** 105:15,22,25

**difficult** 159:19,23,
25 160:6 174:21
178:17 211:2

**dignified** 141:3

**dignity** 223:16

**direct** 21:18 53:6
56:25 59:10 60:4
79:6 86:4 143:23

**directing** 60:24

100:11

**direction** 60:8 187:8

**director** 15:24,25
18:18 106:18,19,20,
24,25 107:2,3,4,5
143:24 212:23
217:20 246:6

**disabled** 170:14
223:8

**disciplinary** 110:7,
11

**disciplining** 110:21

**Disclosures** 80:19
82:7 84:2 260:13,14

**discoveries** 39:19

**discovery** 31:2 93:5,
10

**discuss** 22:17 60:5
245:18

**discussed** 47:9
103:18 211:25
251:11

**discussing** 252:3

**discussion** 96:17
173:6 212:3 245:23

**dismiss** 62:12 63:11
65:11,18 66:25
71:16,18,23 72:2,9,
11,15 73:14,16,21,22
75:9,18 77:17,24
259:7,12,18,19,23,24
260:6,10

**disruption** 150:24

**distancing** 175:23
179:14 186:14

**divorce** 8:19

**doctor** 162:7,9

**document** 38:3,9,12,
14 39:10 40:9,11,14,
19,25 51:16 54:23
62:17 63:9,13 64:5,
11,14,22 65:2,6,14,
15,20,22 66:2,10,16,
18,21 67:6,10,18
70:17,23 71:8,21
73:5,6,19,24 74:2,11,
22 75:2,5,13,19,22,

23 76:23,24,25 77:3,
5,21 80:15,22,23
81:10 82:6,18,25
83:2 84:5,8,12,13
88:11,17,22,25 89:7,
12 90:18,19,24 91:2,
3,4,9 92:19,21 93:2
96:2,5,22 97:5,24
101:22 111:25
113:11 114:19,20
115:21 116:17,18
117:11 124:16,22
125:25 128:13 132:9,
15 142:17 172:25
174:11 177:21,24
178:3,6,9 182:6,15
184:13,17,25 185:13,
15 188:10,13,14,15,
18,20 191:9,13,16
192:12,13,16,17,19
200:7,9,10,12 204:5,
10 205:4,6,9,11,12
206:8,24 208:4,8,16,
18,19 210:2,7 217:11
219:19,22,24,25
220:17,20 232:21
237:5,9,16 248:22

**documentation**
176:16

**documents** 30:16,
21,25 31:5,7 43:22
44:3 53:4 54:15 62:8
63:21 66:5 74:5,13,
14 78:24 79:4,8,12
81:24 82:21,23 83:5,
11,19 88:15,23 89:4,
16,23 90:15 91:5,10
93:9 97:21 98:2,12
99:2,5,9,24,25
100:22 101:2,18
111:22 134:25
176:18 178:14 258:9,
10 260:16,19

**dollars** 159:17

**domain** 183:21 184:9

**downtown** 11:24
12:6,17,24 13:4 15:9,
11,15,18 16:3 17:22,
25 18:8 108:4,5,6,7,8
109:24

**drive** 223:12

**DST** 208:22

**due** 8:19 173:17

**duly** 5:19 257:10

**duplicates** 113:20

**dying** 166:8

---

## E

**E-U-G-E-N-I-A**
199:12

**earlier** 109:4 127:6
143:19 221:6

**early** 58:19

**earned** 126:19
144:17

**earnings** 115:3
124:12,21 125:10,16,
19 128:7,11 131:2
258:16

**easier** 46:17

**East** 7:22 23:11,16
95:11 99:15 148:13

**EDT** 256:7

**Edward** 220:13

**elect** 191:21

**elected** 191:24

**electing** 191:18
241:14

**election** 139:17

**electronic** 80:7
101:14 144:13

**Electronically** 65:2,
5

**elevated** 103:11

**eleven** 100:11,14

**Eli** 30:11

**Eli's** 28:13

**eligible** 127:17,23
128:3,5,12

**eliminations** 210:13

**Elizabeth** 18:10,14
35:13 73:2,7 74:19,
25 85:10 130:8
132:18 145:5,9

208:21 217:19,24
228:5,24 259:21
260:3

**email** 9:21 10:3
11:14,17,23 14:7,24,
25 15:4,12,19,22
16:13 17:4,5,10,14
18:5,7 30:15 31:8
79:17 178:7,8,10
183:4,5,21,22 184:5
185:25 189:19
208:23 209:4,6,9,12,
14 210:24

**emails** 32:18 80:11
183:7,25 184:5

**embarrassing**
223:23

**Empact** 67:25 68:4,
8,9,13,17 69:11,19,
23 70:3,6 103:19,25
104:3,7 111:21
112:11,19 113:8
199:2 226:2,17 228:9
231:19 233:9 235:10,
14,15,25 238:13,21
239:18 242:12,16
243:7,8,14,20 245:11
258:10

**employed** 37:17
107:16 123:14 128:2,
6 129:20 183:10
198:20 199:5 214:20
216:17 242:7 244:17

**employee** 20:14
35:8 48:12 127:13
129:24 140:25 155:4
205:13,17,20 216:18
218:18 220:22
242:23 243:8

**employees** 46:23
47:13 48:16,24 49:7,
13 85:9,16 87:10
94:18,24 95:9 108:14
110:8 121:23 122:13,
19 128:19 141:18
148:12 152:19,23
153:8,18 154:10
155:12,22 158:22
169:22 170:20
171:14,23 172:5
174:3 190:24 191:23
193:2 194:7,10

197:11 200:16,19
201:5,6,22 202:14,17
218:13 231:9 238:24
239:4,7,11 240:21
243:21,22,23 244:6
245:2,4,6

**employer** 35:4 116:8
117:2 125:4 130:2,5
131:8

**employer's** 115:7
116:5,22 129:19

**employment** 48:25
80:4,8 91:16,25
93:25 94:20 104:4
111:9,14 126:12,17
127:7 131:18 134:7
140:13 177:8 185:4
194:5 196:4 198:21
212:11,15 213:19
214:5,11 215:18
217:3 218:18 221:24
226:9,20,22 227:6,8,
12,25 228:11,12,16
229:2,8,9 231:23
233:5,13,20 234:6
239:12,13 240:6
244:18 252:17

**employs** 130:14
242:2

**encourage** 26:14

**encouraged** 29:9

**end** 164:4 180:15
213:14 234:16
235:12 255:10

**ending** 126:3

**engagement** 59:23

**engaging** 56:14
57:16

**engineer** 123:12

**engineering** 123:11
212:24

**ensure** 42:15 44:9,
11,17 54:5 104:22
183:22

**entail** 110:12

**entering** 157:13

**entire** 44:20 81:25
100:13 137:25

153:12

**entirety** 67:2 80:25

**entitled** 198:25
199:14 222:4 227:10
238:10 239:5,8

**entity** 215:9,12 216:8

**entry** 157:18

**establishments**
49:2 239:14

**estimated** 238:2,16
248:24 250:11

**Eugenia** 199:12,13

**Evan** 5:8 55:14,22,25
56:2 58:19,25 66:14,
19 68:2 76:19 77:6
259:14 260:8

**event** 157:14

**eventually** 167:16
180:14

**everyday** 223:13,15

**everyone's** 54:3

**evident** 163:11

**exact** 17:4 182:25

**EXAMINATION** 5:23
147:11 258:3

**examined** 5:20
147:9

**exchange** 25:6,9
135:13 138:5 142:19

**exclude** 79:6

**excuse** 18:20

**execution** 179:21

**exhibit** 38:4,5,9 40:5,
10 41:8 50:18 62:9,
11,17 63:10,25 64:4,
11 65:9,15 66:13,17,
18 68:10 70:12,18
71:15,22 72:25 73:5,
13,19 74:18,23 75:6,
13 76:18,23 77:15,21
80:16,17,23 83:24
84:5 88:12,13 90:12,
18 92:14,19 95:20
96:2,13,18,22 97:2,4,
15,21,24 99:24

100:8,13,18 101:6
103:17,19 111:21,25
114:16,19 115:18,21
116:14,17 124:7,12
132:5,9 135:2,7
142:13,17 147:23,24
172:21,22 173:2,7
174:6 177:16,17,21
181:25 182:3,7,22
185:9,14,15 188:4,8,
10 191:4,9 192:8,12
200:3,7 203:25
204:2,6,25 205:5,7
206:21,25 207:25
208:5,12,16 209:17,
22 210:2 214:19
217:6,9,11 219:14,
15,19 221:2,7 236:25
237:6,7 248:22
251:12 252:5 258:7,
9,10,11,13,14,16,17,
19,21,23,24 259:4,5,
6,9,11,14,15,18,21,
22 260:3,4,7,9,12,14,
15,17,20,21,24
261:3,4,6,7,9,10,12,
13,14,16,17,19,21

**exhibits** 74:20 76:20
258:5 259:2 260:2,3,
8 261:2

**EXHIBITS--------------
-----** 258:5

**exists** 60:6

**expect** 94:24 95:3
221:22

**expectation** 157:10,
17 167:11

**expected** 157:21
160:3 194:8 196:15
211:12 218:7

**expecting** 229:20
241:7

**experience** 253:25

**experienced** 56:21
158:5,9

**experiencing** 22:20
45:7,20

**explain** 32:8 59:22
161:23 162:5 225:15

**explained** 173:15

**explaining** 45:6

**extend** 179:16,20,24
186:16

**extended** 165:16
175:22,24 176:4
186:19 187:9 196:10
211:15

**extending** 211:14

**extension** 186:13
187:3

**extent** 21:16 86:2

**eyes** 150:7 163:11

---

**F**

**face** 159:10,19,25
160:5

**Facebook** 31:17,19
32:21 33:2,6

**facility** 169:25
170:10 171:4,22

**fact** 35:10 94:15
163:25 180:10 201:7
221:21 231:8,22
232:4

**facts** 39:15

**factual** 91:13

**failure** 246:20,24

**fair** 38:18,24 83:13,16
109:9 157:25 159:18,
22,24 175:16 180:7
183:2 190:23 195:2,7
197:2,6 198:23
209:21 254:4,11

**fall** 180:18 181:2

**falling** 180:19,22

**familiar** 188:20

**families** 222:15

**family** 27:24,25 92:5
152:12,21 160:25
161:20 173:18
222:25 223:6,20
253:9,12

**favorable** 44:18

**February** 68:5 75:14 77:22 237:2,8,17 248:23 251:12 252:5 261:21

**federal** 175:22 195:5, 13

**fee** 59:20 60:2,5 252:18

**feed** 222:25

**feel** 178:24 252:6,10

**feeling** 145:5 213:16

**feels** 223:18

**fees** 61:5,20 62:3

**fell** 13:6,9 143:8

**felt** 180:21 186:23,25 252:20

**figure** 180:14

**figures** 117:22

**file** 63:20 144:13 145:16 176:11 245:24 246:17

**filed** 38:19 39:9 40:22 41:2,13,17 51:22 63:16 66:6,10,24 67:7 72:19 74:5 176:13 248:9

**files** 65:2 71:4 80:3,8

**filing** 21:24 42:14 47:8 53:2 145:22 174:16

**financial** 62:2

**financially** 131:19 252:6,11

**find** 27:25 28:5,18,23 49:18 50:5 76:11 215:7 231:23 233:12

**fine** 7:8 57:4 60:12 89:14 121:17 136:4

**finish** 10:18 13:17 45:10 118:16 119:19 121:10 134:23 141:23

**finished** 46:2

**fire** 110:17 213:6

**firm** 237:3 257:20 261:22

**five-minute** 29:25 78:13

**flatten** 166:16

**flattened** 181:21

**flattening** 165:24 166:3,11,15,22

**floor** 103:8

**fluctuates** 106:12

**flustered** 55:18

**focus** 98:25

**folks** 85:11 209:11

**follow** 33:17 51:9

**Follow-up** 205:13

**food** 152:11

**force** 15:2 17:3 107:22,23 108:11,12, 18,21 109:16,24 214:22

**foregoing** 97:9

**foresee** 150:25 151:14

**forfeit** 222:23 252:17

**forfeited** 253:3

**forfeits** 222:2 229:2

**forgo** 241:8

**form** 33:9,10 94:16 101:14 112:19 113:9 114:16 115:18 116:14 122:23 142:22 196:12 222:2, 8 258:11,13,14

**format** 88:2 182:21 218:23

**forms** 131:6

**formula** 236:19

**forward** 22:24

**found** 48:25 56:9 144:18

**Fourseasons.com** 15:4 16:12 183:8,12

**fourth** 51:11 179:13 210:24

**FRANK** 257:5,25

**free** 228:11

**Freeborn** 5:3,6 6:4 258:5

**freezer** 152:8

**frequently** 197:10, 22

**friends** 92:5

**front** 19:21 63:8 64:5 103:7 147:25 150:7 163:11 178:21 179:2 226:18

**FSR** 5:14 81:4,16,20, 24,25 82:10 84:16 99:3 100:19 101:23 172:23 173:3 174:7,8 176:9 177:18,22 182:4,8 185:10,16 188:5,11 204:3,7 205:2,7,8 206:22 207:2,25 208:6,13,17 209:23 210:3 217:7, 12 219:16,20,21 220:3 260:24 261:3, 5,6,8,9,11,12,13,15, 16,18,19

**full** 7:17 136:14 138:18 174:24

**fully** 11:3 68:25 69:4, 14,23 70:2,6

**funds** 117:16

**furlough** 148:11,17 191:12 231:25 233:11

**furloughed** 14:15 231:9,12,15 233:19 234:15,18,22

**future** 222:3

**G**

**gain** 145:10,23 146:8

**gained** 146:12

**gather** 20:9 83:18 93:11

**gathered** 26:24 82:21 83:4 89:4 93:4

**gathering** 39:15 93:9

**gave** 56:4,5 85:23 130:21 221:5

**general** 6:21 106:3 111:7 157:19 246:18

**gentleman** 55:15,16

**gestures** 6:21

**give** 15:19,21 17:10, 11 56:6 63:5 106:3 198:9 222:10,11 232:19 240:12

**glitch** 16:19

**global** 151:2,14 157:5,6,9,20 158:5,9

**GM** 246:22

**good** 5:2,25 6:2 24:6, 22 25:2 26:11 76:13 114:4 147:13,14 179:4 226:6

**Googled** 58:6,15 59:15

**governed** 244:7

**government** 175:22

**Governor** 175:24

**governs** 243:4

**gradually** 180:24

**grandchild** 223:2

**graph** 166:10

**great** 114:4 248:20

**grew** 222:16

**group** 42:8 44:20

**guests** 158:24 167:2 190:6,12

**guidelines** 175:23 179:15 186:14

**Gurrier** 28:22

**guys** 224:9,16,21

**H**

**half** 47:23,24 213:7,9, 12

**hall** 134:18 197:18 205:14,17,20,21,25 212:2,5,10,16 218:3, 23 227:4 231:4 247:4,17

**hand** 257:23

**Handbook** 243:8

**handed** 38:8 97:23 178:14

**handing** 76:16

**hands** 158:23

**Hang** 201:18

**hanging** 62:22

**happen** 164:3 175:6 216:19

**happened** 37:13 131:12 164:22 167:17 197:20

**happening** 150:6,8 151:6 157:12 160:11, 22 162:24 163:12 164:2 166:10 180:5 187:2,6 198:4 201:12,14 211:13

**hard** 80:3 141:9,19 142:3 159:6 178:16 252:20

**hardship** 45:7

**hardships** 45:22

**harmed** 252:7,12

**head** 53:17 236:23

**headache** 24:18

**health** 178:20,25 188:23

**hear** 27:24 84:9 85:3 187:6 192:5

**heard** 28:6,19,23 29:5 37:6 47:6 84:24 108:6 122:22 123:6

130:23 149:6 169:4
198:17 226:8 244:2,4
245:10

**hearing**  91:6 193:21,
24 198:6

**held**  85:7 103:2

**helpful**  136:2

**helping**  163:24

**hereinbefore**  257:10

**hereunto**  257:22

**high**  106:11 187:13,
14

**hire**  33:21 91:15
107:2 110:17

**hired**  102:18

**hold**  102:23 232:8

**holidays**  106:8

**Holmes**  22:5 23:21,
24 24:3 26:6,22,25
41:23 58:4,9 91:19,
24 95:5 250:22

**home**  14:23 42:18
47:17 63:21 107:15
126:20,23 141:3
149:2 150:16,18,21
151:8 152:8,9,10,15,
17,18,20,22,24
153:6,8,12,20 154:3,
7,11,21,22 155:5,13,
17,22 156:11,24
158:14 164:19,23,25
165:6,9,12,16
167:16,19 170:15
174:15 175:25 176:4
179:15,21 186:14
193:20 195:15 196:8,
9 223:12,20

**honest**  12:9 140:21
197:16

**hope**  166:14,20
167:25 168:4 174:23,
25 175:5 180:20

**hopeful**  180:21

**hospitality**  33:17
175:10,12 207:9,12

**hotel**  12:17,24 15:15
20:19 23:15 27:15

28:6,19 30:10 33:19,
23 34:10,15 45:4
46:25 47:14 48:12
49:9,11,13 75:8,16
80:4,9 85:9 91:16,25
93:25 94:7,11,19,20,
24 95:6,10,14 102:7,
19,24 104:5,11,22
107:17 110:6 111:7,
9,15 115:10,14,15
116:9,22 117:2,23
118:6 120:3 121:23
122:14,19,20 123:3,
15,21 124:2,8,24
125:4,9,15 126:8,17
127:11 128:2,6,19,24
130:25 131:8 134:7
135:4 139:23,24
140:2,11 141:4,18
143:22 148:13,15,16
152:23 153:6,7
154:10,18 155:4,8,9,
12,16,24 156:16,17,
24 158:15,22 167:2,
10,12 169:2,8,12,18,
23 170:2,9,21 171:8,
14,21,23,25 172:2,6,
9 173:10 174:3,19,
22,24 175:2 177:3,7
178:18 179:17,24
181:8 182:18 183:7
185:4 186:17,18,19
187:23 188:25 189:3,
8,17,21,24 190:3,5,
14,18,24,25 191:19,
24 196:3,5 197:2,10
198:20 199:5,15
200:16 201:22
202:12,24 203:3
206:9,12,15 211:3
212:9 214:11 215:10,
18 216:8 217:3,21
218:4,5 219:7 220:18
226:9,12,13,23
227:3,4 231:24
233:5,12 234:21,24
235:3 236:5 238:12,
24 239:8,12 240:8,
14,21,22 241:3,5,9,
16,25 242:7,24 245:7
246:18 260:5

**hotel's**  169:5 171:3
177:9 178:24 211:6

**hotels**  5:15 33:14
48:17,25 49:6 75:17

129:14 153:18

**hour**  118:23 121:14

**hourly**  120:9,14,16

**hours**  118:5,8,22,24
119:3,6,8 120:2,5,17,
21,25 121:4 124:20
125:22 150:20
168:18,20,21,24
171:7,9,10,12,13,17,
18 172:4 222:19

**house**  87:6,7 244:18

**household**  161:21

**housekeeping**
12:21,23 103:8,9,10,
12 104:13,20 106:19
107:2 110:8,18,21
111:3 119:7 122:2,3
153:13 169:17 171:2
172:18 184:24

**housemen**  28:11
104:22

**housing**  169:3,6,13,
19,24 170:10,22
171:4,21 172:2
173:13 178:20,25
189:4,9,15 202:13

**human**  15:25 222:15
245:25 246:2,7,13,19

**hundred**  159:17

**hurtful**  223:23
225:15

**hurts**  225:16

**husband**  193:19,25

**Hwang**  64:2,12
259:10

———————

**I**

**I-V-E-Y**  7:20

**idea**  15:20 167:22,24
224:10,16 233:4

**ideas**  33:20

**identical**  113:10

**identification**  38:7
40:7 62:15 64:3
65:13 66:15 70:16

71:19 73:3,17 74:21
75:11 76:21 77:19
80:20 84:3 88:16
90:16 92:17 95:24
96:20 97:22 111:23
114:17 115:19
116:15 124:14 132:7
142:15 172:24
177:19 182:5 185:11
188:6 191:7 192:10
200:5 204:4 205:3
206:23 208:3,14
209:24 217:8 219:17
237:4

**identified**  82:24
85:15 148:10,16
217:19 221:3 232:14

**identifiers**  82:9

**identifies**  75:24
116:8 128:11 184:14
194:6 220:15 248:24
249:3

**identify**  9:21 18:16,
17 40:16 54:25 55:12
58:11,16 79:11 88:19
93:17 94:2 106:21
114:22 115:24
116:20 124:18
132:17 142:21
174:13 176:18
184:16,19 220:5,8
249:20

**identifying**  124:7
135:3 185:2

**imagine**  224:17

**impact**  175:9 180:10

**impacted**  175:12,17

**impacting**  166:18

**implementing**
110:7,11

**important**  6:13

**impression**  234:19

**inappropriate**  163:4

**include**  59:11 255:12

**included**  194:7
243:14,15

**includes**  208:24

**including**  91:14
167:20 194:8 257:20

**income**  228:22 253:4

**incorrectly**  42:23

**increases**  111:3

**incur**  62:2

**incurring**  61:5

**indefinite**  148:17

**indefinitely**  138:21
222:7

**independent**  58:2,
10 59:2

**independently**
79:11

**indicating**  101:21

**individual**  127:25

**individual's**  184:16

**individually**  41:18

**individuals**  46:5
48:5 56:17 69:14
94:2 105:9,13,20
110:17 120:12,18
121:2 123:2,14,20
153:17 194:24
198:19 199:4 220:5
240:21 242:6

**individuals'**  44:22

**industries**  175:18

**industry**  33:17
175:10,12 207:9,12

**infant**  170:15

**infection**  187:13

**inform**  196:7 197:6
216:16 221:15
249:23

**information**  30:25
36:7 39:16 42:15
67:21 78:24 79:4
82:22 83:19 89:23
90:8 93:4,11,19
97:13 127:16 129:9,
22 130:7 190:21
198:8,10 203:5,7,15
219:9 227:22 235:24
240:19

**informed** 35:7,9,10
42:19,20 129:23
132:24 195:22
196:19 197:24
212:22 214:15 215:6
221:19

**informing** 174:16

**infrastructure** 218:6

**infrequently** 197:22

**initial** 38:19,23 57:12
80:18 81:25 82:7
90:6 165:11 173:19
179:21 220:24
260:12

**initially** 37:5 153:25
173:14 197:7

**injured** 13:9

**injuries** 253:18

**injury** 13:15,23 14:2
254:9,12

**inquiring** 206:11

**inspections** 111:19

**Instagram** 31:18,25

**instances** 209:8

**interaction** 111:20

**interactions** 111:13

**interest** 53:19 54:3,8

**interested** 257:17

**interests** 44:12,22
46:7 54:5 55:3
203:12

**internal** 32:7 33:5
191:4,9 246:8 258:21

**International** 5:14

**interpreted** 227:22
228:7,8 229:4

**interrogatories**
92:15 93:3 95:23
96:9 97:11 260:20,23

**interrogatory** 93:16
94:3

**interrupt** 109:4
130:19

**interview** 29:8

**introduced** 58:20,
23,24

**investigation** 58:3,
10 59:3

**involve** 57:3

**involved** 21:17 44:19

**involves** 86:2

**iphone** 183:14

**IRA** 137:7 138:14

**issue** 164:22

**issued** 115:14
125:10 130:25

**issuing** 164:18

**items** 250:6

**Ivey** 5:1,9,12,25 6:1
7:1,13,20 8:1 9:1,18
10:1,17 11:1 12:1
13:1 14:1 15:1 16:1
17:1,18 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1,7
31:1,21,23 32:1 33:1
34:1 35:1 36:1 37:1
38:1,2,8 39:1 40:1,8
41:1 42:1 43:1 44:1
45:1,8 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1,24 55:1
56:1 57:1 58:1 59:1
60:1,23 61:1 62:1,16
63:1,8 64:1 65:1
66:1,17 67:1,13 68:1
69:1 70:1,17 71:1,20
72:1 73:1,4,18 74:1
75:1,12 76:1,22 77:1,
20 78:1,21 79:1,10
80:1,14,21 81:1 82:1,
5 83:1,22 84:1,4,10
85:1 86:1 87:1 88:1,
10 89:1 90:1,17 91:1,
8 92:1,18 93:1 94:1
95:1,25 96:1,21 97:1,
4,23 98:1 99:1,6
100:1,18 101:1
102:1,6 103:1,18
104:1 105:1 106:1
107:1 108:1 109:1,15
110:1 111:1,24 112:1

113:1 114:1,18
115:1,20 116:1,16
117:1 118:1 119:1,21
120:1,2 121:1,22
122:1,18 123:1
124:1,15 125:1 126:1
127:1 128:1 129:1
130:1 131:1,12
132:1,8 133:1 134:1
135:1,16 136:1,6,8
137:1 138:1 139:1
140:1,8 141:1 142:1,
16 143:1 144:1 145:1
146:1 147:1,13,24
148:1 149:1 150:1
151:1 152:1,13 153:1
154:1 155:1 156:1
157:1,16 158:1 159:1
160:1 161:1,10 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1,25 173:1,7
174:1,10 175:1 176:1
177:1,20 178:1 179:1
180:1 181:1,19
182:1,6 183:1 184:1
185:1,12,14 186:1
187:1 188:1,9 189:1
190:1 191:1,8 192:1,
11 193:1 194:1,3,22
195:1,2 196:1 197:1
198:1 199:1 200:1,6
201:1,15 202:1 203:1
204:1,5 205:1,6
206:1 207:1 208:1,4,
15 209:1,25 210:1
211:1,25 212:1 213:1
214:1 215:1,24
216:1,25 217:1,10
218:1 219:1,18
220:1,24 221:1 222:1
223:1,25 224:1 225:1
226:1,7 227:1 228:1
229:1,6,23 230:1,2,
15,23 231:1 232:1,7
233:1,23 234:1,20
235:1,19 236:1
237:1,6 238:1,2
239:1,20 240:1
241:1,13 242:1 243:1
244:1 245:1 246:1
247:1 248:1,17,21
249:1 250:1 251:1
252:1,3 253:1,16
254:1,5,23 255:1

256:1,5,10 258:4

**Ivey-williams** 112:4,
13

---

**J**

**jacket** 24:25

**Jamaica** 223:7

**January** 73:20 74:24
104:10 106:14 110:9,
25

**Jim** 5:5

**job** 29:5 54:4 102:7
139:22 228:21,22
253:10

**jog** 143:15

**jogs** 77:2

**joined** 224:18

**joke** 26:17

**July** 126:2,3,6,16
128:12,20,23 131:2
135:2 186:17,20
200:4,8,15,20 201:23
202:24 203:11
220:15 258:25

**juncture** 231:7,14
234:17 253:14

**June** 84:14,23,25
85:19 86:11,18 87:4
134:20 179:18,25
188:11 189:2,6,9
190:18,23 191:5,10
212:2,15 217:12
218:24 227:4 231:5,
22 258:21

**jurat** 255:12

**jurisdiction** 256:15

**justice** 225:3

---

**K**

**K-9** 159:15

**Kathryn** 5:3 6:3

**keeping** 193:22
198:3 206:5

**kind** 22:20 26:9 43:13
94:8 199:22,23

**knee** 13:10

**knew** 94:6 168:5
247:15

**knowing** 200:23
202:9

**knowledge** 39:25
93:19,22 97:13,19
99:20 193:6 237:19,
21 238:16 243:17

---

**L**

**labeled** 124:22

**labor** 58:15

**lack** 245:19

**lady** 217:16

**laid** 193:13,16 196:24
197:3,7 199:21
234:9,11,13

**lasted** 161:4

**late** 211:5

**law** 5:9,11 44:18
62:14 65:10,16
70:13,20 71:16,24
73:14,21 75:7,15
77:9,16,23 195:19
213:18,22 214:7
221:15 237:3,8
259:8,11,16,19,23
260:5,9 261:22

**lawsuit** 6:6 20:8,24
21:24 27:2 29:20
30:14,18 32:19 33:6
38:20 39:2 40:23
42:11,14 43:22 47:8
52:5 53:20 61:6,21
62:4 63:21 64:20
66:6 68:12 74:6
78:23 79:12 82:22
83:5,20 89:5 91:6
93:5,10,13 94:10,14
100:2 101:3 145:22
176:23 195:3,8
198:24 221:2,13
236:19 238:23 239:5
240:5 246:25 247:8,
12,14 248:8,25

249:12 250:18,23 251:4,5,14

**lawyers** 21:20 55:20 58:15

**lay** 161:25

**layoff** 181:7 187:22 192:23 193:9 196:14 232:6,9 239:25

**layoffs** 194:7

**leader** 28:4 223:13

**learn** 95:4 147:15 189:14

**learned** 148:22,25 149:4,16 167:7 169:5

**leave** 118:22,24 120:8 131:17 138:20 155:25 156:2

**leaves** 215:4

**leaving** 153:14 233:4

**left** 134:13 153:2 154:3 155:19 193:20 213:15,24 252:19

**legal** 43:16 61:20 74:17 91:6 203:16 254:2

**length** 163:19,21 167:12

**letter** 59:23 137:18 139:3 174:14 178:15 179:19 181:6 187:22 189:11,12,16,18,19, 20 190:13 192:8,12 193:3,8 194:6,11 196:20 200:3,8,18, 22,25 201:21 202:7 204:6 207:5 208:7,10 210:6,9,10 212:17 214:10,13 215:21 217:14,16,23 218:2, 11,14,15,16,19 236:25 237:7,18,23 248:22,23 249:3,17 251:11 252:5 258:23, 24 261:21

**letters** 197:12,18 207:18

**letting** 139:15

**level** 190:25 223:24

**leveling** 166:13

**levels** 218:13

**Li** 184:22

**life** 149:22 150:11,15 151:3 166:18 223:8 224:21 225:8

**light** 133:4

**limit** 21:19 56:25 59:10

**limitation** 91:15

**lines** 178:21 179:2

**Linkedin** 31:17,22 32:9,15,17 33:10

**list** 39:19 89:13 208:23

**listed** 125:15 184:17 220:6 250:6

**listen** 119:23 215:25 228:4

**listened** 86:15,17 230:3,4,7

**lists** 99:15 115:10 116:22 117:18,21 124:24 125:22 131:7 184:15 238:4

**litigation** 63:17

**live** 253:12,13 254:19

**lives** 161:21 222:16

**living** 252:15 253:7

**Liz** 132:24

**LLC** 75:16,17,18 104:5 107:17 111:10 115:11,14 116:9,23 117:3,24 118:6 124:8,25 125:4,10,15 126:8,17 130:25 131:8 135:4 198:20 199:5 212:10 215:10 216:9 217:3,21 220:18 226:23 231:24 236:5 242:7

**locate** 79:11 100:2

**located** 22:15 23:11

87:3,12,19 101:2 148:13

**location** 12:7 81:20 131:22

**lockdown** 154:22 156:19,20,21

**locker** 206:19

**log** 85:10

**long** 14:8 17:16 24:18 45:15 102:9 103:4 107:11 119:20 126:23 141:8 142:3 160:13,16 161:3,5 162:11,13,15,19 163:22 165:5,8,11 167:24 168:7,13,16 180:13 198:18

**long-term** 201:14 220:22

**longer** 35:7,17 119:9 128:2 129:20,23 133:2 158:23 186:10 216:5,23

**looked** 42:22 43:2,6, 18 56:3,19,20 57:10 59:6,13,15,16

**losing** 244:18

**loss** 254:10,13

**lost** 27:23,25

**lot** 74:12,13,16 85:16, 17 87:10 119:12 216:4 219:5

**lots** 62:8

**love** 141:15,16

**loved** 225:7,8

**loyal** 140:24 222:21

**luck** 24:6,22

**lunch** 21:23 22:6,12 146:20

**Lundy** 5:2,3,24 6:3 19:23 25:20 30:2 46:19 49:24 50:21 51:7 57:4 60:12,21 62:20,23 63:6 64:9 76:9,12,15 77:12 78:5,10,14,19 81:9

91:7 96:12,24 98:6, 13,22,25 100:7,16 101:10,15 102:5 109:9,13 113:14 114:2,8,10,15 119:14,18 121:9,16 122:17 125:7 135:25 136:3 138:3 141:23 142:11 143:11 146:18 147:12 148:6 157:24 163:7 177:15 179:9 181:14,18 207:17,23 211:18,24 219:13 224:7,11 225:18 226:5 227:15 235:15 241:20 248:15,20 251:19,22 252:2 254:22 256:4 258:4

**lying** 225:13

**Lyneate** 220:13

**M**

**made** 44:12 139:17 141:2 152:7 160:24 174:20 178:17 214:25 215:2 223:19

**mail** 32:7 33:5 79:23, 24 138:22

**mails** 79:19,21

**maintain** 9:22 31:12, 16 64:25 71:3 80:3,7 190:15 253:8

**maintained** 190:24

**maintaining** 190:9

**maintains** 32:22

**maintenance** 218:6

**major** 150:24 210:11

**make** 11:2 13:19 35:12 52:22 54:18,20 60:13 98:15 109:11 129:16 131:20 136:19 139:16 149:19 223:8 241:14

**makes** 47:12

**making** 54:18 78:6 152:20,22 179:7

252:15 253:4

**manage** 105:21

**managed** 120:13

**management** 10:16 131:15

**manager** 12:21,23 14:8 103:9,10,12 104:11,14 105:19 110:6 111:7 119:4 246:18

**managers** 119:5,6

**manages** 34:19 129:13

**mandate** 154:8,23

**mandated** 154:21 155:8,18 156:2,17 221:15

**Manhattan** 10:12 22:16

**manner** 141:3

**Mapp** 220:10,14

**March** 14:14,20,22 19:10 111:6 133:3 148:9,20 151:8 153:2 158:22 159:19,25 160:13 164:6 168:17 172:9,11,16 174:19 177:6 183:12 193:9, 13 196:5,7,15 198:21 199:7 236:10 243:24 245:8

**Maribel** 220:10

**Marie** 28:22 30:12 47:3

**marked** 38:3,6,9 40:6,9 41:8 62:14,17 63:9 64:2,6,11 65:13, 15 66:15,17,18 70:15,18 71:19,21 73:3,5,16,19 74:20, 23 75:10,13 76:20,23 77:19,21 80:15,19,22 81:24 84:2,5 88:11, 15 90:15,18 92:16,19 95:23 96:2,19,22 97:22,24 99:24 100:19 111:22,25 114:17,19 115:19,21

116:15,17 124:13
132:7,9 135:2
142:14,17 172:23
173:2 177:18,21
182:4,7 185:10,13,15
188:5,10 191:6,9
192:9,12 200:4,7
204:3,6 205:2,5,7
206:22,25 208:2,5,
13,16 209:23 210:2
217:7,11 219:16,19
237:3,6,7 248:22

**market** 211:3

**marketing** 33:19,20

**marking** 81:16

**markings** 81:3,4

**marriage** 8:25
257:15

**married** 8:15 194:2

**mask** 159:10

**masks** 159:5,13,14,
19,25 160:5 164:14

**matter** 31:3 36:13
37:2 41:23 55:10
56:15,18,21 59:5
64:17 78:22 82:2
89:9 91:12 92:10
93:6,20 252:4
257:16,17

**matters** 254:2

**Maya** 55:14 56:2
58:19,25

**Meaning** 114:6

**means** 59:22 152:18
172:10 189:17,24

**meant** 24:21 114:14
156:7,13 190:8

**mechanism** 32:10

**media** 31:13,15 32:6
167:22

**medical** 173:14

**meeting** 84:15,22,25
85:6,7,14,20 86:13,
19,23 87:4,11,22
88:2 123:10 134:12,
14,16,18 198:9
212:18,19 213:11,16

218:24 231:5 233:22
247:4,16,17,18

**meetings** 177:13,14
197:18 198:18

**member** 27:23,25
161:20

**member's** 53:19

**members** 27:20,24
28:3,10,16 55:3
93:24 110:21 122:2
169:16 242:2 243:9

**Memo** 191:5,10
258:21

**Memorandum** 62:13
65:9,16 70:13,20
71:16,24 73:14,21
75:7,15 77:9,16,23
259:8,11,16,18,23
260:5,9

**memorize** 54:16,21,
22,23

**memory** 77:3 143:15
204:21 226:6

**mentioned** 46:24
47:4 57:23 213:2,11

**message** 25:11
29:14 32:10 36:9,13,
15,18 37:2 132:18
133:14 135:19 144:8
145:17

**messaged** 27:14

**messages** 19:15
20:6,9 26:21,25 27:5,
11 29:20,23 32:23
33:5 91:19,24 92:9

**middle** 130:16
137:17

**midtown** 16:2 18:20
20:19 23:8,10,16
28:4 33:14,22 45:3
47:16 69:18 85:9
128:7 139:24 152:20
154:18,19 194:18
195:17 215:6 221:20,
25 222:5 232:5
252:23

**migrated** 223:7

**million** 225:9,11

**mind** 52:9 74:17
96:15

**minimum** 168:24

**minute** 25:17,21 63:5
76:8 97:25

**mischaracterizatio
n** 54:14

**misinterpreted**
226:11

**misunderstood**
231:21

**Mm-hmm** 6:18 10:19
51:20 84:18 99:14
112:21 127:9 131:5
132:23 136:18
138:19 148:2 156:12
176:10 205:15
230:22 231:2 233:3

**Moin** 28:18 30:10
46:24

**moment** 48:13 82:15

**monetary** 250:16,21
254:9

**money** 117:19
122:11 127:23
138:20 214:16,17,21,
23,24 216:23 244:5

**monies** 129:16

**month** 12:8 21:8 22:8
34:17 37:22,23
163:18 178:17

**months** 107:14
193:11

**moonlight** 226:22
227:11

**moonlighting**
226:19 228:10,20

**morning** 5:2,25 6:2
24:5 25:10,18 27:8

**morphed** 196:23

**mother** 28:13

**motion** 62:12 63:10,
15 65:11,17 66:25
70:14,21 71:16,17,

23,25 72:9 73:14,15,
20,22 75:9,17 77:17,
24 259:7,12,17,18,
19,23,24 260:6,10

**motions** 72:11,15

**motto** 141:4 223:12

**move** 136:13 163:6
176:25 185:8 208:11
216:23

**moved** 211:7,9

**moving** 22:24 129:25
222:11

**multiple** 133:24

**Mylonas** 184:24

---

**N**

**named** 20:23

**names** 8:13,20 27:18
28:12,15 56:5,7,10
57:18,19 58:8 85:12
184:16 202:19

**Narratives** 216:3

**natural** 154:24,25
207:22

**nature** 243:5

**needed** 15:19 19:7
37:5 39:20 90:7
105:4 118:19 126:23
150:21 203:5 213:4

**news** 149:7 151:12,
15 169:4 187:7

**newsletter** 182:11

**newsletters** 182:18
183:3 197:12

**Nieves** 220:13

**no-fault** 198:25
199:14 227:10 235:9,
21,23 236:6,17
238:5,9 239:3,8,19,
21 240:2,3,14 241:4,
15 245:20 246:3,9,
14,20,24 248:8 249:5

**non-union** 171:14
243:20 245:3

**noncompliance**
110:14

**normal** 168:22
180:24

**Notary** 5:20 147:8
256:18 257:6

**note** 149:20

**noted** 256:7

**notice** 47:17 61:13
62:11 63:10 71:15,23
73:13,20 127:24
128:16 196:12
212:14 213:20,23,25
214:5,11,18 215:17
216:20 222:8,10
259:6,18,22

**notices** 61:16 245:3

**notified** 201:11,13
244:13,14,21

**notify** 197:3

**November** 64:13
208:22

**number** 7:24 10:2
17:17 81:19 84:14,16
91:4 93:18 98:20,24
113:13 168:18 173:3
177:22 185:16
188:11 193:10
195:20 208:6 210:3
217:12 219:20 220:3
221:6,14,17

**numbered** 98:12

**numbers** 8:3 98:5,9
142:18 166:6 180:18,
21,25 187:13 208:17

**nurses** 203:4

**NYF** 208:22

---

**O**

**oath** 6:9

**object** 53:6 56:25
101:8

**objection** 16:14,21
19:4,12 20:13 21:6,
15 22:10 23:18 27:16
29:17,21 32:12 33:7,

12,25 34:5,16 35:24
38:22 39:18 40:18
41:10,20 42:5,17
43:4,25 44:15,25
46:8 48:7,15,19 49:3,
10,16,21 50:11,19
51:5,24 52:7,16,20
53:21 54:9,13 55:5
58:5,14 59:9 60:3,10,
19 61:7,11,17,22
62:5 63:22 64:15,19,
23 65:4,7 66:3,11
68:7,19 69:7,16 70:8
71:5,9,13 72:4,17
73:9 74:7 75:3,20
76:2 77:11 79:5 80:5,
10 82:3 83:9,15
84:21 85:4,25 86:22,
25 87:16,20 88:21
89:10,17,24 90:3,20
91:21 92:3,11,22
93:14 94:4,13,21
95:2,7,12 96:4 100:3
102:8 104:18 105:11,
24 106:5,23 107:18,
24 109:25 110:23
111:4,16 113:12
115:16 117:4,20,25
118:7 120:4,15,20
121:3 122:4,7,15,21
123:5,17,22 124:3,10
125:6,12,17 126:9,18
127:14,21 128:4,14,
21,25 129:6 130:3
131:4,10 135:10,20
136:11,24 137:22
139:11,20,25 140:14
141:22 142:4,9 143:9
145:8,13,25 146:9
148:23 149:23 151:4,
16,20 152:25 153:10,
21,24 154:13 155:15,
23 156:8,25 157:8,23
158:3,11,18 159:8,
11,20 160:4,15
162:8,12,17 163:2
164:8,12 165:2,13,18
166:19,23 167:14
168:3,9,19 173:4,11
175:4,14,19 176:6
177:10 179:3,8,11
180:3,8 181:9,23
183:23 184:11 185:6
186:22 187:25 189:5,
10 190:19 192:2
193:5,14 194:12

196:6,17 197:5,13
198:15 199:8,18
200:21 201:24
202:25 203:13,19,22
204:19 207:15 209:5
210:16 211:8 212:12
213:21 214:6 215:11,
16,20 216:13 217:4
218:8,25 220:19
221:12 226:14,24
227:13,20 228:18
229:11 232:3,18
233:6,14,17 234:7,25
235:6 236:12 237:20
238:14 239:15 240:9,
16,24 241:6,11,17
242:3,8,14 243:11,18
244:9,24 245:9
246:4,10,21 247:2,13
249:13 250:2,13,19,
24 251:6,15 252:9
253:19,23 254:14

**objections** 90:13
95:21 96:8 97:10
260:18,22

**obligation** 46:6
78:23

**obligations** 62:2
69:2,5

**obtain** 159:10

**obtained** 257:19

**obvious** 45:6 254:20

**occupancy** 106:2,
11,13

**occur** 198:14

**occurred** 84:25
135:14 196:14 212:2

**occurring** 86:19
87:4

**October** 102:10
208:6

**odd** 136:21 137:8
138:15

**Odeth** 29:3 30:13

**office** 5:11 103:7
246:2

**Olive** 5:9,11 7:20
8:14,17,23 9:3,12

12:3 17:19 31:21,23,
24 67:12 112:4,12,22
132:10,22 133:6,8
136:17,22 138:7,23
145:4 191:5,10 238:2
256:10 258:4,21

**Olive.ivey** 10:4

**olive.ivey@bmcc**
10:5

**olive.rodriguez@
fourseasons.com**
14:7

**Olive.rodriguez@
fourseasons.com.**
11:21

**oliveivey26** 32:3

**Olivemivey26** 32:2

**olivemivey@gmail.
com** 30:16

**olivemivey@gmail.
com.** 9:25 183:6
186:4

**OM** 99:12,19

**one's** 227:15

**online** 56:3,19 57:11
58:6 59:6,17 159:15,
16

**open** 140:12 170:3
231:17

**open-ended** 48:2

**opened** 45:5 139:23
140:2 219:7

**opening** 28:7 46:25

**operate** 190:14

**operated** 169:13,18

**operating** 169:24
170:10 171:21

**operation** 167:8,10,
13 170:22 171:3
174:24 177:9 202:12

**operations** 104:20
158:16 174:19,22
175:3,17 178:19
179:17,25 186:17,20
188:25 189:3,22,24

190:3,5

**operator** 103:3,5

**opinion** 140:21

**opportunity** 142:2
171:2 173:9

**Opposition** 65:10,17
75:8,15 77:9 259:11
260:5

**opted** 127:4 244:3

**option** 35:3,18
108:15 126:24
129:18,25 131:16
132:2 137:5 138:12
139:13,15 170:12
173:15,16 214:16
222:10

**options** 137:5
138:11

**order** 164:22,24
165:12 175:25
186:15

**orders** 164:19 165:6,
9,16,20,22 176:4
179:15,21 187:15

**organization** 140:25
141:15

**Ortiz** 18:10,14,22
19:16 20:3,6,10
27:11 35:13,22 36:13
37:2,12 73:2,7 74:19,
25 85:10 95:16,18
123:13,20,25 130:8
132:19 135:8 136:15
145:11,23 208:21
217:20,24 229:7
231:6 232:6 252:16
259:21 260:3

**outcome** 44:17
257:17

**outlined** 238:12
252:4

**outlines** 176:9

**overnight** 163:13

**overseas** 151:7

**oversee** 105:4

**oversight** 209:16

**owed** 124:20

---

**P**

**p.m.** 118:9,10,21
133:17 146:20 147:3
256:7

**pack** 153:14 156:2
159:17

**pages** 71:24 98:4
100:11,14,19 101:5,
6,9 112:2 113:18
132:12 235:11

**paid** 120:9,13 121:23,
24 122:3,11 123:8
125:15 126:15,23
127:4,11 142:24
144:5 214:24 241:7
248:7

**pain** 98:16

**painful** 140:23

**Pamela** 220:10,14

**pandemic** 14:17,21
27:20 122:9 126:20
140:22 147:16
148:22 149:5,16,21
150:10 151:2,13,14,
19 155:5,14 156:20
157:5,7,12,20 158:2,
6,9,15,17 160:2,14
161:23 162:3,11,16,
18 163:20 164:7,20
166:17 167:3 168:8,
13,16 175:9,12,17
187:4,11 199:24
211:11,13

**paper** 117:9

**papers** 161:24 162:4

**paragraph** 67:25
68:9 112:4 148:4,6
149:3 174:18 175:7,
21 178:15 179:13
186:12 188:22
200:14 207:7 210:11,
25 230:16,21 231:3,5
232:12,13,25 233:8,
24 234:4,10,13,21
254:5

**part** 37:10 57:7
150:22 163:24 179:6

180:12 232:14 242:6

**partial** 101:9

**participated** 205:21, 25

**participating** 205:16,19

**parties** 44:18 257:16

**parts** 149:9

**pass** 61:20 62:4

**passed** 28:14

**password** 145:12

**past** 8:6,8 11:18

**Paul** 5:13 62:18

**Pauline** 184:24

**pause** 10:25 13:18 19:25 25:22 255:6

**pay** 61:19,24 62:2 114:23,24 117:24 125:20,24 127:12 135:3 198:25 199:15 214:19 222:3 227:10 228:3 229:3,21,25 235:10,21,23 236:6, 18 238:5,10 239:4,9, 19,21 240:14 241:4, 15 245:20 246:3,9, 15,20,24,25 248:8 249:5 253:2

**paycheck** 254:17

**paying** 231:13

**payment** 13:13 122:23 124:19 240:13 245:19 246:3

**payout** 126:7 135:3

**PC** 5:11

**penalty** 35:3 129:17

**pending** 7:10 72:22 161:15 163:8 227:16

**people** 18:18 33:16, 18 42:8 44:13,20 45:4 48:22 69:9 85:17 106:7,9,10,11, 21 141:7,11 145:15 153:11 156:4,21 161:7 163:22 166:6

172:3 184:17 193:7 200:23,24,25 201:4, 8,13 202:8 212:7 216:15,19 217:20 219:4,5 220:8 221:22 222:12 223:4,14 244:2 247:20

**perform** 171:8

**period** 8:16 9:2,11 11:25 14:6,10,12 15:14 45:15 125:22 126:2 148:17 150:9 152:5 158:21 168:25 170:9 172:8,19 181:20 231:11

**periods** 165:16

**permanent** 193:18 195:18 196:23 232:9 239:25

**permanently** 234:9, 11,13

**permitted** 227:6,11 231:23 233:12

**persist** 211:3

**person** 22:4 35:6 36:23 95:18 193:20 199:10 209:13 224:17

**personal** 111:19 154:9 156:23 178:10 183:21,25 184:5,8 206:18 237:18

**personally** 61:25 150:25 151:14 155:3, 12 180:21 202:9 203:14 221:18

**personnel** 173:14

**persons** 93:19

**pertained** 91:24

**pertaining** 80:4,8 176:19

**pertains** 94:11,14 142:6 195:4,8

**Peters** 5:3,6 6:4 258:5

**Petition** 77:9

**Philadelphia** 17:2 108:3,18,22 109:17 173:21,24

**phone** 7:24 8:3,6 30:12,13 34:18 35:6 36:22 45:2,3 52:24 56:8 130:23 186:11

**phrase** 165:23 166:3

**physically** 87:5 177:3

**pick** 95:16

**place** 137:7 138:13 164:5 165:6,9,12,22 179:16 186:15 187:15 213:4 222:20 252:20

**places** 210:19

**plaintiff** 20:24 78:21 93:12

**Plaintiff's** 238:2

**plaintiffs** 38:25 41:23 82:2 91:11,15 93:18 97:8 148:11 254:7

**plaintiffs'** 75:7,14 80:18 82:6 83:25 90:13 95:21 96:7 97:9 260:4,12,14,17, 21

**plan** 34:20 129:13,19, 25 131:15 216:24

**play** 167:23

**playing** 163:24

**pleading** 51:23

**PLLC** 237:8

**pocket** 61:5,24

**point** 17:3 47:25 114:5 157:15 166:12, 16 173:17,21 180:20 193:15 195:16 213:15

**poorly** 141:13 223:22

**portion** 46:21 47:22 50:2 241:22

**position** 12:19 102:15 221:23

222:12

**positions** 102:23 103:2

**potential** 58:11 238:23

**practice** 59:16

**praying** 25:12

**premises** 155:2

**preparation** 152:7, 21,22

**preparations** 160:24

**prepared** 61:19,24, 25 160:8,10

**preparing** 246:7

**present** 21:21 22:2,3 27:6 39:20 177:3 196:5 197:9 236:11

**presented** 52:17 54:16 58:4 69:10 74:15

**president** 161:6

**pretty** 248:13

**previous** 8:25

**previously** 38:3,6,9 40:6,9 62:14 64:2 65:13 66:15 70:15 71:18 72:10 73:3,16 74:20 75:10 76:20 77:18 80:15,19,22 82:20 84:2 87:9 88:15 89:3 90:15 91:18,23 92:16 93:23 95:23 103:18,22,24 108:17 126:11 133:19 134:5 137:12 147:8 157:3 172:23 177:18,21 181:19 182:4 185:10,15 188:5,10 202:11 204:3 205:2 206:22, 25 208:2,5,13,16 209:23 210:2 211:25 216:7 217:7,19 218:21 219:16 230:23 232:14 233:24 237:3 238:21 245:14

**pride** 223:17 225:14

**Principal** 34:19 35:15 37:7 79:24 129:9,11,12 130:2,5, 7,10 131:25 132:20, 25 133:20 134:8,11 214:15 215:9,22 216:8,12,15,17,20,22 217:2

**print** 98:7,17 112:22

**printed** 101:16 162:4 176:22

**prior** 21:23,24 39:8 42:14 43:22 56:14 59:3 103:14 110:3 113:11 126:20 157:12 160:23

**private** 32:18,22 33:4

**privately** 32:11

**privy** 156:5 193:6

**proceeding** 91:6 238:22

**proceedings** 19:25 25:22 255:6

**process** 6:11 8:18 9:18

**produce** 88:23

**produced** 26:25 29:20 30:17 79:12 83:12 89:9 92:10 93:5,12 101:11,14

**producing** 29:22

**production** 31:6 78:24 79:3 81:11 82:2 88:14 90:14 93:10 98:7 101:3 260:16,19

**products** 33:20

**professionals** 178:21 179:2 188:24

**program** 10:14 11:4

**project** 213:3,7

**projects** 47:25 212:22,25 213:10

**proper** 94:15

**properly** 244:14,21

**properties** 23:7 199:6

**property** 11:25 16:2 23:10,16 49:14 95:10 145:15 153:19 169:23 199:16 200:17,20 201:23 203:11 231:11

**protect** 46:6

**protocol** 163:23

**proud** 179:6,10

**provide** 7:17 30:20 31:5 178:20,25 214:4

**provided** 53:7 58:9 61:14 89:13

**provider** 138:21

**providing** 79:7 189:15

**provision** 228:17 235:10

**provisions** 235:22

**Public** 5:20 147:8 256:18 257:6

**purchase** 159:23 160:6

**purchased** 159:15, 17

**purchasing** 159:18, 24

**purpose** 19:5 33:11, 15 232:10

**purposes** 33:9 236:5

**push** 207:20

**put** 40:3 62:9 70:10 83:23 145:21 146:15 164:5 165:12 185:12 188:7 192:7

**putative** 53:19 55:3

**Q**

**qualification** 45:23

**qualified** 56:16

**question** 6:10,16,17 7:2,3,5,10,11 10:18 11:3 16:15 19:13 34:3 36:25 45:8 46:4, 20 49:23 52:11 53:24 54:24 60:9,16,24 86:8 88:6 100:10 118:13,17 125:8 134:23 140:8,15,18 141:24 142:12 145:6 149:13 153:22 155:11 157:4,16,19 161:14,16 163:7 168:11 184:6 189:7 200:2 201:19,20 214:2 215:5,14,25 216:2,4 219:6 227:14,24 228:24 229:18,22 232:11 241:19,21 242:5 247:4,5,6,16,18,19, 21,22,23,25 248:3 250:4

**question's** 13:19

**questioned** 213:5 222:20

**questioning** 229:15 248:13

**questions** 6:12,14 7:15 35:5 46:10,14 56:22,23 87:23,25 88:3,7 114:3 119:13, 19 121:12 194:4 205:13 206:7 212:19, 20 218:22 219:3,5 254:23,25 255:8

**quick** 142:12 248:14 251:20

**quickly** 62:9 64:10 164:4 207:19

**quote** 231:7

**R**

**R-A-S-H-A** 107:8

**raise** 247:5

**raised** 224:24,25 225:2 246:23 247:7, 12,14 248:7

**raising** 247:3

**range** 106:3

**Rasha** 107:6

**rate** 187:13,14

**re-ask** 189:7

**re-read** 241:20

**reach** 27:25 36:5,19, 20 130:7 137:9 138:16

**reached** 15:13 28:14 29:3 35:13 57:11

**react** 60:20

**read** 46:19,22 49:25 50:3 54:15 74:14 97:8 118:13 137:24 138:5 179:13,23 232:15 241:23

**reading** 178:22 233:8,9,15 235:21

**reads** 175:21 178:16 186:12 188:22 200:14 206:8 207:7 228:11 254:6

**real** 161:8

**realization** 34:13

**realize** 223:21

**realized** 43:13 45:12 150:16 195:17

**realizing** 126:25

**reason** 7:13 60:20 98:17 160:24 161:2 215:3 254:6

**rebound** 218:13

**recall** 12:10 13:7 16:5 19:18 20:2,5 22:6,12,15 27:18 28:12,15 37:22,23 55:24 58:24 66:9 67:17 71:7,11 72:19 74:10 83:4,7 85:18 88:24 89:19 90:23 92:12,24 108:24 118:5 120:2,17,21,25 121:4 133:13 135:13 140:5,11 143:3 146:11 147:18,20 149:15 150:13 159:2 164:18 165:11,23

167:5,7 168:17 176:13 177:2 178:2, 5,8,22 183:11 185:20,22,23 186:2 188:17 191:15,18 199:11 200:13 204:9 205:16,19,22,24 206:3,11 207:4 208:7 209:18 210:5,14,20 211:6 212:3,6,8 217:13,15,17 240:2, 13 249:25

**recalled** 33:24 34:4,6 49:8 94:24 95:5 240:7,22 241:5,9,16

**recalling** 218:12 231:16 232:2 234:23

**receive** 10:21 13:11 104:3 105:6 122:19 123:15,25 183:2 209:6,12,13,14,15 212:14,17 214:10,13 215:17,21 239:25 244:3 246:12

**received** 34:18 35:21 71:11 79:14,20,23 124:8 126:6 128:20 129:9,14 132:19 178:5 181:6 182:18, 23 185:23 187:21 193:3,7 204:12 208:9 209:4,9,19 210:9 215:23 243:24 245:3, 7

**receiving** 68:6 79:8 123:3 133:11 178:2 184:5 191:15 204:9 207:4 208:7 210:5 217:13,15

**recently** 19:2 21:5

**recess** 30:5 78:17 121:20 146:20 181:16 211:22 225:23 251:24

**recognize** 132:15 177:24 191:13 220:9

**recollection** 109:15 135:18 136:9 143:7 148:21 149:4 166:2,4 176:3 179:20 200:19 201:21 204:16 218:3

**recommendation** 60:25

**recommending** 111:2

**record** 7:18 19:20 46:18,21 50:2 60:13, 22 76:11 78:20 96:16,17 98:20 135:21 136:2 137:23 138:2 173:6 194:25 241:22

**record's** 109:13

**recorded** 85:19,21 86:11,20,24

**recording** 84:14,24 85:3,24 86:16 228:5 230:3,5

**records** 89:8 176:17 194:20,21

**recruiters** 33:20

**reduced** 190:15,17, 25

**refer** 88:10 91:8 103:16 109:7 147:22 148:3 188:21 226:16 230:15 231:18 233:23 245:11

**reference** 64:18,20 72:7,8 97:14 99:19 143:18 220:16 234:8

**referenced** 37:19 68:8 232:25 234:21

**references** 84:13,15 218:17 234:5 249:15

**referencing** 82:10 125:23

**referred** 8:17 114:25

**referring** 14:16 18:5 20:18 23:2,10 28:10, 16 37:20 70:11 82:24 84:19,22 85:6 90:10 99:21 100:13 134:17 152:13,14 173:23 194:11 225:25 229:7 249:18

**refresh** 135:18 136:8 143:7 148:21 149:3 176:3 179:19 200:18

204:16 218:2

**refreshed** 201:21

**refrigerator** 152:9

**regard** 35:25 43:10 150:14

**regular** 25:19,24 26:4,6,7 175:2 179:17,24 186:16,19 253:10

**regulations** 110:14 243:3

**rehire** 140:3,7,11

**rehired** 34:2,8 140:4

**related** 157:5,19 257:15

**relates** 198:24

**relating** 61:10

**relationship** 93:18

**relative** 226:9 243:9

**relayed** 234:20

**relevant** 93:20 229:22

**relying** 58:3

**remain** 137:13 139:15,19 153:18 210:12 211:4 218:5

**remained** 226:13

**remaining** 101:5 132:3

**remains** 131:21 139:9,12

**remember** 9:4 10:4 12:2,5,8 13:8 15:5 17:15 18:23,24 20:4, 11 21:4,12,13 22:7, 13 26:23 27:12 28:13 29:16,18,22 34:17 37:4,8,11,25 38:16 44:2 55:4 57:19 58:17 64:24 65:24 66:4,12 67:5 71:10, 14 72:20,24 73:10, 11,25 74:14,16 75:4, 21 76:3,4,5 77:4 78:3 83:6,10,21 84:7,11 85:5,12 88:8 89:2,11,

20 90:21,22,25 92:25 102:10 103:13 107:4, 8,25 108:5,23 110:5 129:8 133:11,15,22 134:4 135:15 143:4 144:25 145:2,3 146:2,10,14,15,16 149:6,17,20 158:19, 20 159:3 164:13,17, 21 165:7,10,19,21 167:6,9 169:9,11 173:12,20 176:15 177:4,5,11 181:3,4, 24 186:25 187:20 188:19 192:15,18,24, 25 196:19 197:16,17 198:16 200:11 201:25 204:11 205:10 207:6 208:9, 20 209:20 210:8,22 211:9,15 213:2 219:23,24 230:5,6,9 245:22

**remembering** 230:10

**remind** 17:13

**remote** 172:10 177:13

**remotely** 172:13

**remove** 139:14 214:15,16

**removing** 129:18

**reopen** 22:22 23:4 30:10 94:7,12 178:20 234:24 240:15

**reopened** 33:23 95:6 141:20 210:21,23 235:3

**reopening** 28:19 173:22 211:5,6 218:12 231:15

**reopens** 94:25 240:23 241:5,10

**repeat** 26:18 49:22 93:7 168:10 241:19

**repetitive** 88:4 219:3

**rephrase** 7:3 92:4 242:5

**Reply** 70:12,19 77:15,22 259:15 260:9

**report** 106:18,20 151:12 169:17 173:9

**reported** 105:10,13 120:12,18 121:2 149:10 151:15 180:19 187:14 245:17

**reporter** 6:12,20 257:6

**reporting** 106:7 257:20

**reports** 166:5

**represent** 56:16 58:12 59:4 203:12

**representative** 35:15 42:11 44:5,9 54:4 74:4 93:13 194:23 202:22 203:9 238:23 240:11 251:3

**representatives** 134:13,17 203:16

**represented** 44:13 54:3 55:7

**representing** 6:5 44:10 55:9 57:16 98:11 251:3

**request** 90:5,6,7,14 91:3,4,9,10 246:6 260:18

**requested** 46:21 50:2 241:22

**requests** 89:16,23 90:5

**required** 61:13 119:8

**requirement** 214:4

**requires** 213:19,23

**research** 12:14 42:13 49:18 50:4,8, 12 56:15 58:2,10 161:21,24

**researched** 214:9

**reservations** 103:6

**reserve** 255:9

**reserving** 256:2

**reset** 145:11,19

**resetting** 144:7

**resign** 107:12

**resignation** 229:7, 12,16 232:24

**resigned** 198:21 227:8 229:17,18,24 239:12

**resigns** 229:19,25

**Resorts** 75:17 129:14

**resource** 32:15,25

**resources** 15:25 245:25 246:2,7,13,19

**respect** 39:16 121:25 209:17 223:15

**respond** 24:7 60:8, 24 136:19 137:3

**responders** 169:3,7, 14,19,25 170:3,6,11, 23 171:5,22 189:4,9, 16 202:13

**responding** 192:22

**responds** 138:24

**response** 30:9 35:19,21 94:2 122:16 130:10 133:5,7 136:20 137:8,19 138:15 139:3 164:6 201:16 228:6,25 242:4 247:15,23 248:5

**responses** 6:22 90:13 95:21 96:7 97:9,18 213:14 260:18,22

**responsibilities** 44:5 49:19 61:9 104:17

**responsibility** 44:8, 16 74:4 110:17 202:23

**responsible** 61:15 104:19 110:7,20

111:2 172:17

**responsive** 31:2 82:21 83:5,19 216:3

**restaurant** 22:14

**restaurants** 210:12

**restrictions** 164:5, 10

**result** 13:15 153:9 164:19 167:2

**resulting** 254:9

**resumed** 147:7

**retained** 59:25 258:5

**retaining** 59:3

**retirement** 34:20 216:24

**retrieve** 19:8 206:20

**return** 47:18 140:12 170:21 171:3 174:4, 23 175:2 181:25 213:17

**returned** 180:20

**returning** 141:19 212:21 249:23 252:22

**review** 30:15,23 39:9 40:25 65:6 66:5 67:6 74:5 82:15 97:25 104:7 220:17 256:3

**reviewed** 41:12 51:25 67:25 70:25 71:7 89:8 99:5 124:6 131:7 134:25 220:24

**reviewing** 66:10 90:23 135:6 184:25 242:13

**reviews** 51:16 76:25 82:18 83:2 92:21 96:5 188:14 192:17 200:10 204:10 208:8, 19 210:7 232:21

**revised** 68:5

**revisions** 112:19 113:8 211:10,11

**rich** 223:5,6

**rights** 225:2

**Risman** 55:14 56:2

**rock** 252:20

**Rodriguez** 8:14,17 9:12 12:3 17:19 31:21,24 99:13,20 112:23 132:10,22 133:6 136:17,22 138:8,23 191:6,10 220:11 258:22

**role** 104:16 105:7

**roll** 35:3,18 131:18 137:6 138:12

**rolling** 129:18

**room** 102:17,18 104:21 111:17 184:21,22

**rooms** 106:20,24 143:24

**Roth** 137:7 138:14

**routine** 150:18,19

**RPR** 257:25

**Rudy** 111:8

**Rule** 80:18 82:7 260:12

**rules** 110:14 243:3,4, 9

**run** 76:14

**running** 106:11

**S**

**sacrifices** 223:19

**safety** 190:16

**salaried** 171:11

**salary** 120:9,11,14

**sanitizers** 159:4

**savings** 253:7,8,13, 14

**schedule** 118:20,25

**scheduled** 120:21, 25 121:4 168:20 230:14

**schedules** 172:17

**school** 10:3,7,9,15, 20

**science** 161:12,15, 18,19 162:25 163:9

**scientist** 161:22

**search** 32:17 33:4 79:15 176:17 178:13

**searched** 79:13

**season** 106:9

**Seasons** 11:24 12:7, 17,24 13:5 14:9 15:11,15 17:2,21 18:8,11,19 19:7 20:15,16,17,19 23:3, 4,7,8,9,15 27:15 28:5 31:10 33:13,14,22 34:20 35:7,11,17 37:17 43:9 45:3 47:16 48:18,21 69:18 85:8,11 108:8,13,15, 22 109:6,7,16,24 128:7 129:13,20,23 131:15 132:25 134:13 137:14 139:9, 13,19 141:4 148:14, 15 152:19 154:18 173:23 179:7 183:15, 19,21 184:2,7 194:15,18 195:17 199:7,17 203:7 214:20 215:6 221:19, 25 222:5,17,22 223:12,13,16 225:12 227:25 228:23 229:2, 19 232:5 244:19 248:11 252:22

**seconds** 13:22 255:4

**section** 82:8,13,24 175:8 237:25 239:20 249:15 250:7 251:11

**security** 95:17 123:6,7,12,20,25 190:10,16

**seek** 252:17

**seeking** 42:7 49:8 153:4 236:18 249:11 251:13

**seeks** 91:4,10

**segment** 78:9

**select** 55:20

**Selena** 20:12 41:24 250:17

**sell** 33:18

**send** 36:15,17 53:3 141:2 183:7,20 184:3,4,7 216:20

**sending** 61:16

**senior** 103:10,11 104:13

**seniority** 128:24 129:3

**sense** 163:10

**sentence** 179:14 188:22 204:13 210:11 239:24

**separate** 25:8 132:11 215:9,12 216:8 245:3

**separation** 198:25 199:14 227:10 235:10,21,23 236:6, 18 238:5,10 239:4,9, 19,21 240:14 241:4, 15 245:20 246:3,9, 15,20,25 248:8 249:5

**September** 207:3,11

**served** 89:15,22 223:16 224:20 225:7

**serves** 243:20,22

**service** 220:17 235:20 236:4,10 238:11 253:2

**Services** 75:9,16 104:5 107:17 111:10 115:10,14 116:9,23 117:2,23 118:6 124:8,25 125:4,10,15 126:8,17 127:11 128:2,19 130:25 131:8 135:4 141:18 185:5 187:23 197:11 198:20 199:5,15 212:9 214:12 215:10, 19 216:9 217:3,21 220:18 226:23 231:24 234:22 236:5

**segment** 240:21 242:2,7 245:8 260:5

**serving** 225:14

**set** 39:17 42:16 92:15 93:3 95:22 96:8 97:10 100:8,12 114:11 236:19 257:10,23 260:20,22

**sets** 242:22

**setting** 224:24

**settle** 50:9

**severance** 222:3 228:3 229:3,21,24,25 231:13 252:18 253:2

**shake** 158:23

**share** 136:3

**shared** 226:8,11

**Sharon** 106:24 107:16,21 143:17,18, 21 144:4 145:2 146:13 155:24 156:10,14 245:15,20

**shed** 133:3

**shift** 105:5

**short** 11:25

**Shorthand** 257:6

**shortly** 107:9 178:19

**shot** 24:20

**show** 38:2 40:8 62:16 65:14 66:16 71:20 73:4,18 74:22 75:12 76:22 77:20 80:14 84:4 92:18 96:21 185:13 205:4 217:9 237:5

**showed** 40:20 214:19

**showing** 70:17 90:17 95:25 111:24 114:18 115:20 116:16 142:16 192:11 200:6 206:24 208:4,15 209:25 217:10 219:18

**shown** 38:17 80:21 132:8 172:25 177:20

**shows** 176:16

**side** 62:10 96:14

**sight** 213:15 234:16

**signature** 67:14,15 97:5 112:8,15,25 113:17 237:13 255:10 256:3

**signed** 68:17 103:25 104:8 217:23

**significantly** 105:25

**signing** 67:17

**silence** 193:25

**silly** 219:9 229:17

**similar** 42:9 93:9 182:21 221:22 222:12

**similarly** 39:5 41:19 42:8 56:17 58:12 59:4 61:14 68:25 69:22 148:12 244:8 254:8,12

**simple** 162:5

**simultaneously** 46:17

**single** 48:11

**sit** 39:22 41:6 67:20 94:17 97:17 99:23 127:10 139:17 196:2 203:8 236:3 241:2 250:10 251:14

**situated** 39:6 41:19 56:17 58:12 59:4 61:15 68:25 69:22 148:12 244:8 254:8, 12

**situation** 42:9 48:2 196:22,23 211:2

**sixth** 51:18

**skip** 78:4

**Slade** 184:23

**slow** 106:8,9

**slower** 51:6

**social** 31:13,15 32:6 175:22 179:14 186:13

**society** 180:17

**sole** 252:15

**son** 170:14

**sort** 16:20 145:12

**sound** 131:20

**sounds** 6:21

**source** 86:5 257:19

**speak** 20:20 23:24 25:19,23 26:4,5 36:18 37:6 44:9 52:23 53:6 69:21 142:5,7 169:7 170:25

**speaking** 30:9 37:11 47:7 130:17 143:19 212:6,7,24

**specialized** 159:13

**specific** 149:14 250:7,11

**specifically** 48:4 66:9 91:14 103:19 156:6 203:10,23 204:15,18 220:15 227:3 253:21

**spell** 16:7,8,9 107:7

**spelling** 7:18

**spoke** 16:4 21:2 30:11,12,13 36:11 37:9 42:25 50:4 107:20,25 108:3 109:22 133:25 169:9 248:10

**spoken** 18:10,22 19:9 44:22 46:5,7,23 47:3,8 69:24 93:24 111:10 244:4

**spur** 204:20

**staff** 105:2,3 110:9, 18,22 111:3 122:2,3 167:19 169:17 170:3, 5 171:2 172:18 208:22,25 209:2,3

**staffing** 190:15,18, 25

**Staley** 20:12,20,23 25:5,9,14,24 27:5 41:24 81:4,16,20,24, 25 82:10 84:16 99:3 100:19 101:23 172:22 173:3 174:7,8 176:9 177:17,22 182:3,7,8 185:9,16 188:4,11 204:2,7,25 205:7,8 206:21 207:2 208:6,12,17 209:22 210:3 217:6,12 219:15,20,21 220:3 250:17 260:24 261:3, 4,6,7,9,10,12,14,16, 17,19

**stand** 10:11 225:2,5, 6

**standards** 110:15

**standing** 26:17 128:9

**stands** 34:3

**start** 120:7

**started** 35:5 120:6 166:12 180:18,22 181:2 183:24 193:17 227:17

**starting** 164:3 174:18

**state** 67:24 87:15,19 164:18 165:9 195:9, 13 257:3,7

**stated** 196:20

**statement** 124:13,21 125:11,16 128:11 131:2 227:22 258:16

**states** 50:25 116:5 151:22,25 157:13,18 200:22

**States'** 157:17

**statewide** 175:25

**stating** 154:20 231:7

**status** 93:25 132:25 133:9 137:3,20 138:10 139:5 177:8 196:4 221:16 226:9 244:19

**stay** 62:13 63:11 65:12,18 123:11 164:19,23,25 165:5, 8,12,15 175:25 176:4 179:15,20 186:14 259:7,12

**stayed** 154:4

**staying** 156:4

**steady** 253:4

**stem** 163:25

**stenographically** 257:12

**stint** 108:5,9

**stocked** 152:11

**Stokes** 5:14

**stop** 193:24

**stopped** 167:2 198:6

**store** 206:19

**Street** 7:22 23:11,17 95:11 99:16 141:12 148:13

**strike** 77:12 91:7 103:23 117:16 125:7

**struck** 14:18,21

**struggle** 207:10,13

**stub** 114:23,24 214:19

**student@bmcc. cuny.edu.** 10:6

**stuff** 33:18 153:14

**subject** 91:12 93:20 191:11 242:11

**submit** 87:25 88:6

**submitting** 88:8

**subscribed** 256:12

**substance** 53:11

**substantial** 218:6

**substitutes** 228:22

**suffer** 210:13

**suffered** 254:8,12,16

**suit** 42:7

**sum** 125:15 238:9

**summarizing** 231:4

**summary** 112:11 115:3

**summer** 11:8,11,12 22:8

**supervise** 104:24 105:3

**supervised** 105:2

**supervising** 104:21

**supervisor** 29:3 103:8 105:17 106:15, 17 144:2 245:15

**supervisors** 104:21, 25 105:3 143:22 216:11,14

**Supplemental** 83:25 260:14

**support** 26:19 62:14 70:13,20 71:17,25 73:15,21 77:16,23 259:8,16,19,23 260:10

**suppose** 176:7

**supposed** 196:21

**surgical** 159:14

**surprise** 95:4 187:5, 9,17

**surprised** 27:9 152:2 180:2,4 186:18

**surprises** 95:8

**suspend** 174:21 178:18

**suspending** 188:25 189:3,21 190:7

**suspension** 179:17, 24 186:16,19

**sustained** 250:17,22 251:5,8

**switch** 230:13

**sworn** 5:20 6:8 147:8 256:12 257:10

**system** 15:18 32:7

**T**

**takes** 213:8

**taking** 163:23 190:8, 12 213:12 228:20

**talk** 6:7 19:21 22:21 53:13 255:4

**talked** 21:13

**talking** 11:2 100:7 122:5 224:13,15

**task** 15:2 17:3 107:22,23 108:11,12, 18,21 109:16,24 214:22

**tasked** 110:16

**taught** 141:6 225:4

**Tauscher** 111:8

**teach** 223:14

**team** 27:19,23 28:3, 9,16 121:25 179:7

**teams** 85:20 86:13, 19,23 87:4,10,22 88:2 93:24 177:13

**technical** 16:19

**telephone** 93:17 103:3,4

**telling** 193:23 198:2 222:6 234:15

**tells** 47:21 223:10

**temporarily** 174:21 178:18 188:24 189:21 193:13,16 195:16 196:24 197:3, 7 211:4 233:19

**temporary** 167:12 169:2,6,13,18,24 170:10,22 171:4,21 181:8 187:23 188:3 189:4,8,15 192:23 193:9 194:9 196:14, 16,21,22 197:8 202:12 206:9,12,16 226:13 233:11

**ten** 9:8,15 11:18 14:11,12 118:22,23,

24 119:6,8 168:21 206:4

**term** 156:14 189:23 232:24

**terminate** 216:19 217:2

**terminated** 34:7,10, 15 35:11 37:14 43:11,12,14,15 47:17 94:15,19 126:13,16 127:4,7,13 129:3,5,7, 10 134:7 194:5 195:21 196:11 212:11 213:25 214:17 215:4,7 216:21 221:18,20 222:7 227:5 234:5 236:16 240:2,6

**terminating** 222:9

**termination** 91:15 212:15,18 213:19,20, 22 214:5,11,14 215:18,22 218:17 240:3

**terms** 161:25 162:5 207:21 228:17 229:10 242:23

**testified** 5:21 25:23 47:10 72:10 74:9 82:20 87:9 89:3 91:18,23 93:23 103:22,24 108:17 123:19 126:11 133:20 134:5 137:12 139:8 147:9 156:10 171:20 181:19 182:17 194:3 202:11 216:7 218:21 230:24 233:25 235:4 238:22 244:21 245:14

**testify** 26:2

**testifying** 20:21 157:3

**testimony** 12:22 43:5 127:6,11 135:12 196:3 216:25 257:9, 11

**text** 19:15 20:6,9 24:3,11 25:5,8,10,11 26:21,25 27:5,7,8,11,

13,19,21 28:3,5 29:14,20,22 30:11 36:9,13 37:2,4,9,11 91:19,22,24 92:5,7,9 133:13 135:13,19 138:18 144:8

**texted** 24:5 25:13

**texting** 20:2

**thereof** 97:11 245:19

**thing** 26:16,18 94:8 137:25 179:5

**things** 43:13 45:21 59:17 150:17 180:23 187:7,16 193:23 197:24 199:25 243:13

**thinking** 127:3 134:14 180:22 188:2 247:19

**thirty** 106:10

**thought** 22:21 23:3 56:22 140:3 151:5, 10,17 152:7 154:6,23 167:15 179:4 181:11 193:15 225:5,9 247:3

**thoughtful** 138:4

**throat** 18:20

**thrown** 57:18,20,21 213:9

**time** 6:25 8:16 9:2,11 12:2 14:6,10,12 15:3 18:21 19:10 21:2 25:13 34:14 35:12 45:15 51:14,21 62:10 86:18 89:25 102:9 104:8 107:11,20 109:22 118:20 120:7 130:21 138:4 140:23 142:24 144:22 148:17,18 150:9 152:5 157:22 158:13, 21,22 161:3,5,22 162:21 163:14,15 165:17 166:25 167:18 168:25 170:9, 13 172:6,8,18 173:19 174:22 180:5,7,9 181:20 183:17 186:24,25 187:3,10, 16,24 188:2 190:14

191:20,25 195:19 196:9 198:18 199:20 203:3 204:18,21 210:18 211:11 230:2, 4,6 231:11 246:23 247:11 248:6 253:3 256:7

**timeline** 213:5

**times** 20:5 36:20 86:15 98:7 173:8 176:5 187:12 214:22 249:22

**tips** 117:12,17

**title** 205:12

**titled** 38:10 40:12 63:10 64:12 65:16 66:18 67:12 70:19 71:23 73:7,20 74:24 75:14 77:5 82:6 93:2 96:7 112:11,19 113:8 191:9 226:19 237:10

**titles** 94:6

**today** 6:7,13 7:15 20:21 23:15 24:22 25:12 39:22 41:6 67:20 70:11 94:17 96:13 97:17 99:23 126:11 127:6,10 134:5 139:18 194:4 196:2 203:8 233:9 236:3,13,15 241:2 242:13 247:8 250:10 251:14

**told** 15:17 18:2 24:10,24 28:20 29:9, 10 35:4,6,9,14,16,20 36:3,4 37:5,12,15,16 43:9,14 47:19,21 56:8 123:10,23 126:24 130:11,21 132:20 149:18 152:10 153:13 154:5 155:3,6,7,16,20 156:7 158:23 163:10 164:13 173:13 215:22 221:24 225:11

**tomorrow** 33:23 139:23 140:2,12 141:20 235:3

**tool** 32:14 33:2

**top** 53:16 112:3 115:6 116:4 125:25 132:10 235:20 236:23

**totalling** 249:7

**totally** 222:21

**touch** 193:23

**town** 134:17 197:18 205:13,17,20,21,25 212:2,5,10,16 218:3, 23 227:4 231:4 247:4,17

**track** 171:11

**training** 105:6

**transcribed** 257:13

**transcript** 257:18

**transferred** 16:2 48:17,21 199:6,10,16

**transpired** 130:9

**travel** 207:9,12

**treat** 141:5 223:10, 15,22 225:10

**treated** 45:23 48:23 140:22 141:6,10,12, 13 223:9,11

**trial** 257:21

**true** 67:22 68:4 97:12,18 230:25 232:16 234:2

**truth** 6:9 149:17

**truthfully** 7:15

**Tuesday** 133:16 135:17 136:6,10 143:2,8,14

**turn** 50:17 51:2,4 64:4 81:2,18 82:5,8 91:2 93:16 132:11 137:16 138:17 173:7 174:6 203:25 220:2 235:18 237:22 238:20 239:17

**turned** 79:24

**turning** 100:18 112:10,18 184:13

**tool** — see above

**TV** 147:17 149:8,12 150:3 151:13 152:12 166:9

**twenty** 106:9

**two-minute** 121:8, 14

**Ty** 75:16,17 111:11, 14

**type** 13:11,12 246:8

**typical** 118:22

---

**U**

**U.S.** 149:10 243:8

**unable** 7:14 13:10 144:6

**unaware** 250:11,14

**unceremoniously** 224:19

**uncertainty** 168:7, 13,15

**uncertified** 257:21

**undergoing** 218:5

**understand** 6:25 7:4 23:15 34:25 42:10 45:16 47:10 53:25 78:22 123:24 127:19, 22 153:7 181:7 187:22 189:2,8,23 201:16 232:9 233:10 240:4

**understanding** 14:19 16:11,18 39:23 40:21 41:16 42:6 81:23 97:18 99:24 100:25 112:11 115:13 116:11,25 125:3,9,14 157:19 162:3 185:3 203:9 235:22 238:8 243:6 249:10,14 250:14

**understood** 6:23,24 7:4,5,6 26:5 36:6 114:14 190:2

**undetermined** 193:10

**unemployed** 252:14

**unemployment** 174:17 176:9,11,14, 20,21 221:16 252:24, 25 253:5,6

**unexpected** 151:19, 21 157:4,7,11,14

**unfold** 149:8,11 152:4

**unfolding** 160:20,21

**union** 242:2,7,17 243:9,20,23 244:6, 16,17 245:2,6

**unionized** 243:22

**United** 151:22,25 157:13,17,18

**unlawful** 254:7

**unprecedented** 158:2

**unpredictable** 180:6,11,12

**upset** 26:13

**user** 31:19

**usual** 149:25

**V**

**vacate** 156:18

**vacated** 155:2

**vacation** 124:19 125:20,24 126:7,15, 19,21,25 127:12 135:3 142:24 144:5, 15,16 214:23,24

**vaccination** 181:22

**vaccine** 187:19

**valid** 68:21

**varied** 118:8,18 120:5,8

**varies** 118:10,24 120:23 171:10

**varying** 165:16 176:5

**verbal** 6:20,22

**verbally** 218:22

**verification** 96:19 97:14 237:10 258:8

**verified** 238:18

**Vicky** 184:22

**violated** 195:13

**violation** 42:22 195:4,9

**violations** 249:7,16, 17

**virus** 162:6 166:8

**visit** 206:9,15

**visiting** 206:12

**Vivian** 22:5 41:23 56:5,6 57:25 250:22

**W**

**W-2** 114:17,25 115:2, 19,25 116:15,21 131:6 258:12,13,15

**wages** 117:7,12,17, 24 122:5,8,20 123:3, 15 124:2,5

**Wagner** 5:13,14 254:25

**wait** 10:24 11:2 13:21 130:15 134:22 143:12

**waiting** 47:18 223:4

**wake** 150:19

**walk** 13:10

**wanted** 22:18 29:7 30:7 34:21 43:15 85:9 98:15 129:16 210:25

**wanting** 22:21 45:13

**warm** 22:8,11

**warn** 195:5,9,13,18 244:15 245:3 249:6, 7,16

**warned** 195:23

**Warner** 5:4,7 66:24 70:14,21 71:17,25

73:15,22 75:16 77:17,24 89:15,22 95:22 96:8 97:10 111:11,14 259:16,19, 23 260:10,22

**Warner's** 75:17

**WARNERDEF** 173:5

**WARNERDEF_ 000100** 112:20 113:14

**WARNERDEF_ 000101** 113:8,15

**WARNERDEF_ 000150** 142:14,18 258:20

**WARNERDEF_ 00651** 132:6,12 258:18

**WARNERDEF_ 00652** 132:13

**WARNERDEF_ 00653** 132:6,14 258:18

**warning** 94:16

**watching** 149:8,11 150:2,8

**WD** 144:6,10

**wear** 164:13

**wearing** 159:5

**website** 176:22

**week** 12:4,24,25 168:18,20,21 171:13 172:5 254:18

**weekly** 144:5

**weeks** 151:9,11 152:10 154:23 163:17 168:2,5

**well-being** 52:9

**WHEREOF** 257:22

**wife** 193:19,24

**Williams** 8:22,23 9:3

**Winnie** 184:21 185:3 220:10

**wiped** 223:3

**wished** 24:22

**withdraw** 54:8

**withdrawal** 75:24

**withdrawing** 53:2

**withdrawn** 50:22 52:4,13,19 53:15,19 55:2 122:17 136:7 143:11 145:10 157:24 159:23 179:9 205:18

**witnesses** 60:16

**woman** 223:6

**wondering** 213:24

**word** 28:9 163:14 229:12,16 234:11

**words** 212:13

**work** 13:3,9,25 14:4 15:14 17:2 22:23 33:18 42:21 43:10 45:14 47:2,5,19,21, 23 48:10 49:8,14 92:8 94:8 95:10 106:7 108:16 114:11 118:8,18 119:8,10 120:17,25 122:14 127:2 134:15 139:21, 24 141:11,19 148:19 150:2,18,20,22,23 153:19 158:14 169:12,17 170:8,21 171:3,7 173:15 174:4 183:9 193:20,21 213:17 218:7 221:23 222:2,6,23 226:12,22 227:6,9 228:2 229:8 230:14 231:16 234:14,23 235:5 243:4,9 244:12 249:24 252:21

**Workday** 144:11,12, 13,20,23 145:6,7,11, 24 146:5,8,12

**worked** 13:23 35:17 118:5 119:4,5,6 120:3 214:22 222:19 223:3 230:10 231:10 252:19

**workers** 121:5 171:25 172:3

**workers'** 13:12

**working** 12:16,18, 20,23 17:6 20:15 47:15 48:12,22 115:15 119:2 123:3 124:2,4 141:16 142:6 146:6 148:12 150:2 168:18 169:23 171:14,18,19 172:6, 9,13 178:21 179:2 199:20,24 200:16,19 201:22 202:24 203:3, 11,24 209:11 222:13 233:11

**worklife** 144:17

**workload** 118:11,19 119:9

**works** 27:14 78:14

**worldwide** 204:15, 17 207:8

**write** 149:19

**writing** 137:18 139:3

**written** 59:20 88:2,7 213:20 214:4 215:17 218:23 245:24 246:12

**wrong** 221:11 223:23,24 224:9 225:8

**Y**

**year** 12:10,11,12 14:16 18:24 34:12,14 37:20 47:23,24 102:11 103:6 108:24 109:18 116:2 118:2 119:2 127:12 133:14, 22 135:13,15 143:3 147:20 149:14,15,17 213:7,8,12

**years** 8:3,6,9,24 9:5, 6,8,13,15 11:6,18 14:11,12 17:5 33:21 47:18 69:18 95:14 102:11,12 140:20 141:7 185:4 196:25

220:15,17,21,23
222:18 223:3,7,22
224:19 225:9,11
234:14 236:5,8,9
238:11 253:2,5

**yesterday** 23:21
24:5 60:11,14 63:9
70:18 71:21 80:15
84:5

**York** 7:23 87:19
99:16 148:14,15
164:6 165:6 175:24
181:2 195:9 204:15,
18 211:13 213:18,22
232:5 257:3,4,7

**you's** 55:17

_____

**Z**
_____

**zeroed** 58:18

**ZIP** 115:7 116:5

**Zoom** 19:14 58:23
84:15 85:8,13 134:12