# EXHIBIT D

# Deposition Transcript

Case Number: 1:22-cv-06781-JSR

Date: April 3, 2023

In the matter of:

# STALEY, et al., v FOUR SEASONS HOTELS AND RESORTS, et al.

## Elizabeth Ortiz

**CERTIFIED COPY**

Reported by:

David Novick

Notary Public



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   Case No. 1:22-cv-06781-JSR
     - - - - - - - - - - - - - - - - - - -x
 3   SELENA STALEY, VIVIAN HOLMES, and OLIVE IVEY, on
     behalf of themselves and all others similarly
 4   situated,

 5                        Plaintiffs,

 6        v.

 7   FSR INTERNATIONAL HOTEL INC. d/b/a FOUR SEASONS
     HOTELS AND RESORTS, HOTEL 57 SERVICES, LLC,
 8   HOTEL 57, LLC, TY WARNER HOTELS & RESORTS, LLC, and
     H. TY WARNER,
 9
                         Defendants.
10
     - - - - - - - - - - - - - - - - - - -x
11
                        299 Broadway, 17th Floor
12                      New York, New York 10007

13                      April 3, 2023
                        10:02 a.m.
14

15      DEPOSITION of ELIZABETH ORTIZ, the Defendant in

16   the above-entitled action, held at the above time

17   and place, taken before David Novick, a Shorthand

18   Reporter and Notary Public of the State of

19   New York, pursuant to Notice.

20

21                 *      *      *

22

23

24

25
```

```
 1   APPEARANCES:

 2

     BRUSTEIN LAW PLLC
 3   299 Broadway, 17th Floor
     New York, New York 10007
 4   Ph:  (212) 233-3900
     BY:  EVAN CRAIG BRUSTEIN, ESQ.
 5   E-mail:  evan@brusteinlaw.com

 6

 7   RISMAN & RISMAN, P.C.
     299 Broadway, 17th Floor
 8   New York, New York 10007
     Ph:  (212) 233-6400
 9   BY:  MAYA RISMAN, ESQ.
     E-mail:  info@risman-law.com
10

11   Counsel for Plaintiffs SELENA STALEY,
     VIVIAN HOLMES, and OLIVE IVEY
12

13   STOKES WAGNER, ALC
     903 Hanshaw Road
14   Ithaca, New York 14850
     Ph:  (607) 257-5165
15   BY:  PAUL WAGNER, ESQ.
     E-mail:  pwagner@stokeswagner.com
16
     Attorneys for Defendant FSR INTERNATIONAL
17   HOTELS, INC.

18

     SMITH, GAMBRELL & RUSSELL, LLP
19   1301 Avenue of the Americas, 21st Floor
     New York, New York 10019
20   Ph:  (212) 907-9700
     BY:  KATHRYN T. LUNDY, ESQ.
21   E-mail:  klundy@sgr.com

22   Attorneys for Defendants HOTEL 57 SERVICES, LLC,
     HOTEL 57, LLC, TY WARNER HOTELS & RESORTS, LLC and
23   H. TY WARNER

24                      *      *      *

25
```

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

```
 1                     I N D E X

 2   WITNESS                EXAMINATION BY          PAGE

 3   E. Ortiz              MS. RISMAN              7-39,
                                                 41-239,
 4                                               257-268,
                                                 273-278
 5
                          MS. LUNDY              269-273
 6

 7                   E X H I B I T S

 8   PLAINTIFFS'           DESCRIPTION             PAGE

 9   Exhibit 1           Page 1 of 4 of             21
                      Ms. Elizabeth Ortiz's
10                    LinkedIn biography pages

11   Exhibit 2     An e-mail to Elizabeth Ortiz   57-58
                   from info@news.hanyc.org dated
12                    3-20-20 and Bates-stamped
                         WarnerDEF000700
13

14   Exhibit 3     An e-mail from NYF E-mail to    59
                     Rudy Tauscher dated 2-27-20
15            and Bates-stamped WarnerDEF000902

16   Exhibit 4     A 3-12-20 letter authored by    61
                   Elizabeth Ortiz and Bates-stamped
17                       WarnerDEF003103

18   Exhibit 5     An e-mail from Elizabeth Ortiz  61
                   dated 3-13-20, and Bates-stamped
19                       WarnerDEF003098

20   Exhibit 6        An e-mail chain between      65
                   Rick Kaminskas and Frank Galasso,
21            along with a chart, and Bates-stamped
                         WarnerDEF002482

22   Exhibit 7        An e-mail chain between      85
                   John Johnson and Elizabeth Ortiz
23                 dated 4-28-20 and Bates-stamped
                         WarnerDEF007353
24
     Exhibit 8        An e-mail chain dated       103
25                 6-1-20 and Bates-stamped
```

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

```
 1              I N D E X (cont'd)

 2            E X H I B I T S (cont'd)

 3    PLAINTIFFS'           DESCRIPTION              PAGE

 4    Exhibit 9         A two-page e-mail chain      107
                     Bates-stamped WarnerDEF000917
 5                      through WarnerDEF000918

 6    Exhibit 10          An e-mail from             115
                       Mr. Tauscher to Peter Ward
 7                    dated 3-26-20, along with a list
                      of employees, their addresses, and
 8                     their job titles, Bates-stamped
                         WarnerDEF001127 through
 9                         WarnerDEF001146

10    Exhibit 11   A letter from Hazel Hazard        120
                     and Bates-stamped WarnerDEF000922
11                      through WarnerDEF000924

12    Exhibit 12   A letter to Barbara Chang         123
                      and Reynold Graham by
13                   Rudy Tauscher dated 3-26-20,
                     along with a list of job titles
14                    and employees, Bates-stamped
                         WarnerDEF001104 through
15                         WarnerDEF001106

16    Exhibit 13    An e-mail chain dated 8-7-20     127
                     and Bates-stamped WarrenDEF000935
17
      Exhibit 14    A series of letters written      134
18                   by Rudy Tauscher to a series of
                     employees, all dated 8-5-20, and
19                    Bates-stamped WarnerDEF000936
                        through WarnerDEF001017
20
      Exhibit 15      A three-page document          155
21                  Bates-stamped WarnerDEF002199
                        through WarnerDEF002201
22
      Exhibit 16     A four-page letter written      158
23                   by Elizabeth Ortiz dated 4-9-20
                     and Bates-stamped WarnerDEF002729
24                      through WarnerDEF002732

25
```

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

1               I N D E X (cont'd)

2             E X H I B I T S (cont'd)

3    PLAINTIFFS'          DESCRIPTION              PAGE

4    Exhibit 17     An e-mail chain encompassing    166
                    the dates 3-26-20 and 4-8-20
5                     and Bates-stamped
                     WarnerDEF001160 through
6                      WarnerDEF001161

7    Exhibit 18      A two-page e-mail chain         175
                      among Nicole Spillane,
8                 Michal Dedera, Rudy Tauscher,
                  and Elizabeth Ortiz on 3-19-20
9               and Bates-stamped WarnerDEF008174
                    through WarnerDEF008175
10

11   Exhibit 19     An e-mail from Elizabeth Ortiz   183
                    to NYE Planning Committee dated
11                   5-12-20 and Bates-stamped
12                     WarnerDEF002111

13   Exhibit 20      A document Bates-stamped        183
                     WarnerDEF002112 through
14               WarnerDEF002198 with the cover
                 page titled "NY Forward A Guide
15                To Reopening New York & Building
                        Back Better"
16

17   Exhibit 21      An e-mail by Rudy Tauscher      192
                      to Cathy Hwang and CC-ing
17                    Antoine Chahwan and
18                 Elizabeth Ortiz dated 6-22-20
                  and Bates-stamped WarnerDEF000903
19

20   Exhibit 22     A 61-page document with the      215
                     cover page titled "U.S. EmPact
20               Employee Handbook with Four Seasons
21                     Hotel New York"

22   Exhibit 23      A recording of the 6-25-21      237
                     meeting with the furloughed
23               Employees of Four Seasons New York
                 during which Elizabeth Ortiz was the
24                main speaker and participant
     (Exhibit 23 not provided at time of production)

25

```
 1              I N D E X (cont'd)

 2            E X H I B I T S (cont'd)

 3   PLAINTIFFS'         DESCRIPTION          PAGE

 4   Exhibit 24      An e-mail chain between      262
                  Cathy Hwang and Elizabeth Ortiz
 5                dated 3-30-20 and 3-31-20 and
                    Bates-stamped WarnerDEF009110
 6

 7      Court Reporter DAVID NOVICK, from STENO, has
     retained all exhibits to be attached to the
 8   transcript.
                       REQUESTS
 9
     DESCRIPTION                            PAGE
10
     Production of the people that receive      38
11   less than 50 percent of their annual salary

12   Payroll for nonunion employees for the      99
     week following the shutdown
13
     WARN notices that would be provided       117
14   for the nonunion employees

15   WARN notice sent to the Mayor's office     122

16   Drafts of the letter marked Plaintiffs'    163
     Exhibit 16
17
     Production of any resignation letters      180
18
     Agreement that mandates that the payments  202
19   continue

20   Production of the agreement for continued  203
     payments
21
     Production of the Emergency Communications 221
22   Plan

23   E-mails from employees concerned about not 227
     receiving no-fault separation pay
24
     Production of questions, concerns, and     231
25   complaints placed in the chat box for the
```

1   E L I Z A B E T H     O R T I Z,

2   the Defendant herein, having first been duly sworn

3   by the Notary Public, was examined and testified as

4   follows:

5   (By the court reporter:)

6       Q.   Would you, once again, please state your

7   full name for the record?

8       A.   Elizabeth Ortiz.

9       Q.   And would you, once again, please state your

10   business address for the record?

11       A.   Fifty-seven East 57th Street, New York, New

12   York 10022, I think.

13   EXAMINATION BY

14   MR. RISMAN:

15       Q.   Good morning, Ms. Ortiz.

16       A.   Good morning.

17       Q.   My name is Maya Risman --

18       A.   Hi, Maya.

19       Q.   How are you? -- and I'm going to be asking

20   you a number of questions today related to the case

21   of Selena Staley, Vivian Holmes, and Olive Ivey on

22   behalf of themselves and all others similarly

23   situated, who are the Plaintiffs, against FSR

24   International Hotel Inc. d/b/a Four Seasons Hotel

25   And Resorts, Hotel 57 Services, LLC, Hotel 57, LLC,

 Ty Warner Hotels & Resorts LLC, and H. Ty Warner in a cause of action against the entities that I just named. If there are any questions that you do not understand, please let me know, and I'll rephrase my question. If you answer my question, it will be presumed that you understood my question. Is that clear?
A. Uh-huh. Yes.
Q. Okay. So the other thing is, during the deposition, I would ask that you verbalize your answers, so there's no "uh-huh" or nodding of the head, because the court reporter can't transcribe any physical movements.
A. Understood.
Q. So everything has to be verbally. Understood?
A. Understood. Yes. Thank you.
Q. And the other thing that I would ask of you is that you let me finish my question before you answer my question, even though you may anticipate what my question is.
A. Understood. Thank you.
Q. Have you ever testified before in any deposition?
A. I have.

1     Q.   Which deposition did you testify in?

2          MS. LUNDY:  Objection.  You can answer.

3     A.   Previous employers.

4     Q.   For what previous employer did you testify?

5          MS. LUNDY:  Objection.

6     A.   It would be Interstate Hotels And Resorts, a

7   C.O.R.E. Hotels And Resorts.

8     Q.   What was your position at Interstate? --

9     A.   Yes.

10    Q.   -- Hotels And Resorts?

11    A.   Director of Human Resources.

12    Q.   When was it that you were working there as

13  Director of Human Resources?

14    A.   2003 to 2015.

15    Q.   And do you recall in which action you

16  testified on their behalf?

17         MS. LUNDY:  Objection.

18    A.   Not specifically.

19    Q.   Do you remember what the action was about?

20         MS. LUNDY:  Objection.

21    A.   Not specifically.

22    Q.   How many times did you testify?

23    A.   In my career?  I don't remember.

24    Q.   Was it more than ten times?

25    A.   Less than ten.

1      Q.  Was it more than five times?

2      A.  Probably more than five.

3      Q.  So somewhere between five and ten times you

4   think you testified?

5      A.  Yes.

6      Q.  And every time you testified, it was in your

7   role as an HR Director?

8          MS. LUNDY:  Objection.

9      A.  I don't remember.

10     Q.  What other role did you have when you worked

11  for Interstate Hotels?

12     A.  Probably just as an individual.

13     Q.  Have you ever testified as an individual at

14  a deposition?

15         MS. LUNDY:  Objection.

16     A.  I don't remember.

17     Q.  Have you ever been sued as a defendant in a

18  case?

19         MS. LUNDY:  Objection.

20     A.  No.

21     Q.  Have you ever had a lawsuit as a plaintiff

22  against an entity or individual?

23         MS. LUNDY:  Objection.

24     A.  No.

25     Q.  Have you ever testified in Court?

1       MS. LUNDY:  Objection.

2    A.  No.

3    Q.  Have you ever testified anywhere else other

4  than Court or at a deposition?

5       MS. LUNDY:  Objection.

6    A.  Not that I recall.

7    Q.  Prior to testifying today, did you review

8  any documents to refresh your recollection?

9       MS. LUNDY:  Objection to the extent the

10      question calls for privileged communication with

11      her Counsel; otherwise, you can answer,

12      Ms. Ortiz.

13   A.  I have.

14   Q.  Which documents did you review?

15   A.  Multiple.

16   Q.  Can you name what they are?

17      MS. LUNDY:  Objection.

18   A.  Multiple.  E-mails, paper trail.  Multiple.

19   Q.  Did you review more than 50 documents prior

20  to testifying today?

21   A.  I don't remember.

22   Q.  Did you review more than a hundred documents

23  prior to testifying today?

24   A.  Possibly.

25   Q.  And when you reviewed those documents, did

1   you review them by yourself or with someone else?

2          MS. LUNDY:  Objection.  To the extent it

3      calls for privileged communication with her

4      Counsel, Ms. Ortiz can answer.

5      A.  Both individually and with Counsel.

6      Q.  And how long did it take you to review these

7   documents?

8      A.  I can't quantify over periods -- over a

9   period of time.

10     Q.  Did it take you more than five hours to

11  review these documents --

12         MS. LUNDY:  Objection to --

13     Q.  -- over a period of time?

14         MS. LUNDY:  Objection to the extent it calls

15     for privileged communication with her Counsel.

16     You may answer, Ms. Ortiz.

17     A.  Possibly.

18     Q.  So did it take you more -- so for the

19  record, I'm not asking you for any privileged

20  communication that you had with your Counsel, so

21  these questions are strictly for you to answer, and

22  I will never be asking you for privileged

23  communication between you and your Counsel.  Okay?

24     A.  I understand.

25     Q.  So did it take you longer than ten hours to

1  review the documents that you reviewed prior to

2  testifying today?

3            MS. LUNDY:  Objection.

4       A.  I don't know.  I mean, it's been over a

5  period of several months, so I can't quantify that.

6       Q.  When did you first start reviewing the

7  documents that you reviewed prior to testifying

8  today?

9       A.  Probably at the onset of receiving the

10  request.

11       Q.  So you received the request to review

12  documents, correct?

13            MS. LUNDY:  Objection.

14       A.  Clarify that question?

15       Q.  At some point, you received a request to

16  review documents related to this lawsuit?

17            MS. LUNDY:  Objection to the extent it calls

18       for privileged communication.

19       A.  So it's not a request to review; it would be

20  the request to produce documents, and at that time,

21  then I would have reviewed them if I'm producing

22  them.

23       Q.  And after reviewing them, did you then make

24  copies of them?

25       A.  No.

1    Q.  What did you do with them after you reviewed

2    them?

3    A.  They're electronic.

4    Q.  So after reviewing the documents, did you

5    then electronically send them over?

6        MS. LUNDY:  Objection to the extent it seeks

7        privileged communications.

8    A.  Yeah, I would have.

9    Q.  Can you please describe your educational

10   background to me?

11   A.  I have a Master's Degree in Psychology.

12   Q.  Any other degrees?

13   A.  I have a Bachelor's Degree in Communication

14   Arts.

15   Q.  And where's your Master's Degree in

16   Psychology from?

17   A.  William Paterson University.

18   Q.  When did you get that?

19   A.  I don't remember.

20       MS. LUNDY:  Objection.

21   A.  So I want to say 1980 -- 1986, maybe.

22   Q.  And when did you obtain your Bachelor's

23   Degree?

24   A.  I'm sorry.  My Master's Degree was probably

25   1989; I was on an extended college plan; and my

1   Bachelor's Degree would have been probably '87.

2      Q.  And where was your Bachelor's Degree

3   obtained?

4      A.  Same:  William Paterson University.

5      Q.  And prior -- okay.  Withdrawn.

6          After you obtained your Psychology Degree,

7   where was the next job where you worked?

8      A.  I moved to Greece.

9      Q.  And how long did you live in Greece?

10     A.  About seven years.

11     Q.  And what did you do for work when you were

12  in Greece?

13         MS. LUNDY:  Just note my general objection

14      to this line of questioning on the basis of

15      relevancy, but I won't keep making objections to

16      interrupt, but please note my objection.  You

17      can answer, Ms. Ortiz.

18     A.  At one point, I taught English.

19     Q.  And at some point, did you move back to the

20  United States?

21     A.  I did.

22     Q.  And did you then obtain work in the

23  United States?

24     A.  I did.

25     Q.  And what was that work that you obtained?

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

1    A.  I don't know.  I worked in various

2  restaurants and small restaurants and bars, and

3  then, I got into Human Resources at the

4  Rainbow Room.

5    Q.  When you say you got into Human Resources at

6  the --

7    A.  I was hired as a Human Resources assistant.

8    Q.  So I would just remind you, you just have to

9  let me finish the question --

10    A.  Okay.

11    Q.  -- and then you answer; it's just easier for

12  the transcriber to transcribe.

13      MS. RISMAN:  Correct?

14    Q.  I'm sorry.  So what year was it that you

15  worked in the Rainbow Room?

16    A.  So I would say 1990 -- 1993 until -- or 1994

17  until probably 1996 -- no, 1997.

18    Q.  And after that, where did you work?

19    A.  I worked for -- as a Director of Human

20  Resources for a group called -- I don't even

21  remember the name of the group, but it was owned by

22  a gentleman by the name of Pino -- P-I-N-O --

23  Luongo -- L-U-O-N-G-O, I guess -- and he had a

24  group of restaurants across the country.

25    Q.  And how long did you work there?

1    A.  A year.

2    Q.  And what did you do for work after that?

3    A.  I was hired as the Director of Talent

4  Acquisition at Tavern on the Green, and then, I

5  became the Director of Employment at Tavern on the

6  Green.

7    Q.  And what years did you do that?

8    A.  Probably '97 to '99, maybe.

9    Q.  And what did you do for work after 1999?

10   A.  So it was the same owner as Tavern on the

11  Green; we opened the Russian Tea Room.

12   Q.  What year was that?

13   A.  I want to say the Russian Tea Room we opened

14  probably in 2000.  I don't recall specifically.

15   Q.  What was your position at the Russian

16  Tea Room?

17   A.  Director of Human Resources.

18   Q.  How many employees was -- withdrawn.

19       How many employees worked at the Russian

20  Tea Room at the time that you were the Director?

21       MS. LUNDY:  Objection.

22   A.  I don't remember.

23   Q.  And after working at the Russian Tea Room,

24  where did you work?

25   A.  Windows on the World in the World Trade

ELIZABETH ORTIZ                                                JOB NO. 568002
APRIL 03, 2023

1   Center.

2       Q.   How long did you work there for?

3       A.   Until September 11th, 2001.

4       Q.   Okay.

5            (Whereupon, a discussion was held off the

6       record.)

7       Q.   Back on.  After working at the Windows on

8   the World, where did you work?

9       A.   I was a freelance consultant for a couple of

10  years.

11      Q.   And how long did you do that for?

12      A.   Probably until about -- until I started at

13  the Roosevelt, and I want to say I started at the

14  Roosevelt probably in either 2003 or 2004; I want

15  to say probably 2004.

16      Q.   And what was your position at the Roosevelt?

17      A.   Director of Human Resources.

18      Q.   And how long did you work there as the

19  Director of Human Resources?

20      A.   Twelve years, maybe.

21      Q.   And where did you work after the Roosevelt?

22      A.   I worked for the Sofitel at a C.O.R.E.

23  Hotels.

24      Q.   And when you worked at the Sofitel, what was

25  your position there?

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

 1      A.   Director of Human Resources.

 2      Q.   And how long did you work there for?

 3      A.   About four-and-a-half years.

 4      Q.   And after working at the Sofitel, where did

 5   you work?

 6      A.   Hotel 57 Services, LLC.

 7      Q.   And how long did you work for Hotel 57

 8   Services, LLC?

 9        MS. LUNDY:  Objection.  You can answer.

10      A.   I'm still employed by them.

11      Q.   Did you ever tell anyone that you worked for

12   the Four Seasons Hotels And Resorts?

13        MS. LUNDY:  Objection.

14      A.   Yes.

15      Q.   Who did you tell that you worked at the

16   Four Seasons Hotels And Resorts?

17        MS. LUNDY:  Objection.

18      A.   Random people; I mean, I don't know

19   specifics.

20      Q.   Do you know the difference between

21   Hotel 57, LLC and Four Seasons Hotels And Resorts?

22        MS. LUNDY:  Objection.

23      A.   I don't know the specific structure; they're

24   different entities; I don't know the specific

25   business structure, but my employer's at Hotel 57;

1  the Four Seasons would be the operator.

2     Q.  So when you told people in the past that you

3  worked for Four Seasons Hotels And Resorts, is that

4  statement accurate?

5        MS. LUNDY:  Objection.

6        MR. WAGNER:  And objection.

7     A.  That's the operator, so my employer is

8  Hotel 57 Services.

9     Q.  So why would you tell anyone that you worked

10 for Hotel 57 -- withdrawn.

11       Why would you tell anyone that you worked

12 for Four Seasons Hotels And Resorts?

13       MS. LUNDY:  Objection.

14    A.  Because that's the operator, and I mean it's

15 more known than -- I mean, in the hotel industry,

16 it's a hotel with a brand name that's known, so it

17 would make more sense -- it's more recognizable.

18    Q.  So did you ever work directly for

19 Four Seasons Hotels And Resorts?

20       MS. LUNDY:  Objection.

21       MR. WAGNER:  Objection.

22    A.  I don't think so.  I mean, my employer is

23 Hotel 57.

24    Q.  On your LinkedIn page, does it state that

25 you worked for Four Seasons Hotels And Resorts?

1          MS. LUNDY:  Objection.

2     A.  Probably.

3     Q.  Why would it state that there?

4     A.  Again, it's the brand name, it's the

5    operator.

6     Q.  Is that your employer?

7          MS. LUNDY:  Objection.

8     A.  The employer's Hotel 57.

9     Q.  So I'm going to show you what we're marking

10   as Plaintiffs' Exhibit 1.

11          (Whereupon, Page 1 of 4 of

12     Ms. Elizabeth Ortiz's LinkenIn biography pages

13     was marked as Plaintiffs' Exhibit 1 for

14     identification, as of this date.)

15     Q.  Ms. Ortiz, we're going to be presenting you

16   with what's just been marked as Plaintiffs'

17   Exhibit 1.  Do you recognize what that is?

18     A.  Yes.

19     Q.  What is that?

20     A.  It's my LinkedIn page.

21     Q.  And is it accurate that your LinkedIn page

22   states that you are the Director of People and

23   Culture at Four Seasons Hotel And Resorts?

24     A.  Yes.

25     Q.  Is that statement not accurate?

```
 1          MS. LUNDY:  Objection.
 2      A.  I'm not sure what what you mean by "not
 3   accurate." It sounds like a trick question.
 4      Q.  I'm not trying to trick you; I'm just trying
 5   to see whether this is what is on your LinkedIn
 6   page.
 7      A.  That's what's on my LinkedIn page.
 8      Q.  So my question to you is, is what is on your
 9   LinkedIn page accurate or inaccurate?
10          MS. LUNDY: Objection.
11      A.  It would be accurate for the purposes of
12   people wanting -- or for people knowing a brand.
13      Q.  And when you say it would be accurate for
14   people wanting --
15      A.  It's a brand recognition.  That's the
16   operator.  The operator is Four Seasons Hotels And
17   Resorts.
18      Q.  But it states that you're the Director of
19   People and Culture of Four Seasons Hotels And
20   Resorts, correct?
21      A.  Uh-huh.  Uh-huh.
22      Q.  So my question to you is, is that statement
23   accurate that you are the Director of People and
24   Culture at Four Seasons Hotels And Resorts?
25          MS. LUNDY:  Objection.
```

1      A.  Yes, for the purposes of the brand

2   recognition.  However, I am employed by Hotel 57

3   Services, LLC.  I would employ Hotel 57

4   Services, LLC just as Sofitel Luxury Resorts;

5   that's the operator, but I was -- would be employed

6   by a different business entity.  It's the structure

7   -- it's the business structure of the different

8   entities.

9      Q.  So you were never employed by Sofitel Luxury

10  Hotels And Resorts?

11        MS. LUNDY:  Objection.

12     A.  So the business entity would have been

13  something else; I don't remember what it is, but

14  the business entity then does business as Sofitel

15  Luxury Hotels And Resorts.

16     Q.  When you were employed by Sofitel Luxury

17  Hotels And Resorts, did you work there with

18  Rudy Tauscher?

19        MS. LUNDY:  Objection.

20     A.  Yes, I did.

21     Q.  Did you know Mr. Tauscher from working with

22  him at Sofitel --

23     A.  I did.

24     Q.  You just have to let me finish. -- Sofitel

25  Hotels And Resorts?

```
 1      A.  Okay.

 2      Q.  Yes?

 3      A.  Yes.

 4      Q.  Is that the first time that you met him,

 5   when you worked there together?

 6           MS. LUNDY:  Objection.

 7      A.  I believe so.

 8      Q.  And what was his position at Sofitel Hotels

 9   And Resorts?

10           MS. LUNDY:  Objection.

11      A.  He was hired as the General Manager or the

12   -- yeah, he was hired as the General Manager.

13      Q.  Do you recall what year that was?

14      A.  No.

15      Q.  When you first started working at

16   Hotel 57, LLC and prior to being hired, did

17   somebody interview you for that position?

18           MR. WAGNER:  Objection.  And let me just

19       state the reason for my objection.  When you

20       asked her the question "Before you were hired by

21       Hotel 57, LLC" --

22           MS. RISMAN:  I'm going to withdraw it.

23      Q.  At some point, you said you began working

24   for Hotel 57, LLC, correct?

25           MR. BRUSTEIN:  Services.
```

```
 1          MR. WAGNER:  Services.  That was the nature
 2      of my --
 3      Q.  At some point -- I'm going to withdraw that
 4   too.  At some point, Ms. Ortiz, you said that you
 5   began working for Hotel 57 Services, LLC, correct?
 6      A.  Yes.
 7      Q.  Did somebody interview you for that
 8   position?
 9      A.  Yes.
10      Q.  Who interviewed you?
11      A.  It would have been initiated by the
12   General Manager, Rudy Tauscher; I mean, I wouldn't
13   have had the -- so it had been initiated by the
14   General Manager, Rudy Tauscher; then, I was
15   interviewed by Stacey Koppel (phonetic), probably,
16   who's the Regional Director of the operating
17   entity, and then Abigail Charpienter --
18   C-H-A-R-P-I-E-N-T-E-R, I believe.
19          (Whereupon, a discussion was held off the
20      record.)
21      Q.  Ms. Ortiz, who does Stacey Kopel work for?
22          MS. LUNDY:  Objection.
23      A.  I don't know.
24      Q.  Does she work for Four Seasons Hotels And
25   Resorts?
```

1          MR. WAGNER:   Objection.

2          MS. LUNDY:   Objection.

3     A.  I don't know what the entity is.

4     Q.  Do you know if Stacey Kopel works for

5  Hotel 57, LLC?   I'm sorry.  Let me re-ask that.  Do

6  you know if Stacey Kopel works for Hotel 57

7  Services, LLC?

8          MS. LUNDY:   Objection.

9     A.  I do not know.

10     Q.  Do you know who Abigail Charpienter works

11  for?

12          MS. LUNDY:   Objection.

13     A.  No, I do not.

14     Q.  Do you know if Abigail Charpienter works for

15  Hotel 57 Services, LLC?

16     A.  I do not.

17     Q.  Do you know if she works for Four Seasons

18  Resorts And Hotels?

19          MS. LUNDY:   Objection.

20     A.  I don't know the business entity.

21     Q.  Do you know if she works for

22  FSR International Hotel Inc.?

23          MS. LUNDY:   Objection.

24     A.  I don't.

25     Q.  Now, does Hotel 57 Services, LLC do business

1  as the Four Seasons Hotel New York?

2      A.  I don't know.

3      Q.  Have you ever seen the words Four Seasons

4  Hotel New York?

5      A.  Yes.

6      Q.  Where have you seen those?

7          MS. LUNDY:  Objection.

8      A.  On the marquee, on letterhead, on various

9  operating documents.

10      Q.  Do you know the reason that that's on the

11  letterhead?

12      A.  They're the operator.

13      Q.  Four Seasons Hotel New York is the operator

14  of the hotel?

15          MS. LUNDY:  Objection.

16      A.  Yes.

17      Q.  How do you know that?

18      A.  Because they're the operator.  I mean, I

19  don't know -- it's the business entity that

20  operates the property.  There are operators and

21  there are owners, and depending on the flag -- you

22  know, there's the Four Seasons flag, there's the

23  Marriott flag, there's a -- depending on the

24  brandings.  Those are all the operators; they're

25  not the owning entity or necessarily the employer.

1    Q.  So I'd like to focus your attention only on

2   this particular hotel --

3    A.  Okay.

4    Q.  -- and the Four Seasons --

5    A.  Okay.

6    Q.  -- Hotels, so anything to do with Marriott

7   or another hotel, you know, I don't want you to

8   testify about here.

9    A.  Understood.

10    Q.  So when I'm asking you about this particular

11   Hotel, I'm only asking about the Four Seasons Hotel

12   New York, correct?

13    A.  Okay.

14    Q.  And you said that those words are on the

15   marquee? --

16    A.  Yes.

17    Q.  -- stating the Four Seasons Hotel New York,

18   correct?

19    A.  Yes.

20    Q.  And they are on the letterhead, correct?

21    A.  Yes.

22    Q.  And that is letterhead that you then would

23   sign a letter for?

24        MS. LUNDY:  Objection.

25    A.  Yes.

1    Q.   Where else do you see the words Hotel -- I'm

2   sorry.  Withdrawn.

3        Where else would you see the words Four

4   Seasons Hotel New York in your work at the hotel?

5        MS. LUNDY:  Objection.

6    A.   Multiple places.  I mean, I can't

7   singular-specify where, but it would be multiple

8   places; I mean, it's the brand, right?  It's the

9   logo.  It's the -- wherever the operator would put

10   a logo.

11   Q.   So is it your understanding that Hotel 57

12   Services, LLC would put that logo somewhere or some

13   other entity?

14        MS. LUNDY:  Objection.

15   A.   Clarify your question?

16   Q.   Yeah.  Is it your understanding that the

17   logo and the brand Four Seasons Hotel New York was

18   placed there by Hotel 57 Services, LLC?

19        MS. LUNDY:  Objection.

20   A.   I don't know.

21   Q.   Do you know if it was placed there by

22   another entity?

23        MS. LUNDY:  Objection.

24   A.   I don't know.

25   Q.   And you've written letters with the

 1  letterhead Four Seasons Hotel New York at the top

 2  of the letter, correct?

 3     A.  Yes.

 4     Q.  Okay.  Where did you get the letterheads

 5  from?

 6     A.  They would have been ordered -- the

 7  Purchasing Department -- but I don't know -- I

 8  don't know where.  I know where I ordered them

 9  from:  I ordered them through Purchasing.  I don't

10  know where they come from specifically, if they're

11  -- I don't know.

12     Q.  Ms. Ortiz, when you were working for

13  Hotel 57 Services, LLC, who was your supervisor --

14         MS. LUNDY:  Objection.

15     Q.  -- when you first started working there?

16     A.  So my role reports to the role of

17  General Manager.

18     Q.  Who was the General Manager when you first

19  began working for Hotel 57 Services, LLC?

20     A.  Rudy Tauscher.

21     Q.  And what year was that?

22     A.  2019.

23     Q.  And what month was that?

24     A.  I don't remember.  I think, October.  It was

25  October.  Yes.  October.

1    Q.  And when you began as the Director of Human

2  Resources at Hotel 57 Services LLC, who did you

3  supervise?

4         MS. LUNDY:  Objection.

5    A.  Well -- I mean, my division -- that role

6  oversees the People and Culture division with the

7  responsibility towards overseeing each of the

8  different divisions; that's something -- that's

9  normally what HR does.

10   Q.  Okay.  And did you always have the same

11 position the entire time that you've been working

12 for Hotel 57 Services, LLC?

13   A.  Yes.

14   Q.  And at some point in time, Mr. Rudy Tauscher

15 was no longer the General Manager there, correct?

16   A.  Correct.  He resigned.

17   Q.  He resigned?  Yes?

18   A.  Yes.

19   Q.  And when was it that he resigned?

20   A.  I want to say January of 2021.

21   Q.  And do you know the reason that he resigned?

22   A.  I do not.

23   Q.  And after he resigned, do you know where he

24 went to work?

25   A.  Not for certain.

1  Q.  After Mr. Tauscher resigned, did you stay in

2  touch with him?

3  A.  I have.

4  Q.  Are you friends with him on LinkedIn?

5  A.  I don't know.  Probably.  I don't know.

6  Q.  Do you know if he went to the Aman Hotel in

7  New York City?

8  A.  I did.  I never -- you know, I never

9  specifically contacted him there or spoke to him

10  there, but that's my understanding.

11  Q.  Do you know if Mr. Tauscher's position was

12  ever eliminated at Hotel --

13  A.  I don't.  Sorry.

14  Q.  It's okay -- at Hotel 57 Services, LLC?

15  A.  That's a mouthful.  What do you mean

16  specifically by that?

17  Q.  Do you know if Mr. Tauscher's position was

18  ever eliminated at Hotel 57 Services, LLC?

19      MS. LUNDY:  Objection.

20  A.  That's not eliminated.  I mean, it's just we

21  haven't filled the position.

22  Q.  So currently, nobody is the manager of the

23  hotel --

24      MR. WAGNER:  Objection.

25  Q.  -- known as the Four Seasons Hotel New York,

1  correct?

2        MS. LUNDY:  Objection.

3     A.  I would ask for more clarity on that

4  question.

5     Q.  Okay.  Do you currently have -- withdrawn.

6        Does Four Seasons Hotel New York currently

7  have a general manager?

8        MS. LUNDY:  Objection.

9     A.  There is a general manager position; it is

10  not currently filled; it is currently vacant.

11     Q.  And how long has that position been vacant

12  for?

13     A.  Since Rudy Tauscher's resignation.

14     Q.  Do you know if any efforts have been made to

15  fill that position?

16     A.  Not at this juncture.

17     Q.  Do you know why not?

18        MS. LUNDY:  Objection.

19     A.  I don't currently know.  No.

20     Q.  Do you know who has made the decision not to

21  make any attempts to fill the position of General

22  Manager at the Four Seasons Hotel New York?

23     A.  I don't currently know.

24        MS. LUNDY:  Objection.

25     Q.  When you first began working at Hotel 57

ELIZABETH ORTIZ
APRIL 03, 2023                                          JOB NO. 568002

1  Services, LLC, what were your duties?

2      A.  Well, I mean, that's a broad question.  I

3  think my responsibility is to oversee the daily

4  activities of the People and Culture division,

5  which includes oversight on benefits and

6  compensation, labor relations, employee relations

7  -- am I missing anything? -- talent management,

8  recruiting, training.

9      Q.  Did your duties ever change throughout the

10  time from when you first started working at

11  Hotel 57 Services, LLC up until the present time?

12      A.  They have.

13      Q.  How have they changed?

14      A.  Well, I no longer have a division to have

15  oversight on.  I'm a single person in the division

16  with oversight on everything that I just mentioned,

17  but also not limited to -- including oversight, to

18  -- the employees that are currently in the

19  building, not limited to ensuring that the

20  structure of the building is safe and secure, not

21  limited to ensuring that the employees have a safe

22  and secure work environment, not limited to the

23  response of any inquiries that come into the hotel.

24  So it has changed now from a specific divisional

25  oversight into a more general oversight, still

1  focused on the People and Culture tasks, but

2  however, including a broader oversight of the

3  property overall.

4  Q.  When you say "a broader oversight of the

5  property," do you mean the actual physical

6  structure of the hotel?

7  A.  Yes.

8  Q.  What do you do to make sure that you are

9  properly supervising the physical structure of the

10  hotel?

11  MS. LUNDY:  Objection.

12  A.  Well, from a safety and security level,

13  making sure that -- you know, working in

14  collaboration with our Engineering Team, making

15  sure that our water chillers are up and running,

16  making sure that our water movement is done in such

17  a way so that we don't attract, you know, bacteria

18  or Legionnaire's disease, making sure that the flow

19  of the water throughout the building is safe and

20  secure.  This is not something I do personally, but

21  it's oversight to those divisions that would ensure

22  that.  Making sure that we don't have any -- in

23  collaboration with the team that's there, making

24  sure that we don't have any walk-ins off the street

25  that breach security, ensuring that we have, you

1 know, a clean, well-lit property, general

2 management of the building and the team that's

3 there.

4     Q.  And do you have to do all those things

5 because  the hotel is not operational?

6         MS. LUNDY:  Objection.

7     A.  It's a limited crew.

8     Q.  But had the hotel been operational for

9 business, would you have to do all of the things

10 that you just mentioned?

11        MS. LUNDY:  Objection.

12    A.  No.

13    Q.  How many people currently work at the hotel?

14    A.  On a rotational scheduled basis, 25.

15    Q.  And when you say "On a rotational scheduled

16 basis," what does that mean?

17    A.  Well, there's not 25 people all at one time;

18 it's shift work.  So there are rotational shifts

19 throughout the day, so at any one time, there's not

20 25 people in the building; it's 25 people that are

21 currently working.

22    Q.  So are there 25 people currently on a

23 payroll of the hotel?

24        MS. LUNDY:  Objection.

25    A.  I can't answer that question.

1     Q.  Who does the payroll for the hotel?

2         MS. LUNDY:  Objection.

3     A.  We have a finance duo.

4     Q.  Who is that?

5     A.  We have a staff accountant, and then, we

6  have a Director of Finance.

7     Q.  Did you ever do payroll for the hotel?

8     A.  I don't process payroll, no.  I provide data

9  for payroll to be processed.

10    Q.  Would you provide the data for the people

11 that process the payroll?

12    A.  Sometimes.

13    Q.  Other than you, is there anybody else from

14 the hotel that provides the data to the people that

15 process the payroll?

16    A.  Yeah.  The Director of Security would.

17    Q.  Who is that?

18    A.  Steve Tablan (phonetic).

19    Q.  Is he one of the 25 employees?

20    A.  He is.

21    Q.  The 25 employees that currently work at the

22 hotel, are they full-time employees?

23    A.  No.

24    Q.  The 25 people that you just mentioned, do

25 any of them receive less than 50 percent of their

```
 1  full-time annual salary?
 2        MS. LUNDY:  Objection.
 3    A.  Yes.
 4    Q.  How many of them?
 5        MS. LUNDY:  Objection.
 6    A.  I don't know off the top of my head.
 7        MS. RISMAN:  We would seek the production of
 8    those people that receive less than 50 percent
 9    of their annual salary.  We have requested this
10    in the past and should have already received
11    that; we do not have that information.
12        MS. LUNDY:  By Counsel, we ask that you
13    follow up in writing and we'll consider your
14    request.
15    Q.  Do you know where the payroll records are
16  kept?
17    A.  They're electronic.
18    Q.  Are they kept in a particular computer?
19    A.  No.  They're on a server.
20    Q.  Do you know what payroll company you use?
21        MS. LUNDY:  Objection.
22    A.  I do.
23    Q.  What is it?
24    A.  ADP.
25    Q.  Does that same server also keep W-2 forms
```

```
 1   for employees or past employees?
 2       A.  Yes.
 3           MS. LUNDY:  Objection.
 4       Q.  Does it keep W-2s for both current employees
 5   and past employees?
 6       A.  Yes.
 7       Q.  And do you have access to those W-2s?
 8           MS. LUNDY:  Objection.
 9       A.  I do.
10       Q.  Who sends out the W-2s from the hotel?
11           MS. LUNDY:  Objection.  You -- Ms. Risman,
12       you use the term "hotel"; I just want to clarify
13       what you're referring to, if you don't mind --
14           MS. RISMAN:  So, for the record, the entire
15       time that Mr. Boland took the depositions, he
16       was saying "the hotel," and it seemed like
17       everybody understood what that meant.
18       Q.  Do you understand what I mean when I say
19   "the hotel"?
20       A.  I do.
21           MS. LUNDY:  I don't understand, so I'd like
22       clarity, please.
23           MS. RISMAN:  So maybe you should ask
24       Mr. Boland what he meant when he said "the
25       hotel" during his deposition.
```

```
 1        MS. LUNDY:  Ms. Risman, you weren't present
 2   when I was deposing Spillane and I don't think
 3   my request is out of line, so I'm just asking
 4   you to clarify --
 5        MS. RISMAN:  So the only request that you
 6   can have for the record is an objection to form;
 7   that's the only objection you could have, but
 8   speaking objections, as you know, are not
 9   allowed.  So I understand that you're trying to
10   say that you want me define "the hotel," but
11   that is not something for you to say during the
12   deposition.  You could say "objection to your
13   interrogatories," "objection to our demands,"
14   but during the deposition, you can't say -- and
15   the Witness just stated that she knows what I
16   mean when I say "the hotel."
17        MS. LUNDY:  Ms. Risman, I appreciate the
18   instruction and direction about how to object to
19   questions during depositions, but I was merely
20   trying to avoid the need to object to every
21   single question when you use the term "hotel." I
22   will continue making that objection, and we can
23   proceed; I was merely trying to keep the record
24   a little bit cleaner, but please proceed.
25        MS. RISMAN:  Thank you.
```

1   Q.  Ms. Ortiz, the hotel that you work is known

2   as the Four Seasons Hotel New York, correct?

3   A.  That's the operator.

4   Q.  Is that the name that the hotel is known

5   for?

6        MS. LUNDY:  Objection.

7   A.  That's the -- that's the flag, that's the

8   operator.

9   Q.  When people stayed at the hotel when the

10  hotel was still open, did people stay at the Four

11  Seasons Hotel New York?

12       MR. WAGNER:  Objection.

13       MS. LUNDY:  Objection.

14  A.  I guess so.

15  Q.  Do you know when people stayed at the hotel

16  located at 57 East 57th Street in New York,

17  New York whether they thought they were staying at

18  the Hotel 57 Services, LLC?

19       MS. LUNDY:  Objection.

20       MR. WAGNER:  Objection.

21  A.  I can't speak for what other people thought

22  or what guests think.

23  Q.  Do you know of the hotel located at 57 East

24  57th Street as ever being known as Hotel 57

25  Services, LLC --

```
 1          MR. WAGNER:  Objection.

 2          MS. LUNDY:  Objection.

 3     Q.  -- to any guests that were staying there?

 4          MS. LUNDY:  Objection.

 5     A.  I don't know.  I don't know.  I can't speak

 6  for what guests think.

 7     Q.  Ms. Ortiz, do you know what Hotel 57, LLC

 8  is?

 9     A.  Hotel 57 -- no, I don't.

10     Q.  Have you ever heard of the company

11  Hotel 57, LLC?

12     A.  No.

13     Q.  Ms. Ortiz, have you ever heard of Ty Warner

14  Hotels & Resorts?

15     A.  Yes.

16     Q.  What entity is Ty Warner Hotels & Resorts?

17          MS. LUNDY:  Objection.

18     A.  It's a different operating entity.

19     Q.  And how did you ever become aware of

20  Ty Warner Hotels & Resorts?

21          MS. LUNDY:  Objection.

22     A.  It's just a different operating entity, but

23  I know that -- actually, I don't know how I became

24  aware.  I don't know.

25     Q.  Have you ever seen e-mails from Ty Warner
```

1   Hotels & Resorts or Ty Warner Hotels & Resorts LLC?

2       A.  Not specifically that name.

3       Q.  Have you ever seen e-mails from either

4   Ty Warner Hotels & Resorts or Ty Warner Hotels &

5   Resorts LLC where that is stated in the signature

6   line of an e-mail?

7           MS. LUNDY:  Objection.

8       A.  Probably.

9       Q.  Ms. Ortiz, do you know when the hotel known

10  as the Four Seasons Hotel New York closed for

11  guests?

12          MS. LUNDY:  Objection.

13      A.  Well, it was a State mandate, right, so it

14  would have been in March of 2020.

15      Q.  Do you know if all hotels in New York City

16  closed in March of 2020?

17      A.  To the best of my knowledge, I believe so,

18  or -- actually, no, I don't know.  I believe --

19  what I recall -- and it was such a very weird time.

20  What I recall is the closure of -- the State

21  mandate specifying closure to everything but

22  essential businesses.

23      Q.  And is it during that time that the hotel

24  where you worked closed for guests?

25          MS. LUNDY:  Objection.

1    A.  Well, yeah.  I mean, it was mandated by the

2  State.

3    Q.  But are you aware of any hotels that

4  remained open?

5        MS. LUNDY:  Objection.

6    A.  No.  I don't remember.  I don't know.

7    Q.  Do you know who decided to close the hotel

8  for guests in March of 2020?

9        MS. LUNDY:  Objection.

10    A.  Again, my recollection is that it was a

11  State mandate that any businesses that were

12  considered nonessential were to be closed; that's

13  my recollection.

14    Q.  Do you know how long that State mandate

15  lasted for?

16    A.  I don't remember.

17    Q.  Do you know if there's still a State mandate

18  going on now where hotels have to remain closed?

19        MS. LUNDY:  Objection.

20    A.  I don't know specifically, but I don't

21  believe there is.

22        MS. LUNDY:  Can we take a break, please?

23        (Whereupon, a break was taken at 10:51 a.m.,

24    and the deposition resumed at 10:58 a.m.)

25        (Whereupon, the requested portion of the

```
 1        record was read back.)
 2        Q.  So, Ms. Ortiz, how many employees are
 3   currently in the building at each individual time?
 4        A.  Probably -- so there's three -- wait.  One,
 5   two -- there's three shifts.  So there's three
 6   shifts, so at any time, like, a third of that 25; I
 7   guess that mathematically makes sense.  Yes.
 8        Q.  Is it fair to say that every single person
 9   of those 25 people that currently work for Hotel 57
10   Services, LLC work only part-time?
11            MS. LUNDY:  Objection.
12        A.  No.
13        Q.  How many of those 25 people work part-time?
14        A.  I don't know.  I would have to look.  As
15   I've said earlier, I can't remember off the top of
16   my head.  Maybe five, but I'm not sure.
17        Q.  Maybe five work part-time?
18        A.  Yes.
19        Q.  Do the other people work full-time?
20            MS. LUNDY:  Objection.
21        A.  Yes.
22        Q.  Do you currently work full-time?
23        A.  Yes.
24        Q.  Did your salary ever decrease during your
25   tenure as Director of People and Culture?
```

```
 1          MS. LUNDY:  Objection.
 2     A.   There was a period where we went on reduced
 3  work weeks, but the overall salary didn't decrease;
 4  it's just we were paid -- I think there was a
 5  period of time where -- or I may have used vacation
 6  time -- I don't remember, but there was a period of
 7  time where I went from five to four days, but I
 8  don't know how long that was.
 9     Q.   And during that period of time that you went
10  from five to four days, you were only paid for four
11  days of work, correct?
12     A.   Correct.
13     Q.   And how long did that last for?
14          MS. LUNDY:  Objection.
15     A.   I don't remember.
16     Q.   Are you back to being paid for five days a
17  week?
18     A.   I am.
19     Q.   Did there come a time that the employees at
20  Hotel 57 Services, LLC were placed on furlough?
21          MS. LUNDY:  Objection.
22     A.   Yes.
23     Q.   And who determined that those employees were
24  to be placed on furlough?
25     A.   I mean, I don't recall specifically.  It
```

1   would have been a collaboration based on the

2   circumstances at the time.  I don't know whether

3   there was any one entity that made that

4   determination; I think it was a result of the

5   mandates, the virus.  So it would have been a

6   collaboration.

7       Q.  Ms. Ortiz, who was it a collaboration with?

8           MS. LUNDY:  Objection.

9       Q.  I'm going to rephrase that.  What entities

10  made the decision to furlough the employees that

11  were employed at Hotel 57 Services, LLC?

12          MS. LUNDY:  Objection.

13      A.  Well, I mean, we were under State orders,

14  right, to close the hotel to guests, so I think it

15  was indirectly made by those State orders

16  initially.

17      Q.  But when the hotel was closed to guests,

18  they were then reopened to medical personnel,

19  correct?

20      A.  We did.  It was a very short period of time

21  in between that closure and then the reopening to

22  medical personnel.

23      Q.  So is it your testimony that there was a

24  State mandate only for a short period of time for

25  hotels to close?

1          MS. LUNDY:  Objection.

2      A.  No, I don't remember the length of time.  I

3  remember that we were allowed -- I don't remember,

4  because Broadway had shut down, the Philharmonic

5  had shut down, a lot of the U.N. wasn't in town.

6  From a business perspective, there wasn't any -- I

7  don't remember how long the mandate lasted, but it

8  was at that time that we -- that we -- furloughed

9  some of the employees.

10      Q.  And at that time, how many employees did you

11  furlough when you say "we furloughed the

12  employees"?

13      A.  I don't recall.

14      Q.  And when you say "we furloughed the

15  employees," who do you mean when you say "we"?

16      A.  The collaboration of the business entities,

17  right?  It would be a collaboration between

18  Hotel 57 Services, LLC and the operator Four

19  Seasons, and then, you know, the people -- the

20  people at the property.

21      Q.  And who are the people at the property?

22      A.  The management team at the property.

23      Q.  Who would that be?

24      A.  I mean, there's multiple managers.  The

25  Executive Committee consisted of the General

 1 | Manager, myself, Director of Finance, Director of
 2 | Sales and Marketing, Director of Engineering,
 3 | Director of Food and Beverage, maybe, Director of
 4 | Rooms.
 5 |     Q.  Would all of those directors that you
 6 | mentioned collaborate with FSR International and
 7 | Four Seasons Hotel Services -- I'm sorry.  I'm
 8 | going to withdraw that.
 9 |         MS. RISMAN:  And if you could just read the
10 |     last question back to me.
11 |         (Whereupon, the requested portion of the
12 |     record was read back.)
13 |     Q.  Can we agree to abbreviate Four Seasons
14 | Hotel New York as FSHR?
15 |     A.  FS?
16 |     Q.  FSH -- wait.
17 |         MR. WAGNER:  I'm going to object to that,
18 |     because there are two different DBAs.
19 |     Q.  FSHNY, and can we abbreviate FSR
20 | International Hotels Inc. as FSR?
21 |     A.  I don't know what the entities are.  I
22 | mean --
23 |     Q.  Four Seasons Hotel New York, can we just
24 | abbreviate that as FSHNY during this deposition?
25 |     A.  FSNY.

1     Q.   Okay.   Would you prefer FSNY?

2     A.   That's fine.

3     Q.   Okay.   Perfect.   So FSNY would be the hotel,

4  right?   When I say that you're working at the

5  hotel, that would be Four Seasons New York,

6  correct?

7     A.   The physical property.

8     Q.   So as the Director of People and Culture,

9  you're the Director of People and Culture for the

10 Four Seasons New York, correct?

11         MS. LUNDY:   Objection.

12    A.   Hotel 57 Services, LLC.

13    Q.   Okay.   When you sent a letter out with the

14 letterhead Four Seasons New York and you signed the

15 bottom of the letter as Director of People and

16 Culture, can you agree that nowhere on the letter

17 does it say the words "Hotel 57 Services, LLC,"

18 correct?

19    A.   I agree.

20    Q.   So can we agree during this deposition that

21 when I'm referring to your role as working at the

22 hotel, I will be stating your role as working at

23 FSNY or Four Seasons New York?

24         MS. LUNDY:   Objection.

25    Q.   Can we agree on that?

1      A.   Sure.

2      Q.   Ms. Ortiz, have you ever met Ty Warner?

3      A.   No.

4      Q.   Have you ever seen him?

5           MS. LUNDY:   Objection.

6      A.   Not in person.

7      Q.   Okay.   There was a time that Four Seasons

8  New York or FSNY, right, opened to medical

9  personnel, correct?

10     A.   Uh-huh.   Yes.

11     Q.   And when was that?

12     A.   I don't remember exact dates.   It would have

13 been the end of March or early April in 2020.

14     Q.   And who made the decision to allow medical

15 personnel to stay at the Four Seasons New York?

16     A.   I don't know.

17     Q.   Who told you that medical personnel were

18 staying at the Four Seasons New York?

19          MS. LUNDY:   Objection.

20     A.   Channel 11.   I'm sorry, but that's true.

21     Q.   So is it your testimony that nobody ran the

22 decision to have medical personnel stay at the Four

23 Seasons New York by you before that was done?

24          MS. LUNDY:   Objection.

25     A.   I think at that time there were so much

1   going on with COVID, and I believe that we had an

2   awareness -- I think the State had asked for hotels

3   to open their doors if they could, so I think, like

4   all things during that time, there was speculation

5   that we possibly will do this.  So we had -- it

6   would be fair to say that we had -- discussions

7   based on speculation or based on what if, but it

8   seems like the media outlets -- I honestly

9   remember, like, somebody said that Channel 11 was

10   outside, because we were opening to the medical

11   community.  Did someone tell me ahead of time?

12   Probably.  But I don't recall.  I recall the

13   Channel 11 truck outside.

14       Q.  And at that time that you recall seeing the

15   Channel 11 truck outside, were you physically

16   working in the building of the Four Seasons

17   New York?

18       A.  I was.

19       Q.  Did you ever stop working in the physical

20   building of the hotel?

21       A.  Well, I'm on property most days; some days

22   I'm remote, but it fluctuates based on, you know,

23   what's needed on the property.  But during that

24   period of time, the expectation was that we were to

25   be -- that we collectively, the management team,

 1  was to be -- on property every day.

 2      Q.  So were you on property every day in March

 3  of 2020?

 4      A.  To the best of my recollection, yes.

 5      Q.  Did someone at Ty Warner Hotels & Resorts

 6  make the decision to close the hotel for guests?

 7          MS. LUNDY:  Objection.

 8      A.  I don't know.

 9      Q.  Do you know who Cathy Hwang is?

10      A.  I've spoken with her on the phone.

11      Q.  Have you ever met her?

12      A.  No.

13      Q.  Do you know who she is?

14          MS. LUNDY:  Objection.

15      A.  My understanding is that -- I don't know for

16  sure, but my understanding is she works for Mr.

17  Ty Warner.

18      Q.  And what is your understanding as to what

19  she does for Mr. Ty Warner?

20      A.  I honestly don't know.

21      Q.  Is it also your understanding that she works

22  for Ty Warner Hotels & Resorts?

23      A.  I don't know what entity she works for.

24      Q.  But you have corresponded with her via

25  e-mail, correct?

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1      A.   I have.

2      Q.   And you've spoken to her on the phone?

3      A.   I have.

4      Q.   Have you ever met her in person?

5           MS. LUNDY:   Objection.

6      A.   No.

7      Q.   And do you correspond with Ms. Hwang when

8   you try to get a message out to Mr. Warner?

9           MS. LUNDY:   Objection.

10      A.   No, because I've never been in a position

11   where I needed to message him directly.

12      Q.   Have you ever seen Mr. Tauscher attempt to

13   message Mr. Warner directly through

14   Ms. Cathy Hwang?

15           MS. LUNDY:   Objection.

16      A.   Probably.

17      Q.   Do you recall having to have the permission

18   of someone from Ty Warner Hotels & Resorts prior to

19   having the hotel close for guests?

20           MS. LUNDY:   Objection.

21      A.   Could you be more specific, please?

22      Q.   Did there come a time in March of 2020 where

23   you were made aware that Ty -- someone from

24   Ty Warner Hotels & Resorts agreed that the hotel

25   should be closed for guests?

1        MS. LUNDY:  Objection.

2     A.  I don't remember specifically, but I'm

3   sure -- you know, because our decisions are all

4   collaborative, so I'm sure there was communication

5   to that effect, but I don't have specific knowledge

6   to it directly.

7     Q.  Do you recall Mr. Tauscher ever telling you

8   that Mr. Warner wanted the hotel to be closed for

9   guests in March of 2020?

10     A.  I don't remember specifically.

11     Q.  Okay.  Do you recall there being any tenants

12   at the Four Seasons New York --

13        MS. LUNDY:  Objection.

14     Q.  -- in March of 2020?

15     A.  Can you clarify?

16     Q.  In March of 2020, did the Four Seasons

17   New York have any tenants in any of the commercial

18   retail spaces?

19     A.  Yes.

20     Q.  How many tenants were there?

21     A.  I don't know.

22     Q.  Do you know if there are any tenants there

23   now?

24     A.  Not operating.

25     Q.  And at the time that the hotel closed for

1   guests, did those retail stores also close?

2       A.  I don't remember.  I don't know when they

3   closed.

4       Q.  Did Mr. Tauscher ever send any e-mails that

5   he exchanged with Ms. Cathy Hwang to you?

6       A.  I'm sure.  Specifically, I don't remember,

7   but I'm sure he did.

8       Q.  Did he do that regularly?

9           MS. LUNDY:  Objection.

10      A.  I don't -- I don't know; I don't remember.

11      Q.  What did you first hear about COVID?

12          MS. LUNDY:  Objection.

13      A.  I think it may have been in -- personally, I

14  remember -- I remember it being in, like, January

15  and February, because I had gone to -- my younger

16  brother was living in St. Louis and I had gone to

17  travel to see him because he was pretty ill at the

18  time, so it had to have been -- and we didn't

19  discuss; we kind of laughed about it.  So

20  personally, probably in February, end of January.

21      Q.  And do you recall hearing about COVID in

22  China?

23          MS. LUNDY:  Objection.

24      A.  I'm sure I did.

25      Q.  And then there was an outbreak in Italy,

 1  correct?

 2          MS. LUNDY:  Objection.

 3      A.  I don't remember.

 4      Q.  And then, there came a time that you

 5  investigated whether hotels had to be closed as a

 6  result of the COVID pandemic, correct?

 7          MS. LUNDY:  Objection.

 8      A.  Did I investigate it?  Clarify?

 9      Q.  Yeah.  Did there ever come a time that you

10  investigated whether or not hotels had to be closed

11  as a result of the pandemic?

12          MS. LUNDY:  Objection.

13      A.  I don't know; I don't remember.

14      Q.  Did you ever seek clarification from the

15  Governor's office as to whether hotels were exempt?

16          MS. LUNDY:  Objection.

17      A.  I don't know that it would have been with

18  the Governor's office; it probably would have been

19  with our local Council, but I don't remember

20  specifically.

21      Q.  So I'm going to show you what we're going to

22  be marking as Plaintiffs' Exhibit 2.

23          (Whereupon, an e-mail to Elizabeth Ortiz

24      from info@news.hanyc.org dated 3-20-20 and

25      Bates-stamped WarnerDEF000700 was marked as

 1      Plaintiffs' Exhibit 2 for identification, as of

 2      this date.)

 3      Q.  So Ms. Ortiz, I'm going to be showing you

 4   what's just been marked as Plaintiffs' Exhibit 2.

 5   Oh, wait.  Actually, I gave you the wrong -- I'm

 6   sorry.  Does that document refresh your

 7   recollection whether you sought clarification from

 8   the Governor's office as to whether hotels are

 9   exempt?

10          MS. LUNDY:  Objection.

11      A.  Yeah, but this wasn't from me; this was a

12   communication from our local Council.

13      Q.  Yes, but I'm asking you whether this

14   refreshes your recollection as to whether you

15   sought clarification.

16      A.  To a degree.

17          MS. LUNDY:  Objection.

18      A.  I don't remember the specific e-mail, but I

19   do remember the general idea around this at the

20   time.

21      Q.  Did you -- at that time, did you think that

22   it was possible that the hotel would have to close

23   to guests?

24      A.  I don't know what I thought at that time.

25      Q.  I'm also going to be showing you what is

1    marked as Plaintiffs' 3.

2          (Whereupon, an e-mail from NYF E-Mail to

3       Rudy Tauscher dated 2-27-20 and Bates-stamped

4       WarnerDEF000902 was marked as Plaintiffs'

5       Exhibit 3 for identification, as of this date.)

6       Q.  I'm going to be showing you what's been

7    marked as Plaintiffs' Three, Bates-stamped

8    WarnerDEF902.  So did you ever see that e-mail

9    before?

10      A.  I mean, I must have.  I'm listed in the user

11   group.  I don't remember it specifically, but

12   again, I remember the general conversation.

13      Q.  And what was the general conversation at

14   that time?

15      A.  Just that we were waiting for direction;

16   like, you know, what was happening.  It was so --

17   it was so abrupt and so sudden and so -- it was an

18   awful time, but I think that the likelihood of

19   having to be closed due to the pandemic was

20   becoming more and more realistic, whereas prior to,

21   I don't know, in February, it was more of

22   speculation.

23      Q.  And would you agree with me that this e-mail

24   that we just marked as Plaintiffs' 3 Bates-stamped

25   WarnerDEF902 is dated February 27th, 2020, correct?

1    A.  Yes.

2    Q.  So at that time, would you agree with me

3  that the likelihood that the hotel would be closing

4  was more reasonably probable, correct?

5    A.  I don't know that we knew at that time that

6  we were going to shut down for sure.  I think the

7  focus was more on hygiene and cleanliness and if

8  you're sick, stay home.

9    Q.  So focusing your attention on the third

10  paragraph, where it states, "I am looking...for

11  official announcement such as school- or airport

12  interruptions, and info from sister FS properties

13  and FS Toronto," do you see that?

14    A.  Yes, I do.

15    Q.  Do you recall inquiring whether other

16  entities would be closing at that time due to the

17  COVID pandemic?

18        MS. LUNDY:  Objection.

19    A.  I don't recall specifically, but it's likely

20  that it was.  I didn't -- I mean, I don't recall

21  specifically, but it's likely that we, you know,

22  wanted to know what everybody else was doing,

23  because that's just the collaborative effort of

24  hotels.

25    Q.  And did you get any information from FS

```
 1   properties at that time?

 2        MS. LUNDY:  Objection.

 3     A.  I don't remember.

 4     Q.  And when it says "FS properties," they're

 5   referring to other Four Seasons properties,

 6   correct?

 7        MS. LUNDY:  Objection.

 8     A.  I can't testify to what he meant, but I

 9   assume that that's what he meant.

10     Q.  Other than other Four Seasons properties,

11   what do you think that could possibly mean, "FS

12   properties"?

13        MS. LUNDY:  Objection.

14     A.  I don't know.

15     Q.  Okay.  I'm going to be showing you what's

16   marked as Plaintiffs' 4, and I'm also going to be

17   showing you what's going to be marked as

18   Plaintiffs' 5.

19        (Whereupon, a 3-12-20 letter authored by

20     Elizabeth Ortiz and Bates-stamped

21     WarnerDEF003103 was marked as Plaintiffs'

22     Exhibit 4, and an e-mail from Elizabeth Ortiz

23     dated 3-13-20, Bates-stamped WarrenDEF003098,

24     was marked as Plaintiffs' Exhibit 5 for

25     identification, as of this date.)
```

1    Q.  So focusing your attention to Plaintiffs' 4,

2    Bates-stamped WarnerDEF3103, is that a letter from

3    you?

4         MS. LUNDY:  Objection.

5    A.  Yeah.  Well, I signed it, so yes.

6    Q.  And does the top of that letter state Four

7    Seasons Hotel New York?

8    A.  It does.

9    Q.  And the bottom of that letter states your

10   name, Elizabeth Ortiz, correct?

11   A.  That's correct.

12   Q.  And underneath there, it states Director,

13   People and Culture?

14   A.  That's correct.

15   Q.  And would you agree with me that this letter

16   was sent providing guidelines to the employees,

17   correct?

18   A.  That's correct.

19   Q.  And was this letter sent to all of the

20   employees?

21   A.  That would be my recollection.

22   Q.  Is there any reason to believe that your

23   recollection is not accurate?

24   A.  The only reason it wouldn't have gone to all

25   employees is if we had -- if they had not opened

 1  their e-mail or -- I don't know that we had all

 2  e-mail at that time, but this would have gone to

 3  all the e-mail boxes that we had, so yes, the

 4  intention was all employees.

 5     Q.  And focusing your attention to what's just

 6  been marked as Plaintiffs' 5, Bates-stamped

 7  WarnerDEF3098, would that refresh your recollection

 8  whether this memo went to all employees?

 9     A.  Yes.

10     Q.  So would it be fair and accurate to state

11  that this memo went to all the employees working at

12  Hotel 57 Services, LLC?

13     A.  So the e-mail would have gone to all the

14  e-mail users of all employees, and then, it would

15  have been posted and distributed throughout

16  departments.

17     Q.  So you'd agree with me this was an important

18  memo that you wanted all the employees of the Four

19  Seasons Hotel to have, correct?

20     A.  Yes.

21     Q.  And this memo talks about health and safety,

22  correct?

23     A.  Yes.

24     Q.  And also talking about quarantine and

25  isolation and social distancing, correct?

1    A.  Yes.

2    Q.  And by the time that memo was sent, would

3  you agree with me that it was reasonably

4  foreseeable that the hotel may furlough their

5  employees?

6         MS. LUNDY:  Objection.

7    A.  I don't -- I don't know.  I don't think it

8  was clear at the time; I think we've always had the

9  intention of just -- to answer your question, I

10  don't think it was clear at the time if we were

11  going to furlough employees.

12    Q.  Okay.  So focusing on your attention for

13  when the medical personnel were staying there, how

14  many people were working at the hotel at that time?

15    A.  At which period of time?

16    Q.  At the time that the medical personnel were

17  staying at the hotel.

18    A.  I don't remember; I would have to look.

19    Q.  Who was in charge of deciding how many

20  employees would be working at the hotel at the time

21  that the medical personnel were staying there?

22    A.  I think it was a collaborate effort based on

23  our health and safety protocol, and the health and

24  safety protocol was established by International

25  SOS, so based on what they -- based on their

1   recommendations, we would have had to scale the

2   employee base around those recommendations.

3            (Whereupon, an e-mail chain between

4       Rick Kaminskas and Frank Galasso, along with a

5       chart, and Bates-stamped WarnerDEF002482 was

6       marked as Plaintiffs' Exhibit 6 for

7       identification, as of this date.)

8    Q.  Ms. Ortiz, focusing your attention to what's

9   just been marked as Plaintiffs' Exhibit 6,

10  Bates-stamped WarnerDEF2482, does that refresh your

11  recollection as to who was working there during the

12  time that the medical personnel was staying at the

13  hotel?

14   A.  I don't remember the specific e-mail, but I

15  would say that it's -- I would say that it's -- in

16  line with what we needed at the time.

17   Q.  Okay.  So, Ms. Ortiz, you can see that

18  you're CC-ed on the e-mail on the bottom, correct?

19   A.  Uh-huh.  Yes.

20   Q.  So you did receive this e-mail, correct?

21       MS. LUNDY:  Objection.

22   A.  It would stand to reason that I did.

23   Q.  And do you want to read the e-mail from

24  Rick Kaminskas to us?

25   A.  Yeah. "All, Please review the below and

1  attached to confirm your hourly staffing needs

2  during the period of occupancy by medical staff.

3  Be aware this will be communicated to ownership who

4  will view this with a critical eye.  This is not

5  the time to staff up unnecessarily.  Remember

6  during this period we are in many ways less than a

7  limited service property.  Please get back to me

8  today with any changes that you would like to

9  make." And then, it lists the different employees

10  and the different divisions.

11    Q.  Ms. Ortiz, who is Rick Kaminskas?

12    A.  He was the Director of Finance at the time.

13    Q.  And when he states in this e-mail, "Remember

14  during this period we are in many ways less than a

15  limited service property," what do you think that

16  means?

17    A.  So limited service properties don't provide

18  food and beverage; they are typically grab-and-go

19  types of entities -- hotels, rooms-based only, and

20  now, I remember we actually shut down food and

21  beverage.

22    Q.  So the medical personnel could not get any

23  food and beverage while staying at the hotel; is

24  that correct?

25    A.  We did not have them in-house.  We ordered

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1  -- they had -- they could pick up two meals a day

2  or one meal a day, I think; we had the food

3  delivered; I don't remember from where, though.

4      Q.  Was that for financial reasons?

5      A.  No.

6      Q.  What was the reason for that?

7      A.  Health and safety.

8      Q.  Was there financial impact on the hotel at

9  the time that the medical personnel were staying

10  there?

11        MS. LUNDY:  Objection.

12     A.  What do you mean by that?

13     Q.  Was -- focusing your attention on this

14  e-mail, it says "Be" -- it says, "Be aware this

15  will be communicated to ownership who will view

16  this with a critical eye." Do you see that?

17     A.  Uh-huh.

18     Q.  So why would Ownership view this with a

19  critical eye?

20        MS. LUNDY:  Objection.

21     A.  Well, there's staffing guidelines based on,

22  you know, revenue and production, and if we weren't

23  generating any revenue, then the amount of staffing

24  would be -- would be -- viewed from the perspective

25  that we were no longer generating any revenue.

1      Q.  So after this e-mail, was the staff cut down

2   in any way?

3          MS. LUNDY:  Objection.

4      A.  Well, yeah, it would have been, because we

5   were closed.

6      Q.  Right.  But during the time that the medical

7   personnel were staying there, did the staff ever

8   decrease or increase or change in any way?

9          MS. LUNDY:  Objection.

10     A.  Yes.

11     Q.  How did it change?

12     A.  During the time that the medical staff was

13  there?

14     Q.  Yes.

15     A.  We would have recalled employees.

16     Q.  So would the staff have increased or

17  decreased?

18     A.  From the period of time that we closed due

19  to the State mandate to the period of time that we

20  reopened for the medical personnel, the staff would

21  have increased.

22     Q.  But after this e-mail and the complaint that

23  "ownership who will view this with a critical eye,"

24  did the staffing ever decrease?

25         MS. LUNDY:  Objection.

1      A.  I don't know that that's a complaint.  I

2    think -- based on this chart specifically?  It

3    decreased from this chart?

4      Q.  Yes.  Did it decrease from this chart?

5      A.  Oh.  I don't know.  In what period of time?

6      Q.  So focusing your attention on the time that

7    the medical personnel was staying at the hotel

8    after this e-mail was received by all, did the

9    staffing decrease?

10          MS. LUNDY:  Objection.

11     A.  I don't remember.

12     Q.  And when did the hotel close for medical

13   personnel?

14     A.  I believe the end of June in 2020.

15     Q.  And who decided to close the hotel for

16   medical personnel?

17     A.  It would have been a collaborative decision

18   based on the needs of the medical community.

19     Q.  Okay.  Did the medical community ask the

20   hotel to close the hotel for medical personnel to

21   stay there?

22          MS. LUNDY:  Objection.

23     A.  I don't know.  I don't think so.

24     Q.  Would that not have been a decision by the

25   hotel to make rather than the medical community?

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1          MS. LUNDY:  Objection.

2     A.  Yes, but to clarify what I meant, it would

3  have been based on the needs of the medical

4  community, not necessarily their decision, but

5  based on their needs at the time, and I think we

6  found that there were less and less medical staff

7  requiring rooms.

8     Q.  Is that because the COVID pandemic was

9  getting better?

10         MS. LUNDY:  Objection.

11    A.  No.  I don't know.  I don't think it got

12  better for a long time, but I don't know.

13    Q.  So at the time that the medical personnel

14  were no longer staying at the Four Seasons

15  New York, did the number of employees decrease that

16  were working for --

17         MS. LUNDY:  Objection.

18    A.  Most likely.

19    Q.  -- working for the hotel?

20    A.  Sorry.  Most likely.

21    Q.  And did it then go to this approximately 25

22  employees that you say currently work there today?

23    A.  I don't remember when that decreased.  I

24  actually really don't remember when that decreased.

25  I would say, from my recollection, that we dwindled

 1   down probably throughout 2020, because, I mean, our

 2   whole objective was to reopen, so we wanted to

 3   maintain a fair -- I mean, our intention was to

 4   reopen, so we didn't want to lose sight of that,

 5   and I don't remember when we finally determined

 6   that we would begin work on the property in

 7   anticipation of reopening for guests, but I don't

 8   specifically remember.

 9      Q.  When did the objective to reopen change not

10   to reopen?

11         MS. LUNDY:  Objection.

12      A.  We've always wanted to reopen; it's just a

13   matter of when.  We've never been closed.  We were

14   closed to guests, but, I mean, the property is not

15   closed; we're not open to the Four Season guests;

16   the objective has always been to reopen.

17      Q.  Right.  But the property is not closed,

18   because if the property completely closed down,

19   that would actually be dangerous to the structure,

20   correct?

21         MS. LUNDY:  Objection.

22      A.  I don't know.  I'm not an engineer.

23      Q.  But you speak to the engineers on a daily

24   basis, correct?

25      A.  I do.  Yes.

1      Q.   And would you agree with me that if the

2   property completely closed down without anyone

3   being there, it would be dangerous to the structure

4   of the building?

5          MS. LUNDY:  Objection.

6      A.   I still can't answer that question.  I don't

7   know.

8      Q.   On a day-to-day basis, would you agree with

9   me that people have to walk around and flush the

10  toilets in the hotel?

11     A.   Yes.

12     Q.   And they would have to put on the showers in

13  the hotel daily, correct?

14     A.   Yes.

15     Q.   And what else would they have to do daily in

16  order to maintain the structure of the building?

17         MS. LUNDY:  Objection.

18     A.   I think I answered that question earlier.

19  Just to -- general cleaning and safety and security

20  of the building; I mean, ensuring the operation of

21  the chillers and ensuring the operation of the

22  various equipment, but I've lost track of your

23  original question.  I'm sorry.  What was the

24  original question?

25     Q.   So my original question was, when did the

```
 1   objective change from wanting to reopen the hotel
 2   to not reopening the hotel?
 3          MS. LUNDY:  Objection.  Asked and answered.
 4      A.   We never not wanted to reopen the hotel.
 5      Q.   So why is the hotel not open?
 6          MS. LUNDY:  Objection.
 7      A.   Well, right now, I mean, we're going through
 8   -- we've -- we're redoing a lot of the bathrooms,
 9   and we've got major -- we've got elevator
10   modernization going on; we are -- we've actually
11   just redone most of the bathroom showers; we've
12   installed overflow triggers in the HVAC system
13   within each room to prevent an overflow of the HVAC
14   -- the condensation from the HVAC systems; we have
15   a fire panel modernization that is taking place; we
16   have -- so these are all in preparation to reopen;
17   we wouldn't be doing any of that if we weren't
18   intending on reopening.  So the structure -- I
19   think the elevator modernization is almost
20   complete, the work in the bathrooms -- I think
21   they're starting Phase Two with the work in the
22   bathrooms, which is -- involves -- Sheetrocking --
23   involves just Sheetrock placement -- and that
24   should be starting.  So we've spent -- you know,
25   we've redone all the shower stalls in the
```

1   bathrooms.  So there's a lot of mechanical and

2   foundational work that has been taking place in

3   preparation to reopen.

4       Q.  And when was this decision made that

5   renovations had to be done prior to reopening?

6       A.  I don't remember.

7           MS. LUNDY:  Note my objection.

8       A.  I don't remember.  Maybe in the middle of

9   2021.

10      Q.  Who made that decision?

11      A.  It would have been collaborative.  I mean --

12      Q.  Was FSR International Hotels Inc. part of

13  that decision to renovate prior to any reopening of

14  the hotel?

15      A.  I don't know.

16      Q.  Was Hotel 57 Services, LLC part of that

17  decision to renovate prior to reopening the hotel?

18      A.  Well, the operating decisions are made at

19  the property level, so I would -- it would stand to

20  reason that yes, but I can't speak to it

21  specifically.

22      Q.  Was Hotel 57, LLC part of the decision to

23  renovate prior to reopening the hotel?

24      A.  I would imagine; I mean, it's reasonable,

25  but I don't remember specifically.

1    Q.  Was Ty Warner Hotels & Resorts, LLC part of

2    the decision to renovate the hotel prior to

3    reopening the hotel?

4    A.  It would stand to reason, but I don't know

5    specifically.

6    Q.  Was H. Ty Warner personally part of the

7    decision to renovate the hotel prior to reopening

8    the hotel?

9    A.  I have no idea.

10   Q.  And now that you don't have a general

11   manager to report to, who do you report to?

12   A.  Myself.  I have a dotted line to our

13   Regional Director of People and Culture, but on

14   day-to-day operational things, we collaborate

15   within the property, and also, I suppose my direct

16   report is -- would be -- Antoine Chahwan.

17       (Whereupon, a discussion was held off the

18   record.)

19   Q.  Back on.  Is it your testimony that you

20   report directly to Antoine Chahwan?

21   A.  It depends on the circumstance.

22   Q.  When is it that you report directly to

23   Antoine Chahwan?

24   A.  Well, from the property level to the

25   operators, anything that would have to do with the

 1  operation, including fiscal decisions or labor

 2  decisions; they're still the operators.

 3      Q.  When you say "labor decisions," what do you

 4  mean?

 5      A.  Just with respect to staffing and -- but

 6  that's even collaborative with the Regional

 7  Director of Finance and --

 8      Q.  So when you say "with respect to staffing,"

 9  is it your testimony that Mr. Antoine Chahwan has

10  to approve any changes to staffing?

11      A.  At this juncture, right now, it's not just

12  him, but it would be a discussion between him and

13  the Financial Division.

14      Q.  What role does he have in approving labor

15  decisions?

16      A.  I mean, as an operator, he has a vested

17  interest in making sure that the property

18  management is making the right decisions with

19  respect to the labor costs and the financial

20  impact.

21      Q.  Why is that?

22      A.  Because they're the operator; he works with

23  the operator.

24      Q.  Why is that important to the operator?

25          MS. LUNDY:  Objection.

1      A.  It's their fiscal responsibility.

2      Q.  And the other person that you mentioned in

3   the Financial Division, who is that?

4      A.  Oh, I don't know that I mentioned someone by

5   name.  That would be our Regional Director of

6   Finance, our Director of Finance; there is a

7   Vice President of Finance -- I'm not sure of all

8   the titles; I know where they are in the hierarchy,

9   but I don't know the specific titles.

10     Q.  And who are those people employed by?

11         MS. LUNDY: Objection.

12     A.  I don't know.  I mean, I would assume the

13  operator, but I don't know.

14     Q.  Do you know if they're employed by Hotel 57

15  Services, LLC?

16     A.  I don't.

17     Q.  Do you know if they're employed by FSR

18  International Hotel Inc.?

19     A.  I don't.

20     Q.  Do you know where they're based out of?

21     A.  It depends on the person.

22     Q.  Are any of those people based out of

23  Toronto?

24         MS. LUNDY:  Objection.

25     A.  Not that I know of.

1     Q.  Are any of them based out of Texas?

2     A.  One that I know -- I'm not sure where the --

3  what the regional -- or the vice -- what the --

4  Antoine is based out of Texas; of that I'm certain.

5     Q.  Is there anyone at Hotel 57 Services, LLC

6  that's supervises you at all?

7     A.  On the property level?

8     Q.  On any level.

9     A.  That would be the people that I just

10  mentioned.  I mean, on a regular, daily basis, I

11  mean, we're executive leaders that have had vast

12  responsibilities over certain divisions, so I don't

13  know that supervision is something that's required

14  on a daily basis, but we do have a reporting

15  structure and a responsibility to those people that

16  I just mentioned.

17     Q.  And as part of the reporting structure, you

18  do report to Antoine Chahwan, correct?

19     A.  For specific things, yes.

20     Q.  And is he an employee of Hotel 57

21  Services, LLC?

22     A.  I don't know.

23     Q.  And who would know that?

24        MS. LUNDY:  Objection.

25     A.  I don't know.

1      Q.  Ms. Ortiz, as the Director of People and

2   Culture, would you know everyone who is employed by

3   Hotel 57 Services, LLC?

4           MS. LUNDY:  Objection.

5      A.  No.

6      Q.  Who would know that from Hotel 57

7   Services, LLC?

8           MS. LUNDY:  Objection.

9      A.  I mean, I don't know; that's a broad

10   question.  Like, I would look -- I could look at

11   the system -- our HRIS system -- but I don't know

12   who are the entities -- I mean, there's so many

13   different business entities; I don't know who is

14   employed under what entity.  I know who is employed

15   and/or furloughed on the property level, but I

16   would have to review to confirm; I can't tell you

17   off the top of my head, "Oh, yeah.  He works for

18   Hotel 57 Services." "He doesn't." You know?

19      Q.  Is it because those entities work

20   collectively that you don't know who works for

21   which entity?

22           MS. LUNDY:  Objection.

23      A.  I don't know that that's the reasoning, I

24   think.  Because of all the different business

25   entities, I think different people work under

1 different entities, so I don't know -- like, I

2 don't know -- who's employed by what entity; I only

3 know what I know based on the operation.

4    Q.  But you would agree with me that these

5 entities, like the operator and the owner, they

6 work collaboratively to run the hotel, correct?

7    A.  I think that's stands to reason.  Yes.

8    Q.  I'm sorry?

9    A.  It stands to reason.  Yes.

10    Q.  Is there any reason you think they don't

11 work collaboratively to run the hotel?

12    A.  No.

13    Q.  And did they work collaboratively when it

14 came to making the decision to furlough the

15 employees that worked for the Four Seasons

16 New York?

17       MS. LUNDY:  Objection.

18    A.  I would imagine so.

19    Q.  When you say you would imagine so, what do

20 you mean?

21    A.  It's reasonable to assume that because we

22 work collaboratively, it would have been a

23 collaborative decision, but I can't specifically

24 say, because I wasn't exactly in the room when the

25 decision was made; I was given direction -- I would

 1  have been given direction -- but it would stand to

 2  reason that the different entities, because we do

 3  work collaboratively, would have been involved in

 4  the decisionmaking.

 5      Q.  And when you say you were told, who were you

 6  told by of the decision?

 7          MS. LUNDY:  Objection.

 8      A.  Well, at the time, it would have come from

 9  the General Manager.

10      Q.  And did that decision to furlough employees

11  come from the General Manager to you?

12      A.  No, it was a collaborative discussion based

13  on the need to close.  I mean, we were not going to

14  keep employees if we were closed.

15      Q.  Did Mr. Tauscher tell you that you were

16  going to furlough employees at the Four Seasons

17  New York?

18          MS. LUNDY:  Objection.

19      A.  I think you've already asked that question.

20  It would have been a collaborative decision; I

21  mean, I guess so, but we would have that discussion

22  based on what the State had mandated.

23      Q.  No.  But my question to you is, was it

24  Mr. Tauscher that gave you the decision that was

25  made to furlough employees?

```
 1          MS. LUNDY:  Objection.
 2      A.  No, it was a collaborative discussion, like
 3  to sit down and it's, like, "What are we going to
 4  do?".  I mean, it's a business plan, right?  So if
 5  you're not generating revenue, you have to reduce
 6  the costs, so logically thinking, you're not
 7  generating revenue, how far can you reduce the
 8  cost, including labor, right?  So it's not like
 9  somebody said, like, "Oh, we got to lay off
10  everybody." It's, like, "We're not generating
11  revenue; we don't have services; the U.N.'s not in
12  session; the Philharmonic is closed; Broadway's
13  closed." I mean, it's just a natural business
14  progression that if you're not generating the
15  revenue, you're going to have to reduce the costs.
16  So I don't know who specifically said that; it's
17  just -- it's, like, common sense that you would
18  make that reduction.
19      Q.  And when is it first that you were aware
20  that the hotel was not generating revenue?
21          MS. LUNDY:  Objection.
22      A.  So that would have been on March 20th, and I
23  specifically remember March 20th, because that was
24  the last day that we were open to the public simply
25  because of the directive from the State, and the
```

1   reduction was primarily made in food and beverage,

2   because all of the food and the food operations

3   closed at the direction from the State; it was,

4   like, listed nonessential, and I remember it was,

5   like, nonessential.  Well, is it essential to have

6   a restaurant?  No.  Is it essential to have

7   somebody that can clean the bathrooms?  Yes.  So it

8   was a whole discussion, seriously, between

9   essential and nonessential, so much so to the point

10  that I wrote multiple letters to different

11  individuals allowing them access.  It wasn't a

12  decision we made; I think that's what I'm trying to

13  explain.  We didn't make that decision; we had to

14  make that decision because of the mandate from the

15  State, and then, for obvious business reasons down

16  the road, from a financial perspective, we had to

17  continue making that decision.

18      Q.   Okay.  So by March 20th, 2020, was it

19  reasonably foreseeable that the employees working

20  for the Four Seasons New York would have to be

21  furloughed?

22          MS. LUNDY:  Objection.

23      A.   So that was a mandatory closure.  It was

24  requested by the State of New York to close; it was

25  March 20th.  Governor Cuomo issued the mandate

1    around that time.  Yes.

2       Q.  So my question to you is, by March 20th,

3    2020, was it reasonably foreseeable that the

4    employees working at the Four Seasons New York

5    would have to be furloughed?

6         MS. LUNDY:  Objection.

7       A.  It was foreseeable that we would need to

8    close and therefore reduce costs.

9       Q.  And furlough the employees, correct?

10        MS. LUNDY:  Objection.

11      A.  Cost reduction.  Sorry.  That's part of cost

12   reduction, right?

13      Q.  And we spoke about some renovations

14   previously during this deposition, correct?

15      A.  Uh-huh.  Yes.  Sorry.

16      Q.  And you would agree with me that prior to

17   March of 2020, renovations were already being

18   conducted in the hotel, correct?

19        MS. LUNDY:  Objection.

20      A.  I don't know.

21      Q.  During the time that you worked for the Four

22   Seasons New York, do you ever recall any

23   renovations being conducted prior to 2023, 2022,

24   and 2021?

25        MS. LUNDY:  Objection.

1    A.  I do not.  I only arrived in October of

2  2019.

3    Q.  After arriving and working at the Four

4  Seasons New York, did you ever know of any

5  renovations to be conducted at the hotel?

6    A.  Not at that time.

7    Q.  When was the first time that you knew

8  renovations needed to be conducted at the Four

9  Seasons New York?

10    A.  I want to say mid-year 2021.

11        (Whereupon, an e-mail chain between

12    John Johnson and Elizabeth Ortiz dated 4-28-20

13    and Bates-stamped WarnerDEF007353 was marked as

14    Plaintiffs' Exhibit 7 for identification, as of

15    this date.)

16    Q.  Ms. Ortiz, I'm going to be showing you what

17  we've just marked as Plaintiffs' Exhibit 7 and give

18  you some time to review that.  Does that refresh

19  your recollection as to any renovations that were

20  done prior to 2021 at the Four Seasons New York?

21        MS. LUNDY:  Objection.

22    A.  I'm trying to remember what that was.

23    Q.  So for the record, what I've just marked as

24  Plaintiffs' Exhibit 7, that's Bates-stamped

25  DEF7353.

1     A.   You know, that might have been -- that looks

2   like -- so that looks like the cafeteria, so I

3   think what was happening at the time -- so we

4   didn't have any -- did we have food service?  No,

5   we didn't have any food services, and employees --

6   I don't remember when we closed the cafeteria, but

7   in anticipation of reopening, one of the things

8   that we wanted to do was thinking through -- I

9   think there was this whole six feet apart and

10  partitions, and so, I think the decision was

11  collectively made to, like, rework the cafeteria;

12  and if we were going to rework the cafeteria, then

13  the decision was made to replace the ceiling tiles

14  and replace the floor tiles.  Also, in anticipation

15  of maybe having to change the way we operated a

16  cafeteria, we structurally moved the lines, meaning

17  the service lines; the idea was to move the service

18  lines, that there would be respect given to

19  distance between employees and the seating areas.

20  So in anticipation of reopening, we thought that --

21  you know, the cafeteria, because we would have to.

22  You know, there was that whole thing with the

23  partitions and staying away from people six feet,

24  and so on, so this is -- I'm just trying to see --

25  this employee (indicating), I believe, is one of

1    the carpenters, so that would have been the

2    employee cafeteria.

3        Q.  So you'd agree with me that renovations were

4    done prior to 2021, correct?

5            MS. LUNDY:  Objection.

6        A.  2021?  I don't know if it was renovations;

7    we were just restructuring the cafeteria to make

8    accommodations for what we thought would be the new

9    way of serving food.

10       Q.  Would you agree with me that at the top of

11   the page, it states John Johnson sent you an

12   e-mail; you're Elizabeth Ortiz, correct?

13       A.  To John -- no, I would have sent that.

14       Q.  Oh.  So you sent that to John Johnson,

15   correct?

16       A.  That would have been from -- so this looks

17   like -- who sent this?  Oh, this is just a

18   conversation based on the bottom e-mail: "Say

19   goodbye to the old ceiling!!", and then the chef

20   says great and I said "Nice."

21       Q.  So the old ceiling was replaced, correct?

22           MS. LUNDY:  Objection.

23       A.  Well, yeah, I just said that.  We had

24   decided, because the anticipation was that we would

25   have to adapt a whole new way of food service that

1   when we were doing the restructuring of the

2   cafeteria, we would replace the ceiling tiles and

3   the ceiling -- and/or the floor tiles.  I don't

4   know if it was a renovation; it was a replacement

5   of tiles.

6       Q.  Would you consider the replacement of tiles

7   a renovation?

8           MS. LUNDY:  Objection.

9       A.  No, because we replace tiles all the time.

10      Q.  Okay.  Is the replacement of wallpaper

11  considered a renovation?

12          MS. LUNDY:  Objection.

13      A.  No, I think -- we look at renovation as

14  full-on structural changes, so no, I don't think

15  so.

16      Q.  So --

17      A.  Unless you do it on a high volume, but

18  that's -- in our industry, that would be called a

19  soft good replacement; it's not so much a

20  renovation.  Renovations are structural; like, my

21  understanding of, like, a renovation is when there

22  are structural changes made.

23      Q.  Like moving beams?  Is that what you mean?

24      A.  Correct, or, you know, breaking marble or

25  removing equipment, moving equipment.

1    Q.  So replacement of rugs would not be

2    considered renovation, correct?

3           MS. LUNDY:  Objection.

4    A.  Not -- no, because I think that's carpet

5    replacement, but then -- I mean, I'm not a designer

6    -- my understanding of renovations is when there

7    are structural changes made.  Soft good replacement

8    is carpeting, wallpaper, bookshelves, bedroom sets;

9    that's not a renovation; that's like a soft -- I

10   don't know the term -- soft goods, I think.

11   Q.  So what that hotel is doing now, is that

12   considered renovations?

13          MS. LUNDY:  Objection.

14   A.  Yeah, there are structural changes being

15   made.

16   Q.  Are beams being moved?

17   A.  I don't know specifically.  I know that we

18   are redoing the bathrooms.  I mean, there's

19   significant --  significant changes structurally, I

20   mean, just based on the removing of marble and,

21   like, redoing the bathrooms, so that's my

22   understanding, yes.

23   Q.  So when you remove marble, isn't that the

24   same thing as removing a tile?

25          MS. LUNDY:  Objection.

1      A.  No, but it is a structural change.

2      Q.  How so?

3      A.  It's in the structure.  You have to get

4   jackhammers, you have to remove the walls, you have

5   to remove the concrete, you have to rebuild the

6   space in which it's located, really, is what

7   they've been doing, is breaking apart the space,

8   reinserting the shower pads and then rebuilding --

9   replacing the concrete, replacing the marble,

10  replacing -- making sure that there's no leakage,

11  and then replacing the ceilings.

12     Q.  And how many bathrooms have they done that

13  for?

14          MS. LUNDY:  Objection.

15     A.  I don't know off the top of my head.  I

16  mean, we're almost done with probably the whole

17  hotel; I just don't -- so that would be -- I don't

18  know if they've done all 368 rooms or not.

19     Q.  So you're almost done with the renovations

20  of the whole hotel?

21          MS. LUNDY:  Objection.

22     A.  No, no, just with the -- just that breakage

23  of the marble.

24     Q.  What else is left to do --

25          MS. LUNDY:  Objection.

1    Q.  -- at the hotel related to renovations?

2         MS. LUNDY:  Objection.

3    A.  I don't know specifically.

4    Q.  Who would know that?

5    A.  I don't know.  I mean, it depends on what

6  else we decide to do.  I mean, I don't know.

7         MS. LUNDY:  Do you need a break?

8         THE WITNESS:  Yes, please.

9         (Whereupon, a break was taken at 12:16 p.m.,

10    and the deposition resumed at 12:17 p.m.)

11    Q.  So you were just testifying about bathrooms

12  being done.  Were they all being done at the same

13  time, or were a few bathrooms being done at one

14  time?

15    A.  Well, no, they can't be done -- just not all

16  at the same time.  Floor by floor, I think.  Yeah.

17    Q.  Were all the bathrooms on a particular floor

18  being done at one time?

19    A.  That's my understanding.

20    Q.  Do you walk around the floors to see what's

21  being done?

22    A.  I have.

23    Q.  Because you're the only person left in the

24  building, correct?

25         MS. LUNDY:  Objection.

1      Q.  I'm just kidding.  Do you walk around the

2    floors to see what's being done related to

3    renovations?

4      A.  I just said yes.  Yes.

5      Q.  So you would know whether all the bathrooms

6    are being done at the same time on each floor,

7    correct?

8          MS. LUNDY:  Objection.

9      A.  Not specifically.  I mean, that's not my

10   area of expertise.  I mean, from a

11   People-and-Culture perspective, I check on the work

12   -- on the work -- that the employees are doing,

13   like, what are they doing, but I don't have

14   specific engineering or building knowledge to know

15   specifically, you know, what work has been

16   completed; I know the general idea of what needs to

17   be done.

18     Q.  And is there a director of engineering that

19   supervises the work?

20     A.  No.

21     Q.  Does anybody supervise the work that's being

22   done for the renovations?

23     A.  Yes.  It's a collaborative effort between

24   not so much me, but the Director of Engineering has

25   taken on that role.  The Director of -- sorry --

 1  Security.

 2      Q.  So the Director of Security now supervises

 3  the renovations at the hotel?

 4      A.  Correct.

 5      Q.  And who's that?

 6      A.  Steve Taplan.

 7      Q.  So is it correct to say that there is no

 8  acting General Manager at the hotel, correct?

 9          MS. LUNDY:  Objection.

10      A.  I've answered that before.  No, there isn't.

11      Q.  So I understand there's no General Manager;

12  I'm asking if there's no acting General Manager.

13          MS. LUNDY:  Objection.

14      A.  No, not specifically.

15      Q.  Are you acting as an acting General Manager

16  at this point?

17          MS. LUNDY:  Objection.

18      A.  I am the point of contact for the building

19  in collaboration with the Director of Security.

20      Q.  When you say you're the point of contact --

21      A.  If there are any inquiries --

22      Q.  -- who is contacting you?

23      A.  Whether it's the -- we still have our

24  Ask Four Seasons e-mail open, so whether it's

25  outside entities looking for reservations or

ELIZABETH ORTIZ                                         JOB NO. 568002
APRIL 03, 2023

1   vendors that need entrance into the building or

2   employees that need to come and pick up things from

3   their lockers or things like that, I would be the

4   point of contact, in connection with Steve Taplan.

5       Q.  And when did Steve --

6       A.  Taplan.

7       Q.  -- Taplan, when did he start working for the

8   hotel?

9       A.  I don't know.  He's been there many, many

10  years; I don't know the specific hire date.

11      Q.  Was he there when you were hired to be the

12  Director of People and Culture?

13      A.  Yes.

14      Q.  Do you know what date you became aware that

15  the employees at Four Seasons New York would have

16  to be furloughed?

17          MS. LUNDY:  Objection.  Asked and answered.

18      A.  Yeah, I think I've answered that question

19  several times.

20      Q.  No, those were different questions.  I'm

21  asking you the exact date that you knew that people

22  working at the Four Seasons New York were going to

23  be furloughed.

24          MR. WAGNER:  Objection.

25      A.  I don't remember.

1      Q.   And upon furloughing the employees at the

2    Four Seasons New York, did you know whether there

3    were certain protocol that had to be followed in

4    relation to those furloughs?

5           MS. LUNDY:   Objection to the extent that the

6        question seeks privileged information under the

7        advice of Counsel; Ms. Ortiz can otherwise

8        answer.

9      A.   I would imagine.  Yes.

10     Q.   And what were those protocols that you have

11   to follow?

12          MS. LUNDY:   Same objection.

13     A.   So we have a Collective Bargaining

14   Agreement, and under the Collective Bargaining

15   Agreement, there's notice that needs to be made

16   under the provisions given, and we really didn't

17   know at the time whether or not the provisions of

18   the WARN Act applied, but we proceeded to -- that

19   was at the advice of Counsel that we prepared for

20   distribution, but the distribution -- because we

21   were so unsure as to what was happening at the

22   time, the distribution probably wasn't specific; I

23   mean, there was no 60-day advance notice; I mean,

24   we didn't have -- it was just impossible, but it

25   wasn't just us; it was, like, every other business

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

```
 1   entity in the City that was in that same position.
 2        MS. LUNDY:  Ms. Ortiz, please be mindful of
 3     your testimony, not sharing guidance provided by
 4     Counsel.
 5        THE WITNESS:  Okay.
 6     Q.  So Ms. Ortiz, you mentioned a Collective
 7   Bargaining Agreement in relation to the furloughs.
 8   Can you explain how that the Collective Bargaining
 9   Agreement related to the furloughs?
10     A.  Well, it's a provision of the Collective
11   Bargaining Agreement that you give advance notice
12   to any reduction in workforce.  Whether it's a
13   full-schedule layoff or if it's a reduced workweek,
14   you have to provide one week's notice.
15     Q.  Did the Four Seasons New York provide one
16   week's notice to the employees that were furloughed
17   under the Collective Bargaining Agreement?
18        MS. LUNDY:  Objection.
19     A.  No.  We couldn't have.  I mean, everything
20   was so immediate; it was like from one day to the
21   next; it's like you're open, you're not open,
22   closed.
23     Q.  And do you remember what date that was where
24   the union employees were placed on furlough?
25     A.  The last day of operation was March 20th.
```

ELIZABETH ORTIZ                                                JOB NO. 568002
APRIL 03, 2023

1    When anyone was placed on furlough, I mean, it

2    would have been around that same time, because we

3    didn't provide a week's notice as per the

4    Collective Bargaining Agreement; I think we paid

5    out that following week's schedule in lieu of

6    notice.

7         Q.  When you say you paid out the following

8    week's schedule, what does that mean?

9         A.  Well, under the Collective Bargaining

10   Agreement, we didn't have the -- we didn't have the

11   -- luxury of providing advance notice, so as a --

12   to do the right thing and to also abide by the

13   Collective Bargaining Agreement, anybody that was

14   scheduled to work that following week -- so it

15   might have been the 20th, 21st, 22nd, the week

16   beginning -- well, our workweek begins on

17   Saturdays, so that would have been the schedule

18   beginning March 21st, and again, that was -- that

19   wasn't a decision we made to furlough; that was

20   based on the fact that we were instructed --

21   mandated -- by the State to close.  I want to

22   clarify.  We didn't make that decision; we were

23   instructed to shut down the entity.  And this goes

24   back to what I said before:  it's a logical

25   business progression that if you're not generating

1   revenue, you have to reduce cost.

2       Q.  So is it your testimony that the union

3   employees were paid for a week of work for a week

4   they actually didn't work?

5           MS. LUNDY:  Objection.

6       A.  Yeah, but that's industry practice in the --

7   if -- typically, and -- yeah.  Yes.

8       Q.  And were they paid for a week of work based

9   on the Collective Bargaining Agreement --

10          MS. LUNDY:  Objection.

11      Q.  -- or some other reason?

12      A.  It's an industry practice.  If you don't

13  provide advance notice for any schedule changes,

14  it's typically the right thing to do.  I don't know

15  under what -- I mean, it was just such a crazy

16  time; you wanted to do the right thing; it's like

17  everybody was in shock.

18      Q.  Ms. Ortiz, was that also provided to

19  nonunion employees that were not part of the

20  Collective Bargaining Agreement?

21          MS. LUNDY:  Objection.

22      A.  We did everything that we could at that time

23  to ensure people had some kind of income.  I would

24  say yes for that following week; if there was

25  anybody that was laid off, even nonunion, I would

ELIZABETH ORTIZ                                           JOB NO. 568002
APRIL 03, 2023

1    -- I don't remember -- I don't remember, but I

2    would say, like, wanting to do the right thing at

3    that time, anybody that was given such short

4    notice, we would have -- we would have -- paid out

5    that following week's schedule.

6        Q.   But do you know whether the following week's

7    schedule was paid out for nonunion employees?

8            MS. LUNDY:   Objection.

9        A.   I don't recall at this moment.

10       Q.   Do you have some sort of documents that

11   would show whether that was done?

12           MS. LUNDY:   Objection.

13       A.   Payroll.

14           MS. RISMAN:   We would request payroll for

15       that following week for nonunion employees.

16           MS. LUNDY:   Please follow up in writing, and

17       we'll take it under advisement.

18       Q.   And you mentioned that you were aware that

19   you had to provide notice to the furloughed

20   employees under the WARN Act, correct?

21           MS. LUNDY:   Objection.

22       A.   At some point, yes.

23       Q.   When did you provide the WARN notice to the

24   furloughed employees?

25           MS. LUNDY:   Objection.

1    A.  I don't remember.  What ended up happening

2  is, we closed, we gave verbal notice of layoff, and

3  then, we reopened, and there was a lot -- I know

4  that it's not just our business entity; I know a

5  lot of operations -- and I know we're not talking

6  about other operations, but it wasn't just us; it

7  was just at that time, there were so many different

8  things going on for us, it was, like, "Are we going

9  to reopen?  If we're going to reopen, then we don't

10  want to lay off the staff, and if we're not going

11  to lay off the staff, then we don't need to issue

12  the WARN letters until" -- I don't know, I don't

13  remember.  But there was definitely a period of

14  time where we were -- I mean, everything was very

15  uncertain, and I don't recall when we made the

16  decision to issue the letters to the larger -- when

17  I say the "larger group," those nonessential

18  workers that we knew would not be recalled,

19  although -- well, let me just stop there.

20    Q.  Okay.  You had testified that you reopened.

21  What do you mean that the hotel reopened?

22    A.  Well, we've been talking about it, of when

23  we reopened to the medical community.

24    Q.  I just wanted to make sure that that's what

25  you were talking about.

1      A.  Yes.

2      Q.  So when you said you reopened, you're

3   talking about reopening to the medical community,

4   correct?

5      A.  Yes.

6      Q.  And then, after you closed to the medical

7   community, you would agree with me that the Four

8   Seasons New York never reopened again, correct?

9          MS. LUNDY:  Objection.

10     A.  We've never been closed; we're just not open

11   to guests.  We're still open.

12     Q.  You'd agree the hotel's not open for

13   business?

14         MS. LUNDY:  Objection.

15     A.  We are not open for business?  That's

16   correct.

17         MS. LUNDY:  Can we break here?  It's 12:30.

18     Q.  Just one more question.  So you had said

19   that it was industry practice to pay the employees

20   one week's salary, correct?

21         MS. LUNDY:  Objection.  Go ahead.  I think

22      that it was characterized as union employees.

23     Q.  So -- okay.  I'll ask a different question.

24   You said it was industry practice to pay, I

25   thought, everybody one week's salary; is that not

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

1  correct?

2     A.   Within the union, if you're not providing

3  advanced notice of the schedule, industry practice

4  is to at least provide a week's worth of pay in

5  lieu of notice.  At the time, and I think I said, I

6  don't recall; knowing myself and wanting to do the

7  right thing, I would have wanted to ensure that we

8  paid everyone a week's worth notice, and I'm

9  thinking that we did, but I don't remember.

10     Q.   And who approved that pay?

11     A.   It would have been a collaborative approval.

12     Q.   Is there a final decisionmaker that approves

13  pay like what you're describing?

14          MS. LUNDY:  Objection.

15     A.   No.  It would be amongst the Executive

16  Committee.  Do we need to -- I mean, under the

17  Collective Bargaining Agreement, I don't know that

18  there's much of a decision to be made; I mean, it's

19  just industry practice that that's what you do.

20     Q.   Ms. Ortiz, when it comes to nonunion

21  employees, who would have been the final

22  decisionmaker to approve a week's worth of salary?

23     A.   We would have, just like we did for, like,

24  continuing their benefits and everything else.  I

25  mean, we made the effort to do the right thing, so

1  collectively, it would have been a collective

2  agreement amongst the executive leadership of the

3  hotel, which included the General Manager, myself,

4  Director of Finance, Director of Sales and

5  Marketing, Director of Engineering, Director of

6  Rooms, and Director of Food and Beverage.

7      Q.  Thank you.

8          MS. RISMAN:  We can break now.

9          (Whereupon, a lunch break was taken at

10     12:34 p.m., and the deposition resumed at

11     1:27 p.m.)

12         (Whereupon, the requested portion of the

13     record was read back.)

14     Q.  Ms. Ortiz, would you agree with me that

15  payment of that type of salary would require

16  Ownership approval?

17     A.  You know, there's a threshold with the -- I

18  don't know.  I don't know.

19     Q.  Okay.

20         MS. RISMAN:  This is Plaintiffs' 8

21     (indicating).

22         (Whereupon, an e-mail chain dated 6-1-20 and

23     Bates-stamped WarnerDEF000899 was marked as

24     Plaintiffs' Exhibit 8 for identification, as of

25     this date.)

1  Q.  So, Ms. Ortiz, focusing your attention to

2  Plaintiffs' 8, which is Bates-stamped WarnerDEF899,

3  have you ever seen that e-mail exchange?

4  A.  I mean, I wrote it.  I don't remember

5  specifically writing it, but it's got my name and

6  my e-mail address, so -- I remember the discussion

7  regarding this; I don't remember this specifically,

8  but I do remember the discussion around these --

9  the head count.

10  Q.  So focusing your attention on what's been

11  marked as Plaintiffs' Exhibit 8, would you agree

12  with me that it states there that severance pay

13  does require Ownership approval?  And that's in the

14  first part of the document on the top; it says,

15  "Dear Cathy, Please see below e-mail," and then,

16  the second sentence says, "Rick will be sending a

17  list of employees/positions, under separate cover,

18  that qualify for severance pay and which require

19  ownership approval." Do you see that?

20  A.  Okay.  I do.

21  Q.  So would you agree with me that severance

22  pay doesn't require Ownership approval?

23      MS. LUNDY:  Objection.

24  A.  I mean, that's what that says.  I don't know

25  what he meant by that, but I think that -- I think

1  it would depend on the circumstances; certainly,

2  that's what that says, but I assume that's what we

3  meant; I don't know specifically if that's what he

4  meant.

5     Q.  So in -- on June 1st, 2020, do you believe

6  that Ownership was -- Ownership approval was

7  required for severance pay?

8        MS. LUNDY:  Objection.

9     A.  I can only confirm that that's what that

10 says; I don't know specifically.

11    Q.  What is your knowledge about the severance

12 that was given out at or about June of 2020 to

13 employees working at Four Seasons New York?

14       MS. LUNDY:  Objection.

15    A.  I don't think we paid any severance in June

16 of 2020.

17    Q.  And would you know whether or not Hotel 57

18 Services, LLC paid any severance at that time?

19    A.  I would need to -- I would need to go back

20 and look, but I don't believe so.  I could be

21 wrong.

22    Q.  So focusing your attention to the bottom

23 portion of that document, it says, "Rudy, Please

24 see attached as discussed.  As discussed:

25 Currently, there are 398 employees on lay-off, 57

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1  employees on a reduced work work and 79 employees

2  currently working." Do you see that?

3      A.  I do.

4      Q.  Do you know that statement to be true and

5  accurate?

6          MS. LUNDY:  Objection.

7      A.  It would have been through a head count at

8  the time I wrote it, and I'm in charge of the head

9  count, so I would say that's pretty accurate.

10     Q.  And the 57 employees on the reduced

11 workweek, were those nonunion employees?

12     A.  I don't remember.

13     Q.  Who would know that?

14     A.  I would have to look, but I don't remember.

15     Q.  Where would you look?

16     A.  Probably schedules.

17     Q.  And what type of schedules in particular?

18     A.  Just the employees' schedules whether or not

19 they were put on layoff or not or payroll.

20     Q.  And if they were put on layoff, would that

21 also show reduced work schedules?

22     A.  Yes.

23     Q.  And you kept records of that when they were

24 given a reduced work schedule?

25     A.  Yes.

```
 1          MS. LUNDY:  Objection.
 2     Q.  And so, you'd agree with me that the e-mail
 3   exchange was with Cathy Hwang, correct?
 4     A.  Yes.  It looks that way.  Yes.
 5     Q.  And do you see Cathy Hwang's e-mail address?
 6     A.  I do.
 7     Q.  And what is that?
 8     A.  Chwang@tymail.com.
 9     Q.  Do you know what tymail.com is?
10     A.  No.
11     Q.  Did you ever question what that e-mail was?
12     A.  No.
13          MS. LUNDY:  Objection.
14     Q.  And is that always the e-mail that
15   Ms. Cathy Hwang uses when she corresponds in
16   e-mails with you?
17          MS. LUNDY:  Objection.
18     A.  I don't know; I don't pay attention to it.
19     Q.  Now I'm going to be showing you what's
20   marked as Plaintiffs' Exhibit 9.
21          (Whereupon, a two-page e-mail chain
22     Bates-stamped WarnerDEF000917 through
23     WarnerDEF000918 was marked as Plaintiffs'
24     Exhibit 9 for identification, as of this date.)
25     Q.  Ms. Ortiz, I'm going to be showing you
```

ELIZABETH ORTIZ                                      JOB NO. 568002
APRIL 03, 2023

 1  what's just been marked as Plaintiffs' 9, and you'd

 2  agree with me that that's an e-mail exchange

 3  between you and Mr. Rudy Tauscher, correct?

 4       MS. LUNDY:  Objection.

 5    Q.  That is also an e-mail exchange between

 6  Cathy Hwang and Rudy Tauscher --

 7       MS. LUNDY:  Objection.

 8    Q.  -- and other recipients.  Do you see that?

 9  Ms. Ortiz, do you see the e-mail exchange?

10    A.  Yeah, I'm looking at it.

11    Q.  So focusing your attention to what's just

12  been marked as Plaintiffs' Exhibit 9 WarnerDEF917

13  and 918, so focusing your attention to the bottom

14  of the first page, Page 917, it says, "Regards,

15  Cathy," and then, it says, "Cathy Hwang VP of

16  Finance." Do you see that?

17    A.  I do.

18    Q.  It then says, "Ty Warner Hotels and

19  Resorts." Do you see that?

20    A.  Uh-huh.

21    Q.  Does that refresh your recollection as to

22  whether or not Ms. Cathy Hwang is employed by

23  Ty Warner Hotels & Resorts?

24       MS. LUNDY:  Objection.

25    A.  That's her signature.  I don't know what

1  entity she's employed by, but that's her signature.

2      Q.  And did you know that she was VP of Finance

3  at Ty Warner Hotels & Resorts?

4      A.  I don't know that I knew her exact title

5  ever.

6      Q.  As you currently sit here today, do you know

7  what Ms. Cathy Hwang's title is?

8          MS. LUNDY:  Objection.

9      A.  Well, I am looking at it now; it's VP of

10  Finance.

11      Q.  And it's VP of Finance with Ty Warner Hotels

12  & Resorts, correct?

13          MS. LUNDY:  Objection.

14      A.  That's her signature.

15      Q.  My question to you, again, is, as you sit

16  here today, do you know what Ms. Cathy Hwang's

17  title is?

18          MS. LUNDY:  Objection.

19      A.  I know what her signature says; I don't know

20  what else she does, but it's safe to say that her

21  signature line says she's the VP of Finance, so I

22  would -- it stands to reason that her title is the

23  Vice President of Finance, based on her signature.

24      Q.  Do you know if Ms. Cathy Hwang is also a VP

25  of Finance of Hotel 57 Services, LLC?

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1      A.  I don't.

2      Q.  Do you know if she has any other title with

3    any other entity other than the VP of Finance with

4    Ty Warner Hotels & Resorts?

5      A.  I do not.

6      Q.  So focusing your attention to Plaintiffs' 9,

7    the very top of the e-mail is an e-mail from

8    Rudy Tauscher to you, and it says, "Please see

9    below note from Cathy Hwang.  TWHR.  I need to

10   respond and need your input." Do you see that?

11     A.  Okay.  I do.

12     Q.  Do you ever recall speaking to Mr. Tauscher

13   as to how he should respond to Ms. Cathy Hwang's

14   e-mail?

15     A.  We must have spoken about it if we're --

16   but, see, this was in March.  I think everything

17   was so uncertain at the time; I don't -- I don't

18   know.  I mean, there were multiple discussions

19   surrounding this, but it was so uncertain, and I

20   think that, you know, like anything else, it's,

21   like, well, there are a lot of what-if scenarios,

22   and this was one of those what-ifs; like, if we

23   close, what are we going to be responsible for as

24   far as pay and notices, but I -- you know.

25     Q.  So focusing your attention to the bottom of

1  the e-mail on Page 917, it states there, "TWHR

2  agree with the temporary discontinuance of taking

3  guests and scaling down the operations per your

4  e-mail." Do you see that?

5      A.  Wait.  Where are you reading?

6      Q.  So the bottom of the e-mail of Plaintiffs' 9

7  of WarnerDEF917, which is the first page of the

8  document.  Do you see -- it states, "Dear Rudy,

9  TWHR agree with the temporary discontinuance of

10  taking guests and scaling down the operations per

11  your e-mail." Do you see that?

12      A.  I do.

13      Q.  So would that refresh your recollection that

14  by March 18th, 2020, a decision was made to scale

15  down operations of taking guests?

16      A.  So yeah, that would have been because of the

17  mandate -- the State mandate -- to shut down any

18  essential [sic] operations, but yes.

19      Q.  So your answer is yes?

20          MS. RISMAN:  Can you read back the question,

21      please?

22          (Whereupon, the requested portion of the

23      record was read back.)

24      Q.  So let me try again.  So, Ms. Ortiz, would

25  you agree with me that based on this e-mail, it is

1  apparent that by March 18th, there was discussion

2  about scaling down hotel operations and furloughing

3  employees, correct?

4        MS. LUNDY:  Objection.

5     A.  We were moving in that direction.  Yes.

6     Q.  And you'd further agree that according to

7  this e-mail, Ms. Hwang asked Mr. Tauscher "...what

8  type of notices and packages/benefits both union

9  and nonunion employees [would] be receiving,"

10  correct?

11        MS. LUNDY:  Objection.

12     A.  Yes.  They would -- yes.

13     Q.  And prior to the break, we were discussing

14  the type of notices that both nonunion employees

15  and union employees would be receiving that were

16  being placed on furlough, correct?

17        MS. LUNDY:  Objection.

18     Q.  I'm going to withdraw that.  Ms. Ortiz, at

19  some point, the nonunion employees were receiving

20  notices that were placed on furlough, correct?

21     A.  The nonunion --

22        MS. LUNDY:  Just think to yourself.

23     A.  At that time, we were uncertain which job

24  titles, which individuals would be needed to

25  maintain whatever we were doing at the time.  I

1    can't answer that question.

2       Q.  So are you saying that on March 18th, you

3    did not know which employees would be furloughed?

4          MS. LUNDY:  Objection.

5       A.  I am certain that -- I am certain -- I'm

6    almost sure that the nonessential divisions,

7    predominantly Food and Beverage, were told that we

8    would be shutting down those operations, because it

9    was mandated by the Governor.  As far as any other

10   position was concerned, I don't believe we knew at

11   that particular time what we were going to need and

12   what we weren't going to need.

13      Q.  But by March 21st, 2020, would you agree

14   with me that the decision to furlough both the

15   nonunion employees and the union employees was

16   already made?

17         MS. LUNDY:  Objection.

18      A.  I'm not sure that the decision was made on

19   all of them.

20      Q.  So when was the decision made to furlough

21   most of the employees that worked for Four Seasons

22   New York?

23         MS. LUNDY:  Objection.

24      A.  Well, I think if you look at the

25   nonessential divisions, it would have been -- those

1   would have been first -- they came in phases -- and

2   I don't know that there was ever, once and for all,

3   a final decision to say -- I mean, because every

4   month, we're, like, "Okay, we're going to delay it

5   for another whatever, another month." I don't know

6   that there was ever a once-and-for-all final

7   decision that everybody is going to get furloughed

8   at this point; it was sporadic, starting with the

9   nonessential divisions, first of all; that, I'm

10  sure; and then, as far as the rest of the divisions

11  and the rest of the employees, that didn't happen

12  but for phases, and I don't recall all the

13  different dates.

14      Q.  Okay.  So what was the first division that

15  was furloughed?

16          MS. LUNDY:  Objection.

17      A.  I think I answered that:  it was Food and

18  Beverage, because it's a nonessential department.

19      Q.  And so, what was the second division that

20  was furloughed?

21      A.  I don't remember, and it was all sporadic.

22      Q.  When you say "it was all sporadic," does

23  that mean that most employees were not furloughed

24  in March of 2020?

25          MS. LUNDY:  Objection.

1    A.  No.  I just think that none of us knew -- I

2    mean, all of us thought we were going to be open in

3    a couple of weeks, right, so we -- based on the

4    Governor's mandate, Food and Beverage was shut down

5    because that was, like, identified as the highest

6    contaminating area -- I don't remember; it was just

7    something about Food and Beverage was not safe; and

8    I don't recall after that. "Sporadic" meaning --

9    and I think I've said this before, is -- like,

10   obviously, if we're not generating revenue, you do

11   have to scale down on costs, but I don't remember

12   specifically when and how we did it all at once.  I

13   mean, there were people -- I mean, there's still

14   people in the building, but there have been people

15   in the building this whole time period.

16       Q.  Okay.

17           (Whereupon, an e-mail from Mr. Tauscher to

18       Peter Ward dated 3-26-20, along with a list of

19       employees, their addresses, and their job

20       titles, Bates-stamped WarnerDEF001127 through

21       WarnerDEF001146, was marked as Plaintiffs'

22       Exhibit 10 for identification, as of this date.)

23       Q.  Ms. Ortiz, I'm going to be showing you

24   what's just been marked as Plaintiffs' 10.

25       A.  Yes.

1    Q.  According to this letter sent by First Class

2  Mail, dated March 26th, 2020, it states that "This

3  is to inform you that due to unforeseen business

4  circumstances and major economic downturn stemming

5  from the COVID-19 virus pandemic and consequent

6  travel and tourism disruptions outside of the

7  employer's control (as well as the mandatory

8  closures of bars and restaurant[s] causing the

9  expedited time frame for issuing of this notice,

10  the (Company), will temporarily layoff employees on

11  3/26/20 for approximately 1 month." Do you see

12  that?

13    A.  Yes.

14    Q.  Did you ever see this document before

15  testifying today?

16    A.  Yes.

17    Q.  And did you review this document prior to

18  testifying?

19    A.  I would have at some point; I don't remember

20  when.

21    Q.  Did you provide this document to be used in

22  this litigation as per the Discovery search that

23  you did?

24        MS. LUNDY:  Objection.

25    A.  Either I did or -- I think I did.  Yes.

1    Q.  Okay.  So the second sentence of this letter

2  written to Mr. Ward, Bates-stamped WarnerDEF1127,

3  states, "Approximately 372 employees will be laid

4  off and bumping rights do not exist in connection

5  with the layoff." Do you see that?

6    A.  I do.

7    Q.  Was the WARN notice to the union based on

8  the furlough of these union members on March --

9  withdrawn.

10        Was this the WARN notice that Hotel 57

11  Services, LLC sent to Peter Ward, President of

12  New York Hotel & Motel Trades Council in compliance

13  with the WARN Act?

14        MS. LUNDY:  Objection.

15    A.  I would -- I would assume yes, but I don't

16  remember when exactly, because also, at that same

17  time, we were now debating if we were going to

18  reopen for the medical community, and I don't

19  remember.

20        MS. RISMAN:  So for the record, we demand

21     production of any WARN notices that would be

22     provided in this case for the nonunion

23     employees; this is what we received.  So if

24     Ms. Ortiz does not recall, we will be seeking a

25     witness who does know when WARN notices were

1    sent.

2         MS. LUNDY:  By Counsel, Ms. Elizabeth Ortiz

3    is appearing by a Notice of Deposition to appear

4    today in her personal capacity as the Director

5    of People and Culture; she's testifying based

6    upon that personal knowledge.  The WARN

7    Defendants have produced the union WARN notices.

8    If Counsel would like to follow up in writing

9    for further clarification in that regard, we

10   will respond in writing.  Thank you.

11   Q.  So, Ms. Ortiz, focusing your attention to

12   what's just been marked as Plaintiffs' 10 -- and

13   there are a bunch of names attached to it in

14   Attachment B.  Do you see that?

15   A.  I do.

16   Q.  Did you draft Attachment B?

17   A.  I did not.

18   Q.  Who drafted Attachment B?

19   A.  That would have been done by somebody in my

20   office.

21   Q.  Would that be done under your supervision?

22   A.  Yes.

23   Q.  Do you know if Attachment B was sent over to

24   Mr. Peter Ward, President of the New York Hotel &

25   Motel Trades Council, AFL-CIO?

```
 1      A.  That's my understanding.
 2      Q.  Do you have any reason to believe that this
 3   letter Bates-stamped WarnerDEF1127 was not sent to
 4   Peter Ward, President of New York Hotel & Motel
 5   Trades Council AFL-CIO?
 6      A.  I don't.
 7      Q.  Now, did the Four Seasons New York also send
 8   letters over to government entities?
 9          MS. LUNDY:  Could you repeat the question,
10      please?
11          (Whereupon, the requested portion of the
12      record was read back.)
13      A.  Can you be more specific?
14      Q.  So did the Four Seasons New York also send
15   letters to government entities that included
16   affected union and nonunion employees?
17          MS. LUNDY:  Objection.
18      A.  I don't remember, but I do know that
19   whatever we sent would have been in line with the
20   requirements.
21      Q.  Okay.  And who drafted the letters that were
22   in line with the requirements?
23          MS. LUNDY:  Objection to the extent that
24      question calls for privileged communications.
25      Ms. Ortiz, you may answer.
```

1    A.  This would have been done with the guidance

2  of Counsel.

3    Q.  But did you draft the letters or somebody in

4  your office draft the letters?

5       MS. LUNDY:  Objection.

6    A.  Well, I'm not sure -- I'm not sure what the

7  specific question is.  Like, I didn't write this

8  specifically; it would have been written based on

9  what was provided to us by Counsel.

10      MS. RISMAN:  Plaintiffs' Exhibit 11.

11      (Whereupon, a letter from Hazel Hazard dated

12      3-24-20 and Bates-stamped WarnerDEF000922

13      through WarnerDEF000924 was marked as

14      Plaintiffs' Exhibit 11 for identification, as of

15      this date.)

16   Q.  Ms. Ortiz, I'm going to be showing you what

17  we've just marked as Plaintiffs' Exhibit 11, which

18  is Bates-stamped WarnerDEF922 and 923.  Do you see

19  that?

20   A.  Yes, I do.

21   Q.  And the second page of the document has your

22  signature line, correct?

23   A.  Yes, it does.

24   Q.  And the top of the page of 922 states the

25  date March 24th, 2020, correct?

1      A.  Yes, it does.

2      Q.  And so, is that when you started drafting

3  the WARN notices to the union employees?

4          MS. LUNDY:  Objection.

5      A.  I don't remember.

6      Q.  Okay.  And according to this draft, the

7  first paragraph of the draft, the second-to-last

8  line states -- oh, it's the -- withdrawn.

9          The first paragraph of this draft states,

10  "Please accept this letter as notification on

11  behalf of Four Seasons Hotel New York that due to

12  the unforeseeable, unanticipated and substantial

13  reduction in business levels resulting from the

14  sudden and widespread impact of an infectious

15  disease pandemic known as the Coronavirus...2019

16  ("COVID-19"), employment at Four Seasons Hotel

17  New York, located at 57 East 57th Street, New York,

18  New York 10022, will be laid off starting on

19  March 21st, 2020," and it states, "Four Seasons

20  Hotel New York will be closed for business for the

21  foreseeable future." Do you see that?

22      A.  I do.

23      Q.  Is this the language that was used in the

24  WARN notices that were sent to governmental

25  agencies?

1          MS. LUNDY:  Objection.

2     A.  I don't remember, but this looks like a form

3   letter that was never sent, so I think this was

4   just a draft.  I don't remember.  You should have

5   copies of the -- no, this is a draft, and I don't

6   think this was the specific language, but I don't

7   remember.

8     Q.  Did you provide these drafts to the person

9   that drafted the WARN notices for the employees

10  that worked at the Four Seasons New York?

11         MS. LUNDY:  Objection.

12    A.  Yes, I would have.

13    Q.  And when was the WARN notice sent to the

14  Mayor's office from the Four Seasons New York?

15    A.  I don't remember.

16    Q.  Who would know that?

17    A.  Well, I would; I just don't remember.

18         MS. RISMAN:  We call for the production of

19     the WARN notice sent to the Mayor's office.

20    A.  You should have that.

21         MS. LUNDY:  We ask that you follow up in

22     writing, and we'll respond.  Thank you.

23    Q.  Ms. Ortiz, did you send a WARN notice to

24  somebody named -- somebody named -- Barbara Chang?

25         MS. LUNDY:  Objection.

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

```
 1      A.  The name doesn't sound familiar at this

 2   moment.

 3      Q.  Do you know who Barbara Chang is?

 4          MS. LUNDY:  Objection.

 5      A.  The name doesn't sound familiar at this

 6   moment.

 7          MS. RISMAN:  Plaintiffs' Exhibit 12.

 8          (Whereupon, a letter to Barbara Chang and

 9      Reynold Graham by Rudy Tauscher dated 3-26-20,

10      along with a list of job titles and employees,

11      Bates-stamped WarnerDEF001104 through

12      WarnerDEF001106, was marked as Plaintiffs'

13      Exhibit 12 for identification, as of this date.)

14      Q.  So focusing your attention to what's just

15   been marked as Plaintiffs' 12, have you ever seen

16   this document before?

17      A.  Well, this is the Workforce Department of

18   Labor.  The name isn't familiar, but yes.

19      Q.  And did you help draft this document?

20          MS. LUNDY:  Objection.

21      A.  This would have come from Counsel.

22      Q.  The document's signed by Rudy Tauscher,

23   correct?

24      A.  Uh-huh.  Yes.  Sorry.

25      Q.  Would you agree with me that in the first
```

 1  paragraph, last sentence of the document, it

 2  states, "Approximately 372 employees will be laid

 3  off and approximately 372 employees are represented

 4  by a labor organization, the New York Hotel & Motel

 5  Trades Council, AFL-CIO.  The local and national

 6  labor organizations may be contacted at the

 7  following addresses." Do you see that?

 8      A.  Yes.

 9      Q.  Is this statement true and accurate, that

10  approximately 372 employees were laid off prior to

11  March 26th, 2020?

12      A.  Not prior to.  Again, it was sporadic; it

13  was not all at once.

14      Q.  But by March 26th, 2020, were approximately

15  372 employees laid off?

16      A.  I don't remember, but the number sounds

17  right.

18      Q.  And you'd agree with me that that's the same

19  number that was in Plaintiffs' 10?  Let me just see

20  where that is.

21      A.  That's the same number.

22      Q.  Okay.  Ms. Ortiz, do you know if this notice

23  was sent out on March 26th, 2020 to Barbara Chang

24  and Reynold Graham?

25      A.  So at my direction, this would have been

1  sent out at that time.

2      Q.   So was it sent out on March 26th, 2020?

3      A.   That's my understanding.

4      Q.   Okay.  Is there any reason that you did not

5  send this letter out earlier?

6          MS. LUNDY:  Objection.

7      A.   Again, going back to the mass confusion at

8  the time, I don't think any of us knew what was

9  going on.  I don't know.

10     Q.   Is it your understanding that this could

11  have been sent out earlier than March 26th, 2020?

12         MS. LUNDY:  Objection to the extent it calls

13     for privileged communication.  Ms. Ortiz may

14     answer to the extent it's not privileged.

15     A.   You know, I don't think so.  I think we were

16  all doing the very best we could under the

17  circumstances at the time, and, you know, trying to

18  stay in line with what we were required to do, what

19  we had to do, and what was necessary; we did the

20  very best we could at the time, and I don't think

21  that there's any reason except that we were just

22  doing what we could at the time.

23     Q.   And what we just discussed were the WARN

24  notices sent to the nonunion employees, correct?

25         MS. LUNDY:  Objection.

1    Q.  Withdrawn.  I'm sorry.  The notices that we

2    just discussed sent to -- sent to -- Barbara Chang

3    and Reynold Graham were sent on behalf of the union

4    employees, correct?

5         MS. LUNDY:  Objection.

6    A.  I'm not sure what they were sent on behalf

7    of.  I know that we were required to send notice to

8    the New York City Office for Workforce Development,

9    the division of the Department of Labor.

10   Q.  And you were also obligated to send a WARN

11   notice for the union employees to Peter Ward,

12   President of AFL-CIO, correct?

13        MS. LUNDY:  Objection.

14   A.  Correct.

15   Q.  And you were also supposed to give WARN

16   notices to nonunion employees, correct?

17        MS. LUNDY:  Objection to the extent it calls

18        for privileged communication.  Ms. Ortiz is

19        directed not to answer, but may, to the

20        extent --

21   Q.  So, Ms. Ortiz, I'm going to tell you again.

22   I am never asking you for privileged information,

23   so that's not what my question entails; everything

24   that I ask of you is for non-privileged

25   information.  Okay?

1    A.  Understood.

2    Q.  Ms. Ortiz, was Four Seasons New York

3  required to also send WARN notices to nonunion

4  employees?

5        MS. LUNDY:  Objection.

6    A.  So under the WARN Act, we are required to

7  notify all employees of any intent of -- an intent

8  for -- a closure, union or nonunion; the

9  requirement is for a mass layoff.

10        (Whereupon, a discussion was held off the

11    record.)

12        (Whereupon, an e-mail chain dated 8-7-20 and

13    Bates-stamped WarnerDEF000935 was marked as

14    Plaintiffs' Exhibit 13 for identification, as of

15    this date.)

16    Q.  So, Ms. Ortiz, before we start here, I just

17  want to clarify that I didn't make any statement

18  relating to looking at your phone, but technically,

19  when you're under oath, you shouldn't be looking at

20  any of your electronic devices.  I usually -- I

21  don't know if you were looking at your phone or

22  not, but just in case --

23    A.  There was a notification that I had gotten.

24  My apologies.

25    Q.  No, that's okay.  Ms. Ortiz, focusing your

1  attention to Plaintiffs' 13, Bates-stamped

2  WarnerDEF935, you'd agree with me this is an e-mail

3  between Rick Kaminskas, Alexandra Erbiti, and you,

4  correct?

5       MS. LUNDY:  Objection.

6    A.  It's predominantly between Alex and Rick,

7  and then, Alex asks me a question -- or it's an

8  FYI, "not sure what he needs this for."

9    Q.  So, Ms. Ortiz, the very top of it states,

10  "FYI - [I'm] not sure what he needs this for." Did

11  you ever discuss with Alexandra Erbiti what

12  Rick Kaminskas needed this information for?

13    A.  I'm sure we did.  I mean, I vaguely remember

14  a conversation about this.

15    Q.  And this e-mail is dated August 7th, 2020,

16  correct?

17    A.  Yes.

18    Q.  And in the e-mail, it states, "Can you send

19  me a copy of the warn letter that you are sending

20  out?  No names but just the dates that will be on

21  the letter.  Thanks." Do you see that?  And that's

22  the e-mail from Rick Kaminskas on the very bottom?

23    A.  Yes, I do.

24    Q.  And then, Ms. Alexandra Erbiti responds to

25  that, stating, "Hello, So each letter has the

1  individual's layoff letter specific to them.  I

2  have a tracking sheet with everyone's layoff date,

3  do you prefer that document?" Do you see that?

4      A.  I do.

5      Q.  And then, he then responds again and says,

6  "No, just a sample but tell me how you calculate

7  the dates that would be in the letter." Do you see

8  that?

9      A.  Yes.

10      Q.  And then, Ms. Erbiti responds again and

11  states, "Attached is a copy of the WARN letter,

12  same as union without bumping rights.  We

13  calculated their layoff date according to HEATH,

14  Workday, and ADP's last day of work.  We also

15  double checked with their division head and/or

16  manager to make sure those dates seemed accurate."

17  Do you see that?

18      A.  I do.

19      Q.  And did Ms. Erbiti also check with you to

20  make sure the dates on the WARN notices to the

21  nonunion employees were accurate?

22      A.  I don't recall specifically, but we would

23  have had a conversation about the specific letters.

24      Q.  And do you know if the dates contained on

25  the nonunion WARN notices were calculated based on

1   the last day they worked or when there was a

2   reduction in salary that was more than 50 percent

3   of the employees' salary?

4       MS. LUNDY:  Objection.

5    A.  I'm not sure I understand the question.

6    Q.  What is the date that was used in the

7   furlough notices for the nonunion employees as

8   their last day worked?

9       MS. LUNDY:  Objection.

10   A.  It would have been their last day worked.

11   Q.  Would that be the last day that they were on

12  the hotel premises?

13   A.  I would assume so.

14   Q.  And if that particular employee had their

15  salary reduced by more than 50 percent but was

16  still working for the Four Seasons New York, would

17  you still be using the last day that work was done?

18       MS. LUNDY:  Objection.

19   A.  It's an interesting question.  Can you

20  rephrase that question?

21   Q.  Sure.  So in the WARN notices for the

22  nonunion employees, was the date listed on the

23  letter as the last day worked the date that that

24  particular employee last worked for the Four

25  Seasons New York or the date when their salary was

1   reduced to more than 50 percent of their usual

2   salary?

3            MS. LUNDY:  Objection.

4       A.  I don't remember.  I don't remember.

5       Q.  Are you familiar with the dictates of the

6   WARN Act?

7            MS. LUNDY:  Objection.

8       A.  I would -- I think so.

9       Q.  Do you know whether an employee is

10  technically placed on furlough when their salary is

11  reduced for more than 50 percent of their usual

12  salary?

13           MS. LUNDY:  Objection.

14      A.  I don't know specifically about the 50

15  percent, but I would -- I probably knew, but I've

16  forgotten.  I mean, the triggers for WARN notices

17  are dependent on many things, right?  There's a

18  trigger where it's a shop closing, it's a mass

19  layoff, it's a huge reduction; I mean, there's a

20  lot of different triggers; I can't remember them

21  all at the moment.

22      Q.  So focusing your attention on what's been

23  marked as Plaintiffs' 13, WarnerDEF935, the very

24  top of the e-mail we discussed says, "FYI - not

25  sure what he needs this for"; the second section of

1    that e-mail states -- the very last part of the

2    sentence states -- "We also double checked with

3    their division head and/or manager to ensure those

4    dates seemed accurate." Do you see that?

5        A.  I do.

6        Q.  Okay.  When Ms. Erbiti states in this e-mail

7    that the dates seem accurate, is it because she

8    didn't have accurate dates for the last day that

9    each employee was working at the Four Seasons

10   New York?

11       MS. LUNDY:  Objection.

12       A.  I don't know what she meant by that, but I

13   will tell you there's nothing black and white --

14   there's nothing -- there's no gray area with Alex;

15   she would have had the specific information.  I

16   think that that's just a vernacular, a term that

17   she just used -- I don't know what she meant -- but

18   this particular person is absolutely black and

19   white; she's not gray.

20       Q.  Where does she currently work --

21       MS. LUNDY:  Objection.

22       Q.  -- Ms. Alexandra Erbiti?

23       A.  She doesn't work for me anymore.

24       Q.  Do you know where she works?

25       A.  I do.

ELIZABETH ORTIZ
APRIL 03, 2023                                                    JOB NO. 568002

1     Q.   Where does she work?

2     A.   The Four Seasons New York Downtown.

3     Q.   Do you know why she left the Four Seasons

4  New York Hotel where you work?

5     A.   She had a great opportunity to expand her

6  knowledge in another role.

7     Q.   And what role does she have in Four Seasons

8  New York Downtown?

9     A.   She is the Assistant Director of People and

10  Culture with an oversight into all other areas of

11  People and Culture.

12     Q.   When she was working for the Four Seasons in

13  New York with you, she had the same position,

14  correct?

15     A.   She did.  She was primarily responsible for

16  labor relations, though.  The smaller property

17  affords her the opportunity to be involved in

18  multiple different arms of the discipline.

19     Q.   So at some point in time, you'd agree with

20  me that Four Seasons New York sent WARN notices to

21  the nonunion employees that were furloughed,

22  correct?

23     A.   Yes, we would have.

24     Q.   So my question to you is not whether you

25  would have but whether Four Seasons New York did

1   send those WARN notices to nonunion employees.

2       A.  Yes.

3           MS. LUNDY:  Do you mind if I take a quick

4       bathroom break?

5           MS. RISMAN:  Sure, absolutely.

6           (Whereupon, a break was taken at 2:24 p.m.

7       and the deposition resumed at 2:27 p.m.)

8           (Whereupon, a series of letters written by

9       Rudy Tauscher to a series of employees, all

10      dated 8-5-20, and Bates-stamped WarnerDEF000936

11      through WarnerDEF001017 was collectively marked

12      as Plaintiffs' Exhibit 14.

13      Q.  Ms. Ortiz, I'm going to be showing you what

14  we've just marked as Plaintiffs' 14 Bates-stamped

15  WarnerDEF936 until 1017.  Do you see that?

16      A.  Yes.

17      Q.  And did you have the ability to look at

18  these prior to the deposition?

19          MS. LUNDY:  Objection.

20      A.  Yes.

21      Q.  And you reviewed these documents, correct?

22      A.  Overview.  I don't know that I looked at

23  them in detail, but yes.

24      Q.  And would you agree with me that the letters

25  provided to the effect of nonunion employees are

1    almost identical to one another, correct?

2        MS. LUNDY:  Objection.

3      A.  The general language is the same, but the

4    dates are different.

5      Q.  So the only difference is -- in each of the

6    letters, is -- the date of when the temporary

7    layoff began, correct?

8      A.  For that individual.

9      Q.  Yes.  So I think we're saying the same

10   thing.  So you'd agree with me that according to

11   this letter that we just marked as Plaintiffs' 14,

12   Warner936 to WarnerDEF1017, the letters are almost

13   identical, but the dates are different for each of

14   the individual recipients of the letter, correct?

15       MS. LUNDY:  Objection.

16     A.  Yes.

17     Q.  And the other difference is just the names

18   on the top of the letter where the letter is going

19   to, correct?

20     A.  Yes.

21     Q.  Other than that, the letters are identical,

22   correct?

23       MS. LUNDY:  Objection.

24     A.  So the names are different, the addresses

25   are different, the dates are different, the form

1    language is the same.

2        Q.  Other than the name, the address it's going

3    to, the date when the temporary layoff began, are

4    there any other differences in these letters that

5    we just marked as Plaintiffs' 14?

6        A.  Not that I can -- not that I can tell.

7        Q.  Are you aware of any differences in these

8    letters other than what we've just discussed?

9            MS. LUNDY:  Objection.

10       A.  I don't know what the differences would be.

11   No.  Just basically what I just said:  the name,

12   the address, and the dates.

13       Q.  And who filled in the different names and

14   addresses in these letters?

15       A.  That would have been somebody in my staff.

16   I don't know how to do mail merge.

17       Q.  And who filled in the temporary layoff date

18   in these letters marked 936 to 1017?

19       A.  So that would have been obtained from my

20   staff utilizing the HEATH scheduling system, the

21   work date, HRIS, and the actual department

22   schedules verifying last days worked.

23       Q.  And was there anyone that reviewed the

24   layoff date to make sure that that date was correct

25   for each of these recipients?

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

1      A.  So, again, I can say with almost absolute

2   certainty that my team is extremely -- or at the

3   time, that team was extremely -- diligent in being

4   precise, so HEATH schedules, the work date, HRIS,

5   and the payroll and departmental system would have

6   been -- would have been -- accurate and therefore

7   making these dates as accurate also.

8      Q.  Was there a mail merge spreadsheet that was

9   used?

10         MS. LUNDY:  Objection.

11     A.  I don't know.

12     Q.  Do you know what that is?

13     A.  Vaguely.

14         (Whereupon, a discussion was held off the

15     record.)

16     Q.  So focusing your attention on

17   Vivian Holmes's letter Bates-stamped

18   WarnerDEF1015 --

19     A.  I'm sorry.  1015 or 10 -- oh, here we go.

20   Okay.

21     Q.  So focusing your attention on the date for

22   Ms. Vivian Holmes, it states "temporary layoff

23   which began on 7/14/2020." Do you see that?

24     A.  I do.

25     Q.  Okay.  Do you know whether that was the

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

1    correct date that Ms. Holmes was actually placed on

2    furlough?

3           MS. LUNDY:  Objection.

4      A.  Yeah.  Well, she worked through middle of

5    July, so that's on or about that date, I believe.

6      Q.  Did you work closely with Ms. Holmes when

7    she worked for Four Seasons New York?

8      A.  No.

9      Q.  Are you aware that Ms. Holmes had been

10   placed on a reduced work schedule that was less

11   than 50 percent of her salary per week back in

12   March of 2020?

13     A.  I don't remember when it happened, but she

14   was put on a reduced workweek, but I don't remember

15   when.

16     Q.  So is it your testimony that reduced

17   workweek was not taken into account when this

18   letter was written stating that her temporary

19   layoff began on 7-14-2020?

20          MS. LUNDY:  Objection.

21     A.  I can't say, because in my recollection, she

22   worked for the Department through the middle of

23   July.  I don't know what her -- I know that she

24   wasn't working  full-time, but she was responsible

25   for schedules and payroll which wouldn't have

1   required full-time work.  I don't believe she was

2   on property.  And again, at that time, it was so

3   uncertain.  I don't know -- I don't know if she was

4   needed, like, two days a week or four days a week;

5   I do know that on that day is when we absolutely

6   didn't need her to -- there was no one to do

7   payroll for or schedules.  I don't remember, but --

8   yeah.

9       Q.  Was the reason that Four Seasons New York

10  kept Vivian Holmes working there because they were

11  winding down something --

12          MS. LUNDY:  Objection.

13      Q.  -- or some other reason?

14      A.  I'm not sure I understand the question.

15      Q.  Okay.  So you said that Vivian Holmes was

16  kept working at the Four Seasons New York for a few

17  months after March, correct?

18      A.  Yes.

19      Q.  Do you have any records to show whether her

20  schedule was reduced during that time from March

21  until July?

22          MS. LUNDY:  Objection.

23      A.  I think they've been provided.

24      Q.  Okay.  What specific records would show what

25  hours Ms. Holmes worked from March 21st, 2020 until

1  July 14th, 2020?

2     A.   The HEATH scheduling system would show and

3  then the payroll records would show what she was

4  paid for.

5     Q.   And did anyone look at the payroll records

6  in drafting WarnerDEF1015 as it relates to

7  Ms. Vivian Holmes?

8          MS. LUNDY:  Objection.

9     A.   I would imagine so, but I can't be certain

10  where else would they have gotten the information.

11     Q.   In March of 2020, was there a reasonable

12  expectation that Vivian Holmes would be laid off

13  because the hotel was closing to guests?

14          MS. LUNDY:  Objection.

15     A.   No.

16     Q.   When would there be a reasonable expectation

17  that Ms. Holmes would be laid off?

18          MS. LUNDY:  Objection.

19     A.   I don't know if there was ever a reasonable

20  expectation, because we didn't know.  I don't think

21  -- I don't think we knew.  I think every week we

22  were holding onto, like, planning to reopen.  I

23  don't think there was ever a reasonable

24  expectation.  I think the expectation was to gear

25  up for reopening, because that's what the

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

1  expectation was, and we maintained work schedules

2  with the expectation of reopening as soon as

3  possible.

4      Q.  However, by July 14th, 2020, you no longer

5  thought that the hotel was reopening, did you?

6          MS. LUNDY:  Objection.

7      A.  Not true.  I think that the -- you know,

8  where the delay in reopening was weeks at a time,

9  it became now maybe a month or a couple of months'

10  delay, if I remember correctly.  You know, at one

11  point, it was, like, "We'll be open in two weeks,"

12  "We'll be open at the end of April," "We'll be open

13  -- we're reopening for" -- "We're reopening for the

14  medical staff," "We're closing for the medical

15  staff," "We'll be reopening in July." I mean, it

16  was a consistent rollercoaster of dates.

17      Q.  In May, 2020 --

18      A.  May, 2020?

19      Q.  Uh-huh -- was there ever a decision made to

20  renovate the hotel before reopening it?

21      A.  I don't remember.

22      Q.  In June of 2020, was there ever a decision

23  made to renovate the hotel prior to reopening it?

24      A.  Well, there are always discussions about,

25  you know, things we could do before reopening; I

1  mean, it was a good time to do, you know, work that

2  needed to be done.  I don't remember specific

3  conversations, but certainly, there have always

4  been discussions about -- I mean, hoteliers always

5  want, you know, different things.  "We" -- you

6  know, "We need to redo the locker room"; there's

7  always this ongoing capital wish list, so to speak,

8  but I don't remember specifically.

9      Q.  Okay.  So my question to you is not whether

10  there were discussions to do renovations.  Was

11  there a decision made in June of 2020 that the

12  hotel would not reopen because there would be

13  renovations done to the hotel?

14      A.  Not that I remember.

15      Q.  So when was that decision made that the

16  hotel would not reopen because renovations had to

17  be done to the hotel?

18          MS. LUNDY:  Objection.

19      A.  I think I answered that question earlier.  I

20  think it wasn't until the middle of the year in

21  2021.

22      Q.  And do you know what led to that particular

23  decision that the hotel had to be renovated and

24  would not be reopened?

25          MS. LUNDY:  Objection.

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

```
 1      A.  I don't know.

 2      Q.  Who told you about that decision?

 3      A.  I don't remember.

 4      Q.  And after you received notice of that

 5   decision, what, if anything, did you do in relation

 6   to your job?

 7          MS. LUNDY:  Objection.

 8      A.  That's a broad question.  Can you be more

 9   specific?

10      Q.  Yes.  So after you were told that the hotel

11   would now no longer reopen --

12      A.  No, we are reopening.

13      Q.  So please just let me finish my question,

14   okay?  So after you were told that the hotel would

15   no longer reopen because of renovations that had to

16   be done to the hotel, what, if anything, did you do

17   in relation to your job?

18          MS. LUNDY:  Objection.

19      A.  I don't know what that means.

20      Q.  Did you tell anybody "the hotel is now not

21   reopening any longer because we need to do

22   renovations"?

23          MS. LUNDY:  Objection.

24      A.  I don't know.  Not that I recall as a

25   specific conversation.
```

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

1    Q.  Do you think that it was important for the

2  employees to know that the hotel would no longer be

3  reopened as planned?

4        MS. LUNDY:  Objection.

5    A.  Of course it was important, and I think we

6  were very, very communicative with employees on a

7  regular basis, on -- actually on a regular basis,

8  via newsletter, via e-mails, via phone

9  conversations, absolutely communicative with them.

10  In fact, I'm very almost over-communicative to the

11  point where at one point, the general consensus was

12  that we would no longer communicate because it was

13  more upsetting to the employees that were on

14  furlough to not get any news other than your

15  typical People and Culture information --

16  birthdays, anniversaries.  I don't know.

17    Q.  Why do you think that was upsetting to them?

18    A.  I can't speculate.  I don't know.

19    Q.  Did you ever ask any of them "Why is this

20  upsetting to you?"

21        MS. LUNDY:  Objection.

22    A.  No.

23    Q.  Did anybody write to you telling you that

24  they were upset with what was happening to them?

25        MS. LUNDY:  Objection.

 1     A.  Over the years, I've probably had

 2   conversations with people -- first of all, I get

 3   regular inquiries as to any news on the hotel, just

 4   even one this morning, and I'm always responsive to

 5   that.  People, you know, reach out all the time,

 6   and I'm very cognizant of people wanting to know

 7   this.  So I think we've always been transparent

 8   about the fact that at some point, we will reopen,

 9   it's just a matter of when, and I don't have any

10   other information than that.

11     Q.  So, Ms. Ortiz, as you sit here today, is

12   there a reopening date for the Four Seasons

13   New York?

14     A.  There is not at this moment.

15     Q.  And do you know approximately the time the

16   Four Seasons New York plans to reopen?

17         MS. LUNDY:  Objection.

18     A.  I don't know specifically.  No.

19     Q.  So as you sit here today, it's very possible

20   the Four Seasons can remain closed for another five

21   years, correct?

22         MR. WAGNER:  Objection.

23         MS. LUNDY:  Objection.

24     A.  I don't know that.

25     Q.  But you would -- so, Ms. Ortiz, how long

1  would it take the Four Seasons New York to open

2  after all the renovations are completed?

3        MS. LUNDY:  Objection.

4    A.  It would depend.  It would depend, and I

5  can't speculate, because it's all -- it's all

6  dependent on what the reopening structure would

7  look like, meaning are we going to have food and

8  beverage?  Are we going to have in-room dining?

9  Are we going to offer overnight dining?  Are we

10  going to open gradually?  Are we going to -- are we

11  going to replace any furniture?  It's all dependent

12  on multiple things, so I can't answer that

13  question.

14    Q.  Is there any timetable relating to the

15  renovations?

16        MS. LUNDY:  Objection.

17    A.  Not that I'm aware of.  Not that I'm aware

18  of.

19    Q.  We're just going to take a five-minute

20  break.

21        (Whereupon, a break was taken at 2:46 p.m.,

22     and the deposition resumed at 2:53 p.m.)

23    Q.  So, Ms. Ortiz, you had mentioned that there

24  was no timetable for renovations; is that correct?

25    A.  That I was aware of at that time.

1    Q.  And you had also mentioned that the hotel

2   was still deciding whether or not to have in-room

3   dining for reopening; is that right?

4    A.  No.  I think what I said was -- you had

5   asked what the timetable was, and I said it would

6   be a matter -- it would be -- it would be based on

7   what the reopening structure would look like, and

8   the timetable is dependent on what that reopening

9   structure is.

10   Q.  So for a hotel like Four Seasons New York,

11   wouldn't a reopening structure have to have certain

12   types of things like an in-room dining and

13   out-dining be part of the hotel?

14        MS. LUNDY:  Objection.

15   Q.  I'm going to withdraw that.  Are there

16   certain criteria for a five-star hotel to have in

17   order to operate as a five-star hotel?

18        MS. LUNDY:  Objection.

19   A.  I don't know if it's the stars as much as it

20   is the type of service.  So a luxury hotel, the

21   expectation is that they have a food and beverage

22   outlet, that there are spa facilities, that there

23   are gym facilities; that's what makes a luxury

24   property a luxury property.  The stars are dictated

25   by the requirements of either Forbes or -- you

1   know, I mean, it's Forbes stars and what their

2   criteria is.  I don't know what it is off the top

3   of my head, but yes.

4       Q.  Does the Four Seasons Hotel And Resort brand

5   require a hotel to have certain criteria in order

6   to be part of that brand?

7           MS. LUNDY:  Objection.

8       A.  Specifically -- I don't know what the

9   specifics are, but every brand has criteria that's

10  required.  There are local SOPs that are based on

11  the area, but there are certain general rules of

12  thumb that are required.

13      Q.  So wouldn't it be fair to say that the

14  reopening plans had to contain certain criteria for

15  this particular hotel to reopen?

16      A.  Well, again, it depends on the expectations.

17  I mean, it depends on if we just wanted to reopen

18  to reopen; I mean, realistically, we could open

19  with limited service with, like, a ramp-up period

20  -- which is called a ramp-up period -- with the --

21  with the -- idea that we would eventually become --

22  you know, move into -- that full service, but it

23  wouldn't have to be -- that's what I mean.

24  Reopening could be based on a million things:  Do

25  we just want to reopen one tower -- right now, we

 1   have two towers; do we just want to reopen one

 2   tower?  Do we want to reopen the lower level?  Do

 3   we want to reopen the higher level?  It's all

 4   dependent on the reopening structure.

 5       Q.  So why hasn't any decision been made related

 6   to the reopening structure?

 7           MS. LUNDY:  Objection.

 8       A.  I don't know.

 9       Q.  Who would be responsible for making that

10   decision related to the opening structure?

11           MS. LUNDY:  Objection.

12       A.  I think it's a collaborative decision, but I

13   don't know specifically who.

14       Q.  Would that require Ty Warner to make the

15   decision --

16           MS. LUNDY:  Objection.

17       Q.  -- as to the reopening plans?

18       A.  I mean, I don't know.  It stands to reason

19   that he would be involved.

20       Q.  Would you agree with me that Mr. Warner is

21   involved in a lot of decisions that get made

22   related to the Four Seasons New York hotel?

23           MS. LUNDY:  Objection.

24       A.  You know, I think it's a collaborative

25   effort on every part.  I mean, when you have --

1   yeah.

2       Q.  When you say "it's a collaborative effort,"

3   who's part of this collaborative effort that makes

4   decisions as to whether or not to reopen the hotel?

5       A.  Well, I think it's the operator known as

6   Four Seasons, then it's the Hotel 57 Services, LLC,

7   then it's the -- and then the ownership.  So

8   there's the ownership entity, there's the operator

9   entity, then there's the property operators.

10      Q.  Okay.  Focusing your attention on the

11  ownership entity, who is part of the ownership

12  entity?

13      A.  Well, that's a very broad question.  In

14  short, I don't know all of the -- I don't know all

15  of the members.  I do know that Mr. Warner is at --

16  is responsible for one entity; I don't know which

17  one that is.  When I refer to ownership, I usually

18  refer to Cathy or our asset management team.

19      Q.  And who is Cathy?

20      A.  We've talked about her all day.

21      Q.  Okay.  And she's the owner of Hotel 57

22  Services, LLC?

23          MS. LUNDY:  Objection.

24      A.  No.  No.

25      Q.  So do you think she makes decisions as to

1   whether or not to reopen the hotel?

2       A.  I don't know; I can't speak for Cathy.

3       Q.  So I had shown you an e-mail previously

4   related to ownership approval.  Do you remember?

5       A.  Yes.

6       Q.  So what do you think ownership approval

7   means?

8           MS. LUNDY:  Objection.

9       A.  It goes back to what I said earlier, is,

10  there are different levels of approval; I don't

11  know the specific dollar amounts, but at certain --

12  there are certain thresholds that require -- just

13  like I'm writing checks, right, it depends on the

14  dollar amount of a check.  Do you need one signer

15  or do you need two signers?  It's the same thing

16  with business entities that are involved in this

17  operation.  You know, can we make the decision at

18  the operation level?  Do we need Four Seasons'

19  involvement?  Do we need Ownership involvement?

20  Can Hotel 57 Services, LLC -- it depends on what

21  the thresholds are.

22      Q.  So, again, when you say "Ownership

23  involvement," what does that mean?

24          MS. LUNDY:  Objection.

25      A.  To me, that means the -- whoever that entity

 1   is on the ownership side that represents

 2   Mr. Warner.

 3       Q.  And who is the entity on the ownership side

 4   that represents Mr. Warner?

 5       A.  I have no idea.  I mean, my -- you know, I

 6   haven't spoken with Cathy in a long time.  There

 7   are asset managers that I work with.

 8       Q.  And who are they?

 9       A.  Various asset managers.

10       Q.  And what are their names?

11       A.  All of them?  I don't know all of them.  I

12   always get the -- I want to say it's Solid Rock.  I

13   always get them confused with Black Rock, but

14   there's Solid Rock.

15       Q.  And what do they do for the Four Seasons

16   New York?

17           MS. LUNDY:  Objection.

18       A.  I don't know specifically.  I know that they

19   manage the asset for ownership, I think, but I'm

20   not sure.

21       Q.  And when you say they manage the asset, what

22   does that mean?

23       A.  We have an asset manager.  I mean, if you

24   have an asset, they're managing your asset.

25       Q.  So are they managing the asset for Four

1   Seasons New York Hotel or something else?

2          MS. LUNDY:  Objection.

3      A.  I just said for the owner.

4      Q.  So are --

5      A.  So you asked me who I refer to --

6      Q.  Just let me finish.  Are they managing the

7   assets for Ty Warner Hotels & Resorts?

8          MS. LUNDY:  Objection.

9      A.  That's my understanding.

10     Q.  And when it came to the medical personnel

11  staying at the Four Seasons New York, who made the

12  decision to allow them to stay there from either

13  ownership or management?

14         MS. LUNDY:  Objection.

15     A.  I think I answered that question several

16  times.  It was a collaborative decision based on,

17  you know, the call for -- the call for -- whatever

18  rooms from the Governor's office.

19     Q.  Do you know who made the final decision to

20  allow the medical personnel to stay?

21         MS. LUNDY:  Objection.

22     A.  I don't.

23     Q.  Is it your testimony that Ty Warner did not

24  make the final decision to allow the medical

25  personnel to stay at the Four Seasons New York?

1      MS. LUNDY:  Objection.  That's not her

2      testimony.  She just responded to that

3      question --

4      MS. RISMAN:  Your objection is noted.

5      A.  I don't know.

6      Q.  Do you know whether Ty Warner made the final

7  decision to allow the medical personnel to stay for

8  those few months in the Four Seasons New York?

9      A.  I do not.

10     Q.  Did you ever read any newspaper articles

11 that stated that Ty Warner allowed medical

12 personnel to stay at the Four Seasons New York

13 during the months we discussed previously?

14     A.  You know, as much as it's hard to believe, I

15 don't pay attention to a lot of that, certainly not

16 at that time.  There was a lot things going on in

17 my personal life that I just -- I didn't -- I

18 wasn't really -- the articles may have come across

19 my desk, they may have been presented to me, they

20 may have been shared.  I take a lot of that media

21 information with a grain of salt.

22     Q.  In March of 2020, did the Four Seasons

23 New York, themselves, provide for general media

24 statements regarding allowing medical personnel to

25 stay at the Four Seasons New York?

1    A.  Yeah, we probably did.

2        (Whereupon, a three-page document

3    Bates-stamped WarnerDEF002199 through

4    WarnerDEF002201 was marked as Plaintiffs'

5    Exhibit 15 for identification, as of this date.)

6    Q.  So, Ms. Ortiz, I'm going to be showing you

7    what's been marked as Plaintiffs' 15, Bates-stamped

8    WarnerDEF2199 until 2201.  Now, Ms. Ortiz, did you

9    draft any of this document that I'm showing you

10   that's just been marked Plaintiffs' 15?

11   A.  I don't think so.

12   Q.  Have you ever seen it before?

13   A.  I don't remember specifically in this

14   format, but probably in some format at one point or

15   another.

16   Q.  Okay.  So focusing your attention to both

17   the first page of the document, 2199, and the

18   second page of the document, 2200 --

19   A.  The first page is 2198.

20   Q.  Really?  Can I see?

21       MS. LUNDY:  Mine's 2199.

22       MR. WAGNER:  We're just missing the front

23   page?

24       MS. RISMAN:  Yeah, that's okay.

25   Q.  So focusing your attention to the

 1   document --

 2          MS. LUNDY:  So you're going to move

 3      forward --

 4          MS. RISMAN:  Yeah.  Let's --

 5      Q.  You know what?  Let's take out the 2198 and

 6   just -- maybe that's easier.

 7          MS. LUNDY:  So we have up until 2201.  Am I

 8      just removing 2198 and marking --

 9          MS. RISMAN:  Wait.  Hold on one second.  So

10      you just have 2199, right, on yours?

11          MS. LUNDY:  Correct.

12          MS. RISMAN:  Yeah, that's fine.

13          MS. LUNDY:  So I'm going to remove the

14      Page 2198 and we'll re-mark it beginning at

15      Warner DEF2199 through 2201, Plaintiffs' 15.

16      Q.  So focusing your attention to what's been

17   Bates-stamped 2199, where it states "E-mail and

18   Auto Reply for Contact Us and Medical NYF Inbox,

19   Response for frustrated personnel" -- do you see

20   that?  It's specific -- do you see that, Ms. Ortiz?

21      A.  Yes.

22      Q.  It specifically says, "Dear XXX, We thank

23   you for your continued dedication to helping those

24   in need.  Following the announcement of Governor

25   Andrew Cuomo and the hotel's owner, Ty Warner,

1    Four Seasons Hotel New York is preparing the hotel

2    to accommodate nurses, doctors and medical

3    personnel who are tirelessly working to help

4    New Yorkers as the COVID-19 pandemic evolves." Do

5    you see that?

6        A.  I do.

7        Q.  So that was the e-mail auto reply that was

8    sent to frustrated personnel, correct?

9            MS. LUNDY:  Objection.

10       A.  I don't know.

11       Q.  So the second page of the document,

12   WarnerDEF2200, it says "General Media Statement."

13       A.  Okay.

14       Q.  And underneath, it says, "Following the

15   announcement of Governor Andrew Cuomo and the

16   hotel's owner, Ty Warner, Four Seasons New York is

17   preparing  the hotel to accommodate nurses, doctors

18   and medical personnel who are tirelessly working to

19   help New Yorkers as the COVID-19 pandemic unfolds."

20   Do you see that?

21       A.  Yes, I do.

22       Q.  So a very similar statement to the first

23   statement that I read, correct?

24       A.  Yes.

25       Q.  So does that refresh your recollection

1   whether Ty Warner personally wanted to house

2   medical personnel in the Four Seasons New York?

3          MS. LUNDY:  Objection.

4     A.  Yes.  Again, it would have been a

5   collaborative decision.  Yes.

6     Q.  But that's not what that statement says,

7   correct?

8     A.  No.

9     Q.  That says that it's Ty Warner wanting to

10   house the medical personnel, correct?

11          MS. LUNDY:  Objection.

12    A.  Actually, it says "Ty Warner, Four Seasons

13   Hotel New York is preparing the hotel to

14   accommodate..."

15    Q.  It doesn't say Hotel 57 Services, LLC

16   anywhere there, correct?

17    A.  No.

18    Q.  And focusing your attention to --

19          (Whereupon, a four-page letter written by

20      Elizabeth Ortiz dated 4-9-20 and Bates-stamped

21      WarrenDEF002729 through WarrenDEF002732 was

22      marked as Plaintiffs' Exhibit 16 for

23      identification, as of this date.)

24    Q.  So, Ms. Ortiz, focusing your attention to

25   what we've just marked as Plaintiffs' 16,

1   Bates-stamped WarnerDEF2729 to 2732, would you

2   agree with me that according to this letter, it

3   states under "Hotel Operations" that "On March 20,

4   2020, in an abundance of caution, we made the

5   difficult decision to temporarily suspend most of

6   the hotel operations." Do you see that?

7       A.  Yes.

8       Q.  Now, the second paragraph from that -- and

9   before I get to that, actually, can you look at the

10  signature page Bates-stamped WarnerDEF2732?

11      A.  Yes.

12      Q.  That's your name, correct?

13      A.  That's correct.

14      Q.  So it was written by you, this letter,

15  correct?

16          MS. LUNDY:  Objection.

17      A.  I think a lot of this was how to file for

18  unemployment, that wasn't written by me; we would

19  have pulled it from their website. "Travel

20  Reimbursement," I would have written that.  So yes,

21  some parts of it.

22      Q.  Ms. Ortiz, there's a part in this letter

23  under the heading "Hotel Operations," second

24  paragraph, that states, "Shortly thereafter, our

25  owner Ty Warner, responds to the Governor's call-to

 1  action and asked us to re-open the hotel to provide

 2  housing for the doctors nurses, and other medical

 3  staff working on the front lines." Do you see that?

 4     A.  Yes, I do.

 5     Q.  And it specifically states here that it was

 6  Ty Warner, right, that opened the hotel for medical

 7  personnel, correct?

 8         MS. LUNDY:  Objection.

 9     A.  "...Ty Warner, responded to the Governor's

10  call-to action and us to the re-open the hotel" --

11  I'm sorry; I think out loud.

12         MS. LUNDY:  Try to do that, as --

13         MS. RISMAN:  Can you read the last question,

14     please?  Just the last one.

15         (Whereupon, the requested portion of the

16     record was read back.)

17     A.  Yes, that's what it states.

18     Q.  And you wrote that portion of this letter,

19  correct?

20         MS. LUNDY:  Objection.

21     A.  It would have been a collaborative effort.

22     Q.  The letter is signed by you, correct?

23     A.  Right, but it would have gone under my name.

24     Q.  So the employees that were furloughed by the

25  Four Seasons New York that received that letter,

1   they would have thought you wrote that portion of

2   the letter, correct?

3         MS. LUNDY:  Objection.

4     A.  Well, I think things -- yeah.  Yes.

5     Q.  Now, looking to 2729 of this document,

6   Plaintiffs' 16, Bates-stamped 2729 on the bottom,

7   where it states "Furlough/Paid Time

8   Off/Unemployment," is that the part that you said

9   you took from another website?

10    A.  Well, no.  The time off would have been

11  taken from our policies, I would imagine.

12    Q.  Do you see where it says "Furlough"?

13    A.  Where?  On the --

14    Q.  On that same heading, it says "Furlough" --

15    A.  "Furlough/Paid Time Off/Unemployment."

16    Q.  Do you see that?

17    A.  Yes.

18    Q.  So by that time, the employees at the Four

19  Seasons Hotel New York were already on furlough,

20  correct?

21        MS. LUNDY:  Objection.

22    A.  Well, it goes back to what I've been saying

23  all along, is, we were closed under the direction

24  of the Governor's office; we weren't sure when we

25  would recall staff; there were certain -- there

 1  were certain nonessential divisions that we

 2  couldn't operate because of the mandate, and I

 3  think it was really unclear at the time only

 4  because we had every -- we had every -- expectation

 5  to be back -- be back -- in a fully operating hotel

 6  within a month.

 7      Q.  Okay.  Ms. Ortiz, it is possible to put your

 8  employees that worked for the Four Seasons New York

 9  on temporary furlough, correct?

10          MS. LUNDY:  Objection.

11      A.  Yes.

12      Q.  Yes.  So temporary furlough can mean one

13  month, correct?

14      A.  Correct.

15      Q.  So --

16      A.  So yes.  I see what you're saying.

17      Q.  So just because the Four Seasons New York

18  wanted to bring the hotels employees back did not

19  mean that those same hotel employees were not

20  placed on furlough, correct?

21          MS. LUNDY:  Objection.

22      A.  Correct, and again, that was due to -- so

23  even in the one, two, three, four, the fifth

24  paragraph, there was still the Statewide

25  stay-at-home order until April 29th; then, we had

1   expressed there that we would reopen on April 30th.

2   So it's confusing, right, because I don't know that

3   we ever decided to close or reopen; it was the

4   circumstances at the time and the situation with

5   COVID and the mandates and the health scare and all

6   -- there were multiple -- there were multiple

7   issues happening at the time.  To answer your

8   question, yes.  If you want to use the term

9   "furlough," these were people that were placed on

10   furlough or out of work due to the Governor's

11   office and the mandate for closure and the

12   stay-at-home order; I forgot about the stay-at-home

13   order, so this reminded me (indicating).

14       Q.  So, Ms. Ortiz, are you aware of how many

15   nonunion employees were laid off or placed on

16   furlough on that date, April 9th, 2020?

17       A.  Not off the top of my head; I would have to

18   look.

19       Q.  And focusing your attention on this letter

20   marked Plaintiffs' 16, were there multiple drafts

21   of this letter prior to it going out to the

22   employees?

23       A.  There might have been.

24       MS. RISMAN:  We'd call for production of

25       those drafts.

1          MS. LUNDY:  If you'll follow up in writing,

2      we'll respond in turn.  Thank you.

3      A.  I can't say for sure.  I don't know -- I

4   think -- when I say "multiple drafts," what I mean

5   is that maybe I wrote, "On March 20th, in an

6   abundance of caution, I sent it out" and the

7   Director of Sales and Marketing said "Don't use the

8   word 'abundance'; use 'in an effort.'" That's what

9   I mean.  I don't mean, like, full-on drafts; I

10  mean, like, edits; and I can't -- this, I think

11  specifically, is from my office, based on

12  conversations we would have had.  Anything we do in

13  the hospitality industry is collaborative; we don't

14  work in silos.

15     Q.  You just mentioned that you may have sent a

16  draft to someone and they told you to change a

17  particular word, correct?

18     A.   It wouldn't have been the draft; it would

19  have been, like, "Here it is," and then, it comes

20  back "Don't use 'abundance of caution'; use 'in an

21  effort to maintain safety'," for example.  That, to

22  me, is not a rewrite; that's not multiple drafts;

23  it's just an edit on a word.

24     Q.  So when you say, "Here it is," isn't that a

25  draft of a letter?

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

```
 1          MS. LUNDY:  Objection.
 2      A.  So in my writing, I would say, "Please see
 3   attached.  Let me know if you have any changes.  If
 4   you don't have any changes, I'm sending it out."
 5      Q.  So that would be a draft of a letter,
 6   correct?
 7          MS. LUNDY:  Objection.
 8      A.  Sure.
 9      Q.  You testified previously that paying that
10   one week's salary was the right thing to do.  And
11   I'm paraphrasing what you said.
12      A.  Yes.
13      Q.  Right.  Do you believe it was also the right
14   thing to do to continue paying for the employees'
15   medical benefits after they were on furlough?
16      A.  Yes.
17      Q.  Did the Four Seasons New York, do that?
18      A.  We did.
19      Q.  For how long?
20      A.  I think everyone got an additional two
21   months, I believe; it was an additional two or
22   three months after their last day of work.
23      Q.  And were you the reason that they received
24   those benefits?
25      A.  Well, I don't know.
```

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1    Q.  Did you ask anyone to provide those benefits

2  to the employees that were furloughed?

3         MS. LUNDY:  Objection.

4    A.  I probably would have.

5    Q.  Did you propose to anybody that the

6  employees continue to get paid their salary while

7  on furlough?

8    A.  Not that I recall.

9         (Whereupon, an e-mail chain encompassing the

10        dates 3-26-20 and 4-8-20 and Bates-stamped

11        WarnerDEF001160 through WarnerDEF001161 was

12        marked as Plaintiffs' Exhibit 17 for

13        identification, as of this date.)

14   Q.  Ms. Ortiz, I see you shaking your head as

15  you sit there.  I'm going to be showing you what's

16  just been marked as Plaintiffs' 17, and I'm

17  presuming by you shaking your head, you've seen

18  this e-mail before, correct?

19        MS. LUNDY:  Objection.

20   A.  Again, I don't remember the specific e-mail;

21  I remember this discussion.

22   Q.  And tell me about what you remember about

23  this discussion.

24   A.  Just that I think we -- as an executive

25  committee, we had discussed paying, like, a stipend

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

 1   or a percentage of, I don't know, salary or --

 2   yeah, salary continuation for the furloughed

 3   employees and the managers, and we had also raised

 4   the idea that it would be -- it would be -- good to

 5   pay at least some type of benefits coverage for an

 6   -- for some period of time, whether it was two or

 7   three months, given the unusual circumstances and

 8   given the fact that we were unsure as to when we

 9   would reopen.

10       Q.  But you would agree with me that according

11   to this e-mail, it was Mr. Warner who "approved

12   the... health benefits for furloughed employees for

13   2 months but said no wages will be provided at this

14   time," correct?

15           MS. LUNDY:  Objection.

16       A.  That's what it says.  Yes.

17       Q.  Do you know that e-mail to be a true and

18   accurate depiction of the e-mails that were

19   exchanged on that date?

20           MS. LUNDY:  Objection.

21       A.  I don't remember, but I know that the

22   decision -- we discussed paying additional benefits

23   and we discussed not paying additional salary.

24       Q.  Right, but you asked to have employees paid

25   an additional salary, correct?

1          MS. LUNDY:  Objection.

2      A.  We did.

3      Q.  And that was rejected by Mr. Warner,

4   correct?

5      A.  I don't know for a fact, but that's what

6   this e-mail says.

7      Q.  Do you have any reason to believe this

8   e-mail is not true and accurate?

9          MS. LUNDY:  Objection.

10     A.  No.

11     Q.  At any time in the drafting of the WARN

12  notices, did anyone tell you not to use the word

13  "permanent"?

14         MS. LUNDY:  Objection to the extent it calls

15     for privileged communications; I direct you not

16     to answer if it was not a communication with

17     your attorney.

18     A.  Okay.

19         MR. BRUSTEIN:  You mean if it was?

20         MS. LUNDY:  If it was not, you may not; if

21     it was, you may not.  Did that make sense?  Did

22     I switch it around?

23     A.  I understand what you're saying; I'm just

24  trying to remember where the direction came from.

25  I can't answer that question.

1    Q.  Okay.  Would you agree with me that there

2   was protocol at the Four Seasons New York that when

3   it came to the furloughs of the employees, the word

4   "permanent" should never be used --

5        MS. LUNDY:  Objection.

6    Q.  -- related to their layoffs?

7        MS. LUNDY:  Note my objection.

8    A.  Yes.

9    Q.  And you would agree with me that is why the

10  furloughs were always labeled "temporary

11  furloughs," correct?

12       MS. LUNDY:  Objection.

13   A.  No.  I would say that the furloughs were

14  labeled "temporary" because the furloughs were

15  temporary.

16   Q.  Okay.  But those furloughs at some point

17  were no longer temporary, correct?

18       MS. LUNDY:  Objection.

19   A.  No, they're still temporary.

20   Q.  Do you know what the meaning of "temporary"

21  is?

22       MS. LUNDY:  Objection.

23   A.  Not permanent.

24   Q.  Okay.  And you'd agree with me that

25  permanent layoffs would be something longer than a

1   certain period of time, correct?

2        MS. LUNDY:  Objection.

3     A.  No.  I think "permanent" is -- there's a

4   definitive end; "temporary" is there is no end.

5     Q.  Have you ever looked up the definition of

6   "temporary"?

7     A.  No, but I consider myself educated enough to

8   understand what the definition is and what the word

9   is.

10    Q.  If I told you that the definition of

11  "temporary" is something which is not intended to

12  last for a long time, would you think that

13  definition was correct?

14       MS. LUNDY:  Objection.

15    A.  I think "long time" is subjective, it's

16  relative, it's based on your experience. "Long

17  time" depends on the situation.

18    Q.  Do you think a few years is a long time for

19  a furlough to last?

20       MS. LUNDY:  Objection.

21    A.  Long time?  What's a long time?  I think

22  it's relative.  It depends on what you're looking

23  at.  Is three years a long time?  From the time I

24  woke up this morning to now has been a really long

25  time, right?  So it's all relative.

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1    Q.  So, Ms. Ortiz, do you think that three years

2   to go without a salary is a long time to be without

3   a salary?

4         MS. LUNDY:  Objection.

5    A.  Again, that's relative.  If somebody's

6   independently wealthy or they don't need to work,

7   then they don't need a salary.

8    Q.  Do you think the employees that worked the

9   Four Seasons New York mostly were independently

10  wealthy?

11   A.  I know that some are that haven't worked.

12   Q.  And who are those people?

13   A.  I don't know.  They retired or they moved

14  or --

15   Q.  But would you agree with me that most of the

16  people that worked at the Four Seasons New York

17  were not independently wealthy?

18   A.  I think that's safe to say.

19   Q.  So do you think that those people that were

20  not independently wealthy that worked for the Four

21  Seasons New York being on furlough and not being

22  paid a salary for about three years now is a long

23  time not to be paid a salary?

24         MS. LUNDY:  Objection.

25   A.  Why are they not being paid a salary?

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

 1     Q.  You have to first answer my question.

 2     A.  Well, I'm asking for clarity, though.

 3   They're not being paid a salary.  Is that because

 4   they've not chosen to work, or is it because

 5   they've not chosen to supplement their wages?

 6   That's -- I just need clarity on that.

 7     Q.  So they can't work for the Four Seasons

 8   New York, correct?

 9     A.  Correct.

10     Q.  And you said they've not chosen to work.  Is

11   that where -- withdrawn.

12         Are you saying they should be working

13   somewhere else other than the Four Seasons

14   New York?

15     A.  No, I'm asking the question are they not

16   making a salary because they're not working

17   anywhere else?

18     Q.  My question to you is, should those people

19   that are on furlough from the Four Seasons New York

20   be seeking to work in other places at this time

21   while they're on furlough?

22         MS. LUNDY:  Objection.

23     A.  That's not my decision; that's an

24   independent decision.  I don't know.

25     Q.  Your question to me was, is it because they

1  are not working, correct?  So my question to you

2  back is, do you think that those people that are

3  currently on furlough for the Four Seasons New York

4  should be working elsewhere at this time while

5  they're on furlough?

6       MS. LUNDY:  Objection.

7   A.  So -- they could be.

8   Q.  So they should be seeking other work,

9  correct?

10  A.  I didn't say "should"; I said they could.

11  Q.  They could be seeking other work, right?

12  A.  They could be.

13  Q.  Because Four Seasons New York has no

14  intention of bringing them back to work?

15      MR. WAGNER:  Objection.

16      MS. LUNDY:  Objection.

17  A.  That's not true.

18  Q.  So why should they be seeking other work,

19  then?

20      MS. LUNDY:  Objection.

21  A.  If I don't have a salary for three years,

22  I'm going to be working; I'm going to be something

23  else.  That was all I meant.  I wouldn't go for

24  three years and not work.

25  Q.  Do you think a lot of those people that

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

 1  worked at the Four Seasons New York relied on the

 2  fact that the hotel would be reopening and they

 3  would be getting their jobs back?

 4         MS. LUNDY:  Objection.

 5     A.  And they still have that opportunity.  Yes.

 6     Q.  And when is it that they would have that

 7  opportunity?

 8     A.  I've already answered that question.  I

 9  don't know.

10     Q.  So my question to you, again, is, for those

11  people who worked at the Four Seasons New York that

12  have gone without a salary for three years, is that

13  a long time to be without a salary?

14         MS. LUNDY:  Objection.

15     A.  If a person has chosen not to work in that

16  three-year period, that is a long time to go

17  without a salary.

18     Q.  So focusing your attention back to the label

19  of a temporary layoff versus a permanent layoff, do

20  you recall the reason why the furlough of the

21  employees of the Four Seasons New York should only

22  be called "temporary"?

23         MS. LUNDY:  Objection.

24     A.  Because it is temporary; we have every

25  intention to reopen.

1    Q.  And when you say "we," who do you mean?

2    A.  I have every intention on the property

3  reopening.

4        (Whereupon, a two-page e-mail chain among

5        Nicole Spillane, Michal Dedera, Rudy Tauscher,

6        and Elizabeth Ortiz on 3-19-20 and Bates-stamped

7        WarnerDEF008174 through 008175 was marked as

8        Plaintiffs' Exhibit 19 for identification, as of

9        this date.)

10   Q.  So --

11       MS. LUNDY:  I don't think she's done

12       reading.

13   Q.  It's okay.  While you read, I can still say

14  -- so, Ms. Ortiz, I'm giving you what --

15       MS. LUNDY:  I'm sorry, Ms. Risman.  Can you

16       just give her a minute to finish reading the

17       document so she can hear your question?  She

18       can't do two things at once.

19       MS. RISMAN:  My question is just for the

20       court reporter, that I'm marking it as

21       Plaintiffs' 18; that's all it is.

22   Q.  So, for the record, Ms. Ortiz, I'm marking

23  this document as Plaintiffs' 18, Bates-stamped

24  WarnerDEF8174, 8175, and just let me know when

25  you're done reviewing.

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

1    A.  Okay.

2    Q.  Ms. Ortiz, would you agree with me that this

3  is an e-mail between Nicole Spillane, Michal Dedera

4  from Rudy Tauscher --

5         MS. LUNDY:  What page are you on?

6         MS. RISMAN:  Oh.  8174.

7         MS. LUNDY:  There's multiple e-mails on this

8    page.

9         MS. RISMAN:  I understand; your objection's

10   noted.

11   Q.  So, at the top of the page, you'll see that

12  there's an e-mail exchange between Nicole Spillane

13  from Rudy Tauscher, and you're CC-ed on that

14  e-mail, correct?

15   A.  Correct.

16   Q.  And can you read that e-mail?

17   A.  Sure.  "Dear Nicole:  Because of legal

18  issues, please use the term 'temporary' closing at

19  all times and in any communication going forward.

20  This can/should never...be misconstrued as a

21  permanent 'closure.'"

22   Q.  So do you know why this can never be

23  misconstrued as a permanent closure?

24   A.  Because we never had any intention of it

25  being a permanent closure.

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

 1    Q.  And can you tell me what legal issues are at

 2   stake here?

 3        MS. LUNDY:  Objection.

 4    A.  I don't know what he would have meant.

 5    Q.  And you'd agree with me -- so this e-mail is

 6   dated March 19th, 2020?

 7    A.  Yes.

 8    Q.  And from the time of that e-mail, would you

 9   agree with me that nobody at the Four Seasons

10   New York ever used the word "permanent" when it

11   came to either the closure of the hotel or the

12   furloughs, correct?

13        MS. LUNDY:  Objection.

14    A.  I don't know why we would have said

15   "permanent closure" anyway, because it wasn't a

16   permanent closure.  I don't know where that came

17   from, but I do know that we wanted to be very clear

18   that we were not closing.  We wanted to make sure

19   everyone -- "everyone" meaning the public, the

20   guests, the employees -- knew that we were not

21   closing permanently forever; that's all that that

22   meant.

23    Q.  And prior to this date, March 19th, 2020,

24   was there somebody who used the word "permanent

25   closure"?

1   A.  No, I don't know.

2   Q.  And did there ever come a time that anybody

3   used the word "permanent layoffs" relating to the

4   layoffs that the employees from the Four Seasons

5   New York were on?

6       MS. LUNDY:  Objection.

7   A.  It's never been permanent.  No.

8   Q.  You had said previously that you were

9   familiar with the WARN Act, correct?

10  A.  Yes.

11  Q.  Do you recall any part of the WARN Act that

12  states after an employee is on furlough for more

13  than six months, that employment is then deemed a

14  permanent layoff?

15      MS. LUNDY:  Objection.  That's not what the

16      WARN Act says.

17  Q.  I'm not -- I'm asking you whether you know

18  anything about the WARN Act related to permanent

19  layoffs.

20  A.  I don't know of any language in the WARN Act

21  that says after six months it's considered

22  permanent layoff.  No.

23  Q.  Do you know if any language in the WARN Act

24  states that after six months it's considered a

25  termination of employment?

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

```
 1            MS. LUNDY:  Objection.
 2       A.  No.
 3       Q.  So back in March 19th, 2020, when that
 4   e-mail was sent to you, did you think that the
 5   furloughs would last for over three years?
 6       A.  No.
 7       Q.  And had you thought the furloughs would last
 8   for over three years, would you then consider them
 9   to be permanent furloughs?
10            MS. LUNDY:  Objection.
11       A.  I wouldn't have thought -- I wouldn't have
12   thought about it.
13       Q.  So what if the layoffs lasts for ten years?
14   Would you consider them to be permanent layoffs?
15            MR. WAGNER:  Objection.
16            MS. LUNDY:  Objection.
17       A.  Not if an operation is still operating.
18       Q.  While on furlough, have any employees
19   provided you with resignation letters?
20       A.  Some, yes.
21       Q.  How many resignation letters do you have?
22       A.  I would have to look.
23       Q.  And where are those kept?
24       A.  In the HRIS.
25       Q.  Is that in your office?
```

1    A.  It's on a server; it's electronic.

2       MS. RISMAN:  We call for the production of

3   any resignation letters.

4       MS. LUNDY:  Please follow up in writing and

5   we will respond in turn.

6    Q.  Were those resignation letters from union

7  employees or nonunion employees?

8    A.  Some.  Some have -- I think it's just

9  employees in general.  I don't know.

10    Q.  And approximately how many resignation

11  letters do you think you received from March of

12  2020 until today's date?

13    A.  I would have to look at the termination

14  file, which you have.

15    Q.  The what file?

16    A.  The termination list, I would have to look

17  at it, and we've produced that.

18    Q.  But you haven't produced the resignation

19  letters, have you, to your knowledge?

20       MS. LUNDY:  Objection.

21    A.  No.  Probably -- I don't know.  I'd have to

22  look.

23    Q.  Do you recall in 2020 having people sign

24  acknowledgment forms?

25       MS. LUNDY:  Objection.

1      A.   What acknowledgment forms?

2      Q.   Do you know what an acknowledgment form is?

3      A.   Acknowledging what?

4      Q.   I'm just asking you, do you know what an

5   acknowledgment form is?

6           MS. LUNDY:   I object.

7      A.   But an acknowledgment to what?

8      Q.   I'm just asking you if you ever had anyone

9   sign any acknowledgment forms.

10          MS. LUNDY:   Objection.

11     Q.   If you know.

12     A.   It's possible if we had new hires.

13     Q.   So did you have any new hires in July of

14  2020?

15     A.   In July of 2020?

16     Q.   Yes.

17     A.   No, we were closed.

18     Q.   Did you ever have any new hires in August of

19  2020?

20     A.   No.

21     Q.   Did you ever ask employees that were

22  scheduled to work during those months to sign

23  acknowledgment forms?

24          MS. LUNDY:   Objection.

25     A.   If so, it would have been for the Meal

1  stipend or the Uniform Maintenance stipend; that's

2  the only two things that I can think of.

3      Q.  So what is the Meal stipend?

4      A.  We no longer served food, and in place of

5  not serving food, we would give, I think we're

6  doing, like, $20 or $10 a day -- I don't

7  remember -- in lieu of providing food on the

8  property for those people that are on the property;

9  and then, the laundry would be for people who

10  launder their own uniforms, because under the

11  New York Hospitality Wage Order, we're required to

12  provide for both of those.

13      Q.  Do you recall in May of 2020 that New York

14  was attempting to open back up --

15          MS. LUNDY:  Objection.

16      Q.  -- for business?

17          MS. LUNDY:  Objection.

18      A.  Sure.  I guess so.  I don't remember.

19          MS. LUNDY:  Please don't guess.

20          THE WITNESS:  Sorry.

21      A.  I don't remember.

22      Q.  Do you remember receiving anything from

23  New York State related to opening up New York for

24  business?

25      A.  No.

ELIZABETH ORTIZ
APRIL 03, 2023                                    JOB NO. 568002

```
 1     Q.  You mentioned the Planning Committee earlier
 2   in your testimony, correct?
 3     A.  Uh-huh.
 4     Q.  What is the Planning Committee?
 5     A.  It's the key leaders of the hotel -- the
 6   executive leaders of the hotel -- which I've
 7   mentioned several times -- that include the
 8   General Manager, myself, Directors of Sales and
 9   Marketing, Director of Engineering, Hotel Manager,
10   Director of Rooms -- all the division heads anyway
11   -- and that's what it was.  So it's the C.O.R.E.
12   leadership of the property.
13           MS. RISMAN:  Nineteen, please.
14           (Whereupon, an e-mail from Elizabeth Ortiz
15       to NYE Planning Committee dated 5-12-20 and
16       Bates-stamped WarnerDEF002111 was marked as
17       Plaintiffs' Exhibit 19, and a document
18       Bates-stamped WarnerDEF002112 through
19       WarnerDEF002198, with the cover page entitled
20       "NY Forward A Guide To Reopening New York &
21       Building Back Better" was marked as Plaintiffs'
22       Exhibit 20 for identification, as of this date.)
23     Q.  Ms. Ortiz, I'm going to be showing you
24   what's been marked as Plaintiffs' 19 and
25   Plaintiffs' 20.  So Plaintiffs' 19 is Bates-stamped
```

 1   WarnerDEF2111, and Plaintiffs' 20 is Bates-stamped

 2   WarnerDEF2112 until 2162 [sic].  And I'm just

 3   focusing your attention now to Plaintiffs' 19 2111.

 4   Is that an e-mail from you to the NYF Planning

 5   Committee?

 6       A.  Yes.

 7       Q.  What does NYF stand for?

 8           MS. LUNDY:  Objection.

 9       A.  It's a code.  It's a payroll -- it's an

10   e-mail code.

11       Q.  So who did this e-mail go to?

12       A.  To the people I just mentioned earlier on

13   the Planning Committee:  the executive leaders.

14       Q.  Okay.  And you'd agree with me that you

15   write in  this e-mail, second paragraph from the

16   bottom, "Although hotels were deemed essential

17   businesses and were permitted to remain open, the

18   re-opening guidelines do not allow for certain

19   aspects of a hotel (like the health club) to

20   operate when the order lapses.  We urge you to

21   review the re-opening guidelines for further

22   direction." Do you see that?

23       A.  Yes.

24       Q.  So what were the reopening guidelines that

25   everyone was told to review here?

```
 1      A.  I assume this is the New York Forward

 2   document that's attached on Exhibit 20.

 3      Q.  So there were no other reopening guidelines

 4   that you're referring to?

 5      A.  No.

 6      Q.  So this document that's attached as

 7   Exhibit 20, it's marked confidential.  Do you see

 8   that?

 9      A.  Where?

10      Q.  On the bottom left-hand side, it says

11   "Confidential."

12      A.  Yes.

13      Q.  Was this confidentially given to you

14   directly by the Governor?

15      A.  No, I don't remember.  I don't know.  This

16   would have been printed from the link that's

17   attached here.  I don't know where the

18   "Confidential" came from; it's not mine.

19      Q.  And you'd agree with me that Plaintiffs' 20

20   was a document where the cover stated, "New York

21   Forward," correct?

22      A.  Yes.

23      Q.  And said "A Guide To Reopening New York &

24   Building Back Better," correct?

25      A.  Yes.
```

1   Q.  And throughout, it spoke about how New York

2   could reopen, correct?

3        MS. LUNDY:  Objection.

4   Q.  Without going through every single page,

5   this was a document that New York sent out?

6   A.  It was issued by the Governor's office.

7   Yes.

8   Q.  And did you use this in any way to try to

9   reopen the Four Seasons New York?

10  A.  Not that I recall.

11       MS. LUNDY:  Can we just go off the record

12    for a second?

13       (Whereupon, a discussion was held off the

14    record.)

15       MS. RISMAN:  We can do five minutes.

16       (Whereupon, a break was taken at 3:56 p.m.,

17    and the deposition resumed at 4:05 p.m.)

18   Q.  So, Ms. Ortiz, going back to the WARN

19  notices that were sent to the nonunion employees,

20  were those notices mailed out?

21  A.  Yes.

22  Q.  Were they also e-mailed?

23  A.  Most likely, yes.

24  Q.  And do you know how many people they were

25  sent to?

1    A.  No.  Probably, like, 50 or 60.  I don't

2  remember off the top of my head.

3    Q.  If I said 78, would that refresh your

4  recollection?

5        MS. LUNDY:  Objection.

6    A.  Yeah, that sounds about right.

7        THE WITNESS:  Sorry.

8    Q.  And who entered the change in address of

9  every letter?

10       MS. LUNDY:  Objection.

11   A.  Say that again?

12   Q.  So who entered the change of the name, the

13  address, and the date of layoff in every one of

14  these letters?

15       MS. LUNDY:  Objection.

16   A.  I think I answered that earlier.  It would

17  have been one of my assistants, probably Lisa,

18  because she did all the mail merge, or Alex.

19   Q.  And did somebody actually stuff an envelope

20  with each of these letters?

21   A.  They would have.  Yes.

22   Q.  And was there a particular procedure that

23  was done to ensure that everyone received their

24  letter?

25   A.  I don't think so.  Not anything other than

1    the normal.  No.

2        Q.  And was there any type of checklist that

3    somebody had to go through to make sure that the

4    letters were mailed out properly?

5        A.  I don't think so.  It was a smaller group

6    and they had already done bulk mailing, so it would

7    have been the same process.

8        Q.  Was there any process used that ensured that

9    no one was missed and everyone received the letter?

10       A.  That would have been through the employee

11   data checklist.  If that's what you're referring

12   to, then yes.

13       Q.  And how were these letters kept --

14           MS. LUNDY:  Objection.

15       Q.  -- by the Four Seasons New York?

16           MS. LUNDY:  Objection.

17       A.  What do you mean "how they were kept"?

18       Q.  Were these letters kept on a computer system

19   or some other way?

20       A.  Everything we have is electronic.

21       Q.  And did anyone follow up with the employees

22   to make sure that they received these letters?

23       A.  I don't know.  I didn't.

24       Q.  And can you tell me why these letters were

25   not sent before August 5th, 2020 to the nonunion

1  employees of FSNY?

2       MS. LUNDY:  Objection.

3    A.  I think I've answered that question.  I

4  think at the time, we had a rolling reopening date

5  and we didn't anticipate any extended layoffs, and

6  if you see by the dates on the letters, there are

7  varying dates of letters; we had every intention

8  of, you know, just calling people back, and we

9  wanted to make sure that -- I guess that we had the

10  -- I don't know what we wanted to make sure.  I

11  think that there was never any intention for them

12  to be out so long.

13    Q.  But you'd agree with me that the WARN notice

14  to the union employees was sent in March of 2020,

15  correct?

16       MS. LUNDY:  Objection.

17    A.  Yes, because that was a larger group, right?

18  So that's, like, a mass layoff.  These nonunion

19  employees had varying dates of layoffs, so --

20    Q.  Would you agree with me that most of the

21  layoff dates for this group of 78 nonunion

22  employees was in March of 2020?

23       MS. LUNDY:  Objection.

24    A.  No.  I would have to look at it; I think

25  there are varying dates there.

1    Q.  And we discussed previously that the dates

2  listed for some of these employees, although their

3  salary was decreased by more than 50 percent, the

4  dates put on these letters was essentially the last

5  day that they worked for Four Seasons New York,

6  correct?

7    A.  That would be -- yes.

8    Q.  Now, do you recall a closure plan being

9  discussed in 2020?

10        MS. LUNDY:  Objection.

11    A.  I might, but I've probably forgotten.  I'd

12  have to jog my memory.

13    Q.  Are you aware of any revised closure

14  staffing model for New York?

15    A.  So, again, that was just every -- every day,

16  every week, it was, like, a different conversation:

17  Are we opening next week?  Are we opening at the

18  end of the month?  Are we opening in the middle of

19  next month?  So that staffing model would have been

20  adjusted and revised based on those conversations.

21    Q.  And who would be reviewing that staffing

22  model?

23        MS. LUNDY:  Objection.

24    A.  At the time, it would have been whatever

25  leaderships that were in the Executive Committee

1    that were on property.

2       Q.  So is it your testimony that in June of

3    2020, the hotel had no intention of renovating the

4    hotel prior to reopening it?

5          MS. LUNDY:  Objection.

6       A.  What do you mean "the hotel," though?  The

7    hotel or the operators?

8       Q.  So my question to you is, in June of 2020,

9    did anyone, whether operators or owners or

10   managers, have any intention of renovating the

11   hotel prior to reopening the hotel?

12         MR. WAGNER:  Objection.

13         MS. LUNDY:  Objection.

14      A.  I think I've answered that question; I think

15   we talked about there were conversations of before

16   we reopen; like, we talked about the cafeteria

17   before, we talked about, you know, new carpeting or

18   the employee locker rooms; there were always

19   different discussions -- "Wow.  We should take this

20   time of closure to, you know, rework some of these

21   areas." So I think the conversation was always

22   ongoing.

23      Q.  So, Ms. Ortiz, I'm not asking you about

24   conversations; I'm asking you whether there was a

25   decision in June of 2020 that renovations had to be

ELIZABETH ORTIZ                                      JOB NO. 568002
APRIL 03, 2023

 1   done prior to the hotel reopening for business.

 2         MS. LUNDY:  Objection.

 3      A.  I don't remember.

 4      Q.  Do you recall whether Antoine Chahwan ever

 5   provided you with any reopening model?

 6      A.  Not specifically.  I'd have to see it.

 7      Q.  Do you recall whether Mr. Chahwan ever made

 8   any determination that the General Manager should

 9   be retained in case there was a closure of the

10   hotel?

11         MS. LUNDY:  Objection.

12      A.  I don't understand the question.

13      Q.  So I'm going to be showing you what's marked

14   as 21.

15         (Whereupon, an e-mail by Rudy Tauscher to

16      Cathy Hwang and CC-ing Antoine Chahwan and

17      Elizabeth Ortiz dated 6-22-20 and Bates-stamped

18      WarnerDEF000903 was marked as Plaintiffs'

19      Exhibit 21 for identification, as of this date.)

20      Q.  Ms. Ortiz, I'm going to be showing you

21   what's been marked as Plaintiffs' 21, WarnerDEF9097

22   [sic].  Are you aware that there was a closure

23   label model that was discussed between the various

24   ownership and operation persons --

25         MS. LUNDY:  Objection.

1     A.   In relation to this e-mail?

2     Q.   So I'm just wondering if this e-mail

3  refreshes your recollection as to whether there was

4  any discussion related to a closure label model for

5  the Four Seasons New York.

6          MS. LUNDY:   Objection.

7     A.   No.   What this e-mail does is it reminds me

8  of our due diligence to notify the union of any

9  continuation of a closure, which is what this does.

10    Q.   And do you see where it says, "Our

11 requirement is that GM is retained in the attached

12 version shown.  Both GM and HM positions remaining

13 until the issue is resolved"?  Do you see that?

14         MS. LUNDY:   We're looking at a different

15    e-mail.

16         MS. RISMAN:   Are you?  I'm sorry.

17    A.   WarnerDEF903.

18    Q.   Sorry about that.  Hold on.  Oh, okay.  I'm

19 sorry.  So this e-mail deals with your notification

20 to the union, correct?

21         MS. LUNDY:   Objection.

22    Q.   This e-mail -- I'm sorry.  Warner DEF903

23 deals with your communication to the union,

24 correct?

25         MS. LUNDY:   Objection.

1      A.  Not mine.

2      Q.  Tell me, what is Plaintiffs' 21

3   Bates-stamped Warner DEF903?  Is that an e-mail you

4   ever saw before?

5      A.  Well, my name is on it; I don't remember the

6   specific e-mail, but I remember this discussion.

7      Q.  And what do you remember about the

8   discussion?

9      A.  Nothing.  We did our due diligence to let

10  the -- notify the union of our temporary closure,

11  that we would reopen at the end of August or early

12  September.

13     Q.  And did you continue to notify the union

14  when the hotel didn't reopen?

15      MS. LUNDY:  Objection.

16     A.  We continued to notify the union as per the

17  contract of any reduced workweeks or layoffs.

18     Q.  And at some point, the Four Seasons New York

19  entered into a stipulation with the union, correct?

20      MS. LUNDY:  Objection.

21     A.  That's a broad question.  I mean, there's

22  several side letters.  I don't know which one

23  you're referring to.

24     Q.  At some point, did the Four Seasons New York

25  enter into a settlement agreement with the union,

```
 1   where they agreed to pay union members monies while

 2   the union members were on layoff?

 3            MS. LUNDY:  Objection.

 4       A.   That was a City Council decision.

 5       Q.   Other than the City Council decision, was

 6   there any other settlement agreement that was

 7   entered into --

 8            MS. RISMAN:  I think that was part of your

 9       -- your -- exhibits.

10            MS. LUNDY:  Our Defendants' exhibits from

11       Plaintiff's --

12       A.   I'm sorry.  What was the question again?

13            MS. LUNDY:  Do you know where it is?

14            MR. BRUSTEIN:  If you give me one minute,

15       I'll tell you.  Twenty-three.

16       Q.   So, Ms. Ortiz, I'm going to show you what's

17   previously been marked as Exhibit D23.

18            MS. LUNDY:  I don't know if you made that

19       distinction on the record.

20            MS. RISMAN:  Yeah, I don't think he did.

21       Q.   So I'm going to be showing you what's been

22   previously marked as Exhibit 23, and that's

23   Bates-stamped StaleyVFSR0304.  Is that your

24   signature on the bottom of the document?

25       A.   Yes, it is.
```

1    Q.  Does that refresh your recollection whether

2   Four Seasons New York entered into an agreement

3   with the union to pay union members salaries during

4   their furlough?

5    A.  Yes.

6    Q.  And so, according to this agreement, union

7   members were paid $350 a week, commencing on the

8   week of September 5th, 2021, correct?

9        MS. LUNDY:  Objection.

10   A.  Yes.

11   Q.  And that would be paid through January 1st,

12  2022, correct?

13   A.  Yes.

14   Q.  Were there any other types of agreements

15  similar to this one where the Four Seasons New York

16  entered into an agreement with the union agreeing

17  to pay union members throughout their furlough?

18   A.  Yes, there was -- let me just read this.

19   Q.  So, Ms. Ortiz, you just said there were

20  other agreements that the union entered into with

21  Four Seasons New York paying union members salaries

22  other than this agreement, correct?

23       MS. LUNDY:  Objection.  I don't think that

24    was her testimony; it was more specific.

25   A.  No, I'm just -- I'm talking out loud.  So

1  this was the first one; this is the enhanced

2  severance agreement, and this came after the

3  discontinuation of the City Council decision.

4      Q.  And were there any other agreements after

5  this agreement where the union members were

6  continued to be paid a salary weekly?

7          MS. LUNDY:  Objection.

8      A.  I don't remember.

9      Q.  Do you know if Four Seasons New York is

10  currently paying union members a salary while

11  they're on furlough?

12     A.  That's a better question.  Yes.

13     Q.  They are?

14     A.  Yes.  So that stands to reason that there's

15  an agreement somewhere; I just didn't remember it.

16     Q.  But you'd agree with me that since the

17  furlough date, nobody has been paying the nonunion

18  members a salary, correct?

19         MS. LUNDY:  Objection.

20     A.  No, that's not true.  Nonunion members are

21  being paid as well.

22     Q.  Which nonunion members are being paid?

23     A.  I don't know off the top of my head.  It

24  would have been the hourly -- under the -- whatever

25  employee was designated under the FLSA as nonexempt

1    and not administrative or whatever, that other

2    specification is privy to confidential information.

3        Q.  And do you have a list of those members that

4    were paid --

5        A.  Yeah, I think --

6        Q.  -- based on --

7        A.  I think it's been provided.

8        Q.  -- based on what you're talking about right

9    now?

10       A.  Yes.  I believe it's been provided.

11       Q.  And how many nonunion members were paid that

12   amount?

13       A.  I would have to look.

14       Q.  And what is the amount that was paid to

15   them?

16       A.  It's $500 a week.

17       Q.  And how long was it paid to these nonunion

18   members?

19       A.  Until the hotel reopens.

20       Q.  So it's being paid to date?

21       A.  Correct.

22       Q.  And when did the payments start?

23       A.  Well, it would have all been around the same

24   time.  So it was the City Council mandate, then

25   that ended, then the union had this agreement, then

1  we agreed to pay -- to continue paying -- those

2  nonunion employees that were categorized as

3  nonexempt employees under the FLSA.

4      Q.  Who did that agreement take place with

5  between Four Seasons New York?

6      A.  That would have been Hotel 57 Services, LLC

7  and, I guess, the other entities.

8      Q.  So is it your testimony that Hotel 57, LLC

9  -- I'm sorry.  Withdrawn.

10         Is it your testimony that Hotel 57

11  Services, LLC, on their own, came into an agreement

12  with the other Defendants in this case to pay some

13  nonunion employees monies weekly, or are you saying

14  something else?

15         MS. LUNDY:  Objection.

16      A.  No, it would have been a collaboration

17  again.

18      Q.  So, again, who is it that decided to pay

19  some nonunion members $500 a week until the old

20  hotel opens?

21      A.  So it would have been a collaboration

22  between Hotel 57 Services, LLC Management, the

23  operator, i.e. Four Seasons, and the ownership

24  group.

25      Q.  And do you know the reason that they decided

1  to pay those monies to some nonunion employees that

2  were on furlough?

3      A.  No.

4      Q.  And do you know why it was decided not to

5  pay some of the administrative employees --

6  withdrawn.

7          Do you know why it was decided that

8  administrative employees were not paid this $500 a

9  week?

10     A.  So none of the exempt employees have been

11 paid any of that money; it just followed suit under

12 the City Council agreement that any of the

13 nonexempt employees would continue and the exempt

14 or those classified under the FLSA as

15 administrative or having access to confidential

16 information were not eligible for that money.

17     Q.  So how many of those people were not

18 eligible for that money that were nonunion

19 employees?

20     A.  I don't know off the top of my head.

21 Probably four that I can think of.

22     Q.  Other than the four you mentioned, was

23 anyone else not eligible for those monies?

24     A.  Not that I remember.  I don't know.  I'd

25 have to look.

1      Q.  Can you name the four people?

2      A.  Sure.  I mean, they're categorized as

3   nonexempt under the FLSA anyway.  It would be the

4   Executive Assistant Elizabeth Wedge (phonetic); it

5   would be the -- I forget what her position is, but

6   Vivian Holmes, whatever her position is, and then

7   two of our sales managers, because they are deemed

8   offsite sales managers eligible for overtime --

9   overtime-eligible managers.

10      Q.  So is it that the salaried positions would

11   not be provided with these benefits but the hourly

12   employees would?

13      A.  It's not just the salary; it's the way

14   they're classified under the FLSA.  Like, Vivian

15   Holmes is an hourly employee, but she's classified

16   under the FLSA as an administrative -- has

17   financial knowledge; I forget what all the -- that

18   particular -- what the hell's it called? --

19   classification is.

20      Q.  How about Olive Ivey?

21      A.  She's an exempt manager.

22      Q.  So that's already five people that we named?

23      A.  I forgot about Olive.

24      Q.  Anybody else?

25      A.  Well, yeah.  I said there were the -- wait.

1  Hold on a second.  Did everybody get that money?

2  Yes, they did.  Okay.  Yeah.  It would be any of

3  the exempt managers wouldn't have gotten it.

4      Q.  And everybody else would have gotten $500 a

5  week?

6      A.  The hourly.

7      Q.  The hourly employees would have received

8  $500 a week?

9      A.  Nonexempt, yes.

10     Q.  Is there any agreement that mandates that

11 these payments continue to be made?

12     A.  I would have to look.  I can't imagine that

13 I would have done it without there being an

14 agreement, so -- and you may have it; I'd have to

15 look for it.

16         MS. RISMAN:  If this was not provided, we

17     call the agreement be provided to us.

18         MS. LUNDY:  Can we take a break for a

19     minute?

20         MS. RISMAN:  Sure.

21         MR. BRUSTEIN:  You mean, like, a five-minute

22     break?

23         MS. LUNDY:  Yeah.

24         (Whereupon, a break was taken at 4:30 p.m.,

25     and the deposition resumed at 4:35 p.m.)

1          MS. RISMAN:  We're back on?  Just the last

2      question.  Sorry.

3          (Whereupon, the requested portion of the

4      record was read back.)

5      Q.  So if there is an agreement, is it kept at

6    the Four Seasons New York?

7      A.  So I have to -- let me just answer your

8    question.  Yes, they would be kept at the Four

9    Seasons New York if there is an agreement.

10     Q.  And to your knowledge, you believe there is

11   some sort of agreement where some of these nonunion

12   employees are continuing to be paid $500 a week?

13     A.  Yes, there would be; I wouldn't have

14   arbitrarily made that decision.

15     Q.  And are there any e-mails related to this

16   agreement?

17     A.  I'm sure there are, and I would think that

18   it's been provided, but I can double-check.

19         MS. RISMAN:  So we'd call for the production

20     of this agreement in case we have not been

21     provided it.

22         MS. LUNDY:  Please follow up in writing, and

23     we'll respond.

24     Q.  Ms. Ortiz, are you familiar with the EmPact

25   agreement that the Four Seasons employees had to

1   sign in order to work for the Four Seasons

2   New York?

3        A.  Yes.

4        Q.  Are you aware of whether all Four Seasons

5   employees sign an EmPact agreement?

6        A.  Yes.

7             MR. WAGNER:   Objection.

8        Q.  And I'm asking you about Four Seasons

9   employees and other Four Seasons sister properties.

10  Are you aware of whether those employees also sign

11  an EmPact agreement?

12            MS. LUNDY:   Objection.

13       A.  I wouldn't know.

14       Q.  So you only know about the Four Seasons

15  EmPact agreement that was signed by the employees

16  of the Four Seasons New York, correct?

17       A.  Yes.   That I have personal knowledge of,

18  yes.

19       Q.  And you reviewed that EmPact agreement,

20  correct?

21       A.  Yes.

22       Q.  And would you agree with me that the EmPact

23  agreement is essentially the same for all employees

24  except for various amendments that get put in at

25  various times?

1      MS. LUNDY:  Objection.

2    A.  I'm not sure what you mean by that.

3    Q.  Is the EmPact agreement the same for all

4  employees that work at Four Seasons New York?

5      MS. LUNDY:  Objection.

6    A.  Well, yeah.  There's also those employees

7  who are covered by the Collective Bargaining

8  Agreement, so it is a little bit different; the

9  arbitration process, the mediation process, that's

10  very similar.

11   Q.  Would you agree with me that the --

12  withdrawn.

13     Would you agree with me that the EmPact

14  agreement for the nonunion employees of Four

15  Seasons New York is essentially the same for all of

16  the nonunion employees?

17   A.  Yes.

18   Q.  Are there any differences in the EmPact

19  agreement for nonunion employees from one employee

20  to another?

21     MS. LUNDY:  Objection.

22   A.  Not that I believe.

23   Q.  So are you aware whether Vivian Holmes

24  signed an EmPact agreement with Four Seasons

25  New York?

1      A.  Yes.

2      Q.  And are you aware whether Olive Ivey signed

3  an agreement?

4      A.  Yes.

5      Q.  And did Selena Staley sign a similar

6  agreement?

7      A.  Yes.

8      Q.  And you'd agree that every single nonunion

9  employee at Four Seasons New York must sign an

10  EmPact agreement or they cannot work there?

11      MS. LUNDY:  Objection.

12      MR. WAGNER:  Objection.

13      A.  No, I don't think it would be that they

14  cannot work there.  I think there's language -- I

15  would have to look at it, but there's not "if you

16  don't sign it, you can't work here."

17      Q.  Do you know anybody -- withdrawn.

18      Do you know anyone that was employed by the

19  Four Seasons New York that refused to sign the

20  EmPact agreement?

21      A.  No.

22      Q.  And when is the first time that you read the

23  EmPact agreement?

24      A.  Probably when I was hired.

25      Q.  And did you have to sign an EmPact agreement

```
 1   as well?

 2       A.  I did.

 3       Q.  And --

 4       A.  I didn't have to; I chose to.

 5       Q.  And prior to testifying today, did you

 6   review the EmPact agreement?

 7       A.  Briefly, not recently.

 8       Q.  Okay.  Prior to signing a declaration in

 9   this case, did you review the EmPact agreement?

10       A.  What do you mean by that?

11       Q.  Did there come a time that you signed a

12   declaration in this case?

13       A.  Probably.  I don't remember.

14           (Whereupon, a discussion was held off the

15       record.)

16       Q.  So look, let's try -- so, Ms. Ortiz, I'm

17   going to be showing you what's been previously

18   marked as Exhibit 15.

19       A.  Okay.

20       Q.  Do you see that?  And you'd agree with me

21   that that's your declaration, correct?

22       A.  Yes.

23       Q.  And it states there, "Declaration of

24   Elizabeth Ortiz," correct?

25       A.  Yes.
```

ELIZABETH ORTIZ                                              JOB NO. 568002
APRIL 03, 2023

```
 1      Q.  And Number One states, "I'm the Director of

 2   People and Culture for Defendant Hotel 57

 3   Services, LLC," correct?

 4      A.  Yes.

 5      Q.  Then, it says, "and respectfully submit this

 6   declaration in support of Defendants Hotel 57

 7   Services, LLC, Hotel 57, LLC, Ty Warner Hotels And

 8   Resorts LLC, and H. Ty Warner's collective, the

 9   Warner Defendants, motion to dismiss the Amended

10   Complaint against the Warner Defendants in its

11   entirety." Do you see that?

12      A.  Yes.

13      Q.  When I asked you previously whether you knew

14   who Hotel 57, LLC, you said you didn't know who

15   that was, right?

16      A.  No.

17      Q.  So how did you submit a declaration on their

18   behalf if you don't know who Hotel 57, LLC is?

19          MS. LUNDY:  Objection.

20      A.  I didn't remember.

21      Q.  Do you remember now?

22      A.  It's one of the business entities.

23      Q.  So on what basis do you have the authority

24   to submit a declaration on behalf of Hotel 57, LLC?

25          MS. LUNDY:  Objection.
```

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1     A.   It's one of the business entities.

2     Q.   And do you have a basis to submit a

3   declaration on behalf of Ty Warner Hotels And

4   Resorts LLC?

5          MS. LUNDY:   Objection.

6     A.   I would say as one of the business entities.

7     Q.   Do you work for Ty Warner Hotels And

8   Resorts LLC?

9     A.   I work for Hotel 57 Services, LLC.

10    Q.   So you'd agree with me that --

11    A.   They're joint employers.

12    Q.   So do you also have authority to submit a

13   declaration on behalf of H. Ty Warner?

14         MS. LUNDY:   Objection.

15    A.   Yeah, I would think so.

16    Q.   How is it that you'd also have authority to

17   submit a declaration on behalf of H. Ty Warner?

18         MS. LUNDY:   Objection.

19    A.   It's a good question.  I don't know.

20    Q.   Is H. Ty Warner also a joint employer?

21         MS. LUNDY:   Objection.  Calls for a legal

22   conclusion.

23    A.   I don't know.

24    Q.   So these other joint employers, Defendants

25   Hotel 57 Services, LLC, Hotel 57, LLC, Ty Warner

 1  Hotels And Resorts --

 2      A.  Yes.

 3      Q.  -- are they the ones that draft the EmPact

 4  agreement?

 5          MS. LUNDY:  Objection.

 6      A.  Actually, I'm not sure.

 7      Q.  And so, focusing your attention to Exhibit D

 8  attached to your declaration, is that the EmPact

 9  agreement?

10      A.  Yeah, it's the handbook which contains the

11  EmPact agreement.  Yes.

12      Q.  Which part of it is the handbook and which

13  part of it is the EmPact agreement?

14      A.  Well, I mean, it's all part of it.  There's

15  the C.A.R.E. -- they call it EmPact; anyway, it's

16  all part of the same thing.  There's the C.A.R.E.

17  provision in here somewhere, and then, there's the

18  -- yeah, the C.A.R.E., and then, it's at the end.

19  Yes.

20      Q.  So according to your declaration, Number

21  Three, Number Four, and Number Five, which is the

22  second page of your declaration, you stated that --

23  withdrawn.  I'm sorry.

24          According to your declaration, Number Four,

25  it states that "A true and correct copy of the

ELIZABETH ORTIZ                                         JOB NO. 568002
APRIL 03, 2023

1   EmPact agreement effective February, 2018 is

2   annexed as Exhibit D." Do you see that?

3       A.  Yes.

4       Q.  Now, focusing your attention on Exhibit D

5   there, and focusing your attention to Page Six of

6   the agreement and --

7       A.  Page Six in Exhibit D?

8       Q.  Yes.  And if you look at the top right

9   corner, it says "Page 7 of 63 of Document 52-4."

10      A.  Okay.

11      Q.  You see a picture of someone there, right?

12      A.  Yes.

13      Q.  And who is that a picture of?

14      A.  That's Rudy Tauscher.

15      Q.  Do you know if Mr. Tauscher worked for the

16  Four Seasons New York in February of 2018?

17      A.  I don't remember.

18      Q.  Do you know if the Plaintiffs Ms. Staley,

19  Ms. Holmes, and Ms. Ivey signed the EmPact

20  agreement when Mr. Tauscher was already working

21  there?

22      A.  Yes.

23      Q.  What makes you say that?

24      A.  Because I had to produce the signature pages

25  at the onset of this conversation.

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

```
 1       Q.  And where did you get the signature pages
 2   from?
 3       A.  The personnel files.
 4       Q.  And can you tell me, on the bottom of this
 5   agreement Exhibit D, the EmPact agreement, it
 6   states, "last revised February, 2018," correct?
 7       A.  Yes.
 8       Q.  Would you agree with me that in February,
 9   2018, the person that was the General Manager at
10   the Four Seasons New York was Medhief Tekari --
11   M-E-H-D-I-E-F, T-E-K-A-R-I?
12       A.  I don't know; I wasn't there in 2018 in
13   February.
14       Q.  Now, according to your declaration, it also
15   states that you submit this declaration in support
16   of Defendants' Motion to Dismiss, correct?
17       A.  Yes.
18       Q.  So why do you think that Defendants' Motion
19   To Dismiss should be granted?
20           MS. LUNDY:  Objection.
21       A.  I'm not an attorney, so I couldn't really
22   respond to that.
23       Q.  But is it your personal view that the
24   Plaintiffs' case should be dismissed?
25       A.  Yes.
```

1      Q.   On what basis?

2           MS. LUNDY:  Objection.

3      A.   What's the question?

4      Q.   On what basis should the Plaintiffs' lawsuit

5    be dismissed?

6           MS. LUNDY:  Objection.  Calls for legal

7      conclusions.

8           THE WITNESS:  Can I ask you --

9           MS. LUNDY:  Not while a question is pending.

10          MS. RISMAN:  We're just going to take five

11     minutes.  I'm sorry.

12     A.   That's okay.

13          (Whereupon, a discussion was held off the

14     record.)

15          (Whereupon, the requested portion of the

16     record was read back.)

17     Q.   So you wrote this declaration saying that

18   Plaintiffs' action should be dismissed, correct?

19   So I'm not asking you for a legal conclusion; I'm

20   asking you why you personally thought it was okay

21   to sign a declaration stating that the Plaintiffs'

22   action should be dismissed.

23          MS. LUNDY:  Can I have the exhibit back,

24     please?  Can the Witness have the document back

25     while you're asking your question?

1          MS. RISMAN:  Absolutely.

2          MS. LUNDY:  Thank you so much.  Can you read

3      back the question, please?

4          (Whereupon, the requested portion of the

5      record was read back.)

6          MS. LUNDY:  Objection to the extent it

7      mischaracterizes the declaration in evidence.

8          MS. RISMAN:  So your objection is noted.

9      Q.  Ms. Ortiz, what is your personal feeling as

10   to why the Plaintiffs' action should be dismissed?

11         MS. LUNDY:  Objection.

12     A.  I think there's a couple of things.  First

13   of all, we're not permanently closed, and there's a

14   process, I believe, under the C.A.R.E. and EmPact

15   agreement that has not been followed.

16     Q.  And what is that process that hasn't been

17   followed?

18     A.  There's an arbitration step, I think, that

19   has been eliminated; there's the -- I don't know if

20   it's mediation; there's the formal complaint with

21   the hotel that has not been followed; a formal

22   complaint with my office; I think there are steps

23   that have been taken out of this agreement that

24   have not been followed.

25     Q.  So let's go into -- so I'm going to be

 1   showing you what now we're marking as Plaintiffs'

 2   22.

 3           (Whereupon, a 61-page document with the

 4       cover page titled "U.S. EmPact Employee Handbook

 5       with Four Seasons Hotel New York" was marked as

 6       Plaintiffs' Exhibit 22 for identification, as of

 7       this date.)

 8       Q.  So, Ms. Ortiz, focusing your attention to

 9   Page 56 of the EmPact agreement, the very bottom,

10   where it states "No-Fault Separation Pay," it

11   states here, "If I receive a permanent layoff with

12   no right of recall or I am terminated for no fault,

13   my termination would be considered 'no-fault,'"

14   correct?

15       A.  Yes.

16       Q.  And it states that if that happens, then the

17   person "[cannot] seek mediation or arbitration of a

18   permanent lay-off or 'no-fault' termination under

19   Step 6 of C.A.R.E.," correct?

20       A.  Yes.

21       Q.  Now, focusing your attention to 54 of that

22   same document --

23       A.  To Page 54?

24       Q.  Yes, to Page 54, bottom left-hand side.

25       A.  Yes.

1    Q.   The very top of it says, "Complaint,

2  Arbitration & Review For Employees," correct?

3    A.   That's the C.A.R.E. agreement, yes.

4    Q.   So Step 1 says, "I will discuss the matter

5  informally with my immediate supervisor," correct?

6    A.   Correct.

7    Q.   So at the time that Plaintiffs filed this

8  lawsuit, did they have an immediate supervisor?

9    A.   They would have had supervisors that they

10 worked for previously.  Yes.

11   Q.   Okay.  So who was Ms. Ivey's supervisor in

12 June, 2021?

13   A.   That would have been Sharon Brambrut --

14 B-R-A-M-B-R-U-T.

15   Q.   Was she furloughed in June, 2021?

16   A.   No.

17   Q.   Was she furloughed in June, 2022?

18   A.   No.

19   Q.   Is she still working there now?

20   A.   She's recently been promoted.

21   Q.   So is she working for Four Seasons New York?

22   A.   No.

23   Q.   So when you say, "she's recently been

24 promoted," where is she working?

25   A.   She works for the World Office.  She has

1   left Hotel 57 Services, LLC and now works for Four

2   Seasons Hotel And Resorts International.

3       Q.  How do you know that no one complained to

4   her?

5       A.  What do you mean?

6       Q.  You said Ms. Ivey should have complained to

7   her, correct?

8       A.  Because we worked in conjunction; we never

9   received a formal complaint.

10      Q.  But this says "informally with my immediate

11  supervisor." How do you know she never spoke to

12  her --

13      A.  Because Sharon and I collaborate almost on a

14  daily basis over discussions that we've had; that

15  was never brought to our attention.

16      Q.  And who was Ms. Staley's immediate

17  supervisor?

18      A.  In 2021, that would have been Sharon as

19  well; she was the Director of Rooms.

20      Q.  And in 2022, who was her immediate

21  supervisor?

22      A.  Same.

23      Q.  And when in 2021 did she get a promotion?

24      A.  She didn't leave until the end of December;

25  she's only been gone three months.

1    Q.   And when was formal notice provided to them

2    that she became their supervisor?

3         MS. LUNDY:   Objection.

4    A.   Formal notice provided to them, it was

5    either in a communication saying who was the

6    leadership of the hotel and who to contact if they

7    had any direct questions, it would have been in an

8    e-mail maybe; I don't know that there was any, "Oh,

9    this is now your supervisor"; it was more like, "If

10   you have any questions, please speak with Sharon."

11   Q.   Do you have an e-mail or any documentation

12   that would show that that was provided to them?

13        MS. LUNDY:   Objection.

14   A.   No, but I mean it's common sense; it would

15   have been common sense 'til -- there was nobody

16   else there; I mean, you'd have to be living under a

17   rock to not know that the next person to report to

18   would be the Director of Rooms, given the fact that

19   your other direct supervisors were not there.

20   Q.   My question to you is, is there any document

21   that would show that they now had to report to

22   somebody else other than their supervisor prior to

23   March of 2020?

24        MS. LUNDY:   Objection.

25   A.   Not that I recall.

ELIZABETH ORTIZ                                               JOB NO. 568002
APRIL 03, 2023

1    Q.  Now, you had testified previously that by

2    January of 2021, there was no General Manager,

3    correct?

4    A.  I think he resigned at the end of January.

5    Q.  So Step 5, where it says, "If I am

6    dissatisfied with the written decision in Step 4, I

7    will appeal to the General Manager within 14 days

8    after Step 4," that couldn't have been done if

9    there's no General Manager, correct?

10   A.  But there are leaders in the building that

11   would serve in that role, myself included.

12   Q.  So you did say previously that there was no

13   acting General Manager also, correct?

14       MS. LUNDY:  Objection.

15   A.  I don't think so.  I think I said I've taken

16   on that role, but I don't own that title, and --

17   along with Steven Taplan.

18   Q.  So you'd would agree with me there is no

19   General Manager, correct?

20       MS. LUNDY:  Objection.  At what point in

21    time?

22   Q.  So in 2021, you'd agree there was no

23   General Manager in June, 2021, correct?

24       MS. LUNDY:  Objection.

25   A.  On the property level that those tasks would

```
1   have been distributed to the remaining executive

2   leadership team that was in place.

3       Q.  And in 2022, you'd agree with me there was

4   no General Manager, correct?

5       A.  Those tasks would have been redistributed to

6   those of us who were on property in the leadership

7   roles.

8       Q.  But you'd agree with me Step 5 does not

9   state General Manager or those tasks distributed to

10  others or something like that, right?  It just says

11  -- it just says -- "If I am dissatisfied with the

12  written decision in Step 4, I will appeal to the

13  General Manager," correct?

14          MS. LUNDY:  Objection.

15      Q.  Withdrawn.  So my question to you is, you'd

16  agree with me that according to Step 5, it states

17  specifically, "I will appeal to the General Manager

18  within 14 days after Step 4," and it does not state

19  anywhere there that anyone would appeal to anyone

20  other than the General Manager, correct?

21          MS. LUNDY:  Objection.

22      Q.  Yes or no.

23          MS. LUNDY:  You can answer as you see

24      appropriate, Ms. Ortiz.

25      A.  No, because there's always a contingency
```

1  plan in businesses like ours, and whenever -- it's

2  common knowledge in our industry that if there are

3  emergency situations or dire situations, there is a

4  contingency  plan that, absent a regional person,

5  then you'd go to the General Manager; absent a

6  General Manager, you'd go to the Director of Human

7  Resources; absent the Director of Human -- there's

8  a contingency plan; it's in our industry --

9  actually, I probably -- our Emergency

10  Communications Plan has that contingency set up.

11  So no.

12    Q.  So I'd like to see where in this EmPact

13  agreement is this contingency plan.  Please show

14  me.

15      MS. LUNDY:  Objection.

16    A.  I just said it's in the Emergency

17  Communications Plan, so that is brought out under

18  emergency situations like it was during COVID.

19      MS. RISMAN:  We call for the production of

20    this Emergency Plan.

21      MS. LUNDY:  Please follow up in writing and

22    I will respond in turn.  Thank you.

23      MR. BRUSTEIN:  You want to ask her what the

24    exact wording is?

25    Q.  What is the exact wording of this Emergency

 1  Plan?  What is it titled?

 2      A.  I don't have to look at it; I think it's the

 3  Emergency Contingency Plan.

 4      Q.  Was that Emergency Contingency Plan given to

 5  all of the employees?

 6      A.  No.

 7      Q.  Who was it given to?

 8      A.  It's a leadership document that allows for

 9  us under emergency situations.

10      Q.  Would this Emergency Contingency Plan be

11  given to Olive Ivey?

12      A.  No, but she would know who to contact in

13  order of hierarchy.

14      Q.  So my question to you is, was it ever given

15  to Olive Ivey --

16      A.  No.

17      Q.  -- the Emergency Contingency Plan?  Was this

18  Emergency Contingency Plan ever given to

19  Vivian Holmes?

20      A.  No.

21      Q.  Was this Emergency Contingency Plan ever

22  given to Selena Staley?

23      A.  No.

24      Q.  Was this Emergency Contingency Plan ever

25  given to any other nonunion employees?

1    A.  No.

2    Q.  Did you ever do any investigations as to any

3  complaints that you received from any nonunion

4  employees related to them not being paid their

5  severance pay?

6        MS. LUNDY:  Objection.

7    A.  I don't understand the question.

8    Q.  Did you ever do any investigation of any

9  complaints from any nonunion employees when they

10  complained to you that they should be paid with

11  no-fault separation pay and they did not receive

12  it?

13        MS. LUNDY:  Objection.

14    A.  I don't know that anyone ever complained to

15  me that they should receive no-fault separation

16  pay.

17    Q.  Do you recall --

18    A.  It may have come up in general

19  conversations, but I don't remember specific times.

20    Q.  Do you recall having a June 25th, 2021 town

21  hall meeting?

22    A.  I do.

23    Q.  Do you recall during that meeting people

24  complaining that they had not received no-fault

25  separation pay?

1        MS. LUNDY:  Objection.

2     A.  I think there was probably a question as,

3   "Will we be getting any kind of severance?"

4     Q.  And what was your answer to that question?

5     A.  No, because we're not closed.

6     Q.  Did anyone complain as to why the hotel was

7   not reopening and they were not being paid their

8   no-fault separation pay?

9        MS. LUNDY:  Objection.

10     A.  The word "complain," I think, is a

11   subjective word.  Have there been questions and

12   concerns about whether or not we're reopening and

13   whether or not there would be any severance paid?

14   I wouldn't classify those as complaints, not

15   certainly to the level of emergency that would --

16   that would -- warrant any kind of investigation --

17   investigation -- into I don't know to what.  My

18   answer for the last three years has been the same:

19   I don't have any knowledge, we are reopening, and

20   at this juncture, you're on a temporary layoff.

21     Q.  So my question to you is, if a nonunion

22   employee complained to you, "Why is it that I am

23   not getting my no-fault separation pay based on the

24   EmPact agreement," what investigation would you

25   then do?

1            MS. LUNDY:  Objection.

2       A.  So there are over 400 and -- whatever,

3    400-plus employees that have had concerns over the

4    last three years; I don't remember all of the

5    conversations or I don't remember all of the --

6    investigations into what?   Investigate what?

7       Q.  Have you ever investigated why the Four

8    Seasons New York has not paid their employees

9    no-fault separation pay?

10           MS. LUNDY:  Objection.

11      A.  Well, I know why they're not paying them:

12   because we're not closed.

13      Q.  So you'd agree that no investigation would

14   be done by you if there was a complaint like that,

15   correct?

16           MS. LUNDY:  Objection.

17      A.  They are eligible for recall, and we were

18   temporarily closed.

19      Q.  My question to you is, if somebody

20   complained to you about not receiving their

21   no-fault separation pay based on the EmPact

22   agreement, you would not have done an

23   investigation, correct?

24           MS. LUNDY:  Objection.  There's no

25      foundation for this question.

1       A.  I don't know what I am supposed to

2   investigate.  I answered the question.

3       Q.  So, Ms. Ortiz, is it your position that

4   neither the Plaintiffs or the other employees

5   furloughed are entitled to their no-fault

6   separation pay under the EmPact agreement?

7           MS. LUNDY:  Objection.

8       A.  At this juncture, they are not entitled,

9   because the language specifically says, "due to a

10  permanent closure." So no, they are not, because we

11  are not permanently closed.

12      Q.  So is it your testimony that no payments of

13  any kind have been made to any of the employees

14  that were on furlough?

15      A.  That is not my testimony.

16      Q.  Have any payments been made of no-fault

17  separation pay to any of the employees that were

18  furloughed?

19      A.  Not a no-fault separation pay.

20      Q.  So no --

21      A.  No no-fault separation pay.  No.

22      Q.  Now, you stated that various people have

23  provided their concerns to you, correct?

24      A.  Yeah.  Over the last three years, every

25  single employee in one way, shape, or form is just

1  curious as to when we would be reopening.

2     Q.  Have those people e-mailed you with those

3  concerns?

4     A.  Probably.  I don't remember anything

5  specifically.

6     Q.  Did you keep those e-mails of the concerns

7  that you were e-mailed?

8     A.  I've kept everything.

9     Q.  So we'd be calling for production of all of

10  those e-mails of employees that e-mailed you their

11  concerns.

12        MS. LUNDY:  Can you be more specific about

13     what -- concerns about what?

14     Q.  So any concerns that you received in

15  reference to no-fault separation pay, we'd be

16  calling for the production of those.

17     A.  So I don't think I would have received

18  anything that specifically says no-fault separation

19  pay; what I'm referring to is, "Hey, do you have

20  any news on the hotel?  Are we reopening?" That's

21  what I would --

22     Q.  Have anybody provided you with the concerns

23  as to why the hotel has been closed for so long and

24  they still have not received no-fault separation

25  pay?

1       MS. LUNDY:  Objection.

2    A.  Probably, and my answer remains the same:

3    because we are not permanently closed and you're

4    not entitled to that payment under the EmPact

5    agreement.

6    Q.  So when you were provided with those

7    concerns, and that was your answer, did you ever do

8    any investigation prior to providing that answer?

9       MS. LUNDY:  Objection.

10   A.  What investigation?  There's no

11   investigation to be had, and I'm sorry, but you've

12   asked that several times in different formats, and

13   the answer remains the same:  that I am one person

14   in this office managing over 400-plus employees'

15   requests, not to mention a million other things,

16   and under the circumstances, if somebody calls up

17   and says, "Hey, am I going to get paid?", my answer

18   would be, and has always remained, "Not at this

19   time, because you are not entitled to that payment

20   under the EmPact agreement."

21   Q.  So if the Four Seasons New York decided not

22   to recall any of the employees that were

23   furloughed, would they then be entitled to

24   separation pay under EmPact?

25      MS. LUNDY:  Objection.

ELIZABETH ORTIZ                                              JOB NO. 568002
APRIL 03, 2023

1      A.  If the employees were not recalled, but

2  that's not the case; the plan is to recall them.

3      Q.  So my question to you, though, is, if the

4  employees were not recalled, would they then be

5  entitled to separation pay under EmPact?

6          MS. LUNDY:  Objection.

7      A.  That would be me speculating, but I guess if

8  you look at the language specifically, probably so.

9  Yes.

10     Q.  So getting back to the June 21st -- I'm

11  sorry.  Withdrawn.

12         Getting back to the June 25th, 2021 meeting,

13  there were various people there that were getting

14  upset at that meeting, correct?

15         MS. LUNDY:  Objection.

16     A.  There was a pretty rude call.

17     Q.  And people asked you if being on furlough

18  for this long was legal, correct?

19         MS. LUNDY:  Objection.

20     A.  I don't remember.

21     Q.  Okay.  You said that some of the people on

22  the call were rude?

23     A.  Yeah.  I mean, there was a tough call.

24     Q.  How were they rude?

25     A.  I think the aggressiveness, the tone of

1    voice,  what I deemed as disrespectful to me as the

2    messenger, but I understand -- you know, the

3    psychologist in me understands -- that people get

4    upset for whatever reason, so I didn't take it

5    personally.  But yeah.

6        Q.  And during that call --

7        A.  Extremely disrespectful to me.

8        Q.  Sorry.  And during that call, you opened up

9    a chat box for people to tell you their questions,

10   concerns, complaints, correct?

11           MS. LUNDY:  Objection.

12       A.  Yes.

13       Q.  Okay.  And at that time, you were also aware

14   that many of the employees were simply confused

15   about the hotel's future, correct?

16       A.  I can't speculate on what they thought.  Not

17   getting the answer that they wanted at the time was

18   probably more -- was probably more -- the basis of

19   their questioning, because I didn't have the

20   answers.

21       Q.  After that town hall meeting, did you save

22   the questions, concerns, and complaints that were

23   placed in the chat box?

24           MS. LUNDY:  Objection.

25       A.  Yes, of course, and then, we responded to

1    those at a separate time.

2         MS. RISMAN:  We call for the production of

3      those questions, concerns, and complaints placed

4      in the chat box for the June 25th, 2021 meeting.

5      A.  You have them.

6         MS. LUNDY:  Please follow up in writing, and

7      we'll respond in turn.

8      Q.  So how many complaints were there in the

9    chat box for the June 25th, 2021 meeting?

10     A.  I don't remember.

11     Q.  Was it more than 50 complaints?

12        MS. LUNDY:  Objection.

13     A.  I doubt it.

14     Q.  More than 25 complaints?

15     A.  I don't know.

16     Q.  So after you received those complaints in

17   the chat box, did you respond to each of them

18   individually in writing?

19        MS. LUNDY:  Objection.

20     A.  I believe we sent a general e-mail, because

21   there were -- some of the questions were similar,

22   so we responded rather than -- and then, there were

23   individuals that, of course, called me afterwards;

24   I don't remember who or to what degree, but yes.

25     Q.  And would you agree with me that those

1   complaints in the chat box refer to being on

2   furlough for that long, right?

3       A.  I don't remember.

4       Q.  But you did say you searched your records

5   and you do have those complaints, correct?

6           MS. LUNDY:  Objection.

7       A.  I don't know if "complaint" is the right

8   word; I think it's questions regarding the status

9   of the operation. "Complaint" is subjective.  It's

10  a negative term that I just -- they were just

11  questions.

12      Q.  When people -- withdrawn.

13          Was there something in the chat box that

14  stated what the hotel was doing was not legal?

15          MS. LUNDY:  Objection.  Asked and answered.

16      A.  I don't remember.

17      Q.  We're going to be --

18          MS. RISMAN:  Can we take a break?

19          (Whereupon, a break was taken at 5:21 p.m.,

20      and the deposition resumed at 5:30 p.m.)

21      Q.  Ms. Ortiz, you are aware that the June 25th,

22  2021 meeting was recorded, correct?

23          MS. LUNDY:  Objection.

24      A.  I wasn't aware of that until quite recently.

25  I was never notified that I was being recorded.

1    Q.  And did you listen to that recording?

2    A.  No.

3    Q.  You've never listened to it?

4    A.  I have not.

5    Q.  Did you ever see a transcript of the

6  recording?

7    A.  I have not.

8    Q.  And did you ever tell anyone from the

9  over-200 people on the call that a recording could

10  not be done?

11        MS. LUNDY:  Objection.

12    A.  Probably not.  I mean, it's a State law,

13  right?

14    Q.  Okay.  And so, I want to focus your

15  attention on the recording, though, that we're

16  about to play.

17    A.  You have the recording?

18    Q.  We do.

19        MS. LUNDY:  Are we marking this as an

20    exhibit, or you're just playing -- or if this is

21    the court reporter's procedure?

22        MS. RISMAN:  So it's going to be

23    transcribed, correct, and it's already been

24    marked, right?

25        MR. BRUSTEIN:  She just means that --

```
 1          MS. LUNDY:  Is the court reporter going to
 2     transcribe this recording?
 3          MS. RISMAN:  Yes.
 4          MS. LUNDY:  I object to lack of foundation
 5     to the recording that's about to be played; we
 6     don't know any chain of custody, we don't know
 7     who specifically created what's about to be
 8     played, and I reserve further objections to the
 9     use of this line of questioning.  Thank you.
10     Q.  So, Ms. Ortiz, there was a meeting on
11  June 25th, 2021, correct?
12     A.  Yes.
13     Q.  And you spoke at that meeting, correct?
14     A.  Yes.
15     Q.  And there were participants that were mostly
16  furloughed Four Seasons New York employees,
17  correct?
18     A.  I believe so.
19     Q.  And you said that many of them were rude,
20  correct?
21     A.  They were pretty hotheaded.
22     Q.  So we're going to be playing you part of the
23  recording, and you'll let us know if that's your
24  voice on the recording.  Okay?
25     A.  Okay.
```

1        MS. LUNDY:  Objection.

2    A.  Can I ask a question?

3        MS. LUNDY:  No.  Is it the whole recording?

4        MS. RISMAN:  No.

5    Q.  So we're going be playing portions of the

6    recording to you; you just let us know if that's

7    your voice and if that's what was said.

8        MS. LUNDY:  Objection to the extent that the

9        full recording is not going to be transcribed;

10       portions of the recording, again, lack

11       foundation, lack context, and really places the

12       Witness at a disadvantage to properly respond to

13       the question, and I reserve further objections

14       to this line of questioning, even to the extent

15       of directing her not to answer.  Thank you.

16       MS. RISMAN:  So we're going to mark the

17       recording as Plaintiff's Exhibit 23.

18       MR. BRUSTEIN:  I apologize for missing that.

19       (Whereupon, the recording was played, and

20       what was said on the recording was taken down by

21       the court reporter as follows:)

22       "MS. ORTIZ:  So, I think at this juncture,

23       we've got quite a few people on the line.  I'm

24       just going to go ahead and start.  By now, you

25       will have received" --

ELIZABETH ORTIZ                                          JOB NO. 568002
APRIL 03, 2023

 1      Q.  Ms. Ortiz, is that your voice -- Ms. Ortiz,

 2   is that your voice on the recording?

 3          MS. LUNDY:  Objection.

 4      A.  Yes.

 5      Q.  Do you recall starting the meeting that way

 6   on June 25th, 2021?

 7          MS. LUNDY:  Objection.

 8      A.  I guess I did.

 9      Q.  Now, we're going to go to -- now, we're

10   going to --

11          MS. LUNDY:  I'm sorry.  Did we establish

12      what you're representing this recording to be

13      of?

14      Q.  So, Ms. Ortiz, what was the June 25th, 2021

15   meeting?  Withdrawn.

16          MS. LUNDY:  I'm sorry.  I wasn't asking for

17      a question to the Witness; I didn't know for the

18      record with respect to Plaintiffs' Exhibit 23 if

19      you've established what you represent this

20      recording to be of.

21          MS. RISMAN:  So, for the record, Exhibit 23

22      -- Plaintiffs' Exhibit 23 -- is a recording of

23      the June 25th, 2021 meeting, where Ms. Ortiz was

24      the main speaker and participant, speaking to

25      the furloughed employees of Four Seasons

```
 1    New York.
 2         MS. LUNDY:  And note my objection, as I've
 3      stated before.  Thank you.
 4         (Whereupon, a recording of the June 25th,
 5      2021 meeting with the furloughed employees of
 6      Four Seasons New York during which
 7      Ms. Elizabeth Ortiz was the main speaker and
 8      participant was deemed marked as Plaintiffs'
 9      Exhibit 23 for identification, as of this date.)
10    Q.  So we've established that was your voice on
11   what we just played, correct?
12    A.  Yes.
13    Q.  So focusing your attention to 1 minute and
14   28 seconds of the meeting:
15         (Whereupon, the recording, starting at the
16      1-minute-and-28-second mark was played and
17      transcribed by the court reporter as follows:)
18         "MS. ORTIZ:  And -- okay.  Sorry.  I get
19      distracted.  So I do know that you've been
20      waiting for this news for some time, and, you
21      know, I sent out the e-mail earlier; we have
22      followed the proper channels of notifying all
23      the different entities that need to be notified;
24      we have reached out to Mr. Rorrobo [phonetic],
25      we have reached out to Hazel, to Local 94, and
```

1      to -- we've also spoken, you know, at length

2      with the corporate office, and so on and so

3      forth."

4      Q.   Okay.  Ms. Ortiz, that is your voice again

5   on the recording, correct?

6          MS. LUNDY:  Objection.

7      A.   Yes.

8      Q.   When you state that you've followed proper

9   channels of notifying all the different entities

10  that need to be notified, what is it that you

11  meant?

12         MS. LUNDY:  Objection.  The recording that

13     you just played is taken out of context; I don't

14     even know what notice is being referred to in

15     that recording.  I --

16         MR. BRUSTEIN:  She's coaching.

17         MS. RISMAN:  So, Ms. Lundy, the recording

18     speaks for itself; there is no notice that --

19         MS. LUNDY:  Ms. Risman, it's incredibly

20     unusual to play a recording; it's even more

21     unusual to play a recording in bits and pieces

22     and picking out parts without providing the

23     Witness an opportunity to understand even the

24     entire context of what the individual was

25     saying.  So I am just asking that if you're

1   going to play the recording, that it be done in

2   a way that the Witness can properly understand

3   what the recording is saying.

4   Q.  So, Mr. Ortiz --

5       MR. WAGNER:  And can I just -- I'll put my

6   objection on the same basis:  it's incomplete,

7   and any answer we would object to a question.

8   Q.  So let's play the whole recording.

9       MS. LUNDY:  Is there time for that?

10      MR. BRUSTEIN:  Yes.

11      MS. RISMAN:  Maybe we can listen to the

12  recording off the record and then go back on the

13  record, but I don't think that that's going to

14  happen.

15      MS. LUNDY:  That's not fair to Ms. Ortiz.

16      (Whereupon, the recording was played from

17  the beginning and was transcribed by the court

18  reporter as follows:)

19      "MS. ORTIZ:  So I think at this juncture,

20  we've got quite a few people on the line.  I'm

21  just going to go ahead and start.  By now, you

22  will have received the e-mail that I sent out

23  earlier, and I would just note that everyone --

24  everyone -- on the line has been anticipating

25  this in the news for the longest time.  I do

ELIZABETH ORTIZ
APRIL 03, 2023                                                    JOB NO. 568002

```
 1   want to say before we start that on the line
 2   today, we have Mr. Antoine Chahwan; he is our
 3   President of Operations for the Americas; and
 4   also, we have Abigail Charpienter; she's the
 5   Vice President for People and Culture, also for
 6   the Americas; and I do believe we also have our
 7   Regional Director of People and Culture -- from
 8   People and Culture -- Stacey Koppel.  I think
 9   everybody should -- if you can hear me okay,
10   just, like, give me a thumbs up, those people on
11   the screen.  Okay, perfect.  So thanks so much.
12   As always, it's really good to see all of you.
13   I do know that -- let's see -- I do know that --
14   sorry.  One second.  Okay.  Sorry.  I get
15   distracted.  So I do know that you've been
16   waiting for this news for some time, and, you
17   know, I sent out the e-mail earlier; we have
18   followed the proper channels of notifying all
19   the different entities that need to be notified.
20   We have reached out to Mr. Rorrobo, we've
21   reached out to Hazel, to Local 94, and to --
22   we've also spoken, you know, at length with the
23   corporate office, and so on and so forth, and I
24   know that everyone is really keen to reopen the
25   hotel and begin welcoming back our guests.  As I
```

1  said in the e-mail that I sent out earlier, at

2  this time, we are going to continue to remain

3  closed, as the hotel is going to undergo some

4  infrastructure and maintenance work that needs

5  to be done in order to get the hotel back up and

6  running.  This work, we're told, is expected to

7  last into 2022, but we will reassess the

8  reopening plans in the early spring of 2022

9  based upon the progress of the work as it gets

10  done.  Certainly, we're committed to recalling

11  employees when we set up reopening; we're

12  committed to recalling the employees; and, you

13  know, when we get more information regarding

14  that recall and the reopening, then we will

15  reach out, but at this juncture, as I've said,

16  we will keep the hotel closed through the end of

17  this year and early through next spring, at

18  least, and, hopefully, we'll get, you know, more

19  information as it comes along.  I know that

20  there are probably multiple questions, lots of

21  information; as I've said, we do have some

22  senior leaders on the call.  Because there's

23  about 200 people on this call, it wouldn't

24  benefit anyone for us to open the lines for

25  questions.  I will ask if you do have any

1  specific questions, at the very top of your

2  screen next to the People icon, there is a

3  communication bubble; you can click on that

4  communication bubble and you can type on your --

5  you can type in the chat box any questions that

6  you might have.  Sharon is on the line, and she

7  will be fielding those questions, but again, the

8  communication that we have today really is that

9  we will be closed through this year, early next

10  year, and that's the position we're in.

11  Certainly, we're always here and available to

12  respond to any questions or any calls, concerns

13  that you might; we'll continue to be here and

14  we'll continue to want to support you and, you

15  know, provide any kind of assistance or answers

16  to questions that you might have.  At this

17  juncture, I'm going to see if Sharon has any

18  questions online; I'm not sure that you do.  Are

19  there any questions that we have, maybe?  Sharon

20  might be muted.  Let me see here.

21      "MS. BRAMBRUT:  Can you hear me all right?

22  There you go.  Perfect.  Thank you so much.  So

23  just -- I just wanted to reiterate.  You know,

24  it's always really nice to see everyone's faces,

25  and I know that this news is news that --

1   everyone's been waiting to hear an update.  I do

2   see some questions coming in, and really, you

3   know, the gist of the questions are, you know,

4   what is -- you know, where is the owner on this,

5   you know, please tell us exactly what he wants

6   to do, and questions relating to Santa Barbara.

7   What we can tell you is what, really, Elizabeth

8   shared earlier, which is, the hotel will remain

9   closed for work on the infrastructure.  I do see

10   some questions regarding, can you be more

11   specific in regards to the infrastructure?  You

12   know, I think many people on the line are aware

13   that we've had challenges with carpet and

14   wallpaper for a long time, and those are some of

15   the items -- some bigger-picture items -- that

16   people are aware of, continued work on elevators

17   and other systems throughout the building.  I do

18   see a question as to why this wasn't done

19   sooner, and -- I'm sorry.  I think we have

20   people who are not muted but just wanted to talk

21   about the question, why wasn't this done sooner?

22   You know, I think we don't really have specific

23   information other than this work is going to

24   start to take place, and some of it has been in

25   progress, and the estimated timeframe of that

1   is, you know, spring of 2020, but this will

2   continue to be re-evaluated.  I'm just looking

3   to see -- there's a question, Elizabeth -- I

4   don't know if you want to take this one:  Will

5   we be eligible for regular unemployment?

6       "MS. ORTIZ:  So unemployment is based upon a

7   couple of different factors.  Certainly, if you

8   continue to remain eligible -- I mean, if you're

9   eligible for unemployment, you remain eligible

10  for unemployment, but certainly, there is a

11  cutoff time depending on how much time you have

12  used.  I can't speak to what Unemployment would

13  decide, but at this juncture, my best answer for

14  that would to contact the Unemployment office --

15  Unemployment -- directly and make a

16  determination as to what your eligibility would

17  be for a continuation of that unemployment.  And

18  again, it's based on years of service, years

19  worked -- that sort of thing; it's a calculation

20  that the Department of Labor uses.

21      "MS. BRAMBRUT:  Elizabeth, there's another

22  question on the line about severance:  Are

23  people entitled to severance pay?

24      "MS. ORTIZ:  So at this juncture, the -- we

25  are looking at the fact that you are still

1   currently furloughed employees that have worked

2   for the company, have worked for this property

3   for the time period that you have; you are

4   considered to be furloughed, so you wouldn't be

5   -- we wouldn't be paying out that severance at

6   this juncture, only because we do consider you

7   to be furloughed, we do anticipate reopening,

8   and we do anticipate recalling you to work once

9   we do reopen.

10       "MS. BRAMBRUT:  Thank you, Elizabeth.

11   Elizabeth, I'm wondering if it's possible for us

12   to unmute Frank; I'd like to see if we could

13   have him elaborate a little bit.  There's some

14   more questions about the infrastructure and then

15   questions about, the rooms were just redone,

16   what exactly will be fixed?  So perhaps we could

17   see if we could get Frank unmuted.

18       "MS. ORITZ:  Let me see if I can do that

19   here real quick.  Is Frank actually on the line,

20   I think?

21       "MS. BRAMBRUT:  He is.  Yes.

22       "MS. ORTIZ:  You know, it's not allowing me

23   to do it on this end.  Maybe Frank, you can try

24   on your end.

25       "MS. BRAMBRUT:  While we're working on

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

 1   Frank --

 2        "MR. GALASSO:  I'm on.

 3        "MS. BRAMBRUT:  Oh, perfect.  Thank you.

 4        "MR. GALASSO:  Also, when it comes to the

 5   work, I mean, the only thing that I -- you know,

 6   our possibility is what I've been sending

 7   ownership over the past year of work that's

 8   needed at the time, which is upgrading our

 9   electric switch gear room and cooling tower

10   issues that we're having related to our whole

11   HVAC system, and you've got the fire alarm

12   system, but there's other things that they are,

13   you know, complaining to have been removed from

14   the five-year plan, but you have to get together

15   with the guys from IT.  So we're just waiting

16   for the list arriving beyond the stuff that I've

17   already requested over the past year.

18        "MS. BRAMBRUT:  So I just want to mention, I

19   see a few comments that the questions are being

20   ignored.  I just want to clarify.  We have a lot

21   of questions coming in at the same time, and we

22   will get through them, so I don't want anyone to

23   feel like we're ignoring any questions; I'm just

24   going down the line as they come in, so please

25   note we're going to get through them.  There is

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

 1   a question as to, what happens with our benefit

 2   time?  Elizabeth, I don't know if you want to

 3   take that.

 4       "MS. ORTIZ:  So when you're referencing

 5   benefit time, certainly, once you go on furlough

 6   -- and this is a longstanding policy, I mean,

 7   across most organizations -- the time doesn't

 8   accrue.  However, any benefit time that you do

 9   have accrued and on the books, I mean, you're

10   eligible to have that paid -- paid -- out.

11       "MS. BRAMBRUT:  Thank you, Elizabeth.  What

12   -- we want to know if Unemployment will be

13   extended after September?

14       "MS. ORTIZ:  I don't have the answer to that

15   question; that's a Federal, State, and

16   Department of Labor question.

17       "MS. BRAMBRUT:  If the hotel is closed for

18   two years, does the owner -- does Ty Warner --

19   have the right to get out of the contract with

20   the Four Seasons Hotel?

21       "MS. ORTIZ:  That is not something that I

22   have -- that I can answer.

23       "MS. BRAMBRUT:  There is a question here

24   that says, please address if this is legal.

25       "MS. ORTIZ:  If what's legal?

1        "MS. BRAMBRUT:  So the question is, please

2    address if this is legal --

3        "MS. ORTIZ:  If what's legal?

4        "MS. BRAMBRUT:  I'm not sure.  I'll move on

5    to the next one. 'So a one-hundred-story

6    building can be erected in a year.  What you are

7    describing as far as infrastructure takes two

8    months, tops, to complete in an empty building.'

9    I don't know, Frank, if you want to touch on,

10   you know, what the timeframe might be.

11       "MS. GALASSO:  Well, depending on the

12   projects that they start doing -- for example,

13   the fire alarm can take up to a year-and-a-half

14   between the work and all the approvals needed by

15   the City.  As far as -- with regard to the

16   switch gear room, that could take up to five

17   months, plus its delivering of the equipment

18   that's needed; and then cooling-tower work could

19   take -- you know, that could take -- about a

20   month or two.  It all depends on how much work

21   they're going to do and if everything's going to

22   be done together or if it's going to be done one

23   project at a time, which those are the answers

24   we just don't have yet.

25       "MS. BRAMBRUT:  There are a couple of

1  questions about whether the contract with

2  Ty Warner is complete for Four Seasons New York.

3      "MS. ORTIZ:  I have no idea.

4      "MS. BRAMBRUT:  Okay.  There are

5  questions -- so I think the question about 'is

6  this legal?', I have just received a few more

7  questions.  Is it legal to be on a furlough for

8  this amount of time?

9      "MS. ORTIZ:  I see.  So there is no

10  limitations on how long employees can be on

11  furlough.  There are -- there are -- there are

12  thoughts that there are timeframes on that, but

13  from a legal perspective, there isn't a length

14  of time -- you know, from my understanding,

15  there is not any kind of length of time with

16  respect to furlough.  If a company puts

17  employees on furlough with the intention to

18  recall them and return them to work once they

19  are ready to do so, then that is part of -- part

20  of -- the process.  I don't know why this is

21  doing that (indicating).

22      "MS. BRAMBRUT:  So there is a question

23  about, if we get a job, I'm assuming, while on

24  furlough, does that affect severance pay?

25  Meaning, will Four Seasons say you left and

1   therefore you are forfeiting severance?

2       "MS. ORTIZ:  So the policy behind that is

3   typically, if you do leave the place of

4   employment, you're no longer connected to, or

5   associated with, that place of employment, so

6   you would then not be eligible for any type of

7   severance, should that severance ever be paid

8   out.  But again, you know, the issue of

9   severance is not -- as I said earlier, is not --

10  something that we are considering at this time,

11  simply because we do anticipate bringing

12  everyone back to work.

13      "MS. BRAMBRUT:  Thank you, Elizabeth.  So I

14  have a question here.  Depending on the projects

15  that are decided, is there anything concrete

16  about those projects at this point?

17      "MS. ORTIZ:  Frank, maybe?

18      "MS. BRAMBRUT:  Yeah.

19      "MS. GALASSO:  I'm sorry.  I missed that

20  question, Sharon.

21      "MS. BRAMBRUT:  Sorry, Frank.  Just -- so

22  I'm not sure if this is -- if I'm reading it

23  right, but depending on the types of project

24  that they're deciding to do, is there anything

25  concrete as far as these projects?  What are we

1    proceeding with at this point?

2        "MS. GALASSO:  As of today, since, you know,

3    we're all just learning this, I don't have an

4    exact timeline of which project will start when.

5    Once we get there, you know, we can definitely

6    share that with the team.

7        "MS. BRAMBRUT:  Elizabeth, I think this one

8    is for you: 'Can someone put in for pension and

9    then freeze it once it opens again?'

10       "MS. ORTIZ:  So is that under the union

11   benefit plan?

12       "MS. BRAMBRUT:  I believe that, yes.  The

13   question is -- yes.

14       "MS. ORTIZ:  So under the union benefit

15   plan, because we don't manage that plan, I

16   wouldn't be the person to respond to that

17   question.  The pension administrators would have

18   that information for you, so my suggestion would

19   be that you reach out to the fund directly and

20   ask them that question.

21       "MS. BRAMBRUT:  I have a question about the

22   repairs:  'Will our union, Four Seasons

23   employees, be doing the work -- doing the

24   repairs?'

25       "MS. ORTIZ:  Say that again?

1        "MS. BRAMBRUT:  'Will our union, Four

2    Seasons workers, be doing any of the repairs?'

3        "MS. ORTIZ:  We are still under a Collective

4    Bargaining Agreement, so certainly, if there's

5    any work that comes into the building that falls

6    under the Collective Bargaining Agreement, then

7    we would abide by the direction under that

8    agreement.

9        "MS. BRAMBRUT:  'Is there any update on

10   COBRA coverage?'

11       "MS. ORTIZ:  For individuals or --

12       "MS. BRAMBRUT:  The question is just, is

13   there any update on COBRA coverage, and

14   that's --

15       "MS. ORTIZ:  So by now, by now, both union

16   and nonunion -- the union, I believe has -- has

17   -- has already got everything under control with

18   respect to the COBRA subsidy or whether or not

19   you're entitled to Medicare and that sort of

20   thing.  The nonunion plan with the COBRA, you

21   should have already applied for it.  If there

22   are some people that are pending in the

23   system -- and I know that there's a couple out

24   there we do need to get back to; they're missing

25   some responses to the questionnaires regarding

1  the COBRA subsidy -- I will address those

2  directly or independently or separately from

3  this otherwise.

4      "MS. BRAMBRUT:  Bear with me.  Sorry.  So I

5  see another question about COBRA coverage; it

6  looks like more of an individual question.

7  'Besides unemployment, will we be compensated

8  while this work is done?'

9      "MS. ORTIZ:  I don't have an answer to that

10  question, but Unemployment would be probably the

11  only compensation at this juncture.

12      "MS. BRAMBRUT:  'Can we have another town

13  hall with Ownership present and have them answer

14  some of these questions?'

15      "MS. ORTIZ:  I don't have -- again, I'm

16  beginning to sound like a parrot, but I don't

17  have an answer to that question either.

18      "MS. BRAMBRUT:  I think there's just some

19  general feedback that this doesn't sit right

20  with the team on the call, and please, can you

21  schedule a call with Ownership, can you help us

22  schedule a call?  'Is there anything that Four

23  Seasons Corporate would like to share?'

24      "MS. ORTIZ:  You know -- and I'm going to

25  say this; I'm going to, kind of, go off script

1   here for a second.  I will say this, is that I

2   do know that we would love to have everybody

3   back in the building as soon as possible.  I

4   also know that, you know, this is -- it's a hard

5   -- you know, we're -- you know, I think in

6   getting this news across the board, it's tough,

7   right?  It's tough to realize; like, 'Wow, it's

8   been one year and then, you know, potentially

9   another year,' and I will say, you know, for

10  myself, personally, is that we would love to

11  have you back in the building sooner rather than

12  later, and I think, you know, throughout this

13  year, we've done everything possible to remain

14  connected and to remain, you know, engaged with

15  everyone.  It's certainly not an easy position

16  to be in, I get that, and, again, you know,

17  whatever we can do on this end to provide you

18  with the support and the resources and the

19  assistance that -- you know, that -- you need on

20  that end, I mean, I can certainly offer that.  I

21  do know that there are a lot of questions that,

22  you know, are not answered, you know, offline,

23  and if you want to do, you know, one-on-one or

24  have one-on-one calls, I'm happy to speak with

25  -- you know, call us; we can have a

1   conversation.  I think at this juncture, we --

2   you know, there's a lot of people on the line,

3   and I'm really happy to see that you're all

4   here.  I do recognize, again, that this does not

5   sit well, and I understand that, and I --

6   whatever we can do here on this and to support

7   you, I will do that -- we will do that.

8        "MS. BRAMBRUT:  Elizabeth, I think -- I know

9   we're coming to 3:30.  I just want to -- one of

10  the last --

11       "MS. CHARPIENTER:  Sharon --

12       "MS. BRAMBRUT:  Oh, I am sorry.

13       "MS. CHARPIENTER:  Sharon, it's

14  Abigail Charpietner, and just -- I know the team

15  wants to hear from -- more from -- the home

16  office team and people beyond the property, and

17  I also appreciate how incredibly frustrating and

18  difficult.  I know you're asking reasonable

19  questions that you want more answers to, and at

20  this point, what we know is, again, what has

21  been communicated:  that the hotel will remain

22  closed; we have to address these infrastructure

23  issues.  However, we have a longstanding

24  partnership with Ty Warner and his organization,

25  and it is certainly our biggest goal to, sooner

```
 1   rather than later, proudly reopen the hotel in

 2   midtown and continue that long relationship.  We

 3   are working fervently toward that, but we just

 4   don't have -- it's not that we have information

 5   that we're not telling you; we just don't have

 6   any more information at this stage.  So as

 7   Elizabeth has suggested, we're certainly happy

 8   to work on some of these individual questions.

 9   We thought it was important that you hear from

10   us, and while I know these answers are not

11   fulfilling everything that you're looking for at

12   this point, as this news is going to go more

13   broadly, especially as we work with guests that

14   have reservations and we let them know that we

15   don't have an imminent reopening, again, we

16   wanted you to hear from us before you hear it

17   from anyone else; and our commitment is that we

18   will continue -- even as limited as the

19   information is we have is, we'll continue -- to

20   share with you as we have it.  So please reach

21   out to Elizabeth and team if there's individual

22   situations; I saw from the chat that there are

23   still some requests for feedback on, you know,

24   specific situations or individual applications,

25   and we can work with you with that individually,
```

1    but we're probably not going to be able to do it

2    here on this call.  So with that, again, thank

3    you, Sharon and Elizabeth; I appreciate all of

4    your communication, and as we have more, we will

5    keep you posted.

6         "MS. ORTIZ:  Thank you very much, Abigail;

7    I really appreciate it.  And again, we do have

8    the -- Abigail said there are a lot of questions

9    in the chat, and I will go through them and

10   address them individually; and, again, you can

11   reach out -- most of you have my cell phone

12   number, you have the text, you have Sharon, you

13   know how to get ahold; and, like I said, we are

14   here, and we will continue to be here to respond

15   to and support you to the best of our ability.

16        "MS. BRAMBRUT:  Thank you, Elizabeth.  Thank

17   you, Abigail.  Thank you everyone.  We've

18   reached that 3:30 mark.  Again, have a good

19   afternoon, and we will speak with you again

20   soon.

21        "MS. ORTIZ:  Thank you."

22   Q.  Ms. Ortiz, would you agree with me that the

23   recording is a fair and accurate depiction of the

24   town hall meeting that took place on June 25th,

25   2021?

1          MS. LUNDY:  Objection.

2      A.  Yes.

3      Q.  Can we just take five minutes?

4          MS. RISMAN:  Court Reporter?

5          (Whereupon, a discussion was held off the

6      record.)

7      Q.  So, Ms. Ortiz, some time has passed since

8  the June 25th, 2021 meeting, and essentially -- the

9  furloughed employees of Four Seasons New York are

10  essentially in the same position they were on

11  June 25th, 2021, correct?

12          MS. LUNDY:  Objection.

13      A.  Meaning that they're not working at the

14  hotel?

15      Q.  So they're not working at the hotel,

16  correct?

17      A.  That's correct.

18      Q.  They're still on furlough, correct?

19      A.  Correct.

20      Q.  They haven't been paid any salary from the

21  hotel, correct?

22          MS. LUNDY:  Objection.

23      A.  No, because -- I don't know.  It depends on

24  the employee.  I mean, there are people that are

25  getting -- I mean, not a full salary.

1    Q.  So they're not getting paid a full salary,

2  correct?

3    A.  No.  Those that are not working, those that

4  are on furlough, no

5    Q.  And would you agree with me that according

6  to this recording, there was no plan in place

7  setting out the renovations that had to be done?

8        MS. LUNDY:  Objection.

9    Q.  Withdrawn.  On June 25th, 2021, did the

10  hotel have a plan in place related to renovations?

11        MS. LUNDY:  Objection.

12    A.  Well, I think -- and I've said this multiple

13  times today -- that there's always been a running

14  list of capital improvements, and I think

15  Frank Galasso alluded to that as well, the

16  different things that needed to be done.  A

17  specific plan?  We didn't know what was

18  specifically going to be approved of at that

19  particular time, but we've always known what the

20  running list of capital improvements would be.

21    Q.  Were there any emergency capital

22  improvements on June 25th, 2021 that had to be

23  done?

24    A.  I don't remember.

25    Q.  Are there any emergency capital improvements

1  that are going on right now --

2        MS. LUNDY:  Objection.

3     Q.  -- at the hotel?

4     A.  No.  I mean, I don't know.

5     Q.  And so, is there any capital improvement

6  that's preventing the hotel from reopening right

7  now?

8        MS. LUNDY:  Objection.

9     A.  Yeah.  I mean, there's holes in all our

10  bathroom ceilings that need to be fixed; the

11  elevator has incomplete modernization; I think

12  we're almost finished with the chillers -- I don't

13  remember off the top of my head -- and I don't know

14  where we are on the fire panel; I think that's

15  probably done, but I don't -- I can't recall.

16     Q.  And as you sit here today, you'd agree with

17  me that there's no specific timeline for the

18  project to be over?

19        MS. LUNDY:  Objection.

20     A.  No, I don't have an end date.

21     Q.  Would you agree with me that the

22  November 1st, 2021 communication with the

23  furloughed employees was the last time that you

24  sent a memo to the furloughed Four Seasons New York

25  employees?

1          MS. LUNDY:  Objection.

2      A.  I don't remember.

3          MS. RISMAN:  Do you have Exhibit 52?  So

4      that's previously been marked as Exhibit 52

5      (indicating).

6      Q.  So, Ms. Ortiz, I'm going to be showing you

7  the exhibit that's been previously marked

8  Exhibit 52, and it's a memo that went out to all of

9  the furloughed employees, correct?

10     A.  Well, this would have gone to everybody.

11  Yes.

12     Q.  Would you agree with me that that was the

13  last time that this type of memo was sent out to

14  the furloughed employees of Four Seasons New York?

15         MS. LUNDY:  Objection.

16     Q.  Do you know?

17     A.  I don't remember.  It's possible.  I don't

18  know.

19     Q.  Ms. Ortiz, when is the last time that you

20  corresponded with Ms. Cathy Hwang?

21     A.  I don't recall.

22     Q.  Was it in the last year?

23         MS. LUNDY:  Objection.

24     A.  I don't remember.

25     Q.  Did there come a time that you corresponded

1    with Ms. Cathy Hwang related to the reopening of

2    the hotel?

3         A.  I don't remember.

4         Q.  Was there ever a time that she asked you to

5    provide her with the total number of nonunion

6    employees that would consider going back to work

7    when the hotel reopens?

8         A.  I don't remember that specifically.  No.

9         Q.  Okay.

10            (Whereupon, an e-mail chain between

11        Cathy Hwang and Elizabeth Ortiz dated 3-30-20

12        and 3-31-20 and Bates-stamped WarnerDEF009110

13        was marked as Plaintiffs' Exhibit 24 for

14        identification, as of this date.)

15        Q.  Ms. Ortiz, I'm going to be showing you

16    what's just been marked as Plaintiffs' 24 and ask

17    you to take a look at that, please.  Are you ready?

18        A.  Yes.

19        Q.  Would you agree with me that that's an

20    e-mail exchange between you and Cathy Hwang?

21        A.  Yes.

22        Q.  And in that e-mail exchange, she's asking

23    you to provide her with the number of salaried and

24    hourly nonunion employees that are currently

25    furloughed and that the hotel would expect to

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

1    recall if the hotel opened again?

2         MS. LUNDY:  Objection.

3    A.  Well, she's asking the number of nonunion

4    employees we would consider calling back -- she

5    didn't say, like, that are currently furloughed or

6    anything -- when the hotel reopens.  Yes.

7    Q.  And you then responded to her, correct?

8    A.  Yes.

9    Q.  And you stated that there were "58 salaried

10   and hourly non-union employees that are currently

11   furloughed and that we would expect to recall in a

12   reopened hotel."

13   A.  Yes.

14   Q.  Where did you get the number 58 from?

15   A.  From the number of people that are

16   furloughed.

17   Q.  Did you then subtract the number of people

18   that resigned?

19   A.  Yeah, of course.  That's why I would have

20   said, "Of course, we would need more than that

21   number to operate the hotel.  Many originally

22   furloughed employees have moved and and we would

23   need to replace them..." So yes.

24   Q.  After this e-mail, was there ever another

25   discussion with Ms. Hwang related to bringing back

1   nonunion furloughed employees?

2          MS. LUNDY:  Objection.

3       A.  I don't remember.

4       Q.  Okay.  And after this e-mail was exchanged,

5   was anything done to call nonunion employees to

6   discuss whether they would want to go back and work

7   at the hotel?

8       A.  No.

9          MS. RISMAN:  We'll just take a five-minute

10     break.

11         MS. LUNDY:  Sure.

12         (Whereupon, a break was taken at 6:16 p.m.,

13     and the deposition resumed at 6:23 p.m.)

14      Q.   Ms. Ortiz, would you agree with me that at

15  the time that the Four Seasons New York closed,

16  they were looking at other hotels that were also

17  closing at or around the same time to determine

18  whether or not the Four Seasons New York should

19  close?

20         MS. LUNDY:  Objection.

21      A.  I don't know.  I don't know how that

22  decision was made.

23      Q.  Did you ever speak to Rudy Tauscher about

24  the competitive set of hotels that was closing at

25  or around the same time as a result of the COVID

1   pandemic?

2      A.   I don't know that I did specifically; I'm

3   sure that the Executive Committee had conversations

4   around it.   I don't recall.

5      Q.   Are you aware the hotels in the competitive

6   set are all reopened?

7           MS. LUNDY:   Objection.

8      A.   I'm not quite sure -- no, I'm not.

9      Q.   Do you know if the Pierre opened?

10          MS. LUNDY:   Are you speaking about

11   New York City or in general?

12     Q.   So in New York -- I'm sorry.   So let me ask

13   you again.   Do you know if -- do you know if the

14   Four Seasons Downtown reopened?

15     A.   Yes.

16     Q.   And it's open for business, correct?

17     A.   Yes.

18     Q.   And do you know when it reopened?

19     A.   I don't remember.

20     Q.   Do you know if it reopened in 2000?

21     A.   I don't remember.

22     Q.   Okay.   When Mr. Tauscher resigned from being

23   the General Manager, he went to work for a

24   competitive hotel, correct?

25          MS. LUNDY:   Objection.

1      A.  I don't know that it's exactly in our comp.

2   set, but it's in the luxury segment.

3      Q.  When he went to work there, did anyone

4   announce to the employees that were on furlough

5   that the General Manager of the Four Seasons

6   New York had resigned?

7      A.  That would have gone out in an announcement.

8   Yes.

9         MS. LUNDY:  Objection.

10     Q.  Do you what date that announcement was?

11     A.  It would have been in a newsletter in

12  January of 2021 or in February.

13     Q.  Do you know if the Four Seasons Hotel

14  New York has posted any job listing for a new

15  General Manager?

16     A.  I think I answered that question this

17  morning, and no.

18     Q.  Did it -- withdrawn.

19         Did anyone ever ask you to apply for the

20  General Manager position at the Four Seasons

21  New York?

22     A.  No.

23     Q.  How many WARN notices were sent to each of

24  the employees that received a WARN notice that were

25  furloughed?

1        MS. LUNDY:  Objection.

2     A.  What do you mean "how many"?

3     Q.  Did you ever send more than one WARN

4  notice --

5     A.  -- to the same individual?

6     Q.  Yes.  My question to you is, did you ever --

7  withdrawn.

8        Did the Four Seasons New York ever send more

9  than one WARN notice to the same individual?

10       MS. LUNDY:  Objection.

11    A.  I don't remember.

12    Q.  Okay.  Did you ever investigate whether more

13 than one notice, in compliance with the WARN Act,

14 had to be sent to the same individual when that

15 employee was on furlough for longer than six

16 months?

17       MS. LUNDY:  Objection to the extent it calls

18    for privileged communication.

19    A.  I would have had that conversation with my

20 Counsel.

21    Q.  So prior to reopening the hotel, do you

22 believe the General Manager position has to be

23 filled?

24    A.  Yes.

25    Q.  And how long does it take normally to hire a

 1  General Manager --

 2          MR. WAGNER:  Objection.

 3      Q.  -- for a hotel as the Four Seasons New York,

 4  in your opinion?

 5          MS. LUNDY:  Objection.

 6          MR. WAGNER:  Objection.

 7      A.  I can't speculate.  It depends on the labor

 8  pool, it depends on the accessibility, it depends

 9  -- there's multiple factors involved.

10      Q.  So once the layoff extended for over six

11  months for each of the furloughed employees, is it

12  fair to say that you're not aware of any second

13  WARN notice going out to those individuals?

14          MS. LUNDY:  Objection.

15      A.  I said I don't remember.  Not that I'm not

16  aware; I just don't recall if we sent second

17  letters.

18      Q.  Do you know if the Four Seasons should have

19  sent second letters to those individuals?

20          MR. WAGNER:  Objection.

21          MS. LUNDY:  Objection to the extent it calls

22      for privileged communication.

23      A.  No.

24      Q.  I have no further questions.

25          MS. LUNDY:  Thank you.  I just have a few.

 1          MS. RISMAN:  I mean, if I have any --

 2          MR. WAGNER:  I may.  I take a wait-and-see

 3     approach.

 4          MS. LUNDY:  I don't have many.

 5   CROSS EXAMINATION BY

 6   MS. LUNDY:

 7     Q.  Hi, Ms. Ortiz.  Thank you for your time

 8   today; I just have a few follow-up questions.

 9   Ms. Ortiz, did you testify today in your personal

10   capacity based on your own personal knowledge?

11     A.  Yes.

12     Q.  Are you testifying today on behalf of anyone

13   else?

14     A.  No.

15     Q.  Does the EmPact agreement permit employees

16   to have outside employment while still being

17   subject to the terms and benefits of the EmPact

18   agreement?

19     A.  Yes.

20          MS. RISMAN:  Objection.

21     Q.  I'm going to refer you to Exhibit 22,

22   please, at Page 27.

23          MR. BRUSTEIN:  Which exhibit are you looking

24     at?

25          MS. LUNDY:  Exhibit 22.

1          MS. RISMAN:  Is that Plaintiffs' Exhibit 22?

2          MS. LUNDY:  Plaintiffs' Exhibit 22.

3     Q.  Ms. Ortiz, you've testified about

4    Plaintiffs' Exhibit 22 today, have you not?

5     A.  Yes.

6     Q.  And I'm referring to Page 27 of the EmPact

7    agreement.  Do you see that?

8     A.  Yes.

9     Q.  And you just testified that the EmPact

10   agreement permits employees to, quote, "have

11   outside employment."  Is the provision set forth on

12   Page 27 the basis of that statement?

13    A.  Yes.

14    Q.  Ms. Ortiz, you previously today listened to

15   a recording purportedly of a June 25th, 2021 town

16   hall meeting, did you not?

17    A.  Yes.

18    Q.  And in that recording, you stated, quote,

19   "If you do leave place of employment, you would not

20   be eligible for severance," end quote.  What did

21   you mean by that statement?

22    A.  Not being eligible for severance?

23    Q.  Yes.

24    A.  That person resigns.

25    Q.  So when you said, "if you do leave place of

1    employment, you would not be eligible for

2    severance," that was referring to an individual who

3    would resign?

4        A.   That's correct.

5        Q.   But not someone who might find outside

6    employment, which is permissible by the EmPact

7    agreement?

8        A.   That's correct.

9        Q.   I'm going to refer you to the C.A.R.E.

10   processing EmPact agreement that you also testified

11   about today; it begins on Page 54 of the EmPact

12   agreement.

13       A.   Yes.

14       Q.   If you received a complaint about an

15   employee's terms and conditions of employment, what

16   would you do?

17           MS. RISMAN:   Objection.

18       A.   Follow the C.A.R.E. procedure.

19       Q.   And what does a C.A.R.E procedure set forth

20   that pertains to your role with -- at -- Hotel 57

21   Services, LLC?

22           MS. RISMAN:   Objection.

23       A.   The first step involves receiving a written

24   complaint regarding the complaint.

25       Q.   Can you refer me to the specific step within

1   C.A.R.E. that you're referring to?

2      A.   So on Page 54, Step Two, essentially, if the

3   problem's not resolved with their immediate

4   supervisor, the employee is directed to file a

5   written complaint with the Human Resources Office

6   within 14 days after the event, and that I can --

7   that I can -- assist them in preparing the

8   complaint.

9      Q.   And what happens after that through the step

10  C.A.R.E. process that you would be involved in?

11     A.   After having received a written complaint,

12  then I would review the complaint -- like,

13  investigate it, I guess.

14     Q.   Would that be in Step Three of the C.A.R.E.

15  process?

16         MS. RISMAN:   Objection.

17     A.   Yes.

18     Q.   And what would happen after Step Three of

19  the C.A.R.E. process that you would be involved in?

20         MS. RISMAN:   Objection.

21     A.   Following up in writing the decision based

22  on the original complaint.

23     Q.   Step Four provides that "The Director of

24  Human Resources will issue a written decision to me

25  within 7 days after the close of the

1    investigation." Is that what it says?

2       A.  Yes.

3       Q.  Is that referring to you?

4       A.  Yes.

5       Q.  And if an individual was unhappy with a

6    written decision, what could they do under the

7    C.A.R.E. process?

8            MS. RISMAN:  Objection.

9       A.  They could either go to the General Manager

10   or -- it says the General Manager, but assuming it

11   would be a leader on property, and then, the --

12   then they can file for arbitration mediation.

13      Q.  As you sit here today, are you aware of any

14   complaints received by Human Resources relating to

15   no-fault separation pay under Step Two of the

16   C.A.R.E.  process under the EmPact agreement?

17           MS. RISMAN:  Objection.

18      A.  No.

19      Q.  I have no further questions.

20           MS. RISMAN:  We're back on the record.

21   REDIRECT EXAMINATION BY

22   MS. RISMAN:

23      Q.  So, Ms. Ortiz, have you conducted any

24   investigations based on any of the complaints of

25   any of the furloughed employees?

1           MS. LUNDY:  Objection.

2      A.  But I've not received any written complaints

3   specifying specific complaints, so -- and I think

4   I've said before that there's no investigation.

5   Investigation into what?  I mean, it's a

6   rhetorical.

7      Q.  So my question to you is, even had you

8   received complaints regarding why furloughed

9   employees were not paid their no-fault severance

10  pay, you're saying that no investigation had to be

11  conducted, correct?

12          MS. LUNDY:  Objection.  It's a

13    mischaracterization.

14     A.  No.  I'm not saying that.  I'm saying that I

15  have not received any formal written complaints

16  regarding no-fault separation pay.  What I have had

17  are conversations, and not characterized

18  necessarily as complaints.

19     Q.  Ms. Ortiz, you've received multiple

20  complaints in the chat box during that June 25th,

21  2021 meeting, correct?

22          MS. LUNDY:  Objection.

23     A.  But see, you keep using that word

24  "complaint." I don't think that that's the right

25  word.  I think the word "complaint" is subjective,

1   and I think that I received multiple questions

2   regarding the severance and the hotel and the --

3   you know, just listening to that, the different --

4   you know, what was going on as far as the -- the --

5   whatever renovation, structural.  Yeah.

6       Q.  Ms. Ortiz, is furlough a type of leave of

7   absence for an employee based on --

8       A.  Say that again?

9       Q.  Is a furlough a type of leave of absence for

10  an employee based upon your work?

11          MS. LUNDY:  Objection to the extent it's

12      beyond the scope of the Cross Examination.

13          MS. RISMAN:  It's not beyond the scope of

14      the Cross Examination.

15      Q.  When an employee of the Four Seasons

16  New York is out on leave, can that leave also be

17  furloughed?

18          MS. LUNDY:  Objection.

19          MR. WAGNER:  Objection.

20          MS. LUNDY:  It's beyond the scope of Cross

21      Examination.

22      A.  I don't understand the question.

23      Q.  Are the furloughed employees out on leave?

24      A.  They're furloughed.

25      Q.  When they're furloughed, does that mean

ELIZABETH ORTIZ                                      JOB NO. 568002
APRIL 03, 2023

1   they're also out on leave?

2          MR. WAGNER:  Objection.

3          MS. LUNDY:  Objection.  This is beyond the

4      scope of the Cross Examination, and this

5      question's now been asked repeatedly.

6      Q.  Okay.

7          MS. LUNDY:  You can answer.

8      A.  They're furloughed.  It's different

9   terminology meaning different things.

10     Q.  And when an employee is out on leave, what

11  does that mean?

12         MS. LUNDY:  Objection to the extent it's

13     beyond the scope of Cross Examination.

14     A.  Well, is it medical leave?  Is it family

15  leave?  Is it child bonding leave?  It's all under,

16  like, FMLA.  Is it personal leave for personal

17  reasons?  Leave of absence is usually medical or

18  personal leave at the request of the employee.

19     Q.  Ms. Ortiz, would you agree with me that

20  moonlighting is different than having another

21  full-time job?

22     A.  No.

23     Q.  What does moonlighting mean?

24         MS. LUNDY:  Objection.

25     A.  Having a job.

```
 1      Q.  Do most moonlighting jobs provide for

 2   benefits?

 3          MS. LUNDY:  Objection.

 4      A.  I can't speak to that.

 5      Q.  Have you ever done any moonlighting

 6   yourself?

 7          MS. LUNDY:  Objection.  Beyond the scope of

 8      Cross Examination.

 9      A.  I don't know.  Have I maintained more than

10   one job?  I don't think so.  Maybe.

11      Q.  When you worked moonlighting somewhere, did

12   you get benefits from that job?

13          MS. LUNDY:  Objection.

14      A.  I don't remember.  I can't even specify what

15   it was, so I don't know.

16      Q.  Does leave of absence have to be paid or

17   unpaid?

18      A.  It depends on the scope of the leave.

19      Q.  What leave of absence is paid?

20          MS. LUNDY:  Objection.  Once again, we're

21      well beyond the scope of Cross Examination, and

22      I ask Ms. Risman to be mindful of these ongoing

23      objections and the improper questions that

24      continue to be asked.

25      A.  Say the question again?
```

1          (Whereupon, the requested portion of the

2     record was read back.)

3     A.   There's paid family leave, there's

4  short-term disability, there's long-term

5  disability, there's -- personal leave of absence

6  can be paid using PTO time.  It depends on the

7  context.

8     Q.   But you'd agree with me that when somebody's

9  on leave of absence, they are not working at that

10  time, correct?

11          MS. LUNDY:  Objection.

12     A.   Correct.

13     Q.   I have no further questions.  Thank you.

14          MS. LUNDY:  Thank you.

15          MR. WAGNER:  Nothing for me.

16          MS. LUNDY:  We reserve our right to review

17     and signature.

18          (Whereupon, this examination was concluded

19     at 6:40 p.m.)

20

21

22

23

24

25

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

```
 1                    CERTIFICATION

 2

 3     I, DAVID NOVICK, a Notary Public for and within

 4   the State of New York, do hereby certify:

 5     That the witness whose testimony as herein set

 6   forth, was duly sworn by me; and that the within

 7   transcript is a true record of the testimony given

 8   by said witness.

 9     I further certify that I am not related to any of

10   the parties to this action by blood or marriage,

11   and that I am in no way interested in the outcome

12   of this matter.

13     IN WITNESS WHEREOF, I have hereunto set my hand

14   this 3rd day of April, 2023.

15

16                    David Novick

17                    DAVID NOVICK

18

19              *      *      *

20

21

22

23

24

25
```

```
 1                       ERRATA SHEET

 2   CASE NAME:  SELENA STALEY, VIVIAN HOLMES, and
                 OLIVE IVEY, on behalf of themselves
 3               and all others similarly situated
                 v. FSR INTERNATIONAL HOTEL INC.
 4               d/b/a FOUR SEASONS HOTELS AND
                 RESORTS, HOTEL 57 SERVICES, LLC,
 5               HOTEL 57, LLC, TY WARNER HOTELS &
                 RESORTS, LLC, and H. TY WARNER.
 6   DATE OF DEPOSITION:  4-3-23
     WITNESS' NAME:  ELIZABETH ORTIZ
 7
     PAGE/LINE(S)/    CHANGE              REASON
 8   _____/_____/_____/_____
     _____/_____/_____/_____
 9   _____/_____/_____/_____
     _____/_____/_____/_____
10   _____/_____/_____/_____
     _____/_____/_____/_____
11   _____/_____/_____/_____
     _____/_____/_____/_____
12   _____/_____/_____/_____
     _____/_____/_____/_____
13   _____/_____/_____/_____
     _____/_____/_____/_____
14   _____/_____/_____/_____
     _____/_____/_____/_____
15   _____/_____/_____/_____
     _____/_____/_____/_____
16   _____/_____/_____/_____
     _____/_____/_____/_____
17   _____/_____/_____/_____
     _____/_____/_____/_____
18   _____/_____/_____/_____
     _____/_____/_____/_____
19

20   _____
            ELIZABETH ORTIZ
21

22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS_____DAY
23   OF_____, 2023.
     _____
24         NOTARY PUBLIC

25   MY COMMISSION EXPIRES_____
```

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

**Exhibits**

**Exhibit 01** 3:9 21:10, 13,17

**Exhibit 02** 3:11 57:22 58:1,4

**Exhibit 03** 3:13 59:5

**Exhibit 04** 3:15 61:22

**Exhibit 05** 3:17 61:24

**Exhibit 06** 3:19 65:6,9

**Exhibit 07** 3:22 85:14, 17,24

**Exhibit 08** 3:24 103:24 104:11

**Exhibit 09** 4:4 107:20, 24 108:12

**Exhibit 10** 4:6 115:22

**Exhibit 11** 4:10 120:10, 14,17

**Exhibit 12** 4:12 123:7, 13

**Exhibit 13** 4:16 127:14

**Exhibit 14** 4:17 134:12

**Exhibit 15** 4:20 155:5 207:18

**Exhibit 16** 4:22 6:16 158:22

**Exhibit 17** 5:4 166:12

**Exhibit 18** 5:7

**Exhibit 19** 5:10 175:8 183:17

**Exhibit 20** 5:13 183:22 185:2,7

**Exhibit 21** 5:16 192:19

**Exhibit 22** 5:19 215:6 269:21,25 270:1,2,4

**Exhibit 24** 6:4 262:13

**"**

**"COVID-19** 121:16

**$**

**$10** 182:6

**$20** 182:6

**$350** 196:7

**$500** 198:16 199:19 200:8 202:4,8 203:12

**0**

**008175** 175:7

**1**

**1** 21:10,11,13,17 116:11 216:4 237:13

**1-minute-and-28-second** 237:16

**10** 115:22,24 118:12 124:19 137:19

**10022** 7:12 121:18

**1015** 137:19

**1017** 134:15 136:18

**10:51** 44:23

**10:58** 44:24

**11** 51:20 52:9,13,15 120:10,14,17

**11th** 18:3

**12** 123:7,13,15

**12:16** 91:9

**12:17** 91:10

**12:30** 101:17

**12:34** 103:10

**13** 127:14 128:1 131:23

**14** 134:12,14 135:11 136:5 219:7 220:18 272:6

**14th** 140:1 141:4

**15** 155:5,7,10 156:15 207:18

**16** 158:22,25 161:6 163:20

**17** 166:12,16

**18** 175:21,23

**18th** 111:14 112:1 113:2

**19** 175:8 183:17,24,25 184:3

**1980** 14:21

**1986** 14:21

**1989** 14:25

**1990** 16:16

**1993** 16:16

**1994** 16:16

**1996** 16:17

**1997** 16:17

**1999** 17:9

**19th** 177:6,23 179:3

**1:27** 103:11

**1st** 105:5 196:11 260:22

**2**

**2** 57:22 58:1,4 167:13

**2-27-20** 59:3

**20** 159:3 183:22,25 184:1 185:2,7,19

**200** 241:23

**2000** 17:14 265:20

**2001** 18:3

**2003** 9:14 18:14

**2004** 18:14,15

**2015** 9:14

**2018** 211:1,16 212:6,9, 12

**2019** 30:22 85:2

**2020** 43:14,16 44:8 51:13 53:3 54:22 55:9, 14,16 59:25 69:14 71:1 83:18 84:3,17 105:5,12, 16 111:14 113:13 114:24 116:2 120:25 121:19 124:11,14,23 125:2,11 128:15 138:12

**139:25** 140:1,11 141:4, 17,18,22 142:11 154:22 159:4 163:16 177:6,23 179:3 180:12,23 181:14,15,19 182:13 188:25 189:14,22 190:9 191:3,8,25 218:23 244:1

**2021** 31:20 74:9 84:24 85:10,20 87:4,6 142:21 196:8 216:12,15 217:18,23 219:2,22,23 223:20 229:12 231:4,9 232:22 234:11 236:6, 14,23 237:5 257:25 258:8,11 259:9,22 260:22 266:12 270:15 274:21

**2022** 84:23 196:12 216:17 217:20 220:3 241:7,8

**2023** 84:23

**20th** 82:22,23 83:18,25 84:2 96:25 97:15 164:5

**21** 192:14,19,21 194:2

**2111** 184:3

**2162** 184:2

**2198** 155:19 156:5,8,14

**2199** 155:17,21 156:10, 17

**21st** 97:15,18 113:13 121:19 139:25 229:10

**22** 215:2,6 269:21,25 270:1,2,4

**2200** 155:18

**2201** 155:8 156:7,15

**22nd** 97:15

**23** 195:22 235:17 236:18,21,22 237:9

**24** 262:13,16

**24th** 120:25

**25** 36:14,17,20,22 37:19,21,24 45:6,9,13 70:21 231:14

**25th** 223:20 229:12 231:4,9 232:21 234:11

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

236:6,14,23 237:4
257:24 258:8,11 259:9,
22 270:15 274:20

**26th** 116:2 124:11,14,
23 125:2,11

**27** 269:22 270:6,12

**2729** 161:5,6

**2732** 159:1

**27th** 59:25

**28** 237:14

**29th** 162:25

**2:24** 134:6

**2:27** 134:7

**2:46** 146:21

**2:53** 146:22

---

**3**

**3** 59:1,5,24

**3-12-20** 61:19

**3-13-20** 61:23

**3-19-20** 175:6

**3-20-20** 57:24

**3-24-20** 120:12

**3-26-20** 115:18 123:9
166:10

**3-30-20** 262:11

**3-31-20** 262:12

**3/26/20** 116:11

**30th** 163:1

**368** 90:18

**372** 117:3 124:2,3,10,15

**398** 105:25

**3:30** 255:9 257:18

**3:56** 186:16

---

**4**

**4** 21:11 61:16,22 62:1
219:6,8 220:12,18

**4-28-20** 85:12

**4-8-20** 166:10

**4-9-20** 158:20

**400** 225:2

**400-plus** 225:3 228:14

**4:05** 186:17

**4:30** 202:24

**4:35** 202:25

---

**5**

**5** 61:18,24 63:6 219:5
220:8,16

**5-12-20** 183:15

**50** 11:19 37:25 38:8
130:2,15 131:1,11,14
138:11 187:1 190:3
231:11

**52** 261:3,4,8

**52-4** 211:9

**54** 215:21,23,24 271:11
272:2

**56** 215:9

**57** 7:25 19:6,7,21,25
20:8,10,23 21:8 23:2,3
24:16,21,24 25:5 26:5,
6,15,25 29:11,18 30:13,
19 31:2,12 32:14,18
33:25 34:11 41:16,18,
23,24 42:7,9,11 45:9
46:20 47:11 48:18
50:12,17 63:12 74:16,
22 77:14 78:5,20 79:3,
6,18 105:17,25 106:10
109:25 117:10 121:17
150:6,21 151:20 158:15
199:6,8,10,22 208:2,6,
7,14,18,24 209:9,25
217:1 271:20

**57th** 7:11 41:16,24
121:17

**58** 263:9,14

**5:21** 232:19

**5:30** 232:20

**5th** 188:25 196:8

---

**6**

**6** 65:6,9 215:19

**6-1-20** 103:22

**6-22-20** 192:17

**60** 187:1

**60-day** 95:23

**61-page** 215:3

**63** 211:9

**6:16** 264:12

**6:23** 264:13

**6:40** 278:19

---

**7**

**7** 85:14,17,24 211:9
272:25

**7-14-2020** 138:19

**7/14/2020** 137:23

**78** 187:3 189:21

**79** 106:1

**7th** 128:15

---

**8**

**8** 103:20,24 104:2,11

**8-5-20** 134:10

**8-7-20** 127:12

**8174** 176:6

**8175** 175:24

**87** 15:1

---

**9**

**9** 107:20,24 108:1,12
110:6 111:6

**917** 108:14 111:1

**918** 108:13

**922** 120:24

**923** 120:18

**936** 136:18

**94** 237:25 240:21

**97** 17:8

**99** 17:8

**9th** 163:16

---

**A**

**a.m.** 44:23,24

**abbreviate** 49:13,19,
24

**abide** 97:12 252:7

**Abigail** 25:17 26:10,14
240:4 255:14 257:6,8,
17

**ability** 134:17 257:15

**abrupt** 59:17

**absence** 275:7,9
276:17 277:16,19
278:5,9

**absent** 221:4,5,7

**absolute** 137:1

**absolutely** 132:18
134:5 139:5 144:9
214:1

**abundance** 159:4
164:6,20

**abundance'** 164:8

**accept** 121:10

**access** 39:7 83:11
200:15

**accessibility** 268:8

**accommodate** 157:2,
17 158:14

**accommodations**
87:8

**account** 138:17

**accountant** 37:5

**accrue** 247:8

**accrued** 247:9

**accurate** 20:4 21:21,25
22:3,9,11,13,23 62:23

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

63:10 106:5,9 124:9
129:16,21 132:4,7,8
137:6,7 167:18 168:8
257:23

**Acknowledging** 181:3

**acknowledgment**
180:24 181:1,2,5,7,9,23

**Acquisition** 17:4

**Act** 95:18 99:20 117:13
127:6 131:6 178:9,11,
16,18,20,23 267:13

**acting** 93:8,12,15
219:13

**action** 8:2 9:15,19
160:1,10 213:18,22
214:10

**activities** 34:4

**actual** 35:5 136:21

**adapt** 87:25

**additional** 165:20,21
167:22,23,25

**address** 7:10 104:6
107:5 136:2,12 187:8,
13 247:24 248:2 253:1
255:22 257:10

**addresses** 115:19
124:7 135:24 136:14

**adjusted** 190:20

**administrative** 198:1
200:5,8,15 201:16

**administrators** 251:17

**ADP** 38:24

**ADP's** 129:14

**advance** 95:23 96:11
97:11 98:13

**advanced** 102:3

**advice** 95:7,19

**advisement** 99:17

**affect** 249:24

**affected** 119:16

**affords** 133:17

**AFL-CIO** 118:25 119:5
124:5 126:12

**afternoon** 257:19

**again?'** 251:9

**agencies** 121:25

**aggressiveness**
229:25

**agree** 49:13 50:16,19,
20,25 59:23 60:2 62:15
63:17 64:3 72:1,8 80:4
84:16 87:3,10 101:7,12
103:14 104:11,21 107:2
108:2 111:2,9,25 112:6
113:13 123:25 124:18
128:2 133:19 134:24
135:10 149:20 159:2
167:10 169:1,9,24
171:15 176:2 177:5,9
184:14 185:19 189:13,
20 197:16 204:22
205:11,13 206:8 207:20
209:10 212:8 219:18,22
220:3,8,16 225:13
231:25 257:22 259:5
260:16,21 261:12
262:19 264:14 276:19
278:8

**agreed** 54:24 195:1
199:1

**agreeing** 196:16

**agreement** 95:14,15
96:7,9,11,17 97:4,10,13
98:9,20 102:17 103:2
194:25 195:6 196:2,6,
16,22 197:2,5,15
198:25 199:4,11 200:12
202:10,14,17 203:5,9,
11,16,20,25 204:5,11,
15,19,23 205:3,8,14,19,
24 206:3,6,10,20,23,25
207:6,9 210:4,9,11,13
211:1,6,20 212:5
214:15,23 215:9 216:3
221:13 224:24 225:22
226:6 228:5,20 252:4,6,
8 269:15,18 270:7,10
271:7,10,12 273:16

**agreements** 196:14,20
197:4

**ahead** 52:11 101:21
235:24 239:21

**ahold** 257:13

**airport** 60:11

**alarm** 246:11 248:13

**Alex** 128:6,7 132:14
187:18

**Alexandra** 128:3,11,24
132:22

**allowed** 40:9 48:3
154:11

**allowing** 83:11 154:24
245:22

**alluded** 259:15

**Aman** 32:6

**Amended** 208:9

**amendments** 204:24

**Americas** 240:3,6

**amount** 67:23 151:14
198:12,14 249:8

**amounts** 151:11

**and/or** 79:15 88:3
129:15 132:3

**Andrew** 156:25 157:15

**annexed** 211:2

**anniversaries** 144:16

**announce** 266:4

**announcement** 60:11
156:24 157:15 266:7,10

**annual** 38:1,9

**answers** 8:11 230:20
242:15 248:23 255:19
256:10

**anticipate** 8:20 189:5
245:7,8 250:11

**anticipating** 239:24

**anticipation** 71:7 86:7,
14,20 87:24

**Antoine** 75:16,20,23
76:9 78:4,18 192:4,16
240:2

**anymore** 132:23

**apologies** 127:24

**apologize** 235:18

**apparent** 112:1

**appeal** 219:7 220:12,
17,19

**appearing** 118:3

**applications** 256:24

**applied** 95:18 252:21

**apply** 266:19

**approach** 269:3

**approval** 102:11
103:16 104:13,19,22
105:6 151:4,6,10

**approvals** 248:14

**approve** 76:10 102:22

**approved** 102:10
167:11 259:18

**approves** 102:12

**approving** 76:14

**approximately** 70:21
116:11 117:3 124:2,3,
10,14 145:15 180:10

**April** 51:13 141:12
162:25 163:1,16

**arbitrarily** 203:14

**arbitration** 205:9
214:18 215:17 216:2
273:12

**area** 92:10 115:6
132:14 148:11

**areas** 86:19 133:10
191:21

**arms** 133:18

**arrived** 85:1

**arriving** 85:3 246:16

**articles** 154:10,18

**Arts** 14:14

**asks** 128:7

**aspects** 184:19

**asset** 150:18 152:7,9,
19,21,23,24,25

**assets** 153:7

**assist** 272:7

**assistance** 242:15
254:19

**assistant** 16:7 133:9
201:4

**assistants** 187:17

**assume** 61:9 77:12
80:21 105:2 117:15
130:13 185:1

**assuming** 249:23
273:10

**attached** 66:1 105:24
118:13 129:11 165:3
185:2,6,17 193:11
210:8

**Attachment** 118:14,
16,18,23

**attempt** 54:12

**attempting** 182:14

**attempts** 33:21

**attention** 28:1 60:9
62:1 63:5 64:12 65:8
67:13 69:6 104:1,10
105:22 107:18 108:11,
13 110:6,25 118:11
123:14 128:1 131:22
137:16,21 150:10
154:15 155:16,25
156:16 158:18,24
163:19 174:18 184:3
210:7 211:4,5 215:8,21
217:15 233:15 237:13

**attorney** 168:17 212:21

**attract** 35:17

**August** 128:15 181:18
188:25 194:11

**authored** 61:19

**authority** 208:23
209:12,16

**auto** 156:18 157:7

**avoid** 40:20

**aware** 42:19,24 44:3
54:23 66:3 67:14 82:19
94:14 99:18 136:7
138:9 146:17,25 163:14
190:13 192:22 204:4,10
205:23 206:2 230:13
232:21,24 243:12,16

265:5 268:12,16 273:13

**awareness** 52:2

**awful** 59:18

---

### B

**B-R-A-M-B-R-U-T**
216:14

**Bachelor's** 14:13,22
15:1,2

**back** 15:19 18:7 45:1
46:16 49:10,12 66:7
75:19 97:24 103:13
105:19 111:20,23
119:12 125:7 138:11
151:9 160:16 161:22
162:5,18 164:20 173:2,
14 174:3,18 179:3
182:14 183:21 185:24
186:18 189:8 203:1,4
213:16,23,24 214:3,5
229:10,12 239:12
240:25 241:5 250:12
252:24 254:3,11 262:6
263:4,25 264:6 273:20
278:2

**background** 14:10

**bacteria** 35:17

**Barbara** 122:24 123:3,
8 124:23 126:2 243:6

**Bargaining** 95:13,14
96:7,8,11,17 97:4,9,13
98:9,20 102:17 205:7
252:4,6

**bars** 16:2 116:8

**base** 65:2

**based** 47:1 52:7,22
64:22,25 67:21 69:2,18
70:3,5 77:20,22 78:1,4
80:3 81:12,22 87:18
89:20 97:20 98:8
109:23 111:25 115:3
117:7 118:5 120:8
129:25 147:6 148:10,24
153:16 164:11 170:16
190:20 198:6,8 224:23
225:21 241:9 244:6,18
269:10 272:21 273:24
275:7,10

**basically** 136:11

**basis** 15:14 36:14,16
71:24 72:8 78:10,14
144:7 208:23 209:2
213:1,4 217:14 230:18
239:6 270:12

**Bates-stamped** 57:25
59:3,7,24 61:20,23 62:2
63:6 65:5,10 85:13,24
103:23 104:2 107:22
115:20 117:2 119:3
120:12,18 123:11
127:13 128:1 134:10,14
137:17 155:3,7 156:17
158:20 159:1,10 161:6
166:10 175:6,23
183:16,18,25 184:1
192:17 194:3 195:23
262:12

**bathroom** 73:11 134:4
260:10

**bathrooms** 73:8,20,22
74:1 83:7 89:18,21
90:12 91:11,13,17 92:5

**beams** 88:23 89:16

**Bear** 253:4

**bedroom** 89:8

**began** 24:23 25:5 30:19
31:1 33:25 135:7 136:3
137:23 138:19

**begin** 71:6 240:25

**beginning** 97:16,18
156:14 239:17 253:16

**begins** 97:16 271:11

**behalf** 7:22 9:16 121:11
126:3,6 208:18,24
209:3,13,17 269:12

**benefit** 241:24 247:1,5,
8 251:11,14

**benefits** 34:5 102:24
165:15,24 166:1 167:5,
12,22 201:11 269:17
277:2,12

**beverage** 49:3 66:18,
21,23 83:1 103:6 113:7
114:18 115:4,7 146:8
147:21

**bigger-picture** 243:15

**biggest** 255:25

**biography** 21:12

**birthdays** 144:16

**bit** 40:24 205:8 245:13

**bits** 238:21

**black** 132:13,18 152:13

**board** 254:6

**Boland** 39:15,24

**bonding** 276:15

**books** 247:9

**bookshelves** 89:8

**bottom** 50:15 62:9
65:18 87:18 105:22
108:13 110:25 111:6
128:22 161:6 184:16
185:10 195:24 212:4
215:9,24

**box** 230:9,23 231:4,9,
17 232:1,13 242:5
274:20

**boxes** 63:3

**Brambrut** 216:13
242:21 244:21 245:10,
21,25 246:3,18 247:11,
17,23 248:1,4,25 249:4,
22 250:13,18,21 251:7,
12,21 252:1,9,12 253:4,
12,18 255:8,12 257:16

**brand** 20:16 21:4
22:12,15 23:1 29:8,17
148:4,6,9

**brandings** 27:24

**breach** 35:25

**break** 44:22,23 91:7,9
101:17 103:8,9 112:13
134:4,6 146:20,21
186:16 202:18,22,24
232:18,19 264:10,12

**breakage** 90:22

**breaking** 88:24 90:7

**Briefly** 207:7

**bring** 162:18

**bringing** 173:14
250:11 263:25

**broad** 34:2 79:9 143:8
150:13 194:21

**broader** 35:2,4

**broadly** 256:13

**Broadway** 48:4

**Broadway's** 82:12

**brother** 56:16

**brought** 217:15 221:17

**BRUSTEIN** 24:25
168:19 195:14 202:21
221:23 233:25 235:18
238:16 239:10 269:23

**bubble** 242:3,4

**building** 34:19,20
35:19 36:2,20 45:3
52:16,20 72:4,16,20
91:24 92:14 93:18 94:1
115:14,15 183:21
185:24 219:10 243:17
248:6 252:5 254:3,11

**building.'** 248:8

**bulk** 188:6

**bumping** 117:4 129:12

**bunch** 118:13

**business** 7:10 19:25
23:6,7,12,14 26:20,25
27:19 36:9 48:6,16
79:13,24 82:4,13 83:15
95:25 97:25 100:4
101:13,15 116:3
121:13,20 151:16
182:16,24 192:1 208:22
209:1,6 265:16

**businesses** 43:22
44:11 184:17 221:1

---

**C**

**C-H-A-R-P-I-E-N-T-E-R** 25:18

**C.a.r.e** 215:19 271:19

**C.A.R.E.** 210:15,16,18
214:14 216:3 271:9,18
272:1,10,14,19 273:7,

16

**C.O.R.E.** 9:7 18:22
183:11

**cafeteria** 86:2,6,11,12,
16,21 87:2,7 88:2
191:16

**calculate** 129:6

**calculated** 129:13,25

**calculation** 244:19

**call** 122:18 153:17
163:24 180:2 202:17
203:19 210:15 221:19
229:16,22,23 230:6,8
231:2 233:9 241:22,23
253:20,21,22 254:25
257:2 264:5

**call-to** 159:25 160:10

**called** 16:20 88:18
148:20 174:22 201:18
231:23

**calling** 189:8 227:9,16
263:4

**calls** 11:10 12:3,14
13:17 119:24 125:12
126:17 168:14 209:21
213:6 228:16 242:12
254:24 267:17 268:21

**can/should** 176:20

**capacity** 118:4 269:10

**capital** 142:7 259:14,
20,21,25 260:5

**career** 9:23

**carpenters** 87:1

**carpet** 89:4 243:13

**carpeting** 89:8 191:17

**case** 7:20 10:18 117:22
127:22 192:9 199:12
203:20 207:9,12 212:24
229:2

**categorized** 199:2
201:2

**Cathy** 53:9 54:14 56:5
104:15 107:3,5,15
108:6,15,22 109:7,16,
24 110:9,13 150:18,19
151:2 152:6 192:16

261:20 262:1,11,20

**causing** 116:8

**caution** 159:4 164:6

**caution'** 164:20

**CC-ED** 65:18 176:13

**CC-ING** 192:16

**ceiling** 86:13 87:19,21
88:2,3

**ceilings** 90:11 260:10

**cell** 257:11

**Center** 18:1

**certainty** 137:2

**Chahwan** 75:16,20,23
76:9 78:18 192:4,7,16
240:2

**chain** 65:3 85:11
103:22 107:21 127:12
166:9 175:4 234:6
262:10

**challenges** 243:13

**Chang** 122:24 123:3,8
124:23 126:2

**change** 34:9 68:8,11
71:9 73:1 86:15 90:1
164:16 187:8,12

**changed** 34:13,24

**Channel** 51:20 52:9,13,
15

**channels** 237:22 238:9
240:18

**characterized** 101:22
274:17

**charge** 64:19 106:8

**Charpienter** 25:17
26:10,14 240:4 255:11,
13

**Charpietner** 255:14

**chart** 65:5 69:2,3,4

**chat** 230:9,23 231:4,9,
17 232:1,13 242:5
256:22 257:9 274:20

**check** 92:11 129:19
151:14

**checked** 129:15 132:2

**checklist** 188:2,11

**checks** 151:13

**chef** 87:19

**child** 276:15

**chillers** 35:15 72:21
260:12

**China** 56:22

**chose** 207:4

**chosen** 172:4,5,10
174:15

**Chwang@tymail.
com.** 107:8

**circumstance** 75:21

**circumstances** 47:2
105:1 116:4 125:17
163:4 167:7 228:16

**City** 32:7 43:15 96:1
126:8 195:4,5 197:3
198:24 200:12 248:15
265:11

**clarification** 57:14
58:7,15 118:9

**clarify** 13:14 29:15
39:12 40:4 55:15 57:8
70:2 97:22 127:17
246:20

**clarity** 33:3 39:22
172:2,6

**Class** 116:1

**classification** 201:19

**classified** 200:14
201:14,15

**classify** 224:14

**clean** 36:1 83:7

**cleaner** 40:24

**cleaning** 72:19

**cleanliness** 60:7

**clear** 8:7 64:8,10
177:17

**click** 242:3

**close** 44:7 47:14,25

53:6 54:19 56:1 58:22
69:12,15,20 81:13
83:24 84:8 97:21
110:23 163:3 264:19
272:25

**closed** 43:10,16,24
44:12,18 47:17 54:25
55:8,25 56:3 57:5,10
59:19 68:5,18 71:13,14,
15,17,18 72:2 81:14
82:12,13 83:3 86:6
96:22 100:2 101:6,10
121:20 145:20 161:23
181:17 214:13 224:5
225:12,18 226:11
227:23 228:3 241:3,16
242:9 243:9 247:17
255:22 264:15

**closely** 138:6

**closing** 60:3,16 131:18
140:13 141:14 176:18
177:18,21 264:17,24

**closure** 43:20,21 47:21
83:23 127:8 163:11
176:23,25 177:11,15,
16,25 190:8,13 191:20
192:9,22 193:4,9
194:10 226:10

**closure.'** 176:21

**closures** 116:8

**club** 184:19

**coaching** 238:16

**COBRA** 252:10,13,18,
20 253:1,5

**code** 184:9,10

**cognizant** 145:6

**collaborate** 49:6 64:22
75:14 217:13

**collaboration** 35:14,
23 47:1,6,7 48:16,17
93:19 199:16,21

**collaborative** 55:4
60:23 69:17 74:11 76:6
80:23 81:12,20 82:2
92:23 102:11 149:12,24
150:2,3 153:16 158:5
160:21 164:13

**collaboratively** 80:6,

11,13,22 81:3

**collective** 95:13,14
96:6,8,10,17 97:4,9,13
98:9,20 102:17 103:1
205:7 208:8 252:3,6

**collectively** 52:25
79:20 86:11 103:1
134:11

**college** 14:25

**commencing** 196:7

**comments** 246:19

**commercial** 55:17

**commitment** 256:17

**committed** 241:10,12

**committee** 48:25
102:16 166:25 183:1,4,
15 184:5,13 190:25
265:3

**common** 82:17 218:14,
15 221:2

**communicate** 144:12

**communicated** 66:3
67:15 255:21

**communication** 11:10
12:3,15,20,23 13:18
14:13 55:4 58:12
125:13 126:18 168:16
176:19 193:23 218:5
242:3,4,8 257:4 260:22
267:18 268:22

**communications** 14:7
119:24 168:15 221:10,
17

**communicative**
144:6,9

**community** 52:11
69:18,19,25 70:4
100:23 101:3,7 117:18

**comp** 266:1

**company** 38:20 42:10
116:10 245:2 249:16

**compensated** 253:7

**compensation** 34:6
253:11

**competitive** 264:24

265:5,24

**complain** 224:6,10

**complained** 217:3,6
223:10,14 224:22
225:20

**complaining** 223:24
246:13

**complaint** 68:22 69:1
208:10 214:20,22 216:1
217:9 225:14 232:7,9
271:14,24 272:5,8,11,
12,22 274:24,25

**complaints** 223:3,9
224:14 230:10,22
231:3,8,11,14,16 232:1,
5 273:14,24 274:2,3,8,
15,18,20

**complete** 73:20 248:8
249:2

**completed** 92:16
146:2

**completely** 71:18 72:2

**compliance** 117:12
267:13

**computer** 38:18
188:18

**concerned** 113:10

**concerns** 224:12 225:3
226:23 227:3,6,11,13,
14,22 228:7 230:10,22
231:3 242:12

**concluded** 278:18

**conclusion** 209:22
213:19

**conclusions** 213:7

**concrete** 90:5,9
250:15,25

**condensation** 73:14

**conditions** 271:15

**conducted** 84:18,23
85:5,8 273:23 274:11

**confidential** 185:7,11,
18 198:2 200:15

**confidentially** 185:13

**confirm** 66:1 79:16
105:9

**confused** 152:13
230:14

**confusing** 163:2

**confusion** 125:7

**conjunction** 217:8

**connected** 250:4
254:14

**connection** 94:4 117:4

**consensus** 144:11

**consequent** 116:5

**considered** 44:12
88:11 89:2,12 178:21,
24 215:13 245:4

**consisted** 48:25

**consistent** 141:16

**consultant** 18:9

**contact** 93:18,20 94:4
156:18 218:6 222:12
244:14

**contacted** 32:9 124:6

**contacting** 93:22

**contained** 129:24

**contaminating** 115:6

**context** 235:11 238:13,
24 278:7

**contingency** 220:25
221:4,8,10,13 222:3,4,
10,17,18,21,24

**continuation** 167:2
193:9 244:17

**continue** 40:22 83:17
165:14 166:6 194:13
199:1 200:13 202:11
241:2 242:13,14 244:2,
8 256:2,18,19 257:14
277:24

**continued** 156:23
194:16 197:6 243:16

**continuing** 102:24
203:12

**contract** 194:17 247:19

249:1

**control** 116:7 252:17

**conversation** 59:12,13
87:18 128:14 129:23
143:25 190:16 191:21
211:25 255:1 267:19

**conversations** 142:3
144:9 145:2 164:12
190:20 191:15,24
223:19 225:5 265:3
274:17

**cooling** 246:9

**cooling-tower** 248:18

**copies** 13:24 122:5

**copy** 128:19 129:11
210:25

**corner** 211:9

**Coronavirus...2019**
121:15

**corporate** 238:2
240:23 253:23

**correct** 13:12 16:13
22:20 24:24 25:5 28:12,
18,20 30:2 31:15,16
33:1 41:2 46:11,12
47:19 50:6,10,18 51:9
53:25 57:1,6 59:25 60:4
61:6 62:10,11,14,17,18
63:19,22,25 65:18,20
66:24 71:20,24 72:13
78:18 80:6 84:9,14,18
87:4,12,15,21 88:24
89:2 91:24 92:7 93:4,7,
8 99:20 101:4,8,16,20
102:1 107:3 108:3
109:12 112:3,10,16,20
120:22,25 123:23
125:24 126:4,12,14,16
128:4,16 133:14,22
134:21 135:1,7,14,19,
22 136:24 138:1 139:17
145:21 146:24 156:11
157:8,23 158:7,10,16
159:12,13,15 160:7,19,
22 161:2,20 162:9,13,
14,20,22 164:17 165:6
166:18 167:14,25 168:4
169:11,17 170:1,13
172:8,9 173:1,9 176:14,
15 177:12 178:9 183:2

185:21,24 186:2 189:15
190:6 193:20,24 194:19
196:8,12,22 197:18
198:21 204:16,20
207:21,24 208:3 210:25
212:6,16 213:18
215:14,19 216:2,5,6
217:7 219:3,9,13,19,23
220:4,13,20 225:15,23
226:23 229:14,18
230:10,15 232:5,22
233:23 234:11,13,17,20
237:11 238:5 258:11,
16,17,18,19,21 259:2
261:9 263:7 265:16,24
271:4,8 274:11,21
278:10,12

**correctly** 141:10

**correspond** 54:7

**corresponded** 53:24
261:20,25

**corresponds** 107:15

**cost** 82:8 84:11 98:1

**costs** 76:19 82:6,15
84:8 115:11

**Council** 57:19 58:12
117:12 118:25 119:5
124:5 195:4,5 197:3
198:24 200:12

**Counsel** 11:11 12:4,5,
15,20,23 38:12 95:7,19
96:4 118:2,8 120:2,9
123:21 267:20

**count** 104:9 106:7,9

**country** 16:24

**couple** 18:9 115:3
141:9 214:12 244:7
248:25 252:23

**court** 7:5 8:12 10:25
11:4 175:20 233:21
234:1 235:21 237:17
239:17 258:4

**cover** 104:17 183:19
185:20 215:4

**coverage** 167:5 252:13
253:5

**coverage?'** 252:10

**covered** 205:7

**COVID** 52:1 56:11,21
57:6 60:17 70:8 163:5
221:18 264:25

**COVID-19** 116:5 157:4,
19

**crazy** 98:15

**created** 234:7

**crew** 36:7

**criteria** 147:16 148:2,5,
9,14

**critical** 66:4 67:16,19
68:23

**Cross** 269:5 275:12,14,
20 276:4,13 277:8,21

**Culture** 21:23 22:19,24
31:6 34:4 35:1 45:25
50:8,9,16 62:13 75:13
79:2 94:12 118:5
133:10,11 144:15 208:2
240:5,7,8

**Cuomo** 83:25 156:25
157:15

**curious** 227:1

**current** 39:4

**custody** 234:6

**cut** 68:1

**cutoff** 244:11

---

**D**

**d/b/a** 7:24

**D23** 195:17

**daily** 34:3 71:23 72:13,
15 78:10,14 217:14

**dangerous** 71:19 72:3

**data** 37:8,10,14 188:11

**date** 21:14 58:2 59:5
61:25 65:7 85:15 94:10,
14,21 96:23 103:25
107:24 115:22 120:15,
25 123:13 127:15
129:2,13 130:6,22,23,
25 135:6 136:3,17,21,
24 137:4,21 138:1,5

145:12 155:5 158:23
163:16 166:13 167:19
175:9 177:23 180:12
183:22 187:13 189:4
192:19 197:17 198:20
215:7 237:9 260:20
262:14 266:10

**dated** 57:24 59:3,25
61:23 85:12 103:22
115:18 116:2 120:11
123:9 127:12 128:15
134:10 158:20 177:6
183:15 192:17 262:11

**dates** 51:12 114:13
128:20 129:7,16,20,24
132:4,7,8 135:4,13,25
136:12 137:7 141:16
166:10 189:6,7,19,21,
25 190:1,4

**day** 36:19 53:1,2 67:1,2
82:24 96:20,25 129:14
130:1,8,10,11,17,23
132:8 139:5 150:20
165:22 182:6 190:5,15

**day-to-day** 72:8 75:14

**days** 46:7,10,11,16
52:21 136:22 139:4
219:7 220:18 272:6,25

**DBAS** 49:18

**deals** 193:19,23

**Dear** 104:15 111:8
156:22 176:17

**debating** 117:17

**December** 217:24

**decide** 91:6 244:13

**decided** 44:7 69:15
87:24 163:3 199:18,25
200:4,7 228:21 250:15

**deciding** 64:19 147:2
250:24

**decision** 33:20 47:10
51:14,22 53:6 69:17,24
70:4 74:4,10,13,17,22
75:2,7 80:14,23,25
81:6,10,20,24 83:12,13,
14,17 86:10,13 97:19,
22 100:16 102:18
111:14 113:14,18,20
114:3,7 141:19,22

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

142:11,15,23 143:2,5
149:5,10,12,15 151:17
153:12,16,19,24 154:7
158:5 159:5 167:22
172:23,24 191:25
195:4,5 197:3 203:14
219:6 220:12 264:22
272:21,24 273:6

**decisionmaker**
102:12,22

**decisionmaking** 81:4

**decisions** 55:3 74:18
76:1,2,3,15,18 149:21
150:4,25

**declaration** 207:8,12,
21,23 208:6,17,24
209:3,13,17 210:8,20,
22,24 212:14,15
213:17,21 214:7

**decrease** 45:24 46:3
68:8,24 69:4,9 70:15

**decreased** 68:17 69:3
70:23,24 190:3

**Dedera** 175:5 176:3

**dedication** 156:23

**deemed** 178:13 184:16
201:7 230:1 237:8

**DEF2199** 156:15

**DEF7353** 85:25

**DEF903** 193:22 194:3

**defendant** 7:2 10:17
208:2

**Defendants** 118:7
199:12 208:6,9,10
209:24

**Defendants'** 195:10
212:16,18

**define** 40:10

**definition** 170:5,8,10,
13

**definitive** 170:4

**degree** 14:11,13,15,23,
24 15:1,2,6 58:16
231:24

**degrees** 14:12

**delay** 114:4 141:8,10

**delivered** 67:3

**delivering** 248:17

**demand** 117:20

**demands** 40:13

**department** 30:7
114:18 123:17 126:9
136:21 138:22 244:20
247:16

**departmental** 137:5

**departments** 63:16

**depend** 105:1 146:4

**dependent** 131:17
146:6,11 147:8 149:4

**depending** 27:21,23
244:11 248:11 250:14,
23

**depends** 75:21 77:21
91:5 148:16,17 151:13,
20 170:17,22 248:20
258:23 268:7,8 277:18
278:6

**depiction** 167:18
257:23

**deposing** 40:2

**deposition** 8:10,24 9:1
10:14 11:4 39:25 40:12,
14 44:24 49:24 50:20
84:14 91:10 103:10
118:3 134:7,18 146:22
186:17 202:25 232:20
264:13

**depositions** 39:15
40:19

**describe** 14:9

**describing** 102:13
248:7

**designated** 197:25

**designer** 89:5

**desk** 154:19

**detail** 134:23

**determination** 47:4
192:8 244:16

**determine** 264:17

**determined** 46:23 71:5

**Development** 126:8

**devices** 127:20

**dictated** 147:24

**dictates** 131:5

**difference** 19:20
135:5,17

**differences** 136:4,7,10
205:18

**difficult** 159:5 255:18

**diligence** 193:8 194:9

**diligent** 137:3

**dining** 146:8,9 147:3,
12

**dire** 221:3

**direct** 75:15 168:15
218:7,19

**directed** 126:19 272:4

**directing** 235:15

**direction** 40:18 59:15
80:25 81:1 83:3 112:5
124:25 161:23 168:24
184:22 252:7

**directive** 82:25

**directly** 20:18 54:11,13
55:6 75:20,22 185:14
244:15 251:19 253:2

**director** 9:11,13 10:7
16:19 17:3,5,17,20
18:17,19 19:1 21:22
22:18,23 25:16 31:1
37:6,16 45:25 49:1,2,3
50:8,9,15 62:12 66:12
75:13 76:7 77:5,6 79:1
92:18,24,25 93:2,19
94:12 103:4,5,6 118:4
133:9 164:7 183:9,10
208:1 217:19 218:18
221:6,7 240:7 272:23

**directors** 49:5 183:8

**disability** 278:4,5

**disadvantage** 235:12

**discipline** 133:18

**discontinuance**
111:2,9

**discontinuation** 197:3

**Discovery** 116:22

**discuss** 56:19 128:11
216:4 264:6

**discussed** 105:24
125:23 126:2 131:24
136:8 154:13 166:25
167:22,23 190:1,9
192:23

**discussing** 112:13

**discussion** 18:5 25:19
75:17 76:12 81:12,21
82:2 83:8 104:6,8 112:1
127:10 137:14 166:21,
23 186:13 193:4 194:6,
8 207:14 213:13 258:5
263:25

**discussions** 52:6
110:18 141:24 142:4,10
191:19 217:14

**disease** 35:18 121:15

**dismiss** 208:9 212:16,
19

**dismissed** 212:24
213:5,18,22 214:10

**disrespectful** 230:1,7

**disruptions** 116:6

**dissatisfied** 219:6
220:11

**distance** 86:19

**distancing** 63:25

**distinction** 195:19

**distracted** 237:19
240:15

**distributed** 63:15
220:1,9

**distribution** 95:20,22

**division** 31:5,6 34:4,
14,15 76:13 77:3
114:14,19 126:9 129:15
132:3 183:10

**divisional** 34:24

**divisions** 31:8 35:21
66:10 78:12 113:6,25
114:9,10 162:1

**doctors** 157:2,17 160:2

**document** 58:6 104:14
105:23 111:8 116:14,
17,21 120:21 123:16,19
124:1 129:3 155:2,9,17,
18 156:1 157:11 161:5
175:17,23 183:17
185:2,6,20 186:5
195:24 211:9 213:24
215:3,22 218:20 222:8

**document's** 123:22

**documentation**
218:11

**documents** 11:8,14,
19,22,25 12:7,11 13:1,
7,12,16,20 14:4 27:9
99:10 134:21

**dollar** 151:11,14

**done?'** 253:8

**doors** 52:3

**dotted** 75:12

**double** 129:15 132:2

**double-check** 203:18

**doubt** 231:13

**Downtown** 133:2,8
265:14

**downturn** 116:4

**draft** 118:16 120:3,4
121:6,7,9 122:4,5
123:19 155:9 164:16,
18,25 165:5 210:3

**drafted** 118:18 119:21
122:9

**drafting** 121:2 140:6
168:11

**drafts** 122:8 163:20,25
164:4,9,22

**due** 59:19 60:16 68:18
116:3 121:11 162:22
163:10 193:8 194:9
226:9

**duly** 7:2

**duo** 37:3

**duties** 34:1,9

**dwindled** 70:25

---

**E**

**e-mail** 43:6 53:25 57:23
58:18 59:2,8,23 61:22
63:1,2,3,13,14 65:3,14,
18,20,23 66:13 67:14
68:1,22 69:8 85:11
87:12,18 93:24 103:22
104:3,6,15 107:2,5,11,
14,21 108:2,5,9 110:7,
14 111:1,4,6,11,25
112:7 115:17 127:12
128:2,5,18,22 131:24
132:1,6 151:3 156:17
157:7 166:9,18,20
167:11,17 168:6,8
175:4 176:3,12,14,16
177:5,8 179:4 183:14
184:4,10,11,15 192:15
193:1,2,7,15,19,22
194:3,6 218:8,11
231:20 237:21 239:22
240:17 241:1 262:10,
20,22 263:24 264:4

**e-mailed** 186:22 227:2,
7,10

**e-mails** 11:18 42:25
43:3 56:4 107:16 144:8
167:18 176:7 203:15
227:6,10

**earlier** 45:15 72:18
125:5,11 142:19 151:9
183:1 184:12 187:16
237:21 239:23 240:17
241:1 243:8 250:9

**early** 51:13 194:11
241:8,17 242:9

**easier** 16:11 156:6

**East** 7:11 41:16,23
121:17

**easy** 254:15

**economic** 116:4

**edit** 164:23

**edits** 164:10

**educated** 170:7

**educational** 14:9

**effect** 55:5 134:25

**effective** 211:1

**effort** 60:23 64:22
92:23 102:25 149:25
150:2,3 160:21 164:21

**effort.'** 164:8

**efforts** 33:14

**elaborate** 245:13

**electric** 246:9

**electronic** 14:3 38:17
127:20 180:1 188:20

**electronically** 14:5

**elevator** 73:9,19
260:11

**elevators** 243:16

**eligibility** 244:16

**eligible** 200:16,18,23
201:8 225:17 244:5,8,9
247:10 250:6 270:20,22
271:1

**eliminated** 32:12,18,20
214:19

**Elizabeth** 7:8 21:12
57:23 61:20,22 62:10
85:12 87:12 118:2
158:20 175:6 183:14
192:17 201:4 207:24
237:7 243:7 244:3,21
245:10,11 247:2,11
250:13 251:7 255:8
256:7,21 257:3,16
262:11

**emergency** 221:3,9,
16,18,20,25 222:3,4,9,
10,17,18,21,24 224:15
259:21,25

**Empact** 203:24 204:5,
11,15,19,22 205:3,13,
18,24 206:10,20,23,25
207:6,9 210:3,8,11,13,
15 211:1,19 212:5
214:14 215:4,9 221:12
224:24 225:21 226:6

**employ** 23:3

**employed** 19:10 23:2,
5,9,16 47:11 77:10,14,
17 79:2,14 80:2 108:22
109:1 206:18

**employee** 34:6 65:2
78:20 86:25 87:2
130:14,24 131:9 132:9
178:12 188:10 191:18
197:25 201:15 205:19
206:9 215:4 224:22
226:25 258:24 267:15
272:4 275:7,10,15
276:10,18

**employee's** 271:15

**employees** 17:18,19
34:18,21 37:19,21,22
39:1,4,5 45:2 46:19,23
47:10 48:9,10,12,15
62:16,20,25 63:4,8,11,
14,18 64:5,11,20 66:9
68:15 70:15,22 80:15
81:10,14,16,25 83:19
84:4,9 86:5,19 92:12
94:2,15 95:1 96:16,24
98:3,19 99:7,15,20,24
101:19,22 102:21
105:13,25 106:1,10,11
112:3,9,14,15,19 113:3,
15,21 114:11,23 115:19
116:10 117:3,23 119:16
121:3 122:9 123:10
124:2,3,10,15 125:24
126:4,11,16 127:4,7
129:21 130:7,22 133:21
134:1,9,25 144:2,6,13
160:24 161:18 162:8,
18,19 163:15,22 166:2,
6 167:3,12,24 169:3
171:8 174:21 177:20
178:4 179:18 180:7,9
181:21 186:19 188:21
189:1,14,19,22 190:2
199:2,3,13 200:1,5,8,
10,13,19 201:12 202:7
203:12,25 204:5,9,10,
15,23 205:4,6,14,16,19
216:2 222:5,25 223:4,9
225:3,8 226:4,13,17
227:10 228:22 229:1,4

228:4,20,24 229:5
269:15,17 270:6,9
271:6,10,11 273:16

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

230:14 234:16 236:25
237:5 241:11,12 245:1
249:10,17 251:23 258:9
260:23,25 261:9,14
262:6,24 263:4,10,22
264:1,5 266:4,24
268:11 269:15 270:10
273:25 274:9 275:23

**employees'** 106:18
130:3 165:14 228:14

**employees/positions**
104:17

**employer** 9:4 20:7,22
21:6 27:25 209:20

**employer's** 19:25 21:8
116:7

**employers** 9:3 209:11,
24

**employment** 17:5
121:16 178:13,25
250:4,5 269:16 270:11,
19 271:1,6,15

**empty** 248:8

**encompassing** 166:9

**end** 51:13 56:20 69:14
141:12 170:4 190:18
194:11 210:18 217:24
219:4 241:16 245:23,24
254:17,20 260:20
270:20

**ended** 100:1 198:25

**engaged** 254:14

**engineer** 71:22

**engineering** 35:14
49:2 92:14,18,24 103:5
183:9

**engineers** 71:23

**English** 15:18

**enhanced** 197:1

**ensure** 35:21 98:23
102:7 132:3 187:23

**ensured** 188:8

**ensuring** 34:19,21
35:25 72:20,21

**entails** 126:23

**enter** 194:25

**entered** 187:8,12
194:19 195:7 196:2,16,
20

**entire** 31:11 39:14
238:24

**entirety** 208:11

**entities** 8:2 19:24 23:8
47:9 48:16 49:21 60:16
66:19 79:12,13,19,25
80:1,5 81:2 93:25
119:8,15 151:16 199:7
208:22 209:1,6 237:23
238:9 240:19

**entitled** 183:19 226:5,8
228:4,19,23 229:5
244:23 252:19

**entity** 10:22 23:6,12,14
25:17 26:3,20 27:19,25
29:13,22 42:16,18,22
47:3 53:23 79:14,21
80:2 96:1 97:23 100:4
109:1 110:3 150:8,9,11,
12,16 151:25 152:3

**entrance** 94:1

**envelope** 187:19

**environment** 34:22

**equipment** 72:22
88:25 248:17

**Erbiti** 128:3,11,24
129:10,19 132:6,22

**erected** 248:6

**essential** 43:22 83:5,6,
9 111:18 184:16

**essentially** 190:4
204:23 205:15 258:8,10
272:2

**establish** 236:11

**established** 64:24
236:19 237:10

**estimated** 243:25

**event** 272:6

**eventually** 148:21

**everyone's** 129:2
242:24 243:1

**everything's** 248:21

**evidence** 214:7

**evolves** 157:4

**exact** 51:12 94:21
109:4 221:24,25 251:4

**examination** 7:13
269:5 273:21 275:12,
14,21 276:4,13 277:8,
21 278:18

**examined** 7:3

**exchange** 104:3 107:3
108:2,5,9 176:12
262:20,22

**exchanged** 56:5
167:19 264:4

**executive** 48:25 78:11
102:15 103:2 166:24
183:6 184:13 190:25
201:4 220:1 265:3

**exempt** 57:15 58:9
200:10,13 201:21 202:3

**exhibit** 21:10,13,17
57:22 58:1,4 59:5
61:22,24 65:6,9 85:14,
17,24 103:24 104:11
107:20,24 108:12
115:22 120:10,14,17
123:7,13 127:14 134:12
155:5 158:22 166:12
175:8 183:17,22 185:2,
7 192:19 195:17,22
207:18 210:7 211:2,4,7
212:5 213:23 215:6
233:20 235:17 236:18,
21,22 237:9 261:3,4,7,8
262:13 269:21,23,25
270:1,2,4

**exhibits** 195:9,10

**exist** 117:4

**expand** 133:5

**expect** 262:25 263:11

**expectation** 52:24
140:12,16,20,24 141:1,
2 147:21 162:4

**expectations** 148:16

**expected** 241:6

**expedited** 116:9

**experience** 170:16

**expertise** 92:10

**explain** 83:13 96:8

**expressed** 163:1

**extended** 14:25 189:5
247:13 268:10

**extent** 11:9 12:2,14
13:17 14:6 95:5 119:23
125:12,14 126:17,20
168:14 214:6 235:8,14
267:17 268:21 275:11
276:12

**extremely** 137:2,3
230:7

**eye** 66:4 67:16,19 68:23

---

**F**

**faces** 242:24

**facilities** 147:22,23

**fact** 97:20 144:10 145:8
167:8 168:5 174:2
218:18 244:25

**factors** 244:7 268:9

**fair** 45:8 52:6 63:10
71:3 148:13 239:15
257:23 268:12

**falls** 252:5

**familiar** 123:1,5,18
131:5 178:9 203:24

**family** 276:14 278:3

**fault** 215:12

**February** 56:15,20
59:21,25 211:1,16
212:6,8,13 266:12

**Federal** 247:15

**feedback** 253:19
256:23

**feel** 246:23

**feeling** 214:9

**feet** 86:9,23

**fervently** 256:3

**fielding** 242:7

**Fifty-seven** 7:11

**file** 159:17 180:14,15
272:4 273:12

**filed** 216:7

**files** 212:3

**fill** 33:15,21

**filled** 32:21 33:10
136:13,17 267:23

**final** 102:12,21 114:3,6
153:19,24 154:6

**finally** 71:5

**finance** 37:3,6 49:1
66:12 76:7 77:6,7 103:4
108:16 109:2,10,11,21,
23,25 110:3

**financial** 67:4,8 76:13,
19 77:3 83:16 201:17

**find** 271:5

**fine** 50:2 156:12

**finish** 8:19 16:9 23:24
143:13 153:6 175:16

**finished** 260:12

**fire** 73:15 246:11
248:13 260:14

**fiscal** 76:1 77:1

**five-minute** 146:19
202:21 264:9

**five-star** 147:16,17

**five-year** 246:14

**fixed** 245:16 260:10

**flag** 27:21,22,23 41:7

**floor** 86:14 88:3 91:16,
17 92:6

**floors** 91:20 92:2

**flow** 35:18

**FLSA** 197:25 199:3
200:14 201:3,14,16

**fluctuates** 52:22

**flush** 72:9

**FMLA** 276:16

**focus** 28:1 60:7 233:14

**focused** 35:1

**focusing** 60:9 62:1
63:5 64:12 65:8 67:13
69:6 104:1,10 105:22
108:11,13 110:6,25
118:11 123:14 127:25
131:22 137:16,21
150:10 155:16,25
156:16 158:18,24
163:19 174:18 184:3
210:7 211:4,5 215:8,21
237:13

**follow** 38:13 95:11
99:16 118:8 122:21
164:1 180:4 188:21
203:22 221:21 231:6
271:18

**follow-up** 269:8

**food** 49:3 66:18,20,23
67:2 83:1,2 86:4,5 87:9,
25 103:6 113:7 114:17
115:4,7 146:7 147:21
182:4,5,7

**Forbes** 147:25 148:1

**foreseeable** 64:4
83:19 84:3,7 121:21

**forever** 177:21

**forfeiting** 250:1

**forget** 201:5,17

**forgot** 163:12 201:23

**forgotten** 131:16
190:11

**form** 40:6 122:2 135:25
181:2,5 226:25

**formal** 214:20,21 217:9
218:1,4 274:15

**format** 155:14

**formats** 228:12

**forms** 38:25 180:24
181:1,9,23

**forward** 156:3 176:19
183:20 185:1,21

**found** 70:6

**foundation** 225:25
234:4 235:11

**foundational** 74:2

**four-and-a-half** 19:3

**four-page** 158:19

**frame** 116:9

**Frank** 65:4 245:12,17,
19,23 246:1 248:9
250:17,21 259:15

**freelance** 18:9

**freeze** 251:9

**friends** 32:4

**front** 155:22 160:3

**frustrated** 156:19
157:8

**frustrating** 255:17

**FS** 49:15 60:12,13,25
61:4,11

**FSH** 49:16

**FSHNY** 49:19,24

**FSHR** 49:14

**FSNY** 49:25 50:1,3,23
51:8 189:1

**FSR** 7:23 26:22 49:6,
19,20 74:12 77:17

**fulfilling** 256:11

**full** 7:7 148:22 235:9
258:25 259:1

**full-on** 88:14 164:9

**full-schedule** 96:13

**full-time** 37:22 38:1
45:19,22 138:24 139:1
276:21

**fully** 162:5

**fund** 251:19

**furlough** 46:20,24
47:10 48:11 64:4,11
80:14 81:10,16,25 84:9
96:24 97:1,19 112:16,
20 113:14,20 117:8
130:7 131:10 138:2
144:14 161:12,14,19
162:9,12,20 163:9,10,
16 165:15 166:7 170:19
171:21 172:19,21

173:3,5 174:20 178:12
179:18 196:4,17
197:11,17 200:2 226:14
229:17 232:2 247:5
249:7,11,16,17,24
258:18 259:4 266:4
267:15 275:6,9

**Furlough/paid** 161:7,
15

**furloughed** 48:8,11,14
79:15 83:21 84:5 94:16,
23 96:16 99:19,24
113:3 114:7,15,20,23
133:21 160:24 166:2
167:2,12 216:15,17
226:5,18 228:23 234:16
236:25 237:5 245:1,4,7
14 262:25 263:5,11,16,
22 264:1 266:25 268:11
273:25 274:8 275:17,
23,24,25 276:8

**furloughing** 95:1
112:2

**furloughs** 95:4 96:7,9
169:3,10,11,13,14,16
177:12 179:5,7,9

**furniture** 146:11

**future** 121:21 230:15

**FYI** 128:8,10 131:24

---

**G**

**Galasso** 65:4 246:2,4
248:11 250:19 251:2
259:15

**gave** 58:5 81:24 100:2

**gear** 140:24 246:9
248:16

**general** 15:13 24:11,12
25:12,14 30:17,18
31:15 33:7,9,21 34:25
36:1 48:25 58:19 59:12,
13 72:19 75:10 81:9,11
92:16 93:8,11,12,15
103:3 135:3 144:11
148:11 154:23 157:12
180:9 183:8 192:8
212:9 219:2,7,9,13,19,
23 220:4,9,13,17,20

221:5,6 223:18 231:20
253:19 265:11,23
266:5,15,20 267:22
268:1 273:9,10

**generating** 67:23,25
82:5,7,10,14,20 97:25
115:10

**gentleman** 16:22

**gist** 243:3

**give** 85:17 96:11
126:15 175:16 182:5
195:14 240:10

**giving** 175:14

**GM** 193:11,12

**goal** 255:25

**good** 7:15,16 88:19
89:7 142:1 167:4
209:19 240:12 257:18

**goodbye** 87:19

**goods** 89:10

**government** 119:8,15

**governmental** 121:24

**Governor** 83:25 113:9
156:24 157:15 185:14

**Governor's** 57:15,18
58:8 115:4 153:18
159:25 160:9 161:24
163:10 186:6

**grab-and-go** 66:18

**gradually** 146:10

**Graham** 123:9 124:24
126:3

**grain** 154:21

**granted** 212:19

**gray** 132:14,19

**great** 87:20 133:5

**Greece** 15:8,9,12

**Green** 17:4,6,11

**group** 16:20,21,24
59:11 100:17 188:5
189:17,21 199:24

**guess** 16:23 41:14 45:7
81:21 182:18,19 189:9

199:7 229:7 236:8
272:13

**guests** 41:22 42:3,6
43:11,24 44:8 47:14,17
53:6 54:19,25 55:9 56:1
58:23 71:7,14,15
101:11 111:3,10,15
140:13 177:20 240:25
256:13

**guidance** 96:3 120:1

**Guide** 183:20 185:23

**guidelines** 62:16 67:21
184:18,21,24 185:3

**guys** 246:15

**gym** 147:23

---

## H

**hall** 223:21 230:21
253:13 257:24 270:16

**handbook** 210:10,12
215:4

**happen** 114:11 239:14
272:18

**happened** 138:13

**happening** 59:16 86:3
95:21 100:1 144:24
163:7

**happy** 254:24 255:3
256:7

**hard** 154:14 254:4

**Hazard** 120:11

**Hazel** 120:11 237:25
240:21

**head** 8:12 38:6 45:16
79:17 90:15 104:9
106:7,8 129:15 132:3
148:3 163:17 166:14,17
187:2 197:23 200:20
260:13

**heading** 159:23 161:14

**heads** 183:10

**health** 63:21 64:23 67:7
163:5 167:12 184:19

**hear** 56:11 175:17

240:9 242:21 243:1
255:15 256:9,16

**heard** 42:10,13

**hearing** 56:21

**HEATH** 129:13 136:20
137:4 140:2

**held** 18:5 25:19 75:17
127:10 137:14 186:13
207:14 213:13 258:5

**hell's** 201:18

**helping** 156:23

**Hey** 227:19 228:17

**hierarchy** 77:8 222:13

**high** 88:17

**higher** 149:3

**highest** 115:5

**hire** 94:10 267:25

**hired** 16:7 17:3 24:11,
12,16,20 94:11 206:24

**hires** 181:12,13,18

**HM** 193:12

**Hold** 156:9 193:18
202:1

**holding** 140:22

**holes** 260:9

**Holmes** 7:21 137:22
138:1,6,9 139:10,15,25
140:7,12,17 201:6,15
205:23 211:19 222:19

**Holmes's** 137:17

**home** 60:8 255:15

**honestly** 52:8 53:20

**hospitality** 164:13
182:11

**hotel** 7:24,25 19:6,7,21,
25 20:8,10,15,16,23
21:8,23 23:2,3 24:16,
21,24 25:5 26:5,6,15,
22,25 27:1,4,13,14
28:2,7,11,17 29:1,4,11,
17,18 30:1,13,19 31:2,
12 32:6,12,14,18,23,25
33:6,22,25 34:11,23

35:6,10 36:5,8,13,23
37:1,7,14,22 39:10,12,
16,19,25 40:10,16,21
41:1,2,4,9,10,11,15,18,
23,24 42:7,9,11 43:9,
10,23 44:7 45:9 46:20
47:11,14,17 48:18 49:7,
14,23 50:3,5,12,17,22
52:20 53:6 54:19,24
55:8,25 58:22 60:3 62:7
63:12,19 64:4,14,17,20
65:13 66:23 67:8 69:7,
12,15,20,25 70:19
72:10,13 73:1,2,4,5
74:14,16,17,22,23 75:2,
3,7,8 77:14,18 78:5,20
79:3,6,18 80:6,11 82:20
84:18 85:5 89:11 90:17,
20 91:1 93:3,8 94:8
100:21 103:3 105:17
109:25 112:2 117:10,12
118:24 119:4 121:11,
16,20 124:4 130:12
133:4 140:13 141:5,20,
23 142:12,13,16,17,23
143:10,14,16,20 144:2
145:3 147:1,10,13,16,
17,20 148:4,5,15
149:22 150:4,6,21
151:1,20 153:1 157:1,
17 158:13,15 159:3,6,
23 160:1,6,10 161:19
162:5,19 174:2 177:11
183:5,6,9 184:19 191:3,
4,6,7,11 192:1,10
194:14 198:19 199:6,8,
10,20,22 208:2,6,7,14,
18,24 209:9,25 214:21
215:5 217:1,2 218:6
224:6 227:20,23 232:14
240:25 241:3,5,16
243:8 247:17,20 255:21
256:1 258:14,15,21
259:10 260:3,6 262:2,7,
25 263:1,6,12,21 264:7
265:24 266:13 267:21
268:3 271:20 275:2

**hotel's** 101:12 156:25
157:16 230:15

**hoteliers** 142:4

**hotels** 8:1 9:6,7,10
10:11 18:23 19:12,16,
21 20:3,12,19,25 22:16,
19,24 23:10,15,17,25

24:8 25:24 26:18 28:6
42:14,16,20 43:1,4,15
44:3,18 47:25 49:20
52:2 53:5,22 54:18,24
57:5,10,15 58:8 60:24
66:19 74:12 75:1
108:18,23 109:3,11
110:4 153:7 162:18
184:16 208:7 209:3,7
210:1 264:16,24 265:5

**hotheaded** 234:21

**hourly** 66:1 197:24
201:11,15 202:6,7
262:24 263:10

**hours** 12:10,25 139:25

**house** 158:1,10

**housing** 160:2

**HR** 10:7 31:9

**HRIS** 79:11 136:21
137:4 179:24

**huge** 131:19

**Human** 9:11,13 16:3,5,
7,19 17:17 18:17,19
19:1 31:1 221:6,7
272:5,24 273:14

**hundred** 11:22

**HVAC** 73:12,13,14
246:11

**Hwang** 53:9 54:7,14
56:5 107:3,15 108:6,15,
22 109:24 110:9 112:7
192:16 261:20 262:1,
11,20 263:25

**Hwang's** 107:5 109:7,
16 110:13

**hygiene** 60:7

---

**I**

**i.e.** 199:23

**icon** 242:2

**idea** 58:19 75:9 86:17
92:16 148:21 152:5
167:4 249:3

**identical** 135:1,13,21

**identification** 21:14
58:1 59:5 61:25 65:7
85:14 103:24 107:24
115:22 120:14 123:13
127:14 155:5 158:23
166:13 175:8 183:22
192:19 215:6 237:9
262:14

**identified** 115:5

**ignoring** 246:23

**ill** 56:17

**imagine** 74:24 80:18,
19 95:9 140:9 161:11
202:12

**imminent** 256:15

**impact** 67:8 76:20
121:14

**important** 63:17 76:24
144:1,5 256:9

**impossible** 95:24

**improper** 277:23

**improvement** 260:5

**improvements**
259:14,20,22,25

**in-house** 66:25

**in-room** 146:8 147:2,12

**inaccurate** 22:9

**Inbox** 156:18

**include** 183:7

**included** 103:3 119:15
219:11

**includes** 34:5

**including** 34:17 35:2
76:1 82:8

**income** 98:23

**incomplete** 239:6
260:11

**increase** 68:8

**increased** 68:16,21

**incredibly** 238:19
255:17

**independent** 172:24

**independently** 171:6,
9,17,20 253:2

**indicating** 86:25
103:21 163:13 249:21
261:5

**indirectly** 47:15

**individual** 10:12,13,22
45:3 135:8,14 238:24
253:6 256:8,21,24
267:5,9,14 271:2 273:5

**individual's** 129:1

**individually** 12:5
231:18 256:25 257:10

**individuals** 83:11
112:24 231:23 252:11
268:13,19

**industry** 20:15 88:18
98:6,12 101:19,24
102:3,19 164:13 221:2,
8

**infectious** 121:14

**info** 60:12

**info@news.hanyc.
org** 57:24

**inform** 116:3

**informally** 216:5
217:10

**information** 38:11
60:25 95:6 126:22,25
128:12 132:15 140:10
144:15 145:10 154:21
198:2 200:16 241:13,
19,21 243:23 251:18
256:4,6,19

**infrastructure** 241:4
243:9,11 245:14 248:7
255:22

**initially** 47:16

**initiated** 25:11,13

**input** 110:10

**inquiries** 34:23 93:21
145:3

**inquiring** 60:15

**installed** 73:12

**instructed** 97:20,23

**instruction** 40:18

**intended** 170:11

**intending** 73:18

**intent** 127:7

**intention** 63:4 64:9
71:3 173:14 174:25
175:2 176:24 189:7,11
191:3,10 249:17

**interest** 76:17

**interesting** 130:19

**International** 7:24
26:22 49:6,20 64:24
74:12 77:18 217:2

**interrogatories** 40:13

**interrupt** 15:16

**interruptions** 60:12

**Interstate** 9:6,8 10:11

**interview** 24:17 25:7

**interviewed** 25:10,15

**investigate** 57:8 225:6
226:2 267:12 272:13

**investigated** 57:5,10
225:7

**investigation** 223:8
224:16,17,24 225:13,23
228:8,10,11 273:1
274:4,5,10

**investigations** 223:2
225:6 273:24

**involved** 81:3 133:17
149:19,21 151:16 268:9
272:10,19

**involvement** 151:19,
23

**involves** 73:22,23
271:23

**isolation** 63:25

**issue** 100:11,16 193:13
250:8 272:24

**issued** 83:25 186:6

**issues** 163:7 176:18
177:1 246:10 255:23

**issuing** 116:9

**Italy** 56:25

**items** 243:15

**Ivey** 7:21 201:20 206:2
211:19 217:6 222:11,15

**Ivey's** 216:11

---

**J**

**jackhammers** 90:4

**January** 31:20 56:14,
20 196:11 219:2,4
266:12

**job** 15:7 112:23 115:19
123:10 143:6,17 249:23
266:14 276:21,25
277:10,12

**jobs** 174:3 277:1

**jog** 190:12

**John** 85:12 87:11,13,14

**Johnson** 85:12 87:11,
14

**joint** 209:11,20,24

**July** 138:5,23 139:21
140:1 141:4,15 181:13,
15

**juncture** 33:16 76:11
224:20 226:8 235:22
239:19 241:15 242:17
244:13,24 245:6 253:11
255:1

**June** 69:14 105:5,12,15
141:22 142:11 191:2,8,
25 216:12,15,17 219:23
223:20 229:10,12
231:4,9 232:21 234:11
236:6,14,23 237:4
257:24 258:8,11 259:9,
22 270:15 274:20

---

**K**

**Kaminskas** 65:4,24
66:11 128:3,12,22

**keen** 240:24

**key** 183:5

**kidding** 92:1

**kind** 56:19 98:23 224:3,
16 226:13 242:15
249:15 253:25

**knew** 60:5 85:7 94:21
100:18 109:4 113:10
115:1 125:8 131:15
140:21 177:20 208:13

**knowing** 22:12 102:6

**knowledge** 43:17 55:5
92:14 105:11 118:6
133:6 180:19 201:17
203:10 204:17 221:2
224:19 269:10

**Kopel** 25:21 26:4,6

**Koppel** 25:15 240:8

---

**L**

**L-U-O-N-G-O** 16:23

**label** 174:18 192:23
193:4

**labeled** 169:10,14

**labor** 34:6 76:1,3,14,19
82:8 123:18 124:4,6
126:9 133:16 244:20
247:16 268:7

**lack** 234:4 235:10,11

**laid** 98:25 117:3 121:18
124:2,10,15 140:12,17
163:15

**language** 121:23 122:6
135:3 136:1 178:20,23
206:14 226:9 229:8

**lapses** 184:20

**larger** 100:16,17
189:17

**lasted** 44:15 48:7

**lasts** 179:13

**laughed** 56:19

**launder** 182:10

**laundry** 182:9

**law** 233:12

**lawsuit** 10:21 13:16

213:4 216:8

**lay** 82:9 100:10,11

**lay-off** 105:25 215:18

**layoff** 96:13 100:2
106:19,20 116:10 117:5
127:9 129:1,2,13
131:19 135:7 136:3,17,
24 137:22 138:19
174:19 178:14,22
187:13 189:18,21 195:2
215:11 224:20 268:10

**layoffs** 169:6,25 178:3,
4,19 179:13,14 189:5,
19 194:17

**leader** 273:11

**leaders** 78:11 183:5,6
184:13 219:10 241:22

**leadership** 103:2
183:12 218:6 220:2,6
222:8

**leaderships** 190:25

**leakage** 90:10

**learning** 251:3

**leave** 217:24 250:3
270:19,25 275:6,9,16,
23 276:1,10,14,15,16,
17,18 277:16,18,19
278:3,5,9

**led** 142:22

**left** 90:24 91:23 133:3
217:1 249:25

**left-hand** 185:10
215:24

**legal** 176:17 177:1
209:21 213:6,19 229:18
232:14 247:24,25
248:2,3 249:7,13

**legal?'** 249:6

**Legionnaire's** 35:18

**length** 48:2 238:1
240:22 249:13,15

**letter** 28:23 30:2 50:13,
15,16 61:19 62:2,6,9,
15,19 116:1 117:1
119:3 120:11 121:10
122:3 123:8 125:5

128:19,21,25 129:1,7,
11 130:23 135:11,14,18
137:17 138:18 158:19
159:2,14,22 160:18,22,
25 161:2 163:19,21
164:25 165:5 187:9,24
188:9

**letterhead** 27:8,11
28:20,22 30:1 50:14

**letterheads** 30:4

**letters** 29:25 83:10
100:12,16 119:8,15,21
120:3,4 129:23 134:8,
24 135:6,12,21 136:4,8,
14,18 179:19,21 180:3,
6,11,19 187:14,20
188:4,13,18,22,24
189:6,7 190:4 194:22
268:17,19

**level** 35:12 74:19 75:24
78:7,8 79:15 149:2,3
151:18 219:25 224:15

**levels** 121:13 151:10

**lieu** 97:5 102:5 182:7

**life** 154:17

**likelihood** 59:18 60:3

**limitations** 249:10

**limited** 34:17,19,21,22
36:7 66:7,15,17 148:19
256:18

**lines** 86:16,17,18 160:3
241:24

**link** 185:16

**Linkedin** 20:24 21:20,
21 22:5,7,9 32:4

**Linkenin** 21:12

**Lisa** 187:17

**list** 104:17 115:18
123:10 142:7 180:16
198:3 246:16 259:14,20

**listed** 59:10 83:4
130:22 190:2

**listen** 233:1 239:11

**listened** 233:3 270:14

**listening** 275:3

**listing** 266:14

**lists** 66:9

**litigation** 116:22

**live** 15:9

**living** 56:16 218:16

**LLC** 7:25 8:1 19:6,8,21
23:3,4 24:16,21,24 25:5
26:5,7,15,25 29:12,18
30:13,19 31:2,12 32:14,
18 34:1,11 41:18,25
42:7,11 43:1,5 45:10
46:20 47:11 48:18
50:12,17 63:12 74:16,
22 75:1 77:15 78:5,21
79:3,7 105:18 109:25
117:11 150:6,22 151:20
158:15 199:6,8,11,22
208:3,7,8,14,18,24
209:4,8,9,25 217:1
271:21

**local** 57:19 58:12 124:5
148:10 237:25 240:21

**located** 41:16,23 90:6
121:17

**locker** 142:6 191:18

**lockers** 94:3

**logical** 97:24

**logically** 82:6

**logo** 29:9,10,12,17

**long** 12:6 15:9 16:25
18:2,11,18 19:2,7 33:11
44:14 46:8,13 48:7
70:12 145:25 152:6
165:19 170:12,15,16,
18,21,23,24 171:2,22
174:13,16 189:12
198:17 227:23 229:18
232:2 243:14 249:10
256:2 267:25

**long-term** 278:4

**longer** 12:25 31:15
34:14 67:25 70:14
141:4 143:11,15,21
144:2,12 169:17,25
182:4 250:4 267:15

**longest** 239:25

**longstanding** 247:6

255:23

**looked** 134:22 170:5

**looking...for** 60:10

**lose** 71:4

**lost** 72:22

**lot** 48:5 73:8 74:1 100:3,
5 110:21 131:20 149:21
154:15,16,20 159:17
173:25 246:20 254:21
255:2 257:8

**lots** 241:20

**loud** 160:11 196:25

**Louis** 56:16

**love** 254:2,10

**lower** 149:2

**lunch** 103:9

**Lundy** 9:2,5,17,20
10:8,15,19,23 11:1,5,9,
17 12:2,12,14 13:3,13,
17 14:6,20 15:13 17:21
19:9,13,17,22 20:5,13,
20 21:1,7 22:1,10,25
23:11,19 24:6,10 25:22
26:2,8,12,19,23 27:7,15
28:24 29:5,14,19,23
30:14 31:4 32:19 33:2,
8,18,24 35:11 36:6,11,
24 37:2 38:2,5,12,21
39:3,8,11,21 40:1,17
41:6,13,19 42:2,4,17,21
43:7,12,25 44:5,9,19,22
45:11,20 46:1,14,21
47:8,12 48:1 50:11,24
51:5,19,24 53:7,14
54:5,9,15,20 55:1,13
56:9,12,23 57:2,7,12,16
58:10,17 60:18 61:2,7,
13 62:4 64:6 65:21
67:11,20 68:3,9,25
69:10,22 70:1,10,17
71:11,21 72:5,17 73:3,6
74:7 76:25 77:11,24
78:24 79:4,8,22 80:17
81:7,18 82:1,21 83:22
84:6,10,19,25 85:21
87:5,22 88:8,12 89:3,
13,25 90:14,21,25 91:2,
7,25 92:8 93:9,13,17
94:17 95:5,12 96:2,18
98:5,10,21 99:8,12,16,

21,25 101:9,14,17,21
102:14 104:23 105:8,14
106:6 107:1,13,17
108:4,7,24 109:8,13,18
112:4,11,17,22 113:4,
17,23 114:16,25 116:24
117:14 118:2 119:9,17,
23 120:5 121:4 122:1,
11,21,25 123:4,20
125:6,12,25 126:5,13,
17 127:5 128:5 130:4,9,
18 131:3,7,13 132:11,
21 134:3,19 135:2,15,
23 136:9 137:10 138:3,
20 139:12,22 140:8,14,
18 141:6 142:18,25
143:7,18,23 144:4,21,
25 145:17,23 146:3,16
147:14,18 148:7 149:7,
11,16,23 150:23 151:8,
24 152:17 153:2,8,14,
21 154:1 155:21 156:2,
7,11,13 157:9 158:3,11
159:16 160:8,12,20
161:3,21 162:10,21
164:1 165:1,7 166:3,19
167:15,20 168:1,9,14,
20 169:5,7,12,18,22
170:2,14,20 171:4,24
172:22 173:6,16,20
174:4,14,23 175:11,15
176:5,7 177:3,13 178:6,
15 179:1,10,16 180:4,
20,25 181:6,10,24
182:15,17,19 184:8
186:3,11 187:5,10,15
188:14,16 189:2,16,23
190:10,23 191:5,13
192:2,11,25 193:6,14,
21,25 194:15,20 195:3,
10,13,18 196:9,23
197:7,19 199:15
202:18,23 203:22
204:12 205:1,5,21
206:11 208:19,25
209:5,14,18,21 210:5
212:20 213:2,6,9,23
214:2,6,11 218:3,13,24
219:14,20,24 220:14,
21,23 221:15,21 223:6,
13 224:1,9 225:1,10,16,
24 226:7 227:12 228:1,
9,25 229:6,15,19
230:11,24 231:6,12,19
232:6,15,23 233:11,19
234:1,4 235:1,3,8

236:3,7,11,16 237:2
238:6,12,17,19 239:9,
15 258:1,12,22 259:8,
11 260:2,8,19 261:1,15,
23 263:2 264:2,11,20
265:7,10,25 266:9
267:1,10,17 268:5,14,
21,25 269:4,6,25 270:2
274:1,12,22 275:11,18,
20 276:3,7,12,24 277:3,
7,13,20 278:11,14,16

**Luongo** 16:23

**luxury** 23:4,9,15,16
97:11 147:20,23,24
266:2

---

**M**

**M-E-H-D-I-E-F** 212:11

**made** 33:14,20 47:3,10,
15 51:14 54:23 74:4,10,
18 80:25 81:25 83:1,12
86:11,13 88:22 89:7,15
95:15 97:19 100:15
102:18,25 111:14
113:16,18,20 141:19,23
142:11,15 149:5,21
153:11,19 154:6 159:4
192:7 195:18 202:11
203:14 226:13,16
264:22

**mail** 116:2 136:16
137:8 187:18

**mailed** 186:20 188:4

**mailing** 188:6

**main** 236:24 237:7

**maintain** 71:3 72:16
112:25 164:21

**maintained** 141:1
277:9

**maintenance** 182:1
241:4

**major** 73:9 116:4

**make** 13:23 20:17
33:21 35:8 53:6 66:9
69:25 82:18 83:13,14
87:7 97:22 100:24
127:17 129:16,20
136:24 149:14 151:17

153:24 168:21 177:18
188:3,22 189:9,10
244:15

makes   45:7 147:23
150:3,25 211:23

making   15:15 35:13,
14,16,18,22,23 40:22
76:17,18 80:14 83:17
90:10 137:7 149:9
172:16

manage   152:19,21
251:15

management   34:7
36:2 48:22 52:25 76:18
150:18 153:13 199:22

manager   24:11,12
25:12,14 30:17,18
31:15 32:22 33:7,9,22
49:1 75:11 81:9,11
93:8,11,12,15 103:3
129:16 132:3 152:23
183:8,9 192:8 201:21
212:9 219:2,7,9,13,19,
23 220:4,9,13,17,20
221:5,6 265:23 266:5,
15,20 267:22 268:1
273:9,10

managers   48:24 152:7,
9 167:3 191:10 201:7,8,
9 202:3

managing   152:24,25
153:6 228:14

mandate   43:13,21
44:11,14,17 47:24 48:7
68:19 83:14,25 111:17
115:4 162:2 163:11
198:24

mandated   44:1 81:22
97:21 113:9

mandates   47:5 163:5
202:10

mandatory   83:23
116:7

marble   88:24 89:20,23
90:9,23

March   43:14,16 44:8
51:13 53:2 54:22 55:9,
14,16 82:22,23 83:18,
25 84:2,17 96:25 97:18

110:16 111:14 112:1
113:2,13 114:24 116:2
117:8 120:25 121:19
124:11,14,23 125:2,11
138:12 139:17,20,25
140:11 154:22 159:3
164:5 177:6,23 179:3
180:11 189:14,22
218:23

mark   235:16 237:16
257:18

marked   21:13,16 57:25
58:4 59:1,4,7,24 61:16,
17,21,24 63:6 65:6,9
85:13,17,23 103:23
104:11 107:20,23
108:1,12 115:21,24
118:12 120:13,17
123:12,15 127:13
131:23 134:11,14
135:11 136:5,18 155:4,
7,10 158:22,25 163:20
166:12,16 175:7
183:16,21,24 185:7
192:13,18,21 195:17,22
207:18 215:5 233:24
237:8 261:4,7 262:13,
16

Marketing   49:2 103:5
164:7 183:9

marking   21:9 57:22
156:8 175:20,22 215:1
233:19

marquee   27:8 28:15

Marriott   27:23 28:6

mass   125:7 127:9
131:18 189:18

Master's   14:11,15,24

mathematically   45:7

matter   71:13 145:9
147:6 216:4

Maya   7:17,18

Mayor's   122:14,19

meal   67:2 181:25 182:3

meals   67:1

meaning   86:16 115:8
146:7 169:20 177:19
249:25 258:13 276:9

means   66:16 143:19
151:7,25 233:25

meant   39:17,24 61:8,9
70:2 104:25 105:3,4
132:12,17 173:23
177:4,22 238:11

mechanical   74:1

Medhief   212:10

media   52:8 154:20,23
157:12

mediation   205:9
214:20 215:17 273:12

medical   47:18,22 51:8,
14,17,22 52:10 64:13,
16,21 65:12 66:2,22
67:9 68:6,12,20 69:7,
12,16,18,19,20,25 70:3,
6,13 100:23 101:3,6
117:18 141:14 153:10,
20,24 154:7,11,24
156:18 157:2,18 158:2,
10 160:2,6 165:15
276:14,17

Medicare   252:19

meeting   223:21,23
229:12,14 230:21
231:4,9 232:22 234:10,
13 236:5,15,23 237:5,
14 257:24 258:8 270:16
274:21

members   117:8 150:15
195:1,2 196:3,7,17,21
197:5,10,18,20,22
198:3,11,18 199:19

memo   63:8,11,18,21
64:2 260:24 261:8,13

memory   190:12

mention   228:15 246:18

mentioned   34:16
36:10 37:24 49:6 77:2,4
78:10,16 96:6 99:18
146:23 147:1 164:15
183:1,7 184:12 200:22

merge   136:16 137:8
187:18

message   54:8,11,13

messenger   230:2

met   24:4 51:2 53:11
54:4

Michal   175:5 176:3

mid-year   85:10

middle   74:8 138:4,22
142:20 190:18

midtown   256:2

million   148:24 228:15

mind   39:13 134:3

mindful   96:2 277:22

mine   185:18 194:1

Mine's   155:21

minute   175:16 195:14
202:19 237:13

minutes   186:15 213:11
258:3

mischaracterization
274:13

mischaracterizes
214:7

misconstrued   176:20,
23

missed   188:9 250:19

missing   34:7 155:22
235:18 252:24

model   190:14,19,22
192:5,23 193:4

modernization   73:10,
15,19 260:11

moment   99:9 123:2,6
131:21 145:14

money   200:11,16,18
202:1

monies   195:1 199:13
200:1,23

month   30:23 114:4,5
116:11 141:9 162:6,13
190:18,19 248:20

months   13:5 139:17
154:8,13 165:21,22
167:7,13 178:13,21,24
181:22 217:25 248:8,17
267:16 268:11

months' 141:9

moonlighting 276:20, 23 277:1,5,11

morning 7:15,16 145:4 170:24 266:17

Motel 117:12 118:25 119:4 124:4

motion 208:9 212:16, 18

mouthful 32:15

move 15:19 86:17 148:22 156:2 248:4

moved 15:8 86:16 89:16 171:13 263:22

movement 35:16

movements 8:13

moving 88:23,25 112:5

multiple 11:15,18 29:6, 7 48:24 83:10 110:18 133:18 146:12 163:6,20 164:4,22 176:7 241:20 259:12 268:9 274:19 275:1

muted 242:20 243:20

—————

**N**

named 8:3 122:24 201:22

names 118:13 128:20 135:17,24 136:13 152:10

national 124:5

natural 82:13

nature 25:1

necessarily 27:25 70:4 274:18

needed 52:23 54:11 65:16 85:8 112:24 128:12 139:4 142:2 246:8 248:14,18 259:16

negative 232:10

never...be 176:20

news 144:14 145:3

227:20 237:20 239:25 240:16 242:25 254:6 256:12

newsletter 144:8 266:11

newspaper 154:10

nice 87:20 242:24

Nicole 175:5 176:3,12, 17

Nineteen 183:13

no-fault 215:10,18 223:11,15,24 224:8,23 225:9,21 226:5,16,19, 21 227:15,18,24 273:15 274:9,16

no-fault,' 215:13

nodding 8:11

non-privileged 126:24

non-union 263:10

nonessential 44:12 83:4,5,9 100:17 113:6, 25 114:9,18 162:1

nonexempt 197:25 199:3 200:13 201:3 202:9

nonunion 98:19,25 99:7,15 102:20 106:11 112:9,14,19,21 113:15 117:22 119:16 125:24 126:16 127:3,8 129:21, 25 130:7,22 133:21 134:1,25 163:15 180:7 186:19 188:25 189:18, 21 197:17,20,22 198:11,17 199:2,13,19 200:1,18 203:11 205:14,16,19 206:8 222:25 223:3,9 224:21 252:16,20 262:5,24 263:3 264:1,5

normal 188:1

Notary 7:3

note 15:13,16 74:7 110:9 169:7 237:2 239:23 246:25

noted 154:4 176:10 214:8

notice 95:15,23 96:11, 14,16 97:3,6,11 98:13 99:4,19,23 100:2 102:3, 5,8 116:9 117:7,10 118:3 122:13,19,23 124:22 126:7,11 143:4 189:13 218:1,4 238:14, 18 266:24 267:4,9,13 268:13

notices 110:24 112:8, 14,20 117:21,25 118:7 121:3,24 122:9 125:24 126:1,16 127:3 129:20, 25 130:7,21 131:16 133:20 134:1 168:12 186:19,20 266:23

notification 121:10 127:23 193:19

notified 232:25 237:23 238:10 240:19

notify 127:7 193:8 194:10,13,16

notifying 237:22 238:9 240:18

November 260:22

number 7:20 70:15 124:16,19,21 208:1 210:20,21,24 257:12 262:5,23 263:3,14,15, 17,21

nurses 157:2,17 160:2

NY 183:20

NYE 183:15

NYF 59:2 156:18 184:4, 7

—————

**O**

oath 127:19

object 40:18,20 49:17 181:6 234:4 239:7

objection 9:2,5,17,20 10:8,15,19,23 11:1,5,9, 17 12:2,12,14 13:3,13, 17 14:6,20 15:13,16 17:21 19:9,13,17,22 20:5,6,13,20,21 21:1,7 22:1,10,25 23:11,19

24:6,10,18,19 25:22 26:1,2,8,12,19,23 27:7, 15 28:24 29:5,14,19,23 30:14 31:4 32:19,24 33:2,8,18,24 35:11 36:6,11,24 37:2 38:2,5, 21 39:3,8,11 40:6,7,12, 13,22 41:6,12,13,19,20 42:1,2,4,17,21 43:7,12, 25 44:5,9,19 45:11,20 46:1,14,21 47:8,12 48:1 50:11,24 51:5,19,24 53:7,14 54:5,9,15,20 55:1,13 56:9,12,23 57:2,7,12,16 58:10,17 60:18 61:2,7,13 62:4 64:6 65:21 67:11,20 68:3,9,25 69:10,22 70:1,10,17 71:11,21 72:5,17 73:3,6 74:7 76:25 77:11,24 78:24 79:4,8,22 80:17 81:7,18 82:1,21 83:22 84:6,10, 19,25 85:21 87:5,22 88:8,12 89:3,13,25 90:14,21,25 91:2,25 92:8 93:9,13,17 94:17, 24 95:5,12 96:18 98:5, 10,21 99:8,12,21,25 101:9,14,21 102:14 104:23 105:8,14 106:6 107:1,13,17 108:4,7,24 109:8,13,18 112:4,11, 17 113:4,17,23 114:16, 25 116:24 117:14 119:17,23 120:5 121:4 122:1,11,25 123:4,20 125:6,12,25 126:5,13, 17 127:5 128:5 130:4,9, 18 131:3,7,13 132:11, 21 134:19 135:2,15,23 136:9 137:10 138:3,20 139:12,22 140:8,14,18 141:6 142:18,25 143:7, 18,23 144:4,21,25 145:17,22,23 146:3,16 147:14,18 148:7 149:7, 11,16,23 150:23 151:8, 24 152:17 153:2,8,14, 21 154:1,4 157:9 158:3, 11 159:16 160:8,20 161:3,21 162:10,21 165:1,7 166:3,19 167:15,20 168:1,9,14 169:5,7,12,18,22 170:2, 14,20 171:4,24 172:22

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

173:6,15,16,20 174:4,
14,23 177:3,13 178:6,
15 179:1,10,15,16
180:20,25 181:10,24
182:15,17 184:8 186:3
187:5,10,15 188:14,16
189:2,16,23 190:10,23
191:5,12,13 192:2,11,
25 193:6,21,25 194:15,
20 195:3 196:9,23
197:7,19 199:15 204:7,
12 205:1,5,21 206:11,
12 208:19,25 209:5,14,
18,21 210:5 212:20
213:2,6 214:6,8,11
218:3,13,24 219:14,20,
24 220:14,21 221:15
223:6,13 224:1,9 225:1,
10,16,24 226:7 228:1,9,
25 229:6,15,19 230:11,
24 231:12,19 232:6,15,
23 233:11 235:1,8
236:3,7 237:2 238:6,12
239:6 258:1,12,22
259:8,11 260:2,8,19
261:1,15,23 263:2
264:2,20 265:7,25
266:9 267:1,10,17
268:2,5,6,14,20,21
269:20 271:17,22
272:16,20 273:8,17
274:1,12,22 275:11,18,
19 276:2,3,12,24 277:3,
7,13,20 278:11

**objection's** 176:9

**objections** 15:15 40:8
234:8 235:13 277:23

**objective** 71:2,9,16
73:1

**obligated** 126:10

**obtain** 14:22 15:22

**obtained** 15:3,6,25
136:19

**obvious** 83:15

**occupancy** 66:2

**October** 30:24,25 85:1

**Off/unemployment**
161:8,15

**offer** 146:9 254:20

**office** 57:15,18 58:8
118:20 120:4 122:14,19
126:8 153:18 161:24
163:11 164:11 179:25
186:6 214:22 216:25
228:14 238:2 240:23
244:14 255:16 272:5

**official** 60:11

**offline** 254:22

**offsite** 201:8

**Olive** 7:21 201:20,23
206:2 222:11,15

**once-and-for-all**
114:6

**one-hundred-story**
248:5

**one-on-one** 254:23,24

**ongoing** 142:7 191:22
277:22

**online** 242:18

**onset** 13:9 211:25

**open** 41:10 44:4 52:3
71:15 73:5 82:24 93:24
96:21 101:10,11,12,15
115:2 141:11,12 146:1,
10 148:18 182:14
184:17 241:24 265:16

**opened** 17:11,13 51:8
62:25 160:6 230:8
263:1 265:9

**opening** 52:10 149:10
182:23 190:17,18

**opens** 199:20 251:9

**operate** 147:17 162:2
184:20 263:21

**operated** 86:15

**operates** 27:20

**operating** 25:16 27:9
42:18,22 55:24 74:18
162:5 179:17

**operation** 72:20,21
76:1 80:3 96:25 151:17,
18 179:17 192:24 232:9

**operational** 36:5,8
75:14

**operations** 83:2 100:5,
6 111:3,10,15,18 112:2
113:8 159:3,6,23 240:3

**operator** 20:1,7,14
21:5 22:16 23:5 27:12,
13,18 29:9 41:3,8 48:18
76:16,22,23,24 77:13
80:5 150:5,8 199:23

**operators** 27:20,24
75:25 76:2 150:9 191:7,
9

**opinion** 268:4

**opportunity** 133:5,17
174:5,7 238:23

**order** 72:16 147:17
148:5 162:25 163:12,13
182:11 184:20 204:1
222:13 241:5

**ordered** 30:6,8,9 66:25

**orders** 47:13,15

**organization** 124:4
255:24

**organizations** 124:6
247:7

**original** 72:23,24,25
272:22

**originally** 263:21

**ORITZ** 245:18

**Ortiz** 7:8,15 11:12 12:4,
16 15:17 21:15 25:4,21
30:12 41:1 42:7,13 43:9
45:2 47:7 51:2 57:23
58:3 61:20,22 62:10
65:8,17 66:11 79:1
85:12,16 87:12 95:7
96:2,6 98:18 102:20
103:14 104:1 107:25
108:9 111:24 112:18
115:23 117:24 118:2,11
119:25 120:16 122:23
124:22 125:13 126:18,
21 127:2,16,25 128:9
134:13 145:11,25
146:23 155:6,8 156:20
158:20,24 159:22 162:7
163:14 166:14 171:1
175:6,14,22 176:2
183:14,23 186:18
191:23 192:17,20

**operations** 195:16 196:19 203:24
207:16,24 214:9 215:8
220:24 226:3 232:21
234:10 235:22 236:1,
14,23 237:7,18 238:4
239:4,15,19 244:6,24
245:22 247:4,14,21,25
248:3 249:3,9 250:2,17
251:10,14,25 252:3,11,
15 253:9,15,24 257:6,
21,22 258:7 261:6,19
262:11,15 264:14
269:7,9 270:3,14
273:23 274:19 275:6
276:19

**Ortiz's** 21:12

**out-dining** 147:13

**outbreak** 56:25

**outlet** 147:22

**outlets** 52:8

**over-200** 233:9

**over-communicative**
144:10

**overflow** 73:12,13

**overnight** 146:9

**oversee** 34:3

**overseeing** 31:7

**oversees** 31:6

**oversight** 34:5,15,16,
17,25 35:2,4,21 133:10

**overtime** 201:8

**overtime-eligible**
201:9

**Overview** 134:22

**owned** 16:21

**owner** 17:10 80:5
150:21 153:3 156:25
157:16 159:25 243:4
247:18

**owners** 27:21 191:9

**ownership** 66:3 67:15,
18 68:23 103:16
104:13,19,22 105:6
150:7,8,11,17 151:4,6,
19,22 152:1,3,19
153:13 192:24 199:23

246:7 253:13,21

**owning** 27:25

---

**P**

**P-I-N-O** 16:22

**p.m.** 91:9,10 103:10,11
134:6,7 146:21,22
186:16,17 202:24,25
232:19,20 264:12,13
278:19

**packages/benefits**
112:8

**pads** 90:8

**pages** 21:12 211:24
212:1

**paid** 46:4,10,16 97:4,7
98:3,8 99:4,7 102:8
105:15,18 140:4 166:6
167:24 171:22,23,25
172:3 196:7,11 197:6,
21,22 198:4,11,14,17,
20 200:8,11 203:12
223:4,10 224:7,13
225:8 228:17 247:10
250:7 258:20 259:1
274:9 277:16,19 278:3,
6

**pandemic** 57:6,11
59:19 60:17 70:8 116:5
121:15 157:4,19 265:1

**panel** 73:15 260:14

**paper** 11:18

**paragraph** 60:10
121:7,9 124:1 159:8,24
162:24 184:15

**paraphrasing** 165:11

**parrot** 253:16

**part** 74:12,16,22 75:1,6
78:17 84:11 98:19
104:14 132:1 147:13
148:6 149:25 150:3,11
159:22 161:8 178:11
195:8 210:12,13,14,16
234:22 249:19

**part-time** 45:10,13,17

**participant** 236:24

237:8

**participants** 234:15

**partitions** 86:10,23

**partnership** 255:24

**parts** 159:21 238:22

**passed** 258:7

**past** 20:2 38:10 39:1,5
246:7,17

**Paterson** 14:17 15:4

**pay** 101:19,24 102:4,10,
13 104:12,18,22 105:7
107:18 110:24 154:15
167:5 195:1 196:3,17
199:1,12,18 200:1,5
215:10 223:5,11,16,25
224:8,23 225:9,21
226:6,17,19,21 227:15,
19,25 228:24 229:5
244:23 249:24 273:15
274:10,16

**paying** 165:9,14 166:25
167:22,23 196:21
197:10,17 199:1 225:11
245:5

**payment** 103:15 228:4,
19

**payments** 198:22
202:11 226:12,16

**payroll** 36:23 37:1,7,8,
9,11,15 38:15,20 99:13,
14 106:19 137:5 138:25
139:7 140:3,5 184:9

**pending** 213:9 252:22

**pension** 251:8,17

**people** 19:18 20:2
21:22 22:12,14,19,23
31:6 34:4 35:1 36:13,
17,20,22 37:10,14,24
38:8 41:9,10,15,21
45:9,13,19,25 48:19,20,
21 50:8,9,15 62:13
64:14 72:9 75:13 77:10,
22 78:9,15 79:1,25
86:23 94:12,21 98:23
115:13,14 118:5 133:9,
11 144:15 145:2,5,6
163:9 171:12,16,19
172:18 173:2,25 174:11

180:23 182:8,9 184:12
186:24 189:8 200:17
201:1,22 208:2 223:23
226:22 227:2 229:13,
17,21 230:3,9 232:12
233:9 235:23 239:20
240:5,7,8,10 241:23
242:2 243:12,16,20
244:23 252:22 255:2,16
258:24 263:15,17

**People-and-culture**
92:11

**percent** 37:25 38:8
130:2,15 131:1,11,15
138:11 190:3

**percentage** 167:1

**perfect** 50:3 240:11
242:22 246:3

**period** 12:9,13 13:5
46:2,5,6,9 47:20,24
52:24 64:15 66:2,6,14
68:18,19 69:5 100:13
115:15 148:19,20 167:6
170:1 174:16 245:3

**periods** 12:8

**permanent** 168:13
169:4,23,25 170:3
174:19 176:21,23,25
177:10,15,16,24 178:3,
7,14,18,22 179:9,14
215:11,18 226:10

**permanently** 177:21
214:13 226:11 228:3

**permissible** 271:6

**permission** 54:17

**permit** 269:15

**permits** 270:10

**permitted** 184:17

**person** 34:15 45:8 51:6
54:4 77:2,21 91:23
122:8 132:18 174:15
212:9 215:17 218:17
221:4 228:13 251:16
270:24

**personal** 118:4,6
154:17 204:17 212:23
214:9 269:9,10 276:16,
18 278:5

**personally** 35:20
56:13,20 75:6 158:1
213:20 230:5 254:10

**personnel** 47:18,22
51:9,15,17,22 64:13,16,
21 65:12 66:22 67:9
68:7,20 69:7,13,16,20
70:13 153:10,20,25
154:7,12,24 156:19
157:3,8,18 158:2,10
160:7 212:3

**persons** 192:24

**perspective** 48:6
67:24 83:16 92:11
249:13

**pertains** 271:20

**Peter** 115:18 117:11
118:24 119:4 126:11

**Phase** 73:21

**phases** 114:1,12

**Philharmonic** 48:4
82:12

**phone** 53:10 54:2
127:18,21 144:8 257:11

**phonetic** 25:15 37:18
201:4 237:24

**physical** 8:13 35:5,9
50:7 52:19

**physically** 52:15

**pick** 67:1 94:2

**picking** 238:22

**picture** 211:11,13

**pieces** 238:21

**Pierre** 265:9

**Pino** 16:22

**place** 73:15 74:2 182:4
199:4 220:2 243:24
250:3,5 257:24 259:6,
10 270:19,25

**placement** 73:23

**places** 29:6,8 172:20
235:11

**plaintiff** 10:21

**Plaintiff's** 195:11
235:17

**Plaintiffs** 7:23 211:18
216:7 226:4

**Plaintiffs'** 21:10,13,16
57:22 58:1,4 59:1,4,7,
24 61:16,18,21,24 62:1
63:6 65:6,9 85:14,17,24
103:20,24 104:2,11
107:20,23 108:1,12
110:6 111:6 115:21,24
118:12 120:10,14,17
123:7,12,15 124:19
127:14 128:1 131:23
134:12,14 135:11 136:5
155:4,7,10 156:15
158:22,25 161:6 163:20
166:12,16 175:8,21,23
183:17,21,24,25 184:1,
3 185:19 192:18,21
194:2 212:24 213:4,18,
21 214:10 215:1,6
236:18,22 237:8
262:13,16 270:1,2,4

**plan** 14:25 82:4 190:8
221:1,4,8,10,13,17,20
222:1,3,4,10,17,18,21,
24 229:2 246:14
251:11,15 252:20
259:6,10,17

**planned** 144:3

**planning** 140:22 183:1,
4,15 184:4,13

**plans** 145:16 148:14
149:17 241:8

**play** 233:16 238:20,21
239:1,8

**played** 234:5,8 235:19
237:11,16 238:13
239:16

**playing** 233:20 234:22
235:5

**point** 13:15 15:18,19
24:23 25:3,4 31:14 83:9
93:16,18,20 94:4 99:22
112:19 114:8 116:19
133:19 141:11 144:11
145:8 155:14 169:16
194:18,24 219:20
250:16 251:1 255:20
256:12

**policies** 161:11

**policy** 247:6 250:2

**pool** 268:8

**portion** 44:25 49:11
103:12 105:23 111:22
119:11 160:15,18 161:1
203:3 213:15 214:4
278:1

**portions** 235:5,10

**position** 9:8 17:15
18:16,25 24:8,17 25:8
31:11 32:11,17,21 33:9,
11,15,21 54:10 96:1
113:10 133:13 201:5,6
226:3 242:10 254:15
258:10 266:20 267:22

**positions** 193:12
201:10

**possibility** 246:6

**possibly** 11:24 12:17
52:5 61:11

**posted** 63:15 257:5
266:14

**potentially** 254:8

**practice** 98:6,12
101:19,24 102:3,19

**precise** 137:4

**predominantly** 113:7
128:6

**prefer** 50:1 129:3

**premises** 130:12

**preparation** 73:16
74:3

**prepared** 95:19

**preparing** 157:1,17
158:13 272:7

**present** 34:11 40:1
253:13

**presented** 154:19

**presenting** 21:15

**President** 77:7 109:23
117:11 118:24 119:4
126:12 240:3,5

**presumed** 8:6

**presuming** 166:17

**pretty** 56:17 106:9
229:16 234:21

**prevent** 73:13

**preventing** 260:6

**previous** 9:3,4

**previously** 84:14
151:3 154:13 165:9
178:8 190:1 195:17,22
207:17 208:13 216:10
219:1,12 261:4,7
270:14

**primarily** 83:1 133:15

**printed** 185:16

**prior** 11:7,19,23 13:1,7
15:5 24:16 54:18 59:20
74:5,13,17,23 75:2,7
84:16,23 85:20 87:4
112:13 116:17 124:10,
12 134:18 141:23
163:21 177:23 191:4,11
192:1 207:5,8 218:22
228:8 267:21

**privileged** 11:10 12:3,
15,19,22 13:18 14:7
95:6 119:24 125:13,14
126:18,22 168:15
267:18 268:22

**privy** 198:2

**probable** 60:4

**problem's** 272:3

**procedure** 187:22
233:21 271:18,19

**proceed** 40:23,24

**proceeded** 95:18

**proceeding** 251:1

**process** 37:8,11,15
188:7,8 205:9 214:14,
16 249:20 272:10,15,19
273:7,16

**processed** 37:9

**processing** 271:10

**produce** 13:20 211:24

**produced** 118:7
180:17,18

**producing** 13:21

**production** 38:7 67:22
117:21 122:18 163:24
180:2 203:19 221:19
227:9,16 231:2

**progress** 241:9 243:25

**progression** 82:14
97:25

**project** 248:23 250:23
251:4 260:18

**projects** 248:12
250:14,16,25

**promoted** 216:20,24

**promotion** 217:23

**proper** 237:22 238:8
240:18

**properly** 35:9 188:4
235:12 239:2

**properties** 60:12 61:1,
4,5,10,12 66:17 204:9

**property** 27:20 35:3,5
36:1 48:20,21,22 50:7
52:21,23 53:1,2 66:7,15
71:6,14,17,18 72:2
74:19 75:15,24 76:17
78:7 79:15 133:16
139:2 147:24 150:9
175:2 182:8 183:12
191:1 219:25 220:6
245:2 255:16 273:11

**propose** 166:5

**protocol** 64:23,24 95:3
169:2

**protocols** 95:10

**proudly** 256:1

**provide** 37:8,10 66:17
96:14,15 97:3 98:13
99:19,23 102:4 116:21
122:8 154:23 160:1
166:1 182:12 242:15
254:17 262:5,23 277:1

**provided** 96:3 98:18
117:22 120:9 134:25
139:23 167:13 179:19
192:5 198:7,10 201:11

202:16,17 203:18,21
218:1,4,12 226:23
227:22 228:6

**providing** 62:16 97:11
102:2 182:7 228:8
238:22

**provision** 96:10
210:17 270:11

**provisions** 95:16,17

**psychologist** 230:3

**Psychology** 14:11,16
15:6

**PTO** 278:6

**public** 7:3 82:24 177:19

**pulled** 159:19

**Purchasing** 30:7,9

**purportedly** 270:15

**purposes** 22:11 23:1

**put** 29:9,12 72:12
106:19,20 138:14 162:7
190:4 204:24 239:5
251:8

**puts** 249:16

_____

**Q**

_____

**qualify** 104:18

**quantify** 12:8 13:5

**quarantine** 63:24

**question** 8:5,6,19,20,
21 11:10 13:14 16:9
22:3,8,22 24:20 29:15
33:4 34:2 36:25 40:21
49:10 64:9 72:6,18,23,
24,25 79:10 81:19,23
84:2 94:18 95:6 101:18,
23 107:11 109:15
111:20 113:1 119:9,24
120:7 126:23 128:7
130:5,19,20 133:24
139:14 142:9,19 143:8,
13 146:13 150:13
153:15 154:3 160:13
163:8 168:25 172:1,15,
18,25 173:1 174:8,10
175:17,19 189:3 191:8,
14 192:12 194:21

195:12 197:12 203:2,8
209:19 213:3,9,25
214:3 218:20 220:15
222:14 223:7 224:2,4,
21 225:19,25 226:2
229:3 235:2,13 236:17
239:7 243:18,21 244:3,
22 247:1,15,16,23
248:1 249:5,22 250:14,
20 251:13,17,20,21
252:12 253:5,6,10,17
266:16 267:6 274:7
275:22 277:25

**question's** 276:5

**questioning** 15:14
230:19 234:9 235:14

**questionnaires**
252:25

**questions** 7:20 8:3
12:21 40:19 94:20
218:7,10 224:11 230:9,
22 231:3,21 232:8,11
241:20,25 242:1,5,7,12,
16,18,19 243:2,3,6,10
245:14,15 246:19,21,23
249:1,5,7 254:21
255:19 256:8 257:8
268:24 269:8 273:19
275:1 277:23 278:13

**questions?'** 253:14

**quick** 134:3 245:19

**quote** 270:10,18,20

_____

**R**

_____

**Rainbow** 16:4,15

**raised** 167:3

**ramp-up** 148:19,20

**ran** 51:21

**Random** 19:18

**re-ask** 26:5

**re-evaluated** 244:2

**re-mark** 156:14

**re-open** 160:1,10

**re-opening** 184:18,21

**reach** 145:5 241:15

251:19 256:20 257:11

**reached** 237:24,25
240:20,21 257:18

**read** 45:1 49:9,12 65:23
103:13 111:20,23
119:12 154:10 157:23
160:13,16 175:13
176:16 196:18 203:4
206:22 213:16 214:2,5
278:2

**reading** 111:5 175:12,
16 250:22

**ready** 249:19 262:17

**real** 245:19

**realistic** 59:20

**realistically** 148:18

**realize** 254:7

**reason** 24:19 27:10
31:21 62:22,24 65:22
67:6 74:20 75:4 80:7,9,
10 81:2 98:11 109:22
119:2 125:4,21 139:9,
13 149:18 165:23 168:7
174:20 197:14 199:25
230:4

**reasonable** 74:24
80:21 140:11,16,19,23
255:18

**reasoning** 79:23

**reasons** 67:4 83:15
276:17

**reassess** 241:7

**rebuild** 90:5

**rebuilding** 90:8

**recall** 9:15 11:6 17:14
24:13 43:19,20 46:25
48:13 52:12,14 54:17
55:7,11 56:21 60:15,19,
20 84:22 99:9 100:15
102:6 110:12 114:12
115:8 117:24 129:22
143:24 161:25 166:8
174:20 178:11 180:23
182:13 186:10 190:8
192:4,7 215:12 218:25
223:17,20,23 225:17
228:22 229:2 236:5
241:14 249:18 260:15

261:21 263:1,11 265:4
268:16

**recalled** 68:15 100:18
229:1,4

**recalling** 241:10,12
245:8

**receive** 37:25 38:8
65:20 215:11 223:11,15

**received** 13:11,15
38:10 69:8 117:23
143:4 160:25 165:23
180:11 187:23 188:9,22
202:7 217:9 223:3,24
227:14,17,24 231:16
235:25 239:22 249:6
266:24 271:14 272:11
273:14 274:2,8,15,19
275:1

**receiving** 13:9 112:9,
15,19 182:22 225:20
271:23

**recently** 207:7 216:20,
23 232:24

**recipients** 108:8
135:14 136:25

**recognition** 22:15 23:2

**recognizable** 20:17

**recognize** 21:17 255:4

**recollection** 11:8
44:10,13 53:4 58:7,14
62:21,23 63:7 65:11
70:25 85:19 108:21
111:13 138:21 157:25
187:4 193:3 196:1

**recommendations**
65:1,2

**record** 7:7,10 12:19
18:6 25:20 39:14 40:6,
23 45:1 49:12 75:18
85:23 103:13 111:23
117:20 119:12 127:11
137:15 160:16 175:22
186:11,14 195:19 203:4
207:15 213:14,16 214:5
236:18,21 239:12,13
258:6 273:20 278:2

**recorded** 232:22,25

**recording** 233:1,6,9,

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

15,17 234:2,5,23,24
235:3,6,9,10,17,19,20
236:2,12,20,22 237:4,
15 238:5,12,15,17,20,
21 239:1,3,8,12,16
257:23 259:6 270:15,18

**records**  38:15 106:23
139:19,24 140:3,5
232:4

**recruiting**  34:8

**REDIRECT**  273:21

**redistributed**  220:5

**redo**  142:6

**redoing**  73:8 89:18,21

**redone**  73:11,25
245:15

**reduce**  82:5,7,15 84:8
98:1

**reduced**  46:2 96:13
106:1,10,21,24 130:15
131:1,11 138:10,14,16
139:20 194:17

**reduction**  82:18 83:1
84:11,12 96:12 121:13
130:2 131:19

**refer**  150:17,18 153:5
232:1 269:21 271:9,25

**reference**  227:15

**referencing**  247:4

**referred**  238:14

**referring**  39:13 50:21
61:5 185:4 188:11
194:23 227:19 270:6
271:2 272:1 273:3

**refresh**  11:8 58:6 63:7
65:10 85:18 108:21
111:13 157:25 187:3
196:1

**refreshes**  58:14 193:3

**refused**  206:19

**regard**  118:9 248:15

**regional**  25:16 75:13
76:6 77:5 78:3 221:4
240:7

**regular**  78:10 144:7

145:3 244:5

**regularly**  56:8

**Reimbursement**
159:20

**reinserting**  90:8

**reiterate**  242:23

**rejected**  168:3

**related**  7:20 13:16 91:1
92:2 96:9 149:5,10,22
151:4 169:6 178:18
182:23 193:4 203:15
223:4 246:10 259:10
262:1 263:25

**relates**  140:6

**relating**  127:18 146:14
178:3 243:6 273:14

**relation**  95:4 96:7
143:5,17 193:1

**relations**  34:6 133:16

**relationship**  256:2

**relative**  170:16,22,25
171:5

**relevancy**  15:15

**relied**  174:1

**remain**  44:18 145:20
184:17 241:2 243:8
244:8,9 254:13,14
255:21

**remained**  44:4 228:18

**remaining**  193:12
220:1

**remains**  228:2,13

**remember**  9:19,23
10:9,16 11:21 14:19
16:21 17:22 23:13
30:24 44:6,16 45:15
46:6,15 48:2,3,7 51:12
52:9 55:2,10 56:2,6,10,
14 57:3,13,19 58:18,19
59:11,12 61:3 64:18
65:14 66:5,13,20 67:3
69:11 70:23,24 71:5,8
74:6,8,25 82:23 83:4
85:22 86:6 94:25 96:23
99:1 100:1,13 102:9
104:4,6,7,8 106:12,14

114:21 115:6,11 116:19
117:16,19 119:18 121:5
122:2,4,7,15,17 124:16
128:13 131:4,20
138:13,14 139:7
141:10,21 142:2,8,14
143:3 151:4 155:13
166:20,21,22 167:21
168:24 182:7,18,21,22
185:15 187:2 192:3
194:5,6,7 197:8,15
200:24 207:13 208:20,
21 211:17 223:19
225:4,5 227:4 229:20
231:10,24 232:3,16
259:24 260:13 261:2,
17,24 262:3,8 264:3
265:19,21 267:11
268:15 277:14

**remind**  16:8

**reminded**  163:13

**reminds**  193:7

**remote**  52:22

**remove**  89:23 90:4,5
156:13

**removed**  246:13

**removing**  88:25 89:20,
24 156:8

**renovate**  74:13,17,23
75:2,7 141:20,23

**renovated**  142:23

**renovating**  191:3,10

**renovation**  88:4,7,11,
13,20,21 89:2,9 275:5

**renovations**  74:5
84:13,17,23 85:5,8,19
87:3,6 88:20 89:6,12
90:19 91:1 92:3,22 93:3
142:10,13,16 143:15,22
146:2,15,24 191:25
259:7,10

**reopen**  71:2,4,9,10,12,
16 73:1,4,16 74:3 100:9
117:18 140:22 142:12,
16 143:11,15 145:8,16
148:15,17,18,25 149:1,
2,3 150:4 151:1 163:1,3
167:9 174:25 186:2,9
191:16 194:11,14

240:24 245:9 256:1

**reopened**  47:18 68:20
100:3,20,21,23 101:2,8
142:24 144:3 263:12
265:6,14,18,20

**reopening**  47:21 71:7
73:2,18 74:5,13,17,23
75:3,7 86:7,20 101:3
140:25 141:2,5,8,13,15,
20,23,25 143:12,21
145:12 146:6 147:3,7,8,
11 148:14,24 149:4,6,
17 174:2 175:3 183:20
184:24 185:3,23 189:4
191:4,11 192:1,5 224:7,
12,19 227:1,20 241:8,
11,14 245:7 256:15
260:6 262:1 267:21

**reopens**  198:19 262:7
263:6

**repairs**  251:22

**repairs?'**  251:24 252:2

**repeat**  119:9

**repeatedly**  276:5

**rephrase**  8:4 47:9
130:20

**replace**  86:13,14 88:2,
9 146:11 263:23

**replaced**  87:21

**replacement**  88:4,6,
10,19 89:1,5,7

**replacing**  90:9,10,11

**reply**  156:18 157:7

**report**  75:11,16,20,22
78:18 218:17,21

**reporter**  7:5 8:12
175:20 234:1 235:21
237:17 239:18 258:4

**reporter's**  233:21

**reporting**  78:14,17

**reports**  30:16

**represent**  236:19

**represented**  124:3

**representing**  236:12

**represents** 152:1,4

**request** 13:10,11,15, 19,20 38:14 40:3,5 99:14 276:18

**requested** 38:9 44:25 49:11 83:24 103:12 111:22 119:11 160:15 203:3 213:15 214:4 246:17 278:1

**requests** 228:15 256:23

**require** 103:15 104:13, 18,22 148:5 149:14 151:12

**required** 78:13 105:7 125:18 126:7 127:3,6 139:1 148:10,12 182:11

**requirement** 127:9 193:11

**requirements** 119:20, 22 147:25

**requiring** 70:7

**reservations** 93:25 256:14

**reserve** 234:8 235:13 278:16

**resign** 271:3

**resignation** 33:13 179:19,21 180:3,6,10, 18

**resigned** 31:16,17,19, 21,23 32:1 219:4 263:18 265:22 266:6

**resigns** 270:24

**resolved** 193:13 272:3

**Resort** 148:4

**Resorts** 7:25 8:1 9:6,7, 10 19:12,16,21 20:3,12, 19,25 21:23 22:17,20, 24 23:4,10,15,17,25 24:9 25:25 26:18 42:14, 16,20 43:1,4,5 53:5,22 54:18,24 75:1 108:19, 23 109:3,12 110:4 153:7 208:8 209:4,8 210:1 217:2

**resources** 9:11,13 16:3,5,7,20 17:17 18:17,19 19:1 31:2 221:7 254:18 272:5,24 273:14

**respect** 76:5,8,19 86:18 236:18 249:16 252:18

**respectfully** 208:5

**respond** 110:10,13 118:10 122:22 164:2 180:5 203:23 212:22 221:22 231:7,17 235:12 242:12 251:16 257:14

**responded** 154:2 160:9 230:25 231:22 263:7

**responds** 128:24 129:5,10 159:25

**response** 34:23 156:19

**responses** 252:25

**responsibilities** 78:12

**responsibility** 31:7 34:3 77:1 78:15

**responsible** 110:23 133:15 138:24 149:9 150:16

**responsive** 145:4

**rest** 114:10,11

**restaurant** 83:6

**restaurant[s** 116:8

**restaurants** 16:2,24

**restructuring** 87:7 88:1

**result** 47:4 57:6,11 264:25

**resulting** 121:13

**resumed** 44:24 91:10 103:10 134:7 146:22 186:17 202:25 232:20 264:13

**retail** 55:18 56:1

**retained** 192:9 193:11

**retired** 171:13

**return** 249:18

**revenue** 67:22,23,25 82:5,7,11,15,20 98:1 115:10

**review** 11:7,14,19,22 12:1,6,11 13:1,11,16,19 65:25 79:16 85:18 116:17 184:21,25 207:6,9 216:2 272:12 278:16

**reviewed** 11:25 13:1,7, 21 14:1 134:21 136:23 204:19

**reviewing** 13:6,23 14:4 175:25 190:21

**revised** 190:13,20 212:6

**rework** 86:11,12 191:20

**rewrite** 164:22

**Reynold** 123:9 124:24 126:3

**rhetorical** 274:6

**Rick** 65:4,24 66:11 104:16 128:3,6,12,22

**rights** 117:4 129:12

**Risman** 7:14,17 16:13 24:22 38:7 39:11,14,23 40:1,5,17,25 49:9 99:14 103:8,20 111:20 117:20 120:10 122:18 123:7 134:5 154:4 155:24 156:4,9,12 160:13 163:24 175:15,19 176:6,9 180:2 183:13 186:15 193:16 195:8,20 202:16,20 203:1,19 213:10 214:1,8 221:19 231:2 232:18 233:22 234:3 235:4,16 236:21 238:17,19 239:11 258:4 261:3 264:9 269:1,20 270:1 271:17,22 272:16,20 273:8,17,20, 22 275:13 277:22

**road** 83:16

**rock** 152:12,13,14 218:17

**role** 10:7,10 30:16 31:5 50:21,22 76:14 92:25 133:6,7 219:11,16 271:20

**roles** 220:7

**rollercoaster** 141:16

**rolling** 189:4

**room** 16:4,15 17:11,13, 16,20,23 73:13 80:24 142:6 246:9 248:16

**rooms** 49:4 70:7 90:18 103:6 153:18 183:10 191:18 217:19 218:18 245:15

**rooms-based** 66:19

**Roosevelt** 18:13,14, 16,21

**Rorrobo** 237:24 240:20

**rotational** 36:14,15,18

**rude** 229:16,22,24 234:19

**Rudy** 23:18 25:12,14 30:20 31:14 33:13 59:3 105:23 108:3,6 110:8 111:8 123:9,22 134:9 175:5 176:4,13 192:15 211:14 264:23

**rugs** 89:1

**rules** 148:11

**run** 80:6,11

**running** 35:15 241:6 259:13,20

**Russian** 17:11,13,15, 19,23

### S

**safe** 34:20,21 35:19 109:20 115:7 171:18

**safety** 35:12 63:21 64:23,24 67:7 72:19

**safety'** 164:21

**salaried** 201:10 262:23 263:9

**salaries** 196:3,21

**salary** 38:1,9 45:24
46:3 101:20,25 102:22
103:15 130:2,3,15,25
131:2,10,12 138:11
165:10 166:6 167:1,2,
23,25 171:2,3,7,22,23,
25 172:3,16 173:21
174:12,13,17 190:3
197:6,10,18 201:13
258:20,25 259:1

**sales** 49:2 103:4 164:7
183:8 201:7,8

**salt** 154:21

**sample** 129:6

**Santa** 243:6

**Saturdays** 97:17

**save** 230:21

**scale** 65:1 111:14
115:11

**scaling** 111:3,10 112:2

**scare** 163:5

**scenarios** 110:21

**schedule** 97:5,8,17
98:13 99:5,7 102:3
106:24 138:10 139:20
253:21,22

**scheduled** 36:14,15
97:14 181:22

**schedules** 106:16,17,
18,21 136:22 137:4
138:25 139:7 141:1

**scheduling** 136:20
140:2

**school-** 60:11

**scope** 275:12,13,20
276:4,13 277:7,18,21

**screen** 240:11 242:2

**script** 253:25

**search** 116:22

**searched** 232:4

**Season** 71:15

**Seasons** 7:24 19:12,
16,21 20:1,3,12,19,25

21:23 22:16,19,24
25:24 26:17 27:1,3,13,
22 28:4,11,17 29:4,17
30:1 32:25 33:6,22
41:2,11 43:10 48:19
49:7,13,23 50:5,10,14,
23 51:7,15,18,23 52:16
55:12,16 61:5,10 62:7
63:19 70:14 80:15
81:16 83:20 84:4,22
85:4,9,20 93:24 94:15,
22 95:2 96:15 101:8
105:13 113:21 119:7,14
121:11,16,19 122:10,14
127:2 130:16,25 132:9
133:2,3,7,12,20,25
138:7 139:9,16 145:12,
16,20 146:1 147:10
148:4 149:22 150:6
152:15 153:1,11,25
154:8,12,22,25 157:1,
16 158:2,12 160:25
161:19 162:8,17 165:17
169:2 171:9,16,21
172:7,13,19 173:3,13
174:1,11,21 177:9
178:4 186:9 188:15
190:5 193:5 194:18,24
196:2,15,21 197:9
199:5,23 203:6,9,25
204:1,4,8,9,14,16
205:4,15,24 206:9,19
211:16 212:10 215:5
216:21 217:2 225:8
228:21 234:16 236:25
237:6 247:20 249:2,25
251:22 252:2 253:23
258:9 260:24 261:14
264:15,18 265:14
266:5,13,20 267:8
268:3,18 275:15

**Seasons'** 151:18

**seating** 86:19

**second-to-last** 121:7

**seconds** 237:14

**section** 131:25

**secure** 34:20,22 35:20

**security** 35:12,25
37:16 72:19 93:1,2,19

**seek** 38:7 57:14 215:17

**seeking** 117:24 172:20

173:8,11,18

**seeks** 14:6 95:6

**segment** 266:2

**Selena** 7:21 206:5
222:22

**send** 14:5 56:4 119:7,
14 122:23 125:5 126:7,
10 127:3 128:18 134:1
267:3,8

**sending** 104:16 128:19
165:4 246:6

**sends** 39:10

**senior** 241:22

**sense** 20:17 45:7 82:17
168:21 218:14,15

**sentence** 104:16 117:1
124:1 132:2

**separate** 104:17 231:1

**separately** 253:2

**separation** 215:10
223:11,15,25 224:8,23
225:9,21 226:6,17,19,
21 227:15,18,24 228:24
229:5 273:15 274:16

**September** 18:3
194:12 196:8 247:13

**series** 134:8,9

**serve** 219:11

**served** 182:4

**server** 38:19,25 180:1

**service** 66:7,15,17
86:4,17 87:25 147:20
148:19,22 244:18

**services** 7:25 19:6,8
20:8 23:3,4 24:25 25:1,
5 26:7,15,25 29:12,18
30:13,19 31:2,12 32:14,
18 34:1,11 41:18,25
45:10 46:20 47:11
48:18 49:7 50:12,17
63:12 74:16 77:15 78:5,
21 79:3,7,18 82:11 86:5
105:18 109:25 117:11
150:6,22 151:20 158:15
199:6,11,22 208:3,7
209:9,25 217:1 271:21

**serving** 87:9 182:5

**session** 82:12

**set** 221:10 241:11
264:24 265:6 266:2
270:11 271:19

**sets** 89:8

**setting** 259:7

**settlement** 194:25
195:6

**severance** 104:12,18,
21 105:7,11,15,18
197:2 223:5 224:3,13
244:22,23 245:5 249:24
250:1,7,9 270:20,22
271:2 274:9 275:2

**shaking** 166:14,17

**shape** 226:25

**share** 251:6 256:20

**share?'** 253:23

**shared** 154:20 243:8

**sharing** 96:3

**Sharon** 216:13 217:13,
18 218:10 242:6,17,19
250:20 255:11,13
257:3,12

**sheet** 129:2

**Sheetrock** 73:23

**Sheetrocking** 73:22

**shift** 36:18

**shifts** 36:18 45:5,6

**shock** 98:17

**shop** 131:18

**short** 47:20,24 99:3
150:14

**short-term** 278:4

**Shortly** 159:24

**show** 21:9 57:21 99:11
106:21 139:19,24
140:2,3 195:16 218:12,
21 221:13

**shower** 73:25 90:8

**showers** 72:12 73:11

**showing** 58:3,25 59:6
61:15,17 85:16 107:19,
25 115:23 120:16
134:13 155:6,9 166:15
183:23 192:13,20
195:21 207:17 215:1
261:6 262:15

**shown** 151:3 193:12

**shut** 48:4,5 60:6 66:20
97:23 111:17 115:4

**shutting** 113:8

**sic** 111:18 184:2 192:22

**sick** 60:8

**side** 152:1,3 185:10
194:22 215:24

**sight** 71:4

**sign** 28:23 180:23
181:9,22 204:1,5,10
206:5,9,16,19,25
213:21

**signature** 43:5 108:25
109:1,14,19,21,23
120:22 159:10 195:24
211:24 212:1 278:17

**signed** 50:14 62:5
123:22 160:22 204:15
205:24 206:2 207:11
211:19

**signer** 151:14

**signers** 151:15

**significant** 89:19

**signing** 207:8

**silos** 164:14

**similar** 157:22 196:15
205:10 206:5 231:21

**similarly** 7:22

**simply** 82:24 230:14
250:11

**single** 34:15 40:21 45:8
186:4 206:8 226:25

**singular-specify** 29:7

**sister** 60:12 204:9

**sit** 82:3 109:6,15
145:11,19 166:15

253:19 255:5 260:16
273:13

**situated** 7:23

**situation** 163:4 170:17

**situations** 221:3,18
222:9 256:22,24

**small** 16:2

**smaller** 133:16 188:5

**social** 63:25

**Sofitel** 18:22,24 19:4
23:4,9,14,16,22,24 24:8

**soft** 88:19 89:7,9,10

**Solid** 152:12,14

**somebody's** 171:5
278:8

**sooner** 243:19,21
254:11 255:25

**SOPS** 148:10

**sort** 99:10 203:11
244:19 252:19

**SOS** 64:25

**sought** 58:7,15

**sound** 123:1,5 253:16

**sounds** 22:3 124:16
187:6

**spa** 147:22

**space** 90:6,7

**spaces** 55:18

**speak** 41:21 42:5 71:23
74:20 142:7 151:2
218:10 244:12 254:24
257:19 264:23 277:4

**speaker** 236:24 237:7

**speaking** 40:8 110:12
236:24 265:10

**speaks** 238:18

**specific** 19:23,24 34:24
54:21 55:5 58:18 65:14
77:9 78:19 92:14 94:10
95:22 119:13 120:7
122:6 129:1,23 132:15
139:24 142:2 143:9,25
151:11 156:20 166:20

194:6 196:24 223:19
227:12 242:1 243:11,22
256:24 259:17 260:17
271:25 274:3

**specifically** 9:18,21
17:14 30:10 32:9,16
43:2 44:20 46:25 55:2,
10 56:6 57:20 59:11
60:19,21 69:2 71:8
74:21,25 75:5 80:23
82:16,23 89:17 91:3
92:9,15 93:14 104:5,7
105:3,10 115:12 120:8
129:22 131:14 142:8
145:18 148:8 149:13
152:18 155:13 156:22
160:5 164:11 192:6
220:17 226:9 227:5,18
229:8 234:7 259:18
262:8 265:2

**specification** 198:2

**specifics** 19:19 148:9

**speculate** 144:18
146:5 230:16 268:7

**speculating** 229:7

**speculation** 52:4,7
59:22

**spent** 73:24

**Spillane** 40:2 175:5
176:3,12

**spoke** 32:9 84:13 186:1
217:11 234:13

**spoken** 53:10 54:2
110:15 152:6 238:1
240:22

**sporadic** 114:8,21,22
115:8 124:12

**spreadsheet** 137:8

**spring** 241:8,17 244:1

**St** 56:16

**Stacey** 25:15,21 26:4,6
240:8

**staff** 37:5 66:2,5 68:1,7,
12,16,20 70:6 100:10,
11 136:15,20 141:14,15
160:3 161:25

**staffing** 66:1 67:21,23

68:24 69:9 76:5,8,10
190:14,19,21

**stage** 256:6

**stake** 177:2

**Staley** 7:21 206:5
211:18 222:22

**Staley's** 217:16

**Staleyvfsr0304**
195:23

**stalls** 73:25

**stand** 65:22 74:19 75:4
81:1 184:7

**stands** 80:7,9 109:22
149:18 197:14

**stars** 147:19,24 148:1

**start** 13:6 94:7 127:16
198:22 235:24 239:21
240:1 243:24 248:12
251:4

**started** 18:12,13 24:15
30:15 34:10 121:2

**starting** 73:21,24 114:8
121:18 236:5 237:15

**state** 7:6,9 20:24 21:3
24:19 43:13,20 44:2,11,
14,17 47:13,15,24 52:2
62:6 63:10 68:19 81:22
82:25 83:3,15,24 97:21
111:17 182:23 220:9,18
233:12 238:8 247:15

**stated** 40:15 43:5
154:11 185:20 210:22
226:22 232:14 237:3
263:9 270:18

**statement** 20:4 21:25
22:22 106:4 124:9
127:17 157:12,22,23
158:6 270:12,21

**statements** 154:24

**states** 15:20,23 21:22
22:18 60:10 62:9,12
66:13 87:11 104:12
111:1,8 116:2 117:3
120:24 121:8,9,19
124:2 128:9,18 129:11
132:1,2,6 137:22
156:17 159:3,24 160:5,

17 161:7 178:12,24
207:23 208:1 210:25
212:6,15 215:10,11,16
220:16

**Statewide** 162:24

**stating** 28:17 50:22
128:25 138:18 213:21

**status** 232:8

**stay** 32:1 41:10 51:15,
22 60:8 69:21 125:18
153:12,20,25 154:7,12,
25

**stay-at-home** 162:25
163:12

**stayed** 41:9,15

**staying** 41:17 42:3
51:18 64:13,17,21
65:12 66:23 67:9 68:7
69:7 70:14 86:23
153:11

**stemming** 116:4

**step** 214:18 215:19
216:4 219:5,6,8 220:8,
12,16,18 271:23,25
272:2,9,14,18,23
273:15

**steps** 214:22

**Steve** 37:18 93:6 94:4,5

**Steven** 219:17

**stipend** 166:25 182:1,3

**stipulation** 194:19

**stop** 52:19 100:19

**stores** 56:1

**street** 7:11 35:24 41:16,
24 121:17

**strictly** 12:21

**structural** 88:14,20,22
89:7,14 90:1 275:5

**structurally** 86:16
89:19

**structure** 19:23,25
23:6,7 34:20 35:6,9
71:19 72:3,16 73:18
78:15,17 90:3 146:6
147:7,9,11 149:4,6,10

**stuff** 187:19 246:16

**subject** 269:17

**subjective** 170:15
224:11 232:9 274:25

**submit** 208:5,17,24
209:2,12,17 212:15

**subsidy** 252:18 253:1

**substantial** 121:12

**subtract** 263:17

**sudden** 59:17 121:14

**sued** 10:17

**suggested** 256:7

**suggestion** 251:18

**suit** 200:11

**supervise** 31:3 92:21

**supervises** 78:6 92:19
93:2

**supervising** 35:9

**supervision** 78:13
118:21

**supervisor** 30:13
216:5,8,11 217:11,17,
21 218:2,9,22 272:4

**supervisors** 216:9
218:19

**supplement** 172:5

**support** 208:6 212:15
242:14 254:18 255:6
257:15

**suppose** 75:15

**supposed** 126:15
226:1

**surrounding** 110:19

**suspend** 159:5

**switch** 168:22 246:9
248:16

**sworn** 7:2

**system** 73:12 79:11
136:20 137:5 140:2
188:18 246:11,12
252:23

**systems** 73:14 243:17

---

**T**

**T-E-K-A-R-I** 212:11

**Tablan** 37:18

**takes** 248:7

**taking** 73:15 74:2
111:2,10,15

**talent** 17:3 34:7

**talk** 243:20

**talked** 150:20 191:15,
16,17

**talking** 63:24 100:5,22,
25 101:3 196:25 198:8

**talks** 63:21

**Taplan** 93:6 94:4,6,7
219:17

**tasks** 35:1 219:25
220:5,9

**taught** 15:18

**Tauscher** 23:18,21
25:12,14 30:20 31:14
32:1 54:12 55:7 56:4
59:3 81:15,24 108:3,6
110:8,12 112:7 115:17
123:9,22 134:9 175:5
176:4,13 192:15
211:14,15,20 264:23
265:22

**Tauscher's** 32:11,17
33:13

**Tavern** 17:4,5,10

**Tea** 17:11,13,16,20,23

**team** 35:14,23 36:2
48:22 52:25 137:2,3
150:18 220:2 251:6
253:20 255:14,16
256:21

**technically** 127:18
131:10

**Tekari** 212:10

**telling** 55:7 144:23
256:5

**temporarily** 116:10
159:5 225:18

**temporary** 111:2,9
135:6 136:3,17 137:22
138:18 162:9,12
169:10,14,15,17,19,20
170:4,6,11 174:19,22,
24 176:18 194:10
224:20

**ten** 9:24,25 10:3 12:25
179:13

**tenants** 55:11,17,20,22

**tenure** 45:25

**term** 39:12 40:21 89:10
132:16 163:8 176:18
232:10

**terminated** 215:12

**termination** 178:25
180:13,16 215:13,18

**terminology** 276:9

**terms** 269:17 271:15

**testified** 7:3 8:23 9:16
10:4,6,13,25 11:3
100:20 165:9 219:1
270:3,9 271:10

**testify** 9:1,4,22 28:8
61:8 269:9

**testifying** 11:7,20,23
13:2,7 91:11 116:15,18
118:5 207:5 269:12

**testimony** 47:23 51:21
75:19 76:9 96:3 98:2
138:16 153:23 154:2
183:2 191:2 196:24
199:8,10 226:12,15

**Texas** 78:1,4

**text** 257:12

**thing** 8:9,18 86:22
89:24 97:12 98:14,16
99:2 102:7,25 135:10
151:15 165:10,14
210:16 244:19 246:5
252:20

**things** 36:4,9 52:4
75:14 78:19 86:7 94:2,3
100:8 131:17 141:25
142:5 146:12 147:12

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

148:24 154:16 161:4
175:18 182:2 214:12
228:15 246:12 259:16
276:9

**thinking** 82:6 86:8
102:9

**thought** 41:17,21 58:24
86:20 87:8 101:25
115:2 141:5 161:1
179:7,11,12 213:20
230:16 256:9

**thoughts** 249:12

**three-page** 155:2

**three-year** 174:16

**threshold** 103:17

**thresholds** 151:12,21

**thumb** 148:12

**thumbs** 240:10

**til** 218:15

**tile** 89:24

**tiles** 86:13,14 88:2,3,5,
6,9

**time** 10:6 12:9,13 13:20
17:20 24:4 31:11,14
34:10,11 36:17,19
39:15 43:19,23 45:3,6
46:5,6,7,9,19 47:2,20,
24 48:2,8,10 51:7,25
52:4,11,14,24 54:22
55:25 56:18 57:4,9
58:20,21,24 59:14,18
60:2,5,16 61:1 63:2
64:2,8,10,14,15,16,20
65:12,16 66:5,12 67:9
68:6,12,18,19 69:5,6
70:5,12,13 81:8 84:1,21
85:6,7,18 86:3 88:9
91:13,14,16,18 92:6
95:17,22 97:2 98:16,22
99:3 100:7,14 102:5
105:18 106:8 110:17
112:23,25 113:11
115:15 116:9 117:17
125:1,8,17,20,22
133:19 137:3 139:2,20
141:8 142:1 145:5,15
146:25 152:6 154:16
161:7,10,15,18 162:3
163:4,7 167:6,14

168:11 170:1,12,15,17,
18,21,23,25 171:2,23
172:20 173:4 174:13,16
177:8 178:2 189:4
190:24 191:20 198:24
206:22 207:11 216:7
219:21 228:19 230:13,
17 231:1 237:20 239:9,
25 240:16 241:2 243:14
244:11 245:3 246:8,21
247:2,5,7,8 248:23
249:8,14,15 250:10
258:7 259:19 260:23
261:13,19,25 262:4
264:15,17,25 269:7
278:6,10

**timeframe** 243:25
248:10

**timeframes** 249:12

**timeline** 251:4 260:17

**times** 9:22,24 10:1,3
94:19 153:16 176:19
183:7 204:25 223:19
228:12 259:13

**timetable** 146:14,24
147:5,8

**tirelessly** 157:3,18

**title** 109:4,7,17,22
110:2 219:16

**titled** 215:4 222:1

**titles** 77:8,9 112:24
115:20 123:10

**today** 7:20 11:7,20,23
13:2,8 66:8 70:22
109:6,16 116:15 118:4
145:11,19 207:5 240:2
242:8 251:2 259:13
260:16 269:8,9,12
270:4,14 271:11 273:13

**today's** 180:12

**toilets** 72:10

**told** 20:2 51:17 81:5,6
113:7 143:2,10,14
164:16 170:10 184:25
241:6

**tone** 229:25

**top** 30:1 38:6 45:15
62:6 79:17 87:10 90:15

104:14 110:7 120:24
128:9 131:24 135:18
148:2 163:17 176:11
187:2 197:23 200:20
211:8 216:1 242:1
260:13

**tops** 248:8

**Toronto** 60:13 77:23

**total** 262:5

**touch** 32:2 248:9

**tough** 229:23 254:6,7

**tourism** 116:6

**tower** 148:25 149:2
246:9

**towers** 149:1

**town** 48:5 223:20
230:21 253:12 257:24
270:15

**track** 72:22

**tracking** 129:2

**Trade** 17:25

**Trades** 117:12 118:25
119:5 124:5

**trail** 11:18

**training** 34:8

**transcribe** 8:12 16:12
234:2

**transcribed** 233:23
235:9 237:17 239:17

**transcriber** 16:12

**transcript** 233:5

**transparent** 145:7

**travel** 56:17 116:6
159:19

**trick** 22:3,4

**trigger** 131:18

**triggers** 73:12 131:16,
20

**truck** 52:13,15

**true** 51:20 106:4 124:9
141:7 167:17 168:8
173:17 197:20 210:25

**turn** 164:2 180:5 221:22
231:7

**Twelve** 18:20

**Twenty-three** 195:15

**TWHR** 110:9 111:1,9

**two-page** 107:21 175:4

**Ty** 8:1 42:13,16,20,25
43:1,4 51:2 53:5,17,19,
22 54:18,23,24 75:1,6
108:18,23 109:3,11
110:4 149:14 153:7,23
154:6,11 156:25 157:16
158:1,9,12 159:25
160:6,9 208:7,8 209:3,
7,13,17,20,25 247:18
249:2 255:24

**tymail.com** 107:9

**type** 103:15 106:17
112:8,14 147:20 167:5
188:2 242:4,5 250:6
261:13 275:6,9

**types** 66:19 147:12
196:14 250:23

**typical** 144:15

**typically** 66:18 98:7,14
250:3

## U

**U.N.** 48:5

**U.n.'s** 82:11

**U.S.** 215:4

**uh-huh** 8:8,11 22:21
51:10 65:19 67:17
84:15 108:20 123:24
141:19 183:3

**unanticipated** 121:12

**uncertain** 100:15
110:17,19 112:23 139:3

**unclear** 162:3

**undergo** 241:3

**underneath** 62:12
157:14

**understand** 8:4 12:24
39:18,21 40:9 93:11

130:5 139:14 168:23
170:8 176:9 192:12
223:7 230:2 238:23
239:2 255:5 275:22

**understanding** 29:11,
16 32:10 53:15,16,18,
21 88:21 89:6,22 91:19
119:1 125:3,10 153:9
249:14

**understands** 230:3

**understood** 8:6,14,16,
17,22 28:9 39:17 127:1

**unemployment**
159:18 244:5,6,9,10,12,
14,15,17 247:12 253:7,
10

**unfolds** 157:19

**unforeseeable** 121:12

**unforeseen** 116:3

**unhappy** 273:5

**Uniform** 182:1

**uniforms** 182:10

**union** 96:24 98:2
101:22 102:2 112:8,15
113:15 117:7,8 118:7
119:16 121:3 126:3,11
127:8 129:12 180:6
189:14 193:8,20,23
194:10,13,16,19,25
195:1,2 196:3,6,16,17,
20,21 197:5,10 198:25
251:10,14,22 252:1,15,
16

**United** 15:20,23

**University** 14:17 15:4

**unmute** 245:12

**unmuted** 245:17

**unnecessarily** 66:5

**unpaid** 277:17

**unsure** 95:21 167:8

**unusual** 167:7 238:20,
21

**update** 243:1 252:9,13

**upgrading** 246:8

**upset** 144:24 229:14
230:4

**upsetting** 144:13,17,
20

**urge** 184:20

**user** 59:10

**users** 63:14

**usual** 131:1,11

**utilizing** 136:20

---

## V

**vacant** 33:10,11

**vacation** 46:5

**vaguely** 128:13 137:13

**varying** 189:7,19,25

**vast** 78:11

**vendors** 94:1

**verbal** 100:2

**verbalize** 8:10

**verbally** 8:15

**verifying** 136:22

**vernacular** 132:16

**version** 193:12

**versus** 174:19

**vested** 76:16

**vice** 77:7 78:3 109:23
240:5

**view** 66:4 67:15,18
68:23 212:23

**viewed** 67:24

**virus** 47:5 116:5

**Vivian** 7:21 137:17,22
139:10,15 140:7,12
201:6,14 205:23 222:19

**voice** 230:1 234:24
235:7 236:1,2 237:10
238:4

**volume** 88:17

**VP** 108:15 109:2,9,11,
21,24 110:3

---

## W

**W-2** 38:25

**W-2S** 39:4,7,10

**Wage** 182:11

**wages** 167:13 172:5

**WAGNER** 20:6,21
24:18 25:1 26:1 32:24
41:12,20 42:1 49:17
94:24 145:22 155:22
173:15 179:15 191:12
204:7 206:12 239:5
268:2,6,20 269:2
275:19 276:2 278:15

**wait** 45:4 49:16 58:5
111:5 156:9 201:25

**wait-and-see** 269:2

**waiting** 59:15 237:20
240:16 243:1 246:15

**walk** 72:9 91:20 92:1

**walk-ins** 35:24

**wallpaper** 88:10 89:8
243:14

**walls** 90:4

**wanted** 55:8 60:22
63:18 71:2,12 73:4 86:8
98:16 100:24 102:7
148:17 158:1 162:18
177:17,18 189:9,10
230:17 242:23 243:20
256:16

**wanting** 22:12,14 73:1
99:2 102:6 145:6 158:9

**Ward** 115:18 117:2,11
118:24 119:4 126:11

**warn** 95:18 99:20,23
100:12 117:7,10,13,21,
25 118:6,7 121:3,24
122:9,13,19,23 125:23
126:10,15 127:3,6
128:19 129:11,20,25
130:21 131:6,16 133:20
134:1 168:11 178:9,11,
16,18,20,23 186:18
189:13 266:23,24
267:3,9,13 268:13

**Warner** 8:1 42:13,16,
20,25 43:1,4 51:2 53:5,
17,19,22 54:8,13,18,24
55:8 75:1,6 108:18,23
109:3,11 110:4 149:14,
20 150:15 152:2,4
153:7,23 154:6,11
156:15,25 157:16
158:1,9,12 159:25
160:6,9 167:11 168:3
193:22 194:3 208:7,9,
10 209:3,7,13,17,20,25
247:18 249:2 255:24

**Warner's** 208:8

**Warner936** 135:12

**Warnerdef000700**
57:25

**Warnerdef000899**
103:23

**Warnerdef000902**
59:4

**Warnerdef000903**
192:18

**Warnerdef000917**
107:22

**Warnerdef000918**
107:23

**Warnerdef000922**
120:12

**Warnerdef000924**
120:13

**Warnerdef000935**
127:13

**Warnerdef000936**
134:10

**Warnerdef001017**
134:11

**Warnerdef001104**
123:11

**Warnerdef001106**
123:12

**Warnerdef001127**
115:20

**Warnerdef001146**
115:21

**Warnerdef001160**
166:11

**Warnerdef001161**
166:11

**Warnerdef002111**
183:16

**Warnerdef002112**
183:18

**Warnerdef002198**
183:19

**Warnerdef002199**
155:3

**Warnerdef002201**
155:4

**Warnerdef002482**
65:5

**Warnerdef003103**
61:21

**Warnerdef007353**
85:13

**Warnerdef008174**
175:7

**Warnerdef009110**
262:12

**Warnerdef1015**
137:18 140:6

**Warnerdef1017**
135:12

**Warnerdef1127** 117:2
119:3

**Warnerdef2111** 184:1

**Warnerdef2112** 184:2

**Warnerdef2199** 155:8

**Warnerdef2200**
157:12

**Warnerdef2482** 65:10

**Warnerdef2729** 159:1

**Warnerdef2732**
159:10

**Warnerdef3098** 63:7

**Warnerdef3103** 62:2

**Warnerdef8174**
175:24

**Warnerdef899** 104:2

**Warnerdef902** 59:8,25

**Warnerdef903** 193:17

**Warnerdef9097**
192:21

**Warnerdef917** 108:12
111:7

**Warnerdef922** 120:18

**Warnerdef935** 128:2
131:23

**Warnerdef936** 134:15

**warrant** 224:16

**Warrendef002729**
158:21

**Warrendef002732**
158:21

**Warrendef003098**
61:23

**water** 35:15,16,19

**ways** 66:6,14

**wealthy** 171:6,10,17,20

**website** 159:19 161:9

**Wedge** 201:4

**week** 46:17 97:14,15
98:3,8,24 99:15 138:11
139:4 140:21 190:16,17
196:7,8 198:16 199:19
200:9 202:5,8 203:12

**week's** 96:14,16 97:3,
5,8 99:5,6 101:20,25
102:4,8,22 165:10

**weekly** 197:6 199:13

**weeks** 46:3 115:3
141:8,11

**weird** 43:19

**welcoming** 240:25

**well-lit** 36:1

**what-if** 110:21

**what-ifs** 110:22

**white** 132:13,19

**widespread** 121:14

**William** 14:17 15:4

**winding** 139:11

**Windows** 17:25 18:7

**withdraw** 24:22 25:3
49:8 112:18 147:15

**withdrawn** 15:5 17:18
20:10 29:2 33:5 117:9
121:8 126:1 172:11
199:9 200:6 205:12
206:17 210:23 220:15
229:11 232:12 236:15
259:9 266:18 267:7

**woke** 170:24

**wondering** 193:2
245:11

**word** 164:8,17,23
168:12 169:3 170:8
177:10,24 178:3
224:10,11 232:8
274:23,25

**wording** 221:24,25

**words** 27:3 28:14 29:1,
3 50:17

**work** 15:11,22,25
16:18,25 17:2,9,24
18:2,8,18,21 19:2,5,7
20:18 23:17 25:21,24
29:4 31:24 34:22 36:13,
18 37:21 41:1 45:9,10,
13,17,19,22 46:3,11
70:22 71:6 73:20,21
74:2 79:19,25 80:6,11,
13,22 81:3 92:11,12,15,
19,21 97:14 98:3,4,8
106:1,21,24 129:14
130:17 132:20,23
133:1,4 136:21 137:4
138:6,10 139:1 141:1
142:1 152:7 163:10
164:14 165:22 171:6
172:4,7,10,20 173:8,11,
14,18,24 174:15 181:22
204:1 205:4 206:10,14,
16 209:7,9 241:4,6,9
243:9,16,23 245:8
246:5,7 248:14,18,20
249:18 250:12 251:23
252:5 253:8 256:8,13,
25 262:6 264:6 265:23
266:3 275:10

**Workday** 129:14

**worked** 10:10 15:7
16:1,15,19 17:19 18:22,
24 19:11,15 20:3,9,11,
25 24:5 43:24 80:15
84:21 113:21 122:10
130:1,8,10,23,24
136:22 138:4,7,22
139:25 162:8 171:8,11,
16,20 174:1,11 190:5
211:15 216:10 217:8
244:19 245:1,2 277:11

**workers** 100:18 252:2

**workforce** 96:12
123:17 126:8

**working** 9:12 17:23
18:7 19:4 23:21 24:15,
23 25:5 30:12,15,19
31:11 33:25 34:10
35:13 36:21 50:4,21,22
52:16,19 63:11 64:14,
20 65:11 70:16,19
83:19 84:4 85:3 94:7,22
105:13 106:2 130:16
132:9 133:12 138:24
139:10,16 157:3,18
160:3 172:12,16 173:1,
4,22 211:20 216:19,21,
24 245:25 256:3
258:13,15 259:3 278:9

**works** 26:4,6,10,14,17,
21 53:16,21,23 76:22
79:17,20 132:24 216:25
217:1

**workweek** 96:13 97:16
106:11 138:14,17

**workweeks** 194:17

**World** 17:25 18:8
216:25

**worth** 102:4,8,22

**Wow** 191:19 254:7

**write** 120:7 144:23
184:15

**writing** 38:13 99:16
104:5 118:8,10 122:22
151:13 164:1 165:2
180:4 203:22 221:21
231:6,18 272:21

**written** 29:25 117:2
120:8 134:8 138:18
158:19 159:14,18,20

ELIZABETH ORTIZ
APRIL 03, 2023

JOB NO. 568002

219:6 220:12 271:23
272:5,11,24 273:6
274:2,15

**wrong** 58:5 105:21

**wrote** 83:10 104:4
106:8 160:18 161:1
164:5 213:17

---

**X**

---

**XXX** 156:22

---

**Y**

---

**year** 16:14 17:1,12
24:13 30:21 142:20
241:17 242:9,10 246:7,
17 248:6 254:8,13
261:22

**year,'** 254:9

**year-and-a-half**
248:13

**years** 15:10 17:7 18:10,
20 19:3 94:10 145:1,21
170:18,23 171:1,22
173:21,24 174:12
179:5,8,13 224:18
225:4 226:24 244:18
247:18

**York** 7:11,12 27:1,4,13
28:12,17 29:4,17 30:1
32:7,25 33:6,22 41:2,
11,16,17 43:10,15
49:14,23 50:5,10,14,23
51:8,15,18,23 52:17
55:12,17 62:7 70:15
80:16 81:17 83:20,24
84:4,22 85:4,9,20
94:15,22 95:2 96:15
101:8 105:13 113:22
117:12 118:24 119:4,7,
14 121:11,17,18,20
122:10,14 124:4 126:8
127:2 130:16,25 132:10
133:2,4,8,13,20,25
138:7 139:9,16 145:13,
16 146:1 147:10 149:22
152:16 153:1,11,25
154:8,12,23,25 157:1,
16 158:2,13 160:25
161:19 162:8,17 165:17

169:2 171:9,16,21
172:8,14,19 173:3,13
174:1,11,21 177:10
178:5 182:11,13,23
183:20 185:1,20,23
186:1,5,9 188:15 190:5,
14 193:5 194:18,24
196:2,15,21 197:9
199:5 203:6,9 204:2,16
205:4,15,25 206:9,19
211:16 212:10 215:5
216:21 225:8 228:21
234:16 237:1,6 249:2
258:9 260:24 261:14
264:15,18 265:11,12
266:6,14,21 267:8
268:3 275:16

**Yorkers** 157:4,19

**younger** 56:15

ELIZABETH ORTIZ                                    JOB NO. 568002
APRIL 03, 2023

1              ERRATA SHEET

2   CASE NAME:    SELENA STALEY, VIVIAN HOLMES, and
                  OLIVE IVEY, on behalf of themselves
3                 and all others similarly situated
                  v. FSR INTERNATIONAL HOTEL INC.
4                 d/b/a FOUR SEASONS HOTELS AND
                  RESORTS, HOTEL 57 SERVICES, LLC,
5                 HOTEL 57, LLC, TY WARNER HOTELS &
                  RESORTS, LLC, and H. TY WARNER.
6   DATE OF DEPOSITION:   4-3-23
    WITNESS' NAME:   ELIZABETH ORTIZ
7
    PAGE/LINE(S)/      CHANGE              REASON

| | | | |
|---|---|---|---|
| 19 | 25 | From: "employer's at Hotel 57" | Clarification |
| | | To: "employer is Hotel 57 Services, LLC" | |
| 20 | 23 | From: "Hotel 57"  To: "Hotel 57 Services, LLC" | Clarification |
| 21 | 8 | From: "employer's at Hotel 57" | Clarification |
| | | To: "employer is Hotel 57 Services, LLC " | |
| 32 | 20 | From: "That's"   To: "That was" | Clarification |
| 36 | 17 | From: "people"   To: "people working in the building" | Clarification |
| 74 | 11 | Remove: "I mean--" | Clarification |
| 75 | 1-16 | From: "my direct report is--would be" | Clarification |
| | | To: "I directly report to" | |
| 76 | 5 | Remove: "and" | Clarification |
| 76 | 7 | Remove: "and" | Clarification |
| 80 | 1-2 | Remove: "--like, I don't know--" | Clarification |
| 80-81 | 25-1 | Remove: "--I would have been given direction--" | Clarification |
| 95 | 16 | Remove: "given" | Clarification |
| 95 | 18 | Remove: "that" | Clarification |
| 95 | 19 | Remove: "that we" | Clarification |
| 95 | 19 | From: "prepared"  To: "prepapre" | Clarification |
| 95 | 20 | Remove: "the distribution" | Clarification |
| 98 | 6-7 | Remove: "in the--if--typically, and--yeah. Yes." | Clarification |
| 100 | 2 | From: "we closed"  To: "when we temporarily closed" | Clarification |
| 115 | 1 | Remove: "No" | Clarification |

20        _____
                ELIZABETH ORTIZ
21

22  SUBSCRIBED AND SWORN TO
    BEFORE ME THIS 12th DAY
23  OF  June  , 2023.

    _____
24        NOTARY PUBLIC

25  MY COMMISSION EXPIRES  09-26-2026

CHANDRANIE DARSAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6441354
Qualified in New York County
Commission Expires September 26, 2026

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

1                          ERRATA SHEET

2   CASE NAME:        SELENA STALEY, VIVIAN HOLMES, and
                      OLIVE IVEY, on behalf of themselves
3                     and all others similarly situated
                      v. FSR INTERNATIONAL HOTEL INC.
4                     d/b/a FOUR SEASONS HOTELS AND
                      RESORTS, HOTEL 57 SERVICES, LLC,
5                     HOTEL 57, LLC, TY WARNER HOTELS &
                      RESORTS, LLC, and H. TY WARNER.
6   DATE OF DEPOSITION:    4-3-23
    WITNESS' NAME:   ELIZABETH ORTIZ
7

    PAGE/LINE(S)/        CHANGE                    REASON

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 115 | 12-13 | Remove: "all at once. I mean, there were people" | Clarification |
| 115 | 14-15 | From: "people in the building, but there have been | Clarification |
|  |  | people in the building" |  |
|  |  | To: "people working in the hotel and there have |  |
|  |  | been people working in the hotel" |  |
| 116 | 25 | Remove: "Either I did or--" | Clarification |
| 140 | 20 | From: "expectation, becasue" | Clarification |
|  |  | To: "Expectation she would be because" |  |
| 140 | 20-21 | Remove: "I don't think -- I don't think we knew." | Clarification |
| 140 | 22 | Remove: "holding onto, like" | Clarification |
| 140 | 24 | From: "expectation." | |
|  |  | To: "expectation we would need to temproarily lay | Clarification |
|  |  | her off." |  |
| 141 | 7-8 | Remove: "--you know, where" | |
| 141 | 8 | From: "weeks at the time," | Clarification |
|  |  | To: "expected to only be weeks, then" |  |
| 141 | 9 | Remove: "now" | Clarification |
| 141 | 16 | From: "dates." | Clarification |
|  |  | To: "dates, and we continue to plan for re-opening." |  |
| 142 | 21 | From: "2021." | Clarification |
|  |  | To: "2021. And it is the Hotel's excpectation that it |  |
|  |  | will reopen." |  |

19

20          _Bl.Ortiz_
21          _____
            ELIZABETH ORTIZ

22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS _12th_ DAY
23   OF _June_____, 2023.
     _Chandranie Darsan_____
24          NOTARY PUBLIC

25   MY COMMISSION EXPIRES _09-26-2026_

CHANDRANIE DARSAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6441354
Qualified in New York County
Commission Expires September 26, 2026

ELIZABETH ORTIZ                                              JOB NO. 568002
APRIL 03, 2023

```
 1                    ERRATA SHEET

 2   CASE NAME:    SELENA STALEY, VIVIAN HOLMES, and
                   OLIVE IVEY, on behalf of themselves
 3                 and all others similarly situated
                   v. FSR INTERNATIONAL HOTEL INC.
 4                 d/b/a FOUR SEASONS HOTELS AND
                   RESORTS, HOTEL 57 SERVICES, LLC,
 5                 HOTEL 57, LLC, TY WARNER HOTELS &
                   RESORTS, LLC, and H. TY WARNER.
 6   DATE OF DEPOSITION:    4-3-23
     WITNESS' NAME:    ELIZABETH ORTIZ
 7
```

| PAGE/LINE(S)/ | | CHANGE | REASON |
|---|---|---|---|
| 144 | 7 | Remove: "on-- actually on a regular basis" | Clarification |
| 144 | 13 | From: "were on"  To: "were on temporary" | Clarification |
| 145 | 7 | From: "this."  To: "when the hotel will reopen." | Clarification |
| 147 | 5-6 | Remove: "it would be a matter-- it would be" | Clarification |
| 150 | 5-7 | Remove: "Well, I think it's the operator known as Four | Clarification |
| | | Seasons, then it's Hotel 57 Services, LLC, then it's | |
| | | the-- and then the ownership. So" | |
| 150 | 8-9 | From: "there's the ownership entity, there's the | Clarification |
| | | operator entity, then there's the property" | |
| | | To: "It's the ownership entity, the operator entity, | |
| | | and the property" | |
| 151 | 20 | Remove: "Can Hotel 57 Services, LLC-" | Clarification |
| 151 | 20 | From: "it"  To: "It" | Clarification |
| 151 | 25 | Remove: "the--" | Clarification |
| 152 | 1-2 | Remove: "that represents Mr. Warner" | Clarification |
| 152 | 5-6 | Remove: "I mean, my-- you know, I haven't spoken | Clarification |
| | | with Cahty in a long time." | |
| 153 | 17 | Remove: "-- the call for-- whatever" | Clarification |
| 159 | 21 | From: "it."  To: "it were." | Clarification |
| 164 | 10-12 | Remove: "and I can't-- this, I think specifically, is | Clarification |
| | | from my office, based on conversations | |
| | | we would have had." | |

```
20        [signature: Bl Ortiz]
          ELIZABETH ORTIZ

22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS 12th DAY
23   OF June       , 2023.
     [signature: Chandranie Darsan]
24        NOTARY PUBLIC

25   MY COMMISSION EXPIRES 09-26-2026
```

CHANDRANIE DARSAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6441354
Qualified in New York County
Commission Expires September 26, 2026

```
 1                     ERRATA SHEET

 2    CASE NAME:    SELENA STALEY, VIVIAN HOLMES, and
                    OLIVE IVEY, on behalf of themselves
 3                  and all others similarly situated
                    v. FSR INTERNATIONAL HOTEL INC.
 4                  d/b/a FOUR SEASONS HOTELS AND
                    RESORTS, HOTEL 57 SERVICES, LLC,
 5                  HOTEL 57, LLC, TY WARNER HOTELS &
                    RESORTS, LLC, and H. TY WARNER.
 6    DATE OF DEPOSITION:    4-3-23
      WITNESS' NAME:   ELIZABETH ORTIZ
 7
      PAGE/LINE(S)/        CHANGE              REASON
 8
```

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 189 | 8-11 | Remove: "and we wanted to make sure that-- I | Clarification |
| | | guess that we had the-- I don't know what we wanted | |
| | | to makre sure. I think that" | |
| 189 | 11 | From: "there"  To: "There" | Clarification |
| 197 | 24 | Remove: "under the--whatever" | Clarification |
| 197 | 25 | From: " employee, was" | Clarification |
| | | To: "nonunion employees who were" | |
| 198 | 1-2 | Remove: "or whatever, that other specification is | Clarification |
| | | privy to confidential information." | |
| 201 | 15 | From: "employee;"  To: "employee who has" | Clarification |
| 201 | 15-16 | Remove: "but she 's classified under the FLSA as | Clarification |
| | | an administrative." | |
| 201 | 17-19 | Remove: "I forget what all the-- that particualr-- what | Clarification |
| | | the hell's it called?-- classification is." | |
| 201 | 25 | Remove: "I said there were the-- wait. | Clarification |
| 202 | 1-2 | Remove: "hold on a second. Did everybody get that | Clarification |
| | | money? Yes, they did. Okay. Yeah. | |
| 202 | 3 | From: "managers:"  To: "managers, they" | Clarification |
| 202 | 6 | From: "hourly"  To: "hourly non exempt employees." | Clarification |
| 214 | 19 | From: "been eliminated"  To: "not been followed" | Clarification |
| 214 | 23 | Remove: "have been taken out of this agreement" | Clarification |
| 218 | 15 | Remove: "till" | Clarification |

```
19

20        _BUOtiz_____
              ELIZABETH ORTIZ
21

22    SUBSCRIBED AND SWORN TO
      BEFORE ME THIS 12th DAY
23    OF June      , 2023.
      ChandranieDarsan
24          NOTARY PUBLIC

25    MY COMMISSION EXPIRES 09-26-2026
```

CHANDRANIE DARSAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6441354
Qualified in New York County
Commission Expires September 26, 2026

ELIZABETH ORTIZ                                                    JOB NO. 568002
APRIL 03, 2023

```
1                      ERRATA SHEET

2   CASE NAME:    SELENA STALEY, VIVIAN HOLMES, and
                  OLIVE IVEY, on behalf of themselves
3                 and all others similarly situated
                  v. FSR INTERNATIONAL HOTEL INC.
4                 d/b/a FOUR SEASONS HOTELS AND
                  RESORTS, HOTEL 57 SERVICES, LLC,
5                 HOTEL 57, LLC, TY WARNER HOTELS &
                  RESORTS, LLC, and H. TY WARNER.
6   DATE OF DEPOSITION:   4-3-23
    WITNESS' NAME:  ELIZABETH ORTIZ
7
    PAGE/LINE(S)/      CHANGE              REASON
8
```

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 222 | 2 | From: "have to look at it" To: "have it to look at" | Clarification |
| 224 | 5 | From: "not closed." | Clarification |
|  |  | To: "not closed and  you are not permanentlay laid off." |  |
| 225 | 12 | From: "not closed." | Clarification |
|  |  | To: "not closed and they are not permanentaly laid off." |  |
| 226 | 24 | Remove: "Yeah." | Clarification |

```
20        _____
              ELIZABETH ORTIZ
21

22   SUBSCRIBED AND SWORN TO
     BEFORE ME THIS 12th DAY
23   OF June          , 2023.

         NOTARY PUBLIC
24

25   MY COMMISSION EXPIRES  09-26-2026
```

CHANDRANIE DARSAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01DA6441354
Qualified in New York County
Commission Expires September 26, 20 26