# EXHIBIT E

**Page 1**

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   SELENA STALEY, VIVIAN        )

4   HOLMES, and OLIVE IVEY,      )

5   on behalf of themselves      )

6   and all others similarly     )

7   situated,                    )

8        Plaintiffs,             )

9   -against-                    ) No. 22-CV-6781 (JSR)

10  FOUR SEASONS HOTELS AND      )

11  RESORTS, HOTEL 57            )

12  SERVICES, LLC, HOTEL 57,     )

13  LLC, TY WARNER HOTELS &      )

14  RESORTS, LLC, and H. TY      )

15  WARNER,                      )

16        Defendants.            )

17        The videotaped deposition of CATHY

18  HWANG, called as a witness for examination, taken

19  pursuant to the Federal Rules of Civil Procedure of

20  the United States District Courts pertaining to the

21  taking of depositions, taken via Zoom video

22  conference before JACQUELINE M. TIMMONS, a Notary

23  Public within and for the County of DuPage, State

24  of Illinois, and a Certified Shorthand Reporter of

**Page 2**

1   said state, at 280 Chestnut Avenue, Westmont,

2   Illinois, on the 14th day of April, A.D. 2023 at

3   9:05 a.m.

4

5   PRESENT:

6

7        BRUSTEIN LAW PLCC,

8        (299 Broadway, 17th Floor,

9        New York, New York  10007,

10       212-233-3900), by:

11       MR. EVAN CRAIG BRUSTEIN,

12       evan@brusteinlaw.com,

13            and

14       RISMAN & RISMAN, P.C.,

15       (299 Broadway, 17th Floor,

16       New York, New York  10007,

17       212-233-6400), by:

18       MS. MAYA RISMAN,

19       info@risman-law.com,

20            appeared via Zoom Video Conference on

21            behalf of the Plaintiffs;

22

23

24

**Page 3**

1   PRESENT (Continued):

2

3        SMITH GAMBRELL RUSSELL,

4        (1301 Avenue of the Americas, 21st Floor,

5        New York, New York 10019,

6        212-218-8760), by:

7        MS. KATHRYN T. LUNDY,

8        klundy@sgrlaw.com,

9            appeared via Zoom Video Conference on

10           behalf of the Defendants Hotel 57

11           Services, LLC; Hotel 57, LLC; Ty Warner

12           Hotels & Resorts, LLC, H. Ty Warner, and

13           the deponent;

14

15       SMITH GAMBRELL RUSSELL,

16       (311 South Wacker Drive, Suite 3000,

17       Chicago, Illinois  60606,

18       312-360-6000), by:

19       MR. JAMES J. BOLAND,

20       jboland@sgrlaw.com,

21           appeared on behalf of the Defendants

22           Hotel 57 Services, LLC, Hotel 57, LLC,

23           Ty Warner Hotels & Resorts, LLC, H. Ty

24           Warner, and the deponent;

**Page 4**

1   PRESENT (Continued):

2

3        STOKES & WAGNER, ALC,

4        (903 Hanshaw Road,

5        Ithaca, New York  14850,

6        607-257-5165), by:

7        MR. PAUL ERIC WAGNER,

8        pwagner@stokeswagner.com,

9            appeared via Zoom Video Conference on

10           behalf of the Defendant FSR

11           International Hotels, Inc.

12

13  ALSO PRESENT:

14       MS. AMANDA YONUSHATIS, The Videographer.

15

16  REPORTED BY:  JACQUELINE M. TIMMONS,

17               C.S.R., R.M.R., R.D.R.

18               Certificate No. 84-2949.

19

20

21

22

23

24



Page 5

1    THE VIDEOGRAPHER:  This is videotape No. 1 to
2  the videotaped deposition of Cathy Hwang in the
3  matter of Selena Staley, et al., versus FSR
4  International Hotel, Incorporated, being heard
5  before the United States District Court, Southern
6  District of New York, Case No. 22-CV-6781.
7      This deposition is being held at
8  208 Chestnut -- Chestnut Ave. in Westmont,
9  Illinois, on April 14, 2023, at 9:06 a.m.
10     My name is Amanda.  I'm the
11  videographer, Amanda, and the court reporter is
12  Jacqueline Timmons.
13     Counsel, will you please introduce
14  yourselves and affiliations, and the witness will
15  be sworn.
16    MR. BRUSTEIN:  Good morning.  Evan Brustein
17  Brustein Law, on behalf of the plaintiffs.
18     And I believe it's 280, not 208 Chestnut
19  Ave., just --
20    MS. HWANG:  That's correct.  It's 280 Chestnut
21  Avenue.
22    MS. RISMAN:  Maya Risman, Risman & Risman on
23  behalf of plaintiffs.
24    MR. BOLAND:  Jim Boland from Smith Gambrell

Page 6

1  Russell on behalf of the Warner defendants and
2  Ms. Hwang.
3    MS. LUNDY:  Kathryn Lundy of Smith Gambrell
4  and Russell, also on behalf of the Warner
5  defendants and Ms. Hwang.
6    MR. WAGNER:  Paul Wagner of Stokes Wagner on
7  behalf of FSR International Hotels, Inc.
8    MS. HWANG:  Cathy Hwang, the Chief Financial
9  Officer of Ty Warner Hotels & Resorts.
10     (WHEREUPON, the witness was duly
11     sworn.)
12     CATHY HWANG,
13  called as a witness herein, having been first duly
14  sworn, was examined and testified as follows:
15     EXAMINATION
16  BY MR. BRUSTEIN:
17    Q.   Good morning, Ms. Hwang.
18    A.   Good morning.
19    Q.   For today's purposes, do you prefer that
20  I call you Cathy or Ms. Hwang?
21    MR. BOLAND:  Ms. Hwang.
22    MR. BRUSTEIN:  Thank you, Mr. Boland, but I'm
23  asking the witness.
24    MR. BOLAND:  And I'm telling you, you're going

Page 7

1  to call the witness Ms. Hwang.  Thank you.
2    MR. BRUSTEIN:  And I hope that this is the
3  last question you answer on behalf of the witness.
4  BY MR. BRUSTEIN:
5    Q.   Ms. Hwang, I represent the plaintiffs in
6  this action in the Southern District of New York.
7     Are you represented by counsel today?
8    A.   Yes.
9    Q.   And what are the names or name of the
10  attorneys that are representing you today?
11    A.   Jim Boland and Kathryn Lundy.
12    Q.   And what law firm are they with?
13    A.   Freeborn, which has recently been
14  changed to SGR.  I don't remember the full name of
15  the firm.  Smith -- you have to tell me the rest.
16    MR. BOLAND:  Whatever you remember.
17  BY THE WITNESS:
18    A.   SGR.
19  BY MR. BRUSTEIN:
20    Q.   And are you going to allow Mr. Boland to
21  decide what you are referred to today?
22    A.   I prefer to be addressed as Cath --
23  Ms. Hwang.
24    Q.   Not a problem, Ms. Hwang.  Thank you.

Page 8

1    A.   Thank you.
2    Q.   I will be asking a series of questions
3  today, and the reporter will be recording your
4  answers.  As I said, I represent the plaintiffs in
5  this action in the Southern District of New York.
6     You must give verbal responses.  Please
7  do not nod your head or say "uh-huh."  I'm looking
8  to find out everything you know regarding the facts
9  and circumstances surrounding the lawsuit.  For
10  that reason, I'm looking for complete answers.
11     Is that understood?
12    A.   Yes.
13    Q.   Please keep your voice up and speak
14  clearly so the court reporter can transcribe the
15  deposition accurately.  Do you understand?
16    A.   Yes.
17    Q.   Please wait for me to finish asking the
18  question before you answer.  This makes it easier
19  for the court reporter to take down what we are
20  saying and will get us through the deposition
21  quicker, okay?
22    A.   Yes.
23    Q.   If you do not understand a question,
24  tell me you don't understand, and I will rephrase



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
9–12

Page 9

1  it, okay?
2      A.   Okay.
3      Q.   If you do not hear any part of a
4  question, please tell me, and I will repeat it,
5  okay?
6      A.   Okay.
7      Q.   I only expect you to testify about
8  things you remember.  If you don't remember, tell
9  me you don't remember, okay?
10     A.   Okay.
11     Q.   This testimony is given under oath,
12  which is similar to the oath you would take on
13  stand at trial.  Do you understand that you took an
14  oath to give complete and truthful answers?
15     A.   Yes.
16     Q.   If you realize during the deposition
17  that an earlier answer was inaccurate or
18  incomplete, let me know, and I will give you a
19  chance to correct it, okay?
20     A.   Okay.
21     Q.   You may review the transcript that will
22  be generated by the court reporter from the
23  testimony today, and after your review, you may
24  correct any errors you find in the transcript.

Page 10

1      Do you understand that?
2      A.   Yes.
3      Q.   Now, if you make changes to the
4  transcript, I will be able to comment on those
5  changes at trial, okay?
6      A.   Okay.
7      Q.   We can take breaks during the
8  deposition.  If you need to take a break, let me
9  know.  But we can't take a break while a question
10  is pending.  This means that if I ask a question,
11  you must answer the question before we can take a
12  break, okay?
13     A.   Okay.
14     Q.   And if you answer a question, that means
15  that you both understand it and are answering it
16  truthfully, okay?
17     MR. BOLAND:  Object to the form.
18         You may answer.
19  BY THE WITNESS:
20     A.   Okay.
21  BY MR. BRUSTEIN:
22     Q.   Well, if you answer a question, that
23  means that you understood the question, okay?
24     MR. BOLAND:  Same objection.

Page 11

1      You can answer.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MR. BRUSTEIN:
5      Q.   Do you understand the rules of the
6  deposition for today?
7      A.   Yes.
8      Q.   How did you choose to be represented by
9  Mr. Boland?
10     A.   He -- he was referred from Mr. Warner's
11  personal attorney.
12     Q.   And did you do any research of
13  Mr. Boland before retaining him as an attorney?
14     A.   No.  Mr. Warner's attorney did so.
15     Q.   I'm sorry?
16     A.   Mr. Warner's attorney researched.  I did
17  not.
18     Q.   And who is Mr. Warner's attorney that
19  you're referring to?
20     A.   Greg Scandaglia.
21     Q.   Have you ever had your deposition taken
22  before?
23     A.   Yes.
24     Q.   How many times?

Page 12

1      A.   Once.
2      Q.   And what case was that?
3      A.   It was for a case against Montecito Club
4  in Santa Barbara.
5      Q.   And were you a plaintiff or defendant or
6  something else in that case?
7      A.   Defendant.
8      Q.   And what is your connection to --
9      A.   Oh --
10     Q.   -- Montecito?
11     A.   -- I'm sorry.  I need to correct.  We're
12  the plaintiff.
13     Q.   You were the plaintiff?
14     A.   Yes.
15     MR. BOLAND:  Object to the form.
16  BY MR. BRUSTEIN:
17     Q.   And why were -- why were you suing
18  Montecito?
19     A.   No, I don't remember the -- I believe it
20  was Mr. Root.  We were Montecito Country Club.  I
21  was representing as a corporate officer of the
22  club, and it was a lawsuit against Mr. Root.
23     Q.   And what is the corporate name for the
24  Montecito Country Club?



CATHY HWANG                                                    April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS              13–16

Page 13

1      MR. BOLAND:  Objection, vague.
2  BY THE WITNESS:
3      A.   It's Montecito Club, Montecito Country
4  Club.
5  BY MR. BRUSTEIN:
6      Q.   And who owns the Montecito Country Club?
7      A.   Montecito Country Club Property, LLC.
8      Q.   And who owns Montecito Country Club,
9  LLC?
10     MR. BOLAND:  Objection.
11  BY THE WITNESS:
12     A.   I -- I don't know the complex legal
13  entity structure.  It is -- there's many legal
14  structures, and it indirectly leads up to
15  Mr. Warner.
16  BY MR. BRUSTEIN:
17     Q.   When was that prior deposition?
18     A.   I believe it was either end of 2021
19  or -- or 2022 or earlier in 2023.
20     Q.   And is that case still pending?
21     A.   Yes.  To my knowledge, yes.
22     Q.   What was the basis for that lawsuit?
23     A.   It was easement encroachment.
24     Q.   Now, you said that there were other

Page 14

1  legal entities involved in -- in the ownership of
2  that company.  Are you an officer in each one of
3  those legal entities?
4      A.   Yes.
5      Q.   How many of those legal entities are you
6  an officer?
7      A.   I would estimate about 30 to 40 legal
8  entities.  I don't know the exact count.
9      Q.   And when you say 30 to 40 legal
10  entities, is that just related to the Montecito
11  Country Club or is that for all Ty Warner-related
12  companies?
13     A.   All Ty Warner-related companies.
14     Q.   And do you have the same title in each
15  one of the Ty Warner-related companies or different
16  titles?
17     A.   Same title.
18     Q.   And what title is that?
19     A.   Vice president/treasurer/secretary.
20     Q.   So you have three titles in each one of
21  those corporate entities?
22     A.   It's vice president slash secretary
23  slash treasurer.
24     Q.   How long have you known Ty Warner?

Page 15

1      A.   I worked for Mr. Warner for about six
2  years, a little over six years now.
3      Q.   And how long have you known him?
4      A.   I met him probably back in the mid
5  2000s.
6      Q.   When you say mid 2000s, is that like
7  2005?
8      A.   Yes.  I don't know the exact year.
9      Q.   How did you come to meet?
10     A.   I met him at my parents' place of
11  business.  He was a customer.
12     Q.   And what is your parents' place of
13  business?
14     A.   They have a dry cleaners.
15     Q.   And were you working at that dry
16  cleaners when you met him?
17     A.   Yes.  I was visiting and working.
18     Q.   What was your job at the dry cleaners
19  when you met him?
20     A.   I was not an official employee there.  I
21  was just stopping in to help out from time to time.
22     Q.   What type of tasks did you do to help
23  out at the dry cleaners when you met Mr. Warner?
24     A.   I worked at the front receiving

Page 16

1  customers.
2      Q.   Now, you said that you were a VP in
3  these companies.  Are you the VP of finance for the
4  30 or 40 companies that you work with in connection
5  with Mr. Warner, or something else?
6      A.   My officer title for all the companies
7  is vice president/treasurer/secretary.  I am the
8  chief financial officer for Ty Warner Hotels &
9  Resorts, but I'm also the vice
10  president/secretary/treasurer of Ty Warner Hotels &
11  Resorts.
12     Q.   Do you -- do you have other titles for
13  the companies that you work for besides your
14  official title?
15     MR. BOLAND:  Objection, vague.
16        You can answer.
17  BY THE WITNESS:
18     A.   No.
19  BY MR. BRUSTEIN:
20     Q.   Are you the VP of finance or chief
21  financial officer for any other companies besides
22  Ty Warner Hotels & Resorts?
23     A.   To be clear, I'm the chief financial
24  officer for Ty Warner Hotels & Resorts, and I'm the



Page 17

1   vice president, not vice president of finance, of
2   all the other --
3       Q.   Thank you for --
4       A.   -- legal entities.
5       Q.   Thank you for clarifying.
6            Have you ever testified as a witness
7   outside of the one deposition?
8       A.   No.
9       Q.   Now, you said that you were involved in
10  that other lawsuit as an officer.  Were you
11  involved in the decision to bring that lawsuit?
12      A.   No.
13      Q.   What is your involvement in that lawsuit
14  other than as an officer?  Did you have any
15  connection other than being deposed?
16      A.   No.
17      Q.   Have you ever been convicted of a crime?
18      A.   No.
19      Q.   What e-mail address or addresses do you
20  use?
21      A.   My work e-mail address is
22  chwang@tymail.com.
23      Q.   Do you have any e-mail addresses for any
24  of the other entities that you are a VP or

Page 18

1   secretary/treasurer?
2       A.   I may be assigned to another e-mail
3   address for Montecito Country Club, but that's all
4   forwarded to my tymail.com address.
5       Q.   Do you have any personal e-mail
6   addresses that you use for any non-personal
7   purposes, such as communicating with Mr. Warner?
8       A.   No.
9       Q.   Do you have -- how many cell phones do
10  you have?
11      A.   One personal cell phone and one work
12  cell phone.
13      Q.   And do you do any business on your
14  personal cell phone?
15      A.   No.
16      Q.   Does Mr. Warner have your personal cell
17  phone number?
18      A.   I don't believe so.
19      Q.   Do you have any social media presence?
20      A.   No.
21      Q.   Are you on LinkedIn?
22      A.   No.
23      Q.   How come?
24      A.   I just choose not to be.

Page 19

1       Q.   Facebook?
2       A.   No.
3       Q.   Apart from the case that you were
4   deposed in, have you been involved in -- and your
5   deposition here today, have you had any involvement
6   in any other litigation involving Mr. Warner or his
7   entities?
8       A.   No.
9       Q.   Is there any condition, either mental,
10  medical or physical, that would impair your ability
11  to testify truthfully today?
12      A.   No.
13      Q.   Are you taking medication of any kind
14  that would impair your ability to testify
15  truthfully today?
16      A.   No.
17      Q.   And is there any medication that you
18  should have taken that you haven't taken in the
19  last 24 hours that would impair your ability to
20  testify truthfully?
21      A.   No.
22      Q.   And have you taken any drugs or alcohol
23  in the last 24 hours?
24      A.   No.

Page 20

1       Q.   Did you review any documents to prepare
2   for today's deposition?
3       MR. BOLAND:  Objection.  That's a yes or no
4   question.
5       MR. BRUSTEIN:  I don't believe that that's a
6   proper objection.
7       MR. BOLAND:  Well, it's the objection I'm
8   making.  It's a yes or no question, and then we'll
9   get into things.  It's a yes or no for right now.
10           You can answer.
11      MR. BRUSTEIN:  You cannot -- Mr. Boland, we
12  are very early on, and the question was did you
13  review anything.  We do not need you to narrate the
14  questions.
15           You have already interfered by answering
16  for Ms. Hwang as to how she would like to be
17  referred, which she's already shown she's capable
18  as a witness to answer the questions, and I would
19  ask that you please not interfere.
20      MR. BOLAND:  It's a yes or no question.
21           You may -- you may answer.
22      MR. BRUSTEIN:  There are no speaking
23  objections and stop coaching the witness.
24      MR. BOLAND:  I'm not coaching the witness,



Page 21

1   counsel. I'm protecting privilege. There's a
2   privilege line that could be breached here, and I'm
3   allowing her to go into it slowly. That's all.
4   You can get your answers. If you could please --
5        MR. BRUSTEIN: Excuse me, I would just ask for
6   clarification from the videographer if Mr. Boland
7   is also on camera for this deposition.
8        THE VIDEOGRAPHER: He is not on camera.
9        MR. BRUSTEIN: I would ask that he be part of
10  the video camera recording for this. It appears
11  that he wants to continue speaking in an improper
12  way, and I'd like that to be captured for the
13  record.
14       MR. BOLAND: I think I'm captured, but that's
15  fine. Go ahead.
16  BY MR. BRUSTEIN:
17       Q.   Did you review any documents to prepare
18  for today's deposition?
19       A.   Yes.
20       Q.   What documents did you review?
21       MR. BOLAND: Okay. I'm going to object as
22  privileged only to the extent that you reviewed
23  documents provided to you by counsel or with
24  counsel.

Page 22

1        If you did a review of documents outside
2   of that that was with counsel or provided by
3   counsel, please feel free to answer the question.
4   The other one is privileged.
5        MR. BRUSTEIN: That's actually not how you
6   actually spoke in a recorded deposition where you
7   said it was completely fair game as long as it
8   wasn't asked where she got the source. So I
9   understand that you feel very differently when
10  you're asking questions and taking depositions and
11  defending them, but there's a record for a reason.
12       MR. BOLAND: What you said was just not even
13  close to being true.
14       You may proceed.
15  BY MR. BRUSTEIN:
16       Q.   Ms. Hwang -- Ms. Hwang, I'm not asking
17  you if Mr. Boland or any other attorney provided
18  documents to you. I'm simply asking if you
19  reviewed any documents to prepare for today's
20  deposition.
21       MR. BOLAND: Oh, I think she answered.
22  Objection, asked and answered.
23       You can answer again.
24  BY THE WITNESS:

Page 23

1        A.   I reviewed documents prior to today's
2   deposition. But --
3   BY MR. BRUSTEIN:
4        Q.   And --
5        A.   -- it was really in preparation for what
6   was supposed to be scheduled for today, my
7   deposition as the corporate representative.
8        So the question is a little unclear to
9   me.
10       Q.   And when you say as corporate
11  representative, are you referring to a 30(b)(6)
12  deposition?
13       A.   Yes.
14       Q.   Outside of -- and did any of those
15  documents refresh your recollection?
16       A.   Some e-mails.
17       Q.   Which e-mails refreshed your
18  recollection?
19       A.   Just some e-mails exchanged between
20  myself and Four Seasons corporate.
21       Q.   And did anything else refresh your
22  recollection other than e-mails?
23       A.   No.
24       Q.   Now --

Page 24

1        A.   May I take a break?
2        Q.   -- did you graduate from college?
3        A.   May I take a break?
4        Q.   You want to take a break?
5        A.   Yes.
6        Q.   We can take a break.
7        A.   Okay.
8        Q.   How long do you need?
9        A.   Just five minutes. Would that be okay?
10       Q.   Not a problem.
11       THE VIDEOGRAPHER: We are --
12  BY MR. BRUSTEIN:
13       Q.   Do you want to come back at 10:31? Or,
14  I guess, 9:31 for you.
15       A.   Okay.
16       THE VIDEOGRAPHER: We are going --
17       MR. BRUSTEIN: I don't need an hour and five
18  minutes.
19       THE VIDEOGRAPHER: -- off the record at
20  9:26 a.m.
21       (WHEREUPON, a recess was had.)
22       THE VIDEOGRAPHER: We are going back on the
23  record at 9:31 a.m.
24       MR. BOLAND: Did you want to clarify



Page 25

1  something?
2       THE WITNESS:  Yes.  I'd like to clarify a
3  statement I made earlier.
4            You asked if I was involved in any
5  litigation.  Just for completeness, I would like to
6  state that I personally, as an individual, am not
7  involved in any litigation.  However, as a
8  corporate officer, there's some legal matters that
9  I am involved in.
10 BY MR. BRUSTEIN:
11      Q.   Thank you for pointing that out.
12           What legal matters are you involved in
13 as a corporate officer?
14      A.   There's an open lawsuit against a
15 general contractor for installation of wallpaper at
16 Four Seasons Hotel New York.
17      Q.   And what corporate entity are you acting
18 as a corporate officer in that litigation?
19      A.   Hotel 57, LLC.
20      Q.   And what is your corporate officer title
21 for Hotel 57, LLC?
22      A.   Vice president/treasurer/secretary.
23      Q.   And what is your involvement as a
24 corporate officer in that litigation?

Page 26

1       A.   My -- my knowledge is institutional and
2  just rep -- just acting as a corporate officer and
3  owner's representative.
4       Q.   Are you the point person for that
5  litigation for Hotel 57, LLC?
6       A.   Can you clarify your question?
7       Q.   Are you the person acting on behalf of
8  Hotel 57, LLC, as the corporate officer to make
9  sure that litigation is handled properly?
10      A.   Yes.
11      Q.   And were you involved in the decision to
12 file that lawsuit?
13      A.   The owner made that decision to file the
14 lawsuit.
15      Q.   And who's the owner that made that
16 decision?
17      MR. BOLAND:  Objection, vague.
18 BY THE WITNESS:
19      A.   I'm sorry.  I'd like to state that it
20 was Mr. Warner.
21 BY MR. BRUSTEIN:
22      Q.   And were you involved in conversations
23 with Mr. Warner about the decision to file that
24 lawsuit about the wallpaper?

Page 27

1       A.   He discussed it with his attorney, Greg
2  Scandaglia.
3       Q.   After he discussed it with -- well,
4  without discussing any conversations he had with
5  his attorney, did you have conversations with
6  Mr. Warner about proceeding with litigation
7  involving wallpaper?
8       A.   I don't recall.
9       Q.   Well, was there any conversation had
10 before you ended up being the one responsible for
11 the wallpaper litigation for Hotel 57, LLC?
12      A.   My conversation was through counsel.
13      Q.   So you never spoke to Mr. Warner about
14 the decision to file or not file a lawsuit over
15 wallpaper?
16      A.   There were discussions about the
17 wallpaper matter, but I don't recall if I spoke to
18 him exactly about his decision.
19      Q.   And when was the wall -- do you mind if
20 we refer to that as the wallpaper lawsuit?
21      A.   Sure.
22      Q.   When was the wallpaper lawsuit filed?
23      A.   I don't know the exact date.
24      Q.   Was it in the six years that you were

Page 28

1  working as a corporate officer for Mr. Warner's
2  companies?
3       A.   Yes.
4       Q.   Do you know if it was before or after
5  March of 2020?
6       A.   Yes, it was after.
7       Q.   Is it still going on?
8       A.   Yes.
9       Q.   And where did you file that lawsuit?
10      MR. BOLAND:  Objection, vague.
11           Just, counsel, are -- the "you," are you
12 referring to Ms. Hwang personally?
13      MR. BRUSTEIN:  No, I'm referring to her in her
14 corporate officer role, but if she's a -- she's in
15 charge of the litigation for Hotel 57, LLC.
16      MR. BOLAND:  Okay.  So I'm going to object.
17      MR. BRUSTEIN:  So --
18      MR. BOLAND:  It's still value, use of the
19 term.
20           You can answer.
21 BY THE WITNESS:
22      A.   I believe it's in the state of New York.
23 BY MR. BRUSTEIN:
24      Q.   And is that state or federal court?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
29–32

Page 29

1    A.   I don't know.
2    Q.   And did you review the complaint before
3  it was filed in court?
4    A.   Yes.
5    Q.   And did you make sure that everything in
6  that complaint was accurate before starting a
7  lawsuit on behalf of Hotel 57, LLC?
8    A.   Yes.
9    Q.   And was it all accurate?
10    A.   Yes.
11    Q.   You said legal matters.  Were there
12  other legal matters that you were involved in
13  besides the wallpaper lawsuit?
14    A.   Myself as an individual, no.
15    Q.   As a corporate officer, were there other
16  legal matters that you were involved in?
17    A.   Yes.
18    Q.   How many others?
19    A.   I don't know exactly.
20    Q.   More or less than five?
21    A.   Less than five.
22    Q.   What -- and is that less than five
23  including the wallpaper lawsuit?
24    A.   Yes.

Page 30

1    Q.   And is that including this case?
2    A.   Yes.
3    Q.   So what is another lawsuit that you're
4  involved in as a corporate officer?
5    A.   There's a -- there's a termination that
6  has been filed with Four Seasons.
7    Q.   When you say "termination," what does
8  that mean?
9    A.   Termination of management agreement.
10    Q.   And who initiated that lawsuit?
11    A.   Ty Warner Hotels & Resorts.
12    Q.   And who did Ty Warner Hotels & Resorts
13  initiate a termination of management agreement
14  with?
15    A.   Can you clarify your question?
16    Q.   Did Ty Warner Hotels & Resorts sue
17  someone or a company or legal entity to terminate a
18  management agreement?
19    A.   Four Seasons.
20    Q.   Is that the same Four Seasons as in this
21  lawsuit?
22    MR. BOLAND:  Objection, vague.
23      You can answer.
24  BY THE WITNESS:

Page 31

1    A.   I don't know if the legal -- if the
2  legal entity is the same, but I believe so.
3    MR. BRUSTEIN:  Mr. Boland, I'm going to ask
4  you to limit your objections to "objection."  There
5  are not speaking objections, and I believe that
6  you're aware of that.
7    MR. BOLAND:  I'm not speaking.  I'm just
8  providing a legal basis.  That's all.
9    MR. BRUSTEIN:  And that is not necessary.
10  Some might call it coaching, and I'd rather not
11  involve the court, but you can certainly continue
12  to object.
13    MR. BOLAND:  I will object as I see
14  appropriate under the rules in the Federal Rules of
15  Civil Procedure, counsel.  Thank you.
16  BY MR. BRUSTEIN:
17    Q.   Now, when you say that Ty Warner Hotels
18  & Resorts sued to terminate the management
19  agreement, what does that mean?
20    A.   Ty Warner Hotels & Resorts wished to
21  terminate its agreement with Four Seasons as the
22  operator of the hotel.
23    Q.   And when did Ty Warner Hotels & Resorts
24  initiate that lawsuit?

Page 32

1    A.   I believe it was either 2021 or '22.
2    Q.   And when in 2021 do you believe it was?
3    MR. BOLAND:  Object to the form.
4  BY THE WITNESS:
5    A.   I don't recall.
6  BY MR. BRUSTEIN:
7    Q.   Why does Ty Warner Hotels & Resorts want
8  to terminate or end the contract with Four Seasons?
9    A.   Ty Warner Hotels & Resorts believes that
10  operator's interests are not aligned with
11  ownership.
12    Q.   Now, what hotel or hotels are the
13  management agreements at issue in that lawsuit?
14    MR. BOLAND:  Object to the form.
15  BY THE WITNESS:
16    A.   The two hotels would be Four Seasons
17  Hotel New York and Four Seasons Resort Santa
18  Barbara.
19  BY MR. BRUSTEIN:
20    Q.   Is Ty Warner Hotels & Resorts -- when
21  did you -- withdrawn.
22      Do you believe that the operator of Four
23  Seasons Hotel New York has violated the management
24  agreement?



Page 33

1    MR. BOLAND:  Objection, foundation.
2        You can answer.
3    MR. BRUSTEIN:  We're going to have to call the
4  court if you keep coaching.
5    MR. BOLAND:  I'm not coaching the witness,
6  counsel.  I'm just making an objection, and she can
7  answer as she sees fit.
8    MR. BRUSTEIN:  You cannot comment on the
9  question form.  You can object.  That's it.
10   MR. BOLAND:  Have you ever made an objection
11 in court, counsel?
12       You may answer.
13 BY THE WITNESS:
14   A.   Can you repeat your question?
15 BY MR. BRUSTEIN:
16   Q.   Do you believe that the operator has
17 violated the hotel management agreement with
18 respect to Four Seasons Hotel New York?
19   MR. BOLAND:  Same objection.
20       You can answer.
21 BY THE WITNESS:
22   A.   Yes.
23 BY MR. BRUSTEIN:
24   Q.   How do you believe that they have

Page 34

1  violated it?
2    A.   I don't believe that Four Seasons was
3  acting as an agent in the best interests of the
4  ownership.
5    Q.   By doing what?
6    A.   An agent has a duty to maximize the
7  hotel's profitability, and that was not the case.
8    Q.   What -- when did you first believe that
9  the operator, Four Seasons, was not doing its duty
10 to maximize profits for the owner?
11   A.   I need you to clarify if you mean my
12 belief as an individual.
13   Q.   Sure.  As an individual, when did you
14 first believe?
15   A.   2017.
16   Q.   And why do you believe the interests are
17 not aligned?
18   A.   Upon review of financials, I do not
19 believe that the assets for the hotel is being
20 managed properly and the expenses are higher than
21 it should be.
22   Q.   And did you raise these concerns to the
23 Four Seasons back in 2017?
24   A.   I, myself, did not.

Page 35

1    Q.   Did anyone?
2    A.   The -- I'll let you finish the question.
3    Q.   No, no, no, please.  With Zoom, it can
4  be confusing.  So I don't mean to cut you off.
5    A.   But my predecessor, the former chief
6  financial officer, however, she did.
7    Q.   What was her name?
8    A.   Donna Snopek.
9    Q.   When did she leave the company or
10 companies?
11   A.   2019.
12   Q.   Do you know why she left?
13   A.   I don't know any reasons for her
14 termination.
15   Q.   She was terminated?
16   A.   Yes.
17   Q.   And who terminated her employment?
18   A.   Mr. Warner.
19   Q.   Who?
20   A.   The decision to terminate her was
21 Mr. Warner, but I -- an attorney was hired to
22 handle the termination personally.
23   Q.   Did she work in more than ten companies
24 or corporate entities for Mr. Warner?

Page 36

1    A.   Yes.
2    Q.   And was she terminated from all of those
3  corporate entities at the same time?
4    A.   Yes.
5    Q.   Prior to her termination, did she have
6  the same title in each one of those corporate
7  entities?
8    A.   Yes.
9    Q.   What was her corporate title back then?
10   MR. BOLAND:  Objection.
11 BY THE WITNESS:
12   A.   Her corporate officer title was the same
13 as mine, vice president/treasurer/secretary.
14 BY MR. BRUSTEIN:
15   Q.   You testified that you've been working
16 for Mr. Warner for approximately six years, I
17 believe; is that correct?
18   A.   Yes.
19   Q.   So did you and Ms. Snopek share the same
20 title prior to her termination?
21   A.   No.
22   Q.   What was your title prior to her
23 termination?
24   A.   Can you repeat the question?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
37—40

Page 37

1    Q.   Prior to Ms. Snopek's termination in
2  2019, what title or titles did you have for the
3  Warner entities?
4    A.   I was not an officer of Warner entities.
5    Q.   What was your position in the companies
6  prior to her 2019 termination?
7    A.   I was the senior financial analyst for
8  Ty Warner Hotels & Resorts.
9    Q.   Did you work for the other corporate
10  entities or just Ty Warner Hotels & Resorts back
11  before Ms. Snopek was terminated?
12    A.   I worked for Ty Warner Hotels & Resorts.
13    Q.   So you have only been a corporate
14  officer for approximately 30 Warner entities since
15  2019?
16    A.   Since 2020.
17    Q.   When in 2020 did you become a corporate
18  officer for approximately 30 of Mr. Warner's
19  entities?
20    A.   I don't recall.
21    Q.   Did you have to apply to get this
22  promotion?
23    A.   No.
24    Q.   Who promoted you to corporate officer

Page 38

1  for the 30 to 40 Warner entities?
2    MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4    A.   Mr. Warner.
5  BY MR. BRUSTEIN:
6    Q.   Did he discuss each one of the entities
7  individually with you or collectively?
8    A.   He did not discuss them individually
9  with me.
10    Q.   Did you know that you were going to be
11  corporate officer for 30 to 40 different entities?
12    A.   Yes.
13    Q.   How did you come to learn that you would
14  be a corporate officer for 30 to 40 corporate
15  entities?
16    A.   I was appointed as replacement for Donna
17  Snopek.
18    Q.   Did you have any knowledge of the 30 to
19  40 entities before you were appointed a corporate
20  officer in each one of them?
21    A.   Yes.  I was aware that she was the
22  legal, or the officer of all the legal entities,
23  the 30 to 40 legal entities.
24    Q.   But did you have involvement in any of

Page 39

1  the day-to-day operations of those 30 to 40
2  entities before you were appointed an officer in
3  them?
4    A.   I -- I supported Ms. Snopek, and I was
5  involved in communication with some of the entities
6  and some of the businesses.
7    Q.   Can you name all of the corporate
8  entities that you're an officer in?
9    A.   I can't name them off the top of my
10  head.
11    Q.   How many can you name?
12    A.   Maybe about ten.
13    Q.   Why don't you name the ten that you can
14  recall being a corporate officer of.
15    A.   Ty Warner Hotels & Resorts; Hotel 57,
16  LLC; 1260 BB Property, LLC; San Ysidro BB Property,
17  LLC; Montecito Club Property, LLC; A Fairway
18  Property, LLC; Sandpiper Golf Course or Golf Club
19  Property, LLC; Hot Springs, LLC; Tell Road, LLC; TY
20  Mex, LLC.
21    I believe that's ten.
22    Q.   Do you remember any others?
23    A.   It's a complex legal structure.  It
24  would take me a while to jog my memory on all legal

Page 40

1  entities.
2    Q.   Are you a corporate officer for more
3  than a hundred Warner entities?
4    A.   No.
5    Q.   I'm sorry, did you say no?
6    A.   No.
7    Q.   Now, for the corporate entities that you
8  named, do they all have employees?
9    A.   No.
10    Q.   Of the ones that you named, which ones
11  have actual employees?
12    MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14    A.   I believe all of them do except for
15  Hotel 57, LLC.
16  BY MR. BRUSTEIN:
17    Q.   Hotel 57, LLC, has zero employees?
18    A.   I believe all the entity -- all the
19  employees are in -- under a different legal entity.
20    Q.   And what's the front legal entity?
21    A.   Hotel 57 Services, LLC.
22    Q.   And how many employees does Hotel 57
23  Services, LLC, have?
24    A.   I don't know.



Page 41

1    Q.   Back in January of 2020, how many
2  employees did Hotel 57 Services have?
3    A.   I don't know the exact number.
4    Q.   Was it more or less than 500?
5    A.   I would have to guess.  If I was to
6  guess, I would say it was more than 500.
7    THE VIDEOGRAPHER:  Mr. Brustein --
8  BY MR. BRUSTEIN:
9    Q.   As a corporate officer, is it important
10  to know the number of employees?
11    MR. BOLAND:  Object to the form.
12  BY THE WITNESS:
13    A.   There's seasonality in these businesses.
14  The number of employees vary.
15    THE REPORTER:  Mr. Brustein, the videographer
16  needs you.
17    MR. BRUSTEIN:  Okay.
18    THE VIDEOGRAPHER:  Okay.  Mr. Brustein, I just
19  want to get on the record.  My boss wanted me to
20  clarify for you that this is okay with the two of
21  you -- he says it's prejudiced by the jury having
22  the guy in the shot, having the opposing attorney
23  in the shot.  I just want to make sure for the last
24  time -- this is the last time I will ask you,

Page 42

1  everything is good?  The shot has both of them in
2  it.  I just --
3    MR. BRUSTEIN:  We can have Ms. Hwang in the --
4  in the shot by herself.
5    THE VIDEOGRAPHER:  Okay.  Give me just a
6  second.
7        We are -- can we go off and I'll reframe
8  it.
9        We are going off the record at 9:57 a.m.
10        (WHEREUPON, discussion was had
11            off the record.)
12    THE VIDEOGRAPHER:  We are going back on the
13  record at 9:58 a.m.
14  BY MR. BRUSTEIN:
15    Q.   Now, you said that it's seasonal.  At
16  the high time for Hotel 57 Services, LLC, how you
17  many employees do you estimate that they had back
18  in January of 2020?
19    A.   Over 500.
20    Q.   And at the low time back in January 2020
21  for, you know, November 2019, you know, New Year's
22  happens to be high time, so in November 2019, what
23  was the low point of employees at Hotel 57
24  Services, LLC?

Page 43

1    MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3    A.   As I indicated, I don't know the exact
4  number of employees.  This is just a guess that I'm
5  giving you.
6  BY MR. BRUSTEIN:
7    Q.   And what's that based on?
8    A.   Based on my previous experience,
9  reviewing metrics and the performance of the hotel.
10    Q.   Now, where did you go to college?
11    A.   I went to University of Illinois at
12  Chicago.
13    Q.   And did you graduate?
14    A.   Yes.
15    Q.   What did you graduate with a degree in?
16    A.   Accounting.
17    Q.   And what year did you graduate?
18    A.   2001.
19    Q.   And where did you work after -- and did
20  you get any degrees after graduating from college?
21    A.   Yes.
22    Q.   What other degrees?
23    A.   Master's in accounting.
24    Q.   And when did you get that degree?

Page 44

1    A.   2002.
2    Q.   And where did you get that degree?
3    A.   University of Illinois Chicago.
4    Q.   And where did you work after graduating
5  with your Master's.
6    A.   ConAgra Foods.
7    Q.   I'm sorry?
8    A.   ConAgra Foods.
9    Q.   What position did you hold for that
10  company?
11    A.   Staff accountant.
12    Q.   And did you get any degrees after your
13  Master's in accounting?
14    A.   No.
15    Q.   How long did you work as the accountant
16  for ConAgra Foods?
17    A.   About two years.
18    Q.   Why did you stop working?
19    A.   The company was going through some
20  transition, and I left to seek opportunity
21  elsewhere.
22    Q.   And so what opportunity did you seek
23  next?
24    A.   I went to work for Nicor Gas.



CATHY HWANG                                          April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS          45—48

Page 45

1    Q.    And what's that?
2    A.    That's a gas utility company.
3    Q.    What did you do for them?
4    A.    I was a staff accountant.
5    Q.    And how big of a company is that?
6    A.    It provides gas for Northern Illinois.
7  It's large.
8    Q.    And how long did you work for them?
9    A.    Seven years.
10    Q.    And why did you stop working there?
11    A.    It was acquired by another company, and
12  the corporate function was being transitioned to
13  its headquarters out of state.
14    Q.    And then where did you go?
15    A.    I went to work at Navistar.
16    Q.    And what did you do for Navistar?
17    A.    I was a financial analyst.
18    Q.    And how long did you work for them?
19    A.    Two years.
20    Q.    And then what did you do?
21    A.    I went to work for TransUnion.
22    Q.    And what did you do for TransUnion?
23    A.    I was a senior financial analyst.
24    Q.    And how long did you work there?

Page 46

1    A.    Three years.
2    Q.    And then where did you go?
3    A.    I went to ConAgra Foods.
4    Q.    Is that the same ConAgra Foods that you
5  had been at initially?
6    A.    Yes.
7    Q.    Why did you go back to them?
8    A.    It was moving its headquarters back to
9  Chicago.
10    Q.    And so what year was it that you went
11  back to ConAgra Foods?
12    A.    2016.
13    Q.    And how long did you work there --
14    A.    Three months.
15    Q.    -- the second time?
16          Why only three months?
17    A.    Mr. Warner approached me with an
18  opportunity to work for his company.
19    Q.    Had you been speaking to Mr. Warner
20  since back in early 2000?
21    A.    No.  I was introduced to him in --
22    Q.    When were you --
23    A.    -- mid-2000, but I did not speak to him.
24  I did not see him for years.

Page 47

1    Q.    What was your relationship like with
2  Mr. Warner back in the early 2000s?
3    A.    There was no relationship.  I was
4  introduced to him.
5    Q.    Who introduced you to him?
6    A.    My mother.
7    Q.    Did you get his phone number when she
8  introduced you to him?
9    A.    No.
10    Q.    Did you exchange e-mails with Mr. Warner
11  when your mother introduced him?
12    A.    No.
13    Q.    Did you ever see Mr. Warner outside of
14  your parents' store?
15    A.    No.
16    Q.    How many times did you see Mr. Warner at
17  your parents' store?
18    A.    Maybe three times.
19    Q.    So why did he contact you more than a
20  decade later?
21          MR. BOLAND:  Objection, foundation.
22  BY THE WITNESS:
23    A.    He was sharing, and he asked me what I
24  did.  And I said I work for -- I'm a financial

Page 48

1  analyst.  So he just struck up a conversation.  It
2  was just small talk.
3  BY MR. BRUSTEIN:
4    Q.    That was back in early 2000?
5    A.    No, in 2016.
6    Q.    How did you meet him again in 2016?
7    A.    I was visiting my parents' store, and he
8  happened --
9    Q.    And --
10    A.    -- to come in.
11    Q.    I'm sorry.  Continue.
12    A.    What was your question?
13    Q.    So I asked how you met him in 2016.
14  Were you saying that you met him again at your
15  parents' store in 2016?
16    A.    Yes.  He happened to just come in to my
17  parents' store, and I was there visiting, helping
18  out.
19    Q.    And did he remember you from ten years
20  prior?
21    A.    I don't know.
22    Q.    Did you remember him?
23    A.    I knew of him.
24    Q.    And when you spoke to him in 2016, did

Page 49

1  you exchange phone numbers?
2      A.   He gave me his phone number when he
3  offered me a position in his company.  I did not
4  give him --
5      Q.   He offered you --
6      A.   Yes.
7      Q.   He -- he gave you his phone number in
8  your parents' store the first time you saw him back
9  in 2016?
10     A.   Yes.
11     MR. BOLAND:  Object to the form of that
12  question.
13  BY MR. BRUSTEIN:
14     Q.   What number did he give you?
15     A.   His cell phone number.
16     Q.   And was that a personal or a business
17  phone number?
18     A.   It's his business phone number.
19     Q.   And did he offer you a specific position
20  in his company?
21     A.   Financial analyst.
22     Q.   And did he tell you which company you
23  would be working for?
24     A.   His hotels company.

Page 50

1      Q.   And did you know what hotels he owned at
2  that point?
3      A.   He mentioned to me -- he informed me
4  that he owned two Four Seasons.
5      Q.   And which ones did he say?
6      A.   New York and Santa Barbara.
7      Q.   And what is Mr. Warner's business phone
8  number that he gave you?
9      A.   Are you asking for his phone number?
10     Q.   I'm asking you for the business phone
11  number that he gave you, yes.
12     A.   I don't know his phone number by heart.
13  It's in my -- it's recorded in my phone.
14     Q.   Do you know what area code it is?
15     A.   I believe it's 630.
16     Q.   All right.  We can leave a space in the
17  record and when you have an opportunity to review
18  the transcript, you can fill that in.
19         Now, did he offer you a specific salary
20  when he told you that he wanted you to work for his
21  company?
22     A.   No.
23     Q.   You had just started at a new company
24  that you worked for previously, right?

Page 51

1      A.   Yes.
2      Q.   So why did you quit your job that you
3  had worked for once before to go work for
4  Mr. Warner?
5      A.   It sounded like a great opportunity.
6      Q.   What did he tell you about the
7  opportunity that made it sound great?
8      A.   He said he needed a financial analyst to
9  look over his businesses and review the performance
10  of his hotels.
11     Q.   Were you -- and is that what you did
12  once you went to work for Ty Warner Hotels &
13  Resorts?
14     A.   Yes.
15     Q.   Are you part of the reason that -- or
16  the work that you did, the reason that Donna Snopek
17  said Four Seasons was not upholding its part of the
18  hotel management agreements?
19     MR. BOLAND:  Object to the form of that
20  question.
21  BY THE WITNESS:
22     A.   Can you clarify your question.
23     MR. WAGNER:  Same objection for me.
24  BY MR. BRUSTEIN:

Page 52

1      Q.   Was your analysis that you conducted as
2  a financial analyst for Ty Warner Hotels & Resorts
3  part of the basis that Donna Snopek used to claim
4  that Four Seasons was not honoring the hotel
5  management agreement?
6      A.   I don't know what Ms. Snopek used.
7      Q.   Did you make findings as a financial
8  analyst about with whether or not Four Seasons was
9  honoring the hotel management agreement?
10     A.   I reviewed the financial results, but I
11  didn't indicate one way or the other.
12     Q.   Did you provide an analysis of the
13  financial results?
14     MR. BOLAND:  Object to the form of that one.
15  BY THE WITNESS:
16     A.   I reported the financial results to
17  Ms. Snopek.
18  BY MR. BRUSTEIN:
19     Q.   Did you also provide the results to
20  Mr. Warner?
21     A.   Yes.
22     Q.   At the time that Mr. Warner hired you,
23  did he tell you that he was unhappy with the
24  arrangement he had with Four Seasons and the



Page 53

1  management of the two Four Seasons properties he
2  owned?
3     A.   No.
4     Q.   Is Mr. Warner unhappy with the
5  management of the two Four Seasons properties he
6  owns?
7     MR. BOLAND:  Objection, foundation.
8        You can answer.
9  BY THE WITNESS:
10    A.   I don't know how he feels.
11 BY MR. BRUSTEIN:
12    Q.   Have you discussed it with him?
13    A.   I have talked to him about the hotel's
14 performance.
15    Q.   You testified that as a corporate
16 officer, you initiated litigation to terminate the
17 hotel management agreement against Four Seasons.
18    MR. BOLAND:  Objection.  I think that
19 misstates her testimony.
20 BY THE WITNESS:
21    A.   That's -- that's not what I said.
22 BY MR. BRUSTEIN:
23    Q.   Were you involved in the decision to
24 initiate the lawsuit as a corporate officer to

Page 54

1  terminate the hotel management agreements for the
2  two Four Season properties?
3     A.   No.
4     Q.   Do you know if Mr. Warner approves of
5  terminating the hotel management agreements for the
6  two Four Season properties?
7     A.   Yes.  He approved the termination.
8     Q.   As someone that did a financial analysis
9  of those two properties, did you discuss your
10 analysis with Mr. Warner before the termination
11 litigation began?
12    A.   Yes.
13    Q.   What did you tell him?
14    A.   To be clear, it wasn't just my analysis.
15 There were other third-party experts who were
16 engaged to assess the hotel's performance.
17    Q.   What did you tell him?
18    A.   I told him the hotel's not profitable.
19    Q.   What did Mr. Warner tell you?
20    A.   He said we need to -- to manage the
21 hotel or have Four Seasons manage the hotel, that
22 we stop losing money.
23    Q.   Did Mr. Warner tell you that if you
24 manage the hotel without Four Seasons, it could be

Page 55

1  more profitable?
2     A.   No.
3     Q.   So what did he tell you about you,
4  management of the hotel or the Four Seasons
5  managing the hotel?  What did he mean by that?
6     MR. BOLAND:  I'm going to -- I'm only going to
7  object, counsel, because you keep using the word
8  "you."  And I just don't know what you're referring
9  to.  I don't think it's clear.
10    MR. BRUSTEIN:  Thank you.
11 BY MR. BRUSTEIN:
12    Q.   Mr. Warner told you that we need to
13 manage the hotel, right?
14    A.   Just to be clear, Four Seasons, as the
15 operator, manages the hotel, and I assess the
16 performance and oversee the operations.  But it is
17 Four Seasons who's managing the hotel.
18    Q.   But when you spoke to Mr. Warner about
19 your assessments, you said that he told you, tell
20 me if I'm wrong, that we need to manage the hotel.
21 Did I get that right?
22    A.   I meant that we need to have the
23 operator improve their management of the hotel's
24 performance.  This --

Page 56

1     Q.   What did you -- sorry.
2     A.   I use the term "we" loosely, because
3  it's Four Seasons, again, managing the hotel's
4  day-to-day operations.
5     Q.   What did you do to try and get the Four
6  Seasons to manage the hotel better?
7     A.   There was a rate strategy that was
8  implemented under Mr. Warner's direction.
9     Q.   When was that?
10    A.   I believe it was 2018.
11    Q.   Did that satisfy Mr. Warner's concerns
12 about the operation of the Four Seasons Hotel New
13 York?
14    MR. BOLAND:  Objection, foundation.
15       You can answer.
16 BY THE WITNESS:
17    A.   It satisfied his wish to have a pricing
18 strategy in place.  I don't know if it satisfied
19 him overall.
20 BY MR. BRUSTEIN:
21    Q.   For purposes of the deposition, can we
22 refer to the Four Seasons Hotel New York as FSNY?
23    A.   I think I would prefer to make a
24 distinction and say property level team for the



Page 57

1 employees that are actually at the hotel and
2 managing the hotel, because there's also a
3 distinction with Four Seasons corporate employees
4 who are also involved in management of the hotel.
5     Q.   I'm just talking about the hotel itself,
6 the physical --
7     A.   The hotel itself?  You mean the physical
8 building?
9     Q.   Yes, managing the building.
10     A.   Okay.
11     MR. BOLAND:  The --
12 BY THE WITNESS:
13     A.   So you want it -- so you want to --
14 okay.
15 BY MR. BRUSTEIN:
16     Q.   I'll keep referring to everything as
17 Four Seasons Hotel New York.  That's fine.
18         Now, did Mr. Warner have any more
19 complaints about the management of the Four Seasons
20 Hotel New York after the price structure was put
21 into place?
22     MR. BOLAND:  Object to the form.
23 BY THE WITNESS:
24     A.   There were rates that he was not

Page 58

1 satisfied with as it related to group and corporate
2 business.
3 BY MR. BRUSTEIN:
4     Q.   Did he tell you why he wasn't satisfied?
5     A.   Yes.
6     Q.   Now, let me back up for a second.  Where
7 was your office located when you first began
8 working for Ty Warner Hotels & Resorts?
9     A.   280 Chestnut Avenue, Westmont, Illinois.
10     Q.   And is that the same principal place of
11 business for each of the other corporate entities
12 that you're an officer in?
13     A.   Yes.  Ty Warner Hotels & Resorts is
14 based in 280 Chestnut Avenue in Westmont, Illinois.
15     Q.   But you testified that there are about
16 30 to 40 corporate entities that you're an officer
17 in, right?
18     A.   Yes.
19     Q.   Do all of those 30 to 40 entities have
20 the same principal place of business as Ty Warner
21 Hotels & Resorts?
22     MR. BOLAND:  Object to the form.
23 BY THE WITNESS:
24     A.   So place of business, as you already

Page 59

1 know, are located in -- in various states and
2 cities.  The legal entities do not have individual
3 offices.
4 BY MR. BRUSTEIN:
5     Q.   Does Hotel 57, LLC, have a principal
6 place of business at 280 Chestnut Ave. in Westmont,
7 Illinois?
8     MR. BOLAND:  Object to the form.
9 BY THE WITNESS:
10     A.   I believe the business address is
11 280 Chestnut, Westmont, Illinois.
12     Q.   And is that the principal place of
13 business for Hotel 57, LLC?
14     MR. BOLAND:  Object to the form.
15 BY THE WITNESS:
16     A.   Yes.
17 BY MR. BRUSTEIN:
18     Q.   Hotel 57 Services, LLC, does it have a
19 principal place of business at 280 Chestnut Avenue,
20 Westmont, Illinois?
21     MR. BOLAND:  Object to the form.
22 BY THE WITNESS:
23     A.   Yes.  Again, the business address for
24 Hotel 57, LLC, I believe, is at 280 Chestnut

Page 60

1 Avenue.
2 BY MR. BRUSTEIN:
3     Q.   And is it also the principal place of
4 business for Hotel 57 Services, LLC?
5     MR. BOLAND:  Object to the form.
6 BY THE WITNESS:
7     A.   Can you clarify what you mean by
8 principal place of business?
9 BY MR. BRUSTEIN:
10     Q.   Have you ever heard that phrase used
11 before?
12     A.   Yes.  But I'm not sure if I'm getting
13 the distinction.
14     Q.   Have you ever used that phrase before?
15     A.   I don't know if I've used that phrase
16 before.
17     Q.   What do you understand that phrase to
18 mean?
19     A.   The business address.
20     Q.   So is the principal place of business
21 for Hotel 57 Services, LLC, 280 Chestnut Ave.,
22 Westmont, Illinois?
23     MR. BOLAND:  Same objection.
24 BY THE WITNESS:



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
61–64

Page 61

1      A.   Yes.
2   BY MR. BRUSTEIN:
3      Q.   Why was Mr. Warner not satisfied with
4   the pricing structure for Hotel 57 -- for Four
5   Seasons Hotel New York?
6      MR. BOLAND:  Objection, foundation.
7   BY THE WITNESS:
8      A.   So his pricing strategy related to the
9   transient business, but the group business rates
10  were rather low.
11  BY MR. BRUSTEIN:
12     Q.   When you were a financial analyst for Ty
13  Warner Hotels & Resorts, did you meet regularly
14  with Mr. Warner?
15     A.   Yes.
16     Q.   And did you meet in person or on the
17  phone or something else?
18     A.   Usually in person.
19     Q.   Did you call him on his cell phone?
20     A.   He usually called me.
21     Q.   And did he usually call you from the
22  business cell phone number that he had initially
23  given you or some other number?
24     A.   Business cell phone number.

Page 62

1      Q.   Did he ever leave you voice mails?
2      A.   Yes.
3      Q.   Did you communicate with Mr. Warner by
4   e-mail?
5      A.   Yes.
6      Q.   Did he use the e-mail address that
7   you've given that was a tymail or did he have a
8   different e-mail address that he contacted you at?
9      A.   Tymail.
10     Q.   Now, when you did the financial analysis
11  for Ty Warner Hotels & Resorts about the management
12  of Four Seasons Hotel New York, did you do that in
13  some sort of report?
14     MR. BOLAND:  Object to the form.
15  BY THE WITNESS:
16     A.   Yes.
17  BY MR. BRUSTEIN:
18     Q.   And did you e-mail a copy of that report
19  to Mr. Warner?
20     A.   Yes.
21     Q.   What e-mail address did you send it to?
22     A.   You want his work e-mail address?
23     Q.   I want whatever e-mail address you sent
24  it to?

Page 63

1      A.   Katy@tymail.com.
2      Q.   Did you send it to any other e-mail
3   addresses?
4      A.   No.
5      Q.   Now, did you regularly send e-mails to
6   Mr. Warner about issues as they came up?
7      MR. BOLAND:  Object to the form.
8   BY THE WITNESS:
9      A.   I gave him a daily report of Four
10  Seasons Hotel New York.
11  BY MR. BRUSTEIN:
12     Q.   And was that in e-mail format --
13     A.   Yes.
14     Q.   -- or as an attachment?
15     A.   I believe it was -- well, it was sent
16  through e-mail.  It may have been in the body of
17  the e-mail and also as an attachment.
18     Q.   Do you still give him those kind of
19  reports today?
20     A.   No.
21     Q.   When did you stop giving him those
22  reports?
23     A.   I don't recall the year exactly.
24     Q.   Was it before or after the hotel shut

Page 64

1   down in March of 2020?
2      A.   It was before.
3      Q.   Why did you stop giving him e-mail
4   reports?
5      A.   He said he didn't need it anymore.
6      Q.   Did you still continue to e-mail with
7   him about updates on the hotel even if it wasn't a
8   daily report?
9      A.   Yes.
10     Q.   Do you still e-mail with Mr. Warner
11  about the hotel?
12     A.   Yes.
13     Q.   When is the last time you e-mailed with
14  Mr. Warner about the hotel?
15     A.   About Four Seasons Hotel New York?
16     Q.   Yes, about Four Seasons Hotel New York.
17     A.   It may have been a few weeks ago.
18     Q.   Did you search your e-mails for
19  discovery related to this case?
20     A.   I did not.  The IT team did that.  I did
21  not perform the search.
22     Q.   Now, you testified that you reviewed
23  e-mails that refreshed your memory.  Did any of
24  those e-mails involve communications you had



CATHY HWANG                                          April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS          65—68

Page 65

1  directly with Mr. Warner?
2      A.   No.
3      Q.   Have you e-mailed with Mr. Warner about
4  the hotel shutting down?
5      MR. BOLAND:  Object to the form.
6  BY THE WITNESS:
7      A.   I don't recall.  It may have been a
8  phone call.
9  BY MR. BRUSTEIN:
10     Q.   When you e-mail with Mr. Warner, does he
11 respond back?
12     MR. BOLAND:  Object to the form.
13 BY THE WITNESS:
14     A.   Yes.
15 BY MR. BRUSTEIN:
16     Q.   And is he quick to respond to your
17 e-mails, or do you need to follow-up?
18     MR. BOLAND:  Same objection.
19 BY THE WITNESS:
20     A.   It varies.
21     MR. BOLAND:  Evan, we're coming up on about an
22 hour.  I'm just saying, suggesting an hour since we
23 last broke.  Whenever it's a good time for you.
24     MR. BRUSTEIN:  Sure.  Just a few more minutes.

Page 66

1      MR. BOLAND:  Whenever it's good for you.
2      MR. BRUSTEIN:  Thank you.
3  BY MR. BRUSTEIN:
4      Q.   Now, when you have reports and documents
5  to share with Mr. Warner, how does he like to
6  review them?
7      MR. BOLAND:  Object to the form.
8  BY MR. BRUSTEIN:
9      Q.   Has Mr. -- I'll rephrase it.
10          Has Mr. Warner indicated a preference
11 for how he likes to receive large exhibits or
12 attachments to e-mails?
13     MR. BOLAND:  Object to the form.
14 BY THE WITNESS:
15     A.   Yes, he likes to review them on paper.
16 BY MR. BRUSTEIN:
17     Q.   And does he have you print them out or
18 do you just e-mail to him and then he handles
19 printing it out on his own somehow?
20     MR. BOLAND:  Object to the form.
21 BY THE WITNESS:
22     A.   I print it out.
23 BY MR. BRUSTEIN:
24     Q.   And have you been maintaining all of the

Page 67

1  documents you printed out since this litigation
2  began back in August of 2022?
3      MR. BOLAND:  Object to the form.
4  BY THE WITNESS:
5      A.   Yes.
6  BY MR. BRUSTEIN:
7      Q.   And did you understand that you have an
8  obligation as an officer when litigation is
9  involved not to destroy corporate documents related
10 to that litigation?
11     A.   Yes.
12     Q.   And have you preserved all the corporate
13 documents related to this litigation?
14     A.   Yes.
15     Q.   When is the last time you saw Mr. Warner
16 in person?
17     A.   January or February of 2020.
18     MR. BRUSTEIN:  Okay.  If you want to take --
19 do you want to take a five-minute break now or --
20     MR. BOLAND:  Yeah.
21     MR. BRUSTEIN:  -- how long do you want to
22 take?
23     MR. BOLAND:  Yeah, five to ten.  That's fine.
24 Just every hour or so is good.

Page 68

1      THE VIDEOGRAPHER:  We are going off the record
2  at 10:30 a.m.
3          (WHEREUPON, a recess was had.)
4      THE VIDEOGRAPHER:  We are going back on the
5  record at 10:45 a.m.
6  BY MR. BRUSTEIN:
7      Q.   Ms. Hwang, are you ready to continue?
8      A.   Yes.
9      Q.   And did you speak to anyone during the
10 break?
11     A.   Counsel.
12     Q.   I'm not asking you what the
13 communication was, but did you speak to anyone
14 during the break?
15     A.   Yes.  I spoke to Mr. Boland.
16     Q.   Now, earlier you testified that
17 Ms. Snopek was terminated.  What is your
18 understanding of the reason that she was
19 terminated?
20     A.   I was not given the reason.
21     Q.   What did you believe the reason to be?
22     MR. BOLAND:  Sorry about that.
23 BY THE WITNESS:
24     A.   I don't know.



Page 69

1  BY MR. BRUSTEIN:
2     Q.   Had you had any concerns about
3  Ms. Snopek's job performance up until that point?
4     A.   No.
5     Q.   Now, you testified that there was other
6  litigation that you were involved in, and you
7  mentioned the hotel management agreement and you
8  mentioned the wallpaper lawsuit.
9         Were there any other lawsuits that you
10 were involved in as a corporate officer?
11    A.   Yes.  There's a wage-an-hour lawsuit for
12 San Ysidro Ranch.
13    Q.   And is -- which company is being sued in
14 that lawsuit?
15    A.   San Ysidro BB Property.
16    Q.   And what is your role in that
17 litigation?
18    A.   I'm just the officer of the legal
19 entity.
20    Q.   Are there any other officers in that
21 legal entity?
22    A.   Yes.
23    Q.   How many?
24    A.   Two others.

Page 70

1     Q.   Who are the two other officers?
2     A.   Mr. Warner and Joseph Hicks.
3     Q.   What is Mr. Warner's position in that
4  entity?
5     A.   President.
6     Q.   Does he have any other titles?
7     A.   I don't recall.
8     Q.   And just for the record, when you say
9  "Mr. Warner," what is his full legal name?
10    A.   H. Ty Warner.
11    Q.   And is H. his full legal first name?
12    A.   I think it's Harold Ty Warner.
13    Q.   Now, is -- so for purposes of this, are
14 you okay with me calling him Mr. Warner?
15    A.   Yes.
16    Q.   Is Mr. Warner the president of each of
17 the other entities that you're an officer in?
18    A.   Yes.
19    Q.   What is Mr. Hicks' position in each of
20 the entities?
21         Is he an officer in each of the entities
22 that you are involved in, as well?
23    A.   Yes.
24    Q.   And what is his title in those entities?

Page 71

1     A.   Assistant secretary.
2     Q.   Is it the same title for each one of the
3  entities?
4     A.   Yes.
5     Q.   Does Mr. Hicks report to you?
6     A.   Yes.
7     Q.   How long has he been an assistant
8  secretary?
9         MR. BOLAND:  Object to the form.
10 BY THE WITNESS:
11    A.   I don't know.
12 BY MR. BRUSTEIN:
13    Q.   Was he an assistant secretary before you
14 were appointed secretary?
15    A.   Yes.
16    Q.   And what is his background?
17         MR. BOLAND:  Object to the form.
18 BY THE WITNESS:
19    A.   He is an employee of Ty Warner Hotels &
20 Resorts.
21 BY MR. BRUSTEIN:
22    Q.   How long has he been employed by Ty
23 Warner Hotels & Resorts?
24    A.   19 years.

Page 72

1     Q.   Do you know why he reports to you
2  instead of you reporting to him?
3     A.   Mr. Warner appointed me to the chief
4  financial officer, and he has wanted Joseph Hicks
5  to report to me.
6     Q.   And do you report to Mr. Warner?
7     A.   Yes.
8     Q.   Is the reporting structure the same for
9  each of the 30 to 40 legal entities that you're
10 involved in?
11    A.   Yes.
12    Q.   Does Mr. Warner have final
13 decision-making authority for each of the legal
14 entities?
15         MR. BOLAND:  Object to the form.
16 BY THE WITNESS:
17    A.   Yes.
18 BY MR. BRUSTEIN:
19    Q.   If you disagree with Mr. Warner about a
20 decision, do you have the ability to overrule?
21    A.   No.
22    Q.   Do you bring all decisions to
23 Mr. Warner?
24         MR. BOLAND:  Objection.  Object to the form.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
73–76

Page 73

1  BY THE WITNESS:
2      A.   All and every single decision, for every
3  business, for all of his properties?
4  BY MR. BRUSTEIN:
5      Q.   Yes.
6      A.   No.
7      Q.   What type of decisions do you not need
8  authority to bring to Mr. Warner?
9      MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11      A.   I guess materiality of, you know, a
12  simple invoice I'm not going to ask Mr. Warner for
13  his approval.
14  BY MR. BRUSTEIN:
15      Q.   Is there a dollar threshold that you
16  need to request permission from Mr. Warner?
17      A.   No.
18      Q.   Would you request permission from
19  Mr. Warner for a $5,000 item?
20      MR. BOLAND:  Objection.  Object to the form.
21  BY THE WITNESS:
22      A.   It depends on the subject matter and --
23  BY MR. BRUSTEIN:
24      Q.   Is it possible --

Page 74

1      A.   -- his involvement with --
2      MR. BOLAND:  I think she wasn't finished yet.
3      MR. BRUSTEIN:  My apologies.
4  BY THE WITNESS:
5      A.   It depends on the subject matter and his
6  involvement.
7  BY MR. BRUSTEIN:
8      Q.   Is it possible that you might need
9  Mr. Warner's authority for some purchases or
10  invoices as low as $5,000?
11      MR. BOLAND:  Object to the form.
12  BY THE WITNESS:
13      A.   Yes.
14  BY MR. BRUSTEIN:
15      Q.   Would it be fair to say that if he
16  required approval for something as low as -- well,
17  withdrawn.
18          Do you consider $5,000 to be a high or
19  low amount of money in the scope of the types of
20  deals that you're doing for Mr. Warner's companies?
21      A.   Again, it's really not -- it's sometime
22  the materiality and the dollar threshold, but it's
23  also his wish to be involved in certain decision
24  making.

Page 75

1      Q.   Now, how often do you speak to
2  Mr. Warner on the phone?
3      MR. BOLAND:  Objection.
4  BY THE WITNESS:
5      A.   It -- it varies.
6  BY MR. BRUSTEIN:
7      Q.   Do you speak to Mr. Warner every week?
8      MR. BOLAND:  Same objection, overbroad.
9  BY THE WITNESS:
10      A.   Not every week.
11  BY MR. BRUSTEIN:
12      Q.   Do you speak to Mr. Warner most weeks?
13      MR. BOLAND:  Objection.  Object to the form.
14  BY THE WITNESS:
15      A.   What do you mean by "most weeks"?
16  BY MR. BRUSTEIN:
17      Q.   Would you say that on any given day,
18  there's a 50 percent chance or better that you will
19  talk to Mr. Warner?
20      MR. BOLAND:  Object to the form.
21  BY THE WITNESS:
22      A.   It's -- it really depends on what's
23  going on that day.  Mr. Warner could be reaching
24  out to me at any point in time.  I -- I don't know.

Page 76

1  BY MR. BRUSTEIN:
2      Q.   Does Mr. Warner reach out to you by
3  e-mail?
4      A.   Yes.
5      Q.   Does he reach out to you by cell phone?
6      A.   Yes.
7      Q.   Do you have Zoom meetings or Teams
8  meetings or other types of videoconferencing
9  meetings with him?
10      A.   No.
11      Q.   So is it fair to say that the
12  communication you have with him is either on the
13  phone or by e-mail or, I guess, old fashion mail?
14      A.   Yes.
15      Q.   Approximately how many e-mails a week do
16  you exchange on average with Mr. Warner?
17      MR. BOLAND:  Objection, overbroad.
18          You can answer.
19  BY THE WITNESS:
20      A.   Again, it varies.
21  BY MR. BRUSTEIN:
22      Q.   You testified earlier that the last time
23  you saw Mr. Warner was approximately January
24  of 2020?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
77–80

Page 77

1    A.   Yes.
2    Q.   Prior to that, how frequently were you
3  seeing him in person?
4      MR. BOLAND:  Objection, overbroad.
5      You can answer.
6  BY THE WITNESS:
7    A.   Every week, at least a few times a week.
8  BY MR. BRUSTEIN:
9    Q.   Did you regularly schedule meetings, or
10  was it just when things came up?
11    A.   Just when things come up.
12    Q.   Are there any issues that come up that
13  require a call or an e-mail or face-to-face meeting
14  with Mr. Warner?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17    A.   Can you repeat that question, please.
18  BY MR. BRUSTEIN:
19    Q.   I'll ask it differently.
20      With respect to prior to January of 2020
21  when you were meeting a few times a week with
22  Mr. Warner, were you still e-mailing with him on a
23  relatively regular basis back then?
24      MR. BOLAND:  Object to the form.

Page 78

1  BY THE WITNESS:
2    A.   Yes.
3  BY MR. BRUSTEIN:
4    Q.   Since you stopped meeting in person with
5  him, would you say that you e-mail with him more or
6  less frequently than you did prior to January 2020?
7    A.   I'd say about the same.
8    Q.   When you speak with Mr. Warner, do you
9  take notes on those conversations?
10    A.   No.
11    Q.   When Mr. Warner speaks to you over the
12  phone and gives you directions, how do you remember
13  what he's told you to do?
14      MR. BOLAND:  Object to the form.
15  BY THE WITNESS:
16    A.   By memory.
17  BY MR. BRUSTEIN:
18    Q.   Did you e-mail with Mr. Warner about the
19  COVID-19 pandemic?
20      MR. BOLAND:  Objection.
21  BY THE WITNESS:
22    A.   I don't recall.
23  BY MR. BRUSTEIN:
24    Q.   Is it fair to say that since January

Page 79

1  of 2020, you have not had any communication with
2  Mr. Warner outside of telephone calls, e-mails and
3  regular mail?
4    A.   Yes, that's correct.
5    Q.   When you were having your meetings
6  face-to-face with Mr. Warner, did he expect you to
7  bring hard copies of the documents you were
8  discussing with him?
9      MR. BOLAND:  Objection, found -- sorry.
10      Objection, foundation.
11      You can answer.
12  BY THE WITNESS:
13    A.   When you say face-to-face meetings, do
14  you mean prior to January of 2020?
15  BY MR. BRUSTEIN:
16    Q.   Yes.
17    A.   Yes, I would bring him printouts.
18    Q.   And did you have a folder that you kept
19  the printouts or copies of the printouts that you
20  were making for Mr. Warner for corporate
21  recordkeeping purposes?
22    A.   I kept electronic copies.
23    Q.   Do you still have all of those
24  electronic copies today?

Page 80

1    A.   Yes.
2    Q.   Since January 2020, how have you been
3  getting those same types of documents for your
4  meetings or telephone calls with Mr. Warner about
5  the different meeting topics?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8    A.   Can you clarify your question, please.
9  BY MR. BRUSTEIN:
10    Q.   Had you been e-mailing or printing and
11  mailing hard copies of the documents to Mr. Warner
12  so that he could follow along in whatever physical
13  documents you were talking about?
14      MR. BOLAND:  Object to the form.
15  BY THE WITNESS:
16    A.   Yes.
17  BY MR. BRUSTEIN:
18    Q.   Which method were you using?
19    A.   Both.
20    Q.   And are you still maintaining electronic
21  copies of all of the documents you've been sharing
22  with Mr. Warner since January 2020?
23    A.   Yes.
24    Q.   And did you share documents and other



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
81–84

Page 81

1   materials, be they spreadsheets or analysis or
2   pamphlets, or anything like that with Mr. Warner
3   about closing the hotel back in March of 2020?
4       MR. BOLAND:  Object to the form.
5   BY THE WITNESS:
6       A.   You'll have to repeat your question,
7   please.
8   BY MR. BRUSTEIN:
9       Q.   Sure.
10          Did you share documents and other
11  materials, physical, you know, things to look at,
12  with Mr. Warner about the decision to close the
13  Four Seasons Hotel New York?
14      A.   Yes.
15      Q.   And do you have copies of the things
16  that you shared with him about closing the Four
17  Seasons Hotel New York in March 2020?
18      A.   Yes.
19      Q.   Have you shared documents and other
20  materials with Mr. Warner about conversations about
21  reopen -- reopening the Four Seasons Hotel New York
22  with Mr. Warner?
23      MR. BOLAND:  Object to the form.
24  BY THE WITNESS:

Page 82

1       A.   Do you mean by e-mail and mail?
2   BY MR. BRUSTEIN:
3       Q.   Yes.
4       A.   There were certain discussions by e-mail
5   and mail.
6       Q.   And do you still have copies of all of
7   those documents and materials that you shared by
8   e-mail and mail with Mr. Warner about --
9       MR. BOLAND:  Objection.
10  BY MR. BRUSTEIN:
11      Q.   -- reopening the Four Seasons Hotel New
12  York after March 2020?
13      MR. BOLAND:  Object to the form.
14  BY THE WITNESS:
15      A.   Yes.
16  BY MR. BRUSTEIN:
17      Q.   What were the discussions you had with
18  Mr. Warner about reopening the Four Seasons Hotel
19  New York after March 2020?
20      MR. BOLAND:  Objection, overbroad.
21          You can answer.
22  BY THE WITNESS:
23      A.   I present -- I presented the reopening
24  plans presented by Four Seasons as the operator.

Page 83

1   BY MR. BRUSTEIN:
2       Q.   And were those documents that you needed
3   to e-mail him or send him in the mail?
4       A.   It was by e-mail.
5       Q.   And do you still have those e-mails that
6   you sent to Mr. Warner?
7       A.   Yes.
8       Q.   And was that to the katy@tymail.com
9   e-mail address?
10      A.   Yes.
11      Q.   Now, have you discussed this lawsuit
12  with Mr. Warner?
13      A.   No, not directly.
14      Q.   Have you ever discussed retaliating
15  against someone for bringing the lawsuit with
16  Mr. Warner?
17      MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19      A.   I don't know what you mean.  Can you
20  repeat your question?
21  BY MR. BRUSTEIN:
22      Q.   Have you ever discussed retaliating
23  against someone that sued Mr. Warner or one of his
24  entities?

Page 84

1       MR. BOLAND:  Object to the form.
2   BY THE WITNESS:
3       A.   No.
4   BY MR. BRUSTEIN:
5       Q.   Have you ever discussed taking action
6   against someone for bringing a lawsuit against
7   Mr. Warner or one of his entities?
8       MR. BOLAND:  Object to the form.
9   BY THE WITNESS:
10      A.   No.
11  BY MR. BRUSTEIN:
12      Q.   As a corporate officer, would you ever
13  retaliate against one of the plaintiffs in this
14  case for bringing this lawsuit?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17      A.   No.
18  BY MR. BRUSTEIN:
19      Q.   As a corporate officer, would you hold
20  it against the plaintiffs that they believe they
21  have been wronged by the defendants in this case?
22      MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24      A.   What do you mean by "hold against the



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
85–88

Page 85

1  plaintiffs"?
2  BY MR. BRUSTEIN:
3      Q.    Would you consider their employment at
4  the Four Seasons Hotel New York differently because
5  they brought this lawsuit?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.    I'm not involved with employment
9  decisions.
10  BY MR. BRUSTEIN:
11      Q.    Is it your testimony that there are
12  other people at Ty Warner Hotels & Resorts that are
13  involved in the hotel decisions, or is it your
14  testimony that no one at Ty Warner Hotels & Resorts
15  has any involvement with employment decisions for
16  the Four Seasons Hotel New York?
17      A.    No one at Ty Warner Hotels & Resorts has
18  employment decisions.
19      Q.    Is it your testimony that Ty Warner
20  Hotels & Resorts has no oversight of how many
21  employees Four Seasons Hotel New York employs?
22      MR. BOLAND:  Objection to form.  Object to the
23  form.
24          You can answer.

Page 86

1  BY THE WITNESS:
2      A.    Yes.
3  BY MR. BRUSTEIN:
4      Q.    Yes, it's your testimony that Ty Warner
5  Hotels and Resorts has no oversight of the number
6  of employees?
7      A.    No oversight.
8      Q.    Does Ty Warner Hotels & Resorts have any
9  oversight of the salaries for employees of Four
10  Seasons Hotel New York?
11      A.    No.
12      Q.    Does Ty Warner Hotels & Resort have any
13  oversight of sick time for employees at Four
14  Seasons Hotel New York?
15      A.    No.
16      Q.    Does Mr. Warner have oversight of the
17  number of employees at Four Seasons Hotel
18  New York?
19      A.    No.
20      Q.    Does Mr. Warner have the ability to
21  direct people to hire and fire employees of Four
22  Seasons Hotel New York?
23      A.    No.
24      Q.    Does Mr. Warner --

Page 87

1      A.    I would -- I would like just -- just to
2  be clear, there's only two positions that he has
3  influence over, and I don't think he can make the
4  final decision.  There's two key positions, the
5  general manager and director of sales and
6  marketing.  But he does not have the firing
7  decisions for those employees.
8      Q.    Does Mr. Warner have the authority to --
9      A.    And, I'm sorry, may I add one more
10  thing?
11      Q.    Yes.
12      A.    And that was per management agreement.
13      Q.    Does Mr. Warner have the ability to
14  determine which employees are placed on furlough?
15      A.    He has no decision in which employees
16  can be placed on furlough.
17      Q.    Does Mr. Warner have authority to decide
18  to pay or not pay employees on furlough?
19      A.    No, he does not.
20      Q.    Does Mr. Warner have authority to bring
21  employees back to work at the Four Seasons Hotel
22  New York?
23      A.    No.
24      Q.    Does Mr. Warner have the authority to

Page 88

1  open or close the Four Seasons Hotel New York to
2  guests?
3      A.    No.
4      Q.    Does Ty Warner Hotels & Resorts have the
5  authority to open or close the Four Seasons Hotel
6  New York to guests?
7      A.    No.
8      Q.    Who are you claiming has the authority
9  to open and close the Four Seasons Hotel New York
10  to guests?
11      A.    The operator, Four Seasons.
12      Q.    Does Ty Warner Hotels & Resorts have
13  veto power over the operator's ability to open or
14  close the Four Seasons Hotel New York to guests?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17      A.    No, Ty Warner Hotels & Resorts does not
18  have the authority.
19  BY MR. BRUSTEIN:
20      Q.    Does Mr. Warner?
21      A.    No.
22      Q.    What is your understanding of why Four
23  Seasons Hotel New York is not open today?
24      A.    The hotel closed due to the pandemic



Page 89

1  under the local mandate, and it remains closed
2  until we can find a way to open up the hotel
3  profitably and safely.
4      Q.   Who determines the profitability
5  necessary to reopen the hotel?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.   Four Seasons has provided projections.
9  BY MR. BRUSTEIN:
10     Q.   Do you, as an officer of Ty Warner
11 Hotels & Resorts, have any objection to Four
12 Seasons deciding that the hotel can open tomorrow?
13     MR. BOLAND:  Objection, overbroad.
14         You can answer.
15 BY THE WITNESS:
16     A.   No.
17 BY MR. BRUSTEIN:
18     Q.   Is Ty Warner Hotels & Resorts or
19 Mr. Warner taking any position in its litigation to
20 terminate its agreement with Four Seasons about the
21 management of the hotel that is preventing the Four
22 Seasons Hotel New York from reopening?
23     A.   That was a long question.  Would you
24 please repeat.

Page 90

1      Q.   Sure.
2          You testified that there is litigation
3  to terminate Four Seasons' operation of the Four
4  Seasons Hotel New York, right?
5      A.   Uh-huh.
6      Q.   I'm sorry.  You just need to answer
7  verbally.
8      MR. BOLAND:  You have to answer verbally.
9  BY THE WITNESS:
10     A.   Okay.  Can you please repeat.
11     MR. BRUSTEIN:  Can you just read back that
12 question, please.
13         (WHEREUPON, the record was read
14         by the reporter as requested.)
15 BY THE WITNESS:
16     A.   Yes.
17 BY MR. BRUSTEIN:
18     Q.   Is the purpose of that litigation to
19 prevent Four Seasons from being able to operate the
20 Four Seasons Hotel New York?
21     MR. BOLAND:  No.  Objection, overbroad,
22 foundation.
23         You can answer.
24 BY THE WITNESS:

Page 91

1      A.   I don't understand your question.
2  BY MR. BRUSTEIN:
3      Q.   What is Ty Warner Hotels & Resorts
4  trying to accomplish through the litigation to
5  terminate the management agreement with Four
6  Seasons --
7      MR. BOLAND:  Object to the form.
8  BY MR. BRUSTEIN:
9      Q.   -- for --
10     MR. BOLAND:  I'm sorry.  I didn't meant to --
11 I thought you were done.
12 BY MR. BRUSTEIN:
13     Q.   -- for the Four Seasons New York Hotel?
14     MR. BOLAND:  Object to the form.
15 BY THE WITNESS:
16     A.   Will you please repeat the question.
17 BY MR. BRUSTEIN:
18     Q.   What does Mr. Warner want to get out of
19 terminating the hotel management agreement with the
20 Four Seasons?
21     MR. BOLAND:  Objection to the form and
22 foundation.
23 BY THE WITNESS:
24     A.   He wants to modify the management fee

Page 92

1  structure and ensure that ownership interests -- I
2  should say the Four Seasons' interests are aligned
3  with ownership.
4  BY MR. BRUSTEIN:
5      Q.   And when you say ownership, does anyone
6  other than Mr. Warner own stake in the company?
7      MR. BOLAND:  Oh, object to the form and it's
8  vague.
9          You can answer.
10 BY THE WITNESS:
11     A.   Hotel 57, LLC, there's many other legal
12 entities above it, and Mr. Warner owns it
13 indirectly.  He is not --
14 BY MR. BRUSTEIN:
15     Q.   And when you say he owns it -- go ahead.
16     A.   He's not the direct owner of Hotel 57,
17 LLC.
18     Q.   Is he the owner of each of the corporate
19 entities above Hotel 57, LLC?
20     MR. BOLAND:  Objection.  Object to the form.
21 BY MR. BRUSTEIN:
22     Q.   Directly or indirectly.
23     MR. BOLAND:  No.  Same objection.
24 BY THE WITNESS:



Page 93

1     A.    Indirectly.
2  BY MR. BRUSTEIN:
3     Q.    Are you a corporate officer in any -- in
4  all of those other entities?
5     A.    Yes.
6     Q.    What are those other corporate entities?
7     A.    I don't know them by memory.
8     Q.    Is it more than five?
9     A.    I don't know.
10    Q.    As a corporate officer, shouldn't you
11 know which companies you work for?
12    MR. BOLAND:  Object to the form.
13 BY THE WITNESS:
14    A.    Yes.  And you'll understand when you see
15 the entity structure.
16 BY MR. BRUSTEIN:
17    Q.    We'll leave a space in the record so
18 that you can provide the entity structure.
19         Now, would it be fair to say that all
20 roads through all those different corporate entity
21 structures still lead to Mr. Warner as the owner,
22 directly or indirectly, of Hotel 57, LLC?
23    MR. BOLAND:  Object to the form.
24 BY THE WITNESS:

Page 94

1     A.    Yes, indirectly, it leads to Mr. Warner.
2  BY MR. BRUSTEIN:
3     Q.    Now, you testified that the hotel closed
4  down in approximately March 2020 because of
5  COVID-19, right?
6     A.    Yes.
7     Q.    When did you first learn of COVID-19?
8     A.    I don't recall the exact month.
9     Q.    What year?
10    A.    2020.
11    Q.    Was it before the hotel closed down,
12 though, in March 2020?
13    A.    Before March 2020, yes.
14    Q.    Now, who pays your salary?
15    A.    Ty Warner Hotels & Resorts.
16    Q.    Are you paid by any of the other
17 entities that you're a corporate officer?
18    A.    No.
19    Q.    You get no compensation from any of the
20 other legal entities?
21    A.    No, I do not.
22    Q.    Do those legal entities connect back to
23 Ty Warner Hotels & Resorts or just to Mr. Warner?
24    A.    It does not connect back to Ty Warner

Page 95

1  Hotels & Resorts.
2     Q.    Has Mr. Warner's involvement in Four
3  Seasons Hotel New York changed since the hotel was
4  shut down in March 2020?
5     MR. BOLAND:  Object to the form and
6  foundation.
7  BY THE WITNESS:
8     A.    Can you clarify your question?
9  BY MR. BRUSTEIN:
10    Q.    Has Mr. Warner's involvement in Four
11 Seasons Hotel New York changed since the hotel
12 closed in March 2020?
13    MR. BOLAND:  Same objection.
14 BY THE WITNESS:
15    A.    What do you mean by involvement?
16 BY MR. BRUSTEIN:
17    Q.    Is he more or less involved since the
18 hotel closed in March 2020?
19    MR. BOLAND:  Same objection.
20 BY THE WITNESS:
21    A.    He has not been there physically since
22 March of 2020.
23 BY MR. BRUSTEIN:
24    Q.    Does he call you more frequently about

Page 96

1  the Four Seasons Hotel New York since the hotel
2  closed in March 2020, or less frequently?
3     MR. BOLAND:  Object to the form.
4  BY THE WITNESS:
5     A.    More frequently.
6  BY MR. BRUSTEIN:
7     Q.    I'm sorry, you said more?
8     A.    More.
9     Q.    Does he e-mail you more or less
10 frequently since the hotel closed in March 2020
11 about Four Seasons Hotel New York?
12    A.    The same.
13    Q.    When you have calls with Mr. Warner
14 about the Four Seasons Hotel New York, do you
15 follow-up with him to memorialize those
16 conversations in e-mail?
17    A.    No, not usually.
18    Q.    Does he?
19    A.    No.
20    Q.    Are there any other litigation that
21 you're involved in as a corporate officer besides
22 the ones that you mentioned so far today?
23    A.    Yes.  There's an employee severance
24 matter for Four Seasons Hotel or Four Seasons



Page 97

1  Resort Santa Barbara.
2      Q.   And what is your involvement in that
3  litigation?
4      A.   I'm the corporate officer.
5      Q.   And when you say you're the corporate
6  officer, you testified earlier that Mr. Hicks and
7  Mr. Warner were also corporate officers.
8          Are they corporate officers of that
9  company as well?
10     A.   Yes.
11     Q.   Are you acting as the corporate
12  representative, or are they also involved in those
13  litigations --
14     MR. BOLAND:  Object to the form.
15  BY MR. BRUSTEIN:
16     Q.   -- partly?
17     MR. BOLAND:  Sorry.  Object to the form.
18  BY THE WITNESS:
19     A.   I'm acting as the corporate
20  representative.
21  BY MR. BRUSTEIN:
22     Q.   And do you do that for all of the
23  corporate entities that you have a corporate
24  officer role?

Page 98

1      MR. BOLAND:  Object to the form of the
2  question.
3  BY THE WITNESS:
4      A.   I'm not involved in every single
5  entity's business.  If it comes to my attention,
6  yes, then I act as the corporate representative.
7  BY MR. BRUSTEIN:
8      Q.   Let me ask it differently.  For each of
9  the litigation matters that you've testified about,
10  are you acting as the corporate representative?
11     MR. BOLAND:  Object to the form.
12  BY THE WITNESS:
13     A.   Can you tell me the difference corporate
14  representative and corporate officer?
15  BY MR. BRUSTEIN:
16     Q.   I'm asking you, are you acting on behalf
17  of the corporation, or are you doing it as part of
18  the team?
19     MR. BOLAND:  Object to the form.
20  BY THE WITNESS:
21     A.   I don't understand your question.
22  BY MR. BRUSTEIN:
23     Q.   So you testified that you, Mr. Hicks and
24  Mr. Warner are the three corporate officers at each

Page 99

1  of the entities that you happened to be corporate
2  officer -- the corporate officer of that, correct?
3      A.   Yes.
4      Q.   So I'm asking if Mr. Hicks also is
5  involved as a corporate officer in any of the
6  litigation that you mentioned?
7      A.   No.
8      Q.   Are you responsible as a corporate
9  officer for reviewing the filings that are being
10  made in these litigations to make sure that they're
11  accurate?
12     A.   Yes.
13     Q.   And are you reviewing the filings before
14  they're being submitted to court?
15     A.   Yes.
16     Q.   And have you done that in this case?
17     A.   Yes.
18     Q.   And have you done that in the other
19  cases that you testified about yet?
20     A.   Yes.
21     Q.   Have you testified about all the
22  litigation that you're involved in?
23     MR. BOLAND:  Objection to form.
24  BY THE WITNESS:

Page 100

1      A.   No.
2  BY MR. BRUSTEIN:
3      Q.   What other litigation are you involved
4  in?
5      A.   Maybe I misunderstood your question.  I
6  thought you asked if I have testified for all the
7  litigations that I mentioned.
8      Q.   My apologies.
9      A.   No.
10     Q.   I'm asking if you have given an
11  exhaustive list of all the litigation matters that
12  you're involved in as a corporate officer or if
13  there are others?
14     A.   I -- I don't know.
15     Q.   To the extent that there are other
16  litigation out there that you're involved with as
17  the corporate officer, would it be fair to say that
18  your role is the same as a corporate representative
19  making sure that the filings are accurate if you're
20  involved in that litigation?
21     MR. BOLAND:  Object to the form of the
22  question.
23  BY THE WITNESS:
24     A.   Would you please repeat your question.



CATHY HWANG                                                    April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS                   101–104

Page 101

1    BY MR. BRUSTEIN:
2        Q.    To the extent there are other
3    litigations that you don't currently remember,
4    would it be fair to say that your role in those
5    other cases would be the same, to make sure that
6    the filings are accurate?
7        MR. BOLAND:  Same objection.
8    BY THE WITNESS:
9        A.    Yes.
10   BY MR. BRUSTEIN:
11       Q.    Are you aware of any litigation that
12   Mr. Hicks takes that role in?
13       A.    I'm not aware of everything that he's
14   involved in.
15       Q.    Is it possible that there's litigation
16   Mr. Hicks is involved in that involves the
17   corporate entities that you're the corporate
18   officer of that you don't know about them?
19       A.    Yes.
20       Q.    Would you agree that since he reports to
21   you, if one of the entities you're the corporate
22   officer in is being sued, he should be telling you
23   that kind of information?
24       MR. BOLAND:  Objection, vague, overbroad.

Page 102

1        You can answer.
2    BY THE WITNESS:
3        A.    Yes.
4    BY MR. BRUSTEIN:
5        Q.    And is that the kind of thing that you
6    would expect to tell Mr. Warner about?
7        MR. BOLAND:  Object to the form.
8    BY THE WITNESS:
9        A.    Joe communicates to Mr. Warner as well,
10   and he may -- there may be times when he has not
11   informed me of everything.
12   BY MR. BRUSTEIN:
13       Q.    And how does he communicate with
14   Mr. Warner?
15       A.    Same way; by phone, e-mail.
16       Q.    Do you e-mail Mr. Hicks about the Four
17   Seasons Hotel New York?
18       A.    You mean the lawsuit or other matters?
19       Q.    Let's start with the lawsuit.
20       A.    No.
21       Q.    Other matters of the Four Seasons Hotel
22   New York?
23       A.    Yes.
24       Q.    And is Mr. Warner on all of those

Page 103

1    communications or are there some that Mr. Warner is
2    not involved in?
3        MR. BOLAND:  Objection, overbroad.
4        You can answer.
5    BY THE WITNESS:
6        A.    There's some that he -- Mr. Warner is
7    not included in the communication.
8        MR. BRUSTEIN:  All right.  At this point, I'm
9    going to be introducing an exhibit.  I just want to
10   make sure that the exhibits have not been opened.
11       THE REPORTER:  They have not been opened.
12       MR. BRUSTEIN:  Okay.  Wonderful.
13       I'm going to be introducing Exhibit
14   No. 1, and I will be sharing that in the chat.
15       MR. BOLAND:  Do you want -- do you want the
16   court reporter to get it?  The court reporter has
17   got custody of the envelope.
18       THE REPORTER:  Do you want me to open it
19   and --
20       MR. BRUSTEIN:  I am going to ask her to --
21       MR. BOLAND:  Okay.
22       MR. BRUSTEIN:  -- get the envelope.
23       THE REPORTER:  There's a lot of this tape.
24       MR. BOLAND:  You'll get it.

Page 104

1    THE REPORTER:  Okay.  I have Exhibit 1.
2    MR. BRUSTEIN:  Can you please share that --
3    mark that as Hwang Exhibit 1, please.
4        MR. BOLAND:  Well, do you want to stamp the
5    copy that you give to the witness, and then I'll
6    just keep this one for me.
7        (WHEREUPON, a certain document was
8         marked Hwang Deposition Exhibit
9         No. 1, for identification, as of
10        4/14/23.)
11       MR. BOLAND:  This does not have Bates numbers
12   on it, Evan.  Did you know that?
13       MR. BRUSTEIN:  I did not.
14       MR. BOLAND:  So we don't know about these
15   docs.
16       Okay.  There you go.
17       THE WITNESS:  Thank you.
18       MR. BRUSTEIN:  Okay.  So I am now going to
19   paste the first exhibit into the chat if anyone
20   would like to download it.
21       I'm going to be going through it for
22   ease of not having a thousand exhibits, we're going
23   to be taking them one at a time, not the entire
24   packet.  So you can certainly, you know, leap ahead



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
105–108

Page 105

1 if you want, but I'm just going to be starting with
2 the first page.
3        I am going to share my screen at this
4 point so you can see the Bates numbers, Mr. Boland.
5    MR. BOLAND:  Well, I'm just going to note that
6 the exhibit that the witness has has no Bates
7 numbers, and whatever's in the chat doesn't change
8 that.
9    MR. BRUSTEIN:  Well, this is actually my
10 deposition, and so what's in the chat is going to
11 be the electronic copy that we're using.  So, but
12 during your depositions, your copying team cut off
13 Bates numbers, so I'm just putting on the record
14 what the Bates numbers are.
15        If you want to make an issue of it, go
16 right ahead.
17 BY MR. BRUSTEIN:
18    Q.    So the first one is WARNERDEF, and I'm
19 going to be using the abbreviation WD 3098.  It's
20 the first page.
21        Do you see that e-mail?
22    A.    Yes.
23    Q.    Is this an e-mail that you received?
24    A.    No.

Page 106

1    Q.    Okay.  Now, this says March 13, 2020,
2 Employee Guidelines for COVID-19.  Is that about
3 when the hotel -- Four Seasons Hotel New York
4 started to act differently because of COVID-19?
5    MR. BOLAND:  Objection, foundation.
6 BY THE WITNESS:
7    A.    I don't recall.
8 BY MR. BRUSTEIN:
9    Q.    Do you recall if it was before this?
10    A.    I -- I don't recall the dates.
11    Q.    Okay.  I'm going to have you turn the
12 page to page No. 2, and that's Bates No. WD 9121.
13        Do you recognize this e-mail?
14    A.    Clearly it was sent to me, but I -- I
15 don't recall the e-mail.
16    Q.    Does it refresh your recollection that
17 on about March 16, 2020, the Four Seasons Hotel New
18 York took drastic measures because of the
19 Coronavirus?
20    A.    That's what's stated in the e-mail.
21    Q.    Did you have any involvement in that
22 decision?
23    MR. BOLAND:  Object to the form.
24 BY THE WITNESS:

Page 107

1    A.    No.
2 BY MR. BRUSTEIN:
3    Q.    Did Mr. Warner have any involvement in
4 that decision?
5    A.    No.
6    Q.    Would it be fair to say at that point in
7 time COVID-19 was unprecedented on March 16, 2020?
8    A.    Did you say COVID-19 was unprecedented?
9    Q.    At that point, yes.
10    A.    Yes.
11    Q.    Had you seen what was happening in China
12 prior to it arriving in the United States?
13    MR. BOLAND:  Object to the form.
14 BY THE WITNESS:
15    A.    No.
16 BY MR. BRUSTEIN:
17    Q.    Had you seen when it was happening in
18 Italy prior to it arriving in the United States?
19    MR. BOLAND:  Same objection.
20 BY THE WITNESS:
21    A.    No.
22 BY MR. BRUSTEIN:
23    Q.    Turning the page to the next exhibit,
24 WD -- I mean next page in the exhibit, WD 9119.  Do

Page 108

1 you recognize these e-mails between you and
2 Mr. Tauscher?
3    A.    Again, it was sent to me, but I don't
4 recall exactly the e-mails.
5    Q.    Now, this mail talks about the FSNY
6 agreeing with TWHR to temporarily close hotel
7 operations.
8    MR. BOLAND:  Which e-mail are you talking
9 about, I'm sorry?
10 BY THE WITNESS:
11    A.    At the top of the page?  There's two
12 e-mails.
13    MR. BOLAND:  Yeah.
14 BY MR. BRUSTEIN:
15    Q.    So the e-mail from Mr. Tauscher to you
16 on the bottom --
17    A.    Yes.
18    Q.    -- it says, "Four Seasons is in
19 agreement with TWHR to temporarily close hotel
20 operations at FSNY."
21        Do you see that?  It's the first line.
22    A.    I see it.
23    Q.    What does "TWHR" stand for?
24    MR. BOLAND:  Object to the form.



CATHY HWANG                                                      April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS                      109–112

Page 109

1  BY THE WITNESS:
2     A.   Ty Warner Hotels & Resorts.
3  BY MR. BRUSTEIN:
4     Q.   And so this e-mail is saying that Four
5  Seasons agreed with Ty Warner Hotels & Resorts to
6  close the operations at the Four Seasons Hotel New
7  York, right?
8     MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10    A.   That's what's stated in the e-mail.
11 BY MR. BRUSTEIN:
12    Q.   Had you had conversations with
13 Mr. Tauscher that Ty Warner Hotels & Resorts had
14 wanted to close the hotel, Four Seasons Hotel New
15 York, in March of 2020?
16    A.   What I recall is Mr. Tauscher calling me
17 and informing me about the local mandate and that
18 it -- and what was going on, the widespread of
19 COVID-19 in the City of New York, the downturn of
20 the business --
21    Q.   Did you track --
22    A.   -- that --
23    Q.   -- with Mr. Warner about --
24    MR. BOLAND:  Were you finished with your

Page 110

1  answer?
2     THE WITNESS:  I'm not finished with my answer.
3  BY THE WITNESS:
4     A.   What I recall --
5  BY MR. BRUSTEIN:
6     Q.   Sorry.
7     A.   -- was Rudy telling me about the local
8  mandates and that it would be -- that the hotel
9  would be required to shut down soon.
10    Q.   Did you discuss that with Mr. Warner?
11    A.   Yes.
12    Q.   And did you discuss that on the phone or
13 by e-mail?
14    A.   I don't recall.
15    Q.   When you would get an e-mail like this,
16 would you forward that to Mr. Warner to keep him in
17 the loop?
18    A.   I think, more often than not, I would
19 call him.  There's times when I would forward him
20 e-mails, but it was usually a phone conversation.
21 So I can't recall if it was by e-mail or phone.
22    Q.   But you recall that you did reach out to
23 him one way or the other after receiving the e-mail
24 from Mr. Tauscher?

Page 111

1     A.   After speaking with Mr. Tauscher, I
2  believe I informed Mr. Warner what was going on in
3  New York.
4     Q.   And what did Mr. Warner say?
5     A.   I told him that the hotel would be
6  required to shut down due to the City mandate.
7     Q.   And what did he say back?
8     A.   And he said okay.  I mean, what can you
9  do if it's under the local mandate.
10    Q.   Did he tell you that TWHR should agree
11 with that decision?
12    MR. BOLAND:  Object to the form.
13 BY THE WITNESS:
14    A.   I know how it's stated in the e-mail,
15 but T -- TWHR does not have the authority to close
16 down the hotel.
17       And at the time, I -- I think it was a
18 requirement that under the City that the hotel
19 closed.
20 BY MR. BRUSTEIN:
21    Q.   When you read it now, does it read to
22 you as though TWHR is giving authority to shut down
23 the hotel?
24    MR. BOLAND:  Object to the form.

Page 112

1  BY THE WITNESS:
2     A.   I don't think it's authorizing anything.
3  Again, Four Seasons has authority to close and open
4  the hotel.
5  BY MR. BRUSTEIN:
6     Q.   You sent the top e-mail back to
7  Mr. Tauscher, right?
8     A.   Yes.
9     Q.   Can you please read the last sentence in
10 the first paragraph.
11    A.   We will agree -- we agree we will work
12 together on reopening the hotel at a time we both
13 agree is appropriate.
14    Q.   Was that an accurate statement of how
15 you understood reopening the hotel?
16    MR. BOLAND:  Object to the form.
17 BY THE WITNESS:
18    A.   Four Seasons and ownership has a
19 complicated relationship.  Four Seasons has the
20 authority to manage the hotel and its employees.
21       And if -- and at times I -- I pushed the
22 envelope by saying that we agree, but I realize
23 TWHR does not have the authority to close or manage
24 the day-to-day operations of the hotel.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
113–116

Page 113

BY MR. BRUSTEIN:
2    Q.   But in this e-mail you said that you
3  would agree to open it when both parties agreed it
4  was appropriate, right?
5        MR. BOLAND:  Object to the form, misstates the
6  document.
7  BY THE WITNESS:
8    A.   That's what's stated and --
9  BY MR. BRUSTEIN:
10   Q.   And you --
11       MR. BOLAND:  Please wait.  I don't think she's
12  finished.  She's not finished with her answer.
13  BY THE WITNESS:
14   A.   But that's what's stated, and it was
15  probably referring to the funding which needs to be
16  provided in order to reopen the hotel.
17  BY MR. BRUSTEIN:
18   Q.   If Mr. Warner wanted to withhold
19  funding, could the hotel reopen?
20       MR. BOLAND:  Objection, foundation.
21  BY THE WITNESS:
22   A.   Four Seasons can reopen the hotel.  They
23  have the authority to reopen.  So if they decided
24  to reopen without Mr. Warner's funding, that's

Page 114

1  their decision.
2  BY MR. BRUSTEIN:
3    Q.   Is it your testimony that Mr. Warner has
4  the ability to withhold funding?
5        MR. BOLAND:  Objection, vague, overbroad.
6        You can answer.
7  BY THE WITNESS:
8    A.   Mr. Warner, under the management
9  agreement, funds the operating deficits for the
10  hotel.
11  BY MR. BRUSTEIN:
12   Q.   Let's turn ahead two pages in this
13  document.  This is WD 9118.  This is an e-mail
14  about how widespread COVID was at this point,
15  right?
16       MR. BOLAND:  Object to the form.
17  BY MR. BRUSTEIN:
18   Q.   In part?
19       MR. BOLAND:  Same objection.
20  BY THE WITNESS:
21   A.   Are you referring to the e-mail at the
22  bottom half of the page?
23  BY MR. BRUSTEIN:
24   Q.   I'm just saying that the announcements

Page 115

1  about COVID were global, correct?
2        MR. BOLAND:  Object to the -- object to the
3  form of the question.
4  BY THE WITNESS:
5    A.   This is a communications -- he's
6  referring to the communication that was sent to --
7  well, it's an internal communication between the
8  Four Seasons employees.
9  BY MR. BRUSTEIN:
10   Q.   You were in Chicago at the time, right?
11   A.   Yes.
12   Q.   This wasn't limited to New York, was it?
13       MR. BOLAND:  Object to the form.
14  BY THE WITNESS:
15   A.   Yes, that's correct.
16  BY MR. BRUSTEIN:
17   Q.   So in March of 2020, would you agree
18  that it was a global pandemic?
19   A.   March -- by March 20 of 2020, yes.
20   Q.   And people were dying in great numbers
21  in New York City at that point, right?
22       MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24   A.   That's what the news reported, yes.

Page 116

1  BY MR. BRUSTEIN:
2    Q.   And there were dead bodies piling up in
3  trucks in front of the hospitals because of the
4  overflow in the morgues?
5    A.   I don't know personally, because I was
6  not in New York.  But in the news, yes, that's what
7  was reported.
8    Q.   Now, on March 20 of 2020, that's the
9  first time that the staff was notified that they
10  were going to be placed on furlough, right?
11       MR. BOLAND:  Objection, foundation.
12       You can answer.
13  BY THE WITNESS:
14   A.   I don't know if that was the first time.
15  BY MR. BRUSTEIN:
16   Q.   Let's turn the page, WD 9113.  This is
17  an e-mail that you received from Rudy Tauscher
18  about an all employee update.
19       Does that refresh your recollection as
20  to the fact that the employees were notified on
21  March 19, 2020, about the pandemic shutting things
22  down at the hotel?
23       MR. BOLAND:  Object to the form.
24  BY THE WITNESS:



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
117–120

Page 117

1    A.   I see it in the e-mail. I don't recall
2  the exact dates, but, yes, I see it in the e-mail.
3  BY MR. BRUSTEIN:
4    Q.   Was Mr. Warner involved in this
5  decision?
6    A.   No.
7    Q.   Did he have any involvement in notifying
8  the employees of the Four Seasons Hotel New York
9  about they're being placed on furlough?
10    A.   No.
11    Q.   Is there a reason that the employees
12  weren't notified before March 19, 2020 --
13    MR. BOLAND:  Objection, foundation.
14  BY MR. BRUSTEIN:
15    Q.   -- about --
16    MR. BOLAND:  Sorry.  Go ahead.  I apologize.
17  BY THE WITNESS:
18    A.   I don't know.
19  BY MR. BRUSTEIN:
20    Q.   -- about --
21    MR. BOLAND:  Go ahead.  Let him finish his
22  question.
23      I'll object.  Then you can answer.
24    MR. BRUSTEIN:  Let me -- withdraw.

Page 118

1  BY MR. BRUSTEIN:
2    Q.   Is there a reason that the Four Seasons
3  Hotel New York did not notify the employees of the
4  hotel prior to March 19, 2020, that the hotel would
5  be shutting down and they would be placed on
6  furlough?
7    MR. BOLAND:  Objection.  It assumes facts and
8  no foundation.
9      You can answer.
10  BY THE WITNESS:
11    A.   I don't know.
12  BY MR. BRUSTEIN:
13    Q.   Earlier you testified that Mr. Warner
14  doesn't have the ability to open or reopen -- open
15  or close the Four Seasons Hotel New York, right?
16  He can just withhold funding for it, right?
17    MR. BOLAND:  Objection, form.
18  BY THE WITNESS:
19    A.   He can choose to provide funding of
20  operating deficits.
21  BY MR. BRUSTEIN:
22    Q.   Is Mr. Warner currently withholding
23  funding from the Four Seasons Hotel New York?
24    A.   No.

Page 119

1    Q.   At any point from March 2020 until now
2  has Mr. Warner refused to provide funds requested
3  by the Four Seasons Hotel New York?
4    A.   Ownership had provided a list of
5  operating expenses that the ownership would agree
6  to fund, and all those items have been funded.
7    Q.   With respect to Mr. Warner's involvement
8  in Four Seasons Hotel New York, is there anyone at
9  Hotel 57 Services, LLC, other than yourself and
10  Mr. Hicks, that communicates with Mr. Warner
11  directly?
12    MR. BOLAND:  Objection, foundation.
13  BY THE WITNESS:
14    A.   Can you repeat your question, please.
15  BY MR. BRUSTEIN:
16    Q.   You testified that you and Mr. Hicks are
17  officers of Hotel 57 Services, right?
18    A.   Yes.
19    Q.   Other than the two of you, is there
20  anyone else at Hotel 57 Services, LLC, who
21  communicates directly with Mr. Warner?
22    A.   No.
23    MR. BOLAND:  Objection, foundation.
24  BY THE WITNESS:

Page 120

1    A.   No.
2  BY MR. BRUSTEIN:
3    Q.   So if anyone else at Hotel 57 Services,
4  LLC, wanted to speak to Mr. Warner, they would have
5  to send a message to either you or Mr. Hicks; is
6  that correct?
7    A.   Yes.
8    Q.   Now, have you ever rejected a request to
9  fund something at hotel -- at Four Seasons Hotel
10  New York without bringing it to Mr. Warner?
11    A.   Mr. Warner is aware of the items that we
12  have agreed to fund for hotel at -- hotel during
13  closure.
14    Q.   Is he also aware of requests for funding
15  that are rejected?
16    MR. BOLAND:  Objection, assumes facts.
17  BY THE WITNESS:
18    A.   Again, he's aware of the items that we
19  agreed to fund.
20  BY MR. BRUSTEIN:
21    Q.   I'm asking if you are telling him
22  everything or if you keep things from him when
23  requests come in to fund things at the Four Seasons
24  Hotel New York?



Page 121

1      MR. BOLAND:  Object to the form.
2   BY THE WITNESS:
3      A.   I don't keep things from him.  I inform
4   him of the items that are funded.
5   BY MR. BRUSTEIN:
6      Q.   Has there ever been a request for
7   funding since March 20, 2020, at the Four Seasons
8   Hotel New York that has not been funded by
9   Mr. Warner or any of his entities?
10      MR. BOLAND:  Object to the form.
11   BY THE WITNESS:
12      A.   There are certain payroll for certain
13   positions that were not funded because it was not
14   staffing plan that ownership agreed to fund.
15   BY MR. BRUSTEIN:
16      Q.   When you say "ownership agreed to fund,"
17   was that your decision not to fund or someone
18   else's?
19      MR. BOLAND:  Object to the form of that
20   question.
21   BY THE WITNESS:
22      A.   The items that we agreed to fund during
23   hotel closure was discussed between myself and
24   Mr. Warner.

Page 122

1   BY MR. BRUSTEIN:
2      Q.   Were the items that were not to be
3   funded also discussed between yourself and
4   Mr. Warner?
5      A.   Well, us -- outside of what agreed to be
6   funded, logically, is not funded.
7      Q.   I'm just asking you for a straight
8   answer for the record.
9      MR. BOLAND:  Objection, then.  Asked and
10   answered.
11      MR. BRUSTEIN:  Jim, I really need not speaking
12   more than myself and the witness.  I know you get
13   paid by word sometimes, but in this circumstance,
14   it's not your deposition.
15      MR. BOLAND:  Your question made no sense.  I
16   need a straight answer.
17      If you want to ask her that question
18   again, you can do that.  Or if you want to ask her
19   a different question, you can.
20      I'm not interrupting you.  I'm making
21   minor objections and keeping quiet.
22   BY MR. BRUSTEIN:
23      Q.   Ms. Hwang --
24      A.   Yes.

Page 123

1      Q.   -- did you discuss funding requests at
2   Four Seasons Hotel New York with Mr. Warner that
3   were not funded?
4      A.   Yes, he's aware of certain positions
5   that were not agreed upon to be funded.
6      Q.   Whose decision was it to not fund those
7   positions?
8      A.   Again, it was discussed with myself and
9   Mr. Warner.
10      Q.   Was it your decision not to fund those
11   positions?
12      A.   We discussed the staffing plan and
13   those -- the positions that were not on the
14   staffing plan were not funded.
15      Q.   And whose decision was it to not fund
16   it?  Was it you and Mr. Warner together or only one
17   of you?
18      A.   Us together.
19      Q.   So you agreed with Mr. Warner to not
20   fund certain employees' salaries?
21      MR. BOLAND:  Objection, misstates testimony.
22      You can answer.
23   BY THE WITNESS:
24      A.   Yes.

Page 124

1   BY MR. BRUSTEIN:
2      Q.   Which employee positions did you reject
3   funding for?
4      MR. BOLAND:  Object to the form.
5   BY THE WITNESS:
6      A.   So, for instance, the director of IT.
7   BY MR. BRUSTEIN:
8      Q.   Was that your decision --
9      A.   We agreed --
10      Q.   -- or was it --
11      A.   No, we agreed that he would work one day
12   a week, because during the closure, I did not see a
13   need for a full-time IT director.  And if he worked
14   more than one day a week, we weren't funding the
15   additional hours.
16      Q.   Was that decision, was that something
17   that you and Mr. Warner discussed and agreed to?
18      A.   Yes, we went over every single position
19   on the staffing plan.
20      Q.   Did you make notes of Mr. Warner's
21   feedback of the staffing plan?
22      A.   No, we went over them together.  And he
23   agreed to those positions.
24      Q.   When you went over those plans, did they





CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
125–128

Page 125

1   have -- did they have actual names associated with
2   people whose salaries were being cut?
3       MR. BOLAND:  Object to form.  That assumes
4   facts.
5   BY THE WITNESS:
6       A.   No, I did not have the names of the
7   employees.  Four Seasons did not disclose that
8   information to me.
9   BY MR. BRUSTEIN:
10      Q.   With respect to the plan, how did you
11  present it to him?  Was it by e-mail or hard copy
12  that you mailed to him?
13      A.   By e-mail.
14      Q.   Did he e-mail back a response with edits
15  to the plan?
16      A.   No.
17      Q.   Did he approve of every one of your
18  suggestions to cut funding?
19      MR. BOLAND:  Object to the form.  Assumes
20  facts.
21  BY THE WITNESS:
22      A.   I don't -- I don't recall if there were
23  revisions from the first pass of staffing plan, but
24  it was discussed over the phone.

Page 126

1   BY MR. BRUSTEIN:
2       Q.   If there were revisions, would you have
3   saved those changes in a document?
4       A.   Yes.
5       Q.   And would you have saved the original
6   version when you received the first copy?
7       A.   Well, the original version would have
8   been presented by Four Seasons because they
9   determined the employment for their employees.
10      Q.   Did you need to share your suggestions
11  to Mr. Warner before responding to the Four Seasons
12  about the staff funding?
13      A.   Would you please repeat your question.
14      Q.   Earlier you testified there were some
15  decisions you did not need Mr. Warner's approval
16  for.  Was the decision about which staff positions
17  to fund or not fund something that required
18  Mr. Warner's approval?
19      A.   Yes.
20      Q.   Yes, it required his approval?
21      A.   For funding purposes.
22      Q.   Let's go two pages now further.  This is
23  WD 9111.  This e-mail is an update on the Corona
24  case -- Coronavirus cases continuing to increase in

Page 127

1   New York City.
2       MR. BOLAND:  Object to the form.
3   BY MR. BRUSTEIN:
4       Q.   The top e-mail Tauscher says, "Please
5   share with Mr. Warner."  Do you see that at the end
6   of the e-mail?
7       A.   Yes.
8       Q.   What is your understanding of why
9   Mr. Warner needed to have this information?
10      MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12      A.   Reading this that Mr. Warner is -- he
13  just wanted to keep Mr. Warner informed of what was
14  going on in New York and at the hotel, and he
15  communicated that through me.
16  BY MR. BRUSTEIN:
17      Q.   Now, how many positions did Mr. Warner
18  refuse to fund?
19      MR. BOLAND:  Object to the form.  Assumes
20  facts and misstates the testimony.
21      You may answer.
22  BY THE WITNESS:
23      A.   I don't recall.
24  BY MR. BRUSTEIN:

Page 128

1       Q.   Was it more or less than ten positions?
2       MR. BOLAND:  Same objection.
3   BY THE WITNESS:
4       A.   I don't recall.
5   BY MR. BRUSTEIN:
6       Q.   In -- in approximately March 24, 2020,
7   how many positions did the Four Seasons want funded
8   that Mr. Warner refused to fund?
9       A.   To be clear, Four Seasons sent --
10  provided staffing plans throughout the closure.  I
11  don't recall every instance of when they provided
12  the staffing plan.
13      And I can't recall if they provided the
14  staffing plan on March 20th for the initial
15  closure.
16      Q.   Now, did Ty Warner Hotel & Resorts
17  provide the funding for some positions?
18      MR. BOLAND:  Objection, vague and overbroad.
19  BY MR. BRUSTEIN:
20      Q.   In -- in March of 2020, when the Four
21  Seasons requested or provided a staffing plan, did
22  Ty Warner Hotel & Resorts provide funding for some
23  of those positions?
24      MR. BOLAND:  Objection, assumes facts.



Page 129

1 BY THE WITNESS:
2    A.   I don't recall the exact timing of when
3 it was communicated from ownership to the operator
4 which positions would be funded.  Again, I don't
5 remember the exact timing of when the staffing plan
6 was presented by Four Seasons to ownership.
7 BY MR. BRUSTEIN:
8    Q.   At the time that it was presented,
9 though, did Ty Warner Hotels & Resorts agree to
10 provide funding?
11    MR. BOLAND:  Objection, vague.
12 BY MR. BRUSTEIN:
13    Q.   For the staff positions.
14    A.   Initially, if the hotel -- or I should
15 say Rudy Tauscher and his property level team made
16 the decision of keeping certain employees on
17 payroll.  We were funding those items until a
18 staffing plan was presented and we agreed to
19 certain positions.
20    Q.   And when you say "we," are you referring
21 to Mr. Warner, Ty Warner Hotels & Resorts, or
22 something else?
23    A.   Mr. Warner as part of Ty Warner Hotels &
24 Resorts.

Page 130

1    Q.   When was the last position plan that you
2 received from Four Seasons Hotel New York?
3    A.   I think it was presented with the 2022
4 budget.  I can't recall the dates.
5    Q.   Do you still have a copy of that budget
6 and that position plan?
7    A.   Yes.
8    Q.   Prior to the hotel closing in March
9 of 2020, did you have any reason to expect that the
10 hotel would need to be closed for an extended
11 period of time?
12    A.   No.  Prior to COVID, I didn't know of a
13 reason why the hotel would be closed.
14    Q.   So in February 2020, there was no reason
15 for the hotel to claim that it needed to close down
16 for an extended period of time?
17    MR. BOLAND:  Object to the form.
18 BY THE WITNESS:
19    A.   Again, I don't recall the exact timing.
20 I mean, I think by February, COVID was rampant, but
21 other than the reason for COVID, I don't know of
22 any other reason.
23 BY MR. BRUSTEIN:
24    Q.   Okay.  Let's say January 2020, was there

Page 131

1 any business circumstance you could think of that
2 would require the hotel to be closed for an
3 extended period of time?
4    MR. BOLAND:  Object to the form.
5 BY THE WITNESS:
6    A.   No.
7 BY MR. BRUSTEIN:
8    Q.   Let's turn to the next page.  This
9 begins on WD 1586.  I believe it's a three-page
10 document ending on WD 1588.
11       If you want to take a minute to just
12 look through those two pages.  The second and third
13 page are, you know, just the signature line and
14 marked, and so it shouldn't take you that long.  I
15 am going to remain focused on the main page.
16    A.   Can you scroll up to the top of that
17 current page.  Is that dated March 24th?
18    Q.   Yes.
19    A.   Okay.
20    Q.   I can zoom out so you can see more of
21 the page if that's helpful for you.  Is that
22 better?
23    A.   Yes, thank you.
24    Q.   Have you seen this document before?

Page 132

1    A.   No.
2    Q.   Did you know that the hotel was
3 providing notice that says pursuant to
4 29 U.S.C. 2101, et. seq. in the New York WARN Act
5 before it sent out notices?
6    A.   I wasn't aware of this, any
7 communication at -- that the property level team
8 would have sent out.  It looks like this is from
9 Elizabeth Ortiz.  So I was not aware of these
10 communications or the contents of the communication
11 to the employees.
12    Q.   Earlier you testified that you think
13 February was probably the earliest that someone
14 would have been aware of COVID-19 as an issue.
15    MR. BOLAND:  Object to the form.
16 BY MR. BRUSTEIN:
17    Q.   Is there a reason that this type of
18 notification wasn't sent out in February 2020?
19    MR. BOLAND:  Objection, foundation.
20 BY THE WITNESS:
21    A.   I don't know.
22 BY MR. BRUSTEIN:
23    Q.   Okay.  Let's go to next page after this
24 document beginning on WD 2198.  It's a few pages.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
133—136

1 It's ending on WD 2201. I will scroll slowly if
2 you want to look on the screen, but I believe you
3 have a copy in front of you, as well.
4        If you want to look on the screen, just
5 tell me when you would like me to go to the next
6 page. I'm just going to ask you generally if
7 you've seen this document before.
8        Does it look familiar to you?
9     A.   I have not seen this particular
10 document. I'm familiar with some of the phrases
11 and the wording that was used.
12    Q.   Were you involved in the drafting of the
13 phrasing and wording that was used even if you
14 haven't seen this specific version of it?
15    A.   Four Seasons had sent me their planned
16 communications for -- for the website and to the
17 media.
18    Q.   Did you discuss that planned
19 communication with Mr. Warner?
20    A.   I don't recall.
21    Q.   Did Mr. Warner have any objection to
22 being referred to as the hotel's owner publicly?
23       MR. BOLAND: Objection to the form.
24 BY THE WITNESS:

1     A.   Is that stated in this document
2 somewhere?
3 BY MR. BRUSTEIN:
4     Q.   So if you look on the screen. It's the
5 second page, WD 2199. It's old. It says e-mail
6 and auto reply. The second paragraph, "Following
7 the announcement of Governor Andrew Cuomo and
8 hotel's owner, Ty Warner, Four Seasons Hotel New
9 York is preparing the hotel to accommodate nurses,
10 doctors, and it goes on from there."
11    A.   Okay. Can you please repeat your
12 question?
13    Q.   I'm sorry?
14    A.   Would you please repeat your question
15 earlier.
16    Q.   Did Mr. Warner have any objection to
17 being referred to publicly as the hotel's owner?
18       MR. BOLAND: Objection, foundation.
19 BY THE WITNESS:
20    A.   I'm not aware of any objections.
21 BY MR. BRUSTEIN:
22    Q.   If Mr. Warner had a problem with the way
23 the hotel was referring to him, was he the kind of
24 person that would keep that to himself or would he

1 let you know?
2       MR. BOLAND: Object to the form.
3       Excuse me.
4 BY THE WITNESS:
5     A.   Yes, he would let me know.
6 BY MR. BRUSTEIN:
7     Q.   Is it safe to say that he didn't let you
8 know that he had any objection to being referred to
9 as the hotel's owner?
10    A.   I think if he was upset about being
11 referred to as the hotel's owner, he would have let
12 me know.
13    Q.   And you have no recollection of him ever
14 objecting to being referred to as the hotel's
15 owner?
16    A.   I don't recall.
17    Q.   And you've never asked him not to refer
18 to him as the hotel's owner, right?
19    A.   I've never what?
20    Q.   You've never asked any of the people at
21 the hotel not to refer to Mr. Warner as the hotel's
22 owner, right?
23    A.   That's correct.
24    Q.   Okay. Let's turn to the next document

1 in this set. This is WD 9126. And this e-mail is
2 just talking about the fact that the hotel was
3 going to open on April 2nd to medical personnel.
4       MR. BOLAND: Object to the form.
5 BY MR. BRUSTEIN:
6     Q.   Is that your understanding of what this
7 e-mail was about?
8       MR. BOLAND: Object to the form.
9 BY THE WITNESS:
10    A.   Yes.
11 BY MR. BRUSTEIN:
12    Q.   Did Mr. Warner approve the hotel opening
13 to the medical personnel?
14       MR. BOLAND: Object to the form.
15 BY THE WITNESS:
16    A.   He approved the funding to open up the
17 hotel for the medical professionals.
18 BY MR. BRUSTEIN:
19    Q.   And why did he -- did he tell you why he
20 did that?
21    A.   He had -- he heard what was going on in
22 New York, and he wanted to help the first
23 responders.
24    Q.   Were there any tax benefits to reopening



Page 137

1   up the hotel?
2       MR. BOLAND:  Object to the form.
3   BY THE WITNESS:
4       A.   I don't know.
5   BY MR. BRUSTEIN:
6       Q.   As the chief financial officer, wouldn't
7   tax benefits be something under your purview?
8       MR. BOLAND:  Object to the form.
9   BY THE WITNESS:
10      A.   I'm not a tax expert, and we didn't
11  consult with a tax advisor on that matter.  It was
12  important for Mr. Warner to help the first
13  responders.
14  BY MR. BRUSTEIN:
15      Q.   So it was a completely selfless decision
16  for Mr. Warner, from your understanding?
17      A.   This is what he wished to do.
18      Q.   Turning to the next page, WD 9108.  I'm
19  just looking at the top of the page.  It says that
20  you discussed the timeline with Mr. Warner, and
21  that has to do with reopening the hotel, right?
22      MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24      A.   My e-mail communicates to Mr. Tauscher

Page 138

1   that Mr. Warner wished to extend providing rooms
2   for the medical professionals.
3   BY MR. BRUSTEIN:
4       Q.   Right.  And that was in response to
5   Mr. Tauscher talking about reopening the hotel to
6   guests, right?
7       MR. BOLAND:  Object to the form.
8   BY THE WITNESS:
9       A.   This is at the end of April.  The
10  medical professionals were already at the hotel.
11  And, again, Mr. Warner wanted to continue providing
12  the rooms for the medical professionals, so that's
13  my communication to Rudy to continue on with that
14  program.
15  BY MR. BRUSTEIN:
16      Q.   Now, directing your attention to the
17  second to the last paragraph.  It says, "Speaking
18  to industry colleagues, Mandarin Oriental New York,
19  Park Hyatt, Baccarat, The Carlisle, St. Regis, and
20  Peninsula, all hotels prepared to open in June."
21      Do you see that?
22      A.   I see the sentence, yes.
23      Q.   And those hotels are all in the
24  competitive set for the Four Seasons Hotel New

Page 139

1   York, correct?
2       MR. BOLAND:  Object to the form.
3   BY THE WITNESS:
4       A.   Some of the hotels are in the
5   competitive set.  Not all.
6   BY MR. BRUSTEIN:
7       Q.   Which ones are?
8       A.   Mandarin Oriental, St. Regis, and
9   Baccarat.
10      Q.   But your understanding from this e-mail
11  was that hotels in New York City were going to
12  reopen in June 2020?
13      MR. BOLAND:  Object to the form.
14  BY MR. BRUSTEIN:
15      Q.   Right?
16      A.   I understood that they were planning to
17  reopen, and there was discussions about reopening
18  in June.  But there were a lot of uncertainties
19  with COVID at that point in time.
20      Q.   But Mr. Tauscher was asking you about
21  the timeline that Mr. Warner wanted to reopen Four
22  Seasons Hotel New York, right?
23      MR. BOLAND:  Objection, fundamentally
24  misstates.  Object to the form.

Page 140

1       MR. BRUSTEIN:  Again, I appreciate your words.
2   Please limit to objection.
3       MR. BOLAND:  Tell the truth about the
4   documents.
5       MR. BRUSTEIN:  Mr. Boland, I really am going
6   to remind you that your narration was inappropriate
7   here.
8   BY MR. BRUSTEIN:
9       Q.   Ms. Hwang, did you discuss reopening the
10  hotel with Mr. Warner after receiving
11  Mr. Tauscher's e-mail on April 24th, 2020?
12      MR. BOLAND:  Objection.  Object to the form,
13  vague.
14      You can answer.
15  BY THE WITNESS:
16      A.   What I see here is Rudy asking to end
17  the program to provide rooms to medical
18  professionals on May 7th.  And he said he leaves
19  this decision up to Mr. Warner.
20      And that is what I discussed with
21  Mr. Warner, whether he would like to halt the
22  program or continue the program.
23  BY MR. BRUSTEIN:
24      Q.   But my question to you is if in April



Page 141

1  of 2020, you discussed reopening Four Seasons Hotel
2  New York with Mr. Warner?
3      MR. BOLAND:  Objection, asked and answered.
4        You can answer.
5      MR. BRUSTEIN:  Okay.  Mr. Boland, we're going
6  to have to call the court if you are going to
7  continue to voice your objection.
8      MR. BOLAND:  She just gave you the answer.
9      MR. BRUSTEIN:  No, she didn't.
10     MR. BOLAND:  All right.  I think she did.
11  BY THE WITNESS:
12     A.    Would you please -- would you please ask
13  the question again, because I believe I gave my
14  answer.
15  BY MR. BRUSTEIN:
16     Q.    My question was at -- in April 2020, did
17  you discuss with Mr. Warner reopening the hotel to
18  guests?
19     MR. BOLAND:  Object to the form.
20  BY THE WITNESS:
21     A.    In April of 2020, Mr. Warner was focused
22  on providing the rooms to the medical
23  professionals, so that was not discussed.  He
24  didn't bring that up explicitly.

Page 142

1        He stated that he would like to continue
2  the program providing the rooms for medical
3  professionals, and we discussed uncertainties, and
4  we said we didn't -- we didn't know when would be a
5  good time to halt.  I mean, we wanted to continue
6  providing the rooms.
7  BY MR. BRUSTEIN:
8      Q.    I'm sorry, you said you didn't know when
9  it would be a good time to do what?
10     A.    Mr. Warner said that he would like to
11  continue providing the rooms to the first
12  responders, given what was going on in New York
13  with COVID.  We didn't discuss halting the program.
14  He said we would, you know, revisit.
15     Q.    When is the first time you discussed
16  reopening the Four Seasons Hotel New York with
17  Mr. Warner after April 2020?
18     MR. BOLAND:  Object to the form.
19  BY THE WITNESS:
20     A.    I would say spring and summer of 2020.
21  BY MR. BRUSTEIN:
22     Q.    Who initiated that conversation?
23     A.    Well, it came from Four Seasons as the
24  operator.  I don't recall if Rudy was still

Page 143

1  employed at the hotel, but we were extending the
2  program on a monthly basis.  And at some point in
3  time in that period, Four Seasons, as the operator,
4  had proposed reopening.
5      Q.    While the medical program was going on,
6  did you have conversations with Mr. Warner about
7  reopening the hotel to guests, or did that
8  conversation not happen until after the medical
9  personnel left?
10     A.    It didn't happen until after the medical
11  professionals left.
12     Q.    Why didn't Mr. Warner conclude hosting
13  medical professionals at the Four Seasons Hotel New
14  York?
15     MR. BOLAND:  Objection, foundation.
16        You can answer.
17  BY THE WITNESS:
18     A.    Why did he conclude, is that what you
19  said?
20  BY MR. BRUSTEIN:
21     Q.    Why did he stop, basically?
22     A.    I think we stopped at end of June.  At
23  that point in time he felt that he provided, you
24  know, enough support to the first responders.  And

Page 144

1  there were considerations on, you know, ongoing
2  capital projects that we needed to complete.
3      Q.    Did Mr. Warner tell you that?
4      A.    We discussed the capital projects, and
5  he understood the importance of completing those --
6  the improvements during hotel closure.
7      Q.    When did Mr. Warner first discuss doing
8  capital projects as a basis to close the hotel?
9      MR. BOLAND:  Object to the form.  It assumes
10  facts.
11  BY THE WITNESS:
12     A.    I don't recall.
13  BY MR. BRUSTEIN:
14     Q.    Was it before or after the medical
15  personnel began staying at the hotel?
16     MR. BOLAND:  Same objection.
17  BY THE WITNESS:
18     A.    A number of these capital projects were
19  going on.  I think it started before and during.
20  BY MR. BRUSTEIN:
21     Q.    Did they continue while the medical
22  personnel were staying at the hotel?
23     A.    Yes.
24     MR. BOLAND:  Evan, we've been going over an



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
145–148

Page 145

1 hour and a half on this session. Whenever you get
2 a good time, it probably makes sense to take a
3 break.
4        MR. BRUSTEIN:  Well, okay.  Just give me a few
5 questions, and then we can take a break.
6        MR. BOLAND:  Sure.
7        MR. BRUSTEIN:  Do you want to take a lunch
8 break at that point?
9        MR. BOLAND:  Yeah, sure.
10        Cathy, is that good for you --
11        THE WITNESS:  Yeah.
12        MR. BOLAND:  -- to break?
13        THE WITNESS:  Yeah.
14        MR. BOLAND:  Okay.
15        THE WITNESS:  That's fine.
16        MR. BOLAND:  Yeah, that's fine.
17        MR. BRUSTEIN:  Okay.  I'm sorry.  Can I just
18 have that last question read back.
19        (WHEREUPON, the record was read
20        by the reporter as requested.)
21 BY MR. BRUSTEIN:
22    Q.   What projects, capital projects, were
23 happening while the medical personnel were staying
24 at the hotel?

Page 146

1    A.   The elevator project, elevator --
2 elevator monitoring station projects.
3    Q.   Anything else?
4    A.   There's the building facade project.  I
5 can't recall the exact date of completion.
6    Q.   Do you recall the year the building
7 facade project was completed?
8    A.   No.  The project was suspended during
9 COVID, so I know it was during 2020.  But under
10 City mandate, there were certain rules about what
11 projects can continue, so --
12    Q.   Other than the --
13    A.   So I can't recall -- I'm sorry.  So I
14 can't recall the exact date of the completion.
15 There were many delays.
16    Q.   Other than the elevator modernization
17 and the building facade, were there other projects?
18        MR. BOLAND:  Object to the form.
19 BY THE WITNESS:
20    A.   Again, there's a number of projects that
21 were going on.  I can't recall the exact timing.
22 BY MR. BRUSTEIN:
23    Q.   Were they going on while the hotel had
24 the medical personnel staying there?

Page 147

1    A.   There -- I can't recall exactly which
2 projects were, besides the two that I mentioned.  I
3 can't recall exactly all the projects that were
4 going on during the medical professional stay.
5    Q.   Earlier you said there was a wallpaper
6 lawsuit.  Was there a wallpaper project going on
7 when the medical personnel were there?
8    A.   The installation was -- the initial
9 installation was completed before the medical
10 professional stay, but then there was a second
11 round of reinstalling the wallpaper in certain
12 rooms.
13        So I can't recall if that was still
14 going on while the medical professionals were at
15 the hotel.
16    Q.   Now, was there any capital project that
17 required the hotel -- that required the hotel to
18 shut down?
19        MR. BOLAND:  Object to the form.
20 BY THE WITNESS:
21    A.   There were many capital projects.  Due
22 to the nature of the projects, there would be a lot
23 of noise complaints.  And, as I understand it,
24 certain projects would require shutdown of the

Page 148

1 power, which would be disruptive during hotel
2 operations.
3 BY MR. BRUSTEIN:
4    Q.   Which specific projects are you
5 referencing would require the hotel to shut down
6 because of loss of power?
7    A.   There's a switch gear project.  And then
8 I'm not sure about the elevator project if that
9 would also require it during testing.  But there
10 were a number of complaints prior to shutting down
11 at the hotel by guests about the noise complaint,
12 the elevator project.
13    Q.   Other than the switch gear and elevator
14 project, was there any other capital project that
15 required the hotel to shut down?
16        MR. BOLAND:  Objection, vague.
17 BY THE WITNESS:
18    A.   There's a shower pan project that's
19 going on, and, again, it would be disruptive to
20 hotel's operations as it requires removal of
21 drywall and ceilings, and drywalls in the hallways,
22 as well.
23 BY MR. BRUSTEIN:
24    Q.   Anything else?



CATHY HWANG                                          April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS          149--152

Page 149

1      MR. BOLAND:  Same objection.
2      You can answer.
3  BY THE WITNESS:
4      A.   Like, I don't recall every -- every one
5  of the projects that are in progress.
6  BY MR. BRUSTEIN:
7      Q.   Were there any other big projects?
8      MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10     A.   There is a fire panel replacement
11 project, replace -- replacement/upgrade project.
12 BY MR. BRUSTEIN:
13     Q.   Were these projects all part of the
14 five-year plan?
15     A.   I don't know what you mean by the
16 five-year plan.
17     Q.   Did the hotel have a five-year plan from
18 2019?
19     A.   Again, I don't know what you mean by the
20 five-year plan.
21     Q.   What was involved with the switch gear
22 replacement?
23     A.   I think they had to apply for permits
24 and such.  I -- I don't know the details of the

Page 150

1  project.
2      Q.   What is your understanding of how long
3  the hotel would be required to shut down for the
4  switch gear to be replaced once the permit was
5  approved?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.   I don't know.
9  BY MR. BRUSTEIN:
10     Q.   Who would have -- who was responsible
11 for overseeing the switch gear project?
12     A.   We engaged a third party.
13     Q.   Who is the third party?
14     A.   Solid Rock and --
15     Q.   And -- sorry.
16     A.   -- there's a person that is in charge of
17 the capital projects overseeing those projects.
18     Q.   Who is that?
19     A.   Thomas Rosati.
20     Q.   Did he provide you updates on the
21 timeframe for projects?
22     MR. BOLAND:  Object to the form.
23 BY THE WITNESS:
24     A.   No, he does not give me regular updates.

Page 151

1  BY MR. BRUSTEIN:
2      Q.   Does he give Mr. Warner regular updates?
3      MR. BOLAND:  Objection, foundation.
4  BY THE WITNESS:
5      A.   No.
6  BY MR. BRUSTEIN:
7      Q.   How frequently do you receive updates
8  from Mr. Rosati about the status of the renovation?
9      A.   He'll give me the progress of what's
10 going on, but it's hard to determine the completion
11 date with all the delays during COVID and
12 unforeseen, you know, expansion of projects of --
13 during the shower pan replacement project, it may
14 be discovered that other -- you know, additional
15 rooms are impacted.
16     Q.   Did he give you estimates of how long
17 the projects were supposed to last?
18     MR. BOLAND:  Object to the form.
19 BY THE WITNESS:
20     A.   Those estimates continued to change and
21 it's still ongoing.
22 BY MR. BRUSTEIN:
23     Q.   But does he give you estimated
24 timeframes of when he expects projects to conclude

Page 152

1  and how much money or additional funding is needed?
2      A.   I believe he gets updates from Four
3  Seasons employees who are working on certain
4  projects.
5      Q.   Do you ever request updates?
6      A.   When I speak with him, he -- he gives me
7  certain updates, but he does not send me updates
8  regularly.
9      Q.   When he sends you updates, are they
10 verbal or are they printed materials or electronic
11 materials?
12     A.   They're usually verbal.
13     Q.   Does he sometimes give you status
14 reports that are either printed or electronic for
15 you to review?
16     A.   He does not provide reports.
17     Q.   Do you get annual reports from
18 Mr. Rosati about the status of all the renovations
19 or any of the renovations?
20     A.   No, I do not.
21     Q.   Mr. Warner hasn't asked you to demand
22 reports about how long the renovations or how much
23 the renovations are costing?
24     A.   No, he hasn't demanded updates.



CATHY HWANG                                                    April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS            153—156

Page 153

1    Q.   Do you give a blank check to
2  Mr. Rosati's firm -- Rosati's firm or is there a
3  contract that sets forth certain benchmarks of when
4  certain projects need to be completed?
5       MR. BOLAND:  Object to the form.
6  BY THE WITNESS:
7    A.   No, I do not give bench -- blank checks
8  to Mr. Rosati.
9  BY MR. BRUSTEIN:
10    Q.   Do you have contracts with his firm that
11  sets certain benchmarks of when projects need to be
12  completed by?
13    A.   No.
14    Q.   There's no contracts setting deadlines
15  or penalties for taking too long on a project?
16       MR. BOLAND:  Objection, vague.
17  BY THE WITNESS:
18    A.   There's a contract, but there's no set
19  timelines.
20  BY MR. BRUSTEIN:
21    Q.   Does the contract have any sort of
22  timeframe for when it's expected to complete?
23    A.   I don't recall.
24    Q.   Does the contract actually include the

Page 154

1  scope of work?
2    A.   I don't think the scope of work is
3  specifically defined in the contract.
4    Q.   Is there any limit to the oversight or
5  authority that Mr. Rosati has for doing renovations
6  at the Four Seasons Hotel New York?
7       MR. BOLAND:  Object to the form of the
8  question.
9  BY THE WITNESS:
10    A.   He has no authority.
11  BY MR. BRUSTEIN:
12    Q.   Who has the authority?
13    A.   It would be Four Seasons.
14    Q.   Is it your testimony that the Four
15  Seasons is the one overseeing the progress of the
16  renovations at the Four Seasons Hotel New York?
17    A.   Yes.  Thomas serves as an advisor.
18    Q.   Who was paying Mr. Rosati, Mr. Warner or
19  the Four Seasons or someone else?
20    A.   Ty Warner Hotels & Resorts pays
21  Mr. Rosati.
22    Q.   But it's your testimony that he reports
23  not to Ty Warner Hotels & Reports or Mr. Warner or
24  yourself but to the Four Seasons?

Page 155

1    A.   Mr. Rosati is a third party.  He works
2  for a third party firm called Solid Rock.  He does
3  not report to me.  He does not report to Four
4  Seasons.
5    Q.   But my question is, who has oversight of
6  Mr. Rosati and Solid Rock?
7       MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9    A.   Ty Warner Hotels & Resorts have engaged
10  them to advise on projects, has engaged Solid Rock
11  to advise on projects.
12  BY MR. BRUSTEIN:
13    Q.   Since they're advising, is it your
14  testimony that Ty Warner Hotels & Resorts does not
15  have the authority to overrule Solid Rock on
16  renovation projects?
17       MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19    A.   They recommend the projects, and it's up
20  to Ty Warner Hotels & Resorts to decide if we would
21  like to implement those projects.
22  BY MR. BRUSTEIN:
23    Q.   When they recommend projects, do they
24  provide a proposal that includes the scope of work

Page 156

1  and a estimated budget?
2    A.   Yes.
3    Q.   And does that proposal also include a
4  proposed or estimated timeframe for the project to
5  take?
6    A.   I don't recall.
7    Q.   Is it one contract or does it -- or one
8  proposal, or does every renovation or capital
9  project that they propose have its own separate
10  proposal?
11    A.   They would be proposed separately.
12       MR. BRUSTEIN:  We're going to call for the
13  production of those proposals.
14       MR. BOLAND:  Issue a document request.
15       MR. BRUSTEIN:  All right.  At this point if
16  you want to take a break.
17       MR. BOLAND:  Okay.
18       MR. BRUSTEIN:  How much time do you want for
19  your break?
20       MR. BOLAND:  How much time do you need for --
21  how much time -- is there something these people
22  can do something within a half hour and be back, or
23  do we need, like, a little longer than that?
24       THE VIDEOGRAPHER:  We're going off the record



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
157–160

Page 157

1  at 12:37 p.m.
2        (WHEREUPON, discussion was had
3        off the record.)
4        (WHEREUPON, the deposition was
5        recessed until 1:20 p.m., this date,
6        April 14, 2023.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 158

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  SELENA STALEY, VIVIAN      )
4  HOLMES, and OLIVE IVEY,    )
5  on behalf of themselves    )
6  and all others similarly   )
7  situated,                  )
8        Plaintiffs,          )
9     -against-              ) No. 22-CV-6781 (JSR)
10  FOUR SEASONS HOTELS AND    )
11  RESORTS, HOTEL 57          )
12  SERVICES, LLC, HOTEL 57,   )
13  LLC, TY WARNER HOTELS &     )
14  RESORTS, LLC, and H. TY    )
15  WARNER,                    )
16        Defendants.          )
17              April 14, 2023
18              1:31 p.m.
19
20        The videotaped deposition of CATHY
21  HWANG, taken via Zoom Video Conference, resumed
22  pursuant to recess at 280 Chestnut Avenue,
23  Westmont, Illinois.
24

Page 159

1  PRESENT:
2
3        BRUSTEIN LAW PLCC,
4        (299 Broadway, 17th Floor,
5        New York, New York  10007,
6        212-233-3900), by:
7        MR. EVAN CRAIG BRUSTEIN,
8        evan@brusteinlaw.com,
9            and
10       RISMAN & RISMAN, P.C.,
11       (299 Broadway, 17th Floor,
12       New York, New York  10007,
13       212-233-6400), by:
14       MS. MAYA RISMAN,
15       info@risman-law.com,
16           appeared Zoom Video Conference on behalf
17           of the Plaintiffs;
18
19
20
21
22
23
24

Page 160

1  PRESENT (Continued):
2
3        SMITH GAMBRELL RUSSELL,
4        (1301 Avenue of the Americas, 21st Floor,
5        New York, New York  10019,
6        212-218-8760), by:
7        MS. KATHRYN T. LUNDY,
8        klundy@sgrlaw.com,
9            appeared via Zoom Video Conference on
10           behalf of the Defendants Hotel 57
11           Services, LLC, Hotel 57, LLC, Ty Warner
12           Hotels & Resorts, LLC, H. Ty Warner, and
13           the deponent;
14
15       SMITH GAMBRELL RUSSELL,
16       (311 South Wacker Drive, Suite 3000,
17       Chicago, Illinois  60606,
18       312-360-6000), by:
19       MR. JAMES J. BOLAND,
20       jboland@sgrlaw.com,
21           appeared on behalf of the Defendants
22           Hotel 57 Services, LLC, Hotel 57, LLC,
23           Ty Warner Hotels & Resorts, LLC, H. Ty
24           Warner and the deponent;



Page 161

1   PRESENT (Continued):

2

3       STOKES & WAGNER, ALC,

4       (903 Hanshaw Road,

5       Ithaca, New York 14850,

6       607-257-5165), by:

7       MR. PAUL ERIC WAGNER,

8       pwagner@stokeswagner.com,

9           appeared via Zoom Video Conference on

10          behalf of the Defendant FSR

11          International Hotels, Inc.

12

13  ALSO PRESENT:

14      MS. AMANDA YONUSHATIS, The Videographer.

15

16  REPORTED BY: JACQUELINE M. TIMMONS,

17          C.S.R., R.M.R., R.D.R.

18          Certificate No. 84-2949.

19

20

21

22

23

24

Page 162

1       THE VIDEOGRAPHER: We are going back on the

2   record at 1:31 p.m.

3       MR. BRUSTEIN: Can I trouble you for what the

4   last question was, Ms. Timmons.

5       THE REPORTER: Sure.

6           (WHEREUPON, the record was read

7           by the reporter as requested.)

8           CATHY HWANG,

9   called as a witness herein, having been previously

10  duly sworn and having testified, was examined and

11  testified further as follows:

12          EXAMINATION (Resumed)

13  BY MR. BRUSTEIN:

14      Q.   Ms. Hwang, when was Solid Rock first

15  retained?

16      A.   In 2019.

17      Q.   And were they only retained for the Four

18  Seasons Hotel New York, or were they retained for

19  any other properties or entities?

20      A.   To best of my recollection, they started

21  with Four Seasons New York and --

22      Q.   Where did they go?

23      A.   Then they moved on to -- they also

24  started looking at the Four Seasons Santa Barbara.

Page 163

1       Q.   When did they become involved in the

2   Four Seasons Santa Barbara?

3       A.   I don't recall.

4       Q.   Is the Four Seasons Santa Barbara also

5   closed for renovations?

6       A.   Four Seasons Santa Barbara closed on the

7   same date as Four Seasons New York under the local

8   mandate, and it remains closed. During the

9   closure, with all the uncertainties with COVID, we

10  decided to work on some CapEx projects to improve

11  the infrastructure.

12      Q.   When did you decide to keep the hotel

13  closed for capital improvement projects for Four

14  Seasons Hotel New York?

15      MR. BOLAND: Object to the form.

16  BY THE WITNESS:

17      A.   I don't recall the timing.

18  BY MR. BRUSTEIN:

19      Q.   Was it before or after the medical

20  personnel left?

21      MR. BOLAND: Same objection.

22  BY THE WITNESS:

23      A.   I can't give you a clear cut answer, as

24  there were projects that were in progress already

Page 164

1   and in the plans, so I can't recall the timing.

2   BY MR. BRUSTEIN:

3       Q.   So you don't know if the decision to not

4   reopen the hotel was made before or after the

5   medical personnel left the Four Seasons Hotel New

6   York?

7       MR. BOLAND: Object to the form and assumes

8   facts.

9   BY THE WITNESS:

10      A.   Can you repeat your question, please.

11  BY MR. BRUSTEIN:

12      Q.   You -- sitting here today you don't

13  remember if the decision to not reopen the hotel so

14  that capital improvement projects could occur was

15  made before or after the medical personnel left the

16  Four Seasons Hotel New York?

17      MR. BOLAND: Same objection.

18  BY THE WITNESS:

19      A.   There wasn't a clear cut timing of when

20  the decisions were made, because the hotel closed

21  due to COVID and then during the closure, you know,

22  there were ongoing projects which continued. So

23  there wasn't a clear cut decision to close the

24  hotel for the projects. It -- it just kind of



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
165–168

Page 165

1  blurred one into the other.  I think the --
2      Q.    Did you -- no, sorry.
3      A.    Yeah.  I said I can't recall the exact
4  timing.
5      Q.    When did COVID stop being a basis for Ty
6  Warner Hotels & Resorts to reopen Four Seasons
7  Hotel New York?
8      MR. BOLAND:  Object to the form of the
9  question and assumes facts.
10         You can answer.
11 BY THE WITNESS:
12     A.    It continued on for a long length of
13 time, as we were concerned for the safety of the
14 employees.  And to reopen, it would also include
15 the safety of the guests.
16 BY MR. BRUSTEIN:
17     Q.    Was there a certain time that you
18 believed the hotel could reopen safely?
19     A.    We didn't have the safety protocols and,
20 you know, plan that would ensure the safety of the
21 guests.  Four Seasons had presented a plan and
22 ownership felt that it lacked, so the decision was
23 to keep the hotel closed.
24     Q.    You said that ownership believed the

Page 166

1  plan lacked what?
2      A.    The proper safety protocol.
3      Q.    And when you say ownership, is that
4  Mr. Warner?
5      A.    Yes.
6      MR. BRUSTEIN:  I'm now going to mark as
7  Exhibit -- Hwang Exhibit 14.  This is a new
8  exhibit, so, unfortunately, you're going to have to
9  download it, but it begins with WD 9374.  And I'm
10 sharing it in the chat box.  This is a document
11 that was just provided by the Warner defendants
12 late yesterday, and so I was not able to provide it
13 in advance.
14         (WHEREUPON, a certain document was
15          marked Hwang Deposition Exhibit
16          No. 14, for identification, as of
17          4/14/23.)
18 MR. BRUSTEIN:  So I've shared it in the chat
19 box and I'm also going to open it so that you can
20 look at this.  I'm going to share my screen.
21 MR. BOLAND:  What is it again?  I see
22 something -- is it 8 -- was it 9374 something?
23 MR. BRUSTEIN:  9374.
24 BY MR. BRUSTEIN:

Page 167

1      Q.    It's a 54-page document that goes all
2  the way through 9 -- WD 9427.
3      MR. BOLAND:  Okay.
4  BY MR. BRUSTEIN:
5      Q.    And it's titled, COVID-19 Reopening
6  Communications Guidance and Materials, Public
7  Relations and Social Media, and it says it was last
8  updated August 14, 2020.
9         Do you see that?
10     A.    Yes.
11     Q.    Is this part of the -- or the materials
12 that you received from Four Seasons about a
13 proposal to reopen the hotel?
14     MR. BOLAND:  Objection, foundation.
15 BY THE WITNESS:
16     A.    I don't recall if I've received this
17 document before.
18 BY MR. BRUSTEIN:
19     Q.    But you did receive a detailed plan
20 about how to open the hotel in a way that Four
21 Seasons claimed was safe, right?
22     MR. BOLAND:  Object to the form.
23 BY THE WITNESS:
24     A.    Initially I don't think we received any

Page 168

1  plan from Four Seasons.
2  BY MR. BRUSTEIN:
3      Q.    I'm talking about in the summer of 2020.
4  Are you claiming that you didn't receive any plans
5  in the summer of 2020 about reopening the hotel?
6      A.    As it relates to safety protocol, I
7  don't believe it was initially included in their
8  proposal to reopen.
9      Q.    Prior to reopening the hotel to medical
10 staff that were working in the hospitals with
11 people dying from COVID, were any safety protocols
12 put in place to make sure that the hotel's
13 employees and the medical personnel could maintain
14 safety?
15     A.    Are you referring to prior to March
16 of 2020?
17     Q.    No.  I'm referring to prior to
18 Mr. Warner's decision to open the hotel to medical
19 personnel, were there safety protocols put in place
20 so that the hotel employees could be safe when they
21 housed the doctors and nurses who were treating the
22 people dying in the New York City hospitals from
23 COVID-19?
24     A.    There were safety plans presented by the



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
169–172

Page 169

1  hotel.  I don't know if it was implemented and the
2  timing of it.
3      Q.   Did the hotel hire scientific experts to
4  make sure that there was a safety protocol to keep
5  everyone safe or as safe as possible?
6      A.   Yes, they hired a third-party expert.
7      Q.   Did Ty Warner Hotel & Resorts also hire
8  a safety protocols expert?
9      A.   No.  We relied on our hospitality
10  advisors.
11      Q.   And when you say your hospitality
12  advisors, who are they?
13      A.   Solid Rock.
14      Q.   Now, Four Seasons Hotel relied on Johns
15  Hopkins University's medical and scientific
16  experts, right?
17      A.   Yes.
18      Q.   And you opposed their reopening plans
19  because of Solid Rock and their expertise?
20      MR. BOLAND:  Object to the form of the
21  question.
22  BY THE WITNESS:
23      A.   Four Seasons presented Lead With Care,
24  which was a global plan.  It wasn't tailored to the

Page 170

1  hotel specifically.
2  BY MR. BRUSTEIN:
3      Q.   It was in consultation with Johns
4  Hopkins University's medical and scientific
5  advisors, though, correct?
6      A.   That's what I was informed.
7      Q.   Are you aware of the medical and
8  scientific expertise of Solid Rock?
9      A.   There was an employee who looked into
10  and researched safety devices and safety protocols
11  from Solid Rock.
12      Q.   What was that employee's science --
13  scientific or medical background?
14      A.   I don't know.
15      Q.   And when you say they looked into, did
16  they Google stuff?
17      A.   I don't know.
18      Q.   What's the name of this employee?
19      A.   His first name's Sebastian.  I don't
20  recall his last name.
21      Q.   Did Mr. Warner have concerns about
22  opening up the -- the hotel to the medical workers
23  at the time that he had employees working in the
24  hotel?

Page 171

1      MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3      A.   The contacts with employees were
4  minimized.  Third party services were engaged to
5  clean up guest rooms.  There were no changing of
6  linens.  Four Seasons employees would simply drop
7  off clean linens outside the medical professional's
8  door, but not enter the rooms itself.
9  BY MR. BRUSTEIN:
10      Q.   Is Sebastian a doctor?
11      A.   I don't know.
12      Q.   Is he a nurse?
13      A.   I don't know.
14      Q.   Does he have a science degree of any
15  kind?
16      A.   I don't recall.
17      Q.   Was he brought in specifically because
18  of COVID-19?
19      MR. BOLAND:  Object to the form.
20  BY THE WITNESS:
21      A.   I don't know.  He's an employee of Solid
22  Rock.
23  BY MR. BRUSTEIN:
24      Q.   As an officer of a hotel corporation,

Page 172

1  you relied on Sebastian's expertise in determining
2  whether or not it was safe to reopen the Four
3  Seasons Hotel New York?
4      MR. BOLAND:  Objection, vague.
5  BY THE WITNESS:
6      A.   As I stated before, the Lead With Care
7  plan was not tailored to the hotel.  I don't think
8  it was suitable for the hotel.
9  BY MR. BRUSTEIN:
10      Q.   Did you rely on Sebastian's COVID-19
11  expertise in determining whether or not it was safe
12  to reopen the Santa Barbara property?
13      MR. BOLAND:  Same objection.
14  BY THE WITNESS:
15      A.   Same thing with Santa Barbara, there was
16  no specific plan presented for the property.
17  BY MR. BRUSTEIN:
18      Q.   Other than Sebastian, maybe Googling
19  COVID --
20      MR. BOLAND:  That's not what he said.
21      MR. BRUSTEIN:  Excuse me.  I'm going to ask
22  the questions and you can --
23      MR. BOLAND:  I know what you're doing.  I know
24  what you're doing.  Sorry.



Page 173
1     MR. BRUSTEIN:  I'm glad that you know how a
2  deposition works.
3     MR. BOLAND:  No, I know what you're doing.  I
4  know what you're doing.
5     MR. BRUSTEIN:  You know, we're going to call
6  the court if you continue to act in this manner.
7  It's inappropriate.  And I've asked you repeatedly
8  not to disrupt the deposition.  Can you control
9  yourself and limit yourself to objection and if you
10  need to direction your witness not to answer a
11  question, but keep your commentary and your
12  laughter and your head nods and other coaching of
13  the witness out of this, please.
14     MR. BOLAND:  Not happening.
15        You can answer.
16     Ask your questions.
17  BY MR. BRUSTEIN:
18     Q.    Are you aware of any other efforts that
19  were made by Ty Warner Hotels & Resorts; Hotel 57
20  Services, LLC; Hotel 57, LLC; yourself; Mr. Warner
21  or Solid Rock to figure out how to safely reopen
22  the Four Seasons Hotel New York other than
23  Sebastian Googling?
24     MR. BOLAND:  Object to the form.

Page 174
1  BY THE WITNESS:
2     A.   I did not say Sebastian Googled.  I
3  don't know if he Googled.
4  BY MR. BRUSTEIN:
5     Q.    So he may not have even Googled?
6     A.   I don't know what he did for his
7  research.  I don't know.
8     Q.    So it could have been more or less than
9  even Googling?
10     A.   I don't know.
11     Q.    So are you aware of anything
12  specifically that was done to research how to
13  safely reopen the Four Seasons Hotel New York after
14  March of 2020?
15     MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17     A.   Can you repeat your question, please.
18  BY MR. BRUSTEIN:
19     Q.    Are you aware of anything specifically
20  that was done to research how to safely reopen the
21  Four Seasons Hotel New York after March of 2020?
22     A.   Ownership asked the operator to come
23  back with a plan that's specific for the hotel and
24  tailored to the hotel's needs.

Page 175
1     Q.    I'm sorry, you said you requested that?
2     A.   Yes.
3     Q.    And did they?
4     A.   There may have been another revised plan
5  more detailed out, but, again, we didn't feel that
6  it was appropriate for the hotel.
7     Q.    What about --
8     A.   Ownership felt --
9     Q.    Sorry.
10     A.   Ownership felt that it wasn't
11  appropriate for the hotel.
12     Q.    And when you say "ownership," is that
13  Sebastian or Mr. Warner or someone else?
14     A.   Sebastian is not ownership.  I'd say --
15     Q.    So is that --
16     A.   -- Mr. Warner and myself.
17     Q.    What objection did Mr. Warner and you
18  have to the safety protocols that were offered or
19  suggested by the Four Seasons proposal?
20     A.   I don't recall the specifics.
21     Q.    Did you write them down anywhere?
22     A.   I don't think so.
23     Q.    Did you e-mail the Four Seasons your
24  objections to their plans so they could try and

Page 176
1  address it?
2     A.   Again, to my recollection, we requested
3  a more tailored plan of safety proposals for the --
4  for Four Seasons New York.
5     Q.    Right, but you testified they gave you a
6  more detailed plan and that one still didn't suit
7  your needs, right?
8     MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10     A.   I meant -- I meant a plan that's
11  tailored for the hotel.  We didn't -- we didn't
12  feel that it was tailored at all for the hotel.
13  BY MR. BRUSTEIN:
14     Q.    Right.  That was about the first plan I
15  thought.  Was that about the second plan, as well?
16     A.   Yes.
17     Q.    So did you give them specific objections
18  as to why it wasn't tailored specifically to the
19  Four Seasons Hotel New York?
20     A.   I gave them general comments, no.  So no
21  specifics.
22     Q.    And did you provide those in writing?
23  Or verbally over the phone?
24     A.   I don't recall.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
177–180

Page 177

1    Q.   Well, if you were concerned about the
2  specifics and making sure that it was properly
3  conveyed, did you give them written instructions so
4  they could follow the objections that you and
5  Mr. Warner had and try to reopen the hotel safely?
6       MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8    A.   It may have been over a phone call.
9  That's why I don't recall if it was e-mail or phone
10  call.  I can't recall.
11  BY MR. BRUSTEIN:
12    Q.   How many plans were offered by the Four
13  Seasons to reopen the Four Seasons Hotel New York?
14    A.   I don't recall.
15    Q.   Was it more or less than five?
16    A.   Are we including informal plans?
17    Q.   Let's start with formal plans.
18    A.   Over the course of three years, I -- I
19  can't tell you if it was higher or lower than five.
20    Q.   Informal plans reduced to writing, more
21  or less than five?
22    A.   Informal plans which did not include
23  projections, financial projections and market
24  analysis, including those, I would say over five.

Page 178

1    Q.   Did Mr. Warner accept any of those
2  plans?
3    A.   No.
4    Q.   Did Mr. Warner reject every single plan,
5  both the informal and the formal ones presented by
6  Four Seasons to reopen the Four Seasons Hotel New
7  York since March 2020?
8       MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10    A.   Yes.
11  BY MR. BRUSTEIN:
12    Q.   Did he have the same objections for each
13  plan, or was there -- were the plans getting closer
14  to Mr. Warner's criteria to be able to reopen the
15  hotel?
16       MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18    A.   When you say plan, do you mean the
19  reopening plan in general or just the safety
20  protocol plans?
21  BY MR. BRUSTEIN:
22    Q.   The reopening plan.
23    A.   So for the reopening plan, if it
24  includes financial projections, we felt that it --

Page 179

1  it lacked profitability for the hotel to reopen at
2  those points in time.
3    Q.   Was there a specific price point that
4  you required, that Mr. Warner required in the
5  proposal, to be able to reopen the Four Seasons
6  Hotel New York?
7       MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9    A.   The hotel is a business.  We would
10  expect the business to make a profit in order to
11  reopen.
12  BY MR. BRUSTEIN:
13    Q.   Is it your testimony that every proposal
14  put forth by the Four Seasons included Mr. Warner
15  taking a loss?
16    A.   They gave multiple year projections, and
17  in the initial years, it certainly would take a
18  loss.
19    Q.   How long did the proposals say it would
20  be before the hotel would be profitable?
21    A.   I don't recall.
22    Q.   Did you ever discuss getting paycheck
23  protection funding?
24    A.   Discuss with whom?

Page 180

1    Q.   With Mr. Warner.
2    A.   Yes.
3    Q.   What did that conversation consist of?
4    A.   He was open to it.
5    Q.   Is there a reason that you did not
6  seek -- did you seek PPP funding for the employees
7  of the hotel?
8    A.   We found out the hotel would not qualify
9  for the program.
10    Q.   How come?
11    A.   Head count.  It was not considered a
12  small business.
13    Q.   Now, is it your testimony that the New
14  York Four Seasons is -- the New York Hotel Four
15  Seasons is -- sorry, the Four Seasons Hotel New
16  York is not causing a loss for Mr. Warner as it
17  sits shuttered?
18    A.   There's a loss.
19    Q.   Based on the projections from the Four
20  Seasons, is it more of a loss for the Four Seasons
21  Hotel New York to remain shuttered or for it to
22  reopen?
23       MR. BOLAND:  No, object to the form.
24  BY THE WITNESS:



Page 181

1    A.   I don't recall all the different
2    scenarios that were presented, but it was not
3    profitable in the initial years.
4    BY MR. BRUSTEIN:
5        Q.   You would agree it's not profitable for
6    the hotel to remain closed as well, though, right?
7        A.   Yes.
8        Q.   But sitting here today as the chief
9    financial officer for Ty Warner Hotels & Resorts
10   and Hotel 57, LLC, and Hotel 57 Services, LLC, you
11   can't say with any degree of certainty whether it's
12   more or less profitable for the hotel to have
13   reopened or to have remained closed under any of
14   the proposals put forth by Four Seasons?
15       MR. BOLAND:  Object to the form.
16   BY THE WITNESS:
17       A.   Can you repeat your question again.
18   BY MR. BRUSTEIN:
19       Q.   You testified that you're an officer in
20   all of the Warner entities involved in the
21   ownership of the Four Seasons Hotel New York,
22   right?
23       A.   Yes.
24       Q.   And you're the chief financial officer

Page 182

1    for each of those entities?
2        A.   I'm the chief financial officer for just
3    Ty Warner Hotels & Resorts.
4        Q.   Oh, you're not the chief financial
5    officer for the other entities?
6        A.   No.
7        Q.   As the officer for all of those entities
8    and the chief financial officer for Ty Warner
9    Hotels & Resorts, sitting here today, you can't say
10   whether it's profit -- it's more profitable for the
11   hotel to remain shuttered or to reopen?
12       MR. BOLAND:  Object to the form.
13   BY THE WITNESS:
14       A.   We weren't going to open up the hotel
15   knowing that it's not going to be profitable.
16   BY MR. BRUSTEIN:
17       Q.   So even if it was less profitable to
18   remain shuttered, you wouldn't open up the hotel
19   for a loss?
20       MR. BOLAND:  Object to the form.
21   BY THE WITNESS:
22       A.   If it was less profitable, is that what
23   you said?  I don't understand.
24           Can you repeat your question.

Page 183

1    BY MR. BRUSTEIN:
2        Q.   I'm going to -- I'm going to break down
3    with date numbers, okay, but I'm going to use small
4    ones to make this simple.  If it cost Mr. Warner $2
5    a day to keep the hotel closed, but reopening the
6    hotel would only cost him $1 a day, would
7    Mr. Warner and Ty Warner Hotels & Resorts still
8    keep the hotel closed because it was losing a
9    dollar a day?
10       MR. BOLAND:  Object to the form.  And no
11   foundation and assumes facts.
12           You can answer.
13   BY THE WITNESS:
14       A.   As an officer of the company, I would
15   advise Mr. Warner to select the option that would
16   minimize his loss and maximize his profitability.
17   BY MR. BRUSTEIN:
18       Q.   So you would, under that scenario,
19   recommend reopening the hotel?
20       MR. BOLAND:  Objection, incomplete
21   hypothetical.
22           You can answer.
23   BY THE WITNESS:
24       A.   If it was going to -- but, again, it

Page 184

1    would not be Mr. Warner's decision to open up the
2    hotel.  It would be the Four Seasons' decision to
3    open up the hotel.
4    BY MR. BRUSTEIN:
5        Q.   Just without any money?
6        MR. BOLAND:  Well, object to the form, assumes
7    facts.
8    BY THE WITNESS:
9        A.   Four Seasons can get their money if they
10   like.  No one is stopping them from, you know,
11   seeking financing to open up the hotel.
12   BY MR. BRUSTEIN:
13       Q.   Is it your position the Four Seasons
14   could just go ahead and pay the employees if they
15   wanted?
16       A.   Yes, they paid their employees what they
17   want.
18       Q.   And you're referring to the employees of
19   the Four Seasons Hotel New York?
20       A.   I'm referring to -- I'm sorry?  Can you
21   repeat your question.
22       Q.   The employees of the Four Seasons --
23   sorry.  The employees of the Four Seasons Hotel New
24   York.



Page 185

1    MR. BOLAND: Object to the form.
2  BY THE WITNESS:
3    A.   All I heard was employees to the Four
4  Seasons Hotel New York.
5  BY MR. BRUSTEIN:
6    Q.   You asked who I was referring to, which
7  employees. So I'm referring -- you're saying the
8  Four Seasons could pay the employees of the Four
9  Seasons Hotel New York if the Four Seasons wanted
10 to?
11   A.   Yes. It's up to Four Seasons to decide
12 what employees are paid.
13   Q.   And so it's not just Ty Warner Hotels &
14 Resorts' responsibility to pay the employees of
15 Four Seasons Hotel New York?
16   MR. BOLAND: Object to the form of the
17 question.
18 BY THE WITNESS:
19   A.   Ty Warner Hotels & Resorts is providing
20 funding for operating deficits, including payroll,
21 during closure. Ty Warner Hotels & Resorts does
22 not get to decide what employees are paid.
23       It is up to Four Seasons to decide what
24 employees are paid.

Page 186

1  BY MR. BRUSTEIN:
2    Q.   Did Ty Warner Hotels & Resorts, LLC,
3  receive any PPP money?
4    A.   No.
5    Q.   Did they lay off any employees during
6  the pandemic?
7    A.   Yes.
8    Q.   How many?
9    A.   I would say half the department.
10   Q.   How many people is that?
11   A.   Approximately five.
12   Q.   Is there a reason Ty Warner Hotels &
13 Resorts did not apply for PPP money for those five
14 employees?
15   A.   It didn't qualify.
16   Q.   How come?
17   A.   Head count.
18   Q.   How many employees work at Ty Warner
19 Hotels & Resorts?
20   A.   Right now there's probably about a
21 dozen. At the time I think there were less.
22   Q.   So what -- what was your understanding
23 of how many employees was the cutoff for PPP
24 eligibility?

Page 187

1    A.   You have to take the businesses, the
2  head count for the businesses collectively --
3    Q.   When you --
4    A.   -- to apply for PPP.
5    Q.   I'm sorry?
6    A.   You have to count the head count of all
7  the employees for all the businesses collectively.
8  You can't say there's just -- we'll apply for a
9  program for 12 employees. So for --
10   Q.   When you say all the businesses, do you
11 mean the 30 or 40 entities that Mr. Warner has?
12   A.   Right.
13   Q.   Is it your position that the employees
14 at the time that the Four Seasons Hotel New York
15 and the Four Seasons in Santa Barbara are part of
16 the same entity?
17   MR. BOLAND: Object to the form.
18 BY THE WITNESS:
19   A.   I think you're confusing the program.
20 That's not how it works. It's not by entity. It's
21 by number of employees.
22 BY MR. BRUSTEIN:
23   Q.   And so do you consider the Four Seasons
24 Hotel New York employees and the Four Seasons Santa

Page 188

1  Barbara employees all under the Ty Warner Hotels &
2  Resorts umbrella as employees of Ty Warner Hotels?
3    MR. BOLAND: Sorry, object to the form.
4  BY THE WITNESS:
5    A.   Four Seasons' employees do not fall
6  under the umbrella of Ty Warner Hotels & Resorts,
7  LLC.
8  BY MR. BRUSTEIN:
9    Q.   So what employees prevented Ty Warner
10 Hotels & Resorts from qualifying for PPP money?
11   A.   It would be all the different
12 businesses, like I said, but they do not fall under
13 the umbrella of Ty Warner Hotels & Resorts.
14   Q.   Do they fall under Ty Company?
15   MR. BOLAND: Object to the form.
16 BY MR. BRUSTEIN:
17   Q.   Do they fall under Ty, Inc.?
18   MR. BOLAND: Same objection.
19 BY THE WITNESS:
20   A.   No.
21 BY MR. BRUSTEIN:
22   Q.   What company do they fall under?
23   A.   They fall into the individual legal
24 entities.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
189–192

Page 189

1    Q.   Did you actually try and apply for PPP
2   money for Ty Warner Hotels & Resorts?
3    A.   Yes.  We looked into it, but we didn't
4   actually apply for it.
5    Q.   Did you submit an application for the
6   employees of the Four Seasons Hotel New York?
7    A.   No.  Again, their --
8    Q.   Why not?
9    A.   -- head count was too high.
10    MR. BRUSTEIN:  Now, let's take a five-minute
11   break.
12    THE WITNESS:  Okay.
13    THE VIDEOGRAPHER:  We are going off the record
14   at 2:07 p.m.
15       (WHEREUPON, a recess was had.)
16    THE VIDEOGRAPHER:  We're going back on the
17   record at 2:15 p.m.
18   BY MR. BRUSTEIN:
19    Q.   Okay.  At this point I'm going to ask
20   that the witness be shown what has previously, or
21   I'm going to ask that you mark Exhibit 5 as Hwang
22   Exhibit 5, please.
23       And I'll share it with electronic
24   sharing.

Page 190

1       (WHEREUPON, a certain document was
2        marked Hwang Deposition Exhibit
3        No. 5, for identification, as of
4        4/14/23.)
5    THE REPORTER:  Here's the marked original.
6    MR. BOLAND:  Okay.  Thanks.
7    THE REPORTER:  Okay.
8   BY MR. BRUSTEIN:
9    Q.   Smith Gambrell & Russell, that's the
10   firm that is representing you today, right?
11    A.   Yes.
12    Q.   Did you know that they got $5.47 million
13   in PPP money?
14    A.   No.
15    Q.   And do you see that they were actually
16   forgiven the $5.53 million, so the entire amount
17   plus interest?
18    A.   Yes.
19    Q.   And if you look down at the bottom of
20   the first page, do you see it says 263 jobs
21   reported?
22    A.   Yes.
23    Q.   You would agree that that is a lot more
24   than the 12 that you said were employed by Ty

Page 191

1   Warner Hotels & Resorts?
2    A.   Yes.
3    Q.   Can you please explain to me what you
4   mean when you say each individual entity by itself
5   didn't qualify.
6    A.   So you would have to take TWH, Ty Warner
7   Hotels & Resorts employees, along with employees of
8   other businesses.  In aggregate, we didn't qualify.
9    Q.   When you say other businesses, are you
10   referring to the Four Seasons Hotel New York
11   employees in the aggregate or not?
12    A.   There's other businesses like Ty, Inc.,
13   Montecito Country Club and, you know, other
14   properties out in Santa Barbara, as well.
15    Q.   How many employees did Ty, Inc., have
16   back in January of 2020?
17    A.   I'd say it was about 200.
18    Q.   So combining Ty, Inc., and Ty Warner
19   Hotels & Resorts, you're about 212.  That's still
20   less than the number of employees that your law
21   firm that received the PPP money, right?
22    A.   Right.
23    Q.   Now, did you actually submit an
24   application on behalf of any of the entities that

Page 192

1   you are an officer for?
2    A.   I think the question you should ask is,
3   what prevented us from filing for PPP.
4    Q.   Sure.  What prevented you from filing
5   for PPP?
6    A.   One of the criteria is that if there's
7   alternate source of financing available to an owner
8   like Ty Warner, then you would not qualify.
9    Q.   What would alternate source -- what
10   alternate source of financing precluded the
11   companies from getting PPP?
12    A.   If he was able to apply for a loan at a
13   bank and get approved, and he would, then he
14   wouldn't qualify for the small business PPP loan.
15    Q.   So is it your testimony that your
16   attorneys couldn't apply for a loan at a bank, but
17   Mr. Warner was so unique that only he could get a
18   loan from a bank?
19    MR. BOLAND:  Object to the form.
20   BY THE WITNESS:
21    A.   Can you repeat your question again,
22   please.
23   BY MR. BRUSTEIN:
24    Q.   Are you claiming that your own attorneys





Page 193

1 couldn't get a loan from a bank and that's the only
2 reason that they applied for PPP money?
3        Withdrawn.
4    A.  I don't know.
5    Q.  Are you claiming that PPP money was only
6 given out to companies that could not get loans
7 from banks?
8    MR. BOLAND:  Object to the form.
9 BY THE WITNESS:
10    A.  That's not what I'm claiming.
11 BY MR. BRUSTEIN:
12    Q.  So let me ask my question again.  Did
13 you, as an officer of any of the 30 to 40 Warner
14 entities, apply on behalf of any of those entities
15 for a PPP loan?
16    A.  Like I say, we didn't qualify.  You have
17 to take all the employees of businesses in
18 aggregate.  And we exceeded the head count, so we
19 did not qualify initially even with that criteria.
20    Q.  And where did you determine that you did
21 not qualify and that all of your employees of the
22 30 to 40 entities had to be combined?
23    A.  Where did I determine that, is that what
24 you asked?

Page 194

1    Q.  Yes.
2    A.  I don't understand the question.
3    Q.  How did you come to that decision that
4 none of your companies, even if Ty, Inc., and Ty
5 Warner Hotels & Resorts were combined they had 220
6 employees or so --
7    A.  We exceeded --
8    Q.  -- could not --
9    MR. BOLAND:  Wait.  Wait.  You have to let him
10 finish the question.
11    THE WITNESS:  Okay.
12 BY MR. BRUSTEIN:
13    Q.  So how did you determine that you
14 exceeded that amount?
15    A.  I aggregated the head count of all the
16 employees of Mr. Warner's businesses, and we
17 exceeded the head count requirement.
18    Q.  Now, were you aware that the PPP head
19 count was only per location?
20    MR. BOLAND:  Object to the form.
21 BY THE WITNESS:
22    A.  I was informed that it's not per
23 location, but you need to look at his businesses in
24 aggregate.

Page 195

1    MR. BRUSTEIN:  Okay.  Now, I'm going to mark
2 as Exhibit 9, Hwang Exhibit 9 at this deposition,
3 and I will put it into the chat, as well.
4    MR. BOLAND:  Do we have a copy of that one or
5 not?
6    THE REPORTER:  Yes.
7    MR. BOLAND:  Okay.
8        (WHEREUPON, a certain document was
9        marked Hwang Deposition Exhibit
10        No. 9, for identification, as of
11        4/14/23.)
12 BY MR. BRUSTEIN:
13    Q.  I'm going to share my screen so we can
14 start looking at it.
15    MR. BRUSTEIN:  Mr. Boland, you may recognize
16 the heading.
17    THE REPORTER:  One for you.
18    MR. BOLAND:  Okay.  Here you go.
19    THE WITNESS:  Thank you.
20 BY MR. BRUSTEIN:
21    Q.  Yeah.  I'm just going to direct your
22 attention to the middle of the first page.  This is
23 a Freeborn alert.  It's a client alert.  And that's
24 your attorney's prior firm, right?

Page 196

1    A.  Yes.
2    Q.  And it describes who is eligible, and it
3 says (a) 500 employees total (including all
4 affiliate entities) or 500 employees per location
5 for certain industries (including hotels and
6 restaurants).
7        Now, the Four Seasons properties you
8 talked about are hotels, right?
9    A.  Yes.
10    Q.  Did you ever look into applying for PPP
11 money for the Four Seasons Hotel New York?
12    A.  Yes.
13    Q.  When did you do that?
14    A.  In 2020.
15    Q.  Did you complete an application?
16    A.  No.
17    Q.  Why not?
18    A.  Four Seasons provided their employee
19 head count, and it exceeded the head count -- head
20 count requirement, so it was not filed.
21    Q.  So it's your testimony that the hotel
22 had more than 500 employees?
23    A.  Yes.
24    Q.  Now, is there a reason you didn't apply



Page 197

1  for PPP for Ty, Inc., and Ty Warner Hotels &
2  Resorts since the hotels wouldn't have been
3  included in those numbers?
4      MR. BOLAND:  Object to the form.
5  BY THE WITNESS:
6      A.   Mr. Warner also owns golf courses,
7  country clubs, and there's employees at those
8  locations, as well.
9  BY MR. BRUSTEIN:
10     Q.   Are those considered restaurants?
11     A.   Country clubs and golf courses.
12     Q.   Now, in terms of the PPP loan money,
13  were you responsible for looking into whether or
14  not to apply for Four Seasons Hotel New York?
15     MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17     A.   Yes, I looked into it.
18  BY MR. BRUSTEIN:
19     Q.   And why did you take on that
20  responsibility?
21     A.   It's a financial responsibility.
22     Q.   I'm going to go back to showing you
23  Exhibit 1.  I'm sharing my screen, and we had left
24  off on page 17, but I would like to go to page 20,

Page 198

1  which is Bates stamp No. WD 9122.
2      And this is an e-mail from Mr. Tauscher
3  to you indicating that the hotel is discontinuing
4  the medical state program as of June 30, 2020, and
5  that the hotel would go into temporary closure
6  until the end of August or early September.
7      Do you see that?
8  A.   Yes.
9      Q.   At that point did you tell Mr. Tauscher
10  that Mr. Warner did not want to reopen the hotel?
11     MR. BOLAND:  Object to the form, assumes
12  facts.
13  BY THE WITNESS:
14     A.   I communicated to Four Seasons
15  corporate.
16  BY MR. BRUSTEIN:
17     Q.   Who at Four Seasons corporate did you
18  communicate with in June of 2020 to let them know
19  that Mr. Warner did not want to reopen the hotel?
20     MR. BOLAND:  Object to the form and assumes
21  facts.
22  BY THE WITNESS:
23     A.   I don't recall if it was June of 2020,
24  but I would have spoke to Antoine Chahwan.

Page 199

1  BY MR. BRUSTEIN:
2      Q.   And what did you tell him?
3      A.   That we -- the hotel is closed, and
4  after the doctors and nurses leave, that we would
5  continue on with the CapEx projects, the capital
6  projects.
7      Q.   Was the hotel operating at a loss prior
8  to COVID?
9      A.   Yes.
10     Q.   Has the hotel been operating at a loss
11  since 2017 when Ms. Snopek first raised concerns
12  about the management of the hotel?
13     A.   Yes.
14     Q.   Now, in June of 2020, is there a reason
15  that the medical state program ended?
16     A.   I think that was when COVID spike was
17  starting to decline, and we felt that, you know,
18  we've given support to the doctors and nurses.
19  But, again, you know, we couldn't continue forever.
20  So Ty Warner decided to end the program on
21  June 30th.
22     Q.   Now, was -- are you saying that by the
23  end of June 2020, COVID was starting to recede?
24     MR. BOLAND:  Object to the form, vague.

Page 200

1  BY THE WITNESS:
2      A.   It was lower than March.  I'm not saying
3  that it was going away.  That was not the case.
4  BY MR. BRUSTEIN:
5      Q.   Is it your testimony that the doctors
6  and nurses no longer needed a place to stay?
7      MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9      A.   No, that's not what I said.
10  BY MR. BRUSTEIN:
11     Q.   Mr. Warner -- did Mr. Warner tell you
12  that he had gotten enough positive press that it
13  was time to shut it down?
14     A.   No, that's not what he said.
15     Q.   Was Mr. Warner no longer concerned about
16  the doctors and nurses that were fighting on the
17  front lines?
18     MR. BOLAND:  Objection, foundation.
19  BY THE WITNESS:
20     A.   No, that's not what he said.
21  BY MR. BRUSTEIN:
22     Q.   Did he need to sell any of his assets to
23  be able to maintain the doctors and nurses that
24  were fighting the pandemic?



Page 201

1     A.    Sell his properties, is that what you're
2  referring to?
3     Q.    Yes.
4     A.    No.
5     Q.    So he could afford to keep it open if he
6  had wanted to; he just thought it was enough of his
7  help?
8     MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10    A.    Four Seasons Hotel New York is a
11 business.  And it was -- with the pandemic and
12 COVID and what was happening in New York,
13 Mr. Warner was very generous and opened up his
14 luxury hotel to first responders in New York.  He
15 didn't have to do that.
16 BY MR. BRUSTEIN:
17    Q.    Is there a reason he wasn't as generous
18 with his own employees?
19    MR. BOLAND:  Object to the form of the
20 question.
21 BY THE WITNESS:
22    A.    No.  I don't understand your question.
23 BY MR. BRUSTEIN:
24    Q.    Is it your testimony that the hotel will

Page 202

1  only reopen if it's profitable?
2     MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4     A.    Again, it's -- Four Seasons Hotel New
5  York is a business, and to conduct a business,
6  there should be profits.  It would be irresponsible
7  for me to advise Mr. Warner to open up the hotel
8  when it would not make money.
9        And to rely on projections, there's no
10 guarantee that those projections are accurately
11 estimating when the market may rebound.
12 BY MR. BRUSTEIN:
13    Q.    Does that position hold true for the
14 Santa Barbara property, as well?
15    A.    Again, the projections, there are no
16 guarantees on when the market would rebound and
17 start making money.
18    Q.    So even if the projection said
19 Mr. Warner would make money, that wouldn't be
20 sufficient to reopen the hotel?
21    MR. BOLAND:  Objection, vague.
22 BY THE WITNESS:
23    A.    We had third party experts, experts
24 within hospitality reviewing those projections, and

Page 203

1  we didn't -- we felt that it was not accurate, that
2  it was unrealistic at the time and it was
3  unachievable.
4        I mean, some of these projections came
5  in, you know, prior -- very early on when, you
6  know, we didn't know what was going to happen with
7  COVID.
8  BY MR. BRUSTEIN:
9     Q.    When you say experts, is that Sebastian
10 or other people?
11    A.    Sebastian is not a financial expert.  It
12 would be other people.  We had other firms besides
13 Solid Rock assessing the hotel's projections and
14 the New York market.
15    Q.    Did those other experts provide you an
16 analysis of the Four Seasons reopening plan?
17    A.    Yes.
18    Q.    And did they do that orally or did they
19 provide you with written documentation in support
20 of their analysis?
21    A.    Written documentations.
22    Q.    And do you still have copies of that
23 written documentation?
24    A.    Yes.

Page 204

1     Q.    And is that documentation supporting
2  your decision not to reopen the hotel?
3     MR. BOLAND:  Object to the form.  That assumes
4  facts.
5        You can answer.
6  BY THE WITNESS:
7     A.    Yes.
8  BY MR. BRUSTEIN:
9     Q.    And you've preserved those documents?
10    A.    Yes.
11    Q.    Does Mr. Warner have any intention of
12 reopening the hotel with Four Seasons as the
13 operator?
14    MR. BOLAND:  Objection, foundation.
15       You can answer.
16 BY THE WITNESS:
17    A.    Ownership and operator have been
18 actively discussing and negotiating on the
19 reopening.
20 BY MR. BRUSTEIN:
21    Q.    You testified earlier that you commenced
22 a lawsuit to terminate the operating and hotel
23 management agreement with the Four Seasons, right?
24    A.    Right.



Page 205

1      MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MR. BRUSTEIN:
5      Q.   Is that litigation still ongoing?
6      A.   It's still ongoing, and the negotiations
7  are still ongoing.
8      Q.   So are you still actively trying to
9  terminate the relationship with the Four Seasons?
10      MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12      A.   As I had indicated, we're negotiating
13  with Four Seasons on the reopening.
14  BY MR. BRUSTEIN:
15      Q.   If you win your litigation and are able
16  to terminate the agreement with Four Seasons, will
17  Four Seasons still be the operator of the Four
18  Seasons Hotel New York?
19      MR. BOLAND:  Objection, foundation.
20  BY MR. BRUSTEIN:
21      Q.   You can answer.
22      A.   The lawsuit has been filed, but, again,
23  we're still negotiating.  We haven't terminated the
24  relationship.

Page 206

1      Q.   Did you file that lawsuit in good faith?
2      MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4      A.   Yes.
5  BY MR. BRUSTEIN:
6      Q.   And one of the things that you asked for
7  in that lawsuit was for the Four Seasons to not
8  operate the Four Seasons Hotel New York, correct?
9      MR. BOLAND:  Objection, foundation.
10  BY THE WITNESS:
11      A.   Yes.
12  BY MR. BRUSTEIN:
13      Q.   So, then, one of your intentions is for
14  the Four Seasons Hotel New York to never be opened
15  by the Four Seasons, right?
16      MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18      A.   We're negotiating with Four Seasons to
19  reopen the hotel.  If the negotiation is
20  successful, we will reopen with Four Seasons.
21  BY MR. BRUSTEIN:
22      Q.   And if the lawsuit is successful, you
23  will not reopen the Four Seasons Hotel New York as
24  a Four Seasons, right?

Page 207

1      MR. BOLAND:  Objection, no foundation.
2  BY THE WITNESS:
3      A.   I don't know how to say it otherwise.
4  We're -- we're negotiating with Four Seasons.
5  BY MR. BRUSTEIN:
6      Q.   I'm asking you if you're successful in
7  the litigation and you win and you terminate the
8  hotel management agreement, do you understand that
9  that means you would no longer have the Four
10  Seasons Hotel New York in existence?
11      MR. BOLAND:  Objection, no foundation.
12      You can answer.
13  BY THE WITNESS:
14      A.   We have paused on litigating, and we're
15  negotiating with Four Seasons.
16  BY MR. BRUSTEIN:
17      Q.   Have you withdrawn your request to
18  terminate the negotiation -- terminate the
19  management agreement?
20      A.   No, it -- we're negotiating with Four
21  Seasons currently, and --
22      Q.   What's the status --
23      A.   -- we're doing that very actively.
24      Q.   What's the status of those negotiations?

Page 208

1      A.   It's been ongoing.
2      Q.   Sitting here today, do you know whether
3  the hotel is going to ever open again?
4      A.   Mr. Warner wants the hotel open.  Four
5  Seasons wants the hotel open.  The hotel will
6  reopen.  The hotel will reopen.  It's just a
7  question of when, and it would depend on the
8  negotiations.
9      Q.   Well, Mr. Warner wants the hotel to
10  reopen.  Does he want it to reopen as a Four
11  Seasons, or does he just want it to open as a
12  successful hotel no mater who manages it?
13      MR. BOLAND:  Objection, foundation.
14      MR. BRUSTEIN:  You really got to stop after
15  ever question objecting like this.  The next time
16  you do it, I'm calling the court.
17      MR. BOLAND:  We'll take transcript from the
18  last three depositions of your clients and we'll
19  compare them, shall we?
20      You may answer.
21      MR. BRUSTEIN:  I'm happy to go toe to toe with
22  you in court, Mr. Boland, but this is my
23  deposition.  And I'm going to ask you for the lat
24  time to stop having speaking objections.



Page 209

1    MR. BOLAND: I'm not speaking objections. I
2 put a legal basis on the record. Nothing more.
3 Nothing less. Seriously.
4       MR. BRUSTEIN: Okay. We're going to go off
5 record. We're going to call the court.
6       THE VIDEOGRAPHER: We are going off record at
7 2:42 p.m.
8          (WHEREUPON, discussion was had
9            off the video record as follows:)
10      MR. BOLAND: This is counting against your
11 time.
12      MR. BRUSTEIN: It's not. We're calling the
13 court. When we call the court in other instances,
14 that's not part of the time.
15      MR. BOLAND: No, it's part of the time now.
16      MR. BRUSTEIN: How do you figure?
17      MR. BOLAND: Because it's your deposition.
18 This is not a break. You're calling it and you're
19 stopping it. I am doing nothing other than making
20 an objection with a plain legal work for a legal
21 objection. That's it, and not even all the time.
22      MR. BRUSTEIN: I want -- are we on the record
23 or are we off the record?
24      THE REPORTER: I'm still on.

Page 210

1    MR. BOLAND: We're still on.
2    THE REPORTER: I've been writing, so --
3    THE VIDEOGRAPHER: Do you want me to go back
4 on?
5    THE REPORTER: Do you want it on -- we're not
6 on video, but I'm on the record. Do you want the
7 video on?
8    MR. BRUSTEIN: I just want to make sure
9 Mr. Boland's continuous obstruction is part of this
10 record.
11      MR. BOLAND: I'm not obstructing anything,
12 counsel. I barely speak.
13      MR. BRUSTEIN: You speak every single question
14 with an insertion of your commentary on the type of
15 question. The federal rules do not allow speaking
16 objections. You can say objection. And if you
17 need to say objection, do not answer, at that point
18 you can say more. But you cannot continue to
19 interrupt the deposition. It is inappropriate.
20      MR. BOLAND: I think you're making --
21      MR. BRUSTEIN: Let's go.
22      MR. BOLAND: You're making a big deal out of a
23 single word legal basis, of which I always thought
24 you could put a legal basis for an objection on the

Page 211

1 record, period.
2    MR. BRUSTEIN: We're not in front of the
3 judge. We're not in front of a jury.
4    MR. BOLAND: Well, that's the entire point,
5 right, to just preserve the legal ground, nothing
6 more, nothing less.
7    MR. BRUSTEIN: Vague is not an objection under
8 the federal rules that you can interrupt the
9 deposition for.
10      MR. BOLAND: I'm not interrupting.
11      MR. BRUSTEIN: You state objection --
12      MR. BOLAND: I'm not interrupting. Honestly.
13 It's an objection to the form of the question,
14 that's all.
15      MR. BRUSTEIN: All right. Please stop
16 coaching the witness. Please stop interrupting the
17 deposition, and please allow us to get through this
18 so that Ms. Hwang can be finished at a reasonable
19 hour.
20      Okay. Can we go back on the record.
21      MR. BOLAND: I don't think we were ever off.
22      THE REPORTER: Well, we were off the video. I
23 have this on the transcript if you want.
24      MR. BOLAND: That's all right. Just continue.

Page 212

1          (WHEREUPON, the following
2            proceedings were had back on the
3            video record:)
4    THE VIDEOGRAPHER: We are going back on the
5 record at 2:44 p.m.
6 BY MR. BRUSTEIN:
7    Q.   Thank you. I'm now showing you in the
8 exhibit the next page.
9    MR. BOLAND: Do you want to get to the paper?
10      THE WITNESS: I'm not sure.
11      MR. BOLAND: It was like three pages up from
12 the last one.
13      MR. BRUSTEIN: This is the twenty-first page.
14 It's WD --
15      MR. BOLAND: No, no, go the other way. Keep
16 going, and then you can get to the one that he's
17 got on the screen, which, "Hello Cathy, the hotel
18 has 58 salaried."
19      MR. BRUSTEIN: She can see the screen just as
20 well as you can.
21      THE WITNESS: Okay. I have it.
22      MR. BOLAND: Okay.
23      Is there a Bates number on this one?
24      MR. BRUSTEIN: Yes, I already put it on the



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
213—216

Page 213

1  record.  It's 90.
2  BY MR. BRUSTEIN:
3     Q.   Now, Ms. Hwang, why did you ask
4  in March 2022 about who would be considered calling
5  back when the hotel reopens?
6     A.   I don't recall.
7     Q.   Did you receive a list of who Elizabeth
8  Ortiz said were the 58 salaried and hourly
9  non-union employees that we would expect to recall?
10    A.   I don't recall if she provided a list.
11    Q.   Now, she -- she said in her e-mail many
12 of the originally furloughed employees have moved
13 on.  Do you know what she meant by that?
14    A.   I -- I don't recall this e-mail, but,
15 no, I don't know what she -- I could assume things,
16 but I don't know exactly what she meant.
17    Q.   In -- in March of 2022, was there a path
18 to reopening the hotel?
19    A.   Was there a path?
20    Q.   Yeah.  Were you guys ready to reopen the
21 hotel in March of 2022?
22    MR. BOLAND:  Object to the form.
23 BY THE WITNESS:
24    A.   No.

Page 214

1  BY MR. BRUSTEIN:
2     Q.   So was there something that happened
3  that made you reach out to Ms. Ortiz to find out
4  about the number of employees that might be called
5  back?
6     A.   I don't recall the reason for this
7  question that I asked her.
8     Q.   Had Mr. Warner asked you to look into
9  it?
10    A.   I don't know.  I -- I can't recall why I
11 asked her this question.
12    Q.   Have you asked her this question on
13 other occasions?
14    A.   I don't know.
15    Q.   Have you asked her this question since
16 March of 2022?
17    A.   I don't recall.
18    Q.   Sitting here today, do you know what the
19 current number of employees, non-union employees
20 are who may be recalled?
21    A.   No.
22    Q.   Okay.  Let's turn to the next page.
23 This is WD 1147.
24    Now, in this e-mail, you indicated that

Page 215

1  Mr. Warner has approved extending the health
2  benefit coverage for two months for 22 employees
3  who were recently furloughed.
4     Do you see that at the top of the page?
5     A.   Yes.
6     Q.   Why did he only extend the health
7  benefits coverage for two months?
8     A.   And just to be clear, Mr. Warner
9  approved the funding for the health benefits, and
10 that's what he approved.
11    Q.   So he approved what was asked for?
12    MR. BOLAND:  Object to the form.
13 BY THE WITNESS:
14    A.   I don't recall if they were asking for
15 two months of health benefits.
16 BY MR. BRUSTEIN:
17    Q.   So my question is how did he decide on
18 two months of health benefits being what's
19 appropriate for the people that housed the medical
20 professionals at the height of COVID?
21    MR. BOLAND:  Object to the form.
22 BY THE WITNESS:
23    A.   I was reading up on what other companies
24 were doing in the retail sector and various

Page 216

1  industries.  Some companies offered nothing, while
2  other companies provided about two months in
3  extension of their health benefits.  And I --
4  BY MR. BRUSTEIN:
5     Q.   When you say two --
6     MR. BOLAND:  Were you finished?
7  BY MR. BRUSTEIN:
8     Q.   Are you --
9     A.   Yes.  And I asked Mr. Warner if he would
10 consider funding for two months of extension in
11 health benefits package, considering what was going
12 on in New York with COVID.
13    Q.   Now, you said other companies were
14 paying two months.  That was two month's salary
15 that other companies were paying, right?
16    A.   No.  Other companies were paying nothing
17 for health benefits.  And the -- while some
18 companies paid up to and -- again, I'm sure there
19 were other companies that paid even greater than
20 two months, but it seemed that some of the retail
21 sectors, like Macy's, I remember, and some of the
22 other companies that I researched were offering two
23 months of health benefits.
24    Q.   Now, in Ms. Ortiz's e-mail at the bottom



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
217–220

Page 217

1  of the page, it refers to a tax credit.  I'm going
2  to highlight it on the screen.
3       Do you -- do you see where I've
4  highlighted?
5    A.   Yes.
6    Q.   You can proceed with your document.
7       What is the tax credit that Mr. Warner
8  or Ty Warner Hotels & Resorts received during the
9  pandemic?
10      MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12    A.   It's the ERC credit, Employee Retention
13  Credit.
14  BY MR. BRUSTEIN:
15    Q.   And what is that?
16    A.   It's a tax refund from the government to
17  employers who are paying for benefits for their
18  furloughed employees.
19    Q.   Was there a limit to how many months the
20  tax credit was for?
21    A.   I don't know.
22    Q.   Is it possible the tax credit could have
23  been more than two months?
24      MR. BOLAND:  Object to the form.

Page 218

1  BY THE WITNESS:
2    A.   I don't know.
3  BY MR. BRUSTEIN:
4    Q.   Wouldn't that have been an important
5  thing to know before determining how many months of
6  benefits to provide out-of-work employees?
7    A.   We value the employees at Four Seasons,
8  and this -- and we value their safety.  And
9  continuing to, you know, have this relationship
10  with them after -- and we planned on recalling them
11  when the hotel reopens.  I thought it would -- was
12  a great gesture on Mr. Warner's part to extend the
13  health benefits for these employees.
14    Q.   My question, though, was if you ever
15  looked into how long the government would have
16  given you a tax credit for providing health
17  benefits to your out-of-work employees?
18    A.   No, this was something that was
19  researched by Four Seasons.
20    Q.   Did you know that Four Seasons requested
21  three months of health benefits coverage?
22      MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24    A.   As I stated before, I can't recall if

Page 219

1  they -- how many months of health benefits they
2  asked for or if they were specific in that request
3  at all, but -- okay.  If -- I can't recall.
4  BY MR. BRUSTEIN:
5    Q.   What does -- what does "temporary" mean
6  to you?
7    A.   Temporary is not permanent.
8    Q.   How long is temporary?
9      MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11    A.   I don't know.
12  BY MR. BRUSTEIN:
13    Q.   When you worked for each of those
14  companies that you testified earlier that you
15  worked for, were you a temporary or a permanent
16  employee?
17    A.   Permanent employee.
18    Q.   Even the one that you only worked at for
19  three months?
20    A.   Yes.
21    Q.   Now, let's go to the next page --
22  actually, two pages down.  This is bearing Bates
23  stamp No. WD 1160, and I'm going to direct you to
24  the bottom of the page.

Page 220

1       Do you see where it says FSNY estimated
2  cost for furloughed employees?
3    A.   Yes.
4    Q.   So the Four Seasons had actually
5  calculated how much it would cost to provide three
6  months of salary and health benefits for the
7  workers -- the employees, right?
8    A.   Yes, they calculated the wages.
9    Q.   And they even provided a 50 percent
10  reduction in salary in case Mr. Warner didn't want
11  to pay all of it, right?
12      MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14    A.   Where?  I don't -- I don't see that.
15  BY MR. BRUSTEIN:
16    Q.   Do you see the second column says wage
17  at 50 percent?
18    A.   Oh, okay.  Yes, I see that now.
19    Q.   Now, going up to your e-mail, can you
20  please read what you wrote to Rudy.
21    A.   "I discussed the proposed wages and
22  health benefits costs as presented in your e-mail
23  with Mr. Warner.  He approved the standard health
24  benefits for furloughed employees for 2 months but



Page 221

1 no wages will be provided at this time."
2    Q.   Did Mr. Warner tell you why he did not
3 want to provide wages?
4    A.   The hotel is closed.  There's no income
5 coming in.
6    Q.   This was a global pandemic.  Was he
7 concerned about how his employees would feed
8 themselves and their families and stay safe?
9    MR. BOLAND:  Object to the form.
10 BY THE WITNESS:
11    A.   He's not -- he's not required to pay
12 wages of employees while they're not working.
13 BY MR. BRUSTEIN:
14    Q.   Well --
15    A.   He's not required to pay health benefits
16 of employees while they're not working.
17    Q.   If Mr. Warner reopened the hotel, would
18 he be paying the wages and benefits of the
19 employees?
20    MR. BOLAND:  Object to the form of the
21 question.
22 BY THE WITNESS:
23    A.   If employees are working, then they
24 would be earning their wages.

Page 222

1 BY MR. BRUSTEIN:
2    Q.   Do you believe that continuing to keep
3 the hotel closed is hurting the employees?
4    MR. BOLAND:  Object to the form of the
5 question.
6 BY THE WITNESS:
7    A.   Do you mean the furloughed employees?
8 BY MR. BRUSTEIN:
9    Q.   Yes, the employees that are not working
10 at the hotel.
11    MR. BOLAND:  Same objection.
12 BY THE WITNESS:
13    A.   They're free to find other jobs.
14 BY MR. BRUSTEIN:
15    Q.   Are you aware of the no fault separation
16 pay compensation?
17    MR. BOLAND:  Object to the form.
18 BY THE WITNESS:
19    A.   I've read the subsection in the EmPact
20 Agreement for Four Seasons.
21 BY MR. BRUSTEIN:
22    Q.   Would Mr. Warner pay the no fault
23 separation pay for employees who found other jobs
24 because the hotel has still not reopened?

Page 223

1    MR. BOLAND:  Object to the form of the
2 question.
3 BY THE WITNESS:
4    A.   Employees are eligible for severance if
5 they were permanently separated.
6 BY MR. BRUSTEIN:
7    Q.   How many years does the hotel need to be
8 closed before you consider the employees to be
9 permanently separated?
10    MR. BOLAND:  Object to the form.
11 BY THE WITNESS:
12    A.   The hotel is not permanently closed.
13 BY MR. BRUSTEIN:
14    Q.   My question was, how long do you believe
15 employees should remain on furlough and out of work
16 before they're eligible for the no fault separation
17 pay that they have worked towards --
18    MR. BOLAND:  Objection.
19 BY MR. BRUSTEIN:
20    Q.   -- for years --
21    MR. BOLAND:  I'm sorry.  I didn't know you
22 were finished.
23 BY MR. BRUSTEIN:
24    Q.   -- years and sometimes decades?

Page 224

1    MR. BOLAND:  Object to the form.
2 BY THE WITNESS:
3    A.   Would you please repeat the question.
4    MR. BRUSTEIN:  Can I have that read back,
5 please.
6         (WHEREUPON, the record was read
7          by the reporter as requested.)
8 BY THE WITNESS:
9    A.   As I stated earlier, employees are
10 eligible for severance if they are permanently
11 separated.  So I don't know how long that would
12 mean, except for if the permanent -- if the hotel
13 was permanently closed, or if the employees were
14 permanently separated, which is not the case here.
15 BY MR. BRUSTEIN:
16    Q.   If you win the litigation and terminate
17 the hotel management agreement, would the employees
18 be entitled to no fault separation pay?
19    MR. BOLAND:  Object to the form of the
20 question.
21 BY THE WITNESS:
22    A.   We would recall those employees.
23 BY MR. BRUSTEIN:
24    Q.   Even if the hotel didn't operate by the



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
225–228

Page 225

1   Four Seasons?
2       A.   Yes.  As long as --
3       Q.   Would you --
4       A.   -- they would want a job, we would
5   recall those employees.
6       Q.   And would they still be entitled to no
7   fault separation pay?
8       A.   No, we would recall those employees and
9   offer them jobs.
10      Q.   So none of these employees are entitled
11  to severance?
12      MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14      A.   Can you clarify your question?
15  BY MR. BRUSTEIN:
16      Q.   It's your position that all of the
17  furloughed workers or all the employees are still
18  on furlough if they haven't found another job?
19      MR. BOLAND:  Object to the form.
20  BY THE WITNESS:
21      A.   As long as they didn't resign, they're
22  still on furlough.
23  BY MR. BRUSTEIN:
24      Q.   Why would any employee have to resign if

Page 226

1   the hotel is closed?
2       MR. BOLAND:  Object to the form.
3   BY THE WITNESS:
4       A.   I would guess if they wanted to take a
5   position at, say, another Four Seasons Hotel
6   downtown, for instance, then they would resign from
7   their position at this location and move on to
8   their new jobs.
9   BY MR. BRUSTEIN:
10      Q.   If they took a job not at a Four
11  Seasons, let's say they took it at a restaurant,
12  when you claim the hotel is going to reopen, would
13  you reach out to employee to offer them their job
14  back even though they were working at a restaurant?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17      A.   We would recall the employees and offer
18  them positions.  Employees are --
19  BY MR. BRUSTEIN:
20      Q.   Is your testimony --
21      A.   Employees are free to work at other
22  jobs.  This doesn't interfere after they're
23  recalled.  They're allowed to moonlight.
24      Q.   My question is not about moonlighting.

Page 227

1       A.   Okay.  They're allowed to work now
2   during the term of their furlough.
3       Q.   And would the Four Seasons Hotel New
4   York reach out to every one of those workers if the
5   hotel ever reopened and say to them, you have a
6   right to come back to the hotel if you want?
7       A.   Is this assuming that Four Seasons would
8   continue to manage the hotel?  Because your other
9   question stated otherwise.
10      Q.   Let's start with if Four Seasons
11  continued to manage the hotel.
12      A.   Okay.  I can't direct the Four Seasons
13  to call their employees.  That would be Four
14  Seasons' decision.
15      Q.   Okay.  And if it was not operated by the
16  Four Seasons, would you be calling every employee
17  that had gotten a new job to see if they want to
18  exercise their right to be recalled?
19      A.   I would have to consult with Mr. Warner,
20  but my recommendation would be under a new brand,
21  yes, let's reach out to those employees, as long as
22  Four Seasons does not object -- does not object to
23  reaching out to those employees and offering them
24  positions.

Page 228

1       Q.   But sitting here today, you haven't had
2   any conversations with Mr. Warner about whether or
3   not the employees would have an automatic right to
4   recall if the hotel opened not with Four Seasons?
5       A.   We haven't ruled out any possibilities
6   of Four Seasons.  We still have an ongoing
7   negotiation with them.
8       Q.   But you haven't had conversations with
9   Mr. Warner to determine whether or not the
10  employees would have that right or not.  That's
11  still open for discussion?
12      MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14      A.   No, we haven't had that discussion.
15  BY MR. BRUSTEIN:
16      Q.   All right.  Let's turn ahead.  I believe
17  it's three pages.  Page 26.  Maybe it's two pages.
18  WD 4202.
19          This is an e-mail from Sharon Brambrut
20  about New York State COVID sick leave.
21          Why is Ms. Brambrut e-mailing you about
22  a COVID sick leave policy --
23      MR. BOLAND:  Object.
24  BY MR. BRUSTEIN:



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
229–232

Page 229

1      Q.   -- if you have no --
2      MR. BOLAND:  Sorry.  Go ahead.  I apologize.
3  BY MR. BRUSTEIN:
4      Q.   -- if you have no oversight of
5  employee's sick time?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.   This would be for funding purposes for
9  payroll.  Employees' COVID sick time would be
10  included in that payroll expense.
11  BY MR. BRUSTEIN:
12      Q.   Now, does the closure of the Santa
13  Barbara location have anything to do with the Four
14  Seasons Hotel New York closure?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17      A.   Four Seasons Santa Barbara was closed
18  for the same reason Four Seasons New York was
19  closed.  It was due to COVID.
20  BY MR. BRUSTEIN:
21      Q.   But does it remain closed today because
22  the owner does not believe it's profitable enough
23  to reopen?
24      MR. BOLAND:  Object to the form.

Page 230

1  BY THE WITNESS:
2      A.   There are capital projects at the hotel,
3  and we also want to make sure that the hotel is
4  profitable when it opens.
5  BY MR. BRUSTEIN:
6      Q.   Two completely separate properties, but
7  the same exact excuses for not reopening?
8      MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10      A.   I didn't say they were excuses.  You
11  did.
12  BY MR. BRUSTEIN:
13      Q.   I did.  But I'm saying, same reasons for
14  not reopening the two?
15      A.   Yes.
16      Q.   When did the Four Seasons -- when did
17  Mr. Warner shift his reasoning for not reopening
18  from COVID to capital projects and profitability?
19      MR. BOLAND:  Object to the form of the
20  question.
21  BY THE WITNESS:
22      A.   I don't agree that that's all in the
23  same order.  And, again, I don't recall the timing
24  of these events.

Page 231

1  BY MR. BRUSTEIN:
2      Q.   Let's turn to the next page, which is
3  WD 9102.  This e-mail says that ownership approved
4  the employee talking points.
5      MR. BOLAND:  The -- object to the form.
6  BY MR. BRUSTEIN:
7      Q.   I'm just talking about that first line.
8  Do you see that?
9      A.   The first line, yes.
10      Q.   That the ownership approved the employee
11  talking points?
12      A.   Yes, I see the first line.
13      Q.   Why was ownership approval required for
14  employee talking points?
15      MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17      A.   I know how things are stated in the
18  e-mails, and sometimes it's purposeful on my part,
19  but I realize that I don't have the authority to
20  make these decisions.
21      If ownership did not approve the media
22  statements, Four Seasons still has the authority to
23  proceed with the media statements as they see fit.
24  BY MR. BRUSTEIN:

Page 232

1      Q.   So would it be fair to say you were
2  misrepresenting your authority in this e-mail?
3      MR. BOLAND:  Object to form.
4  BY THE WITNESS:
5      A.   I wouldn't say that I'm misrepresenting.
6  I would say that I think it -- ownership should
7  have input.  Whether Four Seasons accepts that or
8  not, it's their decision.
9  BY MR. BRUSTEIN:
10      Q.   Well --
11      A.   But given --
12      Q.   -- the e-mail --
13      MR. BOLAND:  Were you done?  Were you done or
14  not?
15      THE WITNESS:  No.
16  BY THE WITNESS:
17      A.   Given that ownership is funding the
18  hotel during closure, I feel that ownership should
19  have more input.
20  BY MR. BRUSTEIN:
21      Q.   Well, this e-mail appears to be
22  Mr. Chahwan seeking your approval before sharing it
23  with the team, right?
24      MR. BOLAND:  Object to the form.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
233–236

Page 233

1  BY THE WITNESS:
2      A.   If you read his e-mail, that's not
3  exactly what he says.  He's not looking for my
4  approval.
5  BY MR. BRUSTEIN:
6      Q.   Mr. Chahwan was not involved in the
7  Santa Barbara property, right?
8      A.   No.
9      Q.   But why is he -- why is Santa Barbara
10  part of your conversation with Mr. Chahwan?
11      A.   Because Mr. Chahwan works very closely
12  with a colleague of his who oversees the Santa
13  Barbara property.
14      Q.   And what does that have to do with
15  approving employee talking points for the New York
16  hotel?
17      MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19      A.   I think he was just consulting with his
20  colleague.  I don't know.
21  BY MR. BRUSTEIN:
22      Q.   Have all of the other Ty Warner
23  properties reopened except the Santa Barbara
24  location and the Four Seasons Hotel New York?

Page 234

1      MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3      A.   They're reopened now, yes.
4  BY MR. BRUSTEIN:
5      Q.   When did they reopen?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.   Actually, I have to correct my
9  statement.  Coral Casino still remains closed.
10  BY MR. BRUSTEIN:
11      Q.   Why is that one closed?
12      A.   It's going through construction.
13      Q.   How long has that construction been
14  going on?
15      A.   Over two years.
16      Q.   Does Mr. Warner use the losses on these
17  properties for tax benefit purposes?
18      MR. BOLAND:  Object to the form of the
19  question.
20  BY THE WITNESS:
21      A.   I do think -- I think some of his legal
22  entities roll up to his personal taxes, but, again,
23  I'm not certain.  That would have to be discussed
24  with the tax advisor.

Page 235

1  BY MR. BRUSTEIN:
2      Q.   Have you ever reviewed Mr. Warner's
3  personal taxes?
4      A.   No, Mr. Warner signs off on his personal
5  taxes.
6      Q.   So you've never seen Mr. Warner's tax --
7  personal taxes?
8      A.   I've not reviewed his personal taxes.
9      Q.   Give me one moment.
10          I'm now introducing as exhibit -- a
11  document that I've asked to be shown to the
12  witness.
13      MR. BOLAND:  Do we have a copy of this one or
14  not?
15      MR. BRUSTEIN:  Yes, you do.
16      THE REPORTER:  What number?
17      MR. BRUSTEIN:  No. 7.
18          (WHEREUPON, a certain document was
19          marked Hwang Deposition Exhibit
20          No. 7, for identification, as of
21          4/14/23.)
22      MR. BOLAND:  Thanks.
23  BY MR. BRUSTEIN:
24      Q.   Now, I'm going to share this in a

Page 236

1  minute.  Do you see this document in front of you?
2      A.   And you're not sharing your screen with
3  me.
4      Q.   I know.  I didn't know if you had the
5  copy in front of you.  I'll share it.
6      A.   Oh, I have a copy.
7      Q.   This says it's the declaration of Cathy
8  Hwang in Support of H. Ty Warner's Notice of
9  Removal.
10      A.   Yes.
11      Q.   And if you look at the last page, it's
12  signed by Cathy Hwang.
13      A.   Yes.
14      Q.   Is that your signature?
15      A.   That's my signature.
16      Q.   And this is a declaration for another
17  lawsuit that you were involved in?
18      A.   Yes.
19      Q.   It's not one of the lawsuits that you
20  mentioned earlier when I asked you about that,
21  though, correct?
22      A.   I'm not involved in that personally.
23  This is a personal matter.  It's not for one of his
24  businesses.



Page 237

1    Q.   So are you involved in it in a personal
2  way or in a business way?
3      MR. BOLAND:  Object to the form.
4  BY THE WITNESS:
5      A.   Like I said, I can't recall every single
6  legal matter for Mr. Warner and that was the reason
7  why I said I couldn't -- you know, that it would be
8  a guess.
9  BY MR. BRUSTEIN:
10     Q.   But when you completed this declaration,
11  you knew it was important to be truthful, right?
12     A.   Yes.
13     Q.   And you swore to tell the truth that
14  everything in this document was true and accurate,
15  right?
16     A.   Yes.
17     Q.   And that's the same oath that you took
18  today to tell the truth, right?
19     A.   Yes.
20     Q.   Can you please read paragraph No. 11 --
21  it's on the third page -- aloud for the record.
22     A.   "On all personal and business paperwork
23  about which I am aware, including his personal tax
24  returns, Mr. Warner has listed his office address

Page 238

1  in Westmont, Illinois or his home address in Oak
2  Brook, Illinois as address of record."
3      Q.   Was that statement based on your
4  personal knowledge?
5      A.   Yes.
6      Q.   So had you actually reviewed
7  Mr. Warner's personal tax returns to know what he
8  had listed as his address?
9      A.   I looked at all his documentation for
10  his residency and his address.
11     Q.   Had you looked at his tax returns?
12     A.   I spoke with his advisor, and I may have
13  seen a copy, and I just reviewed to make sure that
14  his Illinois address was listed, because this was
15  one of the questions that came up in terms --
16     Q.   So when you test -- sorry.
17     A.   -- in terms of his residency.
18     Q.   So you reviewed his personal tax returns
19  for purposes of residency?
20     MR. BOLAND:  Object to the form.
21  BY THE WITNESS:
22     A.   I didn't -- I do not review his personal
23  tax runs for accuracy or even content.  That's up
24  to his tax advisor to do so.

Page 239

1  BY MR. BRUSTEIN:
2      Q.   I'm not asking you about whether or not
3  he's paying what he should in taxes.  I'm asking
4  about your testimony and whether or not you
5  actually reviewed his tax returns.
6      A.   I consulted with his tax accountant and
7  asked if he files in Illinois.
8      Q.   A moment ago you said you reviewed it
9  for his address.  Was that not accurate?
10     A.   I said I may have reviewed it for his
11  address.  I don't recall positively.
12     Q.   When you submitted a declaration in
13  California, the Central District of California
14  Federal Court, not everything that you've said in
15  there was based on your personal knowledge?
16     MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18     A.   It's based on my personal knowledge.
19  BY MR. BRUSTEIN:
20     Q.   So you had reviewed his personal tax
21  returns to know what he listed as his business
22  address and his home address; is that correct?
23     MR. BOLAND:  Object to the form.
24  BY THE WITNESS:

Page 240

1      A.   To be clear, I may have gained this
2  personal knowledge through the tax accountant.  I
3  can't recall if I actually saw -- saw his tax
4  return.  And if I did, then it would have been for
5  the address.
6  BY MR. BRUSTEIN:
7      Q.   So when you testified today that you had
8  not reviewed his personal tax returns, you don't
9  know sitting here today if that testimony was true?
10     A.   So I guess it would have -- it would
11  depend on whether you're asking me how I am
12  reviewing his tax return.
13     Q.   I just asked you if you reviewed.  And
14  you said --
15     A.   I said I don't review Mr. Warner's tax
16  returns.  He signs off on them.
17     Q.   And I asked if you ever had, and you
18  said no, right?
19     A.   That's right.
20     Q.   I didn't ask if you reviewed it for
21  accuracy.
22     A.   Okay.
23     Q.   Now, do you know if Mr. Warner has paid
24  California taxes?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
241–244

Page 241

1    THE VIDEOGRAPHER: Oh, something's going on.
2  We have to go off very quickly.
3    MR. BRUSTEIN: I'm sorry.  I can't --
4    MR. BOLAND: I think she's almost out of time.
5    THE REPORTER: She needs to go off the record.
6    THE VIDEOGRAPHER: Going off the record at
7  3:24 p.m.
8         (WHEREUPON, discussion was had
9            off the record.)
10   THE VIDEOGRAPHER: We will go back on.
11        Going back on the record at 3:25 p.m.
12 BY MR. BRUSTEIN:
13   Q.   Do you need the question read back to
14 you?
15   A.   Yes, please.
16        (WHEREUPON, the record was read
17            by the reporter as requested.)
18 BY THE WITNESS:
19   A.   I don't know.
20 BY MR. BRUSTEIN:
21   Q.   Now, does Mr. Warner have a home office
22 in California?
23    MR. BOLAND: Object to the form.
24 BY THE WITNESS:

Page 242

1    A.   Can you please clarify what you mean by
2  a home office.
3  BY MR. BRUSTEIN:
4    Q.   Where do you understand Mr. Warner to be
5  residing?
6     MR. BOLAND: Object to the form.
7  BY THE WITNESS:
8    A.   Mr. Warner has resided in Oak Brook,
9  Illinois, prior to 2020.  He's been in Santa
10 Barbara since.  He went out there for the holidays,
11 and then with the outbreak of COVID, he has not
12 traveled since.
13 BY MR. BRUSTEIN:
14   Q.   That's a long holiday.  Would you
15 consider that a temporary stay in California?
16    MR. BOLAND: Object to the form.
17 BY THE WITNESS:
18   A.   Yes, he still has his home here.
19 BY MR. BRUSTEIN:
20   Q.   Now, does Mr. Warner still work for Ty
21 Warner -- with Ty Warner Hotels & Resorts and Ty,
22 Inc.?
23   A.   Yes.
24   Q.   I'm sorry?

Page 243

1    A.   Yes.
2    Q.   And does he work out of the Westmont
3  location currently?
4    A.   No, he has not been back here.
5    Q.   When you communicate with Mr. Warner and
6  you send him business documents, where do you send
7  them?
8    A.   To his Santa Barbara house.
9    Q.   And what's the address of the Santa
10 Barbara house?
11   A.   1000 Channel Drive, Santa Barbara.
12   Q.   Does he live at that house currently?
13   A.   Yes.
14   Q.   And for how many years consecutively has
15 he lived at that house?
16    MR. BOLAND: Object to the form.
17 BY THE WITNESS:
18   A.   Since he went out there for holiday in
19 2019, before Christmas.
20 BY MR. BRUSTEIN:
21   Q.   Now, you testified earlier that he --
22 the last time you saw him was January 2020.  Did
23 you go out to California to see him in
24 January 2020?

Page 244

1    A.   Yes.
2    Q.   The last time you had seen Mr. Warner,
3  was actually in California, not in Chicago?
4    A.   Yes.
5    Q.   Does Mr. Warner have a private jet?
6    A.   Yes.
7    Q.   Did he take his private jet from
8  Chicago, Illinois, to Santa Barbara back in 2019?
9    A.   No.  He flew commercial.
10   Q.   Does he still have the private jet if he
11 wanted to use it?
12   A.   Yes, but it's going under -- it's going
13 through maintenance.
14   Q.   How many years has the jet been under
15 maintenance?
16   A.   I -- I don't know.
17   Q.   Is it also since the start of the
18 pandemic?
19   A.   It was prior to the pandemic.
20   Q.   Now, you said Mr. Warner went to Santa
21 Barbara for the holidays in 2019.  Is there a
22 reason he didn't come back in January of 2020?
23   A.   Yes.  He stayed because he wanted to
24 look after Four Seasons Hotel in Santa Barbara.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
245–248

Page 245

1    Q.   So he wasn't staying there just for the
2  holiday, then, if he was going to stay there after
3  January 2020, right?
4        MR. BOLAND:  Object to the form.
5  BY THE WITNESS:
6        A.   He visited Santa Barbara for the
7  holidays, and when he saw the state that Four
8  Seasons Resort Santa Barbara was in, he was
9  concerned about the deferred maintenance, and he
10  decided to look after the hotel.
11  BY MR. BRUSTEIN:
12       Q.   Was Mr. Warner working when he was in
13  California?
14       A.   Mr. Warner is always working.
15       Q.   So when he's not in Chicago, does he
16  have an office in California that he does work out
17  of?
18       MR. BOLAND:  Object to the form.
19  BY THE WITNESS:
20       A.   He doesn't -- unless you consider his
21  office in his house, he doesn't have a formal
22  office out in California.
23  BY MR. BRUSTEIN:
24       Q.   Does he have a home office in

Page 246

1  California?
2        MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4        A.   Can you clarify home office.
5  BY MR. BRUSTEIN:
6        Q.   You said office in home.  I'm using your
7  words just together.
8        A.   Okay.
9        Q.   Why don't you describe it.
10       A.   He has a room in his house that he uses
11  with a computer.
12       Q.   Does it have a desk?
13       A.   Yes.
14       Q.   Telephone?
15       A.   Yes.
16       Q.   Printer?
17       A.   I don't know if there's a printer.
18       Q.   When you meet -- when you met with him
19  in 2019 in California, where did you meet him?
20       A.   At his property out in San Ysidro Ranch.
21       Q.   Now, would it be fair to say that
22  Mr. Warner does not routinely work in Chicago
23  anymore?
24       MR. BOLAND:  Object to the form.

Page 247

1  BY THE WITNESS:
2        A.   He works remotely.
3  BY MR. BRUSTEIN:
4        Q.   So let's go back to Exhibit 7 for a
5  second.  Paragraph 14, can you please read the
6  first sentence.
7        A.   Did you ask me to read it out loud?
8        Q.   Yes, please.
9        A.   Okay.  "Mr. Warner routinely works out of
10  this office.  Prior to the Covid-19 pandemic,
11  Mr. Warner was in this office on a daily basis,
12  unless he was traveling for business or personal
13  reasons."
14       Q.   And that's referring to the 280 Chestnut
15  Avenue office that you're currently sitting in,
16  right?
17       A.   Yes.
18       Q.   You would agree that he has not, in the
19  present tense, worked out of 280 Chestnut Avenue
20  since 2019, right?
21       A.   Yes.
22       Q.   You didn't say that it had been, at that
23  point, almost two years since he had worked out of
24  that office, did you?

Page 248

1        A.   I don't -- I don't recall saying that it
2  had been two years.
3        Q.   Do you think someone that hasn't been to
4  a place in two years is still currently doing
5  anything there?
6        MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8        A.   I think how people work has changed
9  since COVID.
10  BY MR. BRUSTEIN:
11       Q.   Do you think Mr. Warner is with you in
12  Westmont, Illinois, right now because of COVID?
13       MR. BOLAND:  Object to the form.
14  BY THE WITNESS:
15       A.   It started with the reason for COVID.
16  He stopped travelling.
17  BY MR. BRUSTEIN:
18       Q.   I'm asking if because of COVID you think
19  that means that you can say that he works in
20  Chicago still or Westmont?
21       A.   He's not physically in the office, but
22  he's working remotely with us.
23       Q.   That's not what you said in your federal
24  filing that you swore to.  So what I would like to



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
249–252

Page 249

1  know is whether you think it's a fair and truthful
2  statement in October or September of 2021 to say
3  that Mr. Warner routinely works out of this office
4  in Westmont, Illinois?
5      A.   I read that as he worked out of this
6  office prior to COVID-19.
7      Q.   When you just testified, I want to make
8  sure I heard you correctly, did you say worked,
9  "e-d," as in the past tense?
10     A.   It -- it says here that he works out of
11  his office.
12     Q.   Right, but when you testified --
13     A.   I thought --
14     Q.   -- that --
15     A.   I thought that to mean that prior to
16  COVID, I'm stating that he was at this office
17  physically.
18     Q.   Even though it's in the present tense
19  and not the past tense, you thought it meant past
20  tense?  That's your testimony?
21     MR. BOLAND:  Object to the form.
22  BY THE WITNESS:
23     A.   I guess it's the spelling, then.  I
24  didn't -- I didn't catch that to mean something

Page 250

1  different than he was working in Westmont prior to
2  COVID-19.
3  BY MR. BRUSTEIN:
4      Q.   Have you been to his home in Santa
5  Barbara?
6      A.   Yes.
7      Q.   How big is his Santa Barbara home?
8      A.   I don't know.
9      Q.   Before filling out this declaration, did
10  you understand that this was because Mr. Warner
11  wanted to have the case transferred back to
12  Chicago?
13     MR. BOLAND:  Object to the form.
14  BY THE WITNESS:
15     A.   No, I don't know the strategy or
16  whatever you're inferring.
17  BY MR. BRUSTEIN:
18     Q.   Did someone tell you what to put in this
19  sworn declaration?
20     A.   I worked on this with Mr. Warner's
21  attorney and some of this is my wording, as well.
22     Q.   Which of it is Mr. Warner's attorney?
23     MR. BOLAND:  So -- well, you signed it.  You
24  can answer.

Page 251

1  BY THE WITNESS:
2      A.   I don't know if this is --
3  BY MR. BRUSTEIN:
4      Q.   Which of it is your wording?
5      A.   No. 3.  No. 4.
6      Q.   So that's your wording?  You chose those
7  words or you know them to be true?
8      A.   Like I said, I worked on it with
9  Mr. Warner, and those are my wording and some of it
10  is what I know to be true.  I can't tell you if
11  every word was my word.  It may have been revised.
12     Q.   So Mr. Warner asked you to sign this for
13  him?
14     A.   No, Mr. Warner's attorney asked if I
15  would sign this for him.
16     Q.   All right.  Now, let's go down to
17  paragraph 18.  Can you please read that sentence
18  aloud.
19     A.   "Mr. Warner does not consider any
20  property in California to be his home or primary
21  residence."
22     Q.   You testified that you'd been to his
23  home in California, right?
24     A.   Yes.

Page 252

1      Q.   So that sentence is not true, right?
2      MR. BOLAND:  No, object to the form of the
3  question.
4  BY THE WITNESS:
5      A.   I've been to his house in Santa Barbara
6  if we want to be precisely accurate.
7  BY MR. BRUSTEIN:
8      Q.   I want you to just be accurate.
9      A.   Okay.
10     Q.   You testified you've been to his home
11  today, right?
12     A.   So Mr. Warner considers Westmont or
13  Oak Brook his home, but he has been living out in
14  Santa Barbara since the pandemic.  And he
15  considers -- he considered this to be his home here
16  in Westmont and Oak Brook.
17     Q.   Now, earlier you mentioned that you were
18  the -- an officer in a company called Fairway BB
19  Property, LLC, right?
20     A.   Yes.
21     Q.   What is that company?
22     A.   That entity is for the Santa Barbara
23  house.
24     Q.   What's it do?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
253—256

Page 253

1    A.   We have employees that, you know, handle
2  and look after his house in Santa Barbara.
3        MR. BOLAND:  And when you get a chance, we're
4  going about an hour.  Whenever it's good for you.
5        MR. BRUSTEIN:  Sure.  Just a few more
6  questions.
7        MR. BOLAND:  Sure.
8  BY MR. BRUSTEIN:
9    Q.   You said they're employees that look
10  after his house.  That's Mr. Warner's house in
11  California?
12    A.   That's 1000 Channel Drive, the house
13  located on 1000 Channel Drive.
14    Q.   And that, you're saying, is definitely
15  not his home, even though he's lived there for the
16  last three years straight?
17    A.   I said that's his house, but he
18  considers Oak Brook his home.
19    Q.   Did he tell you that before or after he
20  asked you to sign the declaration to get a case
21  removed from California?
22        MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24    A.   He has always considered Oak Brook his

Page 254

1  home.  He's lived here for decades.
2  BY MR. BRUSTEIN:
3    Q.   But has -- did he ever tell you
4  specifically that he didn't consider himself to
5  have any property in California to be his home
6  before he asked you to sign a legal document to get
7  a case removed from California?
8        MR. BOLAND:  Same objection.
9        You can answer.
10  BY THE WITNESS:
11    A.   He did not ask me to sign a legal
12  document.
13  BY MR. BRUSTEIN:
14    Q.   Well, his lawyer told you it would help
15  Mr. Warner, right?
16    A.   Yes.
17    Q.   And did his lawyer tell you that it was
18  important to say that Mr. Warner doesn't consider
19  any property in California to be his home or
20  residence?
21        MR. BOLAND:  Okay.  I will be happy to allow
22  her to answer about the things that she said here.
23  Beyond that, conversations with counsel, that's
24  going to be privileged, and I'm going to instruct

Page 255

1  her not to answer those.
2        MR. BRUSTEIN:  Mr. Warner's personal attorney,
3  how is that privileged?
4        MR. BOLAND:  Because she could have a
5  relationship with the attorney to help to give
6  advice.  It could be the exact same thing.  An
7  attorney can use anybody for work product, and
8  there's a privilege that applies.
9        She can say -- anything about the
10  declaration, fine.
11        MR. BRUSTEIN:  Okay.
12  BY MR. BRUSTEIN:
13    Q.   So your attorney said that you can
14  answer.
15        MR. BOLAND:  No, what I said was, you're not
16  going to answer the conversations with -- about
17  counsel.  You can ask -- he can ask you questions
18  about what are the statements that you put in the
19  declaration because you signed that.
20        MR. BRUSTEIN:  I was not telling her to ignore
21  your advice.  I was saying the question I asked,
22  you were fine with it.
23        MR. BOLAND:  I didn't think I was.  That's why
24  I objected.  But maybe I don't recall what it was.

Page 256

1  BY THE WITNESS:
2    A.   Can you repeat the question.
3  BY MR. BRUSTEIN:
4    Q.   Was it your suggestion or someone else's
5  to include, "Mr. Warner does not consider any
6  property in California to be his home or primary
7  residence"?
8    A.   I don't recall if it was my wording or
9  the attorney's wording.
10    Q.   How many houses does Mr. Warner own?
11    A.   Here, Santa Barbara?
12    Q.   In the world, directly or indirectly.
13    A.   He has other houses where he allows his
14  employees to stay.
15    Q.   How many houses does Mr. Warner own
16  directly or indirectly?
17    A.   I would say he -- I -- I don't know.  I
18  would be guessing.
19    Q.   More than ten?
20    A.   No, under ten.
21    Q.   And this sentence, "Mr. Warner does not
22  consider any property in California to be home or
23  primary residence," did you discuss the
24  truthfulness of that statement with Mr. Warner



Page 257

1  before you signed this document?
2      A.  Mr. Warner has expressed to me before,
3  this is where he resides and this is his home.
4  Like I said, he's lived here for decades.  And
5  maybe I don't know through personal knowledge, but
6  he has been a customer of my parents consistently
7  for a number of years.  I would say 20.
8      Q.  Did Mr. Warner, however, ever tell you
9  specifically that he doesn't consider any property
10  in California to be his home?
11      A.  He has expressed that this is his home
12  in Oak Brook, but I don't think he's ever mentioned
13  that he has -- that he considers Santa Barbara his
14  home.
15      Q.  I'm asking the opposite.  Has he ever
16  specifically told you that he does not consider his
17  property, his house in Santa Barbara to be his
18  home?
19      A.  No, he hasn't said those words.
20      MR. BRUSTEIN:  We can take a break now if you
21  want.  Five minutes or --
22      MR. BOLAND:  Yeah, about five minutes.
23      THE VIDEOGRAPHER:  We are going off the record
24  at 3:49 p.m.

Page 258

1      (WHEREUPON, a recess was had.)
2      THE VIDEOGRAPHER:  We are going back on the
3  record at 4:01 p.m.
4  BY MR. BRUSTEIN:
5      Q.  Ms. Hwang, has Mr. Warner ever asked you
6  to lie?
7      A.  To -- I didn't hear your question.
8      Q.  Has Mr. Warner ever asked you to lie?
9      A.  No.
10      Q.  Before going to work for Mr. Warner, did
11  you research him?
12      A.  I Googled him to research his properties
13  before my interview with the CFO.
14      Q.  What year did you Google?
15      A.  2016.
16      Q.  When you Googled him in 2016, did you
17  find out about his felony tax conviction?
18      A.  Yes.
19      Q.  Did that concern you?
20      A.  No.
21      Q.  Why not?
22      A.  Because it was a closed case, and he was
23  reformed and his businesses were still in -- in
24  operation.

Page 259

1      Q.  Did you say he was reformed?
2      A.  He -- he served his community service
3  hours, and I spoke to the CFO about the current
4  state of his case.
5      Q.  And what were you told?
6      A.  She said that his tax case has been over
7  and just exactly what I read in Google when I
8  Googled him, that his case was over and he had to
9  serve community hours and his business --
10      Q.  Were you concerned --
11      A.  -- and his businesses were still in
12  operations and she didn't tell me anything that
13  made me concerned.
14      Q.  Is that the chief financial officer who
15  was fired?
16      A.  Yes.
17      Q.  Was she fired related to his conviction?
18      A.  I don't know the reason for her
19  termination.
20      Q.  Were you concerned about being the chief
21  financial officer for someone where the -- for a
22  company where the president had already been
23  convicted of tax evasion?
24      A.  No.

Page 260

1      Q.  Let's go back to Exhibit 1, page 30.
2  This is an invitation for an August 26, 2020,
3  meeting.
4      MR. BOLAND:  Do you have -- do you have a
5  Bates number on that one?
6      MR. BRUSTEIN:  I'm sorry, yes.  It is WD 9101.
7      MR. BOLAND:  Thank you.
8  BY MR. BRUSTEIN:
9      Q.  Is there a reason there were no Hotel 57
10  Services, LLC, employees at the meeting about the
11  staffing model for Four Seasons Hotel New York --
12      MR. BOLAND:  Object --
13  BY MR. BRUSTEIN:
14      Q.  -- on August 26th?
15      MR. BOLAND:  Sorry.
16      Object to the form.
17  BY THE WITNESS:
18      A.  I don't know if there's a reason.
19  BY MR. BRUSTEIN:
20      Q.  When Mr. Tauscher was the general
21  manager of Four Seasons Hotel New York, did he
22  report directly to you or to someone else?
23      MR. BOLAND:  Object to the form.
24  BY THE WITNESS:



Page 261

1    A.    He did not report to me.
2  BY MR. BRUSTEIN:
3    Q.    So which officer of Hotel 57 Services,
4  LLC, did Mr. Tauscher report to?
5    MR. BOLAND:  Object to the form.
6  BY THE WITNESS:
7    A.    I don't know.  I don't know.  It would
8  just -- he worked with Antoine Chahwan quite a bit,
9  but I don't know if he actually reported to him.
10  BY MR. BRUSTEIN:
11    Q.    Did he report directly to Mr. Warner?
12    A.    No.
13    Q.    Earlier --
14    A.    Rudy was a Four Seasons employee.  He
15  reported to Four Seasons.
16    Q.    Earlier you testified there were only
17  two people Mr. Warner had the ability to control
18  the hiring and firing of, and one of them I
19  thought, correct me if I'm wrong, was the general
20  manager.
21    MR. BOLAND:  Object to the form.
22  BY THE WITNESS:
23    A.    That's not exactly what I said.  I said
24  he had influence over hiring of two people.  He

Page 262

1  does not have influence of firing.  He does not
2  make that decision.
3  BY MR. BRUSTEIN:
4    Q.    Is he able to hire a new general manager
5  today if he wanted to?
6    A.    Four Seasons would have to hire a
7  general manager and make that decision.
8    Q.    Is Mr. Warner preventing the Four
9  Seasons from filling the general manager position
10  at the Four Seasons Hotel New York?
11    A.    No.
12    Q.    Has Mr. Warner approved funding for a
13  general manager position at Four Seasons Hotel New
14  York?
15    MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17    A.    Four Seasons provided the staffing plan,
18  and after Rudy was -- Rudy resigned, I don't
19  believe there was a suggestion for his replacement.
20  BY MR. BRUSTEIN:
21    Q.    Would you agree that hotels without
22  general managers tend to be less profitable?
23    MR. BOLAND:  Object to the form of the
24  question.

Page 263

1  BY THE WITNESS:
2    A.    During operations, I would agree.
3  BY MR. BRUSTEIN:
4    Q.    I want to direct you to the next page.
5  This is a June 24, 2021, Communications Plan.  Have
6  you seen this document?  It's WD 8977.  And it
7  continues for the next four pages, to WD 8981.  I'm
8  sorry, five pages, WD 8982.
9    A.    I don't know if I've seen this
10  particular document before, but I'm familiar with
11  the wording.
12    Q.    Was there a reason that June 25, 2021,
13  it was announced to the staff and employees that
14  the hotel was going to be undergoing renovations
15  and not reopening for an extended period of time?
16    A.    I don't recall the timing of the
17  financial projections, but I'm sure that was a
18  factor.  And with the ongoing capital projects, we
19  were not planning to reopen.
20    Q.    For at least a year?
21    A.    It said we would -- I believe it said we
22  would reassess, right?  In '22.
23    Q.    Do you have a target reopening date as
24  you sit here today?

Page 264

1    MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3    A.    No.
4  BY MR. BRUSTEIN:
5    Q.    How long do you expect it would take to
6  hire sufficient staff to reopen the hotel once all
7  other obstacles are gone to reopen?
8    MR. BOLAND:  Object to form.
9  BY THE WITNESS:
10    A.    I don't know.  Four Seasons would have
11  to restaff.
12  BY MR. BRUSTEIN:
13    Q.    So three years plus into the hotel being
14  shut down, you don't have any sense of how long it
15  would take to get the hotel up and running?
16    MR. BOLAND:  Same objection.
17  BY THE WITNESS:
18    A.    I don't know.
19  BY MR. BRUSTEIN:
20    Q.    Do you think that's important
21  information for someone to have if they want to
22  actually reopen a hotel?
23    MR. BOLAND:  Object to the form of the
24  question.



Page 265

1  BY THE WITNESS:
2    A.  I think the plan needs to be reassessed,
3  and depending on how long the negotiations take, it
4  may not be realistic to set a target reopening date
5  at this point.
6  BY MR. BRUSTEIN:
7    Q.  Is it possible that the hotel may not
8  open in the next five years?
9    A.  I don't know.
10    Q.  So it's possible?
11    MR. BOLAND:  Object to the form.
12  BY THE WITNESS:
13    A.  I don't know.
14  BY MR. BRUSTEIN:
15    Q.  Is it possible that the hotel may not
16  open in ten years?
17    MR. BOLAND:  Same objection.
18  BY THE WITNESS:
19    A.  I don't know.
20  BY MR. BRUSTEIN:
21    Q.  Okay.  Now, on page 37, the --
22    MR. BOLAND:  The Bates on this one.
23    MR. BRUSTEIN:  I apologize.  Thank you for
24  reminding me.  WD9124.

Page 266

1  BY MR. BRUSTEIN:
2    Q.  Mr. Tauscher sent you an e-mail
3  suggesting to reopen in late August of 2020.  Did
4  you tell him at that point there was no way that
5  was going to happen?
6    A.  I don't know what I communicated to Rudy
7  Tauscher in June of 2020.  I can't recall.
8    Q.  Okay.  Now, in April of 2020, you asked
9  the Four Seasons to reevaluate the current staffing
10  and determine additional furloughs needed to reduce
11  the labor, right?
12    A.  Yes.
13    Q.  And you sent an e-mail saying that there
14  were 133 working employees for Hotel 57 and Hotel
15  57 BB.  What is Hotel 57 BB?
16    A.  I think that was just the wording that
17  was used by Four Seasons.
18    Q.  So you don't know what Hotel 57 --
19    A.  I don't know the exact legal entity
20  name.  I'm not sure why they're saying Hotel 57 BB,
21  but I think there's a small number of employees
22  in --
23    Q.  I'm just asking -- I'm not asking about
24  a document.  I'm just asking about the company.

Page 267

1    MR. BOLAND:  Object to the form, then.
2  BY THE WITNESS:
3    A.  Can you repeat your question, then.
4  BY MR. BRUSTEIN:
5    Q.  Are you an officer of the company Hotel
6  57 BB?
7    MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9    A.  I don't recall.  I need to look at the
10  list of all the legal entities and the entity
11  structure to be sure.
12  BY MR. BRUSTEIN:
13    Q.  So it's possible you're an officer for a
14  company you don't even know what the name is?
15    MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17    A.  I don't know all the legal entities for
18  the businesses, the exact name of all the legal
19  entities.
20  BY MR. BRUSTEIN:
21    Q.  Now -- all right.  What capital projects
22  are still outstanding as we sit here today?
23    MR. BOLAND:  Object to the form.
24  BY THE WITNESS:

Page 268

1    A.  My understanding is that the shower pan
2  project, the fire panel project.  Those are two
3  of some of the other ongoing capital projects that
4  are still in progress.
5  BY MR. BRUSTEIN:
6    Q.  Are the elevators done?
7    A.  I'm not -- I'm not positive if it's
8  completed yet.
9    Q.  Is the wallpaper done?
10    A.  Yes.  There are --
11    Q.  Are the wall --
12    A.  Well, I just need to disclaim that there
13  is -- there's a select number of rooms that we left
14  alone, but as far as I know, the wallpaper project
15  is completed.
16    Q.  Why were some of the rooms not finished?
17    MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19    A.  It was minor, and also I think they
20  wanted to have a sample of rooms with the original
21  installation of wallpaper.
22  BY MR. BRUSTEIN:
23    Q.  When were the rest of the rooms
24  completed?



Page 269

1    A.   I don't recall.

2    Q.   I'm now going to direct you to page 71

3  of this exhibit, which I will share.  WD 3078.

4    MR. BOLAND:  Wait, let me -- can I see the --

5  the top of it.  Oh, is that the top of it, the very

6  first page?

7    MR. BRUSTEIN:  Yes.

8    MR. BOLAND:  Okay.  Let me find it.

9    What's the date on that one?  3/13/20?

10   MR. BRUSTEIN:  Correct.

11   MR. BOLAND:  Okay.

12  BY MR. BRUSTEIN:

13   Q.   Ms. Hwang, do you see that?

14   A.   Yeah.  I prefer to find the hard copy,

15  but I haven't been able to locate it.

16   MR. BRUSTEIN:  It's pretty far down.

17   THE WITNESS:  Is it?

18   MR. BOLAND:  Yeah.

19   And, I'm sorry, what did you say the

20  Bates number was?  I apologize.

21   MR. BRUSTEIN:  It's 3078.  You can just hold

22  them up high if you want.  I mean, they're probably

23  out of order.

24   THE WITNESS:  I think I found it.  Can you

Page 270

1  scroll up to the top of that page, please.

2  BY MR. BRUSTEIN:

3    Q.   It's a March 13, 2020, e-mail.

4    A.   Okay.  I found it.

5    Q.   So that was before the hotel had shut

6  down for COVID, right?

7    A.   Yes.

8    Q.   And it's an invoice for NewGen?

9    A.   Yes.

10   Q.   Is that the company that you said you're

11  suing for the way the wallpaper was done?

12   A.   No.  NewGen, I believe, is the company

13  that installed it for the second time.

14   Q.   And did NewGen do a good job installing

15  it the second time?

16   A.   As far as I know, there hasn't been any

17  issues after the second installation.

18   Q.   And Frank Galasso, he's one of people

19  that works at Hotel 57 Services and oversees some

20  of the projects, or did at the time?

21   A.   Yes.

22   Q.   And he said NewGen has completed 210

23  rooms as of today, which was March 12, 2020?

24   A.   Okay.

Page 271

1    Q.   So prior to the hotel shutting down, the

2  hotel was able to have the wallpaper replaced not

3  once, but twice in more than 200 rooms?

4    A.   The first installation was completed

5  during the renovation.  I believe that renovation

6  completed in 2016.

7    Q.   And the hotel was open during that

8  renovation, right?

9    A.   I'm -- I'm not sure.  I started late in

10  2016 when the renovation was substantially

11  complete.

12   Q.   Okay.  Well, when you started, had you

13  been told that the hotel had been shut down?

14   A.   I don't recall hearing that, no.

15   Q.   And it was completed in March of 2020,

16  so from the time that you started until the hotel

17  shut down in March of 2020, it didn't shut down for

18  any renovations up until that point, right?

19   MR. BOLAND:  Object to the form.

20  BY THE WITNESS:

21   A.   Can you repeat your question, please.

22  BY MR. BRUSTEIN:

23   Q.   The hotel didn't shut down at any point

24  prior to March 2020 when you were overseeing it,

Page 272

1  right?

2    A.   So my knowledge of the wallpaper issue

3  is limited, because my -- the previous CFO was

4  overseeing and in touch with the status of the

5  project prior to her leaving.

6    Q.   Okay.  Well, about ten pages further in

7  the document, Exhibit 1, WD 5545, there's an e-mail

8  to you --

9    MR. BOLAND:  Hold on.  We got to get to it.

10  Hold on one second.

11   MR. BRUSTEIN:  I'll talk while you do your

12  thing.

13  BY MR. BRUSTEIN:

14   Q.   Do you recall that the hotel manager

15  said that -- this is a June 26, 2020, e-mail.  "I

16  confirmed with Frank and Sebastian today, the

17  wallpaper project is scheduled to be completion in

18  mid July, at the latest July 17.  All the rooms on

19  the schedule except the six rooms left for legal

20  purposes will have been completed."

21   Sitting here today, do you have any

22  reason to believe that any rooms other than the six

23  ones for the legal purposes you talked about were

24  not completed by July 17, 2020?



Page 273

1    A.   I don't have a reason to believe
2  otherwise, unless there were some delays.  I
3  don't -- I don't know.
4    Q.   Okay.  So would it be fair to say that
5  NewGen had completed all the work of the
6  wallpapering by July 2020?
7    MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9    A.   Again, I don't recall the completion
10  date, but if we were to go by this document, yes,
11  it's --
12  BY MR. BRUSTEIN:
13    Q.   And the next sentence in that says, "On
14  a side know, I also wanted you to know we're near
15  completion of the systems integrated of the
16  penthouse as required by Mr. Warner on his last
17  visit."
18    So Mr. Warner actually had specific
19  requirements of what type of renovations needed to
20  occur?
21    MR. BOLAND:  Object to the form.
22  BY THE WITNESS:
23    A.   He stayed in the penthouse, and, gosh, I
24  don't know what year, but he wanted the lighting

Page 274

1  and certain systems in the penthouse updated.  It
2  was malfunctioning.  So Michal was -- Michal had --
3  with Four Seasons was tasked to make sure that
4  project was completed.
5  BY MR. BRUSTEIN:
6    Q.   Now, in the middle of this pandemic you
7  said that Mr. Warner was very concerned about the
8  medical profession, correct?
9    A.   Yes.
10    Q.   His priority was the health and safety
11  of the employees and potential guests?
12    A.   Yes.
13    Q.   He put their well being ahead of any
14  financial decisions he was considering?
15    MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17    A.   It's a business.  I -- I don't know -- I
18  don't know if Mr. Warner -- you would have to ask
19  Mr. Warner that question.  I don't know if he --
20  how he prioritizes.
21  BY MR. BRUSTEIN:
22    Q.   We'll get to ask Mr. Warner questions
23  later.  That's fine.
24    Now, page 85 of this document, so it

Page 275

1  should be about four pages later, WD 6339.  It's a
2  four-page document ending at 6342.
3    These are notes.  You probably haven't
4  seen this e-mail before, but they're notes from, it
5  says an owner visit from 12/17.  Or it says visit
6  check, 12/17 and visit checklist.
7    Do you know when Mr. Warner visited the
8  hotel to come up with these demands for projects
9  and updates?
10    MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12    A.   I don't know when his last visit to the
13  hotel was.  I was, however, with Mr. Warner.  We
14  went to the hotel.  The last time we went there was
15  fall of 2019.
16  BY MR. BRUSTEIN:
17    Q.   All of the things that you talked about
18  as basis for shutting down the hotel can be found
19  on this list, right?
20    MR. BOLAND:  Object to the form.
21  BY THE WITNESS:
22    A.   No.  These were --
23  BY MR. BRUSTEIN:
24    Q.   Look --

Page 276

1    MR. BOLAND:  Let her finish.
2  BY THE WITNESS:
3    A.   These were items that Mr. Warner pointed
4  out to the team prior to his last visit.  I think
5  this has been ongoing.
6  BY MR. BRUSTEIN:
7    Q.   And nothing on this list required the
8  hotel to shut down, correct?
9    MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11    A.   I don't know what MR level project is,
12  but --
13  BY MR. BRUSTEIN:
14    Q.   Now, with respect to the Montecito
15  property that's still closed, was that shut down
16  because it wasn't -- is that still shut down
17  because it's not profitable to reopen it?
18    A.   Which property?
19    Q.   The Montecito property.
20    A.   Montecito Country Club?
21    Q.   Yes.
22    A.   No, it's open.
23    Q.   I thought -- I thought you said there
24  was another property that was closed for



Page 277

1  renovations for more than three years.
2      A.   No, they were closed during COVID, and I
3  think there were further renovations.  Again, I
4  don't remember the timing, but it was closed for a
5  while for renovations.  I don't recall if it was
6  three years.
7      Q.   I'm now going to direct your attention
8  to Exhibit 1, page 89, which is the very next
9  document, WD 7650.
10         This is a May 4, 2020, e-mail exchange
11  where you e-mailed Michal, who was the hotel
12  manager at the time, right?
13     A.   Yes.
14     Q.   And you said that Mr. Warner was asking
15  about the pixel size of the TV at the Ty Bar.
16     A.   Okay.  I see it.  I see the e-mail.
17     Q.   Was the Ty Bar closed at that point?
18     A.   Yes.  The hotel was closed.
19     Q.   I'm sorry?
20     A.   Ty Bar is inside of the hotel.  The
21  hotel was closed.
22     Q.   Well, medical professionals were staying
23  at the hotel, but they couldn't access the Ty Bar,
24  right?

Page 278

1      A.   No, Ty Bar was closed.
2      Q.   So is there a reason Mr. Warner in May
3  of 2020, at the height of the pandemic when people
4  were -- when dead bodies were stacking up in the --
5  in the streets outside hospitals, needed to know
6  how big a TV was in a closed bar in his hotel?
7      MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9      A.   I think this was initiated by Michal.
10  BY MR. BRUSTEIN:
11     Q.   Well, the bottom e-mail --
12     MR. BOLAND:  Are you done?  I don't know if
13  she was done.
14  BY THE WITNESS:
15     A.   He is asking -- this is one of the
16  capital items that he had discussed, and I think
17  this was -- I'm just trying to see when the e-mail
18  was initiated.  I think there was discussions
19  about this -- I think it was a renewal for rented
20  items.
21  BY MR. BRUSTEIN:
22     Q.   So even the pixel size of the TV was
23  something that Mr. Warner was involved in deciding?
24     MR. BOLAND:  Object to the form.

Page 279

1  BY THE WITNESS:
2      A.   The TV in the Ty Bar, it would
3  malfunction periodically while the hotel was in
4  operation.  And I think this was a project where
5  Mr. Warner was reconsidering what we should do with
6  the TV screen.
7      MR. BRUSTEIN:  At this point I'm going to ask
8  that the witness be shown Exhibit 8, Hwang.  When
9  you first bring it up.
10  BY MR. BRUSTEIN:
11     Q.   This is a declaration that you --
12     THE REPORTER:  Wait a minute.  Wait a minute.
13         (WHEREUPON, a certain document was
14         marked Hwang Deposition Exhibit
15         No. 8, for identification, as of
16         4/14/23.)
17     MR. BOLAND:  Thank you.
18     THE REPORTER:  Okay.
19  BY MR. BRUSTEIN:
20     Q.   May I continue?
21     A.   Yes, please.
22     Q.   This is a declaration that you signed in
23  connection with this case, right?
24     A.   Yes.

Page 280

1      Q.   And on the fifth page, you signed it
2  declaring under the penalty of perjury, right?
3      A.   Yes.
4      Q.   And that's similar to the oath you took
5  today, right?
6      A.   Yes.
7      Q.   And you swore that everything in this
8  declaration was true, right?
9      A.   Yes.
10     Q.   I'm going to direct your attention to --
11  but before I do, and so you read this carefully to
12  make sure that it was accurate and truthful because
13  you knew that not only were -- would it be a crime
14  to submit false testimony, but that it was in
15  connection with a federal lawsuit.  And so it was
16  important to be accurate, right?
17     A.   Yes.
18     Q.   Now, I'm going to direct your attention
19  to paragraph 5.  You said that Staley signed the
20  EmPact Agreement and that true and accurate copies
21  of her signature pages of the EmPact Agreement were
22  attached as Exhibit B, right?
23     A.   Yes.
24     Q.   And you said that she signed the EmPact



Page 281

1 Agreement you had attached as Exhibit A, right?
2    A.   That's what's stated here.
3    Q.   I'm sorry?
4    A.   Yes, that's what's stated.
5    Q.   And by stated, that's what you swore was
6 true?
7    A.   Yes.
8    Q.   And going down a little bit in
9 paragraph 7, you said that Holmes signed the EmPact
10 Agreement and true and accurate cop- -- and signed
11 an updated version in 2018.  Do you see that?
12    A.   Yes, I see it.
13    Q.   And it says true and accurate cop- --
14 true and correct copies of Holmes' signature pages
15 of the EmPact Agreement are collectively annexed
16 hereto as Exhibit C.
17       It then goes on, the EmPact Agreement
18 annexed hereto as Exhibit A is the version that
19 Staley signed in 2018.
20       Do you mean Holmes in that sentence?
21    A.   Can you repeat your last statement?
22    Q.   The last sentence says the EmPact
23 Agreement annexed hereto is the version that Staley
24 signed in 2018.  I'm asking if you meant to say

Page 282

1 that Holmes signed in 2018, because the rest of the
2 paragraph is dealing with Holmes' signature pages.
3       Is that sentence supposed to be about
4 Staley or Holmes?
5       Do you understand the question?
6    A.   Yes, I'm just trying to understand.
7    Q.   Do you agree that it should be about
8 Holmes?
9    A.   I don't know.  I'd have to review that
10 again to be sure.
11    Q.   So you think you meant to say Staley's
12 exhibits twice?
13    MR. BOLAND:  Object to the form.
14 BY THE WITNESS:
15    A.   I don't know.
16 BY MR. BRUSTEIN:
17    Q.   Okay.  Let's jump down to paragraph 9.
18 That paragraph is about Ivey.  Do you see that?
19    A.   Yes.
20    Q.   And that says that Ivey signed an
21 updated version in or about 2018, right?
22    A.   Yes.
23    Q.   And true and acc- -- and true and
24 correct copies of Ivey's signature pages of the

Page 283

1 EmPact Agreement are collectively annexed hereto as
2 Exhibit D.  The EmPact Agreement annexed hereto as
3 Exhibit A is the version that Staley signed in
4 2018.
5       Is this one also to be about Staley or
6 did you mean for this one to be about Ivey?
7    A.   I don't know.  I would have to review
8 the exhibit.
9    Q.   Okay.  So let's go down to Exhibit B
10 first.  I'm just going to warn you, it's far in the
11 back.  So if you want to start from the back, it's
12 a little easier.
13       And I'm looking at the first page of the
14 Exhibit B.  Is this the EmPact Revision
15 Acknowledgement Form for the 2018 EmPact Revision
16 you were referencing?
17       And if you want, you can keep your
18 exhibit open to the first page so you can look at
19 them side by side if you want that.  That may be
20 helpful to you.
21       So is this the signature page that you
22 said was for the Em- -- the 2018 EmPact Agreement?
23       Ms. Hwang, are you still there?
24    A.   Yes, I'm here.

Page 284

1    Q.   Is this the Acknowledgment Form to the
2 2018 EmPact Agreement that you were referencing for
3 Ms. Staley?
4    A.   Yes.
5    Q.   Going to the next page in this, it's
6 2015, and then the next one is back all the way in
7 2011, and then there's one more for 2008 for
8 Ms. Staley, and then it goes to Exhibit C, correct?
9       For Exhibit C, that's Ms. Holmes, and
10 the first one she signed was in 1998, and then the
11 next one it says in, I believe -- I don't know if
12 that's 2016, maybe.  No, that's '98 again.  And
13 then the last one for her, it says 2018, then,
14 right?
15    A.   Yes, I see that.
16    Q.   So that -- so that's the acknowledgment
17 form you were referencing for Ms. Holmes.  Does
18 that refresh your recollection as to whether or not
19 in the declaration you meant to say Staley for that
20 paragraph that was referencing Holmes, or if you
21 meant to say Holmes?
22       It's a simple question.  Is this the
23 form that you're saying Ms. Holmes signed for the
24 2018 EmPact Agreement?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
285–288

Page 285

1    A.   Yes.
2    Q.   And then going to Exhibit D, the first
3  one for Ms. Ivey is in 1997.  The second one is
4  also 1997.  And then there are two from 2018.  Do
5  you see that?  They appear to be the same date,
6  just a double copy, right?
7    A.   Yes.
8    Q.   So is that also the Acknowledgment Form
9  that you're acknowledging in your declaration?
10   A.   It's the EmPact Agreement is -- in
11  Exhibit A is the same.
12   Q.   So -- so that's what I'm asking you.  So
13  is that a yes?  Just because on the first page in
14  your declaration, you had referenced Staley in the
15  earlier paragraphs for Holmes and Ivey.  And I just
16  want to know, are you saying these are the
17  signature pages that you're swearing were for the
18  EmPact Agreement in your declaration?
19       If you want to go off record and think
20  about this, you can.
21       MR. BOLAND:  No, she's looking.  She's
22  looking.
23       MR. BRUSTEIN:  We don't need the coaching.
24       MR. BOLAND:  No, I'm just saying we're not

Page 286

1  going off the record while you're asking the
2  witness to do something.  That's all.
3  BY THE WITNESS:
4    A.   It merely says that's the agreement that
5  Staley signed in 2018.
6  BY MR. BRUSTEIN:
7    Q.   I'm not saying that's a false statement.
8  I'm just asking you if you meant for it to say that
9  Holmes signed it and that Ivey signed it.
10   A.   No, I -- I meant -- I meant that Staley
11  signed it in 2018.  That's the Exhibit A was signed
12  by Staley in 2018.
13   Q.   But the purpose of attaching the other
14  exhibits was because you're saying that Holmes and
15  Ivey also signed this exhibit, right?
16   A.   Yes.
17   Q.   And you swore that under penalties of
18  perjury, right?
19   A.   Yes.
20   Q.   What research did you do before making
21  that representation to the court?
22   A.   I reviewed the pages that were signed,
23  the acknowledgment forms.
24   Q.   And you took the oath seriously and were

Page 287

1  thorough in your review, right?
2    A.   Yes.
3    Q.   You understand that filing false
4  statements under oath can result in sanctions both
5  for you and your attorneys?  Did you know that?
6    A.   No, I'm not an expert in law.
7    Q.   Well, I'm now going to direct your
8  attention to page 7 of this exhibit.  This is the
9  EmPact Agreement that you swore under penalty of
10  perjury Ms. Holmes, Ms. Ivey and Ms. Staley signed,
11  right?
12       MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14   A.   Yes.
15  BY MR. BRUSTEIN:
16   Q.   In the middle of the page, can you
17  please read for the record what the date is that it
18  was last revised.
19   A.   2018.
20   Q.   Give me the full year, date and month.
21   A.   May 30, 2018.
22   Q.   Now, can you please tell me whether
23  April 4, 2018, happens before or after May 30,
24  2018?

Page 288

1    A.   That happens after.
2    Q.   So would you agree that Selena could not
3  have signed an EmPact Agreement on April 4, 2018,
4  that had been revised on May 30, 2018.
5       MR. BOLAND:  Object to the form.
6  BY MR. BRUSTEIN:
7    Q.   You agree that she couldn't have signed
8  something before it existed?
9    A.   Yes.
10   Q.   So would you agree that when you said
11  the April 4, 2018, signature page was related to a
12  May 30, 2018, revision of the EmPact Agreement,
13  that was not a true statement?
14       MR. BOLAND:  Object to the form.
15  BY MR. BRUSTEIN:
16   Q.   You're not going to find the answer in
17  the papers.  I'm asking you whether or not your
18  statement that she signed something on April 4,
19  2018, for a document dated May 30, 2018, is true or
20  not?
21   A.   I thought it said 2018.  I am just
22  reviewing the document that I signed.
23   Q.   Well, the document you signed said that
24  you attached the document that Ms. Staley had



Page 289

1  signed, right, as a true and accurate copy?
2      A.   Yes.
3      Q.   And the document you attached to your
4  exhibit said May 30, 2018, right?
5      A.   Yes.
6      Q.   And so that wasn't true.
7      A.   It was an oversight on my part.  I
8  didn't see the month and the date.
9      Q.   Same question.  May 3, 2018, is that
10  before or after May 30, 2018?
11     A.   It's before.
12     Q.   So would you agree that Vivian Holmes'
13  May 3, 2018, signature could not have been for the
14  May 30, 2018, revision that you claimed it was,
15  right?
16         MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18     A.   Yes.
19  BY MR. BRUSTEIN:
20     Q.   One last time.  April 18, 2018, is that
21  before or after May 30, 2018.
22     A.   Before.
23     Q.   So you would also agree that when you
24  swore under oath that Olive Rodriguez signed -- or

Page 290

1  Olive Ivey signed the EmPact Agreement for May 30,
2  2018, with an April 18, 2018, signature page, that
3  was also not true?
4      A.   As I indicated, I didn't see the exact
5  date.
6      Q.   Well, you also indicated that you
7  reviewed it and made sure it was accurate, right?
8      A.   Yes.
9      Q.   So when you swore under oath that you
10  had done that, was it that you hadn't actually read
11  what you were signing?
12         MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14     A.   Like I said, it was an oversight on my
15  part on the exact date.
16  BY MR. BRUSTEIN:
17     Q.   And so it resulted in you submitting a
18  false statement to the court under penalty of
19  perjury?
20         MR. BOLAND:  Object to the form.
21  BY MR. BRUSTEIN:
22     Q.   You can answer.
23     A.   Can you repeat your question?
24     Q.   And so you ended up having your

Page 291

1  attorneys submit a false statement to the court,
2  correct?
3         MR. BOLAND:  Object to the form.
4  BY THE WITNESS:
5      A.   Yes, that was submitted by the
6  attorneys.
7         MR. BRUSTEIN:  Let's take a five-minute break
8  here.
9         THE VIDEOGRAPHER:  Going off the record at
10  4:53 p.m.
11         (WHEREUPON, a recess was had.)
12         THE VIDEOGRAPHER:  We are going back on record
13  at 4 -- 5 o'clock p.m.
14  BY MR. BRUSTEIN:
15     Q.   Now, Ms. Hwang, you testified that you
16  were involved in reviewing court documents related
17  to the wallpaper litigation, right?
18     A.   Yes.
19     Q.   And you testified that you made sure
20  that those were truthful and accurate, as well,
21  right?
22     A.   Yes.
23         MR. BRUSTEIN:  At this point I'm going to ask
24  that Exhibit 13 be marked and show it to the

Page 292

1  witness.
2         (WHEREUPON, a certain document was
3         marked Hwang Deposition Exhibit
4         No. 13, for identification, as of
5         4/14/23.)
6         MR. BRUSTEIN:  And I placed a copy of it in
7  the chat.
8         THE REPORTER:  Okay.
9  BY MR. BRUSTEIN:
10     Q.   Do you have conversations with
11  Mr. Warner about determining what documents should
12  be considered confidential and which documents are
13  okay to share publicly or to file publicly?
14         MR. BRUSTEIN:  Object to the form.
15  BY THE WITNESS:
16     A.   No.
17  BY MR. BRUSTEIN:
18     Q.   Who decides from the company, Ty Warner
19  Hotel & Resorts or Hotel 57, LLC, or any of the
20  other entities that you're officer in, what
21  information should be confidential and what
22  information is okay to publicly disclose?
23         MR. BOLAND:  Object to the form.
24  BY THE WITNESS:



Page 293

1    A.   It's discussed with Mr. Warner's
2  attorney.
3  BY MR. BRUSTEIN:
4    Q.   Do you get to weigh in on the
5  designation of confidentiality, or is that
6  something that Mr. Warner, himself, has authority
7  over?
8    MR. BOLAND:  Object to the form.
9  BY THE WITNESS:
10    A.   Sure, I have input, and so does
11  Mr. Warner, but we discuss that with counsel.
12  BY MR. BRUSTEIN:
13    Q.   Prior to filing this lawsuit, Hotel 57,
14  LLC, versus Integral Contracting, Incorporation,
15  did you have any reservations about publicly
16  disclosing any of the information contained in this
17  federal lawsuit?
18    A.   No, left that up to --
19    Q.   Did you --
20    A.   -- the counsel.
21    Q.   Did you review the complaint before it
22  was filed to make sure nothing confidential was
23  revealed in the filing?
24    A.   I reviewed the filing.

Page 294

1    Q.   And did you do that before it was filed?
2    A.   Yes.
3    Q.   And did you make sure that it was
4  truthful and accurate?
5    A.   Yes.
6    Q.   And did you discuss with Mr. Warner
7  relevation -- revelations about ownership of Hotel
8  57, LLC?
9    MR. BOLAND:  Object to -- object to the form.
10  BY THE WITNESS:
11    A.   No, I did not have a discussion with
12  Mr. Warner.
13  BY MR. BRUSTEIN:
14    Q.   Did you have the authority to publicly
15  disclose the ownership of Hotel 57, LLC?
16    A.   Can you repeat your question, please.
17    Q.   Did you have the authority to publicly
18  disclose the ownership of Hotel 57, LLC?
19    MR. BOLAND:  Object to the form.
20  BY THE WITNESS:
21    A.   Mr. Warner discussed that with his
22  attorney, and his attorney, in turn, discussed it
23  with me.  So I -- you know, I would have to make
24  sure that Mr. Warner's okay with it, but it was

Page 295

1  done through his attorney.
2  BY MR. BRUSTEIN:
3    Q.   And so you knew before you approved this
4  document to be publicly filed that there was no
5  confidentiality concern about disclosing the
6  ownership of Hotel 57, LLC --
7    MR. BOLAND:  Object to the form.
8  BY MR. BRUSTEIN:
9    Q.   -- right?
10    MR. BOLAND:  Object to the form.  Sorry.
11  BY THE WITNESS:
12    A.   As I said, I discussed that with counsel
13  and counsel discussed that with Mr. Warner.  I did
14  not have a direct discussion with Mr. Warner.
15  BY MR. BRUSTEIN:
16    Q.   But you knew that by filing this
17  publicly, it would become public information who
18  owned Hotel 57, LLC?
19    A.   Yes.
20    Q.   Can you please read paragraph 6 into the
21  record aloud.
22    A.   "Owner's sole member is Hotel 57 HoldCo
23  LLC ('HoldCo'), which is a limited liability
24  company organized under the laws of Delaware."

Page 296

1    Q.   Is that another entity of Mr. Warners
2  that you are a director or officer of?
3    A.   Yes.
4    Q.   Please read paragraph 7.
5    A.   HoldCo's members are H. Ty Warner, an
6  individual, and Hotel 57 I, Inc., a corporation.
7    Q.   Is that statement true?
8    A.   I would have to look at the legal entity
9  structure.  As I had indicated it's a complex
10  structure, and I don't have it committed to memory.
11    Q.   Before approving this complaint, did you
12  look at the operating structure to make sure that
13  it was accurate?
14    A.   Yes.
15    Q.   And are you an officer in Hotel 57 Corp.
16  I, Inc.?
17    A.   I'm not sure if those are one of the
18  entities.  I don't know.
19    Q.   Now, this lawsuit discusses some pretty
20  specific things about vendors at Hotel -- at Four
21  Seasons Hotel New York, right?
22    MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24    A.   Yes.



Page 297

1 BY MR. BRUSTEIN:
2     Q.   It discloses the identity of vendors
3 that the hotel uses?
4     MR. BOLAND:  Same objection.
5 BY THE WITNESS:
6     A.   Yes.
7 BY MR. BRUSTEIN:
8     Q.   It identifies the type of wallpaper that
9 the hotel used in its property?
10        Directing your attention to page 5,
11 paragraph 37.  It says, "Owner ultimately decided
12 to use a custom silk wallcovering supplied by Jolie
13 Papier, Ltd., which was a reputable New York-based
14 wallcovering supplier with decades of experience."
15    A.   Yes.
16    Q.   Is there any concern disclosing the
17 identities of these vendors publicly?
18    A.   Not that I'm aware of.
19    Q.   No basis to claim it was confidential?
20    MR. BOLAND:  Object to the form.
21 BY THE WITNESS:
22    A.   I don't know.
23 BY MR. BRUSTEIN:
24    Q.   Did you have any basis as an officer of

Page 298

1 the company to claim it was confidential?
2     MR. BOLAND:  Object to the form.
3 BY THE WITNESS:
4     A.   No.
5 BY MR. BRUSTEIN:
6     Q.   This lawsuit also disclosed the dollar
7 amounts that the hotel was paying both for the
8 initial wallpaper project and the repairs, right?
9     A.   I don't recall.  I am reviewing the
10 document now.  I don't know if it was specifically
11 stated.
12    Q.   Well, let me direct your attention to
13 paragraph 156.  As a result of Integral's breaches
14 of the Agreement, Owner has suffered damages in
15 excess of $1.219 million plus interest, attorneys'
16 fees and costs.
17    A.   Okay, yes.  I see that.
18    Q.   And that's related to the cost that the
19 hotel was paying, right?
20    A.   Yes.
21    Q.   Paragraph 142, Owner paid $1.195 million
22 to NewGen for the replacement of the defectively
23 installed wallcovering?
24    A.   Yes.

Page 299

1     Q.   And that's the company that we had
2 talked about in those e-mails previously, right?
3     A.   Yes.
4     Q.   So neither you nor Mr. Warner prevented
5 misinformation from being publicly filed in a
6 lawsuit, right?
7     A.   Yes.
8     Q.   Would it be fair to say that the amount
9 you're paying your vendors is not confidential?
10    MR. BOLAND:  Object to the form, overbroad.
11 BY THE WITNESS:
12    A.   Yes, unless we have an agreement for
13 confidentiality.
14 BY MR. BRUSTEIN:
15    Q.   Now, in this lawsuit you claim that you
16 entered into a contract with NewGen Painting,
17 Incorporated, for the wallpaper covering.  Is that
18 true?
19    A.   Can you repeat that question again,
20 please.
21    Q.   This lawsuit says that you entered into
22 a contract with NewGen Painting, Incorporated, for
23 the replacement of the wallpaper covering --
24 wallcovering, right?

Page 300

1        I'm just asking if you entered into a
2 contract with NewGen Painting before they began
3 doing the repairs for the hotel.
4     A.   I know they were engaged.  I don't
5 recall if there was a contract.  I'd have to -- I'm
6 just reading through the document now.
7     Q.   Let me direct your attention to
8 paragraph 138.  It says, "On approximately
9 November 19, 2021, Owner entered into a contract
10 for the replacement of the wallcovering with NewGen
11 Painting, Inc."
12       Next paragraph, "NewGen Painting was a
13 contractor specializing in commercial, retail, and
14 residential wallcovering and painting and was
15 well-qualified to perform the replacement of the
16 wallcovering."
17       "140.  Pursuant to the November 19th
18 contract, NewGen Painting removed the
19 defectively-installed wallcovering, furnished
20 replacement custom silk wallcovering provided by
21 Jolie Papier, Limited, and installed replacement
22 wallcovering."
23       Is that statement -- are those
24 paragraphs true and accurate?



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
301–304

Page 301

1    Here, let me help you.  I am going to
2 turn your attention back to Exhibit 1.  I am going
3 to share my screen, because I know it can take you
4 a little bit of time, and we're short on time.
5 Exhibit 1, WD 5545.
6    MR. BOLAND:  We -- is this after the one you
7 just showed us?
8    MR. BRUSTEIN:  In a completely separate
9 document.  It's page 80 of Exhibit 1.
10    MR. BOLAND:  Oh, no, no.  I understand that.
11 Just is it earlier -- okay.  It's earlier than the
12 one we were just looking at, right?
13    MR. BRUSTEIN:  It's about 10 or 11 pages from
14 the back.
15    MR. BOLAND:  Okay.
16    MR. BRUSTEIN:  I'll read it while you find it.
17 BY MR. BRUSTEIN:
18    Q.  "Dear Cathy, I confirmed with Frank and
19 Sebastian today that the wallpaper project is
20 scheduled to be completed by mid July, at the
21 latest by July 17th."
22    And this is June 26, 2020, before the
23 date that you swore was true that you retained them
24 in 2021.

Page 302

1    So when you said that you reviewed this
2 lawsuit, going back to Exhibit 13, and you retained
3 this company in November of 2021 to replace the
4 wallpaper, that except for those six legal rooms,
5 had already been replaced back in 2020, that wasn't
6 true, right?
7    MR. BOLAND:  Object to the form.
8 BY THE WITNESS:
9    A.  I don't recall the exact date of the
10 agreement.
11 BY MR. BRUSTEIN:
12    Q.  Does the e-mail I just showed you
13 refresh your recollection that the work was done
14 before November 19, 2021?
15    MR. BOLAND:  Object to the form.
16 BY THE WITNESS:
17    A.  That's what it says in the e-mail.  I
18 don't recall if that was exactly the year when it
19 was completed.
20 BY MR. BRUSTEIN:
21    Q.  Well, Michal didn't work there much
22 after this e-mail, right?
23    MR. BOLAND:  Object to the form.
24 BY MR. BRUSTEIN:

Page 303

1    Q.  This was a true e-mail that was sent by
2 Michal and received by you back on June 26, 2020,
3 right?
4    A.  Yes.  I don't recall when Michal
5 resigned.
6    Q.  You know it was before November 2021,
7 right?
8    A.  I'm not -- I don't recall.
9    Q.  Okay.  Well, I'm going to ask you the
10 same question or similar question that I asked you
11 before.
12    Did June 26, 2020, happen before or
13 after November 19, 2021?
14    A.  It's before.
15    Q.  It would be fair to say that if the
16 wallpaper was scheduled to be completed by July 17,
17 2020, you wouldn't have retained someone, the same
18 exact company in November 19, 2021, to do the work
19 that they had already done?
20    MR. BOLAND:  Object to the form.
21 BY THE WITNESS:
22    A.  I must have misread the date, then.  I
23 don't recall exactly when the wallpaper project was
24 completed and when they were engaged.

Page 304

1 BY MR. BRUSTEIN:
2    Q.  So you would agree that the statement
3 that the owner entered into a contract with NewGen
4 Painting on November 19, 2021, was not a true
5 statement?
6    MR. BOLAND:  Object to the form.
7 BY THE WITNESS:
8    A.  I believe the date -- there's a
9 discrepancy in the dates.
10 BY MR. BRUSTEIN:
11    Q.  You think it's important to be accurate
12 in federal filings?
13    A.  Yes.
14    Q.  And you think it's important to be
15 accurate when you swear to the truth of matters
16 under oath?
17    A.  Yes.
18    Q.  Do you think the fact that a date may be
19 wrong is something that matters when you swear to
20 tell the truth?
21    MR. BOLAND:  Object to the form.
22 BY THE WITNESS:
23    A.  Yes, the date matters.  Again, I -- I
24 don't think I caught the date.



Page 305

1  BY MR. BRUSTEIN:
2      Q.   I'm now going to show you a document
3  that I'd ask be marked as Hwang Exhibit 3.
4           (WHEREUPON, a certain document was
5           marked Hwang Deposition Exhibit
6           No. 3, for identification, as of
7           4/14/23.)
8  BY MR. BRUSTEIN:
9      Q.   Can I continue?
10     A.   Yes, please.
11     Q.   I am going to direct your attention to
12  page 10, the second to the last page of this
13  document.  That's your verification and signature
14  dated December 23, 2022, right?
15     A.   Yes.
16     Q.   And you swore that you were the agent of
17  the defendants?
18     MR. BOLAND:  Object to the form.
19  BY MR. BRUSTEIN:
20     Q.   Right?
21     A.   Yes.
22     Q.   Under what authority were you designated
23  as an agent of Mr. Warner?
24     MR. BOLAND:  Object to the form.

Page 306

1          Excuse me.
2  BY THE WITNESS:
3      A.   Mr. Warner appointed me as the corporate
4  officer for the legal entities.
5  BY MR. BRUSTEIN:
6      Q.   Mr. Warner is an individual defendant in
7  this case, though, correct?
8      A.   Yes.
9      Q.   And on the first page, the first line
10  says, "Defendants Hotel 57 Services, LLC, Hotel 57,
11  LLC, Ty Warner Hotels & Resorts LLC, and H. Ty
12  Warner ('Defendants')."  So when you said you were
13  an agent of defendants, did you understand that you
14  were representing to the court that you were agent
15  of Mr. Warner?
16     MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18     A.   I meant I was an agent of the legal
19  entities.
20  BY MR. BRUSTEIN:
21     Q.   Do you consider Mr. Warner to be a legal
22  entity?
23     A.   No, he's an individual.
24     Q.   He was one of the defendants that you

Page 307

1  indicated you were an agent of?
2      MR. BOLAND:  Object to the form.
3  BY MR. BRUSTEIN:
4      Q.   Did you not mean that when you swore in
5  your verification --
6           (WHEREUPON, there was a short
7           interruption.)
8      MR. BOLAND:  Bless you.
9  BY MR. BRUSTEIN:
10     Q.   -- that you were an agent of the
11  defendant?
12     MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14     A.   Again, I'm not an expert of law, and
15  when I signed off on the verification, I took it as
16  I'm a corporate representative for the defendants.
17  BY MR. BRUSTEIN:
18     Q.   So you did not mean to represent
19  yourself as an agent of Mr. Warner when you swore
20  under penalty of perjury that you were?
21     MR. BOLAND:  Object to the form of the
22  question.
23  BY THE WITNESS:
24     A.   I'm an employee of Mr. Warner, and I'm

Page 308

1  an agent of his legal entities.
2  BY MR. BRUSTEIN:
3      Q.   I understand that, but you swore under
4  penalty of perjury that you were an agent of his.
5  And I'm asking if you meant to swear to that under
6  oath or not?
7      MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9      A.   And I'm explaining that I'm the agent of
10  his legal entities, and it didn't occur to me that
11  I needed to be that technical and think of him as
12  an individual.  For the defendants, I was acting as
13  an agent for the defendants.
14  BY MR. BRUSTEIN:
15     Q.   Okay.  Now, you also testified that you
16  were involved in reviewing accuracy of submissions
17  for the hotel management termination litigation
18  involving the Hotel Four Seasons -- Four Seasons
19  Hotel New York and Santa Barbara, correct?
20     A.   Yes.
21     Q.   And you reviewed that filing before it
22  was filed in court, right?
23     MR. BOLAND:  Object to the form.
24  BY THE WITNESS:



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
309–312

Page 309

1    A.   Yes.
2  BY MR. BRUSTEIN:
3    Q.   And you did so to make sure that it was
4  accurate and truthful?
5    A.   Yes.
6    Q.   I'm now showing you Exhibit 4.  I'd ask
7  that that be marked as Hwang Exhibit 4.
8        I'm going to just let you know that it's
9  several documents.  It's not just the Petition for
10 Appointment of the Arbitrators, but I'm going to
11 start with the first portion of the document.
12    THE REPORTER:  Wait a minute.  You keep
13 talking, but I need to grab the exhibit.  So,
14 sorry.
15    MR. BRUSTEIN:  I'm sorry.  I got ahead of
16 myself.
17    THE REPORTER:  That's all right.
18        (WHEREUPON, a certain document was
19        marked Hwang Deposition Exhibit
20        No. 4, for identification, as of
21        4/14/23.)
22    THE REPORTER:  Okay.  Thanks.
23 BY MR. BRUSTEIN:
24    Q.   I'm going to represent to you that it's

Page 310

1  actually a collection of documents from that
2  litigation.  I'm right now going to be referencing
3  the first 11 pages, which are titled the Petition
4  for Appointment of Arbitrators.
5        Have you seen that document before?
6        Have you seen those documents -- that
7  11-page document before?
8    A.   I was reviewing the full stack of
9  information that was handed to me.  Yes, I've seen
10 the 10, 11-page document before.
11    Q.   And you reviewed it before it was filed
12 to make sure it was accurate, right?
13    A.   Yes.
14    Q.   So that document on page 4 under the
15 Factual Background, paragraph A, can you read that
16 sentence, please, with the header.
17    A.   "Owner Terminates the Parties'
18 Agreements Due to Four Seasons' breaches."
19        More than two decade --
20    Q.   Just that sentence is all.
21    A.   Okay.
22    Q.   Thank you.  That's not a future will
23 terminate or will try to terminate.  You and your
24 company claim in this lawsuit that the HMA had

Page 311

1  already been terminated, right?
2    MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4    A.   We're announcing that the owner wishes
5  to terminate the agreement with Four Seasons.
6  BY MR. BRUSTEIN:
7    Q.   Well, let's be a little bit more
8  accurate as to what you allege.  On page 5,
9  paragraph 16, I will read it, and you tell me if
10 I'm reading it correctly.
11        As a result of Four Seasons' breaches,
12 Owner served detailed default notices on Four
13 Seasons in February 2021, and then, after Four
14 Seasons failed to cure those defaults, served
15 notices in March 2021 terminating Four Seasons'
16 management of both hotels under the HMAs.  However,
17 Four Seasons refused to vacate the properties and
18 contested Owner's termination of the HMAs."
19        Did I read that correctly?
20    A.   Yes.
21    Q.   The two hotels referenced are the Four
22 Season Hotel New York and the Four Seasons Santa
23 Barbara, right?
24    A.   Yes.

Page 312

1    Q.   So according to this federal filing that
2  you swore is true, Ty Warner Hotels & Resorts tried
3  to evict Four Seasons from the Four Seasons Hotel
4  New York because Ty Warner Hotels & Resorts and
5  Mr. Warner considered the HMA to be done, right?
6    MR. BOLAND:  Object to the form.  Yeah, object
7  to the form.
8  BY THE WITNESS:
9    A.   I would not say that we tried to evict
10 them.  We announced that we'd like to terminate the
11 management agreement.  We didn't -- when you evict
12 someone, you're forcing someone out physically.
13 BY MR. BRUSTEIN:
14    Q.   Fine.  But according to this filing, you
15 considered it to be over.  The HMA was terminated
16 back in March 2021 when Four Seasons failed to cure
17 the default notices, right?
18    MR. BOLAND:  Object to the form.
19 BY THE WITNESS:
20    A.   Can you repeat your question again.
21 BY MR. BRUSTEIN:
22    Q.   Did Ty Warner Hotels & Resorts,
23 Mr. Warner, and any other entity that he's involved
24 with, send notice that the HMA was terminated --



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
313—316

Page 313

1  terminated and try to move on from Four Seasons?
2      MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4      A.   Yes, we initiated the termination.
5  BY MR. BRUSTEIN:
6      Q.   And that's because you, meaning
7  Mr. Warner, and the entities, collectively,
8  considered the HMA to be over and terminated,
9  right?
10     MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12     A.   No, that's not what I would say.
13  BY MR. BRUSTEIN:
14     Q.   Do you understand terminated to be the
15  end?
16     MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18     A.   Four Seasons is still managing the
19  hotel.  So, yes, we filed this --
20  BY MR. BRUSTEIN:
21     Q.   My question --
22     A.   -- to terminate --
23     MR. BOLAND:  Let her finish.
24  BY THE WITNESS:

Page 314

1      A.   -- but they're still managing the hotel.
2  The term -- the termination process --
3  BY MR. BRUSTEIN:
4      Q.   My question --
5      A.   -- is not complete.
6      Q.   Okay.  But my question was about simply
7  the word "terminated."  Do you understand the word
8  "terminated" to mean finished, over?
9      MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11     A.   The term here, I would define it as
12  cutting the relationship with Four Seasons as the
13  operator.
14  BY MR. BRUSTEIN:
15     Q.   When you terminate an employee, is that
16  considered temporary or permanent?
17     MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19     A.   In this case, I don't know.
20  BY MR. BRUSTEIN:
21     Q.   Have you ever terminated an employee
22  before?
23     A.   Yes.
24     Q.   Is that considered temporary or

Page 315

1  permanent?
2      MR. BOLAND:  Object to the form.
3  BY THE WITNESS:
4      A.   Are you asking about furloughing an --
5  an employee or terminating an employee?
6  BY MR. BRUSTEIN:
7      Q.   I did not say furlough.  I said
8  terminate.  Are you confused about the definition
9  of terminating?
10     MR. BOLAND:  Object to the form.
11  BY THE WITNESS:
12     A.   No.  I'm not.
13  BY MR. BRUSTEIN:
14     Q.   Are you aware of any definition of
15  terminating that is not permanent?
16     MR. BOLAND:  Object to the form.
17  BY THE WITNESS:
18     A.   Termination is complete when the entire
19  process of termination is complete.
20  BY MR. BRUSTEIN:
21     Q.   Yes, but the position your company took
22  in this lawsuit was that they terminated the
23  relationship by serving notices in March of 2021,
24  right?

Page 316

1      MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3      A.   Yes.
4  BY MR. BRUSTEIN:
5      Q.   And your understanding of termination is
6  a permanent ending, right?
7      MR. BOLAND:  Object to the form.
8  BY THE WITNESS:
9      A.   Yes.
10     MR. BRUSTEIN:  Okay.  I'm going to take a
11  five-minute break.  I -- I don't know if I have
12  much more left.
13     THE VIDEOGRAPHER:  We are going off the record
14  at 5:34 p.m.
15         (WHEREUPON, a recess was had.)
16     THE VIDEOGRAPHER:  We are going back on the
17  record at 5:40 p.m.
18  BY MR. BRUSTEIN:
19     Q.   Now, you testified earlier that you,
20  Mr. Warner and Mr. Hicks, I believe, are the
21  officers of all the 30 or 40 companies that you are
22  involved in; is that correct?
23     A.   Yes.
24     Q.   And are the three of you all officers of



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
317–320

Page 317

1  Hotel 57 Services, LLC?
2      A.   Yes.
3      Q.   As officers of Hotel 57 Services, LLC,
4  do you have supervisory authority over its
5  employees?
6      MR. BOLAND:  Object to the form.
7  BY THE WITNESS:
8      A.   No.
9  BY MR. BRUSTEIN:
10     Q.   So as an officer of the company Hotel 57
11  Services, LLC, you have no control over any of the
12  employees?
13     A.   Yes, that's correct.
14     Q.   Does Mr. Warner retain all of the
15  authority over the employees at Hotel 57 Services,
16  LLC?
17     MR. BOLAND:  Object to the form.
18  BY THE WITNESS:
19     A.   No, Mr. Warner does not have any
20  authority over the Hotel 57, LLC, employees.
21  BY MR. BRUSTEIN:
22     Q.   Is it your testimony that the employees
23  of Hotel 57 Services, LLC, have no supervisor?
24     A.   The employees of Hotel 57, LLC, report

Page 318

1  to Four Seasons.
2      Q.   Is there anyone within Hotel 57
3  Services, LLC, that's actually in charge?
4      A.   In charge of?
5      Q.   The other employees.
6      A.   Yes.
7      Q.   Who?
8      A.   The Four Seasons managers are in charge
9  of the Hotel 57, LLC, employees.
10     Q.   When you say managers --
11     A.   Property --
12     Q.   -- is that the general?
13     A.   I'm sorry.  I'll let you finish.
14     Q.   Is that general manager or someone else?
15     A.   Anyone in managerial role, including the
16  general manager.  It could be food and beverage
17  manager or HR manager.
18     Q.   Some of the plaintiffs in this case were
19  managers at Hotel -- at the Four Seasons Hotel New
20  York, right?
21     A.   I don't -- I don't know.  I'm -- I'm not
22  familiar with employees by name.
23     Q.   Well, you reviewed the filings in this
24  case, right?

Page 319

1      A.   Yes.  Yes.
2      Q.   So then you know from reviewing them
3  that, at least the allegations are, that two of the
4  plaintiffs worked with some level of supervisory
5  experience, right?
6      A.   Yes.
7      Q.   Are you testifying that they have more
8  authority of the operation and management of
9  employees of Hotel 57 Services than you do as a
10  officer of the company?
11     A.   That's correct.
12     Q.   Are you claiming that they have more
13  authority than Mr. Warner himself?
14     A.   Yes, Mr. Warner nor any of the officers
15  for Hotel 57, LLC, has authority over Hotel 57,
16  LLC -- I'm sorry, Hotel 57 Services, LLC,
17  employees.
18     Q.   What about Mr. Tauscher, when he was
19  actually general manager, who was paying him?
20     MR. BOLAND:  Object to the form.
21  BY THE WITNESS:
22     A.   Four Seasons pays him.
23  BY MR. BRUSTEIN:
24     Q.   So it's your testimony that

Page 320

1  Mr. Tauscher, when he was the general manager, was
2  a Four Seasons employee, not a Hotel 57 Services,
3  LLC, employee?
4      MR. BOLAND:  Object to the form.
5  BY THE WITNESS:
6      A.   He is a Hotel 57 Services, LLC, employee
7  but he's paid by Four Seasons.  The funding is
8  provided during closure by ownership, but Four
9  Seasons actually processes the payroll.
10  BY MR. BRUSTEIN:
11     Q.   What about Elizabeth Ortiz?
12     MR. BOLAND:  Object to the form.
13  BY THE WITNESS:
14     A.   The same.
15  BY MR. BRUSTEIN:
16     Q.   Meaning she's paid by Four Seasons when
17  the hotel is operating?
18     MR. BOLAND:  Object to the form.
19  BY THE WITNESS:
20     A.   Maybe I need to define that a little bit
21  better.  Hotel -- Four Seasons processes the
22  payroll and pays the employees, but it --
23  BY MR. BRUSTEIN:
24     Q.   Okay.



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
321–324

Page 321

1    A.   But I guess it's paid out of the legal
2  entity for Hotel 57 Services, LLC.  It's a bit
3  complicated because even the funding goes through.
4    Q.   I will ask a different question.
5    A.   Okay.
6    Q.   Who supervises Elizabeth Ortiz?
7    A.   Before Rudy Tauscher resigned, I believe
8  Elizabeth reported to Rudy Tauscher.
9    Q.   And now who does she report to?
10    A.   I don't know.  I believe she reports to
11  someone at another Four Seasons employee, but she
12  does not report to any of the corporate officers.
13    Q.   Are the Warner entities joint employers
14  with Four Seasons?
15    MR. BOLAND:  Object to the form.  That calls
16  for a legal conclusion.
17    MR. WAGNER:  I object, as well.
18  BY MR. BRUSTEIN:
19    Q.   You can answer.
20    A.   No.  The employees are employed by Four
21  Seasons.  They are not employed by Ty Warner
22  entities.
23    Q.   Now, earlier you testified that there
24  was a third property that -- of Mr. Warner's that

Page 322

1  has been closed for years for renovations.  What
2  property was that?
3    A.   Can you repeat that question again.
4    Q.   There was a third property, in addition
5  to the two Four Seasons hotels, that Mr. Warner
6  owns that has been closed for years for
7  renovations.  What is that third property?
8    A.   So Montecito Country Club was closed for
9  renovation.
10    Q.   Okay.  But -- but it's now reopened?
11    A.   Yes.
12    Q.   Okay.  Now, is there anything else you
13  haven't already testified to that you want to add
14  now?
15    MR. BOLAND:  Object to the form.
16  BY THE WITNESS:
17    A.   No, I'm here to answer your questions.
18  BY MR. BRUSTEIN:
19    Q.   Is there anything else relating to this
20  lawsuit that you haven't testified to that you want
21  to add now?
22    MR. BOLAND:  Object to the form.
23  BY THE WITNESS:
24    A.   No.

Page 323

1  BY MR. BRUSTEIN:
2    Q.   Is the testimony you've given today
3  complete and accurate in every respect?
4    MR. BOLAND:  Object to the form.
5  BY THE WITNESS:
6    A.   As to -- to my knowledge, yes, it's
7  accurate.
8  BY MR. BRUSTEIN:
9    Q.   Give me just one second.
10    Did Mr. Warner want the general manager
11  and hotel manager positions eliminated after the
12  hotel shut down in March 2020?
13    MR. BOLAND:  Object to the form.
14  BY THE WITNESS:
15    A.   Which positions?  Can you repeat your
16  question?
17  BY MR. BRUSTEIN:
18    Q.   Rudy Tauscher's general manager
19  position.
20    MR. BOLAND:  Same objection.
21  BY THE WITNESS:
22    A.   Mr. Warner didn't see a need for a
23  general manager during hotel closure.
24  BY MR. BRUSTEIN:

Page 324

1    Q.   What about hotel manager during a hotel
2  closure?
3    A.   He was fine having a hotel manager, but
4  he didn't see the need for a general manager during
5  hotel closure.
6    Q.   So it would be fair to say he was
7  looking to eliminate that position during the hotel
8  closure?
9    MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11    A.   He -- Mr. Warner cannot eliminate a
12  position or employees, terminate employees.  That's
13  up to Four Seasons.
14  BY MR. BRUSTEIN:
15    Q.   Mr. Warner did decrease the salaries
16  during the closure of the hotel management
17  including bonuses, right?
18    MR. BOLAND:  Object to the form.
19  BY THE WITNESS:
20    A.   The salaries were not reduced for the
21  hotel employees.
22  BY MR. BRUSTEIN:
23    Q.   For the management, didn't they get a
24  reduced salary?



Page 325

1    MR. BOLAND:  Object to the form.
2  BY THE WITNESS:
3    A.   Not to my knowledge, they did not get a
4  reduced salary.
5  BY MR. BRUSTEIN:
6    Q.   Does Mr. Warner use funding or the lack
7  of funding to try and have people eliminate their
8  own positions?
9    MR. BOLAND:  Object to the form.
10  BY THE WITNESS:
11    A.   No.
12    MR. BRUSTEIN:  I have no further questions for
13  today.  I am going to leave it open based upon the
14  testimony that there are e-mails and documents that
15  Ms. Hwang sent and received that have not been
16  provided.  Those documents were specifically
17  requested in our discovery request.  Those
18  documents also were part of the motion to compel,
19  which was granted by the court, and the court
20  ordered the defendants to produce those documents.
21    So we will be having a meet and confer
22  probably on Monday to address the deficiencies of
23  defendant's productions.  And we will, after
24  reviewing the additional productions, determine

Page 326

1  whether or not we need to depose Mr. Hwang --
2  Ms. Hwang further.
3    Ms. Hwang, thank you very much for your
4  time today.
5    MR. BOLAND:  Two things.  One, we disagree
6  with everything you just said.  Two, she's -- this
7  deposition is over.  And three, actually, three
8  things, we will reserve signature.
9    MR. WAGNER:  No questions from FSR.  Thank
10  you.
11    MR. BRUSTEIN:  Are we off?
12    THE VIDEOGRAPHER:  We are going off record at
13  5:52 p.m.
14    FURTHER DEPONENT SAITH NOT.
15
16
17
18
19
20
21
22
23
24

Page 327

1  STATE OF ILLINOIS )
2                    )   SS:
3  COUNTY OF DU PAGE )
4        I, JACQUELINE M. TIMMONS, a Notary
5  Public within and for the County of DuPage, State
6  of Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8        That previous to the commencement of the
9  examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12        That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17        That before the conclusion of the
18  deposition, the witness has requested a review of
19  this transcript pursuant to Rule 30(e)(1);
20        That the said deposition was taken
21  before me at the time and place specified;
22        That I am not a relative or employee or
23  attorney or counsel, nor a relative or employee of
24  such attorney or counsel for any of the parties

Page 328

1  hereto, nor interested directly or indirectly in
2  the outcome of this action.
3        IN WITNESS WHEREOF, I do hereunto set my
4  hand and affix my seal of office at Chicago,
5  Illinois, this 21st day of April, 2023.
6                  Jacqueline M Timmons
7
8        Notary Public, DuPage County, Illinois.
9        My commission expires January 23, 2026.
10
11
12  C.S.R. Certificate No. 84-2949.
13
14
15
16
17                OFFICIAL SEAL
                   JACQUELINE M TIMMONS
18              NOTARY PUBLIC, STATE OF ILLINOIS
                MY COMMISSION EXPIRES 1/23/2026
19
20
21
22
23
24



CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023
329–332

Page 329

1                    I N D E X
2     WITNESS                    EXAMINATION
3     CATHY HWANG
4          By Mr. Brustein             6
5
6                  E X H I B I T S
7     NUMBER                  MARKED FOR ID
8     Hwang Deposition
9          Exhibit No. 1            104
10         Exhibit No. 3            305
11         Exhibit No. 4            309
12         Exhibit No. 5            190
13         Exhibit No. 7            235
14         Exhibit No. 8            279
15         Exhibit No. 9            195
16         Exhibit No. 13           292
17         Exhibit No. 14           166
18
19
20
21
22
23
24

Page 330

1                DEPOSITION ERRATA SHEET
2
3     Our Assignment No. J9562590
4     Selena Staley, et al., vs. Four Seasons Hotels and
5     Resorts, et al.,
6
7            DECLARATION UNDER PENALTY OF PERJURY
8
9            I declare under penalty of perjury that I
10    have read the entire transcript of my Deposition
11    taken in the captioned matter or the same has been
12    read to me, and the same is true and accurate, save
13    and except for changes and/or corrections, if any,
14    as indicated by me on the DEPOSITION ERRATA SHEET
15    hereof, with the understanding that I offer these
16    changes as if still under oath.
17
18            Signed on the _____ day of
19            _____, 20___.
20            _____
21            CATHY HWANG
22
23
24

Page 331

DEPOSITION ERRATA SHEET

1
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24            CATHY HWANG

Page 332

DEPOSITION ERRATA SHEET

1
2     Page No._____Line No._____Change to:_____
3     _____
4     Reason for change:_____
5     Page No._____Line No._____Change to:_____
6     _____
7     Reason for change:_____
8     Page No._____Line No._____Change to:_____
9     _____
10    Reason for change:_____
11    Page No._____Line No._____Change to:_____
12    _____
13    Reason for change:_____
14    Page No._____Line No._____Change to:_____
15    _____
16    Reason for change:_____
17    Page No._____Line No._____Change to:_____
18    _____
19    Reason for change:_____
20    Page No._____Line No._____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24            CATHY HWANG



1          DEPOSITION ERRATA SHEET

2

3    Our Assignment No. J9562590

4    Selena Staley, et al., vs. Four Seasons Hotels and

5    Resorts, et al.,

6

7          DECLARATION UNDER PENALTY OF PERJURY

8

9          I declare under penalty of perjury that I

10   have read the entire transcript of my Deposition

11   taken in the captioned matter or the same has been

12   read to me, and the same is true and accurate, save

13   and except for changes and/or corrections, if any,

14   as indicated by me on the DEPOSITION ERRATA SHEET

15   hereof, with the understanding that I offer these

16   changes as if still under oath.

17

18                     Signed on the *22nd* day of

19              *May*          , 20*23*.

20              

21              CATHY HWANG

22

23

24

CATHY HWANG                                                April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

| 1 | DEPOSITION ERRATA SHEET |
|---|---|

Page No. 12    Line No. 14    Change to: "Yes" to

"Montecito Country Club LLC was the plaintiff"

Reason for change: Clarification

Page No. 19    Line No. 8    Change to: "No." to "Yes."

Reason for change: Correction

Page No. 26    Line No. 20    Change to: Add "as president of

Hotel 57, LLC." at end of sentence

Reason for change: Clarification

Page No. 30    Line No. 11    Change to: "Hotel 57, LLC"

Reason for change: Correction

Page No. 30    Line No. 19    Change to: "FSR International

Hotels, Inc."

Reason for change: Clarification

Page No. 31    Line No. 20    Change to: Change

"Ty Warner Hotels & Resorts" to "Hotel 57, LLC"

Reason for change: Correction

Page No. 32    Line No. 9    Change to: Change

"Ty Warner Hotels & Resorts" to "Hotel 57, LLC"

Reason for change: Correction

SIGNATURE:     DATE: 5/22/23

              CATHY HWANG

CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023

1    DEPOSITION ERRATA SHEET

2    Page No. 39    Line No. 19    Change to: "Tell" to "Hill"

3    _____

4    Reason for change: Spelling

5    Page No. 39    Line No. 17    Change to: Change "Montecito

6    Club" to "Montecito Country Club"

7    Reason for change: Correction

8    Page No. 34    Line No. 18    Change to: Change "Course"

9    to "Trust"

10   Reason for change: Correction

11   Page No. 49    Line No. 10    Change to: "Yes, or it might

12   have been at a later time in 2016."

13   Reason for change: Clarification

14   Page No. 69    Line No. 15    Change to: "SYR Service

15   Company"

16   Reason for change: Correction

17   Page No. 87    Line No. 3    Change to: Insert "as president

18   of Hotel 57 LLC" after "over"

19   Reason for change: Clarification

20   Page No. 91    Line No. 24    Change to: Insert "Hotel 57,

21   LLC" after "wants"

22   Reason for change: Clarification

23   SIGNATURE: *Cathy Hwang*    DATE: 5/22/23

24            CATHY HWANG



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CATHY HWANG                                                     April  14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

| | |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Page No. 113  Line No. 24  Change to: Change "Mr. |
| 3 | Warner's" to "Hotel 57, LLC's" |
| 4 | Reason for change: Clarification |
| 5 | Page No. 114  Line No. 8  Change to: Change "Mr. |
| 6 | Warner" to "Hotel 57, LLC" |
| 7 | Reason for change: Clarification |
| 8 | Page No. 120  Line No. 11  Change to: Change "we" to |
| 9 | "Hotel 57, LLC" |
| 10 | Reason for change: Clarification |
| 11 | Page No. 120  Line No. 18  Change to: Change "we" to |
| 12 | "Hotel 57, LLC" |
| 13 | Reason for change: Clarification |
| 14 | Page No. 121  Line No. 22  Change to: Change "we" to |
| 15 | "Hotel 57, LLC" |
| 16 | Reason for change: Clarification |
| 17 | Page No. 123  Line No. 18  Change to: Add "for Hotel 57, |
| 18 | LLC" after "together" |
| 19 | Reason for change: Clarification |
| 20 | Page No. 126  Line No. 21  Change to: Add "Hotel 57, LLC" |
| 21 | after "For" |
| 22 | Reason for change: Clarification |
| 23 | SIGNATURE: _Cathy Hwang_   DATE: _5/22/23_ |
| 24 | CATHY HWANG |



CATHY HWANG                                                April  14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

1            DEPOSITION ERRATA SHEET

2    Page No. 127   Line No. 23   Change to: Add "Hotel 57, LLC

3    refused to fund" after "recall"

4    Reason for change: Clarification

5    Page No. 129   Line No. 17   Change to: Change "We were"

6    to "Hotel 57, LLC was"

7    Reason for change: Clarification

8    Page No. 129   Line No. 23   Change to: "as part of Ty Warner

9    Hotels & Resorts" to "as President of Hotel 57, LLC"

10   Reason for change: Correction

11   Page No. 136   Line No. 16   Change to: Insert "Hotel 57,

12   LLC" between "the" and "funding"

13   Reason for change: Clarification

14   Page No. 144   Line No. 12   Change to: Add "but the Hotel

15   was already closed because of Covid."

16   Reason for change: Clarification

17   Page No. 146   Line No. 22   Change to: Change

18   "monitoring" to "modernization"

19   Reason for change: Transcription error

20   Page No. 155   Line No. 20   Change to: Change "Ty Warner

21   Hotels & Resorts" to "Hotel 57 LLC"

22   Reason for change: Correction

23   SIGNATURE:         DATE: 5/22/23

24            CATHY HWANG

CATHY HWANG                                          April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

| | |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Page No. 165  Line No. 12  Change to: Replace first |
| 3 | sentence with "Ty Warner Hotels & Resorts does not decide when the Hotel opens." |
| 4 | Reason for change: Clarification |
| 5 | Page No. 166  Line No. 5  Change to: Add "as president of |
| 6 | Hotel 57, LLC." |
| 7 | Reason for change: Clarification |
| 8 | Page No. 169  Line No. 9  Change to: Change "We relied |
| 9 | on" to "Hotel 57, LLC relied on Ty Warner Hotels & Resorts"' |
| 10 | Reason for change: Clarification |
| 11 | Page No. 178  Line No. 3  Change to: "Hotel 57 LLC did |
| 12 | not accept them." |
| 13 | Reason for change: Clarification |
| 14 | Page No. 178  Line No. 10  Change to: "Hotel 57, LLC |
| 15 | rejected them." |
| 16 | Reason for change: Clarification |
| 17 | Page No. 175  Line No. 16  Change to: Add "for Hotel 57, |
| 18 | LLC" after "myself" |
| 19 | Reason for change: Clarification |
| 20 | Page No. 179  Line No. 17  Change to: Change "It" to "Hotel |
| 21 | 57, LLC." |
| 22 | Reason for change: Clarification |
| 23 | SIGNATURE: *Cathy Hwang*      DATE: 5/22/23 |
| 24 | CATHY HWANG |



CATHY HWANG                                            April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

```
 1              DEPOSITION ERRATA SHEET
 2    Page No. 180   Line No. 18   Change to: Add "to Hotel 57,
 3    LLC" after "loss"
 4    Reason for change: Clarification
 5    Page No. 183   Line No. 14   Change to: Change "the
 6    company" to "Hotel 57, LLC"
 7    Reason for change: Clarification
 8    Page No. 183   Line No. 14   Change to: Change "the
 9    Company" to "Hotel 57, LLC"
10    Reason for change: Clarification
11    Page No. 183   Line No. 16   Change to: Change "his" to
12    "Hotel 57, LLC's"
13    Reason for change: Clarification
14    Page No. 185   Line No. 19   Change to: Add "has no
15    responsibility to pay employees" after "Ty Warner Hotels & Resorts"
16    Reason for change: Clarification
17    Page No. 198   Line No. 14   Change to: Add "No, and I"
18    to start of answer
19    Reason for change: Clarification
20    Page No. 199   Line No. 4   Change to: Change "we" to
21    "Hotel 57, LLC"
22    Reason for change: Clarification
23    SIGNATURE: Cathy Hwang        DATE: 5/22/23
24              CATHY HWANG
```

 ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CATHY HWANG                                      April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

1                    DEPOSITION ERRATA SHEET

2     Page No. 202   Line No. 22   Change to: Change "We" to

3     "Hotel 57, LLC"

4     Reason for change: Clarification

5     Page No. 204   Line No. 24   Change to: Add "Hotel 57 LLC

6     commenced proceedings"

7     Reason for change: Clarification

8     Page No. 205   Line No. 22   Change to: Change "lawsuit" to

9     "arbitration"

10    Reason for change: Clarification

11    Page No. 206   Line No. 4    Change to: Change answer to

12    "It is an arbitration filed in good faith."

13    Reason for change: Clarification

14    Page No. 206   Line No. 11   Change to: "In the arbitration,

15    yes."

16    Reason for change: Clarification

17    Page No. 207   Line No. 14   Change to: Change "litigating"

18    to "arbitrating"

19    Reason for change: Clarification

20    Page No. 208   Line No. 4    Change to: Change to Mr.

21    Warner wants" to "Mr. Warner and Hotel 57, LLC want"

22    Reason for change: Clarification

23    SIGNATURE: *Cathy Hwang*          DATE: 5/22/23

24              CATHY HWANG



CATHY HWANG                                        April 14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

```
 1              DEPOSITION ERRATA SHEET
 2    Page No. 213   Line No. 24   Change to: Add "FSR was not
 3    ready" after "No"
 4    Reason for change: Clarification
 5    Page No. 216   Line No. 10   Change to: Insert "Hotel 57,
 6    LLC" beween "consider" and "funding"
 7    Reason for change: Clarification
 8    Page No. 218   Line No. 7   Change to: Change "We" to
 9    "Hotel 57 Services, LLC"
10    Reason for change: Clarification
11    Page No. 221   Line No. 11   Change to: "He's not -- he's not
12    required to pay" to "Hotel 57, LLC's not required to fund"
13    Reason for change: Clarification
14    Page No. 224   Line No. 22   Change to: Change "We" to
15    "Hotel 57 Services, LLC"
16    Reason for change: Clarification
17    Page No. 225   Line No. 4   Change to: Change "We"
18    to "Hotel 57 Services, LLC"
19    Reason for change: Clarification
20    Page No. 225   Line No. 8   Change to: Change "we" to
21    "Hotel 57 Services, LLC"
22    Reason for change: Clarification
23    SIGNATURE: Cathy Hwang          DATE: 5/22/23
24              CATHY HWANG
```



CATHY HWANG                                                    April  14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

1          DEPOSITION ERRATA SHEET

2   Page No. 226   Line No. 17   Change to: Change "we" to

3   "Hotel 57 Services, LLC"

4   Reason for change: Clarification

5   Page No. 235   Line No. 8   Change to: "I have seen his

6   personal taxes, but I have not reviewed them substantively."

7   Reason for change: Clarification

8   Page No. 247   Line No. 21   Change to: "Yes, physically.

9   He works remotely."

10  Reason for change: Clarification

11  Page No. 254   Line No. 16   Change to: "I don't recall what his

12  lawyer said."

13  Reason for change: Correction

14  Page No. 261   Line No. 7   Change to: Change "I don't

15  know.  I don't know." to "None."

16  Reason for change: Correction

17  Page No. 261   Line No. 23   Change to: change "I said he" to

18  "As president of Hotel 57, LLC, he had influence over hiring of two people."

19  Reason for change: Clarification

20  Page No. 293   Line No. 24   Change to: Add ", but not for

21  that purpose."

22  Reason for change: Clarification

23  SIGNATURE: *Cathy Hwang*   DATE: 5/22/23

24          CATHY  HWANG



CATHY HWANG                                                    April  14, 2023
SELENA STALEY -against- FOUR SEASONS HOTELS

| | |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Page No. 297  Line No. 18  Change to: Add "in this |
| 3 | complaint." |
| 4 | Reason for change: Clarification |
| 5 | Page No. 298  Line No. 4  Change to: Add ", not in the |
| 6 | complaint." |
| 7 | Reason for change: Clarification |
| 8 | Page No. 312  Line No. 9  Change to: Add "No, Ty Warner |
| 9 | Hotels and Resorts is not a party." |
| 10 | Reason for change: Clarification |
| 11 | Page No. 312  Line No. 10  Change to: Change "we" to |
| 12 | "Hotel 57, LLC" |
| 13 | Reason for change: Clarification |
| 14 | Page No. 313  Line No. 4  Change to: Change "Yes, we" to |
| 15 | "Hotel 57, LLC" |
| 16 | Reason for change: Clarification |
| 17 | Page No. 316  Line No. 3  Change to: "Yes, Hotel 57 LLC |
| 18 | took a position in arbitration." |
| 19 | Reason for change: Clarification |
| 20 | Page No. 324  Line No. 20  Change to: Add "Mr. Warner |
| 21 | does not determine salaries, and the" to beginning of answer |
| 22 | Reason for change: Clarification |
| 23 | SIGNATURE: *Cathy Hwang*       DATE: 5/22/23 |
| 24 | CATHY HWANG |


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

CATHY HWANG
SELENA STALEY -against- FOUR SEASONS HOTELS

April 14, 2023

```
 1                    DEPOSITION ERRATA SHEET
 2      Page No. 118   Line No. 19    Change to: Change "He" to
 3     "Hotel 57 Services, LLC"
 4      Reason for change: Clarification
 5      Page No. 185   Line No. 19    Change to: Add "Ty Warner
 6     Hotels and Resorts funds Hotel 57 LLC's" before "providing"
 7      Reason for change: Clarification
 8      Page No._____ Line No._____ Change to:_____
 9      _____
10      Reason for change:_____
11      Page No._____ Line No._____ Change to:_____
12      _____
13      Reason for change:_____
14      Page No._____ Line No._____ Change to:_____
15      _____
16      Reason for change:_____
17      Page No._____ Line No._____ Change to:_____
18      _____
19      Reason for change:_____
20      Page No._____ Line No._____ Change to:_____
21      _____
22      Reason for change:_____
23      SIGNATURE: Cathy Hwang        DATE: 5/22/23
24                 CATHY HWANG
```



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com