# EXHIBIT H

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ------------------------------------x
   SELENA STALEY, VIVIAN HOLMES, and
4  OLIVE IVEY, on behalf of themselves
   and all others similarly situated,

5

6

           Plaintiffs,      Case No.
7                          22-CV-6781

8       vs.

9  FSR INTERNATIONAL HOTEL INC. d/b/a
   FOUR SEASONS HOTELS AND RESORTS,
10  HOTEL 57 SERVICES, LLC, HOTEL 57, LLC,
   TY WARNER HOTELS & RESORTS, LLC, and
11  H. TY WARNER,

12          Defendants.
   ------------------------------------x
13

14

15       DEPOSITION OF VIVIAN HOLMES

16          New York, New York

17        Thursday, March 30, 2023

18

19

20

21

22

23

24  Reported by:
   Frank J. Bas, RPR, CRR
25  Job No. 224130

Page 2

1
2
3
4          March 30, 2023
5          10:05 a.m.
6
7          Deposition of VIVIAN HOLMES, held at
8    the offices of Freeborn & Peters, 1155 Avenue
9    of the Americas, New York, New York, before
10   Frank J. Bas, a Registered Professional
11   Reporter, Certified Realtime Reporter, and
12   Notary Public of the State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S :
3
4    Brustein Law PLLC
5    Attorneys for Plaintiffs
6       299 Broadway
7       New York, New York 10007
8    BY:  EVAN BRUSTEIN, ESQ.
9
10   Risman & Risman, P.C.
11      299 Broadway
12      New York, New York 10007
13   BY:  MAYA RISMAN, ESQ.
14
15   Stokes Wagner, ALC
16   Attorneys for FSR
17   International Hotels, Inc.
18      903 Hanshaw Road
19      Ithaca, New York 14850
20   BY:  PAUL WAGNER, ESQ. (Via Zoom)
21
22
23
24
25

Page 4

1
2    A P P E A R A N C E S :
3
4    Freeborn & Peters LLP
5    Attorneys for Warner Defendants
6       311 South Wacker Drive
7       Chicago, Illinois 60606
8    BY:  JAMES BOLAND, ESQ.
9        KATHRYN LUNDY, ESQ.
10       MARC ZIMMERMAN, ESQ.
11
12
13
14
15
16
17
18
19
20
21
22
23       - o0o -
24
25

Page 5

1                V. HOLMES
2         ATTORNEY BOLAND:  Jim Boland,
3    Freeborn & Peters, on behalf of the
4    Warner defendants.
5         ATTORNEY LUNDY:  Kathryn Lundy of
6    Freeborn & Peters also on behalf of the
7    Warner defendants.
8         ATTORNEY ZIMMERMAN:  Marc
9    Zimmerman, with a C, also on behalf of
10   the Warner defendants.
11        ATTORNEY BRUSTEIN:  Evan Brustein,
12   Brustein Law, on behalf of plaintiff
13   Vivian Holmes.
14        ATTORNEY WAGNER:  Paul Wagner from
15   Stokes Wagner appearing by Zoom on
16   behalf of FSR International Hotels, Inc.
17             _ _ _
18
19   V I V I A N   H O L M E S ,
20   called as a witness, having been first duly
21   sworn by a Notary Public, was examined and
22   testified
23   as follows:
24   EXAMINATION BY
25   ATTORNEY BOLAND:

Page 6

V. HOLMES

1
2     Q.   Good morning, Ms. Holmes.  My name
3  is Jim Boland.  I represent the Warner
4  defendants.  Could you please just state your
5  name fully and spell your last name for the
6  record?
7     A.   Yes.  It's Vivian Holmes,
8  H-o-l-m-e-s.
9     Q.   You understand, Ms. Holmes, you've
10  just been put under oath?
11     A.   Yes.
12     Q.   You understand that you are sworn
13  to tell the truth, right?
14     A.   Yes.
15     Q.   You understand that penalty of
16  perjury applies just as if we were in a court
17  or trial?
18     A.   Yes.
19     Q.   During the course of the day do you
20  agree to tell me if I ask you a question that
21  you don't understand?
22     A.   Yes.
23     Q.   Do you agree to tell me, if you
24  have any questions about what I am asking you?
25     A.   Yes.

Page 7

V. HOLMES

1
2     Q.   Okay.  Is there any reason why you
3  can't give full and complete testimony today,
4  ma'am?
5     A.   No.
6     Q.   Are you represented by counsel
7  today?
8     A.   Yes.
9     Q.   Is that Mr. Brustein?
10     A.   That is correct.
11     Q.   Okay.  From time to time he may
12  make objections to my questions for the
13  record.  I would ask that once he finishes,
14  unless he instructs you not to answer, you
15  answer my questions.  Okay?
16     A.   Yes.
17     Q.   All right.
18        ATTORNEY BOLAND:  Let's make use of
19     the trees I killed.  Evan, I am going to
20     mark these things 1 through whatever.  I
21     would propose we just mark all of the
22     exhibits consecutively, but that's
23     totally up to you.  In other words,
24     we'll go through 50, if you were to
25     start tomorrow you would start at 51 and

Page 8

V. HOLMES

1
2  then the next deposition would start at
3  another.  You can think about that.  If
4  you want to do it differently, we can
5  put a DX in front of this later.
6        ATTORNEY BRUSTEIN:  That's fine.
7     Thank you.
8        ATTORNEY BOLAND:  Take your time.
9     I just was making the proposal.
10        (Defendants' Exhibit 1, Amended
11     Notice of Deposition was marked for
12     identification).
13     Q.   Ms. Holmes, I have handed you what
14  has been marked as exhibit 1, which for the
15  record --
16     A.   I'll get my glasses.
17     Q.   Okay.
18        (Pause in proceedings.)
19     Q.   Good to you go?
20     A.   Yes.
21     Q.   I have handed you what has been
22  marked 1, which is a document entitled Amended
23  Notice of Deposition.  My first question,
24  Ms. Holmes, have you ever seen this before?
25     A.   Yes, I have.

Page 9

V. HOLMES

1
2     Q.   When?
3     A.   When it was sent to me a few weeks
4  ago.
5     Q.   Well, okay.  A few weeks ago.  And
6  this is for your deposition to take place
7  today, March 30, 2023, right?
8     A.   Yes.
9     Q.   And you will see on the second page
10  this was actually dated March 27, 2023?
11     A.   Mm-hmm.
12     Q.   Did you see a prior notice of
13  deposition?  And I'm not going to try and fool
14  you, I am going to mark it.  Have you seen the
15  amended notice that I just put in front of
16  you?
17     A.   Yes.
18     Q.   Okay.  And you think you saw it a
19  few weeks ago?
20     A.   No.
21     Q.   Okay.  You saw it recently?
22     A.   Yes.
23     Q.   When was that?
24     A.   I think Thursday of last week?
25  Wednesday or Thursday of last week.

Page 10

```
 1            V. HOLMES
 2    Q.  Okay.
 3        (Defendants' Exhibit 2, amended
 4    notice was marked for identification).
 5    Q.  Ms. Holmes I'm handing you what has
 6  been marked as exhibit 2, which for the record
 7  is a document entitled -- no, it doesn't have
 8  a title.  It just says:  Please take notice
 9  that defendants Hotel 57 Services, and it goes
10  on, will take the deposition of you, correct,
11  in the first paragraph?
12    A.  Mm-hmm.
13    Q.  You have to say yes or no, ma'am.
14    A.  Yes.
15    Q.  Okay.  And you recognize your
16  deposition was originally scheduled for a few
17  weeks ago and then continued until today,
18  right?
19    A.  Yes.
20    Q.  Okay.  And this deposition notice
21  you'll see on the second page, ma'am, is dated
22  February 21, 2023?
23    A.  Yes.
24    Q.  Have you seen the first notice of
25  deposition before?
```

Page 11

```
 1            V. HOLMES
 2    A.  I was told by Evan.
 3    Q.  That you were going to be deposed?
 4    A.  Yes.
 5    Q.  Okay.  When were you told by Evan
 6  that you were going to be deposed?
 7        ATTORNEY BRUSTEIN:  Objection.  Do
 8    not answer.  Please don't comment on
 9    attorney-client communication.
10        ATTORNEY BOLAND:  I don't think
11    that's for the purposes of giving legal
12    advice.
13    Q.  Are you going to rely on your
14  counsel's instruction and not answer the
15  question?
16    A.  Yes.
17    Q.  Okay.
18        (Ms. Risman enters).
19    Q.  Putting aside when you were told by
20  Mr. Brustein that you were going to be
21  deposed, for how long have you known you were
22  going to be deposed?  In other words, from
23  today going back, how many weeks?
24    A.  About four weeks.
25    Q.  About four weeks?  Okay.  What have
```

Page 12

```
 1            V. HOLMES
 2  you done to prepare for your deposition today
 3  over the last four weeks, if anything?
 4        ATTORNEY BRUSTEIN:  I'm going to
 5    object and limit the answer to anything
 6    not involving attorney-client
 7    communication.
 8        ATTORNEY BOLAND:  Well, she can
 9    answer if she met with you.  She just
10    doesn't have to reveal the substance.  I
11    just want to know what she has done.
12    Q.  I'm not asking what anyone has told
13  you.  What have you done, if anything, over
14  the last four weeks or so since you learned
15  you were going to be deposed to prepare for
16  your deposition?
17    A.  I read over briefly the EmPact.
18  I've read over the discoveries.  The
19  complaints.
20    Q.  Anything else?
21    A.  That's about it, for my -- what I
22  can recollect.
23    Q.  Is there anything that would
24  refresh your recollection about what you did
25  to prepare for your deposition today?
```

Page 13

```
 1            V. HOLMES
 2    A.  No.
 3    Q.  Okay.  When you say the EmPact, are
 4  you talking about the EmPact agreement?
 5    A.  Yes.
 6    Q.  Okay.  When you say the
 7  "discoveries," what are you referring to?
 8    A.  Just what we submitted to you, or
 9  to both of you.  I looked briefly over that.
10    Q.  Can you tell me exactly what it was
11  you looked at, as best you can recall, ma'am?
12    A.  I don't remember.
13    Q.  When did you look at that, the
14  discovery information?
15    A.  About three, four weeks ago.
16    Q.  Okay.  And then you also talk about
17  looking at the complaints, is that right?
18    A.  Yes.
19    Q.  And there were two complaints in
20  this case, correct?
21    A.  Yes.
22    Q.  And did you review both of them?
23    A.  Briefly.
24    Q.  Briefly?  And when did you do that?
25    A.  About two weeks ago.
```

Page 14

V. HOLMES

1
2    Q.  Have you done anything else to
3    prepare for your deposition other than the
4    things that you just mentioned?
5    A.  That's all I can remember.
6    Q.  Okay.  This is a yes or no
7    question.  Did you have conversations with
8    counsel to prepare for your deposition?
9    A.  Yes, I have.
10    Q.  Okay.  How many?
11    A.  Two.
12    Q.  In-person?  By Zoom?  By telephone?
13    How did they occur?
14    A.  By telephone.
15    Q.  When did they happen?
16    A.  On Tuesday.
17    Q.  Of this week?
18    A.  Yes.
19    Q.  And you had two different calls?
20    A.  Yes.
21    Q.  So one on Tuesday?
22    A.  Yes.
23    Q.  And when was the other?
24    A.  Um, can I look at my notes?
25    Because I don't remember.  It was like three

Page 15

V. HOLMES

1
2    weeks --
3        ATTORNEY BRUSTEIN:  You can't look
4    at anything.  You just have to answer to
5    the best of your recollection.
6    A.  About three weeks ago.
7    Q.  About three weeks ago?
8    A.  Yes.
9    Q.  So let's start with the one about
10    three weeks ago.  What lawyers were present on
11    the call?  And by the way, all of your
12    meetings with lawyers have been by telephone
13    to prepare for your deposition, is that fair?
14    A.  Yes, that is fair.
15    Q.  Alright.  Who was on the call three
16    weeks ago?
17    A.  Evan Brustein and Brian Bromberg.
18    Q.  Anyone else?
19    A.  No.
20    Q.  How long did the call last?
21    A.  About an hour.
22    Q.  Did you collectively, I know you
23    were in separate places on the phone, review
24    any documents during that call?
25        ATTORNEY BRUSTEIN:  Objection.  Do

Page 16

V. HOLMES

1
2    not answer.
3        ATTORNEY BOLAND:  She can answer
4    that.  It's a yes-or-no question.  I'm
5    asking her what documents there are.
6        ATTORNEY BRUSTEIN:  You cannot ask
7    her about whether she and her attorney
8    reviewed documents.
9        ATTORNEY BOLAND:  Of course I can.
10        ATTORNEY BRUSTEIN:  I'm objecting.
11        ATTORNEY BOLAND:  Fine.  Are you
12    instructing her not to answer?
13        ATTORNEY BRUSTEIN:  I am
14    instructing her not to answer that
15    question.
16    Q.  Ms. Holmes, are you going to follow
17    your counsel's instruction and not answer my
18    question?
19    A.  Yes, I am.
20    Q.  Okay.  Yes-or-no question.  Were
21    you sent any documents in advance to review by
22    your lawyers?
23        ATTORNEY BRUSTEIN:  I am going to
24    object and direct her not to answer what
25    was sent by her attorneys to review, if

Page 17

V. HOLMES

1
2    anything.
3    Q.  You are going to follow your
4    lawyers instruction?
5    A.  Yes, I am.
6    Q.  Okay.  I've just got to complete
7    the record so we can take it to the judge.
8    A.  I understand.
9    Q.  The second call that you had on
10    Tuesday, I take it?
11    A.  Yes.
12    Q.  Who was on that call?
13    A.  Evan Brustein.
14    Q.  All right.
15    A.  And --
16    Q.  Go ahead, please.
17    A.  And Maya.
18    Q.  And how long did that last?
19    A.  A little over an hour.
20    Q.  Okay.  Did you collectively review
21    any -- yes or no question -- review any
22    documents on that call?
23        ATTORNEY BRUSTEIN:  Objection.  Do
24    not answer.
25    Q.  And you are going to follow your --

Page 18

```
1              V. HOLMES
2        ATTORNEY BOLAND:  And that's
3    privilege, right, is the grounds?
4        ATTORNEY BRUSTEIN:  Yes.
5    Q.  Are you going to follow
6    Mr. Brustein's instruction and not answer?
7    A.  Yes.
8    BY ATTORNEY BOLAND:
9    Q.  He appreciates that.  Did
10   Mr. Brustein or any other lawyers send you any
11   documents to review in advance of their call?
12       ATTORNEY BRUSTEIN:  Objection.  I
13   direct her not to answer.
14       ATTORNEY BOLAND:  Privilege, right?
15       ATTORNEY BRUSTEIN:  Yes.
16   Q.  Are you going to follow his
17   instruction and not answer my question, ma'am?
18   A.  Yes, I am.
19   Q.  At any point in time have any of
20   your lawyers, yes or no question, sent you
21   documents to review in preparation for your
22   deposition?
23       ATTORNEY BRUSTEIN:  I'm sorry.
24   Could you repeat that question?
25       ATTORNEY BOLAND:  It was basically
```

Page 19

```
1    a broader one than you just objected to.
2    Q.  At any time have any of the lawyers
3    sent her documents, yes or no question, to
4    review in preparation for your deposition?
5        ATTORNEY BRUSTEIN:  Objection.  I'm
6    directing her not to answer.
7        ATTORNEY BOLAND:  Privilege, right?
8        ATTORNEY BRUSTEIN:  Yes.
9    Q.  Okay.  You are you going to follow
10   his instruction and not answer?
11       ATTORNEY BRUSTEIN:  I am also going
12   to object to you asking her if she's
13   going to be following her attorneys
14   directions.
15   Q.  Are you going to follow your
16   attorneys instruction and not answer my
17   question, ma'am?
18       ATTORNEY BRUSTEIN:  I directed her
19   not to answer.  There's no reason to get
20   an answer from her.  You are going to
21   take this to the judge –
22       ATTORNEY BOLAND:  It completes the
23   circle.  She can just answer yes or no.
24   That's fine.
25
```

Page 20

```
1              V. HOLMES
2    Q.  Are you going to follow his
3    instruction and not answer my question, ma'am?
4        ATTORNEY BRUSTEIN:  I think you can
5    also take to the judge the objection and
6    my direction not to answer and the judge
7    will either overrule my objection or
8    not.  I think it's gratuitous and an
9    unnecessary question.
10   Q.  Are you going to follow your
11   lawyer's instruction and not answer my
12   question, ma'am?
13       ATTORNEY BRUSTEIN:  I'm still
14   objecting to this.
15       ATTORNEY BOLAND:  I am just asking
16   her if she's going to follow the
17   instruction and not answer the question
18   to complete the loop for the record.
19   It's not a big deal.
20       ATTORNEY BRUSTEIN:  The loop is
21   already completed.
22       ATTORNEY BOLAND:  This is silly.
23       ATTORNEY BRUSTEIN:  This is silly.
24   Why don't we move on.
25       ATTORNEY BOLAND:  Okay.  I object.
```

Page 21

```
1              V. HOLMES
2    It's ridiculous.
3    Q.  Did any of the documents that you
4    did review, the ones that you told me about,
5    the EmPact, the discovery and the complaints,
6    did they refresh your recollection about any
7    of the underlying events at issue in the case?
8    A.  Yes and no.  I mean ...
9    Q.  How so?  What did they help to
10   refresh your recollection on?
11   A.  Well, it didn't help.  I was just
12   reviewing it just to stay focused on, you
13   know, if there was anything that I missed and
14   everything seemed relative to what I know.
15   Q.  Okay.  What's your home address,
16   ma'am?
17   A.  ███████████████████
18   ████████████
19   Q.  And do you have a mobile telephone
20   that you use?
21   A.  Yes, I do.
22   Q.  What is the number?
23   A.  ████████
24   Q.  And have you had that same number
25   for a while, for a number of years?
```

Page 22

```
1              V. HOLMES
2      A.  Yes.
3      Q.  About how long, do you have an
4  idea?
5      A.  About twenty-five years.
6      Q.  Oh, my.  Okay.  What email
7  addresses have you used over the last, say,
8  five years?
9          ATTORNEY BRUSTEIN:  Objection.
10     Q.  You can answer.
11         THE WITNESS:  I can answer?
12         ATTORNEY BRUSTEIN:  Yes, you can
13     answer.
14     A.  Okay.  ████████@yahoo.com.
15     Q.  Any other email addresses?
16     A.  I do.
17     Q.  What are they?
18     A.  Dviivian —
19     Q.  Vvivian?
20     A.  D, as in David, Vivian.
21     Q.  Got it.
22     A.  – 42@Verizon.net.
23     Q.  Any others?
24     A.  No.
25     Q.  Do you participate in or do you
```

Page 23

```
1              V. HOLMES
2  have a presence on any social media platforms?
3      A.  Yes.
4      Q.  Which ones?
5      A.  Facebook, Instagram, LinkedIn.
6      Q.  Any others?
7      A.  That is all, to the best of my
8  knowledge.
9      Q.  Are you known by, to your friends
10 or colleagues by any nicknames?
11     A.  No.
12     Q.  You mentioned LinkedIn.
13         (Defendants' Exhibit 3, LinkedIn
14     profile was marked for identification.)
15     Q.  Ms. Holmes, I am handing you what
16 has been marked as exhibit 3.  And I am going
17 to make a representation to you, ma'am, and if
18 it's wrong your lawyers will correct me over
19 the calls later, but I am going to tell you
20 this is a copy of the activity from your
21 LinkedIn profile that I printed up recently.
22         You can see at the top there's
23 2/28/23 at 07:14?  How often do you go on
24 LinkedIn, ma'am?
25         ATTORNEY BRUSTEIN:  I'm sorry.  Can
```

Page 24

```
1              V. HOLMES
2  I just have a moment to review this?
3          ATTORNEY BOLAND:  You can look at
4      it.
5      Q.  How often do you go on to LinkedIn?
6          ATTORNEY BRUSTEIN:  Objection.
7      You've just handed me a ten-page
8      document that has not been turned over
9      in discovery.  I would like a minute to
10     review —
11         ATTORNEY BOLAND:  You can take a
12     look at it.
13         ATTORNEY BRUSTEIN:  I know, but
14     before you ask a question where I need
15     to pay attention to it —
16         ATTORNEY RISMAN:  I would like to
17     take a look at it, too.
18         ATTORNEY BOLAND:  So let's be
19     clear.  I'm not going to eat up
20     deposition time by people leafing
21     through every page of the document to
22     eat up the time that we have.  If you
23     want to go off the record to do it, I'm
24     happy to do that.
25         ATTORNEY RISMAN:  Let's go off the
```

Page 25

```
1              V. HOLMES
2      record —
3          ATTORNEY BRUSTEIN:  No, let's not
4      go off the record.  I got this.  I'm not
5      taking time.  You're handing me a ten
6      page document.  I would like to have a
7      few seconds to be able to look at it.
8          ATTORNEY BOLAND:  Feel free, sir.
9          ATTORNEY BRUSTEIN:  Thank you.
10         ATTORNEY BOLAND:  I'm not actually
11     going to ask her about the document yet,
12     so I'll just ask her other questions.  I
13     just want to know how often she goes on
14     LinkedIn.
15         THE WITNESS:  I feel comfortable
16     answering these questions because I'm
17     not —
18         ATTORNEY BRUSTEIN:  Please.  No one
19     has asked you any questions.  If I
20     object or we have a back and forth,
21     that's between the attorneys.
22         Okay.  I'll wait to look at this
23     for a question.
24     Q.  Yes, I just want to know how often
25 you go on LinkedIn, ma'am?
```

V. HOLMES

1    A.  Maybe --
2    ATTORNEY BRUSTEIN:  I'm going to
3  object.  What is the purpose of how
4  often she goes on?
5    Q.  You can answer the question.
6    A.  Maybe once every week or once --
7  recently I've gone on more than usual.  But
8  not often.
9    Q.  Okay.  And when you say once every
10  week, and I'm not holding you to that being
11  every week --
12    A.  Yes, please don't.
13    Q.  But on a semi-regular basis
14  essentially, would that be a fair
15  characterization?
16    A.  Of once a week?
17    Q.  Yeah.
18    A.  Loosely.
19    Q.  Okay.  And how long have you done
20  that for?
21    A.  I'm not sure.
22    Q.  How long have you been on LinkedIn
23  for?
24    A.  Oh, I'm not sure about that either.

V. HOLMES

1    Q.  More than --
2    A.  It's not something that, you
3  know --
4    Q.  Let's use COVID as the denominator
5  here, the demarcation line, since that seems
6  to fit.
7    Were you on LinkedIn before the
8  COVID pandemic hit in March of 2020?
9    A.  Yes.
10    Q.  Okay.  And you've been on ever
11  since?
12    A.  Yes.
13    Q.  And you're still on today, right?
14  On LinkedIn?  You still maintain that profile?
15    A.  Yes.
16    Q.  Okay.
17    (Defendants' Exhibit 4, LinkedIn
18    document was marked for identification).
19    Q.  I am handing you what has been
20  marked as exhibit 4 --
21    ATTORNEY BRUSTEIN:  Are there no
22    questions?
23    ATTORNEY BOLAND:  No.  Once she
24    told me that she has been on it

V. HOLMES

1  regularly, I don't need that for
2  reference.
3    THE WITNESS:  So we're done with 3?
4    Q.  Yes, you're done with 3.  And feel
5  free to take a look at this one, it's like
6  it's more like two pages.  But I will make a
7  representation to you, ma'am, that I went to
8  your LinkedIn page yesterday and the top upper
9  right-hand 3/29/23 at 16:30.  Have you had a
10  chance to take a look at both pages?
11    (The witness reviews document.)
12    ATTORNEY BRUSTEIN:  I would just
13    note this is a four page document.
14    ATTORNEY BOLAND:  Is it?
15    ATTORNEY BRUSTEIN:  It's only two
16    pages.
17    ATTORNEY BOLAND:  Oh, yeah.  That
18    was 2 of 4.  Fair enough.
19    (The witness reviews document.)
20    Q.  Do you recognize this, at least
21  this part of your LinkedIn profile, ma'am?
22    A.  Yes.
23    Q.  Okay, good.  And under your
24  experience where do you identify yourself as

V. HOLMES

1  currently being employed?
2    A.  I'm not employed right now.  I am
3  furloughed.
4    Q.  Where does your experience identify
5  you as being currently employed?
6    A.  At the Four Seasons hotel.
7    Q.  Thank you.  Tell me a little bit
8  about your education, ma'am?  I see here you
9  went to John Jay College?
10    A.  That is correct.
11    Q.  When did you -- and you graduated
12  in 2003?
13    A.  Yes.
14    Q.  A degree in criminology?
15    A.  Yes.
16    Q.  What did you do after you
17  graduated?
18    A.  Well, I graduated while I was
19  working for the Four Seasons Hotel.
20    Q.  So when did you start working at
21  the Four Seasons Hotel?  I thought it was
22  2016, but maybe I'm wrong?
23    ATTORNEY BRUSTEIN:  Objection.  Is
24    there a question?

V. HOLMES

1
2    Q.  Yes.  When did you start working at
3  Four Seasons Hotel?
4        ATTORNEY BOLAND:  That you could
5    answer.  He's not objecting to that one.
6    A.  1998.
7    Q.  Okay.  So you went to college while
8  you were employed, correct?
9    A.  Yes.
10    Q.  I take it after you got your degree
11  you just continued working at the Four
12  Seasons, correct?
13    A.  Yes.
14        (Defendants' Exhibit 5, Complaint
15    was marked for identification).
16        ATTORNEY BOLAND:  Let's mark this
17    as exhibit 5.
18    Q.  Ms. Holmes, I have handed you a
19  document that bears the title Complaint.  And
20  if you look at the top, ma'am, you'll see that
21  there is some stamping lines and I will
22  represent to you that that is placed on it by
23  the electronic filing system with the court at
24  the top of the first page.
25        Do you see where I'm referring to?

V. HOLMES

1
2    A.  Yes.
3    Q.  Feel free to leaf through it as
4  much as you need to.  This is a copy of the
5  original of the first complaint that was filed
6  on your behalf in this case?
7    A.  Yes.
8        (The witness reviews document.)
9    Q.  Did you review the complaint that's
10  marked as exhibit 5 before it was filed?
11    A.  Yes, I did.
12    Q.  Okay.  So you read it through.  Did
13  you read it through from start to finish
14  completely before it was filed?
15    A.  Yes.
16    Q.  Did you approve it to be filed,
17  ma'am?
18    A.  Yes, I did.
19    Q.  And this has individual causes of
20  action.  Do you know what a cause of action
21  is?  Do you understand that?
22    A.  Briefly.
23    Q.  Just tell me your understanding so
24  we're on the same page.  I want to make sure I
25  use the right term.

V. HOLMES

1
2    A.  Cause of action?
3    Q.  Yes.
4    A.  I guess what I am -- what we're
5  complaining about?
6    Q.  Okay.  You know what a claim -- can
7  you think of it as like a claim for relief?
8  Does that ring a bell for you or not?
9    A.  I'm not sure.
10    Q.  Do you understand that there are
11  individual claims being asserted on your
12  behalf or were being asserted on your
13  behalf -- well, strike that.
14        Do you understand that you have
15  individually sued the defendants in this case,
16  correct?
17    A.  Correct.
18    Q.  Okay.  And you understand that you
19  have asserted various causes of action or
20  claims for relief against them?
21    A.  Correct.
22    Q.  Okay.  We're going to get back to
23  those a little bit but I just want to
24  understand.  Did you review each of the causes
25  of action that was asserted on your behalf

V. HOLMES

1
2  prior to the complaint being filed?
3    A.  Yes.
4    Q.  Okay.  There's also an amended
5  complaint that was filed.  By the way --
6        ATTORNEY BOLAND:  Strike that.
7    Q.  Is exhibit 5 one of the complaints
8  that you reviewed in preparation for your
9  deposition today?
10    A.  I believe so.  I'm not sure.  If
11  there was another one -- I don't remember
12  which one I looked at.  If there was one or
13  two.
14    Q.  Okay.  Maybe this will help a
15  little bit.
16    A.  Okay.
17        (Defendants' Exhibit 6, First
18    Amended Complaint was marked for
19    identification).
20    Q.  I am handing you, ma'am, what has
21  been marked as exhibit 6, which for the record
22  is a document titled First Amended Complaint?
23        ATTORNEY BRUSTEIN:  Look at it
24    before you answer.
25        THE WITNESS:  Okay.

V. HOLMES

1
2      ATTORNEY BRUSTEIN:  I just want you
3  to answer his -- taking that as your
4  answer.
5      Q.  And you will see, ma'am, at the top
6  that there is that same type of stamping line.
7  And this has got a file date of 12/19/2022,
8  right?
9      A.  Yes, I see that.
10     Q.  Okay.  And you have seen the first
11  amended complaint before?
12     A.  Yes.
13     Q.  All right.  Did you review the
14  first amended complaint prior to it being
15  filed?
16     A.  Yes.
17     Q.  From start to finish, first page to
18  last?
19     A.  Yes.
20     Q.  Okay.  In detail, right?
21     A.  To the best of my recollection,
22  yes.
23     Q.  Every paragraph, because you see we
24  all have numbered paragraphs in these things?
25     A.  Yes.

V. HOLMES

1
2      Q.  All right.  Did you approve it to
3  be filed on your behalf?
4      A.  Yes.
5      Q.  All right.  As between the two
6  complaints that we have seen, one marked as
7  exhibit 5 and one marked as exhibit 6, did you
8  review both or one of these in preparation for
9  your deposition today?
10     A.  I am not sure which one I reviewed.
11  But I did see both complaints before they were
12  filed.
13     Q.  You saw both complaints before they
14  were filed.  Okay.  Here's what I understand,
15  to get the sense of.  We have the original
16  complaint that was exhibit 5 that was filed --
17     A.  Yes, August 19 --
18     Q.  -- filed on August 9, 2022,
19  correct?
20     A.  Yes.
21     Q.  And you reviewed it before it was
22  filed?
23     A.  Absolutely.
24     Q.  Have you reviewed it at all since
25  it was filed?

V. HOLMES

1
2      A.  I can't answer that.  I reviewed a
3  complaint and I don't know if it was the
4  August or the December.  But I have reviewed
5  both.
6      Q.  Fair enough.  I'm just wondering if
7  after this complaint number one, exhibit 5 was
8  filed, putting aside what you did to prepare
9  for your deposition today, did you review it,
10  ever review it again after you reviewed it and
11  approved it to be filed?
12     A.  I cannot answer your question --
13     ATTORNEY BRUSTEIN:  Objection.
14     Q.  You may answer.
15     A.  I cannot answer your question the
16  way you want me to.  I read both but I don't
17  know which one I read recently.
18     Q.  Okay.  And I understand that.  What
19  I'm wondering is that after the complaint
20  number one was filed, putting aside what you
21  did recently, did you ever pick it up and
22  review it again or don't you remember?
23     ATTORNEY BRUSTEIN:  Objection.  I
24  am going to direct her not to answer.
25  At this point you've asked her four times

V. HOLMES

1
2  and she's answered it four times.
3      Q.  You can answer the question, ma'am.
4      A.  Again, I read both.  I don't know
5  which one I read recently.
6      Q.  Okay.  Fair enough.  You understand
7  that both complaints in this case were filed
8  as class actions, correct?
9      A.  Yes, I am aware.
10     Q.  What's a class action?
11     A.  It's when you certify a class
12  action to represent a group that have the same
13  interest on something that was unjust.
14     Q.  And you understand in a class
15  action that you are seeking to serve as the
16  representative of others who will not be
17  actually joined as parties to the case?
18     A.  Yes.  I understand that.
19     Q.  What investigation, if any, did you
20  do to determine what may be your
21  responsibilities or obligations to serve as a
22  class representative?
23     A.  You are asking me what steps did I
24  take to know what I need to do to be a class
25  representative?

V. HOLMES

1
2  Q. Correct.
3  A. Okay.
4      ATTORNEY BRUSTEIN: Objection.
5  You can answer.
6  A. I just know that I am willing to be
7  a class representative and I'm not sure what,
8  you know, what are the steps once it's
9  certified, what I need to do. But I am going
10  to do it.
11  Q. Do you have an understanding as to
12  whether or not you have responsibilities as a
13  class representative, should a class be
14  certified?
15  A. I'm sure that I have
16  responsibilities.
17  Q. What are they?
18  A. I am not sure.
19  Q. Did you do any investigation to
20  find out?
21  A. Honestly, no.
22  Q. Okay. What is your authority with
23  respect -- I am asking you about your
24  authority with respect to the case, okay?
25  That's the topic I want to get to. Let's

V. HOLMES

1
2  start with the allegations that are made in
3  the complaint.
4      What authority do you have as to
5  whether specific allegations in the complaint
6  were made or not made?
7      ATTORNEY BRUSTEIN: I'm going to
8  object.
9  A. I don't understand the question.
10  Q. Yes, sure. You understand --
11      ATTORNEY BRUSTEIN: Before you ask
12  that again, I would like to just take a
13  five-minute break?
14      ATTORNEY BOLAND: Sure.
15      ATTORNEY BRUSTEIN: Thanks.
16      ---
17  (Recess from 10:32 to 10:39.)
18      ---
19      ATTORNEY BOLAND: We're back on the
20  record.
21      ATTORNEY BRUSTEIN: Before we go on
22  to the next question, I think she just
23  wants to correct one of the answers that
24  she gave.
25      ATTORNEY BOLAND: Sure.

V. HOLMES

1
2  A. Yes. As far as investigating for
3  class action, I didn't really understand what
4  you meant by investigation. But I am a class
5  representative and I am willing to talk to my
6  attorneys to be guided and also to talk to the
7  class members that do join, just to make sure
8  that everything goes the way it's supposed to.
9  Q. Okay. And putting that aside, in
10  addition to that, ma'am, I understand what
11  you're willing to do, fair enough. I think
12  that's what you're telling me, what you were
13  willing to do?
14  A. Yes.
15  Q. Okay. Did you do any investigation
16  to determine what your responsibilities might
17  be legally as a class representative?
18  A. That's what I just answered.
19  Q. So what investigation did you do
20  legally that led you to the conclusion that
21  being willing to talk to attorneys and talk to
22  class representatives are your legal
23  obligations as a class representative? You
24  have to let me finish and I'll try to do the
25  same for you.

V. HOLMES

1
2  A. Mm-hmm.
3      ATTORNEY BRUSTEIN: I am going to
4  object to the form of the question.
5  Q. You may answer.
6  A. What do you mean by investigation?
7  Q. Yes. Did you do any research --
8  research -- to determine what, if any, might
9  be your legal obligations if you are a class
10  representative and the class is certified?
11  A. Well, I'm not an attorney, so I
12  would -- that's what I have Evan and Maya for.
13  They would guide me and let me know what
14  investigation needs to be made when being a
15  class representative.
16  Q. So is the answer that you have not
17  done any as of yet? Any investigation?
18      ATTORNEY BRUSTEIN: Objection.
19  Q. You may answer.
20  A. The investigations that I have made
21  is knowing that I want to be a class
22  representative.
23  Q. Okay. How did you investigate
24  that?
25  A. I don't understand the question.

V. HOLMES

1
2    Q.  I mean did you do anything --
3    A.  Maybe you can use another word
4  other than investigation?
5    Q.  Sure.  I'll do research.  Research
6  work?
7        ATTORNEY BRUSTEIN:  Objection.
8    Q.  Have you done any research --
9  online research, book research, magazine
10  research, any kind of research at all -- to
11  determine what if any your legal obligations
12  may be as a class representative should a
13  class be certified?
14    A.  My obligation is to make sure that
15  the case goes in the proper direction and that
16  I am representing the rest of the employees
17  that are in my same situation.
18    Q.  Okay.  I understand you're
19  testifying now that you believe those are your
20  obligations, is that a fair?
21    A.  As a class representative, yes.
22    Q.  My question is slightly different.
23  What if any research did you do to determine
24  what your obligations may be?
25        ATTORNEY BRUSTEIN:  Objection.

V. HOLMES

1
2    A.  The researches that I mentioned, I
3  spoke with my attorneys and I have spoken to
4  some members.
5    Q.  Who?  Not your attorneys.  Who are
6  the members?
7    A.  Olive Rodriguez and Selena Staley.
8    Q.  And what did they if anything tell
9  you about your legal obligations as a class
10  representative should a class be certified?
11        ATTORNEY BRUSTEIN:  Objection.
12    A.  They did not speak about the
13  obligations.
14    Q.  And it would be both Olive and
15  Selena?
16    A.  Yes.
17    Q.  Other than talking to some class
18  members have you done any other research to
19  determine what, if any, your legal obligations
20  are as a class representative?
21        ATTORNEY BRUSTEIN:  Objection.
22    A.  No other researches other than what
23  I have stated.
24    Q.  Okay.  Do you understand yourself,
25  ma'am, you understand there are claims

V. HOLMES

1
2  asserted on both complaints on behalf of you
3  personally, right?
4    A.  Yes.
5    Q.  What is your authority with respect
6  to whether claims are added, dropped,
7  dismissed, et cetera?  Do you have any
8  authority in terms of determining approving
9  what claims, specifically claims are asserted
10  on your behalf?
11        ATTORNEY BRUSTEIN:  Objection.
12    A.  Could you re-ask that?  You're
13  asking me if I have the authority to --
14    Q.  Yeah, I want to know --
15    A.  -- to change anything?
16    Q.  To have something changed.  I know
17  you won't personally do it.  To have the
18  complaint changed, to either add claims,
19  withdraw claims, dismiss claims.  What is your
20  authority?
21        ATTORNEY BRUSTEIN:  Objection.
22    A.  I'm not sure.
23    Q.  Did you do any investigation,
24  research, to find out?
25    A.  Not that I remember.

V. HOLMES

1
2    Q.  What about with settlement.  What
3  is your authority when it comes to settling?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  I'm not sure.
6    Q.  Did you make any research -- do any
7  research to find out?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't remember.
10    Q.  Is there anything that would
11  refresh -- you don't remember whether you did?
12    A.  Answer -- ask the question again
13  please?
14    Q.  Yes, sure.  Did you do any research
15  or -- I'm going to say research or
16  investigation -- to find out what authority
17  you have to settle claims in this case?
18        ATTORNEY BRUSTEIN:  Objection.
19    A.  I'm not sure.  I don't know what
20  authority I have.
21    Q.  I understand you don't know what
22  authority you have.  I get that.  I want to
23  know whether you did any research or
24  investigation to determine what authority you
25  have?

V. HOLMES

1
2      ATTORNEY BRUSTEIN:  Objection.
3      A.  No, I haven't.
4      Q.  Okay.  What lawyers are
5  representing you in this case?
6      A.  Evan Brustein, Maya Risman and
7  Brian Bromberg.
8      Q.  How did you pick -- strike that.
9          How did you go about selecting the
10  lawyers that would represent you in this case?
11     A.  I had a referral.
12     Q.  A referral from whom?
13     A.  Tanish Trapp.
14     Q.  Can you spell that for me, ma'am?
15  I'm sorry.
16     A.  T-a-n-i-s-h, Trapp, T-r-a-p-p.
17     Q.  And who is Ms. Trapp?
18     A.  She's a reservations and sales
19  coordinator.
20     Q.  Where?
21     A.  I'm not sure.
22     Q.  So you don't know who she works
23  for?
24     A.  At this moment?  No.
25     Q.  Who did she work for previously?

V. HOLMES

1
2  Do you have any idea of who she's worked for
3  in the past?
4      A.  Yes.
5      Q.  Where?  Who?
6      A.  Four Seasons Hotel.
7      Q.  So a Four Seasons employee?
8      A.  Mm-hmm.
9          THE COURT REPORTER:  Yes?
10         THE WITNESS:  Yes.
11     Q.  Why did you -- did you seek a
12  referral from Ms. Trapp or did she offer a
13  referral on her own?
14     A.  She offered.
15     Q.  And what were the circumstances, if
16  you can describe them to me, that gave rise to
17  it?
18     A.  She was in the same situation as
19  several of us were, myself, and she stated
20  that she didn't understand we were going to be
21  called back, we were listening to rumors.  And
22  she said I think we need a legal
23  representative.  I know someone and are you
24  willing.  And I said, you know, I'll think
25  about it.  But I did not -- I didn't become

V. HOLMES

1
2  active until several months after.
3      Q.  So looking at the date on the first
4  complaint we saw that was August of 2022, the
5  date that it was filed, how far in advance of
6  that were your conversations with Ms. Trapp
7  that you just described?
8      A.  About a year before.
9      Q.  About a year?
10     A.  Yes.
11     Q.  So 2021?
12     A.  Yes.
13     Q.  And did you have any other
14  conversations with folks similar to the ones
15  you had with Ms. Trapp, before the suit was
16  filed in August of 2022?
17     A.  I don't remember.
18     Q.  To whom or to what firm did Ms.
19  Trapp refer you?
20     A.  To Risman & Risman and Brustein
21  Law.
22     Q.  To both of them?
23     A.  Yes.
24     Q.  Do you have an understanding as to
25  how Ms.  Trapp became familiar with those law

V. HOLMES

1
2  firms?
3      A.  I don't know.
4      Q.  What investigation, if any, did you
5  do of, for example, Mr. Brustein before you --
6          ATTORNEY BOLAND:  Strike that.
7      Q.  I take it at some point you engaged
8  Mr. Brustein to represent you in connection
9  with a lawsuit against the defendants in this
10  case?
11     A.  Yes.
12     Q.  Okay.  Prior to that time what, if
13  any, investigations did you do into
14  Mr. Brustein and his qualifications?
15     A.  I don't remember.
16     Q.  Did you do any?
17     A.  Don't remember.
18     Q.  After the time that you engaged
19  Mr. Brustein what, if any, investigation did
20  you do into his qualifications?
21     A.  I don't remember.
22     Q.  Did you do any?
23     A.  I don't remember.
24     Q.  That's fair.  I've just got to ask
25  the questions and get the answers, ma'am.

V. HOLMES

1
2  A.  Sure.
3  Q.  What about -- you said Risman &
4  Risman?  Was that the other firm that you
5  referred to?
6      ATTORNEY BOLAND:  Strike that.
7  Q.  I understand Mr. Brustein is a sole
8  practitioner, right?  He basically -- he has
9  his own office?
10  A.  I'm not sure.
11  Q.  Okay.  Were you referred to him by
12  name or by law firm?
13  A.  By name.
14  Q.  By personal name?  Okay.  What
15  about Risman & Risman, were you referred to
16  them by name or to any individual law firm --
17  lawyer?
18  A.  By name.
19  Q.  Okay.  And who were you referred
20  to?
21  A.  Maya Risman.
22  Q.  All right.  And I take it that at
23  some point you engaged Risman & Risman and
24  Ms. Risman to represent you in connection with
25  the lawsuit against the defendants in this

V. HOLMES

1
2  case, fair?
3  A.  Fair.
4  Q.  Okay.  What, if any, investigation
5  did you do into Ms. Risman's qualifications
6  before you engaged the firm?
7  A.  I don't remember, other than
8  Tanish's vouching for her saying that, you
9  know, she's a good attorney.
10  Q.  And after you engaged Ms. Risman,
11  what, if any, investigation did you do into
12  her qualifications?
13  A.  I don't remember.
14  Q.  Do you know whether you did any?
15  A.  I don't remember.
16  Q.  Any other lawyers representing you
17  in this case?
18  A.  Brian Bromberg.
19  Q.  Okay, sorry.  You probably told me
20  that.
21  A.  I did.
22  Q.  I didn't write it down.  When did
23  you come to engage Mr. Bromberg?
24  A.  Several months ago.  I don't
25  recall.

V. HOLMES

1
2  Q.  And how did that engagement come
3  about, ma'am?
4  A.  He was added to the case.
5  Q.  Okay.  Did you make a decision to
6  engage Mr. Bromberg, in addition to the
7  lawyers that you already had representing you?
8  A.  Yes, I authorized for him to join
9  the -- to certify the class action.
10  Q.  Why did you add another lawyer?
11  A.  That's his specialty.
12  Q.  What's his specialty?  I'm sorry.
13  A.  Class actions.
14  Q.  And how did you come to learn that?
15  A.  By my attorneys.
16  Q.  What investigation, if any, did you
17  do of the new lawyer's qualifications before
18  you engaged him?
19  A.  I don't remember.
20  Q.  What, if any, investigation did you
21  do of the new lawyer's qualifications after
22  you engaged him?
23  A.  I don't remember.
24  Q.  Have you met all three of your
25  lawyers in person?

V. HOLMES

1
2  A.  Yes.  I've seen them.
3  Q.  How many times?
4  A.  I think once -- twice.
5  Q.  What are the roles of the various
6  lawyers with respect to this lawsuit?  In
7  other words, is there a lead counsel?  Are
8  they co-counsel?
9  A.  I don't understand the question.
10  Q.  Yes, sure.  Do you direct the work
11  of your lawyers in this case?  Let me start
12  with that.
13      ATTORNEY BRUSTEIN:  Objection.  I
14      am going direct her not to answer,
15      attorney-client communication.
16  Q.  Are you going to follow the
17  instruction and not answer?
18  A.  Yes.
19  Q.  Okay.  Do you allocate work among
20  the various lawyers?  You, Ms. Holmes, do you
21  allocate work amongst the various lawyers?
22      ATTORNEY BRUSTEIN:  Objection.  I
23      direct her not to answer.
24  Q.  You are not going to answer, right?
25  A.  No.

V. HOLMES

1
2    Q.  Okay.  That's fine.  Do you have
3  written fee agreements with any of your
4  lawyers?
5    A.  I don't know how to answer that
6  question.  What are you -- can you re-ask it?
7    Q.  Sure, no problem.  When you
8  engaged -- let's start with Mr. Brustein.
9  When you engaged Mr. Brustein did you sign any
10  kind of an engagement letter with any
11  discussion of fees or not being paid fees?
12    A.  To the best of my knowledge I
13  believe so.
14    Q.  And did you maintain a copy of
15  that?
16    A.  I think so.
17    Q.  How about with the Risman firm?
18  Did you sign a written engagement letter of
19  some sort with the Risman firm?
20    A.  I believe it's all in the same.
21    ATTORNEY RISMAN:  Just for the
22    record it's Risman (Rees-man).
23    ATTORNEY BOLAND:  Risman.  I'm so
24    sorry.
25    ATTORNEY RISMAN:  I happy to hear

V. HOLMES

1
2  it a few times, but like over and over
3  it's really hard for me.  I'm sorry.
4    ATTORNEY BOLAND:  I am going to
5    write that out.
6    ATTORNEY RISMAN:  I know it's
7    spelled like Risman, but it's Risman
8    (Rees-man.)
9    ATTORNEY BOLAND:  No worries.  I'll
10    try -- it's going to haunt me now.
11    ATTORNEY BRUSTEIN:  Just think of
12    Reese's Pieces.
13    Q.  Fair enough.  What about with the
14  Risman firm?  Did you sign a written
15  engagement letter with them?
16    A.  I answered that.
17    Q.  I know.  I am asking one more time.
18  I want to make sure I'm clear with the
19  interruption.
20    A.  I think it's all and the same.
21    Q.  Okay.  And how about with
22  Mr. Bromberg?  Did you sign an engagement
23  letter with Mr. Bromberg?
24    A.  I'm not sure.  I don't remember.
25    Q.  Are you paying lawyers on an hourly

V. HOLMES

1
2  basis or is this being done on a contingency
3  basis?
4    ATTORNEY BRUSTEIN:  Objection.  I
5    direct her not to answer.
6    Q.  Are you going to follow his
7  instruction?
8    A.  Yes.
9    Q.  Okay.  Do you have any
10  responsibility to your understanding, ma'am,
11  for any of the costs involved in this lawsuit?
12    A.  Could you ask that again?
13    Q.  Yes, sure.  Do you have any
14  responsibility, to your understanding, for any
15  of the costs involved in this lawsuit?
16    A.  Your question is do I have to pay
17  them?
18    Q.  Do you have to pay -- yes.  Do you
19  understand that you have any personal
20  responsibility to pay costs relating to -- any
21  costs relating to this lawsuit?
22    A.  Yes.
23    Q.  Okay.  What is your understanding?
24    A.  My understanding is that they get
25  paid a third of whatever damages is incurred.

V. HOLMES

1
2    Q.  Okay.  Let's assume -- you
3  understand that there's a chance that you
4  could prevail in this lawsuit and win, right?
5    A.  Yes, I understand.
6    Q.  You understand there's a chance you
7  could lose, correct?
8    A.  Yes, I understand that.
9    Q.  Okay.  Now if you -- whether you
10  win or you lose, putting aside legal fees, do
11  you have any understanding that you have any
12  liability or responsibility to pay costs, like
13  filing fees, paying the notice of the --
14  notice going to the class if one is certified;
15  any financial obligation?
16    A.  I'm not sure if I should answer
17  that.  That goes back to if this case was
18  based on a contingency.
19    Q.  Well, you've already answered that.
20  You told me they get a third.  That answers my
21  contingency question.  My question is
22  different.
23    Q.  Okay.  Ask it again?
24    Q.  Yes, sure.  Do you understand that
25  apart from legal fees there may be costs,

Page 58

V. HOLMES

1
2 other out of pocket costs associated with
3 being represented in a lawsuit?
4   A. No.
5   Q. You don't. You don't understand
6 that, for example, if somebody wants to buy
7 the transcript, order the transcript from this
8 fine man here, that that was going to cost
9 money?
10   A. No.
11   Q. All right. Did you understand that
12 if a class is certified, that there will have
13 to be notice provided to the class?
14   A. Yes.
15   Q. Okay. Do you have any
16 understanding that you have any obligation or
17 responsibility to pay the costs of that
18 notice?
19   A. No. I'm not sure.
20   Q. Okay. Do you understand as to
21 whether win, lose or draw at the end of this
22 case, you will have any personal out of pocket
23 financial responsibility?
24   A. No.
25   Q. No you don't have an understanding

Page 59

V. HOLMES

1
2 or no you don't believe you will have any?
3   A. No, I don't believe that anything
4 will come out of pocket.
5   Q. Okay. Are you prepared as you sit
6 here today, ma'am, to accept whatever
7 individual personal financial liability may go
8 along with this case?
9     ATTORNEY BRUSTEIN: Objection.
10   Q. You may answer.
11   A. Could you ask that again?
12   Q. Sure.
13     ATTORNEY BOLAND: Why don't we read
14 it back.
15     (Requested portion of the record
16     read back.)
17   A. Yes.
18   Q. You are. Okay. And that would
19 include -- would that include, hypothetically,
20 paying the legal fees of the defendants, if
21 that were to come to pass?
22     ATTORNEY BRUSTEIN: Objection.
23   Q. You may answer.
24   A. No.
25   Q. You're not prepared to accept that?

Page 60

V. HOLMES

1
2   A. No.
3   Q. Okay. All right. Let's take a
4 look at your amended complaint. You might
5 want to keep that one out because I think
6 we're going to come back to that one from time
7 to time. This is exhibit 6. All right. We
8 talked earlier that the complaint lays out,
9 among other things, your individual claims,
10 right?
11   A. Yes.
12   Q. And it contains, you know, the term
13 allegation. Does that term make sense to you
14 in the context of the complaint?
15   A. Yes.
16   Q. Okay. And there's a lot of
17 numbered paragraphs of allegations, right?
18   A. Mm-hmm.
19   Q. Okay. And you'll notice that there
20 are allegations that are made about you in the
21 complaint, in the amended complaint, correct?
22   A. Yes.
23   Q. And let's take a look at the
24 very -- page 2 of it, please, ma'am. Strike
25 that. If you can start on page 1. And you'll

Page 61

V. HOLMES

1
2 see right under Complaint it identifies
3 plaintiffs and then it goes on and you are one
4 of them, right?
5   A. Yes.
6   Q. So the term plaintiffs, as you
7 understand it throughout the complaint
8 includes you, personally?
9   A. Yes.
10   Q. All right. And if we take a look,
11 ma'am, there's a lot of allegations in the
12 complaint about plaintiffs, and you can start
13 with, for example, paragraph 1 on page 2.
14     Do you see it refers to this action
15 is brought by "plaintiffs," correct?
16   A. Yes.
17   Q. That includes you, right?
18   A. Yes.
19   Q. And, for example, if you look at
20 paragraph 6, and you can take a look at it, it
21 also refers to "plaintiffs," correct?
22   A. Yes.
23   Q. And that includes you, right?
24   A. Yes.
25   Q. And in paragraph 15 for example, on

Page 62

V. HOLMES

1
2   page 4?  Do you see that allegation also talks
3   about "plaintiffs," right?
4       A.  Yes.
5       Q.  And as we talked about earlier you
6   recognize, ma'am, that there's a lot of
7   allegations in the complaint about plaintiffs,
8   right?
9       A.  Yes.
10      Q.  Okay.  What did you do, if
11  anything, to ensure the accuracy of each and
12  every one of those allegations?
13      A.  I read them.
14      Q.  Anything else?
15      A.  I read them to make sure that they
16  were accurate.
17      Q.  Okay.  And you did that before the
18  complaints were filed, both complaints, right?
19      A.  Yes.
20      Q.  And if there was anything that was
21  inaccurate you would have raised that with
22  your lawyers to make sure they knew, correct?
23      A.  Yes.
24      Q.  So sitting here today you take
25  responsibility for the accuracy of the

Page 63

V. HOLMES

1
2   allegations that are made about plaintiffs,
3   that includes you, in the amended complaint,
4   do you not?
5       A.  Yes.
6           ATTORNEY BRUSTEIN:  Objection.
7           You can answer.
8       Q.  Now with respect to allegations
9   that aren't about you, don't involve
10  plaintiffs -- and I'll take for example, let's
11  go to page 9.  And this is just for example,
12  purposes, ma'am.  If you'll see starting at
13  paragraph 42, there's allegations about
14  something called Four Seasons Hotels, and then
15  it's followed by a colon?
16          Do you see what I am referring to,
17  starting at paragraph 42 and going down?
18      A.  Mm-hmm.  Yes.
19      Q.  Okay.  What, if anything, did you
20  do to ensure the accuracy of allegations such
21  as the ones we see on page 9 of the complaint?
22          ATTORNEY BRUSTEIN:  Objection.
23          You can answer.
24      A.  I'm not sure how to answer this
25  question.  What are you asking me?

Page 64

V. HOLMES

1
2       Q.  Yes.  There are allegations in the
3   complaint that are about the plaintiffs, and
4   that includes you, right?
5       A.  Right.
6       Q.  And then there are allegations that
7   mention you specifically, correct?
8       A.  Yes.
9       Q.  Okay.  And you told me before, and
10  I don't want to misstate your testimony so
11  tell me if I'm wrong, that you read those to
12  ensure that they were accurate?
13      A.  Yes.
14      Q.  What about the allegations that
15  aren't about plaintiffs, including you, but
16  about others?  And here I just used an example
17  of, you know, Four Seasons Hotels.  What, if
18  anything, did you do to ensure the accuracy of
19  the allegations that were made about others,
20  not about you?
21      A.  I didn't make allegations about
22  others.
23      Q.  Well, there's allegations in the
24  complaint, ma'am, on paragraph 42, I'm
25  sorry -- starting at paragraph 42 about Four

Page 65

V. HOLMES

1
2   Seasons Hotels.
3       A.  Right.
4       Q.  What did you do to ensure the
5   accuracy of allegations such as that?
6       A.  That's the hotel that I work for.
7       Q.  I understand that.  What did you do
8   to ensure the accuracy of that allegation?
9           ATTORNEY BRUSTEIN:  Objection.
10          You can answer.
11      A.  It is accurate.  That's the Four
12  Seasons and those are the addresses.
13      Q.  All right.  Let's look at another
14  one.  Maybe I'll give you a little bit of a
15  different one to get you ...
16          Look at paragraph 44.  It says Four
17  Seasons Hotels is registered and authorized to
18  do business and to work in New York State, and
19  it goes on.  I'm not trying to limit it.  What
20  did you do to ensure the accuracy of that
21  allegation about where Four Seasons Hotels is
22  registered and authorized to do business?
23          ATTORNEY BRUSTEIN:  Objection.
24      A.  Four Seasons Hotels is registered.
25      Q.  Yeah.  What investigation did you

Page 66

V. HOLMES

1  V. HOLMES
2  do to ensure that that was true, if any?
3      A.  I didn't do any investigation on
4  that.
5      Q.  Okay.  With respect to the
6  allegations that aren't about you
7  individually, did you do any investigation or
8  research to confirm that they were true before
9  the complaint was filed -- before any of the
10  complaints were filed?
11      ATTORNEY BRUSTEIN:  Objection.
12      A.  I don't remember.
13      Q.  Do you keep yourself apprised of
14  the developments in the case?  In other words
15  things that are filed with the court?
16      A.  Do I keep myself aware, you're
17  saying?
18      Q.  Yes.  Sorry.  Aware.  Yes.  Do you
19  keep yourself informed about the different
20  things that are filed in the case?
21      A.  Sometimes.
22      Q.  All right.  Let's look at a few.
23          (Defendants' Exhibit 7, Notice of
24      Motion to Compel Arbitration and Dismiss
25      Class Claims and Stay Action, Memorandum

Page 67

V. HOLMES

1  V. HOLMES
2  of Law in Support was marked for
3  identification).
4      Q.  Ma'am, I am handing you what has
5  been marked as --
6      A.  Are we still referring to this
7  exhibit 6?
8      Q.  Yes.  Keep that one out.  We're
9  going to get back to that a couple of times.
10          You have been handed what has been
11  marked as exhibit 7.  For the record it's two
12  documents placed together as one exhibit.  The
13  first is Document 27 from the case, filed
14  11/9/2002.
15          Notice of Motion to Compel
16  Arbitration and Dismiss Class Claims and Stay
17  Action.
18          The second is three pages in,
19  Document 31, Memorandum of Law in Support.
20          Go ahead and leaf through that.  I
21  just want to ask you if you've ever seen it
22  before, first?
23          (The witness reviews document.)
24      Q.  Have you ever seen it before,
25  ma'am?

Page 68

V. HOLMES

1  V. HOLMES
2      A.  I don't remember.
3      Q.  Did you know that there was a
4  motion filed to basically take this case out
5  of court and send it to arbitration?
6      A.  I'm not sure.
7      Q.  You are not sure if you knew that?
8      A.  Well --
9      Q.  Yeah, I am asking independent of
10  the document if you were aware of that fact?
11      A.  Yes.
12      Q.  You were aware of that fact?
13      A.  That you guys wanted to take it to
14  arbitration?
15      Q.  Okay.  Yes.
16      A.  That's what you are asking me?
17      Q.  Yes.
18      A.  Yes.
19      Q.  All right.  And did you know -- I
20  am going to do it in baby steps.  Did you know
21  there was a motion, a petition of some sort
22  filed with the court asking the court to do
23  exactly that, send the case to arbitration?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  Yes.

Page 69

V. HOLMES

1  V. HOLMES
2      Q.  Did you review the papers that were
3  submitted in connection with that?
4      A.  I don't remember.
5      Q.  How often do you get papers that
6  are filed in the case on regular basis?
7      ATTORNEY BRUSTEIN:  Objection.  I
8  am going to direct her not to answer.
9      Q.  Are you going to follow the
10  instruction?
11      A.  Yes.
12      Q.  Got it.  Okay.  So as you sit here
13  today you don't know if you saw exhibit 7
14  before?
15      A.  I don't remember.
16      Q.  Okay.
17      ATTORNEY BRUSTEIN:  Are you done
18  with this one?
19      A.  Are we done with this?
20      ATTORNEY BOLAND:  Yes.
21          (Defendants' Exhibit 8, Declaration
22      of Cathy Hwang was marked for
23      identification.
24      Q.  I am handing you, ma'am, what has
25  been marked as exhibit 8 which for the record

V. HOLMES

1   is a document Declaration of Cathy Hwang.
2   It's Document 30 in the lawsuit.  And I will
3   represent to you, ma'am, this is in connection
4   with the motion with respect to arbitration.
5   And motion to dismiss, that I will get to in a
6   sec.
7        My first question is have you ever
8   seen exhibit 8 before?
9   A.  I don't recall.  I don't remember.
10       ATTORNEY BRUSTEIN:  Just for the
11   record it also has the attachments, or
12   exhibits?
13       ATTORNEY BOLAND:  Yes.  And the
14   document will be what it is.  It will be
15   marked and all of that other good stuff.
16       ATTORNEY BRUSTEIN:  The last time
17   you had said that it was a three-page so
18   I just was --
19       ATTORNEY BOLAND:  There were two
20   docs together.  There was the doc itself
21   and then the memorandum -- the notice of
22   motion and then the memorandum in
23   support.  I put them all together rather
24   than mark them separately.  This is all

V. HOLMES

1   one thing with the exhibits.
2   Q.  And as you sit here today, you
3   don't know if you've ever seen exhibit 8
4   before, is that fair?
5   A.  Yeah, I don't remember.
6        (Defendants' Exhibit 9, Memorandum
7   of Law in Opposition to Defendants'
8   Motion to Compel Arbitration, Dismiss
9   Class Claims and Stay Action was marked
10   for identification).
11       ATTORNEY BRUSTEIN:  I'm sorry, what
12   was the last question?
13       ATTORNEY BOLAND:  As she sits here
14   today she doesn't know if she's ever
15   seen exhibit 8 before.
16       ATTORNEY BRUSTEIN:  This is not
17   exhibit A.  That's what he's asking
18   about.
19       ATTORNEY BOLAND:  No, I was asking
20   about exhibit 8.  The whole thing.
21       ATTORNEY BRUSTEIN:  Exhibit A or 8?
22       ATTORNEY BOLAND:  8.
23       ATTORNEY BRUSTEIN:  I heard "A."
24       ATTORNEY RISMAN:  I did, too.

V. HOLMES

1        ATTORNEY BRUSTEIN:  Then I
2   apologize.
3        ATTORNEY BOLAND:  No worries.
4        ATTORNEY BRUSTEIN:  It just
5   happened to be the letter/number issue.
6        ATTORNEY BOLAND:  Yes.
7   Q.  All right.  I am handing you,
8   ma'am, what has been marked as exhibit 9 --
9   A.  We're done with 8?
10   Q.  We are done with 8, ma'am.  Which
11   for the record is Document 44 in the lawsuit.
12   Memorandum of Law in Opposition to Defendants'
13   Motion to Compel Arbitration, Dismiss Class
14   Claims, and Stay Action.
15       Ma'am, my first question is going
16   to be have you ever seen exhibit 9 before?
17   A.  I don't remember.
18   Q.  Do you have a recollection at all
19   of any of the -- well, strike that.
20       You had mentioned to me I think
21   earlier that you had looked at at least one of
22   the complaints in preparation for your
23   deposition, right?
24   A.  I -- yes.

V. HOLMES

1   Q.  Okay.  So I take that you had that
2   in your possession at your, at your home or
3   office or whatever?
4   A.  Yes.
5   Q.  Okay.  Do you have a file with any
6   other filings that were made in the
7   arbitration other than the complaint that you
8   looked at?
9   A.  I don't understand.
10   Q.  Yes, sure.  You had mentioned to me
11   that you looked at a couple of things before
12   you were deposed to prepare, one of which was
13   the complaint, at least one of the complaints,
14   right?
15   A.  Mm-hmm.
16   Q.  Yes?
17   A.  Yes.
18   Q.  Okay.  The other was you said some
19   discovery materials, and I'll ask you about
20   those in a minute, right?
21   A.  Yes.
22   Q.  I take it, tell me if I am wrong,
23   that you had those in your possession
24   somewhere maybe in your home?

V. HOLMES

1  
2    A.  Yes.
3    Q.  All right.  Do you have them
4  physically, you know, paper, or do you have
5  them electronically?
6    A.  Both.
7    Q.  All right.  Other than the
8  complaint and the discovery materials that
9  we'll get to in a minute do you have any other
10  documents from the lawsuit, filings such as
11  what we see here as exhibit 9 in your file?
12    A.  No.
13    Q.  Okay.
14    ATTORNEY BRUSTEIN:  Are you done
15  with this exhibit?
16    ATTORNEY BOLAND:  Yes.
17    ATTORNEY BRUSTEIN:  Could we take a
18  five-minute break?
19    ATTORNEY BOLAND:  Sure.
20    ATTORNEY BRUSTEIN:  Thanks.
21    ---
22    (Recess from 11:11 to 11:19.)
23    ---
24    (Defendants' Exhibit 10,
25    Declaration of Evan Brustein was marked

V. HOLMES

1  
2  for identification).
3    Q.  I am handing you what has been
4  marked as exhibit 10, which for the record is
5  Document 43 from the lawsuit titled
6  Declaration of Evan Brustein.
7    And my first question, ma'am, is,
8  and I'm not trying to hide the ball on you, I
9  will represent to you that there is a
10  declaration by you attached to this.  If you
11  want to look back towards the end, I think
12  it's like the second-to-last page.
13    Do you recognize that page at
14  least, ma'am?
15    A.  Yes.
16    Q.  Okay.  Have you ever seen, other
17  than the declaration that is attached that you
18  have executed, ma'am, have you ever seen
19  exhibit 10 before?
20    A.  Meaning just this page?
21    Q.  No, no, no.  I understand that you
22  will have seen the, some of the exhibits in 10
23  before.  I understand that, ma'am.  I want to
24  know if you have seen the declaration itself
25  as packaged this way with the exhibits that

V. HOLMES

1  
2  are attached?
3    ATTORNEY BRUSTEIN:  Objection.
4    (The witness reviews document.)
5    A.  I'm not sure.  I have seen the
6  EmPact, that's part of the exhibit, right?
7    Q.  Yes, ma'am.
8    A.  I did sign it.  I signed this last
9  page.
10    Q.  Yes.  I want to know if you have
11  seen, as a filing, exhibit 10 in its entirety?
12  In other words, the very first page with the
13  exhibits attached to it.  I understand you
14  have seen some of the exhibits before.  I want
15  to understand if you have seen this document
16  that was filed with the court?
17    ATTORNEY BRUSTEIN:  Objection.
18    You can answer.
19    A.  I'm not sure.
20    Q.  You don't know whether you have
21  seen it before?
22    A.  Not as a packet, the way you're
23  saying it to me.
24    Q.  Okay.  That's what I want to know.
25  Okay?

V. HOLMES

1  
2    (Defendants' Exhibit 11, Reply
3  Memorandum of Law in Further Support of
4  the Warner Defendants' Motion to Compel
5  was marked for identification).
6    Q.  Ma'am, I am handing you what has
7  been marked as exhibit 11, which for the
8  record is Document 46 filed in the lawsuit
9  titled Reply Memorandum of Law in Further
10  Support of the Warner Defendants' Motion to
11  Compel, and goes on.
12    My question is going to be the same
13  as the others.  Have you ever seen exhibit 11
14  before?
15    A.  No, I have not.
16    Q.  Okay.  Do you have an
17  understanding, ma'am, that after the first
18  complaint was filed, the original complaint
19  was filed there was a motion to dismiss that
20  complaint that was filed?
21    A.  Yes.
22    (Defendants' Exhibit 12, Notice of
23  Motion to Dismiss, Memorandum of Law in
24  Support of the Warner Defendants' Motion
25  to Dismiss the Complaint was marked for

V. HOLMES

1    identification).
2        Q.  I am handing you, ma'am, what has
3    been marked as exhibit 12, which is Document
4    28 in the lawsuit.  And this is two documents
5    I will represent to you as one exhibit.  The
6    first two pages are Document 28 in the lawsuit
7    titled Notice of Motion to Dismiss.  The rest
8    of the document is Document 41 in the lawsuit,
9    Memorandum of Law in Support.
10       My question is -- I know you
11   understand that there was a motion to dismiss
12   filed.
13       A.  Right.
14       Q.  Have you ever seen exhibit 12
15   before?  Either part of it, either the Notice
16   of Motion to Dismiss or the Memorandum in
17   Support?
18       A.  No.
19       (Defendants' Exhibit 13,
20       Declaration of Elizabeth Ortiz was
21       marked for identification).
22       Q.  I am handing you, ma'am, what has
23   been marked as exhibit 13, which for the
24   record is Document 40 in the lawsuit plus the
25

V. HOLMES

1    attachments titled Declaration of Elizabeth
2    Ortiz.  I understand, ma'am, that you may have
3    seen some of the attachments before.
4        A.  Mm-hmm.
5        Q.  My question is actually have you
6    ever seen this filing as it was filed in the
7    court as exhibit 12?
8        A.  No.
9        Q.  Exhibit 13, I'm sorry.
10       ATTORNEY BOLAND:  Did I mark that
11   13 or 12?
12       THE COURT REPORTER:  13.
13       ATTORNEY BOLAND:  Okay, good.
14       Q.  Do you know whether your lawyers
15   opposed the first motion to dismiss that the
16   Warner defendants filed?
17       ATTORNEY BRUSTEIN:  Objection.
18       A.  Do I know if they --
19       Q.  Whether they opposed it in court,
20   whether they filed an opposition -- let me
21   make it simpler.  Do you know whether your
22   lawyers filed an opposition in court to the
23   Warner defendants' motion to dismiss the first
24   complaint?
25

V. HOLMES

1        ATTORNEY BRUSTEIN:  Objection.
2        A.  I believe so.
3        Q.  That's your understanding?
4        A.  That's my understanding.
5        Q.  You do know that there was a
6    second, a first amended complaint filed?
7    We've got it sitting around right there,
8    right?
9        A.  I'm sorry?
10       Q.  You know -- you can put that aside.
11   You know that there was a first amended
12   complaint then filed after the first -- after
13   the original complaint, right?
14       A.  Yes.
15       Q.  Okay.  Were you aware that the
16   Warner defendants filed a motion to dismiss
17   that complaint as well?
18       A.  Yes.
19       (Defendants' Exhibit 14, Notice of
20       Motion to Dismiss, Memorandum of Law in
21       Support of the Warner Defendants' Motion
22       to Dismiss was marked for
23       identification).
24       Q.  I am handing you, ma'am, what has
25

V. HOLMES

1    been marked exhibit 14, which for the record
2    is again two documents, two documents placed
3    together as a single exhibit.  The first is
4    Document 50 from the lawsuit titled Notice of
5    Motion to Dismiss.  And the second two pages
6    is Document 53 from the lawsuit, Memorandum of
7    Law in Support of the Warner Defendants'
8    Motion to Dismiss.
9        And my basic question is going to
10   be have you ever seen exhibit 14, either of
11   the two documents that are attached?
12       A.  No, I haven't.
13       (Defendants' Exhibit 15,
14       Declaration of Elizabeth Ortiz with
15       exhibits was marked for identification).
16       Q.  I am handing you, ma'am, what has
17   been marked as exhibit 15, which for the
18   record is a document, Document 52 and exhibits
19   from the lawsuit entitled Declaration of
20   Elizabeth Ortiz.
21       I understand, ma'am, that you may
22   have seen some of the exhibits that are
23   attached to exhibit 15 before.  My question is
24   have you ever seen this filing, the
25

V. HOLMES

1  declaration of Elizabeth Ortiz with the
2  exhibits attached before?
3      ATTORNEY BRUSTEIN: Objection.
4  A. No, I haven't.
5      (Defendants' Exhibit 16,
6  Plaintiffs' Memorandum of Law in
7  Opposition to Defendants' Hotel 57
8  Services Motion to Dismiss the Amended
9  Complaint was marked for
10  identification).
11  Q. I am handing you, ma'am, what has
12  been marked as exhibit 16 which for the record
13  is Document 57 from the lawsuit entitled
14  Plaintiffs' Memorandum of Law in Opposition to
15  Defendants' Hotel 57 Services, and it goes
16  on ... Motion to Dismiss the Amended
17  Complaint.
18      And my question is have you ever
19  seen exhibit 16 before?
20  A. No, I haven't.
21  Q. So I take it you didn't do anything
22  to ensure the accuracy of anything that was
23  represented in the opposition before it was
24  filed, correct?

1      V. HOLMES
2  declaration of Elizabeth Ortiz with the
3  exhibits attached before?
4      ATTORNEY BRUSTEIN: Objection.
5  A. No, I haven't.
6      (Defendants' Exhibit 16,
7  Plaintiffs' Memorandum of Law in
8  Opposition to Defendants' Hotel 57
9  Services Motion to Dismiss the Amended
10  Complaint was marked for
11  identification).
12  Q. I am handing you, ma'am, what has
13  been marked as exhibit 16 which for the record
14  is Document 57 from the lawsuit entitled
15  Plaintiffs' Memorandum of Law in Opposition to
16  Defendants' Hotel 57 Services, and it goes
17  on ... Motion to Dismiss the Amended
18  Complaint.
19      And my question is have you ever
20  seen exhibit 16 before?
21  A. No, I haven't.
22  Q. So I take it you didn't do anything
23  to ensure the accuracy of anything that was
24  represented in the opposition before it was
25  filed, correct?

1      V. HOLMES
2      ATTORNEY BRUSTEIN: Objection.
3  A. I'm not sure.
4  Q. Well, if you haven't seen it, then
5  I take it, ma'am, and tell me if I am wrong,
6  that you did nothing to ensure the accuracy of
7  anything that was contained in the opposition
8  before it was filed?
9      ATTORNEY BRUSTEIN: Objection.
10  A. I'm not sure.
11  Q. Well, did you see it before, or
12  not?
13  A. Well, I didn't see it like this.
14  But I don't know if I helped to put this
15  together. That's what I have my attorneys
16  there for.
17  Q. I understand that.
18  A. Okay.
19  Q. Did you have any conversations with
20  your attorney, it's a yes or no question, just
21  the subject matter, about the content of the
22  opposition to the Warner defendants' motion to
23  dismiss?
24      ATTORNEY BRUSTEIN: Objection.
25  A. I don't remember.

1      V. HOLMES
2  Q. Anything that would bring that
3  back, that would refresh your recollection in
4  any way, ma'am?
5      ATTORNEY BRUSTEIN: Objection.
6  A. I don't remember.
7  Q. Okay. Do you have any recollection
8  or memory of questioning the accuracy of
9  anything that was stated in exhibit 16?
10      ATTORNEY BRUSTEIN: Objection. I
11  am going to direct her not to answer any
12  questions about attorney-client
13  communication.
14      ATTORNEY BOLAND: I am only
15  asking -- I am asking nothing more than
16  you won't have to put out a privilege
17  log. I never am asking for the
18  substance of the communication.
19  Q. Do you have any recollection of
20  questioning the accuracy of anything that was
21  contained in exhibit 16?
22  A. I don't remember.
23      ATTORNEY BRUSTEIN: Objection.
24      (Defendants' Exhibit 17,
25  Declaration of Evan Brustein with

1      V. HOLMES
2  exhibits was marked for identification).
3  Q. I am handing you, Ms. Holmes, what
4  has been marked as exhibit 17.
5      MR. ZIMMERMAN: For the record, was
6  she directed not to answer that last
7  question?
8      ATTORNEY BOLAND: I think she
9  answered it. You let her answer that
10  last one, right?
11      ATTORNEY BRUSTEIN: I mean she had
12  an answer.
13      ATTORNEY RISMAN: There was an
14  objection on the record and she answered
15  it.
16      ATTORNEY BOLAND: Okay.
17  Q. I have handed you, ma'am, what has
18  been marked as exhibit 17 which for the record
19  is Document 56 and exhibits to it, that's
20  titled Declaration of Evan Brustein. Again,
21  ma'am, I believe you may know -- well, have
22  you ever seen exhibit 17 or any of the
23  exhibits before?
24      ATTORNEY BRUSTEIN: Objection.
25      (The witness reviews document.)

V. HOLMES

1
2     A.  No, I haven't.
3         (Defendants' Exhibit 18,
4     Declaration of Vivian Holmes was marked
5     for identification).
6     Q.  Ms. Holmes I am handing you what
7     has been marked as exhibit 18 which for the
8     record is a document marked as Document 55 in
9     the lawsuit, and it's titled Declaration of
10    Vivian Holmes.
11        Do you recognize this as a
12    declaration that you executed on or about
13    February 6 of 2023, ma'am?
14    A.  I do remember signing it.  Do you
15    have the rest of this document?
16    Q.  It's Document 55.
17    A.  Oh, okay.
18    Q.  Yeah, that's all I have.
19    A.  Okay.  Yes.
20    Q.  And you understood that when you
21    executed this it was also under penalty of
22    perjury, correct?
23    A.  Yes.
24    Q.  And the statements that were made
25    were true and correct at the time you executed

V. HOLMES

1
2     it?
3     A.  Yes.
4     Q.  And they remain true and correct
5     today?
6     A.  Yes.
7     Q.  All right.  We're almost to the end
8     of this chain.
9         (Defendants' Exhibit 19, Reply
10    Memorandum of Law in Further Support of
11    the Warner Defendants' Motion to Dismiss
12    the Amended Complaint was marked for
13    identification).
14    Q.  I am handing you, Ms. Holmes, what
15    has been marked as exhibit 19, which for the
16    record is Document 58 in the lawsuit titled
17    Reply Memorandum of Law in Further Support of
18    the Warner Defendants' Motion to Dismiss the
19    Amended Complaint.
20        And a simple question, ma'am.  Have
21    you ever seen -- this is 19, sorry.  Right?
22    THE COURT REPORTER:  You have 19,
23    yes.
24    Q.  Thank you.  Okay.  Have you ever
25    seen exhibit 19 before?

V. HOLMES

1
2     A.  No, I haven't.
3     Q.  All right.  Do you understand that
4     one of your responsibilities as a plaintiff in
5     this lawsuit is to cooperate in the discovery
6     process?
7     A.  I believe so.
8     Q.  Okay.  Do you have an understanding
9     of what the discovery process is?
10    A.  I'm not sure.
11    Q.  Okay.  Do you understand that --
12    let me give you an example.  Well, strike
13    that.  You're here today for a deposition,
14    right?
15    A.  Yes.
16    Q.  Okay.  Do you understand this to be
17    part of the discovery process of learning the
18    facts before trial?
19    A.  Yes.
20    Q.  Do you understand that there are
21    also things like requests for documents to be
22    produced that the parties exchange?
23    A.  Yes.
24    Q.  Do you understand that to be part
25    of the discovery process before trial?

V. HOLMES

1
2     A.  Yes.
3     Q.  The same thing, have you ever heard
4     the term interrogatory?
5     A.  No.
6     Q.  No?
7     A.  (Nodding head affirmatively.)
8     Q.  You don't know what interrogatories
9     are?
10    ATTORNEY BRUSTEIN:  Objection.
11    Q.  You can answer.
12    A.  I'm assuming they're questions.
13    Q.  Did you -- well, we'll get to it in
14    a second.
15    A.  Mm-hmm.
16    Q.  With respect to the discovery
17    process that we just talked about, I just want
18    to confirm that we're on the same page now, do
19    you have an understanding that as a plaintiff
20    in this lawsuit you have an obligation to
21    participate in the discovery process?
22    A.  Yes.
23    Q.  Okay.  All right.  We are going to
24    mark some things that are more paper than they
25    seem that we are going to use, but we are

Page 90

V. HOLMES

1
2  going to mark them.
3         (Defendants' Exhibit 20,
4  Plaintiffs' Rule 26 (A)(1)(A) Initial
5  Disclosures was marked for
6  identification).
7      Q.  Ms. Holmes, I am handing you what
8  has been marked as exhibit 20, which for the
9  record is a document titled Plaintiffs' Rule
10  26 (A)(1)(A) Initial Disclosures.  And
11  following it are documents bearing the Bates
12  number Staley v FSR 0001 to 0261.  And let's
13  start with the document that's entitled
14  Plaintiffs' Rule 26 (A)(1)(A) Initial
15  Disclosures.
16         Have you ever seen this before?
17      A.  No, I haven't.
18         ATTORNEY BRUSTEIN:  Look at the
19  document before you answer.
20         THE WITNESS:  Okay.
21         (The witness reviews document.)
22      Q.  I am just asking you about the
23  first document right now, before we get to the
24  things with the numbers on them.
25      A.  Okay.  I've seen some of this.

Page 91

V. HOLMES

1
2      Q.  What parts have you seen, ma'am?
3      A.  No, I haven't seen this.
4      Q.  Okay, you haven't seen that?
5      A.  No.
6      Q.  So here I am going to let you know,
7  ma'am, if you take a look at -- well, strike
8  that.
9         Have you ever heard of a Bates
10  number?
11      A.  No.
12      Q.  Okay.  So if you take a look at the
13  page that you are looking at right now --
14      A.  Mm-hmm.
15      Q.  -- you will see in the lower
16  right-hand corner there's a little number
17  there with an prefix attached to it.  So the
18  prefix, when I'm talking about prefix is
19  Staley v FSR and then there's a number that
20  follows?
21      A.  Yes.
22      Q.  Do you see that?
23      A.  Mm-hmm.
24      Q.  That's what we call a Bates number.
25  And in litigation lawyers put Bates numbers on

Page 92

V. HOLMES

1
2  the pages of every document because that's the
3  way lawyers are.
4      A.  Okay.
5      Q.  All right.  If I take a look,
6  ma'am, at the document itself, the disclosures
7  themselves -- right there, you've got it in
8  your hand.  And if you take a look, the pages
9  are not numbered, but it is after -- it's the
10  fifth page.
11         ATTORNEY BRUSTEIN:  Can you just
12  state what the top number is on the
13  fifth page.
14         ATTORNEY BOLAND:  I don't have a
15  number on it.
16         ATTORNEY BRUSTEIN:  No, I am
17  saying --
18         ATTORNEY BOLAND:  Oh, 33.
19         ATTORNEY BRUSTEIN:  Thank you.
20      Q.  Are you with me?
21      A.  Yes, I am.
22      Q.  And you will see that under B there
23  is something, a copy or description by
24  category and location of all documents, and
25  then that goes on.  Do you see what I am

Page 93

V. HOLMES

1
2  referring to?
3      A.  Yes.
4      Q.  And then you'll see that there's a
5  number of things following on this page that's
6  1 to 15.  But it goes on for pages.
7      A.  Mm-hmm.
8      Q.  Do you see that?
9      A.  Yes.
10      Q.  And you'll see after the first one
11  it says Staley v FSR 001, right?
12      A.  Yes.
13      Q.  Okay.  That may be a typo because
14  if you take a look at the page of the
15  documents that we have there, it says
16  Staley --
17      A.  There's three zeros.
18      Q.  But you match up the number, right?
19      A.  Yes.
20      Q.  And the last number that we have
21  here on I think it's the next -- three pages
22  in from the back.
23      A.  This one?
24      Q.  You'll see the last number there is
25  Staley v FSR 0261?

V. HOLMES

1
2     A.  Yes.
3     Q.  And if you take a look, ma'am, and
4   I'm not trying to hide the ball on you, take a
5   look at the last page of the documents that
6   are appended to exhibit 20 and you'll see it's
7   the 261 page?
8     A.  Yes.
9     Q.  Okay.  Did you have any role in
10  gathering documents initially to be turned
11  over in the lawsuit in connection with the
12  initial disclosures that we have marked as
13  exhibit 20?
14    A.  Can you rephrase that?
15    Q.  Yes, sure.  Earlier on in the
16  lawsuit -- well, strike that.
17        You are familiar with a document
18  request?  I think I went over that a little
19  bit?
20    A.  Yes.
21    Q.  Okay.  You know that the Warner
22  defendants, and I think be FSR served document
23  requests on you?
24    A.  Yes.
25    Q.  Okay.  Before that time period

V. HOLMES

1
2   happened, were you involved in gathering and
3   providing to your lawyers documents related to
4   the case to be turned over in connection with
5   the initial disclosures?
6     A.  I don't remember.
7     Q.  Do you recognize the first page of
8   this as a document from your files?  This is
9   on FSR -- it starts Staley v FSR 0001?
10    A.  Possibly.
11    Q.  Okay.  So you don't remember -- I
12  want to be fair to you, ma'am.
13    A.  Mm-hmm.
14    Q.  You don't remember gathering
15  documents initially for your lawyers before we
16  served a document request on you?
17    A.  No.
18        ATTORNEY BRUSTEIN:  Objection.  Do
19    not answer.  You've got to wait a second
20    so he can finish with his question.
21        ATTORNEY BOLAND:  I think I was
22    finished.  I want to know whether she
23    remembers gathering documents initially
24    to provide to you guys before our
25    document requests, to understand the

V. HOLMES

1
2   timing of what we have.
3        ATTORNEY BRUSTEIN:  Objection.
4     A.  I don't remember.
5     Q.  Okay.  Putting aside the document
6   that we had looked at earlier that you hadn't
7   seen before, had you reviewed a complete set
8   of documents turned over --
9        ATTORNEY BOLAND:  Strike that.
10    You're not going to be able to know
11    that.  Don't worry about it.
12        ATTORNEY BRUSTEIN:  You're done
13    with this whole set?
14        ATTORNEY BOLAND:  Yes.  We are not
15    going to use that.
16        (Defendants' Exhibit 21,
17    Plaintiffs' First Supplemental
18    Disclosures was marked for
19    identification.)
20    Q.  Ms. Holmes, I am handing you what
21  has been marked as exhibit 21 which for the
22  record is a document titled Plaintiffs' First
23  Supplemental Disclosures and there's a date on
24  it of December 29, 2022.  Have you ever seen
25  exhibit 21 before?

V. HOLMES

1
2     A.  No, I don't recall.
3     Q.  You will see, ma'am, that there is
4   a -- do you remember how we saw the listing of
5   the documents and the Bates numbers in the
6   prior exhibit, right?
7     A.  Yes.
8     Q.  And we see we have another thing
9   listed here, audio recording on the June 25,
10  2021 Zoom meetings, right?  That description?
11    A.  Yes.
12    Q.  Okay.  And then there's a Bates
13  number of Staley v FSR 0262.  That may also be
14  a typo in terms of zeros, right?
15    A.  Yes.
16    Q.  What is that?
17    A.  What is it?
18    Q.  Yes.  What is it?
19        ATTORNEY BRUSTEIN:  Objection.
20    A.  An audio recording, that's what it
21  says.
22    Q.  Okay.  It's an audio recording.
23  Have you ever heard it?
24    A.  I don't know which one you're
25  talking about.

Page 98

V. HOLMES

1
2     Q.   The one that's identified here on
3  this page.
4     A.   I would have to hear it.  I don't
5  know what you heard.
6     Q.   Okay, I haven't heard it.  I am
7  asking what is on the plaintiff's initial
8  disclosures.  You're a plaintiff, right?
9     A.   Yes.
10    Q.   Okay.  So it's a disclosure on your
11  behalf, right?  You understand that?
12    A.   Yes.
13    Q.   Okay.  Identified there is an audio
14  recording --
15    A.   Mm-hmm.
16    Q.   -- on the June 25, 2021 zoom
17  meeting.  Right?
18    A.   Yes.
19    Q.   Have you heard it?
20       ATTORNEY BRUSTEIN:  Objection.
21    Q.   That audio recording that is
22  identified on your disclosure?
23    A.   I've heard what I have possession
24  of, yes.
25    Q.   And is this what you have

Page 99

V. HOLMES

1
2  possession of, ma'am?  What's identified here?
3       ATTORNEY BRUSTEIN:  Objection.
4     Q.   You can answer the question?
5     A.   I do.
6     Q.   How did you obtain it?
7     A.   I was --
8       ATTORNEY BRUSTEIN:  Objection.
9     A.   I was invited to the Zoom meeting.
10    Q.   Understood.  How did you obtain an
11  audio recording?
12    A.   I recorded it.
13    Q.   How did you do that?
14    A.   By pressing record on my phone.
15    Q.   Do you have any idea of where all
16  of the participants in that meeting may have
17  been located?
18       ATTORNEY BRUSTEIN:  Objection.
19    A.   I believe in New York.
20    Q.   Do you know whether they were all
21  in New York or some may have scattered to
22  other places during the pandemic?
23       ATTORNEY BRUSTEIN:  Objection.
24    A.   My understanding, they were all in
25  New York.

Page 100

V. HOLMES

1
2     Q.   Are you sure of that?
3       ATTORNEY BRUSTEIN:  Objection.
4     A.   I believe that they were in
5  New York.
6     Q.   Okay.  I understand you believe.  I
7  am asking if you know whether they were?
8       ATTORNEY BRUSTEIN:  Objection;
9       asked and answered.
10    Q.   You may answer.
11    A.   I don't know how to answer that.
12    Q.   Do you know --
13    A.   I was home, so ...
14    Q.   I understand you were home, ma'am.
15  How many other people were on that call?
16       ATTORNEY BRUSTEIN:  Objection.
17    A.   I'm assuming close to 200.
18    Q.   Okay.  Do you know whether some of
19  those people could have been in New Jersey?
20       ATTORNEY BRUSTEIN:  Objection.
21    A.   I don't know.
22    Q.   Do you know whether any of those
23  people could have been in Connecticut?
24       ATTORNEY BRUSTEIN:  Objection.
25    A.   I don't know.

Page 101

V. HOLMES

1
2     Q.   Do you know whether any of those
3  people could have been in Illinois?
4       ATTORNEY BRUSTEIN:  Objection.
5     A.   I don't know.
6     Q.   Do you know whether any of those
7  people could have been in states where it's
8  illegal to record them without their consent?
9       ATTORNEY BRUSTEIN:  Objection.
10    A.   I don't know.
11    Q.   What investigation did you do as to
12  the legality of recording an audio
13  conversation before you did it, at the June
14  25, 2021 meeting?
15       ATTORNEY BRUSTEIN:  Objection.
16    A.   I didn't do any investigation.
17    Q.   After you recorded the meeting, is
18  that stored on a file on your phone?  Is there
19  kind of like an audio file?
20       ATTORNEY BRUSTEIN:  Objection.
21    A.   I'm not sure.
22    Q.   Okay.  So how did you -- I take it
23  you turned it over to be produced to us in
24  this lawsuit, right?
25    A.   Yes.

Page 102

V. HOLMES

1
2  Q.  How did you do that?
3     ATTORNEY BRUSTEIN:  Objection.  I
4  am going to direct her not to answer
5  that.
6     ATTORNEY BOLAND:  How she took an
7  audio recording and turned it over --
8  got it to produce to us?
9     ATTORNEY BRUSTEIN:  How she
10  provided it to her counsel?
11     ATTORNEY BOLAND:  How she got it to
12  somebody to give to us.  How she
13  produced her own document?  You are
14  going to instruct her not to answer that
15  question, counsel?
16     ATTORNEY BRUSTEIN:  I am going to
17  direct her not to answer how she
18  provided it to her counsel.
19  Q.  How did you get it out the door to
20  anyone to be produced in this case?
21  A.  I don't know how to answer --
22     ATTORNEY BRUSTEIN:  Objection.  I
23  am going to again instruct her not to
24  answer to the extent it relates to
25  attorney-client communication.

Page 103

V. HOLMES

1
2  A.  I can't answer it.
3  Q.  Okay.  Where does the document
4  reside, if at all, in your possession?  Your
5  personal possession?  Where does the recording
6  reside?
7  A.  On my phone.
8  Q.  It's still on your phone?
9  A.  Yes.
10  Q.  So there's a -- do you know the
11  term native file?
12  A.  No.
13  Q.  You don't understand the term
14  native file?
15  A.  (Shaking head.)
16     ATTORNEY BRUSTEIN:  Objection.
17  Q.  Okay.  But there was a recording
18  resident on your phone right now of this, that
19  is of the meeting of June 25, 2021?
20     ATTORNEY BRUSTEIN:  Objection.
21  A.  Yes.
22  Q.  Okay.  When was the last time you
23  listened to it?
24  A.  I don't remember.
25  Q.  With whom, other than counsel, if

Page 104

V. HOLMES

1
2  anyone, have you shared the recording?
3  A.  I don't remember sharing it.
4  Q.  Do you use your phone to text?
5  A.  Yes.
6  Q.  Okay.  Have you sent it to anyone
7  by text?
8     ATTORNEY BRUSTEIN:  Objection.  To
9  the extent that it involves
10  attorney-client communication I direct
11  her not to answer that.
12  Q.  Yeah, I don't want to know about
13  the lawyers.
14  A.  I don't remember.
15  Q.  Have you sent it by email?
16     ATTORNEY BRUSTEIN:  Objection.  The
17  same objection.  I direct her to exclude
18  any attorney-client communication.
19  Q.  Feel free.  I am not asking you
20  about the lawyers.
21  A.  I don't remember.
22  Q.  Have you taken it and put it on any
23  kind of other media other than your phone,
24  like a drive or your PC or anything like that?
25     ATTORNEY BRUSTEIN:  Objection.

Page 105

V. HOLMES

1
2  A.  I'm not sure.
3  Q.  When did you start the recording
4  and when did you end it?  In other words did
5  you start it before the meeting began and
6  ended it after or did you start it at some
7  point during it?
8  A.  To the best of my knowledge, I
9  started it before the meeting.
10  Q.  And what about when it ended?
11  A.  Until the end.
12  Q.  Okay.  Whom if anyone did you ask
13  permission -- whom if anyone on that call did
14  you ask their permission to record?
15  A.  Did I ask permission to record?
16  Q.  Yes.
17  A.  No, I did not.
18  Q.  Whom --
19     ATTORNEY BRUSTEIN:  Objection.
20  Q.  -- if anyone on that call did you
21  inform that you were recording it?
22     ATTORNEY BRUSTEIN:  Objection.
23  A.  I don't remember.
24  Q.  Since that, other than your lawyers
25  here, since that recording was made have you

Page 106

V. HOLMES

1   sought legal counsel as to whether anything
2   you did in recording that call might have been
3   illegal?
4       ATTORNEY BRUSTEIN:  Objection.  I
5   am going to direct her not to answer
6   that question.
7       Q.  Are you going to follow his
8   instruction, ma'am?
9       A.  Yes.
10      Q.  Okay, that's fine.
11          Was anyone present in the -- in a
12  room with you when you recorded the call?
13      A.  To the best of my knowledge, no.
14      Q.  Were you at home?
15      A.  Yes.
16      Q.  At the time that you had recorded
17  the call were you aware that there were some
18  Four Seasons employees who had transferred or
19  moved to different hotels to work in different
20  locations?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  I'm not sure.
23      Q.  You don't know if you were aware of
24  it or you don't know whether they were?

Page 107

V. HOLMES

1       ATTORNEY BRUSTEIN:  Objection.
2       A.  I don't --
3       Q.  You can answer, ma'am.
4       A.  I don't know whether they were.
5       Q.  Did you attempt to make any effort
6   to find out before you recorded that call,
7   where the participants might be located?
8       ATTORNEY BRUSTEIN:  Objection.  And
9   you just asked two very different
10  questions, about transferring and
11  participants in the call.
12      ATTORNEY BOLAND:  Because they are
13  two different questions.  One was one.
14  The second one was the second.
15      Q.  You may answer.
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  I don't -- I don't know.
18      (Defendants' Exhibit 22, letter
19  dated March 29, 2023 was marked for
20  identification.)
21      Q.  I am handing you, ma'am, what has
22  been marked as exhibit 22, which is an exhibit
23  of recent vintage, which is a letter dated
24  March 29, 2023 from the Brustein law firm,

Page 108

V. HOLMES

1   Mr. Brustein, unsigned, to Ms. Lundy.
2       ATTORNEY BRUSTEIN:  Objection.
3       ATTORNEY BOLAND:  There's no
4   signature.  I didn't see a signature.
5       ATTORNEY BRUSTEIN:  There's an S
6   slash.  I'm not sure why that's relevant
7   for the record.
8       Q.  You may answer.  Okay.  Have you
9   ever seen exhibit 22 before?  And I recognize
10  it's only like yesterday.
11      (The witness reviews document.)
12      A.  No, I am not sure.  I didn't see
13  this.  I don't think so.
14      Q.  It's dated yesterday.
15      A.  Oh, okay.
16      Q.  It's not that long ago.
17      A.  No then.
18      Q.  It says I write this Supplemental
19  Disclosure Letter, capital S, capital D,
20  capital L, right?  Do you see that?
21      A.  Yes.
22      Q.  What's a supplemental disclosure
23  letter?  Do you have any idea?
24      ATTORNEY BRUSTEIN:  Objection.

Page 109

V. HOLMES

1       A.  No, I have no idea.
2       Q.  Me neither.  Let me direct your
3   attention, there was a document -- you see
4   here that there is an A on this, August 27,
5   2021 settlement agreement and then it goes on?
6   I am not trying to say that it doesn't say
7   other things.  Do you see what I am referring
8   to?
9       A.  Yes.
10      Q.  And then it has another Bates
11  number, Staley v FSR 0304?
12      A.  Yes.
13      Q.  Okay.
14      (Defendants' Exhibit 23, Staley v
15  FSR 0304 was marked for identification).
16      Q.  I am handing you, ma'am, what has
17  been marked as exhibit 23 which for the record
18  is a document bearing the Bates number of
19  Staley v FSR 0304.
20      A.  Are we done with this?
21      Q.  Yes.
22      A.  Oh, okay.
23      Q.  My first question, ma'am:  Have you
24  ever seen exhibit 23 before?

Page 110

V. HOLMES

1
2     (The witness reviews document.)
3     A. Yes, I have.
4     Q. What is it?
5     A. It's an agreement between the Four
6  Seasons and the employees. Union employees.
7     Q. Okay. And you said you had seen it
8  before. When did you first see exhibit 23?
9     A. I don't remember.
10    Q. Well, was it, you know, within the
11 last couple of --
12    A. Last year.
13    Q. You've got to let me finish and I
14 have to let you finish otherwise he can't take
15 us down, okay? It was within the last year?
16    A. Yes.
17    Q. All right. When you say within the
18 last year, we're in like March of 2023, do you
19 believe it was after March of 2022 or before
20 then?
21    A. Before March 22, I believe.
22    Q. Okay. Was it before the original
23 complaint was filed in August of 2022?
24    A. You're asking me if I saw this
25 before the complaint was filed?

Page 111

V. HOLMES

1
2     Q. Correct. The original complaint.
3  The original lawsuit that started off the
4  whole case.
5     A. I don't remember in what order.
6     Q. All right. How did you obtain it?
7     A. It was given to me.
8     Q. By whom?
9     A. By a co-worker.
10    Q. Who?
11    A. José Dilone.
12    Q. Can you help me with the last name?
13    A. D, as in David, i-l-o-n-e.
14    Q. And who is Mr. Dilone, other than a
15 co-worker?
16    A. You want to know his title?
17    Q. Yeah.
18    A. He was a tailor.
19    Q. I'm sorry?
20    A. Tailor.
21    Q. A tailor? Is he a union employee
22 or a non-union employee?
23    A. Union.
24    Q. Do you have any understanding at
25 all as to how Mr. Tailor [sic] obtained

Page 112

V. HOLMES

1
2  exhibit 23?
3     A. No, I don't.
4     THE COURT REPORTER: Mr. Tailor?
5     Q. Mr. Dilone, the tailor, obtained
6  exhibit 23.
7     A. No.
8     Q. How long have you had exhibit 23
9  for?
10    A. I don't remember.
11    Q. Have you -- just a yes or no
12 question and we'll get to the specifics of it.
13 Have you turned over documents, searched your
14 files for documents to be produced to the
15 Warner defendants in this case?
16    A. Have I produced documents to turn
17 over to the --
18    Q. Yeah. Have you taken your files
19 and produced documents to be turned over to us
20 in this case?
21    ATTORNEY BRUSTEIN: Objection.
22    A. Yes, I have.
23    Q. Okay. Why wasn't this produced
24 originally, exhibit 23?
25    ATTORNEY BRUSTEIN: Objection. I'm

Page 113

V. HOLMES

1
2  directing her not to answer.
3     ATTORNEY BOLAND: What's the legal
4  basis?
5     ATTORNEY BRUSTEIN: Attorney-client
6  communication. You're asking why
7  something wasn't done in preparation --
8     ATTORNEY BOLAND: Why she didn't
9  produce -- turn this over earlier to be
10 produced.
11    ATTORNEY BRUSTEIN: I'm directing
12 her not to answer the question.
13    Q. Are you going to follow his
14 instruction?
15    ATTORNEY BRUSTEIN: I am going to
16 object again to that line of
17 questioning.
18    ATTORNEY BOLAND: Feel free.
19    ATTORNEY BRUSTEIN: I directed her
20 not to. Move on.
21    ATTORNEY BOLAND: No, feel free.
22    Q. Are you going to follow your
23 lawyer's instruction?
24    ATTORNEY BRUSTEIN: I'm objecting.
25    ATTORNEY BOLAND: Let me do this.

Page 114

V. HOLMES

1
2      Q.  Every time your lawyer instructs
3  you not to answer, are you going to follow his
4  instructions?  We'll do it once.
5      A.  Yes.
6      Q.  Got it.
7      ATTORNEY BRUSTEIN:  You can roll
8  your eyes.
9      ATTORNEY BOLAND:  I certainly can.
10  Okay.
11      Q.  When did you turn this over to be
12  produced to us in this case?
13      ATTORNEY BRUSTEIN:  Objection.
14  Directing her not to answer.
15      ATTORNEY BOLAND:  Okay.  Let's do
16  this.
17      ATTORNEY BRUSTEIN:  Your comments
18  under your breath are not really
19  necessary.
20      ATTORNEY BOLAND:  Let's do this.
21  They're more than necessary.  That was
22  23?
23      THE COURT REPORTER:  Yes, sir.
24      THE WITNESS:  Are we done with 23?
25      ATTORNEY BOLAND:  Maybe.  But you

Page 115

V. HOLMES

1
2  can put it to the side.
3      (Defendants' Exhibit 24,
4  Defendants' First Demand For Production
5  of Documents was marked for
6  identification).
7      Q.  I am handing you, ma'am, what has
8  been marked as exhibit 24.
9      ATTORNEY BRUSTEIN:  Thank you for
10  throwing this to me.
11      ATTORNEY BOLAND:  I'm not.  I'm
12  tossing it to everybody.
13      Q.  You'll see this is a document
14  entitled, ma'am, Defendants' First Demand --
15      (Discussion off the record.)
16      ATTORNEY BOLAND:  Defendants' First
17  Demand For Production of Documents.
18      Q.  Have you ever seen exhibit 24?
19      A.  I believe so.
20      Q.  Okay.  And you'll see -- when did
21  you first see it, ma'am?
22      A.  I don't remember.  But I think it
23  was in December.
24      Q.  Okay.  I'm not trying to hide the
25  ball on you.  If you'll look at page 8.  And

Page 116

V. HOLMES

1
2  you'll see the date of this is November 29,
3  2022, right?
4      A.  Mm-hmm.
5      Q.  So you feel you saw it sometime
6  after that?
7      A.  Yes.
8      Q.  Okay.  Did you have an
9  understanding, ma'am, that there was a request
10  contained in exhibit 24 for you personally to
11  search your files to produce documents to the
12  Warner defendants?
13      A.  Yes.
14      Q.  All right.  What did you do to
15  search your files?
16      A.  What did I do in order to
17  provide ...
18      Q.  Yes.  Let me step back for a
19  second.  What understanding did you have, if
20  any, of what you were supposed to do to
21  produce documents in response to exhibit 24?
22      A.  Well, I read the demands and if I
23  had the documents for the demands, I submitted
24  them.
25      Q.  Okay.

Page 117

V. HOLMES

1
2      A.  Whether --
3      Q.  I am not trying to cut you off,
4  ma'am.
5      A.  -- with emails or hard copies.
6  Whatever I had in my possession.
7      Q.  And was this the first time that
8  you had searched your files for documents that
9  might be relevant to the claims in the
10  lawsuit?
11      A.  I believe so.
12      Q.  Okay.  So when you say your files,
13  I want to understand what you searched.  You
14  have two email accounts, am I right about
15  that?
16      A.  Yes.
17      Q.  Did you search both of those
18  accounts?
19      A.  Possibly.
20      Q.  I understand it's possible.  I want
21  to know if you did or you didn't?
22      A.  Possibly.  I can't answer that
23  because I don't know which email the, whatever
24  I submitted.
25      Q.  Fair enough.  I'm not asking you

Page 118

V. HOLMES

1
2 where you found documents in which email
3 account. All right. I want to know whether
4 you searched both of them for documents?
5      A.  Yes.
6      Q.  How did you do that?
7      A.  I type in, you know, Four Seasons
8 or Elizabeth Ortiz or whoever is related, and
9 that's how I searched for documents.
10     Q.  Anything else that -- you typed in
11 Four Seasons, you typed in Elizabeth Ortiz.
12 Anything --
13     A.  Or Alexandra, to name a few.  I
14 don't remember, you know, how I produced the
15 documents, as far as, you know, what names I
16 went to.
17     Q.  I want to be fair to you.  You did
18 sort of a key word type of a search, is that
19 fair?
20     A.  That is fair.
21     Q.  Okay.  And then when you got the
22 results back, to the extent you got results
23 back and that were in your email account, what
24 did you do then?
25         ATTORNEY BRUSTEIN:  Objection.  I

Page 119

V. HOLMES

1
2 would direct her not to answer to the
3 extent that it calls for attorney-client
4 communication.
5      Q.  What did you do, I'm not including
6 talking to anybody, I want to know what you
7 did once you got the hits back from your
8 keyword search?  What did you do next to
9 produce the documents on your files?  I don't
10 want to know if you had any conversations with
11 your lawyers?
12         ATTORNEY BRUSTEIN:  Objection.  I
13     appreciate you respecting the objection.
14     I am also going to direct her not to say
15     what she did with anything that she
16     found.  You can again roll your eyes.  I
17     image when you defend your clients you
18     will object in a similar manner.
19         ATTORNEY BOLAND:  Let's get back to
20     the question.
21     Q.  For step 1, you did a keyword
22 search on your email accounts, is fair?
23     A.  Fair.
24     Q.  What did you do next?
25     A.  I read what I found.

Page 120

V. HOLMES

1
2      Q.  You read what you found.  Okay.
3 Did you produce everything that you found that
4 came up from your email search or did you read
5 it and select from the things that came up
6 those documents that you would produce and
7 those that you would not?
8         ATTORNEY BRUSTEIN:  Objection to
9     did she produce everything.
10     Q.  You can answer.
11     A.  I don't remember.
12     Q.  Do you remember the question?
13     A.  Yeah -- well, I don't understand.
14 You're asking me if I produced it or if I ...
15     Q.  Yeah, I want to know if after you
16 did your keyword search, if everything that
17 came up responsive was produced, or whether
18 you only produced a subset of what was -- that
19 came up in the keyword search?
20         ATTORNEY BRUSTEIN:  Objection.  I
21     would direct her not to answer what she
22     produced to her attorneys.  And that's
23     what your question is, however cleverly,
24     asking.
25         ATTORNEY BOLAND:  Okay.  I take it

Page 121

V. HOLMES

1
2 though at some point you produced some
3 emails?  Is that accurate or inaccurate?
4         ATTORNEY BRUSTEIN:  Objection.  I
5     am going to again direct you to stop
6     asking what she produced to her
7     attorneys.
8         ATTORNEY BOLAND:  She's a plaintiff
9     in this case who has an obligation to
10     turn over documents.  I don't care if
11     she turns them over to you or turns them
12     over to me directly.  I am entitled to
13     know what she did to turn over
14     responsive documents, period.  If you
15     want to direct her not to answer, free
16     to do that, that's fine.
17         ATTORNEY BRUSTEIN:  She already
18     answered what she did.
19         ATTORNEY BOLAND:  I want to know
20     whether she produced part of what she
21     found or produced them all.  That's all
22     I am trying to figure out, is what we
23     got.  Do we have a subset or do we have
24     everything that she identified.  It's
25     not a tough question.

V. HOLMES

1
2      ATTORNEY BRUSTEIN: And I am
3   directing her not to answer what was
4   produced to you. You're asking how the
5   end process is made, and that calls for
6   attorney-client communication.
7      ATTORNEY BOLAND: I'm not asking
8   about how the end process is made. I
9   want to know what she did. And I'm
10  sorry, the fact that she turns over what
11  she produces to lawyers is not
12  privileged. It's just a fact of life.
13  That's how things get done.
14     I want to know what she identified
15  to be produced to turn over. That's
16  what I want to know. What she turned
17  over. Whether she culled it or she gave
18  me everything that the keywords hit.
19  That's all I want to know.
20     ATTORNEY BRUSTEIN: I'm objecting.
21  Your invariably asking her for
22  attorney-client communication.
23     ATTORNEY BOLAND: Fine. You're
24  instructing her not to answer?
25     ATTORNEY BRUSTEIN: Yes.

V. HOLMES

1
2      ATTORNEY BOLAND: Fine.
3      Q.  Let's talk about where else you
4   searched for documents, if anywhere, other
5   than email. What other sources that you
6   have -- you have email is one, maybe personal
7   files, whatever -- what else did you search?
8      A.  I'm not sure. I don't remember.
9      Q.  How about texts? Did you search
10  your texts on your phone for documents that
11  might be responsive?
12     A.  I don't remember.
13     Q.  Files on your computer; in other
14  words electronic files where you have these
15  things. Did you search your computer for
16  files, for documents that might be responsive?
17     A.  Are you referring to emails?
18     Q.  No, no, no. We went through
19  emails. I'm sorry. Anything that's in hard
20  copy like PDF files or things like that, that
21  you meant to save, Word docs, things like
22  that?
23     ATTORNEY BRUSTEIN: Objection.
24     A.  I believe so.
25     Q.  How did you do that?

V. HOLMES

1
2      A.  By going into ADP.
3      Q.  Help me out.
4      A.  I'm sorry. That's like our
5   payroll. That's how I was able to submit my
6   paychecks.
7      Q.  Okay, fair enough. You have some
8   W-2s and things that you produced?
9      A.  Right, things that I produced.
10     ATTORNEY BRUSTEIN: If he's talking
11  don't -- I would ask that you give her
12  the same courtesy so the reporter can
13  get everything down.
14     ATTORNEY BOLAND: Yeah, we talked
15  about this. We both do it.
16     Q.  Other than the payroll records that
17  you produced did you do any other search of
18  files that you may have stored on a computer,
19  and I mean either the hard drive or in the
20  cloud, to turn over that would be responsive
21  in this case?
22     ATTORNEY BRUSTEIN: Objection.
23     A.  I'm not sure. And I don't
24  remember.
25     Q.  Any other locations that you have

V. HOLMES

1
2   in your home or on a device where you -- where
3   you could have stored any materials relevant
4   to your employment at the Four Seasons or this
5   case?
6      A.  If I have any other devices
7   that ...
8      Q.  For example, do you have like a
9   paper file somewhere? You know, keep things
10  in paper, like in a drawer or in a file
11  cabinet or anything like that?
12     A.  Yes. I have a folder that I kept
13  work-related items.
14     Q.  Did you search that folder for
15  documents that would be responsive to the
16  document requests in this case?
17     A.  I believe so.
18     Q.  Okay. Did you search that folder,
19  beyond the documents that were responsive to
20  the requests, at any other time to identify or
21  produce documents that were responsive -- that
22  would be relevant in the case?
23     ATTORNEY BRUSTEIN: Objection.
24     A.  I'm not sure.
25     Q.  Okay. Any other locations in your

Page 126

V. HOLMES

1       home or in your possession or control where
2       you could have stored any documents or
3       information relating to your employment at the
4       Four Seasons?  Let's just start with that,
5       broadly.
6
7           ATTORNEY BRUSTEIN:  Objection.
8       A.  I don't remember.  I don't -- I'm
9       not sure.
10      Q.  You don't know what files you have
11      or where things -- I'm trying to understand?
12          ATTORNEY BRUSTEIN:  Objection.
13      A.  I have one file.
14      Q.  One file?
15      A.  Yeah.
16      Q.  Okay.  When you produced
17      documents --
18          ATTORNEY BOLAND:  Strike that.
19      Q.  Did you contact your internet --
20      your email providers for any archived emails
21      that may be responsive to the document
22      requests in the case?
23      A.  I don't understand the question.
24      Q.  Yeah, sure.  You've got I think two
25      personal email accounts, right?

Page 127

V. HOLMES

1
2       A.  Yes.
3       Q.  All right.  And they're through
4       public providers?
5       A.  Yes.
6       Q.  Okay.  Did you contact either of
7       those providers to get documents that might
8       have been archived but didn't show up in your
9       live file of your email accounts?
10      A.  No.  We're done with exhibit 24?
11      Q.  We are.
12          ATTORNEY BRUSTEIN:  I just want to
13      point out for your purposes at 1 o'clock
14      we have to take a break to call the
15      Court.  I don't know if you want to
16      break before or after that call?
17          ATTORNEY BOLAND:  Do you need a
18      break?
19          ATTORNEY BRUSTEIN:  I just was
20      saying for your purposes.
21          ATTORNEY BOLAND:  For my purposes,
22      I'm good to go.  I leave it to these
23      folks.  Anybody else, too.  But they're
24      the ones I worry about.
25          (Discussion off the record.)

Page 128

V. HOLMES

1
2           (Defendants' Exhibit 25,
3       Plaintiffs' Responses and Objections to
4       Defendants' First Request For Production
5       of Documents was marked for
6       identification).
7       Q.  I am handing you, ma'am, what has
8       been marked as exhibit 25 which for the record
9       is a document titled Plaintiffs' Responses and
10      Objections to Defendants' First Request For
11      Production of Documents.
12          Have you ever seen this before,
13      ma'am?
14          (The witness reviews document.)
15      A.  Yes, I believe so.
16      Q.  Okay.  I just want to go through --
17      A.  I'm sorry.
18      Q.  I didn't mean to interrupt you.
19      You'll see if we go to the next to last page
20      there's a date of December 29, 2022?
21      A.  Mm-hmm.
22      Q.  You have to say yes or no.
23      A.  Yes.
24      Q.  That's okay.  Did you review
25      exhibit 25 prior to December 29, 2022?

Page 129

V. HOLMES

1
2       A.  I believe so.
3       Q.  Okay.  And you understand that this
4       was a response to the document we looked at a
5       bit earlier that when we served, when the
6       Warner defendants served a request for
7       production of documents on you and others,
8       right?
9       A.  Yes.
10      Q.  You'll see on the first page
11      there's general statement and general
12      objections, right?
13      A.  Yes.
14      Q.  And then if you go to page 4
15      there's responses and objections to document
16      requests, right?
17      A.  Yes.
18      Q.  Okay.  Did you read all of the
19      objections and responses that are asserted in
20      exhibit 25 before it was served in December of
21      2022?
22          ATTORNEY BRUSTEIN:  Objection.
23      A.  I don't remember the particulars of
24      this, but I did see the document.
25      Q.  I understand you don't remember the

Page 130

V. HOLMES

1
2 particulars.
3     A.  Mm-hmm.
4     Q.  Do you remember reading it?
5     A.  Yes.
6     Q.  Okay.  Did you approve it to be
7 served on your behalf?
8         ATTORNEY BRUSTEIN:  Objection.  I
9     am directing her not to answer.
10     Q.  Do you stand by each and every
11 objection that your lawyer has made on your
12 behalf in exhibit 25?
13     A.  Yes.
14     Q.  Thank you.
15         (Defendants' Exhibit 26,
16     Defendants' First Set of Interrogatories
17     was marked for identification.
18     Q.  Ma'am, I am handing you what has
19 been marked as exhibit 26.
20         ATTORNEY BRUSTEIN:  Can I take a
21     two second break?  I am just grabbing a
22     water.
23         ATTORNEY BOLAND:  Yeah, yeah.  I've
24     got to pass out my stuff, first.
25         ATTORNEY BRUSTEIN:  Thank you.

Page 131

V. HOLMES

1
2     Q.  My first question, ma'am, is have
3 you ever seen exhibit 26 before?
4         (The witness reviews document.)
5     A.  Yes.
6     Q.  And do you remember we used the
7 term "interrogatory" before?
8     A.  Yes, I remember seeing something
9 like this.
10     Q.  When you say "something like this"
11 I want to know if you saw it --
12     A.  Yes, I remember seeing this.
13     Q.  What is your understanding of what,
14 if anything, you were required to do in
15 response?
16         ATTORNEY BRUSTEIN:  Objection.
17     You can answer.
18     A.  What was my understanding of this?
19 I needed to produce the information.
20     Q.  Okay.  So let me just understand.
21 Do you understand that the written
22 interrogatories are basically questions for
23 you to answer under oath?
24     A.  Yes.
25     Q.  Okay.  Fair enough.  So in order to

Page 132

V. HOLMES

1
2 respond to them did you have an understanding
3 of what you personally were required to do?
4     A.  Yes.
5     Q.  And what was that?
6     A.  To answer the questions.
7     Q.  Okay.  And did you do that?
8     A.  Yes.
9     Q.  All right.  And you understand
10 that -- well, strike that.  I'll come back to
11 that in a second.
12     A.  Hold on to this?
13     Q.  No.
14         (Defendants' Exhibit 27,
15     Plaintiffs' Responses and Objections to
16     Warner Defendants' First Set of
17     Interrogatories was marked for
18     identification).
19     Q.  Ma'am, I am handing you what has
20 been marked as exhibit 27 which for the record
21 is a document titled Plaintiffs' Responses and
22 Objections to Warner Defendants' First Set of
23 Interrogatories.  And my first question:  Have
24 you ever seen exhibit 27 before?
25     A.  Yes.

Page 133

V. HOLMES

1
2     Q.  Okay.  And if you take a look
3 ma'am, I think at the next to last page there
4 is a verification, right?
5     A.  Yes.
6     Q.  And it says -- and this is signed
7 by you, correct?
8     A.  Yes.
9     Q.  All right.  And you say, I have
10 read the foregoing Plaintiffs' Responses and
11 Objections to Warner Defendants First Set of
12 Interrogatories and know the contents thereof
13 and you go on.  Correct?
14     A.  Yes.
15     Q.  So you understood that you were in
16 the verification verifying that the answers
17 and responses were true and correct, to the
18 best of your knowledge, information and
19 belief, right?
20     A.  Yes.
21     Q.  Okay.  And you understand that's
22 kind of like under oath, like we are today?
23     A.  Yes.
24     Q.  All right.  And did you read each
25 and every response to verify that it was true

Page 134

V. HOLMES

1
2  and correct, to the best of your knowledge,
3  information and belief?
4      A.  Yes.
5      Q.  All right.  And do you see that
6  here there are objections that were made as
7  well, right?  You could see on the very first
8  page, General Objections, and then there are
9  objections to the interrogatories themselves,
10  you could see it on the third page.  The very
11  first one is an example, Plaintiffs object,
12  and then it goes on?
13      A.  Yes.
14      Q.  Did you review the objections that
15  were being made to the interrogatories on your
16  behalf?
17      A.  Yes.
18      Q.  You did.  Okay.  In other words did
19  you approve -- strike that.  You verified it.
20  No problem.  I wanted to ask you about one of
21  them.  If you take a look on the very first
22  one, objection 5.  It says "Plaintiffs object
23  to these interrogatories, which seek
24  confidential and proprietary business
25  information."

Page 135

V. HOLMES

1
2      Right?
3      A.  Right.
4      Q.  Okay.  What business information
5  was asked from you in these interrogatories?
6      A.  I don't remember.
7      Q.  Was there any?
8      A.  I don't remember.
9      Q.  Do you have a business on your own
10  of some sort that we asked for documents from?
11  Like do you run a business?
12      A.  No.
13      Q.  Do you know if Ms. Staley runs a
14  business?
15      A.  I don't know.
16      Q.  Do you know if Ms. Ivey runs a
17  business?
18      A.  I don't know.
19      Q.  But as far as you are concerned,
20  was there any confidential and proprietary
21  business information that our interrogatories
22  asked you to divulge?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  I don't remember.
25      Q.  Anyway, do you stand by the

Page 136

V. HOLMES

1
2  objections that were made on your behalf in
3  the answer to interrogatories?
4      A.  From exhibit 27?
5      Q.  Yes.
6      A.  Yes.
7      Q.  Okay.
8      (Defendants' Exhibit 28, letter
9  dated February 24, 2023 from Brustein
10  law firm was marked for identification).
11      Q.  Ma'am, I am handing you what has
12  been marked as exhibit 28 which for the record
13  is a letter dated February 24, 2023 from
14  Brustein law firm to Ms. Lundy.  And I don't
15  want to hide the ball on you, ma'am.  If you
16  take a look at the next to last page I think
17  there's a verification from you?
18      A.  No, there isn't.  Oh, this is --
19      Q.  Next to last page, yes.
20      A.  Okay.
21      Q.  All right.  So first question:
22  Have you ever seen exhibit 28 before?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  I'm not sure.
25      Q.  Well, to be fair, ma'am, in the

Page 137

V. HOLMES

1
2  declaration --
3      A.  Wait a second.
4      Q.  Oh, sure.
5      A.  You're saying if I saw this portion
6  of it or this letter?
7      Q.  Well, the letter goes on for two
8  pages.
9      A.  Okay.  So I did see this portion of
10  it.
11      Q.  The portion on the second page of
12  the letter?
13      A.  Yes.
14      Q.  Okay.
15      A.  But I didn't, you know, ...
16      Q.  You didn't see the first page of
17  the letter?
18      A.  No.
19      Q.  All right.  Did you verify that the
20  information, at least as it relates to you,
21  was true and correct?
22      ATTORNEY BRUSTEIN:  Objection.
23      A.  Yes.
24      Q.  All right.  So if we look at the
25  second page, there's a B, and it says:

Page 138

V. HOLMES

1  Plaintiff Vivian Holmes's estimated damages
2  are as follows. And then there's a romanette
3  (i), (ii) and (iii), correct?
4      A. Yes.
5      Q. Okay. Is that a true and accurate
6  copy estimation, I know it's an estimated
7  amount, of the three categories of damages
8  that you seek in this lawsuit?
9      A. Yes.
10     Q. And you don't seek any other
11 categories of damages in this lawsuit other
12 than the three categories identified by
13 romanette (i), (ii) and (iii), is that
14 accurate?
15     ATTORNEY BRUSTEIN: Objection.
16     A. Yes.
17     ATTORNEY BOLAND: Does anyone want
18 to take five minutes? Because I'm
19 switching gears. It's up to you guys.
20     ATTORNEY BRUSTEIN: I'm fine.
21     ATTORNEY BOLAND: Okay. It's no
22 problem. We can keep plowing along. I
23 just want to make sure everybody was on
24 the same page.
25

Page 139

V. HOLMES

1      ATTORNEY BRUSTEIN: When you say
2  switching gears, we're going to be
3  taking a break in about half an hour.
4      Q. Ms. Holmes, tell me your
5  understanding of the nature of your dispute
6  with the defendants in this lawsuit?
7      A. Ask me again?
8      Q. Yes, sure. Please tell me what is
9  your dispute with the defendants in this
10 lawsuit?
11     ATTORNEY BRUSTEIN: Objection.
12     A. My dispute is that it seems that
13 the furlough has been indefinite so it leads
14 me to believe that we're in a permanent
15 layoff. I believe that my WARN Act was
16 violated. I believe the company did not act
17 in good faith. And if the company looked at
18 my records, I have been a model employee. I
19 have done above and beyond what was expected
20 of me. And I don't feel that I should be
21 treated the way I have been. I feel it was
22 very dishonest. I went in as a young woman,
23 I'm now middle-aged, and I was always a team
24 player. And I was instructed that, you know,
25

Page 140

V. HOLMES

1  I worked for a company that we're all a
2  family, and our main goal is to take care of
3  the guests and the golden rule, you know, do
4  to others as you would like them done to
5  yourself, and all of that has gone to the
6  garbage.
7      I loved the company. Which, you
8  know, it's evident, because I was there for so
9  long. And I was really looking forward to
10 going back. I thought that that's what would
11 happen. That's what was said. It's three
12 years now.
13     Q. If the hotel -- I didn't mean to
14 interrupt you. I apologize.
15     A. And the company first stated it
16 wasn't opening because of COVID. I believed
17 that. Then other hotels started opening,
18 competitors were opening. Four Seasons did
19 not. And they switched from it being due to
20 COVID to it being for renovations.
21     We have done renovations while
22 we've been working. I was a witness to that.
23 These are my disputes. I want -- I wanted to
24 work. I wanted to go back.
25

Page 141

V. HOLMES

1      Q. Are you done? I didn't want to
2  interrupt you.
3      A. Yes.
4      Q. If the hotel were to open in the
5  next couple of weeks or couple of months would
6  you want to go back to work there or not?
7      ATTORNEY BRUSTEIN: Objection.
8      A. Yes.
9      Q. So let's assume, just for the sake
10 of argument, ma'am, that renovations get
11 concluded and the hotel raps up to staff up
12 say within, it could be six months, eight
13 months, I don't know, I'm not suggesting a
14 time period. If the opportunity to be
15 recalled arises, is that something you want to
16 be offered to you?
17     ATTORNEY BRUSTEIN: Objection.
18     A. Yes.
19     Q. Okay. Do you know whether that
20 would be the case for, you know, every other
21 employee who like you, is on furlough?
22     ATTORNEY BRUSTEIN: Objection.
23     A. I can't answer that question for
24 anyone else.
25

Page 142

V. HOLMES

1
2     Q.   Okay.  But you would like to be
3  called back if and when the hotel reopens?
4         ATTORNEY BRUSTEIN:  Objection.
5     A.   Yes.
6     Q.   So the beginning, and tell me if
7  I'm wrong, of the story that leads up to the
8  dispute happens back when COVID struck in
9  early 2020?
10        ATTORNEY BRUSTEIN:  Objection.
11    A.   Could you repeat that?
12    Q.   Yeah, sure.  You are complaining, I
13 think, and tell me if I'm wrong, about
14 events that have unfolded since COVID pandemic
15 struck in early 2020?
16    A.   I'm not complaining about events
17 that happened during COVID.
18    Q.   Okay.  All right.  So what events
19 are you -- are the focus of your complaint?
20    A.   My focus is that other hotels have
21 opened and the Four Seasons used COVID as an
22 excuse.
23    Q.   During the COVID -- okay.  I want
24 to get a date on it, if I could.  COVID
25 started in about March of 2020; fair?

Page 143

V. HOLMES

1
2         ATTORNEY BRUSTEIN:  Objection.
3     A.   Fair.
4     Q.   Okay.  Taking that as the starting
5  point, when is it that you think the Four
6  Seasons started to do something, or the
7  defendants -- sorry -- the defendants started
8  to do something wrong that you are complaining
9  about?
10        ATTORNEY BRUSTEIN:  Objection.
11    A.   Roughly about a year after.
12    Q.   Okay.  All right.  I want to take a
13 look at some things.  Let's look at something
14 first.
15        (Defendants' Exhibit 29, Staley
16 v FSR 0001 through 89 was marked for
17 identification).
18    Q.   Ma'am, I am handing you what has
19 been marked as exhibit 29 which for the record
20 is a collection of documents Bates-numbered
21 Staley v FSR 0001 through 89.
22        And I want you to leaf through
23 this, ma'am, and tell me if you recognize
24 these documents -- they were represented to us
25 as coming from you.  I'm just going to tell

Page 144

V. HOLMES

1
2  you that.
3         ATTORNEY BRUSTEIN:  Objection.
4     Q.   I don't know if that's true or not.
5         ATTORNEY BRUSTEIN:  Objection.  I
6  don't know who made that representation.
7  But --
8         ATTORNEY BOLAND:  I think there
9  were Post-Its on them when they were
10 turned over to us in our copy.
11        (The witness reviews document.)
12        ATTORNEY BRUSTEIN:  To the extent
13 that there were attorney notes on
14 documents that you received, we would
15 ask for them to be clawed back and
16 turned back over.  We're not aware of
17 any Post-It notes.  And I'm assuming the
18 electronic copy that was provided to you
19 did not include any Post-It notes.
20        ATTORNEY BOLAND:  The electronic
21 copy did not.  I am going by the thing
22 that you're actually telling us, which
23 plaintiff produced which documents.
24        ATTORNEY BRUSTEIN:  And I am just
25 asking to claw them back.

Page 145

V. HOLMES

1
2         ATTORNEY BOLAND:  Okay.  We'll
3  consider your request.
4         (The witness reviews document.)
5     A.   A lot of these documents I really
6  can't see.  I recognize some.  And I'm not
7  sure that I turned in all of these.
8     Q.   Okay.  I am going to show you -- I
9  didn't mean to interrupt you.  I apologize.
10 Please finish.
11    A.   That's okay.
12    Q.   I am going to show you some
13 documents from time to time and then you could
14 tell me if it's a document that you don't
15 have, or we'll ask you if it's a document that
16 you have and you turned over.  Okay?
17    A.   Sure.
18    Q.   All right.
19        ATTORNEY BRUSTEIN:  Objection.
20    Q.   I think you mentioned, ma'am, that
21 you believe you were a valued employee?
22    A.   Yes.
23    Q.   And the Four Seasons had
24 actually -- the defendants, the hotel, had
25 actually told you that, right?

Page 146

V. HOLMES

1
2  A.  Yes, they had.
3      ATTORNEY BOLAND:  What's my next
4  one?  30?
5      THE COURT REPORTER:  30, yes.
6      ATTORNEY BRUSTEIN:  Are we done
7  with this?
8      ATTORNEY BOLAND:  You can put it to
9  the side.  If you can't identify those
10  as the docs you turned over.
11      (Defendants' Exhibit 30, letter,
12  Staley v FSR 0281 was marked for
13  identification).
14      Q.  I am handing you, ma'am, what has
15  been marked as exhibit 30, which for the
16  record is a document bearing the Bates number
17  Staley v FSR 0281.
18      And do you recognize exhibit 30,
19  ma'am?
20      A.  Yes.
21      Q.  Is this one of the documents you
22  turned over in the case?
23      A.  Yes.
24      Q.  All right.  And this was a
25  laudatory note about your performance back in

Page 147

V. HOLMES

1
2  2016, right?
3      A.  That is correct.
4      Q.  Okay.  Help me out a little bit.
5  You were hired I think in 1998, did you say
6  that earlier, at the Four Seasons?
7      A.  That's when I was hired.
8      Q.  What were your jobs over time?
9      A.  What were my positions during the
10  time --
11      Q.  Yeah.
12      A.  Okay.  I started as a housekeeper
13  administrative assistant.  Then I became a
14  floor supervisor.  And then I became a rooms
15  division administrative assistant.
16      Q.  Can you give me some approximate
17  dates on those changes?  So in 1998
18  housekeeping, right?
19      A.  Mm-hmm.
20      Q.  Okay.
21      A.  Roughly I became a floor supervisor
22  in two thousand and -- maybe 2000.  2001.
23      Q.  Okay.  We're not going to hold you
24  to it.
25      A.  Okay.  And then I became a rooms

Page 148

V. HOLMES

1
2  division, maybe about 2004.
3      Q.  Okay.  So we're looking at exhibit
4  30.  And that was the job that you had when
5  you went on furlough?
6      A.  Yes.
7      Q.  All right.  And so this letter that
8  we have here was from that time period when
9  you were in the position that you held at the
10  time of being furloughed?
11      A.  Yes.
12      Q.  Okay.  And is this what you were
13  talking about earlier when you say you believe
14  that you were a valued employee?  This type of
15  an example?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  Not just this.
18      Q.  Not just that.  I'm not trying to
19  suggest it's only that.  Is this an example?
20      A.  It's an example.
21      Q.  Okay.
22      (Defendants' Exhibit 31, Staley
23  v FSR 045 was marked for
24  identification).
25      Q.  So if that is a document that you

Page 149

V. HOLMES

1
2  believe you turned over, ma'am, where did you
3  find that in your possession?
4      A.  In my folder.
5      Q.  In the folder, okay.  I am handing
6  you now what has been marked as exhibit 31
7  which for the record has two documents
8  together.  The top page you cannot read it, is
9  Staley v FSR 045.  And the bottom one I do
10  not -- it has something that I cannot read the
11  Bates number on because it's on something
12  else.  I will represent to you, ma'am, that
13  these lawyers turned this over twice.  Once it
14  wasn't easy to read.  The second one I think
15  is easier to read.
16      A.  Okay.
17      Q.  And what is -- what do we have here
18  in the two documents that comprise exhibit 31?
19      A.  This is one of many cards that I
20  received from my director, showing
21  appreciation of my work.
22      Q.  Okay.  You had told me a little bit
23  earlier, and I don't mean to misquote you,
24  that you felt you weren't treated right at
25  least at the time period about a year after

Page 150

V. HOLMES

1
2 COVID struck and then moving forward.
3     Is that accurate or inaccurate?
4     ATTORNEY BRUSTEIN: Objection.
5     A. Yes, it's accurate.
6     Q. Were you treated any differently
7 than any other of the non-union employees at
8 the hotel that were also placed on furlough?
9     A. Yes.
10     Q. Who were you treated differently
11 than?
12     A. I was treated differently from
13 other non-union employees that are getting
14 $500 per week from ownership and I was
15 excluded. When I asked why was I excluded I
16 was told, by Elizabeth Ortiz, that ownership
17 excluded positions as myself.
18     Q. Okay. Any other --
19     A. Which I'm non-union hourly. I'm
20 not management.
21     Q. Understood. Any other way in which
22 you were treated differently than the other
23 non-union employees who were put on furlough?
24     A. Yes.
25     Q. Okay. Tell me what that is?

Page 151

V. HOLMES

1
2     A. Other employees were offered task
3 force or were offered to be relocated.
4     Q. And you weren't offered either of
5 those?
6     A. No.
7     Q. Okay. Any other ways that you were
8 treated differently than other non-union
9 employees who were also furloughed?
10     A. That's about all I can remember.
11     Q. Had you been given the $500 per
12 week and given the chance to go on a task
13 force or relocated, would you have any
14 complaints with the Four Seasons or the
15 defendants in this case today?
16     ATTORNEY BRUSTEIN: Objection.
17     A. Probably not.
18     ATTORNEY BRUSTEIN: Can we take a
19 five-minute break?
20     ATTORNEY BOLAND: Yes.
21     ATTORNEY BRUSTEIN: Thanks.
22     ---
23     (Recess from 12:40 to 12:57.)
24     ---
25     ATTORNEY BRUSTEIN: Before we

Page 152

V. HOLMES

1
2 continue I think Ms. Holmes just wanted
3 to expand or correct her prior answer.
4     ATTORNEY BOLAND: We'll go on the
5 record?
6     THE COURT REPORTER: Yes.
7     Q. Ma'am, do you have something you
8 want to change from your prior answer?
9     A. Yes. As far as me being paid the
10 $500 a week and task force and possibly
11 relocation or the option to or being offered,
12 the case is not about that. The case is about
13 the WARN Act. My rights were violated. I
14 didn't get proper notice for the WARN Act. I
15 didn't -- I wasn't offered severance pay. So
16 it's about, you know, no-fault separation pay.
17 That's what I was -- I was violated from that.
18     Q. Okay. So number 1, and I don't
19 want to know the substance, you had a
20 conversation with your lawyer on the break,
21 did you not? Just yes or no.
22     A. Yes.
23     Q. And after that conversation you
24 came back and gave me that changed answer,
25 correct?

Page 153

V. HOLMES

1
2     A. No.
3     Q. You didn't come -- it didn't follow
4 the break that we just took?
5     A. Not quite. He asked me --
6     ATTORNEY BRUSTEIN: Objection,
7 no --
8     ATTORNEY BOLAND: Even I'm with you
9 on that one.
10     THE WITNESS: Sorry.
11     ATTORNEY BRUSTEIN: He's asking if
12 after the break you are now answering a
13 question. He's not talking about --
14     A. I am answering a break -- I am
15 answering a question after the break, yes.
16     Q. Fair. You're not telling me that
17 anything you said before was untrue?
18     A. Absolutely not.
19     Q. Okay. When did you first learn
20 about the coronavirus, the COVID pandemic?
21 Not the pandemic. The COVID outbreak. That
22 COVID had been discovered. When did you first
23 learn that?
24     A. In about February or March.
25     Q. February or March? Okay. At some

Page 154

V. HOLMES

1    point the hotel -- well, strike that.
2         The hotel stayed open initially
3    when COVID was first discovered, did it not?
4    A.  For about two weeks.
5    Q.  Yes.  When I say open, I mean open
6    to public, the public, right?
7    A.  Yes.
8    Q.  Okay.  And then after that for a
9    while the hotel was no longer taking the
10   public in as guests, correct?
11   A.  Correct.
12   Q.  Okay.  But the hotel remained open
13   in terms of workers and people going to work
14   in some fashion, correct?
15        ATTORNEY BRUSTEIN:  Objection.
16   A.  Yes, but at what -- what is your
17   time frame?  What are you ...
18   Q.  Right about the time that COVID --
19   strike that.  There was a time period at which
20   the hotel stopped taking guests in from the
21   public, right?
22   A.  Correct.
23   Q.  Okay.  But at that same time
24   period, the time I'm referencing, the hotel
25

Page 155

V. HOLMES

1    itself as a business with employees still
2    remained open, right?
3         ATTORNEY BRUSTEIN:  Objection.
4    A.  Yes, for a few weeks.
5    Q.  Well, in fact you went in and you
6    were a worker that worked after the hotel
7    itself was no longer taking guests?
8    A.  Yes.
9    Q.  Okay.  That's all I was getting at.
10        (Defendants' Exhibit 32, Staley
11   v FSR 0028 was marked for
12   identification.)
13   Q.  I am handing you, ma'am, what has
14   been marked as exhibit 32, which for the
15   record is a document bearing the Bates number
16   Staley v FSR 0028.  Do you recognize exhibit
17   32, ma'am?
18   A.  Yes, I do.
19   Q.  And is this one of the documents
20   that you found in your files to produce in
21   this case?
22   A.  Yes.
23   Q.  And you recall that at a point in
24   time workers had to be deemed seasonal to be
25

Page 156

V. HOLMES

1    allowed to go out and about and go to work,
2    right?
3    A.  Yes.
4    Q.  And you were one of those folks who
5    worked at the hotel who was deemed essential
6    at that point in time, correct?
7    A.  Yes.
8    Q.  And there were others, were there
9    not, that were deemed essential and went into
10   work at that point in time, correct?
11   A.  Correct.
12   Q.  All right.  How many?
13   A.  I am not sure.
14   Q.  Do you have any idea?
15   A.  No, I don't.
16   Q.  Who were they?
17        ATTORNEY BRUSTEIN:  Objection.
18   A.  I don't remember.
19   Q.  Do you have any names?
20   A.  Maybe one.  What was her name?
21   Rasha, and I don't remember her last name.
22   Q.  What did Rasha do?
23   A.  She was the assistant director.
24   Q.  If you have in your file, there was
25

Page 157

V. HOLMES

1    exhibit 18, ma'am.  It was a declaration that
2    you had signed.  It's a Declaration of Vivian
3    Holmes, Document 55.  If you have them in
4    order it would have been exhibit 18.  It's a
5    one pager.
6    A.  Yes.
7    Q.  And you'll see, ma'am, in your
8    declaration --
9    A.  Mm-hmm.
10   Q.  -- in paragraph 2 -- you have to
11   say yes or no?
12   A.  Yes.
13   Q.  If you are going to say it out
14   loud.
15   A.  I got you.
16   Q.  You say:  Beginning in March of
17   2020, I went from working 40 hours per week at
18   the Four Seasons Hotel New York to working
19   less than 17 hours per week there, correct?
20   A.  Correct.
21   Q.  And then you say "I have not worked
22   more than 17 hours per week at the Four
23   Seasons Hotel New York since my hours were
24   reduced in March of 2020, correct?
25

Page 158

V. HOLMES

1
2    A.  Correct.
3    Q.  And when you say March of 2020, is
4  that when you became an essential employee who
5  went in while others, you know, did not?  Is
6  that the time period when your hours were cut
7  down?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  My hours were cut in March 2020,
10  yes.
11    Q.  Yes, they were cut down and you
12  were still at work -- you still were working
13  for a bit of time because you were deemed
14  essential?
15    A.  One second?
16    Q.  Sure.
17    A.  This one was given to me just to go
18  in for one day.
19    Q.  Okay.
20    A.  That's it.
21    Q.  Okay.  Go ahead?
22    A.  Because they needed for me to wrap
23  up everything that needed to -- to put the
24  payroll in position.
25    Q.  Okay.  And so you didn't have to go

Page 159

V. HOLMES

1
2  into the hotel to do that?
3    A.  I went in.  That's why I got the
4  letter.  There was one day.  I believe it was
5  a Thursday, March 26 of 2020.
6    Q.  Okay.
7    A.  It was one day that they gave me
8  this.
9        ATTORNEY BRUSTEIN:  Just to clarify
10    for the record, she's referencing
11    exhibit 32.  Just because you had been
12    asking about an earlier exhibit.
13        ATTORNEY BOLAND:  Yeah, sure.
14    Exhibit 32.  Thank you.
15    Q.  So the designation as an essential
16  employee was just to allow you to go into the
17  hotel for one day?
18    A.  Right.  Because you couldn't come
19  into the city unless you had -- right.
20    Q.  I think I asked you this before but
21  I want to make sure now I have it correct,
22  because you were only in for one day.
23        To your knowledge, were there other
24  individuals that were back at the hotel
25  working because they, too, had been designated

Page 160

V. HOLMES

1
2  as essential?
3        ATTORNEY BRUSTEIN:  Objection.
4    Q.  In other words on premises?
5        ATTORNEY BRUSTEIN:  Objection.
6    A.  Was there other employees that was
7  working inside the building during this time?
8    Q.  Yes.
9    A.  Yes.
10    Q.  Okay.  And you were only in one for
11  day.  So is your experience of seeing other
12  people on premises after March 20 of 2020, is
13  that experience solely because from that one
14  day or were you back in the hotel at any time
15  after that?
16    A.  You want to know was I aware that
17  there were other people in the building?
18    Q.  I want to know if your experience
19  of knowing how many people were in the
20  building or having seen them is based on that
21  one day or were you there any other days after
22  that?
23    A.  I don't know --
24        ATTORNEY BRUSTEIN:  Objection.
25    Q.  You can answer.

Page 161

V. HOLMES

1
2    A.  I don't know how many people were
3  in the hotel, I said that to you.
4    Q.  No, I understand that, ma'am.  I
5  want to know just if your observation, your
6  personal observation is based on the one day
7  that you went in or whether you have
8  stopped back into the hotel at any days after
9  that?
10    A.  My observation is because I was
11  doing payroll for employees in the hotel from
12  home one day per week.
13    Q.  I see.  So you were doing payroll
14  of employees from home, so you understood that
15  there were employees still working?
16    A.  Yes.
17    Q.  Okay.  Do you know whether they
18  were working at the hotel or some people were
19  working remotely or a combination?
20    A.  A combination.
21    Q.  How many people continued to work?
22    A.  I'm not sure.
23    Q.  How many hours did those
24  individuals continue to work per week?
25    A.  From the people I was paying?  I

Page 162

V. HOLMES

1  can only answer that.
2  Q.  Okay.
3  A.  About three days a week.
4  Q.  And when you say the people you
5  were paying, what do you mean by that?
6  A.  Employees that were in my
7  department, that I'm responsible to pay their
8  wages.
9  Q.  I see.  So your responsibilities
10  with respect to payroll does not extend to
11  everyone employed by the hotel, but just the
12  folks within your area, is that fair?
13  A.  You're asking me if I only paid the
14  people in my department?
15  Q.  Yes.
16  A.  Yes.
17  Q.  Okay.  Outside of your department
18  how many, if you know, people continued to
19  work at the hotel after March of 2020?  March
20  21, 2020?
21  A.  (No response.)
22  Q.  By working at the hotel I mean
23  either on premises or remotely.
24  A.  I know a few.

Page 163

V. HOLMES

1  Q.  You know a few who did?
2  A.  Mm-hmm.
3  Q.  Who do you know who did?
4  A.  Sharon Brambrut.  Elizabeth Ortiz.
5  Rasha.
6  Q.  Okay.
7  A.  That's all I could remember for
8  now.
9  Q.  Okay.  Those are people you know.
10  Do you have any understanding of beyond these
11  how many folks employed by the hotel, and
12  let's say with non-union folks, employed by
13  the hotel continued to work either on site or
14  remotely or a combination after March 20,
15  2020?
16  A.  Marie Kirkland.  A guy named Brian
17  but I don't know his last name.  I don't
18  remember the rest.
19  Q.  Okay.  Beyond the people you
20  remember, do you have any idea of whether
21  there are folks that you weren't aware of,
22  you're not personally aware of who nonetheless
23  continued to work at the hotel either remotely
24  or on site after March 20 of 2020?

Page 164

V. HOLMES

1  ATTORNEY BRUSTEIN:  Objection.
2  A.  I'm not sure.  I don't remember.
3  Q.  You don't know?
4  ATTORNEY BRUSTEIN:  Objection.
5  Q.  With respect to any of the folks
6  that you mentioned here, do you know how many
7  hours did they continue to work per week?
8  A.  I'm not sure.
9  Q.  When you say you're not sure do you
10  have an idea or do you just not know?
11  A.  I'm assuming three to four days.
12  Q.  But you don't know?
13  A.  But I don't know.
14  Q.  Is it accurate, ma'am, that there
15  was a general, in your impression, uncertainty
16  about how long COVID would last when it first
17  broke out, and the hotel shut down to external
18  operations in March of 2020?
19  ATTORNEY BRUSTEIN:  Objection.
20  A.  Could you repeat that, please?
21  Q.  Yeah.  Did you have uncertainty in
22  your mind about how long COVID would last, how
23  long the threat would last around the time the
24  hotel stopped taking in guests from the public

Page 165

V. HOLMES

1  in March of 2020?
2  ATTORNEY BRUSTEIN:  Objection.
3  A.  No, I didn't know.
4  Q.  You didn't know?
5  A.  No.
6  Q.  So you had no idea whether it would
7  be a week, two weeks, three months or
8  whatever?
9  A.  Well, we were first led to believe
10  that we were just going to be home for two
11  weeks.  That's what our letter said.
12  Q.  And I'm not suggesting about what
13  the Four Seasons or the folks at the Four
14  Seasons were saying.  I just want to know
15  whether you personally, in your personal
16  experience?
17  A.  Personally I didn't know.  I don't
18  know.
19  Q.  You had no idea?
20  A.  I had no idea.
21  Q.  Were you hopeful that it would end
22  quickly?
23  ATTORNEY BRUSTEIN:  Objection.
24  A.  Of course.

V. HOLMES

1
2    Q.  Okay.  Over time did the hope that
3  it would end quickly fade?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  Yes.  Somewhat.
6    Q.  Okay.  Initially what was your, if
7  you have one, what was your personal
8  expectation as to how long COVID would be
9  shutting down operations like the hotel?
10       ATTORNEY BRUSTEIN:  Objection.
11   A.  I don't know.  I didn't know.
12   Q.  No, I know you didn't know.  Did
13  you have any expectation?  Any belief?
14   A.  No.
15   Q.  It was all still uncertain?
16       ATTORNEY BRUSTEIN:  Objection.
17   A.  Yes.
18       (Defendants' Exhibit 33, Staley
19     v FSR 0204 to 0207 was marked for
20     identification).
21   Q.  Ms. Holmes, I am handing you what
22  has been marked as exhibit 33, which for the
23  record is a document bearing the Bates number
24  Staley v FSR 0204 to 0207.  First question,
25  ma'am, is have you ever seen exhibit 33

V. HOLMES

1
2  before?
3    A.  Yes.
4    Q.  Okay.  And I will represent to you
5  that in the section of documents that I
6  thought was produced by you, and I may be
7  wrong, this was not contained in there.
8        Is this a document that you found
9  in your files and turned over to be produced
10  in this case?
11       ATTORNEY BRUSTEIN:  Objection.  Do
12     not answer.
13   Q.  Is this a document that you found
14  in your files?
15       (The witness reviews document.)
16   Q.  Is this a document you found in
17  your files?
18   A.  I don't remember.
19   Q.  You don't remember?
20   A.  (Coughing).
21   Q.  Strike that.  You told me.  You
22  have seen this before, right?
23   A.  I don't remember now.  I remember
24  seeing a portion of it but now some of it is
25  kind of vague.  I don't remember.

V. HOLMES

1
2    Q.  Did you --
3    A.  But I definitely remember this
4  second form.
5    Q.  Oh, okay.
6    A.  Because I used it in order to file
7  for unemployment.
8    Q.  Okay.  So fair enough.  The
9  hotel -- the Four Seasons had provided you
10  with some instructions to help you get into
11  unemployment benefits after COVID hit, right?
12   A.  Right.
13   Q.  Okay.  If you look at the very
14  first page, ma'am, you'll see this is dated
15  April 9, 2020, right?
16   A.  Yes.
17   Q.  And I want to know, I am going to
18  ask you some things here and I want to know if
19  it's consistent with your recollection and
20  your understanding of the facts at the time.
21  Okay?
22   A.  Mm-hmm.
23   Q.  So it says on Hotel Operations, it
24  says on March 20, 2020 and it goes on, and it
25  says made the decision to temporarily suspend

V. HOLMES

1
2  most of the hotel operations.  Is that
3  consistent with your understanding and
4  recollection, ma'am?
5    A.  Yes.
6    Q.  And it says at that time we had
7  communicated our hope was to return to a full
8  hotel operation on April 15, 2020.  Is that
9  right?
10   A.  Yes.
11   Q.  Okay.  Is that consistent with your
12  recollection at the time as well?
13       ATTORNEY BRUSTEIN:  Objection.
14   A.  Yes.
15   Q.  Okay.  Then it talks about shortly
16  thereafter our owner Ty Warner responded to
17  the governor's call to action and it goes on.
18  Feel free to read to that to yourself, ma'am.
19  I don't want to waste the pages, but go ahead
20  and read it.
21       ATTORNEY BRUSTEIN:  Where are you
22     asking her to read?
23       ATTORNEY BOLAND:  "Shortly
24     thereafter, our owner, Ty Warner," that
25     paragraph.

Page 170

1          V. HOLMES
2          (The witness reviews document.)
3      A.  Okay.
4          ATTORNEY BRUSTEIN:  You want her to
5      read just that paragraph, "our owner Ty
6      Warner"?
7          ATTORNEY BOLAND:  Yes.
8      A.  Okay, I read it.
9      Q.  Okay.  And is it accurate and
10     consistent with your recollection that at some
11     point in time the hotel started to take in, I
12     don't want to call them first responders, but
13     basically medical staff and whatnot and house
14     them, the people who were working on the front
15     lines of the pandemic, right?
16     A.  I do remember that.
17     Q.  Okay.  In terms of the group of
18     folks for whom you do the payroll, did the
19     number of people working on site at the hotel,
20     let's start with on site, increase as a result
21     of them?
22         ATTORNEY BRUSTEIN:  Objection.
23     A.  I don't remember.
24     Q.  How many people, in terms of the
25     folks you were doing the payroll for, were

Page 171

1          V. HOLMES
2      back working in the hotel during the time
3      period that it was open for the medical staff
4      to stay?
5          ATTORNEY BRUSTEIN:  Objection.  Are
6      you referring to union, non-union or
7      everyone?
8          ATTORNEY BOLAND:  People she's
9      responsible for.
10     A.  I don't remember.
11     Q.  Of the people you were responsible
12     for, how many hours per week were they working
13     during the time period that the hotel was
14     housing the medical staff working on the front
15     lines of the pandemic?
16         ATTORNEY BRUSTEIN:  Objection.
17     A.  Estimated, about twenty-four hours.
18     Q.  That's estimated?
19     A.  No, twenty-one.  About twenty-one
20     hours.
21     Q.  And you don't know how many people
22     that was?
23     A.  I don't remember.
24     Q.  All right.  When you say estimated
25     about twenty-one, were some more, some less?

Page 172

1          V. HOLMES
2      Was everybody at the same amount?
3      A.  Some less, and maybe some more.
4      Q.  And did the composition of people
5      change over the time period that the hotel was
6      housing the medical staff?  In other words was
7      it the same people who started when they
8      opened up, and ended when they stopped housing
9      the staff or did the composition of the
10     individuals involved change?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember but I believe
13     there were some changes.  But they were due to
14     some employees making the changes.  Because
15     they didn't want to -- they were scared
16     because of COVID.  And then someone else
17     replaced them.
18     Q.  In terms of the folks that you were
19     not responsible for payroll, there were other
20     operational areas within the hotel that you
21     didn't have responsibility for doing the
22     payroll, correct?
23     A.  Correct.
24     Q.  Were there also individuals from
25     those areas back working in the hotel during

Page 173

1          V. HOLMES
2      the time period that it was housing the
3      medical teams?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  I'm not sure.
6      Q.  You don't know one way or the
7      other?
8      A.  I'm not sure.
9      Q.  Looking down to the next paragraph,
10     it says:  Since then, the COVID-19 pandemic
11     has continued to impact our business and the
12     hospitality industry."
13         Is that consistent with your
14     recollection of the state of play at the time
15     of this memo on April 9 of 2020?
16         ATTORNEY BRUSTEIN:  Objection.
17     A.  Yes.
18     Q.  Okay.  And I think you mentioned to
19     me earlier, and I'm not trying to misquote you
20     in any way, that there were varying dates
21     after March of 2020 when the hotel was at
22     least targeted to hopefully reopen, is that
23     accurate?
24         ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't understand the question.

V. HOLMES

1
2    Q.  Fair enough.  You mentioned, and I
3  don't want to misquote you, so tell me if I
4  am, that initially right when the hotel ceased
5  operations to the outside, at least, there was
6  a hope that it was going to open in about two
7  weeks?
8       ATTORNEY BRUSTEIN:  Objection.
9    A.  Yes.  I remember.
10    Q.  And that obviously didn't happen,
11  right?
12    A.  Correct.
13    Q.  And then there were, am I correct
14  ma'am, updates that were provided in the form
15  of memos very similar to what we see here as
16  exhibit 33 on a periodic basis going forward?
17       ATTORNEY BRUSTEIN:  Objection.
18    A.  I don't remember.
19    Q.  You don't remember whether you
20  received like Four Seasons type memos in that
21  time period with periodic updates about the
22  status of things in terms of reopening, that
23  kind of stuff?
24    A.  Yes, I had some.  But they weren't
25  like, you know, periodic, continuously like

V. HOLMES

1
2  you're saying.
3    Q.  Okay.  A number of them followed
4  the March 20 closing, right?
5    A.  Yes.
6    Q.  Okay.  And in that time period, in
7  those communications there were, were there
8  not, targeted dates for the hotel to reopen
9  that kept getting extended?
10       ATTORNEY BRUSTEIN:  Objection.
11    A.  I don't remember the dates.  But
12  they did --
13    Q.  You don't remember the dates but
14  the fact that there were dates in there that
15  kept getting extended from communication to
16  communication, did that happen?
17       ATTORNEY BRUSTEIN:  Objection.
18    A.  Extensions happened.
19    Q.  Okay.  And they were reported,
20  correct?
21       ATTORNEY BRUSTEIN:  Objection.
22    A.  Some.
23    Q.  All right.  Well let's look at the
24  one we have here.  I just want to ask you
25  about the sentence in that paragraph we were

V. HOLMES

1
2  just looking at.  It says For these reasons --
3  I'll start here.  "For these reasons it is
4  necessary to extend the suspension of regular
5  hotel operations until April 30, 2020."
6       Right?
7    A.  Yes.
8    Q.  Okay.  And is that --
9    A.  (Coughing).
10    Q.  Are you okay?
11    A.  Mm-hmm.
12    Q.  Is that an example of a report of
13  an extension of when the hotel had previously
14  anticipated it would reopen?
15    A.  Yes.
16       ATTORNEY BRUSTEIN:  Objection.
17    Q.  All right.  Oh, let me ask you
18  another question, ma'am, just out of
19  curiosity.
20       ATTORNEY BRUSTEIN:  On this
21    exhibit?
22       ATTORNEY BOLAND:  Yes, on this
23    exhibit.
24    Q.  If you take a look, please, at the
25  last page.  And you'll see the last paragraph

V. HOLMES

1
2  before the salutation and then Ms. Ortiz's
3  name?
4    A.  Yes.
5    Q.  It says "These are unprecedented
6  times," exclamation point, correct?
7    A.  Yes.
8    Q.  Do you agree with that statement or
9  disagree with it?
10       ATTORNEY BRUSTEIN:  Objection.
11    It's a yes or no.
12    A.  What are you asking me?  If I see
13  it?
14    Q.  Yes.
15    A.  Yes, I see it.
16    Q.  Looking at this, as of April 2020,
17  do you agree or disagree with the statement
18  "these are unprecedented times"?
19       ATTORNEY BRUSTEIN:  Objection.
20    A.  I guess, yes.
21    Q.  You agree with it?
22       ATTORNEY BRUSTEIN:  Objection.
23    A.  Yes.
24       (Defendants' Exhibit 34, Staley
25    v FSR 0054 was marked for

Page 178

V. HOLMES

1    identification).
2        Q.  Ma'am, I am handing you what has
3    been marked as exhibit 34, which for the
4    record is a document bearing the Bates number
5    Staley v FSR 0054.  And have you ever seen
6    exhibit 34 before?
7        (The witness reviews document.)
8        A.  Yes.
9        Q.  Okay.  Is this one of the documents
10   that you gathered from your files to be
11   produced in the case?
12       A.  I don't remember.
13       Q.  Did you gather and produce, putting
14   aside this particular one, any of the, I'm
15   going to call them memos, with this Four
16   Seasons letterhead, to be produced in this
17   case?
18       ATTORNEY BRUSTEIN:  Objection.
19       A.  Did I produce some of these?
20       Q.  Yes.  Did you find any of these in
21   your file?  And I'm not holding you to any
22   specific one.  But I'm just talking about
23   these memos from Elizabeth Ortiz or from the
24   manager that are on this letterhead.  Were any
25

Page 179

V. HOLMES

1    of those in your file?
2        A.  Possibly.
3        Q.  You don't know one way or the
4    other?
5        ATTORNEY BRUSTEIN:  Objection.
6        A.  Possibly.
7        Q.  I know it's possible.  A lot of
8    things are possible.  Do you know one way or
9    the other whether you did or you didn't?
10       ATTORNEY BRUSTEIN:  Objection.
11       A.  Possibly.
12       Q.  Okay.  Did you receive these types
13   of -- I'm just talking generally -- these
14   types of notifications, memos in this format,
15   during the time period from after March 2020,
16   when the hotel ceased operations to the
17   public?
18       A.  Some, yes.
19       Q.  How did you get them?
20       A.  I believe via email.
21       Q.  And when you say email, what email
22   address were they sent on?
23       ATTORNEY BRUSTEIN:  Objection.
24       A.  I'm not sure.
25

Page 180

V. HOLMES

1        Q.  Okay.  Did you continue to receive
2    emails -- strike that.
3        Did you have a Four Seasons email
4    address?
5        A.  I did.
6        Q.  Did you receive materials via that
7    email address or emails via that email address
8    after March 20, 2020?
9        A.  I don't remember.
10       Q.  Do you still maintain, do you still
11   have access to your Four Seasons email
12   account?
13       ATTORNEY BRUSTEIN:  Objection.
14       A.  No, I don't.
15       Q.  Why not?
16       ATTORNEY BRUSTEIN:  Objection.
17       A.  I can't answer that.
18       Q.  Have you tried to access it?
19       A.  I tried maybe a year and change
20   ago.  I -- I haven't had it for a long time.
21       Q.  When you say you haven't had it,
22   I'm trying to understand what you mean.  What
23   kind of -- was it an exchange account?  An
24   Outlook account?  What kind of account was it?
25

Page 181

V. HOLMES

1        A.  Oh, I had an authentication code.
2        Q.  Okay?
3        A.  And that's how I was able to access
4    my emails.  And I don't know what happened.  I
5    just lost access to my emails.
6        Q.  Do you know --
7        A.  And to Workday, which is the
8    database that Four Seasons used.  I lost
9    access to that as well.
10       Q.  Did you ever contact anyone at Four
11   Seasons about gaining access to either Workday
12   or your email, after you lost access to it?
13       A.  One time I asked Elizabeth Ortiz.
14       Q.  And what did she tell you?
15       A.  She reset my Workday.
16       Q.  Okay.  And was that all you raised
17   with her was Workday?  Did you raise email?
18       A.  I don't remember.
19       Q.  And she reset it and gave you
20   access back to Workday?
21       A.  Yes.
22       Q.  All right.  And she reset your
23   authorization code, is that how she helped you
24   out?
25

V. HOLMES

1
2   A.  She reset my password.
3   Q.  Okay.  When was the last time you
4   tried to get into your work email?
5   A.  I don't remember.  But it's been a
6   long time.
7   Q.  And how about Workday, when was the
8   last time you tried to get into Workday?
9   A.  I believe last -- last year
10  sometime.  In the beginning of the summer,
11  maybe.
12  Q.  And you weren't able to get in, is
13  that accurate?
14  A.  I don't remember.
15  Q.  Do you know whether any of the
16  other non-union employees who are on furlough
17  currently use, have access to their Four
18  Seasons work emails?
19  A.  I'm not sure.
20  Q.  Have you asked anybody?
21  A.  I'm not sure.
22  Q.  Did you receive documents such as
23  exhibit 34 via mail?  U.S. mail?
24  A.  I'm not sure.
25  Q.  Okay.  Why don't we go through this

V. HOLMES

1
2   and then we can all break for lunch, how's
3   that?  All right.
4       If we take a look, this is April 30
5   of 2020, correct?
6   A.  Yes.
7   Q.  And you see it has a section under
8   Hotel Operations, right?
9   A.  Yes.
10  Q.  And I'm not trying to discount any
11  of the things, it talks again in the first
12  couple of sentences about the housing of
13  medical staff, right?
14  A.  Mm-hmm.  Yes.
15  Q.  Okay.  And it talks, they're going
16  to continue to provide that housing to the
17  medical community until May 31 of 2020,
18  correct?
19      ATTORNEY BRUSTEIN:  Objection.
20  A.  Yes.
21  Q.  Okay.  And that's consistent with
22  your understanding of what was happening at
23  the hotel at the time, correct?
24  A.  Yes.
25  Q.  By the way, you're not contending

V. HOLMES

1
2   in this lawsuit, are you, that the Four
3   Seasons did not house the medical staff after
4   COVID hit in March of 2020?
5       ATTORNEY BRUSTEIN:  Objection.
6   A.  You're asking me if I don't --
7   Q.  I am asking, is it your contention
8   that this is not true?  In other words that
9   there was no medical staff there and this was
10  all a lie?
11      ATTORNEY BRUSTEIN:  Objection.
12  A.  No, I'm not saying that.
13  Q.  Going down, it says additionally
14  the COVID-19 pandemic has continued to impact
15  our business and the hospitality industry.
16  Correct?
17      ATTORNEY BRUSTEIN:  Objection.  Are
18  you saying correct that it says that or
19  is it correct --
20  Q.  Is it correct that it says that?
21  A.  Yeah, it says that.
22  Q.  Okay.  And is that consistent with
23  your recollection and understanding of the
24  state of affairs at the time on April 30,
25  2020?

V. HOLMES

1
2       ATTORNEY BRUSTEIN:  Objection.
3   A.  Yes.
4   Q.  All right.  And then it says, "with
5   the social distancing guidelines and stay at
6   home orders still in place ..." And I want to
7   draw a pause there.
8       Do you remember the term social
9   distancing guidelines from the time period
10  early in the pandemic?
11  A.  Yes.
12  Q.  Okay.  What did you understand
13  those to be?
14      ATTORNEY BRUSTEIN:  Objection.
15  A.  I understood we had to be six feet
16  apart.
17  Q.  Six feet apart.  And that was
18  something that was generally put in place in
19  most areas, but certainly in New York,
20  correct?
21      ATTORNEY BRUSTEIN:  Objection.
22  A.  I believe so.
23  Q.  Okay.  And then there were stay at
24  home orders.  Do you recall there being stay
25  at home orders issued by the governor of

Page 186

V. HOLMES

1  New York?
2       ATTORNEY BRUSTEIN: Objection.
3       A.  I do remember that.
4       Q.  And the hotel is a hotel that is
5  open when it's open for travelers, as well as
6  people from the city who might want to stay
7  there, correct?
8       A.  Correct.
9       Q.  Do you know whether there were stay
10  at home orders that were issued in other
11  states as well?
12      ATTORNEY BRUSTEIN: Objection.
13      A.  I'm not sure.
14      Q.  You don't know?
15      A.  Mm-hmm.
16      Q.  Any reason to believe that there
17  weren't?
18      ATTORNEY BRUSTEIN: Objection.
19      A.  No reason to believe that.
20      Q.  And they say "it is necessary to
21  extend the suspension of regular hotel
22  operations until June 15, 2020."
23      Correct?
24      ATTORNEY BRUSTEIN: Objection.
25

Page 187

V. HOLMES

1       Again are you asking if it's true or
2  that it says it in the document?
3       ATTORNEY BOLAND: No, I am only
4  asking her if it says it in the
5  document.
6       A.  It says it in the document.
7       Q.  Okay.  Is that another example of
8  the anticipated perhaps potential reopening of
9  the hotel being extended again?
10      ATTORNEY BRUSTEIN: Objection.
11      A.  Yes.
12      ATTORNEY BOLAND: Okay.  Why don't
13  we take a lunch break.
14      (Lunch recess taken at 1:32 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 188

V. HOLMES

1    A F T E R N O O N   S E S S I O N
2       (2:29 p.m.)
3       _ _ _
4
5  V I V I A N   H O L M E S,
6       resumed as a witness, having been
7       previously sworn by a Notary Public,
8       was examined and testified further as
9       follows:
10  EXAMINATION BY
11  ATTORNEY BOLAND:
12      Q.  Ms. Holmes, you recognize you're
13  still under oath, right?
14      A.  Yes.
15      Q.  Okay.  I want to direct your
16  attention to exhibit, what's been marked as
17  exhibit 35.  Which for the record is a
18  document bearing the Bates number Staley v FSR
19  0086 to 87.
20      (Defendants' Exhibit 35, Staley
21  v FSR 0086 to 87 was marked for
22  identification.)
23      Q.  My first question is going to be,
24  and take a look at it, I'm not trying to stop

Page 189

V. HOLMES

1  you from doing that, if you have ever seen
2  exhibit 35 before?
3       (The witness reviews document.)
4       A.  I don't remember.
5       Q.  Do you recognize the form of the
6  document that is marked as exhibit 35?
7       A.  It looks like the similar form that
8  they would use to send emails.
9       Q.  When you say send emails, what do
10  you mean by that?
11      A.  These documents were sent via
12  emails.
13      Q.  Okay.  And these would be, for want
14  of a better term, what's happening type of
15  emails that would be sent on a periodic basis?
16      ATTORNEY BRUSTEIN: Objection.
17      A.  They were sent sometimes.
18      Q.  Okay.  And this is dated May 15,
19  2020, right?
20      A.  That's what it says here, yes.
21      Q.  Is this one of the documents that
22  you found in your files and produced in this
23  case?
24      ATTORNEY BRUSTEIN: Objection.
25

Page 190

V. HOLMES

1
2    A. I don't remember.
3    Q. Okay. I take it you don't remember
4 this specific document, but do you remember
5 documents of this type?
6    A. I remember documents of this type.
7    Q. Yeah, you don't remember this
8 specific one?
9    A. No, I don't remember.
10    Q. I want to direct your attention, if
11 we could, to a couple of things. There's a
12 section under, it says what's happening at
13 FSNY this week, question mark. And then it
14 says Leadership message from Frank Galasso,
15 director of engineering, right?
16    ATTORNEY BRUSTEIN: I'm sorry, what
17    did you just say?
18    Q. It says what is happening at FSNY
19 this week? And then it says Leadership
20 message from Frank Galasso, director of
21 engineering?
22    ATTORNEY BRUSTEIN: I thought you
23    said "meeting." That's why -- I thought
24    you said meeting instead of message.
25    Q. Yes. Do you see where I'm

Page 191

V. HOLMES

1
2 referring to, ma'am?
3    A. Yes, I see it.
4    Q. What would you call this? Would
5 you call this a newsletter? Would you call it
6 an update? What would you call it?
7    ATTORNEY BRUSTEIN: Objection.
8    A. I don't know what I would call it.
9 I would call it information.
10    Q. Okay.
11    A. I don't know what the hotel calls
12 it.
13    Q. Yeah, I was just wondering if you
14 had a term for it?
15    A. No, I don't have a term for it.
16    Q. All right. And in these documents
17 that will be provided from time to time would
18 there be typically an update message included,
19 like we have here, Dear Four Seasons family,
20 something similar to that?
21    ATTORNEY BRUSTEIN: Objection.
22    A. I don't know. Sometimes there
23 would. Sometimes there wouldn't.
24    Q. Okay. If you take a look down
25 there is a -- there are two sections. One is

Page 192

V. HOLMES

1
2 May 15-21 anniversaries. Do you see that?
3    A. Yes.
4    Q. And then there's May 15-21
5 birthdays, right?
6    A. Yes.
7    Q. Okay. Would it be your
8 understanding that the individuals identified
9 were all current employees?
10    ATTORNEY BRUSTEIN: Objection.
11    A. I don't know that.
12    Q. Did they report the anniversaries,
13 the service anniversaries of people who had
14 quit?
15    ATTORNEY BRUSTEIN: Objection.
16    A. I don't know that.
17    Q. Did they -- you don't know whether
18 service anniversaries --
19    A. They're producing this document.
20 I'm not producing this document.
21    Q. I am asking your understanding,
22 ma'am. Did you have an understanding that
23 when -- strike that.
24    You have seen these types of
25 documents before, correct?

Page 193

V. HOLMES

1
2    A. Yes.
3    Q. Okay. And there would typically be
4 a section about anniversaries and birthdays,
5 would there not?
6    ATTORNEY BRUSTEIN: Objection.
7    A. Sometimes yes. Sometimes no.
8    Q. Okay. Did you read these when they
9 were sent to you or did you just not pay
10 attention to them, or not look at them?
11    ATTORNEY BRUSTEIN: Objection.
12    A. When I received them I may pay
13 attention. I may not.
14    Q. Okay. In the ones you have seen,
15 do you recall there being sections about
16 anniversaries and birthdays?
17    ATTORNEY BRUSTEIN: Objection.
18    A. I don't remember.
19    Q. You don't know whether the Four
20 Seasons, for example, would record the service
21 anniversary of somebody who had quit five
22 years earlier?
23    ATTORNEY BRUSTEIN: Objection.
24    A. I wouldn't know that.
25    Q. What would be your assumption?

Page 194

V. HOLMES

1
2      ATTORNEY BRUSTEIN: Objection.
3      A. I don't know.
4      Q. You don't have any assumption?
5      ATTORNEY BRUSTEIN: Objection.
6      A. No.
7      Q. Okay. Do you have any reason to
8  believe that you weren't sent that exhibit 35,
9  ma'am?
10      ATTORNEY BRUSTEIN: Objection.
11      A. I'm sorry?
12      Q. Do you have any reason to believe
13  that you were not sent what has been marked as
14  exhibit 35?
15      ATTORNEY BRUSTEIN: Objection.
16      A. I'm not sure.
17      Q. My question is do you have any
18  reason to believe that it didn't get sent to
19  you?
20      ATTORNEY BRUSTEIN: Objection.
21      A. I don't know.
22      Q. I know you don't know whether you
23  got it or not. My question is do you have any
24  reason to believe that it wasn't sent?
25      ATTORNEY BRUSTEIN: Objection.

Page 195

V. HOLMES

1
2      A. I cannot answer that. This was
3  sent from the hotel.
4      Q. Right. And you're a person who had
5  a hotel email address, correct?
6      A. That I don't have access to.
7      Q. I didn't ask about whether you had
8  access to it now. I just asked you if you had
9  an email address from the hotel, correct?
10      ATTORNEY BRUSTEIN: Objection.
11      A. At what period of time?
12      Q. Let's say -- let's look at the date
13  of this. This is May 15, 2020. Did you still
14  have an email address for the hotel -- from
15  the hotel? A Four Seasons email address?
16      A. I don't remember, and I don't
17  believe so.
18      Q. You don't remember and you don't
19  believe so. Why don't you believe so?
20      A. Because I don't remember when was
21  the first time that I had access to the email.
22      Q. How did you find out about the June
23  25, 2021 meeting that you recorded?
24      A. They sent an email to my personal
25  email address.

Page 196

V. HOLMES

1
2      Q. You got it through your personal
3  email account, not through your work email
4  address, that's your testimony under oath?
5      ATTORNEY BRUSTEIN: Objection.
6      A. Yes.
7      Q. Your testimony under oath is you
8  don't have access to the Four Seasons email
9  address today?
10      ATTORNEY BRUSTEIN: Objection.
11      A. I don't.
12      Q. You don't?
13      A. I don't have access to the emails.
14      Q. Okay.
15      A. To the Four Seasons emails.
16      Q. You don't have that, okay. Did you
17  have access, and I want to know yes or no, or
18  if you don't know, to the Four Seasons email
19  address on May 15, 2020?
20      ATTORNEY BRUSTEIN: Objection.
21      A. I don't remember.
22      Q. Tell me if I'm right. The
23  documents of the type that are marked, that we
24  have marked here as exhibit 35 were sent by
25  email, is that fair?

Page 197

V. HOLMES

1
2      ATTORNEY BRUSTEIN: Objection.
3      A. That's fair.
4      Q. Okay. Were these sent, ever sent
5  to your personal email account?
6      ATTORNEY BRUSTEIN: Objection.
7      A. Some were.
8      Q. Okay. When you were looking
9  through your email accounts did you flag
10  emails for production that would have
11  contained a document such as exhibit 35?
12      ATTORNEY BRUSTEIN: Objection.
13      A. I don't remember what I submitted,
14  as far as documents that look like this.
15      Q. How long ago did you search for
16  documents to produce in this case, ma'am?
17      ATTORNEY BRUSTEIN: Objection.
18      A. Last year, when I was submitting
19  discoveries.
20      Q. Okay. So in 2022, late 2002?
21      ATTORNEY BRUSTEIN: Objection.
22      A. About.
23      Q. Okay. You can't remember what you
24  did then, right?
25      A. No.

Page 198

V. HOLMES

1
2   Q.  So I take it your memory of things
3   over time goes away, is that fair?
4       ATTORNEY BRUSTEIN:  Objection.
5   A.  It's possible.
6   Q.  Okay.  And you would probably have
7   less memory of things that happened in 2021
8   than do you in 2022, right?
9       ATTORNEY BRUSTEIN:  Objection.
10  A.  Not necessarily.
11  Q.  Why not?
12      ATTORNEY BRUSTEIN:  Objection.
13  A.  I can't answer that.
14  Q.  Okay.  Do you think your memory
15  gets better with age or worse with age?
16      ATTORNEY BRUSTEIN:  Objection.
17  A.  I don't know what the formula is,
18  how my memory works.
19  Q.  Okay.  And you don't remember that,
20  the particular document that we had marked as
21  exhibit 35?
22      ATTORNEY BRUSTEIN:  Objection.
23  A.  I don't remember it.
24  Q.  Okay.
25      (Defendants' Exhibit 36, Staley

Page 199

V. HOLMES

1
2   v FSR 0055 was marked for
3   identification).
4   Q.  I am handing you, ma'am, what has
5   been marked as exhibit 36, which for the
6   record is a document bearing the Bates number
7   Staley v FSR 0055.
8       My first question, ma'am, is have
9   you ever seen exhibit 36 before?
10      (The witness reviews document.)
11  A.  I don't remember this document.
12  Q.  I beg your pardon?  I'm sorry.
13  A.  I don't remember this document.
14  Q.  And you don't --
15  A.  It looks similar to another one
16  that you submitted.
17  Q.  There are a number of these with
18  different dates.
19  A.  Oh, okay.
20  Q.  Do you remember seeing these over
21  time in the time period after COVID struck?
22      ATTORNEY BRUSTEIN:  Objection.
23  A.  Some I did.  Some I didn't.
24  Q.  Okay.  Fair enough.  Do you
25  remember seeing more than one of these after

Page 200

V. HOLMES

1
2   the time period that COVID struck?
3       ATTORNEY BRUSTEIN:  Objection.
4   A.  I don't remember seeing too many.
5   Q.  Okay.  And the reason I'm asking,
6   ma'am, is because I think you testified
7   earlier and correct me if I'm wrong, that one
8   of the things that you, when I asked you about
9   the reason why you sued, just generally, and
10  you had mentioned that you were told that it
11  was going to -- the hotel was going to open
12  one day and then it was going to open another
13  day, another day and another day.  Do you
14  remember that generally?
15  A.  And that my WARN Act was violated.
16  Q.  I'll get to the WARN Act later, I
17  promise you.
18  A.  That's fine.
19  Q.  Okay.  I am talking about the dates
20  that you had mentioned.  You did talk about
21  that, right?  Dates being extended?
22  A.  You talked about dates being
23  extended, yes.
24  Q.  Yeah.  Is that something that you
25  also remember happening, dates were reopening

Page 201

V. HOLMES

1
2   being extended?
3       ATTORNEY BRUSTEIN:  Objection.
4   A.  I remember the hotel not reopening.
5   Q.  You don't remember any
6   communications about the dates that the hotel
7   might reopen, you know, like it was going to
8   be X date and then moved to another date and
9   another date?
10  A.  Some.
11  Q.  How did you find out about that?
12      ATTORNEY BRUSTEIN:  Objection.
13  A.  Via email.
14  Q.  What do you mean?  An email for
15  what?  An email with just saying that or an
16  email containing a document such as we have
17  here as exhibit 36?  Some combination?  How
18  did you find out about the communication of
19  dates being moved?
20      ATTORNEY BRUSTEIN:  Objection.
21  A.  The time that I found out about
22  dates being extended was through email.
23  Q.  Okay.  I understand email is the
24  transmission.  Was the information you got in
25  a text of an email or was it an attachment to

Page 202

V. HOLMES

1
2 an email in a document perhaps such as we have
3 here as exhibit 36?
4     A. I don't remember.
5     Q. All right. So you don't know
6 whether you have seen this particular
7 document, exhibit 36, before, is that fair?
8     A. That is fair.
9     Q. Okay. So you can't tell me, as you
10 sit here today, whether you had read, for
11 example, the second paragraph talking about
12 the last communication, one on May 2020,
13 indicated looking for a potential reopen of
14 June 15, 2020, you don't know whether you've
15 ever seen that before, right?
16     ATTORNEY BRUSTEIN: Objection.
17     A. I don't remember.
18     Q. Okay. And you don't remember
19 whether you had seen the prior one, the prior
20 communication, any prior communication talking
21 about a reopen date of June 15, 2020, do you?
22     ATTORNEY BRUSTEIN: Objection.
23     A. I don't remember.
24     Q. Okay. And it says: Since that
25 time, our owner, Ty Warner, has agreed to

Page 203

V. HOLMES

1
2 extend the complementary housing for the
3 health care professionals through June 30,
4 2020.
5     You don't remember when you saw
6 that either, do you?
7     ATTORNEY BRUSTEIN: Objection.
8     A. I don't remember.
9     Q. Do you have any understanding as to
10 when the temporary housing for the health care
11 professionals ended?
12     A. No. The hotel should know that.
13     Q. I'm sorry?
14     A. I said the hotel should know that.
15     Q. I understand that. I wanted to
16 know what you know.
17     A. Oh, okay.
18     Q. And you don't know?
19     A. No.
20     Q. Okay. And then it says, in
21 addition to that extension, "the social
22 distancing guidelines and the stay at home
23 orders still in place."
24     Is that consistent with your
25 understanding of the state of affairs during

Page 204

V. HOLMES

1
2 COVID as of May 22, 2020?
3     ATTORNEY BRUSTEIN: Objection.
4     A. I don't know.
5     Q. You don't know?
6     A. No.
7     Q. And then it says: Therefore, it is
8 necessary to extend the suspension of regular
9 hotel operations until July 15, 2020."
10     Right?
11     ATTORNEY BRUSTEIN: Objection.
12     Q. That's what it says, right?
13     A. That's what it says on the paper,
14 yes.
15     Q. Did you have any understanding of
16 that representation being made?
17     ATTORNEY BRUSTEIN: Objection.
18     A. I don't know.
19     Q. You don't know?
20     A. No.
21     Q. Okay. And you understand the
22 difference between the regular hotel
23 operations that are being suggested here and
24 the hotel operations that are not open to the
25 public, right?

Page 205

V. HOLMES

1
2     ATTORNEY BRUSTEIN: Objection.
3     A. No, I don't have a clear
4 understanding of that.
5     Q. Okay. Well, you knew the hotel was
6 not open to the public, but was nonetheless
7 open in housing medical professionals,
8 correct?
9     ATTORNEY BRUSTEIN: Objection.
10     A. They're considered public.
11     Q. They were housing medical
12 professionals?
13     A. (Nodding head affirmatively.)
14     Q. Were they taking reservations from
15 the outside?
16     A. I don't know.
17     Q. What efforts have you made to find
18 out before you sued?
19     ATTORNEY BRUSTEIN: Objection.
20     A. I'm sorry?
21     Q. What efforts did you make to find
22 out before you sued?
23     ATTORNEY BRUSTEIN: Objection.
24     A. You're asking me if I made an
25 investigation?

V. HOLMES

1
2    Q.  Yeah.
3    A.  I wasn't called back to work.
4    Q.  I understand that.  What
5    investigation did you make before you sued to
6    find out what had actually been happening at
7    the hotel from March 20, 2020 until the time
8    you sued the defendants in the case?
9        ATTORNEY BRUSTEIN:  Objection.
10    A.  I don't remember.
11    Q.  Did you do anything?
12        ATTORNEY BRUSTEIN:  Objection.
13    Q.  You may answer, ma'am.  Did you do
14    any investigation at all?
15        ATTORNEY BRUSTEIN:  Objection.
16    A.  I don't remember.
17    Q.  You don't remember whether you did?
18    A.  Uh-uh.
19    Q.  Okay.
20        ATTORNEY RISMAN:  Off the record
21    for a second.
22        (Discussion off the record.)
23        (Defendants' Exhibit 37, Staley
24    v FSR 0056 was marked for
25    identification).

V. HOLMES

1
2    Q.  Ma'am, I am handing you what has
3    been marked as exhibit 37, which for the
4    record is a document bearing the Bates number
5    Staley v FSR 0056.
6        First question, ma'am.  Have you
7    ever seen exhibit 37 before?
8        (The witness reviews document.)
9    A.  I don't remember this.  I don't
10    remember this document.
11    Q.  You don't know if you have ever
12    seen it before?
13    A.  I don't recall.
14    Q.  So you don't know whether this is a
15    document that you found and produced, or is it
16    not a document that you found and produced?
17        ATTORNEY BRUSTEIN:  Objection.
18    A.  I don't know.
19    Q.  You don't know whether that's one
20    of the documents that you found in your files
21    and turned over?
22    A.  No, I don't remember it.
23    Q.  You don't remember it.  So I take
24    it that you've never -- you don't remember
25    actually reading any of the language on this

V. HOLMES

1
2    page, is that accurate, ma'am?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't remember it.
5    Q.  Okay.  What were the dates that you
6    understood to have been provided over time for
7    the hotel's -- let me finish, ma'am.
8        What were the dates over time,
9    starting in March 2020 that you understand the
10    hotel was providing based on their expectation
11    or hope to reopen?
12        ATTORNEY BRUSTEIN:  Objection.
13    Q.  You said initially two weeks, you
14    thought it was going to be two weeks, right?
15        ATTORNEY BRUSTEIN:  Objection.
16        There was like five questions there.
17    Q.  You may answer.
18        ATTORNEY BRUSTEIN:  Which question?
19    Q.  Do you understand my question,
20    ma'am?  Or not.  If you don't, tell me.
21    A.  I don't understand.
22    Q.  Okay.  Originally you told me I
23    think, and tell me if I'm wrong, that when the
24    hotel closed there was an expectation that it
25    was going to reopen in about two weeks.  Did I

V. HOLMES

1
2    have that correct or incorrect?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  It was correct.
5    Q.  Okay.  What was the next date after
6    that, that was provided as a date of
7    anticipated reopening?
8    A.  I don't remember.
9    Q.  Do you remember any of the dates
10    that were provided for anticipated reopening?
11    A.  Specific dates, no.
12    Q.  General dates.  Can you give me a
13    broader sense of any dates of the interim
14    period, any dates from May 20 of 2020, and I
15    understand there's the two weeks, any dates
16    other than that up to today, where you were
17    informed or understood that the hotel was
18    saying they expected to reopen?
19        ATTORNEY BRUSTEIN:  Objection.
20    A.  I really don't remember.
21    Q.  Did you have an understanding at
22    the time, ma'am, putting out specific dates,
23    that the hotel was trying to reopen as quickly
24    as it could?  Was that your understanding at
25    the time, around the March to, say, August of

V. HOLMES

1
2  2020 time period?
3      ATTORNEY BRUSTEIN:  Objection.
4      A.  Like it was my understanding?
5      Q.  Yeah.  Was it your understanding or
6  not?
7      ATTORNEY BRUSTEIN:  Objection.
8      A.  I was hopeful that they were going
9  to open.
10     Q.  Did you have an understanding as to
11  what the hotel wanted to do?
12     ATTORNEY BRUSTEIN:  Objection.
13     A.  I can't answer that.  I don't know
14  what the hotel wanted to do.
15     Q.  Okay.  You understand that if the
16  hotel is closed it's not making money,
17  correct?
18     ATTORNEY BRUSTEIN:  Objection.
19     A.  I don't understand that.
20     Q.  You think that the hotel could be
21  profitable being empty?
22     ATTORNEY BRUSTEIN:  Objection.
23     A.  I don't know if the hotel --
24     Q.  Did you think about it?
25     ATTORNEY BRUSTEIN:  Objection.

V. HOLMES

1
2      Q.  You can answer.  He's just
3  objecting.  You may answer.  Did you think
4  about whether the hotel could be profitable if
5  it remained closed to the public?
6      A.  That's not for me to think about.
7      Q.  I didn't ask you if it was for you
8  to think about it.  I asked if you if you did
9  or you didn't --
10     A.  I didn't.
11     Q.  Have you ever thought about it?
12     ATTORNEY BRUSTEIN:  Objection.
13     A.  No, I don't think about that.
14     Q.  Going down this document if we
15  could, ma'am.  And I'm just going to ask if
16  something refreshes your memory or not.  The
17  second paragraph says:  "With that said,
18  my last communication to you on May 22,
19  2020 ..."
20         And then it goes on.
21     A.  Okay.
22     Q.  "I want to just say, with June 30
23  right around the corner I wanted to let you
24  know that all health care professionals will
25  be leaving by June 30, 2020 and the program

V. HOLMES

1
2  will discontinue."
3         Does that in any way refresh your
4  memory or recollection about when the
5  temporary housing for health care
6  professionals ended?
7      ATTORNEY BRUSTEIN:  Objection.
8      A.  I don't know.  It says it here.
9      Q.  Yeah, I was just wondering if now
10  you remember something based on having read it
11  and with that date?
12     A.  No I don't remember.
13     Q.  Okay.  Were you still, at the time
14  period of June 22, 2020, performing the
15  payroll function for the folks in your area?
16     A.  June 2020?
17     Q.  The date of this, I just want to
18  peg it to the date, the date here is June 22,
19  2020.  Were you still performing the payroll
20  function for the folks in your area?
21     ATTORNEY BRUSTEIN:  Objection.
22     A.  Yes, I was.
23     Q.  How long did you continue to do
24  that?
25     A.  About two weeks after that date.

V. HOLMES

1
2      Q.  And then you stopped, what, about
3  the end of June, beginning of July?
4      A.  That's a good estimate.
5      Q.  Okay.  At the time that you
6  stopped, who if anyone to your knowledge took
7  over that function?
8      ATTORNEY BRUSTEIN:  Objection.
9      A.  I'm not sure.
10     Q.  When you look at the next paragraph
11  other than the one we were just looking at,
12  ma'am, it says "Upon departure of health care
13  professionals, we will temporarily be
14  suspending most of our hotel operations.
15  During this time, the hotel will continue to
16  operate with a reduced staffing to maintain
17  the building's safety and security."
18         And it says "The upcoming schedules
19  will reflect these changes."
20         Right?  That's what it says,
21  correct?
22     ATTORNEY BRUSTEIN:  Objection.
23     A.  Yes.  That's what it says on the
24  paper.
25     Q.  Okay.  Were there schedules for

Page 214

V. HOLMES

1  various departments available for someone like
2  you to take a look at through Four Seasons,
3  interacting with Four Seasons systems?
4
5         ATTORNEY BRUSTEIN: Objection.
6      A. You're asking me if I was able to
7  see other department schedules?
8      Q. I am asking you if you were able to
9  see any department schedules to start out
10  with?
11        ATTORNEY BRUSTEIN: Objection.
12     A. Other than my own department?
13     Q. Any of them. It could be your own,
14  it could be others. That was simply the
15  general question. Were you able to access and
16  see schedules?
17        ATTORNEY BRUSTEIN: Objection.
18     A. During what period of time?
19     Q. During the period of time of, let's
20  say, starting in June 22 of 2020?
21        ATTORNEY BRUSTEIN: Objection.
22     A. I would be able to see just my
23  department.
24     Q. Okay. You were able to see your
25  department, you weren't able to see others, is

Page 215

V. HOLMES

1
2  that fair?
3      A. That's fair.
4      Q. Did you look, after June 22 of
5  2020, did you access the schedules to see, you
6  know, who from your department was scheduled
7  for work and who wasn't, that kind of thing?
8         ATTORNEY BRUSTEIN: Objection.
9      A. While I was still working?
10     Q. Let's start with while you were
11  still working, yeah.
12     A. I could see the schedules while I
13  was still working, for my department.
14     Q. I know you could see them. I was
15  wondering if you went in and looked at them
16  and accessed them?
17        ATTORNEY BRUSTEIN: Objection.
18     A. It's the way that I would be able
19  to pay them.
20     Q. Okay. And how many people were
21  still working during that time period between
22  June 22 of 2020 and the time you stopped
23  working?
24        ATTORNEY BRUSTEIN: Objection.
25     A. I don't remember.

Page 216

V. HOLMES

1
2      Q. So you don't know how many people
3  were working?
4      A. Uh-uh.
5      Q. Do you know how many hours each of
6  them was working?
7         ATTORNEY BRUSTEIN: Objection.
8      A. I don't remember.
9      Q. Okay. You don't remember. I take
10  it you weren't able to see the schedules for
11  other departments?
12        ATTORNEY BRUSTEIN: Objection.
13     A. No, I wasn't able to see other
14  departments.
15     Q. Okay. I don't know that. I'm just
16  asking you. So you don't know how many folks
17  from other departments continued to work after
18  June of 2020, do you?
19     A. Based on a schedule?
20     Q. Just based on anything. You don't
21  know how many people from other departments
22  continued to work after June of 2020, do you?
23        ATTORNEY BRUSTEIN: Objection.
24     A. I'm not sure.
25     Q. Do you know at all, any number?

Page 217

V. HOLMES

1
2         ATTORNEY BRUSTEIN: Objection.
3      A. I don't know.
4      Q. You don't know. After you stopped
5  doing the payroll function do you know how
6  many folks in your department continued to
7  work after June of 2020?
8         ATTORNEY BRUSTEIN: Objection.
9      A. I don't know how many. I know some
10  of the ones who were working.
11     Q. You know some of the people were
12  working, you don't know how many in total, is
13  that fair?
14     A. That's fair.
15     Q. Who do you know was still
16  working?
17        ATTORNEY BRUSTEIN: Objection.
18     A. You want the names of people that
19  were still working?
20     Q. The ones you know, yes.
21        ATTORNEY BRUSTEIN: Objection.
22     A. Pamela Carrington. James Kirkland.
23  Abdul Khan.
24     Q. Khan?
25     A. Khan.

Page 218

1          V. HOLMES
2    Q.  Thank you.
3    A.  I can't remember all of them.
4        ATTORNEY BRUSTEIN:  Can we take a
5    quick break?
6        ATTORNEY BOLAND:  Okay.  Let me
7    finish this line and then we'll be able
8    to do it.  I'm almost finished with this
9    line.
10       ATTORNEY BRUSTEIN:  I just have to
11   go to the bathroom so hopefully it's not
12   a long line.
13       ATTORNEY BOLAND:  It's not a long
14   line.
15       ATTORNEY BRUSTEIN:  That's off the
16   record?
17       ATTORNEY BOLAND:  No.
18       ATTORNEY BRUSTEIN:  That's fine.
19   Q.  With respect to the individuals, do
20   you know whether they constitute the entire
21   group of people from your department who were
22   working or just some people that you know?
23   A.  I don't understand the question.
24   Q.  Is this everyone who was working
25   after June of 2020 in your department or just

Page 219

1          V. HOLMES
2    the names that you recall?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  They're the names I recall.
5    Q.  Okay.  And there could be more
6    names, is that fair?
7        ATTORNEY BRUSTEIN:  Objection.
8    A.  Possibly.
9    Q.  Okay.  How many hours were each of
10   these people working per week?
11       ATTORNEY BRUSTEIN:  Objection.
12   A.  Average?
13   Q.  No, I want to know -- let's start
14   with Pamela.  How many hours was she working
15   per week?
16       ATTORNEY BRUSTEIN:  Objection.
17   A.  It varied.
18   Q.  How do you know?
19   A.  Because I talked with her.
20   Q.  Okay.  What did she tell you?
21   A.  Well, when I --
22       ATTORNEY BRUSTEIN:  Objection.
23   Q.  What did she tell you.  Not when.
24   A.  She's working on average twenty-one
25   days -- I mean twenty-one hours per week.

Page 220

1          V. HOLMES
2    Sometimes fourteen.
3    Q.  And sometimes more than twenty-one
4    if twenty-one was the average?
5        ATTORNEY BRUSTEIN:  Objection.
6    A.  I'm not sure.
7    Q.  You don't know.  James Kirkland,
8    how many hours was he working per week?
9        ATTORNEY BRUSTEIN:  Objection.
10       ATTORNEY BOLAND:  Strike that.  Let
11   me go back to Pamela.
12   Q.  How long did she continue to work?
13       ATTORNEY BRUSTEIN:  Objection.
14   A.  Until she retired.
15   Q.  When did she retire?
16   A.  I don't remember.
17   Q.  Was it in 2020?  Was it in 2021?
18   Do you have an idea?
19   A.  I don't remember.
20   Q.  James Kirkland, how many hours a
21   week did he work after June of 2020?
22       ATTORNEY BRUSTEIN:  Objection.
23   A.  I don't remember.
24   Q.  How long did he continue to work
25   after June of 2020?

Page 221

1          V. HOLMES
2        ATTORNEY BRUSTEIN:  Objection.
3    A.  I believe he's still working.  I'm
4    not sure.
5    Q.  And the last one was Abdul Khan, is
6    that right?  The last person that you
7    mentioned?
8    A.  Yeah.
9    Q.  How many hours was Mr. Khan working
10   after June of 2020, a week?
11       ATTORNEY BRUSTEIN:  Objection.
12   A.  I don't remember.
13   Q.  Okay.  How long did Mr. Khan
14   continue to work after June of 2020?
15       ATTORNEY BRUSTEIN:  Objection.
16   A.  I'm not sure.
17       ATTORNEY BOLAND:  Okay.  We'll take
18   a break.
19       ATTORNEY BRUSTEIN:  Thank you.
20           ---
21   (Recess from 2:59 to 3:06.)
22           ---
23       ATTORNEY BOLAND:  Back on the
24   record?
25       THE COURT REPORTER:  Back on the

Page 222

V. HOLMES

1    record.
2        (Defendants' Exhibit 38, Staley v
3    FSR 0017 to 18 was marked for
4    identification.)
5    Q.  Ms. Holmes, I am handing you what
6    has been marked as exhibit 38, which for the
7    record is a document that bears the Bates
8    numbers Staley v FSR 0017 to 18.  And my first
9    question is going to be, ma'am, have you ever
10   seen this before?
11       (The witness reviews document.)
12   A.  Yes, I've seen this before.
13   Q.  Okay.  And is this one of the
14   documents that you got from your files to
15   produce in this case?
16       ATTORNEY BRUSTEIN:  Objection.
17   A.  I don't remember.
18   Q.  The date of this is July 15, 2020,
19   is that correct, ma'am?
20   A.  Yes, it says July 15, 2020.
21   Mm-hmm.
22   Q.  Okay.  And since you've seen this
23   before I take it you received it in some
24   fashion, is that accurate?
25

Page 223

V. HOLMES

1        ATTORNEY BRUSTEIN:  Objection.
2    A.  I've seen it before.
3    Q.  Yeah, but my question was since
4    you've seen it before, am I correct that you
5    received it in some fashion?
6    A.  I don't remember how I received it.
7    Q.  Did you receive it?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't remember.
10   Q.  So how would you have seen it
11   before?  Help me out.  I'm just trying to
12   understand, ma'am.  How would you have seen it
13   before if you didn't receive it?
14   A.  I --
15       ATTORNEY BRUSTEIN:  Objection.
16   A.  I recognize the language.
17   Q.  You recognize the language, I get
18   that.
19   A.  Mm-hmm.
20   Q.  Was it sent to you in some fashion?
21   A.  I don't remember how.
22   Q.  I understand that.  That's fine.
23   The first question wasn't how.  The question
24   was, was it sent to you in some fashion, by
25

Page 224

V. HOLMES

1    some method?
2    A.  I don't remember.
3    Q.  The first sentence says: "During
4    these unprecedented times, we know that there
5    are uncertainties around many things ..." and
6    there's a comma and then the sentence goes on,
7    correct?  I just want to get you to where it
8    says, you can read up to the comma in the
9    first sentence, right?
10       ATTORNEY BRUSTEIN:  Objection.  Did
11   you ask her if she can read up to the
12   comma?
13       ATTORNEY BOLAND:  Yes, I'm asking
14   if she can read up to the comma.
15   A.  You want me to read it?
16   Q.  Yes, to yourself.
17   A.  Yes, I read it.
18   Q.  All right.  Did you agree with that
19   sentiment as of July 15, 2020, meaning "During
20   these unprecedented times we know that there
21   are uncertainties around many things"?
22       ATTORNEY BRUSTEIN:  Objection.
23   Q.  Did you agree with that or not?
24       ATTORNEY BRUSTEIN:  Objection.
25

Page 225

V. HOLMES

1    A.  I didn't write it.  I'm not --
2    Q.  I know you didn't write it, ma'am.
3    I'm asking if you agree with it?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't know who the unprecedented
6    times was for.
7    Q.  Let me ask you a question.  Had you
8    ever lived through a pandemic before?
9    A.  Before this pandemic?
10   Q.  Yes.
11   A.  No.
12   Q.  So would you consider, as a term to
13   use for the pandemic and its effects
14   unprecedented?
15       ATTORNEY BRUSTEIN:  Objection.
16   A.  That's the language that I guess
17   the hotel was using.
18   Q.  I understand that.  My question is
19   about you.  You would have -- did you consider
20   the circumstances caused by the pandemic that
21   started in early 2020 to be unprecedented?
22       ATTORNEY BRUSTEIN:  Objection.
23   A.  I didn't think about it like that.
24   Q.  How did you think about it?
25

Page 226

V. HOLMES

1
2       ATTORNEY BRUSTEIN:  Objection.
3       A.  I just didn't.
4       Q.  You didn't think about the fact
5  that this is something completely different
6  than I've ever lived through before?
7       A.  It was different.
8       Q.  Okay.  Had you ever lived through
9  anything that was similar in nature in your
10  view?
11      ATTORNEY BRUSTEIN:  Objection.
12      Q.  You can answer that question,
13  ma'am.
14      A.  If I've lived through anything
15  that's similar?
16      Q.  Had you ever lived through any set
17  of circumstances that was similar, in your
18  view, to the circumstances that followed the
19  outbreak of COVID-19 in early 2020?
20      A.  In my view?
21      Q.  Yes.
22      A.  I have.
23      Q.  What were those?
24      A.  It's personal.
25      Q.  Sorry, ma'am.  We're under oath

Page 227

V. HOLMES

1
2  here.  What were they?
3       ATTORNEY BRUSTEIN:  Objection.
4       A.  I have lived times that, you know,
5  I thought were unprecedented for me.
6       Q.  For you.  In terms of the broader
7  scope, you understood that COVID-19 and the
8  pandemic was global in nature, right?
9       ATTORNEY BRUSTEIN:  Objection.
10      A.  It was global.
11      Q.  Okay.  Had you lived through
12  anything similar in your view to COVID-19 on
13  that scale, that broad scale?
14      A.  No.
15      Q.  So was it, in your view, a very new
16  and different experience?
17      A.  It was different.
18      Q.  Was it new as well?  In other words
19  you hadn't seen it before?
20      ATTORNEY BRUSTEIN:  Objection.
21      A.  I hadn't seen COVID before.
22      Q.  Had you seen anything like COVID
23  before, in your personal experience on a scale
24  even in a city scale?
25      ATTORNEY BRUSTEIN:  Objection.

Page 228

V. HOLMES

1
2       A.  I hadn't seen COVID before.
3       Q.  I know you haven't seen COVID
4  before.  Had you seen anything similar to
5  COVID before, in your personal experience?
6       ATTORNEY BRUSTEIN:  Objection.
7       A.  I don't remember.
8       Q.  You don't remember?
9       A.  No.
10      Q.  Okay.  When COVID hit, ma'am, did
11  you get the feeling that there were
12  uncertainties about what would happen in the
13  future?  In other words you couldn't predict
14  how things were going to happen over the next
15  few weeks, few months?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  No one can predict what's going to
18  happen, with anything.
19      Q.  Fair enough.  Did you feel that
20  that situation was exacerbated or made more, I
21  don't want to you use the wrong word, was
22  heightened by the fact that the COVID-19
23  pandemic had taken its grip?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  Could you ask that again please?

Page 229

V. HOLMES

1
2       Q.  Yes, sure.  Did the presence of
3  COVID-19 add to the degree of uncertainty that
4  already exists in your view, as to what could
5  happen in the future?
6       ATTORNEY BRUSTEIN:  Objection.
7       A.  I don't know what could have
8  happened in the future.
9       Q.  Not my question.  I understand you
10  don't know what could happen in the future.
11  Did COVID-19 add any uncertainty, exaggerate
12  the level of uncertainty about what would
13  happen in the future, in your view?
14      ATTORNEY BRUSTEIN:  Objection.
15      A.  I didn't think about it.  I don't
16  know.
17      Q.  You didn't think about it?
18      A.  Uh-uh.
19      Q.  You said you saw this internal memo
20  before, is that accurate or do I have that
21  wrong?
22      A.  I said I remember some of the
23  language.
24      Q.  Okay.
25      A.  Or the content.

Page 230

V. HOLMES

1
2     Q.  What was the purpose of this to
3  your understanding?
4     A.  My understanding is that we had
5  options to continue medical and dental
6  coverage.
7     Q.  Okay.
8     A.  By using Businessolver.
9     Q.  If you'll look at the second
10 paragraph, ma'am.  The one that says you will
11 receive a monthly invoice, right?
12    A.  Yes.
13    Q.  There's a sentence in there that
14 says: "If payment is not received by the
15 required due date," and then -- I just want to
16 make sure your with me at that sentence.  Are
17 you following that one?
18    A.  Yes, I see it.
19    Q.  Okay.  "Your benefits will be
20 terminated," and it says, "and you can
21 reinstate your benefits once you return to
22 work."  Correct?
23       ATTORNEY BRUSTEIN:  Objection.
24    A.  That's what it says here.
25    Q.  Yes.  Did you have an expectation

Page 231

V. HOLMES

1
2  that there would be a time period when you
3  would in fact return to work?
4       ATTORNEY BRUSTEIN:  Objection.
5     A.  I was told that we would return
6  back to work.
7     Q.  I understand what this says.  The
8  question is whether you had an expectation
9  that you would return to work?
10       ATTORNEY BRUSTEIN:  Objection.
11    A.  I believed in what the Four Seasons
12 said.
13    Q.  And your expectation was based
14 solely on what the Four Seasons said, is that
15 fair?
16       ATTORNEY BRUSTEIN:  Objection.
17    Q.  You can answer.
18    A.  I thought we were coming back.
19    Q.  Okay.  And you thought they were
20 going to come back.  Why did you think that?
21    A.  Because that is what the Four
22 Seasons said.
23    Q.  Okay.  Any other reason that you
24 thought they were going to reopen?
25    A.  That we're going to be open or that

Page 232

V. HOLMES

1
2  we're coming back?
3     Q.  You're coming back, sorry.  Any
4  other reason that you think you're coming
5  back?
6       ATTORNEY BRUSTEIN:  Objection.
7     A.  No other reason.
8     Q.  Okay.  Did you have an
9  understanding or belief at the time, and I
10 want to put this in July of 2020, that the
11 Four Seasons, this is just your understanding,
12 intended to try to reopen the hotel to the
13 public and bring you back, and others back?
14       ATTORNEY BRUSTEIN:  Objection.
15    A.  I don't remember.
16       ATTORNEY BOLAND:  I am going to
17 mark two documents at the same time,
18 exhibits 39 and 40.
19       (Defendants' Exhibit 39, Staley
20 v FSR 0002 was marked for
21 identification).
22       (Defendants' Exhibit 40, Staley
23 v FSR 0016 was marked for
24 identification).
25    Q.  Ma'am, I am handing you two

Page 233

V. HOLMES

1
2  documents marked exhibits 39 and 40.
3       Exhibit 39 has the Bates number
4  Staley v FSR 0002.  And exhibit 40 bears the
5  Bates number Staley v FSR 0016.  You can look
6  at them side by side, if you like, ma'am.  My
7  question is have you seen either or both of
8  these documents before?
9       (The Witness reviewing documents.)
10    A.  Are these the same --
11       ATTORNEY BRUSTEIN:  Answer the
12 question.
13    A.  Okay.
14       (The witness reviews document.)
15    A.  So your question is if I have seen
16 these documents -- this document?
17    Q.  There's two documents in front of
18 you, ma'am.  Because I am going to represent
19 to you, they have different Bates numbers.  It
20 was in the production from the plaintiffs
21 twice.  One with the Bates number 16 and one
22 with the Bates number 2.
23    A.  Okay.
24    Q.  Okay?  So my first question is --
25 well, strike that.

Page 234

V. HOLMES

1
2       Let's consider them as one for
3   right now. Have you seen the August 5, 2020
4   letter that we see represented on both of
5   these exhibits before?
6       A. I've seen them before.
7       Q. Okay. And are these two documents,
8   documents that you found in your files to be
9   produced in this case?
10      ATTORNEY BRUSTEIN: Objection.
11      A. No. Not in my file.
12      Q. Okay. Did you find them anywhere
13  when you produced documents for them to be
14  produced in this case?
15      A. This particular document I
16  remember --
17      Q. Yes.
18      A. -- only because I had sent an email
19  to Elizabeth Ortiz asking her what was the
20  status of my furlough. And in return, she
21  submitted this letter, or memo, whatever, via
22  email, that was dated back to August 5th. But
23  the email was like in 2021, I believe.
24      Q. Oh, I see. So you did not receive
25  the document that we have represented here on

Page 235

V. HOLMES

1
2   two different exhibits until 2021, is that
3   your testimony?
4       A. Yes.
5       Q. Okay. How did you receive it in
6   2021? Was it by email from Ms. Ortiz?
7       A. She sent it as an attachment via
8   email.
9       Q. Okay. Now there are two copies
10  that were produced to us. Did you have two
11  copies of this in your files, somewhere in
12  your files? Email, anywhere. Whatever you've
13  got that you looked for.
14      A. I had it as an email.
15      Q. I understand that. I understand
16  you have it as an email. But I have two
17  copies produced to me. I'm just trying to
18  figure out why I've got two copies produced to
19  me?
20      A. I can't answer that. I don't know
21  why you have two copies.
22      Q. So you did receive this -- it's
23  your testimony, and I want to be fair to you,
24  under oath, you did not receive this at some
25  point on or around August 5 of 2021, as

Page 236

V. HOLMES

1
2   stated?
3       A. No.
4       Q. Okay. How did you receive it --
5   you said by email, in 2021, right?
6       A. Yes.
7       Q. What email account?
8       A. My personal account.
9       Q. In 2020, in August of 2020, were
10  you accessing your Four Seasons email account?
11      A. No.
12      Q. Have you accessed your Four Seasons
13  email account since August of 2020?
14      A. I haven't had access to it.
15      Q. Okay. So you don't know whether
16  this was sent to you at your Four Seasons
17  account, that you didn't access, or have
18  access to, is that fair?
19      ATTORNEY BRUSTEIN: Objection.
20      A. I don't know.
21      Q. You don't know whether it was or it
22  wasn't?
23      A. Right.
24      Q. Okay. You've had communications
25  with -- have you had communications or

Page 237

V. HOLMES

1
2   discussions, and I'm talking about electronic,
3   it could be in person, with any other
4   non-union employees about the notice that we
5   see here on exhibits 39 and 40, only with
6   respect to when they got it?
7       ATTORNEY BRUSTEIN: Objection.
8       A. I don't remember.
9       Q. Did you talk to Ms. Staley about
10  that?
11      ATTORNEY BRUSTEIN: Objection.
12      A. I don't remember.
13      Q. I'm trying to get the last name
14  right, because I always get it wrong.
15  Ms. Ivey. Did you talk to Ms. Ivey about
16  that?
17      ATTORNEY BRUSTEIN: Objection.
18      A. I don't remember.
19      Q. Okay. So as you sit here today you
20  don't know whether everybody didn't get the
21  notice on or around August 5, 2020 or just you
22  didn't receive it?
23      A. Oh, I don't know what they
24  received.
25      Q. You don't know what anybody else

Page 238

V. HOLMES

1
2 received?
3     A.  No.
4     Q.  We would have to go ask them,
5 wouldn't we?
6         ATTORNEY BRUSTEIN: Objection.
7     A.  I guess.
8     Q.  Right. Okay. So you understand
9 this to be a notice under the WARN Act, is
10 that right, ma'am?
11        ATTORNEY BRUSTEIN: Objection.
12    A.  I'm sorry?
13    Q.  Do you understand this to be a
14 notice provided under the WARN Act? You have
15 a WARN Act claim? You've been talking about
16 the WARN Act since you went and had your
17 conversation with your lawyer?
18        ATTORNEY BRUSTEIN: Objection.
19        That's inappropriate.
20    Q.  Do you understand that you have a
21 claim under the WARN Act?
22    A.  Yes, I understand that.
23    Q.  Did you understand this whenever
24 you received it to be a notice provided under
25 the WARN Act?

Page 239

V. HOLMES

1
2         ATTORNEY BRUSTEIN: Objection.
3     A.  It says on the paper that it's a
4 WARN Act notice.
5     Q.  Okay. So you got a WARN Act notice
6 in 2021, is that your testimony?
7         ATTORNEY BRUSTEIN: Objection.
8     A.  Via email, the attachment?
9     Q.  Yes.
10    A.  That's when I got this.
11    Q.  That's when you got that, but you
12 didn't get it earlier in any way?
13    A.  Exactly.
14    Q.  Okay. So what is your complaint
15 about the WARN Act notice? What's wrong with
16 it?
17    A.  Well, this --
18        ATTORNEY BRUSTEIN: Objection.
19    A.  To my understanding the WARN Act
20 notice, it's given to you prior, 60 days prior
21 to you being furloughed, and it comes with
22 payment of 60 days.
23    Q.  You understand it comes with a
24 payment of 60 days?
25    A.  They're supposed to give you pay to

Page 240

V. HOLMES

1
2 warn you that you may be unemployed.
3     Q.  Okay. And so what is your
4 complaint about this one? Let's say it
5 doesn't include a payment with it, right? Is
6 that one of your complaints about it?
7     A.  We did not receive payment. I did
8 not receive payment.
9     Q.  Okay. That's one of your
10 complaints. And then do you have another
11 complaint about the timing?
12        ATTORNEY BRUSTEIN: Objection.
13    A.  We did not get it in a timely
14 manner.
15    Q.  When you say "we," when did
16 everybody else get it, ma'am?
17        ATTORNEY BRUSTEIN: Objection.
18    A.  I'll correct that. I did not
19 receive it in a timely manner.
20    Q.  What's a timely manner?
21        ATTORNEY BRUSTEIN: Objection.
22    A.  To my understanding, 60 days prior.
23    Q.  To what?
24    A.  To being unemployed.
25    Q.  Okay. When did you first -- were

Page 241

V. HOLMES

1
2 you first able to apply for unemployment?
3         ATTORNEY BRUSTEIN: Objection.
4     A.  I don't remember.
5     Q.  Well, when do you think -- tell me
6 the date that you should have been provided
7 the WARN Act notice? I've got a pen, I've got
8 a paper. What date?
9         ATTORNEY BRUSTEIN: Objection. And
10 I'm not sure what supplies you have have
11 any relevance to the question.
12    Q.  You may answer.
13        ATTORNEY BRUSTEIN: Objection.
14    A.  60 days prior.
15    Q.  I want a date, ma'am. Calendar --
16        ATTORNEY BRUSTEIN: Objection.
17    Q.  What calendar date should have been
18 sent to you; tell me, please?
19        ATTORNEY BRUSTEIN: Objection.
20    A.  I can't answer that.
21    Q.  You're the plaintiff who has come
22 in and you have filed a lawsuit against
23 defendants forcing them to come into court,
24 spent thousands and hundreds of thousands of
25 dollars to defend it.

Page 242

V. HOLMES

1
2    ATTORNEY BRUSTEIN:  Objection.
3    Q.  Is it your testimony, ma'am, that
4  you can't tell me under oath the date that
5  you're saying that these defendants should
6  have provided you with a WARN Act notice?
7    ATTORNEY BRUSTEIN:  Please stop
8    pointing at the witness.
9    Q.  You may answer.
10    ATTORNEY BRUSTEIN:  I object.
11    A.  So the WARN Act should have been
12  provided in March.  March 2020.
13    Q.  Do you have any particular day in
14  March of 2020?
15    ATTORNEY BRUSTEIN:  Objection.
16    A.  A specific date?
17    Q.  Yeah.  I'm wondering if you have a
18  specific date.  If you don't tell me.  That's
19  fine.  I just want to know?
20    ATTORNEY BRUSTEIN:  Objection.
21    A.  I don't know.
22    Q.  And that's when you think it should
23  have been provided to you, is that fair,
24  ma'am?
25    ATTORNEY BRUSTEIN:  Objection.

Page 243

V. HOLMES

1
2    A.  To all of us.  We should have all
3  gotten a WARN Act.
4    Q.  Why?
5    A.  Because we were going to be laid
6  off.
7    Q.  Didn't other people continue to
8  work after March of 2020?
9    A.  Other people like who?
10    Q.  Well, you testified earlier, did
11  you not, ma'am, that there were folks that
12  came into the hotel, even before the temporary
13  housing was put up for the medical
14  professionals, right?
15    A.  Some.
16    Q.  Okay.  And there were other people
17  who came into the hotel and worked while the
18  medical professionals were being housed there,
19  right?
20    A.  Some.
21    Q.  Okay.  And there are people who
22  have continued to work at the hotel even after
23  they left in June of 2020, you testified to
24  that earlier, too, right?
25    A.  Some.

Page 244

V. HOLMES

1
2    Q.  Okay.  So why would the WARN Act
3  have to be provided to all of those folks who
4  continued to work?
5    ATTORNEY BRUSTEIN:  Objection.
6    A.  It would have been provided to the
7  ones that are not working.
8    Q.  Okay.  And who are those people
9  among the non-union employees?
10    ATTORNEY BRUSTEIN:  Objection.
11    Q.  Other than you?
12    ATTORNEY BRUSTEIN:  Objection.
13    A.  I'm not sure.
14    Q.  Did you make any effort to figure
15  that out before you had a lawsuit filed on
16  your behalf as a class action?
17    ATTORNEY BRUSTEIN:  Objection.
18    A.  There are some that are in my same
19  position.  In my same situation.
20    Q.  Okay.  Who?  I've got a pen.
21    ATTORNEY BRUSTEIN:  Objection.
22    Q.  I'll write it down.
23    ATTORNEY BRUSTEIN:  I don't know
24    what your supplies have to do with
25    anything.  There's a court reporter.

Page 245

V. HOLMES

1
2    That's necessary commentary.
3    Q.  You can answer.
4    A.  Olive, Selena.
5    Q.  Okay.
6    A.  That's what I have for now.
7    Q.  So I understand your belief and
8  your claim that you should have been given
9  some money when the WARN Act notice was
10  provided.  That's one of your complaints about
11  it, is that fair?
12    ATTORNEY BRUSTEIN:  Objection.
13    A.  My WARN Act was violated.
14    Q.  I understand that.  And you said
15  you -- you gave me two ways, right?  You said
16  timing, correct?
17    ATTORNEY BRUSTEIN:  Objection;
18    mischaracterization of the testimony.
19    Q.  You may answer.  Timing was one of
20  the ways in which the WARN Act was violated,
21  in your view with respect to you, correct?
22    ATTORNEY BRUSTEIN:  Objection.
23    A.  Yes.
24    Q.  Okay.  And then the other way was I
25  think you had testified, and tell me if I'm

V. HOLMES

1  wrong, that you believe that you were supposed
2  to also have been provided with money at the
3  time that the WARN Act notice was given?
4      A.  Yes.
5      Q.  Okay.  Let's put aside the money.
6  How were you harmed by the timing of receiving
7  the WARN Act notice?
8      ATTORNEY BRUSTEIN:  Objection.
9      A.  By not receiving the WARN Act?
10     Q.  Yeah.  By not receiving it earlier
11 than, you know, you did.
12     A.  It didn't allow us -- allow me to
13 prepare.
14     Q.  Prepare for what?
15     A.  For employment, or for whatever it
16 is that we need to -- I needed to prepare for.
17     Q.  Okay.  So let's assume that the
18 WARN Act notice was given in March of 2020.
19 What other jobs were out there for you to be
20 able to take up at that time in the midst of
21 the COVID-19 pandemic?
22     ATTORNEY BRUSTEIN:  Objection.
23     A.  There were essential jobs.
24     Q.  Which ones?  Which ones have you

V. HOLMES

1  looked into?  Tell me?
2      A.  I didn't look into any.
3      Q.  What jobs were out there?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  I don't know but there were
6  essential jobs out there.
7      Q.  Can you identify one?
8      ATTORNEY BRUSTEIN:  Objection.
9      A.  Nurses.
10     Q.  Are you a nurse?
11     ATTORNEY BRUSTEIN:  Objection.
12     A.  That wasn't the question.
13     Q.  Okay.
14     A.  The question was what essential
15 jobs is out there and I gave you one.
16     Q.  Very good, thank you.
17     ATTORNEY BRUSTEIN:  Excuse me.
18     Q.  Let me get one that is more --
19     ATTORNEY BRUSTEIN:  Can you please
20 stop pointing at the witness.
21     ATTORNEY BOLAND:  I'm just making
22 gestures.  I'm not pointing at the
23 witness.  Knock it off.

V. HOLMES

1      Q.  I'm talking about the ones that
2  would have been suitable for you.  What jobs
3  were out there for someone like you, and I'm
4  not suggesting to denigrate your background,
5  but I'm not a nurse either, what jobs were out
6  there for you to get back in March of 2020 in
7  the midst of the COVID-19 pandemic?
8      ATTORNEY BRUSTEIN:  Objection.
9      A.  There were many.
10     Q.  Which ones?
11     ATTORNEY BRUSTEIN:  Objection.
12     A.  Home attendant.  A cashier.
13 Transporter in the hospital.  There were many
14 jobs.
15     Q.  Okay.
16     A.  Essential jobs.
17     Q.  Okay.  And after you got the WARN
18 notice, which you say was in 2021, right --
19 when in 2021?  I'm sorry.  I didn't ask you
20 that.  I don't think I asked you that.
21     A.  I don't remember.
22     Q.  Well, early?  Mid?  Late?
23     A.  Probably the middle of the year.
24     Q.  The middle of the year?  What did

V. HOLMES

1  you do to find alternative employment after
2  you got the WARN notice?
3      A.  I didn't look for employment.
4      Q.  Why not?
5      A.  They kept stating that we would
6  return.
7      Q.  Sure.  But you also -- you've read
8  the EmPact agreement haven't, you, ma'am?
9      A.  I have.
10     Q.  You know that it allows you to
11 moonlight, take a second job if you like,
12 right?
13     ATTORNEY BRUSTEIN:  Objection.
14     Q.  You do know it says that, don't
15 you?
16     ATTORNEY BRUSTEIN:  Objection.
17     Q.  Do you know that the EmPact
18 agreement specifically allows you to moonlight
19 or take a second job?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  I'm not sure.
22     Q.  But you made no effort to find a
23 second job or to moonlight or do something
24 else after you got the WARN notice?

Page 250

V. HOLMES

1
2    A.  If I did that, I was -- if there
3  was any severance pay or any no-fault
4  separation it would be forfeited if I found
5  another job.
6    Q.  Who told you that?
7    A.  Elizabeth Ortiz.
8    Q.  Was that on that recording?
9    A.  She said it to me verbally.
10    Q.  When?
11    A.  I don't remember.  In one of our
12  conversations.  But it's also in the -- it's
13  also in the recording.
14    Q.  It's in the recording that says if
15  you find another job, I want to be very fair
16  to you, ma'am, what is the exact language that
17  was used in the recording?
18    A.  I can't give you --
19    ATTORNEY BRUSTEIN:  Objection.
20    A.  -- the exact language.
21    Q.  Okay.  Give me the exact words,
22  other than that recording, that Ms. Ortiz said
23  to you to convey what you have just conveyed
24  as the message?
25    ATTORNEY BRUSTEIN:  Objection.

Page 251

V. HOLMES

1
2    A.  I can't give you that either.
3    Q.  Did you take any notes of that
4  conversation that you had with Ms. Ortiz where
5  she told you what you have suggested she told
6  you?
7    ATTORNEY BRUSTEIN:  Objection.
8    A.  I don't remember.
9    Q.  Did you record it like you recorded
10  the meeting?  Did you record that conversation
11  with Ms. Ortiz?
12    A.  I don't remember.
13    Q.  Do you record conversations that
14  you have with folks?
15    ATTORNEY BRUSTEIN:  Objection.
16    Q.  As a matter of practice?
17    ATTORNEY BRUSTEIN:  Objection.
18    A.  No.
19    Q.  After the August 5, 2020 notice
20  that we were just looking at, you remained an
21  employee on furlough, is that fair?
22    ATTORNEY BRUSTEIN:  Objection.
23    A.  I'm sorry.  Ask that again?
24    Q.  Yes.  After the August 5 notice --
25  well, strike that.  You got it later.  Never

Page 252

V. HOLMES

1
2  mind.
3    Throughout 2020 you remained an
4  employee on furlough, is that fair?
5    ATTORNEY BRUSTEIN:  Objection.
6    A.  The hotel says I'm furloughed.
7    Q.  Okay.
8    (Defendants' Exhibit 41, Staley
9    v FSR 0057 was marked for
10    identification).
11    Q.  Ms. Holmes, I'm handing you what
12  has been marked as exhibit 41 which for the
13  record is a document bearing the Bates number
14  Staley v FSR 0057.
15    Have you ever seen exhibit 41
16  before?
17    (The witness reviews document.)
18    A.  I don't remember this.
19    Q.  You don't remember it?  You don't
20  know if you received it or not?  Or you know
21  you didn't receive it?
22    A.  I don't remember.
23    Q.  Okay.  Well, you don't remember --
24  I'm trying to understand.  Did you -- strike
25  that.

Page 253

V. HOLMES

1
2    When these were sent to you, the
3  ones that you did receive, did you testify
4  that they came by email?
5    ATTORNEY BRUSTEIN:  Objection.
6    A.  I don't remember how it came.
7    Q.  Okay.  So you don't remember
8  whether you've even seen this, right?
9    A.  Mm-hmm.
10    Q.  Okay.  If you look at the second
11  paragraph, ma'am.
12    A.  Mm-hmm.
13    Q.  You say, the one that starts "in my
14  last communication to you on June 22, 2020,"
15  right?  Then it goes on.  I'm not trying to
16  suggest it doesn't.  The part I wanted to talk
17  about is there's a sentence that says as
18  Governor Cuomo announced at the end of June,
19  there are also new travel restrictions for all
20  individuals traveling from states with high
21  COVID-19 infection rates.  Do you see that?
22    A.  I see it.
23    Q.  Is that consistent with your
24  recollection of the events, of the situation
25  at the time?

Page 254

V. HOLMES

1
2     ATTORNEY BRUSTEIN:  Objection.
3     A.  I don't remember.
4     Q.  It says: "As of today 33 states
5  meet the metrics for the travel advisory
6  requiring individuals who have traveled to
7  New York from those states to quarantine for
8  14 days."
9        Is that consistent with your
10  recollection of the circumstances at the time?
11     ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.
13     Q.  And then it says:  Additionally,
14  key New York City events and attractions have
15  been cancelled or there are extensive delays
16  in reopening."
17        Is that consistent with your
18  recollection of the events at the time?
19     ATTORNEY BRUSTEIN:  Objection.
20     A.  I don't remember.
21     Q.  When you were working at the hotel,
22  before COVID struck, did you have an
23  understanding of the things that drew
24  travelers to stay at the hotel?  In other
25  words things in the city like Broadway, the

Page 255

V. HOLMES

1
2  Philharmonic, museums, things of that nature?
3     ATTORNEY BRUSTEIN:  Objection.
4     A.  I don't know.
5     Q.  You don't know?
6     A.  Uh-uh.
7     Q.  How long were you there?
8     A.  For a little over a score.
9     Q.  I like that term a lot.
10     A.  You can borrow it.
11     Q.  I think Lincoln beat me to it.
12        Did you have an understanding at
13  the time, ma'am, that there were delays in for
14  example, Broadway reopening?
15     ATTORNEY BRUSTEIN:  Objection.
16     A.  I remember Broadway being closed.
17     Q.  You remember Broadway being closed?
18     A.  Mm-hmm.
19     Q.  What about things like Lincoln
20  Center, the Philharmonic, museums?
21     ATTORNEY BRUSTEIN:  Objection.
22     Q.  Do you remember those being open or
23  closed around the time in 2020?
24     A.  I remember them being closed.
25     Q.  Being closed.  But you would agree

Page 256

V. HOLMES

1
2  with me as the plaintiff in this case, would
3  you not, ma'am, that in order for an
4  institution such as the Four Seasons Hotel to
5  reopen to the public it would have to be
6  economically feasible for it to do that, in
7  other words it wouldn't be a losing money
8  operation?
9     ATTORNEY BRUSTEIN:  Objection.
10     A.  I don't run a hotel.  I don't know
11  that.
12     Q.  Okay.  But in the score that you
13  were there, did you understand that they were
14  in it for charity or in it to make a profit?
15     ATTORNEY BRUSTEIN:  Objection.
16     A.  I don't know that.
17     Q.  You don't know?
18     A.  No.
19     Q.  Okay.  By the way, do you have any
20  reason to believe -- I'm just going to ask you
21  a question, ma'am.  You'll see in this, the
22  third paragraph says: "At this juncture, we
23  need to readjust our reopening date to October
24  15, 2020."  Right?
25     ATTORNEY BRUSTEIN:  Objection.

Page 257

V. HOLMES

1
2     Q.  I'm just getting you to the page
3  with me.  Do you see that sentence?
4     A.  Yes, I see it on the paper.
5     Q.  Okay, cool.  And that's consistent
6  with what we have seen in other notes like
7  this, where there has been adjustments to the
8  reopening date?  We've talked about this
9  before, right?
10     ATTORNEY BRUSTEIN:  Objection.
11     A.  I don't remember.
12     Q.  You don't remember talking about
13  the other emails where we started, you know,
14  April and then it would move to May and then
15  it would move to July, those kinds of things,
16  the anticipated reopening date?
17     A.  I remember you reading them.
18     ATTORNEY BRUSTEIN:  Objection.
19     Q.  Yes.  You remember me reading them?
20     A.  I remember you reading them.
21  Whether it's true or not, I don't know.  It
22  was on paper.  You were reading them.
23     Q.  Yeah, I understand that.  Did you
24  have any reason to believe at any point in
25  time that the hotel was not gunning to reopen

Page 258

1           V. HOLMES
2   on the dates that it was targeting each time?
3           ATTORNEY BRUSTEIN:  Objection.
4       A.  I don't know what the hotel was
5   gunning for.
6       Q.  You don't know one way or the
7   other?
8       A.  I do not.
9       Q.  Okay.
10          (Defendants' Exhibit 42, Staley
11      v FSR 0088 to 89 was marked for
12      identification).
13      Q.  I am handing you, ma'am, what has
14  been marked as exhibit 42, which for the
15  record is a document bearing the Bates number
16  Staley v FSR 0088 to 89.
17          My first question is do you
18  recognize exhibit 42?
19      A.  No.  I don't remember it.
20      Q.  Do you recognize the form of it,
21  though, similar to another one we looked at
22  earlier, right?
23          ATTORNEY BRUSTEIN:  Objection.
24      A.  I remember the format.
25      Q.  Okay.  And if you'll look at the

Page 259

1           V. HOLMES
2   very first, the top of it, ma'am, at least,
3   "The Questions Follow Up From All Employee
4   Town Hall Call," right?  Do you see where I'm
5   referring to on the page?
6       A.  I see what you're referring to.
7       Q.  And it says following the two town
8   hall calls hosted by general manager, Rudy
9   Tauscher, right?
10          ATTORNEY BRUSTEIN:  Objection.  Is
11      there a question?
12      Q.  Yeah, do you see where I'm looking
13  at?
14      A.  I see what you're reading.
15      Q.  Okay.  And the date of this at the
16  bottom is August 28, 2020, right?
17      A.  Yes.
18      Q.  Did you participate in any town
19  hall calls prior to August 28, 2020 hosted by
20  general manager, Rudy Tauscher?
21      A.  I don't remember.
22      Q.  And so I take it you don't remember
23  anything that might have been said at them
24  either, correct?
25          ATTORNEY BRUSTEIN:  Objection.

Page 260

1           V. HOLMES
2       A.  I don't remember.
3       Q.  And if you take a look at the
4   second page, ma'am, Bates number 89.  And we
5   have boxes for August 28 to September 3,
6   birthdays and anniversaries, right?
7       A.  Yes, I see that.
8       Q.  Okay.  I take it your testimony is
9   that you don't know whether any of the people
10  that are listed, for example, on anniversaries
11  would, because they're marking their
12  anniversary, still be employed?
13          ATTORNEY BRUSTEIN:  Objection.
14      A.  I don't know.
15      Q.  What would be your assumption?
16          ATTORNEY BRUSTEIN:  Objection.
17      A.  I don't have an assumption on that.
18          (Defendants' Exhibit 43, Staley v
19      FSR 0221 was marked for identification).
20      Q.  I am handing you, Ms. Holmes, what
21  has been marked as exhibit 43, which for the
22  record is a document that bears the Bates
23  number Staley v FSR 0221.  Before I turn to
24  this, ma'am.  The document that we had marked
25  as exhibit 42, is that one of the documents

Page 261

1           V. HOLMES
2   that you gathered from the files you have in
3   some fashion, be it electronic or paper, to be
4   produced in this case?
5           ATTORNEY BRUSTEIN:  Objection.
6       A.  I don't remember.
7       Q.  Okay.  Let's go to exhibit 43.
8   Have you ever seen exhibit 43 before?
9           (The witness reviews document.)
10      A.  Yes, I remember seeing this.
11      Q.  Okay.  You remember this one.  You
12  understood at this point in time – it says In
13  my last communication with you on August 11,
14  2020, do you see that in the fourth paragraph
15  down?
16      A.  I see it.
17      Q.  Okay.  By the way, you have seen
18  this before.  Did you see it on or around
19  September 17, 2020?  And I mean in that time
20  period.  Or have you seen it since that time
21  period in connection with this case?
22      A.  I don't remember.
23      Q.  You don't remember.  Did you read
24  it when you first saw it?
25          ATTORNEY BRUSTEIN:  Objection.

V. HOLMES

1
2     Q.  Did you read exhibit 43 when you
3  first saw it?
4        ATTORNEY BRUSTEIN:  Objection.
5     A.  I don't remember.  But I remember
6  this going -- you know, this happening.
7     Q.  Okay.  And what is the "this"
8  you're referring to when you say "this
9  happening"?
10    A.  I remember Rudy Tauscher saying
11  that we would go back to work possibly at the
12  end of the year.  Or that the decision was
13  extended until the end of the year.
14    Q.  Okay.  And so you remember --
15    A.  The verbiage.
16    Q.  I'm sorry.  Go ahead?
17    A.  The verbiage.
18    Q.  The verbiage.  Do you remember the
19  prior date, the October 15, 2020 date being
20  referenced at the same time?
21    A.  I don't remember that.
22    Q.  Okay.  Anything else that you
23  recall about this, exhibit 43?
24    A.  I don't remember anything else.
25    Q.  What was happening at the hotel, to

V. HOLMES

1
2  the extent of your knowledge, during the time
3  period let's say after June of 2020 until the
4  end of year-end 2020?
5     A.  Repeat that?
6        ATTORNEY BRUSTEIN:  Objection.
7     Q.  Yeah.  In terms of what was
8  happening inside the structure, the building
9  of the hotel from June of 2020 until year-end
10  2020, do you have any knowledge or
11  understanding of what was going on?
12       ATTORNEY BRUSTEIN:  Objection.
13    A.  I don't know.
14    Q.  Did you have any conversations with
15  any of the folks you know who continued to
16  work there about what was going on?
17    A.  I don't remember.
18    Q.  Did you have any understanding
19  about discussions or things at the hotel about
20  how to make it safer, now with the lessons
21  learned from COVID?
22       ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't know.
24    Q.  When you were at the hotel, after
25  COVID struck but before they closed down to

V. HOLMES

1
2  outside operations, I want to focus on that
3  time period, just before March 20 of 2020,
4  were there protocols put in place to ensure
5  health and safety, given the fact that COVID
6  had broken out but the hotel was still open?
7        ATTORNEY BRUSTEIN:  Objection.
8     A.  I don't understand.
9     Q.  Yeah, sure.  There was a time
10  period after COVID was revealed before the
11  hotel actually closed down to guests from, you
12  know, taking reservations, right?
13    A.  Okay.
14    Q.  That's true, right?  You recall
15  that, right?
16       ATTORNEY BRUSTEIN:  Objection.
17    A.  Do I recall them stopping guests
18  from coming in?
19    Q.  Yes.  Do you recall that COVID was
20  discovered in the United States --
21    A.  Mm-hmm.
22    Q.  -- and there was a time period
23  between that date and the time that it got so
24  bad that the hotel and other businesses closed
25  down?

V. HOLMES

1
2        ATTORNEY BRUSTEIN:  Objection.
3     A.  I don't understand.
4     Q.  Okay.  The hotel closed down March
5  20 of 2020, right?
6        ATTORNEY BRUSTEIN:  Objection.
7     Q.  Ceased taking outside reservations
8  and outside guests?
9     A.  I don't remember.
10    Q.  You don't know?
11    A.  I don't know.  I don't remember.
12    Q.  Did you work at the hotel at a time
13  period in March of 2020 before it shut down to
14  outside guests?
15    A.  I worked at the hotel before they
16  shut down to outside guests.
17    Q.  Yes.  And specifically in March of
18  2020, like during those first several weeks of
19  March?
20    A.  I worked in March.
21    Q.  Okay.  And were there any protocols
22  or directives put in place to guard against
23  the transmission of COVID-19 during that time
24  period?
25    A.  I don't remember.

Page 266

V. HOLMES

1
2    Q.  You don't remember there being like
3  an a no handshake policy?
4    A.  I don't remember.
5    Q.  You don't remember whether they
6  were telling people to keep distance from one
7  another during that time period?
8    A.  I don't remember.
9    Q.  During the time period that you
10  were doing payroll, before you stopped doing
11  payroll at the end of June-ish in 2020, is
12  that fair, right around there?
13    ATTORNEY BRUSTEIN:  Objection.
14    A.  Stopped doing payroll when?
15    Q.  In 2020.  I think you said you
16  continued to do work on a reduced time basis
17  doing the payroll for your department after
18  COVID struck up to a certain point in time,
19  right?
20    A.  From home, or from --
21    Q.  Yes, from home.
22    A.  Oh, from home?  Yes, I was working
23  one day per week.
24    Q.  Okay.  What efforts were going on
25  at the hotel to retrofit or refit things to

Page 267

V. HOLMES

1
2  account for the possibility of contamination
3  from COVID spreading?
4    ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't know.
6    Q.  Do you know whether there was
7  anything going on?
8    A.  I don't know.
9    (Defendants' Exhibit 44, FSR 0058
10    was marked for identification).
11    Q.  Ms. Holmes, I'm handing you what
12  has been marked as exhibit 44, which for the
13  record is a document bearing the Bates number
14  FSR 0058.  My first question, ma'am, is have
15  you seen exhibit 44 before?
16    (The witness reviews document.)
17    A.  I don't remember seeing it, but I
18  do know of it.
19    Q.  You knew about the change?
20    A.  Yes.
21    Q.  Okay.  Was information like that
22  shared outside of Four Seasons employees, to
23  your knowledge?
24    ATTORNEY BRUSTEIN:  Objection.
25    A.  I don't know.

Page 268

V. HOLMES

1
2    Q.  So with respect to the documents
3  we've been looking at that are in that nice
4  little Four Seasons stationery that we see
5  there at the top, were those, the
6  communications that we've been looking at, in
7  your understanding, internal communications
8  only or were they sent to people who were not
9  employees?
10    ATTORNEY BRUSTEIN:  Objection.
11    A.  I don't know.
12    (Defendants' Exhibit 45, Staley
13    v FSR 0001 was marked for
14    identification).
15    Q.  I am handing you, ma'am, what has
16  been marked as exhibit 45 which for the record
17  is a document bearing the Bates number Staley
18  v FSR 0001.  I think I sort of got to this a
19  little bit when we were talking earlier, but I
20  wanted to confirm, ma'am.  Have you ever seen
21  this email before?
22    (The witness reviews document.)
23    A.  I don't remember it.
24    Q.  Do you know whether this was a
25  document that you found in your email and

Page 269

V. HOLMES

1
2  produced in this lawsuit?
3    A.  I don't remember.
4    ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't remember.
6    Q.  Have you seen emails before,
7  ma'am -- do you understand what group email
8  addresses are, in terms of sending things out
9  to a group?
10    A.  I understand what a group email is.
11    Q.  Yes.  And do you see that under
12  Elizabeth Ortiz from, there's a date for a
13  sent date and then there's to, right?
14    A.  I see that.
15    Q.  Okay.  And do you see NYF All Staff
16  DST, and then there are some carets, and then
17  an address, right?  All Staff NYF DST
18  @Fourseasons.com?
19    A.  I see that.
20    Q.  Were you a recipient of emails
21  addressed to that group in 2020?
22    ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't know.
24    Q.  When you looked at your emails to
25  produce them in this case did you look to see

V. HOLMES

1
2  whether there were any emails addressed to the
3  group email address, that were nonetheless in
4  your email files?
5      A.  I don't remember.
6          (Defendants' Exhibit 46, Staley
7      v FSR 0059 was marked for
8      identification).
9      Q.  I am handing you, ma'am, what has
10  been marked as exhibit 46, which for the
11  record is a document bearing the Bates number
12  Staley v FSR 0059.
13          Have you ever seen exhibit 46
14  before, ma'am?
15          (The witness reviews document.)
16      A.  I don't remember.
17      Q.  If you take a look, this is dated
18  December 3 of 2020, is that right?
19      A.  That's what it says, yes.
20      Q.  And if you look at the second
21  paragraph, the second sentence, it says most
22  major attractions remain closed while
23  restaurants suffer from several eliminations.
24  Do you have any reason to believe that that's
25  not true --

V. HOLMES

1
2      ATTORNEY BRUSTEIN:  Objection.
3      Q.  -- as of December 3, 2020?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  I don't know whether it's true or
6  not.
7      Q.  Okay.  I know you don't.  Do you
8  have any reason to believe that it isn't true?
9      ATTORNEY BRUSTEIN:  Objection.
10      A.  I don't know.
11      Q.  Okay.  And it says travel
12  restrictions are still prohibitive requiring
13  travelers from 45 states to quarantine for at
14  least four days.  Right?
15      ATTORNEY BRUSTEIN:  Objection.
16      A.  I'm sorry?  What are you asking?
17      Q.  I was reading the next sentence,
18  actually.  It says travel restrictions are
19  still prohibitive requiring travelers from 45
20  states to quarantine for at least 4 days.
21  That's what's written there, right?
22      A.  That's what's written there.
23      Q.  Do you know whether it's true or
24  not?
25      A.  I don't know.

V. HOLMES

1
2      Q.  Do you have any reason to believe
3  it's false?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  I don't know.
6      Q.  I understand you don't know whether
7  it's true or false.  I want to know if you
8  have any reason to believe it's false?
9      ATTORNEY BRUSTEIN:  Objection.
10      A.  I can't answer that.
11      Q.  Okay.  It says "In addition,
12  coronavirus is now surging in states across
13  the country as well as in several markets
14  abroad, a situation that is expected to
15  continue into the winter months."
16          Right?  At least that's what it
17  says?
18      A.  That's what you read, yes.
19      Q.  Do you know whether that's true or
20  false?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  I don't know.
23      Q.  Do you have any reason to believe
24  it's false?
25      ATTORNEY BRUSTEIN:  Objection.

V. HOLMES

1
2      A.  I can't answer that.
3          (Defendants' Exhibit 47, Staley v
4      FSR 0213 was marked for identification).
5      Q.  Ms. Holmes, I'm handing you what
6  has been marked as exhibit 47, which for the
7  record is a document bearing the Bates number
8  Staley v FSR 0213.  First of all, my question
9  is if you have ever seen exhibit 47 before?
10          (The witness reviews document.)
11      A.  No.  I don't remember this.
12      Q.  Okay.
13      A.  In February of 2020?
14      Q.  Well, that's what I am going to
15  point out, ma'am.  That appears to be some
16  snafu on the dates and I was wondering if you
17  noticed that.  Because in February 8 of 2020
18  there had not been yet an announcement in
19  December of 2020 that they were hopeful they
20  were going to reopen at the end of April 2021,
21  right?  In other words COVID hadn't really hit
22  in February of 2020, correct?
23      ATTORNEY BRUSTEIN:  Objection.
24      Q.  COVID hadn't really hit in February
25  of 2020 yet, had it?

V. HOLMES

1
2      ATTORNEY BRUSTEIN:  Objection.
3      A.  I can't answer that.
4      Q.  Okay.  You don't remember seeing
5  this document before?
6      A.  No, I don't.
7      Q.  Okay.  I just want to ask you a
8  couple of questions and see if this is your
9  understanding.  I'm going to point you to the
10  time period of February 2021.  I want to ask
11  you if this is your understanding of the state
12  of events in February of 2021, okay?
13      And it says:  "Unfortunately," this
14  is the second paragraph, "given the current
15  state of the pandemic, local and state
16  restrictions and the continued lack of demand,
17  a reopening in April is just not feasible."
18      And you see the prior sentence says
19  April of 2021.
20      Is that your understanding of the
21  state of affairs that existed in February of
22  2021?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  I don't know.
25      Q.  Okay.  It says:  While our primary

V. HOLMES

1
2  concern has always been the health and safety
3  of our employees and guests, it also needs to
4  be financially viable for us to open [sic]
5  right?  It says that?
6      ATTORNEY BRUSTEIN:  Objection.
7      Q.  For us to reopen.  Sorry.  Do you
8  see that sentence, ma'am?
9      A.  I see what you read, yes.
10      Q.  Did you have an understanding about
11  whether it needed to be financially viable
12  before the hotel could reopen?
13      ATTORNEY BRUSTEIN:  Objection.
14      A.  I don't know.
15      Q.  Okay.  It says:  "The hotels in our
16  competitive set share the same challenges."
17  Right?
18      ATTORNEY BRUSTEIN:  Objection.
19      A.  I don't know.
20      Q.  I'm not asking you to verify
21  whether it's true or not.  I just wanted to
22  point out that that's what the sentence says?
23      A.  Yes.  That's what you read.
24      Q.  Okay.  Who were the hotels that you
25  considered to be in the same competitive set,

V. HOLMES

1
2  I'm just using that word, as the Four Seasons
3  New York at 57th?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  During what time?  Like what are
6  you --
7      Q.  Let's say in 2020, 2021.  What were
8  the other hotels?
9      ATTORNEY BRUSTEIN:  Objection.
10      Q.  That you considered to be the
11  peers, you know, the equals to the Four
12  Seasons New York on 57th?
13      ATTORNEY BRUSTEIN:  Objection.
14      A.  The Ritz-Carlton.
15      Q.  Okay.
16      A.  The St. Regis.  The Mandarin.  To
17  name a few.
18      Q.  Which of those hotels, if any, was
19  reopened in February of 2021?
20      A.  I don't know.
21      ATTORNEY BRUSTEIN:  Objection.
22      Q.  If you look, ma'am, at the
23  paragraph that says:  Given that this
24  continues to be an evolving situation with
25  several unknowns, do you see that paragraph?

V. HOLMES

1
2  I just want to direct you to it.
3      A.  Yes, I see the paragraph.
4      Q.  And it says:  "Once the pandemic
5  conditions improve and demand increases our
6  goal is to confirm a reopening date with you
7  approximately 60 to 90 days in advance of
8  reopening the hotel."  Correct?
9      ATTORNEY BRUSTEIN:  Objection.
10      A.  That's what you read.
11      Q.  Yeah.  Did there come a time where
12  instead of giving like an October 15, 2020,
13  December 2020, April 2021, it switched over to
14  an uncertainty as to the precise date that the
15  hotel would reopen?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  I don't remember.
18      (Defendants' Exhibit 48, Staley
19  v FSR 0060 was marked for
20  identification).
21      Q.  Ms. Holmes, I am handing you what
22  has been marked as exhibit 48, which for the
23  record is a document bearing the Bates number
24  Staley v FSR 0060.
25      And my question is have you ever

Page 278

V. HOLMES

1    seen exhibit 48 before?
2        (The witness reviews document.)
3    A.  I don't remember it.
4    Q.  All right.  Is this one of the
5    documents that you found and turned over to be
6    produced in this case?
7        ATTORNEY BRUSTEIN:  Objection.  Do
8        not answer about whether or not you
9        turned it over.
10   Q.  Okay.  Is this one of the documents
11   you found to be produced in this case?
12   A.  I don't remember.
13       ATTORNEY BRUSTEIN:  Objection.
14   Q.  You don't remember, okay.  If you
15   take a look, ma'am, at the paragraph that
16   begins "We look forward to connecting."
17   A.  Okay.  I see it.
18   Q.  It says: "We look forward to
19   connecting with you next week at our virtual
20   town hall scheduled on Wednesday, March 31, at
21   3 p.m."
22       Did you participate in a virtual
23   town hall on March 31?
24   A.  I don't remember.

Page 279

V. HOLMES

1    Q.  Did you record any other town hall
2    meetings or just the one in June of 2021?
3    A.  I don't remember.
4    Q.  If you looked at your phone or
5    someplace else -- well, strike that.
6        I thought you told me, but tell me
7    if I'm wrong.  The file that you, the actual
8    audio recording that you made of the meeting
9    in June of 2021, that's on your phone, is that
10   right?
11   A.  The recording from June?
12   Q.  Yes.  That's contained on your
13   phone?
14   A.  I do have it on my phone.
15   Q.  Okay.  And you recorded it on your
16   phone, am I right about that?
17   A.  Yes.
18   Q.  Okay.  Did you look on your phone
19   to see if you recorded any other meetings or
20   conversations?
21       ATTORNEY BRUSTEIN:  Objection.
22   A.  I don't remember if I looked.
23   Q.  Okay.  Can you look now?
24       ATTORNEY BRUSTEIN:  Objection.  No,

Page 280

V. HOLMES

1    I'm directing her not to.  If you want a
2    discovery demand, you can put it in
3    writing and we'll consider it.
4    Q.  You are not going to take a look at
5    your phone?  You're following his
6    instructions?  That's fine.
7        ATTORNEY BRUSTEIN:  Objection.
8        You're really crossing the line here.
9        ATTORNEY BOLAND:  I don't see a
10       line on the table.
11       ATTORNEY BRUSTEIN:  That's clever.
12       ATTORNEY BOLAND:  You may answer.
13       ATTORNEY BRUSTEIN:  No, she may
14       not.  I'm directing her not to.
15       (Defendants' Exhibit 49, Staley
16       v FSR 0069 to 80 was marked for
17       identification).
18   Q.  Ms. Holmes, I am handing you what
19   has been marked as exhibit 49, which for the
20   record is a document bearing the Bates number
21   Staley v FSR 0069 to 80.
22       Have you seen exhibit 49 before?
23       (The witness reviews document.)
24   A.  Yes.

Page 281

V. HOLMES

1    Q.  Is this one of the documents that
2    you identified for production in this case?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I'm not sure.
5    Q.  You don't know whether this came
6    from your files or somebody else's files to be
7    produced?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't remember.
10   Q.  If you take a look -- what is
11   exhibit 49, ma'am?
12   A.  COBRA continuation of coverage.
13   Q.  Okay.  And what was the purpose of
14   it, to your understanding?
15   A.  Eligibility for COBRA.
16   Q.  If we take a look down under the
17   box that's sort of shaded, there's a sentence
18   that says coverage provided by Four Seasons
19   and then it goes on?  Do you see where I'm
20   referring to?
21   A.  Yes I see it.
22   Q.  And it talks about the qualifying
23   event and involuntary reduction of work hours,
24   right?

Page 282

V. HOLMES

1
2     A.   Yes, I see that.
3     Q.   And it talks about then the COBRA
4  effective date, 5/1/2021, right?
5     A.   Yes, I see that.
6     Q.   And it says the duration of
7  coverage, 18 months, right?
8     A.   I see that.
9     Q.   Okay.  And then you obviously are
10  identified as the person eligible down below,
11  right?
12     A.   I see my name.
13     Q.   And all of those facts are
14  accurate, right?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.   I see that.
17     Q.   Are those facts accurate?  In other
18  words the qualifying event to your
19  understanding was an involuntary reduction of
20  work hours, right?
21         ATTORNEY BRUSTEIN:  Objection.
22     A.   I see that.  That's what it says
23  there.
24     Q.   I understand that.  I'm asking you
25  is that to your understanding, ma'am,

Page 283

V. HOLMES

1
2  accurate?
3         ATTORNEY BRUSTEIN:  Objection.
4     A.   I don't know.
5     Q.   You have no idea whether or not
6  it's accurate?
7     A.   I don't know.
8     Q.   Okay.
9         (Defendants' Exhibit 50, Staley
10         v FSR 0061 was marked for
11         identification).
12     Q.   Ma'am, I am handing you what has
13  been marked as exhibit 50, which for the
14  record is a document bearing the Bates number
15  Staley v FSR 0061.  And my first question,
16  ma'am, is have you ever seen exhibit 50
17  before?
18         (The witness reviews document.)
19     A.   Yes, I remember this.
20     Q.   Okay.  And is this one of the
21  documents that you identified in your files to
22  be produced?
23         ATTORNEY BRUSTEIN:  Objection.
24     A.   I don't know.
25     Q.   You don't know whether you had this

Page 284

V. HOLMES

1
2  or not?
3     A.   I've seen this.
4     Q.   No, I understand that, ma'am.  I
5  was wondering if you knew you had this in your
6  files?
7     A.   I don't remember.
8     Q.   Do you see it says in the paragraph
9  that says, it says "We know everyone is keen
10  to reopen our hotel and begin welcoming back
11  guests.  At this time, we will continue to
12  remain closed, as the hotel will be undergoing
13  substantial infrastructure and maintenance
14  work that is expected to last well into 2022."
15         Is this the communication you had
16  referred to earlier when you had mentioned to
17  me, and I'm not trying to quote you, that at
18  one point it was said that the hotel was
19  staying closed because of COVID, closed to the
20  outside and then after that it was because of
21  repair work?
22         ATTORNEY BRUSTEIN:  Objection.
23     A.   I'm not sure.
24     Q.   Okay.  When did you learn that, as
25  you testified earlier, the COVID effect on

Page 285

V. HOLMES

1
2  keeping the hotel closed had given way or
3  changed into a concept of repairs and
4  infrastructure work?
5     A.   I don't remember.
6     Q.   What, if anything, have you done
7  since June of 2021 to determine for yourself
8  what work is being done, if any, at the hotel?
9         ATTORNEY BRUSTEIN:  Objection.
10     A.   I don't know.
11     Q.   No, I know you don't know.  What
12  did you do to try to find out, if anything?
13         ATTORNEY BRUSTEIN:  Objection.
14     A.   I can't answer that.
15     Q.   Well, sure.  I'm trying to ask you,
16  ma'am:  Did you make any efforts, you
17  personally make any efforts after June of 2021
18  up until today to find out what work, if any,
19  is actually going on in terms of repair,
20  infrastructure work at the hotel?
21         ATTORNEY BRUSTEIN:  Objection.
22     A.   I haven't done anything.
23     Q.   Pardon?
24     A.   I have not done anything.
25     Q.   You haven't had communications with

Page 286

V. HOLMES

1
2  any of the folks you know who are still
3  working there?
4     A.  Oh, I don't remember.
5     Q.  Who do you know, if anyone, who is
6  still working there right now?
7     A.  I don't know.
8     Q.  Okay.  Who, if anyone, do you know
9  that was still working there after, let's say
10  at any point after June of 2021?
11    A.  I don't remember.
12    Q.  Is there anybody, putting aside the
13  names, are you aware of knowing people who
14  were still working there or you're just
15  blanking on that?
16       ATTORNEY BRUSTEIN:  Objection.
17    A.  Could you ask the question again?
18    Q.  Yeah.
19    A.  You're going pretty fast --
20    Q.  I am?
21    A.  -- with a lot of questions and, you
22  know, if you could slow down that would help.
23    Q.  Sure.
24    A.  Thank you.
25    Q.  What I want to know is after June

Page 287

V. HOLMES

1
2  of 2021 can you identify any people you know
3  who continued to work at the hotel?
4     A.  I don't remember.
5        ATTORNEY BRUSTEIN:  Can we take
6  another five break?
7        ATTORNEY BOLAND:  Sure.
8        ATTORNEY BRUSTEIN:  Thank you.
9        ---
10       (Recess from 4:14 to 4:23.)
11       ---
12       (Defendants' Exhibit 51, Staley
13    v FSR 0082 to 85 was marked for
14    identification.)
15    Q.  Ms. Holmes, I am handing you what
16  has been marked as exhibit 51, which for the
17  record is a document bearing the Bates number
18  Staley v FSR 0082 to 85.
19       Have you ever seen exhibit 51?
20       (The witness reviews document.)
21    A.  Yes.
22    Q.  You have, okay.  Is this one of the
23  documents that you retrieved from your files
24  to be produced?
25    A.  I don't remember.

Page 288

V. HOLMES

1
2     Q.  Okay.  This one you recognize.  Is
3  there a reason you could tell me why you
4  remembered this one versus some of the other
5  ones we saw?
6     A.  I just remember this one.
7     Q.  Okay.  And this was one of the
8  information memos or some sort that was sent
9  out, this one's dated July 9 of 2021, correct?
10    A.  That's what it says.
11    Q.  Yes.  On the page 85 -- sorry.  The
12  Bates number 85.  The one that we talked about
13  that little number in the lower right-hand
14  corner.
15    A.  Yes.
16    Q.  You'll see we have the two boxes,
17  the one for anniversaries and the one for
18  birthdays, each during the period of July 3
19  through 15?
20    A.  Yes, I see it.
21    Q.  And if you look at the folks with
22  the anniversary dates, do you recognize any of
23  those names?
24    A.  Yes.
25    Q.  Who do you recognize?

Page 289

V. HOLMES

1
2     A.  Lyneate Agyeman, Edward Nieves, Li
3  Hong, Pamela Mapp, Winnie Chan, Uddin, Martin
4  Munoz, Maribel Rodriguez.  And I believe Tara.
5  I don't remember her last name.
6     Q.  Had any of those folks left their
7  employment with the hotel prior to the date
8  here of July 3 to 15, when they're reported
9  with having their service anniversaries?
10       ATTORNEY BRUSTEIN:  Objection.
11    A.  I don't know.
12    Q.  Were they still employees as of
13  this time period, you know, July 9 of 2021?
14       ATTORNEY BRUSTEIN:  Objection.
15    A.  I don't know.
16    Q.  Are they still employees today?
17       ATTORNEY BRUSTEIN:  Objection.
18    A.  I don't know.
19    Q.  Have you ever seen in any of these
20  documents, ma'am, a service anniversary being
21  reported for an employee who was no longer
22  employed by the company at the time that the
23  list was posted?
24       ATTORNEY BRUSTEIN:  Objection.
25    A.  I don't remember.

Page 290

V. HOLMES

1
2      (Defendants' Exhibit 52, Staley
3   v FSR 0062 to 64 was marked for
4   identification).
5      Q.  I am handing you what has been
6   marked as exhibit 52, which for the record is
7   a document bearing the Bates number Staley
8   v FSR 0062 to 64.
9         And my first question is do you
10  recognize exhibit 52?
11      (The witness reviews document.)
12      A.  Yes, I remember this.
13      Q.  You remember this?
14      A.  Mm-hmm.
15      Q.  Okay.  When you say you remember
16  this one, and you remember the other one, that
17  is because you received them or saw them in
18  some fashion at or around the time that
19  they're dated, meaning, you know, the last one
20  was July of 2021, this one's November of 2021,
21  right?
22      ATTORNEY BRUSTEIN:  Objection.
23      A.  I don't remember that.
24      Q.  Okay.  You wouldn't have seen them
25  before the time period that they were dated,

Page 291

V. HOLMES

1   would you have?
2      Q.  ATTORNEY BRUSTEIN:  Objection.
3      A.  I don't know.
4      Q.  Did you ever see any of these
5   before the time period that they were dated;
6   in other words, you know, before the very
7   first date?
8      A.  I'm not sure.
9      Q.  Okay.  Do you have a recollection
10  of that ever happening?
11      A.  I'm not sure.
12      Q.  You're not sure whether you have a
13  recollection of it, or do you have a
14  recollection of it?
15      ATTORNEY BRUSTEIN:  Objection.
16      A.  I don't understand.
17      Q.  Yeah, I understand you're not sure
18  whether you saw one beforehand or not, before
19  the date of it.  I get that.
20      My question is do you have a
21  recollection of that ever happening?
22      ATTORNEY BRUSTEIN:  Objection.
23      A.  I do not have an understanding of
24  that.
25

Page 292

V. HOLMES

1
2      Q.  Okay.  You don't have a
3   recollection of it, right?
4      A.  Uh-uh.
5      Q.  Okay.  You'll see here again we
6   have got, on the second page, a list of
7   birthdays.
8      A.  Yes.
9      Q.  And you look at this list, can you
10  identify anyone here that you know was not
11  employed by the hotel as of November of 2021?
12      ATTORNEY BRUSTEIN:  Objection.
13      A.  I don't know that.
14      Q.  Okay.  And the anniversaries are on
15  the next page, but obviously we can't see
16  that.
17
18      ATTORNEY BRUSTEIN:  Objection.
19      Q.  Is exhibit 52 one of the
20  documents -- and if I asked you this I
21  apologize -- one of the documents that you
22  found in your files to be produced in this
23  case?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  I don't remember.

Page 293

V. HOLMES

1
2      (Defendants' Exhibit 53, Staley
3   v FSR 0050 to 51 was marked for
4   identification).
5      Q.  I am handing you, ma'am, what has
6   been marked as exhibit 53, which is a document
7   bearing the Bates numbers Staley v FSR 0050 to
8   51.
9         Have you ever seen this before?
10      A.  Yes.
11      Q.  What is it?
12      A.  It's my W-2 statement.
13      Q.  For what year, man?
14      A.  2020.
15      Q.  Okay.  Is this one of the documents
16  that you located to be produced in this case?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  I don't remember.
19      Q.  You don't remember whether this was
20  a document that you found to be produced?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  I don't remember.
23      Q.  Okay.  Let's take a look a couple
24  of things, ma'am.  You had mentioned before I
25  think, and tell me if I'm wrong, that one of

Page 294

V. HOLMES

1   the places you looked for documents was on the
2   ADP system?
3
4       ATTORNEY BRUSTEIN:  Objection.
5       A.  Yes.
6       Q.  Okay.  As you sit here today you
7   don't know if this is one of the documents
8   that you found to be produced on that system?
9       ATTORNEY BRUSTEIN:  Objection.
10      A.  That is correct.  I don't remember.
11      Q.  All right.  You had been receiving
12  W-2s, as I understand it annually for the
13  entire time period that you were employed,
14  right?
15      A.  Yes.  Every year.
16      Q.  Every year.  Okay.  This one is for
17  the year end of 2020?  Year-end 2020, right?
18      A.  Yes.  That's what it says.
19      Q.  And who is your employer?
20      ATTORNEY BRUSTEIN:  Objection.
21      A.  The Four --
22      Q.  Who is your employer on the W-2?
23      ATTORNEY BRUSTEIN:  Objection.
24      You're asking two different questions.
25      ATTORNEY BOLAND:  No, I'm not.

Page 295

V. HOLMES

1
2       Q.  You may answer.
3       ATTORNEY BRUSTEIN:  Objection.
4       Q.  Who is identified as your employer
5   on the W-2 that we have marked as exhibit 53?
6       ATTORNEY BRUSTEIN:  Objection.
7       A.  On the W -- on the W-2 it says
8   Hotel 57 Services, LLC.
9       Q.  And did you get paid by check or by
10  direct deposit or did it vary over time?
11      A.  It varied over time.
12      Q.  Did you start out like getting paid
13  by check and then switched over to direct
14  deposit?
15      A.  That is correct.
16      Q.  Okay.  When you were paid by check,
17  up until the time -- what time did you switch
18  over?
19      A.  I don't remember.
20      Q.  Who was the payor, what was the
21  check drawn on?  Who paid you prior to the
22  time period that you moved to direct deposit?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  I don't remember.
25      Q.  And in the direct deposit records

Page 296

V. HOLMES

1
2   do you get notification that there's been a
3   deposit made to your account?
4       A.  Yes.
5       Q.  And it goes straight to the bank
6   that you use, is that fair?
7       ATTORNEY BRUSTEIN:  Objection.
8       A.  It says direct deposit.
9       Q.  Yes, direct deposit into your bank?
10  Your personal bank?
11      A.  Yes.
12      Q.  What bank is that?
13      ATTORNEY BRUSTEIN:  Objection.
14      A.  Citibank.
15      Q.  Citibank?  Do you have access to
16  statements from Citibank?  In other words can
17  you pull them online?
18      A.  I'm sure.
19      Q.  Did you make any effort to do that
20  in response to the document request to produce
21  documents in this case?
22      ATTORNEY BRUSTEIN:  Objection.
23      A.  I don't remember.
24      Q.  You don't remember whether you went
25  to Citibank and looked for documents?

Page 297

V. HOLMES

1
2       A.  Well, I didn't go to Citibank.  But
3   I don't remember pulling it, yes.
4       Q.  Pulling it from the website.
5   Sorry.
6       A.  Mm-hmm.
7       (Defendants' Exhibit 54, Staley
8   v FSR 0020 to 21 was marked for
9   identification).
10      Q.  I am handing you, Ms. Holmes, what
11  has been marked as exhibit 54, which for the
12  record is a document that bears the Bates
13  number Staley v FSR 0020 to 21.
14      Do you recognize exhibit 54?
15      A.  Yes.
16      Q.  And what is it?
17      A.  A W-2.
18      Q.  A W-2 for you?
19      A.  Yes.
20      Q.  And what is the year?
21      A.  2021.
22      Q.  And is this one of the documents
23  that you gathered to be produced in the case?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  I don't remember.

Page 298

V. HOLMES

1
2    Q.  Well, let me ask you a question,
3    and this is just to understand.  Do you have
4    any understanding as to how your W-2s could
5    have been produced by the plaintiffs in this
6    case if you weren't the person to get them?
7        ATTORNEY BRUSTEIN:  Objection.
8        A.  I'm not sure.
9        Q.  All right.  And who is the employer
10   identified on this W-2?
11       A.  It reads Hotel 57 Services, LLC.
12       Q.  So you were paid by Hotel 57
13   Services, LLC in 2020, right?
14       ATTORNEY BRUSTEIN:  Objection.
15       A.  I'm not sure.
16       Q.  Well, you got a W-2 from them.  Did
17   you not get that money that was reflected in
18   the W-2?
19       A.  I see that it says Hotel 57
20   Services in 2020, that's what you showed me.
21       Q.  Yes.
22       A.  Right.
23       Q.  You were paid, by whatever you want
24   to call it, you were paid by the hotel if we
25   want to put it that way, in 2020, were you

Page 299

V. HOLMES

1
2    not?
3        ATTORNEY BRUSTEIN:  Objection.
4        A.  I don't know how to answer that.
5        Q.  Okay.  You got a W-2 from Hotel 57
6    Services, LLC for 2020, right?
7        A.  That is correct.
8        Q.  What did that relate to?
9        A.  To me working.
10       Q.  At the hotel?
11       A.  Yes.
12       Q.  Okay.  So you were paid for working
13   at the hotel in 2020, right?
14       A.  Yes.
15       Q.  You got a W-2 from Hotel 57
16   Services, LLC for 2021, right?
17       A.  Yes.
18       Q.  What did that relate to?
19       ATTORNEY BRUSTEIN:  Objection.
20       A.  To working.
21       Q.  So you were paid by the hotel in
22   2021, right?
23       A.  I was paid by -- correction.  I was
24   paid by the hotel in 2021 because I asked to
25   be paid benefit time owed to me.

Page 300

V. HOLMES

1
2        Q.  Okay?
3        A.  Because I needed money.
4        Q.  Fair enough.  But you were still
5    paid during 2021, right?
6        A.  That is correct.
7        Q.  Okay.
8            (Defendants' Exhibit 55, Staley
9        v FSR 0027 was marked for
10       identification).
11       Q.  I am handing you what has been
12   marked as exhibit 55 which has the Bates
13   number Staley v FSR 0027.
14       A.  Can I backtrack?
15       Q.  Yes.
16       A.  For 2021, sorry.  That wasn't for
17   benefit time.
18       Q.  Okay.  Whatever it was for, you
19   were paid some money?
20       ATTORNEY BRUSTEIN:  Objection.
21       A.  Yes, I was paid some money.
22       Q.  Okay.  And I have handed you what
23   has been marked as exhibit 56.  Did I give it
24   to you?
25       A.  55.

Page 301

V. HOLMES

1
2        ATTORNEY BRUSTEIN:  55.
3        ATTORNEY BOLAND:  Oh, yes.  55, I'm
4    sorry.
5        Q.  Do you recognize exhibit 55, ma'am?
6        A.  Yes.
7        Q.  What is it?
8        A.  It's my pay stub for vacation.
9        Q.  Okay.  And when were you paid the
10   vacation?
11       A.  In June 30 of 2022.
12       Q.  Okay.  Is exhibit 55 one of the
13   documents that you pulled and gathered to be
14   produced in the case?
15       ATTORNEY BRUSTEIN:  Objection.
16       A.  I'm not sure.
17       Q.  You don't know how it ended up in
18   the production that plaintiffs made in the
19   case?
20       A.  I'm not sure how I produced it.  Or
21   produced it.
22       Q.  You don't know whether you're the
23   one who got this or not?
24       A.  Correct.
25       Q.  Okay.  Who is the employer

Page 302

V. HOLMES

1
2  identified on your earnings statement?
3      ATTORNEY BRUSTEIN: Objection.
4      A.  On this paper it says Hotel 57
5  Services, LLC, and it also says Four Seasons
6  Hotel.
7      Q.  What does it say before Four
8  Seasons Hotel?
9      A.  D/b/a.
10     Q.  What does that mean?
11     A.  I have no idea.
12     Q.  Okay.  So we looked at some dates
13  earlier about when the hotel stopped taking
14  visitors from outside.  Just to take us back
15  to that time period of March of 2020.  Do you
16  remember that, looking at documents that
17  showed that?
18     A.  I remember you talking about it.
19     Q.  Do you remember when the hotel
20  stopped taking visitors in, ma'am?
21     ATTORNEY BRUSTEIN: Objection.
22     A.  I don't remember the date.
23     Q.  Okay.  Do you remember it was in
24  March of 2020, putting aside whatever specific
25  date it was?

Page 303

V. HOLMES

1
2      ATTORNEY BRUSTEIN: Objection.
3      A.  I don't remember.
4      Q.  Do you remember it was around March
5  of 2020?
6      ATTORNEY BRUSTEIN: Objection.
7      A.  I don't remember.
8      Q.  So it could have been 2019; fair?
9      ATTORNEY BRUSTEIN: Objection.
10     Q.  As far as you know?
11     ATTORNEY BRUSTEIN: Objection.
12     Q.  Could it have been 2019, ma'am,
13  that the hotel stopped taking visitors in
14  because of COVID, based on your recollection?
15     A.  No.
16     Q.  Okay.  It was in 2020, was it not?
17     A.  It was in 2020.
18     Q.  Okay.  Within the first three
19  months?  The first four months?  When was it?
20     ATTORNEY BRUSTEIN: Objection.
21     A.  I don't remember.
22     Q.  Was it in June?  Was it in April?
23  Can you give me any kind of -- anything other
24  than it was in 2020?
25     ATTORNEY BRUSTEIN: Objection.

Page 304

V. HOLMES

1
2      A.  No, I can't.
3      Q.  So it could have been July of 2020,
4  based on your recollection of events, right?
5      ATTORNEY BRUSTEIN: Objection.
6      A.  I don't remember.
7      Q.  No, my question was different.
8  Based on your recollection of events, and your
9  inability to remember any date of it, it could
10  have been July 2020 when the hotel stopped
11  taking guests from the outside through
12  reservations and the like, right?
13     ATTORNEY BRUSTEIN: Objection.  And
14  that wasn't the question you were asking
15  before.
16     Q.  You may answer.
17     ATTORNEY BRUSTEIN: Objection.
18     A.  It could be whatever you have on
19  paper.
20     Q.  Okay.
21     A.  I don't know that.
22     Q.  All right.  At some point in 2020,
23  though, and you don't know when it was, the
24  hotel stopped taking visitors from the outside
25  through reservations, right?

Page 305

V. HOLMES

1
2      A.  They stopped taking guests.
3      Q.  Stopped taking guests, thank you.
4  That's a good way of putting it.
5          You filed the lawsuit on, we looked
6  earlier, in August of 2022, do you remember
7  that?
8      A.  Yes.
9      Q.  Why did you sue in August of 2022?
10     ATTORNEY BRUSTEIN: Objection.  Do
11  not answer.
12     ATTORNEY BOLAND: Why?
13     Q.  You can answer.
14     ATTORNEY BOLAND: She can answer
15  the question.
16     ATTORNEY BRUSTEIN: About the date
17  that she filed the lawsuit?
18     ATTORNEY BOLAND: Yes.  The hotel
19  shut down in 2020.  She didn't file the
20  lawsuit until 2022.  I want to know why
21  she filed in 2022.
22     ATTORNEY BRUSTEIN: I am going to
23  instruct her not to answer it to the
24  extent that it calls for attorney-client
25  communication.

Page 306

V. HOLMES

1
2   Q. You can answer, ma'am. Why did you
3   file in 2022?
4   A. I can't answer that.
5   Q. Well, you told me that you went and
6   you got -- you had a discussion about a
7   referral with, I can't remember the person's
8   name, I'm so sorry, and you got Mr. Brustein's
9   name and Ms. Risman's name. Right?
10  ATTORNEY BRUSTEIN: Objection.
11  Q. Do you remember testifying to that
12  earlier?
13  A. Could you repeat that?
14  Q. Yeah, sure. We talked earlier
15  about how you found out about the lawyers in
16  the case and you said you were referred to
17  them, correct?
18  A. That is correct.
19  Q. Okay. And you had a conversation,
20  and I think you said it was in 2021, over a
21  year before you actually filed, with somebody
22  who gave you those names; fair?
23  ATTORNEY BRUSTEIN: Objection.
24  Q. Is that accurate, ma'am?
25  A. Yes.

Page 307

V. HOLMES

1
2   Q. Okay. What prompted you to
3   actually file a lawsuit, and I don't want to
4   know what lawyers told you, I want to know why
5   you made the decision to file a lawsuit in
6   August of 2022?
7   ATTORNEY BRUSTEIN: Objection. I
8   direct her not to answer that question.
9   Q. You're not going to tell me as the
10  class representative in this case, a person
11  who wants to be the class representative, why
12  you sued in August of 2022?
13  ATTORNEY BRUSTEIN: Objection.
14  Just because you raise your voice
15  doesn't make it an appropriate question.
16  Q. You're not going to answer the
17  question?
18  A. I'm not going to answer it.
19  Q. Okay. Did something happen, some
20  event happen in the time period just prior or,
21  or just before August of '22 to make you
22  decide that you wanted to proceed towards a
23  lawsuit?
24  ATTORNEY BRUSTEIN: Objection.
25  A. We weren't called back to work.

Page 308

V. HOLMES

1
2   Q. Well, okay. But you hadn't been
3   called back to work in January of 2022,
4   correct?
5   A. That is correct.
6   Q. And you didn't sue in January of
7   2022, right?
8   A. I think that's irrelevant, when I
9   decided to sue. The entire city is open,
10  okay? The hotels are open. Broadway's open.
11  I feel that you guys deliberately were not
12  opening the hotels for us were for other
13  reasons other than for business.
14  Q. Okay. Are you finished?
15  A. I am.
16  Q. All right.
17  ATTORNEY BRUSTEIN: Let's take a
18  five minute break.
19  ATTORNEY BOLAND: No, I'm in the
20  middle of a question.
21  ATTORNEY BRUSTEIN: You're actually
22  not.
23  ATTORNEY BOLAND: Fine. Take the
24  witness out. Go ahead. Go ahead.
25  We'll take a break.

Page 309

V. HOLMES

1
2   ATTORNEY BRUSTEIN: Thank you.
3   ---
4   (Recess from 4:44 to 4:52.)
5   ---
6   Q. Okay. Before we broke I was asking
7   you what prompted you to sue in August of 22,
8   when the hotel had been closed for a while in
9   2020, 2021, and then throughout 2022, I was
10  wondering if there was some sort of triggering
11  event for you to make a decision yeah, I want
12  to file a lawsuit?
13  ATTORNEY BRUSTEIN: Objection.
14  A. There wasn't a triggering event.
15  It's just that enough is enough.
16  Q. And that's because the hotel hadn't
17  reopened, is that --
18  A. The hotel has not reopened. They
19  do not communicate properly. They're paying
20  some people, they're not paying other people.
21  They're giving severance to union employees at
22  an amount that is not even contractual. Just
23  a lot is going on with the hotel. I had been
24  there for 20 something years and I feel that I
25  deserve more than what has been given to me.

Page 310

```
1           V. HOLMES
2  And to others, just like myself.
3    Q.  Okay.
4    A.  They just want us to like
5  disappear, get another job so that they don't
6  have to deal with us.
7    Q.  Okay.  So --
8    A.  And it's not fair.
9    Q.  And is it fair to say you reached a
10 breaking point or so, so to speak, by August
11 of '22 and that that's caused you to --
12    A.  You can call it whatever you want.
13 It's just enough for me.
14    Q.  Enough for you, okay.  Fair enough.
15 Do you have the amended complaint that we
16 asked you to keep out?  If you haven't, that's
17 fine.
18    A.  Yes, I do.
19    Q.  Let's take a look at the first
20 page, ma'am.  You've sued a number of
21 different defendants, do you see that?
22    A.  I see that.
23    Q.  Okay.  And I want to go through
24 them and I want to ask you a little bit about
25 each of them, okay?
```

Page 311

```
1           V. HOLMES
2        We looked at your W-2s and the
3  employer's name and address and ZIP code was
4  identified on those, and the employer was
5  identified as Hotel 57 Services, LLC.  Do you
6  remember that?
7        ATTORNEY BRUSTEIN:  Objection.
8    A.  I see the 57, LLC.
9    Q.  Yeah.  And you saw it on your W-2s,
10 correct?
11    A.  I see it on my W-2.
12    Q.  Okay.  So you sued Hotel 57
13 Services, LLC.  What did Hotel 57 Services,
14 LLC do wrong that caused you to sue it?
15        ATTORNEY BRUSTEIN:  Objection.
16    A.  That's what I have my attorneys
17 for.
18    Q.  Well, I want to know if you have
19 any understanding, ma'am, or any contention --
20 your attorneys can't testify --
21        ATTORNEY BOLAND:  Strike that.
22    Q.  Your attorneys can't testify in the
23 case.  You understand you're going to testify
24 at trial, right?
25    A.  Yes, I understand that.
```

Page 312

```
1           V. HOLMES
2    Q.  Okay.  What I want to know is, I
3  want to find out what your testimony is going
4  to be about Hotel 57 Services, LLC, that's why
5  we're taking the deposition.  And I am asking
6  you, in your understanding what did Hotel 57
7  Services, LLC do that caused you to sue it?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't know how to answer that.
10    Q.  Okay.  Why did you sue Hotel 57
11 Services, LLC?
12    A.  To me all of these entities are all
13 and the same.  It's just you guys hiding
14 behind companies.
15    Q.  Who is the "you guys" you're
16 talking about?
17    A.  Four Seasons, Ty Warner.  You know,
18 whoever is paying me, since there's always
19 different information.  I don't know.  These
20 are all the entities.
21    Q.  Okay.  So what I have to find out,
22 ma'am, is what your personal knowledge is
23 about Hotel 57 Services, LLC.  Because I need
24 to know what you are going to be able to
25 testify to them at trial.  What is Hotel 57
```

Page 313

```
1           V. HOLMES
2  Services, LLC?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't know.
5    Q.  Did you make any investigation
6  before the complaint was filed to find out
7  what Hotel 57 Services, LLC is?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't know what it is.  I know
10 that it's a name.  It's on my paycheck.  It's
11 on, you know, documents.  I see the Four
12 Seasons and the Ty Warner and they're
13 fighting.  It's in newspapers, it's in
14 magazines.  Everyone is talking and names are
15 thrown left and right.
16    Q.  Okay.
17    A.  So whatever sticks, you take.
18    Q.  Let's look at page 11 of your first
19 amended complaint, ma'am.
20    A.  I'm sorry.  Page what?
21    Q.  Page 11.
22    A.  Sure.
23    Q.  And you'll see that there's a
24 section called Hotel 57 Services, LLC and then
25 there's a colon after that, do you see that on
```

Page 314

V. HOLMES

1
2  the page?
3     A.  Number 67 you said?
4     Q.  It's right above 67.
5     A.  Okay.
6     Q.  And then you'll see that there are
7  a number of numbered allegations starting at
8  67 that continue on for a few pages up until
9  92. Do you see that?
10    A.  I see that.
11    Q.  So by my count, ma'am, we've got 26
12 numbered allegations in there.  Do you see the
13 words in, let's take 67, "information and
14 belief"?
15    A.  I see that.
16    Q.  Okay. By my count 18 allegations
17 have that heading, which is about 70 percent
18 of the allegations about Hotel 57 Services,
19 LLC.  What --
20    ATTORNEY BRUSTEIN:  Objection.
21    That's a statistic you made up.
22    Q.  What does "upon information and
23 belief" mean, based on your understanding?
24    ATTORNEY BRUSTEIN:  Objection.
25    A.  I don't know what it means.  I

Page 315

V. HOLMES

1
2  don't write it.  That's what I have my
3  attorneys for, to put in the language that you
4  guys understand.
5     Q.  Okay. So you don't know what upon
6  information and belief means, fair?
7     ATTORNEY BRUSTEIN:  Objection.
8     A.  Fair.
9     Q.  Okay.  What, if anything, did you
10 do to confirm the accuracy of any of the
11 allegations in paragraphs 67 to 92?
12    ATTORNEY BRUSTEIN:  Objection.
13    A.  I don't know how to answer that.
14    Q.  Did you do any investigation,
15 ma'am, to determine what you were saying in
16 paragraphs 67 to 92 of your first amended
17 complaint was true?
18    ATTORNEY BRUSTEIN:  Objection.
19    A.  I don't know how to answer that.
20    Q.  You don't know how to answer that?
21    A.  No.
22    Q.  I'm sorry.  I'm trying to ask the
23 question as clearly as possible.  I apologize
24 if I am not.
25    Did you conduct any investigation,

Page 316

V. HOLMES

1
2  yourself, research, anything, to determine
3  whether the allegations in paragraphs 67 to 92
4  of your first amended complaint were true?
5     ATTORNEY BRUSTEIN:  Objection.
6     A.  Again, I don't know how to answer
7  that.
8     Q.  Well, let's take a look at one of
9  them. It says, 86:  Hotel 57 Services --
10    ATTORNEY BRUSTEIN:  What page?
11    ATTORNEY BOLAND:  I'm sorry.  Page
12    13. Paragraph 86.
13    A.  13?
14    Q.  Yes, it's on page 13.  "Hotel 57
15 Services, LLC managed the hotel."
16    Right?  That's your allegation?
17    A.  I see it.
18    Q.  Okay.  And that's not on
19 information and belief, right?  That doesn't
20 have that language in there, correct?
21    A.  I don't understand the question.
22    Q.  It doesn't have the words "upon
23 information and belief" starting it the way
24 many of the other allegations do, correct?
25    A.  That is correct.

Page 317

V. HOLMES

1
2     Q.  Okay.  Did you do anything to
3  determine whether this statement, "Hotel 57
4  Services, LLC managed the hotel," was true or
5  not true?
6     ATTORNEY BRUSTEIN:  Objection.
7     A.  I don't know how to answer that.
8     Q.  Okay.  Does Hotel 57 Services, LLC
9  actually manage the Four Seasons Hotel?
10    ATTORNEY BRUSTEIN:  Objection.
11    A.  I don't know.
12    Q.  Okay.  Did you try to find out
13 whether it did or not before the complaint was
14 filed?
15    ATTORNEY BRUSTEIN:  Objection.
16    A.  I don't know how to answer that.
17    Q.  I'm trying to see what I'm not --
18 what I am asking about, ma'am --
19    A.  I don't understand your question.
20 I don't understand.
21    Q.  Okay.  You have made allegations
22 against a number of different parties in this
23 case, Hotel 57 Services, LLC being one of
24 them, right?
25    A.  I've made allegations towards the

V. HOLMES

1   V. HOLMES
2   hotel.
3      Q.  Yes.  Well, towards Hotel 57
4   Services, LLC in these paragraphs that we're
5   looking at now, right?
6      A.  Right.
7      Q.  I want to know if you did anything
8   to determine whether what was being put in the
9   complaint about Hotel 57 Services, LLC was
10  actually true or not true?
11     A.  Did I do anything as far as what?
12     Q.  Research, investigation --
13     A.  I have.  I've seen things in
14  magazines.  I've seen things in the newspaper.
15  I look at my paycheck, I see different names.
16  I look up the Four Seasons, Toronto pops up,
17  Chicago pops up.
18     Q.  Okay.  What about Hotel 57
19  Services, LLC --
20     A.  That's on my paycheck and on my
21  W-2.
22     Q.  I understand that.  And I
23  understand that --
24     A.  So that's an investigation.
25     Q.  Okay.

V. HOLMES

1   V. HOLMES
2      A.  Once I look that up and it's there,
3   then this makes this accurate.
4      Q.  That they manage the hotel?
5         ATTORNEY BRUSTEIN:  Objection.
6      A.  I can't answer that.
7      Q.  Okay.  Other than looking at your
8   paycheck what else did you do to investigate
9   Hotel 57 Services, LLC?
10     A.  I don't remember.
11     Q.  Did you do anything?
12        ATTORNEY BRUSTEIN:  Objection.
13     A.  I can't answer that.
14     Q.  Okay.  At trial, ma'am, what are
15  you going to tell the judge Hotel 57 Services,
16  LLC, that entity, did wrong?
17        ATTORNEY BRUSTEIN:  Objection.
18     A.  Violation of the WARN Act and
19  no-fault separation pay.  That's why --
20     Q.  So you think Hotel 57 Services, LLC
21  violated the WARN Act -- okay?
22     A.  Yes.
23     Q.  -- and you also think that Hotel 57
24  Services, LLC was required to pay you no-fault
25  separation pay, is that fair?

V. HOLMES

1   V. HOLMES
2      A.  Yes.
3      Q.  Anything else that Hotel 57
4   Services, LLC did wrong that you are going to
5   tell the judge?
6         ATTORNEY BRUSTEIN:  Objection.
7      A.  I can't answer that right now.
8      Q.  Why not?
9      A.  Because I don't know.
10     Q.  You also have identified another
11  entity, after Hotel 57 Services, LLC, called
12  Hotel 57, LLC.  What is Hotel 57, LLC?
13     A.  Isn't it the same thing we were
14  talking about?
15     Q.  No, we were talking about Hotel 57
16  Services, LLC.  We're looking at the next
17  entity, the next defendant you sued, Hotel 57
18  Services -- Hotel 57, LLC.  Take a look at the
19  third line of the defendants, you'll see they
20  look kind of similar.  The first one's Hotel
21  57 Services, LLC, do you see that?
22     A.  Are we still on page 13?
23     Q.  No.
24     A.  What page --
25     Q.  The front page.  The first page.

V. HOLMES

1   V. HOLMES
2   After Hotel 57 Services, LLC we have another
3   defendant named, correct?
4      A.  Yes.
5      Q.  And what is that defendant called?
6      A.  Hotel 57, LLC.
7      Q.  What is Hotel 57, LLC?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  I can't answer that.
10     Q.  What investigation, if any, did you
11  do to find out what Hotel 57, LLC is before
12  you sued them in federal court?
13     A.  I can't answer that.
14     Q.  Why can't you answer that?
15     A.  I can't answer that right now.
16     Q.  Well, tell me why?
17        ATTORNEY BRUSTEIN:  Objection.
18     Q.  Is it because you don't know?
19        ATTORNEY BRUSTEIN:  Objection.
20     A.  Because I'm not sure.  I don't
21  remember.
22     Q.  Looking at paragraph -- I'm
23  sorry -- page 14 to 15 I think of your first
24  amended complaint, ma'am.  You have got the
25  same type of a heading with a colon of Hotel

V. HOLMES

1
2  57, LLC, do you see that at the top of page
3  14?
4      A.  I see that.
5      Q.  And then you have paragraphs 93 to
6  107, right?
7      A.  I see that.
8      Q.  Okay.  And you can go and count
9  them, ma'am.  I count eleven of them "upon
10 information and belief."  Right?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  What are you asking me?
13     Q.  Yeah.  A lot of them, and you can
14 count them, I count eleven, eleven of them
15 begin with the words "upon information and
16 belief," do they not?
17     A.  I don't know.
18     Q.  You don't know -- you don't see the
19 words "upon information and belief" in these
20 allegations from 93 to 107?
21     A.  Yes, I see that.
22     Q.  Okay.
23     A.  I don't see eleven of them.
24     Q.  Okay.  You didn't count them,
25 right?

V. HOLMES

1
2      A.  I didn't count them.
3      Q.  What investigation was done either
4  by you or by anybody else, to your knowledge,
5  to determine whether the allegations that were
6  made in paragraphs 93 to 107 were true?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  I don't remember.
9      Q.  Was any investigation done?
10         ATTORNEY BRUSTEIN:  Objection.
11     A.  I don't remember.
12     Q.  What did Hotel 57, LLC do wrong
13 that caused you to sue them in federal
14 district court?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  Violation of the WARN Act and
17 no-fault separation pay.
18     Q.  And why was Hotel 57, LLC supposed
19 to give you a WARN Act notice?
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  I can't answer that.
22     Q.  Why did you sue them, then?
23         ATTORNEY BRUSTEIN:  Objection.
24     A.  Because of the WARN Act violation
25 and no-fault separation pay.

V. HOLMES

1
2      Q.  Well, I understand that.  But you
3  didn't sue the St. Regis hotel for the WARN
4  Act violation, did you?
5      A.  I did not sue the St. Regis.
6      Q.  Because you would have sued --
7      A.  They didn't come up in any of the,
8  you know, magazines and stuff.
9      Q.  Okay.  I want to know why did you
10 think that Hotel 57, LLC violated the WARN
11 Act?
12         ATTORNEY BRUSTEIN:  Objection.
13     A.  I can't answer that.
14     Q.  Why?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  I can't answer that.
17     Q.  I understand you can't answer it.
18 Why can't you tell me -- why can't you answer
19 the question of why you sued them --
20         ATTORNEY BRUSTEIN:  Objection.
21     Q.  Why you think they violated the
22 WARN Act?
23     A.  Because they're hiding behind --
24 this is all in the same.  All of these
25 entities are all the same.

V. HOLMES

1
2      Q.  They're all the same?  How do you
3  know that?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  I can't answer that.
6      Q.  Why not?
7      A.  Because I'm not sure.
8      Q.  What are you going to tell the
9  judge that Hotel 57, LLC did at trial?  What
10 are you going tell him that they did wrong?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  That they violated the WARN Act and
13 no-fault separation pay.
14     Q.  And why was Hotel 57, LLC required
15 to pay you no-fault separation pay?
16         ATTORNEY BRUSTEIN:  Objection.
17     A.  I can't answer that.
18     Q.  Why?
19         ATTORNEY BRUSTEIN:  Objection.
20     A.  I can't answer that.
21     Q.  You've also sued Ty Warner Hotels,
22 is that accurate?  And I'll make the right
23 name.  Why don't we go to the very first page
24 of your complaint.  And on the, I think it's
25 the fourth line of your list of defendants you

V. HOLMES

1  have Ty Warner Hotels & Resorts, LLC, right?
2  have Ty Warner Hotels & Resorts, LLC, right?
3     A.  I see that.
4     Q.  What is Ty Warner Hotels & Resorts,
5  LLC?
6        ATTORNEY BRUSTEIN:  Objection.
7     A.  I can't answer that.
8     Q.  Why can't you answer that?  Do you
9  not know?
10       ATTORNEY BRUSTEIN:  Objection.
11    A.  I know that he's the owner of the
12 Four Seasons.
13    Q.  He is a -- well, you understand,
14 LLC is a limited liability company, right?
15    A.  I understand.
16    Q.  Okay.  It's not a he or her,
17 whatever -- well, I don't know anymore.  But
18 it doesn't have a gender.
19       It's an it, right?  It's an entity?
20    A.  Mm-hmm.
21       ATTORNEY BRUSTEIN:  Objection.
22    Q.  Okay.  Why did you sue Ty Warner
23 Hotels & Resorts, LLC?
24    A.  For violation of the WARN Act and
25 no-fault separation pay.

V. HOLMES

1     Q.  Who all was required to give you a
2  WARN Act notice?
3     A.  Everyone that was hiding behind the
4  Four Seasons and Ty Warner.
5     Q.  Who is that?  What entities?
6     A.  I don't know.  You tell me.
7     Q.  Well, you're the one who sued,
8  ma'am.  You're the one who started the lawsuit
9  in court, right?
10    A.  And you're the one who is defending
11 them.
12    Q.  You're the one who started the
13 lawsuit in court, right?
14       ATTORNEY BRUSTEIN:  Objection.
15    Q.  I want to know why you, as the
16 plaintiff in this case, sued this particular
17 entity?
18       ATTORNEY BRUSTEIN:  Objection.  Are
19 you winking?
20       ATTORNEY BOLAND:  Me?  No.  I have
21 contact lenses that go off center.
22       ATTORNEY BRUSTEIN:  I apologize.
23       ATTORNEY BOLAND:  Sometimes I go
24 like this.  (Indicating) I have not


V. HOLMES

1  winked in decades.
2        ATTORNEY RISMAN:  Why do I find
3  that hard to believe.
4        ATTORNEY BOLAND:  It's true.  Yeah,
5  you would find that hard to believe.
6     Q.  Why did you sue Ty Warner Hotels &
7  Resorts, LLC?
8        ATTORNEY BRUSTEIN:  Objection.
9     A.  Because of the WARN Act violation
10 and no-fault separation pay.
11    Q.  Okay.  What are you going to come
12 in and tell the court at trial Ty Warner
13 Hotels & Resorts, LLC did wrong?
14       ATTORNEY BRUSTEIN:  Objection.
15    A.  I can't answer that.
16    Q.  Why not?
17       ATTORNEY BRUSTEIN:  Objection.
18    A.  I can't answer that.
19    Q.  You can't answer why not?  You
20 can't tell me why you can't answer it?
21    A.  I can't answer.
22    Q.  Got it.  And here on paragraphs
23 108, I think it is, to 119 you have got I
24 believe 12 numbered allegations here.  Right?

V. HOLMES

1     A.  108 --
2     Q.  To 119?
3     A.  -- to 119, yes.
4     Q.  Take a look at these, ma'am.
5  They're all upon information and belief, are
6  they not?
7     A.  I see that.
8     Q.  Okay.  What investigation was done,
9  if any, to determine what is alleged in
10 paragraphs 108 to 119 is true or not true?
11       ATTORNEY BRUSTEIN:  Objection.
12    A.  I cannot answer that.
13    Q.  And why can't you answer that?
14    A.  I cannot answer that.
15       ATTORNEY BRUSTEIN:  Objection.
16    Q.  You also sued H. Ty Warner -- and
17 this is on page 1 if you want to go back.
18 Okay?  Who is H. Ty Warner?
19    A.  An entity.
20    Q.  You think it's an entity and not a
21 person?
22       ATTORNEY BRUSTEIN:  Objection.
23    A.  I can't answer that.
24    Q.  You don't know who H. Ty Warner is,

Page 330

V. HOLMES

1  do you?
2      A.  I can't answer that.
3      Q.  You can't answer whether you know
4  what it is or not?
5      A.  I can't answer.
6      Q.  Really?  Okay.  What did H. Ty
7  Warner do wrong?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  Violation of the WARN Act and
10 no-fault separation pay.
11     Q.  Okay.  What are you going to tell
12 the judge H. Ty Warner did wrong when you
13 testify at trial?
14         ATTORNEY BRUSTEIN:  Objection.
15     A.  The same thing.
16     Q.  That H. Ty Warner violated the WARN
17 Act?
18     A.  Yes.
19     Q.  How?
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  I can't answer that.
22     Q.  Well, you are going to just say he
23 violated the WARN Act and not tell him how?
24         ATTORNEY BRUSTEIN:  Objection.
25

Page 331

V. HOLMES

1      A.  I can't answer that.
2      Q.  Okay.  And what about with anyone
3  else, with any of the other defendants that
4  you sued; how are you going to tell the judge
5  they violated the WARN Act?
6          ATTORNEY BRUSTEIN:  Objection.
7      A.  I can't answer that.
8      Q.  And what about with no-fault
9  separation pay, how are you going to tell --
10 what are you going to tell the judge about how
11 any of them violated something with respect to
12 no-fault separation pay?
13     A.  I can't answer that.
14     Q.  If you look at page 16 of your
15 complaint.  And you've got, from paragraphs
16 120 to 133 following the identification of Ty
17 Warner with a colon, correct?
18     A.  I see that.
19     Q.  And all of these, and you can take
20 a look at them, ma'am, begin with the heading
21 "Upon information and belief," do they not?
22     A.  Yes, I see that.
23     Q.  What investigation, if any, was
24 gone before the lawsuits were filed to
25

Page 332

V. HOLMES

1  determine whether any of the allegations that
2  are in paragraphs 120 to 133 of your first
3  amended complaint were true or not true?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  I can't answer that.
6      Q.  And why can't you answer that,
7  ma'am?
8      A.  I can't answer that.
9      Q.  You can't answer why you can't
10 answer?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  Mm-hmm.
13     Q.  Okay.  So you have talked before
14 that there are two things, I think, and tell
15 me if I'm wrong, that you think the defendants
16 did wrong.  One of them was a violation of the
17 WARN Act.  Right?
18     A.  Yes.
19     Q.  And the other one was not paying
20 no-fault separation pay, right?
21         ATTORNEY BRUSTEIN:  Objection.
22     Q.  You can answer.
23     A.  Yes.
24     Q.  Okay.  Anything else you think the
25

Page 333

V. HOLMES

1  defendants did wrong?
2          ATTORNEY BRUSTEIN:  Objection.
3      A.  I can't answer that.
4      Q.  Well, I am asking you, ma'am.  Is
5  there anything else that you think that these
6  defendants did wrong?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  I can't answer that.
9      Q.  So the answer is no, there's
10 nothing else you think they did wrong,
11 correct?
12         ATTORNEY BRUSTEIN:  Objection;
13     mischaracterizes of the testimony.
14     A.  I can't answer that.
15     Q.  Do you intend to testify at the
16 trial, ma'am?
17     A.  Yes.
18     Q.  You do?  You plan to testify in
19 support of your claims, right?
20     A.  Yes.
21     Q.  And yet you can't tell me if
22 there's anything else you think the defendants
23 did wrong; fair?
24         ATTORNEY BRUSTEIN:  Objection.
25

Page 334

V. HOLMES

1
2   A.  I can't answer that.
3   Q.  Okay.  Let's talk about the WARN
4  Act if we could.  I think if we look at page
5  46 of your complaint we have a first cause of
6  action, do we not, right?
7   A.  Yes.
8   Q.  Okay.  And it says violation of
9  federal worker adjustment and restraining
10  [sic] notification act.
11       Do you understand that to be the
12  WARN Act?
13       ATTORNEY BRUSTEIN:  Objection.
14   A.  I'm sorry?
15   Q.  Do you understand that to be the
16  WARN Act?
17       ATTORNEY BRUSTEIN:  Objection.  You
18    may want to correct the record.
19   Q.  Violation of federal worker
20  adjustment and restraining notification --
21  retraining notification.  Sorry.
22       ATTORNEY BOLAND:  Good point.  It's
23    not a restraining notification act.
24   Q.  Is that what you understand to be
25  the WARN Act, ma'am?

Page 335

V. HOLMES

1
2   A.  That is correct.
3   Q.  Okay.  And then you also have
4  another WARN Act claim, do you not, on page
5  49?
6   A.  Yes.
7   Q.  Okay.  And what are the differences
8  between the two WARN Acts?
9       ATTORNEY BRUSTEIN:  Objection.
10   A.  I can't answer that right now.
11   Q.  Why not?
12   A.  Because I don't remember.
13   Q.  Okay.  If we look at paragraph 316
14  of your complaint, ma'am, on page 47.  And
15  you'll see that there's paragraph 316 that
16  begins "Defendants terminated the employment
17  of plaintiffs," right?
18       ATTORNEY BRUSTEIN:  Objection.  Are
19    you asking 317 or 316?
20       ATTORNEY BOLAND:  316.
21       ATTORNEY BRUSTEIN:  Sorry.
22       ATTORNEY BOLAND:  Yeah.  The one
23    that begins "Defendants terminated the
24    employment of plaintiffs."  I could have
25    misspoke.

Page 336

V. HOLMES

1
2   Q.  Right?
3   A.  I see that.
4   Q.  Okay.  And plaintiffs includes you,
5  right?
6   A.  Yes.
7   Q.  Okay.  So this allegation is about
8  you, it may be others as well, but it's
9  definitely about you, correct?
10   A.  That is correct.
11   Q.  Okay.  It says:  Defendants
12  terminated the employment of plaintiffs,
13  including you.  And I just want to ask you
14  about you.  And it says as the class members
15  as part of, or as the foreseeable result of,
16  mass layoffs or plant closings ordered by
17  defendants on or about March 20, 2020; on or
18  about September 21, 2020; on or about March
19  22, 2021; and then it says and/or June 25,
20  2021 -- and then it goes on -- "by placing the
21  class members on indefinite furlough without
22  providing timely," and then it goes on, right?
23       Was your employment terminated,
24  ma'am?
25       ATTORNEY BRUSTEIN:  Objection.

Page 337

V. HOLMES

1
2   A.  I can't answer that.
3   Q.  Why?
4   A.  I can't answer that.
5   Q.  But this allegation is about you.
6  Is it true or is it false?
7       ATTORNEY BRUSTEIN:  Objection.
8   A.  I am a plaintiff.
9   Q.  No, I want to know if the
10  allegation about you is true.  That your
11  employment was terminated on one of these
12  dates?
13       ATTORNEY BRUSTEIN:  Objection.
14   A.  I can't answer that.
15   Q.  But this allegation's about you,
16  ma'am.  Are you going to go and testify to the
17  judge yes, my employment was terminated on
18  March 20, 2020?
19       ATTORNEY BRUSTEIN:  Objection.
20   A.  I can't answer that.
21   Q.  What date was your employment
22  terminated?
23       ATTORNEY BRUSTEIN:  Objection.
24   A.  I can't answer that.
25   Q.  So with respect to your claim for

Page 338

V. HOLMES

1       V. HOLMES
2  violation of the WARN Acts, you're not going
3  to be able to tell the judge when your
4  employment was terminated; true?
5           ATTORNEY BRUSTEIN: Objection.
6       A.  I can't answer that.
7       Q.  Let's go to paragraphs 22 and 23 of
8  your complaint.  And I think that these are on
9  page 5.  Okay.  And you'll see in paragraph 22
10  you allege Defendants also failed to provide
11  plaintiffs -- and that includes you, right?
12  Paragraph 22.  The first sentence starts out
13  with the clauses "Defendants also failed to
14  provide plaintiffs."
15          Do you see that?
16      A.  I see that.
17      Q.  "Plaintiffs" includes you, correct?
18      A.  I am a plaintiff.
19      Q.  All right.  And you're one of the
20  people that's identified here, right?
21      A.  I am a plaintiff.
22      Q.  Yes.  So this allegation's about
23  you?  It's about others, but it's also about
24  you, right?
25      A.  I am a plaintiff, yes.

Page 339

V. HOLMES

1       V. HOLMES
2           ATTORNEY BRUSTEIN: Objection.
3       Q.  It's about you, okay.  And then it
4  says, the 60 days notice and then it goes on.
5  In 23 you allege:  By reason of defendants'
6  unlawful conduct plaintiffs and others
7  similarly situated have suffered money damages
8  and other resulting injury and loss, correct?
9           ATTORNEY BRUSTEIN: Objection.
10      A.  I can't answer that.
11      Q.  You don't know whether it says
12  that?
13          ATTORNEY BRUSTEIN: It doesn't.
14      A.  You read it.
15      Q.  I'm just asking you if it says
16  that.  I'm just getting you to what it says?
17          ATTORNEY BRUSTEIN: Objection.  It
18  doesn't.
19      Q.  Okay.  Why don't you read that to
20  yourself, paragraph 23.  Go ahead and read
21  paragraph 23 to yourself.
22      A.  I read it.
23      Q.  Okay.  Now you understand that
24  plaintiffs in this allegation includes you,
25  right?

Page 340

V. HOLMES

1       V. HOLMES
2           ATTORNEY BRUSTEIN: Objection.  And
3  please stop pointing at the witness.
4       Q.  You may answer, ma'am.
5       A.  I am a plaintiff.
6       Q.  So this allegation is about you, is
7  it not?
8       A.  I am a plaintiff.
9       Q.  My question is, is this allegation
10  about you?  Yes or no.
11          ATTORNEY BRUSTEIN: Objection.
12      A.  I am a plaintiff.
13      Q.  I understand you're a plaintiff.
14  So you would say, admit that this allegation
15  is about you, individually, as well as others,
16  but it's about you?
17          ATTORNEY BRUSTEIN: Objection.
18      A.  I'm not going to answer that.
19      Q.  You are not going to answer that?
20      A.  I'm a plaintiff.
21      Q.  Okay.  All right.  I want to know,
22  ma'am, what money damages did you suffer as a
23  result of the violation of the WARN Act?
24          ATTORNEY BRUSTEIN: Objection.
25      A.  I can't answer that.

Page 341

V. HOLMES

1       V. HOLMES
2       Q.  Why?
3           ATTORNEY BRUSTEIN: Objection.
4       A.  I can't answer that.
5           ATTORNEY BRUSTEIN: Let's take a
6  five-minute break.
7           ATTORNEY BOLAND: No.
8           ATTORNEY BRUSTEIN: What do you
9  mean no?
10      Q.  What other resulting injury or loss
11  did you suffer as a result of the violation of
12  the WARN Act?
13          ATTORNEY BRUSTEIN: Objection.
14      A.  I can't answer that.
15          ATTORNEY BRUSTEIN: Do you want to
16  take a five-minute break?
17          THE WITNESS: Yes.
18          ATTORNEY BOLAND: Go ahead.
19          THE WITNESS: Thank you.
20          ATTORNEY RISMAN: Let's just note
21  for the record how long the deposition
22  has been going so far?
23          (Discussion off the record.)
24          ATTORNEY RISMAN: So she's been
25  testifying for five hours and 22

Page 342

V. HOLMES

1  minutes.
2
3      ---
4   (Recess from 5:29 to 5:31.)
5      ---
6      ATTORNEY BOLAND:  Back on the
7  record.
8      THE COURT REPORTER:  Back on.
9   Q.  Ma'am, going back to the complaint.
10  We were looking at the allegations in
11  paragraphs 22 and 23.  Do you remember that
12  generally, just a few minutes ago?
13     A.  Yes.
14     Q.  Okay.  And I asked you about
15  monetary damages that you had suffered as a
16  result of the violation of the WARN Act and I
17  also asked you about other resulting injury
18  and loss that you had suffered.  Do you
19  remember those questions?
20     A.  Yes.
21     Q.  Okay.  What monetary damage has
22  anybody else who is a non-union employee
23  suffered as a result of anybody's violation of
24  the WARN Act?
25     ATTORNEY BRUSTEIN:  Objection.

Page 343

V. HOLMES

1      A.  I can't answer others but I can
2   answer my own.
3      Q.  Okay.  You said you couldn't answer
4   before.  Did something change that now you
5   can?
6      ATTORNEY BRUSTEIN:  Objection.
7      A.  Nothing changed.  I can answer the
8   question.
9      Q.  Okay.  What monetary damages did
10  you suffer as a result of the violation of the
11  WARN Act?
12     A.  Of the WARN Act?  I wasn't paid for
13  the 60 days that should occur every six months
14  of me not working.
15     Q.  Any other monetary damages that you
16  suffered as a result of the violation of the
17  WARN Act?
18     A.  Yes, I haven't been paid wages that
19  I have been customized to for 20-plus years.
20  My 401(k) just stopped.  I stopped
21  contributing to my 401(k).  I haven't had
22  medical insurance or dental insurance.  I have
23  had extensive amount of work done to my teeth
24  that I am not able to be insured properly to

Page 344

V. HOLMES

1   pay.
2      Q.  Okay.  Anything else that you
3   suffered as a result of the violation of the
4   WARN Act?
5      ATTORNEY BRUSTEIN:  Objection.
6      A.  Just my lifestyle has changed.
7      Q.  Your lifestyle changed?
8      A.  My lifestyle has changed.  That
9   pretty much covers it.
10     Q.  Those are the monetary damages
11  you've suffered as a result of the violation
12  of the WARN Act?
13     A.  Yes.
14     Q.  Okay.  What about in the category
15  of other resulting injury and loss; is there
16  anything in addition to what you just told me
17  that falls into that category other than
18  monetary damages?  In other words other
19  resulting injury and loss that you suffered as
20  a result of the WARN Act?
21     ATTORNEY BRUSTEIN:  Objection.
22     A.  Yeah, loss of wages.  Loss of my
23  lifestyle.
24     Q.  Okay.  You want to be compensated

Page 345

V. HOLMES

1   for that in this lawsuit?
2      ATTORNEY BRUSTEIN:  Objection.
3      A.  Yes.
4      Q.  Okay.  And with respect to anybody
5   else, any other non-union employee, who you
6   think had suffered from a violation of the
7   WARN Act, can you tell me what monetary
8   damages those other employees have suffered?
9      ATTORNEY BRUSTEIN:  Objection.
10     A.  I am assuming similar to the ones
11  that I have.
12     Q.  Do you know?
13     ATTORNEY BRUSTEIN:  Objection.
14     A.  I'm not sure.
15     Q.  Okay.  What about the other -- we
16  would have to ask them, just as I'm asking you
17  right now, right?
18     ATTORNEY BRUSTEIN:  Objection.
19     A.  You would have to ask them.
20     Q.  And what about in terms of other
21  resulting injury and loss for other people
22  that might be in the class, other non-union
23  employees, can you tell me what all of them
24  have suffered in that regard --

Page 346

V. HOLMES

1
2       ATTORNEY BRUSTEIN: Objection.
3       Q.  As a result of a violation of the
4   WARN Act?
5       ATTORNEY BRUSTEIN: Objection.
6       A.  They have also lost wages and been
7   violated.  I can't really answer that for
8   them.
9       Q.  You can't answer that?  We would
10  have to ask them, right?
11      ATTORNEY BRUSTEIN: Objection.
12      A.  Individually, what they suffered?
13  Yes.
14      Q.  Okay.
15      A.  But as a group we've suffered the
16  same things, which is the violation of the
17  WARN Act and no-fault separation pay.  As a
18  group that's what we --
19      Q.  I understand you're talking about
20  the violation and the no-fault separation pay.
21  I'm talking about WARN Act right now.  Okay?
22      A.  Yes.
23      Q.  You gave me the monetary damages
24  and the other resulting injury and loss that
25  you believe you've suffered and want to be

Page 347

V. HOLMES

1
2   compensated for, right?
3       ATTORNEY BRUSTEIN: Objection.
4       A.  Correct.
5       Q.  Okay.  And I was just saying with
6   respect to the monetary damages and all of the
7   resulting injury and loss that anybody else
8   might have suffered from a violation of the
9   WARN Act, we would have to go and ask them
10  what those things are for them, right?
11      ATTORNEY BRUSTEIN: Objection.
12      A.  They should be the same as myself.
13      Q.  But you don't know, do you?
14      ATTORNEY BRUSTEIN: Objection.
15      A.  For sure, no.
16      Q.  Okay.  We would have to ask them to
17  be certain, wouldn't we?
18      ATTORNEY BRUSTEIN: Objection.
19      Q.  We would have to ask them to be
20  certain, wouldn't we?
21      ATTORNEY BRUSTEIN: Objection.
22      Q.  You may answer.
23      ATTORNEY BRUSTEIN: Objection.
24      A.  I can't answer that.
25      Q.  Why not?

Page 348

V. HOLMES

1
2       ATTORNEY BRUSTEIN: Objection.
3       A.  I don't know what their personal
4   losses have been.
5       Q.  Yeah.  That's what I am just
6   saying.  You can't answer for them, we would
7   have to go ask them what their personal losses
8   have been, wouldn't we?
9       ATTORNEY BRUSTEIN: Objection.
10      Q.  Right?
11      ATTORNEY BRUSTEIN: There may be
12      other ways.  She's already told you she
13      can't answer that.  Objection.
14      Q.  You may answer, ma'am.
15      A.  I can't answer that.
16      Q.  I want to take your attention back
17  to page 47 of your complaint, again, to
18  paragraph 316.  And I had asked you, you know,
19  to identify what date you suffered termination
20  of employment and you couldn't do that for
21  yourself.  Could you tell me for every other
22  class member, every other non-union employee,
23  what day or date they suffered a termination
24  of employment?
25      ATTORNEY BRUSTEIN: Objection.

Page 349

V. HOLMES

1
2       A.  I cannot answer that.
3       Q.  We would have to ask them?
4       ATTORNEY BRUSTEIN: Objection.
5       A.  I can't answer that.
6       Q.  The second category of thing that
7   you complained about is the failure of them
8   not being paid the no-fault separation pay,
9   right?
10      A.  Yes.
11      Q.  Okay.  If we take a look at page 51
12  of your complaint, ma'am.  You have there a
13  third cause of action, breach of contract.
14  Right?
15      A.  Yes.  What number is that?
16      Q.  It's page 51 and it's in the
17  middle, it says "as and for a third cause of
18  action."
19      And that's what I was referring to,
20  breach of contract?
21      A.  Yes.  I see that.
22      Q.  Okay.  And that claim relates to
23  the EmPact agreement and you not being paid
24  no-fault separation pay, correct?
25      A.  That is correct.

Page 350

V. HOLMES

1
2     Q.  Okay.  And if we look at page 5 of
3  your amended complaint, ma'am.  We have
4  paragraph 24.  And you allege:  Despite
5  terminating the employment of the plaintiffs
6  and others similarly situated in New York, and
7  making their layoffs permanent, defendants
8  have not paid them the no-fault separation pay
9  owed to them as per their contracts.  Right?
10     A.  That is correct.
11     Q.  I recognize there's other
12  plaintiffs identified, but this allegation is
13  also about you individually as a plaintiff,
14  correct?
15     A.  Yes.
16     Q.  And the contracts that you are
17  referring to, the contract for you, is the
18  EmPact agreement, right?
19     A.  That is correct.
20     Q.  Okay.  And that's an agreement that
21  you signed an acknowledgment to, you signed
22  off on, right?
23     A.  Yes.
24     Q.  Okay.  I wanted to ask you a little
25  bit about that, if I could.

Page 351

V. HOLMES

1
2        (Defendants' Exhibit 56, Staley v
3     FSR 0032 was marked for identification).
4     Q.  I am handing you, ma'am, exhibit 56
5  which for the record is a document
6  Bates-stamped Staley v FSR 0032.
7        Do you recognize exhibit 56?
8     A.  Yes.
9     Q.  Okay.  And what is it?
10     A.  It's the cover letter to the
11  EmPact.
12     Q.  The cover page?
13     A.  The cover page.
14     Q.  And is this the cover page to the
15  EmPact agreement that you signed?
16        ATTORNEY BRUSTEIN:  Objection.
17     A.  I don't know.  I can't see the rest
18  of the document.
19     Q.  I understand that.  And I was just
20  wondering -- let me take a step back for a
21  second.  Is this page here one of the
22  documents that you retrieved to be produced in
23  the case?
24        ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't remember.

Page 352

V. HOLMES

1
2     Q.  Do you have a copy in your files
3  somewhere of the EmPact agreement you that
4  signed?
5        ATTORNEY BRUSTEIN:  Objection.
6     A.  I have a copy of the EmPact.
7     Q.  Okay.  I want to be fair to you,
8  ma'am, that you had signed a declaration, I
9  think in connection with the version of the
10  EmPact agreement that you signed.  So let's go
11  to --
12        ATTORNEY BRUSTEIN:  Are you done
13  with 56?
14        ATTORNEY BOLAND:  No.
15     Q.  -- go to exhibit 57, ma'am.
16        (Defendants' Exhibit 57,
17  Declaration of Vivian Holmes dated
18  December 5, 2022 was marked for
19  identification).
20        ATTORNEY BOLAND:  Which for the
21  record is a document titled Declaration
22  of Vivian Holmes dated December 5, 2022.
23     Q.  Do you see that?
24     A.  Yes.
25     Q.  And that's your signature, right?

Page 353

V. HOLMES

1
2     A.  Yes.
3     Q.  Okay.  You talk about, in paragraph
4  3, you say:  I have reviewed the EmPact
5  agreement annexed to the Declaration of Evan
6  Brustein dated December 5, 2022, and that is
7  the true and correct [sic] copy of the EmPact
8  agreement last revised February 2018 that I
9  acknowledged receiving in 2018.
10        Correct?
11     A.  That is correct.
12        ATTORNEY BRUSTEIN:  Objection.  It
13  doesn't say that, but ...
14        ATTORNEY BOLAND:  Well, it says
15  what it says.  All right.
16     Q.  If you want to pull out, ma'am,
17  document 43 from your pile.  I think the
18  exhibit number is 10.  You'll see that this is
19  a declaration of Evan Brustein.  And the date
20  on there you can see matches the date in your
21  declaration dated, it's December 5, 2022.
22  Right?
23     A.  Yes, I see it.
24     Q.  This is the declaration you were
25  referring to in your -- your declaration that

Page 354

```
1              V. HOLMES
2  is exhibit 57, right?
3          ATTORNEY BRUSTEIN:  Objection.
4      A.  Answer the question -- I mean ask
5  the question again?
6      Q.  Sure.  In paragraph 3 you talk
7  about reviewing an EmPact agreement annexed to
8  the Declaration of Evan Brustein.  Right?
9      A.  Yes.
10     Q.  And that declaration was dated
11 December 5, 2022, according to your
12 declaration, right?
13         ATTORNEY BRUSTEIN:  Objection.
14     A.  Correct.
15     Q.  Okay.  And exhibit 10 is the
16 Declaration of Evan Brustein dated December 5,
17 2022 that you were referring to in paragraph 3
18 of your declaration, that is exhibit 57,
19 right?
20     A.  I'm not understanding.
21     Q.  Is exhibit 10 --
22     A.  Yes, exhibit 10.
23     Q.  -- the Declaration of Evan Brustein
24 dated December 5, 2022 that you were referring
25 to in paragraph 3 of your declaration that is
```

Page 355

```
1              V. HOLMES
2  exhibit 57?
3          ATTORNEY BRUSTEIN:  Objection.
4      A.  Are you asking me if this is the
5  declaration of the EmPact?  Or what ...
6      Q.  What I'm wondering is if exhibit 10
7  is the declaration of Evan Brustein that you
8  are referring to in exhibit 3 of your
9  declaration that we have marked as exhibit 57?
10     A.  I'm sorry.  I don't understand.
11     Q.  Sure.  In paragraph 3 you refer to,
12 of your declaration that is exhibit 57, you
13 refer to reviewing an EmPact agreement annexed
14 to the declaration of Evan Brustein, dated
15 December 5, 2022.  Right?
16     A.  Correct.
17     Q.  Is that exhibit 10 that you are
18 referring to?
19     A.  Yes.
20     Q.  Okay.  And if you'll look at the
21 very first document on exhibit 10 after that,
22 there is a document that begins EmPact
23 employee handbook, right?
24     A.  Yes.
25     Q.  And in paragraph 4 of your
```

Page 356

```
1              V. HOLMES
2  declaration, ma'am, you say:  The EmPact
3  agreement I signed in 2018 had a welcome
4  letter on page 6 signed by -- I won't get that
5  name right --
6      A.  Mehdi Eftekari.
7      Q.  Thank you.
8          -- the Four Seasons Hotel New York
9  general manager in February 2018, not his
10 successor, Randy [sic] Tauscher, right?
11         ATTORNEY BRUSTEIN:  Objection.
12     Q.  That's what you were talking about
13 in paragraph 4, of what the EmPact agreement
14 you signed had in it?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  I don't remember but it sounds
17 about right, that Mehdi Eftekari was the
18 general manager in 2018.
19     Q.  And did you remember that he was
20 identified on page 6 of the EmPact agreement
21 you signed in 2018 when you executed your
22 affidavit?
23         ATTORNEY BRUSTEIN:  Objection.
24     A.  I don't remember.
25     Q.  Okay.  And I'm just trying to
```

Page 357

```
1              V. HOLMES
2  understand, how do you know that the one you
3  signed in 2018 had a welcome letter on page 6
4  signed by the gentleman that you identify in
5  paragraph 4 of your declaration?
6      A.  Well, I am seeing it now.  He's
7  there.
8      Q.  I understand he's there.  But I
9  want to know how you remembered at the time
10 period that you signed your declaration in
11 December of 2022, that he was on that page of
12 the EmPact agreement you signed?
13     A.  I don't remember.
14     Q.  Okay.  And the reason I'm asking
15 you is very simple, ma'am.  Did you have a
16 copy of the EmPact agreement that you are
17 referencing, the 2018 one that you are
18 describing in paragraph 3 and 4 of your
19 declaration, do you have a copy of that?
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't remember.  I do have a copy
22 of it.  I don't -- I can't tell you right now
23 what year it is.  But I do have a copy of it.
24     Q.  Did you mark that as one of the
25 documents that you should produce in this
```

V. HOLMES

1   case?
2       ATTORNEY BRUSTEIN:  Objection.
3       A.  I don't remember.
4       Q.  Is this, is exhibit 56 a copy of
5   the front page of the EmPact agreement you
6   have in your file?
7       ATTORNEY BRUSTEIN:  Objection.
8       A.  I don't remember.
9       Q.  In any event, the EmPact agreement
10  that you say that you signed is the one that
11  is attached and we see as the first exhibit to
12  Mr. Brustein's declaration, right?
13      A.  Correct.
14      Q.  Okay.  I have marked that
15  separately so that we don't have to worry
16  about all of the other stuff in that.
17      ATTORNEY BRUSTEIN:  Are we done
18  with 10?
19      ATTORNEY BOLAND:  I don't know.  10
20  we're done with, yes.
21      (Defendants' Exhibit 58, EmPact
22      agreement was marked for
23      identification).
24      Q.  I have handed you, Ms. Holmes, what

V. HOLMES

1   has been marked as exhibit 58, which for the
2   record is -- well, it's a document that has no
3   Bates number.  Because I will represent to
4   you, ma'am, if you look at the stamp at the
5   top it is the same as the first exhibit to
6   Mr. Brustein's declaration that was marked as
7   exhibit 10.  I just thought it would be easier
8   for us to use the document on its own.
9       What we have as exhibit 58 is a
10  copy of the EmPact agreement that you actually
11  signed in 2018, right?
12      ATTORNEY BRUSTEIN:  Objection.
13      (The witness reviews document.)
14      Q.  Is this a copy of the EmPact
15  agreement that you signed in 2018?
16      ATTORNEY BRUSTEIN:  Objection.
17      A.  I don't know if this is the copy.
18      Q.  Well, ma'am, you signed a
19  verification, did you not --
20      A.  Yes.
21      Q.  -- on exhibit 57 saying that the
22  document that was attached to Mr. Brustein's
23  declaration was the true and accurate copy of
24  the EmPact agreement last revised February

V. HOLMES

1   2018 that I acknowledged receiving in 2018?
2       A.  That is correct.
3       Q.  I am going to tell you I just took
4   that document out and marked it as exhibit 58.
5       ATTORNEY BRUSTEIN:  Objection.  She
6   has to believe you.
7       ATTORNEY BOLAND:  You can see it on
8   the page at the top.
9       ATTORNEY BRUSTEIN:  But what's the
10  point in copying it and saying it's in
11  both exhibits?
12      ATTORNEY BOLAND:  It's easier to
13  use.  This one's not in color.  It's
14  easier to use.  I just marked it as the
15  same.
16      Q.  I just want to know, is this a copy
17  of the EmPact agreement that you acknowledged
18  receiving in 2018 or not?
19      ATTORNEY BRUSTEIN:  Objection.
20      A.  You know that.  I didn't make the
21  copies.  I was going by one and now you're
22  giving me another one and saying it's the
23  same.
24      Q.  Okay.

V. HOLMES

1       A.  It is to me.
2       Q.  Let's go off of Mr. Brustein's
3   declaration that's exhibit 10.  The one that
4   you signed under oath and penalty of perjury
5   was the copy that you acknowledged in 2018.
6       So is it your contention, ma'am,
7   that under the EmPact agreement you were
8   entitled to be paid no-fault separation pay?
9       A.  Yes.
10      Q.  Okay.  And if we look at page 56 of
11  the EmPact agreement.  And you'll see there's
12  a place at the bottom no-fault separation pay,
13  correct?
14      A.  Correct.
15      Q.  Okay.  And that's what you want for
16  your breach of contract claim, correct?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  Yes.
19      Q.  Okay.  And you see that, ma'am,
20  that the section on no-fault separation pay
21  continues for about a page and a little bit
22  more after that, to page 58?
23      A.  I see that.
24      Q.  Have you read the terms under

Page 362

V. HOLMES

1  no-fault separation pay that begin on page 56
2  and continue to the top of 58?
3  A. I have no.
4  Q. Okay. And you agree that those are
5  the terms that apply to your breach of
6  contract claim for failing to pay no-fault
7  separation pay, right?
8  ATTORNEY BRUSTEIN: Objection.
9  A. Yes.
10  Q. Okay. Let's take a look at page 54
11  of the EmPact agreement, if you could. Strike
12  that for one quick sec.
13  No-fault separation pay on page 56,
14  ma'am, it says: If I receive a permanent
15  layoff with no right of recall or I am
16  terminated for no-fault, my termination will
17  be considered no-fault. Right?
18  A. I see that.
19  Q. What happened to you?
20  ATTORNEY BRUSTEIN: Objection.
21  A. I haven't been working for three
22  years, and as far as I'm concerned it seems
23  like a permanent layoff.
24  Q. A permanent layoff with no right to

Page 363

V. HOLMES

1  be recalled?
2  A. I have not been recalled.
3  Q. I understand that. Do you believe
4  that you have been given a permanent layoff
5  and you have no right at all to be recalled?
6  ATTORNEY BRUSTEIN: Objection.
7  A. I believe that I have been
8  permanently laid off.
9  Q. Okay. Do you believe that you have
10  no right to be recalled?
11  ATTORNEY BRUSTEIN: Objection.
12  A. I can't answer that.
13  Q. I asked you what you believe?
14  ATTORNEY BRUSTEIN: Objection.
15  A. I can't answer that.
16  Q. Okay. Do you believe you have a
17  right to be recalled if the hotel reopens?
18  ATTORNEY BRUSTEIN: Objection.
19  A. I believe I should be called.
20  Q. Are you willing to give that up in
21  order to receive no-fault separation pay in
22  this lawsuit?
23  ATTORNEY BRUSTEIN: Objection.
24  A. Can you ask that again?

Page 364

V. HOLMES

1  Q. Yeah, sure. Are you willing to
2  give up any option of being called back,
3  recalled back, if the hotel reopens, you know,
4  in weeks, months, whatever, in exchange for
5  getting no-fault separation pay in this
6  lawsuit?
7  ATTORNEY BRUSTEIN: Objection.
8  A. I can't answer that because I
9  haven't been called back.
10  Q. Yeah, I know. Let's assume the
11  hotel's going to open sometime in the future,
12  maybe three months, four months, five months,
13  whatever.
14  A. I can't answer that. Because the
15  lawsuit is now. And you're talking about four
16  months later. I don't know what's going to
17  happen from now to four months.
18  Q. Okay. You want a court to find, do
19  you not, ma'am, that because of your
20  circumstances you have suffered a permanent
21  layoff with no right of recall, right?
22  ATTORNEY BRUSTEIN: Objection.
23  A. I have been permanently laid off.
24  Q. Okay. You understand that there's

Page 365

V. HOLMES

1  a dispute about that, that the hotel
2  disagrees, correct?
3  A. I don't know what the hotel
4  disagrees or agrees on.
5  Q. Has the hotel told you that you've
6  been permanently laid off, ma'am?
7  ATTORNEY BRUSTEIN: Objection.
8  Q. Anybody?
9  A. I haven't been working.
10  Q. I didn't ask you that question. I
11  asked you whether anybody has told you you've
12  been permanently laid off?
13  A. I can't answer that.
14  Q. You can't answer whether anybody
15  told you that?
16  ATTORNEY BRUSTEIN: Objection.
17  A. I haven't been working for three
18  years.
19  Q. I understand that. I get that. I
20  understand your circumstance, ma'am. I really
21  do. What I want to know is has anyone told
22  you, you have been permanently laid off?
23  A. Well, if you wasn't working for
24  three years what would you call?

Page 366

V. HOLMES

1
2    Q.  I am not asking you what your
3    interp --
4        A.  That's what I am asking you.  What
5    would you call it?
6        Q.  It doesn't work that way,
7    unfortunately.  I know if I was in your
8    position I would want it to.  But it does not.
9    The question is, ma'am, has anyone at the
10   hotel told you that you are permanently laid
11   off?
12       ATTORNEY BRUSTEIN:  Objection.
13       A.  I can't answer that.
14       Q.  Why?
15       A.  Because I don't know how to answer
16   that.
17       Q.  I want to know if anybody used
18   those words to you, they said, Ms. Holmes, you
19   have been permanently laid off?
20       ATTORNEY BRUSTEIN:  Objection.
21       A.  I can't answer that.
22       Q.  Why?  It never happened, did it?
23       ATTORNEY BRUSTEIN:  Objection.
24       A.  I am saying that I'm permanently
25   laid off.

Page 367

V. HOLMES

1
2        Q.  I understand you're saying that.
3    Do you understand that the hotel and the
4    defendants may disagree with the state of
5    affairs, that you are not permanently laid
6    off?  You understand there could be a
7    disagreement, right?
8        ATTORNEY BRUSTEIN:  Objection.
9        A.  I don't know what they know.
10       Q.  Do you understand that the judge,
11   for you to recover under your breach of
12   contract claim, is going to have to find that
13   you were permanently laid off with no right of
14   recall?
15       ATTORNEY BRUSTEIN:  Objection.
16       A.  I don't know how to answer that.
17       Q.  In pursuing your breach of contract
18   claim, ma'am, have you considered that the
19   results of you prevailing on it may mean that
20   the judge finds that you have been permanently
21   laid off with no right of recall?
22       A.  You're asking me if I feel that the
23   judge would think that I've been permanently
24   laid off?
25       Q.  No.  I am asking you if you have

Page 368

V. HOLMES

1
2    considered whether in order to find out, to
3    find in your favor, the judge or the jury
4    would have to reach a finding, a conclusion
5    that you have been permanently laid off with
6    no right of recall?
7        ATTORNEY BRUSTEIN:  Objection.
8        There's more to that sentence.
9        Q.  You may answer despite the
10   coaching.
11       ATTORNEY BRUSTEIN:  I'm just trying
12       to make sure the question's accurate.
13       ATTORNEY BOLAND:  No, you're
14       coaching.
15       ATTORNEY BRUSTEIN:  Objection.
16       Q.  You can answer.
17       A.  I do understand that the jury and
18   the judge has to find findings to back up what
19   I'm saying.
20       Q.  Okay.  What I want to know is if
21   you have considered whether to prevail on your
22   claim for no-fault separation pay, the judge
23   or the jury may have to find that you have
24   been permanently laid off with no right of
25   recall?

Page 369

V. HOLMES

1
2        ATTORNEY BRUSTEIN:  Objection.
3        A.  I don't understand.
4        Q.  Do you know whether anybody -- are
5    you willing, in pursuing your breach of
6    contract claim, to give up any right that you
7    may have to be recalled if the hotel reopens
8    to prevail in your breach of contract claim?
9        ATTORNEY BRUSTEIN:  Objection.
10       A.  The hotel is not opening right now.
11   I haven't gotten any notice that they're
12   opening.
13       Q.  I understand that.  You understand
14   it's possible that they may open in the future
15   or they may not, right?
16       ATTORNEY BRUSTEIN:  Objection.
17       A.  Those are the only two options.
18       Q.  Exactly.  Right?  So they're both
19   option -- they're both viable options?  It
20   could open or it might not, right?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  Those are the two options, yes.
23       Q.  And if it does, I think you
24   testified earlier, you would like to be
25   recalled back or to have the option to join

V. HOLMES

1  V. HOLMES
2  the hotel again if it reopens, right?
3      A.  I would love to work.
4      Q.  Okay.  Are you willing to give that
5  up in order to prevail on a breach of contract
6  claim in this lawsuit for no-fault separation
7  pay?
8      ATTORNEY BRUSTEIN:  Objection.
9      A.  Am I willing to give up the
10  lawsuits in order to go back to work?  Is that
11  what you're saying?  I don't understand.
12      Q.  No.  I am asking you if you're
13  willing to give up the ability to be recalled
14  in the future if the hotel reopens in order to
15  recover now on your breach of contract claim
16  for no-fault separation pay?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  I'm sorry.  But I don't understand.
19      Q.  So you understand that the words
20  here say, if I receive a permanent layoff with
21  no right of recall, or I am terminated for
22  no-fault.  That's the phrases, right?
23      A.  Yes.  That's what it says.
24      Q.  Okay.  Has anyone given you any
25  kind of notice of termination of your

V. HOLMES

1  V. HOLMES
2  employment?
3      ATTORNEY BRUSTEIN:  Objection.
4      Q.  You can answer.
5      A.  A written notice stating that I'm
6  not working for the hotel?
7      Q.  Yes.  That -- no, that your
8  employment is terminated.  Not you're on
9  furlough.  Not you're on a layoff.  You're
10  terminated?
11      A.  I haven't worked for three years.
12      Q.  I didn't ask you that, ma'am.  I
13  asked you if you have been given a notice that
14  you've been terminated?
15      A.  But I consider that I'm permanently
16  laid off.
17      Q.  So you consider yourself to be
18  permanently laid off, right?
19      A.  I haven't been working and I
20  haven't received any wages from the hotel.
21      Q.  I am just trying to understand,
22  ma'am, your claim.  You're the plaintiff in
23  this lawsuit.  Do you believe -- is it your
24  contention that you have been permanently laid
25  off or is it your contention that your

V. HOLMES

1  V. HOLMES
2  employment has actually been terminated,
3  officially ended?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  I understand that I have been
6  permanently laid off.
7      Q.  Okay.  Do you understand that you
8  have been permanently laid off with no right
9  of being recalled ever?
10      ATTORNEY BRUSTEIN:  Objection.
11      A.  I don't know that.
12      Q.  What's your understanding?
13      A.  Of?
14      Q.  Whether or not you have been
15  permanently laid off with no right of recall,
16  as you sit here today?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  I don't know.
19      Q.  You don't know.  All right.  If
20  giving up a right of recall is required for
21  purposes of prevailing on your breach of
22  contract claim as a result of a permanent
23  layoff are you willing to give up that right
24  to recover on your breach of contract claim?
25      ATTORNEY BRUSTEIN:  Objection.

V. HOLMES

1  V. HOLMES
2      A.  I don't understand.
3      Q.  Yeah.  If the choice is, ma'am,
4  prevail on the breach of contract claim for a
5  permanent layoff or not prevail on the breach
6  of contract claim but have a right to be
7  recalled back if the hotel reopens, which do
8  you choose?
9      ATTORNEY BRUSTEIN:  Objection.
10      A.  I don't know that the hotel is
11  going to open.
12      Q.  I understand that.
13      A.  So I can't make that decision.
14      Q.  I am talking about the ability to
15  be recalled in the future if it reopens.  Are
16  you willing to give that up?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  I would like to work for the hotel.
19      Q.  I didn't ask you that.  Are you
20  willing to give that up in order to prevail in
21  your breach of contract claim for no-fault
22  separation pay?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  I don't know how to answer that.
25      Q.  Why?

Page 374

V. HOLMES

1
2    A.  Because I would love to go back to
3    work.
4    Q.  Okay.  Do you know whether any
5    other --
6    A.  I love the company.  I believed in
7    the company.  I thought that, you know, it was
8    a righteous company.  That's what I've always
9    believed.
10    Q.  Do you know --
11    A.  And now I'm here.
12    Q.  Do you know whether -- are you
13    okay, ma'am?
14    A.  It's just very upsetting.
15    Q.  I understand that.
16    ATTORNEY BRUSTEIN:  Can we take a
17    five-minute break, please?
18    ATTORNEY BOLAND:  Sure.
19    ---
20    (Recess from 6:05 to 6:10.)
21    ---
22    BY ATTORNEY BOLAND:
23    Q.  Ma'am, we were talking about the
24    EmPact agreement before we broke, and I was
25    asking you about, you know, if given a choice

Page 375

V. HOLMES

1
2    between receiving no-fault separation pay
3    based on a breach of contract claim theory or
4    having the ability to be called back, you
5    know, which you would pick and we've gone
6    through it, and I'm not doing it again.
7    Do you know for anyone else who you
8    believe was permanently laid off with no right
9    of recall, whether they would make the -- what
10    choice they would make, whether they would
11    want to have the ability to be recalled in the
12    future or whether they would want to collect,
13    you know, EmPact, no-fault separation pay as a
14    result of this lawsuit?
15    ATTORNEY BRUSTEIN:  Objection.
16    A.  I don't know.
17    Q.  Okay.  I want to direct your
18    attention, ma'am, to page 54 of the EmPact
19    agreement.  It's right in front of you.
20    A.  54 you said?
21    Q.  Yes.  And you'll see there's a
22    section here called Complaint, arbitration and
23    review from employees and then underneath it's
24    got the acronym C.A.R.E., right?
25    A.  Mm-hmm.

Page 376

V. HOLMES

1
2    Q.  Okay.  And there are certain steps
3    here to be taken, right?
4    A.  Yes.
5    Q.  Okay.  One is I will discuss the
6    matter informally with my immediate
7    supervisor.
8    When did you raise with your
9    immediate supervisor any failure to pay
10    no-fault separation pay under the EmPact
11    agreement?
12    ATTORNEY BRUSTEIN:  Objection.
13    A.  I don't remember when.
14    Q.  Did you do it?
15    A.  Yes, informally I spoke -- I did.
16    Q.  Who did you speak to?
17    A.  I spoke to Elizabeth Ortiz.
18    Q.  Was she your immediate supervisor?
19    A.  At the time, yes.
20    Q.  And when was that conversation,
21    ma'am?
22    A.  I don't remember when.
23    Q.  Okay.  In step 2 it says if step 1
24    does not solve the problem I will file a
25    written complaint with the human resources

Page 377

V. HOLMES

1
2    offices within 14 days, et cetera.
3    Did you do that?
4    A.  I sent an email.
5    Q.  To whom?
6    A.  Elizabeth Ortiz.
7    Q.  Okay.  When?
8    A.  I don't remember.
9    Q.  Was it within 14 days after the
10    event or the problem occurred?
11    ATTORNEY BRUSTEIN:  Objection.
12    A.  I don't remember.
13    Q.  It says the director of human
14    resources will conduct an investigation
15    concerning my written complaint including
16    meeting with me within seven days after
17    filing.
18    Did that happen?
19    A.  Somewhat.  Not within that time
20    frame, but somewhat.
21    Q.  Tell me what happened?
22    A.  She replied that she was trying to
23    do the best she could and she was going to ask
24    the question to ownership and to the Four
25    Seasons if I could get a no-fault separation

Page 378

V. HOLMES

1  pay.
2      Q.  Okay.  And it says the director of
3  human resources will issue a written decision
4  to me within seven days after the close of the
5  investigation.
6      Did that happen?
7      A.  In writing?  No.
8      Q.  Did it happen not being in writing?
9      ATTORNEY BRUSTEIN:  Objection.
10     A.  Yes.  She spoke to me.
11     Q.  What did she tell you?
12     A.  She told me that ownership was not
13  giving out any severance pay to non-union
14  employees and that she was talking to the Four
15  Seasons to see what she could do but that they
16  weren't -- that they wouldn't do that at that
17  time.
18     Q.  So you used the term severance pay
19  in that --
20     A.  No-fault separation pay.
21     Q.  So they were giving no-fault
22  separation pay to union employees, she told
23  you that?
24     ATTORNEY BRUSTEIN:  Objection.

Page 379

V. HOLMES

1      A.  That's not what I said.
2      Q.  I am trying to figure out what she
3  reported back to you about non-union employees
4  and no-fault separation pay?
5      A.  I never said non-union employees.
6      Q.  Okay.  All right.  Tell me again
7  what --
8      A.  To me, I asked for my -- for my
9  severance pay.
10     Q.  Okay.
11     A.  For my no-fault severance pay.  She
12  said that the Four Seasons or ownership was
13  not offering that.
14     Q.  Did she tell you why?
15     A.  No.
16     Q.  Okay.  And it says, if I am
17  dissatisfied with the written decision in step
18  4 I will appeal to the general manager within
19  14 days after step 4.
20     Did you do that?
21     A.  There is no general manager for me
22  to report to.
23     Q.  There's no general manager of the
24  hotel?

Page 380

V. HOLMES

1      A.  No, there isn't.
2      Q.  Okay.  All right.  The next step is
3  step 6.  And it's got a list of four things in
4  A, B, C and D, right?  A is employment
5  discrimination.  B is harassment.  C is a wage
6  and hour violation.  And D is termination of
7  my employment from the hotel, including
8  constructive discharge but not a permanent
9  layoff, right?
10     A.  I see that.
11     Q.  Okay.  And a permanent layoff is
12  what you are contending happened to you, is
13  that true?
14     A.  Yes.  I have been permanently laid
15  off.
16     Q.  Okay.  And just to be fair, do you
17  believe you have been permanently laid off
18  with no right to be recalled?
19     ATTORNEY BRUSTEIN:  Objection.
20     A.  I can't answer that.  The hotel --
21  when are they going to recall me back?  When
22  I'm a hundred years old?  When are they going
23  to call me back?  How can I give up
24  something --

Page 381

V. HOLMES

1      Q.  Ma'am, I am asking if that's your
2  contention, that you have been permanently
3  laid off and --
4      A.  I have been permanently laid off.
5      Q.  I just want to know --
6      A.  I have been permanently laid off.
7      Q.  Okay.
8      A.  If you're doing what you do now for
9  three years, what would you call it?  You
10  wouldn't be able to survive three years
11  without working.
12     Q.  It doesn't work this way.  I would
13  love to be able to have a discussion with you,
14  but not in this context.  And not while you're
15  being represented by others.
16     Okay.  In your amended complaint
17  that is exhibit 6 --
18     ATTORNEY BRUSTEIN:  Do you want to
19  leave the EmPact open?
20     ATTORNEY BOLAND:  I don't think so.
21  Unless she wants to refer to it.  But if
22  she wants to refer to it she can keep it
23  out.  But it doesn't have to be left
24  open.

V. HOLMES

1
2   Q.  Exhibit 6 is the first amended
3   complaint.  The thing we've been looking at.
4   I think you've got it open.  And to get you
5   back oriented again, ma'am, I want to take you
6   to page 51.  And this is your breach -- we
7   were here before.  This is your breach of
8   contract claim, right?
9       A.  Yes.
10      Q.  Okay.  I want to direct your
11  attention to paragraph 347.
12      A.  Number 347?
13      Q.  Paragraph 347.
14      A.  On 52?
15      Q.  It's on 52, correct.
16      A.  Okay.
17      Q.  You have an allegation there that
18  says plaintiffs -- that includes you, right?
19  -- and each of the class members of the
20  proposed subclass have materially performed
21  their contractual obligations, right?  That's
22  the allegation that you made?
23      A.  Yes.
24      Q.  Okay.  And you understood that the
25  contractual obligations would be obligations

V. HOLMES

1
2   that you and others had under the EmPact
3   agreement?
4       A.  That is correct.
5       Q.  Okay.  So you do recognize that the
6   EmPact agreement put obligations on you, and
7   the others who acknowledged it as well,
8   correct?
9       A.  Correct.
10      Q.  Okay.  And you know that you have
11  materially performed -- can you give me an
12  example of what you understand some of those
13  obligations to be, if you remember, as you sit
14  here today?
15      ATTORNEY BRUSTEIN:  Objection.
16      A.  What are you asking me?
17      Q.  Yeah.  I was just asking, you
18  understood that the EmPact agreement placed
19  obligations on you as an employee just as it
20  placed obligations on your employer, right?
21      A.  Correct.
22      Q.  Okay.  Can you give me an idea of
23  maybe an example of one or two of the
24  obligations that you understand that you had
25  under the EmPact agreement?

V. HOLMES

1
2       ATTORNEY BRUSTEIN:  Objection.
3       A.  I don't know how to answer that.
4       Q.  Well, one of the obligations that
5   you think that the employer had under the
6   EmPact agreement was to pay you no-fault
7   separation pay in the particular context that
8   you're in where you believe you've been
9   permanently laid off, right?
10      A.  Yes.
11      Q.  Okay.  I want to find on the other
12  side.  As you sit here today can you identify
13  or think of any of the obligations that you
14  had under the EmPact agreement?
15      A.  Can you repeat that, please?
16      Q.  Yes.  As you sit here today can you
17  think of any of the obligations that you had,
18  as an employee, under the EmPact agreement?
19      ATTORNEY BRUSTEIN:  Objection.
20      A.  I met all of my obligations.  The
21  hotel has not met their obligations.
22      Q.  I understand that, ma'am.  I'm just
23  trying --
24      A.  If you understand it, why are you
25  asking me this over and over again in

V. HOLMES

1
2   different forms.
3       Q.  Because you --
4       A.  I am permanently laid off.
5       Q.  Okay.  You want to represent a
6   class of a whole bunch of people that aren't
7   going to be in court, right?
8       ATTORNEY BRUSTEIN:  Objection.
9       Q.  Right?
10      A.  I am the class representative, yes.
11      Q.  If a class is certified.  And a
12  class hasn't been certified yet, right?
13      A.  If a class is certified, yes.
14      Q.  You made an allegation in paragraph
15  347 that you had satisfied all of your
16  obligations under the EmPact agreement, right?
17      A.  I have met my obligations.
18      Q.  Okay.  How do you know whether
19  anyone else who might be in any class or
20  subclass has satisfied their obligations under
21  the EmPact agreement?
22      ATTORNEY BRUSTEIN:  Objection.
23      A.  They're in the same position as I
24  am.
25      Q.  Yeah, but how do you know what they

Page 386

V. HOLMES

1  have done over the last number of years to see
2  whether they have violated --
3
4      A.  They have done nothing.  They
5  haven't been working.
6      Q.  Ma'am, let me finish the question
7  please.  How do you know whether over the last
8  several years they have satisfied their
9  obligations or not satisfied their obligations
10  under the EmPact agreement?
11      ATTORNEY BRUSTEIN:  Objection.
12      A.  I'm not sure.  I can't answer that.
13      Q.  You don't know.  We have to ask
14  them and find out what their particular
15  circumstances are, wouldn't we?
16      ATTORNEY BRUSTEIN:  Objection.
17      Q.  You can answer.
18      ATTORNEY BRUSTEIN:  Objection.
19      A.  We may have to ask them.
20      Q.  Okay.  And I want to direct your
21  attention if I could, ma'am, to paragraph 353.
22  And this is an allegation where you say:
23  Based upon the foregoing facts plaintiffs and
24  each of the members of the proposed subclass
25  have sustained damages including but not

Page 387

V. HOLMES

1  limited to their no-fault separation pay and
2  the natural and probable consequences of the
3  breach.  Right?  That's an allegation that you
4  made about yourself and about others?
5
6      A.  Yes.
7      Q.  Okay.  I understand you want to get
8  paid no-fault separation pay.  I get that.
9  Okay?  What damages other than no-fault
10  separation pay have you suffered as a result
11  of the breach of the EmPact agreement that you
12  have alleged in your first amended complaint?
13      ATTORNEY BRUSTEIN:  Objection.
14      A.  I don't understand the question.
15      Q.  Sure.  You have said -- you say
16  here that you, plaintiffs, and other members
17  of the class, have sustained damages and then
18  here's what I want to focus on, okay?  You say
19  "including but not limited to, their no-fault
20  separation pay."
21
22      A.  These are attorney verbiage.  I
23  don't understand what you're asking me.
24      Q.  Yeah --
25      A.  That's what I have my attorneys

Page 388

V. HOLMES

1  for, so they could put it in language that you
2  guys understand.  Okay?  I put it in simple
3  language.  They put it in their sophisticated
4  language.  What are you asking me?
5      Q.  Other than no-fault separation pay,
6  not receiving --
7      A.  Other than no-fault -- okay.
8      Q.  Other than that amount, whatever
9  that is, what other damages have you suffered
10  as a result of the breach of the EmPact
11  agreement that you have alleged in the first
12  amended complaint?
13      A.  I have suffered not being paid --
14      ATTORNEY BRUSTEIN:  Objection.
15      Q.  Go ahead.  It's okay.
16      A.  I have suffered not being paid my
17  wages.  Not contributing to social security.
18  Not putting it into my 401(k).
19      Q.  Okay.
20      A.  I have suffered.  I have been used
21  to -- I'm not a person that jumps from job to
22  job.  I live a normal life.  I take care of my
23  family.  And everything has changed for me.  I
24  have a family.  I have children.  I have

Page 389

V. HOLMES

1  grandchildren, just like yourself.  I have
2  two.  And I had a very normal consistent life
3  that has been now turned upsidedown.
4      Q.  I appreciate that, ma'am.
5      A.  It's not for you to appreciate.
6  It's for you to understand.  Have some
7  empathy, have some compassion, that I'm not
8  here asking for the billions of dollars that
9  Ty Warner or the Four Seasons has.  All I'm
10  asking is for what I am entitled to.  What I
11  had in the contract.
12      All I'm asking is to be recognized
13  for everything that I did while I was in the
14  company.  I went above and beyond, and I did
15  things that I didn't even get paid for.  I was
16  a model employee.  And I'm not asking for a
17  lot.  And I can't understand why some people
18  got paid, others didn't.  Some people got
19  severance, some people are continuously
20  getting severance.  Some people -- I don't
21  understand the formula, what's going on in the
22  hotel.  And yes, I'm permanently laid off.  I
23  haven't received any money.  You keep saying
24  would you give up this, would you do that.

Page 390

V. HOLMES

1   Nothing has been said as to when I'm going
2   back. I can permanently be furloughed? Who
3   can permanently be furloughed? That doesn't
4   make sense.
5   Q. I'm not trying to step on your
6   answer, ma'am. I understand. Do you want to
7   be compensated in this lawsuit for all of the
8   things that you just described?
9   A. Yes.
10   ATTORNEY BOLAND: Okay. I have
11   nothing further.
12   ATTORNEY BRUSTEIN: Okay.
13   THE COURT REPORTER: Any questions,
14   counsel?
15   ATTORNEY BRUSTEIN: I don't know,
16   Paul, do you have any questions?
17   ATTORNEY WAGNER: None for me,
18   thank you.
19   ATTORNEY BRUSTEIN: Can we just
20   take few minutes, two-minute break?
21   ATTORNEY BOLAND: Yes, sure.
22   ---
23   (Recess from 6:24 to 6:32.)
24   ---
25

Page 391

V. HOLMES

1   ATTORNEY BRUSTEIN: So we have no
2   questions. We're just going to reserve
3   our right to --
4   ATTORNEY BOLAND: Reserve
5   signature?
6   ATTORNEY BRUSTEIN: Yes. And to
7   review.
8   ATTORNEY BOLAND: Okay. Thank you.
9   ---
10   (Time noted: 6:33 p.m. EDT)
11
12   _____
13
14   VIVIAN HOLMES
15
16   Sworn and subscribed to before
17   me this _____ day
18   of _____, 2023,
19   in the jurisdiction aforesaid.
20
21   _____
22   NOTARY PUBLIC
23
24
25

Page 392

1
2        C E R T I F I C A T E
3   STATE OF NEW YORK    )
4   COUNTY OF NEW YORK    )
5        I, FRANK J. BAS, a Certified
6   Shorthand Reporter and Notary Public within
7   and for the State of New York, do hereby
8   certify:
9        That the witness whose testimony is
10   hereinbefore set forth, was duly sworn by me
11   and that such testimony given by the witness
12   was taken down stenographically by me and then
13   transcribed.
14        I further certify that I am not
15   related by blood or marriage to any of the
16   parties in this matter and that I am in no way
17   interested in the outcome of this matter.
18        That any copy of this transcript
19   obtained from a source other than the court
20   reporting firm, including from co-counsel, is
21   uncertified and may not be used at trial.
22        IN WITNESS WHEREOF, I have hereunto
23   set my hand this 11th day of April, 2023.
24
25   _____
     FRANK J. BAS, RPR, CRR

Page 393

1
2   ---------------- I N D E X ----------------
3   WITNESS        EXAMINATION BY        PAGE
4   VIVIAN HOLMES     MR. BOLAND        6
5
     ---------------- EXHIBITS----------------
6   (Exhibits retained by Freeborn & Peters.)
7   DEFENDANTS'                    PAGE
8    Defendants' Exhibit 1, Amended       8
     Notice of Deposition
9
     Defendants' Exhibit 2, amended     10
10   notice
11   Defendants' Exhibit 3, LinkedIn     23
     profile
12
     Defendants' Exhibit 4, LinkedIn     27
13   document
14   Defendants' Exhibit 5, Complaint     30
15   Defendants' Exhibit 6, First     33
     Amended Complaint
16
     Defendants' Exhibit 7, Notice of     66
17    Motion to Compel Arbitration and
     Dismiss Class Claims and Stay
18    Action, Memorandum of Law in
     Support
19
     Defendants' Exhibit 8, Declaration   69
20   of Cathy Hwang
21   Defendants' Exhibit 9, Memorandum   71
     of Law in Opposition to Defendants'
22    Motion to Compel Arbitration,
     Dismiss Class Claims, and Stay
23    Action
24   Defendants' Exhibit 10, Declaration  75
     of Evan Brustein
25

Page 394

```
1
2
3    ------ EXHIBITS CONTINUED ------
     Defendants' Exhibit 11, Reply      77
4    Memorandum of Law in Further
     Support of the Warner Defendants'
5    Motion to Compel
6    Defendants' Exhibit 12, Notice of  77
     Motion to Dismiss, Memorandum of
7    Law in Support
8    Defendants' Exhibit 13, Declaration 78
     of Elizabeth Ortiz
9
     Defendants' Exhibit 14, Notice of  80
10   Motion to Dismiss, Memorandum of
     Law in Support of the Warner
11   Defendants' Motion to Dismiss
12   Defendants' Exhibit 15, Declaration 81
     of Elizabeth Ortiz with exhibits
13
     Defendants' Exhibit 16, Plaintiffs' 82
14   Memorandum of Law in Opposition to
     Defendants' Hotel 57 Services
15   Motion to Dismiss the Amended
     Complaint
16
     Defendants' Exhibit 17, Declaration 84
17   of Evan Brustein with exhibits
18   Defendants' Exhibit 18, Declaration 86
     of Vivian Holmes
19
     Defendants' Exhibit 19, Reply      87
20   Memorandum of Law in Further
     Support of the Warner Defendants'
21   Motion to Dismiss the Amended
     Complaint
22
     Defendants' Exhibit 20, Plaintiffs' 90
23   Rule 26 (A)(1)(A) Initial
     Disclosures
24
     Defendants' Exhibit 21, Plaintiffs' 96
25   First Supplemental Disclosures
```

Page 395

```
1
2
3    ------ EXHIBITS CONTINUED ------
4    Defendants' Exhibit 22, letter     107
     dated March 29, 2023
5
     Defendants' Exhibit 23, Staley v   109
6    FSR 0304
7    Defendants' Exhibit 24, defendants' 115
     First Demand For Production of
8    Documents
9    Defendants' Exhibit 25, Plaintiffs' 128
     Responses and Objections to
10   Defendants' First Request For
     Production of Documents
11
     Defendants' Exhibit 26, Defendants' 130
12   First Set of Interrogatories
13   Defendants' Exhibit 27, Plaintiffs' 132
     Responses and Objections to Warner
14   Defendants' First Set of
     Interrogatories
15
     Defendants' Exhibit 28, letter     136
16   dated February 24, 2023 from
     Brustein law firm
17
     Defendants' Exhibit 29, Staley     143
18   v FSR 0001 through 89
19   Defendants' Exhibit 30, letter,    146
     Staley v FSR 0281
20
     Defendants' Exhibit 31, Staley     148
21   v FSR 045
22   Defendants' Exhibit 32, Staley     155
     v FSR 0028
23
     Defendants' Exhibit 33, Staley     166
24   v FSR 0204 to 0207
25   Defendants' Exhibit 34, Staley     177
     v FSR 0054
```

Page 396

```
1
2
3    ------ EXHIBITS CONTINUED ------
4    Defendants' Exhibit 35, Staley     188
     v FSR 0086 to 87
5
     Defendants' Exhibit 36, Staley     198
6    v FSR 0055
7    Defendants' Exhibit 37, Staley     206
     v FSR 0056
8
     Defendants' Exhibit 38, Staley v   222
9    FSR 0017 to 18
10   Defendants' Exhibit 39, Staley     232
     v FSR 0002
11
     Defendants' Exhibit 40, Staley     232
12   v FSR 0016
13   Defendants' Exhibit 41, Staley     252
     v FSR 0057
14
     Defendants' Exhibit 42, Staley     258
15   v FSR 0088 to 89
16   Defendants' Exhibit 43, Staley v   260
     FSR 0221
17
     Defendants' Exhibit 44, FSR 0058   267
18
     Defendants' Exhibit 45, Staley     268
19   v FSR 0001
     Defendants' Exhibit 46, Staley     270
20   v FSR 0059
21   Defendants' Exhibit 47, Staley v   273
     FSR 0213
22
     Defendants' Exhibit 48, Staley     277
23   v FSR 0060
24   Defendants' Exhibit 49, Staley     280
     v FSR 0069 to 80
25
```

Page 397

```
1
2    ------ EXHIBITS CONTINUED ------
3    Defendants' Exhibit 50, Staley     283
     v FSR 0061
4
     Defendants' Exhibit 51, Staley     287
5    v FSR 0082 to 85
6    Defendants' Exhibit 52, Staley     290
     v FSR 0062 to 64
7
     Defendants' Exhibit 53, Staley     293
8    v FSR 0050 to 51
9    Defendants' Exhibit 54, Staley     297
     v FSR 0020 to 21
10
     Defendants' Exhibit 55, Staley     300
11   v FSR 0027
12   Defendants' Exhibit 56, Staley v   351
     FSR 0032
13
     Defendants' Exhibit 57, Declaration 352
14   of Vivian Holmes dated December 5,
     2022
15
     Defendants' Exhibit 58, EmPact     358
16   agreement
17
18   DIRECTIONS NOT TO ANSWER
     Page       Line
19
     11/7; 15/22; 16/20; 17/20; 18/9; 19/3; 53/10;
20   53/19; 55/25; 69/5; 101/24; 102/17; 105/22;
     112/21; 114/9; 118/19; 120/13; 130/4; 167/6;
21   278/8; 279/24; 305/9; 307/2
22
23
24
25
```

Page 398

1
2
            WITNESS ERRATA SHEET
3  Case Name: Selena Staley, et al v FSR
   International Hotels, et al
4  Dep. Date:  March 30, 2023
   Deponent: Vivian Holmes
5
   Pg. Ln.  Now Reads      Should Read    Reason
6   __|__|_____|_____  _____
7   __|__|_____|_____  _____
8   __|__|_____|_____  _____
9   __|__|_____|_____  _____
10  __|__|_____|_____  _____
11  __|__|_____|_____  _____
12  __|__|_____|_____  _____
13  __|__|_____|_____  _____
14  __|__|_____|_____  _____
15  __|__|_____|_____  _____
16  __|__|_____|_____  _____
17  __|__|_____|_____  _____
18  __|__|_____|_____  _____
19  __|__|_____|_____  _____
20
21      _____
           Signature of Deponent
22
      SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 2023.
24  _____    _____
      (NOTARY PUBLIC)     MY COMMISSION EXPIRES:
25

Index: $500..2021

---

**$**

**$500**  150:14 151:11 152:10

---

**(**

**(A)(1)(A)**  90:4,10,14 394:23

**(i)**  138:4,14

---

**0**

**0001**  90:12 95:9 143:16,21 268:13,18 395:18 396:19

**0002**  232:20 233:4 396:10

**001**  93:11

**0016**  232:23 233:5 396:12

**0017**  222:4,9 396:9

**0020**  297:8,13 397:9

**0027**  300:9,13 397:11

**0028**  155:12,17 395:22

**0032**  351:3,6 397:12

**0050**  293:3,7 397:8

**0054**  177:25 178:6 395:25

**0055**  199:2,7 396:6

**0056**  206:24 207:5 396:7

**0057**  252:9,14 396:13

**0058**  267:9,14 396:17

**0059**  270:7,12 396:20

**0060**  277:19,24 396:23

**0061**  283:10,15 397:3

**0062**  290:3,8 397:6

**0069**  280:17,22 396:24

**0082**  287:13,18 397:5

**0086**  188:20,22 396:4

**0088**  258:11,16 396:15

**0204**  166:19,24 395:24

**0207**  166:19,24 395:24

**0213**  273:4,8 396:21

**0221**  260:19,23 396:16

**0261**  90:12 93:25

**0262**  97:13

**0281**  146:12,17 395:19

**0304**  109:12,16,20 395:6

**045**  148:23 149:9 395:21

**07:14**  23:23

---

**1**

**1**  7:20 8:10,14,22 60:25 61:13 93:6 119:21 127:13 152:18 329:18 376:23 393:8

**10**  74:24 75:4,19,22 76:11 353:18 354:15, 21,22 355:6,17,21 358:19,20 359:8 361:4 393:9,24

**101/24**  397:20

**102/17**  397:20

**105/22**  397:20

**10550**  21:18

**107**  322:6,20 323:6 395:4

**108**  328:24 329:2,11

**109**  395:5

**10:32**  39:17

**10:39**  39:17

**11**  77:2,7,13 261:13 313:18,21 394:3

**11/9/2002**  67:14

**114/9**  397:20

**115**  395:7

**118/19**  397:20

**119**  328:24 329:3,4, 11

**11:11**  74:22

**11:19**  74:22

**11th**  392:23

**12**  77:22 78:4,15 79:8,12 328:25 394:6

**12/19/2022**  34:7

**120**  331:17 332:3

**120/13**  397:20

**128**  395:9

**12:40**  151:23

**12:57**  151:23

**13**  78:20,24 79:10,12, 13 316:12,13,14 320:22 394:8

**130**  395:11

**130/4**  397:20

**132**  395:13

**133**  331:17 332:3

**136**  395:15

**14**  80:20 81:2,11 254:8 321:23 322:3 377:2,9 379:20 394:9

**143**  395:17

**146**  395:19

**148**  395:20

**15**  61:25 81:14,18,24 93:6 169:8 186:23 189:19 195:13 196:19 202:14,21 204:9 222:19,21 224:20 256:24 262:19 277:12 288:19 289:8 321:23 394:12

**15-21**  192:2,4

**15/22**  397:19

**155**  395:22

**16**  82:6,13,20 84:9,21 233:21 331:15 394:13

**16/20**  397:19

**166**  395:23

**167/6**  397:20

**16:30**  28:10

**17**  84:24 85:4,18,22 157:20,23 261:19 394:16

**17/20**  397:19

**177**  395:25

**18**  86:3,7 157:2,5 222:4,9 282:7 314:16 394:18 396:9

**18/9**  397:19

**188**  396:4

**19**  35:17 87:9,15,21, 22,25 394:19

**19/3**  397:19

**198**  396:5

**1998**  30:6 147:5,17

**1:32**  187:15

---

**2**

**2**  10:3,6 28:19 60:24 61:13 157:11 233:22 376:23 393:9

**2/28/23**  23:23

**20**  90:3,8 94:6,13 160:12 162:21 163:15,25 168:24 175:4 180:9 206:7 209:14 264:3 265:5 309:24 336:17 337:18 394:22

**20-plus**  343:20

**200**  100:17

**2000**  147:22

**2001**  147:22

**2002**  197:20

**2003**  29:13

**2004**  148:2

**2016**  29:23 147:2

**2018**  353:8,9 356:3,9, 18,21 357:3,17 359:12,16 360:2,19 361:6

**2019**  303:8,12

**2020**  27:9 142:9,15, 25 157:18,25 158:3,9 159:5 160:12 162:20, 21 163:16,25 164:19 165:2 168:15,24 169:8 173:15,21 176:5 177:16 179:16 180:9 183:5,17 184:4,25 186:23 189:20 195:13 196:19 202:12,14,21 203:4 204:2,9 206:7 208:9 209:14 210:2 211:19,25 212:14,16, 19 214:20 215:5,22 216:18,22 217:7 218:25 220:17,21,25 221:10,14 222:19,21 224:20 225:22 226:19 232:10 234:3 236:9,13 237:21 242:12,14 243:8,23 246:19 248:7 251:19 252:3 253:14 255:23 256:24 259:16,19 261:14,19 262:19 263:3,4,9,10 264:3 265:5,13,18 266:11, 15 269:21 270:18 271:3 273:13,17,19, 22,25 276:7 277:12, 13 293:14 294:17 298:13,20,25 299:6, 13 302:15,24 303:5, 16,17,24 304:3,10,22 305:19 309:9 336:17, 18 337:18

**2021**  48:11 97:10 98:16 101:14 103:19 109:6 195:23 198:7 220:17 234:23 235:2, 6,25 236:5 239:6

248:19,20 273:20 274:10,12,19,22 276:7,19 277:13 279:3,10 285:7,17 286:10 287:2 288:9 289:13 290:20 292:19 297:21 299:16,22,24 300:5, 16 306:20 309:9 336:19,20

**2022** 35:18 48:4,16 96:24 110:19,23 116:3 128:20,25 129:21 197:20 198:8 284:14 301:11 305:6, 9,20,21 306:3 307:6, 12 308:3,7 309:9 352:18,22 353:6,21 354:11,17,24 355:15 357:11

**2023** 9:7,10 10:22 86:13 107:20,25 110:18 136:9,13 391:18 392:23 395:4, 16 398:4,23

**206** 396:7

**21** 10:22 96:16,21,25 297:8,13 336:18 394:24 397:9

**22** 107:19,23 108:10 110:21 204:2 211:18 212:14,18 214:20 215:4,22 253:14 307:21 309:7 310:11 336:19 338:7,9,12 341:25 342:11 395:4

**222** 396:8

**23** 109:15,18,25 110:8 112:2,6,8,24 114:22,24 338:7 339:5,20,21 342:11 393:11 395:5

**232** 396:10,11

**24** 115:3,8,18 116:10, 21 127:10 136:9,13 350:4 395:7,16

**25** 97:9 98:16 101:14 103:19 128:2,8,25 129:20 130:12 195:23 336:19 395:9

**252** 396:13

**258** 396:14

**26** 90:4,10,14 130:15, 19 131:3 159:5 314:11 394:23 395:11

**260** 396:16

**261** 94:7

**267** 396:17

**268** 396:18

**27** 9:10 67:13 109:5 132:14,20,24 136:4 393:12 395:13

**270** 396:19

**273** 396:21

**277** 396:22

**278/8** 397:21

**279/24** 397:21

**28** 78:5,7 136:8,12,22 259:16,19 260:5 395:15

**280** 396:24

**283** 397:3

**287** 397:4

**29** 96:24 107:20,25 116:2 128:20,25 143:15,19 395:4,17

**290** 397:6

**293** 397:7

**297** 397:9

**2:29** 188:3

**2:59** 221:21

---

**3**

**3** 23:13,16 28:4,5 260:5 270:18 271:3 278:22 288:18 289:8 353:4 354:6,17,25 355:8,11 357:18 393:11

**3/29/23** 28:10

**30** 9:7 70:3 146:4,5, 11,15,18 148:4 176:5 183:4 184:24 203:3 211:22,25 301:11 393:14 395:19 398:4

**300** 397:10

**305/9** 397:21

**307/2** 397:21

**31** 67:19 148:22 149:6,18 183:17 278:21,24 395:20

**316** 335:13,15,19,20 348:18

**317** 335:19

**32** 155:11,15,18 159:11,14 395:22

**33** 92:18 166:18,22, 25 174:16 254:4 393:15 395:23

**34** 177:24 178:4,7 182:23 395:25

**347** 382:11,12,13 385:15

**35** 188:18,21 189:3,7 194:8,14 196:24 197:11 198:21 396:4

**351** 397:12

**352** 397:13

**353** 386:21

**358** 397:15

**36** 198:25 199:5,9 201:17 202:3,7 396:5

**37** 206:23 207:3,7 396:7

**38** 222:3,7 396:8

**39** 232:18,19 233:2,3 237:5 396:10

**3:06** 221:21

---

**4**

**4** 27:18,21 28:19 62:2 129:14 271:20 355:25 356:13 357:5, 18 379:19,20 393:12

**40** 78:25 157:18 232:18,22 233:2,4 237:5 396:11

**401(k)** 343:21,22 388:19

**41** 78:9 252:8,12,15 396:13

**42** 21:17 63:13,17 64:24,25 258:10,14, 18 260:25 396:14

**42@verizon.net** 22:22

**43** 75:5 260:18,21 261:7,8 262:2,23 353:17 396:16

**44** 65:16 72:12 267:9, 12,15 396:17

**45** 268:12,16 271:13, 19 396:18

**46** 77:8 270:6,10,13 334:5 396:19

**47** 273:3,6,9 335:14 348:17 396:21

**48** 277:18,22 278:2 396:22

**49** 280:16,20,23 281:12 335:5 396:24

**4:14** 287:10

**4:23** 287:10

**4:44** 309:4

**4:52** 309:4

---

**5**

**5** 30:14,17 31:10 33:7 35:7,16 36:7 134:22 234:3 235:25 237:21 251:19,24 338:9 350:2 352:18,22 353:6,21 354:11,16, 24 355:15 393:14 397:14

**5/1/2021** 282:4

**50** 7:24 81:5 283:9, 13,16 397:3

**51** 7:25 287:12,16,19 293:3,8 349:11,16 382:6 397:4,8

**52** 81:19 290:2,6,10 292:19 382:14,15 397:6

**53** 81:7 293:2,6 295:5 397:7

**53/10** 397:19

**53/19** 397:20

**54** 297:7,11,14 362:11 375:18,20 397:9

**55** 86:8,16 157:4 300:8,12,25 301:2,3, 5,12 397:10

**55/25** 397:20

**56** 85:19 300:23 351:2,4,7 352:13 358:5 361:11 362:2, 14 397:12

**57** 10:9 82:8,14,16 295:8 298:11,12,19 299:5,15 302:4 311:5,8,12,13 312:4, 6,10,23,25 313:7,24 314:18 316:9,14 317:3,8,23 318:3,9, 18 319:9,15,20,23 320:3,11,12,15,17, 18,21 321:2,6,7,11 322:2 323:12,18 324:10 325:9,14 352:15,16 354:2,18 355:2,9,12 359:22 394:14 397:13

**57th** 276:3,12

**58** 87:16 358:22 359:2,10 360:5 361:23 362:3 397:15

**5:29** 342:4

**5:31** 342:4

**5th** 234:22

---

**6**

**6** 33:17,21 35:7 60:7 61:20 67:7 86:13

356:4,20 357:3 380:4 381:18 382:2 393:4, 15

**60**  239:20,22,24 240:22 241:14 277:7 339:4 343:14

**64**  290:3,8 397:6

**66**  393:16

**67**  314:3,4,8,13 315:11,16 316:3

**69**  393:19

**69/5**  397:20

**6:05**  374:20

**6:10**  374:20

**6:24**  390:24

**6:32**  390:24

**6:33**  391:11

---

**7**

**7**  66:23 67:11 69:13 393:16

**70**  314:17

**71**  393:21

**75**  393:24

**77**  394:3,6

**78**  394:8

---

**8**

**8**  69:21,25 70:9 71:4, 16,21,22,23 72:10,11 115:25 273:17 393:8, 19

**80**  280:17,22 394:9 396:24

**81**  394:12

**82**  394:13

**84**  394:16

**85**  287:13,18 288:11, 12 397:5

**86**  316:9,12 394:18

**87**  188:20,22 394:19 396:4

**89**  143:16,21 258:11, 16 260:4 395:18 396:15

---

**9**

**9**  35:18 63:11,21 71:7 72:9,17 74:11 168:15 173:15 288:9 289:13 393:21

**90**  277:7 394:22

**917-405-7932**  21:23

**92**  314:9 315:11,16 316:3

**93**  322:5,20 323:6

**96**  394:24

---

**@**

**@fourseasons.com**  269:18

---

**A**

**Abdul**  217:23 221:5

**ability**  370:13 373:14 375:4,11

**abroad**  272:14

**Absolutely**  35:23 153:18

**accept**  59:6,25

**access**  180:12,19 181:4,6,10,12,13,21 182:17 195:6,8,21 196:8,13,17 214:15 215:5 236:14,17,18 296:15

**accessed**  215:16 236:12

**accessing**  236:10

**account**  118:3,23 180:13,24,25 197:5 236:7,8,10,13,17 267:2 296:3

**accounts**  117:14,18 119:22 126:25 127:9 197:9

**accuracy**  62:11,25 63:20 64:18 65:5,8, 20 82:23 83:6 84:8, 20 315:10

**accurate**  62:16 64:12 65:11 121:3 138:6,15 150:3,5 164:15 170:9 173:23 182:13 208:2 222:25 229:20 282:14,17 283:2,6 306:24 319:3 325:22 359:24 368:12

**acknowledged**  353:9 360:2,18 361:6 383:7

**acknowledgment**  350:21

**acronym**  375:24

**act**  139:16,17 152:13, 14 200:15,16 238:9, 14,15,16,21,25 239:4,5,15,19 241:7 242:6,11 243:3 244:2 245:9,13,20 246:4,8, 10,19 319:18,21 323:16,19,24 324:4, 11,22 325:12 326:24 327:3 328:10 330:10, 18,24 331:6 332:18 334:4,10,12,16,23,25 335:4 340:23 341:12 342:16,24 343:12,13, 18 344:5,13,21 345:8 346:4,17,21 347:9

**action**  31:20 32:2,19, 25 37:10,12,15 40:3 52:9 61:14 66:25 67:17 71:10 72:15 169:17 244:16 334:6 349:13,18 393:18,23

**actions**  37:8 52:13

**active**  48:2

**activity**  23:20

**Acts**  335:8 338:2

**actual**  279:8

**add**  44:18 52:10 229:3,11

**added**  44:6 52:4

**addition**  40:10 52:6 203:21 272:11 344:17

**additionally**  184:13 254:13

**address**  21:15 179:23 180:5,8 195:5,9,14,15,25 196:3,4,9,19 269:17 270:3 311:3

**addressed**  269:21 270:2

**addresses**  22:7,15 65:12 269:8

**adjustment**  334:9, 20

**adjustments**  257:7

**administrative**  147:13,15

**admit**  340:14

**ADP**  124:2 294:3

**advance**  16:21 18:11 48:5 277:7

**advice**  11:12

**advisory**  254:5

**affairs**  184:24 203:25 274:21 367:5

**affidavit**  356:22

**affirmatively**  89:7 205:13

**aforesaid**  391:19

**age**  198:15

**agree**  6:20,23 177:8, 17,21 224:19,24 225:4 255:25 362:5

**agreed**  202:25

**agreement**  13:4 109:6 110:5 249:9,19 349:23 350:18,20 351:15 352:3,10 353:5,8 354:7 355:13

**agreements**  54:3

**agrees**  365:5

**Agyeman**  289:2

**ahead**  17:16 67:20 158:21 169:19 262:16 308:24 339:20 341:18 388:16

**Alexandra**  118:13

**allegation**  60:13 62:2 65:8,21 316:16 336:7 337:5,10 339:24 340:6,9,14 350:12 382:17,22 385:14 386:22 387:4

**allegation's**  337:15 338:22

**allegations**  39:2,5 60:17,20 61:11 62:7, 12 63:2,8,13,20 64:2, 6,14,19,21,23 65:5 66:6 314:7,12,16,18 315:11 316:3,24 317:21,25 322:20 323:5 328:25 332:2 342:10

**allege**  338:10 339:5 350:4

**alleged**  329:10 387:12 388:12

**allocate**  53:19,21

**allowed**  156:2

**Alright**  15:15

**alternative**  249:2

**amended**  8:10,22 9:15 10:3 33:4,18,22 34:11,14 60:4,21 63:3 80:7,12 82:9,17 87:12,19 310:15

313:19 315:16 316:4
321:24 332:4 350:3
381:17 382:2 387:12
388:13 393:8,9,15
394:15,21

**amount** 138:8 172:2
309:22 343:24 388:9

**and/or** 336:19

**annexed** 353:5 354:7
355:13

**anniversaries**
192:2,12,13,18
193:4,16 260:6,10
288:17 289:9 292:14

**anniversary** 193:21
260:12 288:22
289:20

**announced** 253:18

**announcement**
273:18

**annually** 294:12

**answering** 25:16
153:12,14,15

**answers** 39:23 49:25
57:20 133:16

**anticipated** 176:14
187:9 209:7,10
257:16

**anybody's** 342:23

**anymore** 326:17

**apologize** 72:3
140:15 145:9 292:21
315:23 327:23

**appeal** 379:19

**appearing** 5:15

**appears** 273:15

**appended** 94:6

**applies** 6:16

**apply** 241:2 362:6

**appreciates** 18:9

**appreciation** 149:21

**apprised** 66:13

**approve** 31:16 35:2

130:6 134:19

**approved** 36:11

**approving** 44:8

**approximate** 147:16

**approximately**
277:7

**April** 168:15 169:8
173:15 176:5 177:16
183:4 184:24 257:14
273:20 274:17,19
277:13 303:22
392:23

**arbitration** 66:24
67:16 68:5,14,23
70:5 71:9 72:14 73:8
375:22 393:17,22

**archived** 126:20
127:8

**area** 162:13 212:15,
20

**areas** 172:20,25
185:19

**argument** 141:11

**arises** 141:16

**asserted** 32:11,12,
19,25 44:2,9 129:19

**assistant** 147:13,15
156:24

**assume** 57:2 141:10
246:18 364:11

**assuming** 89:12
100:17 144:17
164:12 345:11

**assumption** 193:25
194:4 260:15,17

**attached** 75:10,17
76:2,13 81:12,24
82:3 91:17 358:12
359:23

**attachment** 201:25
235:7 239:8

**attachments** 70:12
79:2,4

**attempt** 107:6

**attendant** 248:13

**attention** 24:15
109:4 188:17 190:10
193:10,13 348:16
375:18 382:11
386:21

**attorney** 5:2,5,8,11,
14,25 7:18 8:6,8
11:7,10 12:4,8 15:3,
25 16:3,6,7,9,10,11,
13,23 17:23 18:2,4,8,
12,14,15,23,25 19:6,
8,9,12,19,23 20:4,13,
15,20,22,23,25 22:9,
12 23:25 24:3,6,11,
13,16,18,25 25:3,8,9,
10,18 26:3 27:22,24
28:13,15,16,18 29:24
30:4,16 33:6,23 34:2
36:13,23 38:4 39:7,
11,14,15,19,21,25
41:3,11,18 42:7,25
43:11,21 44:11,21
45:4,8,18 46:2 49:6
50:6 51:9 53:13,22
54:21,23,25 55:4,6,9,
11 56:4 59:9,13,22
63:6,22 65:9,23
66:11 68:24 69:7,17,
20 70:11,14,17,20
71:12,14,17,20,22,
23,24,25 72:2,4,5,7
74:14,16,17,19,20
76:3,17 79:11,14,18
80:2 82:4 83:2,9,20,
24 84:5,10,14,23
85:8,11,13,16,24
89:10 90:18 92:11,
14,16,18,19 95:18,21
96:3,9,12,14 97:19
98:20 99:3,8,18,23
100:3,8,16,20,24
101:4,9,15,20 102:3,
6,9,11,16,22 103:16,
20 104:8,16,25
105:19,22 106:5,22
107:2,9,13,17 108:3,
4,6,25 112:21,25
113:3,5,8,11,15,18,
19,21,24,25 114:7,9,
13,15,17,20,25
115:9,11,16 118:25
119:12,19 120:8,20,
25 121:4,8,17,19
122:2,7,20,23,25
123:2,23 124:10,14,
22 125:23 126:7,12,

18 127:12,17,19,21
129:22 130:8,20,23,
25 131:16 135:23
136:23 137:22
138:16,18,21,22
139:2,12 141:8,18,23
142:4,10 143:2,10
144:3,5,8,12,13,20,
24 145:2,19 146:3,6,
8 148:16 150:4
151:16,18,20,21,25
152:4 153:6,8,11
154:16 155:4 156:18
158:8 159:9,13
160:3,5,24 164:2,5,
20 165:3,24 166:4,
10,16 167:11 169:13,
21,23 170:4,7,22
171:5,8,16 172:11
173:4,16,24 174:8,17
175:10,17,21 176:16,
20,22 177:10,19,22
178:19 179:6,11,24
180:14,17 183:19
184:5,11,17 185:2,
14,21 186:3,13,19,25
187:4,11,13 188:12
189:17,25 190:16,22
191:7,21 192:10,15
193:6,11,17,23
194:2,5,10,15,20,25
195:10 196:5,10,20
197:2,6,12,17,21
198:4,9,12,16,22
199:22 200:3 201:3,
12,20 202:16,22
203:7 204:3,11,17
205:2,9,19,23 206:9,
12,15,20 207:17
208:3,12,15,18
209:3,19 210:3,7,12,
18,22,25 211:12
212:7,21 213:8,22
214:5,11,17,21
215:8,17,24 216:7,
12,23 217:2,8,17,21
218:4,6,10,13,15,17,
18 219:3,7,11,16,22
220:5,9,10,13,22
221:2,11,15,17,19,23
222:17 223:2,9,16
224:11,14,23,25
225:5,16,23 226:2,11
227:3,9,20,25 228:6,
16,24 229:6,14
230:23 231:4,10,16

232:6,14,16 233:11
234:10 236:19 237:7,
11,17 238:6,11,18
239:2,7,18 240:12,
17,21 241:3,9,13,16,
19 242:2,7,10,15,20,
25 244:5,10,12,17,
21,23 245:12,17,22
246:9,23 247:3,6,10,
13,19,21,23 248:9,12
249:14,17,21 250:19,
25 251:7,15,17,22
252:5 253:5 254:2,
11,19 255:3,15,21
256:9,15,25 257:10,
18 258:3,23 259:10,
25 260:13,16 261:5,
25 262:4 263:6,12,22
264:7,16 265:2,6
266:13 267:4,24
268:10 269:4,22
271:2,4,9,15 272:4,9,
21,25 273:23 274:2,
23 275:6,13,18
276:4,9,13,21 277:9,
16 278:8,14 279:22,
25 280:8,10,12,13,14
281:4,9 282:15,21
283:3,23 284:22
285:9,13,21 286:16
287:5,7,8 289:10,14,
17,24 290:22 291:3,
16,23 292:12,18,24
293:17,21 294:4,9,
20,23,25 295:3,6,23
296:7,13,22 297:24
298:7,14 299:3,19
300:20 301:2,3,15
302:3,21 303:2,6,9,
11,20,25 304:5,13,17
305:10,12,14,16,18,
22 306:10,23 307:7,
13,24 308:17,19,21,
23 309:2,13 311:7,
15,21 312:8 313:3,8
314:20,24 315:7,12,
18 316:5,10,11
317:6,10,15 319:5,
12,17 320:6 321:8,
17,19 322:11 323:7,
10,15,20,23 324:12,
15,20 325:4,11,16,19
326:6,10,21 327:15,
19,21,23,24 328:3,5,
9,15,18 329:12,16,23
330:9,15,21,25 331:7

332:5,12,22 333:3,8,
13,25 334:13,17,22
335:9,18,20,21,22
336:25 337:7,13,19,
23 338:5 339:2,9,13,
17 340:2,11,17,24
341:3,5,7,8,13,15,18,
20,24 342:6,25 343:7
344:6,22 345:3,10,
14,19 346:2,5,11
347:3,11,14,18,21,23
348:2,9,11,25 349:4
351:16,24 352:5,12,
14,20 353:12,14
354:3,13 355:3
356:11,15,23 357:20
358:3,8,18,20
359:13,17 360:6,8,
10,13,20 361:18
362:9,21 363:7,12,
15,19,24 364:8,23
365:8,17 366:12,20,
23 367:8,15 368:7,
11,13,15 369:2,9,16,
21 370:8,17 371:3
372:4,10,17,25
373:9,17,23 374:16,
18,22 375:15 376:12
377:11 378:10,25
380:20 381:19,21
383:15 384:2,19
385:8,22 386:11,16,
18 387:13,22 388:15
390:11,13,16,18,20,
22 391:2,5,7,9

**attorney-client** 11:9
12:6 53:15 84:12
102:25 104:10,18
113:5 119:3 122:6,22
305:24

**attorneys** 16:25
19:14,17 25:21 40:6,
21 43:3,5 52:15
83:15 120:22 121:7
311:16,20,22 315:3
387:25

**attractions** 254:14
270:22

**audio** 97:9,20,22
98:13,21 99:11
101:12,19 102:7
279:9

**August** 35:17,18

36:4 48:4,16 109:5
110:23 209:25 234:3,
22 235:25 236:9,13
237:21 251:19,24
259:16,19 260:5
261:13 305:6,9
307:6,12,21 309:7
310:10

**authentication**
181:2

**authority** 38:22,24
39:4 44:5,8,13,20
45:3,16,20,22,24

**authorization**
181:24

**authorized** 52:8
65:17,22

**Avenue** 21:17

**average** 219:12,24
220:4

**aware** 37:9 66:16,18
68:10,12 80:16
106:18,24 144:16
160:16 163:22,23
286:13

---

**B**

**baby** 68:20

**back** 11:23 25:20
32:22 39:19 47:21
57:17 59:14,16 60:6
67:9 75:11 84:3
93:22 116:18 118:22,
23 119:7,19 132:10
140:11,25 141:7
142:3,8 144:15,16,25
146:25 152:24
159:24 160:14 161:8
171:2 172:25 181:21
206:3 220:11 221:23,
25 231:6,18,20
232:2,3,5,13 234:22
248:7 262:11 284:10
302:14 307:25 308:3
329:18 342:6,8,9
348:16 351:20 364:3,
4,10 368:18 369:25
370:10 373:7 374:2
375:4 379:4 380:22,
24 382:5 390:3

**background** 248:5

**backtrack** 300:14

**bad** 264:24

**ball** 75:8 94:4 115:25
136:15

**bank** 296:5,9,10,12

**BAS** 392:5,25

**based** 57:18 160:20
161:6 208:10 212:10
216:19,20 231:13
303:14 304:4,8
314:23 375:3 386:23

**basic** 81:10

**basically** 18:25 50:8
68:4 131:22 170:13

**basis** 26:14 56:2,3
69:6 113:4 174:16
189:16 266:16

**Bates** 90:11 91:9,24,
25 97:5,12 109:11,19
146:16 149:11
155:16 166:23 178:5
188:19 199:6 207:4
222:8 233:3,5,19,21,
22 252:13 258:15
260:4,22 267:13
268:17 270:11 273:7
277:23 280:21
283:14 287:17
288:12 290:7 293:7
297:12 300:12 359:4

**Bates-numbered**
143:20

**Bates-stamped**
351:6

**bathroom** 218:11

**bearing** 90:11
109:19 146:16
155:16 166:23 178:5
188:19 199:6 207:4
252:13 258:15
267:13 268:17
270:11 273:7 277:23
280:21 283:14
287:17 290:7 293:7

**bears** 30:19 222:8
233:4 260:22 297:12

**beat** 255:11

**beg** 199:12

**began** 105:5

**begin** 284:10 322:15
331:21 362:2

**beginning** 142:6
157:17 182:10 213:3

**begins** 278:17
335:16,23 355:22

**behalf** 5:3,6,9,12,16
31:6 32:12,13,25
35:3 44:2,10 98:11
130:7,12 134:16
136:2 244:16

**belief** 133:19 134:3
166:13 232:9 245:7
314:14,23 315:6
316:19,23 320:10,16,
19 329:6 331:22

**believed** 140:17
231:11 374:6,9

**bell** 32:8

**benefit** 299:25
300:17

**benefits** 168:11
230:19,21

**big** 20:19

**billions** 389:9

**birthdays** 192:5
193:4,16 260:6
288:18 292:7

**bit** 29:8 32:23 33:15
65:14 94:19 129:5
147:4 149:22 158:13
268:19 310:24
350:25 361:22

**blanking** 286:15

**blood** 392:15

**Boland** 5:2,25 6:3
7:18 8:8 11:10 12:8
16:3,9,11 18:2,8,14,
25 19:8,23 20:15,22,
25 24:3,11,18 25:8,
10 27:24 28:15,18
30:4,16 33:6 39:14,
19,25 49:6 50:6
54:23 55:4,9 59:13

**beat** 69:20 70:14,20
71:14,20,23 72:4,7
74:16,19 79:11,14
84:14 85:8,16 92:14,
18 95:21 96:9,14
102:6,11 107:13
108:4 113:3,8,18,21,
25 114:9,15,20,25
115:11,16 119:19
120:25 121:8,19
122:7,23 123:2
124:14 126:18
127:17,21 130:23
138:18,22 144:8,20
145:2 146:3,8 151:20
152:4 153:8 159:13
169:23 170:7 171:8
176:22 187:4,13
188:12 218:6,13,17
220:10 221:17,23
224:14 232:16
247:23 280:10,13
287:7 294:25 301:3
305:12,14,18 308:19,
23 311:21 316:11
327:21,24 328:5
334:22 335:20,22
341:7,18 342:6
352:14,20 353:14
358:20 360:8,13
368:13 374:18,22
381:21 390:11,22
391:5,9 393:4

**book** 42:9

**borrow** 255:10

**bottom** 149:9 259:16
361:13

**box** 281:18

**boxes** 260:5 288:16

**Brambrut** 163:5

**breach** 349:13,20
361:17 362:6 367:11,
17 369:5,8 370:5,15
372:21,24 373:4,5,21
375:3 382:6,7 387:4,
11 388:11

**break** 39:13 74:18
127:14,16,18 130:21
139:4 151:19 152:20
153:4,12,14,15 183:2
187:14 218:5 221:18
287:6 308:18,25

341:6,16 374:17
390:21

**breaking** 310:10

**breath** 114:18

**Brian** 15:17 46:7
51:18 163:17

**briefly** 12:17 13:9,23,
24 31:22

**bring** 84:2 232:13

**broad** 227:13

**broader** 19:2 209:13
227:6

**broadly** 126:6

**Broadway** 254:25
255:14,16,17

**Broadway's** 308:10

**broke** 164:18 309:6
374:24

**broken** 264:6

**Bromberg** 15:17
46:7 51:18,23 52:6
55:22,23

**brought** 61:15

**Brustein** 5:11,12 7:9
8:6 11:7,20 12:4
15:3,17,25 16:6,10,
13,23 17:13,23 18:4,
10,12,15,23 19:6,9,
12,19 20:4,13,20,23
22:9,12 23:25 24:6,
13 25:3,9,18 26:3
27:22 28:13,16 29:24
33:23 34:2 36:13,23
38:4 39:7,11,15,21
41:3,18 42:7,25
43:11,21 44:11,21
45:4,8,18 46:2,6
48:20 49:5,8,14,19
50:7 53:13,22 54:8,9
55:11 56:4 59:9,22
63:6,22 65:9,23
66:11 68:24 69:7,17
70:11,17 71:12,17,
22,24 72:2,5 74:14,
17,20,25 75:6 76:3,
17 79:18 80:2 82:4
83:2,9,24 84:5,10,23,
25 85:11,20,24 89:10

90:18 92:11,16,19
95:18 96:3,12 97:19
98:20 99:3,8,18,23
100:3,8,16,20,24
101:4,9,15,20 102:3,
9,16,22 103:16,20
104:8,16,25 105:19,
22 106:5,22 107:2,9,
17,25 108:2,3,6,25
112:21,25 113:5,11,
15,19,24 114:7,13,17
115:9 118:25 119:12
120:8,20 121:4,17
122:2,20,25 123:23
124:10,22 125:23
126:7,12 127:12,19
129:22 130:8,20,25
131:16 135:23 136:9,
14,23 137:22 138:16,
21 139:2,12 141:8,
18,23 142:4,10
143:2,10 144:3,5,12,
24 145:19 146:6
148:16 150:4 151:16,
18,21,25 153:6,11
154:16 155:4 156:18
158:8 159:9 160:3,5,
24 164:2,5,20 165:3,
24 166:4,10,16
167:11 169:13,21
170:4,22 171:5,16
172:11 173:4,16,24
174:8,17 175:10,17,
21 176:16,20 177:10,
19,22 178:19 179:6,
11,24 180:14,17
183:19 184:5,11,17
185:2,14,21 186:3,
13,19,25 187:11
189:17,25 190:16,22
191:7,21 192:10,15
193:6,11,17,23
194:2,5,10,15,20,25
195:10 196:5,10,20
197:2,6,12,17,21
198:4,9,12,16,22
199:22 200:3 201:3,
12,20 202:16,22
203:7 204:3,11,17
205:2,9,19,23 206:9,
12,15 207:17 208:3,
12,15,18 209:3,19
210:3,7,12,18,22,25
211:12 212:7,21
213:8,22 214:5,11,
17,21 215:8,17,24

216:7,12,23 217:2,8,
17,21 218:4,10,15,18
219:3,7,11,16,22
220:5,9,13,22 221:2,
11,15,19 222:17
223:2,9,16 224:11,
23,25 225:5,16,23
226:2,11 227:3,9,20,
25 228:6,16,24
229:6,14 230:23
231:4,10,16 232:6,14
233:11 234:10
236:19 237:7,11,17
238:6,11,18 239:2,7,
18 240:12,17,21
241:3,9,13,16,19
242:2,7,10,15,20,25
244:5,10,12,17,21,23
245:12,17,22 246:9,
23 247:3,6,10,13,19,
21 248:9,12 249:14,
17,21 250:19,25
251:7,15,17,22 252:5
253:5 254:2,11,19
255:3,15,21 256:9,
15,25 257:10,18
258:3,23 259:10,25
260:13,16 261:5,25
262:4 263:6,12,22
264:7,16 265:2,6
266:13 267:4,24
268:10 269:4,22
271:2,4,9,15 272:4,9,
21,25 273:23 274:2,
23 275:6,13,18
276:4,9,13,21 277:9,
16 278:8,14 279:22,
25 280:8,12,14
281:4,9 282:15,21
283:3,23 284:22
285:9,13,21 286:16
287:5,8 289:10,14,
17,24 290:22 291:3,
16,23 292:12,18,24
293:17,21 294:4,9,
20,23 295:3,6,23
296:7,13,22 297:24
298:7,14 299:3,19
300:20 301:2,15
302:3,21 303:2,6,9,
11,20,25 304:5,13,17
305:10,16,22 306:10,
23 307:7,13,24
308:17,21 309:2,13
311:7,15 312:8
313:3,8 314:20,24

315:7,12,18 316:5,10
317:6,10,15 319:5,
12,17 320:6 321:8,
17,19 322:11 323:7,
10,15,20,23 324:12,
15,20 325:4,11,16,19
326:6,10,21 327:15,
19,23 328:9,15,18
329:12,16,23 330:9,
15,21,25 331:7
332:5,12,22 333:3,8,
13,25 334:13,17
335:9,18,21 336:25
337:7,13,19,23 338:5
339:2,9,13,17 340:2,
11,17,24 341:3,5,8,
13,15 342:25 343:7
344:6,22 345:3,10,
14,19 346:2,5,11
347:3,11,14,18,21,23
348:2,9,11,25 349:4
351:16,24 352:5,12
353:6,12,19 354:3,8,
13,16,23 355:3,7,14
356:11,15,23 357:20
358:3,8,18 359:13,17
360:6,10,20 361:18
362:9,21 363:7,12,
15,19,24 364:8,23
365:8,17 366:12,20,
23 367:8,15 368:7,
11,15 369:2,9,16,21
370:8,17 371:3
372:4,10,17,25
373:9,17,23 374:16
375:15 376:12
377:11 378:10,25
380:20 381:19
383:15 384:2,19
385:8,22 386:11,16,
18 387:13 388:15
390:13,16,20 391:2,7
393:24 394:17
395:16

**Brustein's** 18:6
306:8 358:13 359:7,
23 361:3

**building** 160:7,17,20
263:8

**building's** 213:17

**bunch** 385:6

**business** 65:18,22
134:24 135:4,9,11,

14,17,21 155:2
173:11 184:15
308:13

**businesses** 264:24

**Businessolver**
230:8

**buy** 58:6

---

**C**

**C.A.R.E.** 375:24

**cabinet** 125:11

**calendar** 241:15,17

**call** 15:11,15,20,24
17:9,12,22 18:11
91:24 100:15 105:13,
20 106:3,13,18
107:7,12 127:14,16
169:17 170:12
178:16 191:4,5,6,8,9
259:4 298:24 310:12
365:25 366:5 380:24
381:10

**called** 5:20 47:21
63:14 142:3 206:3
307:25 308:3 313:24
320:11 321:5 363:20
364:3,10 375:4,22

**calls** 14:19 23:19
119:3 122:5 191:11
259:8,19 305:24

**cancelled** 254:15

**capital** 108:20,21

**cards** 149:19

**care** 121:10 140:3
203:3,10 211:24
212:5 213:12 388:23

**carets** 269:16

**Carrington** 217:22

**case** 13:20 21:7 31:6
32:15 37:7,17 38:24
42:15 45:17 46:5,10
49:10 51:2,17 52:4
53:11 57:17 58:22
59:8 66:14,20 67:13
68:4,23 69:6 95:4
102:20 111:4 112:15,

20 114:12 121:9 124:21 125:5,16,22 126:22 141:21 146:22 151:15 152:12 155:22 167:10 178:12,18 189:24 197:16 206:8 222:16 234:9,14 256:2 261:4,21 269:25 278:7,12 281:3 292:23 293:16 296:21 297:23 298:6 301:14,19 306:16 307:10 311:23 317:23 327:17 351:23 358:2 398:3

**cashier** 248:13

**categories** 138:8,12, 13

**category** 92:24 344:15,18 349:6

**Cathy** 69:22 70:2 393:20

**caused** 225:21 310:11 311:14 312:7 323:13

**ceased** 174:4 179:17 265:7

**center** 255:20 327:22

**certified** 38:9,14 41:10 42:13 43:10 57:14 58:12 385:11, 12,13 392:5

**certify** 37:11 52:9 392:8,14

**cetera** 44:7 377:2

**chain** 87:8

**challenges** 275:16

**Chan** 289:3

**chance** 28:11 57:3,6 151:12

**change** 44:15 152:8 172:5,10 180:20 267:19 343:5

**changed** 44:16,18 152:24 285:3 343:8 344:7,8,9 388:24

**characterization** 26:16

**charity** 256:14

**check** 295:9,13,16, 21

**Chicago** 318:17

**children** 388:25

**choice** 373:3 374:25 375:10

**choose** 373:8

**circle** 19:24

**circumstance** 365:21

**circumstances** 47:15 225:21 226:17, 18 254:10 364:21 386:15

**Citibank** 296:14,15, 16,25 297:2

**city** 159:19 186:7 227:24 254:14,25 308:9

**claim** 32:6,7 238:15, 21 245:8 335:4 337:25 349:22 361:17 362:7 367:12, 18 368:22 369:6,8 370:6,15 371:22 372:22,24 373:4,6,21 375:3 382:8

**claims** 32:11,20 43:25 44:6,9,18,19 45:17 60:9 66:25 67:16 71:10 72:15 117:9 333:20 393:17, 22

**clarify** 159:9

**class** 37:8,10,11,14, 22,24 38:7,13 40:3,4, 7,17,22,23 41:9,10, 15,21 42:12,13,21 43:9,10,17,20 52:9, 13 57:14 58:12,13 66:25 67:16 71:10 72:14 244:16 307:10, 11 336:14,21 345:23 348:22 382:19 385:6, 10,11,12,13,19

**characterization** 26:16

**clauses** 338:13

**claw** 144:25

**clawed** 144:15

**clear** 24:19 55:18 205:3

**clever** 280:12

**cleverly** 120:23

**clients** 119:17

**close** 100:17 378:5

**closed** 208:24 210:16 211:5 255:16, 17,23,24,25 263:25 264:11,24 265:4 270:22 284:12,19 285:2 309:8

**closing** 175:4

**closings** 336:16

**cloud** 124:20

**co-counsel** 53:8 392:20

**co-worker** 111:9,15

**coaching** 368:10,14

**COBRA** 281:13,16 282:3

**code** 181:2,24 311:3

**colleagues** 23:10

**collect** 375:12

**collection** 143:20

**collectively** 15:22 17:20

**college** 29:10 30:7

**colon** 63:15 313:25 321:25 331:18

**color** 360:14

**combination** 161:19,20 163:15 201:17

**comfortable** 25:15

**comma** 224:7,9,13, 15

**comment** 11:8

**commentary** 245:2

**comments** 114:17

**COMMISSION** 398:24

**communicate** 309:19

**communicated** 169:7

**communication** 11:9 12:7 53:15 84:13,18 102:25 104:10,18 113:6 119:4 122:6,22 175:15,16 201:18 202:12,20 211:18 253:14 261:13 284:15 305:25

**communications** 175:7 201:6 236:24, 25 268:6,7 285:25

**community** 183:17

**companies** 312:14

**company** 139:17,18 140:2,8,16 289:22 326:14 374:6,7,8 389:15

**compassion** 389:8

**Compel** 66:24 67:15 71:9 72:14 77:4,11 393:17,22 394:5

**compensated** 344:25 347:2 390:8

**competitive** 275:16, 25

**competitors** 140:19

**complained** 349:7

**complaining** 32:5 142:12,16 143:8

**complaint** 30:14,19 31:5,9 33:2,5,18,22 34:11,14 35:16 36:3, 7,19 39:3,5 44:18 48:4 60:4,8,14,21 61:2,7,12 62:7 63:3, 21 64:3,24 66:9 73:8, 14 74:8 77:18,20,25

79:25 80:7,13,14,18 82:10,18 87:12,19 110:23,25 111:2 142:19 239:14 240:4, 11 310:15 313:6,19 315:17 316:4 317:13 318:9 321:24 325:24 331:16 332:4 334:5 335:14 338:8 342:9 348:17 349:12 350:3 375:22 376:25 377:15 381:17 382:3 387:12 388:13 393:14,15 394:15,21

**complaints** 12:19 13:17,19 21:5 33:7 35:6,11,13 37:7 44:2 62:18 66:10 72:23 73:14 151:14 240:6, 10 245:10

**complementary** 203:2

**complete** 7:3 17:6 20:18 96:7

**completed** 20:21

**completely** 31:14 226:5

**completes** 19:23

**composition** 172:4, 9

**comprise** 149:18

**computer** 123:13,15 124:18

**concept** 285:3

**concern** 275:2

**concerned** 135:19 362:23

**concluded** 141:12

**conclusion** 40:20 368:4

**conditions** 277:5

**conduct** 315:25 339:6 377:14

**confidential** 134:24 135:20

**confirm** 66:8 89:18 268:20 277:6 315:10

Index: Connecticut..dates

**Connecticut** 100:23

**connecting** 278:17, 20

**connection** 49:8 50:24 69:3 70:4 94:11 95:4 261:21 352:9

**consecutively** 7:22

**consent** 101:8

**consequences** 387:3

**considered** 205:10 275:25 276:10 362:18 367:18 368:2, 21

**consistent** 168:19 169:3,11 170:10 173:13 183:21 184:22 203:24 253:23 254:9,17 257:5 389:3

**constitute** 218:20

**constructive** 380:9

**contact** 126:19 127:6 181:11 327:22

**contained** 83:7 84:21 116:10 167:7 197:11 279:13

**contamination** 267:2

**contending** 183:25 380:13

**content** 83:21 229:25

**contention** 184:7 311:19 361:7 371:24, 25 381:3

**contents** 133:12

**context** 60:14 381:15 384:7

**contingency** 56:2 57:18,21

**continuation** 281:13

**continue** 152:2 161:24 164:8 180:2 183:16 212:23

213:15 220:12,24 221:14 230:5 243:7 272:15 284:11 314:8 362:3

**continued** 10:17 30:11 161:21 162:19 163:14,24 173:11 184:14 216:17,22 217:6 243:22 244:4 263:15 266:16 274:16 287:3 394:2 395:3 396:3 397:2

**continues** 276:24 361:22

**continuously** 174:25 389:20

**contract** 349:13,20 350:17 361:17 362:7 367:12,17 369:6,8 370:5,15 372:22,24 373:4,6,21 375:3 382:8 389:12

**contracts** 350:9,16

**contractual** 309:22 382:21,25

**contributing** 343:22 388:18

**control** 126:2

**conversation** 101:13 152:20,23 238:17 251:4,10 306:19 376:20

**conversations** 14:7 48:6,14 83:19 119:10 250:12 251:13 263:14 279:21

**convey** 250:23

**conveyed** 250:23

**cool** 257:5

**cooperate** 88:5

**coordinator** 46:19

**copies** 117:5 235:9, 11,17,18,21 360:22

**copy** 23:20 31:4 54:14 92:23 123:20 138:7 144:10,18,21 352:2,6 353:7

357:16,19,21,23 358:5 359:11,15,18, 24 360:17 361:6 392:18

**copying** 360:11

**corner** 91:16 211:23 288:14

**coronavirus** 153:20 272:12

**correct** 7:10 10:10 13:20 23:18 29:11 30:8,12 32:16,17,21 35:19 37:8 38:2 39:23 57:7 60:21 61:15,21 62:22 64:7 82:25 86:22,25 87:4 111:2 133:7,13,17 134:2 137:21 138:4 147:3 152:3,25 154:11,12,15,23 156:7,11,12 157:20, 21,25 158:2 159:21 172:22,23 174:12,13 175:20 177:6 183:5, 18,23 184:16,18,19, 20 185:20 186:8,9,24 192:25 195:5,9 200:7 205:8 209:2,4 210:17 213:21 222:20 223:5 224:8 230:22 240:18 245:16,21 259:24 273:22 277:8 288:9 294:10 295:15 299:7 300:6 301:24 306:17, 18 308:4,5 311:10 316:20,24,25 321:3 331:18 333:12 334:18 335:2 336:9, 10 338:17 339:8 347:4 349:24,25 350:10,14,19 353:7, 10,11 354:14 355:16 358:14 360:3 361:14, 15,17 365:3 382:15 383:4,8,9,21

**correction** 299:23

**cost** 58:8

**costs** 56:11,15,20,21 57:12,25 58:2,17

**Coughing** 167:20 176:9

**counsel** 7:6 14:8 53:7 102:10,15,18 103:25 106:2 390:15

**counsel's** 11:14 16:17

**count** 314:11,16 322:8,9,14,24 323:2

**country** 272:13

**COUNTY** 392:4

**couple** 67:9 73:12 110:11 141:6 183:22 190:17 274:8 293:23

**court** 6:16 30:23 47:9 66:15 68:5,22 76:16 79:8,13,20,23 87:22 112:4 114:23 127:15 146:5 152:6 221:25 241:23 244:25 321:12 323:14 327:10,14 328:13 342:8 364:19 385:7 390:14 392:19

**courtesy** 124:12

**cover** 351:10,12,13, 14

**coverage** 230:6 281:13,19 282:7

**covers** 344:10

**COVID** 27:5,9 140:17,21 142:8,14, 17,21,23,24 150:2 153:20,21,22 154:4, 19 164:17,23 166:8 168:11 172:16 184:4 199:21 200:2 204:2 227:21,22 228:2,3,5, 10 254:22 263:21,25 264:5,10,19 266:18 267:3 273:21,24 284:19,25 303:14

**COVID-19** 173:10 184:14 226:19 227:7, 12 228:22 229:3,11 246:22 248:8 253:21 265:23

**criminology** 29:15

**crossing** 280:9

**CRR** 392:25

**culled** 122:17

**Cuomo** 253:18

**curiosity** 176:19

**current** 192:9 274:14

**customized** 343:20

**cut** 117:3 158:6,9,11

**D**

**D/b/a** 302:9

**damage** 342:21

**damages** 56:25 138:2,8,12 339:7 340:22 342:15 343:10,16 344:11,19 345:9 346:23 347:6 386:25 387:9,17 388:10

**database** 181:9

**date** 34:7 48:3,5 96:23 116:2 128:20 142:24 195:12 201:8, 9 202:21 209:5,6 212:11,17,18,25 222:19 230:15 241:6, 8,15,17 242:4,16,18 256:23 257:8,16 259:15 262:19 264:23 269:12,13 277:6,14 282:4 289:7 291:8,20 302:22,25 304:9 305:16 337:21 348:19,23 353:19,20 398:4

**dated** 9:10 10:21 107:20,24 108:15 136:9,13 168:14 189:19 234:22 270:17 288:9 290:19, 25 291:6 352:17,22 353:6,21 354:10,16, 24 355:14 395:4,16 397:14

**dates** 147:17 173:20 175:8,11,13,14 199:18 200:19,21,22, 25 201:6,19,22 208:5,8 209:9,11,12, 13,14,15,22 258:2 273:16 288:22

302:12 337:12

**David** 22:20 111:13

**day** 6:19 158:18 159:4,7,17,22 160:11,14,21 161:6, 12 200:12,13 242:13 266:23 348:23 391:17 392:23

**days** 160:21 161:8 162:4 164:12 219:25 239:20,22,24 240:22 241:14 254:8 271:14, 20 277:7 339:4 343:14 377:2,9,16 378:5 379:20

**deal** 20:19 310:6

**Dear** 191:19

**decades** 328:2

**December** 36:4 96:24 115:23 128:20, 25 129:20 270:18 271:3 273:19 277:13 352:18,22 353:6,21 354:11,16,24 355:15 357:11 397:14

**decide** 307:22

**decided** 308:9

**decision** 52:5 168:25 262:12 307:5 309:11 373:13 378:4 379:18

**declaration** 69:21 70:2 74:25 75:6,10, 17,24 78:21 79:2 81:15,20 82:2 84:25 85:20 86:4,9,12 137:2 157:2,3,9 352:8,17,21 353:5, 19,21,24,25 354:8, 10,12,16,18,23,25 355:5,7,9,12,14 356:2 357:5,10,19 358:13 359:7,24 361:4 393:19,24 394:8,12,16,18 397:13

**deemed** 155:25 156:6,10 158:13

**defend** 119:17 241:25

**defendant** 320:17 321:3,5

**defendants** 5:4,7,10 6:4 10:9 32:15 49:9 50:25 59:20 79:17 80:17 94:22 112:15 116:12 129:6 133:11 139:7,10 143:7 145:24 151:15 206:8 241:23 242:5 310:21 320:19 325:25 331:4 332:16 333:2,7,23 335:16,23 336:11,17 338:10,13 350:7 367:4

**defendants'** 8:10 10:3 23:13 27:18 30:14 33:17 66:23 69:21 71:7,8 72:13 74:24 77:2,4,10,22, 24 78:20 79:24 80:20,22 81:8,14 82:6,8,16 83:22 84:24 86:3 87:9,11, 18 90:3 96:16 107:19 109:15 115:3,4,14,16 128:2,4,10 130:15,16 132:14,16,22 136:8 143:15 146:11 148:22 155:11 166:18 177:24 188:21 198:25 206:23 222:3 232:19, 22 252:8 258:10 260:18 267:9 268:12 270:6 273:3 277:18 280:16 283:9 287:12 290:2 293:2 297:7 300:8 339:5 351:2 352:16 358:22 393:7, 8,9,11,12,14,15,16, 19,21,24 394:3,4,6,8, 9,11,12,13,14,16,18, 19,20,22,24 395:4,5, 7,9,10,11,13,14,15, 17,19,20,22,23,25 396:4,5,7,8,10,11,13, 14,16,17,18,19,21, 22,24 397:3,4,6,7,9, 10,12,13,15

**defending** 327:11

**degree** 29:15 30:10 229:3

**delays** 254:15 255:13

**deliberately** 308:11

**demand** 115:4,14,17 274:16 277:5 280:3 395:7

**demands** 116:22,23

**demarcation** 27:6

**denigrate** 248:5

**denominator** 27:5

**dental** 230:5 343:23

**Dep** 398:4

**department** 162:8, 15,18 214:7,9,12,23, 25 215:6,13 217:6 218:21,25 266:17

**departments** 214:2 216:11,14,17,21

**departure** 213:12

**Deponent** 398:4,21

**deposed** 11:3,6,21, 22 12:15 73:13

**deposit** 295:10,14, 22,25 296:3,8,9

**deposition** 8:2,11,23 9:6,13 10:10,16,20, 25 12:2,16,25 14:3,8 15:13 18:22 19:5 24:20 33:9 35:9 36:9 72:24 88:13 312:5 341:21 393:8

**describe** 47:16

**describing** 357:18

**description** 92:23 97:10

**deserve** 309:25

**designated** 159:25

**designation** 159:15

**detail** 34:20

**determine** 37:20 40:16 41:8 42:11,23 43:19 45:24 285:7 315:15 316:2 317:3 318:8 323:5 329:10

332:2

**determining** 44:8

**developments** 66:14

**device** 125:2

**devices** 125:6

**difference** 204:22

**differences** 335:7

**differently** 8:4 150:6,10,12,22 151:8

**Dilone** 111:11,14 112:5

**direct** 16:24 18:13 36:24 53:10,14,23 56:5 69:8 84:11 102:4,17 104:10,17 106:6 109:3 119:2,14 120:21 121:5,15 188:16 190:10 277:2 295:10,13,22,25 296:8,9 307:8 375:17 382:10 386:20

**directed** 19:19 85:6 113:19

**directing** 19:7 113:2, 11 114:14 122:3 130:9 280:2,15

**direction** 20:6 42:15

**directions** 19:15 397:18

**directives** 265:22

**directly** 121:12

**director** 149:20 156:24 190:15,20 377:13 378:3

**disagree** 177:9,17 367:4

**disagreement** 367:7

**disagrees** 365:3,5

**disappear** 310:5

**discharge** 380:9

**disclosure** 98:10,22 108:20,23

**disclosures** 90:5,10, 15 92:6 94:12 95:5 96:18,23 98:8 394:23,25

**discontinue** 212:2

**discount** 183:10

**discovered** 153:22 154:4 264:20

**discoveries** 12:18 13:7 197:19

**discovery** 13:14 21:5 24:9 73:20 74:8 88:5,9,17,25 89:16, 21 280:3

**discrimination** 380:6

**discuss** 376:5

**discussion** 54:11 115:15 127:25 206:22 306:6 341:23 381:14

**discussions** 237:2 263:19

**dishonest** 139:23

**dismiss** 44:19 66:24 67:16 70:6 71:9 72:14 77:19,23,25 78:8,12,17 79:16,24 80:17,21,23 81:6,9 82:9,17 83:23 87:11, 18 393:17,22 394:6, 10,11,15,21

**dismissed** 44:7

**dispute** 139:6,10,13 142:8 365:2

**disputes** 140:24

**dissatisfied** 379:18

**distance** 266:6

**distancing** 185:5,9 203:22

**district** 323:14

**division** 147:15 148:2

**divulge** 135:22

**doc** 70:21

**docs** 70:21 123:21
146:10

**document** 8:22 10:7
24:8,21 25:6,11
27:19 28:12,14,20
30:19 31:8 33:22
67:13,19,23 68:10
70:2,3,15 72:12 75:5
76:4,15 77:8 78:4,7,
9,25 81:5,7,19 82:14
85:19,25 86:8,15,16
87:16 90:9,13,19,21,
23 92:2,6 94:17,22
95:8,16,25 96:5,22
102:13 103:3 108:12
109:4,19 110:2
115:13 125:16
126:21 128:9,14
129:4,15,24 131:4
132:21 144:11 145:4,
14,15 146:16 148:25
155:16 157:4 166:23
167:8,13,15,16 170:2
178:5,8 187:3,6,7
188:19 189:4,7 190:4
192:19,20 197:11
198:20 199:6,10,11,
13 201:16 202:2,7
207:4,8,10,15,16
211:14 222:8,12
233:14,16 234:15,25
252:13,17 258:15
260:22,24 261:9
267:13,16 268:17,22,
25 270:11,15 273:7,
10 274:5 277:23
278:3 280:21,24
283:14,18 287:17,20
290:7,11 293:6,20
296:20 297:12 351:5,
18 352:21 353:17
355:21,22 359:3,9,
14,23 360:5 393:13

**documents** 15:24
16:5,8,21 17:22
18:11,21 19:4 21:3
67:12 74:10 78:5
81:3,12 88:21 90:11
92:24 93:15 94:5,10
95:3,15,23 96:8 97:5
112:13,14,16,19
115:5,17 116:11,21,
23 117:8 118:2,4,9,
15 119:9 120:6
121:10,14 123:4,10,

16 125:15,19,21
126:3,17 127:7
128:5,11 129:7
135:10 143:20,24
144:14,23 145:5,13
146:21 149:7,18
155:20 167:5 178:10
182:22 189:12,22
190:5,6 191:16
192:25 196:23
197:14,16 207:20
222:15 232:17 233:2,
8,9,16,17 234:7,8,13
260:25 268:2 278:6,
11 281:2 283:21
287:23 289:20
292:20,21 293:15
294:2,7 296:21,25
297:22 301:13
302:16 313:11
351:22 357:25 395:8,
10

**dollars** 241:25 389:9

**door** 102:19

**draw** 58:21 185:7

**drawer** 125:10

**drawn** 295:21

**drew** 254:23

**drive** 104:24 124:19

**dropped** 44:6

**DST** 269:16,17

**due** 140:20 172:13
230:15

**duly** 5:20 392:10

**duration** 282:6

**Dvivian** 22:18

**DX** 8:5

---

**E**

**earlier** 60:8 62:5
72:22 94:15 96:6
113:9 129:5 147:6
148:13 149:23
159:12 173:19
193:22 200:7 239:12
243:10,24 246:11
258:22 268:19

284:16,25 302:13
305:6 306:12,14
369:24

**early** 142:9,15
185:10 225:22
226:19 248:23

**earnings** 302:2

**easier** 149:15 359:8
360:13,15

**easy** 149:14

**eat** 24:19,22

**economically** 256:6

**EDT** 391:11

**education** 29:9

**Edward** 289:2

**effect** 284:25

**effective** 282:4

**effects** 225:14

**effort** 107:6 244:14
249:23 296:19

**efforts** 205:17,21
266:24 285:16,17

**Eftekari** 356:6,17

**electronic** 30:23
123:14 144:18,20
237:2 261:3

**electronically** 74:5

**eleven** 322:9,14,23

**Eligibility** 281:16

**eligible** 282:10

**eliminations** 270:23

**Elizabeth** 78:21 79:2
81:15,21 82:2 118:8,
11 150:16 163:5
178:24 181:14
234:19 250:7 269:12
376:17 377:6 394:8,
12

**else's** 281:7

**email** 22:6,15 104:15
117:14,23 118:2,23
119:22 120:4 123:5,6
126:20,25 127:9

179:21,22 180:4,8,12
181:13,18 182:4
195:5,9,14,15,21,24,
25 196:3,8,18,25
197:5,9 201:13,14,
15,16,22,23,25 202:2
234:18,22,23 235:6,
8,12,14,16 236:5,7,
10,13 239:8 253:4
268:21,25 269:7,10
270:3,4 377:4

**emails** 117:5 121:3
123:17,19 126:20
180:3,8 181:5,6
182:18 189:9,10,13,
16 196:13,15 197:10
257:13 269:6,20,24
270:2

**Empact** 12:17 13:3,4
21:5 76:6 249:9,18
349:23 350:18
351:11,15 352:3,6,10
353:4,7 354:7 355:5,
13,22 356:2,13,20
357:12,16 358:6,10,
22 359:11,15,25
360:18 361:8,12
362:12 374:24
375:13,18 376:10
381:20 383:2,6,18,25
384:6,14,18 385:16,
21 386:10 387:11
388:11 397:15

**empathy** 389:8

**employed** 29:2,3,6
30:8 162:12 163:12,
13 260:12 289:22
292:11 294:13

**employee** 47:7
111:21,22 139:19
141:22 145:21
148:14 158:4 159:16
251:21 252:4 259:3
289:21 342:22 345:6
348:22 355:23
383:19 384:18
389:17

**employees** 42:16
106:19 110:6 150:7,
13,23 151:2,9 155:2
160:6 161:11,14,15
162:7 172:14 182:16
192:9 237:4 244:9

267:22 268:9 275:3
289:12,16 309:21
345:9,24 375:23
378:15,23 379:4,6

**employer** 294:19,22
295:4 298:9 301:25
311:4 383:20 384:5

**employer's** 311:3

**employment** 125:4
126:4 246:16 249:2,4
289:7 335:16,24
336:12,23 337:11,17,
21 338:4 348:20,24
350:5 371:2,8 372:2
380:5,8

**empty** 210:21

**end** 58:21 75:11 87:7
105:4,11 122:5,8
165:22 166:3 213:3
253:18 262:12,13
263:4 266:11 273:20
294:17

**ended** 105:6,10
172:8 203:11 212:6
301:17 372:3

**engage** 51:23 52:6

**engaged** 49:7,18
50:23 51:6,10 52:18,
22 54:8,9

**engagement** 52:2
54:10,18 55:15,22

**engineering** 190:15,
21

**ensure** 62:11 63:20
64:12,18 65:4,8,20
66:2 82:23 83:6
264:4

**enters** 11:18

**entire** 218:20 294:13
308:9

**entirety** 76:11

**entities** 312:12,20
324:25 327:6

**entitled** 8:22 10:7
81:20 82:14 90:13
115:14 121:12 361:9
389:11

**entity** 319:16 320:11, 17 326:19 327:18 329:20,21

**equals** 276:11

**ERRATA** 398:2

**essential** 156:6,10 158:4,14 159:15 160:2 246:24 247:8, 16 248:17

**essentially** 26:15

**estimate** 213:4

**estimated** 138:2,7 171:17,18,24

**estimation** 138:7

**et al** 398:3

**Evan** 5:11 7:19 11:2, 5 15:17 17:13 41:12 46:6 74:25 75:6 84:25 85:20 353:5,19 354:8,16,23 355:7,14 393:24 394:17

**event** 281:24 282:18 307:20 309:11,14 358:10 377:10

**events** 21:7 142:14, 16,18 253:24 254:14, 18 274:12 304:4,8

**evident** 140:9

**evolving** 276:24

**exacerbated** 228:20

**exact** 250:16,20,21

**exaggerate** 229:11

**EXAMINATION** 5:24 188:11 393:3

**examined** 5:21 188:9

**exchange** 88:22 180:24 364:5

**exclamation** 177:6

**exclude** 104:17

**excluded** 150:15,17

**excuse** 142:22 247:19

**executed** 75:18 86:12,21,25 356:21

**exhibit** 8:10,14 10:3, 6 23:13,16 27:18,21 30:14,17 31:10 33:7, 17,21 35:7,16 36:7 60:7 66:23 67:7,11, 12 69:13,21,25 70:9 71:4,7,16,18,21,22 72:9,17 74:11,15,24 75:4,19 76:6,11 77:2, 7,13,22 78:4,6,15,20, 24 79:8,10 80:20 81:2,4,11,14,18,24 82:6,13,20 84:9,21, 24 85:4,18,22 86:3,7 87:9,15,25 90:3,8 94:6,13 96:16,21,25 97:6 107:19,23 108:10 109:15,18,25 110:8 112:2,6,8,24 115:3,8,18 116:10,21 127:10 128:2,8,25 129:20 130:12,15,19 131:3 132:14,20,24 136:4,8,12,22 143:15,19 146:11,15, 18 148:3,22 149:6,18 155:11,15,17 157:2,5 159:11,12,14 166:18, 22,25 174:16 176:21, 23 177:24 178:4,7 182:23 188:17,18,21 189:3,7 194:8,14 196:24 197:11 198:21,25 199:5,9 201:17 202:3,7 206:23 207:3,7 222:3,7 232:19,22 233:3,4 252:8,12,15 258:10,14,18 260:18, 21,25 261:7,8 262:2, 23 267:9,12,15 268:12,16 270:6,10, 13 273:3,6,9 277:18, 22 278:2 280:16,20, 23 281:12 283:9,13, 16 287:12,16,19 290:2,6,10 292:19 293:2,6 295:5 297:7, 11,14 300:8,12,23 301:5,12 351:2,4,7 352:15,16 353:18 354:2,15,18,21,22 355:2,6,8,9,12,17,21 358:5,12,22 359:2,6,

8,10,22 360:5 361:4 381:18 382:2 393:8, 9,11,12,14,15,16,19, 21,24 394:3,6,8,9,12, 13,16,18,19,22,24 395:4,5,7,9,11,13,15, 17,19,20,22,23,25 396:4,5,7,8,10,11,13, 14,16,17,18,19,21, 22,24 397:3,4,6,7,9, 10,12,13,15

**exhibits** 7:22 70:13 71:2 75:22,25 76:13, 14 81:16,19,23 82:3 85:2,19,23 232:18 233:2 234:5 235:2 237:5 360:12 393:6 394:2,12,17 395:3 396:3 397:2

**EXHIBITS--------------
-----** 393:5

**existed** 274:21

**exists** 229:4

**expand** 152:3

**expectation** 166:8, 13 208:10,24 230:25 231:8,13

**expected** 139:20 209:18 272:14 284:14

**experience** 28:25 29:5 160:11,13,18 165:17 227:16,23 228:5

**EXPIRES** 398:24

**extend** 162:11 176:4 186:22 203:2 204:8

**extended** 175:9,15 187:10 200:21,23 201:2,22 262:13

**extension** 176:13 203:21

**Extensions** 175:18

**extensive** 254:15 343:24

**extent** 102:24 104:9 118:22 119:3 144:12 263:2 305:24

**external** 164:18

**eyes** 114:8 119:16

**F**

**Facebook** 23:5

**fact** 68:10,12 122:10, 12 155:6 175:14 226:4 228:22 231:3 264:5

**facts** 88:18 168:20 282:13,17 386:23

**fade** 166:3

**failed** 338:10,13

**failing** 362:7

**failure** 349:7 376:9

**fair** 15:13,14 26:15 28:19 36:6 37:6 40:11 42:20 49:24 51:2,3 55:13 71:5 95:12 117:25 118:17, 19,20 119:22,23 124:7 131:25 136:25 142:25 143:3 153:16 162:13 168:8 174:2 196:25 197:3 198:3 199:24 202:7,8 215:2,3 217:13,14 219:6 228:19 231:15 235:23 236:18 242:23 245:11 250:15 251:21 252:4 266:12 296:6 300:4 303:8 306:22 310:8, 9,14 315:6,8 319:25 333:24 352:7 380:17

**faith** 139:18

**falls** 344:18

**false** 272:3,7,8,20,24 337:6

**familiar** 48:25 94:17

**family** 140:3 191:19 388:24,25

**fashion** 154:15 222:25 223:6,21,25 261:3 290:18

**fast** 286:19

**favor** 368:3

**feasible** 256:6 274:17

**February** 10:22 86:13 136:9,13 153:24,25 273:13,17, 22,24 274:10,12,21 276:19 353:8 356:9 359:25 395:16

**federal** 321:12 323:13 334:9,19

**fee** 54:3

**feel** 25:8,15 28:5 31:3 104:19 113:18,21 116:5 139:21,22 169:18 228:19 308:11 309:24 367:22

**feeling** 228:11

**fees** 54:11 57:10,13, 25 59:20

**feet** 185:15,17

**felt** 149:24

**fighting** 313:13

**figure** 121:22 235:18 244:14 379:3

**file** 34:7 73:6 74:11 101:18,19 103:11,14 125:9,10 126:13,14 127:9 156:25 168:6 178:22 179:2 234:11 279:8 305:19 306:3 307:3,5 309:12 358:7 376:24

**filed** 31:5,10,14,16 33:2,5 34:15 35:3,12, 14,16,18,22,25 36:8, 11,20 37:7 48:5,16 62:18 66:9,10,15,20 67:13 68:4,22 69:6 76:16 77:8,18,19,20 78:13 79:7,17,21,23 80:7,13,17 82:5,25 83:8 110:23,25 241:22 244:15 305:5, 17,21 306:21 313:6 317:14 331:25

**files** 95:8 112:14,18 116:11,15 117:8,12

119:9 123:7,13,14, 16,20 124:18 126:10 155:21 167:9,14,17 178:11 189:23 207:20 222:15 234:8 235:11,12 261:2 270:4 281:7 283:21 284:6 287:23 292:22 352:2

**filing** 30:23 57:13 76:11 79:7 81:25 377:17

**filings** 73:7 74:10

**financial** 57:15 58:23 59:7

**financially** 275:4,11

**find** 38:20 44:24 45:7,16 107:7 149:3 178:21 195:22 201:11,18 205:17,21 206:6 234:12 249:2, 23 250:15 285:12,18 312:3,21 313:6 317:12 321:11 328:3, 6 364:19 367:12 368:2,3,18,23 384:11 386:14

**finding** 368:4

**findings** 368:18

**finds** 367:20

**fine** 8:6 16:11 19:25 54:2 58:8 106:11 121:16 122:23 123:2 138:21 200:18 218:18 223:23 242:19 280:7 308:23 310:17

**finish** 31:13 34:17 40:24 95:20 110:13, 14 145:10 208:7 218:7 386:6

**finished** 95:22 218:8 308:14

**finishes** 7:13

**firm** 48:18 50:4,12,16 51:6 54:17,19 55:14 107:25 136:10,14 392:20 395:16

**firms** 49:2

**fit** 27:7

**five-minute** 39:13 74:18 151:19 341:6, 16 374:17

**flag** 197:9

**floor** 147:14,21

**focus** 142:19,20 264:2 387:18

**focused** 21:12

**folder** 125:12,14,18 149:4,5

**folks** 48:14 127:23 156:5 162:13 163:12, 13,22 164:6 165:14 170:18,25 172:18 212:15,20 216:16 217:6 243:11 244:3 251:14 263:15 286:2 288:21 289:6

**follow** 16:16 17:3,25 18:5,16 19:10,16 20:2,10,16 53:16 56:6 69:9 106:8 113:13,22 114:3 153:3 259:3

**fool** 9:13

**force** 151:3,13 152:10

**forcing** 241:23

**foregoing** 133:10 386:23

**foreseeable** 336:15

**forfeited** 250:4

**form** 41:4 168:4 174:14 189:6,8 258:20

**format** 179:15 258:24

**forms** 385:2

**formula** 198:17 389:22

**forward** 140:10 150:2 174:16 278:17, 19

**found** 118:2 119:16, 25 120:2,3 121:21 155:21 167:8,13,16 189:23 201:21 207:15,16,20 234:8 250:4 268:25 278:6, 12 292:22 293:20 294:8 306:15

**fourteen** 220:2

**fourth** 261:14 325:25

**frame** 154:18 377:20

**Frank** 190:14,20 392:5,25

**free** 25:8 28:6 31:3 104:19 113:18,21 121:15 169:18

**Freeborn** 5:3,6 393:6

**friends** 23:9

**front** 8:5 9:15 170:14 171:14 233:17 320:25 358:6 375:19

**FSNY** 190:13,18

**FSR** 5:16 90:12 91:19 93:11,25 94:22 95:9 97:13 109:12,16,20 143:16,21 146:12,17 148:23 149:9 155:12, 17 166:19,24 177:25 178:6 188:19,22 199:2,7 206:24 207:5 222:4,9 232:20,23 233:4,5 252:9,14 258:11,16 260:19,23 267:9,14 268:13,18 270:7,12 273:4,8 277:19,24 280:17,22 283:10,15 287:13,18 290:3,8 293:3,7 297:8,13 300:9,13 351:3,6 395:6,18,19, 21,22,24,25 396:4,6, 7,9,10,12,13,15,16, 17,19,20,21,23,24 397:3,5,6,8,9,11,12 398:3

**full** 7:3 169:7

**fully** 6:5

**function** 212:15,20

213:7 217:5

**furlough** 139:14 141:22 148:5 150:8, 23 182:16 234:20 251:21 252:4 336:21 371:9

**furloughed** 29:4 148:10 151:9 239:21 252:6 390:3,4

**future** 228:13 229:5, 8,10,13 364:12 369:14 370:14 373:15 375:12

**G**

**gaining** 181:12

**Galasso** 190:14,20

**garbage** 140:7

**gather** 178:14

**gathered** 178:11 261:2 297:23 301:13

**gathering** 94:10 95:2,14,23

**gave** 39:24 47:16 122:17 152:24 159:7 181:20 245:15 247:17 306:22 346:23

**gears** 138:20 139:3

**gender** 326:18

**general** 129:11 134:8 164:16 209:12 214:15 259:8,20 356:9,18 379:19,22, 24

**generally** 179:14 185:18 200:9,14 342:12

**gentleman** 357:4

**gestures** 247:24

**give** 7:3 65:14 88:12 102:12 124:11 147:16 209:12 239:25 250:18,21 251:2 300:23 303:23 323:19 327:2 363:21

364:3 369:6 370:4,9, 13 372:23 373:16,20 380:24 383:11,22 389:25

**giving** 11:11 277:12 309:21 360:23 372:20 378:14,22

**glasses** 8:16

**global** 227:8,10

**goal** 140:3 277:6

**golden** 140:4

**good** 6:2 8:19 28:24 51:9 70:16 79:14 127:22 139:18 213:4 247:18 305:4 334:22

**governor** 185:25 253:18

**governor's** 169:17

**grabbing** 130:21

**graduated** 29:12,18, 19

**grandchildren** 389:2

**gratuitous** 20:8

**grip** 228:23

**grounds** 18:3

**group** 37:12 170:17 218:21 269:7,9,10,21 270:3 346:15,18

**guard** 265:22

**guess** 32:4 177:20 225:17 238:7

**guests** 140:4 154:11, 21 155:8 164:25 264:11,17 265:8,14, 16 275:3 284:11 304:11 305:2,3

**guide** 41:13

**guided** 40:6

**guidelines** 185:5,9 203:22

**gunning** 257:25 258:5

**guy** 163:17

**guys** 68:13 95:24
138:20 308:11
312:13,15 315:4
388:3

— **H** —

**H-O-L-M-E-S** 6:8

**half** 139:4

**hall** 259:4,8,19
278:21,24 279:2

**hand** 92:8 392:23

**handbook** 355:23

**handed** 8:13,21 24:7
30:18 67:10 85:17
300:22 358:25

**handing** 10:5 23:15
25:5 27:20 33:20
67:4 69:24 72:8 75:3
77:6 78:3,23 80:25
81:17 82:12 85:3
86:6 87:14 90:7
96:20 107:22 109:17
115:7 128:7 130:18
132:19 136:11
143:18 146:14 149:5
155:14 166:21 178:3
199:4 207:2 222:6
232:25 252:11
258:13 260:20
267:11 268:15 270:9
273:5 277:21 280:19
283:12 287:15 290:5
293:5 297:10 300:11
351:4

**handshake** 266:3

**happen** 14:15 140:12
174:10 175:16
228:12,14,18 229:5,
10,13 307:19,20
364:18 377:18 378:7,
9

**happened** 72:6 95:2
142:17 175:18 181:5
198:7 229:8 362:20
366:22 377:21
380:13

**happening** 183:22
189:15 190:12,18

**200**:25 **206**:6 262:6,
9,25 263:8 291:11,22

**happy** 24:24 54:25

**harassment** 380:6

**hard** 55:3 117:5
123:19 124:19 328:4,
6

**harmed** 246:7

**haunt** 55:10

**head** 89:7 103:15
205:13

**heading** 314:17
321:25 331:21

**health** 203:3,10
211:24 212:5 213:12
264:5 275:2

**hear** 54:25 98:4

**heard** 71:24 89:3
91:9 97:23 98:5,6,19,
23

**heightened** 228:22

**held** 148:9

**helped** 83:14 181:24

**hereinbefore** 392:10

**hereunto** 392:22

**hide** 75:8 94:4 115:24
136:15

**hiding** 312:13 324:23
327:4

**high** 253:20

**hired** 147:5,7

**hit** 27:9 122:18
168:11 184:4 228:10
273:21,24

**hits** 119:7

**hold** 132:12 147:23

**holding** 26:11
178:22

**Holmes** 5:1,13 6:1,2,
7,9 7:1 8:1,13,24 9:1
10:1,5 11:1 12:1 13:1
14:1 15:1 16:1,16
17:1 18:1 19:1 20:1

21:1 22:1 23:1,15
24:1 25:1 26:1 27:1
28:1 29:1 30:1,18
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1,20
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1,3
86:1,4,6,10 87:1,14
88:1 89:1 90:1,7 91:1
92:1 93:1 94:1 95:1
96:1,20 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1,5 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1,2
153:1 154:1 155:1
156:1 157:1,4 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1,21 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1,13
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1

204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1,6 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1,11 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1,20
261:1 262:1 263:1
264:1 265:1 266:1
267:1,11 268:1 269:1
270:1 271:1 272:1
273:1,5 274:1 275:1
276:1 277:1,21 278:1
279:1 280:1,19 281:1
282:1 283:1 284:1
285:1 286:1 287:1,15
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1,10 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1 349:1 350:1
351:1 352:1,17,22
353:1 354:1 355:1
356:1 357:1 358:1,25
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1,18 367:1
368:1 369:1 370:1

371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1,14
393:4 394:18 397:14
398:4

**Holmes's** 138:2

**Holmes4200@
yahoo.com.** 22:14

**home** 21:15 73:3,25
100:13,14 106:15
125:2 126:2 161:12,
14 165:11 185:6,24,
25 186:11 203:22
248:13 266:20,21,22
472:22

**Honestly** 38:21

**Hong** 289:3

**hope** 166:2 169:7
174:6 208:11

**hopeful** 165:22
210:8 273:19

**hospital** 248:14

**hospitality** 173:12
184:15

**hosted** 259:8,19

**hotel** 10:9 29:7,20,22
30:3 47:6 65:6 82:8,
16 140:14 141:5,12
142:3 145:24 150:8
154:2,3,10,13,21,25
155:7 156:6 157:19,
24 159:2,17,24
160:14 161:3,8,11,18
162:12,20,23 163:12,
14,24 164:18,25
166:9 168:9,23
169:2,8 170:11,19
171:2,13 172:5,20,25
173:21 174:4 175:8
176:5,13 179:17
183:8,23 186:5,22
187:10 191:11 195:3,
5,9,14,15 200:11
201:4,6 203:12,14
204:9,22,24 205:5
206:7 208:10,24
209:17,23 210:11,14,

16,20,23 211:4
213:14,15 225:18
232:12 243:12,17,22
252:6 254:21,24
256:4,10 257:25
258:4 262:25 263:9,
19,24 264:6,11,24
265:4,12,15 266:25
275:12 277:8,15
284:10,12,18 285:2,
8,20 287:3 289:7
292:11 295:8 298:11,
12,19,24 299:5,10,
13,15,21,24 302:4,6,
8,13,19 303:13
304:10,24 305:18
309:8,16,18,23
311:5,12,13 312:4,6,
10,23,25 313:7,24
314:18 316:9,14,15
317:3,4,8,9,23 318:2,
3,9,18 319:4,9,15,20,
23 320:3,11,12,15,
17,18,20 321:2,6,7,
11,25 323:12,18
324:3,10 325:9,14
356:8 363:18 364:4
365:2,4,6 366:10
367:3 369:7,10
370:2,14 371:6,20
373:7,10,18 379:25
380:8,21 384:21
389:23 394:14

**hotel's** 208:7 364:12

**hotels** 5:16 63:14
64:17 65:2,17,21,24
106:20 140:18
142:20 275:15,24
276:8,18 308:10,12
325:21 326:2,4,23
328:7,14 398:3

**hour** 15:21 17:19
139:4 380:7

**hourly** 55:25 150:19

**hours** 157:18,20,23,
24 158:6,9 161:23
164:8 171:12,17,20
216:5 219:9,14,25
220:8,20 221:9
281:24 282:20
341:25

**house** 170:13 184:3

**housed** 243:18

**housekeeper**
147:12

**housekeeping**
147:18

**housing** 171:14
172:6,8 173:2
183:12,16 203:2,10
205:7,11 212:5
243:13

**how's** 183:2

**human** 376:25
377:13 378:4

**hundred** 380:23

**hundreds** 241:24

**Hwang** 69:22 70:2
393:20

**hypothetically**
59:19

---

**I**

**i-l-o-n-e** 111:13

**idea** 22:4 47:2 99:15
108:24 109:2 156:15
163:21 164:11 165:7,
20,21 220:18 283:5
302:11 383:22

**identification** 8:12
10:4 23:14 27:19
30:15 33:19 67:3
69:23 71:11 75:2
77:5 78:2,22 80:24
81:16 82:11 85:2
86:5 87:13 90:6
96:19 107:21 109:16
115:6 128:6 130:17
132:18 136:10
143:17 146:13
148:24 155:13
166:20 178:2 188:23
199:3 206:25 222:5
232:21,24 252:10
258:12 260:19
267:10 268:14 270:8
273:4 277:20 280:18
283:11 287:14 290:4
293:4 297:9 300:10
331:17 351:3 352:19

358:24

**identified** 98:2,13,22
99:2 121:24 122:14
138:13 192:8 281:3
282:10 283:21 295:4
298:10 302:2 311:4,5
320:10 338:20
350:12 356:20

**identifies** 61:2

**identify** 28:25 29:5
125:20 146:9 247:9
287:2 292:10 348:19
357:4 384:12

**ii** 138:4,14

**iii** 138:4,14

**illegal** 101:8 106:4

**Illinois** 101:3

**image** 119:17

**impact** 173:11
184:14

**impression** 164:16

**improve** 277:5

**In-person** 14:12

**inability** 304:9

**inaccurate** 62:21
121:3 150:3

**inappropriate**
238:19

**include** 59:19 144:19
240:5

**included** 191:18

**includes** 61:8,17,23
63:3 64:4 336:4
338:11,17 339:24
382:18

**including** 64:15
119:5 336:13 377:15
380:8 386:25 387:19
392:20

**incorrect** 209:2

**increase** 170:20

**increases** 277:5

**incurred** 56:25

**indefinite** 139:14
336:21

**independent** 68:9

**Indicating** 327:25

**individual** 31:19
32:11 50:16 59:7
60:9

**individually** 32:15
66:7 340:15 346:12
350:13

**individuals** 159:24
161:24 172:10,24
192:8 218:19 253:20
254:6

**industry** 173:12
184:15

**infection** 253:21

**inform** 105:21

**informally** 376:6,15

**information** 13:14
126:4 131:19 133:18
134:3,25 135:4,21
137:20 191:9 201:24
267:21 288:8 312:19
314:13,22 315:6
316:19,23 322:10,15,
19 329:6 331:22

**informed** 66:19
209:17

**infrastructure**
284:13 285:4,20

**initial** 90:4,10,14
94:12 95:5 98:7
394:23

**initially** 94:10 95:15,
23 154:3 166:6 174:4
208:13

**injury** 339:8 341:10
342:17 344:16,20
345:22 346:24 347:7

**inside** 160:7 263:8

**Instagram** 23:5

**institution** 256:4

**instruct** 102:14,23
305:23

**instructed** 139:25

**instructing** 16:12,14
122:24

**instruction** 11:14
16:17 17:4 18:6,17
19:11,17 20:3,11,17
53:17 56:7 69:10
106:9 113:14,23

**instructions** 114:4
168:10 280:7

**instructs** 7:14 114:2

**insurance** 343:23

**insured** 343:25

**intend** 333:16

**intended** 232:12

**interacting** 214:4

**interest** 37:13

**interested** 392:17

**interim** 209:13

**internal** 229:19
268:7

**International** 5:16
398:3

**internet** 126:19

**interp** 366:3

**interrogatories** 89:8
130:16 131:22
132:17,23 133:12
134:9,15,23 135:5,21
136:3 395:12,14

**interrogatory** 89:4
131:7

**interrupt** 128:18
140:15 141:3 145:9

**interruption** 55:19

**invariably** 122:21

**investigate** 41:23
319:8

**investigating** 40:2

**investigation** 37:19
38:19 40:4,15,19
41:6,14,17 42:4
44:23 45:16,24 49:4,

19 51:4,11 52:16,20
65:25 66:3,7 101:11,
16 205:25 206:5,14
313:5 315:14,25
318:12,24 321:10
323:3,9 329:9 331:24
377:14 378:6

**investigations**
41:20 49:13

**invited** 99:9

**invoice** 230:11

**involuntary** 281:24
282:19

**involve** 63:9

**involved** 56:11,15
95:2 172:10

**involves** 104:9

**involving** 12:6

**irrelevant** 308:8

**issue** 21:7 72:6 378:4

**issued** 185:25
186:11

**items** 125:13

**Ivey** 135:16 237:15

---

**J**

**James** 217:22 220:7,
20

**January** 308:3,6

**Jay** 29:10

**Jersey** 100:19

**Jim** 5:2 6:3

**job** 148:4 249:12,20,
24 250:5,15 310:5
388:22,23

**jobs** 147:8 246:20,24
247:5,8,17 248:3,6,
15,17

**John** 29:10

**join** 40:7 52:8 369:25

**joined** 37:17

**José** 111:11

**judge** 17:7 19:22
20:5,6 319:15 320:5
325:9 330:13 331:5,
11 337:17 338:3
367:10,20,23 368:3,
18,22

**July** 204:9 213:3
222:19,21 224:20
232:10 257:15 288:9,
18 289:8,13 290:20
304:3,10

**jumps** 388:22

**juncture** 256:22

**June** 97:9 98:16
101:13 103:19
186:23 195:22
202:14,21 203:3
211:22,25 212:14,16,
18 213:3 214:20
215:4,22 216:18,22
217:7 218:25 220:21,
25 221:10,14 243:23
253:14,18 263:3,9
279:3,10,12 285:7,17
286:10,25 301:11
303:22 336:19

**June-ish** 266:11

**jurisdiction** 391:19

**jury** 368:3,17,23

---

**K**

**Kathryn** 5:5

**keen** 284:9

**keeping** 285:2

**key** 118:18 254:14

**keyword** 119:8,21
120:16,19

**keywords** 122:18

**Khan** 217:23,24,25
221:5,9,13

**killed** 7:19

**kind** 42:10 54:10
101:19 104:23
133:22 167:25
174:23 180:24,25
215:7 303:23 320:20

370:25

**kinds** 257:15

**Kirkland** 163:17
217:22 220:7,20

**knew** 62:22 68:7
205:5 267:19 284:5

**Knock** 247:25

**knowing** 41:21
160:19 286:13

**knowledge** 23:8
54:12 105:8 106:14
133:18 134:2 159:23
213:6 263:2,10
267:23 312:22 323:4

---

**L**

**lack** 274:16

**laid** 243:5 363:9
364:24 365:7,13,23
366:10,19,25 367:5,
13,21,24 368:5,24
371:16,18,24 372:6,
8,15 375:8 380:15,18
381:4,5,7 384:9
385:4 389:23

**language** 207:25
223:17,18 225:17
229:23 250:16,20
315:3 316:20 388:2,
4,5

**late** 197:20 248:23

**laudatory** 146:25

**law** 5:12 48:21,25
50:12,16 67:2,19
71:8 72:13 77:3,9,23
78:10 80:21 81:8
82:7,15 87:10,17
107:25 136:10,14
393:18,21 394:4,7,
10,14,20 395:16

**lawsuit** 49:9 50:25
53:6 56:11,15,21
57:4 58:3 70:3 72:12
74:10 75:5 77:8 78:5,
7,9,25 81:5,7,20
82:14 86:9 87:16
88:5 89:20 94:11,16
101:24 111:3 117:10

138:9,12 139:7,11
184:2 241:22 244:15
269:2 305:5,17,20
307:3,5,23 309:12
327:9,14 345:2
363:23 364:7,16
370:6 371:23 375:14
390:8

**lawsuits** 331:25
370:10

**lawyer** 50:17 52:10
114:2 130:11 152:20
238:17

**lawyer's** 20:11
52:17,21 113:23

**lawyers** 15:10,12
16:22 17:4 18:10,20
19:3 23:18 46:4,10
51:16 52:7,25 53:6,
11,20,21 54:4 55:25
62:22 79:15,23 91:25
92:3 95:3,15 104:13,
20 105:24 119:11
122:11 149:13
306:15 307:4

**layoff** 139:16 362:16,
24,25 363:5 364:22
370:20 371:9 372:23
373:5 380:10,12

**layoffs** 336:16 350:7

**lays** 60:8

**lead** 53:7

**Leadership** 190:14,
19

**leads** 139:14 142:7

**leaf** 31:3 67:20
143:22

**leafing** 24:20

**learn** 52:14 153:19,
23 284:24

**learned** 12:14 263:21

**learning** 88:17

**leave** 127:22 381:20

**leaving** 211:25

**led** 40:20 165:10

**left** 243:23 289:6

313:15 381:24

**legal** 11:11 40:22
41:9 42:11 43:9,19
47:22 57:10,25 59:20
106:2 113:3

**legality** 101:12

**legally** 40:17,20

**lenses** 327:22

**lessons** 263:20

**letter** 54:10,18 55:15,
23 107:19,24 108:20,
24 136:8,13 137:6,7,
12,17 146:11 148:7
159:4 165:12 234:4,
21 351:10 356:4
357:3 395:4,15,19

**letter/number** 72:6

**letterhead** 178:17,25

**level** 229:12

**Li** 289:2

**liability** 57:12 59:7
326:14

**lie** 184:10

**life** 122:12 388:23
389:3

**lifestyle** 344:7,8,9,24

**limit** 12:5 65:19

**limited** 326:14 387:2,
19

**Lincoln** 255:11,19

**lines** 30:21 170:15
171:15

**Linkedin** 23:5,12,13,
21,24 24:5 25:14,25
26:23 27:8,15,18
28:9,22 393:11,12

**list** 289:23 292:6,9
325:25 380:4

**listed** 97:9 260:10

**listened** 103:23

**listening** 47:21

**listing** 97:4

**litigation** 91:25

**live** 127:9 388:23

**lived** 225:9 226:6,8, 14,16 227:4,11

**LLC** 295:8 298:11,13 299:6,16 302:5 311:5,8,13,14 312:4, 7,11,23 313:2,7,24 314:19 316:15 317:4, 8,23 318:4,9,19 319:9,16,20,24 320:4,11,12,16,18,21 321:2,6,7,11 322:2 323:12,18 324:10 325:9,14 326:2,5,14, 23 328:8,14

**Ln** 398:5

**local** 274:15

**located** 99:17 107:8 293:16

**location** 92:24

**locations** 106:21 124:25 125:25

**log** 84:17

**long** 11:21 15:20 17:18 22:3 26:20,23 108:17 112:8 140:10 164:17,23,24 166:8 180:21 182:6 197:15 212:23 218:12,13 220:12,24 221:13 255:7 341:21

**longer** 154:10 155:8 289:21

**looked** 13:9,11 33:12 72:22 73:9,12 96:6 129:4 139:18 215:15 235:13 247:2 258:21 269:24 279:5,23 294:2 296:25 302:12 305:5 311:2

**loop** 20:18,20

**Loosely** 26:19

**lose** 57:7,10 58:21

**losing** 256:7

**loss** 339:8 341:10 342:18 344:16,20,23

**losses** 348:4,7

**lost** 181:6,9,13 346:6

**lot** 60:16 61:11 62:6 145:5 179:8 255:9 286:21 309:23 322:13 389:18

**loud** 157:15

**love** 370:3 374:2,6 381:14

**loved** 140:8

**lower** 91:15 288:13

**lunch** 183:2 187:14, 15

**Lundy** 5:5 108:2 136:14

**Lyneate** 289:2

**M**

**made** 39:2,6 41:14, 20 60:20 63:2 64:19 73:7 86:24 105:25 122:5,8 130:11 134:6,15 136:2 144:6 168:25 204:16 205:17,24 228:20 249:23 279:9 296:3 301:18 307:5 314:21 317:21,25 323:6 382:22 385:14 387:5

**magazine** 42:9

**magazines** 313:14 318:14 324:8

**mail** 182:23

**main** 140:3

**maintain** 27:15 54:14 180:11 213:16

**maintenance** 284:13

**major** 270:22

**make** 7:12,18 23:17 28:7 31:24 40:7 42:14 45:6 52:5 55:18 60:13 62:15,22 64:21 79:22 107:6

**makes** 319:3

**making** 8:9 172:14 210:16 247:23 350:7

**man** 58:8 293:13

**manage** 317:9 319:4

**managed** 316:15 317:4

**management** 150:20

**manager** 178:25 259:8,20 356:9,18 379:19,22,24

**Mandarin** 276:16

**manner** 119:18 240:14,19,20

**Mapp** 289:3

**Marc** 5:8

**March** 9:7,10 27:9 107:20,25 110:18,19, 21 142:25 153:24,25 157:17,25 158:3,9 159:5 160:12 162:20 163:15,25 164:19 165:2 168:24 173:21 175:4 179:16 180:9 184:4 206:7 208:9 209:25 242:12,14 243:8 246:19 248:7 264:3 265:4,13,17, 19,20 278:21,24 302:15,24 303:4 336:17,18 337:18 395:4 398:4

**Maribel** 289:4

**Marie** 163:17

**mark** 7:20,21 9:14 30:16 70:25 79:11 89:24 90:2 190:13 232:17 357:24

**marked** 8:11,14,22 10:4,6 23:14,16 27:19,21 30:15 31:10 33:18,21 35:6,7 67:2, 5,11 69:22,25 70:16 71:10 72:9 74:25 75:4 77:5,7,25 78:4, 22,24 80:23 81:2,16, 18 82:10,13 85:2,4, 18 86:4,7,8 87:12,15 90:5,8 94:12 96:18, 21 107:20,23 109:16, 18 115:5,8 128:5,8 130:17,19 132:17,20 136:10,12 143:16,19 146:12,15 148:23 149:6 155:12,15 166:19,22 177:25 178:4 188:17,22 189:7 194:13 196:23, 24 198:20 199:2,5 206:24 207:3 222:4,7 232:20,23 233:2 252:9,12 258:11,14 260:19,21,24 267:10, 12 268:13,16 270:7, 10 273:4,6 277:19,22 280:17,20 283:10,13 287:13,16 290:3,6 293:3,6 295:5 297:8, 11 300:9,12,23 351:3 352:18 355:9 358:15, 23 359:2,7 360:5,15

**markets** 272:13

**marking** 260:11

**marriage** 392:15

**Martin** 289:3

**mass** 336:16

**match** 93:18

**matches** 353:20

**materially** 382:20 383:11

**materials** 73:20 74:8 125:3 180:7

**matter** 83:21 251:16 376:6 392:16,17

**Maya** 17:17 41:12 46:6 50:21

**meaning** 75:20 224:20 290:19

**means** 314:25 315:6

**meant** 40:4 123:21

**media** 23:2 104:23

**medical** 170:13 171:3,14 172:6 173:3 183:13,17 184:3,9 205:7,11 230:5 243:13,18 343:23

**meet** 254:5

**meeting** 98:17 99:9, 16 101:14,17 103:19 105:5,9 190:23,24 195:23 251:10 279:9 377:16

**meetings** 15:12 97:10 279:3,20

**Mehdi** 356:6,17

**member** 348:22

**members** 40:7 43:4, 6,18 336:14,21 382:19 386:24 387:16

**memo** 173:15 229:19 234:21

**memorandum** 66:25 67:19 70:22,23 71:7 72:13 77:3,9,23 78:10,17 80:21 81:7 82:7,15 87:10,17 393:18,21 394:4,6, 10,14,20

**memory** 84:8 198:2, 7,14,18 211:16 212:4

**memos** 174:15,20 178:16,24 179:15 288:8

**mention** 64:7

**mentioned** 14:4 23:12 43:2 72:21 73:11 145:20 164:7 173:18 174:2 200:10, 20 221:7 284:16 293:24

**message** 190:14,20, 24 191:18 250:24

**met** 12:9 384:21 385:17

**met all** 52:24 384:20

**method** 224:2

**metrics** 254:5

**Mid** 248:23

**middle** 248:24,25 308:20 349:17

**middle-aged** 139:24

**midst** 246:21 248:8

**mind** 164:23 252:2

**minute** 24:9 73:21 74:9 308:18

**minutes** 138:19 342:2,12 390:21

**mischaracterization** 245:18

**mischaracterizes** 333:14

**misquote** 149:23 173:19 174:3

**missed** 21:13

**misspoke** 335:25

**misstate** 64:10

**Mm-hmm** 9:11 10:12 41:2 47:8 60:18 63:18 73:16 79:5 89:15 91:14,23 93:7 95:13 98:15 116:4 128:21 130:3 147:19 157:10 163:3 168:22 176:11 183:14 186:16 222:22 223:20 253:9,12 255:18 264:21 290:14 297:6 326:20 332:13 375:25

**mobile** 21:19

**model** 139:19 389:17

**moment** 24:2 46:24

**monetary** 342:15,21 343:10,16 344:11,19 345:8 346:23 347:6

**money** 58:9 210:16 245:9 246:3,6 256:7 298:17 300:3,19,21 339:7 340:22 389:24

**monthly** 230:11

**months** 48:2 51:24 141:6,13,14 165:8 228:15 272:15 282:7 303:19 343:14 364:5, 13,17,18

**moonlight** 249:12, 19,24

**morning** 6:2

**motion** 66:24 67:15 68:4,21 70:5,6,23 71:9 72:14 77:4,10, 19,23,24 78:8,12,17 79:16,24 80:17,21,22 81:6,9 82:9,17 83:22 87:11,18 393:17,22 394:5,6,10,11,15,21

**Mount** 21:17

**move** 20:24 113:20 257:14,15

**moved** 106:20 201:8, 19 295:22

**moving** 150:2

**Munoz** 289:4

**museums** 255:2,20

---

**N**

**named** 163:17 321:3

**names** 118:15 156:20 217:18 219:2, 4,6 286:13 288:23 306:22 313:14 318:15

**native** 103:11,14

**natural** 387:3

**nature** 139:6 226:9 227:8 255:2

**necessarily** 198:10

**needed** 131:19 158:22,23 246:17 275:11 300:3

**newsletter** 191:5

**newspaper** 318:14

**newspapers** 313:13

**nice** 268:3

**nicknames** 23:10

**Nieves** 289:2

**no-fault** 152:16 250:3 319:19,24 323:17,25 325:13,15 326:25 328:11 330:11 331:9,13 332:21 346:17,20 349:8,24 350:8 361:9,13,21 362:2,7, 14,17,18 363:22 364:6 368:22 370:6, 16,22 373:21 375:2, 13 376:10 377:25 378:21,22 379:5,12 384:6 387:2,8,9,19 388:6,8

**nodding** 89:7 205:13

**non-union** 111:22 150:7,13,19,23 151:8 163:13 171:6 182:16 237:4 244:9 342:22 345:6,23 348:22 378:14 379:4,6

**nonetheless** 163:23 205:6 270:3

**normal** 388:23 389:3

**notary** 5:21 188:8 391:22 392:6 398:24

**note** 28:14 146:25 341:20

**noted** 391:11

**notes** 14:24 144:13, 17,19 251:3 257:6

**notice** 8:11,23 9:12, 15 10:4,8,20,24 57:13,14 58:13,18 60:19 66:23 67:15 70:22 77:22 78:8,16 80:20 81:5 152:14 237:4,21 238:9,14,24 239:4,5,15,20 241:7 242:6 245:9 246:4,8, 19 248:19 249:3,25 251:19,24 323:19 327:3 339:4 369:11 370:25 371:5,13 393:8,10,16 394:6,9

**noticed** 273:17

**notification** 296:2 334:10,20,21,23

**notifications** 179:15

**November** 116:2 290:20 292:11

**number** 21:22,24,25 36:7,20 90:12 91:10, 16,19,24 92:12,15 93:5,18,20,24 97:13 109:12,19 146:16 149:11 152:18 155:16 166:23 170:19 175:3 178:5 188:19 199:6,17 207:4 216:25 233:3, 5,21,22 252:13 258:15 260:4,23 267:13 268:17 270:11 273:7 277:23 280:21 283:14 287:17 288:12,13 290:7 297:13 300:13 310:20 314:3,7 317:22 349:15 353:18 359:4 382:12 386:2

**numbered** 34:24 60:17 92:9 314:7,12 328:25

**numbers** 90:24 91:25 97:5 222:9 233:19 293:7

**nurse** 247:12 248:6

**Nurses** 247:11

**NYF** 269:15,17

---

**O**

**oath** 6:10 131:23 133:22 188:14 196:4, 7 226:25 235:24 242:4 361:5

**object** 12:5 16:24 19:13 20:25 25:20 26:4 39:8 41:4 113:16 119:18 134:11,22 242:10

**objected** 19:2

**objecting** 16:10 20:14 30:5 113:24 122:20 211:3

**objection** 11:7 15:25 17:23 18:12 19:6 20:5,7 22:9 24:6 29:24 36:13,23 38:4 41:18 42:7,25 43:11, 21 44:11,21 45:4,8, 18 46:2 53:13,22 56:4 59:9,22 63:6,22 65:9,23 66:11 68:24 69:7 76:3,17 79:18 80:2 82:4 83:2,9,24 84:5,10,23 85:14,24 89:10 95:18 96:3 97:19 98:20 99:3,8, 18,23 100:3,8,16,20, 24 101:4,9,15,20 102:3,22 103:16,20 104:8,16,17,25 105:19,22 106:5,22 107:2,9,17 108:3,25 112:21,25 114:13 118:25 119:12,13 120:8,20 121:4 123:23 124:22 125:23 126:7,12 129:22 130:8,11 131:16 134:22 135:23 136:23 137:22 138:16 139:12 141:8,18,23 142:4,10 143:2,10 144:3,5 145:19 148:16 150:4 151:16 153:6 154:16 155:4 156:18 158:8 160:3, 5,24 164:2,5,20 165:3,24 166:4,10,16 167:11 169:13 170:22 171:5,16 172:11 173:4,16,24 174:8,17 175:10,17, 21 176:16 177:10,19, 22 178:19 179:6,11, 24 180:14,17 183:19 184:5,11,17 185:2, 14,21 186:3,13,19,25 187:11 189:17,25 191:7,21 192:10,15 193:6,11,17,23 194:2,5,10,15,20,25 195:10 196:5,10,20 197:2,6,12,17,21 198:4,9,12,16,22

199:22 200:3 201:3,
12,20 202:16,22
203:7 204:3,11,17
205:2,9,19,23 206:9,
12,15 207:17 208:3,
12,15 209:3,19
210:3,7,12,18,22,25
211:12 212:7,21
213:8,22 214:5,11,
17,21 215:8,17,24
216:7,12,23 217:2,8,
17,21 219:3,7,11,16,
22 220:5,9,13,22
221:2,11,15 222:17
223:2,9,16 224:11,
23,25 225:5,16,23
226:2,11 227:3,9,20,
25 228:6,16,24
229:6,14 230:23
231:4,10,16 232:6,14
234:10 236:19 237:7,
11,17 238:6,11,18
239:2,7,18 240:12,
17,21 241:3,9,13,16,
19 242:2,15,20,25
244:5,10,12,17,21
245:12,17,22 246:9,
23 247:3,6,10,13
248:9,12 249:14,17,
21 250:19,25 251:7,
15,17,22 252:5 253:5
254:2,11,19 255:3,
15,21 256:9,15,25
257:10,18 258:3,23
259:10,25 260:13,16
261:5,25 262:4
263:6,12,22 264:7,16
265:2,6 266:13
267:4,24 268:10
269:4,22 271:2,4,9,
15 272:4,9,21,25
273:23 274:2,23
275:6,13,18 276:4,9,
13,21 277:9,16
278:8,14 279:22,25
280:8 281:4,9
282:15,21 283:3,23
284:22 285:9,13,21
286:16 289:10,14,17,
24 290:22 291:3,16,
23 292:12,18,24
293:17,21 294:4,9,
20,23 295:3,6,23
296:7,13,22 297:24
298:7,14 299:3,19
300:20 301:15 302:3,

21 303:2,6,9,11,20,
25 304:5,13,17
305:10 306:10,23
307:7,13,24 309:13
311:7,15 312:8
313:3,8 314:20,24
315:7,12,18 316:5
317:6,10,15 319:5,
12,17 320:6 321:8,
17,19 322:11 323:7,
10,15,20,23 324:12,
15,20 325:4,11,16,19
326:6,10,21 327:15,
19 328:9,15,18
329:12,16,23 330:9,
15,21,25 331:7
332:5,12,22 333:3,8,
13,25 334:13,17
335:9,18 336:25
337:7,13,19,23 338:5
339:2,9,17 340:2,11,
17,24 341:3,13
342:25 343:7 344:6,
22 345:3,10,14,19
346:2,5,11 347:3,11,
14,18,21,23 348:2,9,
13,25 349:4 351:16,
24 352:5 353:12
354:3,13 355:3
356:11,15,23 357:20
358:3,8 359:13,17
360:6,20 361:18
362:9,21 363:7,12,
15,19,24 364:8,23
365:8,17 366:12,20,
23 367:8,15 368:7,15
369:2,9,16,21 370:8,
17 371:3 372:4,10,
17,25 373:9,17,23
375:15 376:12
377:11 378:10,25
380:20 383:15 384:2,
19 385:8,22 386:11,
16,18 387:13 388:15

**objections** 7:12
128:3,10 129:12,15,
19 132:15,22 133:11
134:6,8,9,14 136:2
395:9,13

**obligation** 42:14
57:15 58:16 89:20
121:9

**obligations** 37:21
40:23 41:9 42:11,20,

24 43:9,13,19
382:21,25 383:6,13,
19,20,24 384:4,13,
17,20,21 385:16,17,
20 386:9

**observation** 161:5,
6,10

**obtain** 99:6,10 111:6

**obtained** 111:25
112:5 392:19

**occur** 14:13 343:14

**occurred** 377:10

**October** 256:23
262:19 277:12

**offer** 47:12

**offered** 47:14 141:17
151:2,3,4 152:11,15

**offering** 379:14

**office** 50:9 73:4

**offices** 377:2

**officially** 372:3

**Olive** 43:7,14 245:4

**one's** 288:9 290:20
320:20 360:14

**online** 42:9 296:17

**open** 141:5 154:3,6,
13 155:3 171:3 174:6
186:6 200:11,12
204:24 205:6,7 210:9
231:25 255:22 264:6
275:4 308:9,10
364:12 369:14,20
373:11 381:20,25
382:4

**opened** 142:21 172:8

**opening** 140:17,18,
19 308:12 369:10,12

**operate** 213:16

**operation** 169:8
256:8

**operational** 172:20

**operations** 164:19
166:9 168:23 169:2
174:5 176:5 179:17

183:8 186:23 204:9,
23,24 213:14 264:2

**opportunity** 141:15

**opposed** 79:16,20

**opposition** 71:8
72:13 79:21,23 82:8,
15,24 83:7,22 393:21
394:14

**option** 152:11 364:3
369:19,25

**options** 230:5
369:17,19,22

**order** 58:7 111:5
116:16 131:25 157:5
168:6 256:3 363:22
368:2 370:5,10,14
373:20

**ordered** 336:16

**orders** 185:6,24,25
186:11 203:23

**oriented** 382:5

**original** 31:5 35:15
77:18 80:14 110:22
111:2,3

**originally** 10:16
112:24 208:22

**Ortiz** 78:21 79:3
81:15,21 82:2 118:8,
11 150:16 163:5
178:24 181:14
234:19 235:6 250:7,
22 251:4,11 269:12
376:17 377:6 394:8,
12

**Ortiz's** 177:2

**outbreak** 153:21
226:19

**outcome** 392:17

**Outlook** 180:25

**overrule** 20:7

**owed** 299:25 350:9

**owner** 169:16,24
170:5 202:25 326:11

**ownership** 150:14,
16 377:24 378:13
379:13

**P**

**p.m.** 187:15 188:3
278:22 391:11

**packaged** 75:25

**packet** 76:22

**pager** 157:6

**pages** 28:7,11,17
67:18 78:7 81:6 92:2,
8 93:6,21 137:8
169:19 314:8

**paid** 54:11 56:25
152:9 162:14 295:9,
12,16,21 298:12,23,
24 299:12,21,23,24,
25 300:5,19,21 301:9
343:13,19 349:8,23
350:8 361:9 387:8
388:14,17 389:16,19

**Pamela** 217:22
219:14 220:11 289:3

**pandemic** 27:9
99:22 142:14 153:20,
21 170:15 171:15
173:10 184:14
185:10 225:9,10,14,
21 227:8 228:23
246:22 248:8 274:15
277:4

**paper** 74:4 89:24
125:9,10 204:13
213:24 239:3 241:8
257:4,22 261:3 302:4
304:19

**papers** 69:2,5

**paragraph** 10:11
34:23 61:13,20,25
63:13,17 64:24,25
65:16 157:11 169:25
170:5 173:9 175:25
176:25 202:11
211:17 213:10
230:10 253:11
256:22 261:14
270:21 274:14
276:23,25 277:3
278:16 284:8 316:12
321:22 335:13,15
338:9,12 339:20,21
348:18 350:4 353:3

354:6,17,25 355:11, 25 356:13 357:5,18 382:11,13 385:14 386:21

**paragraphs** 34:24 60:17 315:11,16 316:3 318:4 322:5 323:6 328:23 329:11 331:16 332:3 338:7 342:11

**pardon** 199:12 285:23

**part** 28:22 76:6 78:16 88:17,24 121:20 253:16 336:15

**participants** 99:16 107:8,12

**participate** 22:25 89:21 259:18 278:23

**particulars** 129:23 130:2

**parties** 37:17 88:22 317:22 392:16

**parts** 91:2

**pass** 59:21 130:24

**password** 182:2

**past** 47:3

**Paul** 5:14 390:17

**pause** 8:18 185:7

**pay** 24:15 56:16,18, 20 57:12 58:17 152:15,16 162:8 193:9,12 215:19 239:25 250:3 301:8 319:19,24,25 323:17, 25 325:13,15 326:25 328:11 330:11 331:10,13 332:21 344:2 346:17,20 349:8,24 350:8 361:9,13,21 362:2,7, 8,14 363:22 364:6 368:22 370:7,16 373:22 375:2,13 376:9,10 378:2,14, 19,21,23 379:5,10,12 384:6,7 387:2,8,10, 20 388:6

**paycheck** 313:10 318:15,20 319:8

**paychecks** 124:6

**paying** 55:25 57:13 59:20 161:25 162:6 309:19,20 312:18 332:20

**payment** 230:14 239:22,24 240:5,7,8

**payor** 295:20

**payroll** 124:5,16 158:24 161:11,13 162:11 170:18,25 172:19,22 212:15,19 217:5 266:10,11,14, 17

**PC** 104:24

**PDF** 123:20

**peers** 276:11

**peg** 212:18

**pen** 241:7 244:20

**penalty** 6:15 86:21 361:5

**people** 24:20 100:15, 19,23 101:3,7 154:14 160:12,17,19 161:2, 18,21,25 162:5,15,19 163:10,20 170:14,19, 24 171:8,11,21 172:4,7 186:7 192:13 215:20 216:2,21 217:11,18 218:21,22 219:10 243:7,9,16,21 244:8 260:9 266:6 268:8 286:13 287:2 309:20 338:20 345:22 385:6 389:18, 19,20,21

**percent** 314:17

**performance** 146:25

**performed** 382:20 383:11

**performing** 212:14, 19

**period** 94:25 121:14 141:15 148:8 149:25 154:20,25 158:6

171:3,13 172:5 173:2 174:21 175:6 179:16 185:9 195:11 199:21 200:2 209:14 210:2 212:14 214:18,19 215:21 231:2 261:20, 21 263:3 264:3,10,22 265:13,24 266:7,9 274:10 288:18 289:13 290:25 291:6 294:13 295:22 302:15 307:20 357:10

**periodic** 174:16,21, 25 189:16

**perjury** 6:16 86:22 361:5

**permanent** 139:15 350:7 362:15,24,25 363:5 364:21 370:20 372:22 373:5 380:9, 12

**permanently** 363:9 364:24 365:7,13,23 366:10,19,24 367:5, 13,20,23 368:5,24 371:15,18,24 372:6, 8,15 375:8 380:15,18 381:3,5,7 384:9 385:4 389:23 390:3,4

**permission** 105:13, 14,15

**person** 52:25 195:4 221:6 237:3 282:10 298:6 307:10 329:22 388:22

**person's** 306:7

**personal** 50:14 56:19 58:22 59:7 103:5 123:6 126:25 161:6 165:16 166:7 195:24 196:2 197:5 226:24 227:23 228:5 236:8 296:10 312:22 348:3,7

**personally** 44:3,17 61:8 116:10 132:3 163:23 165:16,18 285:17

**Peters** 5:3,6 393:6

**petition** 68:21

**Pg** 398:5

**Philharmonic** 255:2,20

**phone** 15:23 99:14 101:18 103:7,8,18 104:4,23 123:10 279:5,10,14,15,17,19 280:6

**phrases** 370:22

**physically** 74:4

**pick** 36:21 46:8 375:5

**Pieces** 55:12

**pile** 353:17

**place** 9:6 185:6,18 203:23 264:4 265:22 361:13

**places** 15:23 99:22 294:2

**placing** 336:20

**plaintiff** 5:12 88:4 89:19 98:8 121:8 138:2 144:23 241:21 256:2 327:17 337:8 338:18,21,25 340:5, 8,12,13,20 350:13 371:22

**plaintiff's** 98:7

**plaintiffs** 61:3,6,12, 15,21 62:3,7 63:2,10 64:3,15 134:11,22 233:20 298:5 301:18 335:17,24 336:4,12 338:11,14,17 339:6, 24 350:5,12 382:18 386:23 387:16

**Plaintiffs'** 82:7,15 90:4,9,14 96:17,22 128:3,9 132:15,21 133:10 394:13,22,24 395:9,13

**plan** 333:19

**plant** 336:16

**platforms** 23:2

**play** 173:14

**player** 139:25

**plowing** 138:23

**pocket** 58:2,22 59:4

**point** 18:19 36:25 49:7 50:23 105:7 121:2 127:13 143:5 154:2 155:24 156:7, 11 170:11 177:6 235:25 257:24 261:12 266:18 273:15 274:9 275:22 284:18 286:10 304:22 310:10 334:22 360:11

**pointing** 242:8 247:22,24 340:3

**policy** 266:3

**pops** 318:16,17

**portion** 59:15 137:5, 9,11 167:24

**position** 148:9 158:24 244:19 366:8 385:23

**positions** 147:9 150:17

**possession** 73:3,24 98:23 99:2 103:4,5 117:6 126:2 149:3

**possibility** 267:2

**possibly** 95:10 117:19,22 152:10 179:3,7,12 219:8 262:11

**Post-it** 144:17,19

**Post-its** 144:9

**posted** 289:23

**potential** 187:9 202:13

**practice** 251:16

**practitioner** 50:8

**precise** 277:14

**predict** 228:13,17

**prefix** 91:17,18

**premises** 160:4,12

162:24

**preparation** 18:21 19:5 33:8 35:8 72:23 113:7

**prepare** 12:2,15,25 14:3,8 15:13 36:8 73:13 246:14,15,17

**prepared** 59:5,25

**presence** 23:2 229:2

**present** 15:10 106:12

**pressing** 99:14

**pretty** 286:19 344:10

**prevail** 57:4 368:21 369:8 370:5 373:4,5, 20

**prevailing** 367:19 372:21

**previously** 46:25 176:13 188:8

**primary** 274:25

**printed** 23:21

**prior** 9:12 33:2 34:14 49:12 97:6 128:25 152:3,8 202:19,20 239:20 240:22 241:14 259:19 262:19 274:18 289:7 295:21 307:20

**privilege** 18:3,14 19:8 84:16

**privileged** 122:12

**probable** 387:3

**problem** 54:7 134:20 138:23 376:24 377:10

**proceed** 307:22

**proceedings** 8:18

**process** 88:6,9,17, 25 89:17,21 122:5,8

**produce** 102:8 113:9 116:11,21 119:9 120:3,6,9 125:21 131:19 155:21 178:14,20 197:16

222:16 269:25 296:20 357:25

**produced** 88:22 101:23 102:13,20 112:14,16,19,23 113:10 114:12 118:14 120:14,17,18, 22 121:2,6,20,21 122:4,15 124:8,9,17 125:16 144:23 167:6, 9 178:12,17 189:23 207:15,16 234:9,13, 14 235:10,17,18 261:4 269:2 278:7,12 281:8 283:22 287:24 292:22 293:16,20 294:8 297:23 298:5 301:14,20,21 351:22

**produces** 122:11

**producing** 192:19, 20

**production** 115:4,17 128:4,11 129:7 197:10 233:20 281:3 301:18 395:7,10

**professionals** 203:3,11 205:7,12 211:24 212:6 213:13 243:14,18

**profile** 23:14,21 27:15 28:22 393:11

**profit** 256:14

**profitable** 210:21 211:4

**program** 211:25

**prohibitive** 271:12, 19

**promise** 200:17

**prompted** 307:2 309:7

**proper** 42:15 152:14

**properly** 309:19 343:25

**proposal** 8:9

**propose** 7:21

**proposed** 382:20 386:24

**proprietary** 134:24 135:20

**protocols** 264:4 265:21

**provide** 95:24 116:17 183:16 338:10,14

**provided** 58:13 102:10,18 144:18 168:9 174:14 191:17 208:6 209:6,10 238:14,24 241:6 242:6,12,23 244:3,6 245:10 246:3 281:19

**providers** 126:20 127:4,7

**providing** 95:3 208:10 336:22

**public** 5:21 127:4 154:7,11,22 164:25 179:18 188:8 204:25 205:6,10 211:5 232:13 256:5 391:22 392:6 398:24

**pull** 296:17 353:16

**pulled** 301:13

**pulling** 297:3,4

**purpose** 26:4 230:2 281:14

**purposes** 11:11 63:12 127:13,20,21 372:21

**pursuing** 367:17 369:5

**put** 6:10 8:5 9:15 70:24 80:11 83:14 84:16 91:25 104:22 115:2 146:8 150:23 158:23 185:18 232:10 243:13 246:6 264:4 265:22 280:3 298:25 315:3 318:8 383:6 388:2,3,4

**putting** 11:19 36:8, 20 40:9 57:10 96:5 178:14 209:22 286:12 302:24 305:4 388:19

**Q**

**qualifications** 49:14,20 51:5,12 52:17,21

**qualifying** 281:23 282:18

**quarantine** 254:7 271:13,20

**question** 6:20 8:23 11:15 14:7 16:4,15, 18,20 17:21 18:17, 20,24 19:4,18 20:3,9, 12,17 24:14 25:23 26:6 29:25 36:12,15 37:3 39:9,22 41:4,25 42:22 45:12 53:9 54:6 56:16 57:21 63:25 70:8 71:13 72:16 75:7 77:12 78:11 79:6 81:10,24 82:19 83:20 85:7 87:20 95:20 99:4 102:15 106:7 109:24 112:12 113:12 119:20 120:12,23 121:25 126:23 131:2 132:23 136:21 141:24 153:13,15 166:24 173:25 176:18 188:24 190:13 194:17,23 199:8 207:6 208:18, 19 214:15 218:23 222:10 223:4,24 225:8,19 226:12 229:9 231:8 233:7, 12,15,24 241:11 247:14,16 256:21 258:17 259:11 267:14 273:8 277:25 283:15 286:17 290:9 291:21 298:2 304:7, 14 305:15 307:8,15, 17 308:20 315:23 316:21 317:19 324:19 340:9 343:9 354:4,5 365:11 366:9 377:24 386:6 387:14

**question's** 368:12

**questioning** 84:8,20 113:17

**questions** 6:24 7:12, 15 25:12,16,19 27:23 49:25 84:12 89:12 107:11,14 131:22 132:6 208:16 259:3 274:8 286:21 294:24 342:19 390:14,17 391:3

**quick** 218:5 362:13

**quickly** 165:23 166:3 209:23

**quit** 192:14 193:21

**quote** 284:17

**R**

**raise** 181:18 307:14 376:8

**raised** 62:21 181:17

**Randy** 356:10

**raps** 141:12

**Rasha** 156:22,23 163:6

**rates** 253:21

**re-ask** 44:12 54:6

**reach** 368:4

**reached** 310:9

**read** 12:17,18 31:12, 13 36:16,17 37:4,5 59:13,16 62:13,15 64:11 116:22 119:25 120:2,4 129:18 133:10,24 149:8,10, 14,15 169:18,20,22 170:5,8 193:8 202:10 212:10 224:9,12,15, 16,18 249:8 261:23 262:2 272:18 275:9, 23 277:10 339:14,19, 20,22 361:25 398:5

**reading** 130:4 207:25 257:17,19,20, 22 259:14 271:17

**readjust** 256:23

**reads** 298:11 398:5

**reason** 7:2 19:20

186:17,20 194:7,12,
18,24 200:5,9 231:23
232:4,7 256:20
257:24 270:24 271:8
272:2,8,23 288:3
339:5 357:14 398:5

**reasons** 176:2,3
308:13

**recall** 13:11 51:25
70:10 97:2 155:24
185:24 193:15
207:13 219:2,4
262:23 264:14,17,19
362:16 364:22
367:14,21 368:6,25
370:21 372:15,20
375:9 380:22

**recalled** 141:16
363:2,3,6,11,18
364:4 369:7,25
370:13 372:9 373:7,
15 375:11 380:19

**receive** 179:13
180:2,7 182:22
223:8,14 230:11
234:24 235:5,22,24
236:4 237:22 240:7,
8,19 252:21 253:3
362:15 363:22
370:20

**received** 144:14
149:20 174:20
193:12 222:24 223:6,
7 230:14 237:24
238:2,24 252:20
290:17 371:20
389:24

**receiving** 246:7,10,
11 294:11 353:9
360:2,19 375:2 388:7

**recent** 107:24

**recently** 9:21 23:21
26:8 36:17,21 37:5

**recess** 39:17 74:22
151:23 187:15
221:21 287:10 309:4
342:4 374:20 390:24

**recipient** 269:20

**recognize** 10:15
28:21 62:6 75:13

86:11 95:7 108:10
143:23 145:6 146:18
155:17 188:13 189:6
223:17,18 258:18,20
288:2,22,25 290:10
297:14 301:5 350:11
351:7 383:5

**recognized** 389:13

**recollect** 12:22

**recollection** 12:24
15:5 21:6,10 34:21
72:19 84:3,7,19
168:19 169:4,12
170:10 173:14
184:23 212:4 253:24
254:10,18 291:10,14,
15,22 292:3 303:14
304:4,8

**record** 6:6 7:13 8:15
10:6 17:7 20:18
24:23 25:2,4 33:21
39:20 54:22 59:15
67:11 69:25 70:12
72:12 75:4 77:8
78:25 81:2,19 82:13
85:5,14,18 86:8
87:16 90:9 96:22
99:14 101:8 105:14,
15 108:8 109:18
115:15 127:25 128:8
132:20 136:12
143:19 146:16 149:7
152:5 155:16 159:10
166:23 178:5 188:18
193:20 199:6 206:20,
22 207:4 218:16
221:24 222:2,8
251:9,10,13 252:13
258:15 260:22
267:13 268:16
270:11 273:7 277:23
279:2 280:21 283:14
287:17 290:6 297:12
334:18 341:21,23
342:7 351:5 352:21
359:3

**recorded** 99:12
101:17 106:13,17
107:7 195:23 251:9
279:16,20

**recording** 97:9,20,
22 98:14,21 99:11
101:12 102:7 103:5,

17 104:2 105:3,21,25
106:3 250:8,13,14,
17,22 279:9,12

**records** 124:16
139:19 295:25

**recover** 367:11
370:15 372:24

**reduced** 157:25
213:16 266:16

**reduction** 281:24
282:19

**Rees-man** 54:22
55:8

**Reese's** 55:12

**refer** 48:19 355:11,13
381:22,23

**reference** 28:3

**referenced** 262:20

**referencing** 154:25
159:10 357:17

**referral** 46:11,12
47:12,13 306:7

**referred** 50:5,11,15,
19 284:16 306:16

**referring** 13:7 30:25
63:16 67:6 93:2
109:8 123:17 171:6
191:2 259:5,6 262:8
281:21 349:19
350:17 353:25
354:17,24 355:8,18

**refers** 61:14,21

**refit** 266:25

**reflect** 213:19

**reflected** 298:17

**refresh** 12:24 21:6,
10 45:11 84:3 212:3

**refreshes** 211:16

**regard** 345:25

**Regis** 276:16 324:3,5

**registered** 65:17,22,
24

**regular** 69:6 176:4
186:22 204:8,22

**regularly** 28:2

**reinstate** 230:21

**relate** 299:8,18

**related** 95:3 118:8
392:15

**relates** 102:24
137:20 349:22

**relating** 56:20,21
126:4

**relative** 21:14

**relevance** 241:11

**relevant** 108:7 117:9
125:3,22

**relief** 32:7,20

**relocated** 151:3,13

**relocation** 152:11

**rely** 11:13

**remain** 87:4 270:22
284:12

**remained** 154:13
155:3 211:5 251:20
252:3

**remember** 13:12
14:5,25 33:11 36:22
44:25 45:9,11 48:17
49:15,17,21,23 51:7,
13,15 52:19,23 55:24
66:12 68:2 69:4,15
70:10 71:6 72:18
83:25 84:6,22 86:14
95:6,11,14 96:4 97:4
103:24 104:3,14,21
105:23 110:9 111:5
112:10 115:22
118:14 120:11,12
123:8,12 124:24
126:8 129:23,25
130:4 131:6,8,12
135:6,8,24 151:10
156:19,22 163:8,19,
21 164:3 167:18,19,
23,25 168:3 170:16,
23 171:10,23 172:12
174:9,18,19 175:11,
13 178:13 180:10
181:19 182:5,14
185:8 186:4 189:5
190:2,3,4,6,7,9

193:18 195:16,18,20
196:21 197:13,23
198:19,23 199:11,13,
20,25 200:4,14,25
201:4,5 202:4,17,18,
23 203:5,8 206:10,
16,17 207:9,10,22,
23,24 208:4 209:8,9,
20 212:10,12 215:25
216:8,9 218:3
220:16,19,23 221:12
222:18 223:7,10,22
224:3 228:7,8 229:22
232:15 234:16 237:8,
12,18 241:4 248:22
250:11 251:8,12
252:18,19,22,23
253:6,7 254:3,12,20
255:16,17,22,24
257:11,12,17,19,20
258:19,24 259:21,22
260:2 261:6,10,11,
22,23 262:5,10,14,
18,21,24 263:17
265:9,11,25 266:2,4,
5,8 267:17 268:23
269:3,5 270:5,16
273:11 274:4 277:17
278:4,13,15,25
279:4,23 281:10
283:19 284:7 285:5
286:4,11 287:4,25
288:6 289:5,25
290:12,13,15,16,23
292:25 293:18,19,22
294:10 295:19,24
296:23,24 297:3,25
302:16,18,19,22,23
303:3,4,7,21 304:6,9
305:6 306:7,11 311:6
319:10 321:21 323:8,
11 335:12 342:11,19
351:25 356:16,19,24
357:13,21 358:4,9
376:13,22 377:8,12
383:13

**remembered** 288:4
357:9

**remembers** 95:23

**remotely** 161:19
162:24 163:15,24

**renovations** 140:21,
22 141:11

**reopen** 173:22 175:8 176:14 201:7 202:13, 21 208:11,25 209:18, 23 231:24 232:12 256:5 257:25 273:20 275:7,12 277:15 284:10

**reopened** 276:19 309:17,18

**reopening** 174:22 187:9 200:25 201:4 209:7,10 254:16 255:14 256:23 257:8, 16 274:17 277:6,8

**reopens** 142:3 363:18 364:4 369:7 370:2,14 373:7,15

**repair** 284:21 285:19

**repairs** 285:3

**repeat** 18:24 142:11 164:21 263:5 306:13 384:15

**rephrase** 94:14

**replaced** 172:17

**replied** 377:22

**Reply** 77:2,9 87:9,17 394:3,19

**report** 176:12 192:12 379:23

**reported** 175:19 289:8,21 379:4

**reporter** 47:9 79:13 87:22 112:4 114:23 124:12 146:5 152:6 221:25 244:25 342:8 390:14 392:6

**reporting** 392:20

**represent** 6:3 30:22 37:12 46:10 49:8 50:24 70:4 75:9 78:6 149:12 167:4 233:18 359:4 385:5

**representation** 23:17 28:8 144:6 204:16

**representative** 37:16,22,25 38:7,13

**representatives** 40:22

**represented** 7:6 58:3 82:24 143:24 234:4,25 381:16

**representing** 42:16 46:5 51:16 52:7

**request** 94:18 95:16 116:9 128:4,10 129:6 145:3 296:20 395:10

**requested** 59:15

**requests** 88:21 94:23 95:25 125:16, 20 126:22 129:16

**required** 131:14 132:3 230:15 319:24 325:14 327:2 372:20

**requiring** 254:6 271:12,19

**research** 41:7,8 42:5,8,9,10,23 43:18 44:24 45:6,7,14,15, 23 66:8 316:2 318:12

**researches** 43:2,22

**reservations** 46:18 205:14 264:12 265:7 304:12,25

**reserve** 391:3,5

**reset** 181:16,20,23 182:2

**reside** 103:4,6

**resident** 103:18

**Resorts** 326:2,4,23 328:8,14

**resources** 376:25 377:14 378:4

**respect** 38:23,24 44:5 53:6 63:8 66:5 70:5 89:16 162:11 164:6 218:19 237:6 245:21 268:2 331:12 337:25 345:5 347:6

**respecting** 119:13

**respond** 132:2

**responded** 169:16

**responders** 170:12

**response** 116:21 129:4 131:15 133:25 162:22 296:20

**responses** 128:3,9 129:15,19 132:15,21 133:10,17 395:9,13

**responsibilities** 37:21 38:12,16 40:16 88:4 162:10

**responsibility** 56:10,14,20 57:12 58:17,23 62:25 172:21

**responsible** 162:8 171:9,11 172:19

**responsive** 120:17 121:14 123:11,16 124:20 125:15,19,21 126:21

**rest** 42:16 78:8 86:15 163:19 351:17

**restaurants** 270:23

**restraining** 334:9, 20,23

**restrictions** 253:19 271:12,18 274:16

**result** 170:20 336:15 340:23 341:11 342:16,23 343:11,17 344:4,12,21 346:3 372:22 375:14 387:10 388:11

**resulting** 339:8 341:10 342:17 344:16,20 345:22 346:24 347:7

**results** 118:22 367:19

**resumed** 188:7

**retained** 393:6

**retire** 220:15

**retired** 220:14

**retraining** 334:21

**retrieved** 287:23 351:22

**retrofit** 266:25

**return** 169:7 230:21 231:3,5,9 234:20 249:7

**reveal** 12:10

**revealed** 264:10

**review** 13:22 15:23 16:21,25 17:20,21 18:11,21 19:5 21:4 24:2,10 31:9 32:24 34:13 35:8 36:9,10, 22 69:2 128:24 134:14 375:23 391:8

**reviewed** 16:8 33:8 35:10,21,24 36:2,4, 10 96:7 353:4

**reviewing** 21:12 233:9 354:7 355:13

**reviews** 28:12,20 31:8 67:23 76:4 85:25 90:21 108:12 110:2 128:14 131:4 144:11 145:4 167:15 170:2 178:8 189:4 199:10 207:8 222:12 233:14 252:17 261:9 267:16 268:22 270:15 273:10 278:3 280:24 283:18 287:20 290:11 359:14

**revised** 353:8 359:25

**ridiculous** 21:2

**right-hand** 28:10 91:16 288:13

**righteous** 374:8

**rights** 152:13

**ring** 32:8

**rise** 47:16

**Risman** 11:18 24:16, 25 46:6 48:20 50:3,4, 15,21,23,24 51:10 54:17,19,21,22,23,25

55:6,7,14 71:25 85:13 206:20 328:3 341:20,24

**Risman's** 51:5 306:9

**Ritz-carlton** 276:14

**Rodriguez** 43:7 289:4

**role** 94:9

**roles** 53:5

**roll** 114:7 119:16

**romanette** 138:3,14

**room** 106:13

**rooms** 147:14,25

**Roughly** 143:11 147:21

**RPR** 392:25

**Rudy** 259:8,20 262:10

**rule** 90:4,9,14 140:4 394:23

**rumors** 47:21

**run** 135:11 256:10

**runs** 135:13,16

**S**

**safer** 263:20

**safety** 213:17 264:5 275:2

**sake** 141:10

**sales** 46:18

**salutation** 177:2

**satisfied** 385:15,20 386:8,9

**save** 123:21

**scale** 227:13,23,24

**scared** 172:15

**scattered** 99:21

**schedule** 216:19

**scheduled** 10:16 215:6 278:21

**schedules** 213:18, 25 214:7,9,16 215:5, 12 216:10

**scope** 227:7

**score** 255:8 256:12

**search** 116:11,15 117:17 118:18 119:8, 22 120:4,16,19 123:7,9,15 124:17 125:14,18 197:15

**searched** 112:13 117:8,13 118:4,9 123:4

**seasonal** 155:25

**Seasons** 29:7,20,22 30:3,12 47:6,7 63:14 64:17 65:2,12,17,21, 24 106:19 110:6 118:7,11 125:4 126:5 140:19 142:21 143:6 145:23 147:6 151:14 157:19,24 165:14,15 168:9 174:20 178:17 180:4,12 181:9,12 182:18 184:3 191:19 193:20 195:15 196:8, 15,18 214:3,4 231:11,14,22 232:11 236:10,12,16 256:4 267:22 268:4 276:2, 12 281:19 302:5,8 312:17 313:12 317:9 318:16 326:12 327:5 356:8 377:25 378:16 379:13 389:10

**sec** 70:7 362:13

**second-to-last** 75:12

**seconds** 25:7

**section** 167:5 183:7 190:12 193:4 313:24 361:21 375:22

**sections** 191:25 193:15

**security** 213:17 388:18

**seek** 47:11 134:23 138:9,11

**seeking** 37:15

**select** 120:5

**selecting** 46:9

**Selena** 43:7,15 245:4 398:3

**semi-regular** 26:14

**send** 18:10 68:5,23 189:9,10

**sending** 269:8

**sense** 35:15 60:13 209:13 390:5

**sentence** 175:25 224:4,7,10 230:13,16 253:17 257:3 270:21 271:17 274:18 275:8, 22 281:18 338:12 368:8

**sentences** 183:12

**sentiment** 224:20

**separate** 15:23

**separately** 70:25 358:16

**separation** 152:16 250:4 319:19,25 323:17,25 325:13,15 326:25 328:11 330:11 331:10,13 332:21 346:17,20 349:8,24 350:8 361:9,13,21 362:2,8, 14 363:22 364:6 368:22 370:6,16 373:22 375:2,13 376:10 377:25 378:21,23 379:5 384:7 387:2,8,10,20 388:6

**September** 260:5 261:19 336:18

**serve** 37:15,21

**served** 94:22 95:16 129:5,6,20 130:7

**service** 192:13,18 193:20 289:9,20

**Services** 10:9 82:9, 16 295:8 298:11,13, 20 299:6,16 302:5

311:5,13 312:4,7,11, 23 313:2,7,24 314:18 316:9,15 317:4,8,23 318:4,9,19 319:9,15, 20,24 320:4,11,16, 18,21 321:2 394:14

**set** 96:7,13 130:16 132:16,22 133:11 226:16 275:16,25 392:10,23 395:12,14

**settle** 45:17

**settlement** 45:2 109:6

**settling** 45:3

**severance** 152:15 250:3 309:21 378:14, 19 379:10,12 389:20, 21

**shaded** 281:18

**shaking** 103:15

**share** 275:16

**shared** 104:2 267:22

**sharing** 104:3

**Sharon** 163:5

**SHEET** 398:2

**Shorthand** 392:6

**shortly** 169:15,23

**show** 127:8 145:8,12

**showed** 298:20 302:17

**showing** 149:20

**shut** 164:18 265:13, 16 305:19

**shutting** 166:9

**sic** 111:25 275:4 334:10 353:7 356:10

**side** 115:2 146:9 233:6 384:12

**sign** 54:9,18 55:14,22 76:8

**signature** 108:5 352:25 391:6 398:21

**signed** 76:8 133:6

157:3 350:21 351:15 352:4,8,10 356:3,4, 14,21 357:3,4,10,12 358:11 359:12,16,19 361:5

**signing** 86:14

**silly** 20:22,23

**similar** 48:14 119:18 174:15 189:8 191:20 199:15 226:9,15,17 227:12 228:4 258:21 320:20 345:11

**similarly** 339:7 350:6

**simple** 87:20 357:15 388:3

**simpler** 79:22

**simply** 214:14

**single** 81:4

**sir** 25:8 114:23

**sit** 59:5 69:12 71:3 202:10 237:19 294:6 372:16 383:13 384:12,16

**site** 163:14,25 170:19,20

**sits** 71:14

**sitting** 62:24 80:8

**situated** 339:7 350:6

**situation** 42:17 47:18 228:20 244:19 253:24 272:14 276:24

**slash** 108:7

**slightly** 42:22

**slow** 286:22

**snafu** 273:16

**social** 23:2 185:5,8 203:21 388:18

**sole** 50:7

**solely** 160:13 231:14

**solve** 376:24

**someplace** 279:6

**sophisticated** 388:4

**sort** 54:19 68:21 118:18 135:10 268:18 281:18 288:8 309:10

**sought** 106:2

**sounds** 356:16

**source** 392:19

**sources** 123:5

**speak** 43:12 310:10 376:16

**specialty** 52:11,12

**specific** 39:5 178:23 190:4,8 209:11,22 242:16,18 302:24

**specifically** 44:9 64:7 249:19 265:17

**specifics** 112:12

**spell** 6:5 46:14

**spelled** 55:7

**spent** 241:24

**spoke** 43:3 376:15, 17 378:11

**spoken** 43:3

**spreading** 267:3

**St** 276:16 324:3,5

**staff** 141:12 170:13 171:3,14 172:6,9 183:13 184:3,9 269:15,17

**staffing** 213:16

**Staley** 43:7 90:12 91:19 93:11,16,25 95:9 97:13 109:12, 15,20 135:13 143:15, 21 146:12,17 148:22 149:9 155:11,17 166:18,24 177:24 178:6 188:19,21 198:25 199:7 206:23 207:5 222:3,9 232:19,22 233:4,5 237:9 252:8,14 258:10,16 268:16,23 268:12,17 270:6,12 273:3,8 277:18,24

280:16,22 283:9,15
287:12,18 290:2,7
293:2,7 297:7,13
300:8,13 351:2,6
395:5,17,19,20,22,
23,25 396:4,5,7,8,10,
11,13,14,16,18,19,
21,22,24 397:3,4,6,7,
9,10,12 398:3

**stamp** 359:5

**stamping** 30:21 34:6

**stand** 130:10 135:25

**start** 7:25 8:2 15:9
29:21 30:2 31:13
34:17 39:2 53:11
54:8 60:25 61:12
90:13 105:3,5,6
126:5 170:20 176:3
214:9 215:10 219:13
295:12

**started** 105:9 111:3
140:18 142:25 143:6,
7 147:12 170:11
172:7 225:22 257:13
327:9,13

**starting** 63:12,17
64:25 143:4 208:9
214:20 314:7 316:23

**starts** 95:9 253:13
338:12

**state** 6:4 65:18 92:12
173:14 184:24
203:25 274:11,15,21
367:4 392:3,7

**stated** 43:23 47:19
84:9 140:16 236:2

**statement** 129:11
177:8,17 293:12
302:2 317:3

**statements** 86:24
296:16

**states** 101:7 186:12
253:20 254:4,7
264:20 271:13,20
272:12

**stating** 249:6 371:5

**stationery** 268:4

**statistic** 314:21

**status** 174:22 234:20

**stay** 21:12 66:25
67:16 71:10 72:15
171:4 185:5,23,24
186:7,10 203:22
254:24 393:17,22

**stayed** 154:3

**staying** 284:19

**stenographically**
392:12

**step** 116:18 119:21
351:20 376:23
379:18,20 380:3,4
390:6

**steps** 37:23 38:8
68:20 376:2

**sticks** 313:17

**Stokes** 5:15

**stop** 121:5 188:25
242:7 247:22 340:3

**stopped** 154:21
161:8 164:25 172:8
213:2,6 215:22 217:4
266:10,14 302:13,20
303:13 304:10,24
305:2,3 343:21

**stopping** 264:17

**stored** 101:18 124:18
125:3 126:3

**story** 142:7

**straight** 296:5

**strike** 32:13 33:6
46:8 49:6 50:6 60:24
72:20 88:12 91:7
94:16 96:9 126:18
132:10 134:19 154:2,
20 167:21 180:3
192:23 220:10
233:25 251:25
252:24 279:6 311:21
362:12

**struck** 142:8,15
150:2 199:21 200:2
254:22 263:25
266:18

**structure** 263:8

**stub** 301:8

**stuff** 70:16 130:24
174:23 324:8 358:17

**subclass** 382:20
385:20 386:24

**subject** 83:21

**submit** 124:5

**submitted** 13:8 69:3
116:23 117:24
197:13 199:16
234:21

**submitting** 197:18

**subscribed** 391:16
398:22

**subset** 120:18
121:23

**substance** 12:10
84:18 152:19

**substantial** 284:13

**successor** 356:10

**sue** 305:9 308:6,9
309:7 311:14 312:7,
10 323:13,22 324:3,5
326:22 328:7

**sued** 32:15 200:9
205:18,22 206:5,8
307:12 310:20
311:12 320:17
321:12 324:6,19
325:21 327:8,17
329:17 331:5

**suffer** 270:23 340:22
341:11 343:11

**suffered** 339:7
342:15,18,23 343:17
344:4,12,20 345:7,9,
25 346:12,15,25
347:8 348:19,23
364:21 387:10
388:10,14,17,21

**suggest** 148:19
253:16

**suggested** 204:23
251:5

**suggesting** 141:14
165:13 248:5

**suit** 48:15

**suitable** 248:3

**summer** 182:10

**supervisor** 147:1,
21 376:7,9,18

**supplemental**
96:17,23 108:19,23
394:25

**supplies** 241:10
244:24

**support** 67:2,19
70:24 77:3,10,24
78:10,18 80:22 81:8
87:10,17 333:20
393:18 394:4,7,10,20

**supposed** 40:8
116:20 239:25 246:2
323:18

**surging** 272:12

**survive** 381:11

**suspend** 168:25

**suspending** 213:14

**suspension** 176:4
186:22 204:8

**sustained** 386:25
387:17

**switch** 295:17

**switched** 140:20
277:13 295:13

**switching** 138:20
139:3

**sworn** 5:21 6:12
188:8 391:16 392:10
398:22

**system** 30:23 294:3,
8

**systems** 214:4

- - -

**T**

- - -

**T-A-N-I-S-H** 46:16

**T-R-A-P-P** 46:16

**table** 280:11

**tailor** 111:18,20,21,
25 112:4,5

**taking** 25:5 34:3
139:4 143:4 154:10,
21 155:8 164:25
205:14 264:12 265:7
302:13,20 303:13
304:11,24 305:2,3
312:5

**talk** 13:16 40:5,6,21
123:3 200:20 237:9,
15 253:16 334:3
353:3 354:6

**talked** 60:8 62:5
89:17 124:14 200:22
219:19 257:8 288:12
306:14 332:14

**talking** 13:4 43:17
91:18 97:25 119:6
124:10 148:13
153:13 178:23
179:14 200:19
202:11,20 237:2
238:15 248:2 257:12
268:19 302:18
312:16 313:14
320:14,15 346:19,21
356:12 364:16
373:14 374:23
378:15

**talks** 62:2 169:15
183:11,15 281:23
282:3

**Tanish** 46:13

**Tanish's** 51:8

**Tara** 289:4

**targeted** 173:22
175:8

**targeting** 258:2

**task** 151:2,12 152:10

**Tauscher** 259:9,20
262:10 356:10

**team** 139:24

**teams** 173:3

**teeth** 343:24

**telephone** 14:12,14
15:12 21:19

**telling** 40:12 144:22 153:16 266:6

**temporarily** 168:25 213:13

**temporary** 203:10 212:5 243:12

**ten** 25:5

**ten-page** 24:7

**term** 31:25 60:12,13 61:6 89:4 103:11,13 131:7 185:8 189:15 191:14,15 225:13 255:9 378:19

**terminated** 230:20 335:16,23 336:12,23 337:11,17,22 338:4 362:17 370:21 371:8, 10,14 372:2

**terminating** 350:5

**termination** 348:19, 23 362:17 370:25 380:7

**terms** 44:8 97:14 154:14 170:17,24 172:18 174:22 227:6 263:7 269:8 285:19 345:21 361:25 362:6

**testified** 5:22 188:9 200:6 243:10,23 245:25 284:25 369:24

**testify** 253:3 311:20, 22,23 312:25 330:14 333:16,19 337:16

**testifying** 42:19 306:11 341:25

**testimony** 7:3 64:10 196:4,7 235:3,23 239:6 242:3 245:18 260:8 312:3 333:14 392:9,11

**text** 104:4,7 201:25

**texts** 123:9,10

**theory** 375:3

**thereof** 133:12

**thing** 71:2,21 89:3 97:8 144:21 215:7

320:13 330:16 349:6 382:3

**things** 7:20 14:4 34:24 60:9 66:15,20 73:12 88:21 89:24 90:24 93:5 109:8 120:5 122:13 123:15, 20,21 124:8,9 125:9 126:11 143:13 168:18 174:22 179:9 183:11 190:11 198:2, 7 200:8 224:6,22 228:14 254:23,25 255:2,19 257:15 263:19 266:25 269:8 293:24 318:13,14 332:15 346:16 347:10 380:4 389:16 390:9

**THIS___DAY** 398:23

**thought** 29:22 140:11 167:6 190:22, 23 208:14 211:11 227:5 231:18,19,24 279:7 359:8 374:7

**thousand** 147:22

**thousands** 241:24

**threat** 164:24

**three-page** 70:18

**throwing** 115:10

**thrown** 313:15

**Thursday** 9:24,25 159:5

**time** 7:11 8:8 18:19 19:3 24:20,22 25:5 49:12,18 55:17 60:6, 7 70:17 86:25 94:25 103:22 106:17 114:2 117:7 125:20 141:15 145:13 147:8,10 148:8,10 149:25 154:18,19,20,24,25 155:25 156:7,11 158:6,13 160:7,14 164:24 166:2 168:20 169:6,12 170:11 171:2,13 172:5 173:2,14 174:21 175:6 179:16 180:21 181:14 182:3,6,8

183:23 184:24 185:9 191:17 195:11,21 198:3 199:21 200:2 201:21 202:25 206:7 208:6,8 209:22,25 210:2 212:13 213:5, 15 214:18,19 215:21, 22 231:2 232:9,17 246:4,21 253:25 254:10,18 255:13,23 257:25 258:2 261:12, 19,20 262:20 263:2 264:3,9,22,23 265:12,23 266:7,9, 16,18 274:10 276:5 277:11 284:11 289:13,22 290:18,25 291:6 294:13 295:10, 11,17,22 299:25 300:17 302:15 307:20 357:9 376:19 377:19 378:18 391:11

**timely** 240:13,19,20 336:22

**times** 36:25 37:2 53:3 55:2 67:9 177:6, 18 224:5,21 225:7 227:4

**timing** 96:2 240:11 245:16,19 246:7

**title** 10:8 30:19 111:16

**titled** 33:22 75:5 77:9 78:8 79:2 81:5 85:20 86:9 87:16 90:9 96:22 128:9 132:21 352:21

**today** 7:3,7 9:7 10:17 11:23 12:2,25 27:14 33:9 35:9 36:9 59:6 62:24 69:13 71:3,15 87:5 88:13 133:22 151:15 196:9 202:10 209:16 237:19 254:4 285:18 289:16 294:6 372:16 383:14 384:12,16

**told** 11:2,5,19 12:12 21:4 27:25 51:19 57:20 64:9 145:25 149:22 150:16

167:21 200:10 208:22 231:5 250:6 251:5 279:7 306:5 307:4 344:17 348:12 365:6,12,16,22 366:10 378:13,23

**tomorrow** 7:25

**top** 23:22 28:9 30:20, 24 34:5 92:12 149:8 259:2 268:5 322:2 359:6 360:9 362:3

**topic** 38:25

**Toronto** 318:16

**tossing** 115:12

**total** 217:12

**totally** 7:23

**tough** 121:25

**town** 259:4,7,18 278:21,24 279:2

**transcribed** 392:13

**transcript** 58:7 392:18

**transferred** 106:19

**transferring** 107:11

**transmission** 201:24 265:23

**Transporter** 248:14

**Trapp** 46:13,16,17 47:12 48:6,15,19,25

**travel** 253:19 254:5 271:11,18

**traveled** 254:6

**travelers** 186:6 254:24 271:13,19

**traveling** 253:20

**treated** 139:22 149:24 150:6,10,12, 22 151:8

**trees** 7:19

**trial** 6:17 88:18,25 311:24 312:25 319:14 325:9 328:13 330:14 333:17 392:21

**triggering** 309:10,14

**true** 66:2,8 86:25 87:4 133:17,25 137:21 138:6 144:4 184:8 187:2 257:21 264:14 270:25 271:5, 8,23 272:7,19 275:21 315:17 316:4 317:4,5 318:10 323:6 328:5 329:11 332:4 337:6, 10 338:4 353:7 359:24 380:14

**truth** 6:13

**Tuesday** 14:16,21 17:10

**turn** 112:16 113:9 114:11 121:10,13 122:15 124:20 260:23

**turned** 24:8 94:10 95:4 96:8 101:23 102:7 112:13,19 122:16 144:10,16 145:7,16 146:10,22 149:2,13 167:9 207:21 278:6,10 389:4

**turns** 121:11 122:10

**twenty-five** 22:5

**twenty-four** 171:17

**twenty-one** 171:19, 25 219:24,25 220:3,4

**two-minute** 390:21

**Ty** 169:16,24 170:5 202:25 312:17 313:12 325:21 326:2, 4,22 327:5 328:7,13 329:17,19,25 330:7, 13,17 331:17 389:10

**type** 34:6 118:7,18 148:14 174:20 189:15 190:5,6 196:23 321:25

**typed** 118:10,11

**types** 179:13,15 192:24

**typically** 191:18 193:3

Index: typo..weeks

**typo** 93:13 97:14

___

**U**

**U.S.** 182:23

**Uddin** 289:3

**Uh-uh** 206:18 216:4
229:18 255:6 292:4

**uncertain** 166:15

**uncertainties** 224:6,
22 228:12

**uncertainty** 164:16,
22 229:3,11,12
277:14

**uncertified** 392:21

**undergoing** 284:12

**underlying** 21:7

**underneath** 375:23

**understand** 6:9,12,
15,21 17:8 31:21
32:10,14,18,24 35:14
36:18 37:6,14,18
39:9,10 40:3,10
41:25 42:18 43:24,25
45:21 47:20 50:7
53:9 56:19 57:3,5,6,
8,24 58:5,11,20 61:7
65:7 73:10 75:21,23
76:13,15 78:12 79:3
81:22 83:17 88:3,11,
16,20,24 95:25 98:11
100:6,14 103:13
117:13,20 120:13
126:11,23 129:3,25
131:20,21 132:9
133:21 161:4 173:25
180:23 185:12
201:23 203:15
204:21 206:4 208:9,
19,21 209:15 210:15,
19 218:23 223:13,23
225:19 229:9 231:7
235:15 238:8,13,20,
22,23 239:23 245:7,
14 252:24 256:13
257:23 264:8 265:3
269:7,10 272:6
282:24 284:4 291:17,
18 294:12 298:3
311:23,25 315:4

**understanding**
31:23 38:11 48:24
56:10,14,23,24 57:11
58:16,25 77:17 80:4,
5 88:8 89:19 99:24
111:24 116:9,19
131:13,18 132:2
139:6 163:11 168:20
169:3 183:22 184:23
192:8,21,22 203:9,25
204:15 205:4 209:21,
24 210:4,5,10 230:3,
4 232:9,11 239:19
240:22 254:23
255:12 263:11,18
268:7 274:9,11,20
275:10 281:15
282:19,25 291:24
298:4 311:19 312:6
314:23 354:20
372:12

**understood** 86:20
99:10 133:15 150:21
161:14 185:15 208:6
209:17 227:7 261:12
382:24 383:18

**unemployed** 240:2,
24

**unemployment**
168:7,11 241:2

**unfolded** 142:14

**union** 110:6 111:21,
23 171:6 309:21
378:23

**United** 264:20

**unjust** 37:13

**unknowns** 276:25

**unlawful** 339:6

**unnecessary** 20:9

**unprecedented**
177:5,18 224:5,21
225:6,15,22 227:5

**unsigned** 108:2

**untrue** 153:17

**upcoming** 213:18

**update** 191:6,18

**updates** 174:14,21

**upper** 28:9

**upsetting** 374:14

**upsidedown** 389:4

**usual** 26:8

___

**V**

**vacation** 301:8,10

**vague** 167:25

**valued** 145:21
148:14

**varied** 219:17 295:11

**vary** 295:10

**varying** 173:20

**verbally** 250:9

**verbiage** 262:15,17,
18 387:22

**verification** 133:4,
16 136:17 359:20

**verified** 134:19

**verify** 133:25 137:19
275:20

**verifying** 133:16

**Vernon** 21:18

**version** 352:9

**versus** 288:4

**viable** 275:4,11
369:19

**view** 226:10,18,20
227:12,15 229:4,13
245:21

**vintage** 107:24

**violated** 139:17
152:13,17 200:15
245:13,20 319:21
324:10,21 325:12
330:17,24 331:6,12
346:7 386:3

**violation** 319:18
323:16,24 324:4
326:24 328:10
330:10 332:17 334:8,
19 338:2 340:23
341:11 342:16,23
343:11,17 344:4,12
345:7 346:3,16,20
347:8 380:7

**virtual** 278:20,23

**visitors** 302:14,20
303:13 304:24

**Vivian** 5:13 6:7 22:20
86:4,10 138:2 157:3
352:17,22 391:14
393:4 394:18 397:14
398:4

**voice** 307:14

**vouching** 51:8

**Vvivian** 22:19

___

**W**

**W-2** 293:12 294:22
295:5,7 297:17,18
298:10,16,18 299:5,
15 311:11 318:21

**W-2S** 124:8 294:12
298:4 311:2,9

**wage** 380:6

**wages** 162:9 343:19
344:23 346:6 371:20
388:18

**Wagner** 5:14,15
390:18

**wait** 25:22 95:19
137:3

**wanted** 68:13 134:20
140:24,25 152:2
203:15 210:11,14
211:23 253:16

268:20 275:21
307:22 350:24

**warn** 139:16 152:13,
14 200:15,16 238:9,
14,15,16,21,25
239:4,5,15,19 240:2
241:7 242:6,11 243:3
244:2 245:9,13,20
246:4,8,10,19 248:18
249:3,25 319:18,21
323:16,19,24 324:3,
10,22 325:12 326:24
327:3 328:10 330:10,
17,24 331:6 332:18
334:3,12,16,25
335:4,8 338:2 340:23
341:12 342:16,24
343:12,13,18 344:5,
13,21 345:8 346:4,
17,21 347:9

**Warner** 5:4,7,10 6:3
77:4,10,24 79:17,24
80:17,22 81:8 83:22
87:11,18 94:21
112:15 116:12 129:6
132:16,22 133:11
169:16,24 170:6
202:25 312:17
313:12 325:21 326:2,
4,22 327:5 328:7,13
329:17,19,25 330:8,
13,17 331:18 389:10
394:4,10,20 395:13

**waste** 169:19

**water** 130:22

**ways** 151:7 245:15,
20 348:12

**website** 297:4

**Wednesday** 9:25
278:21

**week** 9:24,25 14:17
26:7,11,12,17 150:14
151:12 152:10
157:18,20,23 161:12,
24 162:4 164:8 165:8
171:12 190:13,19
219:10,15,25 220:8,
21 221:10 266:23
278:20

**weeks** 9:3,5,19 10:17
11:23,24,25 12:3,14

13:15,25 15:2,6,7,10,
16 141:6 154:5 155:5
165:8,12 174:7
208:13,14,25 209:15
212:25 228:15
265:18 364:5

**welcoming** 284:10

**whatnot** 170:13

**WHEREOF** 392:22

**Wildwood** 21:17

**win** 57:4,10 58:21

**winked** 328:2

**winking** 327:20

**Winnie** 289:3

**winter** 272:15

**withdraw** 44:19

**woman** 139:23

**wondering** 36:6,19
191:13 212:9 215:15
242:17 273:16 284:5
309:10 351:20 355:6

**word** 21:17 42:3
118:18 123:21
228:21 276:2

**words** 7:23 11:22
53:7 66:14 76:12
105:4 123:14 134:18
160:4 172:6 184:8
227:18 228:13
250:21 254:25 256:7
273:21 282:18 291:7
296:16 314:13
316:22 322:15,19
344:19 366:18
370:19

**work** 42:6 46:25
53:10,19,21 65:6,18
106:20 140:25 141:7
149:21 154:14 156:2,
11 158:12 161:21,24
162:20 163:14,24
164:8 182:4,18 196:3
206:3 215:7 216:17,
22 217:7 220:12,21,
24 221:14 230:22
231:3,6,9 243:8,22
244:4 262:11 263:16
265:12 266:16

281:24 282:20
284:14,21 285:4,8,
18,20 287:3 307:25
308:3 343:24 366:6
370:3,10 373:18
374:3 381:13

**work-related** 125:13

**Workday** 181:8,12,
16,18,21 182:7,8

**worked** 47:2 140:2
155:7 156:6 157:22
243:17 265:15,20
371:11

**worker** 155:7 334:9,
19

**workers** 154:14
155:25

**working** 29:20,21
30:2,11 140:23
157:18,19 158:12
159:25 160:7 161:15,
18,19 162:23 170:14,
19 171:2,12,14
172:25 215:9,11,13,
21,23 216:3,6
217:10,12,16,19
218:22,24 219:10,14,
24 220:8 221:3,9
244:7 254:21 266:22
286:3,6,9,14 299:9,
12,20 343:15 362:22
365:10,18,24 371:6,
19 381:12 386:5

**works** 46:22 198:18

**worries** 55:9 72:4

**worry** 96:11 127:24
358:16

**worse** 198:15

**wrap** 158:22

**write** 51:22 55:5
108:19 225:2,3
244:22 315:2

**writing** 280:4 378:8,9

**written** 54:3,18 55:14
131:21 271:21,22
371:5 376:25 377:15
378:4 379:18

**wrong** 23:18 29:23

64:11 73:23 83:5
142:7,13 143:8 167:7
200:7 208:23 228:21
229:21 237:14
239:15 246:2 279:8
293:25 311:14
319:16 320:4 323:12
325:10 328:14 330:8,
13 332:16,17 333:2,
7,11,24

---

### Y

**year** 48:8,9 110:12,
15,18 143:11 149:25
180:20 182:9 197:18
248:24,25 262:12,13
293:13 294:15,16,17
297:20 306:21
357:23

**year-end** 263:4,9
294:17

**years** 21:25 22:5,8
140:13 193:22
309:24 343:20
362:23 365:19,25
371:11 380:23
381:10,11 386:2,8

**yes-or-no** 16:4,20

**yesterday** 28:9
108:11,15

**York** 21:18 65:18
99:19,21,25 100:5
157:19,24 185:19
186:2 254:7,14
276:3,12 350:6 356:8
392:3,4,7

**young** 139:23

---

### Z

**zeros** 93:17 97:14

**Zimmerman** 5:8,9
85:5

**ZIP** 311:3

**zoom** 5:15 14:12
97:10 98:16 99:9