# EXHIBIT C

SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
1–4

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x
     SELENA STALEY, VIVIAN HOLMES, and
 3   OLIVE IVEY, on behalf of themselves
     and all others similarly situated,
 4
 5
              Plaintiffs,      Case No.
 6                             22-CV-6781 (JSR)
 7        vs.
 8   FSR INTERNATIONAL HOTEL INC. d/b/a
     FOUR SEASONS HOTELS AND RESORTS,
 9   HOTEL 57 SERVICES, LLC, HOTEL 57, LLC,
     TY WARNER HOTELS & RESORTS, LLC, and
10   H. TY WARNER,
11            Defendants.
     ------------------------------------x
12
13
14            DEPOSITION OF SELENA STALEY
15                New York, New York
16             Tuesday, April 11, 2023
17
18
19
20
21
22
23   Reported by:
     Frank J. Bas, RPR, CRR
24   Job No. J9519181
25
```

**Page 2**

```
 1
 2
 3            April 11, 2023
 4            10:18 a.m.
 5
 6        Deposition of SELENA STALEY, held at the offices
 7   of Freeborn & Peters LLP, 1155 Avenue of the Americas,
 8   New York, New York, before Frank J. Bas, a Registered
 9   Professional Reporter, Certified Realtime Reporter,
10   and Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1
 2   A P P E A R A N C E S:
 3
 4   Brustein Law PLLC
     Attorneys for Plaintiffs
 5       299 Broadway
         New York, New York 10007
 6
     BY: EVAN BRUSTEIN, ESQ.
 7
         -and-
 8
     Risman & Risman, P.C.
 9       299 Broadway
         New York, New York 10007
10
         BY: MAYA RISMAN, ESQ.
11
12       -and-
13   Bromberg Law Office, P.C.
     40 Exchange Place
14       New York, New York 10005
15       BY: BRIAN BROMBERG, ESQ. (Via Zoom)
16
     Stokes Wagner, ALC (via Zoom)
17   Attorneys for FSR International Hotel Inc.
         903 Hanshaw Road
18       Ithaca, New York 14850
19       BY: PAUL ERIC WAGNER, ESQ.
20
         -and-
21
     Stokes Wagner, ALC (via Zoom)
22       1201 W Peachtree St. NE
         Atlanta, Georgia 30309
23
         BY: JOHN HUNT, ESQ.
24
25
```

**Page 4**

```
 1
 2   A P P E A R A N C E S:
 3
         SMITH GAMBRELL & RUSSELL, LLP
 4       Attorneys for Warner Defendants
         311 S. Wacker Drive, Suite 3000
 5       Chicago, Illinois 60606
 6       BY: JAMES J. BOLAND, ESQ.
 7
         -and-
 8
         SMITH GAMBRELL & RUSSELL, LLP
 9       1301 Avenue of the Americas
         New York, New York 10019
10
         BY: KATHRYN LUNDY, ESQ.
11           MARC ZIMMERMAN, ESQ.
12
13
14
15
16           - o0o -
17
18
19
20
21
22
23
24
25
```



Page 5

S. STALEY

1
2    ATTORNEY BOLAND:  Jim Boland, Smith, Gambrell
3 & Russell on behalf of the Warner defendants.
4    ATTORNEY LUNDY:  Kathryn Lundy, also Smith,
5 Gambrell & Russell for the Warner defendants.
6    ATTORNEY ZIMMERMAN:  Mark Zimmerman with
7 Smith, Gambrell & Russell.  The same.
8    ATTORNEY WAGNER:  Paul Wagner from Stokes
9 Wagner on behalf of FSR International Hotel Inc.
10    ATTORNEY HUNT:  John Hunt.  I'm here for
11 defendant FSR, Four Seasons.
12    ATTORNEY BRUSTEIN:  Evan Brustein, Brustein
13 Law, for Selena Staley.
14    ATTORNEY RISMAN:  Maya Risman, Risman &
15 Risman, on behalf of the plaintiffs.
16              – – –
17
18 S E L E N A   S T A L E Y,
19 called as a witness, having been first duly sworn by a
20 Notary Public, was examined and testified
21 as follows:
22 EXAMINATION BY
23 ATTORNEY BOLAND:
24    Q.  Good morning, Ms. Staley.  We met earlier.
25    A.  Good morning.

Page 6

S. STALEY

1
2    Q.  My name is Jim Boland.  Can you state your
3 name and spell your last name for the record please?
4    A.  Selena Staley.  S-t-a-l-e-y.
5    Q.  Ms. Staley, what is your current home address?
6    A.  ███████████████████████████████████
7 ███████████████████████.
8    Q.  Ms. Staley, do you understand that you've just
9 been placed under oath?
10    A.  Yes.
11    Q.  You have sworn to tell the truth, right?
12    A.  Yes.
13    Q.  Do you understand that the penalty of perjury
14 applies here?
15    A.  Yes.
16    Q.  Just like as if we were in a court or a trial,
17 correct?
18    A.  Yes.
19    Q.  Do you agree to tell me today if I ask you a
20 question that you don't understand?
21    ATTORNEY BRUSTEIN:  Objection.
22    Q.  You may answer.
23    A.  Oh, yes.
24    Q.  Okay.  Do you agree to tell me if you have any
25 questions about what I am asking you?

Page 7

S. STALEY

1
2    A.  Yes.
3    Q.  Okay.  Any reason why you can't give full and
4 complete testimony today?
5    A.  Nothing.
6    Q.  You are represented by counsel today, is that
7 correct?
8    A.  Yes.
9    Q.  Is that Mr. Brustein?
10    A.  Yes.
11    Q.  From time to time he may make objections for
12 the record.  Unless he instructs you not to answer the
13 question I would ask that you answer my question after
14 his objection.  Okay?
15    A.  Yes.
16    (Exhibit 71, notice of deposition was marked
17 for identification.)
18    Q.  I am handing you, ma'am, what has been marked
19 as exhibit 71.  First of all, just go ahead and take a
20 quick look at it, and let me know when you've had a
21 chance to become familiar with it, okay?
22    (The witness reviews document.)
23    ATTORNEY BRUSTEIN:  While she's looking at it
24 can we go off the record for a second?
25    ATTORNEY BOLAND:  Sure.

Page 8

S. STALEY

1
2    (Discussion off the record.)
3    A.  Okay.
4    Q.  Have you had a chance to take a look at
5 exhibit 71, ma'am?
6    A.  Yes.
7    Q.  Do you recognize it?
8    A.  I've looked at a lot of documents with my
9 attorneys.
10    Q.  Well, let me help you out here, ma'am.
11    ATTORNEY BRUSTEIN:  Don't comment on what you
12 looked at or discussed with attorneys.
13    THE WITNESS:  Okay.
14    ATTORNEY BRUSTEIN:  He's just asking you if
15 you have seen this document.
16    A.  Yes, I've seen it.
17    Q.  Take a look at the second page, ma'am.  You'll
18 see it's dated February 21, 2023?
19    A.  Yes.
20    Q.  Do you recognize this as the first, the notice
21 of deposition, the notice that actually brought you in
22 to be deposed eventually today?
23    A.  Yes.
24    Q.  When did you first see it?
25    A.  I don't remember.



ESQUIRE
DEPOSITION SOLUTIONS

SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
9–12

Page 9

1                      S. STALEY
2      Q.  When did you learn that you were going to be
3   deposed; in other words have to give a deposition in
4   this lawsuit?
5      A.  I don't remember.
6      Q.  Using the exhibit 71 as a benchmark of
7   February 21, 2023, was it around that time period?
8      A.  Possibly.
9      Q.  Putting aside the date that you learned you
10  were going to be deposed, what, if anything, between
11  then and today have you done to prepare for your
12  deposition?
13     A.  I've looked at the claims.  Consulted with my
14  attorneys.
15     Q.  Anything else that you have done between the
16  time that you learned you were going to be deposed and
17  today to prepare for your deposition?
18     A.  That would be it.
19     Q.  Okay.  Let's take those in order.  You said
20  you looked at the claim.  What are you referring to?
21     A.  The amended claim.
22     Q.  You mean the amended complaint?
23     A.  Complaint, yes.
24     Q.  Okay.  You looked at the amended complaint.
25  Did you look back at the original complaint that was

Page 10

1                      S. STALEY
2   filed?
3      A.  I did not.  I looked at the amended complaint.
4      Q.  When did you do that?
5      A.  Maybe a week ago or so.
6      Q.  And when you looked at the amended complaint
7   did you read it in detail; in other words did you read
8   it from start to finish?
9      A.  Yes.
10     Q.  And did you find any allegation of fact in
11  there about you that was inaccurate in any way?
12     A.  I don't understand the question.
13     Q.  Yeah, sure.  You understand that in the
14  amended complaint, we're going to look at it in a
15  second, it had a number of different allegations by
16  paragraph numbers, do you remember that?
17     A.  Yes.
18     Q.  And some of those paragraph numbers referred
19  to plaintiffs, which included you, correct?
20     A.  Yes.
21     Q.  Okay.  In reviewing the amended complaint
22  roughly a week ago did you find any allegation in it
23  about you, as one of the plaintiffs that at least with
24  respect to you, you determined was inaccurate?
25     A.  No.

Page 11

1                      S. STALEY
2      Q.  You said that you consulted with your
3   attorneys.  I don't want to get into the discussions
4   you had with your attorneys about the deposition.  How
5   many times from the time you learned you were going to
6   be deposed until today did you consult with your
7   attorneys about your deposition?
8      A.  Frequently.  Often.
9      Q.  About the deposition itself?
10     A.  Yes, about the deposition.
11     Q.  When you say frequently, more than five?
12     A.  Yes.
13     Q.  More than ten?
14     A.  I would say yes.
15     Q.  More than fifteen?
16     A.  Frequently, a lot.
17     Q.  Well, okay, a lot.  A lot is a relative
18  number.  I'm sorry.  More than 15?
19     A.  I'm not sure of the exact number.
20     Q.  Okay.  Were the consultations you had in
21  person, by telephone, by video hookup or by some
22  combination of those?
23     A.  It was a combination of those.
24     Q.  And when you say a combination of those, does
25  that include an in-person meeting?

Page 12

1                      S. STALEY
2      A.  We did Zoom and by phone.
3      Q.  Okay.  How many times did you meet by Zoom,
4   approximately?
5      A.  I would say approximately ten times.
6      Q.  And during those meetings which attorneys were
7   present?
8      A.  Evan Brustein, Maya Risman and Brian Bromberg.
9      Q.  Okay.  Was Mr. Brustein present for all of the
10  meetings that you had?
11     A.  Not all of them.
12     Q.  The majority of them?  Less than the majority
13  of them?  How would you characterize his attendance?
14     A.  I would say for the majority of them.
15     Q.  Ms. Risman, was she there for all of them?  A
16  majority of them?  Less than a majority of them?
17     A.  For all of them.
18     Q.  For all of them.  And Mr. Bromberg?
19     A.  No, for a majority of them.
20     Q.  For a majority, Mr. Bromberg?
21     A.  Yes.
22     Q.  Okay.  And then the rest of the consultations
23  that you had with your lawyers, other than the ten or
24  so Zoom's, would have been by telephone, is that
25  accurate?



SELENA STALEY                                                    April 11, 2023
STALEY V. FSR INTL.                                                  13–16

Page 13
S. STALEY
1
2     A. Yes.
3     Q. And who were the lawyers that participated in
4  those?
5     A. Evan Brustein, Maya Risman, and Brian
6  Bromberg.
7     Q. And in the same type of a combination, in
8  other words was Mr. Brustein there for most of them,
9  all of them or less than most of them?
10    A. He was there for all of them.
11    Q. And what about Ms. Risman?
12    A. For all of them.
13    Q. And Mr. Bromberg?
14    A. For the majority of them.
15    Q. During any of those -- this is a yes or no
16 question. Were you provided by your lawyers with any
17 documents to review to prepare for your deposition?
18       ATTORNEY BRUSTEIN: Objection. I am going to
19 direct her to limit her answer to the extent that she
20 reviewed any documents that refreshed her
21 recollection.
22       ATTORNEY BOLAND: Well, I'll ask her that.
23 I'll get to that. I was asking her just the general
24 question of whether documents were provided to her.
25 That's not privilege.

Page 14
S. STALEY
1
2       ATTORNEY BRUSTEIN: You asked about if her
3  attorneys provided it.
4       ATTORNEY BOLAND: Correct. Yes. Because you
5  can ask if they were shown documents. I'm only
6  entitled to know the documents that refreshed her
7  recollection, if any.
8       ATTORNEY BRUSTEIN: You're not asking what
9  documents?
10       ATTORNEY BOLAND: No, not at all. Just the
11 fact of whether she was provided documents. I'll
12 start there.
13    Q. Let me ask you it again.
14    A. I don't understand the question.
15    Q. In connection with the preparation for your
16 deposition were you provided -- this is a yes-or-no
17 question -- were you provided any documents at all by
18 your lawyers?
19       ATTORNEY BRUSTEIN: Objection.
20    A. I don't understand the question.
21    Q. Yeah. Did they send you any document to take
22 a look at to prepare for your deposition?
23       ATTORNEY BRUSTEIN: Objection.
24    A. I don't understand the question.
25    Q. Okay. I am trying to be as clear as possible.

Page 15
S. STALEY
1
2  Is the word "document" confusing you? In other words
3  did they send you any of the emails that you may have
4  produced or documents that you gave to them to produce
5  or anything else to review in preparation for your
6  deposition?
7       ATTORNEY BRUSTEIN: Objection.
8     A. I don't remember.
9     Q. Okay. Let me see if I can do it this way.
10 And again yes or no question. Okay?
11    A. I think it's going to be more than a yes or no
12 answer. I don't understand the question.
13    Q. I am trying to figure out a way to make it
14 clearer. I'm having trouble doing that. That's my
15 job.
16    If you look at exhibit 71, we've got a
17 document that has been reduced to a piece of paper.
18 You have a file that's been reduced to a piece of
19 paper, right?
20    A. Yes.
21    Q. Considering this an example of a document, you
22 know, something that's on paper, maybe a printout of
23 an email, maybe a pleading from the case, like the
24 complaint or maybe emails or something like that,
25 here's what I want to know.

Page 16
S. STALEY
1
2    Putting aside your lawyers. Did you review
3  anything like that in preparation for your deposition,
4  or was your preparation for your deposition limited to
5  just looking at the amended complaint, in terms of
6  documents?
7     A. For documents I looked at the amended
8  complaint.
9     Q. During any of the Zoom meeting, yes or no
10 question, were you shown any other types of documents
11 beyond the amended complaint?
12       ATTORNEY BRUSTEIN: Objection.
13    A. No.
14    Q. During your preparations by Zoom or by phone
15 did you and your lawyers you -- yes or no question --
16 talk about documents from the case other than the
17 amended complaint?
18       ATTORNEY BRUSTEIN: Objection. I am going to
19 direct her not to talk about what the topics of
20 conversation were.
21       ATTORNEY BOLAND: Well, you would have to put
22 the topic of the conversation on a privilege log. I'm
23 not asking for anything more than what would have to
24 go on a privilege log. Honestly, I am being very
25 respectful of the privilege. I'm not going to get



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023

17—20

Page 17

1                      S. STALEY
2 there.  I'm taking baby steps.  This is really just
3 whether documents were discussed or not.  That's all
4 it is.  That's not privileged.
5        ATTORNEY BRUSTEIN:  I believe that all
6 attorney-client communication is privileged.
7        ATTORNEY BOLAND:  Not if you tell somebody
8 where to go to the bathroom.  Not everything is
9 privileged.  This is just a fact of something.
10 Nothing more than you would have to put on a privilege
11 log, honestly.
12        ATTORNEY BRUSTEIN:  So you can mark that for a
13 ruling.  But that I am going to direct her not to
14 answer.
15        ATTORNEY BOLAND:  I'll do this once.
16     Q.  Are you going to follow your lawyer's
17 instruction and not answer the question?
18        ATTORNEY BRUSTEIN:  Objection.
19     A.  I don't understand the question.
20     Q.  Mr. Brustein has instructed you not to answer
21 the question.
22        ATTORNEY BOLAND:  Correct.
23        ATTORNEY BRUSTEIN:  Yes.
24     Q.  Are you going to follow his instruction and
25 not answer my question?

Page 18

1                      S. STALEY
2        ATTORNEY BRUSTEIN:  Objection.
3     A.  I don't know.
4        ATTORNEY BOLAND:  Okay.  Let's see if we can
5 get through it and then we'll ask her if she will do
6 it every time and then we get it set so we don't fight
7 over it.
8     Q.  I am asking you the question.  In your Zoom
9 meetings or phone calls with your lawyers to prepare
10 for your deposition, were any documents other than the
11 amended complaint discussed; yes or no?
12        ATTORNEY BRUSTEIN:  Objection.  Do not answer.
13     Q.  Are you going to follow Mr. Brustein's
14 instruction and not answer my question?
15        ATTORNEY BRUSTEIN:  Objection.
16     A.  I don't know.
17     Q.  Well, you either have to answer or not answer
18 me.  Mr. Brustein has instructed you not to answer me.
19 I am just asking you to confirm that you are in fact
20 going to follow his instruction and not answer the
21 question that I just asked you?
22     A.  Yes.
23     Q.  Okay.  And for all of the times when
24 Mr. Brustein instructs you not to answer a question,
25 will you follow his instruction?

Page 19

1                      S. STALEY
2        ATTORNEY BRUSTEIN:  Objection.
3     A.  (No response.)
4     Q.  Do you understand my question, ma'am?
5     A.  I don't understand the question.
6     Q.  That's fair.  Let me see if I can make it
7 simpler for you.  Mr. Brustein -- I had asked you a
8 question, Mr. Brustein instructed you not to answer it
9 on grounds of privilege.  Fine.  I asked --
10        ATTORNEY BOLAND:  It was on the ground of
11 privilege, correct?
12        ATTORNEY BRUSTEIN:  Yes.
13 BY ATTORNEY BOLAND:
14     Q.  Okay.  I then asked you if you were going to
15 follow his instruction not to answer my question and
16 you said yes, do you remember that?
17     A.  Yes.
18     Q.  So that we don't have to go through that
19 exercise going forward, every time in the future if
20 Mr. Brustein instructs you not to answer my question
21 do you intend to follow his instruction?
22        ATTORNEY BRUSTEIN:  Objection.
23     A.  Yes.
24     Q.  Okay.  We're good.
25        I had your full name.  What's your current

Page 20

1                      S. STALEY
2 work address?
3     A.
4        ATTORNEY BRUSTEIN:  Objection.
5     Q.  When he objects, he hasn't instructed you not
6 to answer.
7     A.  Oh.
8     Q.  You can answer my question.  He's just getting
9 an objection on the record.
10     A.  I had, um, some gigs here and there.  One day
11 here, one day there.  I don't have a work address.
12     Q.  Are you presently living in New York or are
13 you presently living somewhere else?
14     A.  Presently living in New York.
15     Q.  When you say you had some gigs here and there,
16 what are you talking about?
17     A.  As an actor.
18     Q.  As an actor, okay.  And how long have you been
19 working as an actor in gigs here and there, as you put
20 it?
21     A.  It would have been starting August of 2021.
22     Q.  Okay.  And continuing through today?
23     A.  Here and there.
24     Q.  When you didn't get the work?
25        ATTORNEY BRUSTEIN:  Objection.



Page 21

S. STALEY

1
2     A.  Some gigs one day here and one day there.
3     Q.  Just out of curiosity, ma'am, how do you find
4  out about these?
5     A.  Actually on casting networks.
6     Q.  Do you have a mobile telephone?
7     A.  Yes.
8     Q.  What's your mobile number?
9     A.  ███████████.
10    Q.  How long have you had that particular number?
11    A.  For more than 25 years.
12    Q.  Okay.  What email addresses have you used,
13  let's say, in the last five years?
14    A.  ████████████████████████████
15  ████████████
16    Q.  Any other email addresses in the last five
17  years?
18    A.  None.
19    Q.  If I were to back that up five years before
20  that, in the last ten years, are there any additional
21  ones?
22    A.  No additional ones.
23    Q.  Are you on any social media?
24    A.  I have LinkedIn and Facebook.
25    Q.  Do you have any nicknames?

Page 22

S. STALEY

1
2     A.  I don't have any nicknames.
3     Q.  You mentioned Facebook.  I want to show you
4  something, if I could.
5        (Exhibit 72; page of LinkedIn profile was
6  marked for identification).
7     Q.  I am handing you, ma'am, what has been marked
8  as exhibit 72 which I will make a representation to
9  you is just the first page of what I found on your
10  LinkedIn profile.  Putting aside you did not create
11  this, do you generally recognize this as the printout
12  from your first page of your LinkedIn profile?
13    A.  Yes.
14    Q.  And you'll see and I'm not trying to hide the
15  ball, ma'am, up in the upper right-hand corner you'll
16  see it prints out the date that this was pulled.  This
17  was just yesterday.
18    A.  Mm-hmm.  Yes, I see that.
19    Q.  How often do you visit LinkedIn?
20    A.  Not often.
21    Q.  Not often?  You have your experience started
22  on this page, do you see that towards the bottom?
23    A.  Say that again please?
24    Q.  Yeah.  Looking down, you'll see there's your
25  name and then it has a position listed for you,

Page 23

S. STALEY

1
2  correct?  Under your picture?
3     A.  Yes.
4     Q.  And the position listed for you is what?
5     A.  Reservations agent.
6     Q.  At Four Seasons Hotel?
7     A.  At Four Seasons Hotel.
8     Q.  Okay.  And then we go down to a level down
9  below and it talks about experience?
10    A.  Mm-hmm.
11    Q.  You have to say yes, so he can pick it up.
12    A.  Yes, I apologize.
13    Q.  No worries.  You also have reservations agent,
14  right?
15    A.  Yes.
16    Q.  And it's at the Four Seasons Hotel?
17    A.  Yes.
18    Q.  And that's the Four Seasons hotel on
19  57th Street?
20    A.  Yes.
21    Q.  Got it.  And what is the period of your
22  experience that's identified here on your LinkedIn
23  page under Four Seasons Hotel?
24    A.  As a reservations agent.
25    Q.  Yeah, and what's the time period that you have

Page 24

S. STALEY

1
2  identified underneath Four Seasons Hotel under
3  reservations agent underneath Four Seasons Hotel?
4  When does it say you worked there?
5     A.  I'm so sorry.
6     Q.  Yeah, sure.  Look at Experience, and look at
7  Reservations Agent, Four Seasons Hotel, and I just
8  want you to tell me what the time period is that
9  follows?
10    A.  It's January 2008 to present.
11    Q.  Okay.  You have your education listed as the
12  City College of New York?
13    A.  Yes.
14    Q.  Did you go to the High School of Performing
15  Arts?
16    A.  Yes.
17    Q.  Good for you.  When did you graduate from the
18  High School of Performing Arts?
19    A.  1982.
20    Q.  You're a very quick thinker and talker and I
21  like that.  But what we'll have to do is I'll do my
22  level best to stop to wait before I finish asking a
23  question.  If you could do the same with me, the
24  reporter would like us a whole lot more.
25        ATTORNEY BRUSTEIN:  Wait two seconds so that



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
25–28

Page 25

S. STALEY

1 you know he's finished.
2     THE WITNESS:  Yes.
3     Q.  You went to -- I'm sorry.  I understood that
4 you graduated from the High School of Performing Arts?
5     A.  1982.
6     Q.  And what did you do of after that?
7     ATTORNEY RISMAN:  1982?
8     THE WITNESS:  1982.
9     A.  I pursued a career as a professional dancer.
10    Q.  I think your LinkedIn profile talked about
11 attending the City College of New York?
12    A.  Yes.
13    Q.  And you've got a bachelor of fine arts in
14 dance?
15    A.  Yes.
16    Q.  Did you wait a year to start college?  Because
17 I see the year you graduated in 1982 and you started
18 college in 1983?
19    ATTORNEY BRUSTEIN:  Objection.  Do we really
20 need to go into pre-college time?
21    ATTORNEY BOLAND:  I just asked her about the
22 High School of Performing Arts because I thought it
23 was cool.
24    Q.  You waited a year to go to college?

Page 26

S. STALEY

1
2     A.  Yes.
3     Q.  And then you graduated in '83?
4     A.  Yes.
5     Q.  I'm sorry.  You went in 1983.  I apologize.
6 '87?
7     A.  Yes.
8     Q.  Did you work during college?
9     A.  Sometimes.
10    Q.  When working was that as a professional dancer
11 or did you do something else as well?
12    A.  I did something else.
13    Q.  What did you do?
14    A.  Reception.
15    Q.  Where?
16    A.  At a leadership program.
17    Q.  Was there a particular employer that you could
18 identify?
19    A.  I don't remember.
20    Q.  How long did you do that?
21    A.  I don't remember.
22    Q.  Was this while you were in college?
23    A.  Yes.
24    Q.  When you graduated from college what did you
25 do?

Page 27

S. STALEY

1
2     A.  I pursued a career as a professional dancer.
3     Q.  And as a person who had a cousin who was an
4 actress, what else did you do at the same time you
5 were pursuing the career as a professional dancer, if
6 anything?
7     A.  Teaching artist work.
8     Q.  Where at?
9     A.  At different high schools.  Public schools.
10    Q.  Anything else that you did while you were
11 pursuing a career as a professional dancer?
12    A.  Continued to audition.
13    Q.  I want to look here.  For example, you've got
14 the reservation agent as the Four Seasons starting in
15 January of 2008.  On your LinkedIn profile, exhibit
16 72.
17    A.  Under experience?
18    Q.  Yes.
19    A.  That is a typo.
20    Q.  It wasn't January of 2008?
21    A.  It was actually 2007.
22    Q.  2007?  Okay.  So using that as the time period
23 that you joined the Four Seasons, can you give me, as
24 best you can a thumbnail sketch of your work
25 experience between the time you graduated from the

Page 28

S. STALEY

1
2 City College of New York in 1987 and the time period
3 that you joined the Four Seasons?
4     A.  I worked as a professional, a dancer/singer
5 for about 25 years.
6     Q.  You talked a little bit before about how at
7 the same time you did some teaching at public schools
8 and the like, is that fair?
9     A.  It's teaching artist work that was very
10 limited.
11    Q.  I understand one you pursued for 25 years was
12 a career as a singer and a dancer.  During that same
13 time period what, if anything, did you do in addition
14 to the teaching artist work?
15    A.  That would be it.
16    Q.  Okay.  And then did you stop pursuing a career
17 as a professional singer and dancer when you joined
18 the Four Seasons or did you continue to pursue that as
19 well?
20    A.  I continued to pursue that as well.
21    Q.  Go ahead.  If you had something else to say?
22 If that's your answer, that's fine.
23    A.  Mm-hmm.
24    Q.  During the time period from say 2007 until
25 August of 2021 when you talked about picking up some



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
29–32

Page 29

S. STALEY

2  other gigs, did you continue to also, you know, work
3  from time to time as a professional singer and dancer
4  in addition to your work at the Four Seasons?
5      A.  I did not.
6      Q.  You never got a gig between 2007 and 2021?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  I'm sorry.  Could you repeat your question.
9      Q.  Yeah, sure.  I was asking you the question,
10  I'll set it up again.  I thought you told me, I don't
11  want to misrepresent your testimony so tell me if I am
12  wrong, I thought you had told me that even after you
13  joined the Four Seasons in 2007 you continued in some
14  fashion to pursue somewhat of a career as a
15  professional singer and dancer.
16      Did I have that wrong or right?
17      A.  I pursued it by going to acting schools.
18      Q.  Okay.
19      A.  That was for me continuing on with the career.
20      Q.  Were you able to secure any, I don't know the
21  best way of saying what type of work it would be.  Is
22  "gig" a good way to describe the type of work that you
23  get as a singer and an actor?
24      A.  I don't remember.  It was so long ago.  I
25  don't remember.

Page 30

S. STALEY

2      Q.  To be clear.  Between the time period that you
3  joined the Four Seasons and August of 2021 when are
4  you started picking up some gigs did you ever find
5  yourself able to secure some work as a professional
6  singer, dancer or actor?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  I don't remember.
9      Q.  You might had, you might not have; you just
10  don't recall?
11          ATTORNEY BRUSTEIN:  Objection.
12      A.  I don't remember.
13      (Exhibit 5, Complaint was previously marked
14  for identification.)
15      Q.  Ms. Staley, I'm handing you what's been
16  previously marked as exhibit 5.  Do you recognize
17  exhibit 5 as a copy of the first complaint that was
18  filed on your behalf in this lawsuit?
19      A.  Yes.
20      Q.  Did you review exhibit 5 before it was filed?
21      A.  Yes.
22      Q.  As part of that review did you read it?  In
23  other words, read every page, every word, all of it
24  from start to finish?
25          ATTORNEY BRUSTEIN:  Objection.

Page 31

S. STALEY

2      A.  I don't remember.  I took a look at it.  I
3  don't remember --
4      Q.  You don't remember in what detail -- I'm
5  sorry.  I didn't mean to interrupt you.
6      A.  Yeah, I don't remember all the way through but
7  I did take a look at it.
8      Q.  You don't recall as you sit here today whether
9  or not you read it from start to finish or you just
10  maybe glanced at it or read parts of it?
11          ATTORNEY BRUSTEIN:  Objection.
12      A.  Yes.
13      Q.  Did you approve it to be filed on your behalf
14  before it was filed?
15      A.  Yes.
16      Q.  And since it was filed on your behalf do you
17  take responsibility for the allegations and the
18  statements and the claims that are made in exhibit 5?
19          ATTORNEY BRUSTEIN:  Objection.
20      A.  I don't understand the question.
21      Q.  Yeah, sure.  Do you understand that you are
22  one of the three plaintiffs in this lawsuit, correct?
23      A.  Yes.
24      Q.  So you understand that this lawsuit has been
25  filed on your behalf as well as the other two folks,

Page 32

S. STALEY

2  right?
3      A.  Yes.
4      Q.  And you understand that exhibit 5 was filed at
5  least in part on your behalf?
6      A.  Yes.
7      Q.  My question is very simply, as one of the
8  plaintiffs in this case on whose behalf this lawsuit
9  was filed do you take responsibility for what is put
10  into exhibit 5?
11          ATTORNEY BRUSTEIN:  Objection.
12      A.  I don't know.
13      Q.  You don't know whether you take responsibility
14  for it?
15          ATTORNEY BRUSTEIN:  Objection.
16      A.  That's why I hired my attorneys.
17      Q.  Fair enough, ma'am.  What I am trying to
18  understand is, I asked you if you had reviewed it
19  before it was filed, I think you said yes.
20      A.  Mm-hmm.
21      Q.  You don't remember the level of detail.
22  That's fine.  I asked you if you approved it to be
23  filed on your behalf before it was filed and you said
24  yes, right?
25      A.  Yes.



Page 33

S. STALEY

1
2    Q. Therefore do you take responsibility for what
3 is contained in exhibit 5?
4        ATTORNEY BRUSTEIN: Objection.
5    A. I don't know.
6    Q. You told me a little bit earlier that you
7 understood, and tell me if I am misstating your
8 testimony, okay, that in the amended complaint that
9 you have read there were allegations, the numbered
10 paragraphs, that related to plaintiffs, do you
11 remember that?
12    A. Yes.
13    Q. And you understand that you are one of the
14 plaintiffs in the case?
15    A. Yes.
16    Q. So those allegations relate in some fashion to
17 you personally?
18    A. Yes.
19    Q. The same was true, is it not, ma'am, of
20 exhibit 5, the first complaint that was filed in the
21 case?
22    A. But there is an amended complaint.
23    Q. There is. And I'll get to that in a minute.
24 I promise you. The same though is true of the first
25 complaint in the case, that there are numbered

Page 34

S. STALEY

1
2 allegations, right? You can leaf through it and see
3 that, correct?
4    A. Yes.
5    Q. And a number of allegations refer to
6 plaintiffs, do they not?
7    A. Yes.
8    Q. And one of those plaintiffs is in fact you
9 individually, correct?
10    A. Yes.
11    Q. All right. When you reviewed and approved
12 this complaint to be filed did you find any
13 allegations about yourself that you found to be
14 incorrect?
15    A. Not at that time, no.
16    Q. Have you since found any allegations in
17 exhibit 5 about yourself that you have determined to
18 be incorrect?
19    A. I don't remember.
20        ATTORNEY BRUSTEIN: Objection.
21    Q. Okay. You don't remember. That's fine. And
22 as you sit here today you don't know whether you will
23 take responsibility for the allegations and the
24 statements that are made in exhibit 5, fair?
25        ATTORNEY BRUSTEIN: Objection.

Page 35

S. STALEY

1
2    A. I don't know.
3        (Exhibit 6, First Amended Complaint was
4 previously marked for identification.)
5    Q. I am handing you, Ms. Staley, what was
6 previously marked as exhibit 6. You can leaf through
7 exhibit 6 as well, ma'am. Let me know when you've had
8 a chance to just become familiar with it.
9        (The witness reviews document.)
10    Q. Do you recognize exhibit 6 as a copy of the
11 first amended complaint filed on your behalf in this
12 lawsuit?
13    A. Yes.
14    Q. And this is the complaint that you reviewed in
15 preparation for your deposition today, right?
16    A. Yes.
17    Q. Got it. Did you review exhibit 6 prior to it
18 being filed?
19    A. Yes.
20    Q. The same question as with exhibit 5. When you
21 reviewed it did you read it from start to finish or do
22 something of a different type of review?
23    A. I read it.
24    Q. You read it from start to finish?
25    A. Yes.

Page 36

S. STALEY

1
2    Q. All right. Did you approve exhibit 6 to be
3 filed on your behalf?
4    A. Yes.
5    Q. Do you take responsibility for the statements
6 and allegations that are made in exhibit 6?
7        ATTORNEY BRUSTEIN: Objection.
8    A. I don't know.
9    Q. All right. In our discussions before we noted
10 that this complaint has allegations that relate to
11 plaintiffs, including you, correct?
12    A. Yes.
13    Q. Sometimes you are mentioned specifically by
14 name, sometimes your just one of the plaintiffs
15 mentioned as a group, correct?
16    A. Yes.
17    Q. All right. You have reviewed those
18 allegations before they were filed?
19    A. Yes.
20    Q. With respect to the allegations made about
21 you, either individually with your name or as one of
22 the plaintiffs, do you take responsibility for the
23 accuracy of those in exhibit 6?
24        ATTORNEY BRUSTEIN: Objection.
25    A. I don't know.



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
37—40

Page 37

S. STALEY

1
2      Q.  You don't know whether you take responsibility
3  that the allegations made about you, about you in
4  exhibit 6 were true and correct?
5          ATTORNEY BRUSTEIN:  Objection.
6      A.  I don't know.
7      Q.  You could keep that one out, at least.  We're
8  going to come back to that one.
9      A.  Okay.
10     Q.  Do you see, ma'am, both of these complaints --
11         ATTORNEY BRUSTEIN:  You want to put 5 to the
12  side, though?
13         ATTORNEY BOLAND:  Yes.
14         ATTORNEY BRUSTEIN:  Because I know the stack
15  gets big.
16         ATTORNEY BOLAND:  It does get big.
17     Q.  Both complaints are filed as class actions,
18  correct?
19     A.  (Pause.)  I thought the judge determines that.
20     Q.  Well, they were filed -- the complaints though
21  were filed as class actions, correct?
22         ATTORNEY BRUSTEIN:  Objection.
23     A.  (No response.)
24     Q.  Do you understand my question?
25     A.  I don't remember.

Page 38

S. STALEY

1
2      Q.  Okay.  Let's take baby steps.  I want to make
3  sure I understand.
4          Do you know what a class action is?
5      A.  It's a lawsuit.
6      Q.  Okay.  Do you know what the difference between
7  a -- well you understand that as an individual, if you
8  got, you know, hit by a car you could file a lawsuit
9  against the driver for hitting you, right?
10     A.  Yes.
11     Q.  And it would just be you against the driver or
12  maybe his insurance company or whatever, but it would
13  be an individual lawsuit by you, correct?
14     A.  Yes.
15     Q.  Do you understand if there's a difference
16  between that type of individual lawsuit and a class
17  action?
18     A.  Yes.  A class action involves a class.
19     Q.  Okay.
20     A.  A group.
21     Q.  All right.  So what is your understanding with
22  respect to how this case has been at least pled, in
23  other words how the complaints have been pled?  Is it
24  an individual case or does it seek to be a class
25  action?

Page 39

S. STALEY

1
2      A.  It seeks to be a class action.
3      Q.  All right.  So with that in mind can you tell
4  me what your understanding is of a class action versus
5  an individual lawsuit?
6      A.  A class action contains a group, a class, more
7  than one individual.
8      Q.  Okay.  Is that sort of the limit of your
9  understanding of it, or do you have any further
10  detailed understanding of what a class action is?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.
13     Q.  When you say you don't remember, I am trying
14  to understand.  Did you know at one point in time and
15  not recall anymore?  Or did you ever know what a class
16  action was, beyond what you just described for me?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  I don't remember.
19     Q.  Did you do any research at the time that
20  either of these complaints were filed or before to
21  determine what a class action is?
22     A.  I don't remember.
23     Q.  What is your role in this class action?
24     A.  I'm a class representative.
25     Q.  Okay.  What is a class representative?

Page 40

S. STALEY

1
2      A.  I represent the class or group and I work in
3  tandem with my attorneys to move the case forward.
4      Q.  What is your authority, ma'am, with respect to
5  the allegations that are being made not only on your
6  behalf but on behalf of the absent class members, the
7  folks who are not here?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't understand the question.
10     Q.  Sure.  Let me see if you understand.  Do you
11  understand that a class action, whether a case becomes
12  a class action or not is ultimately determined by the
13  court?
14     A.  Yes.
15     Q.  And you understand that in this case that
16  hasn't happened yet?
17     A.  Yes.
18     Q.  Do you understand that it may happen, it may
19  not happen, right?
20     A.  I understand.
21     Q.  With respect to pursuing this to be a class
22  action, what, if any, do you understand your authority
23  to be with respect to the allegations made about all
24  of the absent class members?
25         ATTORNEY BRUSTEIN:  Objection.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
41—44

Page 41

1                    S. STALEY
2      Q. You can answer.
3      A. That's why I hired the attorneys.
4      Q. Okay. I understand that. Beyond hiring the
5  attorneys do you have any authority with respect to
6  the allegations that are made about the absent class
7  members?
8          ATTORNEY BRUSTEIN: Objection.
9      A. I don't understand the question.
10     Q. Well, you hired the lawyers, I get that,
11  right?
12     A. Yes.
13     Q. To represent you?
14     A. Yes.
15     Q. And you understand that allegations have been
16  made by you individually, correct?
17     A. I don't understand the question.
18     Q. Do you know what an allegation is in a
19  complaint?
20     A. I don't remember.
21     Q. You don't remember if you understand it? I am
22  asking if you understand what an allegation is in a
23  complaint. If you have an understanding.
24          ATTORNEY BRUSTEIN: Objection.
25     A. It's a claim against something.

Page 42

1                    S. STALEY
2      Q. Let's take a look at exhibit 6 for a quick
3  sec, okay? And you will see on the very second page
4  there's a heading that says Nature of the Action,
5  correct?
6      A. Yes.
7      Q. And then there's a bunch of different numbered
8  paragraphs that follow and continue on into the
9  hundreds going on in this document, correct?
10     A. Yes.
11     Q. All right. Have you ever heard the term
12  allegation used to describe what we have here, say on
13  page 2 with the numbered paragraphs?
14     A. I don't understand the question.
15     Q. The question is, do you see that there are
16  numbered paragraphs on page 2, right?
17     A. Yes.
18     Q. Okay. With respect to what you call those
19  paragraphs, have you ever heard the term allegation
20  used?
21     A. Yes.
22     Q. Okay. Do you understand that these numbered
23  paragraphs are each allegations that have been made by
24  you and on your behalf in this lawsuit?
25     A. Yes.

Page 43

1                    S. STALEY
2      Q. Okay. We're getting there. We talked before
3  about how there were allegations --
4      A. Yes.
5      Q. -- made about you individually. Right? In
6  this complaint?
7      A. The complaints are not only involving me.
8      Q. Yes. But you are among the plaintiffs?
9      A. I'm among them, yes.
10     Q. There are allegations about plaintiffs in this
11  lawsuit of which you are one, correct?
12     A. Yes.
13     Q. Okay. So those are allegations about you.
14  Maybe about others but are about you?
15     A. Yes.
16     Q. And you approved those allegations to be filed
17  on your behalf, right?
18     A. Yes.
19     Q. I want to know what authority you had or have
20  with respect to those allegations as they relate to
21  anybody other than you?
22          ATTORNEY BRUSTEIN: Objection.
23     A. I don't understand the question.
24     Q. Yeah, sure. You authorized --
25          ATTORNEY BRUSTEIN: I'm not asking to take a

Page 44

1                    S. STALEY
2  break right now but at a certain point when it makes
3  sense if we can, because it's been almost an hour.
4          ATTORNEY BOLAND: Sure. Let's see if we can
5  muddle through this point right here and then we'll
6  let you go.
7      Q. I want to understand, ma'am, there are
8  allegations in this complaint that relate to you but
9  relate to other plaintiffs who may be certified by a
10  court. Do you understand that?
11     A. Yes.
12     Q. Okay. And that's a lot of folks that are not
13  before the court now because the only people before
14  the court are you, Ms. Holmes and Ms. Ivey, right?
15     A. Yes.
16     Q. What authority, if any, do you have in the
17  allegations that are being made about those folks
18  other than you?
19          ATTORNEY BRUSTEIN: Objection.
20     A. I don't understand the question.
21     Q. Did you approve the allegations in the
22  complaint to the extent they relate, they intend to
23  relate to people other than you?
24          ATTORNEY BRUSTEIN: Objection.
25     A. I don't understand the question.



SELENA STALEY                                    April 11, 2023
STALEY V. FSR INTL.                                    45–48

Page 45

1                S. STALEY
2     Q. Okay. One of the things that you are seeking
3  in this case is no-fault separation pay, correct?
4     A. Yes.
5     Q. And that requires under the EmPact agreement
6  for you to either have been permanently laid off with
7  no right of recall or to have been terminated without
8  fault right?
9     A. Yes.
10    Q. And you are willing to have a court declare
11 that to be the case so that you can get that no-fault
12 separation pay, true?
13       ATTORNEY BRUSTEIN: Objection.
14    A. Yes.
15    Q. What authority do you believe you have with
16 respect to making that same decision for every other
17 person out there who might be in the same position as
18 you?
19       ATTORNEY BRUSTEIN: Objection.
20    A. I don't understand the question.
21       ATTORNEY BOLAND: We'll take a break.
22              ---
23       (Recess from 11:04 to 11:14.)
24              ---
25    Q. Prior to this lawsuit had you ever been

Page 46

1                S. STALEY
2  involved in a lawsuit before?
3       ATTORNEY BRUSTEIN: Objection.
4     A. No.
5     Q. You've never sued anybody or been sued by
6  anybody?
7       ATTORNEY BRUSTEIN: Objection.
8     A. I don't remember.
9     Q. Let me make it a little bit sharper. You
10 understand that you're a plaintiff in this case,
11 right?
12    A. Yes.
13    Q. And you understand that folks like my clients,
14 Hotel 57 Services, LLC, Mr. Warner and whatnot are
15 defendants, do you understand that?
16    A. Yes.
17    Q. Okay. Prior to this lawsuit have you ever
18 been a plaintiff or a defendant in a case?
19       ATTORNEY BRUSTEIN: Objection.
20    A. I don't remember.
21    Q. So to your recollection this is the first
22 lawsuit that you ever had filed on your behalf?
23       ATTORNEY BRUSTEIN: Objection.
24    A. Yes.
25    Q. Okay. And you understood that this one was

Page 47

1                S. STALEY
2  being filed to become, hopefully to become a class
3  action from your perspective, correct?
4     A. Yes.
5     Q. What, if anything, have you done to educate
6  yourself about your responsibilities as a class
7  representative in a class action?
8     A. I've consulted with my attorneys.
9     Q. I don't want to know anything that you talked
10 about with them, but we'll say that that's one thing
11 you've done. What else have you done if anything to
12 educate yourself about your responsibilities as a
13 class representative?
14    A. I don't understand the question.
15    Q. Do you understand yourself to have any
16 responsibilities as a class representative, should a
17 class action be certified by the court?
18    A. Yes. And as a class representative I
19 represent the group. I work with my lawyers in tandem
20 to move the case forward. Any documents, like amended
21 complaint I will read. Any documents.
22    Q. And you understand, ma'am, that there are
23 legal claims for relief that you have asserted against
24 the defendants in this case, right?
25    A. Could you repeat the question?

Page 48

1                S. STALEY
2     Q. Yeah, sure. You understand that you have
3  asserted a claim against the defendants, a cause of
4  action against the defendants in this case for it
5  allegedly violating the WARN Act?
6     A. Yes.
7     Q. You understand that you have asserted a claim
8  against the defendants in this case for allegedly
9  breaching the EmPact agreement, right?
10    A. Yes.
11    Q. Those are the types of things I'm saying "the
12 claim." A claim for violating the WARN Act. A claim
13 for breaching the contract. Okay?
14    A. Yes.
15    Q. What authority, if any, do you have to decide
16 whether to add claims, change claims or drop claims in
17 this case?
18       ATTORNEY BRUSTEIN: Objection.
19    A. That's what I hired my attorneys for.
20    Q. Sure. But your attorneys are acting on your
21 behalf, are they not?
22    A. Yes.
23    Q. Okay. And ultimately you are the plaintiff
24 who controls the case, are you not?
25    A. That is determined by the judge.



Page 49
S. STALEY

1
2     Q.  Okay.  Let's assume that no class is
3  certified.  Are you the plaintiff who controls the
4  case as respect to yourself; yes or no?
5         ATTORNEY BRUSTEIN:  Objection.
6     A.  That's not a yes or no.
7     Q.  Okay.  Then answer however you like.  I
8  apologize.
9     A.  Could you repeat the question?
10     Q.  Sure.  Let's assume no class is certified in
11  this case, and it's just you and Ms. Holmes and
12  Ms. Ivey suing at the end.  Do you understand that you
13  are the person who controls the claims that are being
14  asserted on your behalf?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  That's what I hired the attorneys for.
17     Q.  I understand.  Do you give the attorneys
18  instructions as to how to proceed in asserting claims
19  on your behalf?  That's just a yes or no question.  I
20  don't want to know the instructions.
21         ATTORNEY BRUSTEIN:  Objection.
22     A.  I don't understand the question.
23     Q.  Okay.  What authority do you have to settle
24  this case?
25     A.  That's what the judge determines.

Page 50
S. STALEY

1
2     Q.  Let's assume that the class is not certified,
3  there's no class, the judge decides there should be no
4  class.  What authority do you have to settle your own
5  claims?
6         ATTORNEY BRUSTEIN:  Objection.
7     A.  I don't understand what you are asking me.
8     Q.  Do you have an understanding of what a
9  settlement is as opposed to taking a case to trial and
10  all the way to a verdict?
11     A.  I don't remember.
12     Q.  Do you understand that lawsuits can settle
13  versus go all of the way to a trial and a verdict?
14     A.  Yes.  It can.
15     Q.  So what's your understanding of what a
16  settlement is?
17     A.  I don't remember.
18     Q.  When you say you don't remember does that mean
19  you knew at one point what a settlement was and you
20  don't recall it today, or you never knew what a
21  settlement of a lawsuit was?
22     A.  I don't remember -- I don't recall it today.
23  I don't remember.
24     Q.  So there was a time, am I right, and I want to
25  be fair to you so tell me if I am wrong, there was a

Page 51
S. STALEY

1
2  time when you knew what it meant to settle a lawsuit,
3  you just don't remember today, is that your testimony?
4     A.  I don't remember.
5     Q.  What authority, if any, do you have to settle
6  this case or at least to -- what authority, if any, do
7  you have to settle this case if a class is certified?
8     A.  That is determined by the judge.
9     Q.  And what's your basis for saying that --
10  strike that.  What is determined by the judge?
11     A.  How any case would settle or would end.
12     Q.  So if no class is certified is it your
13  understanding that the judge decides how it gets
14  settled, if it's not going to be tried?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  I don't understand the question.
17     Q.  Okay.  What lawyers are representing you in
18  this lawsuit?
19     A.  Evan Brustein, Maya Risman, Brian Bromberg.
20     Q.  All right.  How did you go about picking --
21  well, strike that.
22         Were these lawyers all engaged to represent
23  you at the same time or were they engaged at different
24  times?
25     A.  They were engaged at different times.

Page 52
S. STALEY

1
2     Q.  And did you do the engagement?  Did you engage
3  these lawyers personally?
4     A.  It was --
5         ATTORNEY BRUSTEIN:  Objection.
6     A.  It was recommended by a friend.
7     Q.  Who?
8     A.  We're no longer in touch.  We're no longer
9  friends.
10     Q.  Okay.  What's the person's name?
11     A.  At this time, it's been a while, I don't
12  remember.
13     Q.  So I just want to be clear.  You -- strike
14  that.  When you say the lawyers were recommended,
15  which of the lawyers were recommended by the friend?
16     A.  Evan Brustein.
17     Q.  Okay.
18     A.  And Maya Risman.
19     Q.  And when did the friend recommend those
20  lawyers to you?
21     A.  It would be about three years ago.
22     Q.  It so 2020?
23     A.  That's fair.
24     Q.  When in 2020?
25     A.  I don't remember the exact date or time.  But



SELENA STALEY                                  April 11, 2023
STALEY V. FSR INTL.                            53–56

Page 53
S. STALEY
1  it was in 2020.
2  
3  Q.  What were the circumstances that led you to
4  having -- strike that.
5      Was this recommendation made in an oral
6  discussion either in person or by phone or by some
7  other means?
8  A.  It was by phone.
9  Q.  By phone.  What were the circumstances that
10 led to the subject of here's a lawyer you might like
11 come up?  What circumstances led to that?
12 A.  Actually on June 25 of 2021 on that Zoom call
13 it had just become apparent that the hotel was not
14 reopening.
15 Q.  Okay.  And was that the circumstance that --
16 A.  That was the circumstance.  Sorry.
17 Q.  You have to let me finish.  That's okay.  I do
18 it too.  That was the circumstance that led to the
19 subject of hiring a lawyer coming up?
20 A.  Yes.
21 Q.  So that was 2021.  Now you had said that the
22 conversation took place three years ago?
23 A.  Mm-hmm.
24 Q.  Would it be after June of 2021 that the
25 conversation took place?

Page 54
S. STALEY
1  
2  A.  Yes.
3  Q.  Okay.  And was it just one conversation or did
4  you have several conversations with the person about
5  recommending lawyers?
6  A.  It was just one conversation.
7  Q.  Was the person male or female?
8  A.  Female.
9  Q.  It's your testimony here that you cannot in
10 any way or shape remember that person's name, is that
11 accurate?
12 A.  That's accurate.
13 Q.  What experience did you understand that person
14 to have had with the lawyers that she recommended?
15 A.  Someone recommended them to her.
16 Q.  And did she tell you what they recommended
17 them to her for?
18 A.  That they would be good attorneys.
19 Q.  For what purpose, though?
20 A.  For the situation I was in.
21 Q.  Okay.  So I want to make sure I understand the
22 logistics here.  Did you reach out to this other
23 person to ask for recommendations for a lawyer or
24 lawyers to help you in the situation in which you
25 found yourself after June 25 of 2021?

Page 55
S. STALEY
1  
2  A.  She reached out to me.
3  Q.  Okay.  To your understanding what prompted her
4  to reach out to you?
5  A.  She had been in a similar situation.
6  Q.  Where?
7  A.  I don't know her previous employment.
8  Q.  What was the similar situation?
9  A.  That she worked with a job and they were
10 unfair to her and her friend and her had hired
11 attorneys.
12 Q.  Okay.  When they hired the attorneys was that
13 to represent them individually or to represent a class
14 in a class action?
15 A.  She didn't go into the details of it.
16 Q.  Did you ask?
17 A.  I did not.
18 Q.  How many conversations did you have with this
19 person?
20    ATTORNEY BRUSTEIN:  Objection.
21 A.  I had --
22 Q.  About this topic?
23 A.  Just the one.
24 Q.  Just the one, okay.  And what did you do next
25 in terms of engaging a lawyer?

Page 56
S. STALEY
1  
2  A.  I actually called.
3  Q.  You called?
4  A.  The attorneys.  I called Evan.
5  Q.  Okay.
6  A.  And Maya.
7  Q.  And after that you made a determination -- did
8  you make a determination to engage them to represent
9  you in connection with the situation that you found
10 yourself in after June of 2021?
11 A.  Yes.
12 Q.  When did you contact them?
13 A.  Sometime after June 25, 2021.
14 Q.  Well, if you take a look at exhibit 5, ma'am.
15 I want to go to the first one for a sec.  You'll see
16 at the very top of that there is sort of a pre-printed
17 line, I thinking if you've got color it's in blue,
18 case 1:22?
19 A.  Yes.
20 Q.  I will represent to you that that is something
21 generated by the court's filing system?
22 A.  Yes.
23 Q.  And you'll see the date of when this document
24 being filed was August 9 of 2022, right?
25 A.  Yes.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
57–60

Page 57
S. STALEY

1
2    Q. Using that as a reference point, how long in
3  advance of that did you contact Mr. Brustein and
4  Ms. Risman to represent you in connection with the
5  situation that you found yourself?
6    A. I was referring to this first amended
7  complaint when I ...
8    Q. Okay. So if you take a look at the first
9  amended complaint, ma'am. You have it right in front
10  of you as exhibit 6 of, correct?
11    A. Yes.
12    Q. You'll see there's that same court generated
13  printout up at the top, correct?
14    A. Yes.
15    Q. And the file date on that is what date?
16    A. 12/19/22.
17    Q. Which is after the first date of August 9,
18  2022, right?
19    A. Yes.
20    Q. So the lawsuit was commenced in August of
21  2022, correct?
22    A. Yes.
23    Q. Okay. And I take it that you contacted
24  lawyers to represent you in connection with this
25  lawsuit before it was filed?

Page 58
S. STALEY

1
2    A. Yes.
3    Q. All right. What I want to know is how far in
4  advance of August 9, 2022 did you first contact
5  Mr. Brustein and Ms. Risman to represent you?
6    ATTORNEY BRUSTEIN: Objection.
7    A. I don't remember.
8    Q. Well, and the reason I say this is you talked
9  about the meeting on June 25, 2021 and after that you
10  had the conversation with your friend who recommended
11  the lawyers, fair?
12    A. Yes.
13    Q. Okay. That's June of 2021 and then we have
14  over a year between then and the time the complaint is
15  filed, the first one. Correct?
16    A. Yes.
17    Q. What I want to understand is when in that time
18  period did you decide to engage lawyers to file the
19  lawsuit on your behalf?
20    ATTORNEY BRUSTEIN: Objection.
21    A. I don't remember.
22    Q. Well, was it more than a year before you
23  filed?
24    ATTORNEY BRUSTEIN: Objection.
25    A. I don't remember.

Page 59
S. STALEY

1
2    Q. Did you enter into any written fee agreements
3  with any of your lawyers?
4    ATTORNEY BRUSTEIN: Objection.
5    A. I don't remember.
6    Q. Well, did you sign on the dotted line to say
7  yes, I'm hiring you, I'm engaging you, something in
8  writing that you signed?
9    A. After June 25, 2021? Is that what we're
10  referring to?
11    Q. At the time, any time after you decided to
12  engage your lawyers did you enter into any kind of
13  written engagement letter, fee retainer, fee letter,
14  anything like that with your lawyers?
15    A. After June 25?
16    ATTORNEY BRUSTEIN: Objection.
17    Q. Let's see if we can set some things up. Okay?
18  You had the conversation with your friend who
19  recommended Mr. Brustein and Ms. Risman to you after
20  June 25, 2021, right?
21    A. Yes.
22    Q. So I take it you didn't reach out to them and
23  engage them before then, correct?
24    A. I don't understand the question.
25    Q. You did not reach out to Mr. Brustein or

Page 60
S. STALEY

1
2  Ms. Risman to engage them before you had that
3  conversation with your friend when she recommended
4  them?
5    A. I don't remember.
6    Q. All right. So let's see if we can set up a
7  timeline. Okay?
8    A. Okay.
9    Q. There was the meeting on June 25, 2021, right?
10    A. Yes.
11    Q. After that meeting you had the conversation
12  with your friend where she mentioned and brought to
13  your attention Mr. Brustein and Ms. Risman, correct?
14    A. Yes.
15    Q. Before that time period you hadn't talked to
16  Mr. Brustein or Ms. Risman about filing something on
17  your behalf, had you?
18    A. Yes.
19    Q. You talked to them before your friend
20  recommended them to you?
21    A. Yes.
22    Q. When did you first talk to Mr. Brustein and
23  Ms. Risman?
24    A. I don't remember.
25    Q. But it was definitely before June 25 of 2021?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
61—64

Page 61

S. STALEY

1
2    A.  Yes.
3        ATTORNEY BRUSTEIN:  Objection.
4    Q.  How long before June 25 of 2021?
5    A.  I don't remember.
6    Q.  And when your friend recommended -- so how did
7  you learn of Mr. Brustein and Ms. Risman before you
8  had the conversation with your friend where she
9  recommended them?
10   A.  I don't remember.
11       ATTORNEY BRUSTEIN:  Can we take a two-minute
12  break?
13       ATTORNEY BOLAND:  Seriously?
14       ATTORNEY BRUSTEIN:  You can keep asking
15  questions.
16       ATTORNEY BOLAND:  I mean if you need a break
17  you could take a break, I'm not stopping you from
18  taking a break.  But it's only been like a couple of
19  minutes since we were on break.
20       ATTORNEY BRUSTEIN:  You can keep going.
21   Q.  What I am trying to figure out, ma'am, to be
22  absolutely fair with you, is how you came to select
23  these lawyers to represent you in this lawsuit,
24  correct?  Do you understand that?
25   A.  Yes.

Page 62

S. STALEY

1
2    Q.  All right.  So the first thing I want to know
3  is you how you learned their names?
4    A.  From my friend.
5    Q.  Okay.  And I thought you told me that that
6  conversation with your friend where you learned their
7  names was after June 25, 2021?
8    A.  Yes.
9    Q.  Okay.  Got it.  All right.  And until your
10  friend mentioned these lawyers to you, you didn't know
11  who they were, did you?
12   A.  I don't remember.
13   Q.  Are you still thinking or are you finished?
14   A.  I'm finished.
15   Q.  Okay.  At the time that the names of
16  Mr. Brustein and Ms. Risman were mentioned to you
17  after June 25 2021 I take it you reached out to
18  them, is that fair?
19   A.  Yes.
20   Q.  You can't remember how long after their names
21  were mentioned you reached out to them, correct?
22   A.  Correct.
23   Q.  At some point, though, after you reached out
24  to them you decided to retain them to represent you in
25  connection with this lawsuit, right?

Page 63

S. STALEY

1
2    A.  Yes.
3    Q.  Did you enter into any kind of a written
4  engagement letter with either Mr. Brustein, his firm
5  or Ms. Risman or her firm?
6    A.  Yes.
7    Q.  How many engagement letters did you enter
8  into?
9    A.  I don't remember.
10   Q.  But you have a written engagement letter,
11  correct?
12   A.  Yes.
13   Q.  All right.  Prior to engaging Mr. Brustein and
14  Ms. Risman to represent you what, if anything, did you
15  do to investigate their backgrounds, qualifications,
16  their experience, that kind of thing?
17   A.  I actually talked with Vivian and Olive.
18   Q.  Okay.
19   A.  And we discussed it together.
20   Q.  All right.  So you had conversation or more
21  than one conversations with Vivian and Olive about the
22  lawyers?
23   A.  Mm-hmm.
24   Q.  You have to say yes.
25   A.  Yes.  I apologize.

Page 64

S. STALEY

1
2    Q.  That's okay.  Did that include their
3  background, experience, that kind of thing?
4    A.  Yes.
5    Q.  And what did Vivian tell you about the
6  lawyers' background and their experience?
7    A.  I don't remember the exact words but she did
8  some research online.
9    Q.  What did she tell you -- other than that she
10  had done some research online did Vivian tell you
11  anything else about the lawyers' background or
12  experience?
13   A.  That they were good attorneys.  That they
14  were ...
15   Q.  Okay.  What did Olive tell you if anything
16  about the lawyers' background or experience?
17   A.  That she agreed with what Vivian had
18  researched.
19   Q.  And other than talking to Vivian and Olive
20  what, if any, investigation or research into the
21  lawyers and their background and experience did you
22  do?
23   A.  That was my research.  Meeting with Vivian and
24  Olive.
25   Q.  What did you learn about Mr. Brustein or



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
65–68

Page 65

1                         S. STALEY
2  Ms. Risman's experience in class actions?
3      A. I don't understand the question.
4      Q. Sure.  You understand that this case is not
5  brought as just an individual lawsuit but brought to
6  be a class action, right?
7      A. Yes.
8      Q. What, if anything, did you learn about either
9  Mr. Brustein's or Ms. Risman's experience in being
10 lawyers in class actions?
11     A. I don't understand the question.
12     Q. Did you understand Mr. Brustein or Ms. Risman
13 to have ever served as plaintiffs' counsel in a class
14 action?
15     A. I don't remember.
16     Q. Did you do anything to find out whether they
17 had served as plaintiffs counsel in a class action?
18     A. Just sitting down and speaking with Olive and
19 Vivian.
20     Q. What did Olive tell you, if anything, about
21 Mr. Brustein or Ms. Risman's experience as plaintiffs'
22 counsel in class actions?
23     A. It was actually Vivian, Vivian said that they
24 were good attorneys.
25     Q. Good attorneys?  I am talking specifically,

Page 66

1                         S. STALEY
2  though, ma'am, about experience as plaintiffs' counsel
3  in class actions.
4         Did Vivian mention that topic at all?
5      A. She just stated that they would be good for
6  our circumstance, what we were involved in.
7      Q. Did she say anything specifically about class
8  actions?
9      A. Not that I can remember.
10     Q. How about Olive?
11     A. Not that I can remember.
12     Q. And other than that conversation, you didn't
13 do any investigation into the background or experience
14 of the lawyers, right?
15        ATTORNEY BRUSTEIN:  Objection.
16     A. I did, when I sat and talked with my
17 colleagues.
18     Q. I said other than that conversation you didn't
19 do any investigation yourself into the background or
20 experience of the lawyers?
21     A. That was my investigation with the background.
22     Q. Other than that investigation that was your
23 conversation, you did nothing, correct?
24        ATTORNEY BRUSTEIN:  Objection.
25     A. That was my research.

Page 67

1                         S. STALEY
2      Q. Okay.  Any other lawyers representing you in
3  this case?
4      A. Yes.
5      Q. Who?
6      A. Brian Bromberg.
7      Q. And when did you retain Mr. Bromberg?
8      A. Recently.
9      Q. When you say recently, can you give me a
10 ballpark of when?
11     A. Probably a month and a half ago.
12     Q. What prompted you to retain an additional
13 lawyer to represent you in this case?
14     A. That was recommended by my attorneys, Maya and
15 Evan.
16     Q. Why did you decide to add another lawyer?
17     A. At the advice of my attorneys, that was their
18 recommendation.
19     Q. Okay.  But why?  Why was another lawyer added,
20 other than they advised you?  Do you have any
21 understanding as to why another lawyer was added?
22     A. Because he has experience in class action
23 suits.
24     Q. What investigation did you do to determine
25 Mr. Bromberg's experience with class actions?

Page 68

1                         S. STALEY
2      A. By consulting my attorneys.
3      Q. Okay.  Other than consulting your attorneys
4  did you do any investigation to determine
5  Mr. Bromberg's experience with class actions?
6      A. By speaking with my attorneys.
7      Q. Yes.  I'm saying let's leave that aside.  I
8  understand you did that.  Did you do anything else?
9      A. I don't remember.
10     Q. Did you enter into a written engagement
11 document, letter, something like that with
12 Mr. Bromberg?
13     A. Yes.
14     Q. And you signed that?
15     A. Yes.
16     Q. Do you have copies of all of those things?
17        ATTORNEY BRUSTEIN:  Objection.
18     Q. The engagement letters that you executed?
19     A. (No response.)
20     Q. You don't understand my question, do you?
21     A. I don't.
22     Q. Just tell me that.  I'm always happy to
23 rephrase it.
24     A. I don't understand the question.
25     Q. You had testified that you entered into a



Page 69
S. STALEY
1
2  written engagement letter -- strike that.  How many
3  written engagement letters with your lawyers do you
4  have?
5      A.  I don't remember.
6      Q.  Do you have them at home?
7      A.  I don't understand the question.
8      Q.  Do you have copies of the engagement letters
9  that you entered into with your lawyers?
10     A.  Yes.
11     Q.  Okay.  Where do you store those?
12     A.  On my computer.
13     Q.  Okay.  And I want to know, do you have one?
14 Do you have two?  Do you have three?  Do you have
15 more?  How many written engagement agreements are
16 there?
17     ATTORNEY BRUSTEIN:  Objection.
18     A.  I don't remember.
19     Q.  Are they different, or are they all the same?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't remember.
22     Q.  Do you have any role in allocating the work or
23 whatever amongst your various lawyers, or do they do
24  that and on their own?
25     ATTORNEY BRUSTEIN:  Objection.

Page 70
S. STALEY
1
2      A.  I don't understand the question.
3      Q.  Do your engagement letters, this is a yes or
4  no question, address your responsibility for paying
5  any costs or attorneys' fees --
6      (Telephonic interruption.)
7      ATTORNEY BOLAND:  I'm so sorry.
8      Q.  -- of paying any cost or attorneys fees
9  incurred by the lawyers in this case?
10     A.  That would be determined by the judge.
11     Q.  Well, no.  I want to know, are you paying your
12 lawyers or are they working on a contingency basis?
13     ATTORNEY BRUSTEIN:  Objection.
14     A.  I don't understand the question.
15     Q.  Okay.  Have you known anyone who has had to
16 hire a lawyer to do a real estate closing or anything
17 like that?
18     A.  No.
19     Q.  Do you understand that lawyers often charge a
20 fee for their services?
21     A.  I believe so.
22     Q.  Sometimes by the hour?  Sometimes by the
23 project, right?
24     A.  I believe so.
25     Q.  Okay.  Do you have any responsibility for

Page 71
S. STALEY
1
2  paying the attorneys' fees of your lawyers in this
3  lawsuit?
4      ATTORNEY BRUSTEIN:  Objection.
5      A.  That's determined by the judge.
6      Q.  No, I am asking you, ma'am.  As you sit here
7  right now do you understand yourself to have any
8  responsibility for paying the lawyers attorneys' fees?
9      A.  I don't know.
10     Q.  I am going to tell you that there are things
11 that -- strike that.  Do you have an understanding
12 that it cost money to file a lawsuit?  You have to pay
13 a filing fee?
14     A.  I don't know.
15     Q.  Do you have an understanding that we've got a
16 lovely court reporter here who is taking down all of
17 the things that you are saying in this deposition,
18 right?
19     A.  Yes.
20     Q.  Do you think he's doing it for free?
21     A.  No.
22     Q.  Do you have an understanding that if your
23 folks, the plaintiffs want to get a copy of that
24 transcript they're going to have to pay him?
25     A.  Yes.

Page 72
S. STALEY
1
2      Q.  Okay.  I am going to call that a cost.  Okay?
3      A.  Yes.
4      Q.  Do you have any responsibility for paying any
5  of the costs associated with the lawsuit that's been
6  brought on your behalf, to your understanding?
7      A.  To my understanding, that's determined by the
8  judge.
9      Q.  Okay.  You want to serve as the representative
10 of a class action, right, of a class -- strike that.
11     You want to serve as a class representative,
12 correct?
13     A.  Yes.
14     Q.  Okay.  Do you understand that there may be
15 costs associated with providing notice to all of the
16 people who might be caught up in that class action,
17 all of the other plaintiffs?
18     A.  To my understanding that's something the judge
19 will determine.
20     Q.  What is the basis for your understanding that
21 the judge determines things like that or any of the
22 other things that you've cited that the judge
23 determines?
24     A.  Because the judge makes the determination on
25 any -- on a case.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
73–76

Page 73

S. STALEY

1
2    Q.  Okay.  As you sit here today, ma'am, are you
3    willing to accept any financial responsibility for
4    costs or attorneys' fees in connection with this
5    lawsuit?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't know.
8        Q.  Well, let me ask you a question, ma'am.  If
9    you lose and you have to pay costs of the Warner
10   defendants for, you know, getting deposition
11   transcripts, for filing fees, for things like that,
12   are you willing to pay those?
13       ATTORNEY BRUSTEIN:  Objection.
14   A.  I don't know.
15       Q.  You don't know whether you are willing to pay
16   them?
17   A.  I don't know.
18       Q.  Do you have any understanding as to whether
19   you might be liable for costs for bringing this
20   lawsuit, if in fact you lose?
21       ATTORNEY BRUSTEIN:  Objection.
22   A.  I don't know.
23       Q.  Do you have any understanding of whether there
24   might be circumstances where you could be liable for
25   attorneys' fees on the other side, depending on what

Page 74

S. STALEY

1
2    happens in the lawsuit?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't know.
5        Q.  Are you willing to accept responsibility if
6    it's found that you are liable for the Warner
7    defendants attorneys fees in some fashion?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't know.
10       ATTORNEY BRUSTEIN:  Can we take a ten second
11   break?
12       ATTORNEY BOLAND:  We could take a break.
13       ATTORNEY BRUSTEIN:  I just want to get a water
14   bottle.
15       ATTORNEY BOLAND:  We could take an official
16   break.
17       ATTORNEY BRUSTEIN:  Thank you.
18           ---
19       (Recess from 11:46 to 12:00.)
20           ---
21   Q.  I had asked you a bit before about --
22       ATTORNEY BRUSTEIN:  I'm sorry.  She just
23   wanted to correct one answer.
24       ATTORNEY BOLAND:  Sure.
25       ATTORNEY BRUSTEIN:  I apologize.

Page 75

S. STALEY

1
2    A.  I was in a car accident.
3    Q.  Oh.
4    A.  And that was about 25 years ago.  And there
5    was -- I forgot, there was a lawsuit.
6        Q.  There was a lawsuit?
7    A.  Yes.
8        Q.  Were you the plaintiff in that lawsuit suing
9    the person who whacked you?
10   A.  Yes.
11       Q.  Other than in that lawsuit was there a
12   complaint that was filed on your behalf, something
13   similar to what we have in exhibits 5 and 6?
14       ATTORNEY BRUSTEIN:  Objection.
15   A.  Yes.
16       Q.  So you were familiar with what a complaint was
17   from a long timing ago?
18   A.  A long time ago.
19       Q.  And I take it during that time period you
20   didn't have a lot of experience with lawsuits, is that
21   fair?
22   A.  That's fair.
23       Q.  Did you have an understanding though from that
24   experience with the lawsuit that was filed on your
25   behalf 25 years ago, that it was important as a

Page 76

S. STALEY

1
2    plaintiff for the things that are said in the lawsuit
3    that's filed on your behalf to be true and correct?
4    A.  Yes.
5        Q.  And when you reviewed exhibits 5 and 6 before
6    they were filed did you take care to ensure that the
7    allegations that were about you were true and correct?
8    A.  Can you explain, what do you mean the
9    allegations were true?
10       Q.  Of course I can.  Let's look at --
11       ATTORNEY BRUSTEIN:  Are we in 5 or 6?
12       ATTORNEY BOLAND:  We can do 6.  That's
13   probably easier, since that's the one that she's
14   looked at.
15       Q.  Just take a look, ma'am, if you would, at page
16   5.  If you take a look, there's an allegation in
17   paragraph number 22.  Right?  Do you see where I'm
18   referring to?
19   A.  Yes.
20       Q.  And you'll see it says:  Defendants also
21   failed to provide plaintiffs as well as other's
22   similarly situated and terminated from their
23   employment at that time, and it goes on and on?
24   A.  Yes.
25       Q.  Do you see that?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
77–80

Page 77

1                    S. STALEY
2       A. Yes.
3       Q. Do you understand that "plaintiffs" as used in
4    that allegation refers to, among others, you?
5       A. Yes.
6       Q. Okay. And that's what I am trying to figure
7    out. Did you take care, when you reviewed exhibits 5
8    and 6 before they were filed, to make sure that the
9    allegations such as the one we just looked at in
10   paragraph 22 were true and correct as they related to
11   you?
12      A. From my understanding, plaintiffs is not just
13   me. I represent a class. So it's a group.
14      Q. Fair enough. You understand it represents a
15   class. You're a member, right?
16      A. Yes.
17      Q. And in this term, "plaintiffs" as it's used
18   here, may relate to people other than you, right?
19      A. Yes.
20      Q. But it also relates to you personally,
21   correct?
22      A. As plaintiffs we're all in it together.
23      Q. What I am asking though, is that this is an
24   allegation saying defendants also failed to provide
25   plaintiffs. That includes you, right?

Page 78

1                    S. STALEY
2       A. And the class.
3       Q. It includes you, correct?
4       A. Yes. And the class.
5       Q. Okay. Well, it says as well as others
6    similarly situated. What does that mean?
7          ATTORNEY BRUSTEIN: Objection.
8       A. I don't understand the question.
9       Q. Okay. What do the words "as well as others
10   similarly situated" in the first sentence of paragraph
11   22 mean?
12      A. The class.
13      Q. Okay. And then the plaintiffs that we see
14   here are you, Ms. Ivey and Ms. Holmes, correct?
15      A. Correct.
16      Q. And in fact if you look at the very first page
17   of exhibit 6, and take a look at the very first
18   sentence.
19      A. Yes.
20      Q. And it says: Plaintiffs Selena Staley, Vivian
21   Holmes, and Olive Ivey, and then there's a
22   parenthetical, right, after that? Correct?
23      A. Yes.
24      Q. And it says Hereinafter referred to
25   collectively as, quote, "Plaintiffs", closed quote,

Page 79

1                    S. STALEY
2    with a capital P, right?
3       A. Yes.
4       Q. So you understand that when that person
5    "Plaintiffs" capital P is used in the complaint, it's
6    referring to you, Ms. Holmes and Ms. Ivey, right?
7       A. Yes.
8       Q. Okay. So what I want to understand is when
9    you came across an allegation such as the one in
10   paragraph 22, did you take care to make sure that that
11   was true, at least as it related to you?
12      A. Can you clarify what you mean to take care?
13      Q. In other words be careful, look at it
14   carefully to make sure yeah, that's true, at least as
15   it relates to me? Did you do that?
16      A. I don't understand the question.
17      Q. Okay. You wouldn't want the complaint to be
18   alleging something about you that was false, would
19   you?
20      A. No.
21      Q. Do you understand that if a complaint is
22   alleging something about you that's false, that courts
23   might not like that and might sanction you?
24         ATTORNEY BRUSTEIN: Objection.
25      A. I don't understand the question.

Page 80

1                    S. STALEY
2       Q. Do you understand that in a complaint you're
3    supposed to tell the truth about yourself?
4          ATTORNEY BRUSTEIN: Objection.
5       A. Yes.
6       Q. Okay. That's what I want to do. I want to
7    find out if you were careful when you read exhibits 5
8    and 6 before they were filed to be sure that any
9    allegation that related to you in some way was true?
10         ATTORNEY BRUSTEIN: Objection.
11      A. I don't know ...
12      Q. You don't know whether you reviewed the
13   complaint to make sure that it was true or you don't
14   understand my question?
15      A. I don't understand your question.
16      Q. Okay. Did you understand -- I'm trying to
17   find a different way to phrase it for you, ma'am.
18         Were you careful at all when you were
19   reviewing the complaint to make sure there wasn't a
20   statement about you as one of the plaintiffs that at
21   least as it related to you, was not false?
22         ATTORNEY BRUSTEIN: Objection.
23      A. I don't understand the question.
24      Q. Okay. You live in New York, right?
25      A. Yes.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
81–84

Page 81

S. STALEY

1
2    Q.  Okay.  If the complaint said plaintiffs,
3    meaning Ms. Holmes, Ms. Ivey and you, all reside in
4    New York, that would be an allegation about you as
5    well as others, right?
6    A.  Yes.
7    Q.  Okay.  And that would be a true allegation,
8    wouldn't it, at least as it relates to you?
9    A.  Yes.
10   Q.  Okay.  If the allegation said plaintiffs live
11   in New Jersey, at least as it relates to you, that
12   would be false, right?
13   A.  Yes.
14   Q.  Okay.  That's what I want to get that idea.
15       When you reviewed the complaint, did you make
16   sure that the allegations about you were true?
17   A.  But the allegations are not only about me.
18   Q.  I just want to know the allegations about you.
19   I want to know the allegations where you're one of the
20   plaintiffs.
21       Did you make sure that they were true, at
22   least as they were related to you?
23   A.  I don't understand the question.
24   Q.  Okay.  Did you do anything to ensure that the
25   allegations of the complaint in general were true?

Page 82

S. STALEY

1
2    A.  I don't understand the question.
3    Q.  Did you do anything to make sure that there
4    weren't any allegations in the complaint that were
5    lies?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  Can you explain, that I did anything?  I'm not
8    understanding that question.
9    Q.  Yeah.  You read the complaint, right?
10   A.  I read it.
11   Q.  Okay.  When you were reading it did you make
12   sure that anything that was said about you was true?
13   A.  I don't understand the question.
14   Q.  Okay.  I want to get your familiarity with
15   what's going on in the case.
16       Do you receive copies of -- well, strike that.
17       You see the complaint that we have in front of
18   you as exhibit 6, right?
19   A.  Yes.
20   Q.  Have you ever heard the term "pleading"?  A
21   pleading?
22   A.  Like a person pleading?
23   Q.  No.  In other words has anyone used the term
24   pleading in court, like what is a pleading that is
25   filed with the court?

Page 83

S. STALEY

1
2    A.  I'm not familiar.
3    Q.  Okay.  What do you understand exhibit -- well
4    strike that.  Do you understand exhibit 6 to have
5    actually been placed on file with the court?
6    A.  Yes.
7    Q.  Okay.  Do you have an understanding or is
8    there a term that you have heard used for those
9    things, the things that have actually been filed with
10   the court?
11   A.  It's been filed.
12   Q.  Okay.  Can we call them filings?
13   A.  Yes.
14   Q.  Okay.  Do you receive copies of filings that
15   are made in this case?
16       ATTORNEY BRUSTEIN:  Objection.
17   A.  The amended complaint.
18   Q.  Okay.  And then we have the original
19   complaint, right?
20   A.  Correct.
21   Q.  Those are filings that were made, right?
22   A.  Correct.
23   Q.  Did you receive copies of both?
24   A.  Yes.
25   Q.  Do you receive copies of other filings that

Page 84

S. STALEY

1
2    have been made in the case?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't remember.
5    Q.  All right.  Let's take a look at some.
6        (Exhibit 7, Notice of Motion to Compel
7    Arbitration and Dismiss Class Claims and Stay Action,
8    Memorandum of Law in Support was previously marked for
9    identification.)
10   Q.  I am handing you what has been marked as
11   exhibit 7 which for the record is document 27.  Well
12   it's already in the record actually from the last
13   deposition.  You'll see, ma'am, this is two documents.
14   The first one is I think two pages.  The second one
15   begins on the third page.
16   A.  Yes.
17   Q.  Looking up at that filing stamp at the top,
18   the first one is Document 27?
19   A.  Yes.
20   Q.  All right.  And then the next one two pages
21   later is Document 31?
22   A.  Yes.
23   Q.  Okay.  And this is a notice of motion to
24   compel arbitration, and so forth and then a memorandum
25   of law in support.  Correct?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
85–88

Page 85

1                    S. STALEY
2       A.  Yes.
3       Q.  All right.  Have you ever seen exhibit 7
4    before?
5       A.  Yes.
6       Q.  When?
7       A.  I don't remember.
8       Q.  Did you receive a copy of it?
9       A.  Yes.
10      Q.  When you received a copy of it did you read
11   it?
12      A.  I read through it.
13      Q.  I want to know in what level of detail.  Do
14   you have a way that you approach these?  Do you read
15   them word for word very carefully?  Do you look
16   through them?
17      A.  I skimmed through it.
18      Q.  And did you have an understanding in this
19   lawsuit that the defendants, at least the Warner
20   defendants on my side, that's what I am going to talk
21   about right now, believe that this case should not be
22   in court but rather should be in arbitration?
23         ATTORNEY BRUSTEIN:  Objection.
24      A.  I don't understand the question.
25      Q.  Do you understand we're in a lawsuit that's in

Page 86

1                    S. STALEY
2    federal court here in New York, right?
3       A.  Yes.
4       Q.  Have you ever heard of the term arbitration?
5       A.  Yes.
6       Q.  What is your understanding of arbitration?
7       A.  That someone has to decide the outcome of the
8    case.
9       Q.  Do you understand that arbitration is a
10   different way of resolving disputes like the one we
11   have here where you're not in court but you're in a
12   different type of a proceeding?
13      A.  You just are explaining it to me.
14      Q.  Okay.  That's your understanding.  Got it.
15   And did you understand that the Warner defendants in
16   this case have filed a motion to the court because
17   they believe that this case really should have been
18   placed in arbitration rather than in court?
19      A.  I believe so, yes.
20      Q.  And what's the basis for your belief, that you
21   understood that?
22      A.  My understanding is that it's mentioned in the
23   EmPact.
24      Q.  Okay.  There's an EmPact provision that
25   addresses arbitration, am I right?

Page 87

1                    S. STALEY
2         ATTORNEY BRUSTEIN:  Objection.
3       A.  Yes.
4       Q.  Did you have an understanding that -- and you
5    did not file or commence an arbitration against the
6    defendants in this case, you commenced a lawsuit,
7    right?
8       A.  Yes.
9       Q.  Okay.  Why didn't you arbitrate?
10      A.  I believe I was terminated.
11      Q.  No.  But why didn't you arbitrate the case?
12   Why didn't you go to arbitration to get your no-fault
13   employment payment?
14      A.  We were all placed on furlough.
15      Q.  What I want to understand is why did you file
16   a lawsuit rather than an arbitration?
17      A.  Because we had been placed on extended
18   furlough.  And the hotel hadn't reopened.
19      Q.  Okay.  That's why you sued, right?
20      A.  Yes.
21      Q.  Okay.
22      A.  Based on the phone call on the 25th of June,
23   2021.
24      Q.  Okay.  So what I want to understand is that
25   you had a dispute, you wanted to get money back,

Page 88

1                    S. STALEY
2    right?
3         ATTORNEY BRUSTEIN:  Objection.
4       A.  I don't understand the question.
5       Q.  You filed a lawsuit to get money, didn't you?
6         ATTORNEY BRUSTEIN:  Objection.
7       A.  No.  I'm representing a class.  And --
8       Q.  There's no class that's been certified yet
9    correct, ma'am?
10        ATTORNEY BRUSTEIN:  Objection.
11      A.  I represent the class.
12      Q.  You understand that the court has not
13   certified a class, he hasn't decided that this will be
14   a class action yet, right?
15      A.  I don't understand.
16      Q.  Do you understand, ma'am, that right now this
17   lawsuit is just being brought by you, Ms. Holmes and
18   Ms. Ivey?
19      A.  Yes.
20      Q.  Okay.  And that at some point the judge may
21   decide that you can bring it also on behalf of a
22   class, correct?
23      A.  Yes.  But it hasn't been decided yet.
24      Q.  Correct.  Okay.  When you filed this lawsuit,
25   though, whatever happens with the class you want



Page 89

S. STALEY

1  money, don't you?
2
3      ATTORNEY BRUSTEIN:  Objection.
4      A.  Well, I -- I want to be treated fairly.
5      Q.  Well, but the court can't order that, you know
6  that?  The court can give you money.  What do you want
7  the court to --
8      A.  I want to have the opportunity to present my
9  side, the truth.
10     Q.  Okay.
11     A.  Of what the defendants are in violation of.
12     Q.  And what do you want the judge to give you, or
13  the jury to give you at the end of the case?
14     A.  That's decided by the judge.
15     Q.  What do you want?
16     A.  I want to be heard.
17     Q.  Well, I understand that, ma'am.  But do you
18  want something?  Do you want to be paid some money
19  back?  What do you want?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't understand your question.
22     Q.  Why did you sue?
23     A.  Because I want to be heard.  I've been
24  violated.
25     Q.  Okay.  Fair enough.  You want to have your day

Page 90

S. STALEY

1
2  in court, right?
3      A.  Yes.
4      Q.  Okay.  What do you want to recover?  What's
5  the recovery you want the court to order?
6      ATTORNEY BRUSTEIN:  Objection.
7      A.  I don't know.
8      Q.  Okay.  Let's put that aside for a minute.
9  We'll come back to it.  You actually went to court
10  instead of going to arbitration, right?
11     A.  Yes.
12     Q.  Okay.  I just want to know why you picked
13  court rather than arbitration?
14     A.  Because we were put on extended furlough.
15     Q.  And you didn't think that -- I am sorry.  I
16  didn't mean to interrupt you.  That's my fault.  Go
17  ahead, please.
18     A.  We were put on extended furlough and the hotel
19  hadn't reopened.  So that's why I hired the attorneys.
20     Q.  Fair enough, ma'am.  I understand that.  What
21  I am trying to understand is do you understand that
22  you could file your case in court or you could file
23  your case in arbitration?
24     ATTORNEY BRUSTEIN:  Objection.
25     Q.  Did you have that understanding or not?

Page 91

S. STALEY

1      A.  I don't understand.
2      Q.  Okay.  So what is your understanding of why
3  the Warner defendants, to the extent you have one,
4  filed a motion to compel arbitration in this case?
5      A.  I don't understand the question.
6      Q.  Well, you understood that the Warner
7  defendants had filed a motion to ask the judge to
8  order this case to no longer be in court but be sent
9  to a private arbitration?  Did you understand that or
10  not?
11     A.  That hasn't happened yet.
12     Q.  The filing of the motion?
13     A.  No, that we have to go to arbitration.
14     Q.  You understand that.  You understand, though,
15  that the Warner defendants filed a motion to ask the
16  judge to make that happen, right?
17     A.  Correct.
18     Q.  Okay.  What's your understanding of why they
19  filed it?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't -- I don't know.
22     Q.  You don't know?
23     A.  I don't know.
24     Q.  And you don't know after having, you know,
25

Page 92

S. STALEY

1
2  read through and reviewed through what we have here as
3  exhibit 7, correct?
4      A.  Correct.
5      (Exhibit 8, declaration of Cathy Hwang was
6  previously marked for identification.)
7      Q.  I am handing you what has been marked as
8  exhibit 8 previously.  You can see at the top, ma'am,
9  that we have got now document 30 filed in the lawsuit?
10     A.  Yes.
11     Q.  And we'll call this another filing, okay?
12     A.  Yes.
13     Q.  All right.  And my first question is have you
14  ever seen exhibit 8 before?
15     A.  I've seen lots of documents.  I don't
16  remember.
17     Q.  You don't remember if you've seen this before?
18     A.  Yes.
19     Q.  Well, and maybe I'll have something that will
20  refresh your memory later.  We'll keep this out for a
21  sec.  You'll see this is entitled Declaration of Cathy
22  Hwang?
23     A.  Yes.
24     Q.  I am going to direct your attention, ma'am.
25  If you look a couple of pages in there's an Exhibit A



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
93—96

Page 93
1              S. STALEY
2  cover page.  A couple of pages into it.
3      A.  Okay.
4      Q.  Do you see the cover page?
5      A.  Yes.
6      Q.  Let's turn to the next one.  You'll see we
7  have got here a document that begins with a cover page
8  U.S. EmPact Employee Handbook last revised May 30,
9  2018, right?
10     A.  Yes.
11     Q.  Have you ever seen this before, irrespective
12  of whether it was included in this filing or not?
13     A.  I don't remember.
14     Q.  In any event, you had executed the
15  acknowledgment form for one of the EmPact agreements,
16  right?
17     A.  Yes.
18     Q.  Okay.  We'll get to that in a second.  If
19  you'll look, ma'am, at page 27 of the EmPact agreement
20  that we have here attached to the declaration that is
21  exhibit 8.
22     A.  Yes.
23     Q.  You'll see that there is a provision at the
24  bottom called moonlighting and outside employment?
25         (The witness reviews document.)

Page 94
1              S. STALEY
2      A.  Yes.
3      Q.  You see that provision, right?
4      A.  Yes.
5      Q.  Okay.  And have you seen -- strike that.
6         Do you have a copy of the EmPact agreement
7  that you acknowledged in your possession?
8      A.  I do.
9      Q.  Did you turn it over to be produced in this
10  case?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.
13     Q.  All right.  When you acknowledged the EmPact
14  agreement had you read it in advance?  The EmPact
15  agreement?
16         ATTORNEY BRUSTEIN:  Objection.
17     A.  I don't remember.
18     Q.  You've read the EmPact agreement, though, have
19  you not, ma'am?
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't remember.
22     Q.  Okay.  You don't know whether you've ever read
23  it?
24         ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't remember.

Page 95
1              S. STALEY
2      Q.  Have you ever read part of it?
3         ATTORNEY BRUSTEIN:  Objection.
4      A.  I don't remember.
5      Q.  But you had a copy of it?
6      A.  Yes.
7      Q.  And you actually had any time, since you had a
8  copy of it, to open it up and take a look and see what
9  it says, correct?
10     A.  Yes.
11     Q.  You'll see that the stamping on this page for
12  the court stamping shows that it was filed on what
13  date?
14     A.  11/15/22.
15     Q.  Okay.
16         (Exhibit 9, Memorandum of Law in Opposition to
17  Defendants' Motion to Compel Arbitration, Dismiss
18  Class Claims and Stay Action was previously marked for
19  identification.)
20     Q.  I am handing you what has been marked as
21  exhibit 9 previously.  You see, ma'am, we have another
22  filing in the case, right?
23     A.  Yes.
24     Q.  And we have got Document 44 now filed December
25  6, 2022, correct?

Page 96
1              S. STALEY
2      A.  Yes.
3      Q.  You'll see this is a Memorandum of Law in
4  Opposition to Defendants' Motion to Compel
5  Arbitration, and then it goes on, correct?
6      A.  Yes.
7      Q.  Have you seen exhibit 9 before?
8      A.  I don't remember.
9      Q.  You don't know whether you saw it at all or
10  reviewed it in any way, shape or form?
11     A.  I don't remember.
12     Q.  Have you been provided copies of filings in
13  the case after they were made?
14     A.  Yes.
15     Q.  Okay.  We know the amended complaint is one
16  that you had, is that fair?
17     A.  Yes.
18     Q.  Do you have other filings?
19     A.  I don't remember.
20     Q.  Do you have a file like an electronic file on
21  your computer or someplace where you store --
22     A.  Of the amended complaint, yes.
23     Q.  Okay.  Where you store any other filings that
24  may have been sent to you?
25     A.  I don't remember.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
97–100

Page 97

S. STALEY

1
2    Q.  You don't remember whether you have that kind
3  of a folder on your computer or someplace where you
4  store the electronic copies?
5    A.  Correct.
6    Q.  When filings are provided -- well, strike
7  that.  Do you know whether any filing other than the
8  amended complaint was ever provided to you?
9    A.  Yes.
10    Q.  Okay.  What ones were provided to you other
11  than the amended complaint?
12        ATTORNEY BRUSTEIN:  Objection.
13    A.  I don't remember.
14    Q.  If you see any let me know, okay?  During the
15  course.  I am going to mark this.
16    A.  Okay.
17    Q.  Was exhibit 9 ever provided to you?
18    A.  Yes.
19    Q.  Okay.  When?
20    A.  I don't remember.
21    Q.  How do you know it was provided to you?
22    A.  Because I received information from my
23  attorneys.
24    Q.  Well, but I'm saying this specific document.
25  What I want to understand is whether this specific

Page 98

S. STALEY

1
2  document that we have as exhibit 9 was provided to
3  you?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't remember.
6    Q.  So you don't know whether this one was
7  provided or not?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't remember.
10    Q.  Looking at it doesn't refresh your
11  recollection that yes, it was, or no it wasn't?
12        ATTORNEY BRUSTEIN:  Objection.
13    A.  I don't remember.
14        (Exhibit 10, Declaration of Evan Brustein was
15  previously marked for identification.)
16    Q.  I am handing you what has been marked
17  previously as exhibit 10, which you'll see, ma'am, we
18  have here another filing.  And this one is Document 43
19  dated December 6, 2022.  Correct?
20    A.  Yes.
21    Q.  Okay.  And you'll see this is titled
22  Declaration of Evan Brustein, right?
23    A.  Yes.
24    Q.  Have you ever seen exhibit 10 before?
25    A.  Yes.

Page 99

S. STALEY

1
2    Q.  How do you know?
3    A.  My attorneys send me documents.
4    Q.  Well, I know they send you documents.  I want
5  to know if they sent you this one?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't remember.
8    Q.  I understand that from time to time, and tell
9  me if I'm wrong -- strike that.
10        Is it accurate that from time to time your
11  attorneys have sent you documents that consist of
12  filings in the case?
13    A.  Yes.
14    Q.  So that's why you know you have more than just
15  the amended complaint, right?
16    A.  Correct.
17    Q.  Okay.  What I want to know is specifically
18  when I show you a document if this is a document that
19  you have seen before.  And I am looking right now at
20  the declaration of Evan Brustein that we have marked
21  here as exhibit 10.
22    A.  I don't remember.
23    Q.  All right.  And you'll see, ma'am, on the
24  second page of it we now have got a copy of the EmPact
25  agreement, right?

Page 100

S. STALEY

1
2    A.  Yes.
3    Q.  Okay.  And this one is dated, last revised,
4  sorry, February 1, 2018, is that right?  On the very
5  first page of the document.
6    A.  Yes.
7    Q.  Okay, cool.  The last one we saw was in May
8  30, 2018.  This was in exhibit 8.
9    A.  Yes.
10    Q.  Okay.  Did you receive either of these?  And I
11  don't mean from in this lawsuit, I mean as an
12  employee.  Did you receive either the February 1, 2018
13  EmPact agreement or the May 30, 2018 EmPact agreement?
14        ATTORNEY BRUSTEIN:  Objection.
15    A.  I don't remember.
16    Q.  You don't know?
17    A.  I don't remember.
18    Q.  Did you acknowledge either of these -- and I'm
19  not trying to hide the ball on you, ma'am.  If you
20  take a look at exhibit 10 you'll see in the EmPact
21  agreement on page 60.  It's on the lower left-hand
22  side of the pages.
23    A.  Yes.
24    Q.  Do you recognize here that there's a document
25  titled EmPact, My Complete Personal Contract with Four



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
101–104

Page 101

1                    S. STALEY
2  Seasons Hotel in New York, right?
3      A.  Yes.
4      Q.  And there's a spot there for the name of the
5  person who is signing off on it to be inserted and
6  their signature, correct?
7      A.  Yes.
8      Q.  And you have executed at least one of these
9  right?
10      A.  Yes.
11      Q.  Have you executed multiple ones or just one?
12          ATTORNEY BRUSTEIN:  Objection.
13      A.  I don't remember.
14      Q.  All right.  But you've executed at least one
15  of these, right?
16      A.  Yes.
17      Q.  All right.  Did you sign an acknowledgment for
18  either the May 30 -- did you sign an acknowledgment
19  for the February 1, 2018 EmPact agreement?
20      A.  I don't remember.
21      Q.  How about the May 30, 2018 EmPact agreement?
22      A.  I don't remember.
23      Q.  Okay.  I want to direct your attention, ma'am,
24  in exhibit -- by the way.  The acknowledgment that you
25  signed on page 60, or the acknowledgment language, the

Page 102

1                    S. STALEY
2  blank language, do you see down at the bottom there's
3  that paragraph that says:  The Four Seasons Hotel
4  New York and I, and it's got a blank for the person's
5  name to be inserted, right?
6      A.  Yes.
7      Q.  Okay.  The next sentence says EmPact is the
8  entire agreement between me and Four Seasons Hotel
9  New York unless modified by a specific letter, the
10  terms of which supersede certain defined parts in
11  EmPact, right?
12      A.  Yes.
13      Q.  And you understand that a specific letter
14  relates to something else in writing, correct?
15          ATTORNEY BRUSTEIN:  Objection.
16      A.  I believe so.
17      Q.  After the EmPact agreement that you
18  acknowledged, did you ever receive any such specific
19  letter, the terms of which would supersede any parts
20  of the EmPact agreement that you acknowledged?
21          ATTORNEY BRUSTEIN:  Objection.
22      A.  I don't remember.
23      Q.  Now I direct your attention -- keep that one
24  open, if you could, ma'am.
25      A.  Yes.

Page 103

1                    S. STALEY
2      Q.  And the reason I'm asking you, I am going to
3  ask you about this because you're telling me a lot
4  that you can't remember, which I completely
5  understand.  If you go two pages after that, and
6  you'll see we have your declaration of Selena Staley?
7  It's document 43-2 at the top?
8      A.  Yes.
9      Q.  Okay.  And you'll see down at the bottom there
10  there's a line with a signature that's kind of hard to
11  read but there?  Plaintiff, Selena Staley?  At the
12  bottom of the declaration.  Did that show up on your
13  copy?
14      A.  Is it this -- am I on the wrong page?
15      Q.  No, you're on the right page.  It's really
16  faint.  So maybe you can't see it.
17      A.  I can't see it.
18      Q.  It didn't copy well, that's fine.
19          ATTORNEY BOLAND:  Is it good on your copy?
20          ATTORNEY BRUSTEIN:  I don't see anything on
21  mine.
22          ATTORNEY BOLAND:  It's right here.  I think
23  it's really faint.
24          ATTORNEY LUNDY:  It's signed.
25          ATTORNEY BRUSTEIN:  Okay.  I thought that was

Page 104

1                    S. STALEY
2  the next question.
3          ATTORNEY BOLAND:  No.
4          ATTORNEY BRUSTEIN:  Jim, just so you can see
5  (indicating).
6          ATTORNEY RISMAN:  It's completely blank.
7          (Informal conversation off the record).
8      Q.  I am going to represent to you that the copy I
9  have has got your signature on it.  If you want to
10  take a look at it and tell me if you recognize that,
11  at the very bottom?
12      A.  Yes.
13      Q.  Is that you?
14      A.  Yes.
15      Q.  Okay.  If you look at the declaration that you
16  signed -- by the way, do you recall signing this
17  declaration?
18      A.  I don't remember.
19      Q.  And you say, and it goes on in numbered
20  paragraphs, I'm one of the named plaintiffs, and it
21  says:  I have reviewed the EmPact agreement annexed to
22  the deposition of Cathy Hwang, right?
23      A.  Mm-hmm.
24      Q.  When did you do that?
25      A.  I don't remember.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
105–108

Page 105

S. STALEY

1
2  Q. Did you do it?
3     ATTORNEY BRUSTEIN: Objection.
4  A. I don't remember.
5  Q. And then it says 3, I have reviewed the EmPact
6  agreement annexed to the declaration of Evan Brustein.
7  Which is the one we're looking at right now, dated
8  December 5, 2022 and it's a true and correct copy. Do
9  you see where I'm referring to?
10  A. Yes.
11  Q. When did you review that?
12  A. I don't remember.
13  Q. Did you review it?
14     ATTORNEY BRUSTEIN: Objection.
15  A. I don't remember.
16  Q. And then the next paragraph says: The EmPact
17  agreement I signed in 2018 was 61 pages, now 62 pages.
18     How did you know that?
19  A. I don't remember.
20  Q. Okay. Because your declaration is dated
21  December 5, 2022, correct? Down at the bottom.
22  A. Yes.
23  Q. And you are talking about an EmPact agreement
24  you signed in 2018, right?
25  A. Yes.

Page 106

S. STALEY

1
2  Q. How did you know in 2022 that it was 61 pages
3  and now 62?
4     ATTORNEY BRUSTEIN: Objection.
5  A. I don't remember.
6  Q. If you'll look at the next paragraph, it says:
7  The EmPact agreement I signed had a welcome letter on
8  page 6 signed by Mehdi Eftekari, the Four Seasons
9  New York general manager in February 2018 now his
10  successor Randy [sic] Tauscher, right?
11     ATTORNEY BRUSTEIN: Objection.
12  A. Yes.
13  Q. How did you know that in 2022 when you signed
14  this document?
15  A. I don't remember.
16  Q. If you take a look at the next one, paragraph,
17  it says: After the EmPact agreement that I signed in
18  2018 I never signed another EmPact agreement for the
19  defendants, right?
20  A. I don't remember.
21  Q. I'm just saying that's what it says, in your
22  declaration?
23  A. Yes.
24  Q. Is that true?
25  A. I don't remember.

Page 107

S. STALEY

1
2  Q. Okay. Let's go back to that EmPact agreement.
3  A. Okay.
4  Q. If you take a look again at this one I think
5  at page 27 again. And you'll see in there, and we
6  have the same -- the provision, you can compare them
7  if you like, moonlight and out -- moonlighting and
8  outside employment, right?
9  A. Yes.
10  Q. And you were always able to get a second job
11  when you worked at the Four Seasons, right?
12     ATTORNEY BRUSTEIN: Objection.
13  A. I don't remember.
14  Q. Okay. But do you see that this provision is
15  in this copy of the EmPact agreement as well?
16  A. Yes.
17  Q. And the date on this is December 6, 2022, the
18  document was filed, correct?
19  A. Yes.
20  Q. All right. That was before your amended
21  complaint was filed on December 19, 2022, right?
22  A. Yes.
23  Q. So from at least November of 2022 when
24  Ms. Hwang's declaration was served, filed, and
25  certainly December of 2022 when we have the EmPact

Page 108

S. STALEY

1
2  agreement attached to Mr. Brustein's declaration, your
3  lawyers have known that the EmPact agreement had a
4  provision allowing people to get -- to have
5  moonlighting and other employment, right?
6     ATTORNEY BRUSTEIN: Objection.
7  A. I don't know. I mean ...
8  Q. Well, we have the two documents that have the
9  provisions on moonlighting and other employment,
10  right?
11     ATTORNEY BRUSTEIN: Objection.
12  Q. The two versions of the EmPact agreement?
13  A. I don't understand the question.
14  Q. We looked at two copies of the EmPact
15  agreement just recently, correct?
16  A. Yes.
17  Q. Both of them had the provision on moonlighting
18  and other employment, right?
19  A. Yes.
20  Q. One of them was filed with Ms. Hwang's
21  declaration in November of 2022, right?
22  A. Yes.
23  Q. One of them was filed with Mr. Brustein's
24  declaration in December of 2022, correct?
25  A. Yes.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
109–112

Page 109
S. STALEY
1
2    Q.  So from November of 2022 and December of 2022
3  forward your lawyers have had in their possession a
4  copy of the EmPact agreement that has a specific
5  provision on moonlighting and other employment, right?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't understand the question.
8    Q.  Do you understand your lawyers to have copies
9  of these filings?
10        ATTORNEY BRUSTEIN:  Objection.
11    A.  I don't understand the question.
12    Q.  Okay.  These are filings in the lawsuit,
13  ma'am.  Do you understand your lawyers to have copies
14  of them?
15        ATTORNEY BRUSTEIN:  Objection.
16    A.  I don't understand the question.
17    Q.  Really?  I'm sorry.  I'm trying to be honest.
18  You don't understand whether your lawyers have copies
19  of the filings in the case?
20        ATTORNEY BRUSTEIN:  Objection.
21    A.  I don't understand the question.
22    Q.  Okay.  This is Mr. Brustein's declaration,
23  exhibit 10, right?
24    A.  Yes.
25    Q.  Okay.  He's one of your lawyers in this case,

Page 110
S. STALEY
1
2  right?
3    A.  Yes.
4    Q.  Okay.  Do you understand him to have had
5  possession of the various documents, including your
6  declaration, that he attached to his declaration in
7  December of 2022?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't -- I don't understand the question.
10    Q.  In his declaration that was filed on December
11  6 of 2022 he attached to it a copy of the EmPact
12  agreement, correct?
13    A.  Yes.
14    Q.  Okay.  And that copy of the EmPact agreement
15  has the provision on moonlighting and other
16  employment, right?
17    A.  Yes.
18    Q.  So from at least December of 2022 your lawyers
19  have had in their possession a copy of the EmPact
20  agreement that had the provision on moonlighting and
21  other employment, right?
22        ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't understand the question.
24    Q.  Seriously?
25        ATTORNEY BRUSTEIN:  Objection.

Page 111
S. STALEY
1
2    Q.  Okay.
3        ATTORNEY BRUSTEIN:  Objection to "seriously."
4    Q.  Okay.  You never mentioned in any of your
5  complaints the provision in the EmPact agreement that
6  discusses moonlighting and other employment, do you?
7    A.  I don't understand the question.
8    Q.  Does your complaint mention the EmPact
9  agreement at all?
10    A.  I don't remember that.
11    Q.  Well, you're suing for breach of the EmPact
12  agreement, are you not?
13    A.  Based on the no-fault.
14    Q.  Correct, the no-fault separation pay?
15    A.  Separation pay.
16    Q.  And the contract that that's contained there
17  is the EmPact agreement, right?
18    A.  Correct.
19    Q.  All right.  So you understand your complaint
20  is based in part on the EmPact agreement which you
21  think was breached because you didn't get no-fault
22  separation pay?
23        ATTORNEY BRUSTEIN:  Objection.
24    A.  I still don't understand the question.
25    Q.  Are you suing the Warner defendants, or maybe

Page 112
S. STALEY
1
2  you're not suing them, for breaching the EmPact
3  agreement by not paying you no-fault separation pay?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't understand the question.
6    Q.  Okay.  You understand -- let's talk about --
7  let's just go to the amended complaint, paragraph 6.
8  And I am going to direct your attention, I'll take it
9  really easy, ma'am, to paragraph 8.
10    A.  Page 6?
11    Q.  No, sorry.  Exhibit 6, which is the amended
12  complaint, paragraph 8.
13    A.  Paragraph 8.
14    Q.  And in paragraph 8 your complaint specifically
15  references the EmPact agreement, does it not?
16    A.  Yes.
17    Q.  Okay.  And the EmPact agreement is the
18  document that you believe gives you the right to
19  no-fault separation pay, right?
20    A.  Yes.
21    Q.  Okay.  Nowhere in your complaints do you
22  mention the provision on moonlighting and other
23  employment, do you?
24        ATTORNEY BRUSTEIN:  Objection.
25    A.  Because I'm suing for the no-fault.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
113–116

Page 113
S. STALEY

1
2    Q. I didn't ask you that question. My question
3 is why you didn't?
4    A. Then I didn't understand the question.
5    Q. Your complaints don't mention the provision on
6 moonlighting and other employment, do they?
7    ATTORNEY BRUSTEIN: Objection.
8    A. I don't understand the question.
9    Q. You don't understand whether moonlighting and
10 other employment, that provision, is referenced in
11 your complaint? You don't understand that question?
12    ATTORNEY BRUSTEIN: Objection.
13    A. I don't understand the question.
14    Q. Okay. And you want to serve as a class
15 representative for all kinds of absent class members,
16 correct?
17    A. Yes.
18    Q. Okay. Your complaints in this lawsuit did not
19 attach the EmPact agreement as an exhibit, did they?
20    ATTORNEY BRUSTEIN: Objection.
21    A. I don't remember.
22    Q. Did you ask in any way -- did you look to see
23 whether they attached the EmPact agreement as an
24 exhibit?
25    A. I don't remember.

Page 114
S. STALEY

1
2    Q. All right. Let's move on. Let's see if there
3 are other filings you have seen.
4    (Exhibit 11, Reply Memorandum of Law in
5 Further Support of the Warner Defendants' Motion to
6 Compel was previously marked for identification.)
7    Q. I am handing you what has been marked as
8 exhibit 11, which you'll see, ma'am, is another filing
9 in the case. You'll see this is document 46, Reply
10 Memorandum of Law in Further Support, and it goes on?
11    A. Yes.
12    Q. Did you ever see exhibit 11 before?
13    ATTORNEY BRUSTEIN: Objection.
14    A. I don't remember.
15    Q. Is this a filing that you received at all,
16 ever?
17    ATTORNEY BRUSTEIN: Objection.
18    A. I don't remember.
19    Q. Let's look at exhibit 12 if we could.
20    (Exhibit 12, Notice of Motion to Dismiss,
21 Memorandum of Law in Support of the Warner Defendants'
22 Motion to Dismiss the Complaint was previously marked
23 for identification.)
24    Q. You'll see here again, ma'am, we have another
25 filing in the case, right?

Page 115
S. STALEY

1
2    A. Yes.
3    Q. This is Notice of Motion to Dismiss? It's
4 actually two documents. If you go two pages in again,
5 there's a Memorandum of Law in Support of a Motion to
6 Dismiss?
7    (The witness reviews document.)
8    A. Yes.
9    Q. Okay. Have you ever seen exhibit 12 before?
10    A. Yes.
11    Q. When?
12    A. I don't remember.
13    Q. But you know that of the filings you know
14 you've seen this one?
15    ATTORNEY BRUSTEIN: Objection.
16    A. Yes.
17    Q. How is it that you know you have seen this
18 one?
19    A. Because I received a lot of documents from my
20 attorneys.
21    Q. I understand that. But how do you know you
22 received this particular one?
23    A. I don't remember, but... I don't remember.
24    Q. So are you still standing with your testimony
25 that you actually have, yes, seen the Notice of Motion

Page 116
S. STALEY

1
2 to Dismiss and/or the memorandum that follows it? Or
3 is it that you don't know whether you have seen these
4 before?
5    ATTORNEY BRUSTEIN: Objection.
6    A. I don't remember.
7    Q. Did you know that the Warner defendants had
8 filed a motion with the court to basically get your
9 entire case thrown out of court, you know, dismissed?
10    A. Yes.
11    Q. Okay. Did you know they did that with respect
12 to the first complaint that you filed?
13    A. Yes.
14    Q. Did you take time to educate yourself on the
15 reasons why the Warner defendants thought the judge
16 should dismiss your case?
17    ATTORNEY BRUSTEIN: Objection.
18    A. I don't remember.
19    Q. And as you sit here today you don't know
20 whether exhibit 12 or the memorandum or the motion is
21 one of the things you were sent, right?
22    A. Yes, I don't remember.
23    (Exhibit 16, Plaintiffs' Memorandum of Law in
24 Opposition to Defendants' Hotel 57 Services Motion to
25 Dismiss the Amended Complaint was previously marked



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
117–120

Page 117

S. STALEY

1  for identification.)
2  Q. Exhibit 16.  Do you see this is another
3  filing, right, ma'am?
4  A. Yes.
5  Q. My apologies.  I think I just showed you this.
6  ATTORNEY BOLAND:  Let's take a break.
7  (Lunch recess taken at 12:46 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 118

S. STALEY

1  AFTERNOON SESSION
2  (1:35 p.m.)
3  – – –
4
5  SELENA STALEY,
6  resumed as a witness, having been
7  previously sworn by a Notary Public,
8  was examined and testified further as
9  follows:
10  EXAMINATION BY (Cont'd)
11  ATTORNEY BOLAND:
12  Q. We had looked before, I inadvertently marked
13  16 for you, at exhibit 12, which was the motion to
14  dismiss and the notice for the first complaint.  And
15  we've covered that.  I just want to pick up from that.
16  (Exhibit 13, Declaration of Elizabeth Ortiz
17  was previously marked for identification.)
18  Q. I am handing you what has been marked as
19  exhibit 13, which you'll see is another filing of the
20  case, right?
21  A. Yes.
22  Q. And this is titled Declaration of Elizabeth
23  Ortiz.  This one is on December 5, 2022.  My first
24  question is have you ever seen this document before?

Page 119

S. STALEY

1  A. Yes.
2  Q. When?
3  A. I don't remember.
4  Q. Okay.  So how do you know you saw this
5  particular document when you don't remember seeing a
6  lot of documents?
7  ATTORNEY BRUSTEIN:  Objection.
8  A. I don't remember.
9  Q. Okay.  So looking at this, this is a
10  declaration of Elizabeth Ortiz and you can see it goes
11  through two pages down, it's dated December 2nd,
12  right?
13  A. Yes.
14  Q. And then it's got some attachments.  And I
15  want to be fair to you, because I know you're under
16  oath.  Is it your testimony, ma'am, that you actually
17  did see this declaration and the exhibits?
18  ATTORNEY BRUSTEIN:  Objection.
19  A. I don't remember.
20  Q. You don't remember if you have seen this
21  before?
22  A. No.
23  Q. Okay.  Were you aware, ma'am, that your
24  lawyers, instead of filing an opposition to the Warner

Page 120

S. STALEY

1  defendants' motion to dismiss the first complaint,
2  instead filed a first amended complaint?
3  A. (No response.)
4  Q. Let me go back and take that slowly.  You're
5  aware that you had a first complaint that was in
6  August of 2022, right?
7  A. Yes.
8  Q. And you're aware you had an amended complaint
9  which we have as exhibit 6 in December of 2022, right?
10  A. Yes.
11  Q. And in between that time we just saw that the
12  Warner defendants moved to throw out the claims in the
13  first complaint in their entirety.  Do you remember
14  that?
15  ATTORNEY BRUSTEIN:  Objection.
16  Q. The motion to dismiss we just looked at --
17  A. Yes.
18  Q. Okay.  Did you know that rather than fight
19  that motion with an opposition, your lawyers instead
20  chose to amend the complaint?
21  ATTORNEY BRUSTEIN:  Objection.
22  A. I don't understand the question.
23  Q. Sure.  You understood from what we talked
24  before, that the Warner defendants had filed a motion



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
121–124

S. STALEY

1
2  to dismiss your first complaint in its entirety,
3  right?
4      A.  I don't remember.
5      Q.  Well, we looked at that before lunch.  There
6  was the motion to dismiss the first complaint that I
7  think was exhibit 12.  And you can take a look at it.
8  Remember, there was a notice of motion to dismiss your
9  first --
10     A.  That was the defendants who were --
11     Q.  The defendants, right.  The defendants wanted
12 to throw out your case, right?
13     A.  Yes.
14     Q.  Get the judge to do that?
15     A.  Yes.
16     Q.  Okay.  Do you know whether your lawyers filed
17 an opposition to that motion, or whether instead
18 they've just filed an amended complaint?
19         ATTORNEY BRUSTEIN:  Objection.
20     A.  I don't remember.
21     Q.  You don't remember.  Did you know at the time
22 whether or not your lawyers planned to fight the
23 motion to dismiss by opposing it, or not?
24         ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't remember.

S. STALEY

1
2      Q.  You don't remember, okay.  In any event we saw
3  that in exhibit 6 there was a first amended complaint
4  filed, correct?
5      A.  Yes.
6      Q.  Did you know that the defendants again, the
7  Warner defendants filed a motion to dismiss that
8  complaint as well?
9      A.  That was the defendants, yes.
10     Q.  You knew that they filed a motion to dismiss
11 your current complaint, right?
12     A.  I don't remember.
13     Q.  So do you understand that the complaint that
14 you currently have on file is now the one that's
15 alive, so to speak, is the first amended complaint
16 that you reviewed in preparation for your testimony?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  Can you repeat the question?
19     Q.  Yeah, sure.  You filed an original complaint
20 in August, correct?
21     A.  Yes.
22     Q.  But then you've amended that and filed a new
23 complaint in December of 2022, right?
24     A.  Yes.
25     Q.  Okay.  You understand that that's the

S. STALEY

1
2  complaint that we currently have alive in the case?
3      A.  Yes.
4      Q.  Okay.  Did you know that the Warner defendants
5  had moved to dismiss that complaint in its entirety as
6  well?
7      A.  I don't remember.
8      Q.  Do you have any idea of what a motion to
9  dismiss a complaint in its entirety is?
10         ATTORNEY BRUSTEIN:  Objection.
11     A.  I don't -- I don't remember.
12     Q.  Okay.  Do you have an idea that the Warner
13 defendants -- an understanding, whatever the title may
14 be -- that the Warner defendants have filed a motion
15 asking the judge to basically throw your entire case
16 out?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  I don't remember.
19     Q.  You don't remember?
20     A.  Uh-uh.
21     Q.  Did you ever know that?
22     A.  I don't remember.
23     Q.  Okay.  Do you think that that's an important
24 thing for you to be aware of as a plaintiff in a
25 lawsuit?

S. STALEY

1
2         ATTORNEY BRUSTEIN:  Objection.
3      A.  I don't understand the question.
4      Q.  Sure.  Do you think that whether the
5  defendants have filed a motion to ask the judge to
6  throw your case out right away is an important thing
7  for you, as a plaintiff, to know?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't remember.
10     Q.  You don't remember whether it's an important
11 thing for you to know?
12     A.  I don't remember.
13     Q.  I am trying to understand what you mean by you
14 don't remember, ma'am.  Because I'm asking you a
15 different question.  I'm not asking you if you
16 remember something.  I'm asking whether you, sitting
17 here today as a plaintiff in this lawsuit think that
18 knowing whether the defendants have filed a motion to
19 throw your entire lawsuit out is an important thing
20 for you to know?
21         ATTORNEY BRUSTEIN:  Objection.
22     A.  I don't understand the question.
23     Q.  Can you help me out and tell me what you don't
24 understand?
25     A.  I don't know.



SELENA STALEY                                    April 11, 2023
STALEY V. FSR INTL.                              125–128

S. STALEY

1
2      Q.  Okay.  Do you have an understanding -- and I
3  may have asked you this before but I'm trying to get
4  back to basics here.
5         Let me show you what has been marked as
6  exhibit 14.
7         (Exhibit 14, Notice of Motion to Dismiss,
8  Memorandum of Law in Support of the Warner Defendants'
9  Motion to Dismiss was previously marked for
10  identification.)
11     Q.  You'll see here, ma'am, we have another
12  filing?
13     A.  Yes.
14     Q.  Okay.  Now I want to take a look at the date
15  up at the top so you can see the file date.  This is
16  January 2023, right?
17     A.  Yes.
18     Q.  Of course that obviously follows, comes after,
19  December 19 of 2022 when your first amended complaint
20  was filed?
21     A.  Yes.
22     Q.  Okay.  And you'll see, and if you look at
23  this, we have again those same two documents that we
24  have, we have the first two pages, which are Notice of
25  Motion to Dismiss, right?

S. STALEY

1
2      A.  Yes.
3      Q.  And then we have a Memorandum of Law in
4  Support, correct, that follows, like starting on the
5  third page?
6      A.  On the third page?
7      Q.  Yes.
8      A.  Thank you.  Okay.  Yes.
9      Q.  And you'll see in the Notice of the Motion to
10  Dismiss, ma'am, it starts with the terms "Please take
11  notice," right?
12     A.  Yes.
13     Q.  And then it talks about defendants Hotel 57
14  Services LLC, Hotel 57, LLC, Ty Warner Hotels &
15  Resorts, LLC and H. Ty Warner, collectively the Warner
16  defendants, right?
17     A.  Yes.
18     Q.  And you understand that you have sued all of
19  those companies, right?  Or those three companies and
20  that individual, correct?
21     A.  Yes.
22     Q.  Okay.  And so they call themselves here the
23  Warner defendants.  Do you understand that?
24     A.  Yes.
25     Q.  All right.  And they ask, going down, for an

S. STALEY

1
2  order, do you see where I'm at, it's one, two, three,
3  four -- five lines down after the 10007?
4      A.  Yes.
5      Q.  It says:  For an order, pursuant to rule
6  12(b)(6) of the Federal Rules of Civil Procedure, and
7  then there's a colon, right?
8      A.  Yes.
9      Q.  Okay.  And do you see the first one says:
10  Dismissing the amended complaint against the Warner
11  defendants in its entirety with prejudice.  Do you see
12  that?
13     A.  Yes.
14     Q.  Do you have an understanding of what that's
15  asking for?
16        ATTORNEY BRUSTEIN:  Objection.
17     A.  I don't know.
18     Q.  You don't have any understanding of what
19  that's asking for?
20        ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't understand that question.
22     Q.  Okay.  First of all, let's go through the
23  drill.  Have you ever seen exhibit 14 before?  Either
24  the notice or the memorandum, or both?
25        ATTORNEY BRUSTEIN:  Objection.

S. STALEY

1
2      A.  I don't remember.
3      Q.  Okay.  As a person who wants to represent the
4  class, do you think it's important for you to
5  personally have a good understanding of all of the
6  things that are happening in the lawsuit?
7         ATTORNEY BRUSTEIN:  Objection.
8      A.  I thought that that's something that the judge
9  would determine.
10     Q.  No, the judge isn't going to determine whether
11  you have a good understanding of the things in the
12  lawsuit.  I want to know whether you think it's
13  important for you to have a good understanding of the
14  things that are happening in the lawsuit that you
15  filed?
16        ATTORNEY BRUSTEIN:  Objection.
17     A.  That's why I hired the attorneys.
18     Q.  I understand you have lawyers, ma'am.
19     A.  Yes.
20     Q.  Okay.  I want to know, though, as the
21  plaintiff, let's just stay with your own individual
22  claims that are at issue here.  Do you think it's
23  important for you to have a good understanding of the
24  things that are happening in the lawsuit?
25     A.  I don't understand the question.  It's not an



SELENA STALEY                                                      April 11, 2023
STALEY V. FSR INTL.                                                   129–132

Page 129

S. STALEY

1
2  individual claim.
3      Q. You're not suing?
4      A. It's not an individual.  It's a group, as you
5  said, plaintiffs.
6      Q. You don't think you're part of that?
7      ATTORNEY BRUSTEIN:  Objection.
8      A. Yes.
9      Q. So you have a stake in this, right?
10     A. Yes.
11     Q. Okay.  Let's put aside anybody else in the
12 individual plaintiffs.  I just want to talk about your
13 stake as a plaintiff.  Do you think it's important for
14 you as a plaintiff with a stake in the lawsuit to be
15 aware of the things that are happening in the case?
16     ATTORNEY BRUSTEIN:  Objection.
17     A. I've reviewed the complaint, so I have been
18 following up on what's going on in the case.  Like
19 doing, reading those documents, for example.  The
20 amended complaint and what information has been
21 provided.
22     Q. Sure.  And after the amended complaint was
23 filed, we see you have a document here that has a
24 notice of motion to dismiss that complaint and a
25 memorandum in law in support of that motion to dismiss

Page 130

S. STALEY

1
2  filed by the Warner defendants, right?
3      ATTORNEY BRUSTEIN:  Objection.
4      A. Yes.
5      Q. I want to know if you believe, just for
6  yourself, as a person with a stake in this case, if
7  you think it's important for you to keep yourself
8  aware of things like we see here in exhibit 14?
9      ATTORNEY BRUSTEIN:  Objection.
10     A. Maybe I just don't understand what you're
11 asking me.
12     Q. Do you think it's important to know whether a
13 group of defendants that you sued, filed a motion with
14 the court to have the judge throw your whole lawsuit
15 out?
16     ATTORNEY BRUSTEIN:  Objection.
17     A. I don't understand the question.
18     Q. You don't understand whether it's -- what part
19 don't you understand, ma'am?  I really want to help
20 you?
21     ATTORNEY BRUSTEIN:  Objection.
22     A. I answered the question by saying in reading
23 the amended complaint, I've been keeping up.  So I've
24 been doing what needs to be done to follow the case.
25     Q. I didn't ask you that.  My question is

Page 131

S. STALEY

1
2  specifically with respect to a motion to have your
3  entire case against them thrown out.  I want to know
4  if you think, as an individual with a stake in the
5  lawsuit, do you think it's important for you to be
6  aware of the fact that a whole group of defendants
7  have filed a motion with the court asking a judge to
8  throw your lawsuit against them out?
9      ATTORNEY BRUSTEIN:  Objection.
10     A. I don't -- I don't know.
11     Q. Okay.  What about as a class representative
12 seeking to serve as a representative of other people;
13 do you think it's important for you as a class
14 representative to be aware of whether an entire group
15 of defendants have filed a motion with the court
16 asking the judge to throw your lawsuit against them
17 completely out?
18     ATTORNEY BRUSTEIN:  Objection.
19     A. I have, I understand the amended complaint, so
20 I'm following what's going on with the case.
21     Q. My question is about a motion to dismiss, to
22 throw it all out.  Not about the amended complaint
23 itself.  I know you read that.  Okay?
24     A. Mm-hmm.
25     Q. I want to know as a person who is asking the

Page 132

S. STALEY

1
2  judge to let them serve as a class representative on
3  behalf of others, do you think it's important for you
4  to be aware of things such as exhibit 14 where a whole
5  group of defendants has asked the judge to throw your
6  entire case against them out?
7      ATTORNEY BRUSTEIN:  Objection.
8      A. I don't understand the question.  I've
9  answered it.
10     Q. You have not answered whether you think it's
11 important to keep aware of things like exhibit 14,
12 where a whole group of defendants has asked the judge
13 to throw your case out.
14     ATTORNEY BRUSTEIN:  Objection.
15     Q. That's what I want to know.  Do you think it's
16 important for you, as a person who wants to --
17     ATTORNEY BRUSTEIN:  Objection.  Would you stop
18 pointing at her?
19     Q. Do you think it's important for you as a
20 person who wants to represent an entire group of
21 class -- a entire class of plaintiffs to be aware of
22 whether one group of defendants has filed a motion
23 asking the judge to throw your entire case against
24 them out?
25     ATTORNEY BRUSTEIN:  Objection.



Page 133

S. STALEY

1
2    A.  I -- I don't -- I feel that I've answered your
3    question.  I'm keeping abreast of any material that
4    comes.
5        Q.  But you don't know whether you have seen
6    exhibit 14 before?
7            ATTORNEY BRUSTEIN:  Objection.
8        Q.  Right?
9            ATTORNEY BRUSTEIN:  Objection.
10       A.  I don't know.
11       Q.  Has the judge ruled on a motion to dismiss
12   yet?
13           ATTORNEY BRUSTEIN:  Objection.
14       A.  I don't know.
15       Q.  Well, you said you were keeping abreast of the
16   things that happen.
17       A.  I haven't looked at anything on the docket
18   yet, so I just wrote.
19       Q.  Do you look at the docket or do you rely on
20   your lawyers to send you information about what's
21   happening in the case?
22           ATTORNEY BRUSTEIN:  Objection.
23       A.  Both.
24       Q.  You've gone and looked at the docket?
25       A.  I have.

Page 134

S. STALEY

1
2        Q.  Where did you access that docket?
3            ATTORNEY BRUSTEIN:  Objection.
4        A.  I don't remember right now but -- I'm trying
5    to remember.  You can find it online, actually.
6        Q.  The entire docket you can find online?
7            ATTORNEY BRUSTEIN:  Objection.
8        A.  Not the whole docket, but information.
9        Q.  What information is online about this lawsuit,
10   that you found?
11       A.  When claims are filed.  Things such as that.
12   Or court date.
13       Q.  Where did you find it?
14       A.  I don't remember the website.
15       Q.  Did you go on the PACER system?
16           ATTORNEY BRUSTEIN:  Objection.
17       A.  I don't remember.
18       Q.  Do you have an ID for the PACER system?
19           ATTORNEY BRUSTEIN:  Objection.
20       A.  I don't -- I don't know.
21       Q.  Have you ever heard of the PACER system?
22           ATTORNEY BRUSTEIN:  Objection.
23       A.  I don't know.
24       Q.  Did you ever print out any pieces from the
25   docket of this case?  Anything that you found from the

Page 135

S. STALEY

1
2    docket in this case?
3        A.  No.
4        Q.  What did you see in the docket of the case?
5        A.  There's like a court date.
6        Q.  What court date was that?
7        A.  That was a while ago.  I'm just trying to
8    remember.  That there would possibly be a trial date
9    coming up, I thought, in April.
10       Q.  And you found that on the internet?
11       A.  That was a while ago.
12       Q.  Did you find that on the internet?  I'm sorry.
13   Did you find that on the internet?
14       A.  Yes.
15       Q.  Do you have any idea where?
16           ATTORNEY BRUSTEIN:  Objection.
17       A.  It was a while ago.  I don't remember.
18       Q.  Okay.  What other motions have been filed in
19   this case other than the ones we've looked at so far?
20           ATTORNEY BRUSTEIN:  Objection.
21       A.  I don't remember.
22       (Exhibit 15, Declaration of Elizabeth Ortiz
23   with exhibits was previously marked for
24   identification.)
25       Q.  I am handing you what has been marked as

Page 136

S. STALEY

1
2    exhibit 15, previously.  You'll see here, ma'am, we
3    have another court filing?
4        A.  Yes.
5        Q.  And this one's dated January 20, 2023?
6        A.  Yes.
7        Q.  And this is a declaration of Elizabeth Ortiz,
8    right?
9        A.  Yes.
10       Q.  And there are some exhibits.  You can leaf
11   through, if you want.  You may have seen some of these
12   exhibits before, I don't know.  Have you ever seen
13   this filing before?
14           ATTORNEY BRUSTEIN:  Objection.
15       A.  I don't remember.
16       Q.  You don't know if you have ever seen it
17   before?
18       A.  I don't remember.
19       Q.  Okay.  Now we'll go to exhibit 16 that I got
20   out prematurely.
21       A.  Okay.
22       Q.  Do you see we've got another court filing,
23   ma'am?
24       A.  Yes.
25       Q.  This one is dated February 7, 2023, is that



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
137–140

Page 137

1                    S. STALEY
2  right?
3      A.  Yes.
4      Q.  Here we have Plaintiffs' memorandum of law in
5  opposition to defendants Hotel 57 Services LLC, and it
6  goes on, and the last thing is "motion to dismiss the
7  amended complaint," right?
8      A.  Yes.
9      Q.  You saw just a few minutes ago we were looking
10  at the notice of motion and the motion to dismiss the
11  amended complaint, right?
12      A.  Yes.
13      Q.  You see here we have a Memorandum of Law in
14  Opposition, right?
15      A.  Yes.
16      Q.  Filed on behalf of you and the other
17  plaintiffs, right?
18      A.  Yes.
19      Q.  Have you ever seen exhibit 16 before?
20      A.  Yes.
21      Q.  When?
22      A.  I don't remember.
23      Q.  So I want to understand, based on your memory,
24  how do you know you saw exhibit 16 before?
25      A.  All information I will get from my attorneys,

Page 138

1                    S. STALEY
2  that they send me information.
3      Q.  How do you know this was sent to you?
4      A.  Because they've sent me other documents.
5      Q.  I know.  How do you know this one was one of
6  the ones they sent?
7      A.  Because they always send me everything.
8      Q.  So you've gotten every document that we've
9  looked at before?
10      A.  Anything that my attorneys have, they have
11  sent to me.
12      Q.  So I just want to be clear because I want to
13  be fair to you later before the Court.
14          Is it your testimony, ma'am, that you have
15  received every filing that we have looked at so far
16  today?
17          ATTORNEY BRUSTEIN:  Objection.
18      A.  Not every filing.  What my attorneys have
19  sent.
20      Q.  So your attorneys have sent some filings to
21  you, is that accurate?
22      A.  Yes.
23          ATTORNEY BRUSTEIN:  Objection.
24      Q.  What I want to know is can you tell us under
25  oath, penalty of perjury and all, that exhibit 16 is

Page 139

1                    S. STALEY
2  in fact one of those filings that your attorneys sent
3  to you?
4          ATTORNEY BRUSTEIN:  Objection.  Please stop
5  pointing.
6      A.  Yes.
7      Q.  So did you receive this?
8      A.  Yes.
9      Q.  Okay.  When?
10      A.  I don't remember.
11      Q.  Did you read it?
12      A.  Not through the whole thing.
13      Q.  Did you read anything that referred to in any
14  way you, either individually or as one of the
15  plaintiffs?
16          ATTORNEY BRUSTEIN:  Objection.
17      A.  I don't remember.  I just scanned -- probably
18  scanned through it.
19      Q.  What, if any, effort did you make -- strike
20  that.
21          Did you review exhibit 16 before it was filed?
22      A.  I don't remember.
23      Q.  Did you approve it to be filed before it was
24  filed?
25          ATTORNEY BRUSTEIN:  Objection.

Page 140

1                    S. STALEY
2      A.  I don't remember.
3      Q.  Did you do anything to ensure that anything
4  that was said about you, either individually as one of
5  the plaintiffs in exhibit 16 was true?
6          ATTORNEY BRUSTEIN:  Objection.
7      A.  I don't remember.
8      Q.  Did your lawyers oppose the motion to dismiss
9  all of the claims against that you asserted?
10          ATTORNEY BRUSTEIN:  Objection.
11      A.  I don't remember.
12      Q.  Did they agree that some counts should not
13  stand?  Strike that.  You won't understand that.  I've
14  got to make that better, in normal language.
15          Do you know whether your lawyers have conceded
16  that some of the claims that have been asserted on
17  your behalf should not necessarily be sustained as
18  claims?
19          ATTORNEY BRUSTEIN:  Objection.
20      A.  I don't remember.
21      Q.  When you say you don't remember, ma'am, is
22  that because you don't know or because you actually
23  think you knew at one time and you just don't recall?
24      A.  I don't remember.
25      Q.  That wasn't my question.  My question was when



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
141—144

Page 141

S. STALEY

1  you say you don't remember, is it because at one time
2  you think you knew that and you just don't remember
3  now, or whether you don't know whether you ever knew
4  that, what I was asking you before?
5
6       ATTORNEY BRUSTEIN:  Objection.
7       A.  I don't understand the question.
8       Q.  You've told me a lot that you don't remember
9  things.  There's been a lot of things you don't
10  remember.  That's fine.  Nobody remembers everything.
11  But what I want to understand, ma'am, is when you say
12  you don't remember, is it that you don't remember
13  whether you knew something before or not or you think
14  you might have but you don't recall?
15       ATTORNEY BRUSTEIN:  Objection.
16       A.  I don't remember.
17       (Exhibit 17, Declaration of Evan Brustein with
18  exhibits was previously marked for identification.)
19       Q.  Let's look at exhibit 17.  You'll see we have
20  another filing, right, ma'am?
21       A.  Yes.
22       Q.  This is filed on February 7, 2023, right?
23       A.  Yes.
24       Q.  Another declaration from Mr. Brustein?
25       A.  Yes.

Page 142

S. STALEY

1
2       Q.  My question is have you ever seen this
3  particular filing before, exhibit 17?
4       ATTORNEY BRUSTEIN:  Objection.
5       Q.  Declaration and exhibits?
6       A.  I don't remember.
7       Q.  You don't know if you have seen that one
8  before?
9       A.  I don't remember.
10       (Exhibit 19, Reply Memorandum of Law in
11  Further Support of the Warner Defendants' Motion to
12  Dismiss the Amended Complaint was previously marked
13  for identification.)
14       Q.  I am handing you what has been marked as
15  exhibit 19.  And you'll see again, ma'am, we have
16  another filing?
17       A.  Yes.
18       Q.  And this one is February 14, 2023, right?
19       A.  Yes.
20       Q.  Okay.  And this is a Reply Memorandum of Law
21  in Further Support of the Warner Defendants' Motion to
22  Dismiss the Amended Complaint, right?
23       A.  Yes.
24       Q.  Have you ever seen this filing, exhibit 19,
25  before?

Page 143

S. STALEY

1
2       ATTORNEY BRUSTEIN:  Objection.
3       A.  I don't remember.
4       Q.  As you sit here today, ma'am, what is your
5  understanding of why the Warner defendants believe
6  that your complaint against them should be thrown out
7  in its entirety?
8       ATTORNEY BRUSTEIN:  Objection.
9       A.  Can you repeat that question?
10       Q.  Yes, sure.  We've shown you before that they
11  filed a motion to dismiss the complaint against them
12  in their entirety, right?
13       A.  Yes.
14       Q.  Okay.  So in other words they've asked the
15  judge to get rid of it, do you understand that?
16       A.  Yes.
17       Q.  What I want to know is as you sit here today
18  what is your understanding of why the Warner
19  defendants believe that the judge should dismiss your
20  complaint against them in its entirety?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  I don't understand the question.
23       Q.  Okay.  You understand that they asked the
24  judge to throw the case against them out in its
25  entirety, right?

Page 144

S. STALEY

1
2       A.  Yes.
3       Q.  Okay.  Did you understand that they have to
4  give the judge a reason to do that?
5       ATTORNEY BRUSTEIN:  Objection.
6       A.  I don't understand the question.
7       Q.  You don't understand, okay.  I'm trying to
8  help you, ma'am.  I really, really am.
9       ATTORNEY BRUSTEIN:  Objection.
10       Q.  Do you have an understanding as to whether
11  when the Warner defendants asked the judge to dismiss
12  the complaint, the amended complaint against them in
13  its entirety, whether they had to give the judge
14  reasons to do that?
15       ATTORNEY BRUSTEIN:  Objection.
16       A.  I don't understand the question.
17       Q.  Do you know why the Warner defendants think
18  that the complaint against them should be dismissed in
19  its entirety?
20       ATTORNEY BRUSTEIN:  Objection.
21       A.  I don't understand the question.
22       Q.  The question is do you, as you sit here today,
23  know why the Warner defendants think, told the
24  judge -- strike that.  Let me start from scratch.
25       As you sit here today, ma'am, do you know why



SELENA STALEY                                                    April 11, 2023
STALEY V. FSR INTL.                                                 145–148

Page 145
S. STALEY
1
2  the Warner defendants told the judge that the judge
3  should dismiss the complaint against them in its
4  entirety?
5      A. I don't understand the question.
6      Q. Do you intend to testify at trial?
7         ATTORNEY BRUSTEIN: Objection.
8      A. I don't know.
9      Q. You don't know whether when the case goes to
10  trial you'll have to testify?
11        ATTORNEY BRUSTEIN: Objection.
12     A. The judge hasn't decided that yet.
13     Q. I'm not asking what the judge has decided or
14  not decided.  I am trying to understand, do you have
15  an understanding as to whether when this case goes to
16  trial you will have to testify?
17     A. It hasn't been decided if it's going to trial.
18     Q. You don't want to have a trial on your claims,
19  ma'am?
20     A. I'm just saying it hasn't been decided yet.
21     Q. Well, you just talked about the judge possibly
22  setting a trial date, remember?  You had suggested
23  that that was one of the things that you found when
24  you went online and looked at the docket.
25     A. But it hasn't been decided yet.  It's just a

Page 146
S. STALEY
1
2  date.
3      Q. Okay.  If this case goes to trial do you have
4  an understanding as to whether you'll have to testify?
5         ATTORNEY BRUSTEIN: Objection.
6      A. I'm not sure.
7      Q. You don't know?
8      A. No.
9      Q. Well, you had suggested, ma'am, at one point
10  in time, I'm not trying to put words in your mouth,
11  that you want to be heard, you want to be able to tell
12  your story, right?
13     A. Yes.
14     Q. Do you have an understanding as to whether or
15  not you would have to go to court to do that?
16     A. If the judge decides it.
17     Q. What do you mean by that?
18     A. The judge makes that determination.  If there
19  will be a trial.  It hasn't been decided yet.
20     Q. Okay.  Have you heard the term in connection
21  with this lawsuit "discovery"?
22     A. Yes.
23     Q. Okay.  What do you understand that term to
24  mean?
25     A. That's something that's found out about the

Page 147
S. STALEY
1
2  case.
3      Q. Let's talk about the steps to get us to trial
4  and possibly to get the case resolved.
5         Do you understand that there is a portion of
6  the case that we're in now where the parties obtain
7  information from one another?
8      A. Yes.
9      Q. Okay.  So you understand, for example, that
10  you are here giving a deposition, correct?
11     A. Yes.
12     Q. Okay.  And you understand your lawyers are
13  also taking deposition of defendants' people, right?
14     A. Yes.
15     Q. All right.  And they're getting information
16  under oath just as you're giving it to us today,
17  right?
18     A. Yes.
19     Q. Okay.  Do you understand that to be part of
20  the discovery process before the case goes to trial?
21     A. Yes.
22     Q. All right.  And part of that other process is
23  to provide documents and answer questions under oath,
24  right?
25     A. Yes.

Page 148
S. STALEY
1
2      Q. And you participated in both of those,
3  correct?
4      A. Yes.
5      Q. By the way, as a plaintiff in the case do you
6  understand that you have an obligation to participate
7  in the discovery process?
8         ATTORNEY BRUSTEIN: Objection.
9      A. Yes.
10     Q. And as a class representative or person who
11  wants to serve as a class representative, do you have
12  an understanding that you have an obligation to fully
13  participate in the discovery process?
14        ATTORNEY BRUSTEIN: Objection.
15     A. I don't understand the question.
16     Q. You are a plaintiff in your own right, right?
17  You're a person on the caption of the complaint,
18  correct?
19     A. Yes.
20     Q. Okay.  You also want to serve as a class
21  representative, right?
22     A. Yes.
23     Q. And the judge hasn't decided that yet, right?
24     A. And the judge hasn't decided that yet.
25     Q. But you are going to ask the judge at some



SELENA STALEY                                    April 11, 2023
STALEYV. FSR INTL.                                    149–152

Page 149

S. STALEY

1
2   point to let you serve as a class representative,
3   right?
4       A.  Yes.  But that hasn't occurred yet.
5       Q.  I understand that.  Do you understand that as
6   a person who wants to serve as a class representative
7   you'll have an obligation to fully participate in the
8   discovery process?
9           ATTORNEY BRUSTEIN:  Objection.
10      A.  I don't understand the question.
11      Q.  What don't you understand about that one,
12  ma'am?
13      A.  Because it hasn't been decided yet.  The judge
14  hasn't decided it yet.
15      Q.  Right.  You want to ask him to let you do
16  that --
17      A.  I'm participating.
18      Q.  Okay.  You have an understanding that as a
19  person who wants to serve in that capacity you have an
20  obligation to participate, right?
21      A.  Yes.
22      Q.  Okay.
23          (Exhibit 20, Plaintiffs' Rule 26 (A)(1)(A)
24  Initial Disclosures was previously marked for
25  identification.)

Page 150

S. STALEY

1
2       Q.  Let's look at exhibit 20.  And you'll see,
3   ma'am, in exhibit 20 we have got, in the front, a
4   document that says Plaintiffs' Rule 26 (A)(1)(A)
5   Initial Disclosures, and that goes on for a number of
6   pages.  I don't have numbers on them but it goes on
7   for several pages, correct?
8       A.  Yes.
9       Q.  All right.  Let's start with that.  And then I
10  have also, there are some documents here that you
11  incorporated with that.
12      A.  Yes.
13      Q.  Let's started with the first part, the
14  Plaintiffs' Rule 26 (A)(1)(A) Initial Disclosures.
15  Have you ever seen that document before?
16      A.  I don't remember.
17      Q.  You don't remember seeing this?
18      A.  I don't remember.
19      Q.  Okay.  Why don't you take a look, ma'am, at --
20  I wish I had page numbers, I'll have to count them.
21  Go to I think it's page 5, it is, the fifth page under
22  B.
23      A.  I see that.
24      Q.  You see that?  Okay.  And it says a copy or
25  description by category and location of all documents,

Page 151

S. STALEY

1
2   data compilations and tangible things that are in the
3   possession, custody or control of the party, and that
4   plaintiff may use to support her claims unless solely
5   for impeachment.
6           Do you see that sentence?
7       A.  Yes.
8       Q.  And then you'll see there's a whole bunch of
9   numbers starting at one and going down to 15 on the
10  first page and it goes on for several pages, right?
11      A.  Yes.
12      Q.  And then you will see next to each one there
13  is a designation that says, it starts with the first
14  one, Staley v FSR 001, right?
15      A.  Yes.
16      Q.  And then they go on.  And you can see the
17  numbers increase as we go sequentially?
18      A.  Yes.
19      Q.  Have you ever heard of something called a
20  Bates number?
21      A.  No.
22      Q.  Okay.  Take a look at the documents that are
23  attached, that were part of the exhibit that begin,
24  you know, after that first document's over.  Yes.
25  Here we have got a set of documents, and I am going to

Page 152

S. STALEY

1
2   make a representation to you.  Your lawyers gave us
3   these along with this initial disclosure.  Okay?
4   That's my representation to you.  All right?
5           ATTORNEY BRUSTEIN:  Objection.
6       Q.  And if you take a look you'll see at the
7   bottom lower right-hand corner you'll see we've got a
8   Staley v FSR and then it's got some numbers?
9       A.  Yes.
10      Q.  Okay.  I will represent to you that that's a
11  Bates number.  Lawyers put Bates numbers on every page
12  of documents because lawyers are kind of like that.
13  All right?  You'll see if we start here with FSR 0001
14  and we go to the end of it, the very last one.
15      A.  Yes.
16      Q.  You'll see we have FSR 0261, right?
17      A.  Yes.
18      Q.  And if you look at that very first document
19  that was part of this exhibit, ma'am.
20      A.  Yes.
21      Q.  And you'll look at three pages from the back.
22  The very first doc.  The initial disclosures.
23      A.  Yes.
24      Q.  You'll see the last one there, 81 task force
25  housekeeping email, right?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
153–156

Page 153

S. STALEY

1
2      A. Yes.
3      Q. And you'll see that the number I think with
4  the exception -- well, no, it's not with the
5  exception.  FSR 0261 matches the document we just
6  looked at, right at the end of that pile?
7      A. Yes.
8      Q. Okay.  Do you see the date of the initial
9  disclosures on the very last page is December 26,
10  2022, the day after Christmas?
11      A. I'm sorry?
12      Q. Yes.  The very last page of the disclosures,
13  I'm sorry, the second-to-last page, I apologize, my
14  error, we have a date of December 26, 2022?
15      A. Yes.
16      Q. Okay.  So using that time period, Christmas of
17  2022, did you participate in gathering documents that
18  you had in your possession that might be relevant to
19  this case and turning them over to your lawyers?
20      ATTORNEY BRUSTEIN:  Objection.
21      A. Yes.
22      Q. You did?
23      A. Yes.
24      Q. How did you go about doing that?
25      A. They were documents that I had.

Page 154

S. STALEY

1
2      Q. Okay.
3      A. Mm-hmm.
4      Q. Well, I understand they're documents you had.
5  How did you go about identifying them?  Where did you
6  look?
7      A. In my file.
8      Q. What file is that, ma'am?
9      A. My file at home.
10      Q. Is it an electronic file?  Is it a paper file?
11  Are there combinations of that?
12      A. It's a combination.
13      Q. So you have electronic files on your computer?
14      A. Yes.
15      Q. And then you have a paper file.  Is that
16  contained somewhere in your house?
17      A. Yes.
18      Q. All right.  And the electronic file has got
19  things in PDF form and stuff like that, right?
20      A. Yes.
21      Q. And the paper files just has paper, right?
22      A. Yes.
23      Q. You looked through both of those sources, is
24  that fair?
25      A. Correct.

Page 155

S. STALEY

1
2      Q. What did you turn over?  How did you decide
3  what you would give to your lawyers and what you
4  wouldn't give to your lawyers?
5      ATTORNEY BRUSTEIN:  Objection.
6      A. I don't know.  I don't understand the
7  question.
8      Q. Let's start with your paper file.
9      A. Yes.
10      Q. Did you pull absolutely everything you had in
11  there out and just turned it over to be produced?
12      ATTORNEY BRUSTEIN:  Objection.
13      A. I don't remember.
14      Q. In other words, was everything you have --
15  well, strike that.  Your paper file, what does that
16  contain?  What are the contents of it?
17      ATTORNEY BRUSTEIN:  Objection.
18      A. I don't understand the question.
19      Q. It's your file, right, ma'am?  You have a
20  paper file and you have an electronic file, is that
21  correct?
22      A. Yes.
23      Q. Okay.  Let's start with your paper file.  What
24  do you keep in there?
25      ATTORNEY BRUSTEIN:  Objection.

Page 156

S. STALEY

1
2      A. Documents.
3      Q. Relating to what?
4      A. To Four Seasons.
5      Q. Okay.  So you have a paper file just for stuff
6  relating to Four Seasons, is that accurate?
7      A. Yes.
8      Q. All right.  Start with that.  So that was one
9  of the places you looked for documents to turn over in
10  this lawsuit, is that accurate?
11      A. Yes.
12      Q. Did you turn over everything you have?
13      ATTORNEY BRUSTEIN:  Objection.  I am going to
14  direct her not to answer what she turned over to her
15  attorneys.
16      ATTORNEY BOLAND:  You want to stick with that
17  for the 30(b)(6)?  Yes or no?  Do you want to stick
18  with it?
19      ATTORNEY BRUSTEIN:  Are you saying it's a fair
20  game question for the 30(b)(6)?
21      ATTORNEY BOLAND:  Of course it's a fair game
22  question.  That is what the 30(b)(6) topic of the
23  searched for documents is all about.  There is nothing
24  privileged about what is searched for by a plaintiff
25  or a party and turned over to the lawyers.  Nothing



Page 157

S. STALEY

1
2 privileged about that at all in terms of search for
3 documents.  That's their job.  What we do with it, I
4 grant you, that's a different issue.  What they do to
5 search, what they turn over is not.  If you want to
6 take that position, take it.  But live with the
7 consequences.
8         ATTORNEY BRUSTEIN:  But you are asking if you
9 have everything she turned over to us.
10        ATTORNEY BOLAND:  I didn't ask her that.  I
11 specifically didn't ask her that.  But live with the
12 consequences, because you pulled this with Ms. Holmes
13 as well.  You decide.  I want to get -- I'll move
14 through the question, we'll move on.  It doesn't
15 matter to me.  You're going to live with the
16 consequences of it.
17        ATTORNEY BRUSTEIN:  Can we have the question
18 read back?
19        ATTORNEY BOLAND:  I can ask it.  I'll ask it
20 again.
21    Q.  You had a paper file of documents relating to
22 the Four Seasons?
23    A.  Yes.
24    Q.  Did you just grab everything to turn over to
25 your lawyers, and I'm not asking what they did with

Page 158

S. STALEY

1
2 it, or did you make a decision about what would you
3 grab and what you would take out of there and turn
4 over to your lawyers?
5        ATTORNEY BRUSTEIN:  Objection.
6    Q.  You can answer.
7    A.  I'm just --
8    Q.  You're trying to remember?  Okay.  That's
9 fine.
10    A.  I don't remember.
11    Q.  Well, I want to know, ma'am, I want to know if
12 you made a decision at your level what documents you
13 would turn over or wouldn't turn over to your lawyers
14 or whether you gave them absolutely everything you
15 have?
16        ATTORNEY BRUSTEIN:  Objection.
17    A.  I don't remember.  It's been a while ago.  I
18 gave over lots of different documents.  But to tell
19 you every single piece of paper, I don't remember.
20    Q.  So you can't tell me whether there are some
21 documents that you chose to give over and some that
22 you did not?
23    A.  I don't remember.
24    Q.  Okay.  And therefore you can't tell me if you
25 did that, what criteria you applied?  In other words

Page 159

S. STALEY

1
2 how you decided what to give and what not to give?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't remember.
5    Q.  So as we sit here today, we just don't know
6 whether you gave only some of things you have or
7 whether you gave all of it?
8        ATTORNEY BRUSTEIN:  Objection.
9    A.  I don't remember.
10    Q.  What about electronic documents?  You have a
11 file for electronic documents relating to the Four
12 Seasons?
13    A.  Yes.
14    Q.  Okay.  What is contained in that file, just
15 generally, if you can describe it generally?  Is it
16 just PDF documents?
17    A.  PDF, yes.
18    Q.  Okay.  How about emails?
19    A.  Yes.
20    Q.  You have emails you save them over in your
21 folder or do you have emails that relate to Four
22 Seasons?
23        ATTORNEY BRUSTEIN:  Objection.
24        ATTORNEY BOLAND:  Strike that.  That was a bad
25 question.

Page 160

S. STALEY

1
2    Q.  Do you take emails that relate to Four Seasons
3 and save them in your Four Seasons electronic folder
4 that you discussed earlier?
5    A.  I don't know how to ... emails that were sent
6 to me from the Four Seasons.
7    Q.  Okay.  Let me step back for a second.  You
8 have an electronic Four Seasons folder, right?  A
9 file?
10    A.  I don't understand your question.
11    Q.  Yeah.  So what do you have electronically that
12 relates to -- strike that.  You had said before, tell
13 me if I'm wrong, ma'am, that you have a paper file for
14 the Four Seasons, right?
15    A.  When you say paper file, it's --
16    Q.  In other words physical papers.
17    A.  A folder?
18    Q.  Well, no.  I'm trying to talk about the
19 difference between the things you have in physical
20 format and things you have electronically.
21    A.  In the folder it's all documents that Four
22 Seasons gave me over the course that I worked with
23 them that were for me.
24    Q.  Is that the electronic folder or is that your
25 paper one?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
161–164

Page 161
```
                  S. STALEY
 1
 2      A. That's my paper folder.
 3      Q. Your paper folder, okay, good. We talked
 4  about what you did with that. I can't remember
 5  whether you turned everything over or parts of it.
 6  Got it. Now let's talk about whatever documents that
 7  you store that you maintain only electronically like
 8  on your computer. Okay?
 9      A. Okay.
10      Q. Do you have documents from the Four Seasons,
11  electronically on your computer, or relating to the
12  Four Seasons?
13          ATTORNEY BRUSTEIN: Objection. To the extent
14  that it related to attorney-client communication I am
15  going to instruct her not to answer. But otherwise
16  she can answer.
17      A. I have emails sent to me.
18      Q. You have emails sent to you?
19      A. From Elizabeth Ortiz.
20      Q. Okay.
21      A. I have anything that she put together, which
22  she sent to all employees. I have -- I have those
23  emails that were sent to me.
24      Q. And when you say to you, to what email address
25  are you referring?
```

Page 162
```
                  S. STALEY
 1
 2      A. Selenahar@msn.com.
 3      Q. Your MSN address, okay. And did the emails
 4  that you received from the Four Seasons also sometimes
 5  include attachments?
 6      A. I don't remember. Some did.
 7      Q. Did you also send emails that in some way in
 8  those emails you may have in some way to someone else
 9  referred to your job at the Four Seasons?
10          ATTORNEY BRUSTEIN: Objection.
11      A. Repeat that question?
12      Q. Yeah, sure. Do you send emails?
13          ATTORNEY BRUSTEIN: Objection.
14      A. I don't understand that question.
15      Q. Have you ever sent an email from your MSN
16  account? Any email, at all. Do you send out emails
17  or do you only receive them?
18      A. You mean in my personal email?
19      Q. Yes.
20      A. Yes.
21      Q. Okay. Have you ever sent emails to friends,
22  family, anybody in which you referenced in some way
23  your work at the Four Seasons?
24          ATTORNEY BRUSTEIN: Objection. Again I am
25  going to limit her answer to exclude any
```

Page 163
```
                  S. STALEY
 1
 2  attorney-client communication.
 3      A. I don't remember.
 4      Q. Okay. Do you use any other email account
 5  actively other than the MSN account?
 6      A. (No response.)
 7      Q. Strike that. You told me you had two email
 8  accounts, right?
 9      A. Correct.
10      Q. Okay. Do you use both?
11      A. I do.
12      Q. All right. And do you receive and send emails
13  from both?
14      A. In my personal life, you're asking?
15      Q. Yes.
16      A. Yes.
17      Q. What, if anything, did you do to search your
18  MSN account for any documents that may relate in any
19  way to the Four Seasons?
20      A. What do you mean by search? I don't
21  understand.
22      Q. Well, strike that. Let's get to it in a
23  second. Because I am going to ask you about something
24  called a document request in a little bit. Let's do
25  it now. Let's get it out of the way.
```

Page 164
```
                  S. STALEY
 1
 2      (Exhibit 24, Defendants' First Demand For
 3  Production of Documents was previously marked for
 4  identification.)
 5      Q. I am handing you what has been marked as
 6  exhibit 24 --
 7          ATTORNEY BRUSTEIN: Do you still want 20,
 8  or ...
 9          ATTORNEY BOLAND: Oh, yeah. Yes, sir.
10      Q. Do you see we have here, ma'am, something
11  called Defendants' First Demand For Production of
12  Documents, right?
13      A. Yes.
14      Q. And you'll see that this is a demand for
15  production of documents that has been served on you,
16  as well as others? And you can take a look at the
17  first "Please take notice" paragraph, if you like.
18      (The witness reviews document.)
19      A. Yes.
20      Q. Okay. Have you ever seen exhibit 24 before?
21      A. I don't remember.
22      Q. Did you understand, irrespective of whether
23  you remember this document, that the Warner defendants
24  had served in the discovery process a document similar
25  to what we have here as exhibit 24? In other words a
```



Page 165

S. STALEY

1    request for you to produce documents that you have in
2    this lawsuit?
3    
4        A. Yes.
5        Q. Okay. What did you do to search for documents
6    to produce in this lawsuit in response to any demand
7    that the Warner defendants made?
8        A. I complied and sent those documents.
9        Q. When?
10       A. I don't remember.
11       Q. So we'll take a look, ma'am, we have got
12   here -- well, let's mark something else and then we'll
13   get back and we'll see if we can make sense of all of
14   these things.
15           (Exhibit 25, Plaintiffs' Responses and
16   Objections to Defendants' First Request For Production
17   of Documents was previously marked for
18   identification.)
19       Q. I have handed you what has been marked as
20   exhibit 25, which you will see is Plaintiffs'
21   Responses and Objections to Defendants' First Request
22   For Production of Documents.
23           Do you see that, ma'am?
24       A. Yes.
25       Q. And do you see this is a response to the

Page 166

S. STALEY

1    
2    Warner defendants' first set of document -- request
3    for production of documents that was to you and to
4    others, right?
5        A. Yes.
6        Q. Okay. Have you ever seen exhibit 25 before?
7        A. I don't remember.
8        Q. So you understand that there were document
9    requests that were served on you for you to produce
10   documents, right?
11       A. Yes.
12       Q. You understand that there was a response made
13   on your behalf, right?
14       A. Yes.
15       Q. You don't remember if you saw it or not,
16   right?
17       A. Right.
18       Q. Okay. And you also understand that you gave
19   some documents that were produced to us in connection
20   with initial disclosures, right?
21       A. Yes.
22       Q. Here's what I am trying to figure out. I need
23   to know what you did to search for those. Okay? I
24   asked you ones about the paper file for Four Seasons
25   documents. We've talked about that, right?

Page 167

S. STALEY

1    
2        A. Yes.
3        Q. All right. Now I want to talk about email.
4    You have two email accounts. What, if anything, did
5    you do to search those email accounts for documents
6    that may relate to the Four Seasons?
7        A. Can you explain what do you mean by "search"?
8        Q. Well, emails come in and then they sit in your
9    inbox, right?
10       A. Yes.
11       Q. And then you send emails and they sit in your
12   outbox, right?
13       A. Yes.
14       Q. Did you look through either your inbox or your
15   outbox of your two email accounts for documents that
16   might relate to the Four Seasons?
17       A. Yes. I looked in the emails that I received
18   from Elizabeth Ortiz, and Four Seasons, I went to my
19   folder.
20       Q. The inbox?
21       A. Yes. The inbox.
22       Q. Do you store like emails in a folder in your
23   email system?
24       A. Yes, I do.
25       Q. So you moved them over to your storage system?

Page 168

S. STALEY

1    
2        A. Yes.
3        Q. Okay. So you went to your storage folder and
4    you looked for the emails there, is that fair?
5        A. Yes.
6        Q. All right. What did you do then? Did you
7    identify any emails to produce in this case?
8           ATTORNEY BRUSTEIN: Objection.
9        A. Does that fall under attorney-client
10   privilege? Information that I'm sending to my
11   attorneys?
12       Q. I didn't ask you what you sent yet. I asked
13   what did you do if anything to identify -- or did
14   you -- strike that.
15           Did you identify any emails in your folder to
16   be produced in this case?
17           ATTORNEY BRUSTEIN: Objection.
18       A. I don't remember.
19       Q. Well, the folder contains all emails -- strike
20   that. Is that folder simply for Four Seasons-related
21   emails?
22       A. I don't remember.
23       Q. What other emails are in there?
24       A. I don't remember.
25       Q. Are there some Four Seasons emails in there?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
169–172

Page 169

S. STALEY

1
2    A.  There might be some.
3    Q.  Did you look through them?
4        ATTORNEY BRUSTEIN:  Objection.
5    A.  I don't remember.
6    Q.  Did you identify -- you don't remember if you
7    identified any emails to turn over?
8    A.  I don't remember.
9    Q.  How about emails that you might not have
10   placed in your folder; did you look through your inbox
11   to see if there were any emails relating to the Four
12   Seasons that might need to be produced in this case?
13   A.  I don't remember.
14   Q.  Did you go to your outbox -- your outbox, the
15   emails you send, do you also put those in a folder?
16   The ones that relate to Four Seasons?
17   A.  I do not.
18   Q.  Did you look through your outbox for emails
19   that you may have sent relating to the Four Seasons to
20   see if they should be produced in this case?
21   A.  I didn't look through my outbox.
22   Q.  Why not?
23   A.  It's just something I don't do.  I don't look
24   through my outbox.
25   Q.  Right, but you received a document request

Page 170

S. STALEY

1
2    from the Warner defendants in this lawsuit, right?
3    A.  But that comes into the inbox.
4    Q.  No, no, no.  I'm not talking about that.  The
5    document request was for documents that you have
6    relating to the Four Seasons, right?
7    A.  Yes.
8    Q.  Okay.  And then it's up to you to go and take
9    a look and find out what you have and turn it over in
10   some fashion, right?  You understood that?
11   A.  Yes.
12   Q.  Okay.  I want to know in response to the
13   document requests what you did to look through your
14   outbox for documents that relate to the Four Seasons?
15   A.  Maybe I don't understand what you mean by
16   outbox.  Because I --
17   Q.  Emails you sent.
18   A.  But I don't look in my outbox.
19   Q.  But you can, right?
20   A.  But I don't look in my outbox.
21   Q.  I understand that.  I understand you don't do
22   that on a normal basis, is that right?
23   A.  I don't look in my outbox.
24   Q.  Okay.  But you could click on the sent emails
25   in your email system and see what you sent, right?

Page 171

S. STALEY

1
2    A.  I don't look in my outbox.
3    Q.  So you made no effort to go and look through
4    the emails that you may have sent to see if there are
5    any related to the Four Seasons, correct?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't look in my outbox.
8    Q.  Does your email have -- they're telling me it
9    may not be outbox, it may be sent items?
10   A.  I don't look in sent box or outbox.
11   Q.  Okay.  So it didn't really matter what it was.
12   A.  I don't look at it.
13   Q.  You didn't look at it.  So as you sit here
14   today we don't know that there are emails in your sent
15   items or outbox or whatever it is on your computer
16   that may relate to the Four Seasons because you didn't
17   look through it, right?
18       ATTORNEY BRUSTEIN:  Objection.
19   A.  I don't look through the out box.
20   Q.  Do you text?
21   A.  In my personal life?
22   Q.  Yes.
23   A.  Yes, I text.
24   Q.  Have you sent any text in your personal life
25   that may have mentioned in some fashion in any way

Page 172

S. STALEY

1
2    your work at the Four Seasons?
3        ATTORNEY BRUSTEIN:  Objection.
4    A.  I don't remember.
5    Q.  Did you look for texts that may have related
6    to the Four Seasons in responding to the document
7    requests?
8    A.  I don't remember.
9    Q.  This is just a yes or no question.  I just
10   want to know.  Did you turn over any documents at all
11   to your lawyers to be produced in the case?
12       ATTORNEY BRUSTEIN:  Objection.
13   A.  I don't remember.
14       ATTORNEY BRUSTEIN:  Could we take a
15   five-minute break?
16       ATTORNEY BOLAND:  Sure.
17       ATTORNEY BRUSTEIN:  Thank you.
18               ---
19       (Recess from 2:35 to 2:51.)
20               ---
21       ATTORNEY BOLAND:  Let's go back on the record.
22   Q.  I am handing you what has previously been
23   marked as exhibit 21.
24       (Exhibit 21, Plaintiffs' First Supplemental
25   Disclosures was previously marked for identification.)



Page 173

S. STALEY

1
2    Q. Which you will see, ma'am, is a document
3  entitled Plaintiffs' First Supplemental Disclosures
4  dated December 29, 2022?
5    A. Yes.
6    Q. Have you ever seen exhibit 21 before?
7    A. Yes.
8    Q. You have seen this before?
9    A. Yes.
10   Q. When?
11   A. I don't remember when.
12   Q. You're sure you've seen this one, though?
13   A. Yes.
14   Q. Okay. What is it about this document that
15 makes you sure that you saw it when you're not sure
16 about the others?
17     ATTORNEY BRUSTEIN: Objection.
18   A. My attorneys keep me abreast of any
19 information that they were sent.
20   Q. Right. But we've been through this before
21 with the other documents. I understand that your
22 attorneys have sent you some things that were
23 submitted in the case, fair?
24   A. Yes.
25   Q. Okay. But when I showed you other documents

Page 174

S. STALEY

1
2 you weren't able to tell me whether what I was showing
3 you was in fact one of those documents. Do you
4 remember that?
5    A. Yes.
6    Q. Okay. With respect to exhibit 21, how is it
7 you know that this is in fact one of the documents
8 that you were sent?
9     ATTORNEY BRUSTEIN: Objection.
10   A. It just looks familiar to me.
11   Q. Okay. And you'll see here it discloses
12 something called audio recording on the June 25, 2021
13 Zoom meeting, right?
14   A. Yes.
15   Q. There was a virtual town hall that was
16 conducted through videoconferencing type means on June
17 25 of 2021, right?
18   A. Yes.
19   Q. All right. And you participated in that, did
20 you not?
21   A. Yes.
22   Q. Okay. You did that remotely, right?
23   A. Yes.
24   Q. Everybody was remote back then, right?
25   A. Yes.

Page 175

S. STALEY

1
2    Q. Okay. Did you have an understanding before
3  you came in today as to whether or not someone made an
4  audio recording of that meeting?
5    A. No.
6    Q. You weren't aware of that?
7      ATTORNEY BRUSTEIN: Objection.
8    A. No.
9    Q. So you've never listened to an audio recording
10 of that meeting?
11   A. Maybe I don't understand your question. If
12 you're saying at the time that I was on the Zoom --
13   Q. No. As of today -- before today, I want to
14 know if at any time before today you became aware of
15 the fact that someone had apparently made some type of
16 an audio recording of that meeting?
17   A. Before today?
18   Q. Yes. Did you know that before today?
19     ATTORNEY BRUSTEIN: Objection.
20     ATTORNEY BOLAND: Strike that. Let me go in
21 baby steps.
22   Q. Do you know whether someone made an audio
23 recording of that meeting?
24   A. Before this meeting?
25   Q. No. There was a meeting on June 25, 2021,

Page 176

S. STALEY

1
2 right?
3    A. Yes.
4    Q. Okay. That was by -- it was actually by
5 Microsoft Teams, wasn't it?
6    A. I believe so.
7    Q. Yes. Everybody calls it Zoom and it's not.
8 Do you know whether someone made an audio recording of
9 that meeting?
10     ATTORNEY BRUSTEIN: Objection.
11   A. I mean I don't remember. (Pause.) Yes, I
12 believe I knew.
13   Q. Do you know whether someone made a recording
14 of that meeting as you sit here today?
15   A. Yes.
16   Q. Okay. When did you learn that someone made a
17 recording of the meeting?
18   A. A while after June 25, 2021.
19   Q. Okay. How long after that?
20   A. I don't remember.
21   Q. Was it -- taking the date of this disclosure
22 of December 29, 2022, do you see the signature line
23 right under the 1? There's a date?
24   A. Yes.
25   Q. All right. Did you know about it before



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
177–180

Page 177

1                    S. STALEY
2    December 29, 2022?
3        A. I don't remember.
4        Q. Have you ever listened to a recording of the
5    June 25, 2021 meeting?
6        A. Yes.
7        Q. When?
8        A. Recently. I don't remember when, but I did.
9        Q. Where were you when you listened to it? In
10   other words were you in New York? Were you in another
11   state?
12       A. I was in New York.
13       Q. You were in New York. How did it come about
14   that you listened to the meeting? Listened to the
15   recording?
16       ATTORNEY BRUSTEIN: Objection. To the extent
17   that it involves attorney-client communication I am
18   going to direct her not to answer.
19       Q. He's only directing you not to answer if you
20   have to give away attorney-client communication. If
21   you don't have to give away attorney-client
22   communication I would like you to tell me how you came
23   to listen to the recording when you did?
24       ATTORNEY BRUSTEIN: The same objection.
25       A. I don't remember.

Page 178

1                    S. STALEY
2        Q. Who made the recording?
3        ATTORNEY BRUSTEIN: Objection.
4        A. I don't remember.
5        Q. Did you know at some time?
6        A. Could you repeat the that?
7        Q. Did you know at some point in time who made
8    the recording?
9        A. I don't remember.
10       Q. Do you know whether the recording violated any
11   laws?
12       ATTORNEY BRUSTEIN: Objection.
13       A. I don't know.
14       Q. Do you know whether playing that recording in
15   different locations could violate any laws?
16       ATTORNEY BRUSTEIN: Objection.
17       A. I don't know.
18       Q. You don't know?
19       A. (Shaking head.)
20       Q. Do you have possession of the recording?
21       ATTORNEY BRUSTEIN: Objection.
22       Q. Do you have a copy of it?
23       ATTORNEY BRUSTEIN: Objection.
24       A. I don't know.
25       Q. How did you get it to listen to it?

Page 179

1                    S. STALEY
2        ATTORNEY BRUSTEIN: Objection. To the extent
3    that it involves attorney-client communication I would
4    direct her not to answer.
5        A. I don't remember.
6        Q. Is it accurate to say, though, that you did
7    not make that recording, right?
8        A. Yes.
9        Q. So if any laws were broken by doing it, you
10   didn't break them, right?
11       ATTORNEY BRUSTEIN: Objection.
12       Q. Right?
13       ATTORNEY BRUSTEIN: Objection.
14       ATTORNEY BOLAND: I know you objected.
15       ATTORNEY BRUSTEIN: You asked a second
16   question so I objected again.
17       Q. So to the extent any laws were broken at least
18   you didn't break them, right?
19       ATTORNEY BRUSTEIN: Objection.
20       A. I don't know.
21       Q. You don't know whether any laws were broken
22   with respect to that recording, ma'am?
23       ATTORNEY BRUSTEIN: Objection.
24       A. I didn't -- I didn't make the recording,
25   so ...

Page 180

1                    S. STALEY
2        Q. You didn't make the recording, right?
3        A. No.
4        Q. So if making the recording was illegal
5    anywhere at least you didn't do it, right?
6        ATTORNEY BRUSTEIN: Objection.
7        A. I don't know.
8        Q. What don't you know? You don't know whether
9    you didn't do it, or what don't you know?
10       ATTORNEY BRUSTEIN: Objection.
11       A. I did not make the recording.
12       Q. Okay.
13       (Exhibit 22, letter dated March 29, 2023 was
14   previously marked for identification.)
15       Q. I am handing you what has been marked as
16   exhibit 22. You'll see this is a letter from
17   Mr. Brustein on his letterhead, right?
18       A. Yes.
19       Q. Okay. Have you ever seen exhibit 22 before?
20       A. I believe I have.
21       Q. When?
22       A. I don't remember.
23       Q. And you say you believe you have seen it. Why
24   do you believe you have seen exhibit 22?
25       ATTORNEY BRUSTEIN: Objection.



Page 181

1              S. STALEY
2       A. I don't remember. I mean they send me lots of
3  documents, from my attorneys.
4       Q. I'm sorry. I apologize. I didn't mean to cut
5  you off.
6       A. No worries.
7       Q. You said I believe I have seen this one
8  before. Right? You believe you have seen this one
9  before?
10      A. Yes.
11      Q. I want to know why you believe you have seen
12  this specific exhibit.
13      A. Because my attorneys keep me abreast.
14      Q. Right, but there's a lot of documents that I
15  have shown you, ma'am, where you've said --
16      A. Because this looks familiar to me.
17      Q. This looks familiar to you?
18      A. Yes.
19      Q. You see there's reference there under A,
20  August 27, 2021 settlement agreement and it goes on.
21  And you can read that to yourself.
22         (The witness reviews document.)
23      A. Yes.
24      Q. Okay. What is that?
25         ATTORNEY BRUSTEIN: Objection.

Page 182

1              S. STALEY
2         ATTORNEY BOLAND: Strike that.
3      Q. What is the document that is referred to, to
4  subparagraph (a) on exhibit 22?
5         ATTORNEY BRUSTEIN: Objection.
6      A. I don't know.
7      Q. Why was it being disclosed by Mr. Brustein in
8  this letter?
9         ATTORNEY BRUSTEIN: Objection.
10     A. I don't know.
11     Q. Well, if that looks familiar, when you got the
12  letter or you saw the letter, did you make any attempt
13  to find out why it was being disclosed by
14  Mr. Brustein?
15        ATTORNEY BRUSTEIN: Objection. I direct her
16  not to answer. You're specifically asking about
17  attorney-client communication.
18        ATTORNEY BOLAND: No, I asked her if she made
19  an effort to find out.
20        ATTORNEY BRUSTEIN: Who would she be finding
21  out from other than her attorneys as to why her
22  attorneys were disclosing it? Come on, please.
23        ATTORNEY BOLAND: She can tell me, I consulted
24  with my lawyers.
25        ATTORNEY BRUSTEIN: I will instruct her not to

Page 183

1              S. STALEY
2  answer.
3         ATTORNEY BOLAND: Fine and dandy.
4         (Exhibit 23, Staley v FSR0304 was previously
5  marked for identification.)
6      Q. Exhibit 23. And you'll see this document says
7  Agreement made this 27th day of August 2021, and then
8  it goes on, right?
9      A. Yes.
10     Q. Okay. And then at the bottom it appears to be
11  something partially signed, is that the way it looks
12  to you?
13     A. Yes.
14     Q. Okay. What is this document?
15        ATTORNEY BRUSTEIN: Objection.
16     A. I don't know.
17     Q. Have you ever seen it before?
18     A. I don't know.
19     Q. Do you have any idea why it's being produced
20  by the plaintiffs in the case?
21        ATTORNEY BRUSTEIN: Objection.
22     A. I don't understand the question.
23     Q. Do you have any idea why I have this with a
24  Bates number Staley versus FSR0304, which I am going
25  to represent to you is a Bates number for documents

Page 184

1              S. STALEY
2  produced by the plaintiffs?
3         ATTORNEY BRUSTEIN: Objection.
4      A. This is signed by Elizabeth Ortiz.
5      Q. I understand. I am looking at the Bates
6  number on the bottom, ma'am. That means it came from
7  your side of the v., as we say in litigation.
8         ATTORNEY BRUSTEIN: Objection.
9      A. I don't remember.
10     Q. Did you obtain what we have here as exhibit 23
11  to be produced in the case?
12     A. I don't remember.
13     Q. If you'll look at the top, ma'am, it says
14  agreement made this 27th day of August, 2021 by and
15  between the Four Seasons Hotel New York (hotel) and it
16  says, this is what I want to focus on, the New York
17  Hotel and Motel Trades Council, AFL-CIO, right?
18     A. Yes.
19     Q. Are you a member of that union?
20     A. No.
21     Q. To your knowledge, is Ms. Holmes a member of
22  that union?
23        ATTORNEY BRUSTEIN: Objection.
24     A. I don't know.
25     Q. You don't know? To your knowledge is Ms. Ivey



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
185–188

S. STALEY

1  a member of that union?
2  
3      ATTORNEY BRUSTEIN:  Objection.
4  A.  I don't know.
5  Q.  Are you a member of any union?
6  A.  No.
7  Q.  How about like SAG or AFTRA?
8  A.  Oh, not with the hotel?
9  Q.  Yes.
10  A.  SAG, AFTRA, and Equity.
11  Q.  And Equity, okay.  But not with respect to any
12  unions that relates to the hotel?
13  A.  No.
14  Q.  Okay.
15      (Exhibit 26, Defendants' First Set of
16  Interrogatories was previously marked for
17  identification.)
18  Q.  I am handing you, ma'am, what has been marked
19  as exhibit 26.  You'll see this is entitled
20  Defendants' First Set of Interrogatories, right?
21  A.  Yes.
22  Q.  Do you know what interrogatories are?
23  A.  I don't remember.
24  Q.  Did you ever know what they were?
25  A.  I thought I did.  I thought I would remember.

S. STALEY

1  
2  But I don't remember.
3  Q.  Okay, fair enough.  Do you have an
4  understanding that -- we looked at document requests,
5  in other words demands made upon you to produce
6  documents to the Warner defendants, right?
7  A.  Yes.
8  Q.  Okay.  And that's part of the discovery
9  process, correct?
10  A.  Yes.
11  Q.  Did you also understand, whatever the title
12  is, that part of the discovery process was that the
13  Warner defendants could submit written questions to
14  you that you would then answer under oath?
15  A.  Yes.
16  Q.  Okay.  Is that maybe what your understanding
17  of interrogatories would be?
18  A.  Yes.
19  Q.  Okay.  And these were questions that were sent
20  to you, through your lawyers, obviously, to provide
21  answers to under oath, penalty of perjury, just like
22  you're sitting here today, right?
23  A.  Yes.
24  Q.  Okay.  And you have seen then I take it
25  exhibit 26 before?

S. STALEY

1  
2  A.  Yes.
3  Q.  All right.  There's a lot of different
4  questions in interrogatories, do you see starting on
5  page 3 and going on through page 5?
6  A.  Yes.
7  Q.  Putting aside conversations you may have had
8  with your lawyers, what did you do to gather any
9  information to be provided to the Warner defendants in
10  response to the interrogatories?
11  A.  Can I review it?
12  Q.  Yes, go ahead, please.
13  A.  I provided whatever documents they were
14  requesting.
15  Q.  So this isn't a document request, though,
16  ma'am, right?  These are the written questions for you
17  to answer in writing.  Right?  And I'm not trying to
18  hide the ball on you.  Let me give you the responses,
19  okay?
20      (Exhibit 27, Plaintiffs' Responses and
21  Objections to Warner Defendants' First Set of
22  Interrogatories was previously marked for
23  identification.)
24  Q.  This is exhibit 27.
25      (The witness reviews document.)

S. STALEY

1  
2  Q.  You'll see here we have Plaintiffs' Responses
3  and Objections to the Warner Defendants First Set of
4  Interrogatories, right?
5  A.  Yes.
6  Q.  And to be fair to you, you will see towards
7  the end, I think it is the third page from the end
8  there's a verification.  After that page.  Keep going.
9  Oh, yours has two Vivian's?
10      ATTORNEY BRUSTEIN:  So does mine.
11  Q.  Okay.  They screwed up.  There's a Selena
12  Staley.
13  A.  Okay.
14  Q.  Let's put aside the verification.  Did you do
15  anything to provide the answers that are contained in
16  exhibit 24?
17      ATTORNEY BRUSTEIN:  Objection.
18      ATTORNEY BOLAND:  I apologize.  Exhibit 27.
19  A.  I don't remember.
20  Q.  You don't remember whether you did anything to
21  provide the answers to the interrogatories that were
22  sent to you to be answered?
23  A.  I don't remember.
24  Q.  Did you review the answers --
25      ATTORNEY BOLAND:  Do you mind if I show her



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
189–192

Page 189

1                    S. STALEY
2   the verification?  Because I don't want to trick her.
3        ATTORNEY BRUSTEIN:  No, I mean I don't know
4   what you're --
5        ATTORNEY BOLAND:  I don't want to be unfair to
6   her when she's got a verification on here and she
7   can't look at it.  Do you guys mind?
8        ATTORNEY BRUSTEIN:  No.
9        Q.  I'll show this.  This didn't make it to your
10  copy?
11       ATTORNEY BRUSTEIN:  Was it on the exhibit,
12  though?
13       ATTORNEY BOLAND:  It should have been.
14       Q.  I don't want you to look at anything else,
15  ma'am.  Just that verification.  No, go ahead and read
16  it to yourself.
17       ATTORNEY BRUSTEIN:  That was my confusion.  I
18  didn't know if you were showing her a different
19  exhibit.
20       ATTORNEY BOLAND:  I think there were two
21  Vivian's in there.  They should have had all three of
22  them.
23       (The witness reviews document.)
24       A.  Yes.
25       Q.  And is that an electronic signature that you

Page 190

1                    S. STALEY
2   use sometimes?
3        A.  Yes.
4        Q.  Okay.  Did you in fact review the answers that
5   were provided in exhibit 27?
6        ATTORNEY BRUSTEIN:  Can I just ask that you
7   let her look at the entire exhibit?  Because I think
8   it's confusing that you're showing her a different
9   document.
10       ATTORNEY BOLAND:  Yes, I don't care.
11       ATTORNEY LUNDY:  Let me see if I can pull up
12  the original.
13       Q.  Go ahead.  There are a couple of things that
14  are highlighted on it, it doesn't matter.
15          So you will see, ma'am, that what I just
16  handed you is a copy of what you have there, only this
17  one has your declaration in it?
18       A.  Yes.
19       Q.  I mean your verification in it.  Okay.  Did
20  you review the answers that were provided to the
21  interrogatories before they were served?
22       A.  Yes.
23       Q.  Okay.  And you verified that they were
24  correct, right?  True and correct?
25       A.  Yes.

Page 191

1                    S. STALEY
2        Q.  How did you go about making sure that they
3   were true?
4        ATTORNEY BRUSTEIN:  Objection.
5        A.  I don't remember.
6        Q.  I just want to be clear I've got the chain of
7   events.  You don't remember what you did if anything
8   to help provide information for the answers, right?
9        A.  I don't remember.
10       Q.  Okay.  And you don't remember how you went and
11  verified that they were true and correct, right?
12       A.  I don't remember.
13       Q.  But you did sign the verification that they
14  were true and correct, right?
15       A.  Yes.
16       (Exhibit 28, letter dated February 24, 2023
17  from Brustein Law firm was previously marked for
18  identification.)
19       Q.  This is exhibit 28, ma'am.
20       A.  Yes.
21       Q.  You'll see -- go ahead and leaf through it,
22  just so you can take a look at it.  Because I want to
23  be fair to you.  I think you've got a verification on
24  this one, too.
25       (The witness reviews document.)

Page 192

1                    S. STALEY
2        Q.  Have you seen exhibit 28 before?
3        A.  It looks familiar.
4        Q.  Okay.  And you'll see, ma'am, we've got a
5   letter from Mr. Brustein and then there's, "I write
6   this supplemental disclosure letter on behalf of the
7   plaintiffs," and it goes on.
8          And then there are some numbered paragraphs
9   that continue on to the second page, right?
10       A.  Yes.
11       Q.  Okay.  In your verification that's on the
12  third page, this is another verification that you made
13  in the case, right?
14       A.  Yes.
15       Q.  Under penalty of perjury, just like your
16  testimony today, right?
17       A.  Yes.
18       Q.  Okay.  And in paragraph 2 you say:  Certain
19  information contained in the responses are not within
20  my personal knowledge.  Right?
21       A.  Yes.
22       Q.  And when you say the responses, that certain
23  information on the first two pages is not within your
24  personal knowledge, correct?
25       A.  Yes.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
193–196

Page 193

1                    S. STALEY
2        Q.  And then you say:  The information contained
3    in the responses is based on information either within
4    my personal knowledge, and then you say, or assembled
5    by my attorneys and agents and you go on, right?
6        A.  Yes.
7        Q.  What I want to know, ma'am, is when you look
8    at the first two pages, I want to know what
9    information in paragraphs 1 through 5 and the
10   subparagraphs is information that you have personal
11   knowledge of, if any?
12          (The witness reviews document.)
13       A.  Could you repeat the question?
14       Q.  Yeah, sure.  I want to know if there's any
15   information in paragraphs 1, 2, 5 of the first two
16   pages, including the subparagraphs, that you have
17   personal knowledge of rather than information that was
18   developed by your lawyers and agents as you say in
19   your verification.
20       A.  I don't understand the question.
21       Q.  Okay.  I am going off of your verification,
22   ma'am.  Let's start with that, okay?
23       A.  Okay.
24       Q.  Number 3.  Your paragraph 3 of your
25   verification.  It's the third page of the document,

Page 194

1                    S. STALEY
2    ma'am?
3        A.  Yes.
4        Q.  No, your verification.  There you go.  I think
5    you're with me.  Page 3 of the document by Selena
6    Staley?
7        A.  Yes.
8        Q.  Okay.  And in paragraph 3 you say:  The
9    information contained in the responses.  Right?
10       A.  Yes.
11       Q.  And responses refers to the first two pages of
12   this exhibit, right?
13       A.  Yes.
14       Q.  Okay.  And you say:  Is based on information
15   either within my personal knowledge -- that's you?
16       A.  Yes.
17       Q.  -- or assembled by my attorneys and agents.
18   Right?
19       A.  Yes.
20       Q.  What I am trying to figure out in these first
21   two pages, paragraphs 1 to 5, is what information came
22   from your personal knowledge versus the information
23   assembled by your attorneys and agents?
24          (The witness reviews document.)
25       A.  I don't remember.

Page 195

1                    S. STALEY
2        Q.  Okay.  Well, have you calculated your damages
3    in this case, ma'am?  Do you see number 4a?
4    Plaintiffs estimated breakdown of damages are as
5    follows.  Plaintiff Selena Staley's estimated damages
6    are as follows.  And then it has a 1, 2 and 3.
7           Is that something you came up with or is that
8    something developed by your, I'll get the right
9    language, attorneys and agents as you say in your
10   verification?
11       A.  It was tallied by my information, from my pay
12   stubs with the Four Seasons.
13       Q.  Which pay stubs were those?
14       A.  I don't remember from which date.
15       Q.  Okay.
16       A.  And also based on the WARN Act.
17       Q.  Okay.  And how does the WARN Act -- what
18   damages are allowed by the WARN Act, ma'am?
19          ATTORNEY BRUSTEIN:  Objection.
20       A.  I don't remember the exact.  I don't remember.
21       Q.  Did you calculate the damages that are set
22   forth in paragraph 4, and let's say 4a, A(i), did you
23   calculate those damages for yourself?
24       A.  I don't remember.
25       Q.  Have you ever calculated damages in this case,

Page 196

1                    S. STALEY
2    ma'am?
3        A.  I don't remember.
4        Q.  How was the $22,000 calculated?
5           ATTORNEY BRUSTEIN:  Objection.
6        A.  I don't remember.
7        Q.  How was the $17,667 calculated?
8           ATTORNEY BRUSTEIN:  Objection.
9        A.  I don't remember.
10       Q.  So at trial, ma'am, are you going to be able
11   to go and tell the judge how to calculate these
12   damages?
13          ATTORNEY BRUSTEIN:  Objection.
14       A.  That's why I hired my attorneys.
15       Q.  I didn't ask you that.  I said at trial are
16   you going to be able to tell the judge how to
17   calculate your damages?
18          ATTORNEY BRUSTEIN:  Objection.
19       A.  That's why I hired my attorneys.
20       Q.  That's not my question.  My question is at
21   trial are you going to be able to sit in the witness
22   chair under oath, penalty of perjury, and tell the
23   judge how to calculate your damages?
24          ATTORNEY BRUSTEIN:  Objection.
25       A.  That's why I hired my attorneys.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
197–200

Page 197

S. STALEY

1
2    Q. It's a yes or no question, ma'am.
3    A. It's not --
4        ATTORNEY BRUSTEIN: Objection.
5    A. -- simply a yes or no answer.
6    Q. Do you plan to have your lawyers testify at
7  the trial?
8        ATTORNEY BRUSTEIN: Objection.
9    A. I can discuss with my attorneys. That's why I
10 hired the attorneys.
11   Q. So you're keeping open the option that you can
12 have your lawyers testify at the trial, is that
13 accurate, ma'am?
14       ATTORNEY BRUSTEIN: Objection.
15   A. No.
16   Q. Okay. I want to know whether or not you can
17 tell the judge how to calculate these damages, that
18 you have in 4a subparagraph romanette (i)?
19       ATTORNEY BRUSTEIN: Objection.
20   A. That's why I have my attorneys.
21   Q. So tell me how to calculate it? How do I
22 calculate the $22,000?
23       ATTORNEY BRUSTEIN: Objection.
24   A. I don't remember.
25   Q. What would refresh -- anything that would

Page 198

S. STALEY

1
2  refresh your recollection on how to calculate that?
3        ATTORNEY BRUSTEIN: Objection.
4    A. I don't remember.
5    Q. Do you have a spreadsheet at home?
6        ATTORNEY BRUSTEIN: Objection.
7    A. I don't remember.
8    Q. You have no idea how to calculate that number,
9  as you sit here today, do you, ma'am?
10       ATTORNEY BRUSTEIN: Objection.
11   A. I don't remember.
12   Q. You don't remember whether you have an idea or
13 not?
14   A. I don't remember.
15       ATTORNEY BRUSTEIN: Objection. Please don't
16 insult the witness.
17       ATTORNEY BOLAND: I'm not.
18   Q. How do I calculate the $17,667?
19       ATTORNEY BRUSTEIN: Objection.
20   A. I don't remember.
21   Q. How do I calculate -- oh, the WARN Act is 53,
22 okay. How do I calculate the interest on any damages?
23       ATTORNEY BRUSTEIN: Objection.
24   A. I don't remember.
25   Q. Did you know at one time?

Page 199

S. STALEY

1
2    A. I don't remember.
3    Q. All right. Let's get back to your amended
4  complaint, that's exhibit 6.
5        You understand, ma'am, that the basic facts
6  and circumstance that underlie your claims in this
7  case are supposed to be set forth in your amended
8  complaint, right?
9    A. Yes.
10   Q. Okay. And essentially, and tell me if I'm
11 wrong, your complaint is based upon the facts and
12 circumstances that existed and developed at around the
13 time of March 2020 and after that, after COVID struck,
14 right?
15       ATTORNEY BRUSTEIN: Objection.
16   A. Could you repeat the question?
17   Q. Yeah, sure. The facts that underlie your
18 causes of action in the lawsuit really begin around
19 the time that COVID struck in March of 2020, correct?
20       ATTORNEY BRUSTEIN: Objection.
21   A. We were furloughed March 20, 2020.
22   Q. And that began the chain of events that led
23 you to ultimately file the lawsuit, right?
24       ATTORNEY BRUSTEIN: Objection.
25   A. Actually June 25, 2021, on that Zoom call --

Page 200

S. STALEY

1
2    Q. What is it about the Zoom call that bothers
3  you?
4    A. -- with Elizabeth Ortiz, who it was apparent
5  at that time that the hotel was not going to reopen.
6    Q. Ever?
7    A. Wasn't going to reopen.
8    Q. Ever?
9    A. Wasn't going to reopen.
10   Q. When you say wasn't going to reopen, what do
11 you mean?
12   A. It was going to undergo renovations and
13 maintenance.
14   Q. So it wasn't going to be reopen right away?
15       ATTORNEY BRUSTEIN: Objection.
16   A. It wasn't going to be reopening at that time.
17 That's what we found out in the meeting.
18   Q. At that time, okay. Up to that point in time
19 you had been on a temporary furlough, correct?
20       ATTORNEY BRUSTEIN: Objection.
21   A. Could you repeat the question?
22   Q. Yes. At the point in time of the January 25,
23 2021 you and others at the hotel had been on temporary
24 furlough?
25       ATTORNEY BRUSTEIN: Objection.



Page 201

```
1                    S. STALEY
2      A.  At that time I thought I was terminated.
3      Q.  At January 25 you thought you were terminated?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  Yes.
6      Q.  Okay.  Before then were you on a temporary
7  furlough, as you understood it?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  Maybe I don't understand the question.
10     Q.  Okay.  Let's see if we can go through the
11 history a little bit if we can, ma'am.
12         You gathered documents, some nucleus of
13 documents and turned them over, right?
14     A.  Yes.
15     Q.  When I am going to show you some documents, I
16 am going to show you documents I think you may have
17 produced, but I don't know, so I am going to ask you
18 if this was a document you found and produced, okay,
19 when I ask you this?
20     A.  Okay.
21     Q.  You tell me.  So let's start with --
22         (Exhibit 73, letter, Staley v FSR0212 was
23 marked for identification).
24     Q.  I have handed you, ma'am, what has been marked
25 as exhibit 73, which is for the record a document
```

Page 202

```
1                    S. STALEY
2  bearing the Bates number Staley v FSR0212.  My first
3  question, ma'am, is do you recognize exhibit 73?
4      A.  Yes.
5      Q.  Okay.  And is this one of the documents that
6  you found in your files and turned over to be
7  produced?
8      A.  Yes.
9      Q.  You'll see this was -- what would you call
10 these?  I see these things on Four Seasons like
11 letterhead.  Are these internal memos?  How did you
12 refer to these, if you did?
13     A.  It would be an email.
14     Q.  An email.  So this would come as an attachment
15 to an email?
16     A.  I don't remember if there was an attachment.
17     Q.  Okay.  Because this is a document rather than
18 an email itself with the "To's:" and the "From's:",
19 right?
20     A.  It's an email.
21     Q.  This is an email?
22     A.  It was an email that I received.
23     Q.  Okay.  Have you ever printed out emails
24 before?
25     A.  Yes, I've printed out email.
```

Page 203

```
1                    S. STALEY
2      Q.  Okay.  Do you notice that they usually have
3  got the "To:" the sender, the recipients, the "Re:"
4  line and all of that other stuff, that make them look
5  like emails?
6      A.  Yes.
7      Q.  Okay.  Does this look like an email to you or
8  does this look like something that would be attached
9  to an email?
10     A.  Now that you mention that, it looks like it
11 would be attached to an email.
12     Q.  Okay.  In any event this was March 24, 2020,
13 and this was -- this is a true and correct copy of the
14 email that you produced in the case?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  Can you explain what you mean by true?
17     Q.  Yes.  In other words this is a true copy?
18         ATTORNEY BRUSTEIN:  Objection.
19     Q.  You produced a true copy of what you had?  Or
20 can't you testify to that, ma'am?
21         ATTORNEY BRUSTEIN:  Objection.
22     A.  I don't remember.
23     Q.  Okay.  Anyway you'll see that the text of this
24 memo or whatever the attachment would be called,
25 discusses a COVID case of someone who had stayed at
```

Page 204

```
1                    S. STALEY
2  the hotel, right?
3      A.  I believe so.
4      Q.  And when do you recall COVID first hit that
5  you became aware of it?
6      A.  I don't remember the exact date.
7      Q.  You don't have to give me an exact date.  Can
8  you give me an approximation?
9      A.  I would say in 2019.
10     Q.  Okay.  Did there come a point in time where
11 the hotel closed down to taking in guests from
12 outside, as a result of COVID?
13     A.  Well, I was actually furloughed on March 20,
14 2020.  That's the best to my recollection.
15     Q.  And how do you remember that date so clearly?
16     A.  We were told by our managers that we were
17 being furloughed.
18     Q.  And that was a result of the hotel shutting
19 down operations to outside guests, right?
20     A.  It was due to COVID.
21     Q.  Yes, COVID -- strike that.  The hotel stopped
22 taking guests from the outside at that time, right?
23     A.  Yes.  Due to COVID.
24         ATTORNEY BRUSTEIN:  Just because of your
25 rapid-fire, at some point in the next five minutes or
```



SELENA STALEY                                                    April 11, 2023
STALEY V. FSR INTL.                                                  205—208

Page 205

S. STALEY

1
2  so can we take a break?
3      ATTORNEY BOLAND:  Absolutely.
4      Q.  At that point in time you were put on
5  furlough, is that fair?
6      A.  Yes.
7      Q.  Okay.  What happened after that?  Did you work
8  at all?  Did you not work?  What happened?
9      ATTORNEY BRUSTEIN:  Objection.
10     A.  I was placed on furlough.  And the hotel -- I
11  was waiting for the hotel to bring us back.
12     Q.  How long at that point -- putting that time
13  period of March 2020 on there.  How long did you
14  think, in your view, your belief at the time, how long
15  did you think COVID was going to last, such that the
16  hotel would still be, you know, closed down?
17     A.  I don't know.
18     Q.  Were you anticipating an early end to it or
19  hoping that it would be over shortly, or what was it?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  To be honest, I don't know.
22     Q.  Okay.  Were you uncertain at the time as to
23  how long COVID would last, what the effect would be,
24  how long the hotel would be shut down?
25     A.  To be honest, I don't know.

Page 206

S. STALEY

1
2      Q.  Well, what were you thinking?
3      ATTORNEY BRUSTEIN:  Objection.
4      A.  I don't know, to be honest.  I was -- I don't
5  know.  Just waiting.
6      Q.  You were just waiting, okay.
7      ATTORNEY BOLAND:  Let's go ahead and take a
8  break.
9      ATTORNEY BRUSTEIN:  Thank you very much.
10     ---
11     (Recess from 3:36 to 3:46.)
12     ---
13
14     (Exhibit 74, letter, Staley v FSR0204 to 207
15  was marked for identification)
16     Q.  I am handing you what has been marked as
17  exhibit 74, which for the record is a document bearing
18  the Bates number Staley v FSR0204 to 207.
19     My first question is do you recognize exhibit
20  74?
21     A.  Yes, I recall.
22     Q.  And is this one of the -- is exhibit 74 one of
23  the documents that you found in your files to be
24  produced in the case?
25     ATTORNEY BRUSTEIN:  Objection.

Page 207

S. STALEY

1
2      A.  I don't remember.
3      Q.  All right.  And you have seen this before.  Is
4  it accurate, ma'am, that you saw it at or around April
5  9, when it's dated?
6      A.  I don't remember.
7      Q.  Do you have any reason to believe that you
8  didn't see it at or around April 9, 2020 when it's
9  dated?
10     A.  No.
11     Q.  If we look, this is a Four Seasons memo of
12  some sort to all employees, correct?
13     A.  Yes.
14     Q.  And under Hotel Operations, the sentence says:
15  On March 20, 2020, in an abundance of caution, we made
16  the difficult decision to temporarily suspend most of
17  the hotel operations.  Correct?
18     A.  Yes.
19     Q.  And is that consistent with your recollection
20  of the date that you were placed on furlough?
21     A.  Yes.
22     Q.  And do you have an understanding that the
23  hotel did in fact cease most of its operations, mostly
24  taking in guests from the outside as of March 20,
25  2020?

Page 208

S. STALEY

1
2      A.  Yes.
3      Q.  All right.  And then it says:  At that time we
4  had communicated that our hope was to return to a full
5  hotel operation on April 15, 2020.  Right?
6      A.  Yes.
7      Q.  And was that accurate, too, ma'am, that that
8  was the thought process as you understood it at the
9  time that the hotel shut down to outside guests, that
10  it would hope to reopen by April 15?
11     ATTORNEY BRUSTEIN:  Objection.
12     A.  Yes.
13     Q.  You may answer.
14     A.  At that time.
15     Q.  At that time, yes.  And of course no one knew
16  what was going to happen with the coronavirus and
17  infections and restrictions, right?
18     ATTORNEY BRUSTEIN:  Objection.
19     Q.  Correct?
20     ATTORNEY BRUSTEIN:  Objection.
21     A.  I don't know.
22     Q.  Well, in March of 2020 did you know what was
23  going to happen with coronavirus going forward and
24  restrictions and things that might be put in place to
25  restrict businesses and movement?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
209–212

Page 209

S. STALEY

1
2    A.  I don't know.
3    Q.  Did you know, were you able to go and tell
4  people in March of 2020, you know, this is going to
5  last for two years?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  I don't know.
8    Q.  You don't know whether you were able to do
9  that?
10    A.  I don't know.
11    Q.  What's your recollection?
12    A.  I don't understand the question.
13    Q.  Yeah, sure.  In March of 2020 did you
14  understand that people did not know how the
15  coronavirus pandemic was going to play out over the
16  next few months?
17        ATTORNEY BRUSTEIN:  Objection.
18    A.  I don't know.
19    Q.  Pardon?
20    A.  I don't know.
21    Q.  Okay.  You're planning to testify at trial,
22  right?
23        ATTORNEY BRUSTEIN:  Objection.
24    A.  It hasn't happened yet.
25    Q.  Okay.  And it says, do you see the next

Page 210

S. STALEY

1
2  paragraph says ... shortly thereafter, our owner, Ty
3  Warner, responded to the governor's call to action and
4  asked us to reopen the hotel to provide housing for
5  the doctors, nurses and other medical staff working on
6  the front lines.
7        Do you see that?
8    A.  Yes.
9    Q.  Did you know that after March of 2020 the
10  hotel did reopen to house like doctors, nurses and
11  other medical staff?
12        ATTORNEY BRUSTEIN:  Objection.
13    A.  It was only open to the medical staff.  It
14  didn't reopen to the public.
15    Q.  Nor did I suggest it did.  The question I had
16  was were you aware that after March of 2020, the
17  hospital reopened to take in doctors, nurses and
18  medical staff?
19        ATTORNEY BRUSTEIN:  Objection.  Hotel?
20    A.  Hotel?
21    Q.  Hotel.  What did I say?  The hospital would
22  always be open to people.  Let me strike that.
23        Did you know that after March of 2020 the
24  hotel did open to house doctors, nurses and medical
25  staff?

Page 211

S. STALEY

1
2        ATTORNEY BRUSTEIN:  Objection.
3    A.  I don't remember.
4    Q.  You weren't aware of that at the time?
5    A.  I was not working at the hotel.  I wasn't
6  aware.
7    Q.  So looking at this today and seeing these
8  statements, this is all news to you; you had no idea
9  this was happening?
10        ATTORNEY BRUSTEIN:  Objection.
11    A.  At the time, I remember the hotel did have, to
12  doctors and nurses coming.
13    Q.  You were aware of that at the time?
14    A.  At the time.
15    Q.  Okay.  Did you think that was a good thing?
16        ATTORNEY BRUSTEIN:  Objection.
17    A.  I don't know.
18    Q.  You don't have any opinion at all as to
19  whether opening up the hotel to give housing to
20  doctors, nurses and medical staff working on the front
21  lines of the COVID-19 pandemic was a good thing?
22        ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't remember what I was thinking at that
24  time.
25    Q.  What do you think now?

Page 212

S. STALEY

1
2        ATTORNEY BRUSTEIN:  Objection.
3    A.  I'm not sure.
4    Q.  It might have been better to just let them
5  fend for themselves, is that fair?
6        ATTORNEY BRUSTEIN:  Objection.
7    A.  That's not what I'm saying.
8    Q.  Then what are you saying, ma'am?
9        ATTORNEY BRUSTEIN:  Objection.
10    A.  I'm saying I'm not sure.  My opinion.
11    Q.  I want your opinion?
12        ATTORNEY BRUSTEIN:  Objection.
13    A.  I'm not sure.  That's my opinion.
14    Q.  You're not sure whether it was a good thing or
15  a bad thing to give housing to the doctors, nurses and
16  medical staff working on the front line of the
17  COVID-19 pandemic?
18        ATTORNEY BRUSTEIN:  Objection.
19    Q.  Right?
20        ATTORNEY BRUSTEIN:  Objection.  Just because
21  you add "right" doesn't make it a better question.
22        ATTORNEY BOLAND:  And it's not objectionable.
23    Q.  You may answer?
24        ATTORNEY BRUSTEIN:  You've asked this four
25  times and she's given the answer four times.



SELENA STALEY                                           April 11, 2023
STALEYV. FSR INTL.                                      213–216

Page 213

S. STALEY

1
2    Q. You may answer.
3    A. That's my opinion.
4    Q. When you said "that's," what are you referring
5    to?  What's your opinion?
6    A. I don't know if it's a good or bad thing.
7    Q. Okay.  You weren't working at that time at the
8    hotel when the doctors, nurses and medical staff were
9    housed there, were you?
10   A. I was not.
11   Q. Who was?
12       ATTORNEY BRUSTEIN:  Objection.
13   A. I don't know.
14   Q. How many people were?
15   A. I don't know.
16   Q. Were there union people working there?
17   A. I don't know.
18   Q. Were there non-union people working there?
19   A. I don't know.
20   Q. During the time period after COVID struck and
21   you guys were placed on furlough in March of 2020, did
22   you communicate, you know, on a personal basis with
23   other folks who were also employed by the hotel but
24   placed on furlough?
25   A. I did not.

Page 214

S. STALEY

1
2    Q. So you didn't have conversations with people
3    who said you know, I know Bob or John or whoever and
4    they were working at the hotel?
5    A. I did not.
6    Q. Do you have an understanding as you sit here
7    today as to whether there were union people working at
8    the hotel to, you know, to help with the accommodation
9    of the doctors, nurses and other medical staff?
10       ATTORNEY BRUSTEIN:  Objection.
11   A. I don't know.
12   Q. The same with non-union, you don't know
13   whether there were or not?
14   A. I don't know.
15   Q. Before you filed your lawsuit did you make any
16   attempt to find out?
17       ATTORNEY BRUSTEIN:  Objection.
18   A. I don't remember.
19   Q. If you go to the next paragraph:  "Since then,
20   the COVID-19 pandemic has continued to impact our
21   business and the hospitality industry."
22       Is that statement accurate based on your
23   experience as of April 9, 2020?
24       ATTORNEY BRUSTEIN:  Objection.
25   A. I don't understand the question.

Page 215

S. STALEY

1
2    Q. Yeah.  Did you understand in April -- as of
3    April 9 of 2020 that the COVID-19 pandemic has
4    continued to impact the hotel business and the
5    hospitality industry?
6        ATTORNEY BRUSTEIN:  Objection.
7    A. I don't really remember.
8    Q. Okay.  So do you have any basis to disagree
9    with that statement?
10       ATTORNEY BRUSTEIN:  Objection.
11   A. I don't know.
12   Q. No, do you have any basis, as you sit here
13   today, to disagree with the statement in the first
14   sentence of that paragraph?
15       ATTORNEY BRUSTEIN:  Objection.
16   A. I don't know.
17   Q. You don't know if you have a basis to disagree
18   with it?
19   A. I don't know.
20   Q. Do you agree with it or disagree with the
21   statement?  Let's start there.
22       ATTORNEY BRUSTEIN:  Objection.
23   A. I don't know.
24   Q. The next sentence says:  "The federal
25   government has extended social distancing guidelines

Page 216

S. STALEY

1
2    through April 30, 2020, and New York Governor Andrew
3    Cuomo extended the systemwide stay at home order until
4    April 29, 2020."  Do you see where I'm referring to?
5    A. Okay.
6    Q. Were you aware that the federal government had
7    established social distancing guidelines in or around
8    the time period from March to April of 2020 as a
9    result of COVID-19?
10       ATTORNEY BRUSTEIN:  Objection.
11   A. Could you repeat the that question?
12   Q. Yes, sure.  Were you aware as of April of 2020
13   that the federal government had in fact promulgated,
14   for want of a better word, social distancing
15   guidelines as a result of the COVID-19 pandemic?
16       ATTORNEY BRUSTEIN:  Objection.
17   A. I don't remember.
18   Q. Have you heard the term social distancing?
19   A. Yes.
20   Q. Okay.  Do you understand that there were
21   guidelines about that, what you should do and
22   shouldn't do to keep your distance from folks?
23   A. Yes.
24   Q. What was your understanding of what those
25   were?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
217–220

Page 217

1                    S. STALEY
2     A.  To wear a mask.
3     Q.  What about distancing, and sort of keeping
4  your distance from folks?
5         ATTORNEY BRUSTEIN:  Objection.
6     A.  I don't recall the exact.  But it was I think
7  to be six feet apart.
8     Q.  So a distance apart and then maybe wearing
9  masks at some point?
10    A.  I believe so.
11    Q.  Okay.  Do you remember those actually being
12  guidelines that were suggested by the federal
13  government?
14    A.  I think it was.
15    Q.  And also do you see there's a reference here
16  to Governor Cuomo, right?
17    A.  Yes.
18    Q.  Were you aware that Governor Cuomo and the
19  state of New York was imposing various guidelines and
20  restrictions as a result the COVID-19 pandemic in or
21  around April of 2020?
22    A.  I believe so.
23    Q.  Did you keep yourself apprised of those?  In
24  other words did you learn what they were, keep abreast
25  of what was going on?

Page 218

1                    S. STALEY
2         ATTORNEY BRUSTEIN:  Objection.
3     A.  To the best of my ability.
4     Q.  Okay.  And do you remember that there were
5  initially, you know, stay at home orders?
6         ATTORNEY BRUSTEIN:  Objection.
7     A.  I remember that.
8     Q.  And there were orders that closed businesses,
9  certain businesses down, right?
10    A.  At that time, mm-hmm.
11    Q.  And there were orders that restricted travel
12  like in the city and things like that?
13        ATTORNEY BRUSTEIN:  Objection.
14    A.  I don't remember the restriction word for
15  word, or everywhere, if there were restrictions, I
16  don't know about everywhere.
17    Q.  Did you know that those restrictions were put
18  in place for periods of time and then sometimes they
19  expired, sometimes they were extended?
20    A.  I believe so.
21    Q.  Okay.  And that happened for a period of
22  months after March of 2020, didn't it?
23        ATTORNEY BRUSTEIN:  Objection.
24    A.  I don't remember the exact length.
25    Q.  You don't remember the exact length but you

Page 219

1                    S. STALEY
2  knew that it went on for a period of time after March
3  of 2020, didn't it?
4     A.  I believe so.
5     Q.  Yeah.  And it continued into the summer,
6  didn't it?
7         ATTORNEY BRUSTEIN:  Objection.
8     A.  I don't remember how long.
9     Q.  Do you have any reason to dispute that that
10  continued into the summer?
11        ATTORNEY BRUSTEIN:  Objection.
12    A.  I don't remember.
13    Q.  Well, we could probably just go look at the
14  governor's orders and see when they expired and when
15  they were renewed, couldn't we?
16        ATTORNEY BRUSTEIN:  Objection.
17    A.  I don't know.
18    Q.  Your lawyers could have done that, couldn't
19  they?
20        ATTORNEY BRUSTEIN:  Objection.
21    A.  I don't know.
22    Q.  Do you know if they did?
23        ATTORNEY BRUSTEIN:  Objection.
24    A.  I don't know.
25    Q.  And it says that, in this paragraph:  "For

Page 220

1                    S. STALEY
2  these reasons, it is necessary to extend the
3  suspension of regular hotel operations until April 30,
4  2020."  Do you see that?
5     A.  Yes.
6     Q.  And were you aware of that, you know, shift in
7  a projected reopening from what was it originally?
8  Sorry.  April 15 to April 30?
9     A.  Could you repeat the question?
10    Q.  Yes, sure.  You'll see here that the hotel
11  operations reported that there was originally the hope
12  that they would reopen on April 15, 2020.  That's
13  under the first paragraph of Hotel Operations, right?
14    A.  Yes.
15    Q.  And you were aware of the change in that hope
16  to move it from April 15, 2020 to April 30, right?
17    A.  Yes.
18    Q.  And you were aware of the reasons that were
19  given for that about, you know, stay at home orders
20  and social distancing guidelines and restrictions,
21  right?
22        ATTORNEY BRUSTEIN:  Objection.
23    A.  Yes.
24    Q.  And do you have any reason to dispute that any
25  of that was true?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
221–224

Page 221

S. STALEY

1
2    ATTORNEY BRUSTEIN:  Objection.
3    A.  Not that I can recall.
4    Q.  Okay.
5        (Exhibit 75, letter, Staley v FSR0208 was
6    marked for identification).
7    Q.  I am handing you what has been marked as
8    exhibit 75, which for the record is a document bearing
9    the Bates number Staley v FSR0208.
10   A.  Yes.
11   Q.  And do you recognize exhibit 75, ma'am?
12   A.  Yes.
13   Q.  Okay.  Is this one of the documents that you
14   found in your files to produce in the case?
15       ATTORNEY BRUSTEIN:  Objection.
16   A.  I don't remember.  It's a while ago.
17   Q.  And you'll see this is another one of those
18   memos to the Four Seasons family, right?
19   A.  Yes.
20   Q.  Okay.  And the first one says:  "It is hard to
21   believe that it's been more than a month since we made
22   the difficult decision to temporarily suspend hotel
23   operations and then shortly after, reopen to provide
24   housing for health care professionals working on the
25   front lines," right?

Page 222

S. STALEY

1
2    A.  Yes.
3    Q.  Okay.  And then it goes down to Hotel
4    Operations?
5    A.  Yes.
6    Q.  And it goes through, if you see in that first
7    paragraph, you can take a look at as much of it as you
8    need, it starts out with the March 20, 2020 decision
9    to temporarily suspend most operations?
10   A.  I see that.
11   Q.  And then it talks about shortly thereafter
12   Mr. Warner reopened -- asking to have the hotel
13   reopened to provide the housing for the medical staff,
14   right?
15   A.  I see that, yes.
16   Q.  And it says:  "Since our last communication to
17   you we have been in discussions with ownership
18   regarding the extension of housing medical staff."
19       Right?
20   A.  I see that.
21   Q.  Okay.  And then it says:  "Earlier this week
22   it was determined that we would continue to provide
23   complimentary housing for the medical community until
24   May 31, 2020."
25       Right?

Page 223

S. STALEY

1
2    A.  Yes.
3    Q.  Okay.  And when you're reading that sentence,
4    ma'am, how do you interpret the word "complimentary"?
5        ATTORNEY BRUSTEIN:  Objection.  It means no
6    charge.
7    Q.  Okay.  And do you think that was a good idea,
8    a bad idea, or you still have no opinion?
9        ATTORNEY BRUSTEIN:  Objection.
10   A.  I don't know.
11   Q.  And then it says:  "Additionally, the COVID-19
12   pandemic has continued to impact our business and the
13   hospitality industry."  Right?
14   A.  Yes.
15   Q.  And this statement is made as of April 30,
16   2020, right?
17   A.  Yes.
18   Q.  Any reason to disagree with that statement?
19       ATTORNEY BRUSTEIN:  Objection.
20   A.  I don't know.
21   Q.  And then it says:  "With the social distancing
22   guidelines and the stay at home orders still in
23   place."  Let's stop there.
24       Do you have any reason to believe that that
25   statement is inaccurate as of April 30, 2020?

Page 224

S. STALEY

1
2        ATTORNEY BRUSTEIN:  Objection.
3    A.  I don't know.
4    Q.  So you don't know whether you have a reason to
5    believe or you just don't know whether it's true or
6    not?
7    A.  I don't know.
8    Q.  I have asked you which one it is.  You don't
9    know whether you have a basis to believe it's not true
10   or you don't know whether you -- you just don't know
11   whether it's true or not?
12   A.  I don't know.
13   Q.  Know what?  You don't know what?
14   A.  That there is a basis.  I don't know.
15   Q.  A basis for what?  You don't know there's a
16   basis for what?
17   A.  I don't know.
18   Q.  Ma'am, I'm sorry.  I'm not understanding you,
19   I apologize.  You say I don't -- I asked you, number
20   1.  "With the social distancing guidelines and the
21   stay at home orders still in place."
22       What I want to know is do you have any reason
23   to believe that there were not social distancing
24   guidelines and stay at home orders still in place as
25   of April 30, 2020?



Page 225

1              S. STALEY
2        ATTORNEY BRUSTEIN:  Objection.
3        A. I don't know.
4        Q. Do you know -- I want to understand when you
5    say "I don't know" what that means?
6        A. I don't know at the time that was true for
7    everything and everywhere.
8        Q. How about with respect to the things that
9    would affect the operation of the Four Seasons
10   New York on 57th Street?
11        ATTORNEY BRUSTEIN:  Objection.
12        Q. Was that statement true, that at the time in
13   the City of New York where that hotel is located, that
14   there were social guidelines and stay at home orders
15   still in place --
16        ATTORNEY BRUSTEIN:  Objection.
17        Q. -- as of April 30, 2020?
18        A. I don't know.
19        Q. And then it says:  "It is necessary to extend
20   the suspension of regular hotel operations until June
21   15, 2020."  Right?
22        A. Yes.
23        Q. And were you aware at the time then that with
24   the social distancing guidelines and the stay at home
25   orders in place and the extension of the housing for

Page 226

1              S. STALEY
2    the medical staff, that now there was a move of the
3    plan for reopening to June 15 of 2020?
4        ATTORNEY BRUSTEIN:  Objection.
5        A. Can you repeat the question?
6        Q. Yes, sure.  We saw before that there was
7    originally, when the hotel ceased operations in March
8    of 2020, there was a hope that it would reopen by
9    April 15, do you remember that?
10        A. Yes.
11        Q. Okay.  And then we saw that after that date
12   came and went, with the addition of the medical
13   personnel that was being housed there, and social
14   distancing guidelines and whatnot that date was moved
15   again to April 30, do you remember that?
16        A. Yes.
17        Q. Now we have, with the extension of the medical
18   staff still housing and, you know, the social
19   distancing and other guidelines in place, it's moving
20   again until June 15, 2020, right?
21        ATTORNEY BRUSTEIN:  Objection.
22        A. I don't understand what the question is,
23   though.
24        Q. The question is, I'm just setting the format
25   for the question.  I asked you the first two and you

Page 227

1              S. STALEY
2    were okay.  The first one was the original date of
3    April 15, got moved then to April 30, right?
4        A. Yes.
5        Q. Okay.  And now we have got the date of April
6    30 being moved to June 15, right?
7        A. Yes.
8        Q. And my question is, is that consistent with
9    your recollection of what happened at the time?
10        A. Yes.
11        ATTORNEY BRUSTEIN:  Objection.
12        Q. Okay.  And we saw that the medical staff was
13   going to be, the extension of the time period that
14   they were going to be staying there.  Is it true,
15   ma'am, that for that time period as well you don't
16   know how the hotel was actually staffed in terms of
17   union or non-union employees?
18        A. I don't know.
19        Q. So is it true that you don't know whether
20   there were any employees working or whether there were
21   a lot of employees working?
22        A. I don't know.
23        (Exhibit 76, letter, Staley v FSR0219 was
24   marked for identification).
25        Q. I am handing you what has been marked as

Page 228

1              S. STALEY
2    exhibit 76, which for the record is a document bearing
3    the Bates number Staley v FSR0219.
4        Have you seen exhibit 76 before?
5        A. Yes.
6        Q. Is this one of the documents that you gathered
7    from your files to be produced in the case?
8        ATTORNEY BRUSTEIN:  Objection.
9        A. I don't remember.  It's been a while.
10        Q. Do you have any reason to believe you didn't
11   see this at or around the time that it was dated, May
12   22, 2020?
13        ATTORNEY BRUSTEIN:  Objection.
14        A. I don't remember.
15        Q. And do you see this is another memo to Dear
16   Four Seasons Family, right?
17        A. Yes.
18        Q. And it says:  In the last communication, which
19   came from People and Culture on May 1, 2020, we
20   indicated that we were looking at a potential re-open
21   date of June 15, 2020.
22        Consistent with what we just looked at, right?
23        A. Yes.
24        Q. Okay.  It says:  Since that time, our owner,
25   Ty Warner, has agreed to extend the complimentary



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
229–232

Page 229

1                    S. STALEY
2   housing for the health care professionals through June
3   30, 2020.  Right?
4        A.  Yes.
5        Q.  Okay.  Consistent with your understanding that
6   what started shortly after COVID hit in terms of
7   temporary housing continued for a period of time?
8            ATTORNEY BRUSTEIN:  Objection.
9        A.  Yes.
10       Q.  And you understood that the medical
11  professionals were being housed so they could work on
12  the front lines against the COVID-19 pandemic, right?
13           ATTORNEY BRUSTEIN:  Objection.
14       A.  Yes.
15       Q.  And you remember that the COVID-19 pandemic
16  hit New York City pretty hard, right?
17           ATTORNEY BRUSTEIN:  Objection.
18       A.  I believe so.
19       Q.  You remember news reports, don't you, about
20  hospitals with refrigerator trucks outside to house
21  the bodies, right?
22           ATTORNEY BRUSTEIN:  Objection.
23       A.  I don't remember.
24       Q.  You don't remember that?
25       A.  I don't remember.

Page 230

1                    S. STALEY
2        Q.  Did you watch much TV, like CNN or those other
3   things during the pandemic while you were stuck in the
4   house?
5        A.  Actually, most people don't believe it, but I
6   don't watch a lot of TV.
7        Q.  Okay.  So when the pandemic was hitting you
8   weren't like glued to the TV like a lot of other folks
9   were?
10       A.  I don't watch a lot of TV or a lot of the
11  news.
12       Q.  I understand that.  I am asking you though
13  during that time period did your habits change at all
14  given all of the things that people were looking for
15  every day in information about the pandemic?
16           ATTORNEY BRUSTEIN:  Objection.
17       A.  I watched a little but not everyday.
18       Q.  Did you know that Governor Cuomo was giving
19  like daily news conferences on television?
20       A.  That information would be given to me by,
21  usually my husband.  Because I don't watch a lot of
22  TV.
23       Q.  That's fair.  I'm just trying to figure out
24  what you did.  I want to know whether you know whether
25  Governor Cuomo was appearing, whether it was a news

Page 231

1                    S. STALEY
2   conference or whatever it was, he was appearing
3   virtually every day?
4        A.  The information was provided to me, I would
5   know by my husband.
6        Q.  Did you know anyone who contracted COVID-19
7   during that early time period before we had
8   vaccinations?
9            ATTORNEY BRUSTEIN:  Objection.
10       A.  I did not.
11       Q.  You're very fortunate.  So you didn't have any
12  friends or relatives or anybody contract it, right?
13           ATTORNEY BRUSTEIN:  Objection.
14       A.  No.
15       Q.  Much less get terribly sick with it, right?
16           ATTORNEY BRUSTEIN:  Objection.
17       A.  I did not.
18       Q.  Much less die from it?
19       A.  I did not.
20           ATTORNEY BRUSTEIN:  Objection.
21       Q.  Did you have an understanding, though, that
22  that was happening to others?
23           ATTORNEY BRUSTEIN:  Objection.
24       A.  Yes.
25       Q.  It says, in the next paragraph, "In addition

Page 232

1                    S. STALEY
2   to that extension, the social distancing guidelines
3   and the stay at home orders still in place."
4            Is that consistent with your recollection of
5   what the state of affairs was as of May 22, 2020 in
6   New York?
7            ATTORNEY BRUSTEIN:  Objection.
8        A.  I believe so.
9        Q.  Pardon?
10       A.  I believe so.
11       Q.  Okay.  It says:  "Therefore, it is necessary
12  to extend the suspension of regular hotel operations
13  until July 15, 2020."  Correct?
14       A.  Yes.
15           ATTORNEY BRUSTEIN:  Objection.
16       Q.  And it says.  Then after that, it says "we
17  will advise if this date is to be revised or
18  extended," right?
19           ATTORNEY BRUSTEIN:  Objection.
20       A.  I understand, yes.
21       Q.  Because at that point in time nobody was sure
22  what was going to happen, right?
23           ATTORNEY BRUSTEIN:  Objection.
24       A.  I'm not sure about that.
25       Q.  How about you?  Were you sure what was going



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
233–236

Page 233

S. STALEY

1 to happen going forward at that time, ma'am?
2
3    A. I don't know.
4    Q. You don't know?
5    A. I don't know.
6    Q. You don't know what you thought?
7    A. I don't know.
8    Q. Okay. And so we have a date being extended
9  again to July 15, consistent with your recollection of
10  what was being reported at the time?
11    ATTORNEY BRUSTEIN: Objection.
12    A. Yes.
13    (Exhibit 77, letter, Staley v FSR0216 was
14  marked for identification).
15    Q. I am handing you -- I'm tossing at you,
16  actually, sorry about that, what has been marked as
17  exhibit 77 which, for the record, is a document
18  bearing the Bates number Staley v FSR0216.
19    Do you recognize exhibit 77, ma'am?
20    A. Yes.
21    Q. Is exhibit 77 -- and you received exhibit 77
22  sometime around June 22, 2020?
23    A. I believe so.
24    Q. Okay. And is exhibit 77 one of the documents
25  that you gathered in your files to be produced in the

Page 234

S. STALEY

1
2  case?
3    ATTORNEY BRUSTEIN: Objection.
4    A. I don't remember.
5    Q. Okay. So as you sit here today you don't know
6  whether you got this in your file at home or not?
7    A. I don't remember.
8    Q. And this is another memo to Dear Four Seasons
9  Family, right?
10    A. Could you repeat the that?
11    Q. Sure. This is another one of those memos to
12  Dear Four Seasons Family?
13    A. Yes.
14    Q. Okay. And if you look at the second
15  paragraph, it says: "With that said, my last
16  communication to you on May 22, 2020 indicated that we
17  would be extending the health care professionals
18  complimentary housing through June 30, 2020." Right?
19    A. Yes.
20    Q. And we just looked at that last communication,
21  correct?
22    A. Yes.
23    Q. And it says: "With June 30th right around the
24  corner, I want to let you know that all health care
25  professionals will be leaving by June 30, 2020,"

Page 235

S. STALEY

1  right?
2
3    A. Yes.
4    Q. Consistent with your understanding of what was
5  being reported to you at the time, right?
6    ATTORNEY BRUSTEIN: Objection.
7    A. Yes.
8    Q. It says: "Upon departure of the health care
9  professionals we will temporarily be suspending most
10  of our hotel operations. During this time, the hotel
11  will continue to operate with a reduced staffing to
12  maintain the building's safety and security. The
13  upcoming schedules will reflect these changes," right?
14    ATTORNEY BRUSTEIN: Objection. Are you just
15  asking if it says that?
16    ATTORNEY BOLAND: Yes, I want to see if she's
17  with that.
18    Q. It says that, correct?
19    A. Yes.
20    Q. All right. And is that consistent with your
21  understanding of the state of affairs as of mid June
22  of 2020?
23    ATTORNEY BRUSTEIN: Objection.
24    A. To the best of my recollection.
25    Q. Yes. It says "Unfortunately, we will not" --

Page 236

S. STALEY

1
2  and the "NOT" is in bold and all capital letters,
3  correct?
4    A. Yes.
5    Q. It says "we will not be resuming normal hotel
6  operations on July 15, 2020 as we had hoped."
7    It says "We are now looking at a late summer
8  reopening date and will share more information as we
9  have it," right?
10    ATTORNEY BRUSTEIN: Objection.
11    A. Yes.
12    Q. And is that consistent with your understanding
13  of what the state of affairs was as you understood it
14  in June 22 of 2020?
15    ATTORNEY BRUSTEIN: Objection.
16    A. I don't understand the question. Are you
17  asking me just to see what I'm reading?
18    Q. I'm sorry?
19    A. Are you asking me because of what I'm reading?
20    Q. No, no. Back in the day, in June of 2020 at
21  the time you got the memo was that your understanding
22  of the state of affairs? In other words, the hospital
23  staff was going to be leaving, they weren't going to
24  be able to make a July reopening date, we're going to
25  have to, you know, set something later in the summer?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
237–240

Page 237

1                    S. STALEY
2        ATTORNEY BRUSTEIN:  Objection.
3        A.  I don't remember.  It was a while ago.
4        Q.  Okay.  Were you eager to get back to work
5    during the time period after COVID struck?
6        A.  I was hoping to get back, yes.
7        Q.  Okay.  Were you concerned about going back to
8    work before it was safe to do so?
9        ATTORNEY BRUSTEIN:  Objection.
10       A.  I don't remember if that was a concern.
11       Q.  Were you concerned personally about getting
12   COVID during those early time periods and up to the
13   time we had a vaccine?
14       ATTORNEY BRUSTEIN:  Objection.
15       A.  I don't remember at that time being concerned
16   about that.
17       Q.  Did you, you know, socialize with folks, you
18   know, without wearing masks in close spaces, in rooms
19   or were you careful to observe social distancing and
20   staying apart guidelines?
21       ATTORNEY BRUSTEIN:  Objection.
22       A.  I don't remember at that time everything
23   that -- what I did.  It's been a while ago in
24   reference to that.
25       Q.  Okay.  COVID was a fairly unprecedented event

Page 238

1    in your experience, wasn't it?
2        ATTORNEY BRUSTEIN:  Objection.
3        A.  I understand.  But I don't remember that far
4    back.
5        Q.  Let's step back for the question I asked you.
6    COVID when it hit in, you know, early 2020 and
7    impacted New York and the rest of the country, that
8    was a fairly unprecedented event in your experience,
9    wasn't it?
10       ATTORNEY BRUSTEIN:  Objection.
11       A.  I don't remember.
12       Q.  Had you ever experienced anything like the
13   COVID-19 pandemic before?
14       ATTORNEY BRUSTEIN:  Objection.
15       A.  I don't remember.
16       Q.  Was there another time when the City of New
17   York, in your recollection, was actually closed down
18   the way it was closed down during COVID-19?
19       ATTORNEY BRUSTEIN:  Objection.
20       A.  I don't remember.
21       Q.  So it could have happened, the city could have
22   been closed down, you just don't remember?
23       ATTORNEY BRUSTEIN:  Objection.
24       A.  I don't remember.
25

Page 239

1                    S. STALEY
2        Q.  Okay.  During the time period after you were
3    put on the temporary furlough in March, did you put in
4    any hours at all for which you were paid by the hotel?
5        ATTORNEY BRUSTEIN:  Objection.
6        A.  I don't understand that question.
7        Q.  Yes.  After March of 2020 were you paid any --
8    did you receive any pay from the hotel?  I'm not
9    talking about unemployment.  I'm talking about any
10   payments?
11       ATTORNEY BRUSTEIN:  Objection.
12       Q.  Wages; anything like that?
13       A.  I wasn't employed.  I was terminated.  So I
14   wouldn't have received ...
15       Q.  So you were terminated in March of 2020?
16       A.  Yes.
17       Q.  Where is your notice of termination, ma'am?  I
18   didn't see it in your production?
19       ATTORNEY BRUSTEIN:  Objection.
20       A.  The hotel still hasn't reopened.
21       Q.  I didn't ask you if the hotel reopened.  I
22   asked you where your notice of termination was, ma'am?
23       ATTORNEY BRUSTEIN:  Objection.
24       A.  The furlough was longer than six months.  So I
25   was terminated.

Page 240

1                    S. STALEY
2        Q.  I didn't ask you that.  I asked you what
3    happened in March of 2020, who at the hotel told you
4    you were terminated?
5        A.  I was terminated.  Longer than six months
6    being furloughed, so I was on a permanent furlough,
7    which means I was terminated.
8        Q.  Did anyone from the hotel say you are
9    terminated?
10       A.  Once again, I was terminated.  It was longer
11   than six months.
12       Q.  You're not answering my question, ma'am, with
13   all due respect to you.
14       A.  I am answering your question.
15       Q.  You're fighting with me.
16       ATTORNEY BRUSTEIN:  Objection.
17       Q.  And I'm not trying to fight with you.
18       A.  I'm not fighting.
19       Q.  Identify for me every person who was
20   associated with the Four Seasons hotel who said to
21   you, you are terminated?
22       ATTORNEY BRUSTEIN:  Objection.
23       A.  It was longer than six months, so I was
24   terminated.
25       ATTORNEY BOLAND:  Can you read back the



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
241–244

Page 241

S. STALEY

1    question, please?
2
3        (Requested portion of the record read back.)
4        A. I was terminated.
5        Q. Can you answer my question, please?
6        A. I am answering your question.  I was
7    terminated.
8        Q. I am asking you to identify people.  Not to
9    give me your conclusion.
10       A. I don't remember.
11       Q. So as you sit here today you can't identify a
12   single person associated with the hotel, with the Four
13   Seasons Hotel who said to you, you are terminated?
14       A. I don't remember.
15       Q. So if the hotel were to reopen tomorrow you
16   don't believe you have any right to be recalled, do
17   you?
18       ATTORNEY BRUSTEIN:  Objection.
19       A. I was hoping for the hotel to reopen, I would
20   go back.  But they would have to definitely rehire me.
21       Q. So you don't have any right for them to do
22   that, to be recalled, you would hope that they would
23   want to rehire you, is that accurate?
24       ATTORNEY BRUSTEIN:  Objection.
25       A. They would have to rehire me.

Page 242

S. STALEY

1
2        Q. I didn't ask you that.  I am asking if you
3    believe you have a right to be recalled to that
4    employment that --
5        A. The hotel hasn't reopened --
6        ATTORNEY BRUSTEIN:  Objection.
7        A. -- so I'm still terminated.
8        Q. Ma'am, with all due respect, I am asking you a
9    very specific question.  If the hotel were to reopen
10   tomorrow, is it your belief, your contention that you
11   have a right to be rehired?
12       ATTORNEY BRUSTEIN:  Objection.
13       A. I was hoping that it would reopen, I would.
14   But I would have to be rehired.  I cannot be recalled
15   because I am terminated.
16       Q. And you were terminated -- your testimony, to
17   be absolutely fair to you, you were terminated on
18   March 20 of 2020, is that accurate?
19       ATTORNEY BRUSTEIN:  Objection.
20       A. Yes.
21       Q. Okay.
22       (Exhibit 78, letter, Staley v FSR0214 was
23   marked for identification.)
24       Q. I am handing you what has been marked as
25   exhibit 78.  Ma'am, do you recognize exhibit 78?  This

Page 243

S. STALEY

1
2    is a document that bears the Bates number Staley v
3    FSR0214, right?
4        A. Yes.
5        Q. Okay.  Do you recognize exhibit 78?
6        A. Yes.
7        Q. And this is a copy of a letter to you from the
8    Four Seasons Hotel signed by Rudolf Tauscher dated
9    August 5, 2020, right?
10       A. Yes.
11       Q. This is one of the documents that you found in
12   your files and you turned over to be produced?
13       A. Yes.
14       Q. And you received it around August 5 of 2020?
15       A. Yes.
16       Q. You understand this to be a WARN Act notice --
17       ATTORNEY BRUSTEIN:  Objection.
18       Q. -- or a notice under the WARN Act?
19       ATTORNEY BRUSTEIN:  Objection.
20       A. I'm not sure.
21       Q. Okay.  You say:  This is to inform you -- the
22   first sentence, I'm sorry.  It says:  "This is to
23   inform you that due to unforeseen business
24   circumstances and the continued major economic
25   downturn stemming from the COVID-19 virus pandemic and

Page 244

S. STALEY

1
2    consequent travel and tourism disruptions outside the
3    employer's control, the Four Seasons Hotel New York
4    will continue your temporary layoff which began on
5    3/21/2020 for an as yet undetermined number of
6    months."  Correct?
7        ATTORNEY BRUSTEIN:  Objection.
8        A. Yes.  I see that.
9        Q. Okay.  And it says:  "The layoffs included
10   approximately 464 employees, including yourself and
11   are still expected to be temporary."
12       Right?
13       A. Yes.
14       Q. Was that your understanding at the time that
15   you received this letter?
16       ATTORNEY BRUSTEIN:  Objection.
17       A. I don't know.  Can you repeat the question?
18       Q. Yes.  The sentence, the paragraph I just read,
19   is that consistent with your understanding of the
20   facts as of the date of this letter?
21       ATTORNEY BRUSTEIN:  Objection.
22       A. I don't know.
23       Q. What was your understanding of the facts as of
24   August 5, 2020?
25       ATTORNEY BRUSTEIN:  Objection.



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
245–248

Page 245

1              S. STALEY
2     A. I don't -- I don't remember.
3     Q. Mr. Tauscher says that the Four Seasons
4  New York will continue your temporary layoff which
5  began on 3/21/2020 for an as yet undetermined number
6  of months. Right?
7        ATTORNEY BRUSTEIN: Objection.
8     A. Yeah, but by this time I -- I was terminated.
9     Q. But that's not what he said, is it?
10    A. But by this time I was terminated.
11    Q. My question was that's not what he said,
12  right?
13    A. Yeah, but by this time I was terminated.
14    Q. And it says: The layoffs included
15  approximately 464 employees, including yourself and
16  are still expected to be temporary, correct?
17    A. Yes, but temporary layoff is not an indefinite
18  circumstance. I was terminated by this time.
19    Q. So when March 2020 came around you believed
20  that you were out of a job forever?
21        ATTORNEY BRUSTEIN: Objection.
22    A. I was hoping for the hotel to reopen. I never
23  said forever.
24    Q. Well, you realize, ma'am, that if you sue and
25  you are successful in convincing the judge that you've

Page 246

1              S. STALEY
2  been terminated your done with the hotel, right?
3        ATTORNEY BRUSTEIN: Objection.
4     A. I don't know that.
5     Q. Really? Okay. There is some handwriting
6  there that you can see. There's some underlining and
7  stuff. Is that your handwriting?
8        ATTORNEY BRUSTEIN: Objection.
9     Q. Yes, off to the side. You can see there is
10  underlining for temporary layoff and for as yet an
11  undetermined number of months. And then there is --
12        ATTORNEY BRUSTEIN: Objection.
13        ATTORNEY BOLAND: Oh, never mind. It's not on
14  there.
15        ATTORNEY BRUSTEIN: Is it your handwriting?
16        ATTORNEY BOLAND: No. I can actually read it.
17  That's how I know. All right, never mind. Okay.
18    Q. All right. So did Mr. Tauscher ever tell you
19  that you were not temporarily laid off, you were
20  completely terminated and gone; fired, essentially?
21    A. I don't remember.
22    Q. Did Ms. Ortiz ever tell you you were not
23  temporarily on furlough or laid off, but you were
24  permanently terminated; fired, gone?
25    A. I don't remember.

Page 247

1              S. STALEY
2     Q. Did anyone else from the Four Seasons Hotel
3  ever tell you you're not on temporary layoff or
4  temporary furlough, you're permanently terminated;
5  fired, gone?
6     A. I don't remember.
7     Q. Did you have a work email account with the
8  Four Seasons; in other words, you know, an email
9  address with "@Fourseasons," whatever it is, dot-com?
10    A. I believe so.
11    Q. When was the last time you accessed it?
12    A. I don't remember.
13    Q. Did you access it after March 20 of 2020?
14    A. I don't remember.
15    Q. Did you still have access to it after March 20
16  of 2020?
17    A. I don't remember.
18    Q. Do you keep like access to it -- do you have a
19  device that you accessed it from, like a phone or
20  something like that?
21    A. I don't remember.
22    Q. How did you pick up your work email? Was
23  there a terminal at work for you to get it from?
24    A. I had a computer on my desk where I worked.
25    Q. Did you pick up your email remotely? In other

Page 248

1              S. STALEY
2  words when you weren't at the office?
3     A. When I worked at the hotel, I don't remember
4  having remote access.
5     Q. Okay. You didn't have remote access?
6     A. I don't remember having remote access.
7     Q. Okay, that's fine. How did you receive the
8  notice, the letter that we just looked at dated August
9  5 of 2020?
10    A. It came through the mail.
11    Q. Through the mail?
12    A. Yes.
13    Q. Okay. Did you save the envelope that it came
14  in, or anything like that?
15    A. Yes.
16    Q. Did you turn that over to be produced in the
17  case?
18    A. I would have to look to see if it was attached
19  with the letter. I would have to look.
20    Q. Okay.
21        (Exhibit 41, letter, Staley v FSR0057 was
22  previously marked for identification.)
23    Q. I am handing you what has been marked as
24  exhibit 41 previously. My first question is have you
25  seen exhibit 41 before?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
249–252

---

Page 249

S. STALEY

1
2     A. I don't remember.  It's been a while.
3     Q. Did you continue even after the August 5
4  letter that we saw to receive periodically updates on
5  the status from the Four Seasons?
6     A. Could you repeat that question, please?
7     Q. Yes, sure.  We were just looking at the
8  August -- we looked at a number of these Four Seasons
9  memos that preceded April -- I'm sorry -- August 5 of
10  2020, do you remember that?
11     A. The letter, yes, that I received.
12     Q. We saw the letter, that was on August 5 of
13  2020, correct?
14     A. Yes.
15     Q. And then we saw some, a series of these types
16  of Four Seasons memos that had been sent from March of
17  2020 up to August of 2020, do you remember looking at
18  those with me?
19     A. I don't -- you mean what you just showed me
20  just now, these --
21     Q. What we've been showing, yes.
22     A. Yes, I remember the things that you've been
23  showing me.
24     Q. Yes, and things that you said you had
25  received, some of them you had produced, some of them

---

Page 250

S. STALEY

1
2  you couldn't remember, right?
3        ATTORNEY BRUSTEIN:  Objection.
4     A. I don't understand the question.
5     Q. Okay.  You had seen them before, some of them
6  you may have produced, some of them you don't remember
7  if you produced them?
8        ATTORNEY BRUSTEIN:  Objection.
9     A. I don't remember.
10     Q. Okay.
11        ATTORNEY RISMAN:  Jim, could we take five
12  minutes now?
13        ATTORNEY BOLAND:  No, in a few minutes.  I
14  just want to finish this line.
15        ATTORNEY RISMAN:  Not right this second.
16     Q. I am talking about for example, ma'am if you
17  look at exhibit 74.  This is one of the Four Seasons
18  memos that we just looked at a few minutes ago, right?
19     A. Yes.
20     Q. And this is one that you had recalled seeing
21  at some point, correct?
22     A. Correct.
23     Q. And there were others that we looked at from
24  March and then May and then June, do you remember
25  that?

---

Page 251

S. STALEY

1
2     A. Of 2020?
3     Q. Of 2020, yes.
4     A. Mm-hmm.
5     Q. Things that you had received and you remember
6  seeing, right?
7     A. Yes, what we have here.
8     Q. All right.  All I'm saying is that then we
9  have the event of the August 5, 2020 letter that we
10  just looked at, right?
11     A. Yes.
12     Q. And then all I'm saying is that after that
13  letter you continued to receive these types of Four
14  Seasons, Dear Four Seasons Family memos, did you not?
15     A. I don't remember ...
16     Q. Okay.  So let's look at this one then we'll
17  break.
18        ATTORNEY BRUSTEIN:  You're going back to 41?
19        ATTORNEY BOLAND:  Yes, 41.
20        ATTORNEY BRUSTEIN:  So we're on the same page.
21     Q. Back to exhibit 41.  This is Dear Four Seasons
22  Family and it's dated August 11 of 2020, right?
23     A. Yes.
24     Q. Do you have any reason to believe you didn't
25  receive this?

---

Page 252

S. STALEY

1
2        ATTORNEY BRUSTEIN:  Objection.
3     A. I don't know.
4     Q. It says:  As you are aware the coronavirus is
5  still active worldwide and specifically in New York.
6        Do you have any reason to believe that that
7  statement is not true as of August 11, 2020?
8        ATTORNEY BRUSTEIN:  Objection.
9     A. Could you repeat that question?
10     Q. Yes.  The statement is made:  As you are aware
11  the coronavirus is still active worldwide and
12  specifically in New York, right?
13     A. Yes.
14     Q. And the date of this letter is, or memo, is
15  August 11, 2020?
16     A. Yes.
17     Q. Do you have any reason to believe that as of
18  August 11, 2020 the coronavirus was not still active
19  worldwide and specifically in New York?
20     A. I don't know.
21     Q. Okay.  You just don't know whether it's true
22  or not?
23     A. I mean I don't remember that far back.
24     Q. Okay.  And it says:  In my last communication
25  to you on June 22, 2020 -- you remember we just looked

---



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
253–256

Page 253

1          S. STALEY
2  at that, right?
3      A.  Yes.
4      Q.  -- I indicated that we will continue to delay
5  our reopening of the hotel until late summer.  And it
6  says as much as I want to provide you with clarity on
7  a reopening date, we are still navigating through a
8  myriad of business challenges, correct?
9      A.  Yes.
10     Q.  It says as Governor Cuomo announced at the end
11  of June there are also new travel restrictions for all
12  individuals traveling from states with COVID-19 high
13  infection rates, do you see that?
14     A.  As I'm reading it.
15     Q.  I know you're reading it.  Do you remember
16  that happening?
17     A.  During COVID?  Yes.
18     Q.  Okay.  And you have no reason to believe that
19  that's untrue as of August 11, 2020, right?
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  During that time.
22     Q.  Okay.  It says as of today 33 states meet the
23  metrics for the travel advisory requiring individuals
24  who have traveled to New York from those states to
25  quarantine for 14 days.  Do you remember that?

Page 254

1          S. STALEY
2      A.  As I'm reading it.
3      Q.  Do you remember that being the case, though,
4  back in August of 2020?
5      A.  I don't remember.
6      Q.  Do you have any reason to believe that wasn't
7  the case in August of 2020?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't remember.
10     Q.  It says:  Additionally, key New York City
11  events and attractions have been cancelled or there
12  are extensive delays in reopening.  Right?
13     A.  Well, I'm reading it.  Yes, it says that.
14     Q.  And it's accurate, ma'am, is it not, that one
15  of the drivers of business for the hotel was New York
16  attractions and events?  One of the drivers of
17  business; tourism?
18         ATTORNEY BRUSTEIN:  Objection.
19     A.  Yes.
20     Q.  People come to New York to go to Broadway
21  shows, right?
22         ATTORNEY BRUSTEIN:  Objection.
23     A.  Yes.
24     Q.  And they could stay at the Four Seasons,
25  right?

Page 255

1          S. STALEY
2         ATTORNEY BRUSTEIN:  Objection.
3      A.  But it wasn't open at the time.
4      Q.  I'm not saying that, ma'am.  I'm saying when
5  it was open it was a driver of business, was it not?
6      A.  At the time when it was open.
7      Q.  Correct.  When it was open.  Like the New York
8  Philharmonic was a driver of business, right?
9         ATTORNEY BRUSTEIN:  Objection.
10     A.  At that time.
11     Q.  Like the United Nations was a driver of
12  business, correct?
13         ATTORNEY BRUSTEIN:  Objection.
14     A.  When it was open.
15     Q.  When it was open, right.  And when those
16  things weren't open you would agree with me, would you
17  not, that the drivers of that business were not
18  present anymore?
19         ATTORNEY BRUSTEIN:  Objection.
20     A.  I don't know.  There were so many of them.
21     Q.  Let me ask you a question.  Would you have
22  expected the Four Seasons Hotel to reopen to lose
23  money?
24         ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't know.

Page 256

1          S. STALEY
2      Q.  I asked you what you would have expected?
3         ATTORNEY BRUSTEIN:  Objection.
4      A.  I don't know what I would have expected.
5      Q.  Is it your contention in this case that the
6  Four Seasons Hotel was somehow required to reopen to
7  lose money?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't know.
10         ATTORNEY BRUSTEIN:  Okay.  Take a break.
11             ---
12         (Recess from 4:38 to 4:50.)
13             ---
14     Q.  Ma'am, I'm handing you what has been marked as
15  exhibit 79.
16         (Exhibit 79, letter, Staley v FSR0221 was
17  marked for identification).
18         ATTORNEY BOLAND:  For the record it's a
19  document bearing the Bates number Staley v FSR0221.
20  My first question is do you recognize exhibit 79?
21     A.  Yes.
22     Q.  And this is another one of those Four Seasons
23  memos to Dear Four Seasons Family, right?
24     A.  Yes.
25     Q.  And this was sent to you as well, right?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
257–260

Page 257

S. STALEY

1
2     A.  Yes.
3     Q.  Take a look at the second paragraph.  It talks
4  about coronavirus still being active worldwide, and
5  travel and hospitality industry continues to struggle,
6  et cetera, correct?
7     A.  Correct.
8     Q.  Okay.  What was the state of the ability of
9  the travel and hospitality industry to get back up and
10  running in September of 2020?
11       ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.
13     Q.  Okay.  Did you investigate that at the time,
14  see what was going on elsewhere, at other hotels,
15  restaurants, all of those other things?
16       ATTORNEY BRUSTEIN:  Objection.
17     A.  I don't remember.
18     Q.  By the way, exhibit 79, was that one of the
19  documents that you found in your files to produce in
20  this case?
21       ATTORNEY BRUSTEIN:  Objection.
22     A.  I don't remember.
23     Q.  All right.
24       (Exhibit 80, letter, Staley v FSR0211 was
25  marked for identification).

Page 258

S. STALEY

1
2     Q.  I am handing you exhibit what has been marked
3  as exhibit 80 which for the record is a document
4  bearing the Bates number Staley v FSR0211.
5     A.  Yes.
6     Q.  And do you see this is another one of those
7  Four Seasons, Dear Four Seasons New York Family memos?
8     A.  Yes.
9     Q.  And you received this one as well, correct?
10     A.  Yes.
11     Q.  Is this one of the documents that you found in
12  your files to produce?
13       ATTORNEY BRUSTEIN:  Objection.
14     A.  I don't remember.
15     Q.  If you would take a look at the third
16  paragraph, ma'am.  And it says:  "While the safety of
17  our guests and employees is always our primary
18  concern," and it goes on, "the pandemic continues to
19  create challenging market conditions for New York."
20     A.  Yes.
21     Q.  Go ahead and read that whole paragraph to
22  yourself and let me know when you've had a chance to
23  do so.
24       (The witness reviews document.)
25     A.  I have finished reading it.

Page 259

S. STALEY

1
2     Q.  Okay.  Do you have any reason to believe that
3  any of the statements made in that paragraph are
4  inaccurate?
5       ATTORNEY BRUSTEIN:  Objection.
6     A.  I don't know.
7     Q.  You don't know whether they're accurate or
8  not, right?
9     A.  I don't know.
10     Q.  Okay.
11       (Exhibit 47, letter, Staley v FSR0213 was
12  previously marked for identification.)
13     Q.  I am handing you, ma'am, what has been marked
14  as exhibit 47 which is a document bearing the Bates
15  numbers Staley v FSR0213.
16       Do you see this document has a date on it that
17  looks to be February 8, 2020, right?
18     A.  Yes.
19     Q.  But obviously that date would be before the
20  hotel had stopped operations initially in March of
21  2020 for the COVID-19 pandemic, right?
22     A.  Could you repeat that?
23     Q.  Yes, sure.  First of all, my question is do
24  you recognize exhibit 47?  Let's start there.
25     A.  Yes.

Page 260

S. STALEY

1
2     Q.  Okay.  And this is one of those Four Seasons
3  memo to Dear Four Seasons New York family folks that
4  you received, right?
5     A.  Yes.
6     Q.  Now I think there might be a snafu on the
7  dates, but I want to see if you agree with me.  This
8  memo, you'll see, has a date of February 2020 on it,
9  right?
10     A.  Yes.
11     Q.  But you'll see it references events, for
12  example, in the third paragraph in December of 2020
13  that are after that date, right?
14     A.  After December of 2020?
15     Q.  In other words December of 2020 is after
16  February 8 of 2020, which appears to be the date put
17  on this memo?
18     A.  Yes.
19     Q.  Okay.
20     A.  I see it.
21     Q.  Does that lead you to believe, as it does me,
22  that this is actually February of 2021?
23       ATTORNEY BRUSTEIN:  Objection.
24     A.  I don't know.
25     Q.  But in any event you received this, right?



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
261–264

Page 261
S. STALEY

1
2     A. Yes.
3     Q. If you look at the paragraph that begins, in
4  December of 2020, and it continues on?
5     A. Yes.
6     Q. Okay.  And read that paragraph to yourself and
7  let me know when you've had a chance to do that.
8        (The witness reviews document.)
9     A. I have finished reading it.
10    Q. You there any statements in there that you
11 know to be inaccurate?
12    A. I don't know.
13    Q. If you look at the next paragraph, it says:
14 Please know that the decision to delay the reopening
15 once again, has been very difficult to make.  As much
16 as we want to welcome you back, the demand also needs
17 to reach a certain threshold.
18       Do you have an understanding of what's meant
19 by the term "the demand"?
20       ATTORNEY BRUSTEIN:  Objection.
21    A. I don't know.
22    Q. Have you ever heard about demand being
23 something like, you know, customers wanting to come
24 into the hotel?
25    A. I don't know.

Page 262
S. STALEY

1
2     Q. Okay.  It says:  Unfortunately demand remains
3  minimal and well below the threshold required to
4  reopen.
5        Do you have an understanding -- let's start
6  with today.  As you sit here today do you have an
7  understanding -- what is your understanding of what
8  that sentence means?
9        ATTORNEY BRUSTEIN:  Objection.
10    A. I don't know.
11    Q. You don't understand what's meant by demand?
12    A. I don't.
13    Q. Okay.
14       (Exhibit 81, letter, Staley v FSR0218 was
15 marked for identification).
16    Q. Ma'am, I am handing you what has been marked
17 as exhibit 81, which for the record is a document
18 bearing the Bates number Staley v FSR0218?
19    A. Yes.
20    Q. And do you recognize exhibit 81 as another one
21 of the Four Seasons memos to Dear Four Seasons
22 New York family?
23    A. Yes.
24    Q. And this is another memo that you received,
25 correct?

Page 263
S. STALEY

1
2     A. Yes.
3     Q. And this one's dated March 25, 2021, right?
4     A. Yes.
5     Q. Okay.  Do you see here it says "We look
6  forward to connecting with you next week at our
7  virtual town hall scheduled on Wednesday, March 31 at
8  3 p.m.," right?
9     A. Yes.
10    Q. Did you get notices, at least on some
11 occasions of virtual town hall meetings to be
12 conducted by Microsoft Teams?
13    A. Yes.
14    Q. Okay.  And how many of those did you
15 participate in?
16       ATTORNEY BRUSTEIN:  Objection.
17    A. I don't remember how many.  But I did
18 participate.
19    Q. Okay.  And we know you participated in one on
20 June 25 of 2021, right?
21    A. Yes.
22    Q. Okay.  Did you participate, and I'm not
23 holding you to a number, did you participate in more
24 than just that one?
25    A. I don't remember.

Page 264
S. STALEY

1
2     Q. So that could have been the only virtual
3  meeting that you participated in?
4     A. I don't know.
5     Q. Did you participate in any of the other things
6  that the hotel was offering, you know, virtually like
7  yoga classes or painting classes or things like that?
8        ATTORNEY BRUSTEIN:  Objection.
9     A. I don't know.
10    Q. Did you know though those things were being
11 offered?
12    A. I don't know.
13    Q. You don't remember?
14    A. I don't know.
15    Q. You don't know?
16    A. (Shaking head.)
17    Q. Okay.  In March 25 of 2021 -- well, let me see
18 if I can take a look quickly at this.
19       You'll see, ma'am, in exhibit 81, the
20 paragraph that begins towards the bottom "we do hope
21 that the progress made ..."
22    A. Yes.
23    Q. It says "we do hope that the progress made
24 over the last few months in New York and beyond
25 continues and that we will be able to confirm a



Page 265

1           S. STALEY
2 reopening date soon."
3       Right?
4    A. Yes.
5    Q. Do you remember that we had a series of these
6 Dear New York Family Members prior to August of 2020
7 where there were dates that were set and then those
8 dates would be moved and the dates would be moved and
9 the dates would be moved, do you remember that?
10    ATTORNEY BRUSTEIN:  Objection.
11    A. Yes.
12    Q. And then we have the time period after August
13 5 of 2020 when we don't really have any more dates
14 being set, right --
15    ATTORNEY BRUSTEIN:  Objection.
16    Q. -- for reopening?
17    A. I don't remember.
18    Q. Here we don't have any firm date being set for
19 reopening by March 25 of 2021, correct?
20    ATTORNEY BRUSTEIN:  Objection.
21    A. I don't remember.
22    Q. Well, looking at this memo, do you see a firm
23 date being planned; you know a plan, an anticipated
24 target date for reopening in this memo on March 25,
25 2021?

Page 266

1           S. STALEY
2     (The witness reviews document.)
3    A. Could you repeat the your question?
4    Q. Yes, sure.  We don't see a target date anymore
5 for the reopening in this memo that's exhibit 81,
6 right?
7    A. Can I just read to you what it says?  We do
8 hope that the progress made over the last few months
9 in New York and beyond continues and that we will be
10 able to confirm a reopening date soon.
11    Q. Right.  We don't have one of -- what I was
12 comparing this to, ma'am, I'm not trying to play hide
13 and seek with you, there were a series of these memos
14 after the pandemic struck over a period of months
15 where the hotel kept, you know, setting a target
16 reopening date, right?
17    A. Yes.
18    Q. Okay.  And now at least by March 15 of 2021 we
19 no longer have targeted reopening dates but just an
20 idea that we hope to reopen soon, right?
21    ATTORNEY BRUSTEIN:  Objection.
22    A. I -- I --
23     (The witness reviews document.)
24    A. But I was hoping that there would be a
25 reopening date even after this email, this letter.

Page 267

1           S. STALEY
2    Because they just kept stringing us along, so even
3 though they didn't state the reopening date, a future
4 one, reopening, I was still believing that they were
5 going to reopen the hotel.
6    Q. Fair enough.  But I'm just saying that by this
7 memo we don't have one of those targeted dates given
8 by the hotel, right?
9    A. At this time based on this email here, this
10 letter.
11    ATTORNEY BRUSTEIN:  Objection.
12    Q. Right, there is not a targeted date provided.
13 Okay.  And then you talked about the -- well, strike
14 that.  Let's go to the next one.
15     (Exhibit 50, letter, Staley v FSR0061 was
16 previously marked for identification.)
17    Q. I am handing you, ma'am, what has been marked
18 as exhibit 50.  And you will see this is one of those
19 Dear -- well, this is Good Afternoon Four Seasons
20 New York Family.  Not "Dear."  But it's one of those
21 Four Seasons memos that we've been looking at,
22 correct?
23    A. Yes.
24    Q. And you received this one as well, right?
25    A. Yes.

Page 268

1           S. STALEY
2    Q. Okay.  Was this one of the documents you found
3 in your files to produce?
4    ATTORNEY BRUSTEIN:  Objection.
5    A. I don't remember.
6    Q. All right.  And it says, going down to the
7 paragraph -- this is dated June 25, 2021, right?
8    A. Yes.
9    Q. The same day as the town hall meeting took
10 place, correct?
11    A. Yes.
12    Q. It says:  "We know everyone is keen to reopen
13 our hotel and begin welcoming back guests.  At this
14 time, we will continue to remain closed, as the hotel
15 will be undergoing substantial infrastructure and
16 maintenance work that is expected to last well into
17 2022.  We will reassess our reopening plans in early
18 spring of 2022 based upon the progress of this work,"
19 correct?
20    A. Yes.
21    Q. Is that consistent with what was reported to
22 the folks at the town hall meeting as well?
23    ATTORNEY BRUSTEIN:  Objection.
24    A. I don't remember word for word.
25    Q. I'm not saying word for word.  I'm just saying



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
269–272

Page 269

S. STALEY

1
2  is that consistent with what was reported to the
3  people at the town hall meeting?
4       ATTORNEY BRUSTEIN:  Objection.
5       A.  I believe so.
6       Q.  Okay.  So what was reported at the town hall
7  meeting?
8       A.  I don't understand the question.
9       Q.  What were you told at the town hall meeting by
10  the folks from the Four Seasons, connected to the Four
11  Seasons Hotel?
12      A.  Well, Elizabeth Ortiz did mention that we're
13  not going to be reopening at this time due to
14  maintenance and renovations.  And then also an
15  employee asked about the length of the furlough, and
16  at this time realized that we were terminated because
17  the hotel wasn't going to be reopening.
18      Q.  When you say -- you said -- I'm sorry.  I
19  didn't quite understand that.  You said realized
20  terminated.  Who realized they were terminated?
21      A.  I realized at the time.
22      Q.  You just told me you were terminated in March?
23      ATTORNEY BRUSTEIN:  Objection.
24      A.  It was just according to the WARN Act, every
25  six months --

Page 270

S. STALEY

1
2       Q.  I don't care about the WARN Act, ma'am?
3       ATTORNEY BRUSTEIN:  Objection.
4       Q.  You told me you were terminated in March,
5  right?
6       ATTORNEY BRUSTEIN:  Objection.
7       A.  According to the WARN Act, every six months we
8  should have gotten a notice.
9       Q.  Who told you that?
10      ATTORNEY BRUSTEIN:  Objection.
11      A.  I'm not a lawyer, but just based on my
12  understanding.
13      Q.  What's your understanding based on?  I know
14  it's based on your understanding.  What is your
15  understanding based on?
16      ATTORNEY BRUSTEIN:  I am going to direct her
17  to limit her answer to exclude any attorney-client
18  communications.
19      Q.  Okay.  So what's your understanding based on?
20      A.  What I understand about the WARN Act, that
21  it's to warn and we're supposed to be given a notice
22  every six months.
23      Q.  Really?
24      A.  Or 60 days.
25      Q.  Okay.  Where did you get that understanding?

Page 271

S. STALEY

1
2       ATTORNEY BRUSTEIN:  Objection.  Again, I'm
3  going to direct her not to reveal attorney-client
4  communication.  Otherwise she can answer.
5       Q.  Yes, it's fair.  If you have an understanding
6  about that that's not based on something your lawyers
7  told you, you can tell me that.
8       If you don't have an understanding about that
9  other than what your lawyers told you, tell me I can't
10  answer that.
11      ATTORNEY BRUSTEIN:  Objection.
12      A.  I don't understand --
13      Q.  Okay.
14      A.  -- the question.
15      Q.  You said you understood that there had to be
16  multiple WARN notices, and I'm just paraphrasing, once
17  every certain period of time.  I'm just getting to the
18  topic.  I want to know what your understanding, why
19  you understand that is required?  What's that based
20  on?
21      ATTORNEY BRUSTEIN:  Objection.  Again I am
22  going to --
23      A.  I don't understand the question.
24      Q.  How do you know you're supposed to get WARN
25  notice, multiple WARN notices?

Page 272

S. STALEY

1
2       ATTORNEY BRUSTEIN:  Objection.  I am going to
3  get limit her answer to exclude any attorney-client
4  communication.
5       Q.  So how do you know you're supposed to get
6  multiple WARN notices, ma'am?
7       ATTORNEY BRUSTEIN:  The same objection.
8       Q.  That's not an instruction not to answer.  He's
9  only instructed you not to answer to the extent it
10  reveals any attorney-client communication?
11      A.  I've read some articles.
12      Q.  Which articles?
13      A.  I don't remember which ones.
14      Q.  What publications did they appear in, ma'am?
15      A.  I don't remember.
16      Q.  So it's your testimony under oath that you
17  read articles saying that --
18      ATTORNEY BRUSTEIN:  I'm sorry.  Please stop
19  pointing at the witness.  You've done it throughout
20  this deposition.  I'm asking you --
21      ATTORNEY BOLAND:  Which rule am I violating in
22  the Federal Rules of Civil Procedure, counsel?
23      ATTORNEY BRUSTEIN:  Manners.
24      Q.  You testified you read articles.  I want to
25  make sure --



SELENA STALEY                                          April 11, 2023
STALEY V. FSR INTL.                                          273—276

---

Page 273

1              S. STALEY
2     A.  A newspaper.
3     Q.  A newspaper.  Okay.
4     A.  A newspaper.
5     Q.  Which newspaper?
6     A.  I don't remember which one.  It was a while
7  ago.
8     Q.  When did you read it?
9     A.  I don't remember.  It's been a while ago.
10    Q.  If we want to go tell the judge, here you can
11 look it up and see what she read, how do we determine
12 that?  How do we tell the judge where to go read that?
13       ATTORNEY BRUSTEIN:  Objection.
14    A.  I don't know.
15    Q.  Anyplace else that you developed an
16 understanding that there are multiple WARN notices
17 that are required?
18       ATTORNEY BRUSTEIN:  Objection.
19    A.  I just read a newspaper article.
20    Q.  Nothing else?
21    A.  A newspaper article.  That's what I read.
22    Q.  Okay.
23       ATTORNEY BRUSTEIN:  And there's just a
24 standing objection in terms of limiting it to exclude
25 attorney-client communications.

---

Page 274

1              S. STALEY
2       ATTORNEY BOLAND:  I'm not asking about
3  attorney-client.  That's why I was going to tell her,
4  if she can't answer it except for that.
5     Q.  So you were terminated in March, right?  Of
6  2020?
7     A.  I was actually terminated June 25 of 2021.
8     Q.  So you weren't terminated in March of 2020?
9       ATTORNEY BRUSTEIN:  Objection.
10    A.  I was terminated June 25 of 2021.
11    Q.  Well, did you not testify earlier, ma'am, that
12 you were terminated on March 20 of 2020?
13    A.  I just got confused.
14    Q.  Are you confused about June 25, 2021?
15    A.  I got confused.
16    Q.  Are you confused -- is it possible you're
17 confused about whether you were terminated on June 25
18 of 2021?
19       ATTORNEY BRUSTEIN:  Objection.
20    A.  I was terminated on June 25 of 2021.
21    Q.  Okay.  Who associated with the hotel said to
22 you you're terminated?
23    A.  I was terminated.
24    Q.  That's not my question.  My question is who
25 said that to you?

---

Page 275

1              S. STALEY
2     A.  I was terminated.
3     Q.  You can't answer my question and tell me who
4  said it to you?
5     A.  I was terminated.
6     Q.  I am looking to get names.  Because I'm going
7  to go talk to them.  I'm going to talk to all of the
8  people you identified for me who said you were
9  terminated.  That's why I need to know the names,
10 ma'am.
11       Who on June 25 of 2021, somebody associated
12 with the hotel, told you you were terminated?
13       ATTORNEY BRUSTEIN:  Objection.
14    A.  Based on the hotel not reopening the length of
15 time that they were just stringing us along, it was
16 more than six months, so ...
17    Q.  So would it be accurate that no one told you
18 you were terminated but that was the conclusion you
19 drew based on the facts at the time?
20       ATTORNEY BRUSTEIN:  Objection.
21    A.  (No response.)
22    Q.  You have to answer my question, ma'am.
23    A.  I was -- it was more than six months.  The
24 hotel hadn't reopened.
25    Q.  I understand that, ma'am.  I want to know -- I

---

Page 276

1              S. STALEY
2  asked you to identify for me anyone associated with
3  the hotel who told you on June 25, 2021 that you were
4  terminated and you couldn't identify anyone.
5       So my question was, was that a conclusion that
6  you drew, that you reached, based on the fact that the
7  hotel hadn't reopened, it had been more than six
8  months, that kind of thing?
9       ATTORNEY BRUSTEIN:  Objection.
10    A.  The length of time, you cannot be furloughed
11 indefinitely.
12    Q.  Who told you that?
13       ATTORNEY BRUSTEIN:  Objection.  Again, I am
14 going to direct her not to reveal any attorney-client
15 communication.  To the extent it doesn't include that,
16 she can answer.
17    Q.  You could answer the question, ma'am.
18    A.  Just from that newspaper that I read.
19    Q.  The newspaper article said that multiple WARN
20 notices were required, and it also said that you can't
21 be furloughed indefinitely?
22       ATTORNEY BRUSTEIN:  Objection.
23    Q.  That's your testimony under oath?
24       ATTORNEY BRUSTEIN:  Objection.
25    A.  I read the article.

---



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
277–280

Page 277
S. STALEY
1
2    Q. No, no, no. I am asking about the content of
3  the article, ma'am. You said that the article --
4    A. I don't remember word for word.
5    Q. I am not asking you word for word. You
6  testified earlier that that article said, and I'm not
7  saying word for word, that there were multiple WARN
8  notices that would be required?
9        ATTORNEY BRUSTEIN: Objection.
10    A. If it's longer than six months.
11    Q. I asked you about multiple WARN notices. You
12  got one WARN notice. We saw that on August 5, right?
13        ATTORNEY BRUSTEIN: Objection.
14  Mischaracterization of the evidence.
15    Q. You can answer.
16    A. I still don't understand the question. I gave
17  you my answer.
18    Q. No, this is not how it works. I am going to
19  have to ask you some questions just to get a little
20  clarity. You saw the letter you received that was
21  dated August 5 of 2020, right?
22    A. Yes.
23    Q. Okay. And that said this is a notice under
24  the WARN Act. You saw that in the letter, right?
25        ATTORNEY BRUSTEIN: Objection.

Page 278
S. STALEY
1
2    A. The wording of the letter said WARN Act?
3    Q. Yeah. You want to look at it again? We can
4  do that. Absolutely.
5        ATTORNEY LUNDY: Exhibit 78.
6    Q. It's the penultimate paragraph. Right before
7  "This notice is supplied to you pursuant to."
8        (The witness reviews document.)
9    A. Okay.
10    Q. Okay. So this was notice that was given to
11  you under the WARN Act?
12        ATTORNEY BRUSTEIN: Objection.
13    A. I don't know what you mean by given to me by
14  the WARN Act.
15    Q. Under, pursuant to -- why don't you just read
16  that last --
17        ATTORNEY BRUSTEIN: Objection.
18    Q. -- that paragraph that says, it's only one
19  sentence --
20    A. I don't know.
21    Q. Let me finish, ma'am.
22    A. Yes.
23    Q. This is a document that you produced, right?
24    A. Yes.
25    Q. A document you took from your files?

Page 279
S. STALEY
1
2        ATTORNEY BRUSTEIN: Objection.
3    A. Four Seasons sent this to me.
4    Q. Yes. And you had it in your files?
5    A. Four Seasons sent this to me.
6    Q. And you had it in your files to produce in
7  this case?
8    A. It was not --
9        ATTORNEY BRUSTEIN: Objection.
10    A. It was a letter sent to me.
11    Q. Fair enough, okay. There's a paragraph that
12  begins "This notice is supplied to you." Do you see
13  that paragraph? It's the next-to-the-last paragraph.
14    A. Okay.
15    Q. Read that out loud, please.
16    A. "This notice is supplied to you pursuant to
17  the WARN Act as well and has been supplied to the
18  appropriate governmental agencies."
19    Q. Okay. So you received this letter, right?
20    A. Yes.
21    Q. All right. Now I thought that you had
22  testified and tell me if I'm wrong, that you had read
23  this article that had suggested that there would be
24  multiple letters like that under the WARN Act that
25  would be required to be provided. Do I have that

Page 280
S. STALEY
1
2  right or do I have that wrong?
3        ATTORNEY BRUSTEIN: Objection.
4    A. I said longer than six months. And I said the
5  hotel strung me along.
6    Q. Okay. But you were given this notice, that
7  notice. Is it your belief that you were entitled to
8  more notices under the WARN Act?
9        ATTORNEY BRUSTEIN: Objection.
10    A. I don't -- I don't understand the question.
11    Q. That's because I don't understand what you
12  were telling me before, so it's probably my fault.
13        You got that letter, right?
14    A. Yes.
15    Q. Okay. What's your complaint under the WARN
16  Act about?
17        ATTORNEY BRUSTEIN: Objection.
18    A. That I was on an extended furlough but a
19  furlough has a limit. You can't be furloughed -- the
20  hotel hasn't still reopened.
21    Q. Okay. But you got a notice under the WARN
22  Act. So what's the problem?
23        ATTORNEY BRUSTEIN: Objection.
24    A. It's almost three years and the hotel still
25  hasn't reopened.



SELENA STALEY                                                    April 11, 2023
STALEYV. FSR INTL.                                                    281–284

Page 281

1                    S. STALEY
2     Q.  Okay.  Anything else that was told to you at
3  the June 25, 2021 video meeting?
4          ATTORNEY BRUSTEIN:  Objection.
5     A.  An employee asked about if they get a job,
6  will it forfeit any severance.
7     Q.  What were the exact words the employee used?
8          ATTORNEY BRUSTEIN:  Objection.
9     A.  I don't remember the exact words.
10    Q.  Okay.  You're remembering the substance based
11  on your recollection?
12    A.  That's correct.
13    Q.  Okay.  What else was said?
14    A.  There was going to be -- I said that already.
15  The maintenance.  That's all that I can recall at this
16  time.
17    Q.  What was said in response to the employee
18  asking whether if they got a new job that would, I'm
19  not trying to quote you, I promise, have some effect
20  on severance?
21         ATTORNEY BRUSTEIN:  Objection.
22    A.  I don't remember.
23         (Exhibit 82, letter, Staley v FSR0222 was
24  marked for identification).
25    Q.  I am handing you what has been marked as

Page 282

1                    S. STALEY
2  exhibit 82 which for the record is a document bearing
3  the Bates number Staley v FSR0222.  Do you recognize
4  exhibit 82?
5     A.  Yes.
6     Q.  And this is a copy of a letter that you sent
7  to the Department of Labor, is that accurate?
8     A.  Yes.
9     Q.  Did you actually send this?  I see it's
10  stamped confidential on it or whatever.  Did you
11  actually send this or is this something that you meant
12  to send, or what was it?
13         ATTORNEY BRUSTEIN:  Objection.
14    A.  I don't remember.
15    Q.  You don't remember whether you sent this or
16  not?
17    A.  I don't remember.
18    Q.  And in it you say -- and the date of this
19  letter is what?
20    A.  I have September 8, 2021.
21    Q.  Okay.  And in the first sentence of the text
22  you say: Since March of 2020, I have been on furlough
23  with the Four Seasons Hotel in NYC caused by the
24  COVID-19 pandemic.  Right?
25    A.  Yes.

Page 283

1                    S. STALEY
2     Q.  Your words, right?
3     A.  Yes.
4     Q.  You used the term "furlough" did you not?
5     A.  Yes.
6     Q.  You didn't say I was terminated, have you?
7     A.  I understand.
8     Q.  Okay.  And that's true, though, you didn't use
9  that word, did you?
10    A.  Yes.  According to what I wrote.
11    Q.  Okay.  And it says "Four Seasons Hotel 57 has
12  held virtual Town Halls with anticipated reopening
13  dates in both 2020 and 2021 (please review attached
14  documents) that has not yet come to fruition," right?
15    A.  Yes.
16    Q.  And what were the attached documents you were
17  referring to?
18    A.  I don't remember.
19    Q.  Do you believe that they were those Dear Four
20  Seasons Family, you know, memos that we've been
21  looking at or some selection of those?
22         ATTORNEY BRUSTEIN:  Objection.
23    A.  I don't remember.
24    Q.  Okay.  It says on one of the virtual town hall
25  discussions it was stated by the director of People

Page 284

1                    S. STALEY
2  and Culture, if you obtain employment elsewhere and
3  the hotel doesn't open, you have violated your
4  contract with Four Seasons Hotel 57 and your severance
5  will be forfeited, right?
6     A.  Yes.
7     Q.  Who said that?
8     A.  Elizabeth on June 25, 2021.
9     Q.  Is that a quote?
10         ATTORNEY BRUSTEIN:  Objection.
11    A.  It's not verbatim, but that was what she was
12  intend -- what she said, when she said what she said.
13  That the contract, you sever the contract with Four
14  Seasons.
15    Q.  So you know -- the contract was the EmPact
16  agreement, right?
17    A.  Well, that you're an employee of Four Seasons.
18    Q.  I'm sorry.  The contract was the EmPact
19  agreement, correct?
20         ATTORNEY BRUSTEIN:  Objection.
21    A.  I believe so.
22    Q.  And we've looked at the EmPact agreement
23  earlier today, do you remember that?
24    A.  Yes.
25    Q.  And we saw that in the EmPact agreement you



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
285–288

Page 285

S. STALEY

1
2    were always allowed to moonlight or get another job,
3    right?
4          ATTORNEY BRUSTEIN:  Objection.
5      A.  I don't know.
6      Q.  You looked at that provision, we looked at it
7    twice.  Do you remember looking at it, ma'am?
8          ATTORNEY BRUSTEIN:  Objection.
9      A.  Yeah, we looked at it but I don't remember
10    seeing that on the EmPact.
11      Q.  We looked at it in the EmPact agreement.  Do
12    you remember that?
13      A.  But what the claim here is about the no-fault
14    separation pay.
15      Q.  The provision of which is in the EmPact
16    agreement, correct?
17          ATTORNEY BRUSTEIN:  Objection.
18      A.  I don't understand your question about the
19    moonlighting then.
20      Q.  So the EmPact agreement has a number of pages,
21    in fact you signed an affidavit, or declaration saying
22    that you knew that yours had 62 versus 60 other pages,
23    do you remember that?
24      A.  I understand that.  But I don't understand
25    your question.

Page 286

S. STALEY

1
2      Q.  The EmPact agreement --
3      A.  About the moonlighting.
4      Q.  Allowed you --
5          ATTORNEY BRUSTEIN:  She's still speaking.
6      Q.  I apologize.
7      A.  I don't understand your question about the
8    moonlighting and how that relates to what Elizabeth
9    Ortiz said.  She said if you get a job your contract,
10    I don't know the words verbatim, then I falter on my
11    contract with Four Seasons, which is the EmPact, and I
12    will not be given severance.
13      Q.  Okay.  So you knew --
14      A.  What do you mean I knew?
15      Q.  I was starting the question.
16      A.  Okay.
17      Q.  You knew that the contract that you were
18    talking about was the EmPact agreement, correct?
19          ATTORNEY BRUSTEIN:  Objection.
20      A.  What do you mean I knew?
21      Q.  Well, when you talk about the contract between
22    the employees and Four Seasons, that contract is the
23    EmPact agreement, right?
24      A.  Right.  And she -- right.  And she --
25      Q.  I don't care what she said.  I'm taking it in

Page 287

S. STALEY

1
2    little bits and pieces.
3      A.  Well, I do care what she said.  I was at that
4    meeting.  You were not at that meeting.  And I
5    understand that you want me to repeat those words
6    verbatim.  It's been a long time.  So please, with all
7    respect, due respect, she said if I got another job I
8    was violating -- you're saying the EmPact agreement.
9    I understand that.  But I don't understand your
10    question with the moonlighting with her saying, if I
11    get a job I am violating that contract, when I was,
12    due to the length of time, the hotel hasn't reopened,
13    I'm terminated.  So I still don't understand your
14    question.  Even though that you're saying that it's
15    listed in the EmPact agreement.
16      Q.  Okay.  Let me try it one more time.  Okay?
17    I'm doing this in little bite-sized pieces.
18      A.  Okay.
19      Q.  In the EmPact agreement that we looked at you
20    were allowed to get another job or moonlight, do you
21    remember seeing that?
22          ATTORNEY BRUSTEIN:  Objection.  That's not
23    what it says.
24          ATTORNEY BOLAND:  Oh, that's exactly what it
25    says, counsel.

Page 288

S. STALEY

1
2      Q.  You can answer.
3      A.  I don't remember then.  I don't remember.
4      Q.  After you came away with your understanding of
5    what Ms. Ortiz -- by the way, did you read her
6    deposition in this case?
7          ATTORNEY BRUSTEIN:  Objection.
8      A.  I don't understand your question.
9      Q.  Did you know Ms. Ortiz, your lawyers took
10    Ms. Ortiz's deposition?
11      A.  Okay.
12      Q.  Did you read any, like a rough transcript or
13    any part of that, anything where she testified?
14      A.  I don't -- I don't know.
15      Q.  No, I mean did you read it?  It was just taken
16    like a week and a half ago or something like that?
17          ATTORNEY RISMAN:  Did you read it?
18          ATTORNEY BOLAND:  Me personally, no.
19          ATTORNEY RISMAN:  So how can she have read it?
20          ATTORNEY BOLAND:  Rough transcripts.
21          ATTORNEY RISMAN:  I don't have the rough
22    transcript.
23          ATTORNEY BOLAND:  Go ahead and coach.
24          ATTORNEY RISMAN:  I don't know what you're
25    saying.  We just took the deposition.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
289–292

Page 289

1              S. STALEY
2        ATTORNEY BOLAND:  We get rough transcripts
3   like immediately after.
4        A.  I haven't read it.
5        Q.  Did you have anyone, this is a yes-or-no
6   question, report to you about what she testified at
7   the June 25, 2021 meeting?
8        ATTORNEY BRUSTEIN:  Objection.  I am going to
9   direct her not to answer that.  Because that clearly
10  is asking about attorney-client communication.
11       Q.  Okay.  And you are going follow.  All right.
12  So let me go back and do bite-sized pieces.  Let's put
13  it this way.
14       After you listened to what Ms. Ortiz had said
15  and then I know you can't remember the exact words but
16  your impression I take it was that if you got another
17  job somehow you were forfeiting your right to
18  severance, is that fair?
19       A.  Correct.
20       Q.  Okay.  Did you go back and check with the
21  EmPact agreement to see what it said about that, if
22  anything?
23       A.  I did go back and what I found was that it was
24  referring to the no-fault separation pay.
25       Q.  And where did it say that if you got another

Page 290

1              S. STALEY
2   job you forfeited your right to no-fault separation
3   pay in the EmPact agreement?
4        A.  I don't recall that right now.  I am going
5   based on the understanding of what Elizabeth Ortiz
6   said.
7        Q.  I understand what your understanding was of
8   what she said.  Can you tell me what everybody else
9   who was on that Microsoft Teams meeting understood her
10  to say?
11       ATTORNEY BRUSTEIN:  Objection.
12       A.  I don't -- I don't know.
13       Q.  We would have to ask them what they understood
14  that to be, right?
15       ATTORNEY BRUSTEIN:  Objection.
16       A.  Yes.
17       Q.  Did you get a hearing with the
18  Department of Labor for unemployment?
19       A.  Did not.
20       (Exhibit 83, earning statements, Staley v
21  FSR0188 through 197 was marked for identification).
22       Q.  I am handing you what has been marked as
23  exhibit 83, which is, ma'am, I'll represent to you
24  that this is a group exhibit that I put together from
25  documents produced by the plaintiffs.  I am going to

Page 291

1              S. STALEY
2   assume it's you, but you can let me know.  So it has
3   Bates numbers that begin with Staley v FSR0188, and I
4   think they continue sequentially to 197.
5        And just leaf through that and let me know
6   when you've had a chance to take a look at it.
7        (The witness reviews document.)
8        A.  Okay.  I've looked through them.
9        Q.  And you recognize these as a series of
10  earnings statements from 2020, correct?
11       A.  Yes.
12       Q.  And these are your earning statements, right?
13       A.  Yes.
14       Q.  Okay.  And these are documents I take it that
15  you gathered to produce in the case?
16       ATTORNEY BRUSTEIN:  Objection.
17       A.  These are my pay stubs that I keep.
18       Q.  Well.  That's what I mean.  These are things
19  that you turned over to be produced in the case,
20  because we've got the Bates numbers on them?
21       A.  Yes.
22       Q.  Okay.  And were these kept -- do you keep your
23  pay stubs in your paper file?
24       A.  Yes.
25       Q.  Got it.  And these are all accurate, to the

Page 292

1              S. STALEY
2   best of your knowledge and belief, right?
3        A.  Yes.  And provided to me by Four Seasons.
4        Q.  Okay.  And these reflect the payments made to
5   you, the pay stubs for the payments made to you from,
6   what, the period beginning 2/29/2020 in the first one,
7   to the period ending 12/25/2020 in the last?
8        A.  Yes.
9        (Ms. Risman exiting.)
10       (Exhibit 84, earnings statements, Staley v
11  FSR0224 through 234 was marked for identification).
12       Q.  I am handing you what has been marked as
13  exhibit 84, which is another, which I'll represent to
14  you, ma'am, is another series of documents I put
15  together.  I think they're in order.  Staley v FSR0224
16  through 234.
17       (The witness reviews document.)
18       Q.  Ma'am, do you recognize these as another set
19  of your pay stubs?
20       A.  Yes.
21       Q.  Okay.  And these are documents that you
22  identified in your files to be produced in the case,
23  right?
24       A.  Yes.
25       ATTORNEY BRUSTEIN:  Objection.



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
293–296

Page 293

S. STALEY

1
2    Q. The first page that we have of the ones you
3    gave to us is the period beginning October 9, 2021,
4    right?
5    A. Oh, 2021?
6    Q. Yes, we're in 2021 here.
7    A. Yes.
8    Q. And it goes through the last period ending on
9    12/24/2021 on the last one, right?
10   A. Yes.
11   ATTORNEY BRUSTEIN:  Are we done with 83?  I'm
12   sorry.
13   ATTORNEY BOLAND:  No, let's talk about 83 for
14   a second.
15   Q. That's a true and correct copy of the pay
16   stubs that you found in your file and produced to us,
17   right?
18   A. Yes.
19   Q. And exhibit 84 is a true and correct copy of
20   the pay stubs that you have in your file that you
21   produced to us?
22   A. Yes.
23   Q. All right.  And these reflect payments made to
24   you, at least for this period from October of 2021
25   through December of 2021, right?

Page 294

S. STALEY

1
2    A. Yes.
3    Q. And you'll see in the very first one there is
4    a severance pay of $500, correct?
5    ATTORNEY BRUSTEIN:  Objection.
6    Q. In exhibit 84.  Exhibit 84, in 2021?
7    A. Where --
8    Q. If you take a look at the first page that's
9    Bates-numbered Staley v FSR 0224.
10   A. Yes.
11   Q. All right.  If you take a look at earnings.
12   A. Yes.
13   Q. There's a severance pay of $500?
14   A. I understand.
15   Q. Okay.  And this was being paid to you for the
16   period October 9, 2021 through October 15, 2021?
17   A. Yes.
18   Q. And then that continues on, does it not,
19   ma'am, for the pay stubs that follow?
20   A. Yes.
21   Q. And it continues all the way through the end
22   of the year, right?
23   A. Yes.
24   Q. And this is October from June, let's see,
25   July, August, September, October -- four months after

Page 295

S. STALEY

1
2    you say you were terminated, right?
3    A. Yes.
4    Q. You were still being paid, right?
5    ATTORNEY BRUSTEIN:  Objection.
6    A. I don't understand your question.
7    Q. You received weekly paychecks for $500 from
8    October 9, 2021 through the period ending December 24,
9    2021, correct?
10   ATTORNEY BRUSTEIN:  Objection.
11   A. This case is about the no-fault separation
12   pay.
13   Q. I didn't ask you that.
14   A. But that's what that's about.
15   Q. I didn't ask you that.  I am asking a specific
16   question.  You got these paychecks after you say you
17   were terminated on June 25, 2021, right?
18   A. Yes.
19   Q. You didn't put that in your complaint, did
20   you?
21   ATTORNEY BRUSTEIN:  Objection.
22   Q. Did you or did you not?
23   ATTORNEY BRUSTEIN:  Objection.
24   Q. You can answer.  He's not telling you not to
25   answer.  He's just objecting.

Page 296

S. STALEY

1
2    A. No.
3    ATTORNEY BRUSTEIN:  Are you going back to 83?
4    ATTORNEY BOLAND:  I don't know.
5    ATTORNEY BRUSTEIN:  I saw you throw something
6    and I want to know if I should be also.
7    ATTORNEY BOLAND:  Oh, no. I threw stuff in the
8    back in case I'm going to need it.  But I don't have a
9    lot of space.
10   (Exhibit 85, earnings statements, Staley v
11   FSR0168 to 0202 was marked for identification).
12   Q. I am handing you what has been marked as
13   exhibit 85, which for the record is a document, a
14   group exhibit I put together again and the Bates
15   numbers, I believe they're consecutive, is Staley v
16   FSR0168 to 0202.
17   ATTORNEY BRUSTEIN:  For the record, they're
18   not.
19   ATTORNEY BOLAND:  They're not consecutive?
20   ATTORNEY BRUSTEIN:  I found 254 in the middle.
21   ATTORNEY BOLAND:  It may very well be.  I had
22   put this together as a group exhibit in what I believe
23   is the chronological order that they were produced to
24   us.  So there may be one out of this.  Very good
25   point.  The first page is FSR0168 and the exhibit will



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
297–300

Page 297

S. STALEY

1
2  speak for the rest of the pages.
3      A.  Yes.
4      Q.  These are documents that you produced to us,
5  right?
6      A.  Yes.
7      ATTORNEY BRUSTEIN:  I'm going to object and
8  I'm just going to ask you to take the exhibit back for
9  a minute so you can fix it so it's clean.
10      ATTORNEY BOLAND:  No.
11      ATTORNEY BRUSTEIN:  Just go off the record for
12  a second.
13      ATTORNEY BOLAND:  I'm not going to fix it.  I
14  put them in order to be in chron.  It's a group
15  exhibit.  It's intended to be a group exhibit.  These
16  were all produced in single pages.
17      ATTORNEY BRUSTEIN:  I'm trying to help you
18  out.  Take two seconds and just look at the exhibit
19  slowly and then you'll understand why I'm asking to
20  take it back.
21      ATTORNEY BOLAND:  Am I missing something?  Am
22  I missing dates out of order?  I could be.
23      ATTORNEY BRUSTEIN:  254.
24      ATTORNEY BOLAND:  254 is 7/16/2022.  And then
25  there's 174 that's 7/16/2002.  I have two copies of

Page 298

S. STALEY

1
2  it.
3      ATTORNEY BRUSTEIN:  254?
4      ATTORNEY BOLAND:  254, 7/16/2022 to 7/22/2022.
5      ATTORNEY BRUSTEIN:  And who is that for?
6      ATTORNEY BOLAND:  I took out the wrong one?
7  Oh, I took out Olive Rodriguez.  Give me it back.
8  He's right.  You're right.  I'm wrong.
9      ATTORNEY BRUSTEIN:  I'm just trying to make it
10  so the record is clear.
11      ATTORNEY BOLAND:  Fair enough.  Thank you very
12  much.  So we'll take 254 out.
13      (Informal discussion off the record.)
14      ATTORNEY BOLAND:  They weren't all produced
15  consecutively in the production.  We'll take this one
16  out.
17      ATTORNEY BRUSTEIN:  I'm not objecting.  I'm
18  just making sure that there aren't other peoples' pay
19  stubs that you're asking about collectively and it
20  messes up everything.
21      ATTORNEY BOLAND:  No, that's fair.  Yeah, they
22  might not be consecutive.  This stuff was not produced
23  that way.
24      Q.  Let's go back and let's get it clean now that
25  I have removed the one for Ms. Rodriguez.

Page 299

S. STALEY

1
2      ATTORNEY BRUSTEIN:  Just look through the
3  entire thing.
4      Q.  Yes, go ahead and look through the whole
5  thing.  My question is going to be is this a true and
6  correct copy of your earnings statements for 2022 that
7  you found in your files to be produced in the case?
8      A.  Yes.
9      Q.  And this is a series of earnings statements,
10  your pay stubs, these in 2022, correct?
11      A.  Yes.
12      Q.  And they continue to reflect the $500 per week
13  payments, correct?
14      A.  Yes.
15      Q.  And this is now, you know, getting long after
16  you say you were terminated in June 25 of 2021, right?
17      A.  Yes.
18      Q.  And you didn't put the fact of the continued
19  payments in your complaint, did you?
20      A.  No.
21      Q.  In fact you're still getting $500 a week, are
22  you not?
23      A.  Yes.
24      Q.  I just want you to verify a couple of
25  documents and then we'll be through these.  This is

Page 300

S. STALEY

1
2  86.
3      (Exhibit 86, 2020 Form W-2, Staley v FSR0237
4  to 238 was marked for identification).
5      Q.  86 for the record is a document bearing the
6  Bates number Staley v FSR0237 to 238.
7      A.  Yes.
8      Q.  And is this, ma'am, a true and correct copy of
9  your 2020 W-2 and earnings statement from Hotel 57
10  Services, LLC?
11      A.  Yes.
12      Q.  Okay.  And this is one of the documents that
13  you found in your files and produced?
14      A.  Yes.
15      Q.  And your employer here is listed as Hotel 57
16  Services, LLC, right?
17      ATTORNEY BRUSTEIN:  Objection.
18      A.  Yes.
19      Q.  Okay.  And that's what it is on all of your
20  pay stubs as well, correct?
21      ATTORNEY BRUSTEIN:  Objection.
22      A.  Yes.
23      Q.  No confusion about that, right?
24      ATTORNEY BRUSTEIN:  Objection.
25      A.  Yes.



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
301–304

Page 301

1                    S. STALEY
2      Q. I'm handing you, ma'am, what has been marked
3  as exhibit 86 which for the record is a document --
4         (Discussion off the record.)
5         (Exhibit 87, 2021 Form W-2, Staley v FSR0239
6  to 240 was marked for identification)
7      Q. I am handing you what has been marked as
8  apparently exhibit 87, which for the record is a
9  document bearing the Bates numbers Staley v FSR0239 to
10  240. Do you recognize exhibit 87, ma'am?
11     A. Yes.
12     Q. And it's your 2021 W-2 earnings summary from
13  Hotel 57 Services, LLC, right?
14     A. Yes.
15     Q. And this is a true and correct copy of the
16  document that you found in your files and produced?
17     A. Yes.
18        (Exhibit 88, 2021 Form W-2, Staley v FSR0241
19  was marked for identification).
20     Q. I am handing you what has been marked as
21  exhibit 88 which for the record is a group exhibit,
22  the first page of which is Bates number Staley v
23  FSR0241. I think it might be consecutive.
24        ATTORNEY BRUSTEIN: It is.
25        ATTORNEY BOLAND: To 244.

Page 302

1                    S. STALEY
2      Q. Do you recognize the documents that comprise
3  group exhibit 88?
4      A. Yes.
5      Q. And these are several W-2, form W-2s and
6  earning statements that you received for 2021,
7  correct?
8      A. Yes.
9      Q. And the first one on page FSR 0241 is from
10  Fourth of July Project LLC, right?
11     A. Yes.
12     Q. And you had mentioned that as of at least
13  August of 2021 you started getting some, can I call
14  them entertainment gigs?
15     A. Sure.
16     Q. Okay. And is this the W-2 from one of those
17  jobs?
18     A. Yes.
19     Q. Okay. And the second page is a W-2 for
20  Community Service Productions, right?
21     A. Yes.
22     Q. What is Community Service Productions? Strike
23  that. What did this W-2 relate to?
24     A. As the actor. The gig here and there.
25     Q. This is one of the entertainment gigs?

Page 303

1                    S. STALEY
2      A. Yes.
3      Q. Okay. And this is one that you worked in
4  2021?
5      A. Yes.
6      Q. The last page, I think that has several pages
7  there, the last page is a W-2 and earning statement
8  for Angelina Movie LLC?
9      A. Yes.
10     Q. Is that another one of the gigs?
11     A. Yes.
12     Q. I've got to ask you, what was it?
13     A. It was for a movie.
14     Q. I know that. What movie?
15     A. It's actually on Netflix. It's I'll Be With
16  You Always.
17     Q. Okay. And these are true and correct copies
18  of the W-2s that you received for 2021?
19     A. Yes.
20     Q. Have you continued to, you know, obtain the
21  occasional acting gig in 2022?
22     A. Actually it was dead in 2022.
23     Q. How about in 2023, have you been able to get
24  any work?
25     A. No.

Page 304

1                    S. STALEY
2      Q. You still actively tried?
3      A. Yes.
4      Q. Since the time period that COVID struck, other
5  than the acting work that you did, have you looked to
6  obtain any other type of employment?
7      A. At this time, that is my new career.
8      Q. To look for another job?
9      A. No, my acting.
10     Q. Oh, your acting. Okay. But in terms of
11  supporting yourself or making money in the meantime,
12  have you looked to do anything else?
13        ATTORNEY BRUSTEIN: Objection.
14     A. I'm still pursuing my acting.
15     Q. Okay.
16     A. That is my main focus, and those are the jobs
17  that I'm auditioning for.
18     Q. With respect to the time period like right
19  after March of 2020 did you consider looking for any
20  alternative work right away, other than acting?
21  Because I know that got screwed up by COVID as well.
22        ATTORNEY BRUSTEIN: Objection.
23     A. I don't understand.
24     Q. Yeah. March 2020 hits and your put onto
25  furlough by the Four Seasons, fair?



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
305—308

Page 305

1              S. STALEY
2    A. Yes.
3    Q. After that time period did you look to get any
4 other kind of employment?
5    A. At that time I was receiving my unemployment.
6    Q. I understand that. I understand you were
7 receiving unemployment. The question is --
8    A. And COVID was happening as well.
9    Q. Okay. Did you understand that there were very
10 many prospects for employment from that time period of
11 March until the end of 2020?
12      ATTORNEY BRUSTEIN: Objection.
13    A. I don't remember.
14    Q. Did you investigate like the market for other
15 employment outside of the acting world?
16    A. I don't remember.
17    Q. All right. So you're put on to a furlough in
18 March of 2020, right?
19    A. Yes.
20    Q. And then you have the town hall meeting in
21 June of 2021, right?
22    A. Yes.
23    Q. And then obviously you continued to be paid an
24 amount of money by the hotel after that, including
25 through today, right?

Page 306

1              S. STALEY
2      ATTORNEY BRUSTEIN: Objection.
3    A. I don't understand your question.
4    Q. You continue to get $500 a week from the hotel
5 through today, do you not?
6    A. Yes.
7    Q. So you file a lawsuit in August of 2022,
8 correct? You can look at the very first complaint
9 that we looked at, exhibit 5. And look at the
10 stamping at the top of it. Do you see there's a stamp
11 at the top of -- do you have exhibit 5?
12    A. Yes, I do.
13    Q. Do you see at the top there's a stamp of the
14 filed date?
15    A. Yes, I see that.
16    Q. And it's August 9 of 2022, right?
17    A. On the paper, yes.
18    Q. Okay. What made you decide to file the
19 lawsuit in August of 2022?
20      ATTORNEY BRUSTEIN: Objection.
21    A. I don't remember.
22    Q. Well, I mean because the situation that had
23 existed as of June 25, 2021 had not changed in terms
24 of the hotel reopening between then and August of
25 2022, right? I mean it was still shut down

Page 307

1              S. STALEY
2 essentially, undergoing renovations and repairs and
3 such, is that right?
4      ATTORNEY BRUSTEIN: Objection.
5    A. I don't understand your question.
6    Q. You say you thought that you were
7 terminated --
8    A. But I was still hoping for it to reopen.
9    Q. I understand that. But you said you thought
10 you were terminated in June of 2021 but you didn't sue
11 until August of 2022, correct?
12    A. I don't remember. I don't remember -- I just
13 don't understand your question.
14    Q. Let's take it in bits and pieces.
15    A. Okay.
16    Q. You testified earlier that you believed, your
17 impression was, your understanding was you were
18 terminated in June of 2021?
19    A. Yes.
20    Q. And you knew then you weren't paid no-fault
21 separation pay, correct?
22    A. Correct.
23    Q. Okay. You didn't file a lawsuit until August
24 of 2022. Correct?
25    A. Well, I had to get my attorney and that takes

Page 308

1              S. STALEY
2 time. And then when it's all settled and then its
3 finally filed.
4    Q. Well, it's over a year between the time that
5 you say you believe you were terminated and at that
6 time you knew you didn't get the no-fault separation
7 pay, correct?
8    A. And that's why I needed to file this with my
9 attorneys.
10    Q. I want to know why it took a year and, you
11 know, a month and a half or whatever it was, what made
12 you file it in 2022?
13      ATTORNEY BRUSTEIN: Objection. I am going to
14 direct her to exclude any attorney-client
15 communication from her answer.
16    A. Because it took time.
17    Q. How? What took time?
18    A. Talking with Vivian and Olive and just finding
19 the time.
20    Q. Were you all working that you had other jobs
21 to go to, that you didn't have a chance to chat about
22 when you were going to sue?
23      ATTORNEY BRUSTEIN: Objection. Again, I am
24 directing her to limit her answer to exclude
25 attorney-client communication.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
309–312

Page 309

1                    S. STALEY
2         ATTORNEY BOLAND:  That question called for
3    none of that.
4         Q.  You can answer my question.
5         A.  I don't remember why it took so long.
6         Q.  So what was the triggering event to get a
7    lawsuit filed?
8         A.  I already explained that.  It was in June 25,
9    2021.
10        Q.  Right.  But you don't file until August.  I'm
11   trying to understand --
12        A.  I was --
13        Q.  Let me finish, ma'am.
14        A.  I apologize.
15        Q.  I do it, too.  I want to understand why I have
16   a better than 12 month window between the time that
17   you believe you were terminated and you knew you
18   didn't get the no-fault separation pay and the time
19   you actually file a lawsuit.  I just want to know why
20   the delay?
21        ATTORNEY BRUSTEIN:  Objection.  Again I am
22   going to direct her to exclude from her answer any
23   attorney-client communication.
24        A.  Because it took time.
25        Q.  What took time?

Page 310

1                    S. STALEY
2         ATTORNEY BRUSTEIN:  The same objection.  The
3    same limitation.
4         A.  It took time.
5         Q.  What?  What is the "it"?
6         A.  The time.
7         Q.  No, you said "it took time."
8             What is the "it" in that sentence?  What are
9    you referring to?
10        A.  Getting everything together.  Getting it done.
11        Q.  When did you hire the lawyers?
12        A.  I don't remember the exact date.
13        Q.  Okay.  I don't want the exact date.  Give me
14   an approximation?
15        ATTORNEY BRUSTEIN:  Objection.
16        A.  I don't remember.
17        Q.  Was there some sort of event that happened,
18   you know, shortly before August of 2022 that made you
19   decide now I want to file it, I want to get this on
20   file?
21        A.  Being with Vivian and Olive.
22        Q.  And what about being with Vivian and Olive --
23        A.  Coming together and wanting to ... because of
24   the violation.
25        Q.  What violation?

Page 311

1                    S. STALEY
2         A.  Of the WARN Act and not receiving our no-fault
3    separation pay.  And it took time.
4         Q.  Okay.  So you've got two different complaints
5    that were filed, the original one and the first
6    amended one.  We looked at both of those, right?
7         A.  Yes.
8         Q.  Okay.  And there are specific legal claims
9    that are set forth in each of them, correct?
10        A.  Yes.
11        Q.  Okay.  Putting them aside, ma'am, what did the
12   defendants do wrong?
13        A.  What do you mean by putting them --
14        Q.  I don't want you to have to delve into the
15   complaint and the claims and everything.  I want you
16   to tell me.  What do you think -- what do you contend
17   the defendants did wrong here?
18        ATTORNEY BRUSTEIN:  Objection.
19        A.  They -- I don't -- I don't -- I don't
20   understand that question.  I really don't understand
21   that question.  If I have to put all that aside.
22        Q.  No, what I am saying is I don't want you to
23   have to rely on the specific legal claims that you're
24   asserting, whether it's breach of this, breach of
25   that.  I don't want you to have to worry about that.

Page 312

1                    S. STALEY
2    I just want you to tell me in your own words what did
3    the defendants do wrong that makes it appropriate for
4    you to sue them?
5         ATTORNEY BRUSTEIN:  Objection.
6         A.  I don't understand the question.
7         Q.  Did you sue the defendants because you thought
8    they did something wrong?
9         A.  They violated what I keep explaining.  The
10   EmPact agreement and the WARN Act.
11        Q.  Okay.  So the WARN Act.  How did they violate
12   the WARN Act again?  Tell me exactly?
13        ATTORNEY BRUSTEIN:  Objection.
14        A.  I'm not a lawyer so I don't know how to
15   explain that in legal terms.
16        Q.  I want to know what you think.
17        A.  It's to warn employees that their job is
18   ending and it gives them an opportunity to possibly
19   seek employment, you know, other employment.
20        Q.  Okay.  You got one of those in August of 2020,
21   we saw that, right?
22        ATTORNEY BRUSTEIN:  Objection.
23        A.  I understand.
24        Q.  Okay.  So they gave you that.  Okay.  How else
25   are you violated -- so you have that notice.



SELENA STALEY                                    April 11, 2023
STALEYV. FSR INTL.                               313–316

Page 313
1                    S. STALEY
2          ATTORNEY BRUSTEIN:  Objection.
3          Q.  What did you do when you got it?  Did you go
4    out and get another job?
5          A.  What do you mean?
6          Q.  You got that notice in August of 2020, that
7    said that we've got to give you this because we don't
8    know how long you're going to be unemployed, we're
9    giving you this WARN Act notice?
10         A.  But then they also continued to contact us and
11   saying that they were stringing us along and that they
12   were going to reopen.  So I was hoping that they would
13   reopen.
14         Q.  Fair enough.  You were hoping they were going
15   to reopen.  In addition --
16         A.  And they strung us along.
17         Q.  In addition to hoping they would reopen, after
18   you got that WARN Act notice, did you go out and look
19   for another job?
20         ATTORNEY BRUSTEIN:  Objection.
21         A.  I don't understand the question.  I told you
22   that I've been doing the acting gigs.
23         Q.  Okay.  And you didn't look for any other job
24   other than that?
25         A.  Excuse me.  That is a job.

Page 314
1                    S. STALEY
2          Q.  I'm not saying that.  I'm saying any other job
3    other than those?
4          A.  I looked for a job as an actor.  That is a
5    job.
6          Q.  I'm not disagreeing with you at all.
7          A.  Once again, I looked for a job, as an actor.
8          Q.  What did anybody else who got that notice in
9    August 5 of 2020 do?
10         ATTORNEY BRUSTEIN:  Objection.
11         A.  I have no idea.  I don't know.
12         Q.  We would have to go ask them, wouldn't we?
13         ATTORNEY BRUSTEIN:  Objection.
14         A.  I don't know.
15         Q.  Anything else that you think people, the
16   defendants did wrong in your own terms?  You got your
17   WARN Act.  I get it.  What else did the defendants do
18   wrong?
19         ATTORNEY BRUSTEIN:  Objection.
20         A.  The EmPact agreement.
21         Q.  And that is not paying the no-fault separation
22   pay?
23         A.  No-fault separation pay, yes.
24         Q.  Okay.
25         A.  And also Four Seasons said that they would

Page 315
1                    S. STALEY
2    have good practices and would treat us fairly.
3          Q.  Do you think, though, that you can sue
4    somebody for that?
5          ATTORNEY BRUSTEIN:  Objection.
6          A.  I don't know.  But it is included, I believe
7    as part of the EmPact, that they would treat us
8    fairly.
9          Q.  So what do you want them to have done -- let
10   me go back defendant by defendant, ma'am.  I want to
11   ask you about them.  Because you sued a bunch of
12   different parties here.  Do you see the complaint?
13         A.  They're all the defendants.
14         Q.  But I am going to ask you about each of them
15   individually.  If you take a look at exhibit 6.  And
16   we call this a caption.  Okay?  It's the part where it
17   says under United States District Court, Southern
18   District of New York, they've got the listing of the
19   plaintiffs.  Do you see that?
20         A.  Yes.
21         Q.  And then do you see the listing of the
22   defendants, right?
23         A.  Yes.
24         Q.  Okay.  So you sued a number of different
25   defendants here, right?

Page 316
1                    S. STALEY
2          A.  Yes.
3          Q.  Okay.  Let's start with Hotel 57 Services,
4    LLC.  What is Hotel 57 Services, LLC?
5          ATTORNEY BRUSTEIN:  Objection.
6          A.  It's a defendant.  It's part of the team of
7    the defendants.
8          Q.  What is it?  Is it a company?  Is it a
9    partnership?  Is it something else?  What does it do?
10         ATTORNEY BRUSTEIN:  Objection.
11         A.  It's a company.
12         Q.  What does it do?
13         ATTORNEY BRUSTEIN:  Objection.
14         A.  I don't know.
15         Q.  What investigation did you make before you
16   authorized this lawsuit to be filed on your behalf to
17   find out?
18         ATTORNEY BRUSTEIN:  Objection.
19         A.  I don't remember.
20         Q.  What did Hotel 57 Services, LLC, itself, what
21   did that company do wrong?
22         ATTORNEY BRUSTEIN:  Objection.
23         A.  They violated the WARN Act and the EmPact
24   agreement.
25         Q.  Okay.  With respect to the violation of the



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
317–320

Page 317

S. STALEY

1  WARN Act.  At trial what are you going to testify,
2  what are you going to tell the judge and the jury
3  Hotel 57 did wrong specifically?
5      ATTORNEY BRUSTEIN:  Objection.
6      A.  I don't understand your question.
7      Q.  Yeah.  You're going to say that they violated
8  the WARN Act --
9      A.  I just said it.
10     Q.  I'm sorry.  You think they violated the WARN
11  Act, right?
12         ATTORNEY BRUSTEIN:  Objection.
13     A.  Yes.
14     Q.  Okay.  If we -- if the judge asked you the
15  question, Ms. Staley, how did Hotel 57 Services, LLC
16  violate the WARN Act what are you going to tell him?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  I don't understand the question.
19     Q.  If the judge asks you at trial, Ms. Staley,
20  how did Hotel 57 Services, LLC violate the WARN Act,
21  what will you tell him?
22         ATTORNEY BRUSTEIN:  Objection.
23     A.  I still don't understand your question.
24     Q.  What do you want from Hotel 57 Services, LLC
25  in this lawsuit?

Page 318

S. STALEY

1
2         ATTORNEY BRUSTEIN:  Objection.
3      A.  From the defendants, I would like my no-fault
4  separation pay.
5      Q.  I am not asking about the defendants
6  collectively, ma'am.  I'm asking about Hotel 57 --
7      A.  It's part of the defendants.
8      Q.  I am asking about Hotel 57 Services, LLC
9  specifically.
10     A.  Well, I am talking about the defendants,
11  because Hotel 57 is part of the defendants, and it's
12  not its own separate entity.  It's a part of the
13  defense.  It's part of the defendants.
14     Q.  It's one of the defendants you named, right?
15     A.  But I'm not suing that one separately.
16     Q.  You're not?  So your testimony under oath is
17  you're not suing Hotel 57 Services, LLC --
18     A.  No, I said I'm not suing them each
19  individually.
20         ATTORNEY BRUSTEIN:  Objection.
21     A.  It's all the defendants that I am suing.  All
22  of them.  And so there's nothing individual about any
23  of these companies listed.
24     Q.  Okay.  And you are going to tell the judge
25  that at trial, right?

Page 319

S. STALEY

1
2         ATTORNEY BRUSTEIN:  Objection.
3      A.  They're defendants.
4      Q.  No, I didn't ask you that.
5      A.  They're all in it together.
6      Q.  They're all in it together, what does that
7  mean?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  That they're all defendants.
10     Q.  Well, they're all defendants because you named
11  them as defendants in the lawsuit, correct?
12         ATTORNEY BRUSTEIN:  Objection.
13     A.  They're defendants.
14     Q.  Because you sued them, right?
15     A.  They're defendants.
16     Q.  Ma'am, I want to know if Hotel 57 Services,
17  LLC, if its president walks in and says what do you
18  want from me, what would you tell him?
19         ATTORNEY BRUSTEIN:  Objection.
20     A.  I don't understand your question.
21     Q.  Seriously?
22         ATTORNEY BRUSTEIN:  Objection.  Please don't
23  be offensive to the witness.  She's sitting here
24  answering your questions.
25         ATTORNEY BOLAND:  That's debatable.

Page 320

S. STALEY

1
2      A.  I don't understand your question.
3         ATTORNEY BRUSTEIN:  That's inappropriate
4  comment.
5      Q.  If the president of Hotel 57 Services, LLC
6  walks in and says, ma'am, I'm the president of Hotel
7  57 Services, LLC.  What do you want from me in this
8  lawsuit?
9         ATTORNEY BRUSTEIN:  Objection.
10     A.  I don't understand the question.
11     Q.  What do you want in the lawsuit -- tell me
12  everything you want to come out of this lawsuit?
13     A.  I've already explained what I wanted.
14     Q.  Tell me again?
15         ATTORNEY BRUSTEIN:  Objection.
16     A.  I already explained it.
17     Q.  How much money do you want?
18         ATTORNEY BRUSTEIN:  Objection.
19     A.  I don't know.
20     Q.  Do you want anything in addition to money?
21         ATTORNEY BRUSTEIN:  Objection.
22     A.  I don't know.
23     Q.  Who would know?
24         ATTORNEY BRUSTEIN:  Objection.
25     A.  I don't know.



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
321–324

Page 321
S. STALEY

2    Q. Who's going to testify at the trial about what
3 you want in this lawsuit?
4       ATTORNEY BRUSTEIN: Objection.
5    A. I don't understand your question.
6    Q. Well, somebody has to tell the jury what you
7 want for the jury to give it to you, do you understand
8 that?
9       ATTORNEY BRUSTEIN: Objection.
10    A. It hasn't been decided by the judge yet, so I
11 don't know.
12    Q. Let's go through the other defendants. Let's
13 talk about FSR International Hotel Inc. d/b/a Four
14 Seasons Hotels & Resorts. That's one of the
15 defendants you sued, right?
16    A. It's one of the defendants, with the party of
17 the defendants, yes.
18    Q. What do you want from that entity?
19       ATTORNEY BRUSTEIN: Objection.
20    A. I've already answered that question.
21    Q. No you didn't. I asked you about Hotel 57
22 Services, LLC. I am asking you about --
23    A. They're any -- it's all together --
24    Q. Let me finish please ma'am?
25    A. Sorry.

Page 322
S. STALEY

2    Q. I am asking about FSR International Hotel,
3 Inc. What do you want from FSR International Hotel,
4 Inc.?
5       ATTORNEY BRUSTEIN: Objection.
6    A. From the defendants I would like my no-fault
7 separation pay.
8    Q. What did FSR International Hotel Inc., that
9 company, what did it do wrong?
10    A. They're all one company, the defendants.
11    Q. And you say this after reviewing the amended
12 complaint in its entirety prior to preparing for your
13 deposition today, correct?
14       ATTORNEY BRUSTEIN: Objection.
15    A. Can you repeat that question?
16    Q. Yeah, sure. You say they're all one company,
17 one entity, you say that after having reviewed this
18 amended complaint to prepare for your deposition
19 today?
20       ATTORNEY BRUSTEIN: Objection.
21    A. I don't understand your question.
22       ATTORNEY BRUSTEIN: Let's take a break after
23 this question.
24       ATTORNEY BOLAND: We're going to go for a
25 little bit until we get through these defendants.

Page 323
S. STALEY

2       ATTORNEY BRUSTEIN: Do you need to take a
3 break?
4       THE WITNESS: Yes. After this question I
5 would like to take a break.
6       ATTORNEY BOLAND: No, go take it now.
7       THE WITNESS: Thank you.
8       ---
9       (Recess from 6:06 to 6:14.)
10      ---
11      (Exhibit 89, verification was marked for
12 identification.)
13    Q. Ms. Staley, I am going to hand you something
14 out of order here. This is exhibit 89. And the
15 reason I just want to mark this is because I showed
16 you from that example with the interrogatory answers,
17 your verification that I had in my copy, right? Do
18 you remember that?
19    A. Yes.
20    Q. And you didn't have a copy of it in the copy
21 of the responses that you had as marked as the
22 exhibit, do you remember that?
23    A. Yes.
24    Q. So I just wanted to mark this in the record
25 and have you verify, this is the verification that you

Page 324
S. STALEY

2 signed on December 29, 2022 for the interrogatory
3 answers?
4    A. Okay.
5    Q. Okay. That's all I had. Perfect.
6       ATTORNEY BRUSTEIN: Can I ask for a quick
7 clarification. The exhibit you had used earlier was
8 not the one that actually had the attachments, it
9 wasn't the one that didn't.
10      ATTORNEY BOLAND: So the exhibit I had to use
11 had all the right attachments on it. I had created
12 that --
13      ATTORNEY BRUSTEIN: I am saying the one that
14 was marked into evidence?
15      ATTORNEY BOLAND: It was marked at another
16 deposition and apparently it didn't have the --
17 because it was Vivian. So Vivian had her --
18      ATTORNEY BRUSTEIN: That makes perfect sense.
19 I just wanted to make sure that the one you were
20 looking at that had it wasn't the one we were marking
21 into evidence.
22      ATTORNEY BOLAND: It should have been. I
23 marked it Vivian's. But it doesn't appear that it
24 was.
25      ATTORNEY BRUSTEIN: Okay, thank you.



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
325–328

Page 325

1           S. STALEY
2      Q. Let's get back to exhibit 6, ma'am. I want to
3  ask you about the defendants again, please. The next
4  defendant I want to ask you about is Hotel 57, LLC.
5      A. Yes.
6      Q. What is Hotel 57, LLC? Other than a
7  defendant. I know it's a defendant. What is that
8  company?
9          ATTORNEY BRUSTEIN: Objection.
10     A. I don't know.
11     Q. What does it do?
12         ATTORNEY BRUSTEIN: Objection.
13     A. I don't know.
14     Q. Why did you sue it?
15         ATTORNEY BRUSTEIN: Objection.
16     A. That's why I hired my attorneys for.
17     Q. Well, your attorneys can't testify at trial,
18  ma'am. At trial what are you going to testify that
19  Hotel 57, LLC did wrong?
20         ATTORNEY BRUSTEIN: Objection.
21     A. I don't know.
22     Q. Okay. What do you want from Hotel 57, LLC
23  specifically?
24         ATTORNEY BRUSTEIN: Objection.
25     A. I don't know.

Page 326

1           S. STALEY
2      Q. Let's go to the next one. Ty Warner Hotels &
3  Resorts, LLC. What is Ty Warner Hotels & Resorts,
4  LLC?
5          ATTORNEY BRUSTEIN: Objection.
6      A. I don't know.
7      Q. What does it do?
8          ATTORNEY BRUSTEIN: Objection.
9      A. I don't know.
10     Q. Why did you sue it?
11         ATTORNEY BRUSTEIN: Objection.
12     A. I don't know.
13     Q. What are you going to testify at trial Ty
14  Warner Hotels & Resorts, LLC did wrong?
15         ATTORNEY BRUSTEIN: Objection.
16     A. I don't know.
17     Q. What do you want from Ty Warner Hotels &
18  Resorts, LLC?
19         ATTORNEY BRUSTEIN: Objection.
20     A. I don't know.
21     Q. There's H. Ty Warner. Who is H. Ty Warner?
22     A. He is the owner of Four Seasons Hotel.
23     Q. Have you met Mr. Warner?
24     A. I have not.
25     Q. But you at least know who he is?

Page 327

1           S. STALEY
2      A. I've heard of him, yes.
3      Q. What did he do wrong?
4          ATTORNEY BRUSTEIN: Objection.
5      A. I don't know.
6      Q. Why did you sue him?
7          ATTORNEY BRUSTEIN: Objection.
8      A. I don't know.
9      Q. What do you want from him?
10         ATTORNEY BRUSTEIN: Objection.
11     A. I don't know.
12     Q. You testified that one of the things that you
13  think should have happened is that you should have
14  been paid no-fault separation pay, right?
15     A. Yes.
16     Q. Okay. And you think you should have been paid
17  that when, back in June of 2021 when you believe you
18  were terminated?
19     A. Yes.
20     Q. Okay. So that's when you think that should
21  have been paid and you want interest on the amount
22  that wasn't paid; we saw that in the damages report,
23  right?
24         ATTORNEY BRUSTEIN: Objection.
25     A. I don't remember.

Page 328

1           S. STALEY
2      Q. Okay. After you think you should have been
3  paid hotel separation pay, at some point after that,
4  that same year, you began receiving the $500 per week,
5  correct?
6      A. Yes.
7      Q. And you continued to receive that all through
8  the end of 2021, right?
9      A. Yes.
10     Q. All through 2022, correct?
11     A. Yes.
12     Q. And you continue to receive it today?
13     A. Yes.
14     Q. Have you added up the amount of money that you
15  received by continuing to receive that $500 a week
16  with the amount of money that you would be paid as
17  no-fault separation pay if in fact you were terminated
18  back in June of 2021?
19     A. I don't remember. I don't think I have. I
20  have not.
21     Q. Do you know whether you've actually gotten
22  more money after you say you were terminated through
23  that $500 per week, than you would have received in
24  June of 2021 as no-fault separation pay?
25         ATTORNEY BRUSTEIN: Objection.



SELENA STALEY                                              April 11, 2023
STALEY V. FSR INTL.                                            329–332

Page 329

1              S. STALEY
2      A. I don't know.
3      Q. You understand that the defendants in this
4   case including the Warner defendants contend that you
5   weren't terminated in June of 2021, right?
6          ATTORNEY BRUSTEIN: Objection.
7      A. Okay.
8      Q. Okay. And they think that you are not
9   entitled to no-fault separation pay because they say
10  you're still on a furlough; you understand that,
11  right?
12         ATTORNEY BRUSTEIN: Objection.
13     A. I don't know.
14     Q. Okay. If the consequence of convincing the
15  judge and the jury that you were in fact terminated in
16  June of 2021 means you weren't entitled to that $500 a
17  week that you have been getting, are you willing to
18  pay that back?
19         ATTORNEY BRUSTEIN: Objection.
20     A. I don't understand that question.
21     Q. Yes, sure. Let me ask you a question. If
22  winning on your claim for breach of the EmPact
23  agreement means you get no-fault separation pay but
24  you've got to give back all of that money that you
25  received for, the $500 per week that you started to

Page 330

1              S. STALEY
2   receive in 2021 and continue to receive to this day,
3   are you willing to do that?
4          ATTORNEY BRUSTEIN: Objection.
5      A. I don't understand that question.
6      Q. Okay. Have you heard the term you can't have
7   it both ways? Have you heard somebody use that term?
8      A. I have not.
9      Q. You've never heard that term in your life?
10     A. I have not.
11     Q. Have you heard you can't have your cake and
12  eat it, too?
13     A. I've heard that.
14     Q. Okay. I am asking you if the amount -- if the
15  consequence of this case is you could either have the
16  no-fault separation pay and be terminated as of June
17  25, 2021 or you can say you're still employed on
18  temporary furlough and keep all of the money that you
19  received starting in 2021 and continuing to this day
20  at $500 a week, which do you choose?
21         ATTORNEY BRUSTEIN: Objection.
22     A. Can you repeat that question?
23     Q. Yeah. I want you to assume that you can't
24  have both. You can't have no-fault separation pay and
25  keep all of that money that you have been paid at $500

Page 331

1              S. STALEY
2   a week. Just assume that, okay?
3          ATTORNEY BRUSTEIN: Objection.
4      Q. It's one or the other?
5          ATTORNEY BRUSTEIN: Objection.
6      A. I don't know that.
7      Q. I know you don't know it. I am asking you to
8   assume it?
9          ATTORNEY BRUSTEIN: Objection.
10     A. I don't know that.
11     Q. I didn't ask you if you knew it. I am asking
12  you to assume it hypothetically.
13         ATTORNEY BRUSTEIN: Objection.
14     A. I don't know that.
15     Q. I know you don't know it. I am telling you to
16  assume it hypothetically for purposes of my question.
17     A. I don't know that.
18     Q. I understand you don't know. Listen to me
19  carefully. Okay? I am not being clear, probably.
20     I want you to, for purposes of my question,
21  assume that you can either get -- tell the jury I was
22  terminated and I get no-fault separation pay, but that
23  means you don't get to keep the $500 per week that
24  you've been getting since 2021. Are you willing to do
25  that?

Page 332

1              S. STALEY
2          ATTORNEY BRUSTEIN: Objection.
3      A. I don't understand that question.
4      Q. It's not a hard question, ma'am. Let me try
5   it one more time.
6      I want you to know that you can either get
7   no-fault separation pay and give back all of the money
8   that you've been getting at $500 per week or you can
9   say no, I wasn't terminated I want to keep my $500 per
10  week and keep that, which choice do you make?
11         ATTORNEY BRUSTEIN: Objection.
12     A. I don't know.
13     Q. Do you know what choice anybody else who you
14  want to represent might make?
15         ATTORNEY BRUSTEIN: Objection.
16     A. I don't know.
17     Q. Do you know that if you were actually
18  terminated, your employment was terminated -- strike
19  that. Let me go back. Let's take a look at another
20  exhibit.
21     (Exhibit 90, EmPact Agreement Employee
22  Handbook Last Revised: February 1, 2018 was marked for
23  identification.)
24     Q. I am handing you what has been marked as
25  exhibit 90 which for the record is a document bearing



SELENA STALEY
STALEYV. FSR INTL.

April 11, 2023
333—336

Page 333

S. STALEY

1  the Bates -- well, it doesn't have a Bates number on
2  it. It actually has the file stamp at the top of case
3  number 122, Document 43-1 and it has a number of
4  pages.
5        Do you see that this is the EmPact Agreement
6  Employee Handbook Last Revised: February 1, 2018.
7  Right?
8     A. Yes.
9     Q. Okay. Let's take a look at page 56. You'll
10 see at the bottom of that page, ma'am, there's a
11 section called No-Fault Separation Pay?
12    A. Yes.
13    Q. This is the provision of the contract that you
14 claim was breached because you weren't paid no-fault
15 separation pay, right?
16    A. Yes.
17    Q. All right. If we look at the first sentence,
18 it says: "If I receive a permanent layoff with no
19 right of recall or I am terminated for no fault."
20       Right?
21    A. Yes.
22    Q. And then it goes on to say, "my termination
23 will be considered no-fault" and you get no-fault
24 separation pay, right?

Page 334

S. STALEY

1     A. That's what it says there.
2     Q. So one of two things has to happen for you to
3  get no-fault separation pay. You either have to be
4  permanently laid off with no right of recall, right?
5  Or terminated for no-fault. Right?
6     A. Yes.
7     Q. Okay. And your contention is you were
8  terminated for no-fault, is that right?
9        ATTORNEY BRUSTEIN: Objection.
10    A. I don't know.
11    Q. Well, ma'am, it's your lawsuit. I need to
12 know what you're contending. Which is it?
13       ATTORNEY BRUSTEIN: Objection.
14    A. The hotel still has not reopened.
15    Q. I didn't ask you that question.
16    A. So I was terminated.
17    Q. Were you terminated with no right of recall or
18 were you terminated for no-fault? Your under oath.
19 You have to answer this?
20       ATTORNEY BRUSTEIN: Objection.
21    A. I don't understand the question.
22    Q. What happened to you that entitles you to
23 no-fault separation pay under this provision?
24       ATTORNEY BRUSTEIN: Objection.

Page 335

S. STALEY

1     A. I'm terminated.
2     Q. For no-fault?
3     A. I'm terminated.
4     Q. Well, it doesn't say terminated. It says
5  terminated for no-fault.
6     A. I'm terminated.
7     Q. So then you're not entitled to the no-fault
8  separation pay, right?
9        ATTORNEY BRUSTEIN: Objection.
10    A. I don't know.
11    Q. I need to know what you are going to testify
12 to. That's why we're here.
13       ATTORNEY BRUSTEIN: Objection.
14    Q. And I need to know when I say to you now,
15 there are two provisions here, two conditions that
16 would entitle you to no-fault separation pay. Do you
17 see that?
18    A. Yes.
19    Q. You claim you're entitled to no-fault
20 separation pay, right?
21    A. Yes.
22    Q. Which of those two conditions is your claim
23 based on? What happened to you that entitles you to
24 no-fault separation pay?

Page 336

S. STALEY

1        ATTORNEY BRUSTEIN: Objection.
2     A. That I'm terminated.
3     Q. Is it terminated for no-fault?
4     A. I'm just -- I'm terminated.
5     Q. Well, then if you're not terminated -- so
6  you're not terminated for no-fault, is that correct?
7        ATTORNEY BRUSTEIN: Objection.
8     A. I don't know.
9     Q. And you're not permanently laid off with no
10 right of recall, right?
11       ATTORNEY BRUSTEIN: Objection.
12    A. I don't know.
13    Q. So you can't tell the jury one way or the
14 other, can you?
15       ATTORNEY BRUSTEIN: Objection.
16    A. I don't know.
17    Q. What happened to every other person who you
18 seek to represent?
19    A. I don't know.
20    Q. We would have to ask them, wouldn't we?
21       ATTORNEY BRUSTEIN: Objection.
22    A. I don't know.
23    Q. Okay. Let's go over a couple of pages
24 earlier, ma'am. Page 54. You'll see there's a



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
337–340

S. STALEY
1
2  section here called Complaint, Arbitration & Review
3  for Employees, right?  You're not there?  Page 54 is
4  at the bottom left-hand corner.
5      A.  Okay, I'm there.
6      Q.  Do you see here it says Complaint, Arbitration
7  & Review for Employees, right?  At the top, there's a
8  heading?
9      A.  I understand, starting there.  Oh, Complaint,
10  Arbitration & Review for Employees.  Yes.
11     Q.  Okay, cool.  Do you see that there are steps
12  outlined to be taken in the event of some sort of
13  complaint that you have, right?
14     A.  Yes.
15     Q.  And your complaint is you weren't paid
16  no-fault separation pay, right?
17         ATTORNEY BRUSTEIN:  Objection.
18     A.  I was terminated.
19     Q.  Well, is your complaint that you were
20  terminated or is it your complaint that you weren't
21  paid no-fault separation pay?
22     A.  I was terminated and I was not paid no-fault
23  separation pay.
24     Q.  Okay.  When did you discuss that complaint
25  with your immediate supervisor?

S. STALEY
1
2         ATTORNEY BRUSTEIN:  Objection.
3      A.  I don't know.
4      Q.  Did you?
5         ATTORNEY BRUSTEIN:  Objection.
6      A.  I don't know.
7      Q.  Did you file a written complaint with human
8  resources within 14 days?
9         ATTORNEY BRUSTEIN:  Objection.
10     A.  I don't remember.
11     Q.  So you think you were terminated on June 25 of
12  2021, right?
13     A.  Yes.
14     Q.  Between then and June 29 of 2021 did you file
15  a formal written complaint?
16         ATTORNEY BRUSTEIN:  Objection.
17     A.  I don't remember.
18     Q.  Did you retain a copy of a formal written
19  complaint that you filed?
20     A.  I don't remember.
21     Q.  It says:  "The director of human resources
22  will conduct an investigation concerning my written
23  complaint."
24         To your knowledge, did anybody conduct an
25  investigation based on a written complaint that you

S. STALEY
1
2  submitted?
3      A.  I don't remember.
4      Q.  It says:  "The director of human resources
5  will issue a written decision to me within 7 days
6  after the close of the investigation."  Did that
7  happen?
8         ATTORNEY BRUSTEIN:  Objection.
9      A.  I don't remember.
10     Q.  You know it didn't, don't you?
11         ATTORNEY BRUSTEIN:  Objection.
12     A.  I don't remember.
13     Q.  Ma'am, you know it didn't, don't you?
14     A.  I don't remember.
15     Q.  You're under oath.
16     A.  I don't remember.
17     Q.  And then it says:  "If I am dissatisfied with
18  the written decision in step 4, I will appeal to the
19  general manager within 14 days."
20         Did you do that?
21     A.  I don't remember.
22         ATTORNEY BOLAND:  Let's take a two-minute
23  break.
24                    ---
25         (Recess from 6:29 to 6:32.)

S. STALEY
1
2                    ---
3         ATTORNEY BOLAND:  I have no further questions.
4  Thank you, Ms. Staley.  And we'll see you at the
5  trial.
6         THE WITNESS:  Okay.
7         ATTORNEY BRUSTEIN:  Just reserving right to
8  review and sign.
9         ATTORNEY HUNT:  On behalf of FSR we don't have
10  any questions for Ms. Staley at this time.
11                    ---
12         (Time noted:  6:33 p.m. EDT)
13
14     _____
15         SELENA STALEY
16
17  Sworn and subscribed to before
18  me this _____day
19  of _____, 2023,
20  in the jurisdiction aforesaid.
21
22  _____
23     NOTARY PUBLIC
24
25



Page 341

```
 1            C E R T I F I C A T E
 2  STATE OF NEW YORK        )
 3  COUNTY OF NEW YORK       )
 4       I, FRANK J. BAS, a Certified Shorthand Reporter
 5  and Notary Public within and for the State of New
 6  York, do hereby certify:
 7       That the witness whose testimony is hereinbefore
 8  set forth, was duly sworn by me and that such
 9  testimony given by the witness was taken down
10  stenographically by me and then transcribed.
11       I further certify that I am not related by blood
12  or marriage to any of the parties in this matter and
13  that I am in no way interested in the outcome of this
14  matter.
15       That any copy of this transcript obtained from a
16  source other than the court reporting firm, including
17  from co-counsel, is uncertified and may not be used at
18  trial.
19       IN WITNESS WHEREOF, I have hereunto set my hand
20  this 12th day of April, 2023.
21
22            FRANK J. BAS, RPR, CRR
23
24
25
```

Page 342

```
 1  --------------- I N D E X ----------------
 2  WITNESS      EXAMINATION BY         PAGE
 3  SELENA STALEY     MR. BOLAND          5
 4  ----------------- EXHIBITS------------------
    (Exhibits retained by Mr. Boland.)
 5
    EXHIBIT                            PAGE
 6
    Exhibit 71, notice of deposition      7
 7
    Exhibit 72, page of LinkedIn profile     22
 8
    Exhibit 73, letter, Staley v FSR0212    201
 9
    Exhibit 74, letter, Staley v FSR0204 to 207  206
10
    Exhibit 75, letter, Staley v FSR0208    221
11
    Exhibit 76, letter, Staley v FSR0219    227
12
    Exhibit 77, letter, Staley v FSR0216    233
13
    Exhibit 78, letter, Staley v FSR0214    242
14
    Exhibit 79, letter, Staley v FSR0221    256
15
    Exhibit 80, letter, Staley v FSR0211    257
16
    Exhibit 81, letter, Staley v FSR0218    262
17
    Exhibit 82, letter, Staley v FSR0222    281
18
    Exhibit 83, earning statements, Staley v   290
19  FSR0188 through 197
20  Exhibit 84, earnings statements, Staley v   292
    FSR0224 through 234
21
    Exhibit 85, earnings statements, Staley v   296
22  FSR0168 to 0202
23  Exhibit 86, 2020 Form W-2, Staley v FSR0237  300
    to 238
24
    Exhibit 87, 2021 Form W-2, Staley v FSR0239  301
25  to 240
```

Page 343

```
 1  ----------- EXHIBITS CONTINUED ----------
 2  Exhibit 88, 2021 Form W-2, Staley v FSR0241   301
 3  Exhibit 89, verification                      323
 4  Exhibit 90, EmPact Agreement Employee         332
    Handbook Last Revised: February 1, 2018
 5
 6  PREVIOUSLY MARKED EXHIBITS:
 7  Exhibit 5, Complaint                          30
 8  Exhibit 6, First Amended Complaint            35
 9  Exhibit 7, Notice of Motion to Compel         84
    Arbitration and Dismiss Class Claims and
10  Stay Action, Memorandum of Law in Support
11  Exhibit 8, declaration of Cathy Hwang         92
12  Exhibit 9, Memorandum of Law in Opposition    95
    to Defendants' Motion to Compel
13  Arbitration, Dismiss Class Claims and Stay
    Action
14
    Exhibit 10, Declaration of Evan Brustein      98
15
    Exhibit 11, Reply Memorandum of Law in       114
16  Further Support of the Warner Defendants'
    Motion to Compel
17
    Exhibit 12, Notice of Motion to Dismiss,     114
18  Memorandum of Law in Support of the Warner
    Defendants' Motion to Dismiss the Complaint
19
    Exhibit 16, Plaintiffs' Memorandum of Law    116
20  in Opposition to Defendants' Hotel 57
    Services Motion to Dismiss the Amended
21  Complaint
22  Exhibit 13, Declaration of Elizabeth Ortiz   118
23  Exhibit 14, Notice of Motion to Dismiss,     125
    Memorandum of Law in Support of the Warner
24  Defendants' Motion to Dismiss
25
```

Page 344

```
 1  ----------- EXHIBITS CONTINUED ----------
 2  Exhibit 15, Declaration of Elizabeth Ortiz   135
    with exhibits
 3
    Exhibit 17, Declaration of Evan Brustein     141
 4  with exhibits
 5  Exhibit 19, Reply Memorandum of Law in       142
    Further Support of the Warner Defendants'
 6  Motion to Dismiss the Amended Complaint
 7  Exhibit 20, Plaintiffs' Rule 26 (A)(1)(A)    149
    Initial Disclosures
 8
 9  Exhibit 24, Defendants' First Demand For     164
    Production of Documents
10  Exhibit 25, Plaintiffs' Responses and        165
    Objections to Defendants' First Request For
11  Production of Documents
12  Exhibit 21, Plaintiffs' First Supplemental   172
    Disclosures
13
    Exhibit 22, letter dated March 29, 2023      180
14
    Exhibit 23, Staley v FSR0304                 183
15
    Exhibit 26, Defendants' First Set of         185
16  Interrogatories
17  Exhibit 27, Plaintiffs' Responses and        187
    Objections to Warner Defendants' First Set
18  of Interrogatories
19  Exhibit 28, letter dated February 24, 2023   191
    from Brustein Law firm
20
    Exhibit 41, letter, Staley v FSR0057         248
21
    Exhibit 47, letter, Staley v FSR0213         259
22
    Exhibit 50, letter, Staley v FSR0061         267
23
24  DIRECTIONS NOT TO ANSWER
    Page       Line
25
    16/14; 18/8; 182/11; 289/5
```



SELENA STALEY
STALEY V. FSR INTL.

April 11, 2023
345—347

Page 345

1   DEPOSITION ERRATA SHEET
    Our Assignment No. J9519181
2   Case Caption: Selena Staley, et al. vs. FSR
    International Hotel Inc.
3
              DECLARATION UNDER PENALTY OF PERJURY
4       I declare under penalty of perjury that I have
    read the entire transcript of my deposition taken in
5   the above-captioned matter or the same has been read
    to me, and the same is true and accurate, save and
6   except for changes and/or corrections, if any, as
    indicated by me on the DEPOSITION ERRATA SHEET
7   hereof, with the understanding that I offer these
    changes as if still under oath.
8       Signed on the _____ day of _____
    20___.
9       _____
    SELENA STALEY
10
11
12      Subscribed and sworn to on the ____ day of
13   _____ 20 ____ before me.
14
15   _____
16   Notary Public, in and for the State of
17   _____.
18
19
20
21
22
23
24
25

Page 346

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change:_____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23  SIGNATURE:_____DATE:_____
24        SELENA STALEY
25

Page 347

1   DEPOSITION ERRATA PAGE
2   Page No.____ Line No. _____ Change to:_____
3   _____
4   Reason for change: _____
5   Page No.____ Line No. _____ Change to:_____
6   _____
7   Reason for change:_____
8   Page No.____ Line No. _____ Change to:_____
9   _____
10  Reason for change:_____
11  Page No.____ Line No. _____ Change to:_____
12  _____
13  Reason for change:_____
14  Page No.____ Line No. _____ Change to:_____
15  _____
16  Reason for change:_____
17  Page No.____ Line No. _____ Change to:_____
18  _____
19  Reason for change:_____
20  Page No.____ Line No. _____ Change to:_____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25        SELENA STALEY

