O964STAC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SELENA STALEY, VIVIAN HOLMES,
     and OLIVE IVEY,
4
                 Plaintiffs,
5
                 v.                         22 Civ. 6781 (JSR)
6
     FOUR SEASONS HOTELS AND
7    RESORTS, HOTEL 57 SERVICES,
     LLC, HOTEL 57, LLC, TY WARNER
8    HOTELS AND RESORTS, LLC, AND
     H. TY WARNER,
9                                           Oral Argument

10               Defendants.

11   ------------------------------x
                                            New York, N.Y.
12                                          September 6, 2024
                                            10:15 a.m.
13
     Before:
14
                       HON. JED S. RAKOFF,
15
                                            District Judge
16
                            APPEARANCES
17
     BROMBERG LAW OFFICE, P.C.
18        Attorneys for Plaintiffs
     BY:  BRIAN L. BROMBERG
19
     BRUSTEIN LAW PLLC
20        Attorneys for Plaintiffs
     BY:  EVAN BRUSTEIN
21
     RISMAN & RISMAN, P.C.
22        Attorneys for Plaintiff
     BY:  MAYA RISSMAN
23

24

25
```

O964STAC

1    Appearances continued

2    SMITH GAMBRELL & RUSSELL, LLP
     Attorneys for Defendants TY WARNER HOTEL AND RESORTS LLC and H.
3    TY WARNER
     BY: KATHRYN LUNDY
4        MARK ZIMMERMAN

5

6    STOKES WAGNER, A.L.C.
     Attorneys for Defendant FSR INTERNATIONAL HOTELS INC.
7    BY: PAUL WAGNER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O964STAC

1           (Case called)

2           MR. BRUSTEIN:  Good morning, your Honor, Evan Brustein

3   on behalf of the plaintiffs.  I do want to point out that the

4   party is not Lockhart for the defendants but FSR International

5   Hotels, *et al*.

6           THE COURT:  I didn't hear what you were saying at all

7   other than your name.

8           MR. BRUSTEIN:  The caption that was read at the

9   beginning of the case --

10          THE COURT:  Is not the right caption.

11          MR. BRUSTEIN:  Yes, your Honor.

12          MR. BOLAND:  We'll fix it.

13          MR. BRUSTEIN:  Evan Brustein on behalf of the

14  plaintiffs.

15          MR. BROMBERG:  Good morning, your Honor.  Brian

16  Bromberg, Bromberg Law Office P.C. on behalf of the plaintiffs.

17          MS. RISMAN:  Good morning, Maya Risman, Risman &

18  Risman P.C., on behalf of the plaintiffs.

19          MS. STALEY:  Good morning, your Honor, Selena Staley.

20          THE COURT:  Plaintiff.

21          MS. STALEY:  Plaintiff.

22          MS. LUNDY:  Good morning, your Honor.  Kathryn Lundy

23  of Smith Gambrell on behalf of the Warner defendants.

24          MR. ZIMMERMAN:  Good morning, your Honor.  Mark

25  Zimmerman also of Smith Gambrell & Russell for the Warner

O964STAC

1    defendants.

2              MR. WAGNER:  Good morning, your Honor.  Paul Wagner

3    from for FSR International.

4              THE COURT:  Good morning, all.  We are here for

5    argument on the defendants' motion for summary judgment.

6              Now, the parties have spent some time arguing about

7    alleged efficiencies in the 56.1 statements.  And the Court's

8    preliminary view, after having spent some time reviewing them,

9    is that neither side complied with Rule 56.1.  For example,

10   defendants make much ado about the fact that the plaintiffs'

11   response to Item Six in the defendants' 6.1 statements was not

12   directly responded to.  That's true, but let's take a look at

13   Item Six.  Item Six is, "the terms and conditions of employment

14   for the union employees working at the hotel are governed by

15   applicable union collective bargaining agreements, not the

16   EmPact agreement."

17             Now, 56.1 is limited to statements of fact.  That's

18   not a statement of fact, that's a statement of a legal

19   conclusion.  It has no place in any proper 56.1 statement.

20   56.1 statements, as the local rule makes repeatedly clear, is

21   limited to statements of material facts.  This might have been,

22   in an appropriate time, a proper request to admit, but that's

23   not what 56.1 is about.

24             So the question -- the right answer should have been,

25   "we move to strike as improper."  But the answer that was given

O964STAC

1  by plaintiff's counsel was to cite to another defendants'

2  30(b)(6) responses and that citation, ultimately, is the

3  statement "whether all employees of the hotel had to sign the

4  EmPact agreement."  And further, "union employees received the

5  EmPact agreement but did not have to sign it."  That doesn't

6  bear remotely and the question that was put.

7         Now, I could spend the next two hours -- as I had to

8  last night -- going through the enumerable improprieties by both

9  sides in their 56.1 statements.  A 56.1 statement is designed

10  to help the Court and that is clearly not what happened here.

11  But I'd rather deal with the legal issues *per se*.

12         By the way, just one little point for plaintiffs for

13  future reference, in a huge number of your answers you begin

14  your answer by saying "not relevant."  That's not part of a

15  56.1 statement at all.  I wish you guys had read the rules.

16  The rule is that you either admit the factual statement, if a

17  factual statement is made, which sometimes defendants did.

18  Sometimes they combined three or four statements of fact in a

19  single question.  I won't go on and on about the misconduct of

20  the defendants.

21         But let's talk about just one more example for the

22  plaintiffs.  You're supposed to give either admission or

23  denial, and if it's a denial, you give record statements that

24  show why you are denying and why it's a disputed issue and not

25  an undisputed factual issue.  Usually you start off by saying,

O964STAC

1    "not relevant."  That's not a proper response.  That doesn't

2    tell me whether you are admitting or denying.  If I disagree

3    with you that it's irrelevant, and how could I tell that at

4    this stage, in any event.  So what you are basically asking me

5    is, Judge, do a lot more work.  And, oh, by the way, if you do

6    find it's relevant, here's or response and most of the

7    responses are nonresponsive.

8           Now, that we've had that pleasant chat, yes?

9           MR. BRUSTEIN:  Just an educational question, your

10   Honor, so as not to anger you in the future --

11          THE COURT:  I'm not angry.  I'm just expressing my

12   pleasure at having spent so many hours last night on something

13   that is supposed to be helpful to the Court and proved to the

14   completely unhelpful from both sides.

15          Yes?

16          MR. BRUSTEIN:  So as to avoid that again, your Honor,

17   and I apologize for that, if we take issue with the materiality

18   of a purported fact, is that something that --

19          THE COURT:  That's not what a 56.1 statement is about.

20   You have three options:  You can admit, and a few times you

21   did.  You can say "deny."  And sometimes you did that.  But

22   then what you gave in many, many cases was not, in my view,

23   raising a general dispute as to the fact, or, in a rare

24   instance, although, unfortunately, it was not so rare in this

25   case, where they've propounded an improper 56.1, like the

O964STAC

example I just gave where they are saying "admit a matter of

law," even though the rule, on its face, is about material

facts, then you can say "move to strike."  Those are the three

options, and there are no others.

MR. BRUSTEIN:  Thank you, your Honor.

THE COURT:  All right.  Now, let's talk about the

motions.  Let me hear first from counsel for the moving

defendants.

MS. LUNDY:  Good morning, your Honor.  Kathryn Lundy

on behalf of the Warner defendants in support of our motion

summary judgment, despite plaintiffs' efforts to create triable

issues of fact, this matter is ripe for adjudication on the

three remaining claims against the Warner defendants.  The

first two --

THE COURT:  So let me ask you this, if, let's assume

for the sake of argument that the pandemic caused the layoffs

and that you gave an adequate warning, those are all disputed,

but I'm just asking you to assume that for the moment, but

then, as I understand it, and correct me if I'm wrong, the

further delay in reopening the hotel is because you're redoing

the ball room and things like that.  Doesn't that require a new

WARN statement?

MS. LUNDY:  No, your Honor, they all relate back to

the COVID-19 pandemic.  The COVID-19 pandemic had considerable

effects on the hospitality industry and the ability for a

O964STAC

1   five-star hotel to open and operate profitably and safely.  And

2   the continuation of the closure and the hotel's interest to

3   ensure it can open profitably and safely under --

4          THE COURT:  Before the pandemic, it was operating

5   profitably and safely, yes?

6          MS. LUNDY:  No.  Ms. Hwang testified that even prior

7   to the pandemic they were having profitability issues with the

8   hotel's operation.  And when you include and intervene

9   COVID-19, and the impact that had --

10          THE COURT:  Maybe I'm missing your point.  If there

11   had been no COVID-19, and the hotel had decided we've got to

12   close down because we are unprofitable or we are going to close

13   down temporarily because we think we can make it profitable,

14   make some upgrades or whatever, then you would have to issue a

15   WARN statement; correct?

16          MS. LUNDY:  If we were to close down the hotel to

17   conduct renovations that would last more than six months, yes.

18   Then a WARN Act notice would be required.

19          THE COURT:  Okay.  So now instead the pandemic comes

20   and that may be an independent reason for you closing down, you

21   had a state of emergency and so forth.  The state of emergency

22   is lifted, and you decide, well, we still can't reopen because

23   we've got to deal with these profitability issues.  Why doesn't

24   that require a new WARN statement?

25          MS. LUNDY:  Because it all relates back to the initial

O964STAC

1    closure.  The COVID-19 pandemic --

2               THE COURT:  I thought the initial closure in the WARN

3    statement itself says it was because of the pandemic.

4               MS. LUNDY:  It does say because of the pandemic.  But

5    what --

6               THE COURT:  Okay.  So now the pandemic is over, and if

7    you were profitable and we are not doing repairs you could

8    reopen, but now we have an independent reason to not reopen,

9    but you don't give another WARN statement.

10              MS. LUNDY:  The WARN notice doesn't just identify

11   COVID-19.  It identifies the impact that it had on the hotel's

12   operation.  It specifically says -- it specifically relates to

13   the impact COVID-19 had on the hotel's ability to operate.

14   And --

15              THE COURT:  Yeah, it's talking about COVID-19.

16              MS. LUNDY:  Right.

17              THE COURT:  And that's fine.  But I'm saying -- are

18   you suggesting, for example, that after the pandemic was over

19   and you then decided, you know, the pandemic gave us an

20   opportunity to start upgrading the hotel.  Yes, it's going to

21   take, hypothetically, another 20 years, so we won't issue any

22   further WARN statement.  We'll just keep the hotel closed for

23   20 years because our initial statement, based expressly on the

24   pandemic, is sufficient.  Is that what you are saying?

25              MS. LUNDY:  Yes, your Honor.  I'm saying that the

O964STAC

1    testimony and documents submitted in support of our motion

2    demonstrate that the continued closure of the hotel and the

3    hotel's effort to reopen safely and profitably all relate back

4    to the impact COVID-19 had on the hotel.  The lengthy impact

5    COVID had and the need to update and renovate the hotel all

6    turns back to that initial event.  I don't believe a subsequent

7    WARN Act notice was required.  Because as the evidence

8    demonstrates, it all turns on that March 2020 timeframe.  And

9    the requirement to undertake renovations to open the hotel

10   safely and profitably once it's able to do so.

11            THE COURT:  Well --

12            MS. LUNDY:  If I may point out under the statute and

13   regulation this not a new employment loss.  From the Hotel 57

14   Services' prospective, this is a continuation of their layoff

15   that occurred beginning in March 2020.  This not a new event.

16   This all relates to the same temporary layoff that was going to

17   be less than six months.  And once we determined it was going

18   to be more than that timeframe triggering an employment loss

19   under WARN, we issued the WARN Act promptly upon that

20   understanding.  And nothing has changed since then.

21            THE COURT:  Well, I'm not sure there's any evidence

22   one way or the other before me on this.  But my observation is

23   that a great many hotels have reopened, but not this one.

24            MS. LUNDY:  Yes, your Honor.  But under the

25   regulations it indicates that the timing of issuing a WARN Act

O964STAC

```
1    notice is based upon the employer's business judgment at the

2    time, the best information it had available at the time.  And

3    it wasn't until --

4              THE COURT:  When did the -- it's the ballroom that's

5    being renovated?  When did that start?

6              MS. LUNDY:  I don't know, your Honor.

7              THE COURT:  What, if anything, is in the record as to

8    why you haven't reopened now that the pandemic is over by

9    several years?

10             MS. LUNDY:  Yes, your Honor.  We have testimony by

11   Ms. Cathy Hwang along with Ms. Ortiz all confirming that the

12   hotel is going to reopen once it can do so safely and

13   profitably.  And in connection with our motion, we also

14   submitted a motion to take judicial notice of the hotel's

15   website confirming the reopening date of fall of 2024.

16             THE COURT:  What's the safety issue?

17             MS. LUNDY:  The safety issue was very much related

18   during the height of the pandemic.  And to be clear your Honor,

19   the pandemic was designated as a national emergency until May

20   of 2023.  So while it might feel like it's very much in

21   hindsight --

22             THE COURT:  That's a fair point.  Are you asserting

23   there was a safety issue before the pandemic?

24             MS. LUNDY:  No, your Honor.

25             THE COURT:  So it was the pandemic that was the safety
```

O964STAC

1   issue?

2              MS. LUNDY:  Absolutely.

3              THE COURT:  And that's now out of the picture.

4              MS. LUNDY:  And that's why we are reopening.

5              THE COURT:  As I indicated, I think on the telephone

6    call, I'm not holding my breath on that.

7              But I guess I'll rephrase the question, is there a

8    material issue of fact of whether the failure to reopen in at

9    least the year since the pandemic has been declared closed, so

10   to speak, is due not to the reasons given in the original WARN

11   statement but to other issues?  Is that a materially disputed

12   fact?

13             I'll put it again, that was poorly phrased.

14             Forgetting about whether it's legally significant or

15   not for the moment, is there, on this record, a materially

16   disputed fact as to whether the continued failure of the hotel

17   to reopen is due to things unrelated to the pandemic such as

18   modifying the ballroom?

19             MS. LUNDY:  I don't believe so, Your Honor, from the

20   perspective that Ms. Hwang and Ms. Ortiz confirmed that during

21   the hotel's closure because of the COVID-19 pandemic they

22   continued to conduct renovations at the hotel.  They continued

23   to work with FSR International to ensure that they can reopen

24   the hotel at a time that it would be profitable and safe.

25             But I think from the perspective of the WARN Act

O964STAC

 1    notice, what the record demonstrates is when we issued this

 2    WARN Act notice, what we identified was, one, a concise

 3    statement explaining why we didn't issue it 60 or 90 days in

 4    advance of the pandemic.  We simply were not aware in advance

 5    that the COVID-19 pandemic was going to occur.  And once the

 6    hotel closed in March of 2020, we also didn't know that the

 7    length of this layoff was going to exceed six months,

 8    triggering an employment loss.

 9            What our notice does identify is the fact that the

10    WARN notice was delayed.  It was delayed because of

11    circumstances beyond our control, a business exception, and

12    this layoff was going to be temporary.  Albeit, that temporary

13    layoff was much longer than anyone ever anticipated, but the

14    substance of this WARN Act notice satisfies the requirements

15    under the law and regulation.  They were notified --

16            THE COURT:  Again, and forgive me for coming back to

17    the issue that I'm asking about, but, to be frank, I think it's

18    the issue that most troubles me.  Which is, assuming I'm going

19    to hear from your adversary in a minute as to why he thinks

20    your WARN notice was not timely, adequate, or whatever, but

21    assuming he's wrong and everything you did in your original

22    WARN notice was fine, nevertheless, does the continued delay in

23    the reopening require a new WARN notice because the reason for

24    the original WARN notice has now dissipated?

25            MS. LUNDY:  Our position is it does not.  The failure

O964STAC

1    to reopen in a particular time period, from our perspective,

2    still relates back to COVID-19.  It doesn't necessitate a new

3    WARN Act notice.  There is no change in the employment

4    relationship here.  There is no new employment loss or

5    intervening fact that separated that timeframe, that connection

6    from the initial layoff to the present.  Regardless of however

7    long it's been, the fact that we haven't reopened or the

8    reasons we haven't reopened yet, doesn't change the fact they

9    all relate back to COVID-19.

10            THE COURT:  That's why I asked whether it's a material

11    issue.  I'll give you my hypo once again because I want to be

12    sure I understand your response.  If, in my hypo, the hotel

13    closed down because of COVID-19 and gave a proper WARN

14    statement, and then it made the decision, okay, before we

15    reopen, we're going to take advantage of this and do some major

16    changes in our hotel, upgrade, and in my hypothetical, you know

17    that the upgrades are going to take 20 years.  And do you then

18    have to issue another WARN statement?  And I think you said,

19    no, you don't.  And that's what's giving me pause.

20            MS. LUNDY:  I'm saying, "no, you don't" because it's

21    still a temporary layoff.  The fact that the circumstances

22    relating to why it's a temporary layoff may have changed in

23    your hypothetical, we are talking about renovations now, it

24    doesn't change the fact that it's still temporary.  This isn't

25    a termination.  This remains a temporary layoff.  Again, a long

O964STAC

1    layoff but it still remains temporary.  The fact that the

2    hotel, in your hypothetical, was using this time period to

3    conduct renovations doesn't change the reality that the

4    employment loss remains temporary.  And no additional notice is

5    required.  Because this is a notice statute.  We are letting

6    these folks know are you temporarily laid off.  This is not

7    permanent.  And as your Honor knows, we have taken that

8    position consistently throughout this matter.

9           THE COURT:  That's why I'm asking you about it because

10    you have consistently taken that position.

11           All right.  I cut you off right at the beginning with

12    my question, so go ahead with anything you want to say.

13           MS. LUNDY:  Thank you, your Honor.

14           I appreciate and understand the Court's perspective

15    relative to the Rule 56 statements.  I won't belabor the point

16    except refer the Court to our reply brief where we spent a

17    considerable amount of space addressing plaintiff's response.

18    But I would like to point out one example and that example

19    relates to Exhibit Y to Mr. Bromberg's declaration.  This email

20    by Rudy Tauscher, and I'm happy to give the Court a copy if it

21    would be helpful.

22           May I approach?

23           Your Honor, this is an email from Mr. Tauscher.  He

24    was a former general manager of the hotel.  This email was used

25    to deny 43 facts.  Putting aside the inadmissibility of this

O964STAC

1    email, since Mr. Tauscher wasn't deposed, didn't submit a

2    declaration, but was merely attached to an attorney

3    affirmation, the substance of this email has nothing to do with

4    the material fact it purportedly contravenes.  I give an

5    example of our position Statement 117, which plaintiffs respond

6    to at page 55.  Our statement 117 relates to the Hotel 57

7    Services payment of $500 a week, pursuant to New York City

8    local law.  This email from Mr. Tauscher was used.  First,

9    plaintiffs denied relevance, which is not an appropriate

10   response.  But then they denied that the furlough was temporary

11   because of this inadmissible email by Mr. Tauscher.  Even a

12   quick review of this email from Mr. Tauscher indicates that it

13   has nothing to do with the New York local law payments but

14   merely an internal communication with marketing, confirming

15   that what the public should be aware of is that this hotel is

16   not closing permanently.  And we think this is pretty

17   indicative of how the responses were used for a Rule 56

18   statement.  And we believe it should require some scrutiny as

19   the responses are reviewed.

20         But turning to the three remaining claims.  The WARN

21   Act claims, plaintiffs argue, and we spent a little bit of time

22   on this just now, consecutive WARN Act notice are required

23   every six months during this layoff.  And that's simply not the

24   law.  And I haven't seen any citations that would support that

25   legal theory.

O964STAC

1              They also argue that our August 5, 2020, WARN notice

2    was untimely because COVID-19 and the layoff that followed was

3    foreseeable.  The admissible evidence here at Statements 47

4    through 67, 73, 78 through 89, demonstrate that from March 2020

5    until the beginning of August 2020, we were in regular

6    communications with our employees.  Like everyone around the

7    world, we had no expectation or understanding about this

8    unprecedented event.  When we closed on March 20 to outside

9    guests we told everybody we would be back on April 15.  We

10   believed that.  And when that date came and went, and we were

11   housing first responders, that date changed again, and it

12   changed again.  We were all hopeful we would be able to reopen

13   to outside guests well before employment loss occurred under

14   WARN.  But once August came and we recognized that COVID-19

15   wasn't changing any time soon, we realized we needed to issue

16   our WARN notices, and we did so promptly.  Plaintiff had not

17   submitted any evidence to contravene that reality that we acted

18   within our business judgment and issued those WARN notice

19   promptly upon our understanding that this was going to

20   instigate an employment loss.

21              THE COURT:  I didn't see in your WARN Act notice any

22   reference to so called bumping rights, which are one of the

23   things that are supposed to be included.  Now, your adversary

24   hasn't raised that, so they probably have been waived as an

25   issue.  But just for my curiosity was that a conscious decision

O964STAC

1    or overlooked?

2            MS. LUNDY:  It was a conscious decision because these

3    are not union employees and there is no such thing as bumping

4    rights for nonunion employees.  As our Rule 56 statement

5    identifies and even a review of this document, we followed,

6    from our perspective to a T, what the regulations required

7    regarding content.  Even if the Court determines, for example,

8    that the address is not included here and therefore it violates

9    the statute, the regulations are clear that minor or trivial

10   changes don't impact the intent of the statute which is to

11   provide notice.  We provided notice and we certainly kept in

12   regular communications with our employees leading up to this

13   very difficult decision.

14           Lastly, on WARN, plaintiffs argue with respect to

15   Hotel 57 LLC and Time Warner Hotel and Resorts that they should

16   also be held liable here under the concept of a single employer

17   liability doctrine.  But the Second Circuit has identified that

18   doctrine doesn't apply or only applies to subsidiaries or

19   subcontractors of the employer.  The employer here is Hotel 57

20   Services LLC.  This is on our material statement 19, where we

21   confirm those two entities are neither a subcontractor or a

22   subsidiary of Hotel 57 services.  Similar to the example I gave

23   previously, they cite to Ms. Hwang's testimony, but her

24   testimony has nothing to do on that point.  Even putting aside

25   considerations of the substance of our WARN Act notice, we

O964STAC

1  believe that summary judgement is still warranted relevant to

2  those two Warner defendants and that should be granted.

3          Lastly, on the breach of contract claim against Hotel

4  57 Services LLC the signatory to the EmPact agreement.

5          If I may, your Honor, may I approach and provide you a

6  copy of those relevant pages of EmPact?

7          THE COURT:  Sure.

8          MS. LUNDY:  The alleged breach of contract here

9  relates to the no-fault separation pay under the EmPact

10  agreement.  And that payment is required in two circumstances,

11  where there is a termination from no fault or permanent layoff

12  with no right of recall.  The admissible evidence here

13  demonstrates that not only were these employees not terminated

14  for no fault, but they continued to retain the right to recall

15  and the hotel is in the process of issues those recalls to the

16  hotel.  In response, plaintiffs continue to point to this town

17  hall meeting that occurred on June 25, 2021, claiming that it

18  was at that point, in that meeting, they were terminated.

19          Now, the transcription of that meeting is

20  inadmissible.  That's in Ms. Ortiz's transcript.  Let's put

21  that aside.  Even if the Court were to consider this

22  inadmissible transcription, what you won't see is any employee

23  being told that they were terminated, anyone being told the

24  employment relationship is changing.  The only substantive

25  point on the employment relationship that was relayed to

1   employees at that point was if you resign from your employment,

2   you will not be entitled to no-fault separation pay.

3          During Ms. Ivey's deposition, one of the plaintiffs,

4   she confirmed that after that meeting, on the very same day,

5   she received a letter.  And in that letter she was told that

6   the hotel was committed to recalling her to the hotel.  She

7   also confirmed that after that town hall meeting she never

8   received a notice of termination.  There is simply no evidence

9   to support the idea that they were terminated during that

10  meeting, not in the transcription, not even by plaintiff's

11  testimony.  Their subjective belief, their self-serving

12  conclusion that they were is simply not supported by the

13  evidence.

14         And with respect to recall rights, we have

15  consistently said and maintained that they have that right.  So

16  even if the Court were to say this layoff is more than six

17  months, it's a permanent layoff, okay, but that doesn't negate

18  the fact that they have retained the right to recall.  And the

19  hotel will be exercising that as we reopen the hotel in the

20  next coming months.

21         And even if the Court were to say, you know what,

22  there were questions of fact about whether or not these

23  employees were terminated for no fault or maybe they do or

24  don't have rights of recall, the fact remains that the no-fault

25  separation pay is not required in instances where the layoff is

O964STAC

1    due to a national emergency.  And as we discussed already

2    today, COVID-19 was designated as national emergency from

3    March 13, 2020, through May of 2023.  So if we were to believe

4    that these employees were terminated on June 25, 2021, COVID-19

5    was still a national emergency.  When they initially laid off

6    it was national emergency.  They are still not entitled to the

7    no-fault separation payment, pursuant to the terms of this

8    contract.

9            THE COURT:  Thank you so much.

10           Let me hear from -- I'm sorry, yes, go ahead.

11           MR. WAGNER:  Good morning, Paul Wagner for FSR.  I'm

12   going to focus primarily on the claims against my client and

13   not get into substantive arguments with regard to the WARN

14   notice.

15           I would like to address your hypothetical at the

16   outset, if I may.  In your hypothetical, our perspective would

17   be there would be no new WARN notice necessary.  Certainly, a

18   moral obligation to keep employees that are still able to be

19   recalled and being told they're furloughed, to tell them what

20   is going on and, in fact, the record is replete with those

21   communications saying, we are still staying closed, we're still

22   renovating.

23           And by the way, the real situation post COVID, which

24   is still playing out across America and in New York City,

25   several hotels closed due to bankruptcy were purchased as a

O964STAC

```
1   distressed asset and are opening up as we speak and into the

2   future with a new owner and a new operator.  Would that require

3   a new WARN notice?  We say no.

4        So I think your hypothetical is actually a great one.

5   The answer is, it's on notice because it's putting you on

6   notice that you suffered, pursuant to the WARN law, an

7   employment loss because you layoff is going to exceed six

8   months.  Hard stop.  Now, the fact that the record is replete

9   with communications of why the layoff was continuing, that

10   satisfies the moral obligations.

11        Do you want me to go on, or do you have any questions?

12        THE COURT:  No, are you prepared to send your bill to

13   the codefendants' counsel for a better answer to my question.

14   Anyway, go ahead.

15        MR. WAGNER:  With regard to FSR, your Honor, we should

16   be dismissed from this case.  We are not the employer for

17   Warner under the Guippone case.  Nor are we in privity contract

18   with any of the plaintiffs or the class members.

19        On that first issue of not being the employer, FSR is

20   under the Guippone case, plaintiffs have argued that we come

21   under the prong of *de facto* exercise of control.  There is

22   simply no question of material fact in the record that FSR

23   exercised *de facto* control.  There is some evidence that FSR

24   consulted with the employer, Hotel 57 Services LLC, had

25   discussions and knew about the employer's decision with regard
```

O964STAC

1    to the content and the timing of the WARN notice.  But there is

2    no evidence that they exercised *de facto* control.  And Guippone

3    does not say that *de facto* influence or consultation is enough.

4    It has to be an exercise of control.  It has to be dominion and

5    denomination of that decision.  That evidence is completely

6    missing.

7            And keep in mind, the structure of this hotel

8    operations is that the Hotel 57 Services LLC has no corporate

9    relationship to FSR whatsoever.  There is no common ownership.

10   There is no common board of directors or officers.  And more

11   importantly, all of the decisions made with regard to the

12   alleged liability in this case, i.e. the content and the timing

13   of the WARN notices, the evidence shows consistently that those

14   decisions were made by employees of Hotel 57 Services LLC --

15           THE COURT:  If I find that the WARN notice was

16   adequate and proper, I don't reach this whole single employer

17   business, do I?

18           MR. WAGNER:  Absolutely agree, yes.

19           And by the way, Guippone says whether the parent has

20   specifically directed the allegedly illegal employment

21   practices that forms the basis of the litigation.  It has to

22   direct.  It can't simply know about it and say, okay, we thank

23   you for advising us.  On the contract, there is simply no

24   privity of contract.  Now, plaintiffs make much of -- and I

25   would too if I were arguing in their position -- that the

O964STAC

1    EmPact document --

2              THE COURT:  Are you going to send them a bill too?

3              MR. WAGNER:  I would like to with your permission.

4              -- replete with a reference to the brand, Four

5    Seasons.  The critical piece to the contract, however, is the

6    signature page in the preamble where it says, "Hotel 57

7    Services LLC (hereinafter referred to as Four Seasons Hotel New

8    York)"  End of story, hard stop.  There is just simply no

9    privity of contract here.  So when you take the lack of a

10   single employer with regard to either WARN or the decision not

11   to pay the severance and the lack of privity of contract, FSR

12   should be out of the case.  Thank you, your Honor.

13             THE COURT:  Thank you very much.

14             All right.  Now, I will hear from plaintiffs' counsel.

15             MR. BRUSTEIN:  Thank you, your Honor.  Would you like

16   me to address the motion directly or start with one and turn to

17   the next?

18             THE COURT:  I think collectively, but let me put a few

19   questions just of things on my mind.

20             As I understand your argument about the timing of the

21   WARN notice, because, in your view, the WARN notice failed to

22   provide notice 90 days before the furloughs began.  But the

23   statute says and the regs say that -- and by the way, it's 60

24   days under federal law, 90 days under state law.  It says, "an

25   employer may order a mass layoff before the conclusion of the

O964STAC

```
 1   60-day period."  This is the federal law.  "If the closing or
 2   mass layoff is caused by business circumstances that were not
 3   reasonably foreseeable as of the time that notice would have
 4   been required."  And similarly the New York WARN Act says that
 5   there is an exception to, in their case, the 90-day notice if
 6   the mass layoff was caused by business circumstances that were
 7   not foreseeable when the 90-day notice would have been
 8   required.
 9           Now, in this situation, it is, I believe, undisputed
10   that the pandemic was only declared a federal and state
11   emergency in March 2022.  I could probably take judicial notice
12   of that fact.  So why wasn't this notice timely?
13           MR. BRUSTEIN:  Thank you, your Honor.  And just to
14   clarify, we are not claiming that notice needed to be given 60
15   days before the layoff began in March of 2020.
16           THE COURT:  Okay.
17           MR. BRUSTEIN:  The law is 60 days, and for simplicity,
18   I'm just going to say 60 even though under New York --
19           THE COURT:  Yeah.
20           MR. BRUSTEIN:  However, it's 60 or as soon as it
21   became reasonable to expect.
22           The union was notified in March of 2020.  It's
23   reasonable to question, were they thinking at that time of
24   sending a notice to the nonunion employees about the WARN Act?
25   We don't need to question that because we know the answer is
```

O964STAC

1    yes.  In fact, Exhibit Q to the Bromberg declaration is a draft

2    WARN notice, dated March 24, 2020.

3          Now, the Warner defendants in their opposition have

4    claimed that this is not admissible because we haven't cited to

5    laying the proper foundation.  Even though it's a document they

6    themselves produced in discovery, and courts have consistently

7    found that it's improper to question the authenticity of your

8    own documents.  I could cite the matter if necessary, but I

9    believe it's clear that their draft WARN notice is admissible.

10   In their draft WARN notice dated March 21, 2020, they said the

11   layoff would start on or about March 21st, 2020, Four Seasons

12   Hotels New York intend this layoff to be temporarily.  However,

13   given the unknown certainty surrounding COVID, it's possible

14   this layoff could become permanent.

15         Our contention is not that in January of 2020 they

16   needed to provide notice, but when they drafted the notice in

17   March of 2020, I think it's a reasonable question for a jury to

18   decide, if at that point they should have sent the notice, as

19   opposed to on August 5, 2020.

20         Additionally, when you compare what was drafted on

21   March 24, 2020, as a WARN notice versus what was sent out on

22   August 5, 2020, it's clear less information was provided in the

23   August 5 communication than in the March 24, 2020, draft WARN

24   notice.  The defendants, both of them --

25         THE COURT:  I'm not sure what the relevance of that

O964STAC

1    is.  The question is whether the notice they did give was

2    adequate, not whether it might have been even better because

3    they had an earlier draft that, in your view, was better.

4          MR. BRUSTEIN:  Certainly.  So for one, they don't talk

5    about the departments and the positions that are being

6    eliminated, which is required.  Two, they don't provide

7    additional information explaining their delays from the draft

8    in March 24, 2020, to August 5, 2020, which I do think is

9    entirely relevant.  If between March 24 when they drafted it

10   and August 5 when they sent a different communication, the

11   circumstances had changed, that created a basis for them to

12   say, now we know that should have been included.

13         Now, much ado has been made about the fact that we

14   have repeatedly cited to an email from the hotel manager at the

15   time, Rudy Tauscher, to oppose their repeated referring to the

16   closure as temporary.  This, again, is another document

17   produced by defendants.  But as of March 19, 2020, the hotel

18   manager -- and this is Exhibit Y to the Bromberg declaration.

19         THE COURT:  I'm looking at it.

20         MR. BRUSTEIN:  It says because of legal issues, please

21   use term temporary closing at all times and any communications.

22   This can should, never be misconstrued as a, quote, permanent

23   closure.

24         We are more than four and a half years down the road,

25   and they are still not calling it permanent.  I think that's a

O964STAC

1   reasonable question for a jury to decide whether on March 19,

2   2020, there were legal reasons they refused to call it what it

3   is or not.

4           Now --

5           THE COURT:  A bunch of that email is -- none of it

6   says, of course, that there is going to be a permanent shut

7   down.  It says we don't want it misconstrued as a permanent

8   shut down.  But moreover they go on to say, "these are

9   extremely challenging unprecedented times, but we're going to

10  get through it."  And what could that mean other than they are

11  still hoping to reopen?

12          MR. BRUSTEIN:  Well, the question is whether they are

13  hoping to reopen within six months or whether at that point, as

14  they seem to indicate five days later in the draft WARN notice,

15  that they knew it might last for six months.  Because thinking

16  back to that time, which I know it's years later, people didn't

17  know what the future was going to hold.  And so it was

18  reasonable at that point to think is New York City going to

19  bounce back?  Is the hotel going to reopen?  Because there are

20  bodies lined up in the street.  So it was unprecedented.  We

21  are not denying that in March of 2020 it was unimaginable.

22  What we're arguing is the fact that they had an obligation,

23  which they readily admitted with their notice to the union

24  members to notify the non-union members.  The purpose of WARN

25  is, as it's aptly titled, to warn.  It's to warn employees

O964STAC

1  about a loss of income.  Because six months without an income

2  is important to a lot of people.  So they need to be able to

3  make preparations.  That's why there are portions of the

4  statute that deal with job training, being able to look for new

5  employment, to figure out how you are going to feed your family

6  in the months, and in some cases, the years ahead.  And so,

7  once it reaches six months, the legislatures have decided,

8  that's a job loss.  You can't say it's temporary after six

9  months because that's a long time to be without.

10          THE COURT:  Okay.  So I did want to -- assuming I

11  agree with you then we don't need to reach my hypothetical, but

12  if I disagree with you, I was asking your adversary whether if

13  the unforeseen circumstances that caused you to close down and

14  issue the WARN statement that you do are now no longer

15  operative, but you're still not reopening, do you have to issue

16  a new WARN statement saying the reason we are not reopening is

17  X and we are warning you that it could take a long time.  And

18  your adversary said no, you don't have to do that because it

19  all ultimately ties back, in some sense, to the unforeseen

20  circumstances.  But in my hypo that wasn't true.  My hypo was

21  premised on that there was a new reason you now wanted to

22  upgrade, namely, increase profitability.  She says that was

23  always there but what the WARN statement refers is the COVID-19

24  problem.

25          But on the other hand, I didn't see in the statute any

O964STAC

1    addressing of this need to issue a new statement.  So what

2    about that?

3            MR. BRUSTEIN:  I'm going to address that first.  But I

4    don't want to concede the fact that, one, they had to close --

5            THE COURT:  I understand.  You know, I understand that

6    there are a lot of things you want to cover, and you will be

7    given that opportunity.  But I was hoping to get an answer to

8    my question.

9            MR. BRUSTEIN:  That's why I said I will cover that

10   first, but I do want to touch on the other things.

11           THE COURT:  Go ahead.

12           MR. BRUSTEIN:  We do believe that multiple WARN

13   notices would be required.  Now, there is nothing in the

14   statute that explicitly says that an employer who has an

15   employee suffer a job loss under the WARN Act can violate the

16   statute again.  But that, I would argue or submit, is because

17   statutes don't need to say that you can violate a statute more

18   than once.

19           Putting it into criminal context, if someone steals a

20   car, they're caught and the car is returned to the owner, and

21   the car thief goes back and steals the car a second time, no

22   one would argue you already stole the car the first time, we

23   can't arrest you for a second violation of stealing that same

24   car from that same owner.

25           Here, the reason there is no cause law is what the

O964STAC

defendants have done, we would submit, was unimaginable.  When

someone has been out of work for more than six months, the

fights in court have been about whether or not the notice was

proper, whether they owe them the WARN notice, not about the

fact that they are on a temporary 20-year layoff when they are

eventually on their death beds can be recalled back to work.

So the situation is after six months there is no disputing

under the WARN Act it's a job loss.  The question is:  After

they suffered that job loss, is the WARN Act no longer

applicable?  Does the employer no longer have to provide

anything to the people that they are not saying don't work for

them because they suffered the job loss --

          THE COURT:  Assuming you are right, I'm making no

decision today, this is just to put my next question -- so

assuming, for the sake of argument, that you are right, where

have you made that claim either in your complaint or in your

briefing?

          MR. BRUSTEIN:  In the complaint, which I don't have in

front of me, we do talk about --

          THE COURT:  You don't keep it under your pillow?

          MR. BROMBERG:  I keep it under my pillow.

          THE COURT:  You left it there this morning.

          MR. BRUSTEIN:  In the complaint we do talk about the

fact that after six months they then had continuing obligations

that renewed every time they knew it was reasonable that it

O964STAC

1  would extend another six months.  And so what we argued is that

2  that obligation continued up until June 25, 2021, when our

3  contention is they terminated the employment of the employees

4  under the EmPact agreement, therefore serving that obligation.

5      THE COURT:  When you talk about the EmPact agreement,

6  your adversary was just referred to the fact that that

7  agreement has a national emergency provision.  Why isn't that

8  operable here?

9      MR. BRUSTEIN:  I will answer that but I want to answer

10  the last question in terms of where it is in our brief.

11      THE COURT:  Okay.

12      MR. BRUSTEIN:  In opposition to the Warner defendant's

13  motion, we layout -- I apologize.  I got ahead of myself.  I'm

14  trying to juggle.

15      THE COURT:  Let me just say to counsel in the 11:00

16  matter, obviously this matter is going to go on for another at

17  least 15 minutes, probably more.  So you are free to wander in

18  and out, just be back by 11:30.  Hopefully, we will reach you

19  soon after that.

20      Go ahead, Counsel.

21      MR. BRUSTEIN:  Page 18 of our opposition to the Warner

22  defendants, under the subheading the Warner defendants repeated

23  representation that plaintiff still maintained -- no, sorry,

24  that's actually the question you just asked.  I'll come back to

25  that --

O964STAC

          1          THE COURT:  Or I should say, Counsel in the matter,

          2     you are welcome to stay here, and if you are a gluten for

          3     punishment, that's what you should do.

          4          That's all right, Counsel, why don't you have your

          5     colleague look for that and you can go on.

          6          MR. BRUSTEIN:  Yes, your Honor.

          7          With respect to the national emergency, the EmPact

          8     agreement does not say if there is a national emergency you can

          9     just fire people, and you don't have to pay them no-fault

         10     separation pay.  It's much more specific in terms of what the

         11     obligations for getting out of the no-fault separation pay are.

         12     And it specifically says, and this is on page 58, "I will not

         13     be entitled to no-fault separation pay if my permanent layoff

         14     results from" -- one of them listed is national emergencies

         15     "and any other cause beyond control of the Four Seasons."

         16          THE COURT:  Yeah.

         17          MR. BRUSTEIN:  The national emergency was not the

         18     basis for the terminations.  In fact, sitting here today,

         19     counsel has argued they are still employed.  They argued in

         20     their briefs to this Court that their benefits are intact, that

         21     she haven't lost seniority.  During the June --

         22          THE COURT:  No, I agree, this is an alternative

         23     argument by them.  But nevertheless, they make this argument

         24     that if the Court doesn't accept their other arguments on this

         25     point, then they still are entitled to judgement for this on

O964STAC

1    the national emergency provision.

2         MR. BRUSTEIN:  So on June 25, 2021, at the meeting

3    they did not cite COVID-19 as the reason for the hotel being

4    closed.  Instead, they said it was because they were going to

5    do renovations.  And they said that those renovations were

6    going to last for more than a year.

7         Now, I'm not sure why the defendants think that the

8    transcript in Ms. Ortiz's deposition of that June 25, 2021,

9    meeting are inadmissible --

10        THE COURT:  Maybe I'm misunderstanding, what is the

11   evidence in the record that the hotel closed for any reason

12   other than the pandemic?

13        MR. BRUSTEIN:  So in terms of that, I would direct

14   your Honor to the testimony of Antoine Chahwan, who testified

15   in his deposition that he believed in the summer of 2020 the

16   hotel could safely reopen.  And so for one, all of the orders

17   about closures had exceptions to hotels.  So hotels did not

18   need to shut down, which is evidenced by the fact that the

19   hotel was able to open to house medical personnel.  Four

20   Seasons FSR came up with a safety plan to be able to safely

21   reopen the hotel to guests.  The Warner defendants opposed that

22   plan.  They didn't want to reopen.  There's been litigation,

23   arbitration, it's been secret, so we don't have access to that

24   information, between the defendants in this case about --

25        THE COURT:  The fact that they made an effort to keep

O964STAC

going for a while doesn't mean that the closure wasn't the

result of something beyond their control, which was the

pandemic.  And that's what the provision in the contract says,

employees are not entitled to no-fault separation pay if their

permanent layoff results from national emergencies or any other

cause beyond the control of Four Seasons.

So you are not contesting, are you, that the national

emergency caused by the pandemic was under the control of the

Four Seasons?

MR. BRUSTEIN:  No.  We are contesting the idea that

the layoffs and the termination of the employees resulted from

the pandemic.  Which the fact that the defendants are here

arguing that they still hadn't terminated the employees, speak

to that.  They are claiming that.  And I think that it's

disingenuous to the employees to say you have a no-fault

separation pay that for people who have worked for dozens of

years would pay them six months' salary.  You have to wait for

the hotel to reopen, extending it month after month, saying

it's going to reopen soon and then four and a half, five years

later say, okay, we lost in court, so we are going to use this

exception to say the national emergency -- even though we have

been maintaining you haven't been fired this whole time, now we

are firing you retroactively because of national emergency.

And that's the reasons the defendants are in this situation.

Because they didn't want to pay the no-fault separation pay, so

O964STAC

1    they couldn't admit that it was a permanent layoff, that it was

2    a termination.  They didn't want to have to pay their employees

3    for no-fault layoff.

4          I have to tell you if on March 24 they sent the WARN

5    notice and they said to everyone, look, it's a national

6    emergency, we've got to fire you.  We apologize.  You are not

7    entitled to no-fault separation pay, it's a very different

8    situation, we wouldn't be here that.  Because that, according

9    to the EmPact agreement, makes sense.  But they didn't do that.

10   They've taken the opposite position.  We don't have to give

11   multiple WARN notices.  We didn't even have to tell you we were

12   doing it under WARN.  We could wait five months.  We could tell

13   you stick around for your no-fault separation pay and try to

14   bleed these people dry.  That's what we are dealing with,

15   companies that have secretly had conversations, had an

16   arbitration about breaking up the hotel, renegotiating deals,

17   telling their employees, if you leave and get another job, you

18   lose this benefit.  But now they want to stand in court and say

19   that benefit never existed, that's just shameful, your Honor.

20         Now, the defendants have argued the renovations of the

21   hotel were an ongoing thing but I just want to read to you one

22   section of the June 25, 2021, meeting where they contend that

23   it's clear the employees were terminated, and that's on

24   page 257 of the Ortiz transcript -- I'm sorry, 250.

25   Mr. Galasso is in charge of the renovations for the hotel.  And

O964STAC

1    one of the other people from the hotel says -- and his first

2    name is Frank, by the way.  This is line 21, "Sorry, Frank,

3    just so I'm not sure if I'm reading it right, depending on the

4    types of projects that they are deciding to do, is there

5    anything concrete as far as these projects?  What are we

6    proceeding with at this point?"

7         And his response is:  "As of today, since we are all

8    just learning this, I don't have an exact timeline of which

9    project will start when.  Once we get there, you know, we can

10   definitely share that with the team."  On June 25, 2021, the

11   hotel announced to its nonunion employees, we have been closed

12   for almost a year and a half, we no longer are closed because

13   of the pandemic, we are now going to start renovations.  We

14   don't know when it's going to be.  We don't know what we are

15   going to renovate.  We'll let you know when we know.

16        THE COURT:  Okay.  I want to give you all the time you

17   need to cover everything, but I'm a little concerned because I

18   have, as you know, another matter that I scheduled, it's

19   already running a little late.  So just keep that in mind, but

20   anything else you want to address is fine.

21        MR. BRUSTEIN:  Absolutely, your Honor.  I want to

22   first address the FSR defendant.

23        THE COURT:  I have a question about that.  This is not

24   what you were about to address, and I want to hear what you

25   want to address, but unless I missed it, they did not move to

O964STAC

| | |
|---|---|
| 1 | dismiss the -- some of throw-in claims like breach of the |
| 2 | covenant of good faith and fair dealing, promissory estoppel, |
| 3 | things like that.  But do you agree that I should, |
| 4 | nevertheless, apply the same standard to those that I applied |
| 5 | earlier to the motion that was just made by the other |
| 6 | defendants to dismiss those? |
| 7 | MR. BRUSTEIN:  Yes, and just with the clarification |
| 8 | that I believe with the breach of covenant that was |
| 9 | incorporated into the breach of contract claim -- |
| 10 | THE COURT:  Yes. |
| 11 | MR. BRUSTEIN:  -- outright dismissal, yes. |
| 12 | And we are certainly not going to try to make |
| 13 | arguments that we don't think have merit.  Which is why we |
| 14 | didn't raise the bumping rights in our opposition. |
| 15 | THE COURT:  I thought this was a no-brainer.  I just |
| 16 | wanted to be sure. |
| 17 | MR. BRUSTEIN:  In our opposition to FSR, we've alleged |
| 18 | that FSR is a signatory to EmPact.  They didn't address it. |
| 19 | The EmPact agreement, this specifically has on page 5 a welcome |
| 20 | letter signed by the CEO, the president and chief executive |
| 21 | officer of Four Seasons Hotel and Resorts, J. Allen Smith, |
| 22 | welcoming the employees to an elite group of more than 48,000 |
| 23 | employees worldwide.  It is, at a minimum, a question of fact |
| 24 | whether this establishes that FSR is a party to the contract. |
| 25 | Now, Mr. Chahwan who is not an employee of the hotel, |

O964STAC

testified to the fact that he himself had signed an EmPact

agreement that Four Seasons has obligations to its employees.

And I know there is cute stuff going on with whether it's Four

Seasons or FSR or Four Seasons Hotels and Resorts, but there is

no mistaking that Mr. Chahwan is talking about FSR

International, Four Seasons, not a hotel.  This contract is not

a stand-alone document.

          Now, in the EmPact agreement, they very cleverly at

the end of it say, and this is, you know, page 60 where they

attempt to define Hotel 57 Services LLC as Four Seasons Hotel

New York.  And it says, "hereinafter referred to" not herein

before, hereinafter.

          If you continue reading, the last line of that

paragraph says, "I acknowledge the conditions contained in

EmPact may be modified in writing from time to time by the Four

Seasons Hotel New York as contemplated on page 2 of this

contract."  EmPact is not page 60 of 60.  It's a 61-page

contract.

          Included in that is a signature by the CEO of FSR

welcoming the people who signed the EmPact, which on page 61

there's only one signature line, an employee signature.  So the

idea that Hotel 57 Services LLC is a signatory based on this

standalone one page isn't even accurate.

          Now, the hotel manager does sign a welcome letter on

the page right after FSR and that's on page 6 of the EmPact

O964STAC

agreement.  But he signs it as the general manager and doesn't

even have the title of his company of Hotel 57 Services.  It

just says "general manager."  We attempted in our inartful

counterstatement, 56.1 statement, to identify material facts

they we believe shouldn't be disputed but clearly have been

throughout this case.

           And I certainly apologize for the length of those

facts, but it's because we believe those facts are all relevant

and should be before a jury to decide whether a CEO of a

company signing a welcome letter in a contract, welcoming

employees to a team of 48,000 worldwide gives the correct

impression that they are employees not just of the hotel, not

just of Hotel 57 Services, which appears for the first time and

last time of page 61 of a long document, which talk about

missing the fine print to try to and snooker someone.  But the

fact of the matter is Your Honor, this is replete with

references to Four Seasons, the brand, the international

company, not just this local hotel.  The reason they are able

to attract employees is as Mr. Warner testified, Four Seasons

is the one that has these obligations.  In his testimony, he

says there are Four Seasons employees, not Time Warner Hotel

and Resorts employees.  And the management contracts that are

very clearly written that they are under the purview of Four

Seasons management and treatment, and I don't touch them.

           His right-hand woman, Cathy Hwang also testified about

O964STAC

1    the fact that Rudy, meaning the general manager was "a Four

2    Seasons employee."  He reported to Four Seasons.  Elizabeth

3    Ortiz, the director of people and culture, she testified that

4    she had a dotted line to Antoine Chahwan of FSR.

5        Respectfully, we submit that there are numerous basis

6    that a jury could find FSR is the employer, both under the

7    EmPact agreement and under a single employer analysis with

8    respect to the fact they had control, shared operations, the

9    HMA agreement, the fact that they all worked together.

10   Ironically, in opposition, the Warner defendants say, only a

11   subcontract could be considered a single employer.  We don't

12   agree with that there, and we don't believe the case law

13   certainly doesn't agree with it either, but that's what FSR is,

14   so it's ironic.  And that's the problem here with each one of

15   the defendants trying to remove themselves.  As Cathy Hwang

16   testified, it's a complicated structure.  They have set up

17   company after company after company to avoid liability.

18       One of the things that the Warner defendants took

19   issue in our counterstatement was the fact that we alleged that

20   Mr. Warner did not have his own personal bank accounts.  Why

21   would we allege that?  Are we trying to attack him?  Are we

22   going after him?  No.  Because it's relevant to the single

23   employer test.  One of the factors is dependency of operations.

24   It deals with whether or not the companies are commingling

25   funds.  Mr. Warner has been convicted of using companies to

O964STAC

1    avoid his financial obligations.  The fact of the matter is, in

2    our opposition papers for both of the defendants, we go step by

3    step through each one of the elements to address it.

4          Now, one of the points that wasn't raised by the

5    Warner defendants that I just want to touch on briefly is the

6    idea that our clients did not comply with care.  And so because

7    of that they are precluded from bringing forth claims under

8    no-fault separation pay.

9          And I'm just going to highlight one of the points

10   there, although, I do refer back to the brief for other

11   references.  In the no-fault separation pay it says, "by

12   accepting no-fault separation pay, I'm acknowledging my

13   termination was no fault, and I'm not entitled to challenge my

14   termination through the mediation, arbitration provisions of

15   care."  Care is not just Step Six.  It's Step One through Six,

16   which deals with different ways that you can mediate internally

17   with a supervisor, with a hotel manager -- the hotel manager

18   ceased existing, so that wasn't even a possibility.  And

19   Ms. Ortiz even admitted that she didn't consider complaints

20   about no-fault separation pay to have merit, to be worth

21   investigating because they considered it temporary.  And so any

22   complaints that she received, she didn't even consider to be a

23   complaint.  So to the extent the Court even found the

24   provisions of care applied to the no-fault separation pay

25   section, which we submit they don't, their ability to do so was

O964STAC

1    certainly frustrated.

2            And one further point on care, if you look at the last

3    page of the EmPact agreement it says, I understand if I wish it

4    exercise my right to opt out of mediation arbitration

5    provisions of Care, I must do so in one of the following ways.

6    It's not talking about just Step Six.  It's a package deal.

7    You are either party of Care or you are not.  As this Court

8    already decide and the Second Circuit affirmed, the no-fault

9    separation pay is not part of the mediation arbitration Care

10   section.  So we submit that it certainly is in keeping for our

11   clients to not have had to go through the steps which weren't

12   even possible at that time anyway.

13           THE COURT:  I'm now going to have to unfortunately

14   have to put a time limit on you.  I'll give you another five

15   minutes.

16           MR. BRUSTEIN:  Yes, your Honor.

17           With respect to the adequacy of the WARN notice, your

18   Honor, we submit that the cases is cited by the Warner

19   defendants and FSR are in opposite.  Those cases dealt with

20   minor deficiencies in the notice while still providing advanced

21   notice.  We are not even arguing that 60 days in advance they

22   should have given notice of the layoffs.  We are arguing -- and

23   we submit it's reasonable that at the time they notified the

24   union, at the time they drafted the notices to go out to the

25   nonunion, they should have notified them.  The purpose of WARN

O964STAC

1    is so that people can make, not business judgments, but

2    personal judgments about their own lives.  And we believe that

3    whether it's the no-fault separation pay or the WARN Act

4    violations, those are things that a jury should get to decide

5    the reasonableness of the actions by the defendants and what

6    happened here.  We believe that the defendants have failed to

7    show that there are any material issues not in dispute about

8    the business judgment, that's something that is going to take a

9    lengthy analysis, as evidence by the number of paragraphs they

10   put forth in support to see whether FSR's contention that the

11   hotel could have opened in the summer of 2020, thereby hiring

12   these people back to work, mere months after the initial

13   furloughs or layoffs made it necessary to terminate their

14   employment and keep them out of work for this many years.

15          For those reasons, we submit they failed to meet their

16   burden.

17          THE COURT:  Thank you very much.

18          Let me hear from both counsel for the defendants.

19          MR. BRUSTEIN:  Your Honor, may I have one second to

20   tell you the page number.

21          THE COURT:  Oh, yes.  Thank you for reminding me of

22   that.

23          MR. BRUSTEIN:  It is pages 10 to 12 of the Warren

24   opposition where we address the multiple violation of the WARN

25   Act.  Thank you.

O964STAC

1          THE COURT:  All right.

2          MS. LUNDY:  I'll be very brief, your Honor.

3          Plaintiff spent quite a bit of time discussing notices

4   to the union employees back in March and referred to a draft

5   notice that was prepared for the nonunion employees at Exhibit

6   Q. I asked the Court to scrutinize these exhibits, especially

7   Exhibit Q.  If you look at the fifth paragraph, this is a union

8   draft notice.  It was not a nonunion draft notice.

9          But what's even more important about that time period

10  and why the union employees received notice at that time is

11  clarified by Ms. Ortiz in her transcript at page 96, lines 6

12  through 14.  Their collective bargaining agreement had a

13  two-week notice requirement.  And essentially the hotel was

14  killing two birds with one stone, satisfying their obligations

15  under the CBA and issued a WARN Act notice.

16         But if you look at Exhibit M to Mr. Bromberg's

17  declaration, what you will see the intention at that time,

18  these union folks would only be laid off for one month.  It was

19  not anticipated that this was going to be an employment loss

20  longer than six months at that time.

21         Also, within a matter of days the hotel did reopen.

22  On April 2nd the hotel reopened and brought back many employees

23  to house those first responders.  So the concept that this was

24  foreseeable in March, that we anticipated this lasting more

25  than six months is simply not in the record, that did not

O964STAC

1  happen.

2          Secondly, Mr. Brustein confirmed that there is nothing

3  in the statute that says multiple WARN Act notices are

4  required.  That's correct, this is a notice requirement, not

5  multiple WARN notice requirements, and that's simply not the

6  law or the requirement.  We satisfied that burden.

7          And with respect to the question of what in the record

8  shows that the hotel closed for any other reason other than

9  COVID-19 and its impact on the hotel's ability to operate.

10  There is none.  And I refer the Court to Statements 89 and 91.

11  COVID-19 had a long-term impact on the hotel and its ability to

12  operate profitably.  We are in the process of reopening.

13          And finally, these employees were not hurt.  They

14  received their notices promptly upon the foreseeability of this

15  constituting an employment loss, much longer than they

16  anticipated, but they are going to be recalled.  And even

17  during this long duration of separation of their layoff, many

18  employees have been paid $500 a week voluntarily.  They accrued

19  seniority.  We appreciate these employees and look forward

20  welcoming them back to the hotel.

21          For all the reasons I discussed today, your Honor we

22  ask that the Warner defendants motion be granted.  Thank you.

23          THE COURT:  Thank you.

24          MR. WAGNER:  Even more briefly, your Honor, two points

25  from FSR.  Point Number One, we did move to dismiss those

O964STAC

1    ancillary claims.

2              THE COURT:  I must have missed that.  Where --

3              MR. WAGNER:  Pages 19 through 23 in the opening brief.

4    We just didn't mention them in the reply because the plaintiffs

5    didn't respond.

6              THE COURT:  I don't think there is an issue there,

7    given the response from plaintiffs, but I just wanted to make

8    sure.

9              MR. WAGNER:  Finally, I want to take issue with

10   allegation that this is some sort of a corporate shell game.

11   In the hotel industry, the structure of an owner/operator under

12   a hotel management agreement and an employment entity wholly

13   owned by the owner is the typical arrangement.  The reason for

14   that is quite simple, the owner owns the asset.  The owner

15   indemnifies all liabilities arising from the operations,

16   including employment.  They want final say through that

17   employment entity.  It's very simply.  It's not a shell game,

18   it's a business reality.

19             Thank you, your Honor.  We request that the Court

20   consider our summary judgment motion.

21             THE COURT:  Thank you.  I had one more question for

22   defense counsel, and this may be either one of you.  There was

23   an objection to some of the evidence that plaintiffs are

24   relying on the grounds that they were -- they had not satisfied

25   authenticity.  And the plaintiffs respond that these were

O964STAC

1    documents they received from you, and typically quoting your

2    employees or quoting a document that was from your files or

3    whatever, why doesn't that satisfy authenticity?

4          MR. WAGNER:  Without understanding the specific

5    documents, your Honor, perhaps Ms. Lundy is better equipped to

6    respond that.

7          THE COURT:  This might be more upper alley, yes.

8          MS. LUNDY:  Yes, your Honor.  While they were

9    produced, and there was present opportunity to ask questions of

10   authenticity during our corporate representatives' deposition

11   or even of Ms. Ortiz, relative to the documents that she

12   identified and produced, those questions were never asked.

13   There was not a stipulation made relative to authenticity and

14   that would be the basis of our position in our papers today.

15         THE COURT:  But they're saying that if you're asked

16   for let me put it in terms of a hypothetical, all documents in

17   Four Seasons' possession relating to Four Seasons' discussion

18   of X, and you produced a bunch of documents, isn't that a

19   combination of the question asked and the response in documents

20   given, in effect a concession of authenticity?

21         MS. LUNDY:  I would agree, your Honor.  But I think

22   here it's a little bit more intricate because of all the

23   different entities that are named and have been producing

24   documents and where they have been maintained.

25         THE COURT:  Well, I understand the arguments have been

O964STAC

1    made about distinction between these entities, but they are all

2    Four Seasons related entities, yes?

3           MS. LUNDY:  They are all related.  The documents

4    produced are in connection with the operation of the hotel,

5    yes.

6           THE COURT:  All right.  Thank you.

7           MS. LUNDY:  Thank you.

8           THE COURT:  I thank all counsel very much.

9           And I want to mention a couple things in terms of

10   schedule.  First, I will get you a bottom line on this motion

11   two weeks from today.  That won't be the full opinion, that

12   will follow in due course.  You'll need to have that to know

13   where we are going or not going, as the case may be.

14          Second, everything is stayed for that period of two

15   weeks.  There is the pending motion regarding the notice.  I

16   have some substantial questions about the proposed notice, but

17   we are going to put that on hold until I decide the summary

18   judgment motions.  And then if we go forward, or to the extent

19   we can go forward, then I will convene another argument.  This

20   one might be able to be done by phone on the notice issues so

21   we can resolve those quickly.  But I want to resolve these

22   motions first.

23          So I think that covers everything that was open.

24   Anything about scheduling anyone wanted to know?  Okay.  Good.

25   Thanks so much.

O964STAC

```
1              (Adjourned.  Time noted 11:45 a.m.)

2              (Time noted: 4:33 p.m. via teleconference; appearances
3       noted)

4              THE COURT:  Thank you for calling in.  I missed you so
5       much I couldn't go even a few hours without wanting to talk to
6       you again.

7              You saw my order, what I wanted to mainly discuss.
8       But just so that I don't forget it, there was one more minor
9       issue I wanted to bring up so I understand what the parties'
10      positions are.  And this was one that I don't think was briefed
11      by either side.  So to the extent it's an issue at all, it may
12      have been waived.  But I asked counsel for the Warner
13      defendants about bumping rights.  And counsel said, well, that
14      only applies to unions.  But I'm looking at the statute, and
15      the statute that governs WARN notices, and it says, "notice to
16      each affected employee who does not have a representative,"  in
17      other words, nonunion people, "is to be written in language
18      understandable to the employees, and is to contain --" and then
19      there are four things that are required to be contained.

20             And Number Three is "an indication whether or not
21      bumping rights exist."  So the statute seems to say on its face
22      that even if there are no bumping rights, you have to tell that
23      to the nonunion employee.  So what about that?

24             MS. LUNDY:  This is Kathryn Lundy for the Warner
25      defendants.
```

O964STAC

1          I appreciate the question.  There is case law on this

2     matter, and I apologize to not have it available for this

3     telephonic hearing.

4          THE COURT:  I did not indicate this was going to be on

5     the hearing so there's no reason you should feel the need to

6     apologize.  Go ahead.

7          MS. LUNDY:  In that case, it specifically says that

8     the fact that the WARN notice that was issued to a nonunion

9     employee didn't contain reference to that bumping rights was

10    excusable because it simply didn't apply.

11         THE COURT:  In any event, plaintiff's counsel did not

12    raise this in their briefing, so I think the issue is, if it's

13    an issue at all, it has been waived.  But I just wanted to make

14    sure the record was clear on this.

15         So let's turn to what this call is about.  So it seems

16    to me that the resolution of the motions for summary judgment

17    may be impacted by whether or not the Warner defendants, let's

18    see, I have a typo, apparently, in my order.  But in any event,

19    whether the Warner defendants were required to provide

20    additional notice if any meaningful delay that normally would

21    trigger the issuing of a WARN notice required a new notice if

22    the original reason for the delay had disappeared.

23         So my question -- I'm not deciding that on this

24    call -- my question for this call is, first, whether we need

25    any discovery on this issue or whether the parties think it is

O964STAC

1    been the subject of sufficient discovery and no more is needed.

2    And if anyone thinks further discovery is needed, what

3    discovery do you want.

4         So let me stop there before I go on to the other

5    questions and see what your position is on that.

6         What's plaintiff's position?

7         MR. BRUSTEIN:  Evan Brustein, your Honor.

8         Plaintiffs will welcome the opportunity for additional

9    discovery on this point.  We had previously sought discovery

10   with respect to reopening plans as well as the arbitration and

11   litigation between the defendants over reopening.  Now,

12   obviously, we only had a little bit of time, since this order

13   was issued, to come up with those items that we previously saw.

14   But we certainly would welcome the opportunity for those

15   documents to be produced, and, you know, potentially be able to

16   renew prior motion points for things that are relevant for the

17   failure to reopen or delays in reopening.

18        THE COURT:  Just so I'm clear, what you would be

19   seeking are additional documentary discovery?

20        MR. BRUSTEIN:  Yes.  However, it's possible based upon

21   what those documents turn up that we might also want deposition

22   testimony about those documents.  As noted by the defendants,

23   if we're not asking questions about the documents being

24   produced, there could be issues that the defendants raise about

25   what those documents stand for.

O964STAC

1          THE COURT:  One of the reasons I wanted to convene

2     this call is if we're going to have further discovery, I want

3     to have it on a very expedited basis.  I will still probably

4     have to move the date for my bottom line ruling if we have

5     further discovery, but I'm not prepared to have a situation

6     where there is additional discovery that goes on for weeks and

7     weeks.

8          But before I figure out how we could expedite this,

9     let me hear on this issue from defense counsel.

10          MS. LUNDY:  Thank you, your Honor.  This is Kathryn

11     Lundy.

12          Our position is not only is discovery closed but the

13     discovery that plaintiff is seeking has already been produced

14     or addressed by the Court.  First, on the reopening plans, the

15     Court already issued an order on the request for the document.

16     And it was denied back in May of 2023 by an email order.

17          Secondly, with respect to the renovations that have

18     been occurring both before the pandemic from 2019 through this

19     entire time period, we have produced all of our email

20     correspondence including by Frank Galasso, the head of

21     engineering at the Hotel from Elizabeth Ortiz to all of the

22     underlying invoices for that work.  And we already provided

23     significant testimony about what work has been ongoing during

24     the pandemic, what is continuing, and what is required to be

25     completed in order to open up the Hotel.  We already propounded

O964STAC

1    both testimony and all of our documents on this topic, and we

2    believe any further discovery is necessary here.

3          THE COURT:  Let me make sure, just to take an example,

4    if I recall correctly there's been material changes to the

5    ballroom?  Is that right?  I'm asking defense counsel.

6          MR. WAGNER:  Your Honor, if I could chime in this is

7    Paul Wagner from FSR.

8          My understanding, and this is just from memory is what

9    was disclosed during discovery and the subject of extensive

10   deposition testimony was much broader than the ballroom.  There

11   was a significant capital elevator, replacing and repairing the

12   elevators that were very old.  There was some mechanical

13   replacement.  There was overhauling of rooms to modify the

14   rooms from part of the Hotel from a transient to an extended

15   stay.  And all of that was produced in documentary discovery --

16         THE COURT:  That's very helpful.  But I guess my more

17   narrow question, I was going to use the ballroom as an example,

18   but I am glad you brought in the question, in effect, to what

19   extent are those improvements, for lack of a better word, still

20   ongoing?

21         MR. WAGNER:  This is Paul Wagner again.

22         My understanding is the Hotel had sent out recall

23   notices and recalling employees and getting ready to open

24   within the next two months.  So my understanding is that's all

25   done or about to be completed.

O964STAC

1              MS. LUNDY:  This is Kathryn Lundy.

2              Ms. Ortiz also testified during her deposition about

3     the status of those renovation projects.  And my recollection

4     is that her testimony was the only remaining project was the

5     showers.  One component within the showers in each of the guest

6     rooms, and that was in the process of being completed and

7     inspected.

8              MR. BRUSTEIN:  This is Brian Brustein.

9              THE COURT:  Go ahead.

10             MR. BRUSTEIN:  Mr. Wagner's statements are not things

11    that are part of the record, so I can't really comment on the

12    accuracy of it.  It wasn't anything that's been produced or

13    exchanged.

14             THE COURT:  Well, was there, either deposition inquiry

15    or documentary produced documents that would answer the

16    question, assuming for the sake of argument that it's relevant,

17    how much of the delay in reopening after the pandemic was --

18    and the emergency was over -- was attributable to the need to

19    complete these improvements?

20             MR. WAGNER:  Your Honor, this is Paul Wagner from FSR.

21             Extensive on both documentary and testimonial.  In

22    fact, Mr. Brustein quoted today to your Honor today during the

23    oral argument, my client Antoine Chahwan and the Q and A around

24    that.  So when depositions were taken, it formed a very

25    significant basis or percentage of the questions from

O964STAC

1    plaintiff's counsel.

2              MR. BRUSTEIN:  In Mr. Warner's deposition testimony he

3    was asked the following questions.  And this is April 25, 2023:

4    "Q.  What are the barriers to reopening?

5    "A.  Answer the management dispute.

6    "Q.  Anything else?

7    "A.  As far as I'm concerned, that is the main issue.

8              THE COURT:  All right.  So here is what think makes

9    sense.  It does sound like this issue was sufficiently raised

10   that no further deposition testimony is necessary.  I will

11   allow plaintiffs to send me a letter then no later than

12   5:00 p.m. on Monday saying why they think, given the Court's

13   focus on this issue, the Court should reconsider some its prior

14   rulings on documents that were previously order not or denied

15   the production of.  That letter to be no more than three,

16   single-spaced pages.  I will allow defense counsel jointly to

17   respond to that letter by a letter of similar length to be

18   filed no later than midnight on Tuesday.  And I will resolve

19   that in writing on Wednesday.

20             Independent of that, regardless of how that turns out,

21   I think I would benefit from further briefing on this issue.

22   And in that regard, since you both know what the issue is, and

23   since if I do order the production of any documents they can be

24   produced, I'm sure, very rapidly, so I would suggest -- I don't

25   require anyone to do additional briefing, but you both would be

O964STAC

1    prudent to do so and submit an additional brief on Monday, a

2    week.  Let's see what date that is, that would be

3    September 16th.  Simultaneous briefing of no more than 12

4    double-spaced pages addressing what you think has been

5    established but also more importantly what you think of a legal

6    issue that might be raised here.  And those briefs to be filed

7    by 5:00 p.m. on the 16th.  And then parallel responding briefs

8    of similar length on September 18 by 5:00 p.m.

9             The result of that is my bottom line order will

10   probably be pushed a week or so, but I will still make every

11   endeavor to get you that bottom line order very rapidly so this

12   case can move along or not move along, as the case may be.

13            A question I raised orally today that was partly

14   responded to is whether this issue was ever preserved.  I'm

15   inclined to think it was.  But if either side wants to address

16   that further in the briefs I just ordered, you are free to do

17   so.

18            So I think that is what I needed to cover.  Is there

19   anything else that anyone wanted to raise?

20            MR. BRUSTEIN:  Evan Brustein, your Honor.

21            A few things to clarify.  First, you said that the

22   opposition would be the same length.  So the opposition --

23            THE COURT:  This is going to be four briefs in all.

24   Two, one from each side, on the 16th and two, one from each

25   side, on the 18th.

O964STAC

1             MR. BRUSTEIN:  What was the length for the one due on

2      the 18th?

3             THE COURT:  Same length, 12 pages, double spaced.

4             MR. BRUSTEIN:  I just wanted to clarify that.

5             And is this part of the summary judgment motion or is

6      there a standard that should be --

7             THE COURT:  Yes.  This is part of the Court's

8      consideration of summary judgment.  Obviously, you should refer

9      to things that are in the record.  And then should not refer --

10     I'm grateful that defense counsel gave me, you know, a heads up

11     about some other issues like, you know, if the Hotel, it tends

12     to reopen in two months or whatever, but that's not the issue

13     I'm considering.  I'm only considering this from a summary

14     judgment standpoint, so just things that are just currently

15     part of the record is all that you can rely on.  Plus, if I

16     give you those added documents that would be the one exception.

17            MR. BRUSTEIN:  Understood.

18            The second thing was during oral arguments you asked

19     where we referenced these arguments.  I have them in front of

20     me on the call, if your Honor wishes me to state them?

21            THE COURT:  Sure.

22            MR. BRUSTEIN:  Docket 48 which was the operative

23     complaint, two of the paragraphs that specifically address it

24     are Paragraphs 244 and 245 which read, "each time the

25     defendants --

O964STAC

1          THE COURT:  Don't -- I'll take a look at them.  But I

2    don't want to hold you up.  So just give me the numbers.

3          MR. BRUSTEIN:  244 and 245.  It's referenced in other

4    places as well.  And then with respect to the opposition, I

5    mention the Warner opposition, pages 10 and 12.  But also in

6    the FSR opposition brief we raised it in pages 15 to 17 as

7    well.

8          THE COURT:  Okay.  I will take a look at all those

9    pages as well.

10         Anything else?

11         Okay.  So thank you all for calling in, and I'm sorry

12    I had to bother you with this on a Friday afternoon.  You can

13    now go out to the beach and enjoy yourself, but I look forward

14    to your further submissions.  Thanks a lot.  That concludes

15    this proceeding.

16         (Adjourned)