UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ SELENA STALEY, VIVIAN HOLMES,        │
│ and OLIVE IVEY, on behalf of         │
│ themselves  and  all  others         │
│ similarly situated,                  │
│                                      │
│          Plaintiffs,                 │
│                                      │
│     -against-                        │
│                                      │
│ FSR INTERNATIONAL HOTELS INC.,       │
│ doing business as Four Seasons       │
│ Hotels and Resorts, HOTEL 57         │
│ SERVICES, LLC, HOTEL 57, LLC,        │
│ TY WARNER  HOTELS  &  RESORTS        │
│ LLC, and H. TY WARNER,               │
│                                      │
│          Defendants.                 │
└─────────────────────────────────────┘
```

22-cv-6781 (JSR)

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.:

This case concerns the closure of the Four Seasons Hotel New York during the COVID-19 pandemic. On behalf of a putative class of furloughed employees, plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey filed suit against defendant FSR International Hotels Inc. ("FSR"), as well as defendants Hotel 57 Services, LLC ("Hotel 57 Services"), Hotel 57, LLC ("Hotel 57"), Ty Warner Hotels & Resorts ("TWHR"), and H. Ty Warner (collectively "the Warner defendants"). In their complaint, plaintiffs allege that defendants violated federal and state "WARN" Acts requiring employers to provide advance notice of closures and layoffs, and breached provisions of an employment agreement that required them to make certain severance payments. Before the Court are FSR's and

the Warner defendants' separate motions for summary judgment. For the reasons stated below, FSR's motion is granted in full and the Warner defendants' motion is granted in part and denied in part.

I.    Background

    A. Factual Background

Unless otherwise indicated, the following facts are not materially disputed.[1] For well over a decade, plaintiffs Selena Staley, Vivian Holmes, and Olive Ivey worked as non-union employees at the Four Seasons Hotel New York (the "Hotel") in midtown Manhattan. The Hotel is owned, operated, and managed by various entities to greater and lesser extents. Although the parties disagree over the precise nature of the relationships between those entities, this much is undisputed. FSR, a Nevada corporation, operates and manages branded Four Seasons hotels, including the Hotel. Hotel 57 Services, a Delaware limited liability company, serves as the employer of record of the Hotel's union and non-

---

[1] Defendants have asked the Court to disregard numerous exhibits on which plaintiffs rely on the grounds that plaintiffs have not established their authenticity and admissibility. Defendants also ask the Court to disregard various portions of plaintiffs' 56.1 statements because, in defendants' view, they do not comply with Local Civil Rule 56.1. The Court has considered both parties' arguments with respect to both issues. In ruling on defendants' motions for summary judgment, the Court considers evidence that purports to be authentic, and which is either admissible or appears to contain evidence that could be presented in admissible form at trial. See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam). The Court disregards any 56.1 statements that do not comply with Rule 56.1.

union employees. Hotel 57, a similarly named but legally distinct Delaware limited liability company, owns the Hotel's building and property. Finally, H. Ty Warner serves as an officer of Hotel 57 Services and Hotel 57, as well as of TWHR, a third Delaware limited liability company that has at least some connection to various hotel and resort properties, including the Hotel.

At the outset of their employment at the Hotel, employees sign an "EmPact Agreement," which outlines the terms and conditions of their employment. As relevant here, the EmPact Agreement provides that employees are entitled to "no-fault separation pay" if they either "receive a permanent layoff with no right of recall" or are "terminated for no fault."[2] ECF No. 96, Exhibit B, Empact Agreement, at 56. However, employees are not entitled to no-fault separation pay if their permanent layoff "results from strikes, walkouts, or lockouts, war, national emergencies, fires, acts of God, acts of terrorism, disasters, riots, boycotts, and any other cause beyond the control of Four Seasons." Id. at 58. Although an employee's EmPact Agreement technically lasts for a term of just one year, it automatically renews unless the employee voluntarily resigns, is permanently laid off, is involuntarily terminated, or chooses to become an "At-Will" employee instead. See id. at 60.

_____

[2] Unless otherwise indicated, all case and record citations omit internal alterations, brackets, citations, ellipses, quotations, and quotation marks.

All three plaintiffs had renewed their EmPact Agreements at least
as of 2018. See ECF No. 40, Exhibits E-G.

Against that backdrop, this case arises from the onset of the
COVID-19 pandemic. In the early months of 2020, the coronavirus,
which causes COVID-19, spread rapidly across New York City and the
United States. On March 7, 2020, then-New York State Governor
Andrew Cuomo issued an executive order declaring a state-wide
public-health emergency. See ECF No. 93, Exhibit G, at 1-3. Shortly
thereafter, the World Health Organization designated COVID-19 as
a global pandemic, see ECF No. 93, Exhibit E, at 1, and then-
President Donald Trump declared COVID-19 a national public-health
emergency, see ECF No. 93, Exhibit F, at 1. In the weeks that
followed, Governor Cuomo issued additional executive orders
prohibiting large events and gatherings, closing schools,
directing various businesses (including restaurants, fitness
centers, and shopping malls) to stop providing on-site services,
and requiring employers to substantially reduce their in-person
work forces.[3] See ECF No. 93, Exhibit G, at 3-84.

_____

[3] In connection with their motion for summary judgment, the Warner
defendants filed an unopposed motion asking the Court to take
judicial notice of various news articles tracking the initial
development of the COVID-19 pandemic from December 2019 through
January 2020. See ECF No. 82 (motion); see also ECF No. 93,
Exhibits A, B, C, and D (attached news articles). They also asked
the Court to take judicial notice of the proclamations of Governor
Cuomo and President Trump declaring COVID-19 a state and national
emergency, the duration of the declaration of a national emergency
through May 11, 2023, and various executive orders promulgated by

On March 20, 2020, amidst growing uncertainty about the health and safety risks caused by and associated with the COVID-19 pandemic, the Hotel suspended its hospitality services. The Hotel then proceeded to furlough, transfer, or reduce the hours of most of its employees, some of whom were directed to begin working remotely. On April 2, 2020, the Hotel reopened for the sole purpose of housing COVID-19 first responders in New York City, leading some employees to return to work in-person. At that time, management and staff anticipated that the Hotel would fully reopen later that month.

However, over the next several months, the Hotel engaged in regular correspondence with the furloughed employees in which it repeatedly postponed the reopening date. In its first letter dated April 9, 2020, the Hotel advised the furloughed employees of the partial reopening, apprised them of then-current COVID-related

---

Governor Cuomo, as well as an announcement on the Hotel's website indicating that the Hotel would reopen in fall 2024. See ECF No. 93, Exhibits E-H. Courts can take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Indeed, the Second Circuit has specifically recognized that courts may take judicial notice of the sorts of facts and sources outlined in the Warner defendants' motion. See, e.g., Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 425 (2d Cir. 2008) (news articles); Rynakso v. N.Y. Univ., 63 F.4th 186, 191 n.4 (2d Cir. 2023) (government records); Mirlis v. Greer, 952 F.3d 51, 63 n.11 (2d Cir. 2020) (websites). Given that case law and plaintiffs' lack of opposition, the Court grants the Warner defendants' motion and considers the appended materials in ruling on defendants' motions for summary judgment.

restrictions to which the Hotel was subject, and noted that the
Hotel would resume its regular operations by April 30, 2020. <u>See</u>
ECF No. 97, Exhibit A, at 1. In a second letter dated April 30,
2020, the Hotel explained that continuing restrictions required it
to delay the official reopening until June 15, 2020. <u>See</u> ECF No.
97, Exhibit B, at 1. A month later, in a third letter dated May
22, 2020, the Hotel stated that it would continue housing first
responders through June 30, 2020, and that the reopening date was
further postponed until July 15, 2020. <u>See</u> ECF No. 97, Exhibit C,
at 1. And still one month later, in a fourth letter dated June 22,
2020, the Hotel advised that it would soon stop housing first
responders, that it would "temporarily be suspending most of [the]
hotel operations," and that it was aiming to reopen in "late
summer." ECF No. 97, Exhibit D, at 1.

Come August 2020, Hotel officials determined that the Hotel
could not reopen pursuant to any certain or foreseeable timeline.
Having made that determination, on August 5, 2020, the Hotel sent
furloughed employees a fifth letter, styled as a
"notice . . . pursuant to the WARN Act." <u>See, e.g.,</u> ECF No. 97,
Exhibit E, at 1 (letter addressed to Staley); <u>see also id.,</u>
Exhibits F and G (additional notices addressed to Holmes and Ivey).
Each letter, which contained each recipient's unique layoff date,
stated as follows:

> This is to inform you that due to unforeseen business
> circumstances and the continued economic downturn stemming
> from the COVID-19 virus pandemic and consequent travel and
> tourism disruptions outside the employer's control the Four
> Seasons Hotel New York will continue your temporary layoff
> which began on [layoff date] for an as yet undetermined number
> of months. The layoffs included approximately 464 employees,
> including yourself and are still expected to be temporary.

See, e.g., ECF No. 97, Exhibit E, at 1. Each letter then explained

that "as a result of [the employee's] employment loss," the

employee might "be eligible to receive job retraining, re-

employment services, or other assistance with obtaining new

employment," as well as unemployment insurance benefits. Id. The

letters concluded by stating that the letters would also be

"supplied to the appropriate governing agencies" and by directing

furloughed employees to contact the Hotel's general manager with

any questions. Id. After providing the August 5 notices, the Hotel

continued to correspond with the furloughed employees, initially

pushing the reopening date to April 2021, see ECF No. 97, Exhibit

A, at 1, and then ultimately advising that it could no longer

confirm that date, see ECF No. 97, Exhibit D, at 1.

On June 25, 2021, nearly one year after they received the

August 5 notices, the furloughed employees received yet another

letter from the Hotel. That letter stated that the Hotel would

"continue to remain closed" for "substantial infrastructure and

maintenance work," which was "expected to last well into 2022."

ECF No. 123, Exhibit NN, at 4. The letter further advised that the

Hotel would "reassess . . . reopening plans in the early Spring of 2022 based upon the progress of [that] work" and that the Hotel was "committed to recalling employees" when it eventually reopened. Id.

That same day, the Hotel hosted a virtual town hall with the furloughed employees. At the town hall, Hotel officials answered various questions about the renovations, explaining that the Hotel had been having "challenges" with "carpet and wallpaper for a long time," as well as with "some bigger-picture items," including "continued work on elevators and other systems throughout the building." EFC No. 96, Exhibit 4, at 243:13-17. Hotel officials also addressed questions about whether the Hotel would be providing no-fault separation pay as outlined under the EmPact Agreement, answering that the furloughed employees were not entitled to no-fault separation pay because they had not been permanently furloughed or terminated and the Hotel was planning to recall them when it reopened. See id. at 244:21-245:9.

The Hotel subsequently underwent significant renovations. As Hotel officials had indicated at the June 15 meeting and as various other officials confirmed in their deposition testimony, many of those renovations concerned projects and problems that far predated the Hotel's initial closure. See ECF No. 112, Exhibit A, Deposition of H. Ty Warner, at 202:4-9 (stating that certain projects sought to address a decades-old problems with the Hotel's

elevators); ECF No. 123, Exhibit A, Deposition of Antoine Chahwan, at 252:8-254:22 (stating that certain projects were part of a "5-year renovation plan that began in 2019"); ECF No. 96, Exhibit D, Deposition of Elizabeth Ortiz, at 142:7 (referring to an "ongoing capital wish list"). Indeed, during her deposition, Cathy Hwang, the Chief Financial Officer for TWHR and Vice President of Hotel 57 Services and Hotel 57, stated that "there were capital projects that were in progress prior to COVID" and that "ownership felt that it was a good opportunity to make [the] improvements" during the closure because it was "less disruptive to just do it when the hotel [was] closed than when there[] [were] guests." ECF No. 112, Exhibit B, 30(b)(6) Deposition of Cathy Hwang, at 308:12-13, 18-21. Hwang further explained that "[d]ue to the nature of many of the projects, there would be a lot of noise complaints" and that "certain projects would require shutdown of the power" and the "removal of drywall and ceilings." ECF No. 96, Exhibit E, Deposition of Cathy Hwang, at 147:21-148:21. Those projects included replacing the elevators, upgrading fire panels and switch gears, modifying the HVAC system, replacing ceiling and floor tiles, fixing leaking shower pans, reconfiguring the cafeteria, and reinstalling wallpaper. See id. at 145:4-151:15; Deposition of Elizabeth Ortiz, at 73:12-14, 86:11-87:9.

On May 11, 2023, the executive order declaring the COVID-19 pandemic a national emergency expired. Three months later, on

August 3, 2023, the Hotel issued a press release indicating that it was "expected to reopen in fall 2024." See ECF No. 93, Exhibit H, at 1. Finally, on November 15, 2024, the Hotel issued a second press release announcing that it had reopened to the public on that date.[4]

### B. Procedural Background

On August 9, 2022, more than two years after they were placed on furlough, plaintiffs filed a putative class action complaint against FSR, Hotel 57 Services, Hotel 57, TWHR, and H. Ty Warner. See ECF No. 1. In their complaint, they alleged that defendants had violated the federal Worker Adjustment and Retraining Notification Act and the New York State variant of that Act (collectively the "WARN Acts"), and raised additional claims under New York law for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contract, and alter ego. Specifically, the complaint alleged that defendants had violated the WARN Acts by failing to provide adequate notice of the Hotel's closure in March 2020 and that defendants had failed to provide the no-fault separation pay to which plaintiffs were entitled under the EmPact Agreement.

---

[4] See Now Open: Four Seasons Hotel New York Ushers in a New Era of Elevated Luxury in Midtown Manhattan, Four Seasons Press Room (Nov. 15, 2024), https://press.fourseasons.com/newyork/hotel-news/2024/now-open/. As noted above, courts may take judicial notice of press releases. See supra n.3.

The parties proceeded to engage in extensive motions practice before this Court and the Second Circuit. At the outset, FSR answered the complaint and moved to both compel arbitration and strike the complaint's class allegations. See ECF Nos. 35, 42. While that motion was pending, plaintiffs amended their complaint, dropping the tortious interference claim and adding a promissory estoppel claim. See ECF No. 48. The Warner defendants then moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). See ECF No. 50. Although FSR answered the amended complaint, it did not similarly move to dismiss it. See ECF. No. 49. This Court then denied FSR's motion to compel arbitration and strike the class allegations. See ECF No. 73. The Second Circuit affirmed the Court's denial of the motion to compel arbitration and dismissed the appeal of the motion to strike the class allegations as premature. See ECF No. 77.

After the Second Circuit's mandate issued, this Court granted in part and denied in part the Warner defendants' motion to dismiss. See ECF No. 78. The Court granted the motion to dismiss the WARN Act claims against H. Ty Warner because he did not qualify as a statutory "employer," but denied the motion to dismiss the WARN Act claims against the other defendants. See id. at 4-7. Next, the Court granted the motion to dismiss the breach of contract claim against all of the Warner defendants except Hotel 57 Services because Hotel 57 Services was the only Warner defendant that was

a signatory to the EmPact Agreement. See id. at 8-10. Finally, the Court dismissed the claims for breach of the implied covenant of good faith and fair dealing and promissory estoppel on plaintiffs' consent. See id. at 11.

In the months that followed, plaintiffs moved to certify a class and subclass under Federal Rule of Civil Procedure 23(b)(3). See ECF No. 84. After holding oral argument on plaintiffs' certification motion and questioning the three plaintiffs as to their adequacy to serve as lead plaintiffs, the Court certified two classes. The first class, called the "WARN Class" was defined as "all non-union employees of Defendants who worked for Defendants at the Hotel, and whose employment was furloughed on or after March 14, 2020, and whose employment at the Hotel was furloughed for more than six months, commencing on or after March 14, 2020." ECF No. 113, at 25. The second class, called the "EmPact Class" was defined as "all non-union employees of Defendants who worked for Defendants at the Hotel, and remained on furlough through June 25, 2021 and were not paid their No-Fault Severance Pay." Id. at 25-26.

On the same day that plaintiffs filed their motion for class certification, FSR and the remaining Warner defendants separately moved for summary judgment. See ECF No. 81 (Warner defendants); ECF No. 83 (FSR). On September 6, 2024, after certifying the WARN and EmPact classes and reviewing the parties' summary judgment

briefing and Rule 56.1 statements, the Court held an extensive
final pretrial conference on defendants' summary judgment motions.
See ECF No. 134. At the outset of that conference, the Court
explained that both parties had failed to comply with the
requirements of Local Rule 56.1 by, in the case of defendants,
submitting 56.1 statements containing legal conclusions and, in
the case of plaintiffs, failing to admit or deny factual statements
set out by defendants and to provide a "short and concise"
statement of additional material facts over which there were
genuine issues to be tried. See id. at 4:6-7:4; see also Local
Rules of the United States District Courts for the Southern and
Eastern Districts of New York, Board of Judges of the Eastern
District of New York and the Southern District of New York 52
(2021). As the Court further explained, because the parties had
thus failed to comply with Rule 56.1, their 56.1 statements were
"completely unhelpful" to the Court. ECF No. 134 at 6:14. The Court
then questioned the parties at length about the requirements of
the federal and state WARN Acts and the obligations under the
EmPact Agreement, as well as the record evidence supporting their
arguments.

Later that same day, the Court reconvened the parties for a
second final pretrial conference. See ECF No. 132, at 1-2. During
that conference, the Court posed several additional questions
about the requirements of the federal and state WARN Acts and the

materials produced during discovery that would have served to demonstrate whether or not defendants had complied with them. See ECF No. 134, at 50:4-59:9. At the conclusion of the second final pretrial conference, the Court ordered the parties to submit two sets of supplemental briefing.

As for the first set of supplemental briefing, the Court ordered the parties to "focus on" whether the Court should "reconsider some of its prior rulings on documents that were previously order[ed] or denied the production of" and reopen discovery on a limited basis. Id. at 56:13-15. Plaintiffs and defendants submitted their supplemental briefs on September 9, 2024, and September 10, 2024, respectively. See ECF No. 133; ECF No. 148.[5] Neither party identified or discussed any of the Court's prior discovery-related rulings in its briefing, so the Court did not reopen discovery.

As for the second set of supplemental briefing, the Court ordered the parties to address the specific question of whether defendants are required to provide additional notice under the federal and state WARN Acts when the reason for a closure or layoff changes. Briefing on that specific issue concluded on September 18, 2024. See ECF Nos. 136, 137, 139, 140. After reviewing that briefing in conjunction with the parties' 56.1 statements, the

---

[5] Plaintiffs emailed their first supplemental brief to chambers. It has since been docketed. See ECF No. 148.

Court ordered plaintiffs to provide the Court with "any and all record citations from the discovery record" that they believed were relevant to that issue. ECF No. 141, at 1. The Court also invited defendants to raise "any evidentiary objections to the citations offered in plaintiffs' submission." Id. Plaintiffs submitted their citations on October 15, 2024, see ECF No. 142, and defendants responded with various evidentiary objections on October 22, 2024, see ECF No. 143.

## II. Discussion

### A. Standard

The Court must grant summary judgment if defendants demonstrate that there is "no genuine dispute of any material fact," such that they are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). "A material fact is one that would affect the outcome of the suit under governing law, and a dispute of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." Aetna Life Ins. Co. v. Big Y Foods, Inc., 52 F.4th 66, 72 (2d Cir. 2022). To successfully oppose summary judgment, plaintiffs must "present competent evidence that creates a genuine issue of material fact" and not "merely deny the moving party's allegations in a general way." McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022).

In reviewing the factual record, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the nonmoving party." Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020). "[T]he district court's function is not to weigh the evidence or resolve issues of fact." Lucente v. Int'l Bus. Machines Cop., 310 F.3d 243, 254 (2d Cir. 2002). Instead, the district court's role is "confined to deciding whether a rational juror could find in favor of the non-moving party." Id. "Assessment of credibility and choices between conflicting versions of events are matters for the jury, not the court on summary judgment." Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).

B. Analysis

Following the Court's partial grant and partial denial of the Warner defendants' motion to dismiss, three sets of claims remain in this case: (1) the federal and state WARN Acts claims against both FSR and the remaining Warner defendants, (2) the breach of contract claim against Hotel 57 Services, and (3) various claims against FSR. Below, the Court addresses each set of claims in turn, starting with the WARN Acts claims.

i. WARN Acts Claims

Plaintiffs argue that defendants violated the federal and New York State variants of the WARN Act by failing to provide adequate notice of plaintiffs' extended furloughs. Specifically, plaintiffs

argue that defendants failed to abide by statutory notice periods or to provide additional notices as the furloughs extended beyond six months. They also identify several alleged deficiencies in the August 5 notices.

In order to resolve defendants' motions for summary judgment with respect to plaintiffs' federal and state WARN Act claims, this Court must undertake three separate inquiries. First, the Court must determine whether the WARN Acts require employers to provide multiple notices over the course of a single closure or layoff. Second, the Court must determine whether, on the discovery record before the Court, there is a genuine dispute of material fact as to whether the August 5 notices complied with the WARN Acts. And third, the Court must determine whether there is a genuine dispute of material fact as to whether FSR and the remaining Warner defendants constitute a "single employer," such that they can all be liable for any WARN Acts violations. In the pages that follow, the Court undertakes each inquiry separately and concludes that, as for plaintiffs' federal and state WARN Acts claims, there are genuine issues of material fact as to the liability of defendant Hotel 57 Services only.

a. Do the WARN Acts require multiple notices?

Congress passed the federal WARN Act in response to "extensive worker dislocation that occurred in the 1970s and 1980s." Roberts v. Genting N.Y. LLC, 68 F.4th 81, 89 (2d Circ. 2023). At that time,

"companies were merged, acquired, or closed, causing many employees to lose their jobs, often without notice." Id. In some cases, employers actively concealed anticipated closures and furloughs from their employees. See id. By enacting the WARN Act and requiring employers to give their employees "advance notice" of closures and furloughs, Congress sought to "provide workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that [would] allow [them] to successfully compete in the job market." Id. (citing Guippone v. BH S & B Holdings LLC, 737 F.3d 221 (2d Cir. 2013))(quoting 20 C.F.R. § 639.1(a)). Requiring employers to provide such notice also served to "allow[] the state to provide prompt assistance to displaced workers." Id.

With those objectives in mind, the federal WARN Act requires employers to "give employees at least 60 calendar days' notice in advance of plant closings and mass layoffs." Guippone, 737 F.3d at 225 (citing 29 U.S.C. § 2102(a)(1)). "Plant closing" refers to "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment," while "mass layoff" refers to a "reduction in force" that is "not the result of a plant closing" and results in "losses" of various specified amounts and percentages of employees. 29 U.S.C. §§ 2101(a)(2)-(3). The federal

WARN Act's notice requirement "generally applies to employers who employ 100 or more full-time employees." Roberts, 68 F.4th at 88; see 29 U.S.C. § 2101(a)(1).

Pursuant to various regulations promulgated under the federal WARN Act, the requisite notice must contain four pieces of information. First, the notice must contain "[a] statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect." 20 C.F.R. § 639.7(d)(1). Second, the notice must specify the "expected date when the plant closing or mass layoff will commence," as well as the "expected date when the individual employee will be separated." Id. at § 639.7(d)(2). Third, the notice must provide an "indication whether or not bumping rights exist."[6] Id. at § 639.7(d)(3). And fourth, the notice must include the "name and telephone number of a company official to contact for further information." Id. at § 639.7(d)(4). The notice may also, but need not, include "additional information useful to the employees such as information on available dislocated worker assistance, and, if the planned action is expected to be temporary, the estimated duration, if known." Id. at § 639.7(d).

---

[6] "Bumping rights" refers to the rights of workers with greater seniority to displace less senior employees in connection with layoffs and the like. See Coollick v. Hughes, 699 F.3d 211, 215 (2d Cir. 2012).

Employers must provide such notices to "affected employees," 29 U.S.C. § 2102(a)(1), which are defined as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer," id. at § 2101(a)(5). In turn, an "employment loss" is generally defined as "an employment termination, other than a discharge for cause, voluntary departure, or retirement," "a layoff exceeding 6 months," or "a reduction in hours of work of more than 50 percent during each month of any 6-month period." Id. at § 2101(a)(6). On the issue of "employment loss," the federal WARN Act further provides that a layoff that was originally announced to be six months or less but persists for more than six months "shall be treated as an employment loss" unless two conditions are met. Id. § at 2102(c). The first of those conditions is that "the extension beyond 6 months is caused by business circumstances (including unforeseeable changes in price or cost) not reasonably foreseeable at the time of the initial layoff." Id. at § 2102(c)(1). The second of those conditions is that "notice is given at the time it becomes reasonably foreseeable that the extension beyond 6 months will be required." Id. at § 2102(c)(2). If both conditions are met, then the continued layoff does not constitute an "employment loss."

In addition to providing notice to "affected employees" as outlined above, employers must also provide notice to "the State

or entity designated by the State to carry out rapid response activities" and "the chief elected official of the unit of local government within which such closing or layoff is to occur." Id. at § 2102(a)(2). That notice must specify the name and address of the employment site, the name and telephone number of a company official to contact for further information, a statement as to whether the planned action is expected to be permanent or temporary, the expected date of the first separation, an anticipated schedule for making separations, the job titles of the positions to be affected, and the number of affected employees in each job classification, among other things.[7] See 20 C.F.R. §§ 639.7(e)(1)-(6).

There are three exceptions to the federal WARN Act's myriad notice requirements, but only two are relevant here. First, section 2102(b)(2)(A) provides that "[a]n employer may order a plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. 2102(b)(2)(A). That provision does not alter the form or type of notice that employers must

---

[7] When a closure or layoff concerns union employees, then the notice must also contain the name of their union, as well as the name and address of their chief elected union officer. See 29 U.S.C. § 639.7(e)(6). In this case, neither class contains union employees.

provide to their employees. Second, under section 2102(b)(2)(B), "if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States," then no notice is required. Id. at § 2102(b)(2)(B). Accordingly, where an employer encounters unforeseen business circumstances or a natural disaster, it can effectuate a closing or layoff without satisfying all the WARN Act's notice requirements.

An employer who fails to provide adequate notice is "liable to each aggrieved employee who suffers an employment loss" for up to sixty days of backpay and benefits. Id. at § 2104(a)(1). However, "[it] is not the intent of the regulations" that "inadvertent errors [serve as] the basis for finding a violation of WARN," so long as "[t]he information provided in the notice" is "based on the best information available to the employer at the time the notice is served." 20 C.F.R. § 639.7(a)(4).

The text of the New York WARN Act departs from the text of the federal WARN Act in just two notable respects.[8] "Like the federal statute, the New York WARN Act requires that qualified employers give employees advance notice of a plant closing or mass

---

[8] During the COVID-19 pandemic, the New York legislature amended the New York WARN Act. See 2021 Sess. Laws ch. 86 (S. 2074) (McKinney) (amending N.Y. Lab. Law § 860-b). None of the legislature's statutory amendments bears on the Court's analysis in this case.

layoff." Roberts, 68 F.4th at 92 (citing N.Y. Lab. Law § 860-b). However, under the New York statute, "notice must be given in ninety, rather than sixty, days in advance." Id.; see N.Y. Lab. Law § 860-b(1)). Moreover, the New York statute applies to employers who employ fifty or more employees, rather than 100. See Roberts, 68 F.4th at 92 (citing N.Y. Lab. Law §§ 860-a(3)). The New York WARN Act thus imposes higher standards on employers than the federal WARN Act. Given the heightened standards set forth under the New York WARN Act, "where there is liability under the WARN Act, there is necessarily liability under the New York WARN Act." U.S. Bank Nat'l Ass'n v. DCCA, LLC, 231 A.D.3d 765, 771 (2d Dep't 2024) (quoting Roberts, 68 F.4th at 92). Like the parties, the Court therefore focuses its analysis on the federal WARN Act. Cf. Felder v. Casey, 487 U.S. 131, 151 (1988) ("Under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), when a federal court exercises diversity or pendant jurisdiction over state-law claims, the outcome of a litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of the litigation, as it would be if tried in a State court.").

This case presents a question of first impression in this Circuit, namely whether the federal WARN Act requires employers to provide multiple WARN notices over the course of a single, temporary closure or layoff. The parties dispute whether the WARN Act requires additional notices whenever a layoff lasts more than

sixty days, as well as when an employer invokes the unforeseen business circumstances exception in the context of a temporary closure or layoff that persists for reasons other than those unforeseen circumstances. Defendants also argue that certain federal regulations provide that subsequent events have no bearing on an employer's WARN Act obligations. For the reasons stated below, the Court concludes that the WARN Act requires employers to provide additional notice when an employer relies upon the unforeseen business circumstances exception and the reasons underlying the proceeding closure or layoff change.

"The WARN Act's primary purpose is remedial." Roberts, 68 F.4th at 89. Therefore, as with all remedial statutes, its terms must "be construed in liberal fashion if the underlying Congressional purpose is to be effectuated." N.C. Freed Co. v. Bd. of Governors of Fed. Rsrv. Sys., 473 F.2d 1210, 1214 (2d Cir. 1973); see also EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 149 (2d Cir. 2000) ("It is our duty to interpret remedial statutes broadly."). Indeed, the Second Circuit has instructed district courts to "construe the WARN Act's terms liberally." Roberts, 68 F.4th at 89.

With that instruction in mind, the Court turns to plaintiffs' argument that the WARN Act requires additional notices whenever a layoff lasts more than sixty days. Plaintiffs point to the WARN Act provision defining "employment loss" as "a layoff exceeding 6

months." 29 U.S.C. § 2101(6). They argue that the plain text of that provision obligates employers to provide WARN notices every six-months -- that is, every time they experience an "employment loss" -- for the full duration of a closure or layoff. Defendants counter that neither the "employment loss" provision nor any other WARN Act provision specifically requires employers to provide additional notices under those circumstances.

As defendants repeatedly note in their briefing, see, e.g., ECF No. 99, at 16, the WARN Act plainly requires additional WARN notices under certain limited circumstances, see 20 C.F.R. § 639.10 (providing that additional notice is required when the starting date of a closure or layoff is postponed); see also Graphic Commc'ns Int'l Union v. Quebecor Printing (USA) Corp., 252 F.3d 296, 299 (2001) ("The WARN Act clearly contemplates that an employee may suffer multiple employment losses, necessitating separate notices."). By contrast, the WARN Act does not expressly require employers to provide additional notices every six months. As outlined above, the WARN Act obligates employers to provide advance notice of closures and layoffs to "affected employee[s]," 29 U.S.C. § 2102(a)(1), defined as "employees who may reasonably be expected to experience an employment loss," id. at § 2101(a)(5). And under section 2101(a)(6), an "employment loss" is merely defined as "an employment termination, other than a discharge for cause, voluntary departure, or retirement," "a layoff exceeding 6

months," or "a reduction in hours of work of more than 50 percent during each month of any 6-month period." Id. at § 2101(a)(6).

Plaintiffs nevertheless argue that section 2101(a)(6) could be read to suggest that every furlough period exceeding six months constitutes its own "employment loss" and that the clock restarts at the six-month mark. Under that reading, an employee becomes capable of experiencing a new "employment loss" every six months and is therefore an "affected employee" entitled to a new notice under the WARN Act.

However, that reading of the statute belies the larger statutory scheme. Section 2102(c) makes clear that not every "layoff exceeding 6 months" qualifies as an "employment loss." After all, under section 2102(c), a layoff that was originally announced to be a layoff for six months or less but that subsequently exceeds six months does not constitute an "employment loss" when its extension beyond the original six months is caused by "business circumstances" that were "not reasonably foreseeable at the time of the initial layoff" and the employer provides adequate notice as soon as the need to extend the layoff became "reasonably foreseeable." Id. at 2102(c). Accordingly, both because the WARN Act does not expressly require that employers provide new notices whenever a layoff exceeds six months and because not every layoff exceeding six months qualifies as an "employment loss," the Court concludes that the WARN Act does not

require employers to provide a new WARN notice whenever a layoff
exceeds six months.

The Court is nevertheless persuaded that the WARN Act does
require an employer to provide a new WARN notice when an employer
has invoked the unforeseen business circumstances exception in
connection with a temporary closure and yet remains closed for
other, unrelated reasons.[9] Under section 2102(b)(2)(A), the sixty-
day notice requirement does not apply where a closure or layoff
"is caused by business circumstances that were not reasonably
foreseeable as of the time that notice would have been required."
Id. § 2102(b)(2)(A). The text of section 2102(b)(2)(A) thus makes
clear that application of the unforeseen business circumstances
exception hinges on the particular "business circumstances" that
"caused" the particular closure or layoff. Under subsection
2102(b)(3), "[an] employer relying on [section 2102(b)] shall give

---

[9] Defendants argue that plaintiffs have forfeited this argument by
failing to raise it before summary judgment. The Court disagrees.
Plaintiffs' complaint alleges that defendants violated a
requirement to provide multiple WARN Act notices. See, e.g., ECF
No. 48, at ¶¶ 7, 172, 323. In any event, district courts may
entertain new theories underlying existing claims at summary
judgment. See, e.g., Moore v. Cnty. of De., 586 F.3d 219, 220 (2d
Cir. 2009) (per curiam). And, out of an abundance of caution, the
Court provided the parties with an opportunity to request that the
Court reconsider its prior discovery-related rulings so that the
Court could order additional discovery relating to this argument,
though neither party ultimately availed itself of that
opportunity. The Court also ensured that the parties had ample
opportunity to address the argument at two separate final pretrial
conferences, including one convened specifically for that purpose,
as well as in two subsequent rounds of supplemental briefing.

as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." Id. at § 2102(b)(3). The federal WARN Act therefore contemplates that an employer that encounters unforeseen business circumstances requiring a temporary closure or layoff will inform its employees of the basis for the closure or layoff, which prevented it from providing timely notice. Accordingly, the Court concludes that where a continued closure or layoff is "caused" by a new "circumstance," id. at § 2102(a)(2)(A), the former notice is no longer adequate and a new notice containing a "brief statement" concerning the new "basis" for the continued closure or layoff, id. at 2102(b)(3), is required to comply with the WARN Act.

Defendants insist that such a requirement cannot be squared with the text of the statute, which, they argue, does not contain a provision that expressly requires employers to provide additional notice when the basis for the temporary closure or layoff changes. However, that requirement is implicit in the text of both sections 2102(b)(2)(A) and (b)(3), which must be "construe[d] . . . liberally" to effectuate Congress's purpose in enacting the federal WARN Act. Roberts, 68 F.4th at 89. To hold otherwise would severely undermine that purpose. As both the legislative history and corresponding regulations make clear, Congress enacted the federal WARN Act to ensure that employees could adapt and respond to closures and layoffs by pursuing new

educational and training opportunities and seeking new employment when necessary. See id. at 88; see also 20 C.F.R. § 639.1(a) (outlining the purpose of the federal WARN Act). By requiring employers invoking the unforeseen business circumstances exception to inform employees of the nature of those circumstances, the WARN Act reflects Congress's recognition that such information would be helpful to employees facing a prospective employment loss.

Under defendants' interpretation, an employer could provide a WARN notice and invoke the unforeseen business circumstances exception to advise its employees of a temporary closure, only to remain closed for several months -- or even years -- for reasons totally unrelated to those outlined in its notice. Indeed, at oral argument, in response to questioning from the Court, counsel for the Warner defendants stated that an additional notice would not be required even if such a closure persisted for twenty years, so long as the initial notice advised that the closure was temporary, rather than permanent. See ECF No. 134, at 9:17-10:7; see also id. at 14:21-24 ("The fact that the circumstances relating to why it's a temporary layoff may have changed . . . doesn't change the fact that it's still temporary."); see also ECF No. 137, at 8 (similar). However, under those circumstances, where an employer conceals pertinent information about the nature of a closure from its employees for years on end and leads them to believe that they will be able to return to work in the foreseeable future, the

ability of those employees to respond to any prospective employment loss or to successfully compete in the job market is significantly curtailed, contrary to the purpose of the WARN Acts. Interpreting sections 2102(b)(2)(A) and (3) to require employers to provide additional notices addressing changed circumstances thus serves to effectuate that purpose.

Defendants' only remaining argument is that corresponding federal regulations provide that subsequent developments do not implicate an employer's obligations under the WARN Act, such that employers have no obligation to provide additional notices following any such developments. They cite section 639.7(a)(4), which, as noted above, provides that "[i]t is not the intent of the regulations, that errors in the information provided in a notice that occur because events subsequently change . . . be the basis for finding a violation of WARN." 20 C.F.R. § 639.7(a)(4). Despite defendants' assertion to the contrary, that regulation does not specify that employers have no obligation to provide additional notices when "events subsequently change" and thereby cause the employer to extend a closure or layoff on a new and unrelated basis. Instead, the regulation merely provides that "errors" in a WARN notice that can be attributed to "events [that] subsequently change[d]" cannot serve as the basis for imposing liability under the WARN Act. The Court therefore rejects defendants' final argument and concludes that where an employer

has invoked the unforeseen business circumstances exception in the context of a temporary closure or layoff and the basis for the closure or layoff changes that employer must provide an additional WARN notice explaining the new basis for the closure or layoff.

b. <u>Did the August 5 notices comply with the WARN Acts?</u>

Having clarified the various requirements outlined under the WARN Acts, the Court must determine whether there are any genuine issues of material fact as to whether the August 5 notices complied with them.

Plaintiffs argue that it is beyond dispute that defendants failed to abide by the sixty- and ninety-day notice periods specified under the federal and state WARN Acts, respectively. After all, although the Hotel's purported WARN notices indicated that the plaintiffs were furloughed on various dates proceeding March 14, 2020, the notices were dated and distributed on August 5, 2020 -- in some cases, as many as 100 days <u>after</u> an employee's initial furlough date. <u>See, e.g.,</u> ECF No. 97, Exhibit G, at 1 (letter addressed to Ivey). Indeed, defendants do not dispute that the August 5 notices were dated and distributed well outside the notice periods. Instead, defendants argue that the Hotel's failure to comply with the federal and state notice periods was excused under the unforeseen business circumstances exception.

To repeat, "[a]n employer may order a plant closing or mass layoff before the conclusion of the [notice] period if the closing

or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment" and requires that the employer "exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2). "The employer is not required, however, to accurately predict general economic conditions that . . . may affect demand for its products and services." Id. Under that test an "important indicator" is whether the business circumstances are "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control," such as "an unanticipated and dramatic economic downturn." Id. at § 639.9(b)(1).

On the reduced notice issue, the Court agrees with defendants. Confronted with an unprecedented global pandemic in the early months of 2020, the Hotel's officials exercised "commercially reasonable business judgment" in gradually decreasing the size of their workforce and shuttering their in-person services as required by law. Although the Hotel may not have formally announced the March 2020 furloughs until August 2020, it is undisputed that public understandings of the risks and costs associated with the pandemic developed over time. See generally ECF No. 93, Exhibits

A-G (tracking the development of and regulations surrounding the COVID-19 pandemic). Indeed, it was only in March 2020 that COVID-19 was declared a state and national emergency, as well as a global pandemic. See id. at Exhibits E-G. Given these quintessentially unforeseen business circumstances, the Court concludes that the Hotel's failure to comply with the statutory notice periods was exempted under the federal and state WARN Acts.

Plaintiffs next argue that the August 5 notices plainly violate the WARN Acts and corresponding regulations by omitting critical pieces of information. Specifically, plaintiffs argue that the August 5 notices lack a statement justifying the reduction of the statutory notice periods, the address of their employment site, the schedule for making separations, a list of the job titles affected by the furloughs, and the number of affected employees in each position. See 29 U.S.C. § 2102(b)(3); C.F.R. § 639.7(e).

At the outset, the Court observes that the August 5 notices do, in fact, contain a brief statement justifying the reduced notice period. The very first sentence reads:

> This is to inform you that due to the unforeseen business circumstances and the continued economic downturn stemming from the COVID-19 virus pandemic and consequent travel and tourism disruptions outside the employer's control the Four Seasons Hotel New York will continue your temporary layoff which began on 3/21/2020 for an as yet undetermined number of months.

See, e.g., ECF No. 97, Exhibit E, at 1 (emphasis added). Admittedly, the sentence is not a perfect model of clarity. But by

referring to "the unforeseen business circumstances" presented by the "continued economic downturn stemming from the COVID-19 virus pandemic," it indicates that the delay in providing notice was due to the COVID-19 pandemic. Given that the justification for the reduction in the notice period need only constitute a "brief statement," 29 U.S.C. § 2102(b)(3), the August 5 notices sufficiently satisfied the technical requirements of the unforeseen business circumstances exception.

However, plaintiffs are correct that the August 5 notices lack various pieces of information that must appear in WARN notices supplied to affected employees and government officials.[10] See 28 U.S.C. § 2102(a); 20 C.F.R. §§ 639.7(d)-(e). Nowhere do the August 5 notices list the address of the employees' employment site, the schedule for making separations, the job titles of positions affected by the furloughs, or the number of affected employees in each position. Accordingly, at least with respect to those requirements, the August 5 notices do not comply with the WARN Act.

Defendants raise two arguments to justify those omissions, but neither is persuasive. First, defendants argue that the natural

---

[10] Although the notices were addressed to individual employees, they stated that they were also "supplied to the appropriate governmental agencies," see, e.g., ECF No. 97, Exhibit E, at 1, suggesting that the Hotel intended for them to serve as WARN notices for all intents and purposes.

disaster exception applies, such that they were not required to provide any notice whatsoever and the omission of any details in the August 5 could not give rise to a WARN Act violation. Recall, the natural disaster exception provides that, "if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States," then no notice is required. 29 U.S.C. § 2102(b)(2). Defendants insist that the COVID-19 pandemic constituted a "natural disaster" for purposes of the WARN Act, but the Court is not convinced.

The WARN Act does not define "natural disaster." However, applying traditional canons of statutory construction, the meaning of "natural disaster" can be inferred from the terms that surround it. See Eisenhauer v. Culinary Inst. of Am., 84 F.4th 507, 521 (2d Cir. 2023) ("[T]he canon of noscitur a sociis instructs that a word is known by the company it keeps."). That "natural disaster" appears in a list alongside terms such as "flood," "earthquake," and "drought" suggests that Congress sought to "limit [it] to hydrological, geological and meteorological events," not extend it to diseases, epidemics, pandemics, or viruses. Easom v. US Well Servs., Inc., 37 F.4th 238, 244 (5th Cir. 2022); see also Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc., 145 F.3d 1275, 1282 (5th Cir. 1994) (suggesting that exceptions to the WARN Act's notice requirements should be

"narrowly construed" so as not to infringe the Act's broad remedial purpose). Had Congress intended for "natural disaster" to incorporate such health-related events, it could have included them in text of section 2102(b)(2). The Court therefore concludes that the natural disaster exception does not excuse the omission of required information from the August 5 notices.

Defendants also suggest that any deficiencies rise only to the level of "minor, inadvertent errors" that are "not intended to serve as a basis for finding a violation of WARN." 20 C.F.R. § 639.7(a)(4). However, on their face, the August 5 notices disregard most of the requirements outlined under section 639.7(e). Such blatant disregard for the WARN Act's requirements does not qualify as "minor" or "inadvertent." Id. at § 639.7(a)(4).

Putting the August 5 notices to one side, there is also a genuine issue of material fact as to whether defendants fully complied with the WARN Acts throughout the duration of the furlough. As discussed above, implicit in the provisions outlining the WARN Act's unforeseen business circumstances exception is the requirement that employers provide additional notice where the reason underlying a continued closure or layoff changes. On the record before the Court, a rational juror could conclude that the furloughs initially served as a response to COVID-related restrictions, but later served as an opportunity to complete maintenance and renovation projects that far predated it. After

all, in their deposition testimony, various Hotel officials indicated that the maintenance work sought to address longstanding structural and technical problems at the Hotel and to complete various ongoing projects that would have been too elaborate or disruptive to pursue if the Hotel was open to the public. See, e.g., Deposition of H. Ty Warner, at 202:4-9; Deposition of Antoine Chahwan, at 252:8-254:13. In addition, although employees were informed that the Hotel would "continue to remain closed" for "substantial infrastructure and maintenance work" during the June 25 meeting held nearly one year after they received the August 5 notices, ECF No. 123, Exhibit NN, at 4, they did not receive any additional or purported WARN notices. In light of this and other record evidence, the Court concludes that there is a genuine issue of material fact as to whether defendants fully complied with the federal and state WARN Acts.

Put simply, the notices that the Hotel provided to plaintiffs in this case could be read to give plaintiffs every reason to suppose that they would be recalled after the COVID-19 national and state emergencies were lifted, even if the Hotel was taking advantage of the interim closure to make overdue repairs and upgrades. But if the repairs and upgrades turned out to require a further extension of the layoffs -- here for many months -- a further notice was required.

Accordingly, both because the record demonstrates that the August 5 notices did not comply with the various provisions of the WARN Acts and because there is a genuine dispute of material fact as to whether defendants otherwise complied with them, the Court declines to dismiss plaintiffs' federal and state WARN Acts claims on summary judgment.

### c. Do defendants qualify as a single employer?

Having declined to dismiss plaintiffs' federal and state WARN Acts claims, the Court must determine whether FSR and the remaining Warner defendants constitute a "single employer" for purposes of the WARN Acts. In Guippone, the Second Circuit followed the approach taken by the Third Circuit in Pearson v. Component Tech. Corp., 247 F.3d 471 (3d Cir. 2001), and "adopt[ed] the five non-exclusive factors set forth in the Department of Labor ('DOL') regulations to determine if related entities are single employers as the test to be applied in [the] Circuit." 737 F.3d at 226 (citing 20 C.F.R. § 639.3(a)(3)). Those regulations provide that "independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company depending upon the degree of independence from the parent." Id.

The five factors that courts must consider in determining whether an independent contractor or subsidiary is sufficiently independent from its parent are: (i) common ownership, (ii) common

directors and officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of their operations. See id. (citing 20 C.F.R. § 639.3(a)(2)). The same factors apply to state WARN Act claims. See N.Y. Comp. Codes R. & Regs. tit. 12, § 921-1.1(e)(2). In applying the five factors, courts engage in a "fact-specific inquiry." Guippone, 737 F.3d at 226. "[N]o one factor set out by the DOL is controlling, and all factors need not be present for liability to attach." Id.

Neither FSR nor the Warner defendants disputes that Hotel 57 Services qualifies as the furloughed employees' employer of record, such that Hotel 57 Services could be liable for violations of the federal and state WARN Acts. Instead, they dispute whether FSR and the remaining Warner defendants -- none of which qualifies as the furloughed employees' employer of record -- collectively constitute a "single employer" with Hotel 57 Services. Plaintiffs insist that FSR, Hotel 57, and TWHR satisfy the five Guippone factors. However, because plaintiffs have neither argued nor put forth any evidence to suggest that FSR, Hotel 57, or TWHR are independent contractors for, or subsidiaries of, Hotel 57 Services, the Court concludes that the Guippone factors do not apply and that FSR, Hotel 57, and TWHR cannot be liable under a "single employer" theory. See Coleman v. Optum Inc., No. 22-cv-5664, 2023 WL 6390665, at *9 (S.D.N.Y. Oct. 1, 2023) ("This Circuit

has declined to extend the single employer doctrine beyond the corporate subsidiary and subcontracting of the plaintiff's employment to another distinct employer.") (citing Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361 (2d Cir. 2006)).

For the foregoing reasons, the Court grants FSR's motion for summary judgment as to plaintiffs' federal and state WARN Acts claims and grants in part and denies in part the Warner defendants' corresponding motion. The Warner defendants' motion is granted as to plaintiffs' federal and state WARN Acts claims against Hotel 57 and TWHR, but denied as to plaintiffs' federal and state WARN Acts claims against Hotel 57 Services.

### ii.  Breach of Contract Against Hotel 57 Services

The Court now turns to plaintiffs' breach of contract claim against Hotel 57 Services. Plaintiffs allege that they were permanently laid off with no right of recall and terminated from their employment for no-fault during the June 25 meeting and were therefore entitled to no-fault separation pay under the EmPact Agreement. Hotel 57 Services insists that plaintiffs were neither permanently laid off nor terminated, that plaintiffs in any event failed to abide by an internal dispute resolution procedure before filing their complaint, and that employees are not entitled to severance pay if their permanent layoff or termination results from a national emergency. The Court sides with Hotel 57 Services.

Even assuming that plaintiffs were permanently laid off or terminated during the June 25 meeting and subsequently abided by all of the required conditions precedent outlined under the EmPact Agreement, the EmPact Agreement expressly states that Hotel 57 Services is not obligated to make no-fault separation payments in cases involving national emergencies. Indeed, in signing the EmPact Agreement, employees expressly acknowledge that they "will not be entitled to No-Fault Separation Pay if [their] permanent layoff results from strikes, walkouts, or lockouts, war, <u>national emergencies</u>, fires, acts of God, acts of terrorism, disasters, riots, boycotts, and any other cause beyond the control of the Four Seasons."[11] Empact Agreement at 59 (emphasis added). Plaintiffs have never disputed that the COVID-19 pandemic constituted a national emergency. Nor could they. As discussed above, President Trump declared COVID-19 a national emergency on March 13, 2020, well before plaintiffs were allegedly laid off or terminated at the June 25, 2021 meeting. <u>See</u> ECF No. 93, Exhibit F, at 1.

---

[11] As discussed in greater detail below, Hotel 57 Services is the only defendant that is a party to the EmPact Agreement. However, the EmPact Agreement refers to Hotel 57 Services as "Four Seasons Hotel New York." <u>See</u> EmPact Agreement at 61 ("The Hotel 57 Services, L.L.C., (hereinafter referred to as Four Seasons of New York) recognizes my valuable services as an employee, and agrees . . . to provide me with the benefits described in my EmPact.").

### iii.  Remaining Claims Against FSR

All that remains are plaintiffs' claims against FSR, which, unlike the Warner defendants, did not move to dismiss plaintiffs' amended complaint. As to FSR, plaintiffs have raised claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. As outlined below, FSR's motion for summary judgement is granted with respect to each claim.

The Court's ruling with respect to the breach of contract claim is informed by its prior ruling regarding the Warner defendant's motion to dismiss. In that ruling, the Court explained that "the contract itself refers only to an agreement between plaintiffs and 'Hotel 57 Services, L.L.C. (hereinafter referred to as Four Seasons Hotel New York).'" ECF No. 78, Memorandum Order, at 8. In reaching that conclusion, the Court considered the argument that plaintiffs now raise in opposition to FSR's motion for summary judgment, namely that various parts of the EmPact Agreement specifically refer to "Four Seasons Hotels and Resorts" and "Four Seasons Hotel New York." See, e.g., EmPact Agreement at 5, 9. As the Court explained in its prior ruling, "[t]he part of the contract that specifically refers to consideration and provides for a mutual exchange of promises between plaintiffs and a counterparty . . . refers only to a contract between an employee and 'Hotel 57 Services, L.L.C." Memorandum Order, at 8-9. Because FSR is not a party to the EmPact agreement, it could not have

breached its terms. Accordingly, the Court grants FSR's motion with respect to plaintiffs' breach of contract claim.

The Court similarly grants FSR's motion with respect to plaintiffs' claim that it breached the implied covenant of good faith and fair dealing. Under New York law, "implicit in every contract is a covenant of good faith and fair dealing as a matter of law." N.Y. Univ. v. Continental Ins. Co., 87 N.Y. 2d 308, 318 (N.Y. 1995); see also M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (restating the same principle of New York law). Because there is no contractual relationship between plaintiffs and FSR, they do not share the implied covenant, and the Court must dismiss plaintiffs' claim.

Finally, the Court grants FSR's motion as to plaintiffs' promissory estoppel claim. In their memorandum in opposition to FSR's motion for summary judgment, plaintiffs state that they "do not oppose Defendant FSR's motion to dismiss the promissory estoppel claim." ECF No. 121, at 25 n.140. And, in any event, under New York law, promissory estoppel claims are precluded if a "valid and enforceable written contract, even an implied contract, governs the relevant subject matter." Goldberg v. Pace University, 88 F.4th 204, 214 (2d Cir. 2023). Here, the relevant "subject matter" is the Hotel's obligation to provide no-fault separation pay under the EmPact Agreement, an enforceable contract between plaintiffs and Hotel 57 Services. For both reasons, the Court

dismisses plaintiffs' remaining promissory estoppel claim against FSR.

III. Conclusion

For the reasons stated above, the Court grants FSR's motion for summary judgment in full, and grants in part and denies in part the Warner defendants' motion for summary judgment. The case shall proceed against Hotel 57 Services as to plaintiffs' federal and state WARN Acts claims only. Because the Court has therefore dismissed all the claims applicable to the EmPact class, the EmPact class is hereby decertified. The Clerk of Court is hereby directed to close ECF Numbers 81, 82, and 83.

SO ORDERED.

New York, NY

3/31/, 2025

JED S. RAKOFF, U.S.D.J.