# Exhibit X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Hotel 57 L.L.C. and 1260 BB Property, LLC | |
| Plaintiffs, | |
| -against- | Case No. _____ |
| FSR International Hotels Inc. and Four Seasons Hotels Limited, | |
| Defendants. | |

## **PETITION FOR APPOINTMENT OF ARBITRATORS**

Hotel 57 L.L.C. and 1260 BB Property, LLC (collectively, "Owner") petition this Court pursuant to 9 U.S.C. §§ 5 & 206 for an order resolving the breakdown of the arbitrator selection process in an arbitration pending before the American Arbitration Association ("AAA") between Owner and Respondents, FSR International Hotels Inc. and Four Seasons Hotels Limited (collectively, "Four Seasons"). Owner respectfully requests that this Court order the parties to each select one party-appointed arbitrator, with the third to be chosen either by the two party-appointed arbitrators or, failing that, the AAA; or, in the alternative, that this Court appoint a panel of three arbitrators from among the candidates proposed by the parties, selecting at least one arbitrator with experience in the hospitality industry.

In support of this Petition, Owner submits the Affirmation of Gregory J. Scandaglia and its annexed exhibits,[1] along with the Memorandum of Law filed herewith, and further states as follows:

---

[1] Exhibits to the Scandaglia Decl. are cited herein as "Ex. __."

## NATURE OF THE ACTION

1.      This action arises out of the parties' inability to constitute an arbitral panel to hear a dispute regarding Four Seasons' contractual and fiduciary breaches in its management of two storied hotel properties owned by Owner in New York City (Four Seasons Hotel New York) and Santa Barbara, California (Four Seasons Resort The Biltmore Santa Barbara).

2.      The underlying arbitration agreement between Owner and Four Seasons provides that their dispute shall be resolved by a panel of three arbitrators.  For more than _five_ months, the parties have attempted to constitute the panel.  During that time, they have collectively exchanged _eight_ lists of potential arbitrators and considered _sixty-five_ different candidates.  But the parties have not reached agreement on even one arbitrator – let alone the three necessary to form the panel – and there is no prospect that they will reach agreement in the future as the parties have fundamentally different perspectives on the appropriate composition of the panel.  Because neither the selection protocol nor the applicable arbitration rules provide any mechanism for appointing an arbitrator absent mutual consent, the parties are stuck at an impasse that will indefinitely delay the arbitration proceedings absent court intervention.

3.      Accordingly, pursuant to 9 U.S.C. §§ 5 and 206, Owner commences this proceeding seeking an Order to break the parties' impasse.  To resolve the existing deadlock, the Court should order that arbitrators be selected in accordance with the selection process set forth in the two hotel management agreements that govern the parties' relationship.  Under that process, Owner and Four Seasons are to each select one party-appointed arbitrator and the third is to be chosen either by the two party-appointed arbitrators or, failing that, the AAA.

4.      In the alternative, should this Court be disinclined to revert to the process under the hotel management agreements, it still should exercise its authority to directly appoint all three

arbitrators. In that event, Owner respectfully submits that the Court should consider candidates proposed by the parties and constitute a panel from among those options. In doing so, the Court should select at least one arbitrator with experience in the hospitality industry, which will provide the panel with appropriate balance and experience to assess and resolve the parties' claims and defenses.

5.     At present, the parties are trapped in a selection process that has proven fundamentally unworkable and lacks any mechanism for breaking the existing deadlock. As such, the parties cannot proceed with their arbitration and Owner cannot have its claims against Four Seasons heard and resolved on the merits. That is an untenable situation. The Court can and should resolve the impasse by exercising its statutory authority under the FAA and the New York Convention.

## THE PARTIES

6.     Hotel 57 L.L.C. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Illinois. Hotel 57 L.L.C. owns Four Season Hotel New York, which is located at 57 East 57th Street in New York, New York.

7.     1260 BB Property, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business in Illinois. 1260 BB Property, LLC owns the Four Seasons Resort The Biltmore Santa Barbara, which is located at 1260 Channel Dr., Santa Barbara, California.

8.     FSR International Hotels Inc. ("FIH") is a corporation organized under the laws of Nevada, with its principal place of business in Toronto, Canada.

9.     Four Seasons Hotels Limited ("FSHL") is a foreign corporation organized under the laws of Canada, with its principal place of business in Toronto, Canada.

3

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 9 U.S.C. § 200 *et seq.*, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). The New York Convention applies to this proceeding because it involves an arbitration agreement that arises out of a commercial relationship and at least one party is a citizen of a foreign state.  Section 203 of the New York Convention provides that "district courts of the United States . . . shall have original jurisdiction" over proceedings to which the New York Convention applies.  9 U.S.C. § 203.

11.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that the controversy is between the citizens of different States and citizens of a foreign state and the amount at issue in this dispute exceeds $75,000.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3) because the parties, through a written agreement, consented to venue in this Court.

13.     Venue is also proper in this district pursuant to the New York Convention because the arbitration agreement at issue here provides that the situs of the arbitration shall be New York, New York.  9 U.S.C. § 204.

## FACTUAL BACKGROUND

### A.     Owner Terminates the Parties' Agreements Due to Four Seasons' Breaches.

14.     More than two decades ago, Owner acquired Four Seasons Hotel New York ("FSNY") and Four Seasons Resort The Biltmore Santa Barbara ("FSSB").  Since then, Owner has invested hundreds of millions of dollars in the hotels to fund extensive renovations, to perform ongoing maintenance, and to support day-to-day operations.  Owner's return on that investment

ultimately depends on the management and performance of the properties, and any losses generated by unprofitable operations are born solely by Owner.

15.     To manage each hotel, Owner turned to Four Seasons.  The parties entered into two separate HMAs, one governing the management of FSNY – the Second Amended and Restated Hotel Management Agreement, dated as of August 1, 1996 (as amended, the "FSNY HMA," Ex. 1) – and the other governing the management of FSSB – the Hotel Management Agreement, dated as of November 8, 1995 (as amended, the "FSSB HMA," Ex. 2) (collectively, the FSNY HMA and the FSSB HMA may be referred to as the "HMAs").  The HMAs governed the management of the hotels and set forth obligations that Four Seasons owed to Owner, including duties to maximize profits and minimize costs while operating the properties consistent with the standard of world class luxury hotels.

16.     The dispute underlying this action relates to Four Seasons' mismanagement of FSNY and FSSB in violation of its contractual and fiduciary duties to the direct and substantial financial detriment of Owner.  As a result of Four Seasons' breaches, Owner served detailed default notices on Four Seasons in February 2021, and then, after Four Seasons failed to cure those defaults, served notices in March 2021 terminating Four Seasons' management of both hotels under the HMAs.  However, Four Seasons refused to vacate the properties and contested Owner's termination of the HMAs, and an arbitration before the AAA was initiated on March 29, 2022.

   **B.     The Parties' Arbitration Agreement.**

17.     Each HMA contains an arbitration provision.  (Exs. 1, 2.)  After the parties' dispute arose, the parties recognized that the HMAs would require the parties to conduct two separate arbitrations before separate panels to resolve their disputes at each property.  On July 28, 2021, the parties entered into a letter agreement (the "Letter Agreement"), to provide for a single,

consolidated arbitration in New York, New York before a panel of three neutral, impartial and independent arbitrators.  Pursuant to Letter Agreement, unless otherwise modified, the arbitration provisions of the HMAs remained in full force and effect.

**C.  The Arbitrator Selection Process.**

18.     The HMAs provide that arbitrable disputes are to be resolved by a panel of three arbitrators, and incorporate a well-established and common process for the selection of arbitrators in complex commercial disputes.  Each party is to appoint one arbitrator.  Then, within ten days of their appointment, the two party-appointed arbitrators (or, failing that, the AAA) nominate a third independent arbitrator (who, in certain types of disputes, must have at least ten years of experience in the luxury hotel business).

19.     After arbitration was initiated before the AAA, Owner and Four Seasons entered into a Stipulated Arbitration Protocol dated May 17, 2022 (the "Protocol").  In addition to addressing the scope of discovery in the arbitration, the Protocol established a new, consensus-based process for selecting arbitrators.  The parties expected that this process would result in the prompt constitution of a complete panel.

20.     Under the Protocol, each party was to simultaneously submit the names of eight potential arbitrators to the AAA.  In the event that a candidate appeared on both lists, the AAA would obtain certain disclosures from the candidate.  The AAA then was to provide those disclosures to the parties along with the names of all other candidates identified on the lists (*i.e.*, those who were identified by only one party as potential arbitrators).  After that, each party had an opportunity to select an unmatched candidate from the other's list that it found acceptable.  The parties then would jointly telephonically contact the selected candidates.  If one of those candidates confirmed their availability and willingness to serve, then that candidate became a member of the

panel (subject to the subsequent use of preemptory strikes by either party).  This process was to be repeated every seven business days until a panel was formed.

        **D.**      **The Arbitrator Selection Process Has Reached an Impasse.**

21.     In the five months since the parties entered into the Protocol, they have failed to agree on a single arbitrator.  Despite exchanging <u>eight lists</u> of potential arbitrators – on June 7, 2022, June 28, 2022, July 20, 2022, October 11, 2022 – and identifying a total of <u>sixty-five</u> potential arbitrators, there has been not a single overlap between the respective lists.

22.     The parties have jointly interviewed five potential arbitrators – Hon. Kathleen Roberts (on June 20, 2022), Hon. Eileen Brewer (on June 21, 2022), Hon. Ariel Belen (on July 14, 2022), Hon. Richard Holwell (on August 24, 2022), and Daniel Larken (on September 14, 2022) – and attempted to interview two more candidates who were unavailable (Hon. Barbara Jones) or conflicted from the dispute (Hon. Ruben Castillo).

23.     On October 6, 2022, after months of deadlock and with no agreed arbitrators, Owner sent Four Seasons a letter chronicling the parties' unsuccessful efforts to select an arbitral panel, and acknowledged that the parties had reached an impasse.  Owner expressed its willingness, at Four Seasons' request, to exchange one more round of lists, but cautioned that the impasse was prejudicing Owner and could not be allowed to persist indefinitely.

24.     Despite months of efforts, the parties have not agreed on the appointment of even one arbitrator.

25.     During the list-and-interview process, Owner's focus remained on promptly and fairly constituting a panel.  To that end, Owner expressed a willingness to consider alternative selection procedures.  Owner proposed using a rank-and-strike method and also proposed reverting to the party arbitrator-based selection process under the HMAs.  While, at one point, Four Seasons'

counsel promised to create a written rank-and-strike protocol for consideration, none was ever provided and Four Seasons never agreed to pursue any alternative method that could have broken the parties' deadlock.

26.     The parties' impasse is in part inherent to the structure of the Protocol – which requires mutual consent for the appointment of all candidates – but is also partly philosophical. Throughout the arbitrator selection process, Owner has expressed its belief that at least one panel member should be an individual possessing experience in the hospitality industry.  But Four Seasons has rejected every industry candidate proposed by Owner, has not proposed a single industry candidate of its own, and has stated that it does not believe a viable industry candidate can be selected.

### E.     Court Intervention Is Warranted To Appoint An Arbitration Panel.

27.     In light of the disagreement between the parties and the structure of the Protocol selection process, it is inevitable that the parties' impasse will persist indefinitely.  More than five months have elapsed since the parties entered into the Protocol.  During that period, they collectively have proposed and considered sixty-five candidates.  Yet the parties have not agreed to even one of the three arbitrators necessary to form a panel.  There is no mechanism to resolve this impasse under the Protocol.  Court intervention thus is necessary to break the deadlock.

28.     The HMAs themselves provide a practical and appropriate selection method to resolve the parties' impasse.  Each of the HMAs provides, in relevant part, that in the event of an arbitration, each party shall appoint one arbitrator and the third shall be chosen by agreement of the two-party appointees or, failing that, the AAA.  The Court should order that the appointments be made in that manner as it reflects the previous express written agreement of the parties.

29.     If the Court is disinclined to use the process agreed to by the parties in the HMAs, it alternatively should resolve the impasse by directly appointing all three arbitrators from the candidates proposed by the parties during the list-and-interview process.  Owner respectfully requests that any such panel have at least one arbitrator who has direct experience in the hospitality industry.  The underlying arbitration between the parties involves a significant and highly complex dispute related to the management of two world-class luxury hotels that implicates lengthy and complex hotel management agreements, a wide range of operations from labor and revenue management to maintenance to capital expenditures, and various industry customs, practices and standards.  An individual with hotel industry expertise would enhance a panel by assisting the arbitrators in processing, contextualizing, and understanding the industry-specific issues and evidence that will be part of the arbitration.  Therefore, any panel constituted by direct appointment of the Court should include at least one industry arbitrator.

## CLAIM FOR RELIEF

30.     Section 206 of the New York Convention provides that a court having jurisdiction may "appoint arbitrators in accordance with the provisions of the agreement" entered into by the parties.

31.     Further, under Section 5 of Title 9 of the United States Code, "if for any . . . reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire . . . then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require."  Section 5's lapse standard requires nothing more than "a lapse in time in the naming of the arbitrator . . . or some other mechanical breakdown in the arbitrator selection process."  *Odyssey Reinsurance Co. v. Certain Underwriters at Lloyd's*

*London Syndicate 53*, 615 F. App'x 22, 22-23 (2d Cir. 2015) (quoting *In re Salomon Inc. S'holders' Derivative Litig.,* 68 F.3d 554, 560 (2d Cir.1995)) (emphasis added).

32. As set forth above, there has been a breakdown in the arbitrator selection process for the underlying arbitration.

33. Because of the Protocol's reliance on consensus and the parties' fundamental disagreement about the appropriate composition of a panel, the parties cannot resolve their impasse absent court intervention.

34. Owner respectfully requests this Court enter an Order mandating that the parties, consistent with the arbitration provisions in the HMAs, each select one party-appointed arbitrator, with the third to be chosen either by the two party-appointed arbitrators or, failing that, the AAA; or, in the alternative, appointing a panel of three arbitrators from among the candidates proposed by the parties, including at least one arbitrator with experience in the hospitality industry.

**WHEREFORE,** Petitioners respectfully request that this Court:

A. Issue an Order directing the parties to each select one party-appointed arbitrator, with the third to be chosen either by the two party-appointed arbitrators or, failing that, the AAA; or, in the alternative, directing the appointment of three arbitrators from among the candidates proposed by the parties, including at least one arbitrator with experience in the hospitality industry; and

B. Grant Petitioners such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       October 31, 2022

Respectfully submitted,

   _/s/ Todd E. Soloway_
Todd E. Soloway
Bryan T. Mohler
PRYOR CASHMAN LLP
7 Times Square, 40th Floor
New York, NY 10036
Phone: (212) 421-4100
Fax: (212) 326-0806
Email: tsoloway@pryorcashman.com
       bmohler@pryorcashman.com

Gregory J. Scandaglia
(*pro hac vice* application forthcoming)
Joseph R. Swee
(*pro hac vice* application forthcoming)
SCANDAGLIA RYAN LLP
55 E. Monroe Street, Suite 3440
Chicago, IL 60603
Phone: (312) 580-2020
Fax: (312) 782-3806
Email: gscandaglia@scandagliaryan.com
       jswee@scandagliaryan.com

*Counsel for Petitioners Hotel 57 L.L.C. and 1260 BB Property, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Hotel 57 L.L.C. and 1260 BB Property, LLC<br><br>     Plaintiffs,<br><br>    -against-<br><br>FSR International Hotels Inc. and Four Seasons<br>Hotels Limited,<br><br>     Defendants. | Case No. _____ |

**DECLARATION OF GREGORY J. SCANDAGLIA IN SUPPORT OF
PETITION FOR APPOINTMENT OF ARBITRATORS**

Pursuant to 28 U.S.C. § 1746, GREGORY J. SCANDAGLIA declares:

1.     I am a founder and partner at the law firm Scandaglia Ryan LLP, counsel for Petitioners Hotel 57 L.L.C. and 1260 BB Property, LLC (collectively, "Owner") in this action. I submit this declaration in support of Owner's Petition for the Appointment of Arbitrators.

**The Parties' Relationship and the Underlying Dispute**

2.     More than two decades ago, Owner acquired two luxury hotel properties, Four Seasons Hotel New York ("FSNY") and Four Seasons Resort The Biltmore Santa Barbara ("FSSB"). Since acquiring the FSNY and FSSB, Owner has invested hundreds of millions of dollars in the operation, maintenance, and renovation of the hotels. Owner's return from the hotels depends on the performance of the properties, and Owner must bear losses suffered at the properties.

3.     FSR International Hotels Inc. and Four Seasons Hotels Limited (collectively, "Four Seasons") were engaged to manage FSNY and FSSB pursuant to separate hotel management agreements ("HMAs"). Attached as <u>Exhibit 1</u> hereto is a true and correct copy of relevant excerpts

of the Second Amended and Restated Hotel Management Agreement, dated as of August 1, 1996 (as amended, the "FSNY HMA").  Attached as <u>Exhibit 2</u> hereto is a true and correct copy of relevant excerpts of the Hotel Management Agreement, dated as of November 8, 1995 (as amended, the "FSSB HMA").

4.      The HMAs governed the management of the FSNY and FSSB and set forth obligations that Four Seasons owed to Owner, including duties to maximize profits and minimize costs while operating the properties consistent with the standard of world class luxury hotels. Under the HMAs, Four Seasons was the express fiduciary of Owner and was required to manage the hotels consistent with duties of care and loyalty for the ultimate benefit of Owner.

5.      The dispute underlying this action relates to Four Seasons' extensive mismanagement of FSNY and FSSB in violation of its contractual and fiduciary duties to the direct and substantial financial detriment of Owner, as detailed in default notices served on Four Seasons in February 2021.

6.      On March 24, 2021, after Four Seasons failed to cure the noticed defaults, Owner served notice on Four Seasons terminating the HMAs.  In response to the termination notices, Four Seasons refused to vacate the properties and contested Owner's termination of the HMAs.  An arbitration before the AAA, which is currently pending, was initiated on March 29, 2022.

**<u>The Parties' Arbitration Agreement</u>**

7.      Each HMA contains an arbitration provision.  (Ex. 1, FSNY HMA, § 20.03; Ex. 2, FSSB HMA, § 19.03.)  Recognizing that, absent modification, the HMAs would require the parties to conduct two arbitration proceedings, in July 2021 the parties entered into a letter agreement (the "Letter Agreement") providing for a "single, consolidated arbitration . . . in New York, New York before a panel of three neutral, impartial and independent arbitrators."

8.     Together, the HMAs and the Letter Agreement provide that the arbitration is to be conducted under the auspices of the AAA and governed by the AAA's Commercial Arbitration Rules.  (Ex. 1, FSNY HMA, § 20.03(c); Ex. 2, FSSB HMA, § 19.03(c).)  The Letter Agreement further provided that "the FSNY HMA and the FSSB HMA remain[ed] in full force and effect" except to the extent modified therein.

**The Arbitrator Selection Process**

9.     The HMAs provide that arbitrable disputes among the parties shall be resolved by a panel of three arbitrators.  (Ex. 1, FSNY HMA, § 20.03(a); Ex. 2, FSSBY HMA, § 19.03(a).) Each HMA incorporates a well-established and common selection process for complex commercial disputes.  Each party is to appoint one arbitrator.  (Ex. 1, FSNY HMA, §20.03(a); Ex. 2, FSSB HMA, § 19.03(a).)  Then, within ten days of their appointment, the two party-appointed arbitrators are to nominate a third independent arbitrator (who, in certain types of disputes, must have at least ten years of experience in the luxury hotel business).  (Ex. 1, FSNY HMA, §20.03(a); Ex. 2, FSSB HMA, § 19.03(a).)  In the event the party-appointed arbitrators are unable to agree upon the third panel member, then the AAA is to complete the panel by making the final appointment.  (Ex. 1, FSNY HMA, §20.03(a); Ex. 2, FSSB HMA, § 19.03(a).)  This is the same arbitrator selection procedure called for under Rules R-13 and R-14 of the AAA's Commercial Arbitration Rules.[1]

10.     After the underlying arbitration was initiated, Owner and Four Seasons entered into a Stipulated Arbitration Protocol dated May 17, 2022 (the "Protocol"), which set forth certain agreements on the scope of discovery and included a new, consensus-based process for selecting arbitrators.  Attached hereto as Exhibit 3 is a true and correct copy of the Protocol.

---

[1] *See* AAA Commercial Rules and Mediation Procedures, *available at* https://adr.org/sites/default/files/Commercial%20Rules.pdf.

3

11.     Under the Protocol, each party was to simultaneously submit the names of eight potential arbitrators to the AAA.  In the event that a candidate appeared on both lists (a "joint candidate"), the AAA would obtain certain disclosures from the candidate.  The AAA then was to provide those disclosures to the parties along with the names of all other candidates identified on the lists (*i.e.*, those who were identified by only one party as potential arbitrators).  After that, each party had an opportunity to identify any unmatched candidate from the other's list that it found acceptable (a "matched candidate").  The parties then would jointly telephonically contact the joint candidates and the matched candidates.  If one of those candidates confirmed their availability and willingness to serve, then that candidate became a member of the panel (subject to the subsequent use of preemptory strikes by either party).  This process was to be repeated every seven business days until a panel was formed.

**The Breakdown of the Selection Process**

12.     On June 7, 2022, each party submitted its first list of eight candidates to the AAA.  Attached as Exhibit 4 hereto is a true and correct copy of Owner's first list of candidates submitted on June 7, 2022.  Attached as Exhibit 5 hereto is a true and correct copy of Four Seasons' first list of candidates submitted on June 7, 2022.

13.     No candidate appeared on both of the parties' June 7th lists.  Understanding that the process under the Protocol could devolve into an endless exchange of candidate lists, the parties agreed to defer the exchange of additional lists and to convene joint interviews of two candidates – one identified by each party – to assess their suitability as arbitrators.  I participated in interviews with the Honorable Kathleen Roberts, nominated by Four Seasons, on June 20, 2022, and with the Honorable Eileen Brewer, nominated by Owner, on June 21, 2022.

4

14.     These interviews (as with all subsequent interviews) were extended and substantive, taking roughly an hour or more.  In these interviews, counsel for the parties asked the potential arbitrators numerous questions regarding their personal and professional background, legal, industry and other experience, and perspective on arbitration proceedings.  Ultimately, the parties did not agree to the appointment of either Judge Roberts or Judge Brewer, or any of the other proposed arbitrators identified on their respective June 7th lists.

15.     On June 28, 2022, each party submitted its second list of eight candidates to the AAA.  Attached as Exhibit 6 hereto is a true and correct copy of Owner's second list of candidates submitted on June 28, 2022.  Attached as Exhibit 7 hereto is a true and correct copy of Four Seasons' second list of candidates submitted on June 28, 2022.

16.     No name appeared on both parties' June 28th lists and the parties agreed to delay the exchange of the next set of lists while they interviewed potential arbitrators.

17.     On July 14, 2022, I participated in a joint interview of the Honorable Ariel Belen, who was a candidate from Owner's second list.  Ultimately, the parties did not reach agreement on the appointment of Judge Belen or any of the other proposed arbitrators identified on their respective June 28th lists.

18.     On July 20, 2022, each party submitted its third list of eight candidates to the AAA.  Attached as Exhibit 8 hereto is a true and correct copy of Owner's third list of candidates submitted on July 20, 2022.  Attached as Exhibit 9 hereto is a true and correct copy of Four Seasons' third list of candidates submitted on July 20, 2022.

19.     No name appeared on both parties' July 20th lists, and the parties again agreed to delay the next set of lists while they interviewed potential arbitrators.  The parties sought to

interview the Honorable Barbara Jones (who had been identified on Four Seasons' initial June 7th list) but she was unable to serve as an arbitrator due to other commitments.

20.     On August 24, 2022 and September 14, 2022 respectively, the parties conducted interviews of the Honorable Richard Holwell (who was identified in Four Seasons' June 7th list) and Mr. Daniel Larkin (who Owner proposed as an arbitrator outside of the parties' list exchange process).  But the parties did not agree on the appointment of either, or any of the other proposed arbitrators identified on their respective July 20th lists.

21.     On October 6, 2022, on behalf of Owner, I wrote a letter to counsel for Four Seasons chronicling the parties' unsuccessful efforts to select an arbitral panel to date and acknowledging that the parties had reached an impasse.  I further expressed Owner's willingness, at Four Seasons' request, to exchange one more round of lists, but cautioned that the impasse was prejudicing Owner and could not be allowed to persist indefinitely.

22.     On October 11, 2022, each party submitted its fourth list of eight candidates to the AAA.  Attached as Exhibit 10 hereto is a true and correct copy of Owner's fourth list of candidates submitted on October 11, 2022.  Attached as Exhibit 11 hereto is a true and correct copy of Four Seasons' fourth list of candidates submitted on October 11, 2022.

23.     No name appeared on both parties' October 11th lists, and the parties again agreed to consider interviewing potential arbitrators.  The parties contacted the Hon. Ruben Castillo (from Owner's fourth list) for a potential interview, but he responded that he had a disqualifying conflict.  No further interviews were conducted. The parties did not agree on the appointment of any proposed arbitrators identified on their respective October 11th lists.

**Owner's Efforts to Break the Impasse and Constitute a Panel**

24.     Throughout the arbitrator selection process, Owner has consistently maintained that – given the complex, fact-intensive, and industry-specific nature of the parties' dispute – an appropriate panel should have at least one arbitrator with direct experience in the hospitality industry.  Industry candidates are routinely appointed in complex commercial arbitrations, and the HMAs recognize that industry arbitrators play a unique role, requiring that, for certain types of disputes, the third arbitrator have at least ten years of experience in the hotel business.  Four Seasons has rejected every industry candidate proposed by Owner, has refused to propose any of its own industry candidates, and has stated that it does not believe a viable industry candidate can be selected.  The parties' fundamental disagreement about the composition of an appropriate panel has created an impasse in the arbitration selection process provided for in the Protocol, which requires mutual consent of the parties to constitute a panel.

25.     During the list-and-interview process, Owner's focus remained on promptly and fairly constituting a panel.  To that end, Owner expressed a willingness to consider alternative selection procedures.

26.     For example, I proposed using a rank-and-strike method, which is common in complex commercial disputes and is the default selection method under the AAA's Commercial Arbitration Rules.  (*See* AAA Rule R-12.)  Four Seasons' counsel, at one point, agreed to create a written rank-and-strike protocol for consideration.  But, none was ever provided.

27.     I also proposed reverting to the party arbitrator-based selection process set forth in the FSNY HMA and the FSSB HMA.

28.     To date, Four Seasons has not agreed to pursue any alternative method that could lead to the constitution of a panel.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      October 31, 2022
               Chicago, Illinois

                                      GREGORY J. SCANDAGLIA, ESQ.

# EXHIBIT 1

# SECOND AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

# A M O N G

# REGENT INTERNATIONAL HOTELS, INC.

## And

## HOTEL 57 L.L.C.

## FOUR SEASONS HOTEL, NEW YORK

Dispute within 10 additional days. failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 20.02(b). If either party shall fail to appoint an expert as required hereunder. the expert appointed by the other party shall be the sole expert. Within 90 days after the experts (or such single expert) have been retained. the experts (or such single expert) shall. on a non-binding basis. advise the parties in writing of their views. The expenses of the experts (or such single expert) shall be borne equally; and

(c)     third. if the parties are still unable to resolve the Dispute within such 90 day period. the parties shall resort to the arbitration procedures set forth in section 20.03; and

(d)     fourth. any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of this Agreement.

**20.03     Arbitration**

Except as otherwise provided in section 19.04 and this section 20.03. any Dispute arising out of or relating to this Agreement shall be settled by arbitration as follows:

(a)     each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration. Within 10 days after receipt by the other party of such notice. each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall nominate a third independent arbitrator; provided that in the case of any arbitration in respect of sections 19.05 and 19.06(a). such third arbitrator shall be an independent arbitrator with at least ten years experience in the luxury hotel business in the target market in which the

Hotel competes and a partner of either Pannell, Kerr, Forster or one of the four largest firms of Certified Public Accountants in the United States. If within such 10 day period the two arbitrators fail to nominate the third arbitrator, upon written request of either party, the third arbitrator shall be appointed by the American Arbitration Association and both parties shall be bound by the appointment so made. If either party shall fail to appoint an arbitrator as required under this section 20.03(a), the arbitrator appointed by the other party shall be the sole arbitrator of the matter;

(b) the decision of the arbitrators (or such single arbitrator) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to, if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final, conclusive and binding upon the parties hereto, and may be enforced in any court having jurisdiction;

(c) the arbitration shall be held at New York City and, except for those procedures specifically set forth in this section 20.03, shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof; and

(d) the arbitrators (or such single arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 20.03 either Owner or Operator shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 23.09 and 23.10 governing jurisdiction and service of process shall govern) seeking such mandatory, declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the

obligations contained herein pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 20.03. (ii) commence legal proceedings (in which case the provisions of section 23.09 and 23.10 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement. or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of this Agreement.

## ARTICLE XXI
## OPERATOR'S LIABILITY

### 21.01    Standard of Care

Operator shall not. in the performance of its obligations under this Agreement. be liable to Owner or to any other Person for any act or omission (whether negligent. tortious or otherwise) of Operator or any of its Affiliates engaged by Operator to assist Operator in the performance of its obligations under this Agreement or any of their respective directors. officers. employees. consultants. agents or representatives. except only to the extent such liabilities. obligations. claims. costs and expenses arise out of or are caused by the wilful misconduct. gross negligence or bad faith of Operator or any of its Affiliates or any of their respective directors. officers. employees. consultants. agents or representatives.

### 21.02    Indemnities

(a)    Owner hereby indemnifies and holds Operator and its Affiliates and any of their respective directors. officers. employees. consultants. agents and representatives (collectively. the "Indemnified Parties") harmless from and against any and all liabilities. fines. suits. claims. obligations. damages. penalties. demands. actions. costs and expenses of any kind or nature (including. without limitation. legal fees) arising out of any action or omission or course of action on the part of an

# Exhibit 2

# SECOND AMENDED AND RESTATED HOTEL MANAGEMENT AGREEMENT

## A M O N G

## REGENT INTERNATIONAL HOTELS, INC.

### And

## HOTEL 57 L.L.C.

## FOUR SEASONS HOTEL, NEW YORK

**9.03**     Use of Proprietary Materials by Owner

(a)     Owner shall not use or permit the use of any Proprietary Materials, save and except in accordance with this Agreement and the Proprietary Materials License Agreement.

(b)     Owner shall not disclose or permit the disclosure of any Proprietary Materials at any time to any Person, save and except in accordance with section 9.03(d) or (e) or as may be permitted by Operator pursuant to this Agreement or the Proprietary Materials License Agreement or to those agents, representatives, employees, officers or directors of Owner that must have access to any Proprietary Materials to exercise the rights, or to perform the obligations, of Owner under this Agreement and only for such purposes. Owner shall use its reasonable efforts to ensure that any such Person is aware of the confidential and proprietary nature of the Proprietary Materials and agrees to abide by the same restrictions in respect thereof as are applicable to Owner under this Agreement.

(c)     Owner shall not release any written material (whether in a prospectus, information circular, offering document, marketing campaign or otherwise) or issue any press release or make any other public statement or release any material containing Proprietary Materials or in any way relating to this Agreement or to the Hotel or

to Operator or to any of its Affiliates without the prior written consent of Operator, which consent may be unreasonably withheld and delayed.

**(d)**     The obligations of Owner to Operator under this section 9.03 shall not apply to any Proprietary Materials which (i) are or become generally available to the public other than as a result of the action of Owner or any of its Affiliates or any of their respective agents, representatives, employees, officers or directors, (ii) become available to Owner on a non-confidential basis from a source other than Operator or any of its Affiliates or any of their respective agents, representatives, employees, officers or directors; provided that such source is not bound by a confidentiality agreement with Operator or any of its Affiliates or any of their respective agents, representatives, employees, officers or directors or otherwise prohibited from transmitting Proprietary Materials to Owner by a contractual, legal or fiduciary obligation, or (iii) was known to Owner on a non-confidential basis prior to disclosure to Owner by Operator or any of its Affiliates or any of or any of their respective agents, representatives, employees, officers or directors.

**(e)**     In the event that Owner or any of its Affiliates or any of their respective agents, representatives, employees, officers or directors become compelled by any Applicable Law to disclose any Proprietary Materials, Owner shall provide Operator with prompt written notice so that Operator may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, Owner or any of its agents, representatives, employees, officers or directors will furnish only that portion of such Proprietary Materials which is required by any Applicable Law and each such Person shall exercise its reasonable efforts to obtain reliable assurances that confidential treatment will be accorded such Proprietary Materials.

(f)    Owner acknowledges and agrees that Operator would not have an adequate remedy at law and would be irreparably harmed in the event that any of the provisions of this section 9.03 were not performed in accordance with their specific terms or were otherwise breached. Accordingly, Owner agrees that Operator shall be entitled to injunctive relief to prevent any breach of this section 9.03 and to specifically enforce the terms and provisions hereof in addition to any other remedy to which Operator may be entitled at law or in equity.

(g)    Operator shall not issue any press release or make any public statement concerning Owner except for press releases, public statements and articles featuring the Hotel or as may be required by Applicable Law. Operator shall notify Owner prior to the issuance of any press releases, public statements or articles featuring the Hotel, where practicable, and shall provide Owner with a copy of all such press releases, public statements and articles. Operator shall not disclose or permit the disclosure of confidential information relating to the financial status of the Hotel, except as may be required by Applicable Law or except as may be permitted by Owner or to those agents, consultants, representatives, employees, officers or directors of Operator that must have access to such information to exercise the rights, or to perform the obligations of Operator under this Agreement and only for such purposes. Operator shall use its reasonable efforts to ensure that any such Person is aware of the confidential nature of such information and agrees to abide by the same restrictions in respect thereof as are applicable to Operator under this Agreement.

**19.05**     <u>**Owner's Right to Terminate**</u>

(a)     Subject to the provisions of sections 19.05(b), 19.05(c) and 19.05(d) and in addition to any right arising out of section 19.02, Owner shall have the right to terminate this Agreement at any time following the Termination Test Effective

Date, if, in the two consecutive Fiscal Years immediately preceding the date of calculation of Net Operating Profit (any such two consecutive Fiscal Years a "Test Period"), the Hotel does not achieve positive Net Operating Profit.

**(b)**     Notwithstanding the provisions of section 19.05(a). Owner's right to terminate this Agreement in respect of any Test Period shall only be exercised (i) by written notice by Owner to Operator within 90 days of receipt by Owner of the statement of profit and loss of the Hotel from Operator in accordance with section 10.07(b) for the immediately preceding Fiscal Year. and (ii) with respect to the operations of the Hotel in the immediately preceding Test Period.

**(c)**     Notwithstanding the provisions of section 19.05(a). Owner shall not have the right to terminate this Agreement in respect of any Test Period. if:

       **(i)**     during either Fiscal Year of such Test Period,

           **(A)**     (1) the Achieved Room Revenue of the Hotel for such Fiscal Year is equal to or greater than the Achieved Room Revenue of any one of the top five Comparable Hotels for such Fiscal Year ranked in terms of Achieved Room Revenue (the "Test Hotels") or (2) if the number of Comparable Hotels are equal to or less than eight, the Achieved Room Revenue of the Hotel for such Fiscal Year is equal to or greater than the Achieved Room Revenue of any one of the top four Comparable Hotels for such Fiscal Year ranked in terms of Achieved Room Revenue (in either case, the "Test Hotels"), and

(B)  the Achieved Profit For Rooms Available of the Hotel for such Fiscal Year is equal to or greater than the Achieved Profit For Rooms Available of any one of the Test Hotels for such Fiscal Year: or

(ii)  Operator or any of its Affiliates pays to Owner an aggregate amount equal to the amount by which the Hotel failed to achieve positive Net Operating Profit in the second Fiscal Year of such Test Period.

(d) Notwithstanding the provisions of section 19.05(a). Owner shall not have the right to terminate this Agreement in respect of any Test Period. if. during either Fiscal Year of such Test Period one or more of the following events occurs, which event or events in their totality. after giving effect to the proceeds received from any applicable business interruption insurance. materially and adversely affect Net Operating Profit. Achieved Room Revenue or Achieved Room Profit:

(i)  damage or destruction to all or any part of the Hotel:

(ii)  a Capital Refurbishing Program affecting 20% or more of the Hotel:

(iii)  interference by any Governmental Authority;

(iv)  expropriation of all or any part of the Hotel:

(v)  strikes, walkouts or lock-outs:

(vi)  wars, fires, acts of God. disasters. riots. boycotts or shortages of material or labour: or

- 89 -

     (vii)     any other event similar to those described in this section 19.05(d) beyond the control of Operator and not having a comparable effect on Comparable Hotels.

**19.06**     **Owner's Additional Rights to Terminate**

In addition to any rights arising out of sections 20.02 and 20.06, Owner shall have the right to terminate this Agreement if:

     (a)     an independent expert engaged by Owner and approved by Operator and having at least ten years experience in the luxury hotel business shall at any time during the Operating Term determine that Operator and its Affiliates are no longer considered to be one of the world's leading operators and managers of a chain of luxury and five star hotels; or

     (b)     at any time during the Operating Term, Owner's right to the use of the name "Four Seasons" for the Hotel shall cease for any reason whatsoever (other than by reason of the failure by Owner to fulfil or otherwise comply with its covenants and obligations under section 9.03 of this Agreement or the Proprietary Materials License Agreement) and such cessation of use continues after the expiration of the cure period contemplated by section 19.01(e).

Case 1:22-cv-06781-JSR Document 126-24 Filed 11/04/22 Page 35 of 52

**20.02**     <u>Dispute Resolution</u>

Unless otherwise specifically provided for in this Agreement. all disputes. controversies. claims or disagreements arising out of or relating to this Agreement (singularly. a "Dispute". and collectively, "Disputes") shall be resolved in the following manner:

(a)     first. within 10 days after the receipt of notice of a Dispute by one party to the other. the parties shall negotiate in good faith for a period of 30 days in an effort to resolve the Dispute:

(b)     second. if the parties are unable to resolve the Dispute within such 30 day period. they shall retain a mutually acceptable expert to assist them in resolving the

Dispute within 10 additional days. failing which they shall each retain an expert on the eleventh day and the two experts thus chosen shall together act as the expert for the purposes of this section 20.02(b). If either party shall fail to appoint an expert as required hereunder. the expert appointed by the other party shall be the sole expert. Within 90 days after the experts (or such single expert) have been retained. the experts (or such single expert) shall. on a non-binding basis. advise the parties in writing of their views. The expenses of the experts (or such single expert) shall be borne equally; and

(c)     third. if the parties are still unable to resolve the Dispute within such 90 day period. the parties shall resort to the arbitration procedures set forth in section 20.03; and

(d)     fourth. any party to the Dispute shall be entitled to join any Dispute proceeding arising out of this Agreement with any other Dispute proceeding arising out of this Agreement.

**20.03     Arbitration**

Except as otherwise provided in section 19.04 and this section 20.03. any Dispute arising out of or relating to this Agreement shall be settled by arbitration as follows:

(a)     each party shall be entitled to serve upon the other party written notice of its desire to settle the matter by arbitration. Within 10 days after receipt by the other party of such notice. each party shall appoint an arbitrator and within 10 days of their appointment the two arbitrators so chosen shall nominate a third independent arbitrator; provided that in the case of any arbitration in respect of sections 19.05 and 19.06(a). such third arbitrator shall be an independent arbitrator with at least ten years experience in the luxury hotel business in the target market in which the

Hotel competes and a partner of either Pannell. Kerr. Forster or one of the four largest firms of Certified Public Accountants in the United States. If within such 10 day period the two arbitrators fail to nominate the third arbitrator. upon written request of either party. the third arbitrator shall be appointed by the American Arbitration Association and both parties shall be bound by the appointment so made. If either party shall fail to appoint an arbitrator as required under this section 20.03(a). the arbitrator appointed by the other party shall be the sole arbitrator of the matter:

**(b)** the decision of the arbitrators (or such single arbitrator) shall be made within 30 days of the close of the hearing in respect of the arbitration (or such longer time as may be agreed to. if necessary, which agreement shall not be unreasonably withheld) and the decision of a majority of the panel (or such single arbitrator) when reduced to writing and signed by them shall be final. conclusive and binding upon the parties hereto. and may be enforced in any court having jurisdiction;

**(c)** the arbitration shall be held at New York City and. except for those procedures specifically set forth in this section 20.03. shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association as in effect on the date hereof: and

**(d)** the arbitrators (or such single arbitrator) shall determine the proportion of the expenses of such arbitration which each party shall bear; provided, however, that each party shall be responsible for its own legal fees.

Notwithstanding anything contained in this section 20.03 either Owner or Operator shall be entitled to (i) commence legal proceedings (in which case the provisions of sections 23.09 and 23.10 governing jurisdiction and service of process shall govern) seeking such mandatory. declaratory or injunctive relief as may be necessary to define or protect the rights and enforce the

obligations contained herein pending the settlement of a Dispute in accordance with the arbitration procedures set forth in this section 20.03. (ii) commence legal proceedings (in which case the provisions of section 23.09 and 23.10 governing jurisdiction and service of process shall govern) involving the enforcement of an arbitration decision or award arising out of this Agreement. or (iii) join any arbitration proceeding arising out of this Agreement with any other arbitration proceeding arising out of this Agreement.

# Exhibit 3

**FOUR SEASONS HOTELS LIMITED**
**FSR INTERNATIONAL HOTELS INC.**
1165 LESLIE STREET
TORONTO, ONTARIO M3C 2K8

July 28, 2021

Hotel 57 L.L.C.
c/o Ty Warner Hotels and Resorts, LLC
280 Chestnut Avenue
Westmont, IL 60559

1260 BB Property, LLC
c/o Ty Warner Hotels and Resorts, LLC
280 Chestnut Avenue
Westmont, IL 60559

**Re:** **Four Seasons Hotel New York and Four Seasons**
**Resort The Biltmore Santa Barbara - Letter Agreement**
**Regarding the Consolidated Mediation and the Consolidated Arbitration**

Dear Sir/Madam:

This letter agreement confirms the agreement between, on the one hand, FSR International Hotels Inc., a Nevada corporation ("FSR"), and Four Seasons Hotels Limited, a corporation incorporated under the laws of the province of Ontario, Canada ("Four Seasons"), and on the other, Hotel 57 L.L.C., a Delaware limited liability company ("Hotel 57"), and 1260 BB Property, LLC, a Delaware limited liability company ("1260 BB") (all of the foregoing parties are collectively, the "Parties").

With respect to certain disputes for which the dispute resolution process has been triggered under Section 19.04 and Section 20.02 of a certain Second Amended and Restated Hotel Management Agreement dated as of August 1, 1996, as amended ("FSNY HMA"), Hotel 57 and FSR hereby agree to engage in a good faith Mediation (defined below) in lieu of the steps of the dispute resolution process provided for in Section 19.04 and Section 20.02(a) through (c) of the FSNY HMA. In the event that any dispute referenced in the prior sentence is not resolved by good faith Mediation, that dispute shall be resolved pursuant to Section 20.02(d) and Section 20.03 of the FSNY HMA as such sections are modified by this letter agreement.

With respect to certain disputes for which the dispute resolution process has been triggered under Section 18.04 and Section 19.02 of a certain Hotel Management Agreement dated as of

Hotel 57 L.L.C.
1260 BB Property, LLC
July 28, 2021
Page 2

November 8, 1995, as amended ("FSSB HMA"), 1260 BB and Four Seasons hereby agree to engage in a good faith Mediation in lieu of the steps of the dispute resolution process provided for in Section 18.04 and Section 19.02(a) through (c) of the FSSB HMA. In the event that any dispute referenced in the prior sentence is not resolved by good faith Mediation, that dispute shall be resolved pursuant to Section 19.02(d) and Section 19.03 of the FSSB HMA as such sections are modified by this letter agreement.

The Parties acknowledge that a consolidated mediation regarding all aforementioned disputes ("Mediation") is currently scheduled to proceed on August 19, 2021 with JAMS Mediator David Geronemus.

In the event the disputes referenced above, including any defenses and counterclaims arising out of or relating to the FSNY HMA or the FSSB HMA, are not resolved by the Mediation, then notwithstanding Section 20.03(c) of the FSNY HMA and Section 19.03(c) of the FSSB HMA, the Parties agree to conduct a single, consolidated arbitration ("Arbitration") in New York, New York before a panel of three neutral, impartial and independent arbitrators and that any such Arbitration shall be confidential and that the arbitrators shall have the power to determine arbitrability and the scope of the Arbitration. Further, because the Arbitration will proceed in New York, New York, the Parties further agree that, notwithstanding Section 23.09 of the FSNY HMA and Section 22.09 of the FSSB HMA, the Parties submit and consent to the non-exclusive jurisdiction of the federal and state courts located in New York City for all purposes described in Section 23.09 and 22.09, respectively, as regards any suit, action or other legal proceedings arising out of the Arbitration or involving the enforcement of a decision or award issued in the Arbitration. The Parties further agree that, in the event they proceed to Arbitration, they shall make a good faith effort to agree to a stipulated arbitration protocol that provides for appropriate pre-hearing discovery, including the power to subpoena non-party witnesses for depositions in any locale, and that provides depositions may in certain cases be taken remotely.

This letter agreement shall apply only to the disputes referenced herein.

This letter agreement may be executed in counterparts, all of which shall constitute the same agreement. Except as amended hereby, the FSNY HMA and the FSSB HMA remain in full force and effect as of the date hereof. All references to the FSNY HMA and/or the FSSB HMA in this letter agreement shall be deemed to refer to the FSNY HMA and/or the FSSB HMA (as applicable) as amended by this letter agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**
**[SIGNATURE PAGES FOLLOW]**

Hotel 57 L.L.C.
1260 BB Property, LLC
July 28, 2021
Page 3

IN WITNESS WHEREOF, the Parties have duly executed this letter agreement as of the day and year first above written.

**FSR INTERNATIONAL HOTELS INC.**

By:

Name: Joel Manzin
Title: President

By:

Name: Antoine Chahwan
Title: Secretary

**FOUR SEASONS HOTELS LIMITED**

By: S. Cohen

Name: Sarah Cohen
Title: Executive Vice President
General Counsel & Secretary

By:

Name: Joel Manson
Title: Senior Vice President
and Assistant Secretary

Hotel 57 L.L.C.
1260 BB Property, LLC
July 28, 2021
Page 4


**HOTEL 57 L.L.C.**

By: _____
Name: Cathy Hwang
Title: Chief Financial Officer


**1260 BB PROPERTY, LLC**

By: _____
Name: Cathy Hwang
Title: Chief Financial Officer

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Hotel 57 L.L.C. and 1260 BB Property, LLC

        Plaintiffs,

     -against-

FSR International Hotels Inc. and Four Seasons
Hotels Limited,

        Defendants.

Case No. 22-cv-09331

Hon. Louis L. Stanton

### DECLARATION OF GREGORY J. SCANDAGLIA IN SUPPORT OF REPLY IN SUPPORT OF OWNER'S PETITION FOR AN ORDER DIRECTING APPOINTMENT OF ARBITRATORS

Pursuant to 28 U.S.C. § 1746, GREGORY J. SCANDAGLIA declares:

1.      I am a founder and partner at the law firm Scandaglia Ryan LLP, counsel for Petitioners Hotel 57 L.L.C. and 1260 BB Property, LLC (collectively, "Owner") in this action. I submit this declaration in support of Owner's Reply in Support of its Petition for an Order Directing the Appointment of Arbitrators.

2.      As set forth in my prior Declaration in Support of Owner's Petition for an Order Directing the Appointment of Arbitrators, the dispute in the underlying arbitration (the "Arbitration") between Owner and Defendants FSR International Hotels Inc. and Four Seasons Hotels Limited (collectively, "Four Seasons") implicates two separate luxury hotel properties, Four Seasons Hotel New York ("FSNY") and Four Seasons Resort The Biltmore Santa Barbara ("FSSB"). Four Seasons managed each of those properties subject to a separate hotel management agreement. The hotel management agreement for FSNY is referred to herein as the "FSNY HMA," and the hotel management agreement for FSSB is referred to herein as the "FSSB HMA."

3.     The FSNY HMA and the FSSB HMA each contain provisions governing the resolution of disputes between Owner and Four Seasons.  (Fiotto Ex. 1, §§ 19.02, 19.03; Fiotto Ex. 2, §§ 20.02, 20.03).[1]

4.     In the event of a dispute involving FSSB, the FSSB HMA provides that Owner and Four Seasons first attempt to negotiate in good faith for 20 days.  (Fiotto Ex. 1, § 19.02(a).)  In the event those negotiations do not result in a resolution, then the parties are to proceed to an advisory opinion phase during which either one mutually agreeable expert or two party-appointed experts have 30 days to prepare a non-binding report advising the parties of their views about the dispute.  (*Id.* § 19.02(b).)  If that process also does not lead to a resolution, then the parties are to submit their dispute to binding arbitration before a panel of three arbitrators in the City of Los Angeles, California.  (*Id.* §§ 19.02(c), 19.03(c).)

5.     The FSNY HMA provides for a separate dispute resolution process for disputes involving FSNY.  The process begins with a 30-day good faith negotiation period.  (Fiotto Ex. 2, § 20.02(a).)  That is followed by a 90-day advisory opinion phase involving an expert (or experts) appointed under the FSNY HMA.  (*Id.* § 20.02(b).)  If that process does not lead to a resolution, then the parties are to submit their dispute to binding arbitration in New York City, New York before a panel of three arbitrators appointed under the FSNY HMA.  (*Id.* §§ 20.02(c), 20.03(c).)

6.     The disputes at issue in the Arbitration involve Owner's termination of Four Seasons at both FSNY and FSSB due to Four Seasons' extensive mismanagement of each property in violation of its contractual and fiduciary duties to Owner.  Consequently, the dispute resolution provisions of the FSSB HMA and the FSNY HMA, if unmodified, would have required the parties to submit their disputes to separate proceedings on different timelines involving different arbitral

---

[1] "Fiotto Ex." refers to exhibits attached to the Declaration of Anthony Fiotto in Support of Memorandum in Opposition to Petition for Appointment of Arbitrators ("Fiotto Decl.").

panels in different cities. The parties recognized that multiple parallel and disjointed proceedings would impose unnecessary burden, delay, and complexity.

7.     To avoid such a state of affairs, the parties negotiated and entered into the July 28, 2021 Letter Agreement (the "Letter Agreement"). (Fiotto Ex. 3.)

**The Letter Agreement**

8.     The Letter Agreement replaced the negotiation and advisory opinion phases with a single consolidated mediation to be held within approximately three weeks after the execution of the Letter Agreement.[2] And the Letter Agreement provided for a single, consolidated arbitration in New York City before one panel of arbitrators of three neutral, impartial and independent arbitrators. The Letter Agreement thus provided a streamlined, consolidated process for resolving the parties' dispute through a single proceeding.

9.     In its Opposition to Petition for Appointment of Arbitrators (the "Opposition") and accompanying declaration, Four Seasons asserts that the Letter Agreement created a new selection process that "rejected" party-appointment and industry arbitrators. That is wrong.

10.    The parties' negotiations concerning the Letter Agreement were conducted by Mr. Fiotto and me. During the course of those negotiations, Mr. Fiotto and I did not propose or agree that it would be inappropriate for a panel to include party-appointed arbitrators or one or more industry arbitrators. And we did not propose or agree that a panel should consist exclusively of former judges.

---

[2] Contrary to Four Seasons' assertion in its Opposition and the accompanying declaration, the parties did not agree to replace the advisory opinion processes under the HMAs with a consolidated mediation "because the disputes do not involve matters that require particular industry knowledge." (Fiotto Decl., Dkt. No. 20, ¶ 21.) In fact, during the negotiation of the Letter Agreement, Mr. Fiotto and I never discussed – and certainly did not agree – that the disputes do not involve matters that require industry knowledge. Instead, Mr. Fiotto and I acknowledge that the non-binding advisory opinion processes under the HMAs were unlikely to lead to a resolution of the parties' disputes. We further discussed and agreed that conducting two separate advisory opinion processes on different schedules with different experts would impose undue expense, burden, and delay. That is why the parties agreed through the Letter Agreement to promptly hold a single consolidated mediation.

11.     Consistent with the parties' negotiations, the Letter Agreement does not include any provision precluding party-appointment of arbitrators or the appointment of industry arbitrators, or requiring that arbitrators have judicial experience.

12.     Presumably because the Letter Agreement does not contain any provision that rejects party-appointment or industry arbitrators, Four Seasons purports to find such a rejection implicit in the Letter Agreement's reference to a panel of three "neutral, impartial and independent" arbitrators.  Four Seasons appears to contend that neutrality, impartiality, and independence are inconsistent with party-appointment or industry arbitrators.  That is wrong.

13.     Four Seasons' cites versions of the AAA's Commercial Arbitration Rules from 1993 and 1996, but those rules do not apply to the arbitration underlying this action.  Both the FSNY HMA and the FSSB HMA provide for arbitration conducted "in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") as in effect on the date" of each agreement (*i.e.*, November 8, 1995 and August 1, 1996).  (Fiotto Ex. 1, § 19.03; Fiotto Ex. 2, § 20.03(c).)  Each set of Commercial Arbitration Rules in effect as of those dates provided that an arbitration would be governed by the Commercial Arbitration Rules in effect <u>as of the date of an arbitration demand</u>, thereby incorporating future amendments to the Commercial Arbitration Rules.  (Reply Decl. Ex. 1, Section 1 of the AAA's Commercial Arbitration Rules dated November 1, 1993 ("These rules and any amendment of them shall apply in the form obtained at the time the demand for arbitration or submission agreement is received by the AAA."); Reply Decl. Ex. 2, Section 1 of the AAA's Commercial Arbitration Rules dated July 1, 1996 (same).)[3]  The Arbitration therefore is governed by the AAA's current Commercial Arbitration Rules.

---

[3] "Reply Decl. Ex." refers to exhibits attached hereto.

4

14.     Under the AAA's current Commercial Arbitration Rules, all arbitrators are subject to standards of neutrality, impartiality, and independence absent written agreement otherwise among the parties.  (*See* Reply Decl. Ex. 3, Sections R-13(b) & R-18.)  Section R-18(a) states that "[a]ny arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for," among other things, "partiality or lack of independence" and "inability or refusal to perform his or her duties with diligence and in good faith."[4]  (*Id.* at Section R-18(a).)  Neither the FSNY HMA nor the FSSB HMA contains a written agreement opting out of the standards provided for in Section R-18.

15.     In proceedings governed by the AAA's Commercial Arbitration Rules, party-appointed and industry arbitrators are routinely appointed, reflecting that Section R-18's standards do not preclude their appointment.

16.     In short, under the plain terms of the FSNY HMA and the FSSB HMA, the Arbitration is governed by the AAA's current Commercial Arbitration Rules.  Those Rules include standards regarding neutrality, impartiality, and independence.  As the text of the Rules and customary practices in AAA arbitrations reflect, the appointment of party-appointed arbitrators and industry arbitrators is consistent with those standards.  The Letter Agreement's reference to "neutral, impartial and independent" arbitrators thus neither alters the arbitrator selection process under the HMAs nor reflects a rejection of the appointment of party or industry arbitrators.

17.     Finally, Four Seasons' asserts in its Opposition and accompanying declaration that the Letter Agreement reflects an agreement by the parties "to dispense[] with" the provision of the

---

[4] Relatedly, the AAA's Code of Ethics for Arbitrators in Commercial Disputes (effective March 1, 2004) provides in its Notes on Neutrality that: "This Code establishes a presumption of neutrality for all arbitrators, including party-appointed arbitrators, which applies unless the parties' agreement, the arbitration rules agreed to by the parties or applicable laws provide otherwise."  Likewise, Cannon IX(A) of the Code provides that: "In tripartite arbitrations to which this Code applies, all three arbitrators are presumed to be neutral and are expected to observe the same standards as the third arbitrator."

FSNY HMA and the FSSB HMA providing that, for certain types of disputes, the third arbitrator must have at least ten years of experience in the hotel business (which Four Seasons refers to as the "Industry Panelist Clause[s]"). (Fiotto Decl., Dkt. No. 20, ¶ 21.) That is not accurate. During the negotiation of the Letter Agreement, Mr. Fiotto and I did not discuss – and did not agree to modify or dispense with – the Industry Panelist Clauses. Consistent with that fact, the Letter Agreement does not include any provision modifying or dispensing with the Industry Panelist Clauses. Because the Letter Agreement provides that the FSNY HMA and the FSSB HMA remain in full force and effect except as amended by the Letter Agreement (Fiotto Ex. 3 at 2), the Industry Panelist Clauses have not been dispensed with and remain operative provisions of the FSNY HMA and the FSSB HMA.

18.     For these reasons and those set forth in my prior declaration, the Letter Agreement does not, as Four Seasons claims, memorialize or reflect any agreement by the parties to reject party-appointed or industry arbitrators.

**The Protocol**

19.     After the Arbitration was initiated, Owner and Four Seasons entered into a Stipulated Arbitration Protocol dated May 17, 2022 (the "Protocol") which established a new, consensus-based process for selecting arbitrators described in the Petition and my prior declaration. (*See* Ex. 3.)[5]

20.     Under the party-appointment selection process provided for in the FSNY HMA and the FSSB HMA, Owner's consent was required for the appointment of one arbitrator (*i.e.*, the party-appointed arbitrator that it nominated). The Protocol, by contrast, provided that Owner's consent is required for the appointment of all three arbitrators. In agreeing to the Protocol, Owner

---

[5] "Ex." refers to exhibits attached to my prior declaration (Dkt. No. 7).

relied on the requirement that the Owner must consent before any arbitrator candidate would be appointed to the panel. Owner's intent in agreeing to the Protocol was to pursue a cooperative effort by which the parties could efficiently constitute an appropriate, balanced panel. Owner would not have entered into the Protocol if it had given Four Seasons the authority to unilaterally impose a panel consisting solely of arbitrators with Four Seasons' preferred background and experience.

21.     During the course of the parties' negotiations concerning the Protocol, which were conducted by Mr. Fiotto and me, neither Mr. Fiotto nor I asserted or agreed that it would be inappropriate to constitute a panel with one or more industry arbitrators or that the panel should consist exclusively of former judges. Consistent with that fact, the Protocol does not include any provision requiring that arbitrators have judicial experience or prohibiting arbitrators with industry experience. Thus, the Protocol did not reflect any agreement to reject industry arbitrators or to constitute a panel consisting exclusively of former judges.

22.     Consistent with that understanding, Owner has included industry candidates on each of the four lists of arbitrator candidates that it submitted pursuant to the selection process under the Protocol.

23.     The disputes in the Arbitration implicate lengthy and complex hotel management agreements, a wide range of operations from labor and revenue management to maintenance to capital expenditures, and various industry customs, practices and standards. Since the outset of the arbitrator selection process, Owner has recognized the value of having an industry arbitrator with pertinent experience and knowledge. Early in the arbitrator selection process after the execution of the Protocol and consistently after that, I communicated to Mr. Fiotto that Owner believed an appropriate panel should include at least one industry arbitrator. During arbitrator

candidate interviews that the parties conducted pursuant to the Protocol process, multiple candidates who were former judges spoke highly of the value that industry arbitrators can provide on a multi-member arbitration panel.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 21, 2022
Chicago, Illinois

GREGORY J. SCANDAGLIA, ESQ.